UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, et al.,            )<br>                                            )<br>            Plaintiffs            )<br>                                            )   Civil Action No. 01-1357 (LFO)<br>       v.                                  )<br>                                            )<br>EXXON MOBIL CORPORATION, et al., )<br>                                            )<br>            Defendants        )<br>_____)| |

MEMORANDUM

Pending is defendants' Motion to Dismiss the plaintiffs' complaint. Defendants seek dismissal on several grounds: (1) lack of subject matter jurisdiction and failure to state a claim on plaintiffs' Alien Tort Statute and Torture Victim Protection Act claims; (2) nonjusticiability; (3) forum non conveniens; (4) lack of personal jurisdiction over Exxon Mobil Oil Indonesia; and (5) statute of limitations on John Doe V's claims [docket no. 13].[1]  For reasons explained below, defendants' motion to dismiss for failure to state a claim and lack of subject matter jurisdiction is granted with respect to plaintiffs' Alien Tort Statute and Torture Victim Protection Act claims. PT Arun LNG Company, an entity 55% owned by the Indonesian government, is also dismissed as a party to this suit on justiciability grounds.  The only remaining claims are plaintiffs' state law claims.  None of the defendants' arguments for dismissal of these claims has merit.

Consequently, after entry of the Order accompanying this Memorandum, the unresolved issues are how to proceed with discovery and litigation on the state tort claims without interfering

---

[1]Also pending is Plaintiffs' Motion to Lift Stay of Discovery [docket no. 83] and Defendants' Motion to File Surreply in Opposition to Plaintiff's Proposed Discovery Plan [docket no. 93].

with U.S. foreign policy and Indonesia's sovereignty, and what basis exists for subject matter jurisdiction over plaintiffs' remaining state tort claims.

I.      **Background and Procedural History**

This suit was filed in June 2001 by eleven Indonesian citizens[2] against defendants Exxon Mobil Corporation, Mobil Corporation, Mobil Oil Corporation, and Exxon Mobil Oil Indonesia Inc. (collectively, "Exxon"), and PT Arun LNG Company ("PT Arun"). Plaintiffs allege that defendants violated the Alien Tort Statute, the Torture Victim Protection Act ("Torture Act"), and committed various common-law torts in the course of protecting and securing defendants' liquid natural gas extraction pipeline and liquification facility in Arun, Indonesia.

The Alien Tort Statute in its entirety states "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Torture Act establishes federal jurisdiction and liability for "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture . . ." 28 U.S.C. § 1350 note § 2(a)(1)-(2).

Plaintiffs allege that, during an on-going conflict with the Indonesian government and Achenese rebels, defendants contracted with a unit of the Indonesian national army to provide security for the pipeline. Defendants allegedly conditioned payment on providing security, made decisions about where to build bases, hired mercenaries to train the security troops, and provided logistical support. Plaintiffs claim that Exxon and PT Arun are liable for the alleged actions of the Indonesian soldiers, as an aider and abettor, a joint action/joint venturer, or as a proximate

---

[2]Plaintiffs filed under seal to protect their identities because of fear of reprisals.

cause of the alleged misconduct.

In October 2001 Defendants responded to the Complaint with a Motion to Dismiss. While that motion was under advisement, in response to my request on July 29, 2002 the U.S. State Department filed a Statement of Interest, and reiterated its position in a July 15, 2005 letter. In its Statement, the State Department maintained that it "believes that adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." The State Department observed, however, that its assessment was "necessarily predictive and contingent" on how the case proceeded, including the intrusiveness of discovery and the extent to which the case required "judicial pronouncements on the official actions of the [Government of Indonesia] with respect to its military activities in Aceh." (Emphasis added). The State Department included in its submission a letter from the Indonesian Ambassador to the United States. It stated that Indonesia "cannot accept the extra territorial jurisdiction of a United States court over an allegation against an Indonesian government institution, eq [sic] the Indonesia military, for operations taking place in Indonesia." The parties filed additional briefing on the implications of the State Department's submission.

Soon thereafter, a September 2002 order directed the parties to exchange interrogatories and requests for the preservation of documents. In 2003 the parties submitted extensive briefing regarding supplemental authority on Alien Tort Statute cases (particularly Doe v. Unocal Corp., Civ. Nos. 00-55603, 00-56628). In June 2004 the Supreme Court reached its decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S. Ct. 2739 (2004), which was highly relevant to this case.

In Sosa Enrique Camarena-Salazar, an agent of the U.S. Drug Enforcement Agency, was captured, tortured, interrogated, and eventually killed by suspected drug dealers while on assignment in Mexico in 1985. Dr. Humberto Alvarez-Machain, a Mexican physician, allegedly assisted in prolonging the agent's life during the torture and interrogation. In 1990 a federal grand jury in California indicted Alvarez for Camarena's murder. The United States unsuccessfully sought Mexican assistance in seizing Alvarez. Thereafter the DEA hired Mexican nationals, including petitioner Jose Francisco Sosa, to abduct Alvarez and bring him to El Paso, Texas. Sosa and the other Mexican nationals detained Alvarez overnight, then turned him over to U.S. authorities.

Alvarez was eventually acquitted, and subsequently sued Sosa, other Mexican citizens, the United States, and four DEA agents under inter alia the Alien Tort Statute. The trial court granted summary judgment in favor of Alvarez and awarded him $25,000. A three-judge Ninth Circuit panel affirmed. In a subsequent en banc proceeding upholding the panel's decision, the Ninth Circuit cited an alleged "clear and universally recognized norm prohibiting arbitrary arrest and detention." Alvarez-Machain v. United States, 331 F.3d 604, 620 (9th Cir. 2003) (en banc).

The Supreme Court reversed, ruling on factual grounds that a day-long detention was not a clear violation of international law. The Court also held that the field of international law violations cognizable under the Alien Tort Statute are limited to those cognizable when the statute was passed in 1789, and those that are "specific, universal, and obligatory," with the caveat that the door to additional claims "is still ajar subject to vigilant doorkeeping" by the courts. Sosa, 124 S. Ct. at 2766, 2773-74 (citation and internal quotations omitted).

The Court limited the reach of the statute in part due to the "collateral consequences" of

4

interfering with U.S. foreign relations.  It warned inferior courts to be "particularly wary of impinging on the discretion of the Legislative and Executive branches in managing foreign affairs" (id. at 2763), particularly when the Executive has expressed its views about the litigation.  In such a case, the views of the Executive should be accorded "serious weight."  Id. at 2766; see also Joo v. Japan, 314 F.3d 45, 52 (D.C. Cir. 2005) ("The Executive's judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine.").

Thus, the proper degree of deference to the views of the Executive turns on the actual intrusiveness of the litigation; courts do not abdicate their Article III responsibilities on executive command.  See Marbury v. Madison, 5 U.S. (Cranch) 137, 177 (1803).  Accordingly, it is necessary to identify the specific intra-Indonesian actions, if any, necessary to support discovery and adjudication.

## II.     Federal Statutory Claims

### A.     Alien Tort Statute

Defendants allege that plaintiffs have failed to state a claim upon which relief may be granted under the Alien Tort Statute.  That statute confers subject matter jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Plaintiffs are plainly aliens, who bring tort claims; the remaining issue is whether plaintiffs have adequately pled that defendants violated the law of nations.

Plaintiffs allege a host of potential violations, including genocide, torture, crimes against humanity, arbitrary detention (kidnaping), extrajudicial killing (including murder), and sexual

violence. See Compl. ¶ 26. Defendants respond that adjudication of these claims impermissibly interferes with Indonesia's sovereignty and U.S. foreign policy, and that plaintiffs fail to allege facts that would, if proved, fix liability on Exxon and PT Arun. In assessing whether plaintiffs have stated a claim under the Alien Tort Statute, courts must conduct a more searching merits-based inquiry than is required in a less sensitive arena. See, e.g., Walsh v. Ford Motor Co., 588 F. Supp. 1513, 1519 (D.D.C. 1984) (citation omitted), vacated on other grounds by 807 F.2d 1000 (D.C. Cir. 1986).

In this light, defendants cannot be held liable for violations of international law on a theory that they aided and abetted the Indonesian military in committing these acts, largely for the reasons explained by the court in In re South Af. Apartheid Litig., 346 F. Supp. 2d 538, 549-51 (S.D.N.Y. 2004). In that case, three groups of black South Africans sued several multinational corporations that had conducted business in South Africa during the apartheid years. Plaintiffs there alleged that defendants violated international law and were liable under the Alien Tort Statute. The trial court dismissed the complaint, and held that liability for "aiding and abetting" violations of international law was not itself actionable under the Alien Tort Statute. In reaching its conclusion, the court was "heedful of the admonition in Sosa that Congress should be deferred to with respect to innovative interpretations" of the Alien Tort Statute. Id. at 550. The court also was "mindful of the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear civil suits for the aiding and abetting of violations of international norms across the globe." Id. at 551; see also Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 181-82 (concept of aiding and abetting in a civil context is "at best uncertain in application" and that, when Congress

has not expressly provided for civil aider and abetter liability, it will not be inferred), superseded in part by statute in 15 U.S.C. § 78t(e).[3]

Nor can plaintiffs maintain a claim for "sexual violence," because it is not sufficiently recognized under international law and is not a "specific, universal, and obligatory" norm (although claims of sexual violence may be cognizable elements of such illegal conduct as torture).

Defendants here also contend that plaintiffs have failed to exhaust local remedies on the remaining allegations, thereby precluding their Alien Tort Statute claims. Sosa indicated that exhaustion may be necessary "in an appropriate case," but it did not directly rule on the issue. 124 S. Ct. at 2766 n.21. Even assuming plaintiffs must exhaust local remedies, however, it is apparent here that efforts to pursue this case in Indonesia would be futile. See Hammontree v. NLRB, 925 F.2d 1486, 1517 (D.C. Cir. 1991) ("exhaustion is a prudential doctrine that should be applied flexibly and not when further pursuit of remedies is futile.") (citation omitted). Defendants submit an affidavit from Indonesian Supreme Court Justice Bismar Siregar stating that plaintiffs' claims could be litigated in Indonesia. Plaintiffs effectively counter that they risk the very real possibility of reprisals, including death, if they pursue their claims there. A substantial and serious threat of violence easily meets the futility standard. See Rasoulzadeh v. Assoc. Press, 574 F. Supp. 854, 861 (S.D.N.Y. 1983), aff'd without op. 767 F.2d 908 (2nd Cir. 1985).

---

[3]Plaintiffs also seem to argue that defendants attempted to direct and control the Indonesian military. An attempt to commit a tort, however, is not actionable when no harm results. See, e.g., Thomas v. Powell, 247 F.3d 260, 264 (D.C. Cir. 2001) (holding that any tort "is predicated on a finding that the injury was proximately caused by the breach of duty") (citation and internal quotations omitted).

### 1. Genocide and Crimes Against Humanity

Genocide has been defined as "acts calculated to bring about the physical destruction, in whole or in part, of a national, ethnic, racial, or religious group." Tel-Oren v. Libyan Arab Repub., 726 F.2d 774, 806 (D.C. Cir. 1984) (Bork, J., concurring) (citation omitted). Similarly, a systematic attack on certain segments of a population is a crime against humanity. See Presbyterian Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 479-80 (S.D.N.Y. 2005) (citations omitted). Genocide and crimes against humanity are generally actionable under the Alien Tort Statute as international law violations. However, by definition these claims require adjudication on whether the Indonesian military was engaged in a plan allegedly to eliminate segments of the population; assessing whether Exxon is liable for these international law violations would be an impermissible intrusion in Indonesia's internal affairs. In Doe v. Qi, 349 F. Supp. 2d 1258 (N.D. Cal. 2004), the court declined to adjudicate claims of genocide and crimes against humanity when those claims required the court to evaluate the policy or practice of the foreign state. See id. at 1307-11. That precedent will be followed here.

### 2. Torture, Arbitrary Detention, and Extrajudicial Killing

In general, resolving claims of complicity in arbitrary detention, torture, and extrajudicial killing pose less of a threat of infringing Indonesia's sovereignty. These allegations are more targeted to actions by individuals, rather than a plan of mass killing or mayhem. They also conceivably violate the law of nations. See Sosa, 124 S. Ct. at 2768 (citing with approval the Restatement (Third) of Foreign Relations Law's conclusion that a "'state violates international law if, as a matter of state policy, it practices, encourages, or condones . . . prolonged arbitrary detention'") (citation omitted); id. at 2763 (holding that the Torture Act contains "a clear

mandate . . . providing authority that 'establish[es] an unambiguous and modern basis for' federal claims of torture and extrajudicial killing") (citation omitted); see also Tel-Oren v. Libyan Arab Repub., 726 F.2d 774, 777 (D.C. Cir. 1984) (Edwards, J., concurring).  However, as explained below, plaintiffs fail to plead these violations adequately.

        a.    *Color of Law*

Traditionally only states (and not persons) could be liable under the Alien Tort Statute for torture, arbitrary detention, or extrajudicial killing.  See Sanchez-Espinoza v. Reagan, 770 F.2d 202, 206-07 (D.C. Cir. 1985).  Recently, however, a few courts have held individuals liable for Alien Tort Statute violations when they acted under color of law.  These courts have borrowed heavily from 42 U.S.C. § 1983 color of law jurisprudence.  See, e.g., Bigio v. Coca-Cola Co., 239 F.3d 440, 448 (2nd Cir. 2001).  Reasoning in these cases is unpersuasive, however.  Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states.[4]  See Sanchez-Espinoza, 770 F.2d at 706-07.  Recognizing acts under color of law would dramatically expand the extraterritorial reach of the statute.  Just as aider and abetter liability for international law violations has been rejected by some courts as overly expansive and beyond Congress' mandate (see supra Part II.A.), basing liability for Alien Tort Statute violations on color of law jurisprudence is a similar overreach.

The Supreme Court has recently admonished that "the determination whether a norm is

---

[4]See Craig Forcese, Note: ATCA's Achilles Heel: Corporate Complicity, International Law and the Alien Tort Claims Act, 26 Yale J. Int'l L. 487, 498 (2001); see also Anita Ramasastry, STEFAN A. RIESENFELD SYMPOSIUM 2001: Corporate Complicity, 20 Berkeley J. Int'l L. 91, 146 (2002).

sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." Sosa, 124 S. Ct. at 2766. Similarly, here the State Department warns of untoward consequences of endangering United States' relations with Indonesia.

Additionally, it is notoriously difficult to determine when a party has acted under color of law, making it harder for courts to engage in "vigilant doorkeeping." See, e.g., Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 378 (1995). It is also highly unfair to corporations operating in states with potentially problematic human rights records which under the color of law rule may (or may not) be subject to liability for doing business there and benefitting from the state's infrastructure. Indeed, the Supreme Court suggested that only states, and not corporations or individuals, may be liable for international law violations. See Sosa, 124 S. Ct. at 2766 n.20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.").

Apart from the doctrinal flaw in applying color of law analysis, plaintiffs fail to allege adequately either of the two bases upon which color of law arguably can be based – joint action, and proximate cause.

      i.      Joint Action

Joint action requires an agreement or understanding to deprive a party of their constitutional rights. See, e.g., Parker v. Grand Hyatt Hotel, 124 F. Supp. 2d 79, 88 (D.D.C. 2000). Plaintiffs allege that Exxon and PT Arun worked with the military as joint actors in securing the pipeline, during which the military allegedly committed human rights abuses. As

explained below, these allegations are insufficient to demonstrate that Exxon had an agreement or understanding jointly with the Indonesian military to violate plaintiffs' human rights.

In support of their argument, plaintiffs point to Doe v. Unocal Corp., 110 F. Supp. 2d 1294 (C.D. Cal. 2000), vacated without opinion by 403 F.3d 708 (9th Cir. 2005) as involving a legal theory "essentially identical" to their own.  In that case plaintiffs provided evidence that defendants hired the military for its oil exploration project, and the military used forced labor and committed other atrocities to complete an oil pipeline.  Plaintiffs also provided evidence that defendants knew or should have known "that the military did commit, was committing, and would continue to commit these tortious acts." Id. at 1306.  Even though Unocal and the military shared a common goal of a profitable project, the court found no joint action, because there was no evidence defendants "participated in or influenced" the military's unlawful conduct.  Id.  Similarly, in this case plaintiffs do not sufficiently allege that defendants participated in or influenced the military's actions that allegedly caused the human rights violations.  See Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1453-56 (10th Cir. 1995) (holding that university officials did not engage in joint action to deprive concertgoers of their constitutional rights by conducting pay-down searches, when officials attended meeting at which promoter directed security company to conduct these searches).

Most important, determining whether defendants engaged in joint action with the Indonesian military necessarily would require judicial inquiry into precisely what the two parties agreed to do.[5]  For reasons explained above, such an inquiry cuts too close to adjudicating the

---

[5]As counsel for plaintiffs conceded, in contrast to this case the State Department in the Unocal case stated that the litigation would not interfere with U.S.-Burmese relations.  See Motion Hrng Tr. (Apr. 9, 2002), at 43.

11

actions of the Indonesian government, and for that independent reason, should be avoided on justiciability grounds.

### ii.     Proximate Cause

Another potential theory of liability is that defendants proximately caused the human rights violations, in this case by directing and controlling the military's actions. However, the proximate cause theory is inapplicable here, because it is not a proper basis for establishing "color of law." A determination of whether a party proximately caused an injury is quite distinct from whether it acted under color of law. Indeed, plaintiffs concede this point when they argue that the "issues of intent and causation [regarding proximate cause] are issues of liability distinct from the analysis of whether Exxon Mobil is a state actor." Pls' Opp. to Defs' Mot. to Dismiss, at 16; see Sheldon H. Mahmod, 1 Civil Rights and Civil Liberties Litig. § 2:4, at 2-14-15 (4th ed. 2003).

On a factual basis, plaintiffs do not sufficiently allege that defendants proximately caused human rights violations. The court in Unocal adopted the proximate cause analysis, but nonetheless found that defendants were not the proximate cause of the injuries because plaintiffs failed to "prove that private individuals exercised control over the government official's decisions." Unocal, 110 F. Supp. 2d at 1307. Largely for the reasons explained above (see supra Part II.A.2.a.i.), plaintiffs' allegations fall short of establishing proximate cause here, because defendants did not sufficiently allege that defendants controlled the Indonesian military's actions.[6]

---

[6]In fact, at times the plaintiffs seem to argue that the Indonesian military was using the pipeline project as a mere pretext for committing abuses, which undermines any proximate cause claim. See Compl. ¶ 41 ("The Indonesian military used the pretense of providing 'security' for

### B.     Torture Victim Protection Act ("Torture Act")

The Torture Act creates liability for "[a]n individual" who subjects an individual to torture or extrajudicial killing. 28 U.S.C. § 1350 note § 2(a)(1)-(2). The parties disagree about the meaning of "individual." Plaintiffs argue that "individual" means a "person," which includes corporations. Defendants insist that the word "individual" has a precise meaning and is limited to human beings. On balance, the plain reading of the statute strongly suggests that it only covers human beings, and not corporations. See Clinton v. New York, 524 U.S. 417, 428-29 nn. 13-14 (1988) (holding that term "individual" meant "person" in the specific context of the line-item veto legislation, but noting that "Congress did not intend the result that the word 'individual' would dictate in other contexts," when "person" ordinarily had a broader meaning than "individual").

Even if "individual" could be construed to mean "corporation," plaintiffs face a larger problem. By the clear language of the Torture Act, a party must act "under actual or apparent authority, or color of law" to be liable under the statute. 28 U.S.C. § 1350 note § 2(a)(1)-(2). As explained above (see supra Part II.A.2.a.), defendants did not act under color of law. In addition, determining whether they acted under color of law impermissibly requires adjudication of another country's actions. See Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995) (legislative history of Torture Act confirms that plaintiff must establish government involvement in killing or torture to state a claim).

### C.     Violence Against Women

Plaintiffs also allege that defendants are liable for "Violence Against Women." See

---

the Arun project to practice genocide on the people of Aceh").

13

Compl. ¶ 73-76. However, these allegations seem to be largely a restatement of the claims under the Alien Tort Statute and Torture Act. See id. ¶ 75 ("The acts described herein are actionable under both the ATCA and the TVPA."). For the reasons enumerated above (see supra Part II.B-C), this claim is dismissed.

### D. Lack of Subject Matter Jurisdiction

Defendants also move to dismiss based on lack of subject matter jurisdiction. The Alien Tort Statute itself only grants personal jurisdiction and does not create an independent cause of action. See Sosa, 124 S. Ct. at 2761. Because plaintiffs have failed to state a claim under the Alien Tort Statute, then there is no subject matter jurisdiction over the international law claims as well.

## III. State Law Tort Claims

There remains for consideration the state law tort claims.

### A. Justiciability

As previously noted, defendants argue that the complaint should be dismissed in its entirety as nonjusticiable. Proper concern for Indonesia's sovereignty requires the dismissal of PT Arun LNG Co., an entity that is 55% owned by Pertamina, Indonesia's state-owned oil and gas company. Adjudicating the liability of an entity owned by the Indonesian government would create a significant risk of interfering in Indonesian affairs and thus U.S. foreign policy concerns.[7]

---

[7]Defendants also argue that the complaint should be dismissed on the Act of State doctrine. This doctrine is only implicated when "a court must decide – that is, when the outcome of a case turns upon – the effect of official action by a foreign sovereign." W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., 493 U.S. 400, 406 (1990) (emphasis added). With PT Arun dismissed as a party on justiciability grounds, the resolution of this case will not turn on any

Defendants' argument to dismiss the remaining state law tort claims on justiciability grounds is without merit. These claims are allowed to proceed, with the proviso that the parties are to tread cautiously. Discovery should be conducted in such a manner so as to avoid intrusion into Indonesian sovereignty. To this end, there will be firm control over any discovery conducted by plaintiffs.

### B. Forum Non Conveniens

Defendants move to dismiss this action in favor of litigation in Indonesia as the more convenient forum. Plaintiffs contend that litigating their claims in Indonesia would pose a serious risk to their safety, and that Indonesian courts would be biased. Plaintiffs plead that there is a genuine risk of reprisals if they publicly identify themselves by attempting to litigate in Indonesia. See Pls' Opp. to Defs' Mot. to Dismiss, at 40-42 (describing judicially noticeable[8] press reports about the disappearance of Jafar Siddiq Hamzah and other Indonesians investigating alleged human rights abuses). This recorded experience adequately supports plaintiffs' contention that prosecution of this suit in Indonesia would be futile. See Rasoulzadeh v. Assoc. Press, 574 F. Supp. 854, 861 (S.D.N.Y. 1983) (dismissing defendant's forum non conveniens motion when litigating plaintiffs' claims in Iran posed a significant risk to plaintiffs' safety), aff'd without op. 767 F.2d 908 (2nd Cir. 1985).

### C. Personal Jurisdiction

Defendants contend that Exxon Mobil Oil Indonesia ("Exxon Indonesia") has not had

---

"official action" of the Indonesian government.

[8]See Fed. R. Evid. 201(b)(1) (a court may take judicial notice of a fact that is "generally known within the territorial jurisdiction of the trial court").

sufficient contacts with the District of Columbia to support personal jurisdiction under D.C.'s long-arm statute. See D.C. Code § 12-423. Plaintiffs contend that jurisdiction exists in this forum because Exxon Indonesia is the alter ego of Exxon Mobil Corporation, which concededly is engaged in business with offices here. Plaintiffs have sufficiently pled facts that, if true, would support jurisdiction over Exxon Indonesia as an alter ego of Exxon Mobil. See Shapiro, Lifschitz & Schram v. R.E. Hazard, 90 F. Supp. 2d 15, 22 (D.D.C. 2000) ("Where affiliated parties are alter egos of a corporation over which the Court has personal jurisdiction . . . the corporation's contacts may be attributed to the affiliated party for jurisdictional purposes.").

### D.  Statute of Limitations – John Doe V

Defendants further contend that the statute of limitations bars the claim of John Doe V because his allegations concern actions by the military in "1990." See Compl. ¶ 52. Plaintiffs do not respond to this argument. However, all other plaintiffs allege mistreatment in the years 2000 or 2001. See Compl. ¶¶ 48-51; 53-58. Defendants' motion to dismiss John Doe V's claims will be denied without prejudice, subject to plaintiffs' response to the Order to Show Cause why John Doe V's claims should not be dismissed.

## IV.  Conclusion

The issues and parties in this case have been tailored to a narrower question: did U.S. corporations in their effort to secure their pipeline in Indonesia violate U.S. state tort law? Litigation and discovery on this issue, if conducted with care, should alleviate the State Department's concerns about interfering with Indonesia's sovereign prerogatives while providing a means for plaintiffs to obtain relief through their garden-variety tort claims. It should be feasible, for instance, for plaintiffs to perpetuate testimony and satisfy document discovery

requirements outside Indonesia.  The details remain unresolved, but the parties are urged to propose discovery plans consistent with these suggestions.

      Finally, plaintiffs have not pled any independent basis for subject matter jurisdiction over these claims.  See Compl. ¶ 4.  Nor have they identified the state of the United States whose tort law should, in their view, apply.  The accompanying Order directs plaintiffs to address these issues.

                                                /s/

                                    Louis F. Oberdorfer
                                    UNITED STATES DISTRICT JUDGE