UNSEALED 8/5/08

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, et al.,       )
                          )
        Plaintiffs,       )
                          )   Civil Action No. 01-1357 (LFO/AK)
    v.                    )
                          )   **SEALED**
EXXON MOBIL CORPORATION, et al., )
                          )
        Defendants.       )
_____)

**FILED**
JUL 18 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### MEMORANDUM & OPINION

Defendant ExxonMobil Oil Indonesia (EMOI) moves to dismiss for lack of personal jurisdiction [dkt # 268]. EMOI is a subsidiary of Defendant Exxon Mobil Corporation, which concedes personal jurisdiction. Plaintiffs have made the requisite showing of jurisdiction over EMOI at this stage. Accordingly, an accompanying order denies EMOI's motion.

### I. BACKGROUND

**A.    Overview**

Defendant Exxon Mobil Corporation has offices in Washington D.C. (Haines Dep. 13:16–17, Pls.' Ex. ("Ex.") 402)[1] and is the parent of Defendant Mobil Corporation. Defendant Mobil Corporation, in turn, is the parent of Defendant ExxonMobil Oil Corporation. These three entities comprise "the U.S. Exxon Defendants." The second entity in this chain, Mobil Corporation, is also the parent of non-defendant Mobil Exploration & Producing North America,

---

[1]Exhibits attached to Plaintiffs' Supplemental Memorandum in Opposition [dkt # 337] will be denoted as "Supp. Ex. __."

which is the parent of the fourth and final Exxon Defendant at the heart of this motion: EMOI—a Delaware corporation with a principal place of business in Jakarta, Indonesia.

EMOI operates natural gas fields in Aceh, Indonesia. EMOI contracted with Pertamina, the Indonesian state-owned oil and gas company, for security personnel to guard its facilities. Ex. 337 (Production Sharing Contract). Plaintiffs, Indonesian villagers, allege that Defendants are liable for various torts these security forces allegedly committed against them and their kin. *See generally Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005), *appeal dismissed and mandamus denied*, 473 F.3d 345 (D.C. Cir. 2007), *cert. denied*, No. 07-81, 2008 U.S. LEXIS 4915 (June 16, 2008).

The pending motion turns on EMOI's contacts—including those of its alleged agents—with the District of Columbia and the relationship of those contacts to Plaintiffs' claims. The parties agree that the relevant time period at issue is January 1, 1998 (the start date for discoverable information) through June 19, 2001 (the date Plaintiffs filed the Complaint).

### B.   Facts Relevant to Personal Jurisdiction

EMOI had an ongoing relationship with Exxon Mobil's Manager of International Government Affairs, Robert Haines, who provided security related services on behalf of EMOI from his Washington office. Haines Dep. 116:17–21, Ex. 402; *e.g.*, Ex. 2. Haines viewed EMOI as his "client." Haines Dep. 48:9–10, 173:21–174:4, Ex. 402. Plaintiffs note that there were "over 190 written communications" between Haines and EMOI President Wilson during this time. Pls.' Stmt. of Mat. Facts ("SMF") ¶ 33.

In late 1999 and early 2000, Haines engaged in a number of activities related to security at EMOI (then known as Mobil Oil Indonesia or MOI). On December 9, 1999, for example,

Haines sent a draft of MOI's Government Relations Contact Plan to Wilson, a document that Haines and Wilson "worked on during [Haines's] visit to Jakarta." Ex. 16. This Plan included sections discussing the "breakdown of law and order" in Aceh and EMOI's contract with Pertamina providing "for the reimbursement to the military for maintaining security of MOI facilities in Aceh." Ex. 16 at CA0001179842–43.

A few days later, on December 13, 1999, Haines sent a memorandum to Mobil Corporation's CEO, reporting on his meeting in Indonesia with MOI to discuss the security concerns in Aceh. Ex. 15. The memorandum noted a "complete breakdown of law and order in the province" and that "MOI has asked for the assistance of the military to protect its facilities." Ex. 15. The memorandum also noted that "[t]he presence of troops, however, only serves to inflame the population and results in suspicions that MOI is linked to the military." Ex. 15.

Also, that month, Haines met in Washington D.C. with representatives of Human Rights Watch to discuss human-rights issues taking place in Aceh. Haines Dep. 184:21–185:22, Ex. 402; Ex. 21. Haines reported on this meeting in an e-mail sent to EMOI President Wilson, in which Haines noted that he "expressed our concern about safety and the training of the military and police in Aceh." Ex. 21. Then, in January 2000, Haines met in Washington D.C. with Indonesian human-rights officials at a discussion organized by the United States–Indonesia Society. Ex. 22.

A few months later, in April 2000, Exxon Mobil hosted a "Worldwide ExxonMobil Security Conference" in Washington D.C. Ex. 37. This Security Conference was one of a series of semi-annual conferences at which "[a]ll of the people that worked for the affiliates [that] had security managers and the regional people came together." Farmer Dep. 161:3–5, Ex. 405. The

invitees included Jack Connor, who later became EMOI's Security Advisor (Farmer Dep. 159:3–4, Ex. 405, Ex. 136); Tommy Chong, a security advisor working for an Exxon affiliate in Singapore who "was available to provide security advice and support to affiliates that were located in that part of the world" (Farmer Dep. 38:2–10, 159:2–3, Ex. 405); Michel Laureys, a security advisor based in the United States and at EMOI (Farmer Dep. 159:14–15, Ex. 405, Ex. 138); and a number of other personnel who provided security-related consulting to EMOI.

Haines's relationship with EMOI continued through 2000. On May 5, 2000, for example, EMOI President Wilson sent an e-mail to Haines regarding Haines's upcoming meeting in Washington D.C. with Indonesian representatives regarding U.S. energy-sector issues in Indonesia. Ex. 4. Wilson noted that security was a key topic, particularly the "[d]egradation of law and order throughout Indonesia" and the question of "[h]ow to provide security for operations." Ex. 4. And, in June 2000, Haines met in Washington D.C. with a representative from the Henry Dunant Center, a prominent conflict-resolution organization, to discuss Exxon Mobil's alleged support of the Indonesian military and alternatives to relying on members of the military to provide security services. Ex. 23. This meeting arose after Haines sent an e-mail to EMOI President Wilson stating that this representative "was concerned about ExxonMobil's relationship with the military in Aceh . . ." Ex. 23. Wilson responded to Haines that "it would be good if [he] can meet with her." Ex. 23.

At about this time, from approximately July through November 2000, according to the Complaint, soldiers assigned to Exxon Mobil's operations in Indonesia allegedly beat, shot, and tortured some of the Plaintiffs. See Compl. ¶¶ 49–51, 57 (allegations regarding Plaintiffs John Does II, III, and IV, and Jane Doe III). Meanwhile, in November 2000, Haines met in

Washington D.C. with a woman who raised allegations that the security personnel protecting EMOI's facilities had committed torts—including wrongful arrest, torture, and killing—against the local population. Haines Dep. 190:16–18, Ex. 402; Ex. 24; Ex. 25. Such conduct continued, according to the Complaint, into January 2001, as soldiers assigned to Exxon Mobil's operations in Indonesia allegedly committed further violent acts, such as torture and killing, against other Plaintiffs. *See* Compl. ¶¶ 48, 52, 53, 54, 58 (allegations regarding John Does I, V, VI, VII, VIII, and X, and Jane Doe IV).

EMOI had other contact with Washington D.C. at this time. In January 2001, for example, EMOI employee Deddy Afidick traveled to Washington D.C. to attend training in public affairs and international relations and to meet with Haines. Ex. 36 (e-mail with attached itinerary); Haines Dep. 27:19–28:16, Ex. 402 (testifying that Haines provided training to EMOI public-affairs people in D.C.). During the relevant time period, EMOI President Wilson also traveled to Washington D.C. for business. Haines Dep. 151:16–152:5, Ex. 402.[2]

Meanwhile, also in January 2001, Haines met at Exxon Mobil's Washington Office with an individual from Aceh who had survived an attack there. Ex. 25. William Cummings, working for EMOI Public Affairs, sent an e-mail to Haines before this meeting; attached to the e-mail was Exxon's "approved version of [its] positions on human rights in Aceh." Ex. 26; *see also* Ex. 25. This attachment noted EMOI's contractual relationship with Pertamina: "Under the PSC [Production Sharing Contract], ExxonMobil pays Pertamina for its proportionate part of the costs that Pertamina incurs to provide security to protect ExxonMobil personnel, equipment and

---

[2] These two pages appear to be missing from the submitted version of Exhibit 402. Defendants, however, acknowledge Wilson's visit. *See, e.g.*, EMOI's Reply Mem. at 3.

facilities in the field." Ex. 26 at CA0001055747.

In March 2001, EMOI shut down its production due to escalating attacks and security issues. Haines Dep. 54:14–17, 58:1–4, Ex. 402. The Indonesian Parliament scheduled hearings regarding EMOI's shut-down of operations. Haines Dep. 54:18–56:4, Ex. 402. In a March 15, 2001 e-mail to EMOI President Wilson, Haines explained that he would travel to Jakarta to help prepare Wilson for the hearing. Ex. 2. Wilson responded with an e-mail stating that he was "not comfortable with the hearing on Thursday discussing security issues, militaty [sic] - police, etc." Ex. 2. Wilson further stated that he was "[l]ooking to [Haines] to help with testimony and approach to our participation." Ex. 2. Haines prepared "a written statement for Mr. Wilson to read at the testimony, and it covered various subjects." Haines Dep. 58:19–21, Ex. 402. Haines also attended the hearing itself. Haines Dep. 59:17–18, Ex. 402. That same month, according to the Complaint, a soldier assigned to Exxon Mobil's operations in Indonesia allegedly beat and sexually assaulted Jane Doe I after forcing himself into her house. Compl. ¶ 55.

Haines's activities related to EMOI continued through the remainder of the relevant time period. In late March 2001, for example, Haines met in Washington D.C. with the Indonesian Embassy, non-governmental human-rights organizations, business groups, and the U.S. State Department to discuss the Aceh security situation and the alleged tortious conduct of the security personnel. Ex. 27. Haines reported on this meeting in an April 1, 2001 e-mail to EMOI President Wilson. Ex. 27. Further, in April 2001, Haines met in Washington D.C. with a representative from Human Rights Watch to discuss torts allegedly committed in Aceh, and EMOI's control over the military personnel guarding EMOI's facilities. Ex. 28. Haines reported on this meeting in an e-mail to EMOI President Wilson. Ex. 28. Similar meetings occurred in

Washington D.C. from April to May 2001, as Haines met on various occasions with Indonesian officials and non-governmental organizations to discuss EMOI's shut-down of operations and the conditions necessary for EMOI to restart operations. Ex. 20; Ex. 29. These meetings included negotiating with representatives from Kissinger Associates about "sign[ing] a consulting agreement with a fee of $350,000 annually" to "travel immediately to Indonesia" to perform consulting services, such as reinforcing "the need to find a solution to the security problem that would allow ExxonMobil to resume operations." Ex. 12. Haines reported on these meetings in e-mails to EMOI President Wilson. Exs. 12, 29. Wilson responded, inquiring whether Haines had any concerns about them. Ex. 29.

### C.     Procedural History

In June 2001, Plaintiffs filed this suit, alleging that the Exxon Defendants and Defendant PT Arun LNG (an Indonesian entity) violated the Alien Tort Statute and the Torture Victim Protection Act and committed various common-law torts in the course of protecting and securing EMOI's liquid natural-gas extraction pipeline. *Doe*, 393 F. Supp. 2d at 22. Plaintiffs alleged that Defendants conditioned payment on providing security, made decisions about where to build bases, hired mercenaries to train the security troops, and provided logistical support. *Id.* Plaintiffs further claimed that Defendants were liable for the alleged actions of the Indonesian soldiers as aiders and abettors, joint actors, or as proximate causes of the alleged misconduct. *Id.* In October 2001, Defendants filed a motion to dismiss; this included EMOI's initial motion to dismiss for lack of personal jurisdiction. *Id.* The U.S. Exxon Defendants did not contest personal jurisdiction.

On October 14, 2005, the court granted in part and denied in part Defendants' motion to

dismiss. The court dismissed PT Arun LNG from the suit on justiciability grounds, *id.* at 27, and granted Defendants' motion to dismiss Plaintiffs' federal statutory claims. *Id.* at 21–22. The court, however, allowed Plaintiffs' state-law tort claims against the Exxon Defendants to proceed, with discovery restrictions. *Id.* at 21–22. The court also denied, without prejudice, EMOI's motion to dismiss for lack of personal jurisdiction. *Id.* at 29. The Court of Appeals dismissed Defendants' appeal and denied mandamus, 473 F.3d 345, and the United States Supreme Court denied *certiorari*, No. 07-81, 2008 U.S. LEXIS 4915 (June 16, 2008).

The parties have conducted discovery, and EMOI has again moved to dismiss for lack of personal jurisdiction. (The U.S. Exxon Defendants continue to acknowledge personal jurisdiction exists over them.) While EMOI's motion was pending, Magistrate Judge Kay ordered the Exxon Defendants to produce additional documents related the April 2000 Worldwide Security Conference or other security conferences. *See* Order dated June 17, 2008 [dkt # 317]. The parties filed supplemental briefs regarding these documents on July 16, 2008.

Magistrate Judge Kay also ordered the Exxon Defendants to produce certain documents that they had contested as protected on various grounds. *See* Order dated June 20, 2008 [dkt # 318]. The Exxon Defendants have objected to that Order with respect to 19 of the documents, which they insist are protected from disclosure [dkt # 324]. The court is presently conducting an in camera review of those documents; they are not necessary to resolving the present motion and will be addressed in a separate order.

Additionally, all remaining Defendants (that is, the U.S. Exxon Defendants and EMOI) have moved for summary judgment. That motion will also be resolved in a separate order.

## II. DISCUSSION

The U.S. Exxon Defendants acknowledge that personal jurisdiction exists over them. Indeed, Exxon Mobil has offices in the District of Columbia that are listed in the local phone book. Plaintiffs have made a sufficient showing that its subsidiary, EMOI, had sufficient contact with the District to confer jurisdiction over it as well.

### A.    Legal Framework

#### 1.    General Principles

Due process dictates that personal jurisdiction exists over a defendant only if the defendant has sufficient contact with the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 (1985). When the defendant is not physically present in the forum, "there [must] be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Deckla*, 357 U.S. 235, 253 (1958).

Personal jurisdiction can be asserted under two theories: general jurisdiction and specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984). General jurisdiction exists over a defendant when its contacts with a forum are so "continuous and systematic" that maintenance of suit in that forum does not offend "traditional notions of fair play and substantial justice." *Id.* at 414–15 & n.9 (citations omitted). When a court exercises general jurisdiction, the suit need not relate to or arise out of the defendant's contacts with the forum state. *Id.* at 415 n.9. By contrast, specific jurisdiction exists where the suit arises out of or is related to a defendant's contacts with the forum. *Id.* at 414 n.8. This is reflected in the District of Columbia's long-arm statute. *See* D.C. Code § 13-423(a) (enumerating contacts, such as

9

"transacting any business" or "causing tortious injury in" the District of Columbia); *id.* § 13-423(b) (requiring that the claim for relief "aris[e] from" these contacts). If the suit sufficiently "relates to" the contacts, jurisdiction exists. *See Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 335 (D.C. 2000) (reaffirming past decisions interpreting "the 'arise from' language of § 13-423(b) flexibly and synonymously with 'relate to' or having a 'substantial connection with,' in the same way that the Supreme Court's due process analysis has used these terms interchangeably"). Here, Plaintiffs invoke only the "transacting-business" prong of the long-arm statute. This prong has a "broad reach" covering "the transaction of 'any business.'" *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 932 (D.C. Cir. 1981) (quoting D.C. Code § 13-423(a)(1) (Wright, J., concurring)). "[E]ven a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here." *Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008) (internal quotation marks omitted).

### 2. Burden of Proof

Ultimately, the "plaintiff has the burden to prove that jurisdiction is properly exercised." *Reuber v. United States*, 787 F.2d 599, 599 (D.C. Cir. 1986). Yet the extent of that burden, and the court's corresponding inquiry, depends on the stage of the litigation. Although it has been noted that there is a "lack of decisive precedent in this Circuit" on this point, *see Heller v. Nicholas Applegate Capital Mgmt., LLC*, 498 F. Supp. 2d 100, 108 (D.D.C. 2007), a sensible, tripartite rule has emerged—one consistent with this Circuit's pronouncements.

*First*, before discovery, the court need assess only whether the plaintiff's *alleged facts*, if true, would establish jurisdiction. At that early stage, the defendant is challenging only the

jurisdictional theory alleged, not the underlying facts themselves. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999) ("[A] court may initially deny such a motion to the extent it attacks the plaintiff's theory of jurisdiction without conducting inquiry into the disputed jurisdictional facts . . . ."). That was the basis for EMOI's initial motion to dismiss in 2005, which the court denied. *See Doe*, 393 F. Supp. 2d at 29 ("Plaintiffs have sufficiently pled facts that, if true, would support jurisdiction over Exxon Indonesia . . . .").

*Second*, after discovery (but before an evidentiary hearing regarding jurisdiction or before trial itself), the plaintiff has the burden to factually document the jurisdictional theory. Where those *documented facts*, if true, would establish jurisdiction, the defendant's motion to dismiss will again be denied. *See In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 125 (D.D.C. 2003) ("This 'factually documented' prima facie standard obliges plaintiffs to support their bare allegations, but instructs a court to look favorably upon those assertions once the required proffer is made."); *Heller*, 498 F. Supp. 2d at 108 (noting that the Second Circuit adopted this standard); *see also Mwani v. Bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) ("In the absence of an evidentiary hearing, although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden with a *prima facie* showing.") (internal quotation marks and alteration omitted). Thus, any factual dispute is resolved in the plaintiff's favor, *see Heller*, 498 F. Supp. 2d at 108, and the defendant retains the opportunity to show (at the third stage—a hearing or the trial) that the plaintiff ultimately fails to prove jurisdiction. The present case is in this second, post-discovery phase.

*Third*, if there are disputed facts material to jurisdiction, or if the court simply decides to postpone the question, the court will either conduct an evidentiary hearing or resolve the question

11

through the trial itself. *See Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 915 (7th Cir. 1994) (noting that district judge may defer to trial a definitive determination of personal jurisdiction). At this final stage, the plaintiff must meet its ultimate burden to establish jurisdiction by a preponderance of the evidence. *See Mwani*, 417 F.3d at 7 ("It is only if the court takes evidence on the issue or rules on the personal jurisdiction question in the context of a trial that a heightened, preponderance of the evidence standard applies."). Plaintiffs have made a sufficient showing of jurisdiction to proceed to trial on the question.

**B.     Plaintiffs Have Made a Sufficient Showing That Jurisdiction Exists Over EMOI**

Plaintiffs contend that jurisdiction exists over EMOI under any of three sets of contacts. *First*, they assert that specific jurisdiction exists based on EMOI's own contacts in the District, including (1) its communications with Robert Haines, and (2) its involvement in Exxon's Worldwide Security Conference. *Second*, plaintiffs assert that specific jurisdiction exists based on Haines's contacts in the District, because Haines allegedly acted as EMOI's agent. *Third*, Plaintiffs assert that jurisdiction exists based on the U.S. Exxon Defendants' contacts with the District—that is, that the U.S. Exxon Defendants are merely alter egos of EMOI, such that their concession to jurisdiction confers, by definition, jurisdiction over EMOI. As discussed below, Plaintiffs easily meet their burden to make a sufficient showing of personal jurisdiction.

**1.     EMOI's Own Contacts in the District Support Jurisdiction**

EMOI had significant contact with Robert Haines in the District. In addition to their many written communications during the relevant time period, Haines and Wilson also spoke by telephone—sometimes multiple times per week, "[d]epending on the overall security situation and the needs that [EMOI] had." Wilson Dep. 297:3–12, Ex. 406. "Courts including this one

have found that telephone calls and mailings to Washington, D.C. constitute 'transacting business' under section 13-423(a)(1)." *Dooley v. United Tech. Corp.*, 786 F. Supp. 65, 72 (D.D.C. 1992). EMOI's contacts with Haines sufficiently relate to Plaintiffs' claims: both center on EMOI's security policies and practices in Indonesia. *See, e.g.*, Ex. 4 (e-mail from EMOI President Wilson to Haines advising that the question of "[h]ow to provide security for operations" in Indonesia was a key topic for Haines's upcoming meeting in Washington D.C. with Indonesian representatives); *see also* Exs. 2, 23, 26, *supra*; *cf. Gibbons & Co. v. Roskamp Inst.*, No. 06-720, 2006 U.S. Dist. LEXIS 60762, at *10 (D.D.C. Aug. 28, 2006) (concluding that personal jurisdiction was lacking where e-mails and phone calls with plaintiff were "incidental to the contract allegedly entered into by the parties" and occurred in the District only "[b]ecause plaintiff happened to be located in the District").

Exxon's "Worldwide Security Conference" in Washington D.C. is also particularly significant. A number of personnel working on behalf of EMOI were invited to—and, by all accounts, attended—this Security Conference. A directory produced along with the meeting agenda includes short biographies of a number of these security advisors to EMOI. *See* Supp. Ex. A at CA0001355112–40. EMOI does not dispute that these personnel attended the conference. *See* Defs.' Supp. Mem. at 3 ("Plaintiffs observed that some non-EMOI personnel assisting from time-to-time with EMOI security issues were present at the April 2000 conference . . . ."). And even if these personnel were not EMOI *employees*, a jury could certainly conclude that—as with Robert Haines, discussed below—they were EMOI's agents. *See infra* (noting that a foreign corporation's agent's contacts can establish personal jurisdiction); *see also, e.g.*, Supp. Exs. G, H (noting that one such advisor, Michel Laureys, was at EMOI to provide

13

business within the meaning of § 13-423(a)(1) without ever having been physically present in the District, and, under certain circumstances, *even a single act* may be sufficient to bring a defendant within the purview of the statute.") (emphasis added); *Jackson*, 944 A.2d at 1093 (same).

When one also considers visits to the District by EMOI's personnel and EMOI's sponsorship of the meeting with a Indonesian Minister of Trade in the District (*see* Ex. 164), the likely reasonableness of ultimately exercising personal jurisdiction here, based on EMOI's own contacts, is even more apparent. *See, e.g., Hummel v. Koehler*, 458 A.2d 1187, 1190–01 (D.C. 1983) (finding jurisdiction based on three trips to the District to meet with attorney hired in the District); *Ford v. RDI/Caesars Riverboat Casino, LLC*, 503 F. Supp. 2d 839, 841–21 (W.D. Ky. 2007) (noting that defendant's activity as a sponsor of events in forum state is a factor in jurisdictional analysis). Out of an abundance of caution, however, the court exercises its discretion to defer the ultimate resolution of the jurisdiction question to the trial. *See Rice*, 38 F.3d at 915. That will enable the jury to assess agency questions: whether the security advisors noted above acted as EMOI's agents at the conference and, as discussed below, whether Haines acted as EMOI's agent in Washington D.C.—thus establishing another basis for personal jurisdiction.

  **2. A Jury Could Conclude that Haines was EMOI's Agent, Such that His Contacts Establish Jurisdiction**

"A foreign corporation, acting 'directly or by an agent,' is subject to specific jurisdiction in [D.C.] courts if it has 'transact[ed] any business in the District of Columbia.'" *Jackson*, 944 A.2d at 1092 (quoting D.C. Code § 13-423(a)(1)). "The existence of an agency relationship is a

security consulting and that his costs were charged to EMOI). Moreover, it is reasonable to infer that Exxon Mobil's self-titled *Worldwide Security* Conference, which included a management meeting regarding the "Asia/Pacific" region (Supp. Ex. A at CA0001355094), addressed issues relevant to EMOI—a significant player among Exxon affiliates: Defendants state that EMOI's earnings in 1998, 1999, and 2000 were $295 million, $311 million, and $498 million, respectively. Defs.' SMF ¶ 20; *see also Heller*, 498 F. Supp. 2d at 108 (noting, when assessing personal jurisdiction, that the court "is free to draw reasonable and appropriate inferences and conclusions, even though they may be in dispute, from underlying facts which are not in dispute"). Indeed, a handout at the conference included the "Security Guard Program," which "defines *training requirements, minimum standards, and responsibilities* to ensure that the protective force is prepared to defend personnel, property, and assets . . . ." Supp. Ex. A at CA0001355099 (emphasis added). The protective forces contemplated include those assigned by a host country, like those provided by state-owned Pertamina to EMOI: "The Security Guard Program includes support elements of employees or security contract personnel, and may include specific *law enforcement personnel assigned to the facility by a host-country government*." *Id.* (emphasis added). Moreover, the "Risk Management Process Overview" described at the conference appears to be the process EMOI employed in its "Safeguards and Security Risk Assessment." *Compare* Supp. Ex. A at CA0001355164 (chart separately discussing "Risk Analysis" and "Risk Evaluation" for a particular "Scenario") *with* Supp. Ex. C at CA0001337820 (similar type of chart). In short, this single conference presents a strong case for personal jurisdiction. *See Reiman v. First Union Real Estate Equity & Mortgage Invests.*, 614 F. Supp. 255, 256–57 (D.D.C. 1985) ("[A] nonresident defendant may be considered to have transacted

14

question of fact, for which the person asserting the relationship has the burden of proof." *Id.* at 1097; *see also Friedman v. Freidberg Law Corp.*, 44 F. Supp. 2d 902, 908 (E.D. Mich. 1999) ("[I]t is well-settled that questions as to the existence and/or scope of an agency relationship are questions of fact appropriate for the jury's consideration."). There is a "twofold test for determining whether such a relationship exists: First, the court must look for evidence of the parties' consent to establish a principal-agent relationship. Second, the court must look for evidence that the activities of the agent are subject to the principal's *control*." *Jackson*, 944 A.2d at 1097. "The cases emphasize that the right to control, rather than its actual exercise, is usually dispositive of whether there is an agency relationship." *Id.*

A jury certainly could conclude that Haines acted as EMOI's agent in the District. Indeed, Haines saw EMOI as his "client." Haines Dep. 116:17–21, Ex. 402. EMOI President Wilson frequently instructed Haines regarding actions to take on behalf of EMOI or related to EMOI concerns. *See, e.g.*, Ex. 2 ("[l]ooking to [Haines] to help with testimony" at the Indonesian parliamentary hearing); Ex. 23 (noting that Haines should meet with representative from Henry Dunant Center). In turn, Haines complied and reported to Wilson. *See, e.g.*, Haines Dep. 58:19–21, Ex. 402 (stating that Haines prepared a written statement for Wilson's testimony); *see also* Exs. 12, 22, 27, 28 (reporting to Wilson on various other meetings regarding EMOI security concerns). Haines testified that he did not recall ever refusing requests of his clients, such as EMOI; had he refused such requests, he "would have had to explain it to [his] client" and "probably would have to explain it to [his] supervisor, as well." Haines Dep. 48:9–20, Ex. 402. This strongly indicates that the necessary control existed to establish an agency relationship.

16

Should a jury conclude that Haines was EMOI's agent, his actions would establish personal jurisdiction over EMOI. As recounted above, he had numerous significant contacts in Washington D.C. that sufficiently relate to EMOI security and, therefore, to Plaintiffs' claims. EMOI raises two responses; neither suffice to carry its motion to dismiss. First, EMOI counters that the court may not consider Haines's conduct after early 2001, when the security personnel last allegedly harmed Plaintiffs. Of course, one could say that such actions—even if after the alleged physical attacks—may be quite related to Defendants' overall conduct regarding security provisions and therefore be relevant to Plaintiffs' claims. But this particular point need not be decisive; suffice it to say, many of Haines's significant contacts in the District occurred before Plaintiffs' alleged injuries. *See, e.g.*, Ex. 23 (June 2000 meeting in response to concerns about Defendants' "relationship with the military in Aceh"); Ex. 24 (November 2000 meeting regarding allegations that security protecting EMOI had committed acts of torture and killing against the local population). Second, EMOI contends that Haines's contacts fall under the "government-contacts exception," which "precludes the assertion of personal jurisdiction over a non-resident whose *only* contact with the District of Columbia is with Congress or a federal agency." *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 35 (2007) (emphasis added). But this exception is inapplicable to many of Haines's contacts, which plainly were not with Congress or a federal agency. *See, e.g.*, Ex. 23, Ex. 24, *supra*.

### III. CONCLUSION

EMOI's own contact with the District of Columbia strongly suggests that personal jurisdiction is properly exercised here. Moreover, a jury could conclude that Haines acted as EMOI's agent in the District, such that his acts would independently establish personal

jurisdiction. The court leaves a definitive determination of the question to trial. Accordingly, the court need not address at this time Plaintiffs' argument that EMOI is an alter ego of the U.S. Exxon Defendants. For these reasons, an accompanying order denies, without prejudice, EMOI's motion to dismiss for lack of personal jurisdiction.

Dated: July 18, 2008                                   Louis F. Oberdorfer
                                                       UNITED STATES DISTRICT JUDGE