UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE I, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 01-1357 (LFO) |
| v. | ) | |
| | ) | |
| EXXON MOBIL CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM & OPINION**

Eleven Indonesian villagers allege that Exxon Mobil Corporation, two of its U.S.

affiliates (Mobil Corporation and ExxonMobil Oil Corporation), and its Indonesian subsidiary,

ExxonMobil Oil Indonesia (EMOI), are liable for killings and torture committed by military

security forces protecting and paid for by EMOI.

There is evidence that these security forces committed the alleged atrocities; that EMOI

paid for the security, which was provided "as may be requested by [EMOI]" under a contract;

that EMOI had the right to influence the forces' "deployment logistics" and "to influence the

security plan and the development strategy;" and that EMOI "assisted in the management of

security affairs . . . on behalf of" the Indonesian government entity that provided these forces.

Additionally, there is evidence that EMOI alone was not "equipped to handle all the issues that

were cropping up" with security and therefore "went up the chain and request[ed] additional

corporate kinds of support" from Exxon Mobil Corporation—which enforced "uncompromising

controls" over EMOI's security.  In light of this and similar evidence, EMOI's and Exxon Mobil

Corporation's ultimate liability is a question entrusted to a finder of fact.  Accordingly, the court

will deny Exxon Mobil Corporation's and EMOI's motions for summary judgment.  Because

there is insufficient particularized evidence regarding the other two Defendant affiliates (Mobil

Corporation and ExxonMobil Oil Corporation), however, the court will grant their motions for

summary judgment.  A corresponding order accompanies this memorandum.

## I. BACKGROUND

**A.    Facts**

Exxon Mobil's ties to Indonesia trace back more than one hundred years when a

predecessor to Mobil Oil Corporation first opened a branch office in Indonesia.  Answer ¶ 35

[dkt # 153].  In 1967, Mobil Oil Corporation incorporated Mobil Oil Indonesia Inc. (MOI), a

Delaware corporation with a principal place of business in Jakarta, Indonesia.  Defs.' Response

to Pls.' Counterstatement of Material Facts ("Defs.' SMF Resp.") ¶ 5.  MOI's initial

capitalization was a paltry $1,000.  Pl's. Ex. 77.  A few years later, MOI discovered the lucrative

Arun gas field in Indonesia's Aceh province on the island of Sumatra.  Defs.' SMF Resp. ¶¶ 36,

39.  MOI worked as a contractor for Indonesia's state-owned oil and gas company "Pertamina"

(the official name is Persusahaan Pertambangan Minyak dan Gasbumi Negara). *Id.* ¶ 36; Defs.'

SMF Resp. ¶ 49.  Through a joint venture known as "PT Arun" (officially, PT Arun Natural Gas

Liquefaction Company), Mobil Oil Corporation and the Indonesian Government processed the

natural gas for shipment.  Amended Compl. ¶ 36 [dkt # 123-2].

The Indonesian Government may designate an asset as a "Vital National Object," which

requires military security protection.  Defs.' SMF Resp. ¶ 54.  Defendants contend that, since

1983, the Indonesian Government has designated the Arun Field such a Vital National Object.

Defs.' SMF Resp. ¶ 54.  Plaintiffs argue, however, that Defendants were not required to contract

for the use of the military to protect the Arun Field.  Pls.' Mem. at 15.

A Production Sharing Contract ("PSC" or "Contract"), effective as of 1998, governs the relationship between MOI and Pertamina, and provides for military security protection at MOI's discretion.  Pls.' Ex. 337.  Under the Contract, Pertamina agreed to "assist and expedite [MOI's] execution of" gas extraction and production "by providing . . . security *protection . . . as may be requested by [MOI]* . . . ."  *Id.* ¶ 5.3(c) (emphasis added).  MOI paid Pertamina for these security costs.  *Id.*  Security was a particular concern because Aceh was experiencing violent civil conflict as the Geraken Aceh Merdeka ("GAM") separatist movement demanded independence from the Indonesia Government in Jakarta.  Defs.' SMF ¶ 60.

Mobil Corporation and Exxon Corporation merged in 1999, creating the corporate entities that include the current "Exxon Defendants."  Defs.' SMF Resp. ¶ 8.  The new overarching parent corporation of the various Mobil and Exxon affiliates became Defendant Exxon Mobil Corporation.  Defendant Mobil Corporation became its wholly-owned subsidiary.  *Id.*  Mobil's subsidiary, in turn, is Defendant ExxonMobil Oil Corporation.  These three entities—Exxon Mobil Corporation, Mobil Corporation, and ExxonMobil Oil Corporation (in descending hierarchical order)—comprise "the U.S. Defendants."  (For simplicity, the court refers to each as "Exxon Mobil," "Mobil," and "ExxonMobil Oil.")  Mobil, the second entity in this chain, was also the ultimate parent of MOI, which—after a name change—became EMOI (Exxon Mobil Oil Indonesia Inc.), the fourth Exxon Defendant at issue.  Defs.' SMF Resp. ¶ 6.  This name change did not alter MOI's corporate structure or its relationship to the U.S. Exxon Defendants.  *Id.*  The terms "EMOI" and "MOI" are used interchangeably.

Meanwhile, EMOI's security situation deteriorated.  Defs.' SMF Resp. ¶ 60.  In

December 1999, Robert Haines—Exxon Mobil's Manager of International Government Affairs—sent a memorandum to Mobil's CEO, reporting on his meeting in Indonesia with MOI to discuss the security concerns in Aceh.  Pls.' Ex. 15.  Haines noted a "complete breakdown of law and order in the province" and that "MOI has asked for the assistance of the military to protect its facilities."  *Id*.  Haines also cautioned that "[t]he presence of troops, however, only serves to inflame the population and results in suspicions that MOI is linked to the military."  *Id*.

Troops assigned to EMOI under the Contract, however, allegedly suffered their own breakdown of law and order as they allegedly beat, shot, and tortured Plaintiffs—Indonesian villagers living in Aceh near the Arun Project.  *See* Amended Compl. ¶¶ 67–77.  Plaintiff John Doe I alleges that, in January 2001, "ExxonMobil security personnel" accosted him as he rode his bicycle cart to the local market.  *Id*. ¶ 67.  He contends that the security personnel shot him in the wrist and threw a hand grenade at him, causing severe injuries.  *Id*.  He was allegedly killed in 2003 during a raid on his village.  *Id*.

Plaintiff John Doe II alleges that Exxon Mobil security personnel detained him while he rode his motorbike and that they then tortured him—by beatings and electric shock—over a period of three months.  *Id*. ¶ 68; *see also* Pl. John Doe II's Supp. Response to ExxonMobil Oil Corporation's First Set of Interrogatories ("John Doe II Supp. Interrogs.") [dkt # 265] at 2–3 (stating that soldiers who work for Defendants detained him as he went about his daily routine; beat him; struck him in the chin with a weapon; then detained him, stripped him naked, and burned him).  Similarly, Plaintiff John Doe III alleges that Exxon Mobil's security personnel shot him in his leg as he rode his motorbike; later broke his kneecap and smashed his skull; and tortured him over a period of one month.  *Id*.  ¶ 69.

The other Plaintiffs provide similar evidence of beatings, burnings and harm. *See id*. ¶¶ 70–77 (John Does IV–VIII; Jane Does I–IV); *see also* John Doe IV's Supp. Interrogs. [dkt # 265] at 2–3 (stating that soldiers who worked for Defendants stopped him while traveling; beat him; and carved the abbreviation *GAM* into his back with a knife, leaving a visible scar); John Doe V's Supp. Interrogs. [dkt # 265] at 2–3 (stating that soldiers burned approximately 40 houses in his village and that a soldier named "Beni" from Unit 133 beat his son).

The security situation deteriorated to the point where EMOI could no longer operate the production facilities in Aceh. Defs.' SMF Resp. ¶ 60. Accordingly, on March 9, 2001, EMOI shut down operations for approximately three months. *Id*.

## B.   Procedural History

On June 19, 2001, Plaintiffs, 11 Indonesian citizens proceeding under pseudonyms, filed their Complaint [dkt # 3] against the four Exxon Defendants and Defendant PT Arun. Plaintiffs asserted 15 claims. These included federal claims under the Alien Tort Claims Act, 28 U.S.C. § 1350, and the Torture Victim Protection Act, 28 U.S.C. § 1350; they also included various state-law tort claims, such as wrongful death, assault, and battery.

On October 14, 2005, this court granted Defendants' motion to dismiss Plaintiffs' federal statutory claims, but allowed Plaintiffs' state-law tort claims against the Exxon Defendants to proceed (with discovery restrictions). *Doe*, 393 F. Supp. 2d at 21–22. The court dismissed as nonjusticiable all claims against the joint venture PT Arun, which was 55% owned by Pertamina, because of "a significant risk of interfering in Indonesian affairs and thus U.S. foreign policy concerns." *Id*. at 28. The court required the parties to "tread cautiously" with the surviving tort claims and stated that "[d]iscovery should be conducted in such a manner so as to avoid intrusion

into Indonesian sovereignty." *Id*. at 29.

On March 2, 2006, the court granted [dkt # 136] Plaintiffs' motion to amend the Complaint and to file their First Amended Complaint. The Amended Complaint alleged the following ten torts against each of the four Exxon Defendants:

(1)     wrongful death (Jane Does II, III, and IV, on behalf of their husbands, John Does II, III, and IV);

(2)     battery (John Does I–VII, and Jane Doe I);

(3)     assault (John Does I–VII, and Jane Doe I);

(4)     arbitrary arrest, detention, and false imprisonment (John Does I–VII);

(5)     negligence (all Plaintiffs);

(6)     intentional infliction of emotional distress (all Plaintiffs);

(7)     negligent infliction of emotional distress (all Plaintiffs);

(8)     negligent hiring (all Plaintiffs);

(9)     negligent supervision (all Plaintiffs); and

(10)    conversion (John Does II and V).

The court, however, granted Defendants' motion to dismiss Plaintiffs' claims of intentional infliction of emotional distress, leaving nine torts. The court also concluded that D.C. law applied to the surviving claims except the wrongful-death claim, to which Delaware law applied.

Discovery was limited to two issues: (1) personal jurisdiction over EMOI; and (2) the Exxon Defendants' knowledge of, and proximate cause of, Plaintiffs' alleged injuries. *See* Orders of March 6, 2006 [dkt # 138] and May 3, 2006 [dkt # 158]. The governing discovery Order also "avoided discovery in Indonesia, except that it required defendants to produce any

documents they intend to use in their defense."  May 3, 2006 Mem. at 2.

When discovery closed, EMOI moved to dismiss for lack of personal jurisdiction and all four Exxon Defendants moved for summary judgment.  The court recently denied EMOI's motion for lack of personal jurisdiction [dkt #339], leaving the pending summary judgment motions for this separate resolution.  A few discovery disputes are pending, but the court has concluded that the summary judgment motions are ripe for resolution.  *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 n.2 (11th Cir. 2001) (upholding district court's decision to rule on summary judgment during pending discovery dispute that was "unlikely to produce a genuine issue of material fact").

## II.  DISCUSSION

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the discovery and disclosure materials that it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The court draws all inferences from the evidence in favor of the party opposing summary judgment, here the Plaintiffs.  *See Estate of Coll-Monge v. Inner Peace Mov't,* 524 F.3d 1341, 1346 (D.C. Cir. 2008).

Defendants' bases for summary judgment come under three broad contentions: (A) Defendants are not liable for the alleged torts; (B) even assuming Defendants were otherwise liable, dismissal is required because Pertamina is an indispensable party that cannot be joined;

and (C) in any event, the statute of limitations bars certain claims of John Does II, IV, and V. The court addresses these points in turn.

## A.    A Finder of Fact Could Conclude That EMOI and Its Parent Exxon Mobil Are Liable for the Alleged Torts.

Defendants first say that they simply are not liable for the alleged acts. This argument has three parts: (1) there is insufficient evidence its paid security forces committed the alleged torts (requiring summary judgment in favor of all four Defendants); (2) even if there were such evidence, there is insufficient evidence that EMOI is liable for the security forces' conduct (requiring summary judgment in favor of all four Defendants); and (3) even if there were sufficient evidence of EMOI's liability, there is insufficient evidence that the U.S. Defendants are liable (requiring summary judgment in favor of the three U.S. Defendants). The court finds, however, that a reasonable finder of fact could conclude that the paid security forces committed the alleged torts and that EMOI and Exxon Mobil are liable. There is insufficient evidence of liability for the other two U.S. Defendants—Mobil and ExxonMobil Oil—so the court will grant the motion for summary judgment as to these Defendants.

### 1.    There is Sufficient Evidence That EMOI's Paid Security Forces Committed the Alleged Torts.

Defendants note, almost in passing: "[T]here is no evidence in the record—other than the uncorroborated assertions of Plaintiffs–that the injuries alleged in the Complaint even occurred —Def's Mem. in Supp. of Summ. J. ("Defs.' Mem.") at 3 (Preliminary Statement); *id*. at 6 ("[A]side from Plaintiffs' own self-serving interrogatory responses, nothing in the record substantiates or corroborates any such injuries.") (Summary of Facts).). Defendants own words, however, undercut their argument as they say: "As a threshold matter, there is no dispute that the

8

injuries allegedly suffered by Plaintiffs were caused by members of the Indonesian military." *Id.* at 2. Defendants may dispute their liability, but they seemingly admit, or at least do not contest at this stage, that the injuries did occur.

As noted, the court must construe all evidence in the Plaintiffs' favor. These statements and evidence, detailed to the individual Plaintiffs in the "Facts" Section above, sufficiently state (in light of the limited discovery) that EMOI's paid security forces committed the alleged torts. *See, e.g.*, Amended Compl. ¶¶ 67–77 (allegations of injuries caused by Exxon Mobil security forces); John Doe II's Supp. Interrog. Resps. at 2–3 (same). The question, then, is whether Defendants may be liable for the security forces' conduct. The court begins with an analysis of Defendant EMOI—the entity that paid the security forces to protect it.

### 2.      There is Sufficient Evidence that EMOI is Liable.

EMOI's potential liability for the nine remaining torts is of two types. First, EMOI could be *vicariously* liable for the security forces' alleged acts, which are the bases for seven of the alleged torts (wrongful death; battery; assault; arbitrary arrest, detention, and false imprisonment; negligence; negligent infliction of emotional distress; and conversion). Second, EMOI could be *directly* liable for the two remaining alleged torts: negligent hiring and negligent supervision.

### a.      EMOI's Vicarious Liability for the Underlying Torts of its Paid Security Forces

Plaintiffs contend that EMOI is vicariously liable for the underlying torts based on either respondeat superior or ratification. Plaintiffs make a sufficient showing that EMOI could be liable under the first of these theories; the court does not reach the second question (whether EMOI ratified the security forces conduct, thus creating liability).

Respondeat superior is simply another way to say that the master is liable for the acts of its servants.  There are two requirements to establish liability: (1) a master-servant relationship; and (2) the tortious conduct must occur while the servant is acting within the scope of his or her employment.  *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 62–63 (D.C. 1983).  These are both questions generally to be decided by a finder of fact.  *See Jordan v. Medley*, 711 F.2d 211, 213 (D.C. Cir. 1983) (scope of employment is fact question); *Jaffe v. Pallotta Teamworks*, No. 02-1048, 2006 U.S. Dist. LEXIS 97318, at *4 (D.D.C. Oct. 26, 2006) ("[T]he existence of a master-servant relationship turns on control, which is a question of fact typically left to the jury.").  The court finds that a reasonable finder of fact could conclude that both requirements exist in EMOI's relationship with its paid security forces.

### i.      Master-servant relationship

The right to control and direct the servant in the performance and manner the work is to be done is determinative to establishing a master-servant relationship.  *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982).  Other factors include the selection and engagement of the servant; the payment of wages; the power to discharge; and whether the work is part of the regular business of the employer.  *Id*.  The main question, then, is whether EMOI had a sufficient right to control its paid  security forces who allegedly injured Plaintiffs.

Defendants contend there is no evidence "that the soldiers who allegedly hurt the Plaintiffs were, in fact, those assigned to protect the gas fields, and were not part of the thousands of other troops deployed by the Government of Indonesia to Aceh for general law and order purposes."  Defs.' Reply at 7.  The court, however, must assume the truth of all statements proffered by Plaintiffs (the non-moving party) and construe all evidence in their favor.  These

statements and evidence, if true, establish that security forces assigned to an Exxon Mobil entity committed the alleged torts.  *See, e.g.*, Amended Compl. ¶¶ 67–77 (allegations of injuries caused by "ExxonMobil security forces"); John Doe II's Supp. Interrog. Resps. at 2–3 (same).

Defendants contend that EMOI did not have a right to control the forces assigned to protect it.  Defendants first argue that this court has already concluded—when ruling on Defendants' motion to dismiss—that EMOI lacked sufficient control over the security forces.  Under the law of the case doctrine, "the *same* issue presented a second time in the *same case* in the *same court* should lead to the same result."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996).  But this court's prior ruling addressed a separate issue.  In dismissing Plaintiffs' claims under the Alien Tort Statute, which requires a showing that Defendants acted under color of state law, this court explained that Defendants could not be a proximate cause of the injuries because Plaintiffs failed to allege that Defendants—private entities—controlled Indonesia's *official military actions*. *See Doe*, 393 F. Supp. 2d at 27.  That is different from the immediate question: whether EMOI had sufficient control over the military forces *assigned to it* (some of whom may have even acted *contrary* to official Indonesian military action) for purposes of establishing an agency relationship in the context of common law torts.  Put another way, the Alien Tort Statute essentially protects against unlawful official state conduct, while the common law torts here protect against private conduct, even if military forces actually cause the harm.  Thus, the law of the case doctrine is not applicable here.

Defendants further suggest that they could not have controlled the security forces because they were required by Indonesian law to have military security personnel on site.  But a legal requirement to have certain personnel present does not undercut the separate question of the *right*

*to control* the personnel.  Is the owner of a swimming pool insulated from liability per se for a lifeguard's negligence simply because the lifeguard is required to be there?  Surely not.  There would still be issues of negligence in hiring or supervision and of control—the exact issues disputed here.  The court therefore must assess whether there is sufficient evidence of EMOI's right to control the security forces it paid for protection of its interests in the Arun gas field.

The District of Columbia Court of Appeals found sufficient evidence from which a trier of fact could find a corporation liable for an alleged assault and battery committed by a security guard working at the corporation's store—even though the guard was employed by a separate security company.  *Safeway Stores*, 448 A.2d at 860.  "Most importantly," the defendant corporation "enjoyed the right to control the guards' conduct."  *Id*. at 861.  Evidence showed that the guards acted under the store manager's general direction.  *Id*.  For example, "on occasion," a guard "would lock the doors at the manager's request or would act under the manager's general direction if he were having a problem with a customer."  *Id*.  The manager also "instructed the guards to keep juveniles out of the doorway and to watch for shoplifters."  *Id*.  The record thus reflected that the store manager "identified specific problems requiring the guard's assistance and directed the guard to those problems."  *Id*.  Two other factors supported  the existence of a master-servant relationship: the defendant corporation had the right to discharge an individual guard (even though discharge was subject to the security company's approval) and the corporation paid for the guards on a monthly basis in a lump sum payment to the agency.  *Id*.

Similar evidence exists here.  First and foremost is EMOI's right to control its paid security forces.  For example, EMOI's security advisor received information from EMOI field managers regarding what "they needed to do or wanted to do in the field;" in turn, the security

advisor would take these so-called "business requirements" to the military and say, "this is what we'd like to do over the next week or over the next ten days, can you take the appropriate steps to make sure that that's done." Farmer Dep. 128:17–129:3, Pls.' Ex. 405. EMOI also influenced "deployment logistics" of the military. Pls.' Ex. 197. For example, EMOI employee Tommy Chong wrote an e-mail to various EMOI personnel, with the subject "DEPLOYMENT OF MILITARY RESOURCES," beginning as follows:

> We have revised the deployment logistics of the new military resources as follow[s]:
>
> • POINT A: 40 soldiers inclusive of 15 to handle military escorts for employee travels between Bukit Indah, Cluster 1, Cluster 2 and Point A. 3 out of the existing 5 vehicles will be based at Point A for escort purpose. Soldiers will take over from MOI security guards to man the 2nd gate.

*Id*.

Another internal document, with the subject "Increase in Military Deployment," explicitly referenced EMOI's right to control in the following recommendation: "Military must give undertaking [sic—understanding] that MOI has the *right to influence the security plan and the development strategy*." Pls.' Ex. 182 at CA0001078967 (emphasis added); *see also* Pls.' Ex. 199 at CA0001334008 ("Management to coordinate with Military, support/logistics/manpower, then seek senior management approval."). Indeed, just as the *Safeway Stores* guard was instructed to "keep juveniles out of the doorway," an EMOI security report stated that EMOI personnel would "get A13 [military] Commander to handle" "youths from nearby villages [who] have found their way into Bachelor camp and took meals from Mess Hall." Pls.' Ex. 211 at CA0001120419. A fact finder could reasonably conclude that EMOI had sufficient control over and, effectively,

"managed " the security forces to create a master-servant relationship.  *See* Pls.' Ex. 30 (internal

e-mail stating that "it[']s not going to be easy managing 900 troops in our operational area").

Other *respondeat superior* factors support finding a master-servant relationship.  First,

there is the selection and engagement of the servant.  Under the PSC, "security protection" was

provided "*as may be requested* by [EMOI]."  Pls.' Ex. 337 at ¶ 5.3(c) (emphasis added).  These

security personnel were "dedicated exclusively to providing security for [EMOI's] operations,"

Pls. Ex. 332 (letter from EMOI President Wilson)—they did "not perform a broader role with

respect to military activities within the region."  Pls.' Ex. 166 at CA0001174659 (transcript of

interview with Exxon Mobil Vice President Johnson).

Second, there is payment of wages: EMOI paid the security personnel directly.  *See* Pls.'

Ex. 143 at CA0001003150 (June 2000 Letter Agreement signed by EMOI President states that

Mobil will provide "reasonable stipends to the military and police"); Pls.' Ex. 183 (internal

EMOI e-mail noting that "payment to the A-13 troops for this month and forward will be

doubled from the previous ones as the number of soldiers has also been doubled").

Third, there is the power to discharge.  This factor, however, is not as strong for

Plaintiffs.  The evidence indicates that Pertamina disciplined a soldier assigned to EMOI and

simply advised EMOI of that event—not that *EMOI* had the power to discharge.  *See* Connor

Dep. 79:5–12, Pls.' Ex. 403.

Finally, the purported servants' work is part of the regular business of the employer:

EMOI's own civilian security personnel worked alongside the military security, *see* Pls.' Ex. 201

at CA0001213061 (internal EMOI e-mail stating that "[b]oth military and MOI security guards

are on duty at the main gate"), and, in some cases, were simply replaced by them, *see* Pls.' Ex.

197 at CA0001047717 (internal EMOI e-mail stating that "[s]oldiers will take over from MOI security guards to man the inner gate").

Although there remains some factual dispute, on balance, these factors go to show that a reasonable finder of fact could conclude that a master-servant relationship existed between EMOI and its paid military security forces. True, Pertamina exercised control over the military as well; but that simply means that a finder of fact could conclude that EMOI is fully liable as a joint employer. *See Coles v. Harvey*, 471 F. Supp. 3d 46, 50–51 (D.D.C. 2007) ("[T]wo or more businesses are 'joint employers' when it can be shown that they share or co-determine those matters governing essential terms and conditions of employment.") (internal quotation marks and citations omitted)); *Faison v. Nationwide Mortg. Corp.*, 839 F.2d 680, 685 (D.C. Cir. 1987) (noting that joint tortfeasors in the District of Columbia are generally jointly and severally liable). There is sufficient evidence that EMOI had at least such a joint role, up to and including management of security affairs. *See* Pls.' Ex. 30, *supra*; *see also* Pls.' Ex. 332 at CA0001003150 ("In all such instances where Mobil *assists in the management* of security affairs, such assistance will be considered a service that Mobil provides *on behalf of Pertamina* . . . .") (June 2000 letter agreement between EMOI and Pertamina) (emphasis added).

### ii.    Scope of employment

EMOI's potential *respondeat superior* liability thus turns on the second requirement: whether the servant acted in the scope of its employment. A servant's conduct is within the scope of employment if: (1) it is of the kind the servant is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the master; and (4) if the servant intentionally uses force against another, the

force is not unforeseeable by the master. *Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C. 1981) (citing Restatement (Second) of Agency (1957)). Even a servant's unauthorized intended tortious acts are within the scope of employment if they are "done in connection with the servant's employment" and "not unexpected in view of the duties of the servant." *Id*.

The D.C. Circuit Court of Appeals recently noted that there are "several D.C. cases holding that seriously criminal and violent conduct can still fall within the scope of a defendant's employment under D.C. law—including sexual harassment, a shooting, armed assault, and rape." *Harbury v. Hayden*, 522 F.3d 413, 422 (D.C. Cir. 2008) (citing *Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984) (holding that university dean acted within scope of employment when sexually harassing faculty member during meetings); *Johnson*, 434 A.2d at 409 (holding that laundromat employee acted within the scope of employment when shooting a customer during dispute over clothes); *Lyon v. Carey*, 533 F.3d 649, 652 (D.C. Cir. 1976) (holding that mattress deliveryman acted within scope of employment when raping customer after dispute arose during delivery)). The court explained, "The scope-of-employment test often is akin to asking whether the defendant merely was on duty or on the job when committing the alleged tort." *Id*. Accordingly, the *Harbury* court held that CIA agents acted within the scope of their employment when allegedly interrogating and physically torturing a detainee, as "those actions were incidental to their authorized conduct . . . ." *Id*. at 422.

Similarly, a reasonable finder of fact could conclude that the violent acts alleged here fall within the scope of EMOI's paid security forces' employment. Simply put, the military security forces were engaged to perform armed security for EMOI, and unauthorized acts of violence were foreseeable. For example, an internal document showed concern about the use of deadly

force at the facilities:

> We have requested the A-13 Commander and Commander of the Brimob forces to avoid actions that could result in refugees injured or killed in any possible occupation of Mobil facilities.  While we understand their need to protect the lives of their men and maintain law and order, we discouraged the use of lethal means to resolve this matter.

Pls.' Ex. 72 at CA0001078006; *see also* Pls.' Ex. 150 at CA0001055776–77 (internal document noting a news report that "armed security forces of EMOI . . . conducted security sweeping operations at five villages near the explosive storage of ExxonMobil" and "that thousands of people were threatened due to sweeping operations and gunfire").  This is sufficient evidence that the security forces' alleged conduct falls within D.C.'s expansive scope-of-employment test.  Accordingly, the court need not address Plaintiffs' alternative argument that EMOI would nonetheless be liable by ratification of, or acquiescence in, such conduct.  *See* Pls.' Mem. at 21.

*          *          *

Because a reasonable fact finder could conclude that the security forces were EMOI's servants and acted within the scope of their employment when committing the alleged torts, EMOI may be vicariously liable for those torts and is not entitled to summary judgment.

### b.        EMOI's Direct Liability for its Own Negligence

Plaintiffs further contend that EMOI is directly liable for its alleged negligence in hiring and supervising those forces.  *See Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 431 (D.C. 2006) ("Potential recovery in tort for negligent hiring or retention of an employee is not based on *respondeat superior*, but rather on proof of negligence on the part of the employer himself.").  "As in any negligence action, a plaintiff seeking to establish negligent supervision [or

hiring] bears the burden of presenting evidence that establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of." *Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994).

At the outset, Defendants rely on *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006), for the proposition that these claims must be dismissed because there is no discernible standard of care for military conduct in wartime. *See* Defs.' Reply at 17. But here the applicable standard of care is that related to retaining and supervising security forces—not the standard of care for official wartime conduct itself. *See Whitaker*, 44 F. Supp. 2d at 1282 (holding that the question of what a reasonable person would do "in a combat zone, subject to military regulations and orders," "necessarily implicates the wisdom of the military's strategic and tactical decisions, a classic political question over which this Court has no jurisdiction"). The other elements of each claim must therefore be considered.

### i. Negligent hiring and retention

An employer has the legal duty to use ordinary care so as not to employ or retain an independent contractor it knew or should have known was negligent in performing the contract. *Ames v. Yellow Cab of D.C., Inc.*, No. 00-3116, 2006 U.S. Dist. LEXIS 67788, at *24 (D.D.C. Sept. 21, 2006) (citing *Fry v. Diamond Const., Inc.*, 659 A.2d 241, 248 (D.C. 1995)). Yet a "contractor's negligence in conducting the work it was hired to do creates no presumption that the employer was negligent in selecting the contractor." *Id.* An employer cannot be liable for negligent hiring if the employer conducts a reasonable investigation into the person's background or if such an investigation would not have revealed any reason not to hire that person. *Id.*

18

Here, a finder of fact could reasonably conclude that EMOI was negligent in hiring—or at least in retaining—its paid security forces.  There is sufficient evidence that EMOI should have known that the military security posed undue risks to local Indonesians near its Arun gas venture. When Mike Farmer, Manager of Exxon Mobil's Global Security Department, was asked his opinion of the soldiers, he testified that he "felt that they were not adequately trained to be doing the jobs that they were being asked to do to protect the critical assets."  Farmer Dep. 210:6–13, Pls.' Ex. 405.  One report noted that "[t]he military in general were undisciplined, lacked professional deportment and were not in any state of readiness."  Pls.' Ex. 268 at CA0001337405 (Stirling Group report to EMOI Security Manager).  Another EMOI report on security listed the following points of concern, among others:

> Local security forces ineffectual and often present as great a threat as the activists.

> The military presence is a double edged sword, with some military personnel acting as information brokers, thieves, extortionists, and intimidators.

> Military preference to remain secure, inside the wire results in a number of problems (boredom, harassment, improper conduct).

Pls.' Ex. 269 at CA0001171804–05.

Similarly, an internal EMOI e-mail discussing difficulties related to security at EMOI facilities remarked on "the poor reputation of the Indonesian military, especially in the area of respecting human rights and in their predilection for 'rogue'/clandestine operations."  Pls.' Ex. 172 at CA0001006104.  Further, there is evidence that the military personnel abused EMOI's other employees and contractors.  *See, e.g.*, Pls.' Ex. 271 (e-mail stating that two security guards "were physically beaten by soldiers"); Pls.' Ex. 272 (e-mail from EMOI President Wilson

19

enclosing a letter "regarding military intimidation of our employees"); Pls.' Ex. 341 at

CA0001046598 (letter from EMOI President Wilson stating that "troops reportedly forced their

way into the control room" of an EMOI production facility, "pulled the operator out of the room

at gunpoint," and reportedly told workers that "if the troops were to shoot everyone, no one

would know about it").  This evidence is sufficient to create a question for the trier of fact

regarding EMOI's potential negligent hiring and retaining of its paid security.

### ii.    Negligent supervision

An employer conducting activity through servants or other agents is liable for negligent

supervision if the employer is negligent or reckless (1) in giving improper or ambiguous orders

or in failing to make proper regulations; (2) in the employment of improper persons or

instrumentalities in work involving risk of harm to others; (3) in the supervision of the activity;

or (4) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether

or not servants or agents, upon premises or with instrumentalities under the person's control.

*Tarpeh-Doe*, 28 F.3d at 123 (citing Restatement (Second) of Agency § 213 (1957), *Murphy v.*

*Army Distaff Found., Inc.*, 458 A.2d 61, 64 (D.C. 1983)).

A trier of fact could reasonably conclude that EMOI is liable under the second type of

negligent supervision listed above—that is, that EMOI was negligent or reckless in the

"employment of improper persons or instrumentalities in work involving risk or harm to others."

First, the evidence discussed above, in the context of negligent hiring and retention, suffices for a

finding that EMOI was "negligent in employing" the military security forces.  Second, the

security work involved "risk or harm to others."  This work—providing armed security in a war-

like environment—might fairly be deemed "inherently dangerous" as a matter of law.  *See, e.g.,*

*Pusey v. Bator*, 762 N.E.2d 968, 974–75 (Ohio 2002) ("We . . . hold that when an employer hires

an independent contractor to provide armed security guards to protect property, the

inherently-dangerous-work exception is triggered such that if someone is injured by the weapon

as a result of a guard's negligence, the employer is vicariously liable even though the guard

responsible is an employee of the independent contractor."); Opinion of March 2, 2006 [dkt #

137] (noting that Defendants did not "rebut the idea that providing security in a country afflicted

by civil war may be inherently dangerous"); *but see Schreiber v. Camm*, 848 F. Supp. 1170, 1177

(D.N.J. 1994) ("Courts that have addressed the issue have concluded that the use of armed

security guards to protect one's property is not so inherently dangerous as to confer a

nondelegable duty upon the landowner.").  In any event, the particular evidence here would

support a finding that the work involves the risk of harm to others.  *See, e.g.*, Pls.' Ex. 269 at

CA0001171804 ("Local security forces ineffectual and often present as great a threat as the

activists.").  Thus, summary judgment on this claim is also inappropriate.

*             *             *

In sum, a reasonable trier of fact could conclude that EMOI is liable for each of the

alleged torts.  The next question is whether the three U.S. defendants could also be liable.

### 3.        Liability of the Three U.S. Defendants

To recap, Defendant Exxon Mobil (the ultimate parent corporation) is the parent of

Mobil, which is the parent of both ExxonMobil Oil and EMOI..  Plaintiffs contend that the U.S.

Defendants are liable for the torts alleged here on any of four bases.  The first two rest on

Plaintiffs' argument that the U.S. Defendants are liable for EMOI's acts because all the

Defendants are essentially a single legal entity—whether viewed under either (1) traditional veil-

piercing doctrine, or (2) the "integrated-enterprise" doctrine.  The other bases rest on Plaintiffs'

argument that, even if the U.S. Defendants and EMOI were distinct legal entities, the U.S.

Defendants are nonetheless liable on two independent grounds: (3) direct liability for their

actions as joint tortfeasors (or aiders and abettors) to EMOI's conduct, and (4) vicarious liability

due to EMOI's actions as their agent.

Plaintiffs' approach simply lumps the U.S. Defendants together as the "Parent

Companies."  But liability must be assessed with regard to each entity individually—even when

conducting a veil-piercing or agency analysis.  *See Roman Cath. Archbishop v. Sup. Court*, 15

Cal. App. 3d 405, 412 (1971) ("The 'alter ego' theory makes a parent liable for the actions of a

subsidiary which it controls, but it does not mean that where a parent controls several

subsidiaries each subsidiary then becomes liable for the actions of all other subsidiaries.")

(internal quotation marks omitted); *cf. Hvide Marine Int'l, Inc. v. Employers Ins. of Wausau*, 724

F. Supp. 180, 186 (S.D.N.Y. 1989) (discussing but not reaching proposed "new and broad

application" of veil-piercing doctrine to establish personal jurisdiction based on "triangulation"

theory involving two subsidiaries and single parent); *Court Appointed Receiver of Lancer*

*Offshore, Inc., v. Citco Fund Servs. (Curaco) N.V.*, No. 05-60080, 2008 U.S. Dist. LEXIS 25740,

at *68–74 (S.D. Fl. Mar. 31, 2008) (granting motion to dismiss one subsidiary "lump[ed]"

together with another subsidiary and their parent).

Looking at each Defendant separately, sufficient evidence exists to establish Exxon

Mobil's liability on the fourth ground noted above (i.e., that EMOI acted as Exxon Mobil's

agent).  Accordingly, the court assumes, without deciding, that Exxon Mobil and EMOI are

distinct legal entities.  *See Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1238 (N.D.

Cal. 2004) ("Unlike liability under the alter-ego or veil-piercing test, agency liability does not require the court to disregard the corporate form.").[1]  But Plaintiffs have failed to present sufficient evidence of liability particular to the other two U.S. Defendants—Mobil and ExxonMobil Oil.  Accordingly, they will be dismissed from this case.

### a.    Liability of Exxon Mobil—the Ultimate Parent

Whether a subsidiary is an agent of its parent corporation is a question that "defies resolution by 'mechanical formulae,' for the inquiry is inherently fact-specific."  *TransAmerica Leasing, Inc. v. La Republica De Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000).  "At a minimum, however,  . . . the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of stock in the subsidiary or making appointments to the subsidiary's Board of Directors."  *Id*.

A reasonable trier of fact could conclude that EMOI acted as Exxon Mobil's agent with regard to the military security for the huge Arun gas field.  Sufficient evidence demonstrates that Exxon Mobil exerted significant control over EMOI's security, particularly through Exxon Mobil's Global Security division.  For example, Exxon Mobil Vice President Lance Johnson wrote to Global Security Manger Mike Farmer that "we need to rework the entire security

---

[1]This is not to discount significant evidence in support of veil piercing.  *See, e.g.*, Pls.' Ex. 92 (overlapping officers and directors); Pls.' SMF ¶ 71 (Exxon Mobil's Global Security department implements security policies at EMOI); Pls.' Ex. 77 (EMOI's initial capitalization was only $1,000); Pls.' Ex. 93 (EMOI made "cash calls" to Exxon Mobil for funds).

philosophy for Aceh." Pls.' Ex. 60. Global Security evaluated EMOI's security policies and procedures in detail and prepared a report entitled "Indonesia Strategic Security Study," which Farmer sent to Johnson. Pls.' Ex. 241. Farmer noted that the report "identifies a range of critical tasks that must be completed quickly to position MOI to respond to ongoing and potential security concerns." *Id*. He further stated that, "[f]or each task, we have attached responsibility, recommended a target completion date, and indicated collaborative support required." *Id*. Another report stated that a key to risk reduction at EMOI was to "[e]nhance implementation of XOM [Exxon Mobil] standards by enforcing *uncompromising controls* across the board." Pls.' Ex. 320 at CA0001047341 (emphasis in original).

There is also evidence explaining why Exxon Mobil would exert so much control over EMOI's security: EMOI was a subsidiary "based on . . . exploring and producing oil and gas" and was not "equipped to handle all the issues that were cropping up" related to security. Johnson Dep. 56:21–57:21, Ex. 401. Thus, EMOI did not implement various security procedures without Exxon Mobil's significant guidance and participation. *See* Pls.' Ex. 241 ("To meet these very ambitious targets, MOI will require extensive support from global staff services, particularly Security, Human Resources, Public Affairs and Government Relations."). As Farmer stated in regards to the Indonesia Security Study, "The daily business demands on MOI staff and management make it difficult, if not impossible, to fully progress these items without external help." *Id*. EMOI had to look to its parent corporation in these instances: "If they said that they didn't have the resources and they had a significant problem, basically the only route that they had was to go up the chain and request additional corporate kinds of support." Farmer Dep. 54:2–6, Pls.' Ex. 405. Such a request of support is also consistent with Plaintiffs' stance

regarding EMOI's reliance on Exxon Mobil for funding in general, as EMOI made numerous "cash calls" to Exxon Mobil for greater funds.  Pls.' Ex. 93.

In sum, there is sufficient evidence for this agency question to reach a trier of fact.  *See Bowoto,* 312 F. Supp. 2d at 1222 (denying summary judgment to a U.S. oil company and its foreign subsidiary because there existed a genuine issue whether an agency relationship existed when the subsidiary engaged the Nigerian military to provide security protection).

### b.      Liability of Mobil and Exxon Mobil Oil—the Other Affiliates

By contrast, Plaintiffs' theories of corporate liability are insufficient as to Mobil and Exxon Mobil Oil.  Nearly all of Plaintiffs' allegations and evidence regarding corporate control over EMOI refer to *Exxon Mobil's* control as the ultimate parent, not any control by the other U.S. affiliates.  Plaintiffs have not set forth sufficient evidence from which a reasonable finder of fact could conclude that EMOI acted as these two affiliates' agent.  *See TransAmerica Leasing,* 200 F.3d at 849.  Similarly, Plaintiffs' allegations and evidence related to piercing EMOI's corporate veil are aimed upward to Exxon Mobil, not to the other affiliates; this is insufficient to establish that Mobil and Exxon Mobil Oil are merely alter-egos of EMOI.  *See Roman Cath. Archbishop ,*15 Cal. App. 3d at 412.  Finally, Plaintiffs do not set forth particularized evidence that these two U.S. affiliates took direct action that would make them liable as aiders and abettors.  *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). Thus, Mobil and Exxon Mobil Oil are entitled to summary judgment.

## B.      Pertamina is Not a Required Party, so Dismissal is Not Warranted.

Defendants next argue that they are entitled to summary judgment because: (1) Pertamina

(and its successor in interest, BPMIGAS, *see* Defs.' Br. at 6 n.7) is a required party to this suit; and (2) Pertamina, as an entity owned by the sovereign Indonesia, cannot be joined.  Under these circumstances, Defendants argue, the entire suit must be dismissed.  Not so.

Federal Rule of Civil Procedure 19, entitled "Required Joinder of Parties," sets forth a three-step process for the court to apply in this context: (1) the court determines if the absent entity is "required" to be joined in the suit, (2) if so, the court determines whether joinder is feasible (for example, joinder is not feasible where the absentee is immune from suit); and (3) if the absentee cannot be joined, the court must determine whether, "in equity and good conscience," the action should nonetheless proceed.  *See* Fed. R. Civ. P. 19.[2]

Defendants' fall short on the first step: Pertamina is not a required party.  Rule 19(a)(1) defines a "required party" as follows:

> (1)   *Required Party.*  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
>> (A)   in that person's absence, the court cannot accord complete relief among existing parties; or
>>
>> (B)   that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>
>>> (i)   as a practical matter impair or impede the person's ability to protect the interest; or
>>>
>>> (ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent

---

[2]Rule 19 was amended effective December 1, 2007.  The parties refer to language in the Rule that no longer exists, such as whether a party is "necessary" (as opposed to "required"), but the Rule's "the changes were stylistic only." *Rep. of the Philippines v. Pimentel*, 128 S. Ct. 2180, 2184 (2008) (noting agreement with the Advisory Committee's Notes on the amendment).

obligations because of the interest.

Fed. R. Civ. P. 19(a).  First, subsection (A) is not applicable because the court can accord "complete relief"—full compensatory and injunctive relief against the Defendants, should they ultimately be deemed liable.  Defendants' arguments that such relief could not bind Pertamina is irrelevant to this point.  *See Krieger v. Trane Co.*, 765 F. Supp. 756, 763 (D.D.C. 1991) (noting that it is well settled "that joint tortfeasors are not indispensable parties").  Second, subsection (B)(i) is not applicable because a judgment against Defendants would not require compensatory relief from Pertamina nor bind it to a particular course of action; thus, the action would not "impair or impede its ability to protect" its interest.  Finally, subsection (B)(ii) is not applicable because resolving this suit will not subject Defendants to a substantial risk of the sort of "inconsistent obligations" contemplated by the rule.

Defendants state that if this court issues an injunction, "EMOI could be left in the untenable position of being held in contempt by this Court or breaching its obligations under the [Production Sharing Contract], or even violating Indonesian law concerning the protection of national vital assets."  Defs.' Mem. at 30–31.  But the "inconsistent obligations" under Rule 19 are of a limited type: they occur "when a party is unable to comply with one court's order without breaching another court's order concerning the same incident."  *Delgado v. Plaza Las Ams.*, 139 F.3d 1, 3 (1st Cir. 1998).  Thus, potential conflict with the PSC is not relevant here.  Further, Plaintiffs' requested relief does not include stopping Defendants from doing business, nor would it require a violation of Indonesian law; rather, Plaintiffs request a limited injunction simply to stop "Defendants from further engaging in [the alleged] abuses against Plaintiffs and their fellow villagers."  Amended Compl. 42.  In sum, Pertamina is not a required party under Rule 19.

27

In any event, even if Pertamina were a required party, the court would "in equity and good conscience" conclude that the action should nonetheless proceed, particularly because any prejudice could be lessened by "shaping the relief" to compensatory damages and, perhaps, to limited injunctive relief against Defendants.  *See* Fed. R. Civ. P. 19(b); *cf. Rep. of the Philippines v. Pimentel*, 128 S. Ct. 2180, 2189, 2191 (2008) (noting that shaping relief to money damages against defendants can lessen prejudice but ultimately dismissing case under Rule 19(b) where, unlike here, absent foreign sovereign claimed rights to monies at issue in the litigation).

## C.     The Statutes of Limitations Do Not Bar Any Claims at This Stage

Defendants' final argument is that several claims of three Plaintiffs, John Does II, IV and V, are time-barred.  Specifically, they contend that the claims for battery (Claim 2), assault (Claim 3), arbitrary arrest, detention, and false imprisonment (Claim 4), negligence (Claim 5), and intentional infliction of emotional distress (Claim 6) are subject to a one-year statute of limitations, which, for these three Plaintiffs, expired before the filing of this suit on June 19, 2001.  Plaintiffs concede these points, but ask the court for equitable tolling to allow their claims to proceed.  They argue that equitable tolling is appropriate because of the "extraordinary circumstances" that existed in Aceh, Indonesia, at the time of the alleged torts.  Defendants reply that the District of Columbia does not recognize the doctrine of equitable tolling.

Equitable tolling, generally, allows a plaintiff to initiate an action beyond the statute of limitations under any of four conditions: (1) defendant's fraudulent concealment or misconduct lulled the plaintiff into allowing the filing deadline to pass (often called the "lulling doctrine"); (2) plaintiff, despite due diligence, was unable to discover vital information bearing on the existence of his or her claim (often called the "discovery rule"); (3) plaintiff actively pursued

28

judicial remedies by filing a defective pleading during the statutory period; or (4) extraordinary

circumstances prevented the plaintiff from filing despite his or her diligence.  Am. Jur. § 174 (2d

ed. 2008) (citing various jurisdictions); *see also Bowles v. Russell*, 127 S. Ct. 2360, 2369  (2007)

("Statutes of limitations may . . . be waived or excused by rules, such as equitable tolling, that

alleviate hardship and unfairness.") (Souter, J., dissenting) (citations omitted).

District of Columbia courts recognize a restricted equitable tolling doctrine.  They have

explicitly recognized the first two variations noted above: the lulling doctrine and the discovery

rule.  *See East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153, 156 (D.C. 1998).[3]  But

they have rejected the third (regarding defective pleadings), *see Sayyad v. Fawzi*, 674 A.2d 905

(D.C. 1996), and, at least to this court's knowledge, have never directly addressed the fourth

variation regarding "extraordinary circumstances."  To resolve the present question, this court

would have to predict whether the District of Columbia courts would recognize this

"extraordinary-circumstances" variation.  *See Novak v. Capital Mgmt. and Dev. Corp.*, 452 F.3d

902 (D.C. Cir. 2006) (noting that the federal courts reason by analogy from D.C. cases to predict

how the District of Columbia Court of Appeals would apply D.C. law).

Such a prediction is not yet necessary.  Even if the District of Columbia recognizes an

"extraordinary-circumstances" exception, it is not clear Plaintiffs are entitled to it.  Plaintiffs note

that "Indonesia was in a state of violent civil conflict," that "the Indonesian justice system was

closed to Plaintiffs," that "Plaintiffs were unaware that a forum was available in the United

---

[3]Defendants rely on a footnote in *Johnson v. Marcheta Investors L.P.*, which stated that
"District of Columbia law does not recognize the doctrine of equitable tolling."  711 A.2d 109,
111 n.2 (D.C. 1998).  That statement, however, is dicta and overstates the holding of the case
relied on for that proposition.  *See Bond v. Serano*, 566 A.2d 47, 50 (D.C. 1989) (declining to
apply equitable tolling in a particular context).

States," and that "there was and remains a significant fear of reprisal."  Pls.' Mem. at 54.  Yet

Plaintiffs also must provide some indication of why these particular Plaintiffs (John Does II, IV,

and V) were unable to file timely claims while the other Plaintiffs were able to do so.  The court

will not foreclose that opportunity at this stage because any prejudice to Defendants is minimal:

Even if these claims were barred, every Plaintiff would still remain in the suit because some of

their claims were timely filed.  Accordingly, Defendants' motion for summary judgment on this

basis will be denied without prejudice.  *Cf. East*, 718 A.2d at 161 (refusing to decide whether

equitable tolling applied because plaintiff would not be entitled to it in any event).

### III.  CONCLUSION

Plaintiffs have provided sufficient evidence, at this stage, for their allegations of serious

abuse.  Exxon Mobil and EMOI may be absolved of any wrongdoing.  But the law lays this

ultimate responsibility in the able hands of the fact finder.  As Justice Black has written, finders

of fact "are supposed to reach their conclusions on the basis of common sense, common

understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses

or proof of circumstances from which inferences can fairly be drawn."  *Schulz v. Penn. R. Co.*,

350 U.S. 523, 526 (1956).  No doubt that will be the case here.


Dated: August 27, 2008                              Louis F. Oberdorfer
                                                    UNITED STATES DISTRICT JUDGE