IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE I, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 01-1357 (RCL) |
| | ) | |
| EXXON MOBIL CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS, OR FOR SUMMARY JUDGMENT

Exxon Mobil Corporation and ExxonMobil Oil Indonesia, Inc. (collectively, "Defendants"), hereby respectfully move, pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure, to dismiss the state law claims in the Complaint as nonjusticiable under the political question doctrine and to enter judgment for Defendants. Defendants request oral argument on the motion.

In support of this motion, Defendants submit the attached memorandum of law, accompanying exhibits in support thereof, and a proposed order.

Washington, DC
January 21, 2009

Respectfully submitted,

_Martin Weinstein/ur_

Martin J. Weinstein (Bar No. 37792)
mweinstein@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC  20006
Tel:  (202) 303-1000
Fax:  (202) 303-2000

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
2001 K Street, NW, Fifth Floor
Washington, DC  20006
Tel:  (202) 223-7334
Fax:  (202) 223-7420

Paul W. Wright (Bar No. 20747)
paul.w.wright@exxonmobil.com
Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
Exxon Mobil Corporation
800 Bell Street
Houston, TX  77002

Attorneys for Exxon Mobil Corporation and
ExxonMobil Oil Indonesia Inc.

REDACTED PUBLIC VERSION

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE I, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 01-1357 (RCL) |
| | ) | |
| EXXON MOBIL CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS, OR FOR SUMMARY JUDGMENT

Martin J. Weinstein (Bar No. 37792)
mweinstein@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC  20006
Telephone:  (202) 303-1000
Facsimile:  (202) 303-2000

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W., Fifth Floor
Washington, DC  20036
Telephone:  (202) 223-7334
Facsimile:  (202) 223-7420

Paul W. Wright (Bar No. 111971)
Paul.W.Wright@exxonmobil.com
-and-
Patrick J. Conlon (Bar No. 414621)
Patrick.J.Conlon@exxonmobil.com
Exxon Mobil Corporation
800 Bell Street
Houston, TX  77002

Attorneys for Defendants
Exxon Mobil Corporation and
ExxonMobil Oil Indonesia Inc.

REDACTED PUBLIC VERSION

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ......................................................................1

BACKGROUND ..........................................................................................5

    A.    Relevant Procedural History.............................................................5

    B.    Preclusion of Discovery in Indonesia ...............................................7

    C.    Appellate Courts' Reliance on the Limitations Imposed by the District
        Court in Dismissing Defendants' Appeal .................................12

    D.    Parties' Agreement That Indonesian Discovery Is Necessary Before Trial
        .................................................................................13

ARGUMENT...............................................................................................14

I.    THE REMAINING DISPUTED FACTUAL ISSUES REQUIRE DISCOVERY
AND ADJUDICATION OF THE ACTIONS OF INDONESIAN GOVERNMENTAL
INSTITUTIONS ..........................................................................................15

II.    DISCOVERY IN INDONESIA IS NECESSARY BEFORE A TRIAL...............19

    A.    Plaintiffs Do Not Dispute That Indonesian Discovery Is Necessary.........20

    B.    Forcing Defendants To Go To Trial Without An Opportunity to Defend
        Themselves Would Deny Defendants Due Process...................................25

CONCLUSION...........................................................................................28

REDACTED PUBLIC VERSION

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arch* v. *The American Tobacco Co., Inc.*,
175 F.R.D. 469 (E.D.Pa. 1997)............................................................27

*Baker* v. *Carr*,
369 U.S. 186 (1962)............................................................................23

*Baltimore & Ohio R. Co.* v. *United States*,
298 U.S. 349 (1936)............................................................................26

*Bauldock* v. *Davco Food, Inc.*,
622 A.2d 28 (D.C. 1993) ..............................................................18, 19

*Doe I* v. *Exxon Mobil Corp.*,
393 F. Supp. 2d 20 (D.D.C. 2005)...................................................9, 13

*Doe I* v. *Exxon Mobil Corp.*,
473 F.3d 345 (D.C. Cir. 2007)..........................................................12

*Exxon Mobil Corp.* v. *Doe*,
128 S. Ct. 2931 (2008).....................................................................13

*Exxon Mobil Corp.* v. *Doe*,
No. 07-81, (U.S. Jan. 8, 2008) ........................................................12

*Goldberg* v. *Kelly*,
397 U.S. 254 (1970)....................................................................26, 27

*Jenkins* v. *McKeithen*,
395 U.S. 411 (1969).........................................................................26

*Joo* v. *Japan*,
413 F.3d 45 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1418 (2006) ..............2, 24

*Lande* v. *Menage Ltd. Partnership*,
702 A.2d 1259 (D.C. 1997) ....................................................17, 18, 19

*In re Masonite Corp. Hardboard Siding Prod. Liab. Litig.*,
170 F.R.D. 417 (E.D. La. 1997) .......................................................26

*Mathews* v. *Eldridge*,
424 U.S. 319 (1976)..........................................................................26

*Morrissey* v. *Brewer,*
        408 U.S. 471 (1972)..................................................................................26

*Morgan* v. *United States,*
        304 U.S. 1 (1938).....................................................................................26

*Mujica* v. *Occidental Petroleum Corp.,*
        381 F.Supp.2d 1164 (C.D.Cal. 2005) ......................................................25

*In re Oliver,*
        333 U.S. 257 (1948).................................................................................26

*Ex parte Republic of Peru,*
        318 U.S. 578 (1943).................................................................................24

*Romero* v. *Drummond Co., In*c.,
        --F.3d --, 2008 WL 5274192 (11th Cir. 2008)......................................25

*Safeway Stores, Inc.* v. *Kelly,*
        448 A.2d 856 (D.C. 1982) ......................................................................17

*Sarei* v. *Rio Tinto PLC.,*
        221 F. Supp. 2d 1116 (C.D. Cal 2002) *(remanded on other grounds by ---*
        F.3d---, 2008 WL 5220286 (9th Cir. Dec. 16, 2008)) .........................24

*Sosa* v. *Alvarez-Machain,*
        542 U.S. 692 (2004)..............................................................................2, 24

*Tel-Oren* v. *Libyan Arab Republic,*
        726 F.2d 774 (D.C. Cir. 1984) ................................................................23

*In re Terrorist Attacks on September 11, 2001,*
        538 F.3d 71 (2d Cir. 2008) .....................................................................25

*In re the Complaint of Bankers Trust Co.,*
        752 F.2d 874 (3d Cir. 1984) ...................................................................25

*Thompson* v. *Madison County Bd. of Educ.,*
        476 F.2d 676 (5th Cir. 1973) ..................................................................26

*Wells* v. *Washington Market Co.,*
        19 D.C. (8 Mackey) 385 (1890)..............................................................18

*Whiteman* v. *Dorotheum GmbH & Co. KG,*
        431 F.3d 57 (2d Cir. 2005) .....................................................................25

REDACTED PUBLIC VERSION

## OTHER AUTHORITIES

Fed. R. Civ. P. 12...................................................................................................1

Fed R. Civ. P. 56....................................................................................................1

Production Sharing Contract ¶ 5.3(c) ...............................................................15

Exxon Mobil Corporation ("EMC") and ExxonMobil Oil Indonesia, Inc. ("EMOI") (collectively, "Defendants"), respectfully submit this memorandum in support of their motion, pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure, to dismiss the state law claims in the Complaint as nonjusticiable under the political question doctrine and to enter judgment for Defendants.

## PRELIMINARY STATEMENT

Eleven Indonesian villagers (or their next of kin), who reside in Aceh, Indonesia, seek to adjudicate in this Court claims arising out of alleged atrocities committed by Indonesian soldiers during a civil war in Aceh.  Plaintiffs demand from EMOI – and its ultimate parent corporation, EMC – compensatory and punitive damages for the alleged conduct of Indonesian soldiers.  But Plaintiffs do not allege that Defendants participated in, or directed, any acts that caused them harm.  Plaintiffs claim only that Defendants should be held liable vicariously for the conduct of the Indonesian soldiers during an Indonesian civil war because EMOI – an operator of an Aceh natural gas facility under contract to the Indonesian state-owned oil and gas company – "employed" the Indonesian soldiers by making contractually required payments for the cost of security arranged by the Government of Indonesia.

Defendants have argued throughout this litigation – including on interlocutory appeal – that Plaintiffs' claims require this Court to adjudicate the conduct of Indonesian military during a time of violent civil war in Aceh, and that such claims are nonjusticiable under the political question doctrine.  Between 2002 and 2005, the United States Government submitted three separate Statements of Interest to this Court warning the Court each time that "adjudication of this lawsuit at this time would in fact risk a

1

potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." (*See, e.g.*, Docket No. 38 at 1.)[1]  The Government of Indonesia also repeatedly issued diplomatic notes objecting to this litigation as "unacceptable" to its sovereignty.  (*See, e.g.*, Docket Nos. 38; 91; 244, Ex. H.)

When the Executive concludes that adjudication of a case would adversely affect U.S. foreign relations, the case should be dismissed as nonjusticiable under the political question doctrine.  *See, e.g., Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004); *Joo* v. *Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1418 (2006).  Here, after considering the Executive Branch's stated foreign policy concerns, Judge Oberdorfer dismissed all of Plaintiffs' claims raised under the Alien Tort Statute ("ATS") and dismissed all claims against PT Arun LNG Co. ("PT Arun"), an "entity that is 55% owned by Pertamina, Indonesia's state-owned oil and gas company."  (Docket No. 103 at 8, 11-12, 14.)  The Court reasoned, in part, that adjudicating the ATS claims would require the Court to "evaluate the policy or practice of [a] foreign state" and that "assessing whether Exxon is liable for these international law violations would be an impermissible intrusion in Indonesia's internal affairs."  (*Id.* at 8.)  For similar reasons, the Court also found that the claims against PT Arun were nonjusticiable.  (*Id.* at 14.)

The Court, however, declined to dismiss Plaintiffs' state law tort claims arising out of the same alleged conduct.  In Judge Oberdorfer's view, the case could be

---

[1]   For the Court's convenience, Defendants are enclosing the docket entries referenced in this Memorandum in an accompanying volume of exhibits ("Exhibits Volume"), in numerical order by docket entry.  References in this Memorandum that do not have an associated docket entry in this litigation are enclosed in the Exhibits Volume under letter tabs, following the docket entries.

"tailored to a narrower question:  did U.S. corporations in their effort to secure their pipeline in Indonesia violate U.S. state tort law?" (*id.* at 16), and "[l]itigation and discovery on this issue, if conducted with care, should alleviate the State Department's concerns about interfering with Indonesia's sovereign prerogatives." (*Id.*)  The Court apparently believed that this resolution was consistent with the views of the State Department that the risks posed by the litigation to U.S. foreign policy were "necessarily predictive and contingent" on such questions as the intrusiveness of discovery and whether adjudication of the suit would require "judicial pronouncements on the official actions of the [Government of Indonesia] with respect to its military activities in Aceh." (*Id.* at 3.)

Nonetheless, the Court excluded all discovery in Indonesia in deference to the State Department's statement that any discovery that even "aired" the alleged conduct of the Indonesian military could create instability in Indonesia, and thereby "trigger" the same concerns that led to the dismissal of the federal law claims and all claims against PT Arun.  (*See* Docket No. 91.)  Limited discovery permitted by the Court, of information and materials outside of Indonesia, has now concluded.

Recent developments in this case make clear that the state law claims cannot be adjudicated on the basis set forth by the Court, *i.e.*, without intruding on Indonesia's internal affairs, or under the limited discovery permitted by the Court, and must be dismissed as nonjusticiable under the political question doctrine.

*First,* Judge Oberdorfer's August 2008 decision, which denied Defendants' motions for summary judgment, makes clear that the disputed factual issues that remain for trial require judicial scrutiny and adjudication of the Indonesian

3

Government's conduct, including the conduct of its military and of Pertamina.  Such inquiry and adjudication, however, would trigger the same concerns that caused the Court to dismiss all of Plaintiffs' federal claims and all claims against PT Arun.

*Second*, having now completed the limited discovery that was permitted by the Court, both parties are in agreement that investigation and discovery in Indonesia is a prerequisite for a trial.  Defendants, in particular, have been denied any opportunity even to investigate the basic allegations of the Complaint in Indonesia, which is critical to their ability to defend themselves here.

Judge Oberdorfer may have assumed, at the outset, that the case could be narrowed to simulate a garden-variety D.C. tort case involving the conduct of a private corporation and private security providers.  The progression of the case and the facts developed under the limited discovery have demonstrated, however, that the conduct underlying the state law claims is inextricably intertwined with the conduct of the Indonesian Government, and that the case cannot proceed without intruding on Indonesian sovereignty.

This Court's prior orders, however, preclude any efforts to expand the scope of this case.  Such an expansion, in any event, would be prohibited under the political question doctrine.  Finally, any effort to force Defendants to go to trial based only on the limited record developed to date would deny Defendants due process.

For the reasons set forth below, the remaining state law claims must be dismissed.

## BACKGROUND

A.     <u>Relevant Procedural History</u>

Plaintiffs filed their Complaint in June 2001.  (Docket No. 3.)  Defendants moved to dismiss the Complaint, arguing, in part, that the claims are nonjusticiable under the political question doctrine.  (Docket No. 13 at 31-37.)  Before ruling on the motion to dismiss, Judge Oberdorfer sought the views of the United States Department of State as to whether this litigation would negatively impact U.S. foreign policy.  (May 10, 2002 letter, attached as Tab G to the Exhibits Volume.)  In response, on July 29, 2002, the State Department filed a Statement of Interest (the "2002 Statement").  (Docket No. 38.) In the 2002 Statement, the State Department stated that "adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism."  (*Id.* at 1.)  Specifically, the State Department stated:

- "We anticipate that adjudication of this case will be perceived in Indonesia as a U.S. court trying the [Government of Indonesia] for its conduct of a civil war in Aceh." (*id.* at 2);

- "Indonesia is the fourth largest state in the world, with a population of some 210 million.  It is also the largest Muslim nation, and serves as a focal point for U.S. initiatives in the ongoing war against Al Qaida and other dangerous terrorist organizations.  U.S. counter-terrorism initiatives could be imperiled in numerous ways if Indonesia and its officials curtailed cooperation in response to perceived disrespect for its sovereign interests," (*id.* at 3);

- "This litigation appears likely to further discourage foreign investment, particularly in extractive industries in remote or unstable areas that require security protection.  This, in turn, could have decidedly negative consequences for the Indonesian economy . . . . Litigation in the U.S. that discourages further investment in Indonesia poses a risk of weakening the Indonesian economy in conflict with . . . U.S. goals," (*id.* at 4-5);

- "The [State] Department will continue to work vigorously to bring such [human rights] abuses to an end through diplomatic and other means . . . . The

5

United States also is actively seeking to assist Indonesia in reform efforts aimed at ending the kinds of abuses alleged in this litigation. . . . Should the [Government of Indonesia] withdraw from these programs in reaction to the litigation, it will impact adversely on our goal of improving Indonesia's treatment of all members of its population, including the people of Aceh." (*Id.* at 2-3.)

The 2002 Statement also enclosed a letter from the Indonesian Ambassador to the United States, which stated that Indonesia "cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution, cq [sic] the Indonesian military, for operations taking place in Indonesia." (*Id.*)  Both the United States and Indonesia have reiterated their objections several times throughout this litigation.  (*See, e.g.*, Docket No. 62 (July 2003 Statement of Interest) at 2; Docket No. 91 (State Department's July 2005 Statement of Interest).)

After reviewing the concerns of the Executive Branch concerning U.S. foreign affairs, Judge Oberdorfer dismissed the ATS claims.  Specifically, the Court declined to adjudicate the genocide and crimes against humanity claims because doing so would require "the court to evaluate the policy or practice of the foreign state."  (Docket No. 103 at 8.)  Similarly, in connection with the ATS claims for arbitrary detention, torture, and extrajudicial killings, the Court declined to adjudicate any alleged joint action between EMOI and the Indonesian military:

> determining whether defendants engaged in joint action with the Indonesian military necessarily would require judicial inquiry into precisely what the two parties agreed to do.  For reasons explained above, *such an inquiry cuts too close to adjudicating the actions of the Indonesian government, and for that independent reason, should be avoided on justiciability grounds.*

(*Id.* at 11-12 (emphasis added).)  Thus, the Court held, even inquiring whether Defendants acted jointly with the Indonesian military would "cut too close" to

adjudicating the actions of the Indonesian Government, and must be avoided.

The Court also dismissed all claims against PT Arun, an entity that is 55% owned by Pertamina,[2] an Indonesian state-owned gas and oil company, because litigation against PT Arun "would create a significant risk of interfering in Indonesian affairs and thus U.S. foreign policy concerns." (*Id.* at 14.)

The Court, however, declined to dismiss Plaintiffs' state law claims, which asserted that Indonesian soldiers, allegedly acting as Defendants' "security forces", committed murder, torture, sexual assault, battery, and other torts. Explaining that the State Department had not requested a dismissal of the case outright, the Court held that the case could be tailored "to a narrower question: did U.S. corporations in their effort to secure their pipeline in Indonesia violate U.S. state tort law?" (*id.* at 16), and that "[l]itigation and discovery on this issue, if conducted with care, should alleviate the State Department's concerns about interfering with Indonesia's sovereign prerogatives." (*Id.*) The Court stressed that "the parties are to tread cautiously" so as not to interfere with "Indonesia's sovereign prerogatives," and explained that discovery was to be "conducted in such a manner so as to avoid intrusion into Indonesian sovereignty" and would remain under the Court's "firm control." (*Id.* at 15.)

B.    Preclusion of Discovery in Indonesia

Although the Court permitted the state law claims to proceed, the Court nonetheless precluded discovery – indeed, any action – in Indonesia in deference to the

---

[2]    After a reorganization in 2003, Pertamina's rights and responsibilities were ceded by the Indonesian Government to another 100% Indonesian state-owned entity, BPMIGAS. (*See* Declaration of Peter Coleman ¶ 5, attached as Tab A to the accompanying Exhibits Volume.) In this Memorandum, Pertamina and BPMIGAS are used interchangeably.

concerns expressed by the State Department. Before adopting a discovery plan, in May 2005, the Court held a status conference to address how discovery could proceed in this case given the concerns raised by the State Department. As the Court acknowledged, the case focused squarely on the conduct of Indonesian soldiers during a period where "Aceh was experiencing violent civil conflict as the Geraken Aceh Merdeka ("GAM") separatist movement demanded independence from the Indonesian Government in Jakarta." (Docket No. 365 at 3), and inevitably, the focus of discovery would be on the conduct of the Indonesian military.

At the May 2005 conference, the United States Government explained its concerns about the impact of discovery in this case on U.S. foreign affairs:

> [Assistant United States Attorney] STRAND: I don't want to anticipate what the State Department's response would be to a particular procedure that has not been outlined yet, *but in general, the concern is with discovery taking place at all.* The Indonesian ambassador has written a letter to the State Department.
>
> THE COURT: I think I have seen that.
>
> MR. STRAND: Indicating that *any adjudication of this, including the discovery process, which would air information on what the security forces did would not only be an affront to them, but also would possibly create instability in Indonesia* because Indonesia is looking for cohesion right now in a time when there are strong secessionist movements, and *if information came out through this discovery process that military forces had been involved in these types of abuses, that would raise the very concern that the Indonesian government has expressed to the State Department.*

(Transcript of Status Conference on May 4, 2005 before the Hon. Louis F. Oberdorfer

REDACTED PUBLIC VERSION

("5/4/05 Tr.") at 13 (emphasis added).)[3]  The U.S. Government thus stated that even the

airing through the discovery process of what the Indonesian military allegedly did would

adversely affect U.S. foreign policy by creating instability in Indonesia.

Following this conference, Judge Oberdorfer directed Plaintiffs to submit

a proposed discovery plan, which was provided to the State Department and the

Indonesian Government for review and comment.  (Docket No. 85.)  After reviewing

Plaintiffs' proposed discovery plan – which sought extensive discovery in Indonesia,

although not directly from the Government of Indonesia – the State Department

submitted a second Statement of Interest, in which it advised the Court that:

> The proposed discovery plan triggers the concerns set forth
> in the State Department letter of July 2002, *which remain
> valid today.*

(Docket No. 91 at 1 (hereinafter, "2005 Statement") (emphasis added).)  The 2005

Statement also enclosed a new diplomatic note from the Government of Indonesia, which

stated that "limited discovery as proposed by the plaintiffs is *unacceptable* to Indonesia."

(*Id.* at 2 (emphasis added).)

Subsequently, Judge Oberdorfer issued an order dismissing Plaintiffs'

federal claims but retaining the state law claims.  *Doe I* v. *Exxon Mobil Corp.*, 393 F.

Supp. 2d 20 (D.D.C. 2005) (Docket No. 103).  Defendants moved for a stay of

proceedings pending their appeal to the D.C. Circuit, arguing that *any* discovery would be

prejudicial as the security documents sought by Plaintiffs, for example, were owned by

the Government of Indonesia and protected from disclosure by Indonesian law.  (*See*

Docket No. 108 at 14.)  The Court denied Defendants' motion, noting that discovery

---

[3]   A copy of the 5/4/05 Tr. is attached as Tab B to the Exhibits Volume.

would not irreparably harm Defendants.  The Court reasoned that the United States had

not objected to discovery in absolute terms, but had "carefully qualified its position,

explaining that its assessment was 'necessarily predictive and contingent' on how the

case proceeded, including the intrusiveness of discovery and the extent to which the case

required 'judicial pronouncements on the official actions of the [Government of

Indonesia] with respect to its military activities in Aceh.'"  (Docket No. 109 at 2.)

Judge Oberdorfer then ordered the parties to meet and confer on a joint

discovery plan, and to submit such a plan to Magistrate Judge Kay.  (Docket No. 118,

vacated by Dec. 21, 2005 Order (Docket No. 120), as revised by the Court's order of Jan.

17, 2006.)[4]  The parties submitted their document discovery plans and objections to

Magistrate Judge Kay on February 23, 2006.  (Docket No. 131.)  Defendants' plan sought

to limit discovery to the issues of "(i) whether this Court may exercise personal

jurisdiction over Defendant ExxonMobil Oil Indonesia . . . and (ii) to what degree the

non-EMOI defendants were aware of, and involved in, EMOI's activities."  (*Id.* at 3.)

Plaintiffs' plan, by contrast, sought broad discovery in Indonesia without any subject

matter limits.  (*Id.* at 2.)

On March 6, 2006, Magistrate Judge Kay issued a discovery plan adopting

many of Defendants' proposals, including the limitation of the subject matter to whether

there is personal jurisdiction over EMOI and whether there were acts or omissions of the

U.S. Defendants that were the proximate cause of Plaintiffs' injuries.  Importantly,

Magistrate Judge Kay also "exclude[d] documents physically located in Indonesia."

---

[4]   Judge Oberdorfer formally referred the case to Magistrate Judge Alan Kay for
discovery management on Jan. 4, 2006.  (Minute order, Jan. 4, 2006, attached as Tab
D to the Exhibits Volume.)

(Docket No. 138 at 4.)

Plaintiffs objected to, and appealed, Magistrate Judge Kay's decision to Judge Oberdorfer, who held a hearing on May 1, 2006. Immediately following the hearing, Judge Oberdorfer affirmed Magistrate Judge Kay's limitations on discovery, stating that "the proposed Order [Docket No. 158] *avoided discovery in Indonesia*" so that it "does not implicate the concerns of the U.S. State Department or Indonesian government." (Docket No. 159 at 2 (emphasis added).) That Judge Oberdorfer did not want parties to take *any action* in Indonesia was made clear during the hearing by his denial even of Plaintiffs' request that EMOI be required to create a "log with respect to documents in Indonesia." (Transcript of Status Conference on May 1, 2006 before the Hon. Louis F. Oberdorfer ("5/1/06 Tr.") at 21.)[5] Judge Oberdorfer stated that "the indexing of [EMOI's documents], if they don't already have an index, *requires action in Indonesia*," (*id.* at 22 (emphasis added)), which he did not want to require.[6]

In summary, this Court precluded discovery – indeed, any action – in Indonesia in deference to the concerns raised by the Executive Branch that the airing of what Indonesian military did through the discovery process could destabilize that country and adversely impact U.S. foreign policy interests.

---

[5]    A copy of the 5/1/06 Tr. is attached as Tab E to the Exhibits Volume.

[6]    Judge Oberdorfer permitted Defendants to disclose documents from Indonesia if they obtained the consent of the GOI-owned oil companies, BPMIGAS and MIGAS. (Docket No. 158 at 2.) BPMIGAS already had advised Defendants, however, that they do not consent to any disclosure of such documents. (*See* Docket No. 93, attaching August 9, 2005 Declaration of Richard C. Vint ¶ 8 and August 8, 2005 letter from BPMIGAS.)

REDACTED PUBLIC VERSION

C.   Appellate Courts' Reliance on the Limitations Imposed by the District Court in Dismissing Defendants' Appeal

Defendants appealed the portion of the Court's decision denying their motion to dismiss the state law claims, and, in the alternative, sought a writ of mandamus.  The D.C. Circuit dismissed the appeal under the collateral order doctrine, and also denied mandamus relief.  In denying mandamus relief, the Court of Appeals accorded significant weight to the fact that only narrow discovery had been authorized by the Court, and that no discovery had been permitted in Indonesia.  *See Doe I* v. *Exxon Mobil Corp.*, 473 F.3d 345, 353-54 (D.C. Cir. 2007) ("At the outset, we note that ... the district court has greatly curtailed discovery in this case; for example, Exxon will not be required to produce documents from its Indonesian operations unless it receives all 'necessary authorizations' from the Indonesian government.  The district court imposed this limitation to ensure that there would be no discovery of documents that the Indonesian government deems classified or confidential.").

Defendants subsequently petitioned for review by the United States Supreme Court and applied for a stay of discovery while the petition was pending.  In denying the stay request, the Chief Justice of the United States specifically noted that the denial was based on "the limitation on the current phase of discovery imposed by the District Court," and was "without prejudice to renewal" in light of further proceedings. *Exxon Mobil Corp.* v. *Doe*, No. 07-81, Denial of Petition for Stay of Discovery (U.S. Jan. 8, 2008) (Roberts, C.J., in chambers).

Before acting on the petition for *certiorari*, the Supreme Court called for the views of the Solicitor General.  In his response, the Solicitor General recommended denial of *certiorari,* pointing to the District Court's "avoiding discovery in Indonesia".

(Brief for the United States as *Amicus Curiae* at 5, *Exxon Mobil Corp.* v. *Doe*, 128 S. Ct. 2931 (2008), 2008 WL 2095734 at *14 ("In a case like this, when the United States identifies the manner in which further proceedings in the district court will interfere with foreign policy interests, an order designed to limit proceedings to that extent, but not going further, need not be automatically appealable.")) The Supreme Court ultimately denied Defendants' petition for *certiorari*. *See Exxon Mobil Corp.* v. *Doe*, 128 S. Ct. 2931 (2008).

In summary, the discovery limitations imposed by Judge Oberdorfer were critical to the appellate determination to allow this case to proceed.

D.    <u>Parties' Agreement That Indonesian Discovery Is Necessary Before Trial</u>

While Defendants' appeal was winding its way through the courts, the parties proceeded with the limited discovery that was permitted by the Court over Defendants' objection. This limited discovery, which focused solely on the conduct of the U.S. Defendants and the basis, if any, for personal jurisdiction over EMOI, had been permitted by the Court in the apparent belief that the state law claims could be tried with only the limited discovery, *i.e.*, without discovery in Indonesia. *See Doe* v. *Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 30 (D.D.C. 2005) ("*It should be feasible, for instance, for plaintiffs to perpetuate testimony and satisfy document discovery requirements outside Indonesia.*") (emphasis added). But the facts developed to date plainly demonstrate otherwise, and even Plaintiffs now disagree with the Court's premise.

At the conclusion of the limited discovery, Defendants moved for summary judgment and to dismiss EMOI for lack of personal jurisdiction. (Docket Nos. 269, 268.) The District Court denied Defendants' motions in July and August 2008.

(Docket Nos. 340, 365.)  The Court then invited the parties to submit statements as to how the case may proceed, and whether the case was ripe for trial.  (Docket No. 367.) The parties submitted separate statements in September 2008, but agreed that the case was not ready for trial, and that additional discovery in Indonesia was necessary.  (*See* Docket Nos. 377, 378.)  Defendants, in particular, advised the Court that they have not had an opportunity to conduct any factual investigation into the allegations underlying the Complaint due to the restrictions imposed by the Court.  (*See* Docket No. 377 at 3 & n.2.)  While Plaintiffs disputed the extent of discovery required in Indonesia and how long such discovery may take, Plaintiffs agreed "that some additional discovery, as requested by Defendants, is appropriate before trial."  (Docket No. 378 at 1.)  Indeed, Plaintiffs themselves apparently seek extensive discovery in Indonesia, including "depositions of and document requests to potential lay witnesses," and "appropriate discovery of . . . EMOI, outside the parameters of completed Phase I discovery."  (*Id.* at 2.)[7]

## ARGUMENT

Judge Oberdorfer sought to hear Plaintiffs' claims while at the same time heeding the warnings of the Executive Branch about the negative impact of this litigation on U.S. foreign policy.  He did so by dismissing claims and parties that would require the Court to make pronouncements on the internal affairs of Indonesia, and by excluding any discovery or activity in Indonesia entirely, on the apparent belief that such narrowing

---

[7]   Incidentally, the discovery sought by Plaintiffs in their post-summary judgment statement (*see* Docket No. 378 at 2-3), is no different in kind or scope than the discovery sought by Plaintiffs in their proposed plan in 2005 (Docket No. 86), which prompted the State Department to submit its 2005 Statement and warn that the proposed discovery plan may adversely impact U.S. foreign policy.  (*See supra* at 9.)

REDACTED PUBLIC VERSION

would permit the case to go forward without interfering with U.S. foreign policy. It has

now become clear, however, that it is impossible to proceed to the next phase of

discovery or to adjudicate the claims without intruding on Indonesian sovereignty. A

review of the Court's decision denying Defendants' summary judgment motion makes

clear that numerous disputed issues of fact require a trier of fact to evaluate the conduct

of the Indonesian Government. More importantly, such issues require extensive

investigation and discovery in Indonesia, which Defendants have been precluded from

conducting, but which is critical to Defendants' ability to defend against Plaintiffs'

claims in this case.

## I.   THE REMAINING DISPUTED FACTUAL ISSUES REQUIRE DISCOVERY AND ADJUDICATION OF THE ACTIONS OF INDONESIAN GOVERNMENTAL INSTITUTIONS

In dismissing the federal claims, the Court stated that any inquiry that cuts

too close to adjudicating the actions of the Indonesian Government should be avoided on

justiciability grounds. (Docket No. 103 at 11-12.) The Court's summary judgment

decision now demonstrates, however, that such inquiries are unavoidable given the

factual disputes that must be resolved at trial.

For example, the Court acknowledged in its summary judgment decision

that in determining EMOI's relationship to the Indonesian soldiers at issue, a trier of fact

would have to pass on the "joint action" of EMOI and Pertamina – Indonesia's state-

owned oil and gas agency – which had the responsibility for arranging security for the

Arun facility. The Court noted that under the Production Sharing Contract ("PSC") that

governed the relationship between EMOI and Pertamina, "Pertamina agreed to 'assist and

expedite [EMOI's] execution of' gas extraction and production 'by providing . . . security

15

protection . . . as may be requested by [EMOI].'"  (Docket No. 365 at 3 (*quoting* PSC

¶5.3(c)).)  The Court then expressly noted Pertamina's joint role, in finding that a trier of

fact could conclude that a master-servant relationship existed between the Indonesian

soldiers and EMOI:

> *True, Pertamina exercised control over the military as*
> *well; but that simply means that a finder of fact could*
> *conclude that EMOI is fully liable as a joint employer. . . .*
> There is sufficient evidence that EMOI had at least such a
> joint role, up to and including management of security
> affairs.

(Docket No. 365 at 15 (internal citations omitted, emphasis added).)  The Court already

ruled, however, that any inquiry into whether EMOI engaged in joint action with an

Indonesian governmental institution would cut too close to adjudicating the conduct of

Indonesian Government and should be avoided on justiciability grounds.  (*See* Docket

No. 103 at 11-12 ("such an inquiry [whether EMOI acted jointly with the Indonesian

military] cuts too close to adjudicating the actions of the Indonesian government, and for

that independent reason, should be avoided on justiciability grounds.").)

      Another disputed factual issue that would require the trier of fact to assess

the conduct of the Government of Indonesia is who had control over the selection,

engagement, and activities of Indonesian soldiers who protected the gas facilities

operated by EMOI in Arun.  As the Court recognized in its summary judgment decision,

"the Indonesian Government may designate an asset as a 'Vital National Object,' which

requires military security protection. . . . Defendants contend that, since 1983, the

Indonesian Government has designated the Arun Field such a Vital National Object. . . .

Plaintiffs argue, however, that Defendants were not required to contract for the use of the

military to protect the Arun Field."  (Docket No. 365 at 2-3.)  This disputed fact is highly

relevant because the right to control and direct the servant is a critical factor in determining the existence of a master-servant relationship under D.C. law.[8]  (*See id.* at 10, *citing Safeway Stores, Inc.* v. *Kelly,* 448 A.2d 856, 860 (D.C. 1982).)  Therefore, an important issue for investigation and discovery in Indonesia is whether the Government of Indonesia controlled the selection, deployment and training of the soldiers at issue, and directed their day-to-day activities through military chain of command.[9]

Other remaining factual disputes also require the trier of fact to assess the policy or practice of the Indonesian Government.  For example, a trier of fact must assess the mission and objective of each Indonesian soldier who allegedly committed the torts alleged in the Complaint.  This is because a critical disputed fact is whether the

---

[8]   Judge Oberdorfer previously determined, over Defendants' objection, that D.C. law applies to Plaintiffs' common law claims, and that Delaware law applies to Plaintiffs' wrongful death claim.  (Docket No. 137.)  Judge Oberdorfer reasoned that "the *United States* has an overriding interest in applying its own laws to . . . U.S. companies," "particularly its super-corporations conducting business in one or more foreign countries." (*Id.* at 3 (emphasis added).)  Defendants do not concede that D.C. or Delaware law applies to Plaintiffs' claims, and reserve their right to seek reconsideration of Judge Oberdorfer's choice-of-law decision, among others, if this Court denies the instant motion.

[9]   Defendants argued in their summary judgment motion that Judge Oberdorfer already had ruled, in dismissing Plaintiffs' federal claims, that EMOI lacked sufficient control over the Indonesian military, and therefore the prior ruling was the law of the case. (*See* Docket No. 269 at 12-13; *see also* Docket No. 311 at 5-6.)  The Court, however, distinguished its prior ruling, stating that it had found only that "Plaintiffs failed to allege that Defendants – private entities – controlled Indonesia's *official military actions.*" (Docket No. 365 at 11 (emphasis in original).)  In the Court's view, the question on summary judgment was different:  "whether EMOI had sufficient control over the military forces *assigned to it* (some of whom may have even acted *contrary* to official Indonesian military action)." (*Id.* (emphasis in original).)  Respectfully, Defendants submit that the distinction is without difference because under D.C. law, public law enforcement officers are deemed always to be on duty regardless of who is paying for their services at a particular time, and their acts undertaken in their public function cannot be attributed to their private employers.  (*See infra* at 18-19; *Lande* v. *Menage Ltd. Partnership*, 702 A.2d 1259, 1261 (D.C. 1997).)

Indonesian soldiers alleged to have committed the torts were even assigned by the Government (or, as Plaintiffs allege, EMOI) to protect the Aceh facilities during the relevant time period.  As Judge Oberdorfer noted in denying summary judgment:

> Defendants contend there is no evidence 'that the soldiers who allegedly hurt the Plaintiffs were, in fact, those assigned to protect the gas fields, and were not part of the thousands of other troops deployed by the Government of Indonesia to Aceh for general law and order purposes.' Defs.' Reply at 7.  *The court, however, must assume the truth of all statements proffered by Plaintiffs (the non-moving party) and construe all evidence in their favor.*

(Docket No. 365 at 10 (emphasis added).)  Although the Court denied summary judgment based on a legal presumption, before trial, Defendants are entitled to investigate the allegations to obtain all evidence concerning the deployment status of each Indonesian soldiers at issue, and to offer all appropriate evidence at trial to refute Plaintiffs' claims.

Even assuming, *arguendo*, that the Indonesian soldiers at issue were assigned to protect the Aceh facilities, a trier of fact also must determine whether these soldiers were acting in their public capacity as soldiers engaged in civil war at the time of the alleged torts.  Under D.C. law, "a private entity which employs a police officer during his off-duty hours is not liable for actions of the officer in carrying out his public duty as a police officer." *Lande* v. *Menage Ltd. P'ship*, 702 A.2d 1259, 1261 (D.C. 1997), *citing Bauldock* v. *Davco Food, Inc.*, 622 A.2d 28, 34 (D.C. 1993); *see also Wells* v. *Washington Market Co.*, 19 D.C. (8 Mackey) 385, 393, 398 (1890).[10]  The D.C. Court of

---

[10] Under D.C. law, "[m]embers of the police force are 'held to be always on duty,' and are required to take police action when crimes are committed in their presence. . . . The failure of an officer to exercise arrest powers when a crime is committed in the officer's presence may subject him to criminal penalties. . . . Their on-duty status is not governed by whether they are in or out of uniform." *Lande*, 702 A.2d at 1261-62 (internal citations omitted).

Appeals has held that "[The public officer's private employment] did not change, in the slightest degree, his duties and his responsibility as an officer of the Metropolitan Police force," and an arrest made by the officer even while engaged as an employee of the private entity was "made in virtue of [his public] authority, and not as the agent of this company, and [the company] ought not to be held responsible." *Bauldock* v. *Davco Food, Inc.*, 622 A.2d at 34.

Whether the Indonesian soldiers at issue were engaged in their public functions in fighting a civil war at the time of the alleged torts is a critically disputed fact. During the relevant time period, the Indonesian Government deployed its military to Aceh to battle the armed separatist group GAM, and to protect its natural gas facilities in Aceh. It is entirely possible, for example, that the Indonesian soldiers had reasons to suspect one or more Plaintiffs of being members of GAM and perceived them to be threats to the Government of Indonesia. Defendants have been denied any opportunity to investigate each soldier's assignment, training and orders with respect to their deployment to the Aceh region. At a minimum, the testimony of each soldier will be necessary as to their mission during the relevant time. *See Lande*, at 1262 (finding persuasive the fact that "[t]he officers testified that they took these actions as law enforcement officers. . . . [and] the evidence is that the police exercised their own judgment about what to do as police officers.").) Such discovery or inquiry, however, has been precluded by this Court as an improper intrusion into the internal affairs of the Indonesian Government. (*See supra* at 6.)

## II.     DISCOVERY IN INDONESIA IS NECESSARY BEFORE A TRIAL

Judge Oberdorfer limited discovery to materials outside Indonesia in order

to avoid interfering with U.S. foreign relations.  The progression of the case under the limited discovery now demonstrates, however, that the critical disputed facts that remain for trial are the acts of Indonesian military and Pertamina, and that investigation and discovery in Indonesia is unavoidable if the case were to proceed.  Because discovery in Indonesia is impermissible under the political question doctrine, and because a trial on the current record would deny Defendants due process, the case must be dismissed.

A.      Plaintiffs Do Not Dispute That Indonesian Discovery Is Necessary

To date, by order of the Court, Defendants have not been permitted to conduct *any* investigation or discovery in Indonesia.  Following its decision denying Defendants' motion for summary judgment, the Court invited the parties to meet and confer on whether the case is ready for trial, and how the case may proceed.  Although the parties could not reach an agreement on a joint response, they did agree that the case was not ready for trial, and that discovery in Indonesia was necessary.  (*See supra* at 13-14.)

Defendants would need to conduct a substantial investigation and discovery in Indonesia before this case can proceed to trial.  Defendants have been denied the opportunity to investigate and obtain any information as to the most basic facts relevant to the Complaint, including circumstances surrounding each alleged injury.  The Complaint alleges that each Plaintiff (or next of kin) was injured by Indonesian soldiers.  As detailed in Defendants' statement following the Court's summary judgment decision (Docket No. 377 at 3-7), Defendants need to interview or depose the following individuals in Indonesia, among others, to investigate the basic allegations in the Complaint:

- All Plaintiffs (including substitute Plaintiffs).

- The soldier(s) or others who allegedly accosted John Doe I while he was riding his bicycle, and allegedly shot and/or threw a hand grenade at him in or about January 2001 at or near the facilities operated by EMOI, as alleged in Paragraph 67 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly stopped John Doe II while he was riding his motorbike at or near the facilities operated by EMOI and/or allegedly beat, detained and tortured him at Rancong Camp for some period of time beginning in or about August 1999 or August 2000, as alleged in Paragraph 68 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly shot John Doe III while he was riding his motorbike in or around "Point A," and/or allegedly tortured, beaten, or detained him for a month in or about July 2000, as alleged in Paragraph 69 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly accosted John Doe IV while he was traveling near the facilities operated by EMOI, and/or allegedly beat or handcuffed or blindfolded or tortured or threw him to the ground or carved the word "GAM" into his back, in or around July 1999 or July 2000, as alleged in Paragraph 70 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly burned John Doe V's home in a village near the facilities operated by EMOI and/or allegedly beat John Doe V's son in or about December 1999 or 2000, as alleged in Paragraph 71 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly accosted John Doe VI and allegedly took him into custody or detained or shot him in or around November 2000 at or near the facilities operated by EMOI, as alleged in Paragraph 72 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly accosted John Doe VII and/or allegedly took him into an office in a facility operated by EMOI and/or allegedly kicked or beat him in or around January 2001, as alleged in Paragraph 73 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly invaded Jane Doe I's home in a village near the facilities operated by EMOI, and/or allegedly sexually assaulted or beat her in or around March 2001, as alleged in Paragraph 74 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly burned homes in a village near the facilities operated by EMOI and/or allegedly shot John Doe VIII while he was working in a rice field, in or around December 2000, as alleged in Paragraph 75 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly kidnapped John Doe IX at gunpoint at or around the facilities operated by EMOI in or around September 2000, as alleged in Paragraph 76 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

- The soldier(s) or others who allegedly shot John Doe X while he was working in a field in a village located near the facilities operated by EMOI in or around December 2000, as alleged in Paragraph 77 of the Complaint, and such soldiers' superior officers who were supervising them during the relevant time period.

In addition to the above, Defendants would seek to interview or depose high-level officials of Indonesian Government who were reported by the Indonesian press to have been directly involved in, or have knowledge of, the deployment of Indonesian military to provide security for the Aceh gas facility during the relevant time period.

(*See, e.g.*, Docket No. 377 Ex. 3, at 477 (█████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████);

Docket No. 377 Ex. 4 (█████████████████████████████████

██████████████████████████████████████████████████);

Docket No. 377 Ex. 5 (████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

██████ ).)[11]  This evidence is critical to the question of who assigned and controlled

the military protecting the Arun field.

These are but some examples of an investigation that Defendants would

conduct in Indonesia.  Plaintiffs do not dispute "that some additional discovery, as

requested by Defendants, is appropriate before trial."  (Docket No. 378 at 1.)  Indeed,

Plaintiffs themselves seek extensive discovery of EMOI personnel and contractors and

lay witnesses, including military witnesses.  (*See Id.* at 2, 5.)

Such investigation and discovery, however, has been precluded by the

Court in deference to the Executive Branch's warning that such activities could create

instability in Indonesia and "risk a potentially serious adverse impact on significant

interests of the United States, including interests related directly to the on-going struggle

against international terrorism."  (Docket No. 103 at 3.)

In these circumstances, the Court should dismiss the state law claims as

nonjusticiable.  The political question doctrine requires a federal court to refrain from

adjudicating a case that infringes on or conflicts with the constitutionally-assigned duties

of a coordinate branch of the federal government.  *Baker* v. *Carr*, 369 U.S. 186, 217

(1962).  The conduct of U.S. foreign policy has been constitutionally committed to the

Executive and the Legislative Branches of the federal government.  *See Tel-Oren* v.

*Libyan Arab Republic*, 726 F.2d 774, 803 (D.C. Cir. 1984).  And under the Supreme

---

[11]   Moreover, Plaintiffs have identified more than ██ witnesses in their disclosures as
having information relevant to the claims raised in the Complaint.  (*See* Plaintiffs'
First Supp. Interrogatory Responses, attached as Tab F to the Exhibits Volume.)
Defendants would have to conduct further investigation to determine the identity and
background of such witnesses, and likely will seek to interview or depose many of
these witnesses offered by Plaintiffs.

Court's decision in *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), the

Executive Branch's opinion that a litigation will adversely affect United States foreign

policy must be given "serious weight" by the courts.  *See Joo* v. *Japan*, 413 F.3d 45, 52

(D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1418 (2006) ("The Executive's judgment that

adjudication by a domestic court would be inimical to the foreign policy interests of the

United States is compelling and renders this case nonjusticiable under the political

question doctrine."); *Sarei* v. *Rio Tinto PLC.*, 221 F. Supp. 2d 1116, 1192 (C.D. Cal.

2002) (*remanded on other grounds by* --- F.3d---, 2008 WL 5220286 (9th Cir. Dec. 16,

2008)) ("[P]laintiffs have not cited, and the court has not found, a single case in which a

court permitted a lawsuit to proceed in the face of an expression of concern such as that

communicated by the State Department here.").  *See generally Ex parte Republic of Peru*,

318 U.S. 578, 589-90 (1943) (Executive's certification regarding interference with

foreign policy concerns is "conclusive" and imposes duty upon court "to proceed no

further.").

      Here, this Court itself recognized from the outset that the Executive

Branch's concerns about the negative effect of discovery in Indonesia on U.S. foreign

affairs should be accorded significant weight, and avoided any action in Indonesia.

Moreover, the D.C. Circuit, the Solicitor General, and the Chief Justice of the United

States uniformly relied on the Court's limitations on discovery in declining to grant relief

to Defendants.  While the Court permitted the state law claims to proceed on the apparent

belief that such claims could be adjudicated without discovery in Indonesia, it has

become clear that that is not possible.  Plaintiffs now have stated expressly that they

agree.  The progression of the case has shown that the claims in this case – due to their

singular focus on the conduct of the Indonesian military in a time of civil war – cannot be

adjudicated without intrusive and destabilizing discovery in Indonesia, which has been

precluded by this Court.

 The Court should dismiss the state law claims under the political question

doctrine.  An effort to continue this case under these circumstances would "express a lack

of respect for the foreign policy interests of the United States." *Whiteman* v. *Dorotheum*

*GmbH & Co. KG*, 431 F.3d 57, 72-73 (2d Cir. 2005) (dismissing ATS claims on political

question doctrine after jurisdictional discovery); *see also In re Terrorist Attacks on*

*September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) (case dismissed under Foreign Sovereign

Immunity grounds after jurisdictional discovery).  *See generally Romero* v. *Drummond*

*Co., In*c., --F.3d --, 2008 WL 5274192, at *4 (11th Cir. 2008) (state law claims in ATS

action dismissed for lack of extraterritorial application); *Mujica* v. *Occidental Petroleum*

*Corp.*, 381 F.Supp.2d 1164, 1169 (C.D.Cal. 2005) (dismissing state law claims of

wrongful death, intentional infliction of emotional distress, and negligent infliction of

emotional distress under political question doctrine).

 B. Forcing Defendants To Go To Trial Without An Opportunity to Defend
  Themselves Would Deny Defendants Due Process

 Finally, Defendants have a due process right to "an opportunity to be

heard on the critical and decisive allegations which go to the core of the parties' claim or

defense and to present evidence on the contested facts," which right includes the

opportunity to take critical discovery.  *In re the Complaint of Bankers Trust Co.*, 752

F.2d 874, 890 (3d Cir. 1984) (holding that the trial court's denial, among others, of a

litigant's opportunity to obtain evidence through letters rogatory or commissions

constituted denial of procedural due process).  "[A]n opportunity to be heard in [one's]

defense – a right to his day in court – [is] basic in our system of jurisprudence; and *these*

*rights include, as a minimum, a right to examine the witnesses against him, to offer*

*testimony,* and to be represented by counsel." *In re Oliver*, 333 U.S. 257, 273 (1948)

(emphasis added). The right to investigate facts in order be heard in one's defense is

particularly important where, as here, the nature of Plaintiffs' allegations – of rape,

torture, assault and murder by Indonesian soldiers – threatens to impose grievous

economic and reputational loss on Defendants. *See Morrissey* v. *Brewer*, 408 U.S. 471,

481 (1972) ("due process is flexible and calls for such procedural protection as the

particular situation demands"); *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976)

(describing the three-part balancing analysis to determine what process is due).

   "The right to present evidence is, of course, essential to the fair hearing

required by the Due Process Clause." *Jenkins* v. *McKeithen*, 395 U.S. 411, 429 (1969),

*citing Morgan* v. *United States*, 304 U.S. 1, 18 (1938); *Baltimore & Ohio R. Co.* v.

*United States*, 298 U.S. 349, 368-369 (1936). Defendants have been denied any

opportunity to investigate and present evidence due to the Court's preclusion of any

discovery in Indonesia. *See also Goldberg* v. *Kelly*, 397 U.S. 254, 266-271 (1970)

(holding that "an effective opportunity (for [the defendant]) to defend by confronting any

adverse witnesses and by presenting his own arguments and evidence orally" is among

the procedural rights guaranteed by the Due Process Clause); *see Thompson* v. *Madison*

*County Bd. of Educ.,* 476 F.2d 676, 678 (5th Cir. 1973) ("Due process mandates that a

judicial proceeding give the affected parties an opportunity to be heard on the allegations

asserted in the complaint and to present evidence and argument on the contested facts and

legal issues framed by the answer to the complaint."); *In re Masonite Corp. Hardboard*

REDACTED PUBLIC VERSION

*Siding Prod. Liab. Litig.*, 170 F.R.D. 417, 425 (E.D. La. 1997) (defendants "cannot receive a fair trial without a process which permits a thorough and discrete presentation of [their] defenses.").

Such a right to present evidence includes not only evidence in Defendants' own case, but also evidence to impeach or to refute Plaintiffs' evidence. *See also Arch* v. *The American Tobacco Co., Inc.*, 175 F.R.D. 469, 489 n.21 (E.D.Pa. 1997) (due process also guarantees the right to put on "cross-examination or rebuttal evidence"); *Goldberg* v. *Kelly,* 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").

For the Court to force Defendants to proceed to trial with the current record would deny Defendants due process. The Court has precluded any action in Indonesia. Any expansion of discovery to include Indonesia, however, is precluded by the political question doctrine and the Court's prior orders. Accordingly, the Court should dismiss the state law claims as nonjusticiable under the political question doctrine.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court to dismiss Plaintiffs' state law claims and enter judgment for Defendants.


Washington, DC
January 21, 2009

Respectfully submitted,


_____ /s/ Martin Weinstein _____
Martin J. Weinstein (Bar No. 37792)
mweinstein@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC  20006
Telephone:  (202) 303-1000
Facsimile:  (202) 303-2000

_____ /s/ Alex Young K. Oh _____
Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
2001 K Street, NW, Fifth Floor
Washington, DC  20006
Telephone:  (202) 223-7334
Facsimile:  (202) 223-7420

Paul W. Wright (Bar No. 20747)
paul.w.wright@exxonmobil.com
Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
Exxon Mobil Corporation
800 Bell Street
Houston, TX  77002

Attorneys for Exxon Mobil Corporation and
ExxonMobil Oil Indonesia Inc.