PUBLIC REDACTED VERSION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE I, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civ. No. 01-1357 (RCL) |
| EXXON MOBIL CORPORATION, et al., | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR JUDGMENT ON
THE PLEADINGS, OR FOR SUMMARY JUDGMENT**

Martin J. Weinstein (Bar No. 37792)
mweinstein@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W., Fifth Floor
Washington, DC 20036
Telephone: (202) 223-7334
Facsimile: (202) 223-7420

Paul W. Wright (Bar No. 111971)
paul.w.wright@exxonmobil.com
-and-
Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
Exxon Mobil Corporation
800 Bell Street
Houston, TX 77002

Attorneys for Defendants
Exxon Mobil Corporation and
ExxonMobil Oil Indonesia Inc.

PUBLIC REDACTED VERSION

# TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................ ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 2

I.    THE CASE SHOULD BE DISMISSED AS NONJUSTICIABLE UNDER THE
      POLITICAL QUESTION DOCTRINE ................................................... 2

      A.    Standard of Review .................................................................... 2

      B.    There is No Basis for the Court to Reconsider or Reverse Judge
            Oberdorfer's Discovery Orders ................................................. 3

      C.    Judge Oberdorfer was Well Aware that the State Department Did Not
            Request Dismissal when he Precluded Any Action in Indonesia ............... 8

      D.    Judge Oberdorfer Did Not Contemplate Discovery in Indonesia ............. 10

      E.    Defendants Have More Than Satisfied the Standards for Dismissal Under
            *Baker v. Carr* ......................................................................... 12

II.   FORCING DEFENDANTS TO TRIAL WHILE PRECLUDING THEM FROM
      INVESTIGATING OR SEEKING EVIDENCE IN INDONESIA VIOLATES
      DUE PROCESS ................................................................................ 15

      A.    Applicable Law ........................................................................ 15

      B.    The Court's Findings in the Summary Judgment Decision Do Not
            "Obviate" the Need for Further Discovery ................................... 18

      C.    Plaintiffs' Concession that They Have No Credible Evidence to Connect
            Defendants to the Tortfeasing Soldiers Does Not Curtail Defendants'
            Right to Defend Themselves at Trial ........................................... 22

CONCLUSION .................................................................................................. 26

# Table of Authorities

Page(s)

## CASES

*Ange* v. *Bush,*
    752 F. Supp. 509 (D.D.C. 1990) (Lamberth, J.) .................................................. 2

*Baker* v. *Carr,*
    369 U.S. 186 (1962) ................................................................... 12, 13

*Bardoff* v. *United States,*
    628 A.2d 86 (D.C. 1993) ............................................................... 16

*Bell Atlantic Corp.* v. *Twombly,*
    127 S.Ct. 1955 (2007) .................................................................. 3

*Carmichael* v. *Kellogg, Brown & Root Services, Inc.,*
    450 F. Supp. 2d 1373 (N.D. Ga. 2006) ................................................ 14

*Carmichael* v. *Kellogg, Brown & Root Services, Inc.,*
    564 F. Supp. 2d 1363 (N.D. Ga. 2008) ............................................ 7, 13

*Citizens for Responsibility and Ethics in Wash.* v. *U.S. Dept. of Homeland Sec.,*
    527 F. Supp. 2d 101 (D.D.C. 2007) (Lamberth, C.J.) ................................ 2

*Coalition for Underground Expansion* v. *Mineta,*
    333 F.3d 193 (D.C. Cir. 2003) ......................................................... 2

*Crockett* v. *Reagan,*
    558 F. Supp. 893 (D.D.C. 1982) *aff'd,* 720 F.2d 1355 (D.C. Cir. 1983) ................ 14, 15

*Dale* v. *Executive Office of the President,*
    164 F. Supp 2d. 22 (D.D.C. 2001) ..................................................... 3

*Dingle* v. *District of Columbia,*
    571 F. Supp. 2d 87 (D.D.C. 2008) (Lamberth, C.J.) .................................. 18

*District of Columbia* v. *Hampton,*
    666 A.2d 30, 38 (D.C. 1995) .......................................................... 23

*EEOC* v. *St. Francis Xavier Parochial Sch.,*
    117 F.3d 621 (D.C. Cir. 1997) ......................................................... 3

*Faison* v. *Nationwide Mortg. Corp.,*
    839 F.2d 680 (D.C. Cir. 1987) ........................................................ 19

*Flynn* v. *Schultz*,
  748 F.2d 1186 (7th Cir. 1984) ............................................................. 13, 14

*Galvin* v. *Eli Lilly and Co.*,
  488 F.3d 1026 (D.C. Cir. 2007) ............................................................... 18

*Getz* v. *Boeing Co.*,
  Civ. No. 07-6396, 2008 WL 2705099 (N.D. Cal. July 8, 2008) ................................. 7, 13

*Gonzalez-Vera* v. *Kissinger*,
  449 F.3d 1260 (D.C. Cir. 2006) ............................................................... 14

*Harbury* v. *Hayden*,
  444 F. Supp. 2d 19 (D.D.C. 2006), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008) ...................... 3

*Hester* v. *Dickerson*,
  576 F. Supp. 2d 60 (D.D.C. 2008) (Lamberth, C.J.) ............................................ 3

*Judah* v. *Reiner*,
  744 A.2d 1037 (D.C. 2000) .................................................................... 23

*Lee* v. *U.S. Dept. of State*,
  Civ. No. 89-2212, 1990 WL 109037 (D.D.C. July 25, 1990) (Lamberth, J.) ...................... 2

*LeGrand* v. *Insurance Co. of North America*,
  241 A.2d 734 (D.C. 1968) ..................................................................... 23

*Levy* v. *Currier*,
  587 A.2d 205 (D.C. 1991) ..................................................................... 23

*Masel* v. *Barrett*,
  707 F. Supp. 4 (D.D.C. 1989) ................................................................. 19

*Mathews* v. *Eldridge*,
  424 U.S. 319 (1976) ................................................................. 15, 16, 17

*Medina* v. *California*,
  505 U.S. 437 (1992) .......................................................................... 17

*Midway Motor Lodge* v. *Innkeepers' Telemanagement & Equip. Corp.*,
  54 F.3d 406 (7th Cir. 1995) .................................................................. 15

*Nat'l Shopmen Pension Fund* v. *Disa*,
  583 F. Supp. 2d 95 (D.D.C. 2008) (Lamberth, C.J.) ............................................ 3

*Newton* v. *CBS, Inc.*,
  841 F. Supp. 19 (D.D.C. 1994) ................................................................ 18

*Safeway Stores, Inc.* v. *Kelly,*
        448 A.2d 856 (D.C. 1982) .................................................................... 23

*Sharon* v. *Time, Inc.,*
        599 F. Supp. 538 (S.D.N.Y. 1984) ...................................................... 16

*Singh* v. *George Wash. Univ.,*
        383 F. Supp. 2d 99 (D.D.C. 2005) (Lamberth, J.) ............................... 4

*Smith* v. *Halliburton Co.,*
        Civ. No. H-06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) .......................... 8, 14

*Soc'y of Lloyd's* v. *Ashenden,*
        233 F.3d 473 (7th Cir. 2000) .............................................................. 15

*Societe Internationale Pour Participations Industrielles Et Commerciales* v. *Rogers,*
        357 U.S. 197 (1958) ........................................................................... 16

*Standard Oil Co.* v. *FTC,*
        475 F. Supp. 1261 (N.D. Ind. 1979) .............................................. 16, 17

*In re the Complaint of Bankers Trust Co.,*
        752 F.2d 874 (3d Cir. 1984) ..................................................... 15, 16, 17

*United States* v. *Dean,*
        55 F.3d 640 (D.C. Cir. 1995) .............................................................. 16

*United States* v. *Haim,*
        218 F. Supp. 922 (S.D.N.Y. 1963) ...................................................... 16

*United States* v. *Valenzuela-Bernal,*
        458 U.S. 858 (1982) .................................................................... 15, 17

*Whitaker* v. *Kellogg Brown & Root, Inc.,*
        444 F. Supp. 2d 1277 (M.D. Ga. 2006) .............................................. 14

*Wiley* v. *Glassman,*
        511 F.3d 151 (D.C. Cir. 2007) ............................................................. 3

PUBLIC REDACTED VERSION

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(1) .................................................................................. 2, 3

Fed. R. Civ. P. 12(b)(6) .................................................................................. 2, 3

Fed. R. Civ. P. 12(c) ........................................................................................ 3

Fed. R. Civ. P. 54(b) ........................................................................................ 4

Fed. R. Civ. P. 56 ............................................................................................. 3

U.S. Const. amend. V ................................................................................ 16, 17

U.S. Const. amend. VI ....................................................................................... 17

PUBLIC REDACTED VERSION

Defendants Exxon Mobil Corporation, and ExxonMobil Oil Indonesia Inc. (collectively, "Defendants"), respectfully submit this memorandum in reply to Plaintiffs' Opposition (Docket No. 400, the "Opposition" or "Opp.") to Defendants' Motion to Dismiss, or, in the Alternative, for Judgment on the Pleadings, or for Summary Judgment (Docket No. 389, the "Motion.").[1]

## INTRODUCTION

Plaintiffs do not dispute in their Opposition that discovery in Indonesia is necessary before this case can proceed to trial.  Nor do Plaintiffs dispute that Judge Oberdorfer has precluded any action in Indonesia to date.  Plaintiffs' only response on the justiciability point is to mischaracterize the Motion as raising issues previously decided, and to request the Court to reconsider and reverse the limitations that Judge Oberdorfer imposed on Indonesian discovery.  Plaintiffs ask the Court to do this even though the State Department already has opined that discovery in Indonesia is not acceptable, and the Court of Appeals, the Solicitor General, and the Chief Justice of the United States Supreme Court all specifically relied on these discovery limitations in dismissing Defendants' appeal.  Defendants have demonstrated that the case cannot proceed without running afoul of the political question doctrine, and must be dismissed.

On Defendants' due process argument, Plaintiffs do not dispute that if Defendants are prevented from obtaining evidence that is material to their defense, then the appropriate remedy is dismissal.  Instead, Plaintiffs misstate the law and the record to suggest that Defendants do not need the discovery that they seek.  *First*, the Court's

---

[1]   Defendants' Memorandum in Support of the Motion is referred to in this reply as "Def. Mem." or "Opening Memorandum".  All numbered docket entries and exhibits A-G are contained in the binders of exhibits accompanying Defendants' Opening Memorandum. Exhibits H-T are contained in the Supplemental Exhibits binder accompanying this Reply.

factual findings in its summary judgment opinion do not estop Defendants from

relitigating or seeking further discovery on those issues. *Second*, Defendants cannot be

precluded wholesale from investigating and offering evidence critical to their defense.

*Finally*, Plaintiffs' admission that they have no credible evidence tending to show that

Defendant EMOI controlled the allegedly assaulting soldiers does not obviate

Defendants' need to investigate and defend against Plaintiffs' baseless allegations.

Rather, this serves to further highlight Defendants' need for an investigation and

discovery in Indonesia, if the case were to continue.

## ARGUMENT

### I.   THE CASE SHOULD BE DISMISSED AS NONJUSTICIABLE UNDER THE POLITICAL QUESTION DOCTRINE

####     A.   Standard of Review

Contrary to Plaintiffs' argument (*see* Opp. at 4-5), a motion to dismiss

under the political question doctrine is brought under Rule 12(b)(1), and not Rule

12(b)(6). *See Lee* v. *U.S. Dept. of State*, Civ. No. 89-2212, 1990 WL 109037, at \*3

(D.D.C. July 25, 1990) (Lamberth, J.) ("Because this court has determined that it lacks

jurisdiction over the subject matter of the complaint and thus does not have the power to

grant the relief plaintiff requests, the court will dismiss plaintiff's complaint pursuant to

Fed. R. Civ. P. 12(b)(1)."); *Ange* v. *Bush*, 752 F. Supp. 509 (D.D.C. 1990) (Lamberth, J.)

(dismissing case under the political question doctrine).

In assessing a Rule 12(b)(1) motion, the Court "may consider the

complaint supplemented by undisputed facts evidenced in the record, or the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts."

*Coalition for Underground Expansion* v. *Mineta,* 333 F.3d 193, 198 (D.C. Cir. 2003)

(citations omitted); *see also Citizens for Responsibility and Ethics in Wash.* v. *U.S. Dept. of Homeland Sec.*, 527 F. Supp. 2d 101, 104 (D.D.C. 2007) (Lamberth, C.J.).

Importantly, under Rule 12(b)(1), it is "the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence." *Harbury* v. *Hayden*, 444 F. Supp. 2d 19, 26-27 (D.D.C. 2006) (dismissing claims under the political question doctrine), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008).  Plaintiffs' complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. *EEOC* v. *St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624 (D.C. Cir. 1997).[2]

B.     There is No Basis for the Court to Reconsider or Reverse
       Judge Oberdorfer's Discovery Orders

Recognizing that discovery in Indonesia is required if this matter is to proceed, Plaintiffs seek to reopen and reverse the Court's prior discovery orders that precluded any action in Indonesia in deference to the Executive's concerns about the adverse impact of such discovery on U.S. foreign policy.  (*See* Docket Nos. 158, 159.)  In doing so, Plaintiffs do not even bother to set forth the applicable standards for

---

[2]     The standard for a motion under Rule 12(c), which is pleaded here in the alternative, is equivalent to the standard under Rule 12(b)(6).  The Court should dismiss a claim if the plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp.* v. *Twombly*, 127 S.Ct. 1955, 1974 (2007); *Hester* v. *Dickerson*, 576 F. Supp. 2d 60, 61-62 (D.D.C. 2008) (Lamberth, C.J.).  "However, the Court is not required to accept plaintiffs' asserted inferences or conclusory allegations that are unsupported by the facts set forth in the complaint.  Nor must the court accept as true the plaintiffs' legal conclusions." *Nat'l Shopmen Pension Fund* v. *Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008) (Lamberth, C.J.) (internal citations omitted).

Finally, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." *Wiley* v. *Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007); *see Dale* v. *Executive Office of the President,* 164 F. Supp 2d. 22, 24 (D.D.C. 2001).

PUBLIC REDACTED VERSION

reconsideration, and cannot meet them in any event.[3]

Deferring to the concerns of the State Department that Indonesian discovery would adversely impact U.S. foreign policy, the Court rejected Plaintiffs' previous effort to open discovery in Indonesia. (*See* Docket No. 159.) Now, Plaintiffs argue that their proposed discovery is different in scope than the discovery that they proposed in 2005. Specifically, Plaintiffs contend that because the federal claims under the Torture Victims Protection Act and the Alien Tort Statute were dismissed, the discovery that they now seek for the state law claims is substantially less intrusive on Indonesian sovereignty. (*See* Opp. at 7.) But a comparison of Plaintiffs' discovery plans demonstrates that the distinction that Plaintiffs seek to draw is without any difference:

| Plaintiffs' 5/16/05 Discovery Plan (Docket No. 86.) | Plaintiffs' 9/12/08 Discovery Plan (Docket No. 378.) |
|---|---|
| Depositions of the Plaintiffs (¶ 5.) | Depositions of the Plaintiffs (2.) |
| Depositions of "third party witnesses who are Acehnese villagers with knowledge relating to any of the allegations made in the Complaint," and "contractors or other agents (current and former) of the Defendants who have knowledge relating to any of the allegations made in the Complaint" (¶ 5.) | Depositions of "potential lay witnesses" (Plaintiffs note that "some of these individuals may be former military," providing, as an example, that "████████ ████████████████ were the relevant military officials [in 2000].") (2, 5.) |

---

[3] Under F.R.C.P. Rule 54(b), which governs reconsideration of orders that do not constitute final judgments in a case, the Court will reconsider a prior order under the "as justice requires" standard, which is met in circumstances "when the Court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court." *Singh* v. *George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (Lamberth, J.) (internal citations omitted).

| Plaintiffs' 5/16/05 Discovery Plan (Docket No. 86.) | Plaintiffs' 9/12/08 Discovery Plan (Docket No. 378.) |
|---|---|
| Depositions of "Indonesia-based employees (current and former) of any of the Defendants who have knowledge relating to any of the allegations made in the Complaint" (¶ 5.) | "[D]iscovery of the Parties, including EMOI, outside the parameters of completed Phase I discovery." (2.) |
| Depositions of "experts related to liability and damages" (¶ 5.) | Depositions of "expert witnesses" (2.) |
| "[R]equests for production of documents" to the Parties (¶ 3.) | "[D]ocument requests to potential lay witnesses" (2.) |

As shown in this chart, both plans envision depositions of potential lay witnesses in Indonesia, which Plaintiffs acknowledge "may be former military." Both plans also envision significant discovery of EMOI, presumably including documents owned by Pertamina, which has already stated that it will not permit EMOI to disclose its documents in this litigation. (*See* Def. Mem. at 11, *see also* Ex. 93, attaching Declaration of Rick Vint.) There is little difference in the two plans, and certainly no basis for the Court to reverse Judge Oberdorfer's discovery orders.

Plaintiffs also argue that discovery in Indonesia should not be problematic because the "conduct of discovery over the past two years" "amply demonstrates that the case in no way interferes with U.S. foreign relations." (Opp. at 19, 11-12.) This argument is specious. To date, discovery has been focused on documents and witnesses located *outside* Indonesia to accommodate the Executive's foreign policy concerns. Moreover, the topics were narrowed to whether the Court had personal jurisdiction over Defendant EMOI, and whether the U.S. Defendants had knowledge of, or proximately caused, the injuries in Indonesia. (Def. Mem. at 10-11.) Apart from Plaintiffs' own self-

PUBLIC REDACTED VERSION

serving statements, there has been no discovery whatsoever as to what actually happened

to Plaintiffs in Indonesia.  If permitted, the parties' proposed investigations in Indonesia

into the alleged torts – which involve the conduct of Indonesian military in Aceh – will

by necessity be different in kind and scope than the narrow discovery already

undertaken.[4]

        Even under the limited discovery conducted to date, foreign policy

concerns have in fact emerged.  For example, contrary to Plaintiffs' assertions,

Defendants, as authorized by Magistrate Judge Kay, repeatedly objected during

depositions to Plaintiffs' questions that sought information that is prohibited from

disclosure under Indonesian law.[5]  Furthermore, and again contrary to Plaintiffs'

representations, the Court did *not* "den[y] Exxon's motion to repossess and withhold

certain documents on the grounds that they concerned Indonesian national security."

(Opp. at 12.)  Rather, both Judge Oberdorfer and Magistrate Judge Kay – after

conducting *in camera* reviews of the documents in question – expressly recognized the

legitimacy of the concerns of the Indonesian government, and permitted Defendants to

withhold nearly half of the documents at issue "*on the grounds that Indonesian security*

---

[4]    Plaintiffs also take Defendants' counsel's statement out of context to suggest that Defendants
had conducted a full investigation in Indonesia without any impact on U.S. foreign policy.
(*See* Opp. at 10, n.7.)  The Court asked Defendants' in-house counsel about a possible
settlement, and Mr. Wright explained Defendants' position by stating his belief, based on
trips to Indonesia to preserve documents, and his attendance at the depositions in the United
States, that Plaintiffs' claims were unfounded.  (*See* Jan. 22, 2008 Tr., Ex. H, at 8-9.)
Plaintiffs cannot reasonably take this colloquy to imply a concession that Defendants already
have investigated these claims for purposes of defending them at a possible trial.

[5]    *See, e.g.,* ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

*interests may be violated if such information is disclosed.*"  (*See* Docket No. 318, Mem. Op. of Mag. Judge Kay, June 20, 2008 (emphasis added); *see also* Docket Nos. 350 and 351, Order and Mem. Op. of Judge Oberdorfer, July 28, 2008.)[6]

Plaintiffs next contend that it "strains credulity to suggest that this Court put itself and the litigants through the time and expense of discovery and summary judgment, all the while anticipating that if Plaintiffs' claims proved meritorious, the case would have to be dismissed."[7]  (Opp. at 14.)  This argument ignores the fact that courts routinely permit limited discovery in cases raising the political question doctrine to determine whether dismissal is warranted.  *See, e.g., Getz* v. *Boeing Co.*, Civ. No. 07-6396, 2008 WL 2705099, at *7 (N.D. Cal. July 8, 2008) ("Several courts have been reluctant to dismiss claims at an early stage of discovery before it is certain whether inquiries into military decision-making would be necessitated by Plaintiffs' claims.") (internal citations omitted); *Carmichael* v. *Kellogg, Brown & Root Services, Inc.*, 564 F. Supp. 2d 1363, 1364 (N.D. Ga. 2008) (dismissing case after permitting some discovery, noting that, before the limited discovery occurred, "it was impossible to say with certainty whether this case would require such inquiries into military decision-making as to evoke a nonjusticiable political question"); *Smith* v. *Halliburton Co.*, Civ. No. H-06-0462, 2006 WL 2521326, at *5 (S.D. Tex. Aug. 30, 2006) (dismissing case after some

---

[6]   Plaintiffs also state, incorrectly, that the Court "rejected Exxon's arguments" on Plaintiffs' Motion to Compel Rule 30(b)(6) Designations.  (Opp. at 11.)  But this statement ignores, among other things, the fact that Defendants had objected to Plaintiffs' demand that Defendants review documents or interview witnesses in Indonesia in preparing their Rule 30(b)(6) designees, and Magistrate Judge did *not* require Defendants to take such steps in his decision.  (*See* Docket No. 249.)

[7]   Plaintiffs' claims have not been "proved meritorious" but merely survived summary judgment on threshold issues.  *See* Part II.B, *infra.*

discovery, where nature of claims required that "were the case to proceed, this court would have to second-guess the decisions of the United States military, even though the suit is ostensibly against only military contractors."). Here, the limited discovery to date served to confirm that Plaintiffs' alleged attackers were active-duty soldiers of the Indonesian military who were assigned to Aceh to fight a civil war. Whether these Indonesian soldiers committed the alleged torts in the course of fighting the civil war is a question that cannot be resolved by this Court. *See* Part I.E, *infra*.

In sum, Plaintiffs have not demonstrated why the Court should disturb the limitations imposed on Indonesian discovery.

C.  Judge Oberdorfer was Well Aware that the State Department Did Not Request Dismissal when he Precluded Any Action in Indonesia

Plaintiffs also argue that the case must not be dismissed because the State Department never requested dismissal of the state law claims. (*See* Opp. at 5.) This argument is a red herring. A request from the State Department is not a precondition to dismissal under the political question doctrine.

Here, the Court never asked the State Department for its views on whether any claims or defendants should be dismissed, and the State Department accordingly never requested dismissal of any claims or defendants. Nor did Judge Oberdorfer state that he was dismissing the federal claims and defendant PT Arun in response to a State Department request. Rather, the State Department provided detailed Statements of Interest explaining how this case will adversely impact U.S. foreign policy, and the Court conducted its own justiciability analysis, taking into consideration the State Department's views. (*See* Docket No. 103, at 5 ("the proper degree of deference to the views of the Executive turns on the actual intrusiveness of the litigation; courts do not abdicate their

8

Article III responsibilities on executive command.").)

Moreover, Plaintiffs' recitation of what the State Department purportedly said or did not say is riddled with misleading errors that suggest that the State Department did not object to Indonesian discovery for the state law claims when, in fact, it did. For example, Plaintiffs claim that the United States was served with copies of the parties' discovery requests, and "did not offer any comments or object to the discovery, which has since taken place without incident." (Opp. at 7.) But this statement blatantly ignores the elephant in the room. The State Department objected wholesale to Plaintiffs' proposed discovery plan, as detailed in Defendants' Opening Memorandum (*see* Def. Mem. at 8-9), and, as a result, the Court precluded discovery in Indonesia entirely. There was no need for the State Department to opine further on the narrowed discovery.

Plaintiffs also state that the "final word" from the State Department on this litigation was at a status conference held on December 15, 2005, and that the State Department did not express any concerns about proceeding with the state law claims. (*See* Opp. at 7 ("the United States representative responded that 'the State Department very much appreciates the sensitivity you've shown to its foreign policy concerns,'" (*quoting* Dec. 15, 2005 Tr., Ex. M, at 31:3-5).) What Plaintiffs fail to mention are the following important facts: first, this conference occurred *before* any discovery was permitted in the case; and second, earlier in the *same* conference, the Court stated its willingness to preclude discovery in Indonesia as an accommodation to the State Department's concerns: "as I conceive of this litigation in deference to . . . the foreign policy values advanced by the United States, the idea of this is to shape it so that we, meaning I[,] deal with what was done in the United States, if anything, that is a proximate

cause of the injury suffered, if any, in Indonesia." (*Id.* at 18:2-11.)

Likewise, in quoting the Solicitor General's brief to the Supreme Court, Plaintiffs ignore the critical point that the question presented on the petition for *certiorari* was whether the D.C. Circuit should have heard the appeal under the collateral order doctrine.  On this narrow procedural issue, the Solicitor General of the United States recommended that the petition be denied.  (*See* Def. Mem. 12-13.)  Moreover, the Solicitor General – and the Chief Justice of the Supreme Court – expressly noted that discovery in this case had been narrowed substantially by the Court in an accommodation to the State Department's concerns, and not merely as a case management tool, as Plaintiffs suggest.  (*See* Opp. at 10-11.)

Most importantly, there is simply no authority – and Plaintiffs have offered none – for the novel proposition that a court must wait for a specific request from the State Department before dismissing a case under the political question doctrine.  (*See* Opp. at 18.)  As noted above, the State Department may offer its views on foreign policy effects, but the Court will decide for itself whether to dismiss any claims.  The Court should reject Plaintiffs' attempt to impose an added precondition to justiciability jurisprudence where none exists.

D.     Judge Oberdorfer Did Not Contemplate Discovery in Indonesia

Plaintiffs also argue, incorrectly, that Judge Oberdorfer did not mean for the limitation in Indonesian discovery to go on indefinitely.  (*See* Opp. at 9.)

Although Plaintiffs selectively quote the Court's statements to suggest that the Court limited discovery only temporarily for the sake of efficient administration of justice (*see, e.g.,* Opp. at 10-11), the Court's statements, viewed in their full context, demonstrate that Judge Oberdorfer precluded any action in Indonesia to accommodate the

State Department's concerns about the negative impact of such action on U.S. foreign policy.

For example, at the May 1, 2006 conference, in response to Plaintiffs' request to require Defendants to, at a minimum, index EMOI's documents, Judge Oberdorfer stated, "[t]here are two things that I'm trying to do here. One is to accommodate the State Department's expression of concern about challenging Indonesian sovereignty, and the other thing I'd like to keep this from getting to be … a year of litigation." (May 1, 2006 Tr., Def. Mem. Ex. E, at 5:16-22.) The Court ultimately denied Plaintiffs' request, reasoning: "The proposed Order [of Magistrate Judge Kay] avoided discovery in Indonesia … In that light, *the proposed Order does not implicate the concerns of the U.S. State Department or Indonesian Government.*" (Docket No. 159, at 2 (emphasis added).)

Contrary to Plaintiffs' conjecture, Judge Oberdorfer contemplated that it would be feasible for Plaintiffs to satisfy their document requests and testimony on the state law claims outside Indonesia. (*See* Docket No. 103 at 16-17 ("it should be feasible, for example, for plaintiffs to perpetuate testimony and satisfy document discovery requirements outside Indonesia."); Dec. 15, 2005 Tr., Ex. M, at 18:2-11 ("as I conceive of this litigation in deference to . . . the foreign policy values advanced by the United States, the idea of this is to shape it so that we, meaning I[,] deal with what was done in the United States, if anything, that is a proximate cause of the injury suffered, if any, in Indonesia.").) Indeed, at a status conference in February 2007, the Court specifically asked how Plaintiffs, given the limitation in the case, "would contemplate getting admissible evidence before the court?" (Feb. 5, 2007 Tr., Ex. N, at 4:22-5:2.) Plaintiffs

offered no response.

Months before reassigning this case, Judge Oberdorfer appeared to recognize the tensions created by the Court's rulings permitting the state law claims to proceed, on the one hand, and precluding discovery in Indonesia, on the other hand.  At the last status conference called by Judge Oberdorfer in January 2008, the following colloquy occurred between defense counsel and the Court:

> MR. WELLS:  And my core position is, I don't think you can take the discovery needed, consistent with the due process laws for us to defend ourselves, and also not run afoul of the political question doctrine.  I think there is a – there is a tension and I don't think – I don't think you can accomplish both.  But –
>
> THE COURT:  That's the reason I suggested a mediator.

(Jan. 22, 2008 Tr., Ex. H, at 20:9-16.)

When viewed in full context, Plaintiffs' assertion that Judge Oberdorfer's preclusion of discovery in Indonesia was simply a measure to streamline this litigation is without merit.

E.   Defendants Have More Than Satisfied the Standards for Dismissal Under
      *Baker v. Carr*

Finally, Plaintiffs contend that Defendants cannot satisfy the "six-part test" under *Baker* v. *Carr*, 369 U.S. 186, 217 (1962), for dismissal under the political question doctrine.  (*See* Opp. at 14-20.)  This argument fails.[8]

---

[8]   Plaintiffs incorrectly assert that the law of the case doctrine precludes a "re-opening" of the "*Baker* inquiry" because "[t]his Court has already held that none of the [*Baker*] factors are 'inextricable' from Plaintiffs' tort claims.  Oct. 14, 2005 Mem. Op., Dkt. 103."  (Opp. at 15-16.)  Tellingly, however, Plaintiffs do not provide a "pin cite" for this purported holding in the October 2005 Opinion.  This is because such a holding does not, in fact, appear in the Court's October 2005 Opinion.  The October 2005 Opinion does not cite to *Baker*, and did not resolve the "*Baker* inquiry".

In addition to the first and the fourth *Baker* factors (*see* Def. Mem. at 23), which will not be repeated here, Defendants also rely on the second factor, the "lack of judicially discoverable and manageable standards for resolving" the case, as a reason to dismiss under the political question doctrine. *Baker*, 369 U.S. at 217. As detailed in Defendants' Opening Memorandum, the discovery conducted to date, as well as the Court's decision on summary judgment, have demonstrated that inquiries regarding Indonesian military and other governmental decision-making or policy would be inextricable from Plaintiffs' claims. (*See* Def. Mem. at 15-19.) The progression of the case to date has confirmed that sensitive Indonesian military judgments would be at the heart of this case.

"[C]ourts have declined to exercise jurisdiction over claims that would require examination of 'core military decisions, including [military] communication, training, and drill procedures' or '[t]he strategy and tactics employed on the battlefield.'" *Carmichael* v. *Kellogg, Brown & Root Services, Inc.*, 564 F. Supp. 2d 1363, 1370 (N.D. Ga. 2008) (internal citations omitted). This is because such "strategy and tactics employed on the battlefield are clearly not subject to judicial review." *Id.* at 1371; *see also Getz* v. *Boeing Co.*, CV 07-6396 CW, 2008 WL 2705099, at *8 (N.D. Cal. July 8, 2008) ("[c]ourts lack standards with which to judge whether reasonable care was taken to achieve tactical objectives in combat while minimizing injury and loss of life."); *Flynn* v. *Schultz*, 748 F.2d 1186, 1194 (7th Cir. 1984) (in affirming dismissal under the political question doctrine, the court held that it "lack[s] the resources and competence to discover and resolve the questions of fact regarding events surrounding [plaintiffs'] incarceration and conviction in Mexico"); *Crockett* v. *Reagan*, 558 F. Supp. 893, 898 (D.D.C. 1982)

*aff'd*, 720 F.2d 1355 (D.C. Cir. 1983) ("Even if the plaintiffs could introduce admissible evidence concerning the state of hostilities in various geographical areas in El Salvador . . . the Court no doubt would be presented conflicting evidence on those issues by defendants.  The Court lacks the resources and expertise . . . to resolve disputed questions of fact concerning the military situation in El Salvador.").  "While Plaintiffs' simplistic labeling of this case as a 'garden variety [tort] is superficially appealing, it ignores the true nature of the circumstances giving rise to [the tort] . . . [that] occurred in a combat zone during wartime. . . "  *Whitaker* v. *Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1282 (M.D. Ga. 2006).

Once it becomes clear that judicial inquiry must focus on an area that exceeds judicial competence, a court should dismiss the case under the political question doctrine.  *Gonzalez-Vera* v. *Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir. 2006).  Where "military decision-making or policy would be a necessary inquiry, inseparable from the claims asserted," a political question is unavoidable, and the case should be regarded as nonjusticiable.  *Carmichael* v. *Kellogg, Brown & Root Services, Inc.*, 450 F. Supp. 2d 1373, 1375 (N.D. Ga. 2006); *see also Smith* v. *Halliburton Co.*, Civ. No. H-06-0462, 2006 WL 2521326, at *5 (S.D.Tex. Aug. 30, 2006) (dismissing case after discovery, where nature of claims required that "were the case to proceed, this court would have to second-guess the decisions of the United States military, even though the suit is ostensibly against only military contractors."); *Flynn* v. *Shultz*, 748 F.2d 1186, 1193 (7th Cir. 1984) (dismissing claim as "judicially unmanageable" where "resolution of the issues of the case would … require ascertainment of facts and standards of decision that are beyond judicial discovery and management"); *Crockett* v. *Reagan*, 558 F.Supp. 893,

896-899 (D.D.C. 1982) *aff'd*, 720 F.2d 1355 (D.C. Cir. 1983) (same).

## II.   FORCING DEFENDANTS TO TRIAL WHILE PRECLUDING THEM FROM INVESTIGATING OR SEEKING EVIDENCE IN INDONESIA VIOLATES DUE PROCESS

### A.   Applicable Law

Plaintiffs ignore the entire body of due process jurisprudence arising from

*Mathews* v. *Eldridge*, 424 U.S. 319 (1976), to contend that there is "no due process right

to pretrial discovery in a civil case."[9] (*See* Opp. at 20.)  Plaintiffs then assert, without

any support, that the applicable standard for a due process violation arising from the

preclusion of discovery in Indonesia is that found in a criminal case.  (*See* Opp. at 21,

*quoting United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 872 (1982).)  Plaintiffs are

wrong on both counts.

*First*, the appropriate due process analysis governing the deprivation of

Defendants' ability to investigate and obtain any evidence in Indonesia is stated in

*Mathews*.  (*See* Def. Mem. at 27); *see also In re the Complaint of Bankers Trust Co.*, 752

F.2d 874, 890 (3d Cir. 1984) ("Due process mandates that a judicial proceeding give all

parties an opportunity to be heard on the *critical and decisive allegations* which go to the

*core* of the parties' claim or defense and to present evidence on the contested facts.")

---

[9]   Plaintiffs cite two cases for this proposition, neither of which provides any support.  (*See* Opp at 20.)  In *Soc'y of Lloyd's* v. *Ashenden*, 233 F.3d 473, 479-80 (7th Cir. 2000), the Seventh Circuit upheld the enforcement of English court judgments against American members of an insurance syndicate who had contractually bound themselves to the English judgments, and found no due process violation.  In *Midway Motor Lodge* v. *Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406 (7th Cir. 1995), the court held that the ability to mount a defense was not at issue because defendants were able to present necessary evidence at bankruptcy hearing.

(emphasis in original).[10]  In addition to the authority set forth in the Opening

Memorandum, *Standard Oil Co.* v. *FTC*, 475 F. Supp. 1261 (N.D. Ind. 1979), is

instructive.  In *Standard Oil*, the respondents in an action by the FTC brought an action

against the FTC to secure a declaratory judgment granting them, among other things,

immediate discovery in the FTC proceeding.  The ALJ in the FTC proceeding essentially

had cut off discovery by the respondents until some undetermined date in the future.  *Id.*

at 1277.  The court, citing *Mathews*, found that the essence of due process required

parties to receive "appropriate discovery in time to reasonably and adequately prepare

themselves, and their defenses, before facing charges."  *Id.* at 1275.  The fact that the

ALJ had effectively "stopped plaintiffs' discovery Per se" for several years, was

"tantamount to depriving plaintiffs of a fair opportunity to be heard."  *Id.* at 1279.[11]

      *Second*, the Fifth Amendment Due Process Clause analysis contained in

*Valenzuela-Bernal* does not govern civil cases.  Plaintiffs offer no authority to show

---

[10]  Plaintiffs do not attempt to distinguish *Bankers Trust* other than to say that it was wrongly decided (*see* Opp. at 21 n.12).

[11]  The remaining cases on which Plaintiffs rely are either inapposite, or distinguishable on their facts.  *See, e.g., Bardoff* v. *United States*, 628 A.2d 86, 93 (D.C. 1993) ("There is nothing in the record indicating that the missing testimony was necessary to an adequate defense, or would have been either favorable, material or exculpatory."); *United States* v. *Dean*, 55 F.3d 640 (D.C. Cir. 1995) (appeal from criminal conviction, finding Defendant did not suffer prejudice from the quashing of subpoenas to witnesses who had no favorable testimony to offer); *Sharon* v. *Time, Inc.*, 599 F. Supp. 538, 563 (S.D.N.Y. 1984) ("Time already has ample evidence to place its broad theory of culpability before the jury in a full and fair manner."); *United States* v. *Haim*, 218 F. Supp. 922, 925-26 (S.D.N.Y. 1963) (criminal case where defendants moved to dismiss indictment, but did not specify which witnesses would be called or how their testimony would be favorable); *Societe Internationale Pour Participations Industrielles Et Commerciales* v. *Rogers*, 357 U.S. 197, 211 (1958) (distinguishing the situation there "from one where a party claims that compliance with a court's order will reveal facts which may provide the basis for criminal prosecution of that party under the penal laws of a foreign sovereign thereby shown to have been violated").

PUBLIC REDACTED VERSION

otherwise.  The difference between due process required in administrative or civil

proceedings, on the one hand, and in criminal cases, on the other hand, was addressed by

the Supreme Court in *Medina* v. *California*, 505 U.S. 437 (1992), where the Court held

that the *Mathews* balancing test "does not provide the appropriate framework for

assessing the validity of" state criminal procedural rules:

> In the field of criminal law, we "have defined the category
> of infractions that violate 'fundamental fairness' very
> narrowly" based on the recognition that, "[b]eyond the
> specific guarantees enumerated in the Bill of Rights, the
> Due Process Clause has limited operation." . . . The Bill of
> Rights speaks in explicit terms to many aspects of criminal
> procedure, and the expansion of those constitutional
> guarantees under the open-ended rubric of the Due Process
> Clause invites undue interference with both considered
> legislative judgments and the careful balance that the
> Constitution strikes between liberty and order.

505 U.S. at 443.  Accordingly, in criminal cases, a due process violation is not typically

found unless the conduct in question "offends some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental." *Id.* at 445.

Plaintiffs offer no reason, however, why this narrow, "fundamental fairness" concept of

due process appropriate in criminal cases should govern Defendants' rights in this case.[12]

Under the *Mathews*, *Bankers Trust*, and *Standard Oil* line of cases, there is

no burden on Defendants to show that the discovery sought would be "material", or

---

[12] Even if the Court deemed the due process standards in *Valenzuela-Bernal* to be applicable, the case is factually distinguishable.  There the defendant, who was arrested for transporting three illegal aliens, asserted that he was denied due process because the prosecutor promptly deported two of the three illegal aliens to Mexico.  Without offering any evidence as to how their testimony may have been helpful to his case, the defendant asserted that his Fifth Amendment due process rights and his Sixth Amendment rights to compulsory process were violated, and sought dismissal of the indictment.  The Court found no due process violation because there was no "explanation of how [the missing] testimony would have been favorable and material." *See Valenzuela-Bernal*, 458 U.S. at 872.

"favorable" to their defense.  It is enough for Defendants to show that they have been

deprived *per se* of any opportunity to investigate or obtain evidence in support of their

defense.  *See Standard Oil*, 475 F. Supp. at 1279.

> B.    The Court's Findings in the Summary Judgment Decision Do Not "Obviate" the Need for Further Discovery

Plaintiffs admit that discovery in Indonesia is necessary if this case

continues, but they incorrectly argue that "[t]he Court's findings in its summary judgment

opinion specifically obviate the need to adjudicate the conduct of the Government of

Indonesia and, therefore, the discovery now sought by Exxon."  (Opp. at 23.)

"The judge's role at the summary judgment stage is limited.  As the

Supreme Court in *Anderson* explained, 'the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial.'"  *Dingle* v. *District of Columbia*, 571 F. Supp. 2d 87, 94 (D.D.C.

2008) (Lamberth, C.J.) (citations omitted); *see Galvin* v. *Eli Lilly and Co.*, 488 F.3d

1026, 1037-38 (D.C. Cir. 2007) ("At the summary judgment stage, the court's function is

not to try disputed issues of fact, but only to ascertain whether such an issue is present,

and any doubt on that score is to be resolved against the movant.").  Contrary to

Plaintiffs' assertion, therefore, the Court's factual determinations are not *res judicata*.

*See Newton* v. *CBS, Inc.*, 841 F. Supp. 19, 24 (D.D.C. 1994) ("By presenting genuine

questions of material fact . . . [Plaintiff] has a right to proceed with a trial on the merits

during which she will bear the ultimate burden of persuasion in attempting to prove her

claim...").

Plaintiffs incorrectly assert, for example, that the Court's determination

that a "finder of fact *could* conclude that EMOI is fully liable as joint employer" with

Pertamina, "specifically obviates the need to assess the conduct of Pertamina." (Opp. at 24, *quoting* Docket No. 365 at 14 (emphasis added).) The Court did not, however, find that EMOI was liable as an employer. The Court simply found that sufficient evidence exists to raise a genuine dispute of material fact, and that this dispute must be resolved by the trier of fact. *See Masel* v. *Barrett,* 707 F. Supp. 4, 9 (D.D.C. 1989).[13]

Plaintiffs next contend, again misapprehending the meaning of summary judgment, that because the Court purportedly "found that Defendants' own documents supported Defendants' control of their paid military security," Defendants have no need for further discovery in Indonesia, which may merely "uncover evidence to contradict its own documents." (Opp. at 25.) This argument ignores the fact that Defendants, to date, have had no opportunity to obtain any evidence in Indonesia – including EMOI's documents – to demonstrate that the Indonesian government, and not EMOI, had exclusive command and control over the Indonesian soldiers in the region.[14] The record on summary judgment was therefore far from complete, and Defendants should not be deprived of the opportunity to conduct a full investigation in Indonesia.[15]

---

[13] Plaintiffs are also wrong to contend that, hypothetically, if Pertamina and Defendant EMOI were found to have "controlled" the assaulting soldiers, then the relatives "faults" of each are immaterial. (*See* Opp. at 24.) Even assuming that D.C. law would impose joint and several liability, for purposes of punitive damages, which Plaintiffs seek, the actions of each allegedly tort-feasing defendant would be highly relevant. *See Faison* v. *Nationwide Mortg. Corp.*, 839 F.2d 680, 692 (D.C. Cir. 1987) ("under the laws of the District of Columbia, punitive damages may be apportioned among joint tortfeasors.").

[14] While it is true that the Court permitted Defendant EMOI to bring out of Indonesia any documents that it intended to use in support of its defense, the Court expressly conditioned this grant on EMOI's ability to obtain permission from the Indonesian government, which permission was denied. (*See* Def. Mem. at 11 n. 6.)

[15] Plaintiffs also contend that whether or not the Indonesian law required Indonesian military to protect the so-called "Vital National Projects" is immaterial, because "a legal requirement to have certain personnel present does not undercut the separate question of the *right to control*

Plaintiffs next contend that "any evidence that Defendants could procure from Indonesia is merely cumulative," arguing that "Defendants presumably possess full information regarding control of their facility's paid military security". (Opp. at 26.) But this argument again ignores the fact that Defendant EMOI has not even been permitted to index its own documents, and also has no authority to produce any information outside of Indonesia without permission from Pertamina. (*See* Def. Mem. at 11.) Moreover, such information cannot be "cumulative" because, as Plaintiffs concede, there is no evidence in the record as to even the identity of the allegedly tortfeasing Indonesian soldiers.

Plaintiffs also claim that the resolution of the question "whether Plaintiffs' attackers were more likely than not members of Defendants' paid security force" "does not translate to Defendants' need for broad discovery of the Indonesian government or military." (Opp. at 26.) Plaintiffs are wrong.[16] While Plaintiffs point to a few documents discovered in the U.S. Defendants' file that contain the raw numbers of Indonesian soldiers in the Arun field vicinity (*see* Opp. at 27), Plaintiffs can point to no evidence in the record that would show the names or identity of any individual Indonesian soldiers, much less any soldiers allegedly connected to their claims.

More importantly, Defendants are entitled to investigate, obtain and offer evidence on the critical issue, whether Defendants "controlled" the allegedly tortfeasing

---

the personnel." (Opp. at 25 n.15, *quoting* Docket No. 365 at 11-12.) Plaintiffs fail to appreciate the fact that the designation of Vital National Project status is critical to the determination of who controlled the soldiers guarding the Arun field.

[16] Plaintiffs inaccurately state that Defendants "do not 'dispute that the injuries . . . suffered by Plaintiffs [occurred and] were caused by members of the Indonesian military." (Opp. at 27, quoting Docket No. 365 at 8-9.) Defendants never conceded that the injuries occurred, and stated only that there is no dispute that the Plaintiffs' allegations point to the Indonesian military as having caused the injuries, and not to any Defendants. (*See* Docket No. 269 at 2-3.)

soldiers.  To date, Defendants have been foreclosed from conducting any investigation that routinely would be afforded to defendants in similar "garden variety" tort cases. Defendants have not been given any opportunity to review any documents preserved by EMOI in Indonesia, or to conduct an investigation into the basic allegations of the Complaint.  (*See* Def. Mem. at 20.)  The only "evidence" concerning the specific assaults alleged in the Complaint is contained in interrogatories and other discovery responses from Plaintiffs, which contain little or no information about the identities of the soldiers. In addition to reviewing EMOI's documents and interviewing former or current EMOI employees and contractors who may have information about the allegations, Defendants would have to conduct extensive investigation of third parties.  For example, at a minimum, Defendants would seek to:  interview all ▇ of the witnesses identified by Plaintiffs has having information relevant to their injuries; obtain medical or other records from area hospitals that may substantiate the allegations of injury suffered by Plaintiffs; obtain records from Pertamina or other Indonesian governmental agencies in an effort to learn the names of soldiers who were, in fact, assigned by the Indonesian government specifically to secure the Arun field facilities; and obtain additional information relating to the practice, policies and mission of the Indonesian military units that were assigned to the Aceh region during the relevant time period.

The summary judgment decision did not finally resolve any facts against Defendants, and before the case could proceed to trial, Defendants must be granted an opportunity to conduct an investigation and obtain discovery on all issues relevant to Plaintiffs' claims.

C.      Plaintiffs' Concession that They Have No Credible Evidence to Connect Defendants to the Tortfeasing Soldiers Does Not Curtail Defendants' Right to Defend Themselves at Trial

Finally, in a misguided effort to curtail Defendants' need for an investigation in Indonesia, Plaintiffs essentially concede that they have no credible evidence to show that the specific tort-feasing soldiers were, in fact, agents or employees of Defendant EMOI.  Plaintiffs state that they will "tie their assailants to Defendants" "not primarily by the soldiers' names or descriptions," but "by virtue of the soldier's use of the Exxon complex, vehicles, or other property in the perpetration of their offenses, statements of the soldiers referencing their ties to Defendants and the Exxon complex, and the soldiers' and attackers' immediate and close proximity to the Exxon complex."[17] (Opp. at 27.)  Plaintiffs further concede that it is "unlikely that each individual soldier can be identified and located, even when his name is known." (*Id.* at 28.)

As a threshold matter, the use of Arun field facilities or equipment – all of

---

[17]   Plaintiffs have yet to disclose any evidence that would support even these attenuated claims. The *sum total* of evidence in the record allegedly connecting Plaintiffs' perpetrators to Defendants are the following conclusory and unsupported statements that are contained in Plaintiffs' Highly Confidential interrogatory responses (attached to Def. Mem. as Ex. F):



More importantly, several Plaintiffs do not even allege that the soldiers who injured them worked for Defendants.

which was owned by the Indonesian government and not by Defendants (*see* Production

Sharing Contract, ¶¶ 5.3(f), 9.1, Ex. O) – and the proximity to the facilities is simply

insufficient under D.C. law to impose *respondeat superior* liability on Defendants.  *See*

*Judah* v. *Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) ("the determinative [factor for agency

relationship] is usually 'whether the employer has the right to control and direct the

servant in the performance of his work'"), *citing District of Columbia* v. *Hampton,* 666

A.2d 30, 38 (D.C. 1995); *LeGrand* v. *Insurance Co. of North America,* 241 A.2d 734,

735 (D.C. 1968); *Safeway Stores, Inc.* v. *Kelly,* 448 A.2d 856, 860 (D.C. 1982); *Levy* v.

*Currier,* 587 A.2d 205, 209 n.10 (D.C. 1991).  Plaintiffs can have no information as to

Defendants' alleged right to control the assaulting soldiers if they don't even know who

the soldiers are.

> The vagueness of Plaintiffs' evidence further heightens Defendants' need

to investigate and obtain credible evidence, so as not to be tainted unfairly by general

allegations of atrocities allegedly committed by the entire Indonesian military.

Presumably, Plaintiffs' strategy is to paint a picture where all nameless Indonesian

soldiers found in the vicinity of the Arun field will be deemed "Exxon's security force,"

even though there is no evidence as to who these soldiers were, what their mission was,

and who controlled them.[18]  While Plaintiffs contend that Defendants can seek to "depose

---

[18]   Plaintiffs contend that a single statement contained in a letter from the former manager of
EMOI to Pertamina requesting that any military assigned by Pertamina to secure the Arun
field be "dedicated exclusively to providing security for" the Arun field, (*see* Opp. at 29),
conclusively demonstrates that all soldiers in the Aceh region were "Exxon security
personnel".  (*Id.*)  But this is absurd; further discovery is critical to understand how Pertamina
responded to the manager's letter, and whether the Indonesian military accommodated
EMOI's request.

PUBLIC REDACTED VERSION

Plaintiffs and . . . probe and attempt to discredit the articulated nexus between Plaintiffs'
attackers and themselves," (Opp. at 28), Defendants are entitled to investigate Plaintiffs
and obtain any impeachment materials.  (*See* Def. Mem. at 25-27.)  Without such an
opportunity, the possibility that a finding of liability will be imposed on no more than
conjecture, bias, or sympathy is great.

The little evidence that exists outside of Indonesia further supports
Defendants' need to conduct an investigation in Indonesia.  Such evidence shows that, in
the relevant time period, there were thousands of Indonesian soldiers deployed to the
Aceh region to fight a civil war, and that such soldiers were tasked with providing
security not just for the Arun field, but also for several other Indonesian Vital National
Objects in Aceh.  (*See, e.g.,* ███ Dep., Ex. I, 61:9-62:2 (████████████████
████████████████████████████████████████████████████████
██████████████████████████).)

Other documents in the record show that the Indonesian military freely
accessed the Arun field facilities and equipment without regard to EMOI's wishes.  (*See,
e.g.,* Ex. P, ███████████████████████████████████████████
████████████████████); Ex. Q, ████████████████████████
██████████████████); Ex. R, █████████████████████
████████████████████████████████████████████████
████████████); Ex. S, █████████████████████████████████
████████████████████████████████████████████████
█████████████████); Ex. T, ████████████████████████
████████████████████████████████████████████████

███████████).)[19]

      The above examples show that an investigation in Indonesia is necessary to clarify the roles and responsibilities of the Indonesian military, Pertamina, Defendant EMOI and the Indonesian government, and would not be cumulative, speculative or immaterial.  Such clarification is critical to Defendants' ability to counter Plaintiffs' baseless assertions that the assaulting soldiers – whoever they may be – were under Defendants' control.  Plaintiffs' proposition that Defendants must settle for cross-examining Plaintiffs on the vital issue of whether the alleged assaulting soldiers were "members of Exxon's paid security force," (Opp. at 28), is unprecedented and inconsistent with the requirements of due process.[20]

---

[19]    Plaintiffs' efforts to distinguish the *Lande* line of cases, (*see* Def. Mem. at 17-19), are unavailing.  While Plaintiffs contend that the DC Municipal Regulation referenced by the D.C. Court of Appeals has no application to the Indonesian military, such argument only serves to demonstrate the need for additional discovery in Indonesia to determine whether the Indonesian military has any policy, practice or custom (in addition to any law) that are analogous to the DC regulation.

[20]    Plaintiffs' reference to the *Unocal* cases as "precedent" is disingenuous.  The case was nowhere ready for trial given the late discovery of the fabrication of a plaintiff's claims by the plaintiffs' counsel.  *See* Defs' Mot. to Vacate the Ex Parte Feb. 26, 2008 Pseudonym Order, filed on Jan. 21, 2009 in *Doe* v. *Exxon*, D.D.C. Civ. No. 07-1022 (RCL).

## CONCLUSION

For the reasons set forth above, and set forth in Defendants' Opening Memorandum, Defendants respectfully request the Court to dismiss Plaintiffs' state law claims and enter judgment for Defendants.

Washington, DC
March 5, 2009

Respectfully submitted,

_____/s/ Martin Weinstein_____
Martin J. Weinstein (Bar No. 37792)
mweinstein@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC  20006
Telephone:  (202) 303-1000
Facsimile:  (202) 303-2000

_____/s/ Alex Young K. Oh_____
Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
2001 K Street, NW, Fifth Floor
Washington, DC  20006
Telephone:  (202) 223-7334
Facsimile:  (202) 223-7420

Paul W. Wright (Bar No. 20747)
paul.w.wright@exxonmobil.com
Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
Exxon Mobil Corporation
800 Bell Street
Houston, TX  77002

Attorneys for Exxon Mobil Corporation and
ExxonMobil Oil Indonesia Inc.