UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Exxon Mobil Corporation, *et al.*,<br><br>Defendants. | Civil Case No. 01-1357 (RCL/AK) |
| JOHN DOE VIII, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Exxon Mobil Corporation, *et al.*,<br><br>Defendants. | Civil Case No. 07-1022 (RCL/AK) |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO EXXON'S MOTION TO DISMISS

Agnieszka M. Fryszman
DC Bar No. 459208
Thomas N. Saunders
Alysson Ford Ouoba
**Cohen Milstein Sellers &
Toll PLLC**
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

Terrence P. Collingsworth
D.C. Bar No. 471830
Christian Levesque
D.C. Bar No. 501778
**Conrad & Scherer LLP**
1156 15th Street, N.W.
Suite 502
Washington, D.C. 20005
Tel:  (202) 543-581
Fax:  (866) 803-1125

Paul L. Hoffman
Catherine Sweetser
**Schonbrun, DeSimone,
Seplow, Harris,
  Hoffman & Harrison LLP**
723 Ocean Front Walk
Venice, CA  90291
Tel: (310) 396-0731
Fax: (310) 399-7040

## TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II.  BACKGROUND ........................................................................................ 2

    A.   Facts ................................................................................................... 3

    B.   Procedural History ............................................................................. 5

    C.   Absence of "Effective and Non-Futile Remedies" in Indonesia ........... 7

III. ARGUMENT .............................................................................................. 11

    A.   Standard of Review............................................................................. 11

    B.   Plaintiffs' Claims are Cognizable Under Indonesian Law,  as Exxon's
         Experts Have Already Explained......................................................... 12

    C.   Exxon's Arguments on Six Threshold Doctrines Are Unavailing, as this
         Court and the Court of Appeals Have Already Held. ........................... 16

         1.   The Court of Appeals Rejected Exxon's Arguments on Political
             Question, Comity, and Foreign Affairs Preemption. Exxon Offers
             No Basis to Disregard the Court of Appeals' Opinion. ........................... 17
             a.   The Court of Appeals Affirmed this Court's Holding that
                  the Political Question Doctrine Does Not Apply......................... 17
             b.   The Court of Appeals Affirmed this Court's Holding that
                  the Comity Doctrine Does Not Apply. ....................................... 17
             c.   The Court of Appeals Rejected Exxon's Preemption
                  Argument. ................................................................................. 20

         2.   This Court Rejected Exxon's Arguments Based on Failure to
             Exhaust Remedies, Forum Non Conveniens, and the Act of State
             Doctrine. Because Exxon Did Not Raise these Arguments During
             the Appeal, the Arguments Are Waived. .................................... 20
             a.   This Court Rejected Exxon's Exhaustion Argument................... 24
             b.   This Court Rejected Exxon's Forum Non Conveniens
                  Argument. ................................................................................. 25
             c.   This Court Rejected Exxon's Act of State Argument.................. 28

    D.   The Requirements for Diversity Jurisdiction Are Satisfied................................ 32

         1.   The Jurisdictional Amount Requirement Is Satisfied. .............................. 32

# TABLE OF CONTENTS

Page

2. The Complete Diversity Requirement Is Satisfied. .................................. 35

3. The Court of Appeals Has Instructed that, if this Court Finds
EMOI Is Not Diverse (which the Court Should Not), EMOI Should
Be Dismissed and the Case Should Proceed Without EMOI. .................. 35
 a. The exercise of supplemental jurisdiction is appropriate
here............................................................................................. 37

E. *Kiobel v. Royal Dutch Petroleum* Does Not Bar Plaintiffs' ATS claims. ............ 38

1. The ATS Claims Satisfy the *Kiobel* Standard for Extraterritorial
Application.............................................................................................. 38
 a. Unlike in *Kiobel*, Exxon is a U.S. National and the U.S. has
an Obligation to Regulate its Overseas Conduct. ......................... 40
 b. Exxon's Significant U.S. Conduct is Sufficient to
Overcome the *Kiobel* Presumption. .............................................. 45

2. Exxon can be Held Liable for Aiding and Abetting Under the ATS........ 50
 a. Perišić Confirms the Court of Appeals' Statement that the
Mens Rea Requirement for Aiding and Abetting Is
Knowledge. .................................................................................... 51
 b. Perisic Did Not Alter the Long-Standing and Unwavering
Standard for Actus Reus. ............................................................... 51

IV. CONCLUSION............................................................................................... 54

# TABLE OF AUTHORITIES

Page (s)

CASES

*Action Alliance of Senior Citizens of Greater Phila. v. Sullivan*,
 930 F.2d 77 (D.C. Cir. 1991) ...............................................................16

*Ahmed v. Magan*,
 2013 WL 4479077 (S.D. Ohio Aug. 20, 2013) .....................................45

*In re Air Crash Disaster Near New Orleans, La. On July 9, 1982*,
 821 F.2d 1147 (5th Cir. 1987), *vacated on other grounds, sub nom, Pan Am. World
 Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989) .......................................27

*In re Air Crash off Long Island, N.Y. on July 17, 1996*,
 65 F. Supp. 2d 207 (S.D.N.Y. 1999) ......................................................27

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
 416 F.3d 1242 (11th Cir. 2005) .............................................................50

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
 425 U.S. 682 (1976) ..........................................................................29, 30

*Am. Ins. Ass'n v. Garamendi*,
 539 U.S. 396 (2003) ...............................................................................20

*The Apollon*,
 22 U.S. 363 (1824) .................................................................................44

*Ashcroft v. Iqbal*,
 556 U.S. 622 (2009) ...............................................................11, 14, 15

*Aziz v. Alcolac, Inc.*,
 658 F.3d 388 (4th Cir. 2011) .................................................................50

*Balintulo v. Daimler AG*,
 727 F. 3d 174 (2d Cir. 2013) .................................................................41

*Barr v. Clinton*,
 370 F.3d 1196 (D.C. Cir. 2004) .............................................................12

*Batiste v. Island Records Inc.*,
 179 F.3d 217 (5th Cir. 1999) .................................................................38

*Authorities upon which this brief chiefly relies are marked with asterisks.

iii

## TABLE OF AUTHORITIES

Page (s)

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).................................................................................................11, 15

*Blackmer v. United States,*
   284 U.S. 421 (1932)................................................................................................ 43-44

*Bodner v. Banque Paribas,*
   114 F. Supp. 2d 117 (E.D.N.Y. 2000) ..................................................................19

*Boileau v. Bethlehem Steel Corp.,*
   730 F.2d 929 (3d Cir. 1984)...................................................................................46

*Bowoto v. Chevron,*
   557 F. Supp. 2d 1080 (N.D. Cal. 2008) ...............................................................25

*Bowoto v. Chevron Corp.,*
   2007 WL 2349345 (N.D. Cal. Aug. 14, 2007). ....................................................30

*In re Bridgestone/Firestone,*
   190 F. Supp. 2d 1125 (S.D. Ind. 2002).................................................................15

*Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.,*
   554 F.3d 595 (5th Cir. 2009) .................................................................................37

*Bryant v. Mattel, Inc.,*
   2010 WL 3705668 (C.D. Cal. Aug. 2, 2010)........................................................28

*Cabiri v. Assasie-Gyimah,*
   921 F. Supp. 1189 (S.D.N.Y. 1996)......................................................................25

*Carlsbad Tech., Inc. v. HIF Bio, Inc.,*
   556 U.S. 635 (2009)...............................................................................................37

*Cavalier Clothes v. Major Coat Co.,*
   1991 WL 125179 (E.D. Pa. June 26, 1991) .........................................................35

*Chamber of Commerce of the U.S. v. Whiting,*
   131 S. Ct. 1968 (2011)......................................................................................20, 21

*Cicippio-Puleo v. Islamic Republic of Iran,*
   353 F.3d 1024 (D.C. Cir. 2004).............................................................................46

*Cohen v. Office Depot, Inc.,*
   184 F.3d 1292 (11th Cir. 1999), *upheld in pertinent part and vacated in non-pertinent*
   *part en banc,* 204 F.3d 1069 (11th Cir. 2000) .....................................................32

# TABLE OF AUTHORITIES

Page (s)

*Cronin v. Islamic Republic of Iran*,
    238 F. Supp. 2d 222 (D.D.C. 2002) ........................................................................33

*de Csepel v. Republic of Hungary*,
    714 F.3d 591 (D.C. Cir. 2013) ............................................................11, 30, 31

*Doe I v. Israel*,
    400 F. Supp. 2d 86 (D.D.C. 2005) ........................................................................31

*\*Doe v. Exxon Mobil Corp.*,
    473 F.3d 345 (D.C. Cir. 2007) ..............................................................................5

*Doe VIII v. Exxon Mobil Corp.*,
    527 F. App'x 7 (D.C. Cir. 2013) ...................................................... 7, 16, 50-51

*\*Doe VIII v. Exxon Mobil Corp*,
    654 F.3d 11 (D.C. Cir. 2011) .................................2, 16, 18, 20, 24, 35, 36, 50, 53

*Dou Yee Enters. (S) PTE Ltd. v. Advantek, Inc.*,
    149 F.R.D. 185 (D. Minn. 1993) ...........................................................................36

*Emory v. United Air Lines, Inc.*,
    821 F. Supp. 2d 200 (D.D.C. 2011), *aff'd*, 720 F.3d 915 (D.C. Cir. 2013) ...........................38

*Envtl. Def. Fund, Inc. v. Massey*,
    986 F.2d 528, 531–32 (D.C. Cir. 1993) ................................................................49

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ..............................................................................................11

*In re Estate of Ferdinand Marcos, Human Rights Litig.*,
    25 F.3d 1467 (9th Cir. 1994) ...............................................................................29

*Farrell Lines Inc. v. Columbus Cello-Poly Corp.*,
    32 F. Supp. 2d 118 (S.D.N.Y. 1997) ....................................................................15

*Fehling v. Cantonwine*,
    522 F.2d 604 (10th Cir. 1975) .............................................................................33

*Filártiga v. Peña-Irala*,
    630 F.2d 876 (2d Cir. 1980) ................................................................................42

*Filebark v. U.S. Dep't of Transp.*,
    555 F.3d 1009 (D.C. Cir. 2009) ......................................................................22, 23

# TABLE OF AUTHORITIES

Page (s)

*Ford Motor Co. v. United States*,
    688 F.3d 1319 (Fed. Cir. 2012) .......................................................................... 25

*Fowler v. A & A Co.*,
    262 A.2d 344 (D.C. 1970) ................................................................................... 15

*Freeman v. Nw. Acceptance Corp.*,
    754 F.2d 553 (5th Cir. 1985) .............................................................................. 36

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992) (Kennedy, J., concurring) .................................................... 20

*Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*,
    836 N.Y.S.2d 4 (N.Y. App. Div. 2007) .............................................................. 19

*Gulf Oil Corp. v. Gilbert*,
    330 US. 501 (1947) ............................................................................................. 27

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................................ 53

*Halcomb v. Woods*,
    767 F. Supp. 2d 123 (D.D.C. 2011) .................................................................... 34

*\*Hanna v. Plumer*,
    380 U.S. 460 (1965) ............................................................................................ 32

*Harris v. Sec'y, U.S. Dep't of Veterans Affairs*,
    126 F.3d 339 (D.C. Cir. 1997) ............................................................................ 37

*Hartford Fire Ins. Co. v. California*,
    509 U.S. 764 (1993) ............................................................................................ 18

*Hartman v. Duffey*,
    88 F.3d 1232 (D.C. Cir. 1996) ............................................................................ 22

*Hayes v. D.C.*,
    923 F. Supp. 2d 44 (D.D.C. 2013) ...................................................................... 37

*Holland v. Apfel*,
    23 F. Supp. 2d 21 (D.D.C. 1998), *aff'd sub nom, Holland v. Nat'l Mining Ass'n*, 309
    F.3d 808 (D.C. Cir. 2002) ................................................................................... 19

*Hopkins v. Price Waterhouse*,
    737 F. Supp. 1202 (D.D.C. 1990) ....................................................................... 16

# TABLE OF AUTHORITIES

Page (s)

*Hunter v. District of Columbia,*
  384 F. Supp. 2d 257 (D.D.C. 2005) ..................................................................34

*Huthnance v. District of Columbia,*
  793 F. Supp. 2d 183 (D.D.C. 2011), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013)............33

*Jackson v. CCA of Tenn., Inc.,*
  452 F. App'x 1 (D.C. Cir. 2011) ......................................................................37

*Jaffe v. Pallotta TeamWorks,*
  374 F.3d 1223 (D.C. Cir. 2004) ......................................................................34

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.,*
  402 F.3d 1249 (D.C. Cir. 2005) ......................................................................11

*John Anderson & Co. (Wool) Pty. Ltd. v. Ludlow Jute Co.,*
  569 F.2d 696 (1st Cir. 1978) ...........................................................................18

*Jones v. District of Columbia,*
  424 F. Supp. 110 (D.D.C. 1977) .....................................................................34

*Jota v. Texaco,*
  157 F.3d 153 (2d Cir. 1998) ...........................................................................18

*Kadic v. Karadzic,*
  70 F.3d 232 (2d Cir. 1995) .......................................................................29, 30

*Kahal v. J.W. Wilson & Assocs.,*
  673 F.2d 547 (D.C. Cir. 1982) .......................................................................34

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
  2013 WL 4427943 (D.D.C. Aug. 20, 2013) .............................................30, 38, 39

*KBI Transp. Servs. v. Med. Transp. Mgmt. Inc.,*
  679 F. Supp. 2d 104 (D.D.C. 2010) .................................................................15

*Keane Corp. v. Ins. Co. of North Am.,*
  597 F. Supp. 934 (D.D.C. 1984) .....................................................................35

*Khulumani v. Barclay Nat. Bank Ltd.,* 504 F.3d 254, 260 (2d Cir. 2007), aff'd sub nom.
  *Am. Isuzu Motors, Inc. v. Ntsebeza,* 553 U.S. 1028 (2008) ....................................50

*Kimberlin v. Quinlan,*
  199 F.3d 496 (D.C. Cir. 1999) ................................................................21, 22, 23

# TABLE OF AUTHORITIES

Page (s)

*Kiobel v. Royal Dutch Petroleum Co.,*
  133 S. Ct. 1659 (Apr. 17, 2013)...................................................................... 2, 7, 16, 38-45

*Kowal v. MCI Comm. Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) ................................................................................12

*Krempel v. Prairie Island Indian Cmty.,*
  125 F.3d 621 (8th Cir. 1997) .................................................................................24

*Kvetan v. Emp'rs Contract Servs. of Miami,*
  1996 WL 376935 (S.D.N.Y. July 5, 1996) ............................................................28

*Lacey v. Cessna Aircraft Co.,*
  932 F.2d 170 (3d Cir. 1991)....................................................................................26

*Laffey v. Nw. Airlines, Inc.,*
  740 F.2d 1071 (D.C. Cir. 1984) .......................................................................21, 23

*Langevine v. District of Columbia,*
  106 F.3d 1018 (D.C. Cir. 1997) .............................................................................33

*Lans v. Adduci Mastriani & Schaumberg,*
  786 F.Supp.2d 240 (D.D.C. 2011) .........................................................................26

*LaRoque v. Holder,*
  650 F.3d 777 (D.C. Cir. 2011) ...............................................................................11

*LaShawn A. v. Barry,*
  87 F.3d 1389 (D.C. Cir. 1996) ...............................................................................23

*Linder v. Calero-Portocarrero,*
  180 F.R.D. 168 (D.D.C. 1998).................................................................................21

*Linder v. Portocarrero,*
  963 F.2d 332 (11th Cir. 1992) ...........................................................................29, 31

*Lony v. E.I. Du Pont de Nemours & Co.,*
  935 F.2d 604 (3d Cir. 1991)...............................................................................27, 28

*Lopez v. Shearson Am. Express, Inc.,*
  684 F. Supp. 1144 (D.P.R. 1988)............................................................................36

*Love v. Budai,*
  665 F.2d 1060 (D.C. Cir. 1980).............................................................................32

# TABLE OF AUTHORITIES

Page (s)

*Martin v. Gibson,*
  723 F.2d 989 (D.C. Cir. 1983) ....................................................................32, 34

*McCabe v. McKinney,*
  982 F.2d 529 (10th Cir. 1992) ...........................................................................33

*McKesson Corp. v. Islamic Republic of Iran,*
  672 F.3d 1066 (D.C. Cir. 2012) ....................................................................30, 31

*Med. Center Pharm. v. Holder,*
  634 F.3d 830 (5th Cir. 2011) ..............................................................................22

*Meng v. Schwartz,*
  305 F. Supp. 2d 49 (D.D.C. 2004) ......................................................................37

*Mohammadi v. Islamic Republic of Iran,*
  2013 WL 2370594 (D.D.C. May 31, 2013) ...................................................38, 39

*Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle,*
  429 U.S. 274 (1977) ............................................................................................32

*Munoz v. Cnty. of Imperial,*
  667 F.2d 811 (9th Cir. 1982) ..............................................................................22

*\*Mwani v. Laden,*
  2013 WL 2325166 (D.D.C. May 29, 2013) ................................................ 38-39, 49

*Nw. Forest Res. Council v. Dombeck,*
  107 F.3d 897 (D.C. Cir. 1997) ...........................................................................19

*Nw. Ind. Tel. Co. v. F.C.C.,*
  872 F.2d 465 (D.C. Cir. 1989) .................................................................21, 22, 23

*Oberwetter v. Hilliard,*
  639 F.3d 545 (D.C. Cir. 2011) ...........................................................................11

*Oetjen v. Cent. Leather Co.,*
  246 U.S. 297 (1918) ............................................................................................31

*Palmer v. Barry,*
  794 F. Supp. 5 (D.D.C. 1992) .............................................................................21

*Palmer v. Kelly,*
  17 F.3d 1490 (D.C. Cir. 1994) ...........................................................................22

# TABLE OF AUTHORITIES

Page (s)

*Pasco Int'l (London) Ltd. v. Stenograph Corp.*,
  637 F.2d 496 (7th Cir. 1980) ................................................................36

*In re Perry H. Koplik & Sons, Inc.*,
  357 B.R. 231 (Bankr. S.D.N.Y. 2006) ..................................................19

*Piper Aircraft Co. v Reyno*,
  454 U.S. 235 (1981)................................................................................26

*Pujol v. Shearson Am. Exp. Inc.*,
  877 F.2d 132 (1st Cir. 1989) (Breyer, J.)........................................36, 37

*Pyramid Sec. Ltd. v. IB Resolution, Inc.*,
  924 F.2d 1114 (D.C. Cir. 1991)........................................................36, 37

*Raytheon Eng'rs & Constructors, Inc. v. H L H & Assocs.*,
  1998 WL 224531 (5th Cir. Apr. 17, 1998) ...........................................26

*Roberts v. LaVallee*,
  389 U.S. 40 (1967)..................................................................................25

*Roe III v. Unocal Corp.*,
  70 F. Supp. 2d 1073 (C.D. Cal. 1999) ..................................................30

*Rollins v. Wackenhut Servs., Inc.*,
  703 F.3d 122 (D.C. Cir. 2012)................................................................11

*Romero v. Drummond Co., Inc.*,
  552 F.3d 1303 (11th Cir. 2008) .............................................................50

*Rosenboro v. Kim*,
  994 F.2d 13 (D.C. Cir. 1993) ................................................................32

*Rundquist v. Vapiano SE*,
  798 F. Supp. 2d 102 (D.D.C. 2011) ......................................................38

*Saleh v. Titan Corp.*,
  580 F.3d 1 (D.C. Cir. 2009) ..................................................................20

*Sarei v. Rio Tinto, PLC*,
  550 F.3d 822 (9th Cir. 2008) (*en banc*) ................................................24

*Settles v. U.S. Parole Comm'n*,
  429 F.3d 1098 (D.C. Cir. 2005)..............................................................16

x

# TABLE OF AUTHORITIES

Page (s)

*Sexual Minorities Uganda v. Lively,*
  2013 WL 4130756 (D. Mass. Aug. 14, 2013) .........................................................45, 46, 49

*Shekoyan v. Sibley Int'l,*
  409 F.3d 414 (D.C. Cir. 2005) ............................................................................................37

*Sinaltrainal v. Coca-Cola Co.,*
  578 F.3d 1252 (11th Cir.2009) ...........................................................................................50

*Sosa v. Alvarez-Machain,*
  542 U.S. 692 (2004)............................................................................................................45

*St. Paul Mercury Indem. Co. v. Red Cab Co.,*
  303 U.S. 283 (1938)......................................................................................................32, 34

*Stethem v. Islamic Republic of Iran,*
  201 F. Supp. 2d 78 (D.D.C. 2002) .....................................................................................33

*In re Toyota Motor Corp.,*
  785 F. Supp. 2d 883 (C.D. Cal. 2011) ...............................................................................36

*Tullett Prebon, PLC v. BGC Partners Inc.,*
  2010 WL 2545178 (D.N.J. June 18, 2010)........................................................................36

*United States v. Ali,*
  718 F.3d 929 (D.C. Cir. 2013) ...........................................................................................49

*United States v. Belfast,*
  611 F.3d 783 (11th Cir. 2010) ...........................................................................................44

*United States v. Bowman,*
  260 U.S. 94 (1922).............................................................................................................44

*United States v. Gabriel,*
  2005 WL 1060631 (D.D.C. May 4, 2005) ..........................................................................16

*United States v. Garrett,*
  720 F.2d 705 (D.C.Cir.1983)..............................................................................................49

*United States v. Henry,*
  472 F.3d 910 (D.C. Cir. 2007) ...........................................................................................21

*United States v. Thomas,*
  572 F.3d 945 (D.C. Cir. 2009) ...........................................................................................21

xi

## TABLE OF AUTHORITIES

Page (s)

*Underhill v. Hernandez,*
    168 U.S. 250 (1897) ..................................................................................31

*United States v. Parks,*
    698 F.3d 1 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 2021 (2013) ...........................16

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.,*
    493 U.S. 400 (1990) ..................................................................................29

*Watson v. Merrell Dow Pharm., Inc.,*
    769 F.2d 354 (6th Cir. 1985) .................................................................26, 27

*\*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,*
    810 F.2d 243 (D.C. Cir. 1987) ..............................................................21, 22

*Winters v. Fru-Con Inc.,*
    498 F.3d 734 (7th Cir. 2007) .....................................................................32

*World Wide Minerals Ltd. v. Republic of Kazakhstahn,*
    116 F. Supp. 2d 98 (D.D.C. 2000) (Lamberth, J.) ..................................32

*World Wide Minerals, Ltd. v. Republic of Kazakhstan,*
    296 F.3d 1154 (D.C. Cir. 2002) ...............................................................31

*Wyatt v. Syrian Arab Republic,*
    304 F. Supp. 2d 43 (D.D.C. 2004) ...........................................................46

*Wylain, Inc. v. Kidde Consumer Durables Corp.,*
    74 F.R.D. 434 (D. Del. 1977) ...................................................................36

*Yates v. District of Columbia,*
    324 F.3d 724 (D.C. Cir. 2003) ..................................................................11

*Zschernig v. Miller,*
    389 U.S. 429 (1968) ..................................................................................20

**U.S. STATUTES AND RULES**

28 U.S.C. § 1367 ................................................................................................37

29 U.S.C. §1350 ..................................................................................................2

Fed. R. Civ. P. 12 .............................................................................................11

Fed. R. Civ. P. 19 ..................................................................................15, 36, 37

# TABLE OF AUTHORITIES

Page (s)

**FOREIGN & INTERNATIONAL LAW**

Indonesian Civil Code, Art. 1365 ...............................................................................13

Indonesian Civil Code, Art. 1366 ...............................................................................13

Indonesian Civil Code, Art. 1367 .......................................................................13, 14, 15

Indonesian Civil Code, Art. 1370 ...............................................................................13

Indonesian Civil Code, Art. 1371 ...............................................................................13

Law of the Republic of Indonesia No. 31 of 1997 on Military Court ...........................................10

Law of the Republic of Indonesia, No. 26/2000, Law Concerning Human Rights Courts,
    *available at* http://hrli.alrc.net/mainfile.php/indonleg/132/......................................8

Law of the Republic of Indonesia, No. 11 of 2006, Regarding Governing of Aceh ......................8

Memorandum of Understanding Between the Government of the Republic of Indonesia
    and the Free Aceh Movement (Aug. 15, 2005) ..................................................8

*Prosecutor v. Blagojević & Jokić,*
    Case No. IT-02-60-A, Appeals Chamber J. (May 9, 2007)....................................53

*Prosecutor v. Kayishema and Ruzindana,*
    Case No. ICTR-95-1-A, Judgment (June 1, 2001) ...........................................53-54

*Prosecutor v. Perišić,*
    No. IT-04-81-A, Appeals Chamber J. (Feb. 28, 2013) ....................................50-53

*Prosecutor v. Tadić,*
    No. IT-94-1-A, Appeals Chamber J. (July 15, 1999) ...........................................52

*\*Prosecutor v. Taylor,*
    No. SCSL-03-01-A, Appeals Chamber J. (Sept. 26, 2013) ...............................52, 53

**OTHER AUTHORITIES**

18B Fed. Prac. & Proc. Juris. § 4478.6 (2d ed.) (1990)...................................................22

Amnesty Int'l, Submission to the UN Universal Periodic Review, 13th Session of the
    UPR Working Group, May-June 2012 at 1 (Nov. 2011), *available at*
    http://www.amnesty.org/en/library/info/ASA21/003/2012 ...................................10

# TABLE OF AUTHORITIES

Page (s)

Amnesty Int'l, *Time to Face the Past: Justice for Past Abuses in Indonesia's Aceh Province* (2013), *available at* http://www.amnesty.org/en/library/info/ASA21/001/2013/en ................................................7

Curtis Bradley, *Agora: Kiobel, Attorney General Bradford's Opinion and the Alien Tort Statute*, 106 Am. J. Int'l L. 509 (2012).........................................................................41, 43

Elucidation of Law of the Republic of Indonesia No. 31 of 1997 on Military Court...................10

Emmerich de Vattel, *The Law of Nations: Or, Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns* 162 (1797) .............................................43

Human Rights Watch, World Report 2013, Indon., *available at* http://www.hrw.org/world-report/2013 .................................................................................7

Human Rights Watch, World Report 2012, Indon., *available at* http://www.hrw.org/world-report-2012 ...............................................................................10

Int'l Center for Transitional Justice, Submission to the Universal Periodic Review of the U.N. Human Rights Council (Second Cycle) 13th Session, *available at* http://ictj.org/sites/default/files/ICTJ-Indonesia-Periodic-Review-2011-English.pdf...............9

*Oppenheim's International Law* § 138 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1992) .............................................................................................................................44

Restatement (Third) of the Foreign Relations Law of the United States § 402(2) (1987) .........................................................................................................................44

Transparency Int'l, Corruption Perceptions Index 2013, *available at* http://www.transparency.org/cpi2013/results ...........................................................................9

U.S. State Dep't, Country Reports on Human Rights Practices for 2012 - Indonesia, *available at* http://www.state.gov/documents/organization/204415.pdf ..................................8

U.S. State Dep't, Country Reports on Human Rights Practices for 2011 - Indonesia, *available at* http://www.state.gov/documents/organization/186485.pdf ..................................9

William Blackstone, *Commentaries on the Law of England* 68 (1765) .......................................43

Working Group on the Universal Periodic Review, Human Rights Council, Compilation prepared by the Office of the High Commission for Human Rights in accordance with paragraph 5 of the annex to Human Rights Council resolution 16/21: Indonesia,13th Sess.,U.N. Doc. A/HRC/WG.6/13/IDN/2 (Mar. 12, 2012), *available at* http://www.ohchr.org/EN/HRBodies/UPR/Pages/IDSession13.aspx .......................................9

# TABLE OF AUTHORITIES

Page (s)

Yenni Kwok, "Top Indonesian 'Anticorruption' Judge Is Arrested for Graft", Time, Oct.
4, 2013, *available at* http://world.time.com/2013/10/04/arrest-of-antigraft-judge-
shows-depth-of-indonesias-corruption-crisis/.......................................................................19

## GLOSSARY

| | |
|---|---|
| Clarke Decl. | Decl. of Ross Clarke, 07-cv-1022, Dkt. 25-5 (Nov. 2, 2007) |
| Defendants | All Defendants Listed in 01-cv-1357 & 01-cv-1022 (D.D.C.) |
| Doe I Dkt. | *Doe I v. Exxon Mobil Corp.*, Dkt. 01-cv-1357 (D.D.C.) |
| *Doe VIII Dkt.* | *Doe VIII v. Exxon Mobil Corp.*, Dkt. 07-cv-1022 (D.D.C) |
| EB | Defs.' Mot. to Dismiss, 07-cv-1022, Dkt. 61,<br>& 01-cv-1357, Dkt. 426 (Oct. 30, 2013) |
| EMC | ExxonMobil Corporation |
| EMOI | ExxonMobil Oil Indonesia, Inc. |
| *FNC* | *forum non conveniens* |
| Fryszman Decl. | Decl. of Agnieszka Fryszman,<br>filed in Supp. of Pls.' Opp. to Defs.' Mot. to Dismiss,<br>07-cv-1022, Dkt. 293-3 (Mar. 21, 2008) |
| Hornick Decl. | Decl. of Robert B. Hornick,<br>01-cv-1357, Dkt. 127 (Feb. 3, 2006) |
| Hornick Suppl. Decl. | Supplemental Decl. of Robert B. Hornick,<br>01-cv-1357, Dkt. 134 (Mar. 1, 2006) |
| MTD 2005 Order | Mem. & Op. Granting in Part and Den. In Part<br>Defs.' Mot. to Dismiss, 01-cv-1357, Dkt. 103 (Oct. 14, 2005) |
| Oh. Decl. | Decl. of Alex Young K. Oh,<br>filed with Defs.' Mot. to Dismiss,<br>07-cv-1022, Dkt. 61, & 01-cv-1357, Dkt. 426 (Oct. 30, 2013) |
| Panjaitan Decl. | Decl. of Johnson Panjaitan,<br>01-cv-1357, Dkt. 130-4 (Feb. 16, 2006) |
| Semendawai Decl. | Decl. of Abdul Haris Semendawai,<br>01-cv-1357, Dkt. 115-4 (Dec. 13, 2005) |
| Siregar Decl. | Decl. of Judge Bismar Siregar,<br>01-cv-1357, Dkt. 13, Ex. 8 (Oct. 1, 2001) |
| SJ Op. | Summ. J. Mem. & Op., 01-cv-1357, Dkt. 365 (Aug. 27, 2008) |

SMF                          Pls.' Counterstatement of Material Facts,
                             Filed Under Seal, 07-cv-1022, Dkt. 296 (Mar. 24, 2008)

Winarta Decl.                Decl. of Frans Winarta,
                             01-cv-1357, Dkt. 114-1 (Dec. 9, 2005)

Winarta Supp. Decl.          Supplemental Decl. of Frans Winarta, attached to Defs.' Mot. to
                             Dismiss, 07-cv-1022, Dkt. 61, & 01-cv-1357, Dkt. 426 (Oct. 30,
                             2013)

I.      **INTRODUCTION AND SUMMARY OF ARGUMENT**

Exxon contracted for, controlled, directed, and paid military security personnel who, working exclusively for Exxon and within the scope of that employment, injured the fifteen Indonesian villagers seeking redress in these two cases.  This Court should reject Exxon's decade-long effort to delay a resolution on the merits by repeatedly re-litigating threshold issues that have already been decided and rejected by this Court and the Court of Appeals.

Denying Exxon's motion for summary judgment, this Court found that (a) "there is evidence that these security forces committed the alleged atrocities"; (b) Defendants contracted for and paid the security personnel; and (c) Plaintiffs had presented sufficient evidence of Defendant's control over their paid security personnel to proceed to a jury under a respondeat superior theory of liability.  SJ Op. 1, 10.  And, as Exxon's own experts explained a decade ago, Plaintiffs' state law claims are fully cognizable under Indonesian tort law.  Exxon's own experts also agree that Plaintiffs' theories of liability, including negligent supervision, respondeat superior liability, and liability of a principal for the acts of his or her representative, are available under Indonesian law.

Exxon's renewed arguments for dismissal on a variety of threshold doctrines misrepresent the allegations in the Complaints and ignore this Court's findings on Summary Judgment.  Exxon continues to insist that Plaintiffs' claims require the Court to sit in judgment of the Government of Indonesia's conduct during a now-concluded civil war.  That is not what Plaintiffs alleged and, moreover, this Court has already found that the evidence shows that the security personnel were "dedicated exclusively" to Exxon's operations and did "not perform a broader role with respect to military activities in the region."  SJ Op. at 14; Doe I First Am. Compl. ("Doe I FAC"), *Doe I* Dkt. 129, ¶¶47-49; Doe VIII Compl., *Doe VIII* Dkt. 4, ¶¶40-42.

Not only are the threshold doctrines factually inapplicable, but the Court of Appeals rejected the application of the political question, comity and preemption doctrines in this case. *See Doe VIII v. Exxon Mobil Corp*, 654 F.3d 11, 57-74 (D.C. Cir. 2011).  Exxon offers no basis for this Court to disregard the reasoning of the Court of Appeals, which squarely considered the same arguments Exxon renews here.  The other three arguments, regarding *forum non conveniens*, failure to exhaust remedies, and the act of state doctrine, were rejected by this Court when Exxon asserted them in prior dismissal motions.  Exxon failed to appeal any of these issues.  The controlling law of this Circuit bars Exxon from renewing on remand the rulings it failed to appeal.

Finally, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (Apr. 17, 2013), does not mandate dismissal of the Alien Tort Statute, 29 U.S.C. §1350, claims in this case because Exxon Mobil is a U.S. national and conducted significant conduct in the United States relevant to this action.  Further, as every Circuit to consider this issue has held, aiding and abetting is available under the ATS.

## II.    **BACKGROUND**

The allegations in Plaintiffs' Complaints have been substantiated by discovery.  Plaintiffs therefore cite to both their operative Complaints and this Court's Summary Judgment opinion.[1]

---

[1] Exxon summarizes the original Doe I Complaint, *see* EB at 3 n.3, which is *not* the operative complaint and contains allegations that Plaintiffs have abandoned.  Exxon also ignores this Court's ruling on summary judgment and fails to acknowledge the evidence obtained in discovery.  Plaintiffs will seek to amend their complaint to conform to *Kiobel* and include evidence obtained in discovery, particularly regarding conduct in the United States.

A.    **Facts**

Exxon contracted for the provision of military security in a "Production Sharing Contract."  Doe I FAC ¶46; Doe VIII Compl. ¶39; SJ Op. at 1, 3. Pursuant to the contract, the security personnel were to be provided upon Exxon's request.  SJ Op. at 3.

The "security personnel were 'dedicated exclusively'" to Exxon's operations and did "not perform a broader role with respect to military activities in the region."  SJ Op. at 14; *see also* Doe I FAC ¶47 (the security personnel had the sole and specific purpose of providing security for Exxon); Doe VIII Compl. ¶40 (same).   For example, the security personnel manned the gates and conducted access control—checking identification and inspecting bags; escorted Exxon VIPs; delivered diesel; cleared the roads for Exxon convoys; and guarded remote sites.  SJ Op. at 14-15 (citing exhibits); *see also* SMF ¶¶65-67 (citing, *e.g.*, Exs. 176; 183-197; 201; 203; 213; 223; 405 at 127-29, 220, 254-55, 274-75 to Fryszman Decl.).  Indeed, the military security personnel worked alongside EMOI's own civilian security personnel.  SJ Op. at 14-15 (citing exhibits, including Plaintiffs' Ex. 201, internal EMOI e-mail stating that "both military and MOI security guards are on duty at the main gate").

EMOI paid the security personnel directly and individually.  Doe I FAC ¶52; Doe VIII Compl. ¶45; SJ Op. at 14 (citing evidence).  EMOI also supervised, controlled, and directed the security personnel.  Doe I FAC ¶¶49, 54; Doe VIII Compl. ¶¶42, 47; SJ Op. at 10-15.  For example, Exxon routinely "revised the deployment logistics" of its security personnel.  SJ Op. at 13.  Plaintiffs further alleged and presented evidence that: Senior ExxonMobil management met frequently with the military security personnel to determine "operational strategy" and resources, including daily meetings regarding convoy times; provided the security personnel with instruction and training, including holding joint drills; determined the numbers and locations of the security personnel; and counted the military security personnel as a company resource in

daily security reports.  Doe I FAC ¶54; SJ Op. at 1, 13-14 (citing Exs. 30, 182, 197, 199); *see also*, SMF ¶67 (citing exhibits).

The evidence is sufficient to meet the test for respondeat superior.  SJ Op. at 10-15.

Exxon knew at the time it hired and retained the military security personnel that they posed an undue risk to local villagers.  Doe I FAC ¶¶46, 58-66; Doe VIII Compl. ¶¶39, 48-59; SJ Op at 19.  For example, ExxonMobil Corporation's US-based Global Security Manager testified that he felt the soldiers "were not adequately trained to be doing the jobs they were being asked to do"; internal reports warned that the military security personnel "were undisciplined," that some acted "as information brokers, thieves, extortionists and intimidators," and that they presented "a number of problems" including "boredom, harassment, improper conduct"; and internal e-mails discussed the military security personnel's "predilection" for rogue operations. SJ Op. at 19.

Under Exxon's control and within the scope of employment, the security personnel injured Plaintiffs.  Doe I FAC ¶¶50, 79, 81; Doe VIII Compl. ¶¶42, 65, 67; SJ Op. at 16-17. Exxon argues that it is not "plausible" that its military security personnel injured Plaintiffs, EB at 5, but as this Court previously found, "there is evidence that these security forces committed the alleged atrocities."  SJ Op. at 1, 10-11.  For example, Plaintiffs identified the perpetrators as members of the security forces retained by Exxon.  SMF ¶75.  Several Plaintiffs alleged that they were injured by military security personnel stationed on ExxonMobil's property.  *E.g.*, Ex. A at 2-3 to Statement of Pls. Pursuant to Court's Aug. 28, 2008 Order, *Doe I* Dkt. 378-1 (Sept. 12, 2008) (plaintiff called over to fence and pulled inside ExxonMobil property by military security personnel who then beat him).

4

B.     **Procedural History**

*Doe I*

Doe-I Plaintiffs filed suit in June 2001, seeking relief under the ATS, TVPA, and non-federal law tort.  Compl., *Doe I* Dkt. 3 (June 19, 2001).  In October 2005, this Court dismissed Plaintiffs' ATS and TVPA claims, and granted Plaintiffs leave to amend their complaint, denying Exxon's renewed motion to dismiss the state law claims.  MTD 2005 Order; Order, *Doe I* Dkt. 136 (Mar. 2, 2006).  Exxon then filed an interlocutory appeal and a petition for mandamus before the Court of Appeals, as well as several sequential stay applications which were all denied.  Notice of Appeal as to Order on Mot. to Dismiss, *Doe I* Dkt. 107 (Nov. 10, 2005); Mot. to Stay Proceedings Pending Resolution of Appeal from Court's Order of Oct. 14, 2005, *Doe I* Dkt. 108 (Nov. 14, 2005); Mot. For Recons., or in the Alt.,  Cert. of the Court's Choice of Law Determination, *Doe I* Dkt. 155 (Apr. 24, 2006); Mot. to Stay Pending S.C. Cert. Pet., *Doe I* Dkt. 244 (Nov. 15, 2007).

A full procedural history of *Doe I*, including a history of the United States' Statements of Interest and the district court's response to the U.S. concerns, is set out in the Court of Appeals' opinion.  *Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007).  The Court of Appeals rejected Exxon's claim that the political question doctrine provided a basis for interlocutory review and denied the petition for mandamus.  *Id*. In its opinion, the Court of Appeals emphasized that if the State Department had additional concerns or if it had misinterpreted the State Department's position, the United States was "free to file further letters or briefs with the district court expressing its views," *id.* at 354, but the United States did not raise any further concerns with the district court.  Exxon filed a petition for certiorari and its fifth application for a stay.  That application for a stay, like the others, was denied.  Letter from William K. Sutter, Clerk of the U.S. Supreme Court, to Walter Dellinger, counsel for Defs. (Jan. 7, 2008).

In May 2008, the Solicitor General, in a brief also signed by the Legal Advisor to the State Department, recommended that Exxon's petition for certiorari be denied.  Br. for the United States as Amicus Curiae 1, *Exxon Mobil Corp. v. Doe*, No. 07-81 (U.S. May 2008).  In that brief, the United States explained that

> the court of appeals reasonably regarded petitioners' interlocutory appeal as one from the denial of a motion to dismiss state-law tort claims based on an assertion by private defendants, not by the Executive, that the litigation itself would have adverse consequences for the Nation's foreign policy interests . . . .

*Id.* at 8.  The Supreme Court denied Exxon's petition on June 16, 2008.  Letter from W. Sutter, Clerk of the U.S. Supreme Court, to Agnieszka Fryszman, Counsel for Pls. (June 16, 2008).

While Exxon's appeals were pending, limited discovery proceeded in the district court. Following the close of discovery, Defendants moved for summary judgment.  The district court dismissed two corporate affiliate defendants but denied EMC and EMOI's motion for summary judgment, finding, as described above, that Plaintiffs had presented sufficient evidence to proceed to trial on their claims.  SJ Op. at 7-28.  The district court separately denied EMOI's motion to dismiss for lack of personal jurisdiction.  Mem. & Order, *Doe I* Dkt. 340-2 (July 18, 2008).  The district court then ordered the parties to submit statements regarding "whether the matter is ripe for trial or if additional discovery is necessary."  Order, *Doe I* Dkt. 367 (Aug. 28, 2008).  The parties submitted competing statements to the court.

In September 2008, *Doe-I* was reassigned to this Court.  Order of Reassignment, *Doe I* Dkt. 382 (Sept. 26, 2008).  After reassignment, Exxon filed a renewed motion to dismiss on political question grounds or, in the alternative, for judgment on the pleadings, or for summary judgment.  Exxon Mot. to Dismiss, *Doe I* Dkt. 389 (Jan. 21, 2009).  This Court denied the motion but dismissed Plaintiffs' claims for lack of standing, Order, *Doe I* Dkt. 412 (Sept. 30, 2009), a decision that was reversed by the Court of Appeals, *Doe VIII v. Exxon*, 654 F.3d 11

(D.C. Cir. July 8, 2011).  The Court of Appeals also reinstated Plaintiffs' ATS claims.  The mandate was stayed, however, pending resolution of *Kiobel v. Royal Dutch Shell* by the Supreme Court.  Per Curiam Order, 09-7125, Dkt. 1341654 (D.C. Cir. Nov. 14, 2011).  After the Supreme Court issued its opinion in *Kiobel*, 133 S. Ct. 1659 (2013), the Court of Appeals vacated its judgment of July 8, 2011 and remanded the Alien Tort Statute claims for further consideration in light of *Kiobel* and for consideration of the standard to be applied for aiding abetting liability. *Doe VIII v. Exxon*, 527 F. App'x 7 (D.C. Cir. 2013).  However, the Court of Appeals reaffirmed its original decision to reverse this Court's dismissal of Plaintiffs' non-federal tort claims.  *Id.*

**Doe VIII**

*Doe VIII*, which contains only non-federal law tort claims, was filed in 2007.  On September 30, 2009, this Court dismissed all of the claims on standing grounds, Order, *Doe VIII* Dkt. 48 (Sept. 30, 2009), a decision that was reversed by the Court of Appeals, *Doe VIII*, 654 F.3d 11.  Although *Doe VIII* contains no ATS claims, it was nonetheless stayed with *Doe I* pending the Supreme Court's decision in *Kiobel*, *Doe VIII*, Per Curiam Order, 09-7125, Dkt. 1341654 (D.C. Cir. Nov. 14, 2011), and has since been remanded to this Court.  Exxon now moves, for a second time, to dismiss all of Plaintiffs' claims.

### C.   Absence of "Effective and Non-Futile Remedies" in Indonesia

There are no effective and non-futile remedies available to Plaintiffs in Indonesia, Exxon's contentions, EB at 9-11, notwithstanding.  Despite Indonesia's ongoing transition from decades of authoritarian rule, Indonesia "remains beset by serious human rights problems" and a culture of impunity.  Human Rights Watch, World Report 2013, Indon. at 323, 324, *available at* http://www.hrw.org/world-report/2013 ("HRW Report 2013"); Amnesty Int'l, *Time to Face the Past: Justice for Past Abuses in Indonesia's Aceh Province* at 9 (2013), *available at* http://www.amnesty.org/en/library/info/ASA21/001/2013/en ("Amnesty 2013 Report").  Exxon

7

describes changes in Indonesia, but does not and cannot point to an effective and non-futile remedy that is available to Plaintiffs.

Critically, institutions designed to provide redress to victims of Aceh's violent past have failed to materialize, while those that exist are not functional or have severely limited jurisdiction. For example, the 2005 Helsinki Peace Accord envisioned the creation of a Human Rights Court to hear allegations of international human rights violations in Aceh. *See* Art. 2.2, Mem. of Understanding, Aug. 15, 2005 (attached as Ex. 2 to Oh Decl.). That court, however, has never been implemented. Amnesty 2013 Report at 6. *See also* Supp. to Mem. Re Pls. Opp. to Mot. to Dismiss 4-7, *Doe VIII* Dkt. 26 (Nov. 2, 2007).[2]

A Human Rights Court in Medan was established in 2000, but that court lacks jurisdiction over Plaintiffs' claims and, moreover, has never resolved a human rights case. The Law Concerning Human Rights Courts that established the Medan Court authorizes jurisdiction only over crimes of genocide and crimes against humanity. Art. 7, Law of the Republic of Indonesia, No. 26/2000, Law Concerning Human Rights Courts, *available at* http://hrli.alrc.net/mainfile.php/indonleg/132/; *see also* U.S. State Dep't, Country Reports on Human Rights Practices for 2012 - Indonesia at 10, *available at* http://www.state.gov/documents/organization/204415.pdf ("2012 State Dep't Report"); Amnesty 2013 Report at 10. Neither of those crimes is alleged here. Further, the Medan Court has failed to hear or rule on *any* human rights cases, which hardly qualifies as a genuinely available, effective and non-futile remedy. Amnesty 2013 Report at 10, 12; 2012 State Dep't

---

[2] Even if the human rights Court were operating, it would have jurisdiction only over human rights violations that occurred after the enactment of the 2006 law regarding governance in Aceh, and therefore would not have jurisdiction over the claims in this case. Art. 228, Law of the Republic of Indon., No. 11/2006, Regarding Governing of Aceh; Amnesty 2013 Report at 10; Clarke Decl. at 2-3, attached hereto as Exhibit 1.

Report at 10–11; U.S. State Dep't, Country Reports on Human Rights Practices for 2011 - Indonesia at 10-11, *available at* http://www.state.gov/documents/organization/186485.pdf ("2011 State Dep't Report").

According to the United States government, the Indonesian judiciary is "susceptible to influence from outside parties, including business interests, politicians, and the security forces." 2012 State Dep't Report at 9.  Despite attempts at reform, the Indonesian judiciary remains beset by corruption, nepotism, and a lack of transparency.  2012 State Dep't Report at 1, 9, 12; Transparency Int'l, Corruption Perceptions Index 2013, *available at* http://www.transparency.org/cpi2013/results.  As a result, victims' access to civil remedies is "limited," 2012 State Dep't Report at 12, and impunity for violations of human rights abuses remains widespread.  HRW Report 2013 at 323, 324; *see also* Amnesty 2013 Report at 9 ("[B]arriers in the legal framework and a lack of political will to develop effective mechanisms and strategies to investigate and prosecute crimes in Aceh . . . have entrenched impunity."); Working Group on the Universal Periodic Review, Human Rights Council, Compilation prepared by the Office of the High Commission for Human Rights in accordance with paragraph 5 of the annex to Human Rights Council resolution 16/21:  Indonesia,13th Sess.,U.N. Doc. A/HRC/WG.6/13/IDN/2 (Mar. 12, 2012), *available at* http://www.ohchr.org/EN/HRBodies/UPR/Pages/IDSession13.aspx (noting "grave concerns over the climate of impunity"); Int'l Center for Transitional Justice, Submission to the Universal Periodic Review of the U.N. Human Rights Council (Second Cycle) 13th Session, at 1, 2–3 (Nov. 2011), *available at* http://ictj.org/sites/default/files/ICTJ-Indonesia-Periodic-Review-2011-English.pdf.

The Indonesian Military Courts do not have jurisdiction over corporate entities that contract for, pay, supervise, direct, and control military security forces that violate human rights. *See* Arts. 9(1), 40, and 41 of Law of the Republic of Indonesia No. 31 of 1997 on Military Court (attached as Ex. 11 to Winarta Supp. Decl.); Elucidation of Law of the Republic of Indonesia No. 31 of 1997 on Military Court (specifying that the military courts' jurisdiction over non-soldiers extends only to "civilians who actually work at the Armed Forces") (attached as Ex. 11 to Winarta Supp. Decl.).  Even with respect to cases against soldiers, the Indonesian Military Courts have proven incapable of providing justice for human rights abuses.  "Military tribunals are held rarely, lack transparency, and the charges frequently fail to reflect the seriousness of the abuses committed."  Human Rights Watch, World Report 2012, Indon. at 335, *available at* http://www.hrw.org/world-report-2012 ("HRW Report 2012"); *see also* HRW Report 2013 at 324 ("[T]he military courts hav[e] a poor prosecution record and [there is] no civilian jurisdiction over soldiers who commit serious human rights abuses.").  In an incident in 2012, over 300 soldiers went on a "rampage[]," during which they "randomly fired their weapons into shopping areas, burned down 87 houses, stabbed 13 villagers, and killed a native Papuan civil servant." HRW Report 2013 at 324; 2012 State Dep't Report at 2.  The government responded by conducting "a traditional Papuan 'stone-burning' ceremony," after which it declared the case closed.  *Id.*

Finally, those who seek redress for human rights violations often face harassment and threats of violence.  Amnesty 2013 Report at 9; 2012 State Dep't Report at 23; Amnesty Int'l, Submission to the UN Universal Periodic Review, 13th Session of the UPR Working Group, May-June 2012 at 1 (Nov. 2011), *available at* http://www.amnesty.org/en/library/info/

ASA21/003/2012.  Particularly in Aceh, these groups are subjected "to monitoring, harassment, and interference as well as threats and intimidation."  2012 State Dep't Report at 23; Amnesty 2013 Report at 9.  Foreigners who attempt to intervene are viewed with suspicion and may be monitored, detained, and repatriated.  2011 State Dep't Report at 23.

## III.  ARGUMENT

### A.  Standard of Review

Where, as Exxon concedes, EB at 14 n. 12, the pleadings have closed, the proper motion is for judgment on the pleadings under Rule 12(c).  *Yates v. D.C.*, 324 F.3d 724, 725 (D.C. Cir. 2003).  Because the standard of review under Rule 12(c) is "functionally equivalent" to a 12(b) motion, *see Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012), the same standard of review applies to Defendants' motions in Doe I and Doe VIII.  In ruling on a 12(b)(6) or 12(c) motion , "a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007), and must "'draw[] all reasonable inferences from those allegations in plaintiffs' favor,'" *de Csepel v. Republic of Hungary,* 714 F.3d 591, 597 (D.C. Cir. 2013) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)); *see also Oberwetter v. Hilliard*, 639 F.3d 545, 549 (D.C. Cir. 2011) (12(b)(6) motion may be granted "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief.").  The motion should be denied where a complaint "states a plausible claim for relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Under Rule 12(b)(1), "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction," but it "must still 'accept all of the factual allegations in [the] complaint as true.'"  *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations omitted).  As in the Rule 12(b)(6) context, the court must grant the plaintiff "the benefit of all inferences that can be derived from

the facts alleged." *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting *Kowal v. MCI*

*Comm. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

**B.**   **Plaintiffs' Claims are Cognizable Under Indonesian Law,  as Exxon's**
       **Experts Have Already Explained.**

Exxon raises only a limited challenge to Plaintiffs' non-federal tort claims: challenging

under U.S. procedural standards whether Plaintiffs satisfy the elements of one of the applicable

Indonesian Civil Code provisions and urging under Indonesian procedural rules joinder of the

individual security personnel as defendants. Neither argument has merit.

As Exxon's own experts have repeatedly explained, Plaintiffs' claims are fully

cognizable under Indonesian law.  Siregar Decl. ¶3, attached as Exhibit 2; Hornick Decl. ¶23; *see*

*also* Decl. of Gary F. Bell, attached hereto; Panjaitan Decl. ¶5, attached as Exhibit 3;

Semendawai Decl. ¶3, attached as Exhibit 4.[3]  For example, Judge Siregar, a former Justice of

the Supreme Court of Indonesia, explained that the Plaintiffs' claims "are fully cognizable in

Indonesia" and that actions "in the nature of all of these asserted claims are known to Indonesian

law." Siregar Decl. ¶3.  Both Plaintiffs' and Defendants' experts explained that the Indonesian

Civil Code is based on the Dutch Civil Code (Bell Decl. ¶1; Siregar Decl. ¶1), and is in turn

similar to the Civil Code of France.  Bell Decl. ¶1.

Exxon's own experts agree that Plaintiffs' theories of liability, including negligent

supervision, respondeat superior liability, and liability of a principal for the acts of his or her

representative, are available under Indonesian law. *E.g.* Siregar Decl. ¶3 (negligent hiring and

supervision are fully cognizable in Indonesia); Winarta Decl. ¶3 (Indonesian Civil Code

recognizes liability of principal for acts or employees or representatives); Hornick Decl. ¶23

---

[3] The docket number for each referenced declaration is listed in the glossary.  The
Defendants' declarations are attached as exhibits to the Winarta Supp. Decl., and Plaintiffs'
declarations are attached hereto.

(Indonesian law would recognize negligent hiring and supervision).  *See also* Bell Decl. ¶¶11-12.

As a result, Exxon does not, and cannot, argue that Plaintiffs' claims are not cognizable under Indonesian law. [4]  Plaintiffs' claims may be brought under at least three separate provisions of the Indonesian Civil Code (Exxon misleadingly identifies only one in its brief): Article 1365; 1366 and 1367.  *See* Bell Decl. ¶¶8, 9, 15; *see also* Panjaitan Decl. ¶5 (listing Articles 1365, 1366, 1367, 1370, 1371).  Article 1366 provides simply that "An individual shall be responsible, not only for the damage caused by his act, but also for that which was caused by his negligence or carelessness."  Bell Decl. ¶9.  Article 1367 explicitly provides for liability of an employer or principal for the acts of his or her employees or representatives.  Bell Decl. ¶16; see also Hornick Decl. ¶¶32-34 (translation corrected by Hornick Supp. Decl. ¶16).  Finally, according to Exxon's expert, wrongful behavior under Article 1365 of Indonesian law is quite broad and can include behavior that violates good morals, a person's rights, or a duty of care.  Hornick Decl. ¶14.  Exxon's expert also explains that "fault" under Article 1365 includes negligent behavior.  Id.

Plaintiffs' allegations satisfy the requirements of Articles 1365, 1366 and 1367.  Exxon challenges only that Plaintiffs have not alleged "wrongful behavior" or fault under Article 1365, but even that assertion is plainly erroneous.  Plaintiffs alleged that Defendants are directly liable for the negligent hiring and negligent supervision of their security personnel.  Doe I FAC ¶¶78-81, 122-139; Doe VIII Compl. ¶¶64-67, 76-93.  Plaintiffs alleged that Exxon contracted for and

---

[4] Exxon argues in a footnote that intentional or negligent infliction of emotional distress are not torts under Indonesian law but damages, however, Exxon's own experts disagree on that point.  *Compare* Siregar Decl. ¶3 (former Justice of Indonesian Supreme Court: intentional and negligent infliction of emotional distress are "fully cognizable in Indonesia") *with* Hornick Decl. ¶24 (former counsel for Exxon asserts that intentional or negligent infliction of emotion distress are not separate torts, but are considered damages under Indonesian law).  Plaintiffs' experts agree with Judge Siregar.  Bell Decl. ¶12; Semendawai Decl. ¶3.

supervised the security personnel, including paying the individual, low-ranking military personnel on a monthly basis.  Doe I FAC ¶¶46, 50-53; Doe VIII Compl. ¶¶39, 42-46.  Plaintiffs alleged that ExxonMobil security personnel were acting at all times under Exxon's supervision, direction, and control. Doe I FAC ¶¶49-50, 54; Doe VIII Compl. ¶¶42-43, 47.  Plaintiffs further alleged Defendants had a duty to take reasonable care to ensure that their security personnel were not dangerous. Doe I FAC ¶¶81, 104-108, 124-137; Doe VIII Compl. ¶¶64, 71-75, 78-91. Plaintiffs further allege that Defendants are at fault because at the time they selected and retained the security personnel, Defendants knew that the security personnel were unfit and dangerous. Doe I FAC ¶¶46, 58-66; Doe VIII Compl. ¶¶39, 51- 59.  Plaintiffs also alleged the Defendants are at fault because they failed to adequately supervise the security personnel. Doe I FAC ¶¶131-137; Doe VIII Compl. ¶¶85-91.  Finally, Plaintiffs alleged the conduct was wrongful because it breached the duty of care owed to Plaintiffs. Doe I FAC ¶¶104-108;  Doe VIII Compl. ¶¶71-75. The conduct was also wrongful, as explained by the Hornick Declaration, because it violated a moral duty and Plaintiffs' rights.  Hornick Decl. ¶14.

Plaintiffs also allege that Defendants are vicariously liable for the torts of, *inter alia*, wrongful death, assault, and arbitrary detention committed by their security personnel. Doe I FAC ¶¶84-89, 94-102; Doe VIII Compl. ¶¶102-110.  Indeed, in the course of denying Exxon's motion for summary judgment, this Court found that Plaintiffs had presented sufficient evidence to permit them to proceed to a jury trial on the question of *respondeat superior* liability for torts, including wrongful death, assault, and battery, as well as direct liability for negligent hiring and negligent supervision.  SJ Op. at 10.  As discussed above, Defendants own expert's confirm that respondeat superior liability and liability for the acts of a representative are available under Indonesian law under Article 1367.  Supra pp. 12-13.  Under these circumstances, Exxon's

14

request for dismissal under *Iqbal* is wholly meritless. *Iqbal* requires only that a complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 622, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That standard is more than met here.

Exxon also asserts that Plaintiffs must name the individual soldiers it employed as additional defendants. Exxon's expert – an attorney who has been retained by Exxon as counsel on other matters, Winarta Supp. Decl. ¶4[5], provides no support for his assertion: he cites no provision of the Civil Code, no cases, no authority. Plaintiffs' expert, an academic and author with no relationship to the Plaintiffs, relies on (a) the text of the relevant provision of the Civil Code, Article 1367, (b) a leading treatise on Indonesian law (upon which Defendants' experts also rely elsewhere in their declarations); and (b) cases illustrating that employees need not be named. *See* Bell Decl. ¶¶14-24. Professor Bell conclusively demonstrates that the individual soldiers need not be named. *Id.*; *see also* Panjaitan Decl. ¶8.

In any case, mandatory joinder of parties is a procedural issue. *E.g.*, Fed. R. Civ. P. 19. Under District of Columbia choice of law rules, the law of the forum applies to all procedural matters, as Exxon itself argues elsewhere in its brief. *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C. 1970); EB at 42; *see also KBI Transp. Servs. v. Med. Transp. Mgmt. Inc.,* 679 F. Supp. 2d 104, 106-07 (D.D.C. 2010) ("[F]ederal courts sitting in diversity apply … federal procedural law."). Joinder is not required here under the federal rules, and Exxon does not argue otherwise.

---

[5] Mr. Winarta states that "I and/or my firm have been retained by Exxon in the past.…" Winarta Decl. ¶4. This obvious bias undermines Mr. Winarta's credibility as an expert, and casts doubt on the reliability of his report. *See In re Bridgestone/Firestone*, 190 F. Supp. 2d 1125, 1131 & n.5 (S.D. Ind. 2002) (rejecting expert's opinion regarding Venezuelan law where expert represented defendant in Venezuela); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 128 (S.D.N.Y. 1997).

**C.      Exxon's Arguments on Six Threshold Doctrines Are Unavailing, as this
        Court and the Court of Appeals Have Already Held.**

Exxon has repeatedly raised threshold issues of act of state, comity, exhaustion of local

remedies, *FNC*, political question, and preemption in its serial motions to dismiss before this

Court.  The Court of Appeals squarely considered and rejected Exxon's arguments on the

political question doctrine, comity, and foreign affairs preemption.  *See Doe VIII,* 654 F.3d 11.

Exxon offers no basis for this Court to disregard the Court of Appeals on these issues.[6]  The other

three arguments (*FNC*, failure to exhaust remedies, and the act of state doctrine), were rejected

by this Court when Exxon previously asserted them in prior motions.  Exxon failed to appeal any

---

[6] The Court of Appeals' 2011 Opinion, *Doe VIII,* 654 F.3d 11 (D.C. Cir. 2011), remains good law with respect to the Plaintiffs' non-federal tort claims, including the Court's rejection of Exxon's arguments on political question, comity and foreign affairs preemption.  In its 2013 Opinion remanding this case, the Court of Appeals expressly reaffirmed its decision to allow the non-federal tort claims to proceed.  *Doe VIII v. Exxon*, 527 F. App'x 7 (D.C. Cir. 2013).  The Court's re-affirmance of that holding was made "in accordance with" the original 2011 Opinion, wherein the Court rejected Exxon's arguments based on the threshold doctrines.  *Id.*; *see also U.S. v. Gabriel,* No. CRIM.A.02-216(JDB), 2005 WL 1060631, *3-5 (D.D.C. May 4, 2005) (where Court of Appeals vacated its prior judgment in light of intervening Supreme Court decision and remanded "for further proceedings in accordance with" the prior vacated opinion and the intervening Supreme Court decision, district court held it would be improper to revisit issues decided in the vacated Court of Appeals opinion that were not implicated by the intervening Supreme Court case).  Furthermore, the tort claims and prudential doctrines, unlike the ATS claims, were *not* identified by the Court of Appeals for "further consideration" in light of *Kiobel.*  527 F. App'x 7.  Thus, the Court of Appeals has made it clear that the 2011 Opinion on the tort claims and threshold doctrines remains good law.  Yet, even if the remand order had been silent as to those issues, the 2011 Opinion's holding on those issues would still be good law.  *See Settles v. U.S. Parole Comm'n,* 429 F.3d 1098, 1104 (D.C. Cir. 2005) (where Court of Appeals vacated its prior judgment in opinion only addressing a portion of that judgment, another holding from prior judgment remained "binding precedent"); *Action Alliance of Senior Citizens of Greater Phila. v. Sullivan,* 930 F.2d 77, 83 (D.C. Cir. 1991) ("Although the Supreme Court vacated our prior opinion, it expressed no opinion on the merit of these holdings.  They therefore continue to have precedential weight, and in the absence of contrary authority, we do not disturb them.") (internal citation omitted); *see also Hopkins v. Price Waterhouse,* 737 F. Supp. 1202, 1208 (D.D.C. 1990); *United States v. Parks*, 698 F.3d 1, 7 (1st Cir. 2012) cert. denied, 133 S. Ct. 2021 (2013) (prior decision remains "the expressed decision of this circuit" even though judgment was vacated on other grounds).  Exxon has provided no basis for disregarding the Court of Appeals' holdings.

of these issues.  The controlling law of this Circuit bars Exxon from challenging the rulings it failed to appeal.

1.  **The Court of Appeals Rejected Exxon's Arguments on Political Question, Comity, and Foreign Affairs Preemption. Exxon Offers No Basis to Disregard the Court of Appeals' Opinion.**

   a.  *The Court of Appeals Affirmed this Court's Holding that the Political Question Doctrine Does Not Apply.*

Exxon's serial motions seeking political question dismissal have been rejected by this Court and the Court of Appeals. *E.g. Doe I,* 473 F.3d at 356-57; *Doe VIII,* 654 F.3d at 60.  Exxon now re-argues what the Court of Appeals rejected. EB at 35-36.

The Court of Appeals engaged in a lengthy and careful analysis of the history of the U.S. Department of State's involvement in the case, and the prior, failed interlocutory appeal Exxon pursued to challenge this Court's decision to permit the case to go forward. *See* 654 F.3d at 58-62.  The Court of Appeals noted the opposition of the United States to Exxon's petition for certiorari and concluded that "the considered analysis by this Court in *Doe I* is correct."  *Id.*  The Court then assessed and rejected the very argument Exxon attempts to reassert, that this litigation somehow is in conflict with the peace process in Aceh and the Executive Branch's support for it: "Exxon marshals paltry support for its asserted domestic doctrine of nonjusticiability based on interference with the peace process." *Id.* at 62.  The Circuit also pointed out that "Exxon's invocation of this doctrine founders on a fundamental level."  *Id.* at 63; *see also id.* at 58-62. Exxon provides no basis for disturbing the thorough and considered holding of the Court of Appeals.

   b.  *The Court of Appeals Affirmed this Court's Holding that the Comity Doctrine Does Not Apply.*

As the Court of Appeals put it after rejecting Exxon's assertion of the political question doctrine, "Exxon's invocation of the doctrine of comity . . . fares no better." 654 F.3d at 63-64

(citation omitted).  Exxon's effort to renew its comity argument likewise fails to acknowledge that the Court of Appeals rejected this argument.  EB at 29-33.

As before, Exxon has not met the threshold for application of the comity doctrine.  First, Exxon has not established (and cannot) that compliance with the laws of both the U.S. and Indonesia is impossible, a threshold requirement for comity dismissal.  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993).  Indeed, Exxon, as described above, argues that Indonesian law similarly condemns the general torts that would cover the violations alleged in Plaintiffs' complaints.  EB at 32.  Second, EMC has asserted that it will not submit to jurisdiction in Indonesia, EB at 44.  This is an absolute pre-condition for comity dismissal.  *Jota v. Texaco*, 157 F.3d 153, 160 (2d Cir. 1998); *John Anderson & Co. (Wool) Pty. Ltd. v. Ludlow Jute Co.*, 569 F.2d 696, 697 (1st Cir. 1978).  Finally, the Court of Appeals explained that in order to invoke the comity doctrine, "Exxon must either point to a legal proceeding in Indonesia involving these particular plaintiffs to which the court must defer or at least the availability of effective and non-futile local remedies.  Exxon has done neither."  *Doe VIII,* 654 F.3d at 64 (internal citations omitted).   As before, Exxon can point to no available, effective and non-futile remedies in Indonesia.  *Supra* pp. 7-11.  Exxon suggests that Plaintiffs could bring their claims before the Human Rights Court in Medan, but as described *supra* pp. 8-9, that court does not have jurisdiction over Plaintiffs' claims and has, moreover failed to hear or rule on *any* human rights cases whatsoever, demonstrating that it is not a genuinely available, effective and non-futile remedy.  Exxon proposes Plaintiffs bring their claims in the Indonesian Military Courts, but as even Exxon appears to concede, *see* EB at 33, those courts have no jurisdiction over corporate entities that contract for, pay, supervise, direct, and control military security forces and thus could not hear the claims in this action. *See supra* p. 10. Meanwhile, as the U.S. State

Department, the United Nations, and human rights organizations have found, access to the

country's civil court system remains "limited," the courts lack due process, and the judiciary is

so corrupt that even the Chief Justice of the Constitutional Court was recently arrested for

accepting bribes.  2012 State Dep't Report at 12; U.N. Online Network in Pub. Admin. and Fin.

Report (noting lack of due process in the Indonesian courts), quoted in *Gryphon Domestic VI,*

*LLC v. APP Int'l Fin. Co., B.V.*, 836 N.Y.S.2d 4 (N.Y. App. Div. 2007); Yenni Kwok, "Top

Indonesian 'Anticorruption' Judge Is Arrested for Graft", Time, Oct. 4, 2013, *available at*

http://world.time.com/2013/10/04/arrest-of-antigraft-judge-shows-depth-of-indonesias-

corruption-crisis/.  Individuals and organizations that advocate for human rights and seek redress

for violations of those rights remain subject to harassment and violence.  2012 State Dep't

Report at 23-24.  This lack of effective remedies in Indonesia precludes dismissal on comity

grounds.  *See, e.g.*, *Nw. Forest Res. Council v. Dombeck*, 107 F.3d 897, 901 (D.C. Cir. 1997)

("The case law of this circuit makes it clear that 'comity' is rarely employed to justify the

dismissal of viable claims that are otherwise properly before the court. Rather, in strictly limited

circumstances, we have sometimes held that comity may warrant dismissal of an action where

there is a case *pending* in another jurisdiction involving the same parties, issues, and subject

matter") (emphasis in original); *In re Perry H. Koplik & Sons, Inc.,* 357 B.R. 231, 243 (Bankr.

S.D.N.Y. 2006) (refusing to accord comity to an Indonesian judgment due to undisputed

evidence of pervasive and systemic corruption within the Indonesian judicial system); *Holland v.*

*Apfel*, 23 F. Supp. 2d 21, 29 (D.D.C. 1998) aff'd sub nom. *Holland v. Nat'l Mining Ass'n*, 309

F.3d 808 (D.C. Cir. 2002); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 129-130 (E.D.N.Y.

2000).

c.    *The Court of Appeals Rejected Exxon's Preemption Argument.*

Exxon once again fails to acknowledge that the Court of Appeals considered and rejected

it's argument concerning foreign affairs preemption.  *Doe VIII*, 654 F.3d at 71.  Instead, Exxon

cited four cases in support of its argument as if making it for the first time, EB at 36-37, but the

D.C. Circuit expressly identified two of those cases as "inapposite."  *Doe VIII,* 654 F.3d at 71

(identifying *Zschernig v. Miller*, 389 U.S. 429, 440–41 (1968) and *Saleh v. Titan Corp.*, 580 F.3d

1, 12-13 (D.C. Cir. 2009)).  In addition, Exxon cited *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396,

420 (2003), EB at 36, another case it relied on previously for its preemption argument.  Exxon

Appellee Br. 57, 09-7125, Dkt. 1274117 (D.C. Cir. Oct. 27, 2010).  Therefore, *Garamendi* is

likewise among "the authorities [Exxon] cite[d] in its [appellate] brief [that] are inapposite."

*Doe VIII*, 654 F.3d at 71.

Exxon's one new case, *Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968

(2011), is plainly inapposite as it did not involve foreign affairs preemption. Rather, it held

federal immigration law did *not* preempt provisions of an Arizona law relating to the

employment of unauthorized aliens.  *Id.* at 1973.  To the extent it is relevant at all, *Whiting* held

"'a high threshold must be met if a state law is to be preempted for conflicting with the purposes

of a federal Act.'"  *Id.* at 1985 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88,

110 (1992) (Kennedy, J., concurring)).  Accordingly, once again Exxon has provided this Court

with absolutely no basis for ignoring the Court of Appeals' prior ruling.

     **2.**       **This Court Rejected Exxon's Arguments Based on Failure to Exhaust
Remedies, Forum Non Conveniens, and the Act of State Doctrine.
Because Exxon Did Not Raise these Arguments During the Appeal, the
Arguments Are Waived.**

Defendants have taken the position that adverse rulings by this Court that Plaintiffs chose

not to appeal are waived, EB at 12, n.11, but they incongruously assert that adverse rulings by

this Court Defendants did not appeal can be reconsidered because they are interlocutory. *Id*. at 27, n.22.[7] This is, in a word, nonsense. This Court ruled against Defendants on Failure to Exhaust Remedies, *FNC*, and the Act of State Doctrine.  MTD 2005 Order. Under the controlling law of this Circuit, the law of the case doctrine bars Exxon from now challenging the rulings it failed to appeal.

"Under law of the case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987); *see also U.S. v. Thomas*, 572 F.3d 945, 949 (D.C. Cir. 2009) (where party failed to challenge an issue in first appeal, the decision is "binding on remand."); *Kimberlin v. Quinlan*, 199 F.3d 496, 498 (D.C. Cir. 1999); *Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 173 (D.D.C. 1998); *Palmer v. Barry*, 794 F. Supp. 5, 7 (D.D.C. 1992) ("a district court cannot reconsider, on remand, decisions made at an earlier stage of the litigation and not raised on appeal").

A similar waiver rule applies at the appellate level.  "It is well-settled that 'where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand.'"  *U.S. v. Henry*, 472 F.3d 910, 913 (D.C. Cir. 2007) (quoting *Nw. Ind. Tel. Co. v. F.C.C.*, 872 F.2d 465, 470 (D.C. Cir. 1989)).  "Adherence to the rule that a party waives a 'contention that could have been but was not raised on [a] prior appeal,'" is "necessary to the orderly conduct of litigation." *Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1090 (D.C. Cir. 1984) (quoting *Munoz v. Cnty. of Imperial*, 667 F.2d 811, 817 (9th

---

[7] Without citation, Defendants also argue the *Kiobel* decision somehow revived their waived arguments. EB at 27, n.22. *Kiobel* did not even mention these other abstention doctrines.

Cir. 1982)).  In other words, "[t]he rule serves judicial economy by forcing parties to raise issues

whose resolution might spare the court and parties later rounds of remands and appeals."

*Hartman v. Duffey*, 88 F.3d 1232, 1236 (D.C. Cir. 1996).  Cases discussing or applying this rule

are common.  *See*, *e.g.*, *Palmer v. Kelly*, 17 F.3d 1490, 1495-96 (D.C. Cir. 1994) (holding "the

District waived its claim that it should be liable for only nine days' back pay by failing to press

this argument" in prior appeal); *Nw. Ind. Tel. Co.*, 872 F.2d at 470 ("It is elementary that where

an argument could have been raised on an initial appeal, it is inappropriate to consider that

argument on a second appeal following remand.").[8]

    Exxon tries to avoid this fatal blow to their defenses by arguing the prior orders are

interlocutory orders not subject to the law of the case doctrine.  EB at 27 n.22 (quoting *Filebark*

*v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009)).  Exxon, however, overlooks the

decisive factor of an intervening appeal.  Where a party loses on an issue, and then decides not to

appeal despite having the opportunity to do so, the law of the case doctrine applies.

*Williamsburg Wax Museum*, 810 F.2d at 250.  That was not the situation in *Filebark*.  There, the

district court dismissed the employees' claims in 2006 but allowed the supervisors' claims to

proceed.  555 F.3d at 1011.  Then, in 2008, it reconsidered and dismissed the supervisors'

claims.  *Id.*  Unlike Plaintiffs' authority above, there was no appeal in *Filebark* between the

original and revised orders.  *Id.* at 1013.  Implicitly recognizing the law of the case doctrine is

---

[8] Some courts referring to the law of the case doctrine in the district court and waiver in
the appellate court.  Compare *Kimberlin*, 199 F.3d at 500, with *id.* at 504-05 (LeCraft
Henderson, J., dissenting).   Regardless of the ultimate label for the rule, Defendants' failure to
appeal the issues when they could have should preclude any further pursuit of these issues in this
Court.  *See Med. Center Pharm. v. Holder*, 634 F.3d 830, 834 n.3 (5th Cir. 2011) ("Regardless of
nomenclature, our cases are consistent; they all hold that if an issue was decided by the district
court but was not appealed, the issue is forfeited, and the district court may not reconsider the
issue on remand."); *see also* 18B Fed. Prac. & Proc. Juris. § 4478.6 (2d ed.) (1990) (discussing
law of the case, waiver, and forfeiture).

triggered by an intervening appeal, *Filebark* noted the doctrine does not apply where the interlocutory order is not part of "a final judgment and never subject to appeal." *Id. Filebark* is thus irrelevant to the situation here.  Exxon's unexplained failure to appeal the adverse rulings on exhaustion, *FNC*, and act of state means the law of the case doctrine should be strictly applied. *Nw. Ind. Tel. Co.*, 872 F.2d at 470 (holding "logic" of waiver rule is stronger where "none of the parties have come forward with an explanation (beyond inadvertence) for the failure to properly present these issues in the initial appeal").  In addition, none of the extremely limited exceptions to the law of the case doctrine applies here.  "The law-of-the-case may be revisited *only* if there is an intervening change in the law or if the previous decision was 'clearly erroneous and would work a manifest injustice.'" *Kimberlin*, 199 F.3d at 500 (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996)) (emphasis added).  The second exception is limited to "truly 'exceptional circumstances.'" *Laffey*, 740 F.2d at 1082.

First, Exxon points to no relevant intervening change in the law regarding these specific defenses. *Kimberlin*, 199 F.3d at 501 (holding Supreme Court decision cited by the defendants was not a "change in the applicable law that might have led the District Court to revisit *Kimberlin I*").  *Kiobel* did not address these three defenses, and so cannot overcome the waiver rule.  Second, Exxon cannot demonstrate that the prior rulings were clearly erroneous and manifestly unjust.  Exxon's claim that Indonesia "has undergone a remarkable transformation since 2001," EB at 29, illustrates this point (Indeed, Exxon cites in support a court established in 2000, *supra* pp. 8-9).  If Exxon truly believed these supposed changes made prior orders clearly erroneous or manifestly unjust, it should have appealed in 2005.  Its regret over failing to do so is not grounds for ignoring the law of the case doctrine.

a.     *This Court Rejected Exxon's Exhaustion Argument.*

Exhaustion of remedies is a prudential doctrine of international law.  *See Sarei v. Rio Tinto, PLC,* 550 F.3d 822, 831-32 (9th Cir. 2008) (*en banc*).  It does not apply to the state law claims.  Indeed, Defendants have cited no case holding the Plaintiffs must exhaust remedies before bringing suit pursuant to state law, whether the choice of law rules require the application of foreign or domestic law.

With regard to the ATS claims, as Exxon is forced to admit, this Court already "considered and decided," EB at 27 n.22, the exhaustion issue in response to Defendants' initial motion to dismiss.  *See* MTD 2005 Order 7 ("Even assuming plaintiffs must exhaust local remedies, however, it is apparent here that efforts to pursue this case in Indonesia would be futile.").  Exxon is incorrect, however, that this is an interlocutory order not subject to the law of the case doctrine.  EB at 27 n.22.  Indeed, the Court of Appeals admonished Exxon for not appealing the exhaustion issue and then using a backdoor "attempt to reargue the issue of prudential exhaustion, which it has not appealed." *Doe VIII*, 654 F.3d at 64. As Plaintiffs demonstrated in the preceding section, Exxon's failure to appeal waives any further effort to overturn the prior ruling. Thus, Exxon is precluded from re-litigating this issue on remand and this Court's prior prudential exhaustion finding is final.

Exxon fails to identify what specific, non-futile legal remedies were available to Plaintiffs in Indonesia at the time they filed this suit with the Court.  Instead, Exxon argues only that Indonesia "has undergone a remarkable transformation since 2001."  EB at 29.  But these "changed circumstances" are irrelevant to the prudential exhaustion analysis.  *Id.*  The availability of local remedies for prudential exhaustion purposes necessarily must be determined at the time of filing, *not* twelve years later. *See, e.g.*, *Krempel v. Prairie Island Indian Cmty.*, 125 F.3d 621, 623 (8th Cir. 1997) ("[T]o require a plaintiff to turn back the clock and exhaust

previously unavailable remedies is contrary to judicial efficiency and prejudicial to an individual who brings suit in a forum available for immediate resolution of his claim."); *Bowoto v. Chevron*, 557 F. Supp. 2d 1080, 1097 (N.D. Cal. 2008) (evaluating whether local remedies were available at the time the complaint was filed in federal court, not whether they were available at the time exhaustion was argued nine years later); *see also Roberts v. LaVallee*, 389 U.S. 40, 42 (1967) (holding that petitioner who exhausted his state court remedies and then filed a habeas petition in federal court need not return to the state forum even where there was an intervening change in the state's case law creating a newly available remedy in state court); *Ford Motor Co. v. United States*, 688 F.3d 1319, 1327 (Fed. Cir. 2012) ("[S]ubsequent availability of a remedy does not defeat prior satisfaction of a[n] . . . exhaustion requirement."). Plaintiffs cannot be expected to have predicted, and then exhausted, remedies that did not exist at the time they initiated this litigation.[9]

In addition, Exxon also failed to appeal this Court's *FNC* decision that Indonesia is not an available and adequate alternative forum, MTD 2005 Order at 29, and, as a result, this finding is similarly binding now under the law of the case doctrine. *See* subsection b, *infra*. If Indonesia is not an adequate forum, this is further evidence there are no remedies Plaintiffs could have, or should have, exhausted. *See, e.g.*, *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1197 n.6 (S.D.N.Y. 1996) ("For the same reasons that the Court finds that Ghana provides an inadequate and unacceptable forum for plaintiff's claims, the Court finds that the exhaustion of remedies is not a requirement in this case.") (internal citation omitted).

        b.     *This Court Rejected Exxon's Forum Non Conveniens Argument.*

---

[9] Even if this Court were to consider whether local remedies are currently available, Plaintiffs have provided extensive evidence that no effective, non-futile forum exists in Indonesia to address their claims. *See supra* pp. 7-11.

Exxon once again argues the Indonesian law claims should be dismissed based on *FNC*. Exxon previously argued dismissal under this doctrine in 2001, contending Indonesia was an adequate alternative forum and a more convenient forum in which to litigate and defend Plaintiffs' claims. *See* Mem. of Points & Auths. in Supp. of Mot. to Dismiss 37-46, *Doe I* Dkt. 13 (Oct. 1, 2001). In 2005, the District Court denied Exxon's motion to dismiss the state law claims on *FNC* grounds. *See* MTD 2005 Order. In 2009, the District Court dismissed the remainder of Plaintiffs' claims. *See* Order, *Doe I* Dkt. 412 (Sept. 30, 2009), and Exxon appealed. There is no dispute that Exxon did not raise the denial of dismissal on *FNC* grounds in its 2009 appeal. As a result, Exxon's arguments concerning *FNC* dismissal are barred by the law of the case doctrine. See section C.2.b., *supra*.

Even if this Court considers Exxon's successive and belated *FNC* arguments, it should reject them on the merits. It is axiomatic that a prerequisite to dismissal on *FNC* grounds is the availability of an alternative forum. *See Piper Aircraft Co. v Reyno*, 454 U.S. 235, 241, 254 n.22 (1981). A forum is not available if defendants are not amenable to service of process in the foreign jurisdiction. *See id.* at 254 n.22. Exxon refuses to subject EMC to jurisdiction in Indonesia, but without citing any law, it asserts that this fact *"does not undermine the superiority of Indonesia as the proper forum for Plaintiffs' claims."* EB at 44. Exxon's position is contrary to the case law. For example, in *Lans v. Adduci Mastriani & Schaumberg*, the court held the defendants "failed to establish that Sweden is available as an alternative forum as to *all* defendants." 786 F.Supp.2d 240, 290 (D.D.C. 2011) (original emphasis); *see also Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 180 (3d Cir. 1991); *Raytheon Eng'rs & Constructors, Inc. v. H L H & Assocs. Inc.*, 1998 WL 224531, *11 (5th Cir. Apr. 17, 1998); *Watson v. Merrell Dow Pharm., Inc.*, 769 F.2d 354, 357 (6th Cir. 1985). Additionally, the court rejected the argument

that a defendant "need not show that all parties are amenable to jurisdiction in [the foreign forum]…" *Id.* at 291. The court further noted "there is wide-ranging consensus among the various Circuits that a dismissal based on [*FNC*] requires that the alternate forum have jurisdiction over all of the moving party's co-defendants." *Id.* (citing cases). Exxon has utterly failed to sustain its burden of demonstrating Indonesia is an available forum for all Defendants.

Although the unavailability of Indonesia as an alternative forum is a threshold determination that should end the matter, this Court should also reject Exxon's *FNC* arguments because *FNC* motions filed late in the proceedings after extensive discovery has already taken place are disfavored. *See Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 614 (3d Cir. 1991) ("[W]e hold today that whenever discovery in a case has proceeded substantially so that the parties already have invested much of the time and resources they will expend before trial, the presumption against dismissal on the grounds of *forum non conveniens* greatly increases."). Indeed, the costs and inconvenience associated with late *FNC* motions should be weighed among the *Gulf Oil Corp. v. Gilbert*, 330 US. 501 (1947), private and public interest factors. *See In re Air Crash off Long Island, N.Y. on July 17, 1996*, 65 F.Supp.2d 207, 210 (S.D.N.Y. 1999); *see also In re Air Crash Disaster Near New Orleans, La. On July 9, 1982*, 821 F.2d 1147, 1165 (5th Cir. 1987), *vacated on other grounds, sub nom*, *Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989) (untimeliness of an *FNC* motion "should weigh heavily against the granting of the motion because a defendant's dilatoriness promotes and allows the very incurrence of costs and inconvenience the doctrine is meant to relieve.").

Here, the *Doe I* case was filed approximately twelve years ago in 2001. Two appeals have been filed, neither of which addressed the district court's 2005 *FNC* dismissal ruling. Exxon acknowledges that extensive and "exhaustive" discovery has occurred in this case, which

has included Exxon's production of "over 112 boxes of hard copy documents and 15,000 electronic documents," and eight depositions of former and current employees. *See* Mem. in Opp. to Mot. to Expedite Pls.' Mot. to Modify Court's Scheduling Order 3, *Doe I* Dkt. 431 (Dec. 4, 2013). Indeed, even in those instances where the balance of other private and public interest factors "tilt toward trial" in an alternative forum, that is "not sufficient to overcome the strong ground for retention of jurisdiction in [the U.S. forum] in light of the substantial merits discovery already underway." *Lony*, 935 F.2d at 615; *see also Bryant v. Mattel, Inc.*, 2010 WL 3705668, at *19 (C.D. Cal. Aug. 2, 2010) ("The untimeliness of the [*FNC*] motion is fatal" because "the purpose of the doctrine is to *limit* the burden of the forum, not multiply the burden of having to re-start litigation in a foreign forum, divide claims, and conduct discovery anew.") (original emphasis); *see id.* ("This six year litigation has spanned multiple pleadings, extensive discovery, and motion practice…."); *Kvetan v. Emp'rs Contract Servs. of Miami*, 1996 WL 376935, at *7 (S.D.N.Y. July 5, 1996) ("[T]he efficiencies to be gained by transferring the case . . . are significantly undercut by Chrysler's delay in moving to transfer until five months after this action was filed and one month before fact discovery was scheduled to end. If the case were now sent to Florida . . . the result would be a substantial delay.") (internal citation and quotation omitted).

c.   *This Court Rejected Exxon's Act of State Argument.*

This Court previously denied Exxon's motion to dismiss on act of state grounds. MTD 2005 Order. Defendants chose not to appeal that ruling when they had the opportunity to do so, and so have waived any right to reassert their argument. *See*, *supra*, pp. 20-23.

Defendants' argument on the merits fares no better as "the resolution of this case will not turn on any 'official action' of the Indonesian government." MTD 2005 Order 14 n.7. Defendants raise the same arguments this Court rejected in *Doe I*. As *Doe I* held, this case is

28

governed by *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400 (1990).  MTD 2005

Order 14 n.7.  Here, as in *Kirkpatrick*, "the factual predicate for application of the act of state

doctrine does not exist": nothing in the present suit requires the Court "to declare invalid . . . the

official act of a foreign sovereign." *Kirkpatrick*, 493 U.S. at 405.  In *Kirkpatrick*, a unanimous

Supreme Court found that although the facts necessary to establish the respondent's claim would

also establish Nigerian officials violated the law, "it still [did] not suffice" to trigger application

of the act of state doctrine.  *Id.* at 406.

The act of state defense fails here because Defendants cannot satisfy the official act

requirement.  Individual acts of assault and battery are not the official acts of the Indonesian

government for two reasons: first, the acts were committed by individuals without the authority

to bind the state and, second, illegal conduct is not an "act of state."  *See Alfred Dunhill of*

*London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976) (the act of state doctrine requires a

"public act of those with authority to exercise sovereign powers"); *Kadic v. Karadzic*, 70 F.3d

232, 250 (2d Cir. 1995) (expressing doubt that rape could ever be "the officially approved policy

of a state"); *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1471 (9th Cir.

1994) (holding act of state doctrine applies "only when officials having sovereign authority act in

an official capacity" and finding illegal acts not unreviewable "official acts"); *Linder v.*

*Portocarrero*, 963 F.2d 332, 336 (11th Cir. 1992) ("there is no foreign civil war exception to the

right to sue for tortious conduct").  Not surprisingly, Defendants have "not had the temerity to

assert in this Court," *Kadic*, 70 F.3d at 250, that their security forces' abuse of civilians were

official acts of the Indonesian government.  EB at 34 & n.25 (not arguing "misconduct" were

official acts).[10]  Thus, Defendants' argument that the act of state doctrine applies because

Plaintiffs challenge acts by "Indonesian troops officially deployed by GOI to fight the civil war"

does not satisfy the requirements of the act of state doctrine.  EB at 34.  Moreover, the argument

is factually inaccurate.  As Plaintiffs allege and the evidence shows, Defendants retained

members of the Indonesian military to provide security services for their facilities and operations

in Aceh province.  Doe I FAC ¶46.  These security personnel had the "sole and specific purpose"

of providing security for ExxonMobil.  Id. ¶47.  Indeed, as this Court previously found the

security personnel were ""dedicated exclusively" to Exxon and did "not perform a broader role

with respect to military activities within the region." SJ Op. at 14.  Recent D.C. Circuit authority

illustrates why these facts preclude application of the act of state doctrine.  See McKesson Corp.

v. Islamic Republic of Iran, 672 F.3d 1066, 1073-74 (D.C. Cir. 2012); see also de Csepel v.

Republic of Hungary, 714 F.3d 591, 604 (D.C. Cir. 2013).  McKesson held "the 'official action'

requirement of the act of state doctrine" refers to "conduct that cannot be undertaken by a private

---

[10] Defendants rely on Roe III v. Unocal Corp., 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999), but in that case the court found the superior officer's order to a soldier to dig a trench sufficient to meet the requirement of "a 'statute, decree, order or resolution' authorizing the challenged act as an official act." Id. (quoting Dunhill, 425 U.S. at 695).  By contrast, Defendants here have made no showing their security forces received an order to abuse Plaintiffs.  In any event, any such order would not be an "official act" of the Indonesian government.  Supra pp. 28-29. In contrast, in Bowoto v. Chevron Corp., where the plaintiffs alleged the Nigerian military committed "a series of brutal attacks" on civilians, the court required that "defendants must establish (1) that the low-level official acted pursuant to an order; (2) that the order originated from an official with the authority to bind the state; and (3) that the order was consistent with the laws and policies of the sovereign." 2007 WL 2349345 at *1, *3 (N.D. Cal. Aug. 14, 2007).  The defendants failed to satisfy their burden.  Id. at *6.  Defendants here too have come nowhere close to making this three-part showing.  Id. at *8 ("In contrast to [Unocal], here defendants present no evidence that the acts at issue occurred pursuant to an order.  Moreover, the order at issue in [Unocal] – digging a ditch – is far different than an order to attack unarmed civilians.").  Defendants misinterpret this Court's brief mention of Unocal in another opinion.  See EB at 34 (citing Kaplan v. Cent. Bank of the Islamic Republic of Iran, 2013 WL 4427943, at *9 (D.D.C. Aug. 20, 2013)).  Unocal does not stand for the proposition that the act of state doctrine bars claims when a foreign military is involved.

individual or entity."  672 F.3d at 1073; *de Csepel*, 714 F.3d at 604 (same).  Although Iran

alleged that McKesson Corp.'s claim was one for "expropriation," the Court found that the

Iranian government's agents actions in taking over the company to be more akin to a dispute

between majority and minority shareholders, and therefore not a "'public act of a foreign

sovereign power' to which the act of state doctrine applies."  672 F.3d at 1074 (internal editing

omitted).  Similarly, Defendants' use of Indonesian soldiers as their paid security force is not an

official act because corporate security is not an act that "by [its] nature could *only* be undertaken

by a sovereign power."  *McKesson*, 672 F.3d at 1074 (emphasis added); *see also de Csepel*, 714

F.3d at 604.  Indeed, the military security personnel worked alongside and sometimes replaced

Exxon civilian security performing the same tasks. *Supra* p. 3.

     Finally, Defendants' reliance on *World Wide Minerals, Ltd. v. Republic of Kaz.*, 296 F.3d

1154 (D.C. Cir. 2002) is misplaced.  There, the act of state doctrine was fatal to claims against

Kazakhstan for its expropriation of assets and denial of an export license.  *Id.* at 1166-67.  Far

from the case here, *World Wide Minerals* involved expropriation, "the classic act of state."  *Id.* at

1166.[11]  Furthermore, while the Court of Appeals did not consider the act of state doctrine as

applied to the private defendant, the district court noted "the act of state doctrine would not bar

---

[11] *Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918), which involved the Mexican
government's seizure of property, is inapposite for the same reason.  The few remaining cases
cited by Defendants are also easily distinguished.  For example, *Underhill v. Hernandez*, 168
U.S. 250, 253 (1897), held "acts of legitimate warfare cannot be made the basis of individual
liability."  Plaintiffs' action does not concern acts of legitimate warfare and, as the Eleventh
Circuit has held, *Underhill* does not support the position "that domestic tort actions are not
appropriate remedies for injuries to non-combatants occurring outside of the United States during
conflicts between belligerents."  *Linder*, 963 F.2d at 337.  In *Doe I v. Israel*, 400 F. Supp. 2d 86,
96-97 (D.D.C. 2005), the plaintiffs brought claims directly against the State of Israel and Israeli
military officials in relation to Israel's policy promoting settlement on the West Bank.  Those
facts bear no relation to the claims here.  *Id.* at 113 (contrasting lawsuits against foreign military
officials with those involving "the actions of third-parties in procuring the alleged unlawful acts"
and suggesting the latter would not be subject to act of state defense).

claims" against the private defendant.  *World Wide Minerals Ltd. v. Republic of Kaz.*, 116

F. Supp. 2d 98, 105 (D.D.C. 2000) (Lamberth, J.).

      **D.**      **The Requirements for Diversity Jurisdiction Are Satisfied.**

          **1.**      **The Jurisdictional Amount Requirement Is Satisfied.**

Plaintiffs have adequately pled the jurisdictional amount.  Exxon argues that the

pleadings are insufficient because Plaintiffs' claims "are now governed by Indonesian law."  EB

at 40.  *Id.*  Exxon's argument is misplaced.  Even where foreign law governs a Plaintiffs'

substantive claims, it is federal procedural law that provides the requirements that must be

pleaded for diversity jurisdiction.  *See Hanna v. Plumer*, 380 U.S. 460, 471 (1965); *Cohen v.

Office Depot, Inc.*, 184 F.3d 1292, 1298 (11th Cir. 1999), upheld in pertinent part and vacated in

non-pertinent part en banc, 204 F.3d 1069 (11th Cir. 2000); *Winters v. Fru-Con Inc.*, 498 F.3d

734, 740 (7th Cir. 2007).

The Supreme Court holds that "the sum claimed by the plaintiff controls if the claim is

apparently made in good faith.  It must appear to a **legal certainty** that the claim is really for less

than the jurisdictional amount to justify dismissal." *St. Paul Mercury Indem. Co. v. Red Cab

Co.*, 303 U.S. 283, 288 (1938) (emphasis added); *see also Mt. Healthy Sch. Dist. Bd. of Educ. v.

Doyle*, 429 U.S. 274, 276–77 (1977).  This is an "exacting" and "stringent" standard.  *Martin v.

Gibson,* 723 F.2d 989, 991, 993 (D.C. Cir. 1983); *see also Rosenboro v. Kim*, 994 F.2d 13, 17

(D.C. Cir. 1993).  Moreover, "[t]he inability of plaintiff to recover an amount adequate to give

the court jurisdiction does not show his bad faith or oust the jurisdiction."  *St. Paul Mercury

Indem. Co.*, 303 U.S. at 288.  And "the governing law mandates generosity in evaluating the

eligibility of a claim for federal jurisdiction . . . ."  *Rosenboro*, 994 F.2d at 17; *see also Love v.

Budai,* 665 F.2d 1060, 1063–64 (D.C. Cir. 1980) (reversing district court's dismissal on

jurisdictional amount grounds because, although the complaint alleged loss of only one week's

wages, the plaintiff's allegations of emotional distress and physical discomfort, as well as the

potential for exemplary damages, precluded a finding the jurisdictional amount could not be

met).[12]

As Exxon admits, Plaintiffs have each pled an amount in controversy in excess of the

jurisdictional threshold of $75,000.  EB at 40.  The injuries—including, variously, being beaten,

shot, stomped, dragged across the ground, and killed—clearly support damages in excess of

$75,000 for each individual, thus satisfying the federal pleading requirement.  *See, e.g.*,

*Langevine v. D.C.*, 106 F.3d 1018 (D.C. Cir. 1997) (victim awarded **$201,500** on false arrest and

false imprisonment claims after she was forced against the hood of a car and suffered some

bruising); *Huthnance v. D.C.*, 793 F. Supp. 2d 183, 213 (D.D.C. 2011) aff'd, 722 F.3d 371 (D.C.

Cir. 2013) (awarding **$90,000** for false arrest where victim was held in custody for a few hours

and there was "no evidence of physical injury or loss in pay"); *see also Stethem v. Islamic*

*Republic of Iran*, 201 F. Supp. 2d 78 (D.D.C. 2002) (victim awarded **$1,500,000** for being beaten

on head, shoulders, back and arms, and then held captive for two weeks and released); *id.* (victim

awarded **$1,000,000** for being held captive for nine days, being struck once on the head, and

being made to sit in a stress position); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222

(D.D.C. 2002) (victim awarded **$1,200,000** for being beaten repeatedly and denied medical

treatment for four days).  Indeed, even where the injuries were far less severe than any suffered

---

[12] In addition, boilerplate language is both common and acceptable for purposes of establishing diversity jurisdiction. *See, e.g., McCabe v. McKinney*, 982 F.2d 529, *2 (10th Cir. 1992) ("Unless questioned, standard language such as that in the jurisdictional allegation in [plaintiff's] complaint [which varied "just slightly from the statute"] is sufficient to satisfy the requirement that a plaintiff allege the minimum jurisdictional amount necessary in a diversity action.") (citing *Fehling v. Cantonwine,* 522 F.2d 604, 605 (10th Cir. 1975)).  Exxon's challenge that Plaintiffs have made only "bald assertions" of the jurisdictional amount is thus unavailing. EB at 40.

by the Plaintiffs here, the claimant was awarded $75,000 in compensatory damages. *Halcomb v. Woods,* 767 F. Supp. 2d 123 (D.D.C. 2011) (victim awarded **$75,000** for unreasonable arrest where victim was bruised but suffered no fractures by handcuffs placed on her by member of the WMATA Metro Transit Police).[13]

As demonstrated above, Exxon's argument that without punitive damages Plaintiffs' injuries cannot support damages in excess of $75,000 is incorrect. Plaintiffs suffered injuries similar to, and in some cases worse than, the victims in reported cases. The damage awards emphasized in the string cite above were for compensatory damages only—i.e., damages for material and moral loss—not punitive damages. Exxon concedes that Indonesian law permits damages for material and moral loss. EB at 41; *see also* Bell Decl. ¶29; Panjaitan Decl. ¶6; Hornick Decl. ¶16, 28, 29. Accordingly, the jurisdictional amount has been adequately pled and is supported by the allegations in the operative complaints. *Accord Martin v. Gibson,* 723 F.2d 989, 991 (D.C. Cir. 1983) (quoting *St. Paul Mercury Indem. Co.,* 303 U.S. at 288. Moreover, Plaintiffs dispute that punitive damages are unavailable.[14]

---

[13] Exxon's cases are inapplicable. *Kahal v. J.W. Wilson & Assocs., Inc.*, 673 F.2d 547 (D.C. Cir. 1982), involved allegations of an economist not being paid wages and consulting fees of $4,018.00. *Id.* at 548. *Hunter v. D.C.*, 384 F. Supp. 2d 257 (D.D.C. 2005), involved alleged misconduct far less severe than what was experienced by Plaintiffs in this case, including a complaint that the D.C. Metropolitan Police failed to properly record a stolen vehicle's VIN number in the national registry. *Id.* at 259. Finally, *Jones v. D.C.*, 424 F. Supp. 110 (D.D.C. 1977), cited by Exxon, did not involve the federal diversity statute and the court found the claim for $750,000,000.00 in damages was not in good faith.

[14] Plaintiffs have adequately pled the jurisdictional amount, even assuming that punitive damages are unavailable. But plaintiffs do not concede that punitive damages are unavailable. Indonesian courts have the authority to, and have, imposed such penalties on defendants, in the form of fines and other types of penalties, over and above compensatory damages awarded to plaintiffs. Panjaitan Decl. ¶12.

Moreover, under choice of law rules, the question of whether punitive damages are available is more appropriately governed by the law of each defendant's state of incorporation or principal place of business. The D.C. Circuit ruled that Plaintiffs' non-federal claims are governed by Indonesian law on questions of liability. *Doe VIII,* 654 F.3d at 70. But the question

### 2.     The Complete Diversity Requirement Is Satisfied.

As Plaintiffs argued in depth on the prior motion to dismiss, EMOI's reincorporation in the Cayman Islands after the commencement of *Doe I* does not defeat diversity jurisdiction in *Doe VIII.* Mem. In Opp. to Mot. to Dismiss, *Doe VIII* Dkt. 25, at 35-43 (Nov. 2, 2007).  As an alter ego of EMC, EMOI is deemed to have a single place of citizenship based on the principal place of business of its parent, EMC (i.e., Texas).  Plaintiffs hereby incorporate by reference their prior briefing on this issue.  *Id.*

### 3.     The Court of Appeals Has Instructed that, if this Court Finds EMOI Is Not Diverse (which the Court Should Not), EMOI Should Be Dismissed and the Case Should Proceed Without EMOI.

The Court of Appeals for the D.C. Circuit has already instructed that, if this Court finds diversity jurisdiction is lacking, the appropriate course is to dismiss EMOI and allow Plaintiffs to seek redress against Exxon:  "We agree with appellants that EMOI's non-diversity would not mandate dismissal because the district court, were it to find that EMOI is a non-diverse party, could dismiss EMOI, permitting appellants to proceed against Exxon Mobil Corporation."  *Doe VIII*, 654 F.3d at 71.  Accordingly, if the Court finds that there is no complete diversity, Plaintiffs ask the Court to dismiss EMOI and allow the claims to proceed against Exxon.

In a brief footnote, Exxon argues that EMOI is an indispensable party.  EB at 39 n.28.

---

of punitive damages remains open.  *See Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (under District of Columbia choice of law rules, courts must conduct issue-by-issue analysis, as "different law may apply to different issues in a lawsuit").  Each defendant's principal place of business and place of incorporation take on heightened importance in the choice-of-law analysis for punitive damages, especially where, as here, the non-application of Indonesian law inures to the benefit of Indonesia's citizens.  *See, e.g.*, *Keane Corp. v. Ins. Co. of North Am.*, 597 F. Supp. 934, 938-39 (D.D.C. 1984) ("The place where the injury occurred and where the parties' relationship is centered do not claim as great an interest in the punitive damages issue as in other tort-related issues."); *see also Cavalier Clothes v. Major Coat Co.*, 1991 WL 125179, *4 n.8 (E.D. Pa. June 26, 1991) (adopting the law of defendants' state of domicile to govern issue of punitive damages).

Exxon's argument is foreclosed by the D.C. Circuit, *Doe VIII,* 654 F.3d at 71, and is moreover, meritless.  Exxon ignores Fed. R. Civ. P. 19, which governs the determination of whether a party is indispensable, and argues instead that EMOI is indispensable based on EMOI's role as a subsidiary/agent.  EB 39 n.28.  Exxon's argument is contrary to well-established precedent.  *See Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1121 (D.C. Cir. 1991) ("[A]gents are not indispensable parties in suits against the principal.");  *Wylain, Inc. v. Kidde Consumer Durables Corp.*, 74 F.R.D. 434, 436 (D. Del. 1977) ("[T]he agent is not a necessary party.");  *see also Pujol v. Shearson Amer. Exp. Inc.*, 877 F.2d 132, 136 (1st Cir. 1989) (Breyer, J.) (same); *Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 499-502 (7th Cir. 1980).[15]

The cases cited by Exxon are unavailing.  For example, Exxon cites *Lopez v. Shearson Am. Express, Inc.*, 684 F. Supp. 1144, 1147-49 (D.P.R. 1988), a case that relies on the "primary participant theory" from *Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553, 558 (5th Cir. 1985), which the D.C. Circuit has rejected.  *Pyramid Sec. Ltd.*, 924 F.2d at 1121 (noting that the Fifth Circuit has been the only court of appeals to adopt the primary participant theory and that in *Pyramid*, as here, the litigants made "no effort to connect this theory to the language of Rule 19").[16]

---

[15] Rule 19 requires a two-part test for determining that a party is indispensable.  *Pujol,* 877 F.2d at 134.  Exxon has not addressed either step.  EMOI is not a party "required to be joined if feasible" under the first step (Rule 19(a)), as shown by the cases cited in the body of this brief.  Thus, the Court need not even reach the second step, found in Rule 19(b).  If, however, the Court reached the second step, the four factors in Rule 19(b) support allowing this case to proceed against Exxon in EMOI's absence, as plaintiffs could still obtain an adequate judgment against Exxon, neither Exxon nor EMOI would be unduly prejudiced, and plaintiffs would have difficulty seeking relief in Indonesia if this case were dismissed, *see supra* pp. 8-11.

[16] The other cases cited by Exxon are similarly inapplicable.  Exxon also cites an unpublished out-of-circuit case, *Tullett Prebon, PLC v. BGC Partners Inc.*, 2010 WL 2545178 (D.N.J. June 18, 2010), where the court held that, unlike the present case, the plaintiff lacked Article III standing and that the plaintiff's absent subsidiaries were the actual injured parties.  *Id.* at *5-6.  The court also held that the failure to join the absent subsidiaries as plaintiffs could

If this Court finds that EMOI's presence in this case robs the Court of jurisdiction, the appropriate course is to dismiss EMOI and allow plaintiffs to proceed with their claims against Exxon, consistent with the Circuit Court's direction.

   a.   *The exercise of supplemental jurisdiction is appropriate here.*

In any event, this Court has the discretion to retain the state-law claims pursuant to its supplemental jurisdiction. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); *Jackson v. CCA of Tenn., Inc.*, 452 F. App'x 1, 2 (D.C. Cir. 2011); *Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 346 (D.C. Cir. 1997). The court must consider judicial economy, convenience, comity, and fairness, including "plaintiff's ability to pursue [those] claims in the local court system." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005). All of those factors point to the retention of the claims by this court. Retention of jurisdiction is particularly appropriate where the case has already reached the summary judgment stage and both sides have had a chance to conduct discovery and develop their case. *Hayes v. D.C.*, 923 F. Supp. 2d 44, 50 (D.D.C. 2013); *see also Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) ("[W]hen a district court declines to exercise jurisdiction over remaining state law claims. . . after investing a significant amount of judicial resources in the

---

subject the defendant to inconsistent obligations, *id.* at *6-7, but no such threat is present here. *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011) and *Dou Yee Enters. (S) PTE Ltd. v. Advantek, Inc.*, 149 F.R.D. 185 (D. Minn. 1993) relied on the primary participant theory rejected by the D.C. Circuit in *Pyramid Sec. Ltd.*, 924 F.2d at 1121, and involved breach of contract claims, which unlike tort claims, are more likely to support a finding that a party is indispensable. *See Pujol*, 877 F.2d at 137 (Breyer, J.) (noting that persons jointly liable under a contract are treated differently under Rule 19, and are more likely than joint tortfeasors to be deemed indispensable parties). Lastly, in *Meng v. Schwartz*, 305 F. Supp. 2d 49 (D.D.C. 2004), the court found it lacked enough information about the multiple Doe defendants' interest in the case to apply the requisite analysis under Rule 19. *Id.* at 55-56.

litigation . . . that court has abused its discretion under 28 U.S.C. § 1367."). Factors to be considered by the district court include the number of motions, particularly dispositive motions, filed and considered by the parties; whether depositions have been taken in the case; and the number of years the case has been pending. *Batiste v. Island Records Inc.*, 179 F.3d 217, 228 (5th Cir. 1999). As in *Batiste*, this court has decided a motion to dismiss (which was based on facts and evidence concerning personal jurisdiction) and a summary judgment motion, and the case has been pending for several years. Where voluminous briefing has already been completed by both sides, the court may take that into consideration and choose to exercise supplemental jurisdiction. *Emory v. United Air Lines, Inc.*, 821 F. Supp. 2d 200, 235 (D.D.C. 2011), aff'd, 720 F.3d 915 (D.C. Cir. 2013). Questions of foreign law may be decided by this court and are not a reason to decline to exercise supplemental jurisdiction. *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 132 (D.D.C. 2011).

> **E.**     ***Kiobel v. Royal Dutch Petroleum* Does Not Bar Plaintiffs' ATS claims.**

> **1.     The ATS Claims Satisfy the *Kiobel* Standard for Extraterritorial Application.**

*Kiobel* held that the principles underlying the presumption against the extraterritorial application of federal statutes similarly limits the circumstances in which courts should enforce ATS causes of action based on conduct occurring abroad. 133 S. Ct. at 1669. Three courts in this jurisdiction have applied *Kiobel* and all three agreed that "the Court appeared to leave room for cases in which the conduct took place outside the United States, but where 'the claims touch and concern the territory of the United States … with sufficient force to displace the presumption against extraterritorial application." *Kaplan v. Central Bank of Islamic Republic of Iran*, 2013 WL 4427943, *16 (D.D.C. Aug. 20, 2013); *see also Mohammadi v. Islamic Republic of Iran*, 2013 WL 2370594, *14–15 (D.D.C. May 31, 2013) (same); *Mwani v. Laden*, 2013 WL 2325166,

at * 2-4 (D.D.C. May 29, 2013) (same).

All three cases rejected the argument that Exxon presses here, that *Kiobel* prohibits any ATS case unless all of the underlying conduct occurred within the United States.  EB at 16-19. In fact, only Justice Alito's concurrence, joined by Justice Thomas, took this position, and it was not adopted by the majority.  *See Kiobel*, 133 S. Ct. at 1669-70 (Alito, J., concurring).

As this Court observed, the majority opinion left open precisely which ATS claims would satisfy the standard going forward. *Kaplan*, 2013 WL 4427943 at *16. Justice Kennedy expressly anticipated that other cases will arise that would not be covered by the reasoning and holding of *Kiobel* and "in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation." *Id.* at 1669 (Kennedy, J., concurring).  Seven Justices agreed the majority was "careful to leave open a number of significant questions." *Id.*; *accord id.* at 1669 (Alito, J., concurring) ("This formulation obviously leaves much unanswered"); *id.* at 1673 (Breyer, J., concurring) ("It leaves for another day the determination of just when the presumption against extraterritoriality might be 'overcome.'").  Exxon's interpretation of *Kiobel* is not supportable in light of the Court's limited holding.  *Mohammadi* observed that "the Supreme Court hinted as to what type of conduct occurring entirely abroad might confer jurisdiction under the ATS" and noted that the majority opinion discussed conduct that "touches and concerns the  territory of the United States," while Justice Kennedy "implied that certain 'serious violations of international law principles protecting persons' may rebut the presumption" and Justice Breyer, joined by three other justices, "stated that the ATS would provide jurisdiction where, *inter alia*, 'the defendant is an American national." *Mohammadi*, 2013 WL 2370594 at *14–15.  In *Kiobel*, and other cases in this jurisdiction that have resulted in dismissals, foreign nationals sued foreign corporations

and all of the relevant conduct took place outside the United States.  This case, however, is not a "foreign cubed" case.

This case satisfies *Kiobel* in at least two ways.  **First**, Exxon is a U.S. corporation, whereas in *Kiobel,* the defendant was a dual British and Dutch corporation, and was merely doing business in the United States.  *Kiobel*, 133 S. Ct. at 1662.  There is a long history of federal and international law holding that the laws of the U.S. properly may extend to American nationals when outside the boundaries of the United States.  *Id.* at 1673-76 (Breyer, J., concurring).  **Second**, while there is no support for Exxon's position that *Kiobel* requires all of the wrongful conduct to have occurred in the U.S., here Exxon aided and abetted its security forces from the U.S., and this U.S. conduct substantially assisted in the commission of the tortious acts against Plaintiffs.  This is distinct from *Kiobel* where ***all*** of the conduct occurred outside the United States.  133 S. Ct. at 1669.

> a.  *Unlike in Kiobel, Exxon is a U.S. National and the U.S. has an Obligation to Regulate its Overseas Conduct.*

It is undisputed that EMC is a U.S. company with its principal place of business in Texas.  *See* SJ Op. at 21; Doe I FAC ¶17.  Plaintiffs have alleged that Exxon and EMOI were substantially intertwined, *see* Doe I FAC ¶¶25-34, and, based on evidence of this integration offered during summary judgment, this Court concluded that Plaintiffs had presented "significant evidence in support of veil piercing."  SJ Op. at 23 n.1.  Moreover, this Court found that "[a] reasonable trier of fact could conclude that EMOI acted as Exxon Mobil's agent with regard to the military security for the huge Arun gas field" and that "[s]ufficient evidence demonstrates that Exxon Mobil exerted significant control over EMOI's security, particularly through Exxon Mobil's Global Security division" which was based in Fairfax, Virginia.  SJ Op. at 23.  Thus, all of the conduct in this case is attributable to EMC, a defendant incorporated and with its principal

place of business in the United States.  In addition, at all times relevant to this suit, EMOI was also incorporated in the United States and was an American national.

The issue of whether the ATS extends extraterritorially to American nationals was not discussed in *Kiobel* because the defendant there, Royal Dutch Shell, was a dual British and Dutch corporation.  *Kiobel*, 133 S. Ct. at 1662.  Any decision to upend a long and unbroken line of legal precedent establishing that American nationals are subject to the reach of U.S. law would not, and should not, be done by implication. Exxon's heavy reliance on *Balintulo v. Daimler AG*, 727 F. 3d 174 (2d Cir. 2013) to dismiss the importance of Exxon's nationality is misplaced.  There, the Court stated nothing in *Kiobel* "suggests that the rule of law it applied somehow depends on a defendant's citizenship," *id*. at 190, n.24, but this is just one way of saying the issue of American nationality was not addressed in *Kiobel*.[17]

*Kiobel*'s discussion of Attorney General Bradford's Opinion issued in 1795 certainly reinforces that the Supreme Court understood the ATS could reach American nationals extraterritorially. 133 S. Ct. at 1668.  The Bradford Opinion addressed an attack on the British colony of Sierra Leone.  *Kiobel* distinguished the case by pointing out it involved American citizens and a possible treaty violation.  *Id*.  Although, because of those distinctions, *Kiobel* found the Bradford Opinion did not support the extraterritorial application of the ATS to the foreign corporate defendant, the Bradford Opinion "provides support for the extraterritorial application of the ATS to the conduct of U.S. citizens."  Curtis Bradley, *Agora: Kiobel, Attorney General Bradford's Opinion and the Alien Tort Statute*, 106 Am. J. Int'l L. 509, 510 (2012).

---

[17] More fundamentally*, Balintulo* is not good authority on the scope of *Kiobel* because the entire opinion is dicta.  The case was before the Second Circuit on a writ of mandamus or under the collateral order doctrine.  727 F. 3d at 181. The court ultimately determined it need not resolve whether it had jurisdiction based on one of those two avenues, and instead, without finding a basis for jurisdiction, proceeded to discuss *Kiobel*.  *Id*. at 182, 188.

In addition, *Kiobel* appeared to accept the federal government's recommendation on extraterritorial jurisdiction. The Government argued *Kiobel* should be dismissed for insufficient connection to the United States, but opposed an absolute bar on extraterritorial claims, particularly where the defendant is found within U.S. borders. Supp. Br. for the U.S. as *Amicus Curiae* in Partial Support of Affirmance at 4-5, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491) ("U.S. Supp. Br."). As an example of claims that should not be barred, the Government identified *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980), which "involved a suit by Paraguayan plaintiffs against a Paraguayan defendant based on alleged torture committed in Paraguay." U.S. Supp. Br. at 4. The Government emphasized that the defendant in *Filártiga* "was found residing in the U.S., circumstances that could give rise to the prospect that this country would be perceived as harboring the perpetrator." *Id.* This was a critical difference. In *Kiobel*, because the defendants were British and Dutch nationals, "the United States cannot be thought responsible in the eyes of the international community for affording a remedy for the company's actions, while the nations directly concerned could." *Id.* at 5. The Government affirmed that applying the ATS to conduct that arises abroad in circumstances like those in *Filártiga* supports American foreign policy, including the promotion of respect for human rights. *Id.* at 13. These concerns apply with even more force here because Exxon is an American national.

Indeed, the *Kiobel* Court was met with the argument that the assertion of ATS jurisdiction over foreign corporations for acts taking place in Nigeria would itself violate international law.[18] Thus, the Court was faced with a conflict over the appropriate reach of

---

[18] *See* Br. of the Gov'ts of the Kingdom of the Netherlands and the United Kingdom of Great Britain and Northern Ireland as *Amici Curiae* in Support of Neither Party at 27-28, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491) ("U.K/Dutch Br."). *See*

American law, consistent with international law, and an argument the Court should avoid this conflict by restricting the reach of the ATS itself.  However, international law poses no obstacle to ATS enforcement against U.S. citizens wherever their misconduct occurred, as the United Kingdom and the Netherlands emphasized to the Supreme Court.  U.K./Dutch Br. at 35-36.

The history and context for passage of the ATS leaves no doubt U.S. law may reach American nationals if they are complicit in serious international law violations arising abroad. When U.S. citizens violate the law extraterritorially, such acts engage U.S. responsibility under international law or risk provoking hostile action by foreign sovereigns. *See, e.g.*, Emmerich de Vattel, *The Law of Nations: Or, Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns* 162 (1797) (nations "ought not to suffer their citizens to do an injury to the subjects of another state"); 4 William Blackstone, *Commentaries on the Law of England* 68 (1765) (noting it is "incumbent upon the nation injured, first to demand satisfaction and justice to be done on the offender, by the state to which he belongs"); Bradley, *supra*, at 526 & n.112 (collecting authorities and noting "when the ATS was enacted, the United States would have had a duty to ensure that certain torts in violation of international law, especially those committed by its citizens, were punished and redressed.").

The United States' power to apply its law to its own citizens has never been questioned. For example, in *Blackmer v. United States*, 284 U.S. 421 (1932), the Supreme Court stated:

> While it appears that [Blackmer] removed his residence to France . . . , it is undisputed that he was, and continued to be, a citizen of the United States. He continued to owe allegiance to the United States. By virtue of the obligations of citizenship, the United States retained its authority over him, and he was bound by its laws made applicable to him in a foreign country. Thus, although resident abroad, the petitioner remained subject to the taxing power of the United States. For disobedience to its laws through conduct abroad, he was subject to

---

*also* Supp. Br. of Chevron Corp., *et al.*, as *Amici Curiae* in Support of Respondents at 24-29, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491).

punishment in the courts of the United States.

*Id.* at 436-37 (citations omitted).  The Supreme Court noted explicitly that the case raised no issue of international law because "[t]he Law of Nations does not prevent a State from exercising jurisdiction over its subjects traveling or residing abroad, since they remain under its personal supremacy."  *Id.* at 437 n.2 (internal quotation marks & citation omitted); *accord The Apollon*, 22 U.S. 363, 369-70 (1824); *United States v. Bowman*, 260 U.S. 94, 99, 102 (1922).

There is no question that the United States has the power to apply international law under the ATS to its own citizens.  *See, e.g.*, Sir Robert Jennings & Sir Arthur Watts, eds., *Oppenheim's International Law*, § 138 at 462 (9th ed. 1992); Restatement (Third) of the Foreign Relations Law of the United States, § 402(2) (1987) ("Restatement (Third)") ("[A] state has jurisdiction to prescribe law with respect to . . . the activities, interests, status, or relations of its nationals outside as well as within its territory.");  *See, also, e.g.*, *United States v. Belfast*, 611 F.3d 783, 810 (11th Cir. 2010) ("Congress has the power to regulate the extraterritorial acts of U.S. citizens.").  This principle applies to corporations as well as natural persons.  Restatement (Third), § 402 cmt. e.  Thus, yet another of the principal concerns at issue in *Kiobel* does not exist in this case.

Indeed, international law poses no obstacle to ATS enforcement against U.S. citizens wherever their misconduct occurred.  *See Kiobel*, 133 S. Ct. at 1673-76 (Breyer, J., concurring); Br. of the European Comm'n on Behalf of the European Union as *Amicus Curiae* in Support of Neither Party at 11, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491); U.K./Dutch Br. at 15 ("[T]he extraterritorial application of the ATS to acts committed by American individuals [and] corporations . . . in foreign sovereign territory, would be consistent with international law.").

44

Two post-*Kiobel* ATS cases discussing the significance of a defendant being a U.S. resident both held the *Kiobel* presumption was overcome by this fact. *See Sexual Minorities Uganda v. Lively*, 2013 WL 4130756, at *13 (D. Mass. Aug. 14, 2013); *Ahmed v. Magan*, 2013 WL 4479077, at *2 (S.D. Ohio Aug. 20, 2013). In the *Sexual Minorities* case, the District Court of Massachusetts held the presumption against extraterritoriality was overcome where the defendant was an American citizen and "tortious acts committed by Defendant took place to a substantial degree within the United States." 2013 WL 4130756, at *13. On the significance of the defendant's nationality, the district court stated:

> This is not a case where a foreign national is being hailed into an unfamiliar court to defend himself. Defendant is an American citizen located in the same city as this court . . . An exercise of jurisdiction under the ATS over claims against an American citizen who has allegedly violated the law of nations in large part through actions committed within this country fits comfortably within the limits described in *Kiobel*.

*Id.* at *14. Likewise, in *Ahmed v. Magan*, , the District Court for the Southern District of Ohio found the presumption against extraterritoriality was overcome where a Somali citizen sued a Somali military official for crimes that took place in Somalia, solely because the military official was a legal permanent resident of the United States. 2013 WL 4479077, at *2.

The First Congress passed the ATS to satisfy the country's responsibility to vindicate the law of nations, including ensuring that the U.S. would provide redress when Americans committed violations of international law. *Sosa v. Alvarez-Machain,* 542 U.S. 692, 722 n.15 (2004). Here, Exxon, an American corporation, is subject to U.S. law in its home jurisdiction.

   b. *Exxon's Significant U.S. Conduct is Sufficient to Overcome the Kiobel Presumption.*

The complaint in *Doe I* was drafted and discovery was taken well before *Kiobel* was decided, but nonetheless the evidence indicates that Plaintiffs should be permitted to complete Kiobel-related discovery and amend their complaint to satisfy the new standard. *See Cicippio-*

45

*Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1036 (D.C. Cir. 2004) (finding that Plaintiffs were entitled to amend their complaint in light of recent clarification in law); *Wyatt v. Syrian Arab Republic*, 304 F. Supp. 2d 43, 44 (D.D.C. 2004) (same); *see also Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 939 (3d Cir. 1984) (holding that district court erred in not permitting plaintiffs to amend complaint in light of change in law).

Plaintiffs will be able to allege: (1) Executives in the United States knew that the Indonesian military had a long  history of committing human rights violations, and further knew that the illegal and abusive conduct was likely to continue;  (2) Despite this knowledge, Executives in the United States decided to hire and retain military security for the facilities in Indonesia, knowing that further abuses were likely, and increased their reliance on military security knowing that these abuses continued during the employment relationship, demonstrating sufficient intent to satisfy the international definition of purpose; (3) Executives in the United States decided to pay, supply and train the military security personnel; the assistance provided was substantial and directly led to the violations.  These allegations are more than sufficient to satisfy Plaintiffs' pleading burden under *Kiobel*. *See Sexual Minorities of Uganda*, 2013 WL 4130756 at *15.  Plaintiffs provide the factual summary below to illustrate that further discovery will likely demonstrate an even greater connection to the United States and amendment would not be futile.  The summary is based on the evidence submitted to the court in connection with Plaintiffs' opposition to Exxon's summary judgment motion on the state law claims – evidence that was not focused on identifying a connection to conduct in the United States.  Given the showing Plaintiffs can make now, it is likely that additional facts showing significant conduct in the United States can be obtained if discovery can be completed, and that Plaintiffs will be able to add further allegations.

Plaintiffs alleged that EMC, the United States parent, made and implemented relevant decisions from its headquarters in the United States. Doe I FAC ¶33-34, 54, 56-57; Doe VIII Compl. ¶¶26-27, 47, 49-50.  This Court already found that EMOI required extensive support from management in the United States. SJ Op. at 24.  For example, Lance Johnson, an EMC executive based in Houston, Texas, spent about half of his time working on Indonesia and traveled to EMOI approximately every other month.  SMF at 17.

EMC management based in the United States decided to hire and retain the military security personnel.  Doe I FAC ¶33.  EMOI solicited and obtained EMC's approval for the deployment of military security in Aceh.  SMF at 17.  EMC management officials, primarily working through EMC's Global Security Division, were responsible for providing weapons funding, military equipment and other supplies used to injure Plaintiffs.  Doe I FAC ¶¶54, 56. Defendants testified that they provided motorcycles, trucks, radios, armor, fuel and other supplies to the military security personnel, in addition to food and shelter.  SMF ¶66.  EMOI paid the military security personnel pursuant to a budget endorsed and approved by EMC.  SMF ¶66 (citing documents such as e-mail listing payment amounts circulated among EMC employees).  Even petty charges, such as bonuses, were submitted to EMC for review and approval. SMF at 14, 16-17.

EMC tightly controlled the security function. For example, EMC gave EMOI detailed instructions regarding what kinds of security incidents to report to EMC on an immediate, daily, weekly and monthly basis. SMF ¶69.  EMC was able to monitor the Aceh security situation directly, through a set of live cameras which were streamed over the intranet.  Id.

EMOI had to get approval from EMC in the United States for deploying military security, and provided detailed information regarding the deployments to the United States. Id.  EMC

audited and commissioned studies of EMOI's security plan.  SMF ¶72.  EMC evaluated the
security policies and procedure in detail, and commissioned risk reports.  Id.  Indeed, EMC
Global Security personnel communicated about security issues in Indonesia without including
EMOI on the correspondence.  SMF ¶72.  One such email states "a lot of rumors about people
being killed floating around … Please do not circulate this note outside Global Security."  Id.

Exxon staff met frequently with the military security personnel and provided the
personnel with instruction and training, including joint drills.  SMF ¶67.  There was close
supervision, including daily meetings.  Id.  Exxon had the ability to restrict the conduct of the
soldiers and to determine procedures and a code of conduct.  Id.

An EMC employee, Robert Haines, in Washington, DC was in constant contact with
EMOI.  SMF at 17.  In Washington, DC, he met with federal and foreign government officials,
and representatives of NGOs regarding human rights abuses in Indonesia and Exxon's support of
its military security.  SMF at 32-34, 36-40.  Exxon staff in the United States were long aware of
the allegations of human rights abuses.  Doe I FAC ¶¶63, 64.   The public affairs office in the
United States prepared detailed scripts for responding to press inquiries about allegations of
abuse by Exxon's security personnel.  SMF ¶73.

EMC approved the use of military security and paid and supplied the personnel knowing
that the security personnel were responsible for widespread abuses.  Doe I FAC ¶¶61-66.   Top
US based executives attended meetings where human rights abuses by the security personnel
were discussed.  For example, the U.S. Ambassador to Indonesia discussed the allegations with
Mobil's Chairman, Lucio Noto, in a 1998 meeting.  *Id*. at ¶63.  Indeed, as noted above, Exxon
employees described the military security personnel that Exxon hired, paid and supplied as
having a "poor reputation" "especially in the area of respecting human rights."  SJ Op. at 19.

Numerous human rights groups asked Defendants to cease using military security.  Doe I FAC ¶64.  Nonetheless, Exxon instead determined to increase, and did increase, the number of military security personnel it retained with full knowledge of the abuses.  *Id.*

Sufficient conduct occurred in the United States to demonstrate that the recognition of a cause of action under the ATS to these facts would *not* be extraterritorial.  This conduct need not be limited to the action on the ground that gives immediate rise to the cause of action; it may also apply to decision making that furthered the violation.  *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531–32 (D.C. Cir. 1993) (where relevant decision making was territorial, case was not extraterritorial).  In addition, of course, it may also include actions in the United States taken in furtherance of the acts abroad that give immediate rise to the cause of action. *See Mwani,* 2013 WL 2325166, at *2-4 (presumption against extraterritoriality was displaced where plaintiffs alleged that specific acts took place within the United States in furtherance of an international plot to bomb a diplomatic building in Kenya); *Sexual Minorities Uganda,* 2013 WL 4130756 at *13 (defendants' aiding and abetting of persecution in Uganda not barred as extraterritorial under the ATS given the extensive conduct undertaken in the U.S. in furtherance of the persecution). As the D.C. Circuit has noted, "proving a defendant guilty of aiding and abetting does not ordinarily require the government to establish 'participation in each substantive and jurisdictional element of the underlying offense.'" *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) (*citing United States v. Garrett*, 720 F.2d 705, 713 n. 4 (D.C.Cir.1983)).

These facts described above, which Plaintiffs believe they can expand upon, certainly allow the inference Exxon knew its security personnel were committing human rights violations, and nonetheless made the decisions to pay, supply and deploy them from the United States.  This conduct is central to Plaintiffs' theory that Exxon aided and abetted human rights violations, and

is more than sufficient to overcome the presumption.  This case is far removed from *Kiobel*, a foreign-cubed case where ***all*** of the relevant conduct took place outside the United States.

### 2.      Exxon can be Held Liable for Aiding and Abetting Under the ATS.

Exxon's argument the ATS does not allow for aiding and abetting liability is meritless. As the Fourth Circuit recently observed in *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 395-96 (4th Cir. 2011), every appellate court to consider the question has found aiding and abetting is a well-settled principle of liability under the ATS.  *See, e.g.*, *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1258 n. 5 (11th Cir.2009); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247-48 (11th Cir. 2005); *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007), aff'd sub nom. *Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008).  Indeed, in this case, the Court of Appeals raised no doubt the ATS allowed for aiding and abetting liability. *See Doe VIII,,* 654 F.3d at 29-32.

Instead, the Court of Appeals conducted an extensive analysis of the level of intent required for liability, concluding the "*mens rea*" required is "knowledge" and the requisite "actus reus" is that a defendant's acts must "have a substantial effect in bringing about the violation." *Id*. at 39.  When the Court of Appeals vacated its judgment on the ATS claims, it remanded specifically for further consideration of the impact of *Prosecutor v. Perišić*, No. IT-04-81-A, Appeals Chamber J. (Feb. 28, 2013) (*Perisic*) on the "***standard to be applied for aiding and abetting liability***," **not** whether the ATS allows for aiding and abetting liability.  *Exxon Mobil Corp.*, 527 F. App'x at 7 (emphasis added).  Exxon points to nothing that possibly raises the question of whether intervening law has abolished the application of aiding and abetting liability to the ATS.

a.     *Perišić Confirms the Court of Appeals' Statement that the Mens Rea Requirement for Aiding and Abetting Is Knowledge.*

*Perisic* focused primarily on the *actus reus* for aiding and abetting liability, and in that context applied a new "specific direction" test for *actus reus* to the facts of that case. *Perisic*, ¶¶29-30. *Perisic* agreed with the Exxon Court of Appeals' holding, 654 F.3d at 39, that "'knowledge' suffices to meet the *mens rea* requirement for aiding and abetting liability." *Perisic*, J. ¶48. Exxon fails to address the key distinction between *mens rea* and *actus reus*. EB at 23-27.[19]

b.     *Perisic Did Not Alter the Long-Standing and Unwavering Standard for Actus Reus.*

*Perisic* expressly acknowledged it was applying the well-accepted *actus reus* standard for aiding and abetting liability, requiring the defendant "assist, encourage, or lend moral support to the perpetration of a certain specific crime . . . and this support has a substantial effect upon perpetration of the crime." *Perisic*, J. ¶26 (internal quotation marks & citation omitted). This is functionally identical to the standard the Court of Appeals identified after reviewing the universe of international authorities, as well as domestic common law cases. *See* 654 F.3d at 34-35, 39. There remains no dispute regarding the legal standard that must be applied to determine *actus reus*.

In applying this standard in *Perisic,* the Appeals Chamber had the benefit of a trial record with substantial evidence to evaluate and noted the unique fact that Perisic was the Chief of the Yugoslav army, but a military unit that was ***not*** under his command or control committed murder, inhumane acts, and war crimes. *Perisic*, J. ¶¶2, 4, 27, 46, 72-73, 108-11. The unit

_____

[19] There is no question, and Exxon does not challenge, that Plaintiffs adequately alleged Exxon had knowledge of the brutal and unlawful conduct of its security forces while providing ongoing substantial assistance to those forces. *See, e.g.*, Doe I FAC ¶¶61-66; SJ Op. at 19.

committing the crimes was not even in geographic proximity to Perisic. *Id.* ¶¶38-42. Under

these circumstances, the Appeals Chamber added to the well-established *actus reus* standard that

the evidence must show Perisic had "'carrie[d] out acts *specifically directed* to assist . . . the

perpetration of a certain specific crime.'" *Id.* ¶26 (quoting *Prosecutor v. Tadić*, No. IT-94-1-A,

Appeals Chamber J., ¶229 (July 15, 1999) (*Tadic*)). The Appeals Chamber acknowledged no

other International Criminal Tribunal for the Former Yugoslavia ("ICTY") and International

Criminal Tribunal for Rwanda ("ICTR") decision other than *Tadic* "refer[s] to specific direction

nor provide[s] an equivalent formulation." *Id.*, ¶¶29-30.

A subsequent decision by the Appeals Chamber of the Special Court for Sierra Leone

("SC-SL"), a decision not even mentioned by Exxon, held "that 'specific direction' is not an

element of the *actus reus* of aiding and abetting liability under . . . customary international law."

*Prosecutor v. Taylor*, No. SCSL-03-01-A, Appeals Chamber J., ¶486 (Sept. 26, 2013); *see also*

*id*. ¶¶473-80 (same). After an analysis of state practice and international law, the SC-SL

affirmed the appropriate inquiry for *actus reus* under customary international law remains

whether the "accused's acts and conduct of assistance, encouragement and/or moral support had

a substantial effect on the commission of the crimes." *Id.* ¶482. The SC-SL explained ways in

which assistance can have a substantial effect on the commission of a crime, including

"providing financial support to an organisation committing crimes . . . ." *Id.* ¶369. Other means

of assistance also include "attending meetings," "providing weapons and ammunition," and

providing "vehicles and fuel or personnel." *Id.*

*Taylor* specifically addressed *Perisic* and found the standard applied in *Perisic* was ***not***

customary international law, but rather only based on precedent within that court limited to its

unique facts. *Id.* ¶476. Exxon's failure to acknowledge *Taylor* speaks volumes.

The long list of authorities cited by the Court of Appeals are united in stating the *actus reus* standard for aiding and abetting is whether the acts have a substantial effect in bringing about the violation.  *See* 654 F.3d at 34-35, 39.  This is also the long-recognized standard under federal common law.  *See e.g., Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (requiring the defendant "substantially assist the principal violation.").

*Perisic* does not alter customary international law on the standard for *actus reus* of aiding and abetting.  Nonetheless, even if this Court were to apply the unique *Perisic* standard of whether "'the aider and abettor carries out acts *specifically directed* to assist, encourage, or lend support to the perpetration of a certain specific crime,'" *Perisic*, J. ¶26 (quoting *Tadic*, ¶229), the question is simply whether there is "a sufficient link between the acts of an individual accused of aiding and abetting a crime and the crime he or she is charged with assisting."  *Id.*  ¶72.  A key factor in *Perisic* was Perisic had no control over the soldiers committing the crimes.  *Id.* ¶¶72, 108-11.  This distinction makes all the difference.  In an earlier ICTY Appeals Chamber case involving the same two armies as *Perisic*, the defendant was liable because he retained control over the soldiers he sent to help the perpetrators.  *See Prosecutor v. Blagojević & Jokić*, Case No. IT-02-60-A, Appeals Chamber J., ¶131 (May 9, 2007).  Defendants argue that Exxon officials must have ordered the crimes to occur or they are not liable for the crimes,  EB at 26, but it is clear from *Blagojevic* that providing equipment is enough, whether or not the Defendants ordered a specific use for that equipment, as long as they knew the crimes were being committed.  *Id.*, ¶¶168, 174–75; *see also Prosecutor v. Kayishema and Ruzindana*, Case No. ICTR-95-1-A, Judgment ¶¶201-02 (June 1, 2001) ("tacit encouragement" is enough).

Aiding and abetting is plainly available and Plaintiffs can meet any appropriate standard.

IV.   **CONCLUSION**

For the above reasons, Exxon's motion should be denied.


December 13, 2013                          Respectfully submitted,

                                           /s/Agnieszka M. Fryszman
                                           Agnieszka M. Fryszman
                                           DC Bar No. 459208
                                           Thomas N. Saunders
                                           Alysson Ford Ouoba
                                           **Cohen Milstein Sellers & Toll PLLC**
                                           1100 New York Ave. NW
                                           Suite 500, West Tower
                                           Washington, DC 20005
                                           Telephone:  (202) 408-4600
                                           Facsimile:  (202) 408-4699

                                           Terrence P. Collingsworth
                                           D.C. Bar No. 471830
                                           Christian Levesque
                                           D.C. Bar No. 501778
                                           **Conrad & Scherer LLP**
                                           1156 15th Street, N.W.
                                           Suite 502
                                           Washington, D.C. 20005
                                           Tel:  (202) 543-5811
                                           Fax:  (866) 803-1125

                                           Paul L. Hoffman
                                           Catherine Sweetser
                                           **Schonbrun, DeSimone, Seplow, Harris,**
                                           **  Hoffman & Harrison LLP**
                                           723 Ocean Front Walk
                                           Venice, CA  90291
                                           Tel: (310) 396-0731
                                           Fax: (310) 399-7040

                                           *Attorneys for Plaintiffs*