JOHN DOE I, *et al.*,        )
)
     Plaintiffs,      )
)
     v.            )     Civil No. 01-1357 (RCL)
)
EXXON MOBIL      )
CORPORATION, *et al.*,  )
)
     Defendants.    )
)

JOHN DOE VIII, *et al.*,   )
)
     Plaintiffs,      )
)
     v.            )     Civil No. 07-1022 (RCL)
)
EXXON MOBIL      )
CORPORATION, *et al.*,  )
)
     Defendants.    )
)

## MEMORANDUM OPINION

Today, the Court disposes of a number of pending motions in two separate but closely related cases, *John Doe I, et al. v. Exxon Mobil Corp., et al.*, Civil No. 01-1357 ("*Doe I*") and *John Doe VIII, et al. v. Exxon Mobil Corp., et al.*, Civil No. 07-1022 ("*Doe VIII*"). These cases arise from injuries allegedly inflicted upon plaintiffs by Indonesian soldiers employed by defendants to provide security at a natural gas production facility in Indonesia. Plaintiffs have brought claims arising under Indonesian tort law in both suits and under the Alien Tort Statute in *Doe I*. Before the Court are defendants' motion to dismiss; plaintiffs' motion for leave to file

surreply in opposition thereto; and the parties' competing opposed motions to modify or reconsider the Court's September 18, 2013 scheduling order.

For the following reasons and after consideration of the parties' briefing, the relevant facts, and the applicable law, the Court will **GRANT IN PART AND DENY IN PART** defendants' motion to dismiss, **GRANT** plaintiffs' motion for leave to file surreply in opposition to defendants' motion to dismiss, **GRANT IN PART AND DENY IN PART** plaintiffs' motion to modify the Court's scheduling order, and **DENY** the defendants' motion for reconsideration of the Court's scheduling order.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background[1]

This litigation arises from events occurring in the Aceh Province of Indonesia in the years 2000, 2001, and 2004. Plaintiffs, collectively a group of 15 Indonesian citizens from Aceh, allege various injuries at the hands of Indonesian soldiers hired to provide security services at the Arun natural gas field in Aceh. Defendants are four related corporations: Exxon Mobil Corp. ("EMC"), Mobil Corp. ("MC"), ExxonMobil Oil Corp. ("EMOC"), and ExxonMobil Oil Indonesia, Inc. ("EMOI") (collectively, "Exxon"). MC, EMOC, and EMOI are all wholly owned subsidiaries of EMC. Compl. For Equitable Relief and Damages ¶¶ 13–14, 16, *Doe VIII*, ECF No. 4 ("*Doe VIII* Compl.").

The following factual summary assumes the truth of all of plaintiffs' factual allegations, as the Court must do when evaluating a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pursuant to an exclusivity agreement with the Government of Indonesia ("GOI"), Exxon began developing the Arun natural gas field in the Aceh province of Indonesia in the early

---

[1] Because the two complaints are largely identical, the Court will generally cite only the *Doe VIII* complaint for purposes of this background section, except where necessary to do otherwise.

1970s. *Doe VIII* Compl. ¶ 29. During this period, Exxon retained members of the Indonesian military to provide security at its facilities at Arun. *Id.* ¶ 39. These soldiers committed various unlawful acts against plaintiffs in Aceh, causing injuries to plaintiffs and, in some cases, their death. *See generally* First Am. Compl. For Equitable Relief and Damages ¶¶ 67–77, *Doe I*, ECF No. 123-1 ("*Doe I* First Am. Compl."); *Doe VIII* Compl. ¶¶ 60–63. For example, plaintiffs allege that John Doe I was shot in the wrist by Exxon security personnel, who then threw a hand grenade at him and "left him for dead." *Doe I*, First Am. Compl. ¶ 67. He was later killed during a raid on his village. *Id.* Jane Doe plaintiffs II, III, and IV bring wrongful death claims arising from the murder or disappearance of their husbands, themselves John Doe plaintiffs. *Doe I*, First Am. Compl. ¶¶ 75–77.

Plaintiffs allege that these acts were all committed in the scope of the soldiers' employment as security personnel. *Doe VIII* Compl. ¶ 43. They also set forth in their complaints that Exxon had the ability to control the actions of these soldiers by such methods as conditioning payment on provision of specific security services, making decisions about placement of bases, engaging in strategic mission planning, and deciding on deployment zones. *Id.* ¶ 47. Plaintiffs further assert that Exxon provided material support to the security personnel by, for example, constructing facilities, providing funding for weapons, providing supplies and equipment, and paying for the services of consultants in training and equipping the personnel. *Id.*

## B. Procedural History

The first group of 11 plaintiffs filed suit in 2001. *Doe I* initially alleged the following causes of action: (a) claims arising under the Alien Tort Statute ("ATS") for murder, genocide, torture, kidnapping, and crimes against humanity; (b) claims arising under the Torture Victim

Protection Act ("TVPA") for torture and extrajudicial killing; (c) a claim for Violence Against Women; and (d) various non-federal tort claims. Compl. For Equitable Relief and Damages ¶¶ 63–126, *Doe I*, ECF No. 3 ("*Doe I* Original Compl.").

The defendants moved to dismiss and Judge Oberdorfer, then presiding over *Doe I*, granted in part and denied in part. *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 21–22 (D.D.C. 2005). The court dismissed plaintiffs' federal statutory claims, both those arising under the ATS and the TVPA. *Id.* at 24–28. The court also dismissed the claim for Violence Against Women. *Id.* at 28. Plaintiffs' state law claims were allowed to proceed, except as to then-defendant PT Arun LNG Co., a company that was majority owned by Pertamina, a GOI-owned oil and gas company. *Id.* (concluding that "[a]djudicating the liability of an entity owned by the Indonesian government would create a significant risk of interfering in Indonesian affairs and thus U.S. foreign policy concerns"). The court subsequently determined that D.C. and Delaware law applied to plaintiffs' non-federal tort claims. *Doe I v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 22 (D.D.C. 2008).

In June 2007, a different set of anonymous plaintiffs filed suit in this Court, alleging only non-federal claims. *See Doe VIII* Compl. ¶¶ 70–110. *Doe I* was reassigned here shortly thereafter. *Doe VIII v. Exxon Mobil Corp.*, 658 F. Supp. 2d 131, 132 (D.D.C. 2009), *aff'd in part, rev'd in part*, 654 F.3d 11 (D.C. Cir. 2011), *vacated in part*, 527 F. App'x 7 (D.C. Cir. 2013). The Court dismissed both suits, concluding that plaintiffs, as non-resident aliens, lacked standing to sue in United States courts. *Id.* at 135; Order, Sept. 30, 2009, *Doe I*, ECF No. 412. In light of this threshold determination, the Court declined to reach any of the defendants' other asserted grounds for dismissal. *Doe VIII*, 658 F. Supp. 2d at 133.

4

The Court of Appeals subsequently reversed in part and affirmed in part. While affirming dismissal of the TVPA claim, the Court held that the *Doe I* plaintiffs' ATS claims could proceed on an aiding and abetting theory of liability. *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 15 (D.C. Cir. 2011), *vacated in part*, 527 F. App'x 7 (D.C. Cir. 2013). As to the non-federal claims, it reversed this Court, holding that plaintiffs had standing and that their claims were governed by Indonesian law. *Id.* at 15, 70. It also expressly remanded the question of whether EMOI's presence defeated diversity jurisdiction and whether EMOI could be dismissed to preserve jurisdiction in *Doe VIII*. *Id.* at 71.

The Court of Appeals then, *sua sponte*, stayed proceedings while the Supreme Court considered the cases of *Kiobel v. Royal Dutch Petroleum Co.* and *Mohamad v. Rajoub*. *Doe VIII v. Exxon Mobil Corp.*, USCA Case No. 09-7125, Order, Nov. 14, 2011, ECF No. 1341654. It subsequently vacated its order as to the ATS claims, remanding the issue to this court for consideration of the ATS claims in light of the Supreme Court's holding in *Kiobel* and the International Criminal Tribunal for the Former Yugoslavia's holding in *Prosecutor v. Perišić*. *Doe VIII v. Exxon Mobil Corp.*, 527 F. App'x 7 (D.C. Cir. 2013). The court also affirmed dismissal of the TVPA claims and reversed dismissal of the non-federal claims, expressly preserving Parts IV and VI of its prior opinion. *Id.*

## II. PLAINTIFFS' MOTION FOR LEAVE TO FILE SURREPLY

Before ruling on Exxon's motion to dismiss, the Court must determine whether to grant leave to plaintiffs to file a surreply in opposition to it. As a general rule, surreplies are disfavored. *Kifafi v. Hilton Hotels Retirement Plan*, 736 F. Supp. 2d 64, 69 (D.D.C. 2010). Nonetheless, leave to file is "routinely" granted "when a party is unable to contest matters presented to the court for the first time in the last scheduled pleading." *Ben-Kotel v. Howard*

*Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (internal quotation marks omitted). The decision to grant or deny leave is "committed to the sound discretion of the Court." *Lu v. Lezell*, ---F. Supp. 2d---, Civil Action No. 11-1815 (JEB), 2014 WL 2199314, at *2 (D.D.C. May 27, 2014). A district court should consider "whether the movant's reply in fact raises arguments or issues for the first time, whether the nonmovant's proposed surreply would be helpful to the resolution of the pending motion, and whether the movant would be unduly prejudiced were leave to be granted." *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012).

The Court is persuaded that plaintiffs should be granted leave to file their surreply. First, plaintiffs seek to respond to an additional expert declaration regarding Indonesian law submitted as part of Exxon's reply. Pl.'s Reply in Support of Pl.'s Mot. For Leave to File Surreply 1–4, *Doe I*, ECF No. 453, *Doe VIII*, ECF No. 81. This Court has previously granted leave to file a surreply when the opposing party's reply brief included a supplemental declaration. *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 101 (D.D.C. 2005) ("Were this Court to deny the Wyndham Defendants leave to file a sur-reply, the Wyndham Defendants would be unable to contest matters presented to the court for the first time in the form of S.G.'s supplemental declaration."); *Wultz v. Islamic Republic of Iran*, No. 08-cv-1460 (RCL), 2010 WL 4135913, at *2 (D.D.C. Oct. 20, 2010) (granting leave to file surreply to respond to additional expert declaration on foreign law that expanded on prior declaration). Similarly, plaintiffs should be granted leave to file so they may respond to the additional cases raised in defense expert Winarta's second supplemental declaration.

Second, Exxon argues for the first time in its reply brief that because plaintiffs have allegedly conceded they cannot identify their attackers, their claims must be dismissed for failure to plausibly state a claim. Def.'s Reply in Support of Def.'s Mot. To Dismiss 16–18, *Doe I*, ECF

No. 444, *Doe VIII*, ECF No. 74. While Exxon mentioned this contention in the background section of its opening brief, it did not marshal the point as support for the failure to plausibly state a claim until the reply. *See* Def.'s Mot. to Dismiss 8, *Doe I*, ECF No. 426, *Doe VIII*, ECF No. 61. Therefore, plaintiffs should be permitted to respond to this argument by surreply.

Finally, Exxon has not stated that consideration of plaintiffs' surreply would be prejudicial to them. Absence of prejudice is another factor in favor of granting leave to file a surreply. *See, e.g., Lopez v. Council on American-Islamic Relations Action Network, Inc.*, 657 F. Supp. 2d 104, 108 (D.D.C. 2009); *Kifafi*, 736 F. Supp. 2d at 69.

For these reasons, the plaintiffs' motion for leave to file a surreply is granted and that document will be considered by the Court in deciding Exxon's motion to dismiss.

## III. DEFENDANTS' MOTION TO DISMISS

### A. Standard of Review

Exxon seeks dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). In *Doe I*, with regard to the latter ground for dismissal, Exxon alternatively seeks judgment on the pleadings pursuant to Rule 12(c).

#### 1. Rule 12(b)(1)—Lack of subject matter jurisdiction

A motion to dismiss for lack of subject matter jurisdiction shall be granted if a plaintiff fails to demonstrate that jurisdiction exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). Plaintiff must establish jurisdiction by a preponderance of the evidence. *Bradshaw v. Office of the Architect of the Capitol*, 856 F. Supp. 2d 126, 134 (D.D.C. 2012).

In evaluating its jurisdiction, a court "may consider materials outside the pleadings." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005). The court should construe

the complaint liberally in plaintiffs' favor and accept all factual allegations as true. *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006); *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). Nonetheless, the court "need not accept inferences drawn by the plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions." *Speelman*, 461 F. Supp. 2d at 73.

### 2. Rule 12(b)(6)—Failure to state a claim

A motion to dismiss for failure to state a claim under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To meet Rule 8's requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief," a complaint must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 677–78 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that the plaintiff must plead sufficient factual content that allows a court to draw a "reasonable inference" of liability. *Id.* at 678. While the plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully," he need not show a probability that such unlawful conduct occurred. *Id.*

In making this determination, a court "may consider the facts alleged in the complaint, the documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice." *Cole v. Boeing Co.*, 845 F. Supp. 2d 277, 283 (D.D.C. 2012) (citing *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007)). A Court must accept as true all factual allegations in the complaint. *Iqbal*, 556 U.S. at 678. This includes those which may be "doubtful in fact." *Twombly*, 550 U.S. at 555. On the other hand, the Court need not accord the same deference to legal conclusions stated in the complaint. *Iqbal*, 556 U.S. at 678.

8

### 3. Rule 12(c)—Judgment on the pleadings

A motion pursuant to Rule 12(c) seeks judgment on the pleadings after the pleadings are closed "but early enough not to delay trial." Fed. R. Civ. P. 12(c). The motion is "functionally equivalent to a Rule 12(b)(6) motion." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012). Thus, the same *Twombly-Iqbal* pleading standard outlined above applies to a court's evaluation of a Rule 12(c) motion. *Yancey v. District of Columbia*, 991 F. Supp. 2d 171, 175 (D.D.C. 2013).[2] The court may apply the same standard of review to Exxon's challenges to the sufficiency of the complaints in both *Doe I* and *Doe VIII*.

### B. Legal Standard and Application

#### 1. Threshold prudential and justiciability doctrines

Exxon raises a number of threshold challenges to these proceedings based on various prudential and justiciability doctrines.

##### a. Act of state doctrine

Exxon argues that this Court may not adjudicate plaintiffs' claims because this would require the Court to declare invalid an official act of the GOI. *See* Def.'s Mot. to Dismiss 33–35.

The act of state doctrine "requires American courts to presume the validity of an official act of a foreign sovereign performed within its own territory." *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (internal quotation marks omitted). The doctrine must be considered when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) (quoting

---

[2] While the parties dispute whether Exxon's motion to dismiss in *Doe I* would be better characterized as a Rule 12(b)(6) or a Rule 12(c) motion, the Court need not decide the issue because of the functionally identical standards of review for each. *See* Def.'s Mot. to Dismiss 14 n.12; Pl.'s Resp. in Opp'n To Def.'s Mot. to Dismiss 11, *Doe I*, ECF No. 434, *Doe VIII*, ECF No. 69.

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990)). It provides a "rule of decision" requiring a court to deem legal the official act of a foreign sovereign when the legality of that act is at issue in a case. *W.S. Kirkpatrick & Co.*, 493 U.S. at 406. On the other hand, the act of state doctrine is not an "exception for cases and controversies that may embarrass foreign governments." *Id.* at 409. The burden of proving that an act of state occurred lies with the party asserting the defense. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 951 (D.C. Cir. 2008).

The type of official act that implicates the act of state doctrine is that which is "by nature distinctly sovereign, *i.e.*, conduct that cannot be undertaken by a private individual or entity." *McKesson*, 672 F.3d at 1073. An illustrative list of such public acts includes "pass[ing] a law, issu[ing] an edict or decree, or engag[ing] in formal governmental action taking [plaintiff's] property." *Id.* at 1074. In the context of military operations, the Supreme Court has invoked the act of state doctrine in cases where challenged actions by foreign militaries were taken pursuant to official orders. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 300–01, 303–04 (1918) (stating that the actions of a "duly commissioned military commander" were "not subject to re-examination and modification by the courts of this country" in a suit to declare the commander's seizure of plaintiff's property invalid); *Underhill v. Hernandez*, 168 U.S. 250, 251, 253–54 (1897) (holding suit for damages arising from plaintiff's military detention not subject to adjudication because the acts were those of a military commander representing a foreign government and were, therefore, acts of the government itself).

No such sovereign public act is at issue in this suit. Plaintiffs do not allege that Exxon's security forces, while admittedly soldiers in the Indonesian military, injured them pursuant to official policies of the GOI or orders from military commanders. Indeed, this fact about

10

plaintiffs' allegations is the key point distinguishing these cases from those upon which Exxon bases its argument. *See Oetjen*, 246 U.S. at 303–04 (declining to declare invalid an officially ordered seizure of property). Exxon has made no showing that plaintiffs were injured pursuant to official military orders as required by the act of state doctrine. Because Exxon possesses the burden of proof as the party invoking the defense, this failure to so demonstrate is fatal to their invocation of the doctrine. *See Chabad*, 528 F.3d at 951.

Furthermore, and in the alternative to the reasoning in the preceding paragraph, the *validity* of the Indonesian soldiers' conduct as a matter of Indonesian law is not at issue in this case, thus providing an independent basis for the inapplicability of the act of state doctrine. Plaintiffs' claims only seek to "obtain damages from private parties who procured" the soldiers' conduct. *W.S. Kirkpatrick & Co.*, 493 U.S. at 407. It is not sufficient under the act of state doctrine that a court's factual findings would "impugn" the foreign state's actions; the claims must call for the invalidation of those actions. *See id.* at 408 (holding the act of state doctrine not to apply in a suit that may have involved a judicial determination that foreign officials had engaged in bribery).

### b. Forum non conveniens challenge to the Indonesian law claims

Exxon challenges maintenance of plaintiffs' claims in this Court on the ground that this is a *forum non conveniens*. Def.'s Mot. to Dismiss 43–44.

The existence of an available alternative forum is the first question that must be answered when making a *forum non conveniens* inquiry. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981). To satisfy this requirement, in general, a defendant must be "amenable to process in the other jurisdiction." *Id.* (internal quotation marks omitted). It is the defendant's burden to prove the existence of an available and adequate alternative forum. *El-Fadl v. Cent. Bank of*

*Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996), *abrogated on other grounds*, *Samantar v. Yousuf*, 560 U.S. 305 (2010).

Exxon's argument that Indonesia is available as an alternative forum because EMOI alone is amenable to service there is incorrect. Def.'s Mot. to Dismiss 44. An alternative forum is only available if "the entire case and all parties can come within the jurisdiction of that forum." *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 133 (D.D.C. 2011) (quoting *Saqui v. Pride Cent. Am., LLC*, 595 F.3d 206, 211–12 (5th Cir. 2010)); *see also Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 290–91 (D.D.C. 2011) (citing cases illustrative of a "wide-ranging consensus among the various Circuits that a dismissal based on forum non conveniens requires that the alternate forum have jurisdiction over all of the moving party's co-defendants").

All of the defendants must be amenable to process in Indonesia in order for it to serve as an available alternative forum. The U.S. based Exxon defendants specifically deny that they are amenable to process there. Def.'s Mot. to Dismiss 44. Because Exxon has failed to prove that Indonesia is an available forum for all defendants, as is its burden, the Court cannot dismiss this suit on the ground of *forum non conveniens*. The Court declines to consider whether Indonesia is an adequate forum or if the public and private interest factors weigh in favor of dismissal on the basis of *forum non conveniens* because Exxon has failed to prove Indonesia's availability.

### c. Failure to exhaust local remedies for violations of international law

Exxon also objects to continuation of these suits on the ground that plaintiffs were obligated to exhaust remedies available to them in Indonesia before suing in the United States. Def.'s Mot. to Dismiss 27–29.

Support for some form of exhaustion requirement for claims arising under the ATS has grown in recent years. This has occurred in large part due to the Supreme Court's statement in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) that it would consider a domestic exhaustion requirement "in an appropriate case" arising under the ATS. *Id.* at 733 n.21. The Court's remark came in response to a European Commission amicus brief that suggested it was a rule of international law that plaintiffs exhaust domestic remedies before suit could be brought in foreign courts for violations of customary international law. *Id.*

Building off of the Supreme Court's dictum in *Sosa* and the rule of international law referred to in the European Commission's brief, some courts of appeals have begun to recognize that plaintiffs may be required to exhaust domestic remedies before bringing claims for violations of international law under the ATS.[3] *See Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 829–30 (9th Cir. 2008) (*en banc* plurality op.); *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 679–81 (7th Cir. 2012). An essential element of this exhaustion requirement is that there be effective, non-futile remedies available in the alternative, local forum. *Sarei*, 550 F.3d at 830. It is the defendant's burden to "plead and justify an exhaustion requirement, including the availability of local remedies." *Id.* at 832.

Exxon has failed to prove the availability of effective, non-futile remedies for the international law violations alleged. Plaintiffs have shown that Indonesian human rights

---

[3] The rule being described here applies only to suits for international law violations. *Abelesz* and *Sarei*, two primary cases elaborating the international law exhaustion requirement, draw upon two sources as support for the rule: The Restatement (Third) of Foreign Relations and a case from the International Court of Justice, the *Interhandel Case*. In both authorities, the exhaustion rule arises specifically in cases of international law violations. Restatement (Third) of Foreign Relations Law § 703 cmt. d, § 713 cmt. f (1987) (stating an exhaustion requirement in the context of remedying injuries resulting from international law violations); *Interhandel (Switz. v. U.S.)*, Preliminary Objections, 1959 I.C.J. 6, 27 (Mar. 21) (noting that the exhaustion rule is observed in "cases in which a State has adopted the cause of its national whose rights are claimed to have been disregarded in another State in violation of international law"). The Court finds no support for an exhaustion requirement as to plaintiffs' Indonesian law claims and holds that no such exhaustion requirement applies to those claims.

tribunals are either non-existent or not functional and that recovery in Indonesian civil court for human rights violations of the type alleged in *Doe I* is unlikely in light of political corruption. Ross Clarke Supplemental Decl. ¶¶ 4–5, *Doe I*, ECF No. 446-1, Ex. 2 (citing a U.S. State Department country report for his assessment of the Indonesian court system). These problems are sufficient to demonstrate that pursuit of local remedies in Indonesia would be futile. *See Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1097 (N.D. Cal. 2008) (concluding that plaintiffs had adequately shown the futility of local remedies by, in part, citing State Department reports for the proposition that the Nigerian court system was inefficient and corrupt).

Exxon presents evidence of only one other somewhat similar case to these, a 2003 district court decision where an Indonesian National Police officer was ordered to pay damages for shooting a plaintiff. *See* Frans Hendra Winarta Second Supplemental Decl. ¶ 3(b), *Doe I*, ECF No. 444-4, *Doe VIII*, ECF No. 74-4. This case, does not, however allege the kind of grave human rights violations the *Doe I* plaintiffs have alleged and does not relate to conduct of Indonesian soldiers in Aceh. As expert testimony indicates to the Court, problems of the administration of justice are particularly difficult in Indonesia with respect to past human rights abuses committed by Indonesian soldiers. *See* Clarke Supplemental Decl. ¶ 6 (citing human rights reports for the proposition that a "culture of impunity" still exists for Indonesian soldiers' past human rights abuses).

Because plaintiffs do not have available, effective, and non-futile local remedies for the international law violations alleged here, they are not required to exhaust local remedies in Indonesia before suing in the United States.

d. *International comity*

As an additional alternative ground for dismissal, Exxon contends that this Court should abstain from deciding these cases on grounds of international comity. Def.'s Mot. to Dismiss 29–33.

The doctrine of international comity is the basic "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). The doctrine arises most often in retrospective situations, when "courts consider whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings." *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1030 (11th Cir. 2014); *see also Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 392 (3d Cir. 2006) ("Generally, United States courts will not review acts of foreign governments and will defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States.").

Sometimes, on the other hand, a court may "appl[y] international comity prospectively, without a conflicting past or present foreign proceeding." *GDG Acquisitions*, 749 F.3d at 1030. In that situation, there must generally be an adequate and available alternative local forum in which the plaintiff could pursue effective and non-futile remedies. *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Doe VIII*, 654 F.3d at 64). This means, as in a *forum non conveniens* inquiry, that the court must also consider whether the defendant would be amenable to service of process in the foreign jurisdiction. *Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir. 1998); *see supra* Part III.B.1.b.

Here, as explained above in the Court's discussion of *forum non conveniens*, the Court concludes that abstention on the basis of international comity would be inappropriate because all defendants except EMOI have denied their amenability to service of process in Indonesia.

Exxon argues that the availability of an alternative forum is not absolutely necessary when considering abstention on comity grounds. In *Jota*, the Second Circuit stated that "extreme cases might be imagined where a foreign sovereign's interests were so legitimately affronted by the conduct of litigation in a United States forum that dismissal is warranted without regard to the defendant's amenability to suit in an adequate foreign forum." *Id.* However, *Jota*'s statement does not appear to be the law of this circuit. In *Doe VIII*, the Court of Appeals specifically determined that, in the absence of a prior judgment or pending proceedings to which the Court must defer, the defendant was obligated to present evidence of an adequate and available alternative local forum. *See Doe VIII*, 654 F.3d at 64. The failure to prove an adequate and available alternative forum in Indonesia is fatal to Exxon's comity argument.

### e. Political question doctrine

Exxon argues that this Court lacks jurisdiction over plaintiffs' claims because they encompass non-justiciable political questions. Def.'s Mot. to Dismiss 35–36.

The political question doctrine arises out of the Constitution's separation of powers; it removes from judicial consideration those "controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *El-Shifa Pharmaceutical Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). The Supreme Court, in *Baker v. Carr*, 369 U.S. 186 (1962), broadly listed the types of cases that present non-justiciable political questions:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without

expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.

Suits relating to foreign affairs often give rise to non-justiciable political questions. *El-Shifa*, 607 F.3d at 841. This is unsurprising, as foreign policy decision making is largely assigned by the Constitution to the political branches. *See Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Nonetheless, not all suits implicating foreign affairs give rise to non-justiciable political questions; the nature of the particular question being asked of a court is essential to determining whether the doctrine precludes judicial review. *See El-Shifa*, 607 F.3d at 841.

Here, plaintiffs' allegations do not challenge any foreign relations decisions of the United States. Instead, Exxon argues that political question dismissal is required because the mere maintenance of this suit implicates strong foreign policy concerns of the United States, specifically the United States' policy of supporting the Helsinki Accord and continued peace in Indonesia. Along these lines, the D.C. Circuit has held that "[t]he Executive's judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine." *Hwang Geum Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005). Evidence of the State Department's views as to this issue are accorded "substantial weight" because the effect of litigation on the foreign policy interests of the nation is "at the heart of the Department's expertise." *See In re Papandreou*, 139 F.3d 247, 252 & n.2 (D.C. Cir. 1998) (giving substantial weight to the State Department's views with respect to the exigencies of protocol because the question was at the heart of the Department's expertise).

Exxon's argument for dismissal on this basis fails, however, for the same reason it did previously at the Court of Appeals. In short, there is an insufficiently recent and definite statement from the Executive that this case interferes with the foreign policy of the United States. *See Doe VIII*, 654 F.3d at 62 (holding that without a "sufficiently unambiguous and recent statement from the United States expressing concern" over the suit, dismissal on justiciability grounds was not warranted). No such statements have been forthcoming in the period since the Court of Appeals' decision in 2011. Absent evidence demonstrating the Executive's view that maintenance of this litigation would be "inimical" to United States foreign relations, the Court cannot dismiss on this basis.

Additionally, Exxon's reliance upon *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013) as an intervening change in the law requiring a different conclusion than that reached by the Court of Appeals in *Doe VIII* is misplaced. Def.'s Reply in Support of Def.'s Mot. to Dismiss 29–30. *Kiobel*'s discussion of foreign policy concerns was entirely related to answering whether the presumption against extraterritoriality applies to the ATS. *Kiobel*, 133 S.Ct. at 1664–69. The Court did not invoke the political question doctrine, nor the subset of that doctrine regarding the justiciability of claims when the executive branch has expressed strong reservations about their adjudication. In this context, *Kiobel* is inapposite.

*f. Foreign affairs preemption of plaintiffs' Indonesian law claims*

Finally, Exxon urges dismissal of plaintiffs' Indonesian law claims on the basis of the foreign affairs preemption doctrine. Def.'s Mot. to Dismiss 36–37.

Foreign affairs preemption doctrine holds that in certain cases where state laws implicate foreign affairs, those laws may be preempted, even absent any conflict with federal law. *See Saleh v. Titan Corp.*, 580 F.3d 1, 13 (D.C. Cir. 2009) (analyzing Supreme Court foreign affairs

preemption cases and concluding that "preemption arose not because the state law conflicted with the express provisions of federal law, but because, under the circumstances, the very imposition of *any state law* created a conflict with federal foreign policy interests") (emphasis in original). When no direct conflict exists with federal law, preemption in this context is premised on a field preemption theory. *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012).

The doctrine is rooted in the idea that "at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)). This idea is based on the principle that "the Constitution entrusts foreign policy exclusively to the National Government." *Garamendi*, 539 U.S. at 419 n.11; *see also Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government is such that the interest of the cities, counties and states . . . imperatively requires that the federal power in the field affecting foreign relations be left entirely free from local interference.").

The majority at the Court of Appeals concluded that Exxon's arguments on this point were inapposite, as the cases articulating foreign affairs preemption relate to the "need to prevent the legislatures of the states from conducting foreign policy." *Doe VIII*, 654 F.3d at 71. The Court agrees with this reasoning and holds that foreign affairs preemption doctrine does not apply in this context because the Court is not considering a U.S. state law, making irrelevant the doctrine's concerns about maintaining the proper constitutional balance between state and federal authority.

As support for their argument that Indonesian law is preempted, Exxon cites *Saleh*, which held that the Federal Tort Claims Act preempted the imposition of state *or foreign* tort law. *See Saleh*, 580 F.3d at 7. This argument misses the mark, however, as the *Saleh* court, at that point in its opinion, was discussing whether state or foreign law was preempted by its direct conflict with the FTCA. *Id.* The statement was not rooted in the constitutional inquiry that underlies the foreign affairs field preemption doctrine; instead, the court was merely engaging in a traditional preemption analysis of supreme federal law and conflicting state and foreign laws. *See id.*; *see, e.g.*, *LaSala v. Bordier et Cie*, 519 F.3d 121, 139 (3d Cir. 2008) ("To be sure, Congress has the authority to counter-instruct district courts not to entertain particular categories of civil actions arising under foreign law . . . ."). There is no similar expression of federal policy in this case to indicate that the Court should not entertain these foreign tort claims on the basis of preemption.

### 2. Alien Tort Statute claims in *Doe I*

Exxon objects to plaintiffs' ATS claims as being barred by the presumption against extraterritoriality. Def.'s Mot. to Dismiss 16–22 It also argues that plaintiffs have failed to state claims under the ATS. *Id.* 22–27.

#### a. ATS liability for aiding and abetting international law violations

The Alien Tort Statute provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (2014). The Supreme Court, interpreting this rather opaque text, has concluded that the ATS does not create any new causes of action and is merely a jurisdictional statute. *Sosa*, 542 U.S. at 724. Nonetheless, the Court held that the ATS was enacted with the "understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability" at the

time of the statute's enactment. *Id.* Thus, federal courts may recognize private claims under the ATS as a matter of federal common law if those claims sufficiently "state a violation of the law of nations with the requisite definite content and acceptance among civilized nations." *Kiobel*, 133 S.Ct. at 1663 (internal quotation marks omitted). After undertaking this type of analysis, the Court of Appeals has allowed the *Doe I* plaintiffs' ATS claims to go forward on an aiding and abetting theory of liability, holding that relevant "authorities and sources confirm that aiding and abetting liability is clearly established in the law of nations and consequently such liability is available under the ATS." *Doe VIII*, 654 F.3d at 32.

### b. ATS and the presumption against extraterritoriality

In addition to clarifying what causes of action may be recognized under the ATS, the Supreme Court has also recently answered the question of whether the location of conduct is relevant to determining whether that conduct gives rise to ATS liability. The latter issue relates to the presumption against extraterritoriality, which holds that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). This presumption is not a limit upon Congress's power to legislate; instead, it is a canon of construction that reflects the "perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Id.*

In *Kiobel*, the Court held that the presumption against extraterritoriality applies to the ATS as well. *Kiobel*, 133 S.Ct. at 1665. While the ATS, as a purely jurisdictional statute, does not itself regulate conduct, the Court held that the "principles underlying the canon of interpretation similarly constrain courts considering causes of action that may be brought under the ATS." *Id.* at 1664. The Court so held in light of the magnified "danger of unwarranted judicial interference in the conduct of foreign policy" in the context of ATS claims, where courts

are themselves defining the scope of the claims arising under the statute. *Id.* The Court also held that nothing in the statute, nor the history surrounding its passage, rebutted the presumption against extraterritoriality. *Id.* at 1665–69.

As to the particular case before it, the Court held that petitioners were barred from recovery under the ATS because "all the relevant conduct took place outside the United States." *Id.* at 1669. The Court then noted that in certain situations, claims arising under the ATS might "touch and concern the territory of the United States" with "sufficient force to displace the presumption against extraterritorial application." *Id.* at 1669. The only guidance provided about this "touch and concern" test was the statement that "mere corporate presence" would not suffice to meet it. *Id.*

### c. Application of the presumption to particular ATS cases

In the near year and a half since *Kiobel*'s issuance, courts have begun elaborating the instances when a claim will sufficiently touch and concern the territory of the United States to displace the presumption against extraterritoriality.

The D.C. Circuit has yet to consider this question but the 2nd, 4th, and 11th Circuits have all interpreted the "touch and concern" test. The 4th Circuit held in *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516 (4th Cir. 2014), that the presumption against extraterritoriality was displaced in a suit for claims arising from alleged acts of torture occurring at the Abu Ghraib prison in Iraq. *Id.* at 520. The court held that the claims sufficiently touched and concerned the United States to displace the presumption. *Id.* The court's decision was based first on the substantial connections between the United States and the unlawful conduct occurring in Iraq: the torture was committed by American citizens employed by a U.S. corporation, it was committed pursuant to a contract with a U.S. government agency at a U.S. military facility, and

the CACI employees were required to obtain security clearances from the U.S. Department of Defense. *Id.* at 528–29. Furthermore, the case involved domestic conduct as well—defendant's "managers located in the United States were aware of reports of misconduct abroad, attempted to 'cover up' the misconduct, and 'implicitly, if not expressly, encouraged' it." *Id.* at 529.

The Second Circuit held in *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013) that *Kiobel*'s holding was clear that where all of the relevant conduct occurred abroad, the presumption against extraterritoriality precluded ATS liability. *Id.* at 182. Thus, corporate citizenship in the U.S.—even if a more intimate connection than the mere corporate presence at issue in *Kiobel*—was still insufficient to allow an ATS claim to go forward without relevant domestic conduct. *Id.* The case involved no conduct within the United States that would have been actionable under the ATS. *Id.* at 192. Instead, the U.S. defendants were to be held liable vicariously for the actions of their South African subsidiaries, who were alleged to have aided and abetted violations of customary international law overseas. *Id.* at 179–180, 192. This would not do the job of displacing the presumption.

The Eleventh Circuit has also held that corporate citizenship alone does not displace the presumption against extraterritoriality. *Cardona v. Chiquita Brands Int'l, Inc.*, ---F.3d---, No. 12-14898, 2014 WL 3638854, at *3–4 (11th Cir. July 24, 2014). It held in *Cardona* that any tort cognizable under the ATS had been committed entirely outside of the United States and so the claims did not sufficiently touch and concern the United States to displace the presumption against extraterritoriality. *Id.*

Evaluating these cases, the Court concludes that the presumption against extraterritoriality is not displaced by a defendant's U.S. citizenship alone. *See Balintulo*, 727 F.3d at 179–80, 182, 192; *Cardona*, No. 12-14898, 2014 WL 3638854, at *3–4; *Doe VIII*, 654

F.3d at 75 (Kavanaugh, J., dissenting in part) ("The presumption against extraterritoriality is focused on the site of the conduct, not the identity of the defendant."). On the other hand, when plaintiffs allege U.S. based conduct itself constituting a violation of the ATS, the presumption against extraterritoriality is no obstacle to consideration of ATS claims. *See Al Shimari*, 758 F.3d at 528–29 (holding that the ATS was properly applied because, among other reasons, plaintiffs alleged relevant U.S. based conduct indicating knowledge and encouragement of international law violations abroad); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 323 (D. Mass. 2013) (evaluating a claim for aiding and abetting international law violations committed abroad and holding that the claims sufficiently touched and concerned the United States because the "Amended Complaint adequately sets out actionable conduct undertaken by Defendant in the United States to provide assistance" to the primary tortfeasors); *cf. Morrison*, 561 U.S. at 266 (holding that a court must look to the focus of congressional concern in enacting a piece of legislation to determine whether certain domestic conduct is sufficient to displace the presumption against extraterrioriality).

### d. Application of the presumption to this case

In light of the Supreme Court's holding in *Kiobel* and the judicial decisions interpreting that case, the Court must determine what U.S.-based conduct is alleged by plaintiffs to decide whether the presumption against extraterritoriality is overcome in this case. If plaintiffs have sufficiently alleged conduct within the United States that is actionable under the ATS, their ATS claims are not defeated on the basis of the presumption against extraterritoriality.

Plaintiffs allege generally that EMC and EMOI "management decisions related to Indonesia are centralized and made in the United States." *Doe I*, First Am. Compl. ¶ 25. More specifically, plaintiffs claim that meetings of EMOI's board of directors are held in New York

and important decisions were made at these meetings "related to Indonesia and the retention of military members as security personnel." *Id.* ¶ 27. Plaintiffs also allege that EMC officials based in the United States "made and implemented the decision" to "hire or otherwise retain additional security personnel for [Exxon's] Aceh facilities." *Id.* ¶ 33. Plaintiffs make a number of other allegations regarding the support provided by Exxon to their security personnel. *See id.* ¶ 54 (alleging Exxon provided material support to its security personnel by, for example, constructing facilities, providing funding for weapons, providing supplies and equipment, and paying for the services of consultants in training and equipping the personnel). Plaintiffs do not, however, state *where* this support was planned or authorized or if any of the material or monetary support came from the United States.

Plaintiffs have moved the Court to allow them the opportunity to amend their complaint. Pl.'s Mot. to Modify Scheduling Order, *Doe I*, ECF No. 428, *Doe VIII*, ECF No. 63. Because the complaint was drafted before *Kiobel*, the plaintiffs argue that they should be given an opportunity to allege U.S. based conduct in greater detail because *Kiobel* was a substantial intervening change in the law of the ATS. They argue in their response to Exxon's motion to dismiss that they will be able to allege substantial U.S. based conduct constituting violations of the ATS. *See* Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss 46–50.

The Ninth Circuit recently dealt with a somewhat similar situation. It determined that plaintiffs' request to amend their dismissed complaint alleging ATS violations in light of *Kiobel* should be granted because "[i]t is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile." *Doe I v. Nestle USA, Inc.*, ---F.3d ---, No. 10-56739, 2014 WL 4358453, at *13 (9th Cir. Sept. 4, 2014). Because plaintiffs in that case contended that some actionable conduct occurred in the United

States, the case was distinguishable from *Kiobel* and amendment was not necessarily futile. *Id.* A similar decision was made by the court in *In re S. African Apartheid Litig.*, ---F. Supp. 2d---, Nos. 02 MDL 1499 (SAS), 02 Civ. 4712 (SAS), 02 Civ. 6218 (SAS), 03 Civ. 1024 (SAS), 03 Civ. 4524 (SAS), 2014 WL 1569423 (S.D.N.Y. Apr. 17, 2014). *See id.* at *2, *9 (allowing plaintiffs to file for leave to amend their complaint—in light of the intervening change in the law caused by *Kiobel*—so that they might make a preliminary showing that their claims sufficiently touch and concern the United States to displace the presumption against extraterritoriality).

For this same reason, the Court is of the view that plaintiffs should have the opportunity to file for leave to amend their complaint in light of the intervening change in the law created by *Kiobel*. The Court grants in part plaintiffs' motion to modify the court's scheduling order. Plaintiffs may file for leave to amend their complaint in *Doe I* for the purpose of (1) restating their ATS claims and (2) alleging additional facts so that they may show that these claims sufficiently touch and concern the United States to displace the presumption against extraterritoriality.

The Court denies Exxon's motion to dismiss as to the extraterritoriality issue without prejudice to their right to renew. *Cf. In re Sunrise Sr. Living, Inc. Derivative Litig.*, 550 F. Supp. 2d 1, 8 (D.D.C. 2008) (denying defendants' motion to dismiss because, after granting plaintiffs leave to amend their complaint, "it would be imprudent to address the defendants' several motions to dismiss the complaint . . . at this time"). Upon plaintiffs' filing for leave to amend (or upon their failure to so file within the time specified by the Court in the order accompanying this opinion), Exxon may renew its motion to dismiss as to the extraterritoriality issue.

*d. Failure to sufficiently allege ATS claims*

Aside from the extraterritoriality issue, Exxon has also moved to dismiss plaintiffs' ATS claims on the ground that plaintiffs have failed to sufficiently allege claims arising under the ATS, regardless of whether *Kiobel* precludes them. Because the Court grants plaintiffs the opportunity to file for leave to amend their complaint in *Doe I* as to their ATS claims, the Court declines to consider the sufficiency of plaintiffs' complaint at this stage. Accordingly, defendants' motion to dismiss the ATS claims for failure to sufficiently allege claims arising under the ATS is denied without prejudice to their right to renew. *See id.* Upon plaintiffs' filing for leave to amend (or upon their failure to so file within the time specified by the Court in the order accompanying this opinion), Exxon may renew its motion to dismiss as to the sufficiency of plaintiffs' pleading of their ATS claims.

### 3. Challenge to Diversity Jurisdiction

#### a. Amount in controversy requirement

Exxon challenges the Court's diversity jurisdiction in *Doe VIII* on the ground that plaintiffs have failed to adequately plead that each meets the amount in controversy required, $75,000. Def.'s Mot. to Dismiss 39–41.

For a court to dismiss a suit for failure to adequately plead the amount in controversy, "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938). A court should be "very confident that a party cannot recover the jurisdictional amount before dismissing the case for want of jurisdiction"; thus, the "governing law mandates generosity in evaluating the eligibility of a claim for federal jurisdiction." *Rosenboro v. Kim*, 994 F.2d 13, 17 (D.C. Cir. 1993). To dismiss for failure to plead amount in controversy, the court "must be able to say, after crediting all of the plaintiff's factual allegations . . . that a verdict in excess of the jurisdiction minimum . .

. would have to be set aside as a matter of law." *Sheraton Operating Corp. v. Just Corporate Travel*, 984 F. Supp. 22, 24 (D.D.C. 1997) (quoting 28 U.S.C. §1332, Commentary on 1988 Revision). The party invoking the court's jurisdiction bears the burden of establishing the amount in controversy. *Rosenboro*, 994 F.2d at 17. Nonetheless, "[e]ven a cursory allegation of the amount in controversy, if it exceeds the jurisdictional requirement, is sufficient to evade dismissal." *Info. Strategies, Inc. v. Dumosch*, ---F. Supp. 2d---, Civil Action No. 13-315 (RC), 2014 WL 505360, at *3 (D.D.C. Feb. 10, 2014) (citing 14AA Charles Alan Wright et al., *Federal Practice & Procedure* § 3702 (4th ed. 2011)).

In paragraph 4 of the *Doe VIII* complaint, plaintiffs allege generally that the amount in controversy as to each plaintiff exceeds $75,000. *Doe VIII* Compl. ¶ 4. In the prayer for relief, plaintiffs go on to request, *inter alia*, damages in excess of $75,000 for each plaintiff. *Doe VIII* Compl. Part IX. Exxon has not alleged that these damages amounts were pled in bad faith. Thus, the court may only dismiss if it appears to a legal certainty that the claims are really for less than the jurisdiction amount.

Secondary authority indicates that the legal certainty test is generally only met in three situations:

> 1) when the terms of a contract limit the plaintiff's possible recovery to less than the required jurisdictional amount; 2) when a specific rule of substantive law or measure of damages limits the amount of money recoverable by the plaintiff to less than the necessary number of dollars to satisfy the requirement; and 3) when independent facts show that the amount of damages claimed has been inflated by the plaintiff merely to secure federal court jurisdiction.

14AA Charles Alan Wright et al., *Federal Practice & Procedure* § 3713 (4th ed. 2011). As between these three scenarios, Exxon's arguments relate exclusively to situation two, namely that plaintiffs have failed to prove that sufficient damages are recoverable under Indonesian law. Def.'s Mot. to Dismiss 40–41.

Expert testimony indicates to the Court that Indonesian tort law, while using different terminology from American law, compensates tort victims in similar fashion to the common law. Damages can be awarded for "material" and "moral" loss. Robert N. Hornick Decl. ¶ 16, *Doe I*, ECF No. 426-17, *Doe VIII*, ECF No. 61-17. Material loss damages provide compensation for reasonably foreseeable costs incurred as a result of the tortious act. *Id.* Moral loss damages compensate a victim "for harm that cannot be quantified in money, such as reputational harm, pain and emotional distress." *Id.* Importantly, there has been no allegation that any statutory or customary cap exists on the amount of damages that a plaintiff may be awarded. *Cf. Indiana Hi-Rail Corp. v. Decatur Junction Ry. Co.*, 37 F.3d 363, 366 (7th Cir. 1994) (holding there was a legal certainty that the amount in controversy was not met because plaintiff was "entitled, under Illinois law, only to nominal damages"); *Nwanza v. Time, Inc.*, 125 F. App'x 346, 348 (2d Cir. 2005) (affirming dismissal because New York law permitted recovery only for "out-of-pocket expenses," and plaintiff had not alleged out-of-pocket expenses in excess of the amount in controversy threshold) (internal quotation marks omitted).

The Court has been presented with few examples of specific damage awards in Indonesian case law. Nonetheless, Exxon has not presented the Court with any indication that Indonesian law would prohibit damages in cases like this one in excess of $75,000. For example, defendants' expert Winarta reports that the Indonesia Supreme Court, in 2007, affirmed and increased the $67,800 judgment awarded to the plaintiff in a case against an airline company for negligence. Frans Hendra Winarta Supplemental Decl. ¶ 13, *Doe I*, ECF No. 426-13, *Doe VIII*, ECF No. 61-13. In light of this precedent, the lack of any damage caps under Indonesian law, and the similarity of the types of damages available for torts under Indonesian and

American law, the Court cannot say to a legal certainty that plaintiffs' claims do not meet the amount in controversy.

### b. EMOI is non-diverse

It is argued that EMOI is non-diverse from the plaintiffs in *Doe VIII* because it is a foreign citizen. Therefore, because subject matter jurisdiction in *Doe VIII* is premised on diversity, Exxon contends that EMOI's presence defeats jurisdiction.

A federal court may only exercise jurisdiction based on diversity of citizenship if the amount in controversy is satisfied and the action meets the diversity requirements of § 1332(a). 28 U.S.C. § 1332(a) (2014). Under subsection (a)(2), a court may exercise jurisdiction over an action between "citizens of a State and citizens or subjects of a foreign state." *Id.* This statute has been interpreted to require complete diversity, meaning that all plaintiffs must be diverse from all defendants to the suit. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). The existence of complete diversity of citizenship is determined at the time of an action's commencement. *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991). Subsequent events will not divest a court of jurisdiction. *Id.*

A corporation's citizenship is defined by subsection (c)(1), which states that "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. §1332(c)(1) (2014). Thus, a corporation has "dual citizenship" for purposes of the diversity statute. *Johnson-Brown v. 2200 M Street LLC*, 257 F. Supp. 2d 175, 178 (D.D.C. 2003).

EMOI's principle place of business is in Indonesia. *Doe VIII* Compl. ¶ 16. It was incorporated in Delaware at the time of filing in *Doe I* but was subsequently reincorporated in

the Cayman Islands in December 2005, before the filing in *Doe VIII*. *Id.*; *Doe I* Original Compl. ¶ 25.[4] The parties dispute whether the Court should also assign Indonesian citizenship to EMOI because of the location of its principal place of business or, instead, the American citizenship of EMC's principal place of business—on the ground that EMOI is a mere alter ego of EMC and does not have a true principal place of business of its own. However, the state of EMOI's principal place of business is irrelevant. EMOI's incorporation in a foreign jurisdiction makes EMOI a foreign citizen for purposes of § 1332 and, therefore, non-diverse from the plaintiffs. *See Vantage Drilling Co. v. Hsin–Chi Su*, 741 F.3d 535, 536–38 (5th Cir. 2014) (holding that defendant corporation's foreign state of incorporation destroyed diversity with a foreign plaintiff, even though defendant's principal place of business was in the United States); *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 509 F.3d 271, 272–73 (6th Cir. 2007) (same); *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581–82 (2d Cir. 2002) (same). The court need not reach plaintiffs' alter ego arguments.

### c. Dismissal of EMOI under Rule 21

In light of EMOI's non-diversity, its presence in *Doe VIII* ousts this Court's jurisdiction. Federal Rule of Civil Procedure 21, however, states that a court "may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Rule 21 "allows the district court to dismiss so-called 'jurisdictional spoilers'—parties whose presence in the litigation destroys jurisdiction." *In re Lorazepam & Clorazepate Antitrust Litig.*, 631 F.3d 537, 542 (D.C. Cir. 2011). The key limitation on this dismissal power is that the party to be dismissed must not be indispensable and there must be no prejudice to the parties arising from the dismissal. *Id.*

---

[4] The Court does not consider today EMOI's citizenship for purposes of *Doe I* because jurisdiction in that case is not founded on diversity.

For a party to be indispensable to litigation under Federal Rule of Civil Procedure 19, it must first be determined that the party is necessary. *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1494 (D.C. Cir. 1995). It is a firmly established rule that joint tortfeasors are not necessary parties under Rule 19(a). *Temple v. Synthes Corp.*, 498 U.S. 5, 7–8 (1990); *see also Park v. Didden*, 695 F.2d 626, 631 (D.C. Cir. 1982) ("An almost unbroken line of federal decisions holds that persons whose liability is joint and several may be sued separately in federal court."). As a corollary of this rule, an agent need not be joined in a suit seeking to hold the principal vicariously liable. *Rieser v. District of Columbia*, 563 F.2d 462, 469 n.39 (D.C. Cir. 1977) (holding that "the employee is not a necessary party to a suit against his employer under respondeat superior"). The D.C. Circuit held that a subsidiary is not a necessary party in a case where the parent corporation was to be held liable for the actions of that subsidiary. *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1121–22 (D.C. Cir. 1991) (evaluating the Rule 19(a) factors and concluding that they were not met to require joinder of the subsidiary).

Here, EMOI is a mere joint tortfeasor, along with the other Exxon defendants. To the extent EMOI's conduct will be at issue, it will be as relates to the vicarious liability of the other Exxon defendants for EMOI's conduct. The law of this circuit holds that in a vicarious liability situation, a corporate subsidiary need not be joined in a suit against the parent based on the subsidiary's conduct. *See id.* In arguing otherwise, Exxon primarily relies upon a theory, articulated in a few other courts, which holds that a subsidiary must be joined in a suit against the parent when it is the "primary participant" in the conduct at issue in a case. *See Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553, 559 (5th Cir. 1985). This theory has been rejected by the D.C. Circuit as not being a useful tool for Rule 19 analysis. *Pyramid Sec.*, 924 F.2d at 1121.

In its reply, Exxon makes two arguments rooted in Rule 19(a) for why EMOI is a required party in this case. First, it contends that the Court will be unable to afford complete relief among the parties because the injunctive relief sought by plaintiffs in their complaints would be ineffective without EMOI's presence, thus making EMOI a required party under Rule 19(a)(1)(A). Def.'s Reply 31 (arguing that EMOI is the only party to the Production Sharing Contract before the Court and that Exxon's security personnel were retained pursuant to this contract). Rule 19 requires that a court be able to accord "complete relief" among the parties before it. Fed. R. Civ. P. 19(a)(1)(A). A court is not necessarily bound by the types of relief sought in the complaint; instead, the key is whether the court can fashion complete relief in the absence of the other party. *Lopez v. Fed. Nat'l Mortg. Ass'n*, No. CV 13-04782 MMM (AGRx), 2013 WL 7098634, at *6 (C.D. Cal. Oct. 8, 2013). For example, one court held that although plaintiffs had improperly requested an injunction that could only be enforced against an absent third party, the third party was not required because "the court could, if appropriate, craft meaningful relief by awarding plaintiffs damages against [defendant]." *Id.* at *7. Similarly, here, the Court is capable of according complete relief among the parties before it. The fact that the *Doe VIII* plaintiffs' requested injunction could not bind EMOI is neither here nor there. *Cf. Doe VIII*, 573 F. Supp. 2d at 33 (concluding that it was "irrelevant" that injunctive relief which might be awarded against the Exxon defendants could not bind the absent Indonesian oil company).

Exxon also argues that EMOI is a required party because it has "an interest relating to the subject of the action" and adjudicating plaintiffs' claims in its absence would "impair or impede [its] ability to protect [that] interest." Def.'s Reply in Support of Def.'s Mot. to Dismiss 31; Fed. R. Civ. P. 19(a)(1)(B). This is because, Exxon argues, the Court would be required to determine

EMOI's rights and liabilities under the Production Sharing Contract. Def.'s Reply in Support of Def.'s Mot. to Dismiss 31. Exxon relies on *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011) for its argument. That case articulates an "exception" to the general rule that joint tortfeasors are not necessary parties. *Id.* at 906. The exception applies in situations where the absent entity is an "active participant" whose presence is "critical to the disposition of the litigation." *Id.* The proposed exception is similar to the "primary participant" theory discussed above. *See Freeman*, 754 F.2d at 559. Whatever the merits of this theory of indispensability, it does not prevail in this circuit as demonstrated by *Pyramid Securities*, where the court held that a subsidiary was not required to be joined in a suit against the parent for claims based on the subsidiary's conduct. *Pyramid Sec.*, 924 F.2d at 1121 (allowing the suit to go forward despite risks to the subsidiary's "reputation," on the ground that to do otherwise would "scuttle the established principles that one joint tortfeasor is generally not an indispensable party in a lawsuit against another . . . and, more specifically, that agents are not indispensable parties in suits against the principal (at least where the principal was disclosed)").

Exxon's argument that the remaining defendants would be prejudiced because plaintiffs could later sue EMOI in Indonesia is also not a basis for finding a party required under Rule 19. *Cf. id.* at 1122 (observing that "risks of double *litigation* will be posed in any case where a party is liable both directly and indirectly—either as owner or indemnitor of a potential second defendant," and that without greater indicia of prejudice, such risks were "too remote to sustain [defendant's] claim of indispensability") (emphasis in original).

Because EMOI's presence in *Doe VIII* destroys complete diversity among the parties and because it is not a necessary party to these proceedings, EMOI is hereby dismissed from *Doe VIII* pursuant to the Court's Rule 21 authority.

## 4. Challenge to sufficiency of the pleadings

The factual sufficiency of plaintiffs' pleading of their Indonesian law claims is broadly challenged on two grounds: (1) failure to name and join as defendants the tortfeasors whose primary conduct gives rise to plaintiffs' various claims of vicarious liability and (2) failure to allege sufficient facts as to the claims premised on vicarious liability. Def.'s Mot. to Dismiss 41–43; Def.'s Reply in Support of Def.'s Mot. to Dismiss 14–18. Exxon also contends that two of plaintiffs' non-federal causes of action, those for intentional infliction of emotional distress and negligent infliction of emotional distress, are not recoverable under Indonesian law. Def.'s Mot. to Dismiss 43 n.30.

### a. Failure to join the security personnel who caused plaintiffs' injuries

Federal courts hearing claims based on diversity jurisdiction "apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). In particular, the issue of joinder and whether "a federal court may proceed without the outsider [to the litigation] is a federal matter" in diversity cases, governed by Federal Rule of Civil Procedure 19. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 125 n.22 (1968). When hearing state law claims pursuant to supplemental jurisdiction, federal courts also apply state substantive law and federal procedural law. *Perry v. Blum*, 629 F.3d 1, 8 (1st Cir. 2010).

Exxon presents expert authority contending that Indonesian law requires the joinder of the primary tortfeasor in cases where vicarious liability is alleged. Winarta Second Supplemental Decl. ¶ 7. Plaintiffs dispute this characterization of Indonesian law. Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss 15. The Court need not decide the issue as Indonesian law simply does not govern in this situation. Whether a party is required is a procedural issue that is

governed by federal law in diversity and supplemental jurisdiction cases. *See Provident Tradesmens Bank & Trust Co.*, 390 U.S. at 125 n.22.

The parties have not briefed the issue of whether Rule 19 requires joinder of the Indonesian tortfeasors. Nonetheless, the issue is rather simply disposed of. As elaborated above, joint tortfeasors are not required parties under Rule 19(a). This means that an agent is not a required party when the principal is to be held liable vicariously for the agent's actions. Here, many of the claims against Exxon are premised on vicarious liability for the torts of their security personnel. *Doe I* First Am. Compl. ¶¶ 84–121, 140–44; *Doe VIII* Compl. ¶¶ 70–75, 94–110. Under the rules stated above, the security personnel are not required parties to this suit under Rule 19 because they are mere joint tortfeasors.

> *b. Failure to allege sufficient facts to state claims based on vicarious liability*

Exxon also argues that plaintiffs have failed to plead adequate facts to allege a plausible right to relief on a vicarious liability theory under Indonesian law.

Exxon first contends that plaintiffs have failed to adequately plead that they were injured by Exxon security personnel (and not other soldiers stationed in the area). Def.'s Reply in Support of Def.'s Mot. to Dismiss 15–18. Plaintiffs have alleged that their injuries were perpetrated by ExxonMobil security personnel. *Doe I* First Am. Compl. ¶¶ 67–77; *Doe VIII* Compl. 60–63. They have also alleged that soldiers assigned to provide security for Exxon were not also engaged in military operations in the region. *Doe I* First Am. Compl. ¶¶ 47–48; *Doe VIII* Compl. ¶¶ 40–41. These are factual allegations, which the court must accept as true at the motion to dismiss stage. *Iqbal*, 556 U.S. at 678. Exxon's argument that plaintiffs must plead more to meet the standards articulated in *Twombly* and *Iqbal* seems to be based on a view that plaintiffs must make a showing that it is probable they can prove their injuries were caused by

Exxon security personnel (and not some other group of soldiers or individuals in the area). Plaintiffs need not do this. *See Twombly*, 550 U.S. at 555 (stating that a court must accept as true even factual allegations that are "doubtful in fact"). The factual allegations already pled are adequate on this point.

It is also argued that plaintiffs have failed to adequately plead that Exxon is vicariously liable for plaintiffs' injuries because the pleadings do not sufficiently allege that the underlying wrongful acts were committed in the scope of employment, as required by Indonesian law. Def.'s Reply in Support of Def.'s Mot. to Dismiss 15–18. To determine whether this is a valid basis for dismissal of these claims, the Court must first determine the content of Indonesian law on the issue of vicarious liability. In conducting this inquiry, the Court has consulted expert opinions and accompanying exhibits filed by the parties. *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."); *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984) ("Generally, written or oral expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is proved.").

Vicarious liability under Indonesian law is based on Article 1367 of the Indonesian Civil Code, which provides that a party may be liable for the actions of persons over which he has responsibility. Hornick Decl. ¶ 32; Gary F. Bell Decl. ¶ 15, *Doe I*, ECF No. 434-1, *Doe VIII*, ECF No. 69-1 (translating Article 1367 as providing for liability for "damage caused by the deed of persons under his responsibility"). Subsection 3 of Article 1367 specifically provides for the liability of employers, stating: "Employers and those appointed to represent the affairs of others shall be responsible for damage caused by the acts of their employees and subordinates in

performing the work for which they are engaged." Hornick Decl. ¶ 33; Bell Decl. ¶ 16 (providing a substantially similar translation). There is no requirement of fault on the part of the employer or principal—liability may be vicarious. Bell Decl. ¶¶ 17–20.

To show liability under Article 1367(3), the plaintiff must first show an employment or representation relationship between the principal and agent. Hornick Decl. ¶ 34. Second, the act must have been committed "in the course of performing the employment or representation." *Id.* ¶ 34. The experts before the Court give somewhat conflicting accounts of what this scope of employment requirement means in practice. Exxon's expert Hornick characterized this as a requirement of a "functional connection between the wrongful act and the work that the employee/representative is being directed to perform." *Id.* Similarly, plaintiffs' expert Bell states that plaintiff must show that the wrongful act was committed by employees or representatives in "performing their duties." Bell Decl. ¶ 20. He also argues, citing an Indonesian law treatise, that "employers are responsible for the damages caused by the wrongful act of its employees in performing their duties, even if the employees acted without the authorization or against the order of the employers." *Id.* ¶ 28. Defendants' expert Winarta gives a much more restrictive account, stating that a principal may avoid liability by showing that an "employee deviated from the instructions given by the employer." Frans Hendra Winarta Decl. ¶ 3, *Doe I*, ECF No. 114-1.

Indonesian case law submitted to the court indicates a rather expansive interpretation of Article 1367 that seems more in line with the "functional connection" language adopted by Hornick and the rule stated by Bell that employers can be liable for the acts of employees even when committed without authorization or against orders. For example, in *Suciwati v. P.T.*, the District Court of Central Jakarta held that the primary tortfeasor's employer was jointly and

38

severally liable for the employee's violation of Article 1366, which occurred while the employee was piloting one of his employer's planes. The court stated that the employer was liable simply because the primary tortfeasor "work[ed] at" the defendant airline. *Suciwati v. P.T.*, Decision of the District Court of Central Jakarta, No. 277/PDT.G/2006/PN.JKT.PST, *Doe I*, ECF No. 444-8, *Doe VIII*, ECF No. 74-8. The Supreme Court of Indonesia appeared to state an even broader rule in *Sudiono v. Hadi*. It held that under Article 1367, an employer was liable for the injuries caused by its employee's truck driving. The court held that "[the employer] should have been able to prevent [the employee] from driving such truck if [the employee] was not on duty." *Sudiono v. Hadi*, Decision of the Supreme Court of the Republic of Indonesia, No. 2498 K/Pdt/2000, *Doe I*, ECF No. 444-13, *Doe VIII*, ECF No. 74-13.

Plaintiffs link their injuries to the Exxon security personnel's employment in a few different allegations. First, they allege that some of the injuries were inflicted on Exxon property. *Doe I* First Am. Compl. ¶¶ 68, 70, 72–73; *Doe VIII* Compl. ¶¶ 62–63. Second, some of the injuries were allegedly committed by Exxon personnel while working at an Exxon security post. *Doe VIII* Compl. ¶¶ 62–63. Third, the soldiers assigned to provide security for Exxon at the Arun project were allegedly present only for the purpose of providing security, not for maintaining the general law and order of the area. *Doe I* First Am. Compl. ¶¶ 47–48; *Doe VIII* Compl. ¶¶ 40–41. Fourth, Exxon provided "weapons funding, military equipment, and other supplies" that were used to inflict plaintiffs' injuries. *Doe I* First Am. Compl. ¶ 54; *Doe VIII* Compl. ¶ 47. Finally, plaintiffs allege that the security personnel were acting under the supervision of Exxon and/or its agents, in the course and scope of their employment duties, and in furtherance of Exxon's financial and corporate interests. *Doe I* First Am. Compl. ¶ 79; *Doe VIII* Compl. ¶ 65.

The Court holds that plaintiffs have stated sufficient factual matter to survive a motion to dismiss as to their vicarious liability claims. Plaintiffs allege that some of their injuries were caused on Exxon property and, in some instances, were caused by Exxon personnel stationed at Exxon security checkpoints. These allegations appear to state the kind of "functional connection" required by Indonesian law to show that a principal is liable for the torts of its agent. Furthermore, plaintiffs allege that Exxon paid these individuals to provide security and gave them funding and equipment to carry out that task. Similar to the *Sudiono* case, one could plausibly conclude that Exxon is vicariously liable for the actions of its security personnel because it had a duty to prevent them from inflicting injuries using its equipment and on its property, even when those security personnel were off duty. *See Sudiono*, Decision of the Supreme Court of the Republic of Indonesia, No. 2498 K/Pdt/2000.

### c. *Existence of plaintiffs' causes of action under Indonesian law*

Exxon also disputes that Indonesian law provides causes of action for negligent infliction of emotional distress and intentional infliction of emotional distress. Def.'s Mot. to Dismiss 43 n.30. It premises its argument on the expert declaration of Robert Hornick, who states that these causes of action are unknown to Indonesian law. Hornick Decl. ¶ 24. Plaintiffs respond with expert declarations of their own. Bell Decl. ¶ 31; Johnson Panjaitan Decl. ¶ 5, *Doe I*, ECF No. 434-2, *Doe VIII*, ECF No. 69-2, Ex. 3. Furthermore, one of Exxon's experts, Judge Bismar Siregar, states broadly that these causes of action are "in their essence if not exactly in the form known to the common law, fully cognizable in Indonesia." Bismar Siregar Aff. ¶ 3, *Doe I*, ECF No. 434-2, *Doe VIII*, ECF No. 69-2, Ex. 2.

The Court is not persuaded that negligent and intentional infliction of emotional distress are causes of action known to Indonesian law. It is the plaintiff's responsibility to prove the

existence of their causes of action under Indonesian law. *Esso Standard Oil S.A. v. S.S. Gasbras Sul*, 387 F.2d 573, 581 (2d Cir. 1967) (dismissing plaintiff's claim for failing to prove the validity of his cause of action under Guatemalan law). While the Court is authorized to conduct independent research into foreign law, if "the parties fail to provide an adequate statement of the law, the court is not obligated to independently remedy the deficiency." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 228 (D.D.C. 2011).

Plaintiffs' experts (and Exxon's expert Siregar) affirm that these two causes of action exist under Indonesian law but provide no support for their conclusion, whether by reference to code provisions, cases, or authoritative treatises, aside from general statements that the civil code allows for recovery on this basis. For example, plaintiffs' expert Semendawai simply asserts that "there is nothing in the law that would preclude" these causes of action. Abdul Harris Semendawai Decl. ¶ 3, *Doe I*, ECF No. 434-2, *Doe VIII*, ECF No. 69-2, Ex. 4. Exxon's expert Hornick argues, on the other hand, that intentional and negligent infliction of emotional distress are not causes of action, reasoning that if these two causes of action existed under Indonesian law, it would be unnecessary to consider whether "moral loss" damages are recoverable for wrongful death claims. First Supplement to Robert N. Hornick Decl. ¶ 5, *Doe I*, ECF No. 426-18, *Doe VIII*, ECF No. 61-18. Considering that it is plaintiffs' burden to demonstrate their right to relief under Indonesian law, the Court cannot accept the mere say-so of plaintiffs' experts that such claims exist when considering a motion to dismiss. These claims are dismissed.

## V. MOTIONS FOR RECONSIDERATION AND MODIFICATION OF THE COURT'S SCHEDULING ORDER

Plaintiffs have moved the Court to modify its September 18, 2013 scheduling order by granting them time to file for leave to amend their complaint and extending the briefing schedule relating to defendants' motion to dismiss. As all briefing relating to the motion to dismiss has

41

concluded, the Court denies this portion of the motion as moot. As explained above, plaintiffs shall have the opportunity to file for leave to amend their complaint. They must do so within 30 days.

Exxon has moved the Court to reconsider the aspect of the September 18, 2013 scheduling order permitting discovery, requesting that the Court temporarily stay all discovery pending resolution of the motion to dismiss. Today's opinion disposes of that motion. While defendants do have the opportunity to renew their motion to dismiss as to plaintiffs' ATS claims, this motion would not dispose of all claims before the Court. Therefore, Exxon's arguments for a temporary stay of discovery are no longer current. *See* Def.'s Mot. for Reconsideration of the Court's Scheduling Order 6–9, *Doe I*, ECF No. 445, *Doe VIII*, ECF No. 75 (arguing that a temporary stay of discovery would be appropriate because defendants' motion to dismiss had the potential to dispose of all of plaintiffs' claims). The Court declines to reconsider the discovery permitted in the September 18, 2013 scheduling order and denies Exxon's motion.

## VI. CONCLUSION

In conclusion, the Court dismisses EMOI from *Doe VIII* because it is a non-diverse party whose presence in the case defeats the Court's jurisdiction. The Court also dismisses plaintiffs' claims for intentional infliction of emotional distress in both cases and their claim for negligent infliction of emotional distress in *Doe I*. Defendants' motion to dismiss is otherwise denied.

Plaintiffs may file for leave to amend their complaint in *Doe I* to restate their ATS claims and allege additional facts demonstrating that these claims sufficiently touch and concern the United States to displace the presumption against extraterritoriality. They must do so within 30 days. After that time has elapsed, defendants may renew their motion to dismiss as to the ATS claims.

42

Defendants' motion to temporarily stay all discovery is denied. The Court declines to reconsider its September 18, 2013 scheduling order as to discovery.

Signed by Royce C. Lamberth, United States District Judge, on September 23, 2014.