Public Redacted Copy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, Village A, Aceh, Indonesia, | ) |
| JOHN DOE II, Village, B, Aceh, Indonesia, | ) |
| JOHN DOE III, Village C, Aceh, Indonesia, | ) |
| JOHN DOE IV, Village D, Aceh, Indonesia, | ) |
| JOHN DOE V, Village E, Aceh, Indonesia, | ) |
| JOHN DOE VI, Village F, Aceh, Indonesia, | ) |
| JOHN DOE VII, Village G, Aceh, Indonesia, | ) Civil Action No. 01-1357 (~~LFO~~ |
| JANE DOE I, Village H, Aceh, Indonesia, | ) RCL/AK) |
| JANE DOE II, individually and as | ) |
| Administratrix of her deceased husband's estate, | ) |
| Village I, Aceh, Indonesia, JANE DOE III, individually | ) |
| and as Administratrix of her deceased husband's estate, | ) |
| Village J, Aceh Indonesia, and JANE DOE IV, | ) |
| individually and as Administratrix of her deceased | ) |
| husband's estate, Village K, Aceh, Indonesia, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| EXXONMOBIL CORPORATION, 5959 Las Colinas | ) |
| Boulevard, Irving, Texas, 75039-2298, EXXONMOBIL | ) |
| OIL INDONESIA INC., c/o ExxonMobil Corp., 5959 | ) |
| Las Colinas Boulevard, Irving, Texas, 75039-2298, | ) |
| ~~MOBIL CORPORATION, c/o ExxonMobil Corp.,~~ | ) |
| ~~5959 Las Colinas Boulevard,~~ | ) |
| ~~Irving, Texas, 75039-2298, and~~ | ) |
| ~~MOBIL OIL CORPORATION,~~ | ) |
| ~~c/o ExxonMobil Corp., 5959 Las Colinas Boulevard,~~ | ) |
| ~~Irving, Texas, 75039-2298,~~ | ) |
| | ) |
| Defendants. | ) |
| | ) |

**[PROPOSED] SECOND~~FIRST~~ AMENDED COMPLAINT FOR EQUITABLE RELIEF
AND DAMAGES**

**Public Redacted Copy**

## COMPLAINT

## I.    INTRODUCTION – NATURE OF THE ACTION

1.      Plaintiffs ~~John Doe I~~, John Doe II, ~~John Doe III~~John Doe IV, John Doe V, John

Doe VI, John Doe VII, Jane Doe I, Jane Doe II, Jane Doe III, and Jane Doe IV (hereafter referred

to as "Plaintiffs" unless otherwise specified), on behalf of themselves and, with respect to Jane

Doe II, Jane Doe III, ~~and~~ Jane Doe IV, Jane Doe V, and Jane Doe VI, as Administratrices of the

estates of John Doe I, John Doe III, John Doe VIII, John Doe IX and John Doe X, their deceased

husbands, bring this Complaint for equitable relief and for damages to remedy the injury they

have suffered and continue to suffer from conduct inflicted by members of the Indonesian

military retained by Defendants ExxonMobil Corporation and ExxonMobil Oil Indonesia Inc.,

~~Mobil Corporation, and Mobil Oil~~ (hereafter collectively referred to as "Defendants" unless

otherwise specified) to provide security services.

2.      This is an action for declaratory judgment pursuant to the Declaratory Judgments

Act, 28 U.S.C. § 2201, *et seq.*, as well as for compensatory and punitive damages, and injunctive

relief.  The claims in this action arise from Defendants' conduct in connection with the operation

of their natural gas extraction and processing facilities in Aceh Province, Indonesia.  Plaintiffs

have been subjected to serious abuses, including murder, torture, sexual violence, and

kidnapping in violation of the statutes and common law of the various states of the United States,

including the District of Columbia, and Indonesian law.

3.      Plaintiffs do not have access to an independent or functioning legal system within

Indonesia to raise their complaints.  Further, if they complain to the military authorities, they

would face certain retribution and punishment from these authorities.  Plaintiffs have pursued the

claims set forth herein within a reasonable time of learning of the prospect for bringing an action in the United States courts.

## II.   JURISDICTION AND VENUE

4.     Subject matter jurisdiction exists under 28 U.S.C. § 1332 (a)(2), diversity jurisdiction, as Plaintiffs are citizens of a foreign state while the Defendants are citizens of the United States and the amount in controversy exceeds $75,000.  Subject matter jurisdiction also exists under 28 U.S.C. § 1350, the Alien Tort Statute, as Plaintiffs are aliens who bring claims for torts in violation of the law of nations; 28 U.S.C. § 1331, federal question jurisdiction; and 28 U.S.C. § 1367, supplemental jurisdiction.  Personal jurisdiction over Defendants is based on D.C. Code § 13-423 (2001).

5.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c).

## III.   PARTIES

### Plaintiffs

6.     This Court approved the substitution of Plaintiff Jane Doe V for Plaintiff John Doe I in 2007, Dkt. 200.  Plaintiff John Doe I was a citizen of Aceh Province, Indonesia and resided in Village A.[1]  He brings this action for equitable relief and for damages on behalf of himself to remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint venture partners, and/or their agents, as described more fully herein, and to prevent future harm from occurring.  He feared for his life and the lives of his fellow villagers if he were to

---

[1]  Since the filing of Plaintiffs' original Complaint, Plaintiffs' attorneys have received information that two of the Plaintiffs, John Doe I and John Doe III, have died since the case was commenced, as a result of what Plaintiffs' allege are further abuses.  At this time, however, due to difficulties related to travel in Aceh, Plaintiffs have not yet been able to ascertain the information required to substitute appropriate parties to assert the claims of John Doe I and John Doe III, which were alleged in the initial Complaint.  While Plaintiffs have re-asserted those claims on behalf of John Doe I and John Doe III to ensure the preservation of the claims, as soon as Plaintiffs' attorneys are able to ascertain the necessary information to do so, they will move for leave to substitute appropriate plaintiffs.

disclose his identity and the identity of their village.  Nevertheless, John Doe I agreed to provide

such disclosures in accordance with the terms of an appropriate confidentiality order.  John Doe I

is survived by his next-of-kin.

7.     Plaintiff John Doe II is a citizen of Aceh Province, Indonesia and resides in

Village B.  He brings this action for equitable relief and for damages on behalf of himself to

remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint

venture partners, and/or their agents, as described more fully herein, and to prevent future harm

from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose

his identity and the identity of his village, but will nevertheless provide such disclosures in

accordance with the terms of an appropriate confidentiality order.

8.     This Court approved the substitution of Plaintiff Jane Doe VI for Plaintiff John

Doe III in 2007, Dkt. 200.  Plaintiff John Doe III[2] was a citizen of Aceh Province, Indonesia and

resided in Village C.   He brings this action for equitable relief and for damages on behalf of

himself to remedy the injuries to his person caused by the wrongful conduct of Defendants, their

joint venture partners, and/or their agents, as described more fully herein, and to prevent future

harm from occurring.  He feared for his life and the lives of his fellow villagers if he were to

disclose his identity and the identity of their village.  Nevertheless, John Doe III agreed to

provide such disclosures in accordance with the terms of an appropriate confidentiality order.

John Doe III is survived by his next-of-kin.

9.     Plaintiff John Doe IV is a citizen of Aceh Province, Indonesia and resides in

Village D.  He brings this action for equitable relief and for damages on behalf of himself to

remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint

venture partners, and/or their agents, as described more fully herein, and to prevent future harm

---

[2]  ~~*See* footnote 2, *supra*.~~

from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose

his identity and the identity of his village, but will nevertheless provide such disclosures in

accordance with the terms of an appropriate confidentiality order.

10.     Plaintiff John Doe V is a citizen of Aceh Province, Indonesia and resides in

Village E.  He brings this action for equitable relief and for damages on behalf of himself to

remedy the injuries to his property caused by the wrongful conduct of Defendants, their joint

venture partners, and/or their agents, as described more fully herein, and to prevent future harm

from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose

his identity and the identity of his village, but will nevertheless provide such disclosures in

accordance with the terms of an appropriate confidentiality order.

11.     Plaintiff John Doe VI is a citizen of Aceh Province, Indonesia and resides in

Village F.  He brings this action for equitable relief and for damages on behalf of himself to

remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint

venture partners, and/or their agents, as described more fully herein, and to prevent future harm

from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose

his identity and the identity of his village, but will nevertheless provide such disclosures in

accordance with the terms of an appropriate confidentiality order.

12.     Plaintiff John Doe VII is a citizen of Aceh Province, Indonesia and resides in

Village G.  He brings this action for equitable relief and for damages on behalf of himself to

remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint

venture partners, and/or their agents, as described more fully herein, and to prevent future harm

from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose

**Public Redacted Copy**

his identity and the identity of his village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

13.     Plaintiff Jane Doe I is a citizen of Aceh Province, Indonesia and resides in Village H.  She brings this action on behalf of herself to remedy the injuries to her person caused by the wrongful conduct of Defendants and Defendants' joint venture partners and/or their agents, and to prevent future harm from occurring, as more fully set forth herein.  She fears for her life and the lives of her fellow villagers if she were to disclose her identity and the identity of her village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality or order.

14.     Plaintiff Jane Doe II is a citizen of Aceh Province, Indonesia and resides in Village I.  Her husband, John Doe VIII, was murdered by the wrongful acts of Defendants, their joint venture partners, and/or their agents as described more fully herein.  She serves as the Administratrix of her deceased husband's estate.  She brings this action for equitable relief and for damages on behalf of herself, and as Administratrix of her deceased husband's estate, to remedy injuries caused by the wrongful conduct of Defendants, and to prevent future harm from occurring, as more fully set forth herein.  She fears for her life and the lives of her fellow villagers if she were to disclose her identity and the identity of her village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

15.     Plaintiff Jane Doe III is a citizen of Aceh Province, Indonesia and resides in Village J.  Her husband, John Doe IX, was "disappeared" by security forces employed by Defendants, and, based on information and belief, is presumed to have been murdered by the wrongful conduct of Defendants, their joint venture partners, and/or their agents as described more fully herein.  She brings this action for equitable relief and for damages on behalf of

herself, and as Administratrix of her deceased husband's estate, to remedy injuries caused by the wrongful conduct of Defendants, as more fully set forth herein, and to prevent future harm from occurring.  She fears for her life and the lives of her fellow villagers if she were to disclose her identity and the identity of her village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality agreement or order.

16.     Plaintiff Jane Doe IV is a citizen of Aceh Province, Indonesia and resides in Village K.  Her husband, John Doe X, was murdered by the wrongful acts of Defendants, their joint venture partners, and/or their agents as described more fully herein.  She brings this action for equitable relief and for damages on behalf of herself, and as Administratrix of her deceased husband's estate, to remedy injuries caused by the wrongful conduct of Defendants, as more fully set forth herein, and to prevent future harm from occurring.  She fears for her life and the lives of her fellow villagers if she were to disclose her identity and the identity of her village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

## **Defendants**

17.     Defendant ExxonMobil Corporation ("ExxonMobil Corp.") is a New Jersey corporation with its principal place of business in Texas doing business and authorized to do business in the District of Columbia.  ExxonMobil Corp. maintains numerous places of business within the District of Columbia, including a major office at 2001 Pennsylvania Avenue, N.W. ExxonMobil Corp. was created on November 30, 1999 though the merger of Exxon Corporation and Mobil Corporation, and is the successor in interest to all assets and liabilities previously belonging to the merged entities, including all of their subsidiaries and affiliates.  As a result of the merger, Mobil Corporation merged into Exxon Corporation, which then changed its name to

**Public Redacted Copy**

ExxonMobil Corporation.  Mobil Corporation became a wholly-owned subsidiary of ExxonMobil Corp.  Defendant ExxonMobil Corp. and its predecessors in interest, including Mobil Corp., are hereafter referred to as the "Parent Companies."  ExxonMobil Corp. is now was for years listed as the largest publicly held American corporation in the world by the magazine *Fortune*.  In calendar year 2000, ExxonMobil Corp. reported the world's largest corporate profits, a feat it has since repeated.

18.     The principal business of ExxonMobil Corp. and its divisions and affiliates is energy, involving exploration for, and production of, crude oil and natural gas, manufacturing of petroleum products and transportation and sale of crude oil, natural gas and petroleum products.

19.     Defendant ExxonMobil Corp. is directly, and indirectly through various wholly-owned subsidiaries and divisions, engaged in the marketing and distribution of petroleum products throughout the District of Columbia.  Among its activities within the District of Columbia, ExxonMobil Corp. sells marine and automotive fuel products to vendors, including service station dealers; conducts business with and through various product and retail service distributors; solicits and advertises its own credit and debit cards; and regularly contracts with the Washington Post and other publications for the publication of opinion editorials promoting its business interests.  In addition, from its place of business at 2001 Pennsylvania Avenue, N.W., ExxonMobil Corp. engages in activities to further its business interests through interactions with Members of Congress and the Executive Branch, and various regulatory agencies of the United States government.  ExxonMobil Corp. also employs numerous employees and contractors within the District of Columbia to perform lobbying, public relations, advertising, and other business promotion activities.  Furthermore, ExxonMobil Corp. has numerous shareholders, including institutional investors, who reside in the District of Columbia.

20. ~~Defendant Mobil Corporation ("Mobil Corp.") is a Delaware corporation with its principal place of business in Texas. Mobil Corp. is a wholly owned subsidiary of Defendant ExxonMobil Corp. since the completion of its merger with the Exxon Corporation on November 30, 1999. Prior to its merger with the Exxon Corporation, Mobil Corp.'s principal place of business was in New York and later in Virginia.~~

21. ~~Mobil Corp. was incorporated in Delaware in 1976, and conducted its business primarily through its wholly owned subsidiaries, including Defendant Mobil Oil Corporation ("Mobil Oil"), which is incorporated in New York and has its principal place of business in Texas. Prior to Mobil Corp.'s 1999 merger with the Exxon Corporation, Mobil Oil had its principal place of business in New York and later in Virginia. Mobil Oil is, and has been since 1999, a wholly owned subsidiary of ExxonMobil Corp.~~

22. ~~As a wholly-owned subsidiary and/or affiliate company of Defendant ExxonMobil Corp., Defendant Mobil Oil is doing business and is authorized to do business in the District of Columbia, both on its own behalf and through its position as a wholly owned subsidiary and/or affiliate company of Defendant ExxonMobil Corp. Upon information and belief, Defendant Mobil Oil is engaged in the marketing and distribution of petroleum products throughout the District of Columbia, and, among its activities, sells automotive gasoline and other products to service station dealers as well as leasing service stations to dealers under retail service-station leases and sales agreements using the trademarked name "Mobil."~~

20. At the time this action was originally filed, Defendant ExxonMobil Oil Indonesia, Inc. ("EMOI") ~~is~~was a Delaware corporation, with, upon information and belief, its principal place of business in Indonesia. According to the ~~most current~~ corporate registration information then on record with the Delaware Secretary of State, Division of Corporations, EMOI ~~is~~was

domiciled in the state of Delaware.  EMOI is a wholly-owned subsidiary of ExxonMobil Corp.

EMOI is the successor entity to Mobil Oil Indonesia, Inc. ("MOI"), which was a Delaware

corporation originally incorporated in 1967 by ~~Defendant~~ Mobil Oil Corporation ("Mobil Oil")

or another of ~~Defendant~~ Mobil Corporation's wholly-owned subsidiaries for the purpose of

exploring, exploiting and developing oil and natural gas located in the Arun area of the Aceh

Province, located in Northern Sumatra, Indonesia.  Upon information and belief, MOI's principal

place of business was located in Indonesia.  As of November 30, 1999, MOI became a wholly-

owned subsidiary of Defendant ExxonMobil Corp.  MOI's name was changed to ExxonMobil

Oil Indonesia, Inc. ("EMOI") in 2000.

21.     Upon information and belief, Defendant ExxonMobil Corp. and its predecessors

in interest, for the purpose of attempting to shield themselves from liability or responsibility

from wrongful acts committed in furtherance of their natural gas activities in Indonesia's Aceh

Province, created, or caused to have created, several wholly-owned subsidiaries, divisions and/or

affiliated companies.  These entities include, but are not limited to, Mobil Oil Exploration &

Producing Southeast, Inc. and Mobil Exploration Indonesia Inc. and referred to herein as the

"Other EXMOB Companies."

## IV.     BACKGROUND

### The Origins of Defendants' Presence In Aceh Province

22.     ~~Defendant~~ Mobil Oil or its predecessors in interest commenced business

operations in Indonesia more than one hundred years ago.  Beginning on or about December 26,

1967, Mobil Oil conducted business in Indonesia through its wholly-owned subsidiary, Mobil

Oil Indonesia ("MOI").  MOI is now known as ExxonMobil Oil Indonesia ("EMOI").  Mobil

Oil's parent company and successor in interest, ExxonMobil Corp., has continued to conduct business in Indonesia through EMOI from 1999 to the present.

23.     In or about 1971, Mobil Corp. discovered one of the largest natural gas fields in the world in Arun, which is located in the northern Aceh province in Indonesia.  Thereafter, Mobil Corp. was granted the exclusive rights to explore for and produce natural gas in the Arun area by the Indonesian government, and Mobil Corp. and MOI/EMOI developed natural gas facilities to extract the natural gas.  (The extraction facility, further described below, is referred to hereinafter as "ExxonMobil Extraction Facility" or "Extraction Facility.")  Through a joint venture which is now 35% owned by ExxonMobil Corp., ExxonMobil Corp. also developed a natural gas liquefaction facility to process the natural gas for shipment (the liquefaction facility is referred to hereinafter as the "Arun Liquefaction Facility").

24.     The Arun area that houses the natural gas fields, the Arun Liquefaction Facility, and the ExxonMobil Extraction Facility, and the activities associated therewith, are referred to hereinafter as the "Arun Project."

25.     Since the November 30, 1999 merger, ExxonMobil Corp., either directly or indirectly through its corporate subsidiaries, affiliates and divisions, including EMOI, the Mobil Companies and/or the Other EXMOB Companies, has owned and operated the extraction facilities, succeeded to the Mobil Companies' 35% share in the Arun Liquefaction facility, and succeeded to all other interests of Mobil Corp. and its subsidiaries and affiliates in the Arun Project.  Defendants ExxonMobil Corp., ~~Mobil Corp., Mobil Oil~~, and MOI/EMOI, as well as their predecessors in interest, including Mobil Corp., are referred to collectively hereinafter as "ExxonMobil."

**Public Redacted Copy**

### The Arun Project Facilities

26.     Aceh is a relatively small province located in Northern Sumatra, Indonesia.  It has a population of approximately four million people.  Although it is largely undeveloped, it has extensive oil and natural gas deposits, as well as timber and minerals, and is responsible for a substantial amount of Indonesia's exports.  Aceh produces around one- third of Indonesia's liquefied natural gas.

27.     The Arun Liquefaction Facility developed through ExxonMobil's joint venture is located in north Aceh province.

28.     ExxonMobil's natural gas fields and the ExxonMobil Extraction Facility premises are located on a vast area in North Aceh owned and/or leased and/or controlled and occupied by ExxonMobil.  In addition to extraction operations and production facilities, the ExxonMobil Extraction Facility premises house ExxonMobil headquarters buildings and other facilities such as barracks for ExxonMobil security personnel.  The Extraction Facility is the base of operations for ExxonMobil, including its U.S. personnel, in Aceh.  Pipelines carrying the natural gas run through the property and along roads that abut the area occupied by the facility.

29.     Between the Arun Liquefaction Facility and the ExxonMobil Extraction Facility lies one sizeable town, Lhokseumawe.  In the area covered by ExxonMobil's facilities and the surrounding region, there are also several small settlements or villages.  Acehnese also live along the roads that abut the pipelines running through and from the ExxonMobil extraction facility property.  In 2002, over 2,000 Acehnese residents worked at ExxonMobil's facilities.

30.     The Arun natural gas field is Indonesia's largest producing natural gas field and holds between 13 and 14 trillion cubic feet of gas.  In 1999, the Arun gas fields produced 2 billion cubic meters of natural gas a day.

31.     ExxonMobil Corp. has received hundreds of millions of dollars in revenue from the Arun Project.  Throughout the 1990's and until Mobil Corp.'s merger with the Exxon Corporation in 1999, the Arun gas fields comprised approximately 25% of Mobil Corp's world-wide revenues.[3]

32.     In March 2001, when ExxonMobil temporarily shut down its operations at Arun, Pertamina, the Indonesian natural gas company, reported it stood to lose $100 million for every month that the ExxonMobil facility was shut down.[4]

### ExxonMobil's Security Personnel

33.     From the inception of the Arun Project, ExxonMobil has employed or otherwise retained members of the Indonesian military to provide security services for its facilities and operations in Aceh province, despite the common knowledge, and the knowledge of ExxonMobil, that members of the Indonesian military had a history of gross human rights abuses without reprimand or punishment.

34.     Among the members of the military ExxonMobil retained to provide security were members of Unit 113, which thereafter had the sole and specific purpose of providing security for ExxonMobil.

35.     ExxonMobil security personnel acted "for defensive purposes only, and not for maintaining general law and order."[5] ExxonMobil required that its security personnel be dedicated exclusively to providing security for Exxon operations.

36.     ExxonMobil security personnel acted at all times relevant to this Complaint under the direction and control of ExxonMobil.

---

[3]   The Arun gas fields have been called "the jewel in the company's crown."  Jay Solomon, *Fueling Fears: Mobil Sees Gas Plant Become Rallying Point for Indonesian Rebels*, Wall St. J., Sep. 7, 2000, at 2.

[4]   Patrick Smith, *Exxon's Indonesian Exit Could Have Been Avoided*, Bloomberg News, Mar. 25, 2001, at 1.

[5]   Letter from R.I. Wilson, President and General Manager, ExxonMobil Oil Indonesia Inc., to the Editor, N.Y. Times, July 18, 2002.

37.     ExxonMobil security personnel acted at all times relevant to this Complaint within the scope of and pursuant to their retention by ExxonMobil.

38.     ExxonMobil paid and continues to pay the Indonesian military a regular monthly or annual fee for security services.[6]

39.     In addition to other lump sums, upon information and belief, ExxonMobil pays three million rupiah ($294) per low-ranking military personnel a month. [7]

40.     In 2000, ExxonMobil was paying more than $500,000 per month to retain members of the Indonesian military as security personnel.

41.     At all times relevant herein, ExxonMobil has had the ability to supervise, control and direct, and has supervised, controlled and directed, the actions and activities of its security personnel.  Such supervision, control and direction has included the following:

(a)     conditioning payment on the provision of specific security services;

(b)     making decisions about where to place bases, strategic mission planning, and making decisions about specific deployment areas;

(c)     material support to ExxonMobil security personnel, including but not limited to:

(i)     constructing and/or providing facilities that were used for the detention, interrogation, torture, and other abuses of  Plaintiffs,

---

[6]  Slobodan Lekic, *Indonesian Military Admits to Taking Money from U.S. Company*, Associated Press, Dec. 29, 2005 (ExxonMobil has acknowledged that it paid to have members of the Indonesian military provide security services).

[7]  *Aceh Rebels Accuse ExxonMobil of involvement in "brutal military campaign,"* Agence France-Presse, Jan. 11, 2002.  *See also* Patrick Smith, *Exxon's Indonesia Exit Could Have Been Avoided*, Bloomberg News, Mar. 25, 2001 at 1.  ("ExxonMobil, by all accounts, . . . paid the salaries of the troops that guarded its fields and the nearby P.T. Arun liquefaction plant; it shared equipment the army apparently could not afford.").  According to press reports, only one-third to one-quarter of the financing for Indonesia's armed forces comes from the state budget. The rest is collected from "protection payments."  *E.g.* Slobodan Lekic, *Indonesian Army Admits U.S. firm's 'support'*, Associated Free Press, Dec. 30, 2005; Tina Rosenberg, *A Guerrilla War Stoked by a Thirst for Cash*, N.Y. Times, Dec. 27, 2001, at A18.

Public Redacted Copy

including a facility at the Extraction Facility known as "Post A-13," and a facility at the Liquefaction facility known as "Rancong Camp";

(ii)     providing weapons funding, military equipment, and other supplies used in the abuse of Acehnese residents, including Plaintiffs;

(iii)     paying consultants and/or mercenaries to provide advice, training, intelligence, and equipment to ExxonMobil security personnel.

**ExxonMobil Security Personnel Perpetrated Abuses and Injuries Against Plaintiffs**

42.     ~~Upon information and belief, b~~Beginning at least in the early 1990s and continuing to the present, ExxonMobil security personnel were responsible for widespread acts of abuse, including murder, committed against Plaintiffs or their decedents.

43.     ~~Upon information and belief,~~ ExxonMobil provided equipment, facilities, and other material support to ExxonMobil security personnel that was used in the commission of abuses, including torture and murder of Acehnese villagers, including Plaintiffs or their decedents.

44.     At all times relevant to this Complaint, ExxonMobil security personnel were acting under the supervision, direction, and control of, and with the knowledge and authority of ExxonMobil.

**ExxonMobil ~~Was Aware~~Knew of Abuses By Members of The Indonesian Military When It Retained Them as Security Forces**

45.     Because the history of abuses by the Indonesian military had been extremely well-publicized and widely condemned, ExxonMobil ~~was aware~~knew when it retained members of Indonesia's military to provide security for its Aceh operations that members of the Indonesian

military had in the past engaged in abuses of Indonesian citizens, including kidnapping, murder, rape, torture and other forms of abuse.  Indeed, high-level ExxonMobil executives anticipated that abuses committed by their military security personnel could and would occur.

46.     High-level executives and managers of ExxonMobil Corporation in the United States, including executives and managers working out of offices in Texas and Virginia, knew of the long history of human rights abuses perpetrated by members of the Indonesian military generally and of specific allegations that members of ExxonMobil's military security committed human rights abuses in and around ExxonMobil's facilities in Aceh, Indonesia.  For example, Security Advisor Jack Connor reported to the Manager of ExxonMobil Corporation's Global Security Department in Fairfax, Virginia, on "the poor reputation of the Indonesian military, especially in the area of respecting human rights."

47.     Well before Plaintiffs were injured, information regarding human rights abuses allegedly committed by the military was included in briefings to ExxonMobil's top executives in the United States, including to Mobil Chairman, Lucio Noto.

48.     Well before Plaintiffs were injured, ExxonMobil Corporation executives in the United States received a report from EMOI that military security personnel had been deployed at the Aceh facility, ███████████████████████████████████████████████ ███████████████████████████████████████████████

49.     High-level ExxonMobil executives in the United States were repeatedly briefed on abuse allegations.  For example, Robert Haines, Mobil's manager of international government affairs in Washington, DC, wrote to Mobil Chairman Lucio Noto, in Fairfax, Virginia, in 1999 about allegations of systemic abuses by military security personnel, including allegations that the

military security personnel engaged to protect ExxonMobil's facilities had committed abuses against the local population.

50.     Prior to the abuses committed on Plaintiffs, ExxonMobil Corporation's executives and managers in the United States knew of reports that the military security personnel were using ExxonMobil's facilities as a base to commit serious human rights violations, including rape, torture, and extrajudicial killings.  Many of these reports indicated that the military security personnel were committing these human rights violations on ExxonMobil's facilities or with ExxonMobil's equipment.  For example, ExxonMobil's managers and executives in the United States knew of repeated reports that the military security personnel had tortured Acehenese at one of Mobil's former housing developments and had used ExxonMobil's earth-moving equipment to dig mass graves.

51.     ExxonMobil Corporation's high-level executives in the United States received reports that military security personnel assigned to EMOI were accused of detaining and assaulting villagers.

52.     These reports were repeatedly raised with ExxonMobil's executives and managers in the United States through a variety of sources, including reporters, consultants, members of Aceh's civil society, and U.S. government officials.  For example, the U.S. Ambassador to Indonesia directly raised allegations of human rights abuses involving the use of ExxonMobil's facilities and equipment with Mobil Corporation Chairman Lucio Noto.  In another example, ███

███████████████████████████████████████████████████

██████████████████████████████████████████

53.     Complaints by local villagers of misconduct by the military security personnel were forwarded to high-level executives in the United States.

54.     Continuously during the time that it retained members of the Indonesian military as security personnel, ExxonMobil knew ~~or should have known~~ that members of the military continued to commit gross abuses, because the publication and condemnation of unpunished abuses by members of the military continued at all times that ExxonMobil retained military members as security personnel.

55.     ExxonMobil knew ~~or should have known~~ of abuses by its military security personnel because reports and complaints of such abuse were publicized and/or directed to ExxonMobil and ExxonMobil officials during the period that ExxonMobil retained members of the Indonesian military as security personnel.

**Notwithstanding The History of Abuses Committed By The Military Security Personnel, ExxonMobil Purposefully Deployed and Supported The Military Security Personnel**

56.     ExxonMobil sought and benefited from its use of military security personnel.

57.     Indeed, ExxonMobil's Global Security Division in the United States ██████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

58.     Managers and executives in the United States knew that the Indonesian government was worried about the impact of unrest in Aceh on government revenues.  During a trip to Indonesia in February 2000, Chairman Lucio Noto met with government officials, including President Wahid, and stressed that unrest in Aceh was impacting EMOI's operations and asked for continued security in the areas of EMOI's facilities.  ExxonMobil Corporation likewise developed and implemented a government relations plan, which included outreach to military leaders, emphasizing that unrest in Aceh was negatively impacting the company's

ability to carry out its business, could result in a significant loss of revenue to Indonesia, and could risk foreign investment in future projects.

59.     ExxonMobil took no effective steps to eliminate the abuses; to implement or enforce an effective code of conduct; to discipline, penalize or remove individuals who committed human rights abuses; or to reduce or terminate its reliance on military security when the military security personnel engaged in these foreseeable human rights violations. Instead, despite repeated reports of continued abuses, ExxonMobil requested additional military security.

60.     EMOI ultimately reduced its own guard force and decided to rely on military security personnel instead.  High-level managers in the United States participated in and were responsible for making these decisions.

61.     Notwithstanding the history of abuses and the fact that the military security personnel continued to commit abuses, ExxonMobil Corporation executives in the United States purposefully deployed and supported the military security personnel and continued to do so over time.

62.     The human rights abuses committed by ExxonMobil's military security personnel were a foreseeable consequence of ExxonMobil's purposeful and continued deployment and support of military security.  Indeed, ExxonMobil, including Exxon Mobil Corporation executives in the United States, anticipated that the abuses could and would occur.

63.     ExxonMobil knew that its military security personnel were committing human rights abuses while protecting ExxonMobil's facilities, yet despite that knowledge, purposefully continued to employ and fund the military security personnel.

## Common Knowledge of Unpunished Abuses By Members
## of the Indonesian Military

64.     At least as early as the 1970's and continuing through the present, it was widely

known that members of the Indonesian military were not firmly under civilian control and had

committed murder, torture, illegal detention and other abuses against Indonesian civilians.

Unpunished abuses by members of the Indonesian military have been recognized and condemned

by the United Nations Security Council[8] and the United States, [9] among others.  These practices

have also been documented and widely publicized by the news media,[10] and human rights

organizations.[11]

---

[8]   In 1975, United Nations Security Council adopted resolutions deploring human rights abuses in East Timor. See, e.g., U.N. S/Res/384 (1975); U.N. S/RES/1272 (1999) (calling for cooperation into investigations of reports of systematic, widespread, and flagrant violations of international humanitarian and human rights law).

[9]   The United States Congress has repeatedly cut off and/or restricted aid to Indonesia in response to human rights abuses by the Indonesian military.  It also passed U.S. Senate Resolution 91 which criticized Indonesia's failure to prosecute the perpetrators of human rights abuses and directed the State Department to urge the Indonesian military to prosecute human rights abuses by its soldiers.  S. Res. 91, 107th Cong., 1st Sess. (2001).  The United States Department of State yearly reports on countries' human rights practices have repeatedly condemned abuses of civilians by members of the Indonesian military for several years.  See, e.g., U.S. Dep't of State, Indonesia Country Report on Human Rights Practices ("Country Report") for 1983, Washington, D.C. 1983 at 775; Country Report for 1984 at 774; Country Report for 1985 at 774; Country Report for 1993 at 1.

[10]   For example, in 1977, the Washington Post reported the United States House of Representatives would investigate the "accusation that the Indonesians carried on indiscriminate slaughter and committed other atrocities following their December 1975 occupation of East Timor."  John Sharkey, House to Probe Charge Indonesians Killed 100,000 on Timor, Wash. Post, Mar. 13, 1977, at A19.  See also, e.g., Around the World, Wash. Post, Jan. 2, 1979, at A11 (president of East Timorese independence movement shot dead in an ambush by Indonesian troops). In 1984, the Washington Post reported in 1984 that "illegal executions by military, police or government units have aroused public concerns and drawn condemnation from local and foreign human rights activists."  William Branigin, Death Squads Claim Victims in Asia, Wash. Post, Apr. 12, 1984, at A21.

[11]   For example, in 1989, Human Rights Watch described arbitrary detention and torture by members of the Indonesian military.  Human Rights-Watch Report 1989: Indonesia and East Timor, available at: http:///www.hrw.org/reports/1989/WR89/Indonesia.html.  The same organization reported in 1999 that Indonesia soldiers had "kill[ed] more than a thousand civilians, often leaving their mutilated bodies by the side of roads and rivers.  Many more were arrested, tortured, and arbitrarily detained for months, sometimes years."  Human Rights Watch, Indonesia: Why Aceh is Exploding, August 27, 1999, at 2, available at: www.hrw.org.  The report noted that hundreds of men disappeared and many women were raped and concludes that "not a single move was made to hold Indonesian soldiers accountable for atrocities, despite all the new information that had emerged."  Id.  Amnesty International has issued a long series of reports on human rights abuses in Indonesia, which included reporting on summary executions and disappearances of East Timorese at the hands of the Indonesian military in a statement before the United Nations General Assembly.  See Statement on Behalf of Amnesty International to the United Nations General Assembly, available at 127 Cong. Rec. 10826 (1981).  Amnesty International later reported that between 1989 and 1993 in Aceh, "an estimated 2,000 civilians, including children and the very elderly, have been unlawfully killed, some in public executions and others while in military custody."  "Shock Therapy": Restoring Order in Aceh, available at:

65. ~~Upon information and belief,~~ Defendants were aware of the history of unpunished abuses by members of the Indonesian military.

### Complaints and Reports of Abuse Specifically About and/or Provided to Defendants

66. Defendants knew that their military security personnel were dangerous and unfit, or, to use Defendants' own words: "thieves, extortionists and intimidators" who presented problems including "harassment, improper conduct."

67. The Manager of ExxonMobil Corporation's Global Security Department in Fairfax, Virginia, described ExxonMobil's military security personnel as "not adequately trained" and an analysis commissioned by ExxonMobil described the military as, in general, undisciplined and lacking professional deportment.

68. Defendants ~~were aware of~~ knew of the abuses committed by ExxonMobil security forces. Top ExxonMobil officials attended meetings where human rights abuses by the security personnel were discussed. For example, the United States Ambassador to Indonesia discussed the allegations regarding Mobil with Mobil's Chariman, Lucio Noto, during a November 3, 1998 meeting.

69. ~~Upon information and belief,~~ Defendants ~~were aware~~ knew of press reports in leading publications that investigated and detailed accounts of abuses by ExxonMobil's security personnel, including:

---

www.amnestyusa.org/refugee/document.do?cd=B3CCDFC439385424802569A60060395C  The report noted that "none of the suspected perpetrators of past violations has yet been brought to justice." Id.

**Public Redacted Copy**

(a)    BusinessWeek magazine undertook an independent investigation of the
allegations made against ExxonMobil and published its findings in an
article dated December 1998.[12]

(i)    The article notes that "Mobil's headquarters in Fairfax, Va.
provided detailed responses to questions from BusinessWeek's
reporters and editors." *Id.*

(ii)    The article also states that "Mobil says if it had known of abuses
associated with its operations, it would have protested
aggressively." *Id.*

(iii)    The article quotes H. Sayed Mudhahar, identified as a former top
government official in Aceh who also served as a public relations
manager for ExxonMobil's joint venture partner, P.T. Arun, as
saying "there wasn't a single person in Aceh who didn't know that
the massacres were taking place … everybody was afraid." *Id.*

(iv)    The article notes that Acehnese who were detained and tortured at
the Rancong Camp attended Friday afternoon services at a mosque
at the Liquefaction Facility alongside its employees.[13]

(v)    The article describes an area along a road near the Extraction
Facility that served as a repository for the remains of the victims
and became known as "Skull Hill."[14]  ExxonMobil contractors and

---

[12]/  Michael Shari, *Indonesia: What did Mobil Know?*, BusinessWeek, Dec. 28, 1998.
[13]/  *See id.* at 7.
[14]/  *See id.* at 6.

employees traveled the road that passed Skull Hill on a daily basis and discussed it at work.[15]

(b)   In December 1998, the Associated Press reported that the Indonesian-government backed National Human Rights Commission "had received witness reports that Mobil managers were aware of abuses in Aceh and even provided equipment to soldiers involved in atrocities."[16]

(c)   In September 2000, the Wall Street Journal's Asia edition ran a story recounting reports of abuses by ExxonMobil security forces, including "numerous reports of abuses by troops in and around [Exxon]Mobil facilities."[17]

(d)   In July 2001, an article in Time magazine's Asia edition reported that in Aceh "people literally line up to tell stories of abused and murders committed by the troops they call **Exxon's army**."[18]

(i)   The article further reported that a farmer named Anwar was held for a month by ExxonMobil security personnel and whipped nightly with ropes of barbed wire, burned with cigarettes and beaten unconscious with a wooden board.  He was also forced to watch the security personnel shoot his brother in the head.   The article states that "Anwar says part of his ordeal took place inside the gates of ExxonMobil's cluster IV gas field.  He says he was

---

[15]/  *See id.*
[16]/  Christopher Torchia, *Indonesian Human Rights Group Studies Allegations Against Mobil*, Associated Press, Dec. 24, 1998.
[17]/  Jay Solomon, *Fueling Fears*, Wall St. J., Sep. 7, 2000.
[18]/  Mark R. Mitchell, *Who Knew?*, Time Asia, Jan 29, 2001 (emphasis added).

dragged, kicking and screaming, past men wearing white uniforms and ExxonMobil hard hats…." *Id.*

(ii)     The article also noted that "according to locals, riding a bicycle or oxcart on the street in front of ExxonMobil's facilities has become a deadly game of dodge-bullet, with soldiers taking potshots at just about anybody who moves.  Those who pass at the wrong time of day are sometimes dragged into ExxonMobil's warehouses and taught a lesson." *Id.*

70.   ███████████████████████████████

███████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

███████████

71.     ~~Upon information and belief,~~ In spite of this knowledge, Defendants continued to retain members of the Indonesian military as security personnel at all times relevant to this Complaint.

72.     In spite of their knowledge, Defendants ~~have~~ refused demands to investigate, improve, or cease its security forces' abusive actions.  For example, numerous human rights groups, including several based in Aceh, specifically requested that Defendants cease their operations in Aceh until they could make arrangements to operate without using members of the Indonesian military for security.  These requests were refused, and Defendants instead determined to *increase*, and did increase, the number of Indonesian soldiers it employed or otherwise retained to guarantee the security of the Arun Project, without regard for, and with full

knowledge of, the abuses committed against the Acehnese people who live near the Arun Project.  Moreover, Defendants have continued to pay ExxonMobil security personnel knowing that the security personnel would continue to take any and all actions, including extreme violence of the character and nature described above.

73.     The decisions described above were made, authorized and/or approved by high-level executives in the United States.

74.     Until after this litigation was filed, ExxonMobil declined to sign on to a set of voluntary guidelines for energy and mining companies regarding the respect for human rights at overseas operations. The guidelines were developed by, among others, the governments of the United States and the United Kingdom, non-governmental organizations, and corporations in the extractive industries.  A December 2000 article in the *Wall Street Journal* notes that competitors British Petroleum, Chevron, and Royal Dutch Shell, among others, participated in the agreement, but ExxonMobil did not.  A *New York Times* editorial noted that the voluntary initiative was a "modest step toward reducing a major source of abuses committed by corporations in the third world."

**ExxonMobil Executives in the United States Planned and Authorized the Use, Deployment, Logistics, and Support of the Military Security Personnel**

75.     ExxonMobil Corporation's high-level executives in the United States were responsible for and controlled all facets of EMOI's security, including the decision to use military security and decisions related to the provision of supplies and payment of stipends to the military security personnel.  EMOI sought and received approval from executives in the United States for major decisions regarding the use of military security, including decisions to pay and supply those security personnel.  But for ExxonMobil Corporation's conduct, the abuses would not have occurred as they did.

25

76.     High-level ExxonMobil Corporation executives and managers planned and authorized support for the military security from their offices in the United States.  In addition, executives and managers in the United States sent an employee to Indonesia to coordinate logistics support for the military security.

77.     High-level Parent Company executives in the United States approved an arrangement with Pertamina for the provision of military security.  The arrangement with Pertamina consisted of, *inter alia*, a Production Sharing Contract and a series of letter agreements related specifically to the provision and support of military security as well as less formal agreements.

78.     The Parent Companies in the United States participated in negotiating the Production Sharing Contract.  The letter agreements with Pertamina, although signed by EMOI President Ron Wilson, were reviewed and approved by high-level executives in the United States ██████████████████████████████████████████████████████████████████████████. Upon information and belief, Ron Wilson did not sign the letters without the approval of parent company executives in the United States.

79.     Pursuant to the agreements with Pertamina, the military security personnel were provided upon request. ████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████

**Executives in the United States Approved Specific Requests**
**for Additional Military Security Personnel**

80.     High-level ExxonMobil executives in the United States approved and authorized requests for military security personnel.  For example, Lance Johnson, a Parent Company

**Public Redacted Copy**

executive working in Texas, 

81.

82.     High-level executives in the United States approved the deployment of military security, including the specific locations and tasks to be performed by the military security personnel.  For example, ExxonMobil Corporation's executives in the United States approved deploying troops at all facilities, including producing clusters; moving the military outside the fence line; providing military escorts for shift changes; and having the military security conduct access control and patrols.

83.     These deployments placed military security in proximity to and in contact with the local community, including Plaintiffs.  Indeed, Defendants sought to house the military security "outside the wire," outside of EMOI facilities, and in the local community, in part because the troops were dangerous and disruptive.

84.     High-level ExxonMobil Corporation executives in the United States closely monitored the target troop levels, the actual troop levels, and the assigned locations of the troops. For example, high-level executives in the United States received daily reports listing the locations of the soldiers and their duties.  The reports provided a high level of detail:

85.     The troops would not have been provided and stationed at EMOI's operations, except upon Defendants' request.

### Executives in United States Authorized the Payment of Stipends, Materials, and Logistical Support to the Military Security Personnel

86.     High-level ExxonMobil Corporation executives in the United States authorized the payment of stipends to the military security personnel.

87.     At one point, high-level executives in the United States were informed that the military security ███████████████████████████████████████████████

88.     ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████

89.     In addition to stipends, pursuant to the letter agreement with Pertamina, Defendants agreed to provide food, shelter, vehicles and vehicle maintenance, communications equipment, and fuel, to the military security personnel.  ExxonMobil Corporation's high-level executives in the United States authorized the provision of these supplies to the military security.

90.     ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████.

91.     ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████

**Public Redacted Copy**

92.



93.

94.

95.     Requests to provide material support to military security personnel were reviewed and authorized by ExxonMobil Corporation's high-level executives and legal counsel in the United States.

96.

**Public Redacted Copy**

97.    ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

98.    ██████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████

99.     The Parent Companies in the United States managed the public response to allegations of human rights abuses by EMOI's military security.  Statements and Q&A scripts responding to press inquiries were approved in the United States by executives at the highest levels of the Parent Companies in the United States.

100.    In 1999, Parent Company employees in Fairfax, Virginia took charge of developing the strategy for responding to articles about human rights violations, including Mobil's global and Indonesian response.  ███████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████

Public Redacted Copy

101.    ExxonMobil policy required EMOI to notify Lance Johnson, a Parent Company executive in the United States, immediately for certain events, including where significant adverse reaction from the media was expected, and within 24 hours for other types of incidents.

102.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

103.    The Parent Companies' managers in the United States managed EMOI's public affairs response to questions about human rights abuses by the military security and met with NGOs and others who were concerned about Exxon's support of the military.  ExxonMobil sent employees from the United States to Indonesia to assist in government relations, press, and community relations tasks.

104.    The Parent Companies' public relations effort in the United States was intended to obscure Exxon's connection to the abuses, facilitating Exxon's continued support to the military.

### Military Security Personnel Worked Under The Effective Management, Control, Direction, and Supervision of ExxonMobil Corporation Managers and Executives in the United States

105.    ExxonMobil Corporation in the United States was the final decision-maker in connection with the deployment of military security.

106.    ExxonMobil Corporation executives planned and authorized the deployment of military security personnel, including the locations, tasks, and logistic support, from their offices in the United States.

107.    Managers and executives in the United States were involved in establishing procedures for the military security deployments and in directing, supervising, and managing the deployments.

108.    Executives and managers in the United States spent significant amounts of their time working on Indonesia.  For example, Lance Johnson, a Parent Company executive, working in the United States, spent fifty percent of his time working on Indonesia-related business, and traveled there about every other month.  The Manager of ExxonMobil Corporation's Global Security Department, working in the United States, spent up to a quarter of his time on EMOI security issues.

109.    ExxonMobil Corporation employees in the United States could directly monitor what was happening at EMOI through a set of live CCTV cameras installed at EMOI's Aceh facilities, which were streamed over the Exxon Intranet.

### Executives and Managers in the United States Were in Daily Contact With EMOI to Plan and Manage Security, Including Supervision Of Communications with Military Security Personnel

110.    ExxonMobil Corporation's U.S. executives and managers were in almost daily contact with EMOI's employees in Indonesia.  In many of these communications, ExxonMobil Corporation's U.S. executives and managers were provided detailed information about, *inter alia*,

(i) communications between EMOI and Pertamina regarding the provision of military security, including ███████████████████████████████████████████ ████████████████████████

(ii) ████████████████████████████████████████████████████ ████████████████████████

(iii) ████████████████████████████████████████

(iv) EMOI's meetings with military officials and other government officials about security issues. █████████████████████████ and the implementation of weekly joint drills between EMOI, Pertamina and the military;

(v) EMOI's requests for additional military support and personnel, including, in some instances, specific demands regarding the exact number of personnel needed, the location of personnel, ███████████████████████████████████████████████

(vi) EMOI's instructions to the military security personnel regarding their expected role;

(vii) the deployment of the military security personnel at Exxon's facilities, including the types and numbers of personnel, the precise locations of those personnel, ████████████
████████████

████████ for a code of conduct applicable to the military security personnel;

(ix) the material support EMOI was providing to the military security personnel, including food, lodging, vehicles, communications equipment, transportation by plane of military officers to and from the field, and cash payments;

(x) the replacement of private security guards with military security personnel; and

(xi) ████████████████████████████████████████████
████████████████████████

111.    High-level ExxonMobil Corporation executives and managers in the United States received detailed reports of meetings between the military security personnel and Exxon staff.  These meetings covered deployment goals and day-to-day operational strategy.

112.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████

113.    High-level ExxonMobil Corporation executives and managers in the United States received daily reports regarding the tasks assigned to the military security personnel, including, for example, reports that youths had taken meals at the mess hall, and that the A-13 military security commander would be asked to "handle them."  The daily reports listed locations and the numbers of military security personnel (described as "resources") stationed at each spot:

██████████████████████████████████████████

████████████████████████████████████

114.    Detailed weekly reports were requested by high-level ExxonMobil Corporation executives and managers in the United States.  These reports included a summary of current and planned military deployment and ████████████████████████

██████████████████████████████████████████

███████████████████████████

115.    ExxonMobil Corporation's high-level executives in the United States used and responded to these reports, ████████████████████████████

████████████████████

116.    ████████████████████████████████

██████████████████████████████████

117.    High-level ExxonMobil Corporation executives in the United States hired security consultants to provide specialized security services.  ████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

118.   ExxonMobil Corporation's high-level executives and managers in the United States communicated with staff in Indonesia about the standard operating procedures to be followed by the military security personnel.  At one point, a security advisor to Indonesia reported to Global Security Department staff in Fairfax that implementation of a code of conduct was necessary to avoid incidents like the Business Week "What did Mobil Know" article and explained that "its [sic] not going to be easy managing 900 troops in our operational area."

119.   EMOI repeatedly sought assistance from the Parent Companies in the United States, including from the Global Security and Public Affairs staff in Virginia, Texas, and the District of Columbia, to manage its relationship with the military security personnel and Pertamina.  █████████████████████████████████████

███████████████████████████████████████████████

███████████

**Executives and Managers in the United States Set Standards, Plans, and Tasks for EMOI's Security**

120.   ExxonMobil Corporation's high-level executives in the United States developed and authorized EMOI's security plans.

121.   High-level Parent Company executives in the United States worked on developing the security plan for Aceh without including any EMOI employees in their discussion.  ███

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████



122.     High-level Parent Company executives and managers in the United States selected and appointed employees to fill the senior security positions at EMOI.

123.     High-level Parent Company executives in the United States ordered security assessments that, *inter alia*, reviewed the relationship with the military security and directed detailed modifications to these arrangements, ███████████████████████████████ and enforcing standards for security personnel.  For example, one assessment ███████████████████████████████

124.     High-level Parent Company executives and managers in the United States met to review the assessments in detail.  Upon reviewing these assessments, managers in the United States determined priority action items and shifted target dates for implementation.

125.     High-level Parent Company executives in the United States ordered reports studying the security procedures at EMOI's facilities in Indonesia.  The reports recommended specific tasks to be undertaken by the security personnel, such as "██████████████████

126.     An email circulated among high-level Parent Company executives and managers in the United States recommended a monthly audit of the action plan to ensure it was completed

**Public Redacted Copy**

127.     High-level executives and managers of the Parent Companies frequently traveled from the United States to Indonesia to review and address security issues.  For example, Lucio Noto, the Chairman and CEO of Mobil Corporation, and Lee Raymond, the Chairman and CEO of ExxonMobil Corporation, separately traveled to Indonesia, where they discussed security for EMOI with Pertamina and government officials, including the President of Indonesia.  Lance Johnson, a Parent Company executive, traveled to Indonesia about every other month.   Mike Farmer, the Manager of ExxonMobil Corporation's Global Security Department, traveled to Indonesia over twenty times by the year 2000.  Some of these visits were undertaken to facilitate "security management" of EMOI security by U.S.-based managers.

128.     ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

129.     ExxonMobil Corporation's high-level executives and managers also met with, among others, Indonesian government officials, consultants, and NGO representatives in the United States.  At these meetings, they discussed security concerns as well as allegations of human rights abuses.

130.     These meetings in the United States were part of ExxonMobil's public relations effort to obscure ExxonMobil's connection to human rights abuses committed by the military security personnel and thereby facilitate ExxonMobil's continued utilization of military security.

**Defendants' Centralized Structure and Decision-Making**
**In the United States**

131.     ExxonMobil Corp. and EMOI management decisions related to Indonesia are centralized and made in the United States.

**Public Redacted Copy**

132.     More specifically, ExxonMobil Corporation is one of the largest publicly owned companies~y~ in the world.  It is a U.S. corporation whose stock is traded on the New York Stock Exchange.  Profits from the operations of ExxonMobil Corp. and its affiliates and subsidiaries in Indonesia are reported by, and thus accrue to, ExxonMobil Corp. and its shareholders.

133.     ~~Since its incorporation in 1967, MOI, the predecessor to EMOI, held its Board of Directors meetings in New York at 150 East 42nd St, New York, New York, in a building known as the Socony Mobil Building.  Upon information and belief, MOI Board meetings, including those at which important decisions related to Indonesia and the retention of military members as security personnel were made, were held at this location in New York.~~ █████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

134.     The by-laws of MOI required that all meetings of the stockholders be held at MOI's office in New York City except as otherwise directed by the Board of Directors.  Upon information and belief, all MOI shareholder meetings were held in New York City.

135.     ExxonMobil Corp., including through principals acting out of ExxonMobil Corp.'s headquarters in Irving, Texas, sets policy for and on behalf of all ExxonMobil Corp. entities, including but not limited to EMOI, including as follows:

    (a)     Since the early 1990's, ExxonMobil Corp. put in place a comprehensive program known as the "Operations Integrity Management System" ("OIMS"), which provides for centralized policies on social issues that are formulated and enforced from ExxonMobil Corp.'s corporate headquarters

in Irving, Texas.  Defendant ExxonMobil Corp. applies OIMS throughout all of ExxonMobil Corp., including all of its subsidiaries and affiliates.[19] ExxonMobil Corp.'s public documents state that OIMS is "ExxonMobil-wide"[20] and "used by every ExxonMobil-operated facility"[21] in all of the over 200 countries where ExxonMobil Corp. operates, including in its upstream exploration activities.[22]  ExxonMobil Corp.'s OIMS has been touted as a "corporate-wide commitment with high degree of ownership and involvement,"[23] so designed to ensure that all ExxonMobil Corp.'s "business units pull together."[24]

(b)     The OIMS process begins "at the very top" of ExxonMobil Corp., and includes regular, significant review and direction by senior management.[25] Upon information and belief, ExxonMobil Corp. primarily provides OIMS control checks internally, eschewing third party verification, with ultimate responsibility for the program resting upon corporate headquarters.[26] Upon information and belief, OIMS applies to the management of EMOI.

---

[19]  *See* "Meeting Environmental Expectations," ExxonMobil document, available at: www.exxonmobil.com/Corporate/Files/Corporate/enviroenglish.pdf (referring to the application of OIMS "not only to Exxon Mobil Corp. or to one of its divisions but collectively to all of the companies affiliated with ExxonMobil Corporation or to any one or more of them.")

[20]  *See* "Operations Integrity Management System (OIMS)", available at: www.exxonmobilchemical.com/public_pa/WorldwideEnglish/CorpCitizenship/Com.

[21]  *See* "IFC Safeguard Policies, ExxonMobil Consultation Comments," April 29, 2005, available at: www.ifc.org/IFCExt/SafeGuardDocs.Nsf/0/2b158426a6f1501885256ff2006b3920/$FILE/IFC%20Safegard%20Policies%20-%20ExxonMobil%20comments%20Apr%2029,%2005.doc

[22]  *See* "How ExxonMobil ensures systematic improvement and harmonious performance," John D. Symonds, ISO Management Systems, July-August, 2002, available at www.iso.org/iso/en/iso9000-14000/addresources/articles/pdf/casestudy_4-02.pdf.

[23]  *See* "The Robert W. Campbell Award", www.campbell.aard.org/RWC%202-OIMS.pdf.

[24]  *See* "How ExxonMobil ensures systematic improvement and harmonious performance," John D. Symonds, ISO Management Systems, July-August 2002, available at www.iso.org/iso/en/iso9000-14000/addresources/articles/pdf/casestudy_4-02.pdf.

[25]  *Id.*

[26]  *See* IFC Safeguard Policies, ExxonMobil Consultation Comments", April 29, 2005, available at www.ifc.org/IFCExt/safeGuardDocs/Nsf/0/2b158426a6f1501885256ff2006b3920/$FILE/IFC.

(c)     Upon information and belief, Mobil Corp. had similar centralized

management procedures.  In 1996, the CEO of Mobil set five year targets

for improving environmental, health and safety (EHS) performance "with

the use of a common EHS management system."  In 1998, Mobil Corp.

had over 100 implementation and certification programs worldwide

designed to meet the "ISO 9000" standards.

(d)     In 2000, the United States Department of State and the United Kingdom

Foreign Office, along with NGOs including Amnesty International,

Human Rights Watch, and Business for Social Responsibility, and a group

of leading companies developed the Voluntary Principles on Security and

Human Rights.  ExxonMobil Corp. was invited to participate but chose

not to.  However, ExxonMobil Corp. has since endorsed the Principles and

its "Corporate Citizen Report" states that "detailed guidance for

implementing the principles has been developed and will be applied at

operating sites."  Upon information and belief, ExxonMobil Corp. made

this decision on behalf of all Defendants and other subsidiaries and

affiliates of ExxonMobil Corp.

136.    ExxonMobil Corp. and its controlling principals and other top ExxonMobil Corp.

officials have been continuously involved in ExxonMobil Corp.'s and EMOI's operations in

Indonesia, including through meetings and involvement with Indonesian officials and business

organizations, including:

(a)     Mr. Lucio Noto, Chief Executive Officer of Mobil Corporation

(ExxonMobil Corporation's predecessor), met with the U.S. ambassador

to Indonesia on November 3, 1998 regarding reports linking Mobil Corp. to human rights abuses.

(b)  Harry Longwell, Executive Vice President of ExxonMobil Corp., who worked at ExxonMobil Corp.'s Irving, Texas headquarters, also met with President Megawati Soekarnoputri to discuss security problems in Aceh.[27] Other ExxonMobil Corp. officials who have met with Indonesian officials include Stuart McGill, President of ExxonMobil Production Company, and Rex W. Tillerson, President of ExxonMobil Corp.

(c)  Robert Haines, the Manager of International Affairs, of ExxonMobil Corp., based in Irving, Texas, is the Chairman of the U.S-Indonesia Business Council.  Mr. Haines has led delegations to Jakarta to meet with the Indonesian President and other government officials.

137.  ExxonMobil Corporation's activities in Indonesia are also a subject of concern for the Corporation's U.S. shareholders.  In 2005, shareholders of ExxonMobil Corp. were asked to vote on a proposal by two important institutional shareholders – the New York City Teachers' Retirement System and the New York City Board of Education Retirement System – that ExxonMobil Corp. management "review and report to shareholders by September, 2005, on the corporation's security arrangements with the Indonesian military and private security forces, including support, both monetary and in kind, to the Indonesian government and military."[28] The ExxonMobil Corp. Directors recommended that shareholders vote against the shareholder resolution, and issued a statement that a "standalone Aceh security report is [not] warranted."[29]

---

[27]/ *ExxonMobil Execs Meet Megawati to Discuss Indonesian Security Issues*, Asia Pulse, Aug. 16, 2002.
[28]  *See* Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, ExxonMobil Corporation, Apr. 13, 2005, at 33.
[29]/ *See id.* at 34.

138.    Communications regarding abuses by ExxonMobil security personnel in

Indonesia are formulated in and disseminated from the United States, including as follows:

(a)    Upon information and belief, representatives of ExxonMobil Corp.

corporate headquarters have met with New York City pension funds, as

well with Amnesty International and other non-governmental

organizations, regarding action ExxonMobil Corp. is taking related to

human rights issues in its overseas operations, including, upon information

and belief, abuse issues in Indonesia.[30]

(b)    Andre Madec, Planning Manager for Corporate Public Affairs,

ExxonMobil Corp., has traveled to Indonesia to review ExxonMobil

Corp.'s policies there.

(c)    Houston-based ExxonMobil Corp. spokeswoman Susan Reeves says that

"we have communicated to the government of Indonesia our opposition to

human rights abuse in any form by any organization or individual, as well

as our concern over the violence in Aceh."[31]

139.    Upon information and belief, when ExxonMobil ~~Corp.~~ desired to hire or

otherwise retain additional security personnel for its Aceh facilities, it was ExxonMobil Corp.

management officials based in the United States who made and implemented the decision to do

so.

---

[30]    *See* www.amnestyusa.org/business/xom_background.html. (noting that ExxonMobil has been accused of complicity in human rights abuses through their contract with the Indonesian military to provide security for a natural gas project in the province of Aceh, northern Sumatra and "that to help address these issues, in 1998, Amnesty International USA began actively engaging in campaigning and dialogue with Mobil Oil around these issues.  Following the merger between Mobil and Exxon in 1999, AIUSA continued this approach with ExxonMobil.")

[31]    William Mellor, *Indonesia Seeks $80 Billion as It Fights Corruption*, Bloomberg News, March 24, 2005, at 5.

140.    Defendant ExxonMobil Corp. is fully liable for its own acts and the acts of any subsidiaries, affiliates, divisions or other entities directly or indirectly under its ownership and control, including ~~Defendants~~ Mobil, Mobil Oil and EMOI, as well as other ExxonMobil subsidiaries and affiliates.  Any such subsidiaries, affiliates, divisions or other entities are alter egos of Defendant ExxonMobil Corp., or, alternatively, are in an agency relationship with it. ExxonMobil Corp. is vicariously liable under the doctrine of *respondeat superior* for the acts or omissions of any subsidiaries, affiliates, divisions or other entities under its ownership and control.

**The Parent Company in the United States Acted Through its Agent and Alter Ego EMOI**

141.    ExxonMobil Corporation in the United States acted through its agent and alter ego, EMOI.  The operation was an integrated enterprise.

142.    EMOI acted as the agent of ExxonMobil Corporation, particularly with respect to military security.

143.    EMOI was controlled from the United States by ExxonMobil Corporation, which ran EMOI like a division of the parent companies.  Decision-making authority for all facets of EMOI's operations, including security and the military security, rested with and was exercised by high-level ExxonMobil Corporation executives in the United States.

144.    In particular, ExxonMobil Corporation exerted significant control over EMOI's security.  That control was exercised by the parent's Global Security Division in Fairfax, Virginia, and high-level executives and managers based in Dallas, Houston, and Irving, Texas.

145.    EMOI sought and received ExxonMobil Corporation's approval for key decisions, including the use of military security personnel at EMOI facilities; the organization of EMOI's

security functions; the budget for those functions; the supervisory personnel to put in place; and the locations to which soldiers were to be deployed.

146.    For example, ExxonMobil Corporation controlled EMOI's security budget. Requests for security measures and improvements were submitted to high-level executives in the United States for review, approval and funding.

147.    In addition, ExxonMobil Corp., not EMOI, selected and appointed employees to fill senior security positions at EMOI.

148.    ExxonMobil Corporation, acting in the United States, set standards for EMOI and required uncompromising adherence to those standards.  EMOI adopted and agreed to be bound by these standards.

149.    ExxonMobil Corporation in the United States routinely audited EMOI to ensure compliance with its management systems.

150.    High-level executives and managers in the United States also made decisions about security in Aceh without consulting EMOI and expected EMOI to comply with these decisions, which it did.

151.    ExxonMobil Corporation, acting in the United States, mandated the implementation of particular security measures, including measures related to military security, sometimes over EMOI's objection. ███████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ Final authority over these and other security decisions – including the military security – ultimately rested with these high-level executives and managers in the United States.

152.    Control over security at EMOI rested with and was exercised by these high-level executives in the United States.  Ron Wilson and EMOI's senior security staff sought and received approval from ExxonMobil Corporation in the United States for key security decisions, including the decision to use military security personnel at EMOI facilities; how to organize EMOI's security functions; the budget for those functions; what supervisory personnel to put in place and where to deploy the soldiers.

153.    ExxonMobil Corporation's high level executives in the United States controlled EMOI's budget, including its security budget.  EMOI's budget had to be approved by high-level executives in the United States, and that budget could not be modified without approval from the United States.

154.    ██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████  Projects that could have been financed with EMOI's revenues instead had to be proposed to the Parent Companies, where they competed for funds against projects of other subsidiaries.

155.    EMOI had to make cash calls to ExxonMobil Corporation in the United States to cover its operating and capital expenses.  Requests for security measures and improvements, including requests for the military security, were submitted to high-level executives and legal counsel in the United States for review, approval and funding.  ████████████████████
██████████████████████████████████████████████████████
███████

156.    Day-to-day operations of EMOI, including military security, were also controlled by high-level Parent Company executives in the United States.  EMOI's President sought review and approval of plans for, *inter alia*, acquisitions, negotiations, contracts and agreements, company organization, staffing, projects, drilling, sales of liquefied gas, sponsorships, and security.  Even petty charges like a $500 employee bonus were submitted to high-level executives in the U.S. for approval.  When these executives directed EMOI to perform, or withheld endorsement, EMOI complied.

157.    EMOI was also required to send daily and weekly security reports to the high-level Parent Company executives in the United States.  These reports included information on, *inter alia*, troop numbers, locations, and deployments.

158.    The Parent Companies' high-level executives and managers in the United States evaluated EMOI's security policies and procedures in detail, identifying needed changes, prioritizing key tasks, setting deadlines, and attaching responsibility.  Many of these tasks related to military security.  EMOI's implementation of these changes was audited by the Parent Companies in the United States.

159.    ExxonMobil Corporation, acting in the United States, regularly disseminated security requirements to EMOI.

160.    ███████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████

Public Redacted Copy

161.    EMOI security functions were also shaped in accordance with company-wide policies set by ExxonMobil Corporation in the United States.  ExxonMobil Corporation set standards for EMOI regarding all aspects of its operations, including security, and required uncompromising adherence to those standards.

162.    EMOI was regularly audited by ExxonMobil Corporation to ensure compliance with its management systems.

163.    To satisfy these U.S. security priorities, EMOI required extensive support from the Global Security Department in Fairfax, Virginia, as well as from other divisions in the United States.  Numerous staff members from the United States were rotated through EMOI, while other U.S.-based staff members provided part- and full-time support long-distance.  ExxonMobil Corporation also hired consultants from the United States who provided specialized security services to EMOI.

164.    ExxonMobil Corporation's high-level executives and managers in the United States likewise spent significant portions of their time working on Indonesia.  For example, Lance Johnson, a Parent Company executive, spent fifty percent of his time working on Indonesia, and traveled to Indonesia about every other month.

165.    These high-level executives and managers in the United States were in almost daily contact with staff in Indonesia.

166.    EMOI's formation as an alter ego of the parent company, as well as entry of the agency agreement, occurred in the United States.

167.    EMOI is, and has always been, a wholly-owned subsidiary of the Parent Companies in the United States.  Mobil Oil Corporation, a wholly-owned subsidiary of Mobil

Corporation, incorporated EMOI as a Delaware corporation with an initial capitalization of just $1000. ███████████████████████████████

168.    The Parent Companies, acting from the United States, created and utilized EMOI to undertake the regular business of the Parent Companies – oil and gas production – in Indonesia on the Parents' behalf.

169.    High-level Parent Company executives in the United States selected and approved EMOI's top personnel, including its President, Vice Presidents, and other staff, who were expected to act on the Parent Companies' behalf.  These personnel agreed to, and did, seek the review and approval of high-level executives in the United States for decisions large and small, including decisions related to the military security personnel.

170.    In addition, high-level Parent Company executives in the United States conducted and approved ███████████████████████████████████████ ██████████

171.    ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████  The officers and directors of EMOI and the officers and directors of the Parent Companies also overlapped significantly, and many of EMOI's directors and officers were based in the United States.

172.    EMOI was primarily a production company, and was not equipped to deal with all of its own business operations. ████████████████████████ ████████████████████████████████████████████



. EMOI's financial statements and U.S. tax returns were consolidated with those of the Parent Companies in the United States.

173.

174.   EMOI was operated for the exclusive benefit of the Parent Companies in the United States.

175.   These EMOI-derived revenues for gas and oil sales provided a substantial proportion of the Parent Companies' revenues in the United States.

## V.   INJURIES AND HARM SUFFERED BY PLAINTIFFS

176.   Plaintiff John Doe I resided in Village A, which is located near the Arun Project area.  In January 2001, while riding his bicycle cart to the local market to sell his vegetables, he was accosted by ExxonMobil's security personnel.  Plaintiff John Doe I was detained for nine days, during which time he was tortured by the security personnel.  ExxonMobil security

personnel shot him in the wrist, threw a hand grenade at him and then left him for dead.  Plaintiff

John Doe I suffered severe injuries as a result of this attack, including the loss of his right hand

and left eye and several severe wounds to his body.  In November 2003, John Doe I was killed

during a raid on his village.  John Doe I is survived by Plaintiff Jane Doe V~~his next of kin~~.

Defendants are liable for the conduct described herein.

177.    Plaintiff John Doe II resides in Village B, which is located near the Arun Project

area.  In or about August 2000, while riding on his motorbike, he was stopped on the road by

ExxonMobil's security personnel.  ExxonMobil security personnel put his motorbike in their

truck and then beat him severely on his head and body.  The security providers then tied his

hands behind his back, put a blindfold on him, and threw him in their truck and took him to what

he later learned was Rancong Camp.  The security personnel detained and tortured him there for

a period of three months, all the while keeping him blindfolded.  Plaintiff John Doe II sustained

severe injuries as a result of the beatings inflicted by ExxonMobil security personnel, who also

tortured him using electricity all over his body, included his genitals.  After approximately three

months, the security providers took off his blindfold, took him outside the building where he had

been detained and showed him a large pit where there was a large pile of human heads.

ExxonMobil's security personnel threatened to kill him and add his head to the pile.  Plaintiff

John Doe II eventually was released and he went back to his home. Shortly thereafter,

ExxonMobil security personnel came to his house.  Plaintiff John Doe II escaped, but the

security personnel burned down his house.  Defendants are liable for the acts described herein.

178.    Plaintiff John Doe III resided in Village C, which is located near the Arun Project

area.  In or about July 2000, he was riding his motorbike to visit a refugee camp that is located

near "Point A" of the ExxonMobil LNG complex. The refugee camp houses people who have

been displaced by the destruction of their homes by the ExxonMobil security forces.  As he
approached the camp, ExxonMobil's security personnel shot him in three places on his leg.  He
fell down and lost consciousness.  The security personnel took him to a camp and tortured him
for several hours while he continued to bleed from the gunshot wounds.  The security personnel
broke his kneecap, smashed his skull, and burned him with cigarettes.   The security personnel
then took him to the police headquarters in North Aceh, and the police took him to the hospital
for treatment.  When his wounds were treated, he was returned to the ExxonMobil security
personnel.  ExxonMobil security personnel kept him in custody for approximately one month
and tortured him regularly.  After one month, Plaintiff John Doe III was released.  In November
2002, during a raid on his village, John Doe III, who had been traumatized by the torture he
received at the hands of ExxonMobil's security forces in 2002, drowned while attempting to
escape from the village during the raid.  He is survived by Plaintiff Jane Doe VI~~his next of kin~~.
Defendants are liable for the acts described herein.

179.    Plaintiff John Doe IV resides in Village D, which is located near the Arun Project
area.  In or about July 2000, while he was traveling to a nearby village, he was accosted by
ExxonMobil security personnel.  The security personnel beat him and then handcuffed him and
blindfolded him. They took him to Post A-13 on ExxonMobil's property, where they continued
to torture him by beating him and threatening to kill him.  These soldiers accused him of being
part of GAM, an Acehnese separatist movement.  Plaintiff John Doe IV told the ExxonMobil
security personnel that he is not a member of GAM.  The security personnel nevertheless threw
him to the ground and, using a knife, carved the letters "GAM" into his back.  ExxonMobil
security personnel kept Plaintiff John Doe IV in custody for several weeks, regularly torturing

him and severely injuring him.  He was eventually released.  Defendants are liable for the acts described herein.

180.     Plaintiff John Doe V resides in Village E, which is located near the Arun Project area.  In or about December 2000, ExxonMobil's security personnel came to his house and burned it down.  At that time, the security personnel also physically beat his son and broke his son's leg.  In 2003, after this case was filed, Plaintiff was again abused by ExxonMobil's security personnel, when they took him to one of their posts near Cluster IV of the ExxonMobil complex, where he was kicked and beaten all over his body, sometimes with a piece of wood, causing him severe injuries and ongoing pain.  The security personnel held him for three or four days before he was released.  Defendants are liable for the acts described herein.

181.     Plaintiff John Doe VI resides in Village F, which is located near the Project Arun area.  In or about November 2000, he was accosted by ExxonMobil's security personnel, who took him into custody and accused him of being a member of GAM, an Acehnese separatist movement.  Plaintiff John Doe VI told the security personnel that he is not a member of GAM. The security personnel nevertheless took him to their camp and tortured him for several hours. Among other things, they beat him all over his body with large blocks of wood and shot him in the leg. The security personnel took him to a hospital for treatment, where he stayed for approximately one week.  He was then held by police for four months, after which time his village managed to secure his release.  Defendants are liable for the acts described herein.

182.     Plaintiff John Doe VII resides in Village G, which is located near the Arun Project area.  In or about January 2001, he was accosted by members of ExxonMobil's security personnel.  These security personnel kicked John Doe VII and took him to an office inside the ExxonMobil compound.  There, they beat him with the butt of a gun and a hammer, causing him

to suffer severe injuries.  The next day, the security personnel released him.  Defendants are liable for the acts described herein.

183.     Plaintiff Jane Doe I resides in Village H, which is located near the Arun Project area.  In March 2001, when Plaintiff Jane Doe I was pregnant, a member of ExxonMobil's security personnel forced his way into Jane Doe I's house wielding a rifle.  He threatened to kill her and her unborn child with his gun.  The security personnel then beat and sexually assaulted Plaintiff Jane Doe I.  Defendants are liable for the acts described herein.

184.     Plaintiff Jane Doe II resides in Village I, which is located near the Arun Project area.  In or about December 2000, while her husband John Doe VIII was working in his rice field, members of ExxonMobil's security personnel came to Village B and burned several homes and stores.  The security personnel also opened fire on the field where Jane Doe II's husband was working and killed him.  His murder was an unprovoked and intentional act for which Defendants are liable.

185.     Plaintiff Jane Doe III resides in Village J, which is located near the Arun Project area.  In September 2000, members of ExxonMobil's security personnel kidnapped Plaintiff Jane Doe III's husband, John Doe IX, at gunpoint.  Plaintiff Jane Doe III searched for her husband and made inquiries of Defendants' security personnel, but received no information about his whereabouts or condition.  He has not been found since he was taken away by the security personnel, and Plaintiffs allege that he has been killed by ExxonMobil's security personnel and that he has become yet another victim who has been "disappeared."  His apparent murder was an unprovoked and intentional act for which Defendants are liable.

186.     Plaintiff Jane Doe IV resides in Village K, which is located near the Arun Project area.  In December 2000, ExxonMobil's security personnel, without provocation, shot and killed

her husband, John Doe X, while he was working in the field near their home and in close proximity to her.  His murder was an unprovoked and intentional act for which Defendants are liable.

## VI.    CAUSES OF ACTION

187.    Defendants have exploration and production rights to the Arun Project, of which ExxonMobil Corp. is a part owner.  Pursuant to the contract granting these exploration and production rights and in exchange for ExxonMobil's regularly scheduled payment of fees, ExxonMobil retains personnel for purposes of securing its interests at the Arun Project. ExxonMobil also provides these security personnel with training, supervision, equipment and other resources and support.

188.    In committing the tortious conduct alleged herein, ExxonMobil's security personnel were acting under the supervision of Defendants and/or as Defendants' agents, and/or were acting within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence or subsequent ratification of Defendants.  These security personnel were acting in furtherance of ExxonMobil's financial and corporate interests.

189.    Defendants had reason to know and/or did know the nature and scope of the tortious conduct alleged herein, including the murder, torture, assault and detention of Plaintiffs carried out by ExxonMobil's security personnel, as well as tortious conduct carried out through the use of and benefit from the funding, equipment and other resources provided by ExxonMobil. With this knowledge or probable knowledge, Defendants provided and continue to provide this funding, equipment and other resources to ExxonMobil's security personnel.

190.    The tortious conduct alleged herein, including the murder, torture, assault and detention of Plaintiffs carried out by ExxonMobil's security personnel was reasonably

foreseeable.  Defendants failed to exercise due care in retaining ExxonMobil's security personnel.

191.    Defendants and/or their predecessors acquiesced to tortious conduct, as alleged herein, including the murder, torture, assault and detention of Plaintiffs carried out by ExxonMobil's security personnel.

192.    With respect to all of the causes of action described below, the harm to Plaintiffs was caused by the commissions or omissions of Defendants, including Defendants' retention and supervision of ExxonMobil's security personnel.

**First Cause of Action**
**Wrongful Death**

193.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

194.    Defendants and/or their agents committed wrongful and/or negligent acts or omissions, as alleged herein, which by intent, neglect, and/or default, caused the death of the husbands of Plaintiffs Jane Doe II, Jane Doe III and Jane Doe IV.

195.    Plaintiffs Jane Doe II, Jane Doe III and Jane Doe IV are the heirs at law for their deceased husbands.

196.    Defendants' acts and omissions, including their failure to take affirmative actions aimed at halting or preventing the tortious conduct alleged herein, including the murder, torture, assault and detention of Plaintiffs carried out by ExxonMobil's security personnel caused the deaths of the husbands of Plaintiffs Jane Doe II, Jane Doe III, and Jane Doe IV.

197.    Defendants had a duty of reasonable care toward the husbands of Plaintiffs Jane Doe II, Jane Doe III, and Jane Doe IV to ensure that neither they nor their agents engaged in conduct leading to or likely to lead to foreseeable harm, injury or death of Plaintiffs' husbands,

as described herein.  Defendants failed to use due care to protect the husbands of Plaintiffs Jane

Doe II, Jane Doe III, and Jane Doe IV from foreseeable injury, harm, and death.  Thus,

Defendants proximately caused their wrongful deaths.

198.     The acts described herein constitute wrongful death, actionable under the laws of

the various states, including Delaware, New Jersey, and Texas; and the laws of Indonesia.

**<u>Second Cause of Action</u>**
**Battery**

199.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth

herein.

200.     Defendants and/or their agents committed intentional knowing, and/or reckless

acts which resulted in harmful or offensive contact with the bodies of Plaintiffs John Does I, II,

III, IV, VI, VII, and Jane Doe I.  Plaintiffs did not consent to the contact.

201.     Defendants acted with the intent to cause injury and actually did cause injury,

damage, loss and harm to Plaintiffs John Does I, II, III, IV, VI, VII, and Jane Doe I, including

but not limited to the following injuries:

      (i)      Plaintiff John Doe I's loss of his right hand and left eye and several

severe wounds to his body;

      (ii)     Plaintiff John Doe II's severe injuries suffered as a result of the

beatings inflicted by the ExxonMobil security personnel and the

electricity used all over his body, including his genitals;

      (iii)    Plaintiff John Doe III's gunshot wounds, broken kneecap, smashed

skull, and burns from cigarettes;

     (iv)    Plaintiff John Doe IV's severe injuries suffered from being thrown to the ground and from having a soldier carve the letters "GAM" into his back with a knife;

     (v)    Plaintiff John Doe VI's severe injuries suffered from being beaten and shot in the leg;

     (vi)    Plaintiff John Doe VII's severe injuries suffered from being kicked, beaten with the butt of a gun and a hammer; and

     (vii)    Plaintiff Jane Doe I's severe injuries suffered from when she was beaten and sexually assaulted.

202.    The acts described herein constitute battery, actionable under the laws of the laws of the various states, including the District of Columbia, Delaware, New Jersey and Texas; and the laws of Indonesia.

**Third Cause of Action**
**Assault**

203.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

204.    Defendants and/or their agents intentionally, knowingly and/or recklessly committed or attempted and/or threatened to commit wrongful acts intending to cause harmful or offensive contact with Plaintiffs.  Defendants and/or their agents caused Plaintiffs to imminently fear and/or apprehend such harmful, offensive and/or unlawful contact.  Defendants acted with the intent to threaten and harm and did actually threaten and harm Plaintiffs John Does I, II, III, IV, VI, VII, and Jane Doe I.

205.    Defendants' commissions and omissions, as alleged herein, demonstrated that Defendants had an imminent ability and intent to subject Plaintiffs to an intentional, offensive

**Public Redacted Copy**

and harmful contact.  Defendants knew or should have known that Plaintiffs would regard such intentional and harmful contact as offensive.

206.    Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to Plaintiffs John Does I, II, III, IV, VI, VII, and Jane Doe I.

207.    The acts described herein constitute assault, actionable under the laws of the various states, including the District of Columbia, Delaware, New Jersey and Texas; and the laws of Indonesia.

**Fourth Cause of Action**
**Arbitrary Arrest, Detention and False Imprisonment**

208.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

209.    Defendants, their co-venturers or agents arbitrarily arrested, detained, took into custody, and/or falsely imprisoned Plaintiffs within boundaries fixed by Defendants.  Such arrest, detention, and/or false imprisonment was illegal and unjust, carried on without any other lawful authority or justification.

210.    Plaintiffs John Does I, II, III, IV, VI, and VII were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse, as alleged herein.  Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to Plaintiffs John Does I, II, III, IV, VI, and VII.

211.    These acts constitute arbitrary arrest, detention, and false imprisonment actionable under the laws of the various states, including the District of Columbia, Delaware, New Jersey and Texas; and the laws of Indonesia.

Public Redacted Copy

**Fifth Cause of Action**
**Negligence**

212.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

213.    Defendants had a duty of reasonable care towards Plaintiffs to ensure that neither they nor their agents engaged in conduct leading to or likely to lead to foreseeable harm, injury or death, as described herein.  Defendants failed to use due care to protect the Plaintiffs from foreseeable injury, harm, and death.

214.    Defendants had a duty to Plaintiffs to take ordinary care to ensure that ExxonMobil security personnel whom Defendants retained to perform security services, were not unfit, incompetent or otherwise dangerous to Plaintiffs.

215.    At all relevant times, Defendants and/or their agents, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

216.    Defendants and/or their agents breached the duty of care that they owed Plaintiffs. In engaging in the conduct alleged herein, including the retention of ExxonMobil security personnel, Defendants and/or their agents have not acted as ordinarily prudent and careful persons would act in similar circumstances.

217.    Defendants and/or their agents breached of the duty of care that they owed Plaintiffs is the proximate cause of Plaintiffs' damages, as alleged herein.

~~**Sixth Cause of Action**~~
~~**Intentional Infliction of Emotional Distress**~~

~~218.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.~~

219.    Defendants and/or their agents intentionally committed outrageous and extreme acts, as alleged herein, including the murder, torture, assault and detention of Plaintiffs carried out by ExxonMobil security personnel.  These acts, which are without privilege, were intended to cause and did cause Plaintiffs Jane Does I, II, III, and IV, John Does I, II, III, IV, V, VI, and VII to suffer severe emotional distress.

220.    In the alternative, Defendants engaged in outrageous and extreme acts with reckless disregard for the probability of causing Plaintiffs severe emotional distress and did in fact cause Plaintiffs to suffer severe emotional distress.

221.    Defendants' outrageous and extreme conduct constitutes the intentional and/or reckless infliction of emotional distress and is actionable under the laws of the various states, including the District of Columbia, Delaware, New Jersey and Texas; and the laws of Indonesia.

### Seventh Cause of Action
### Negligent Infliction of Emotional Distress

222.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

223.    At all relevant times, Defendants and/or their agents owed Plaintiffs a duty of care, including the duty not to cause fear or fright to the Plaintiffs.

224.    At all relevant times, Plaintiffs were within a cognizable and foreseeable zone of danger and fear, and thus, at all relevant times, harm and/or injury to the Plaintiffs was reasonably foreseeable if such duty of care was breached.

225.    At all relevant times, Defendants and/or their agents, knew, or reasonably should have known, that the conduct described herein would and did proximately result in Plaintiffs' fear for their safety and in physical and emotional distress to Plaintiffs.

226.    At all relevant times, Defendants and/or agents, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

227.    Despite said knowledge, power, and duty, Defendants and/or their agents negligently failed to act so as to stop engaging in the conduct described herein to prevent or prohibit such conduct, or to otherwise protect Plaintiffs, thereby breaching their duty to Plaintiffs.  To the extent that said negligent conduct was perpetrated by certain Defendants, the remaining Defendants confirmed and ratified said conduct with the knowledge that Plaintiffs' fear and severe emotional and physical distress would thereby increase, and with a wanton and reckless disregard for the deleterious consequences to Plaintiffs.

228.    Plaintiffs Jane Doe II and IV were bystanders and immediately observed the murders of their husbands, which were committed by ExxonMobil security personnel.

229.    As a direct and legal result of Defendants' wrongful acts, Plaintiffs were in fear for their own safety and have suffered and will continue to suffer significant physical consequences, pain and suffering and extreme and severe mental anguish and emotional distress. Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of the various states, including the District of Columbia, Delaware, and New Jersey; and the laws of Indonesia.

### ~~Eighth~~ Sixth Cause of Action
### Negligent Hiring

218.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

**Public Redacted Copy**

219.     Defendants and/or their agents selected, hired, retained and/or contracted with ExxonMobil security personnel to perform work and provide security for the ExxonMobil facilities in Arun.

220.     Defendants had a duty to Plaintiffs to take reasonable care to ensure that ExxonMobil security personnel whom Defendants retained to perform security services, were not unfit, incompetent or otherwise dangerous to Plaintiffs.

221.     Despite actual or constructive knowledge of these characteristics, Defendants hired, retained, and/or contracted with ExxonMobil security personnel to provide security services.  At the time that Defendants selected, hired, retained and/or contracted for the security personnel and at all other relevant times, Defendants knew or reasonably should have known that the security personnel were unfit, incompetent, and/or dangerous and that, as a result, would intentional and/or negligently violate, did violate and would continue to harm Plaintiffs, as alleged herein.

222.     Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting for the security personnel whom Defendants and/or their agents retained to perform this work.  Defendants breached their duty to Plaintiffs, who suffered harm and injury, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

223.     As a direct and proximate result of those violations, Plaintiffs would and did suffer injuries as further alleged herein.

224.     As a direct and proximate result of Defendants' negligent selection, hiring, retention and/or contracting with ExxonMobil security personnel, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

**Public Redacted Copy**

225.    Defendants' conduct constitutes negligent hiring and is actionable under the laws of the various states, including the District of Columbia, Delaware, New Jersey and Texas; and the laws of Indonesia.

**~~Ninth~~ Seventh Cause of Action**
**Negligent Supervision**

226.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

227.    When engaging in the wrongful conduct alleged herein, ExxonMobil security personnel were acting as employees and/or agents of Defendants.

228.    Defendants had a duty to Plaintiffs to take reasonable care to ensure that the ExxonMobil security personnel whom Defendants supervised to perform security services, were not unfit, incompetent or otherwise dangerous to Plaintiffs.

229.    Defendants exercised control over the operative details of the security services provided by the ExxonMobil security personnel, including control over the resources, property, funding and/or equipment used to injure and harm Plaintiffs.

230.    Defendants also had the authority to supervise, prohibit, control, and/or regulate the ExxonMobil security personnel so as to prevent these acts and omissions from occurring. Defendants also had the ability to cease production until such time as the tortious conduct alleged herein were stopped and/or prevented.

231.    Defendants knew or reasonably should have known that the ExxonMobil security personnel would create a risk of harm and actually harm or otherwise violate Plaintiffs' rights, and that, as a direct and proximate result of those violations, Plaintiffs would suffer injuries as alleged herein.

Public Redacted Copy

232.     Defendants knew or reasonably should have known that unless they intervened to protect Plaintiffs and properly supervise, prohibit, control and/or regulate the conduct described herein, the ExxonMobil security personnel would perceive their acts and omissions as being ratified and condoned.

233.     Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate the ExxonMobil security personnel.  Defendants breached their duty to Plaintiffs, who suffered harm and injury, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

234.     As a direct and proximate result of Defendants' negligent supervision of the ExxonMobil security personnel, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

235.     Defendants' conduct constitutes negligent supervision and is actionable under the laws of the various states, including the District of Columbia, Delaware, New Jersey and Texas; and the laws of Indonesia.

### ~~Tenth~~ Eighth Cause of Action
#### Conversion

236.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

237.     As part of the established practices of the ExxonMobil security personnel, homes of villagers near the ExxonMobil facilities in Arun were routinely and systematically burned and destroyed.  Defendants and/or their agents committed wrongful acts or omissions that resulted in the homes of John Doe II and John Doe V being burnt and destroyed.

238.    Defendants thereby deprived Plaintiffs John Doe II and John Doe V of property by wrongful acts and disposition as alleged above.  At the time of the conversion, Plaintiffs John Doe II and John Doe V owned and/or possessed the property.

239.    As a result of Defendants' conversion of Plaintiffs' property, John Doe II and John Doe V were damaged by the loss and/or the loss of the use of their property in an amount to be proven at trial.

240.    Defendants' conduct constitutes conversion and is actionable under the laws of the various states, including the District of Columbia, Delaware, New Jersey and Texas; and the laws of Indonesia.

**Ninth Cause of Action**
**ALIEN TORT STATUTE, 28 U.S.C. § 1350**
**for Extrajudicial Killing; Torture; Cruel, Inhuman and Degrading Treatment; Arbitrary Detention; and Disappearance**

241.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

242.    Plaintiffs are aliens.

243.    Extrajudicial killing; torture; cruel, inhuman and degrading treatment; arbitrary detention; and disappearance are violations of the law of nations.  The norms prohibiting such conduct are norms of international character accepted by the civilized world and defined with specificity. Thus, violations of these norms are cognizable under 28 U.S.C § 1350.

244.    Plaintiffs Jane Doe II, Jane Doe III, and Jane Doe IV, bring claims for extrajudicial killing in violation of the law nations based on the deaths of their husbands at the hands of Defendants' military security personnel.  *See* ¶¶ 184 (Jane Doe II); 185 (Jane Doe III); 186 (Jane Doe IV).  These deliberated killings, which took place while Plaintiffs' husbands were working their fields or after they were kidnapped, were not imposed as lawful punishment

pursuant to a conviction in due process of law, nor were they necessary as a result of exigent circumstances.

245.    The claims of Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV, John Doe V, John Doe VI, John Doe VII, and Jane Doe I, constitute torture in violation of the law of nations based on their torture at the hands of Defendants' military security personnel.  *See* ¶¶ 176 (John Doe I); 177 (John Doe II); 178 (John Doe III); 179 (John Doe IV); 180 (John Doe V); 181 (John Doe VI); 182 (John Doe VII); 183 (Jane Doe I).  These acts of torture included, among other things, being kicked, beaten, burned with cigarettes, electrocuted, sexually assaulted, shot, and carved with a knife.  These acts, which caused Plaintiffs severe mental and physical pain and suffering, were intentionally inflicted for the purpose of obtaining information from, punishing, intimidating, coercing, and/or discriminating against Plaintiffs.

246.    The claims of Plaintiffs Jane Doe I, John Doe I, John Doe II, John Doe III, John Doe IV, John Doe V, John Doe VI, and John Doe VII, as well as Plaintiffs Jane Doe III, Jane Doe IV on behalf of their deceased husband and son, are for cruel, inhuman, or degrading treatment in violation of the law of nations.  *See* ¶¶ 176 (John Doe I); 177 (John Doe II); 178 (John Doe III); 179 (John Doe IV); 180 (John Doe V); 181 (John Doe VI); 182 (John Doe VII); 183 (Jane Doe I);185 (Jane Doe III); 186 (Jane Doe IV).  Plaintiffs or their husband or son were subjected to, among other things, witnessing the torture, severe mistreatment, and killing of an immediate relative; watching as their homes were ransacked and burned; having a grenade thrown at them; being beaten; being electrocuted; being burned with cigarettes; being shot; being carved with a knife; and being sexually abused.  These acts had the intent and effect of causing serious mental and physical pain and suffering to Plaintiffs, grossly humiliating and debating Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and

breaking their physical and/or moral resistance.  Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony.  The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations.

247.    The claims of Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV, John Doe V, John Doe VI, and John Doe VII, for arbitrary detention in violation of international law are based on their unlawful detentions by Defendants' military security personnel.  *See* ¶¶ 176 (John Doe I); 177 (John Doe II); 178 (John Doe III); 179 (John Doe IV); 180 (John Doe V); 181 (John Doe VI); 182 (John Doe VII).  Plaintiffs were all forcibly removed by Defendants' military security personnel to a place where they were detained against their will.  These removals and detentions were done intentionally and with malice to cause Plaintiffs severe mental and physical pain and suffering.  No warrants nor articulable suspicion justified these removals and detentions; plaintiffs were not apprised of any charges against them; and Plaintiffs had no opportunity to challenge any charges at trial.  These acts amounted to kidnapping and arbitrary detention and violated the law of nations.

248.    Plaintiff Jane Doe III brings a claim for the forced disappearance of her husband in violation of international law.  *See* ¶ 185.  Her husband was abducted by Defendants' military security personnel, who have not acknowledged the abduction and detention nor provided information on his fate or whereabouts, intending to and in fact removing him from the protection of the law for a prolonged period of time.

249.    Defendants are directly and vicariously liable for the violations of international law alleged herein.  Defendants are liable for their acts and omissions that led to the injuries described herein in violation of the law of nations.  Defendants' acts and omissions were deliberate and intentional.

250.    The violations described herein were committed by Defendants' agents, military security personnel under Defendants' supervision, direction and control.  The military security personnel acted under the control of and within the scope of their employment by the Defendants.

251.    Defendants were negligent and/or reckless in dealing with the military security personnel.  Defendants ratified the abuses.

252.    Defendants are liable to Plaintiffs in that, *inter alia*, they aided and abetted, participated in a joint or integrated enterprise with, employed, or engaged as agents the military security personnel.

253.    As described in ¶¶ 17, 20, 21, 23-25, 28, 31, 33-44, 54-55, 65, 68-69, 71-72, 45-53, 56-63, 66-67, 70, 73-- 175, the claims touch and concern United States territory.

254.     Plaintiffs are entitled to injunctive relief and to recover compensatory and punitive damages in amounts to be ascertained at trial.

## VII.    DAMAGES

### Compensatory Damages

255.    Plaintiffs are entitled to recover compensatory damages in an amount to be ascertained at trial.

256.    Plaintiffs Jane Doe II, Jane Doe III and Jane Doe IV have sustained pecuniary loss resulting from loss of consortium, society, comfort, attention, services and support of their deceased husbands.

### Punitive Damages

257.    Defendants' unlawful, wanton, reprehensible, reckless and malicious conduct also warrants the imposition of punitive damages in an amount to be determined at trial.

258.     Defendants and/or their agents' tortious conduct alleged herein, including the murder, torture, assault and detention of Plaintiffs and/or their husbands carried out by ExxonMobil security personnel, was intended to and actually did injure Plaintiffs.  Defendants engaged in such outrageous conduct knowingly, willfully, maliciously, unlawfully and/or with reckless indifference and/or gross neglect to the injury and harm Defendants and/or their agents caused Plaintiffs.

259.     Defendants and/or their agents were consciously indifferent and/or consciously aware of the foreseeable result that Plaintiffs would suffer injuries caused by Defendants' and/or their agents' tortious conduct, as alleged herein, including the murder, torture, assault and detention of Plaintiffs and/or their husbands carried out by ExxonMobil security personnel.

## VIII.   <u>DEMAND FOR JURY TRIAL</u>

260.     Plaintiffs demand a trial by jury on all issues so triable.

## IX.     <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request the Court to:

    (a)     enter judgment in favor of each of the Plaintiffs on all counts of the Complaint;

    (b)     declare that Defendants have violated the laws of the various states, including the District of Columbia, and/or Indonesia as set forth herein;

    (c)     award each of the Plaintiffs damages, including compensatory and punitive damages in an amount greater than $75,000;

    (d)     grant each of the Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in abuses against Plaintiffs and their fellow villagers;

**Public Redacted Copy**

(e)      award each of the Plaintiffs the costs of suit including reasonable

attorneys' fees, and

(f)      award each of the Plaintiffs such other and further relief as the Court

deems just under the circumstances.

Dated: November 24, 2014                    Respectfully submitted,


  /s/Agnieszka M. Fryszman

Agnieszka M. Fryszman, DC Bar # 459208
Alysson Ford Ouoba
COHEN, MILSTEIN, SELLERS & TOLL,
P.L.L.C.
1100 New York Avenue, N.W.
West Tower  -  Suite 500
Washington, DC 20005-3964
T:   (202) 408-4600
F:   (202) 408-4699


Terrence Collingsworth, DC Bar # 471830
CONRAD & SHERER LLP
1156 15th Street, N.W.
Suite 502
Washington, D.C. 20005
Tel:   (202) 543-4001
F:   (866) 803-1125


Paul L. Hoffman
SCHONBRUN, DESIMONE,
SEPLOW, HARRIS,
  HOFFMAN & HARRISON LLP
723 Ocean Front Walk
Venice, CA  90291
Tel:  (310) 396-0731
Fax:  (310) 399-7040

*Plaintiffs' Counsel*