**Public Redacted Copy**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr>
<td>

JOHN DOE I, *et al.*,

           **Plaintiffs,**

v.

EXXON MOBIL CORPORATION, *et al.*,

           **Defendants.**

</td>
<td>

**Civ. No. 01-1357 (RCL/AK)**
**Electronically Filed**

**ORAL ARGUMENT**
**REQUESTED**

</td>
</tr>
</table>

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
## LEAVE TO FILE AN AMENDED COMPLAINT AND MOTION TO DISMISS

Jonathan Hacker (Bar No. 456553)
jhacker@omm.com
Rakesh Kilaru (Bar No. 1015310)
rkilaru@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone:  (202) 383-5300

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
800 Bell Street
Houston, TX 77002
Telephone:  (713) 656-5074

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (*pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
Ilana D. Waxman (Bar No. 1012358)
iwaxman@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006-1047
Telephone:  (202) 223-7300

*Attorneys for Defendants Exxon Mobil Corporation*
*and ExxonMobil Oil Indonesia Inc.*

**Public Redacted Copy**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................4

    A. The Indonesian Civil War....................................................................5

    B. EMOI's Operations In Aceh ...............................................................7

    C. EMC's Stewardship Of EMOI From The United States ..................11

ARGUMENT .......................................................................................................12

I.   PLAINTIFFS' ATS CLAIMS MUST BE DISMISSED BECAUSE
    CORPORATIONS CANNOT BE HELD LIABLE UNDER THE ATS ...............13

II. PLAINTIFFS' ATS CLAIMS MUST BE DISMISSED BECAUSE THE U.S.-
    BASED CONDUCT ALLEGED DOES NOT OVERCOME THE PRESUMPTION
    AGAINST EXTRATERRITORIALITY ....................................................16

    A. Under *Kiobel*, ATS Jurisdiction Must Be Based On Actionable *Conduct* Within
       The United States, Not Just U.S. Corporate Citizenship ....................16

    B. Plaintiffs Do Not Allege That EMOI Committed Actionable Conduct Within The
       U.S. ...................................................................................................18

    C. Plaintiffs Do Not Allege That EMC Committed Actionable Conduct Within The
       U.S. ...................................................................................................20

       1. Plaintiffs Fail To Allege Facts Establishing Direct Liability Against EMC
          Based On Its Conduct In The United States ....................................20

       2. EMC's Alleged U.S.-Based Conduct Does Not Give Rise To An Aiding And
          Abetting Claim...............................................................................23

          (a) The Complaint Does Not Allege Facts Establishing That EMC's U.S.-
              Based Acts Were Committed With The Requisite Mens Rea ...............24

              (i) "Purpose" Is The Only Mens Rea Standard With The Required
                 Universal Acceptance, And Plaintiffs Do Not Attempt To Allege A
                 "Purpose" Mens Rea...............................................................24

              (ii) Even Under The Lesser "Knowledge" Standard That Lacks Universal
                 Acceptance, Plaintiffs Still Fail To Allege Facts Sufficient To
                 Establish Mens Rea...............................................................28

              (b) The Complaint Does Not Allege Facts Establishing That EMC's U.S.-
              Based Acts Constituted The Necessary Actus Reus For Aiding And
              Abetting ............................................................................32

              (i) "Specific Direction" Is The Only Actus Reus Standard With The
                 Required Universal Acceptance, And Plaintiffs Do Not Attempt To
                 Allege The "Specific Direction" Actus Reus....................................32

**Public Redacted Copy**

(ii) Even Under The Lesser "Substantial Assistance" Standard That Lacks Universal Acceptance, Plaintiffs Still Fail To Allege Facts Sufficient To Establish Actus Reus ...................................................................36

III. THE AMENDED COMPLAINT FAILS TO ALLEGE ANY INTERNATIONAL LAW VIOLATIONS COGNIZABLE UNDER THE ATS.....................................................39

  A. Plaintiffs' ATS Claims Must Be Dismissed Because Plaintiffs Have Abandoned Any Allegations Of State Action Or Action Under Color Of Law....................................39

  B. "Arbitrary Detention," "Disappearance," And "Cruel Treatment" Are Not Universal And Specific As Required By *Sosa*.................................................................40

  C. Common Law "Extrajudicial Killing" And "Torture" Claims Are Displaced By The TVPA And Are Not Universally Recognized In This Context ....................................42

CONCLUSION...........................................................................................................44

Public Redacted Copy

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*,
  219 F.3d 519 (6th Cir. 2000) ................................................................28

*Agee v. Muskie*,
  629 F.2d 80 (D.C. Cir. 1980), *rev'd on other grounds*, 453 U.S. 280 (1981) ...........5

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010) .........................................................44

*Al-Quaraishi v. Nakhla*,
  728 F. Supp. 2d 702 (D. Md. 2010) ...............................................39, 40

*Al-Shimari v. CACI Premier Tech., Inc.*,
  758 F.3d 516 (4th Cir. 2014) .........................................................20, 21

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
  416 F.3d 1242 (11th Cir. 2005) ....................................................41, 42

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................13

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) ........................................................26, 27

*Balintulo v. Daimler AG*,
  727 F.3d 174 (2d Cir. 2013)................................................17, 20, 22

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ..........................................................................14

*Calvert v. Huckins*,
  875 F. Supp. 674 (E.D. Cal. 1995) ..................................................18

*Cardona v. Chiquita Brands Int'l, Inc.*,
  760 F.3d 1185 (11th Cir. 2014) .............................16, 17, 19, 20

*In re Chiquita Brands Int'l, Inc. ATS & S'holder Deriv. Litig.*,
  792 F. Supp. 2d 1301 (S.D. Fla. 2011) ...........................................42

*Chowdhury v. WorldTel Bangladesh Holding, Ltd.*,
  746 F.3d 42 (2d Cir. 2014)..........................................................13, 20

Public Redacted Copy

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981) ........................................................................................42

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ..........................................................................................14

*Dickerson v. Dist. of Columbia,*
    806 F. Supp. 2d 116 (D.D.C. 2011) ..............................................................12

*Doe I v. Exxon Mobil Corp.,*
    393 F. Supp. 2d 20 (D.D.C. 2005), *aff'd in part, rev'd in part,* 654 F.3d 11
    (D.C. Cir. 2011), *vacated,* 527 F. App'x 7 (D.C. Cir. 2013) .......................*passim*

*Doe I v. Exxon Mobil Corp.,*
    573 F. Supp. 2d 16 (D.D.C. 2008) ..................................................................7

*Doe I v. Nestle USA, Inc.,*
    766 F.3d 1013 (9th Cir. 2014) ..........................................................25, 26, 32

*Doe I v. Unocal Corp.,*
    395 F.3d 932 (9th Cir. 2002) ..........................................................................31

*Doe VIII v. Exxon Mobil Corp.,*
    654 F.3d 11 (D.C. Cir. 2011), *vacated,* 527 F. App'x 7 (D.C. Cir. 2013) ......*passim*

*Eastman Kodak Co. v. Kavlin,*
    978 F. Supp. 1078 (S.D. Fla. 1997) ..............................................................41

*Enahoro v. Abubakar,*
    408 F.3d 877 (7th Cir. 2005) ..........................................................................43

*Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank,*
    552 F. App'x 13 (2d Cir. 2014) ......................................................................22

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995) ............................................................................19

*Foman v. Davis,*
    371 U.S. 178 (1962) ........................................................................................12

*Forti v. Suarez-Mason,*
    694 F. Supp. 707 (N.D. Cal. 1998) ....................................................40, 41, 42

*Gacumbitsi v. Prosecutor,*
    No. ICTR-2001-64-A, Appeal Judgement (July 7, 2006) ............................31

*Garcia v. Chapman,*
    911 F. Supp. 2d 1222 (S.D. Fla. 2012) ..........................................................39

**Public Redacted Copy**

*Giraldo v. Drummond Co., Inc.,*
  No. 2:09-CV-1041, 2013 WL 3873960 (N.D. Ala. July 25, 2013) .........................................20

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983) ........................................................................................28, 31

*Jacobs v. Vrobel,*
  724 F.3d 217 (D.C. Cir. 2013) ................................................................................................30

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
  961 F. Supp. 2d 185 (D.D.C. 2013) ........................................................................................12

*Khulumani v. Barclay Nat'l Bank Ltd.,*
  504 F.3d 254 (2d Cir. 2007) ...........................................................................................25, 27

*Kiobel v. Royal Dutch Petroleum Co.,*
  621 F.3d 111 (2d Cir. 2010), *aff'd on other grounds* 133 S. Ct. 1659 (2013) .................13, 14

*Kiobel v. Royal Dutch Petroleum Co.,*
  133 S. Ct. 1659 (2013) .............................................................................................. *passim*

*Mastafa v. Chevron Corp.,*
  770 F.3d 170 (2d Cir. 2014) ...................................................................................... *passim*

*Meijer, Inc. v. Biovail Corp.,*
  533 F.3d 857 (D.C. Cir. 2008) .................................................................................................5

*Miles v. Apex Marine Corp.,*
  498 U.S. 19 (1990) ...................................................................................................................15

*Mohamad v. Palestinian Auth.,*
  132 S. Ct. 1702 (2012) .......................................................................................................14, 15

*Morrison v. Nat'l Australian Bank Ltd.,*
  561 U.S. 247 (2010) .................................................................................................................17

*Mujica v. AirScan Inc.,*
  771 F.3d 580 (9th Cir. 2014) ...........................................................................16, 17, 20, 30

*Mujica v. Occidental Petroleum Corp.,*
  381 F. Supp. 2d 1164 (C.D. Cal. 2005), *aff'd on other grounds,* 771 F.3d 580 .....................42

*Ndindiliyimana v. Prosecutor,*
  Case No. ICTR-00-56-A, Appeal Judgement (Feb. 11, 2014) ....................................28, 30, 37

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
  582 F.3d 244 (2d Cir. 2009)............................................................................3, 25, 26, 27

**Public Redacted Copy**

*Prosecutor v. Blagojević & Jokić,*
    No. IT-02-60-A, Appeal Judgement (May 9, 2007) ........................................................28, 30

*Prosecutor v. Blaškić,*
    No. IT-95-14-A, Appeal Judgement (July 29, 2004) ..............................................................28

*Prosecutor v. Mrkšić & Šljivančanin,*
    No. IT-95-13/1-A, Appeal Judgement (May 5, 2009) ............................................................28

*Prosecutor v. Orić,*
    Case No. IT-03-68-A, Appeal Judgement (July 3, 2008) ......................................................28

**Prosecutor v. Perišić,*
    Case No. IT-04-81-A, Appeal Judgement (Feb. 28, 2013) ..............................................*passim*

*Prosecutor v. Perišić,* Case No. IT-04-81-A, Decision on Motion for
    Reconsideration (Mar. 20, 2014) .........................................................................................36

*Prosecutor v. Šainović,*
    Case No. IT-05-87-A, Appeal Judgement (Jan. 23, 2014) ........................................35, 36, 37

*Reese v. Loew's Madison Hotel Corp.,*
    Civ. A. No. 13-1331, --- F. Supp. 2d ---, 2014 WL 4248195
    (D.D.C.Aug. 28, 2014) ........................................................................................................12

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,*
    682 F.3d 1043 (D.C. Cir. 2012) ..............................................................................13, 22, 29

*Saha v. George Wash. Univ.,*
    577 F. Supp. 2d 439 (D.D.C. 2008) ......................................................................................4

**Saldana v. Occidental Petroleum Corp.,*
    No. 12-55484, --- F.3d ---, 2014 WL 7012444 (9th Cir. Dec. 15, 2014)..........................10, 22

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985) ............................................................................................39

*Sikhs for Justice, Inc. v. Nath,*
    No. 14-1724-cv, --- F. App'x ---, 2014 WL 7232492 (2d Cir. Dec. 19, 2014) ......................22

**Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) .......................................................................................................*passim*

*Ungar v. Islamic Republic of Iran,*
    211 F. Supp. 2d 91 (D.D.C. 2002) ......................................................................................28

*United States v. Bestfoods,*
    524 U.S. 51 (1998) ..............................................................................................................18

**Public Redacted Copy**

*United States v. Smith,*
  18 U.S. (5 Wheat.) 153 (1820)......................................................................................25

*Van de Berg v. Soc. Sec. Admin.,*
  No. 08-5528, 2009 WL 2568738 (D.C. Cir. Apr. 28, 2009)....................................12

*Wiwa v. Royal Dutch Petroleum Co.,*
  No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002).............................41

*Xuncax v. Gramajo,*
  886 F. Supp. 162 (D. Mass. 1995)...........................................................................41

*Youkelsone v. Fed. Deposit Ins. Corp.,*
  910 F. Supp. 2d 213 (D.D.C. 2012).............................................................................5

## STATUTES

28 U.S.C. § 1350............................................................................................. *passim*

Fed. R. Civ. P. 12.................................................................................................1, 12, 13

Pub. L. No. 102–256, 106 Stat. 73 (1992) ................................................................42

Rome Statute of the Int'l Crim. Ct., July 17, 1998, 2187 U.N.T.S. 90.........................25

Statute of the Int'l Crim. Trib. for the Former Yugoslavia, U.N. Doc. S/25704
  annex (May 3, 1993)...............................................................................................43

Statute of the Int'l Crim. Trib. for Rwanda, U.N. Doc. S/RES/955 annex
  (Nov. 8, 1994).......................................................................................................43

**Public Redacted Copy**

Defendants Exxon Mobil Corporation ("EMC") and ExxonMobil Oil Indonesia Inc. ("EMOI") (collectively, "Defendants" or "Exxon"), respectfully submit this opposition to Plaintiffs' motion for leave to file an amended complaint as to their claims under the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS"), and motion to dismiss the Proposed Second Amended Complaint ("PSAC") under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

The claims in this case arise from an active, hostile, decades-long civil war between the Government of Indonesia and rebel separatists in Indonesia's Aceh Province. In the midst of this conflict, Mobil Oil of Indonesia ("MOI") entered into a business venture with the Government of Indonesia to operate a facility in Aceh to cultivate Indonesian natural gas resources. Under the terms of the agreement, MOI was required to rely on an Indonesian governmental entity—Pertamina—to protect the facility and MOI's personnel. Military activity near the facility was routine during the war—the rebel separatists treated the facility as a target for guerilla attacks, and committed acts of violence both there and nearby. Indonesian soldiers were likewise accused by some international observers of committing assaults and other abuses against unnamed civilians in the course of the violent conflict. But Plaintiffs do not and cannot allege that MOI, or its successor EMOI, or the latter's U.S.-based corporate parent EMC, encouraged the soldiers to commit those abuses—███████████████████ ██████████████████████████████████████████ Plaintiffs have also admitted that EMC or EMOI "have *nothing to do* with . . . who ordered or who personally and directly harmed" them. Dkt. No. 160, at 34:20-35:03 (emphasis added). Instead, the most Plaintiffs can concretely allege about what EMOI and EMC knew and did is that they continued to rely on the Government of Indonesia to provide security for the facility in Aceh

Public Redacted Copy

during the rebel hostilities, while knowing that certain unnamed Indonesian soldiers in the area had been accused of unspecified abuses against unknown civilians. Nothing in Plaintiffs' latest amended complaint, in other words, shows that EMOI or EMC committed any conduct on U.S. soil that constituted a violation of international law or that aided and abetted a violation by someone else.

Plaintiffs' ATS claims must be dismissed for three independent reasons. *First*, corporations cannot be held liable under the ATS. The Supreme Court has made clear that the ATS permits enforcement only of norms that "civilized nations" recognize as "specific, universal, and obligatory," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (quotation omitted), and corporate liability does not come close to meeting that standard. Recognizing corporate liability for ATS claims would also be an improper extension of federal common law because the Supreme Court has foreclosed corporate liability in similar contexts. So has Congress: a federal statute (the Torture Victim Prevention Act, 28 U.S.C. § 1350 ("TVPA")) creates an *express* cause of action for torture and extrajudicial killing that is limited to natural persons, precluding recognition of a broader, *implied* cause of action under the ATS.

*Second*, the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), makes clear that the ATS at most permits jurisdiction where a defendant's conduct *in the United States* is actionable under international law. There is no dispute that the purported international law violations on which Plaintiffs' claims are based were allegedly committed by Indonesian soldiers against Indonesian plaintiffs on Indonesian soil during their long civil war. Post-*Kiobel* decisions have—without exception—rejected efforts to impose derivative liability on multinational corporations through the ATS for alleged atrocities committed on foreign soil. This case should not be the first exception: Plaintiffs' allegations do

Public Redacted Copy

not establish an adequate connection between the alleged offenses committed abroad by a foreign sovereign and U.S. conduct by either EMOI or EMC.

As to EMOI—which operated in Indonesia—Plaintiffs barely allege any U.S. conduct at all, much less U.S. conduct giving rise to international law violations.

As to EMC—which was headquartered in the United States—Plaintiffs allege no acts on U.S. soil that themselves constituted violations of international law. Nor do they identify any U.S. acts that constitute aiding and abetting the alleged offenses committed by Indonesian soldiers in Indonesia. The ATS does not even permit aiding and abetting liability where, as here, the primary conduct was committed by a foreign sovereign on its own soil. Even assuming federal courts may recognize such claims under the ATS, they may only do so according to universally recognized norms. Plaintiffs do not even attempt to satisfy the only aiding and abetting standard that has universal acceptance among civilized nations: proof that the defendant acted with the *purpose* of facilitating human rights violations, and committed "acts *specifically directed* to assist . . . the perpetration of a certain specific crime." *Prosecutor v. Perišić*, Case No. IT-04-81-A, Appeal Judgement ¶ 26 (Feb. 28, 2013) (Oh Decl., Ex. 1)[1] (quotation omitted); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009). Plaintiffs instead allege that aiding and abetting liability is proper where the defendant had a less culpable mens rea (*i.e.*, knowledge rather than purpose) and actus reus (*i.e.*, substantial assistance rather than specific direction), but international law authorities do not universally agree that such proof suffices to state a claim. And even as to the much-disputed "knowledge"

---

[1]   For the Court's convenience, certain materials referred to in this Memorandum are attached as exhibits to the accompanying Declaration of Alex Young K. Oh ("Oh Decl.").

Public Redacted Copy

and "substantial assistance" standards, Plaintiffs fail to allege facts concerning U.S. conduct sufficient to establish aiding and abetting liability.

*Third*, Plaintiffs' ATS claims fail for the distinct reason that they do not allege any international law violations cognizable under federal common law. Plaintiffs urge the Court to recognize claims for torture, extrajudicial killing, arbitrary detention, disappearance, and cruel, inhuman, and degrading treatment. But state action (or action under color of law) is an essential element of all of those claims, and Plaintiffs have abandoned such allegations, instead resting their claims on a theory that Indonesian soldiers were acting as private security for Exxon. Further, some of Plaintiffs' claimed international law violations are precluded by the TVPA, and all are foreclosed by *Sosa*'s requirement that a norm be "specific, universal, and obligatory" before it will be recognized under federal common law.

Leave to amend should be denied, and Plaintiffs' ATS claims should be dismissed.

## BACKGROUND

The parties have extensively recounted the facts underlying Plaintiffs' ATS claims. *See, e.g.*, Dkt. No. 426-1, at 3-13; Dkt. No. 434, at 2-11. Exxon incorporates by reference its recitation of the factual background and procedural history in this case, Dkt. No. 426, at 3-13, and sets forth in the following section only those facts necessary to address the flaws in Plaintiffs' Motion for Leave to Amend ("Mem.") and PSAC. All of the factual assertions below—which are assumed to be true solely for the purposes of this motion—arise from the allegations in the complaint, documents "attached to or incorporated in the complaint, and matters of which [the court] may take judicial notice." *Saha v. George Wash. Univ.*, 577 F. Supp. 2d 439, 442 (D.D.C. 2008) (Lamberth, J.) (quotation omitted). This Court may take

4

Public Redacted Copy

judicial notice of items in the record of the case. *See Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 n.* (D.C. Cir. 2008) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357). The Court also may take judicial notice of "historical, political, or statistical facts, or any other facts that are verifiable with certainty." *Youkelsone v. Fed. Deposit Ins. Corp.*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012); *see also Agee v. Muskie*, 629 F.2d 80, 81 n.1, 89-90 (D.C. Cir. 1980) (taking judicial notice of facts generally known and reported in newspaper articles), *rev'd on other grounds*, 453 U.S. 280 (1981). Moreover, "due to the unique character of the ATS as a jurisdictional statute that derives substantive meaning from customary international law," the Court must "'glimps[e]' at the merits at the jurisdictional stage, . . . [to] ensure[] that the conduct alleged in a complaint may properly be relied upon by the court in conducting its extraterritoriality analysis." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 186 (2d Cir. 2014).

A.      **The Indonesian Civil War**

Plaintiffs' latest complaint omits a critical, overarching, and undisputed point:  all of the events in this case took place during an active civil war in the Aceh province.  Soon after Indonesia declared independence from the Dutch in 1949, tensions erupted between the largely Muslim territory of Aceh and the largely Christian territory of North Sumatra, leading the Indonesian government in 1959 to grant the Aceh territory a degree of autonomy as a "special territory." *See Doe VIII v. Exxon Mobil Corp.*, No. 07-1022 (D.D.C.), Dkt. No. 20-25 ¶ 12. Since the 1970s, a separatist movement known as the "Free Aceh Movement" or "GAM" fought the Government of Indonesia to "obtain Aceh's independence" and "free[dom] from the historical oppression by the Government."  Dkt. No. 3 ¶ 37 (original complaint); Larry Niksch, Cong. Research Serv., RS20572, Indonesian Separatist Movement in Aceh, at 1 (2002) (Oh

**Public Redacted Copy**

Decl., Ex. 2) ("Indonesian Separatist CRS Report"). GAM's "major separatist insurgency"

involved a rebel "military force estimated at 3,000-4,000" that routinely employed "guerrilla-

style attacks." Indonesian Separatist CRS Report, at 1. In particular, GAM "us[ed] heavy-

handed and abusive tactics against civilians and . . . attack[ed] schools and economic

infrastructure." *Id.* at 2. The violent activities of this "separatist movement" prompted the

Government to deploy "more than 30,000 troops" in Aceh to "squelch [the] movement." Dkt.

No. 3 ¶ 37; *see also* Indonesian Separatist CRS Report, at 4-5. The conflict lasted for three

decades. Dkt. No. 3 ¶ 38.[2]

In light of the civil war, then-President of Indonesia General Suharto "designated

Aceh as a 'military operational area,' also known by the Indonesian acronym 'DOM,' and

directed the Indonesian military to occupy the province." *Id.* The Indonesian military was also

tasked with protecting several industrial sites in Aceh that the Government of Indonesia had

deemed vital to the national interests of Indonesia. Among those sites was PT Arun, LNG ("PT

Arun") a natural gas liquefaction facility that was and is majority-owned by the Government of

Indonesia, *see* Dkt. No. 3 ¶ 29.[3] Military protection was necessary at these sites because GAM

routinely attacked them in order to provoke the Indonesian military and assert GAM's

---

[2]  The conflict ended in 2005, after the devastating Indian Ocean tsunami claimed more than 120,000 lives in Aceh. *See* Memorandum of Understanding between the Government of the Republic of Indonesia and the Free Aceh Movement, August 15, 2005 (Oh Decl., Ex. 3); *see also* Amy Waldman, *Thousands Die as Quake-Spawned Waves Crash onto Coastlines Across Southern Asia*, N.Y. Times (Dec. 27, 2004) (Oh Decl., Ex. 4); Seth Mydans, *After the Tsunami, Rebuilding Paradise*, N.Y. Times (Apr. 24, 2005) (Oh Decl., Ex. 5).

[3]  Plaintiffs initially named PT Arun as a defendant. Dkt. No. 3 ¶ 29. Judge Oberdorfer dismissed PT Arun on October 14, 2005, concluding that adjudicating PT Arun's liability "would create a significant risk of interfering in Indonesian affairs and thus U.S. foreign policy concerns." *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005) (Oberdorfer, J.) (Dkt. No. 103), *aff'd in part, rev'd in part*, 654 F.3d 11 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013). Plaintiffs have not challenged PT Arun's dismissal.

Public Redacted Copy

independence.  *See* Indonesian Separatist CRS Report 1-2 ("GAM has been criticized . . . for

attacking schools and economic infrastructure."); *Provincial Violence Erupts*, THE AUSTRALIAN

(Oct. 26, 1999) (Oh Decl., Ex. 6) ("Attacks on government property have been on the rise in

Aceh, as have clashes between the military and the Free Aceh Movement.").

### B.    EMOI's Operations In Aceh

In 1971, MOI discovered a large deposit of natural gas in Aceh ("Arun Field").

PSAC ¶ 23.  Despite the common name, the Arun Field is distinct from PT Arun LNG in a

critical respect:  MOI operated the Arun Field (a natural gas extraction site), whereas the

Indonesian government operated and controlled PT Arun (a liquefaction site).  *Id.*  The Rancong

Camp—a site of alleged war crimes by Indonesian soldiers described in the complaint, *id.*

¶ 177—was located next to PT Arun, *not* the Arun Field, *see id.* ¶ 41.  ██████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

The Court has already determined that whatever oversight Mobil Corp. exercised

over MOI concerning the negotiation and execution of the PSC was insufficient to impose any

aiding and abetting liability on Mobil Corp.  *Doe I v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 32

(D.D.C. 2008) (Oberdorfer, J.) (Dkt. No. 365).  And for good reason.  ██████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*Public Redacted Copy*

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Because the GAM rebels frequently attacked industrial sites vital to the

Indonesian economy, as well as individuals working at them, *see supra* at 6-7, it was essential to

obtain security for the Arun Field. ████████████████████████

████████████████████████████████████████

████████████ *see also* The Safeguarding of National Vital Projects, Presidential Decree

No. 63/2004 (Aug. 5, 2004), art. 4 (Oh Decl., Ex. 8); Dkt. No. 268-1, Ex. 43 (Indonesia Law No.

20/1982, as amended by Law No. 1/1988). ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

─────────────────

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Public Redacted Copy**

Indeed, neither MOI nor EMOI—MOI's successor entity[5]—ever exercised any control over Indonesian troops.  Some troops in the Aceh province were provided by Pertamina, and others were there for other reasons. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

Notwithstanding its lack of authority to select, train, command, or control the security personnel assigned to it by Pertamina, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

---

[5]   In late 1999, Exxon Corporation merged with Mobil Corporation, then an indirect parent corporation of MOI, to form defendant EMC.  PSAC ¶¶ 17, 20.  EMC thus became the indirect parent corporation of MOI, but only after the PSC already had been negotiated and executed by MOI with Mobil Corp.'s oversight.  After the merger, EMOI succeeded MOI.  EMOI was a Delaware corporation when Plaintiffs initiated this action in 2001, PSAC ¶ 20; since 2005, it has been incorporated in the Cayman Islands, *see Doe VIII v. Exxon Mobil Corp.*, No. 07-1022 (D.D.C.), Dkt. No. 4 ¶ 16; *Doe VIII v. Exxon Mobil Corp.*, No. 07-1022 (D.D.C.), Dkt. No. 20-20.  At all times relevant to the PSAC, EMOI has maintained its principal place of business in Jakarta, Indonesia.  PSAC ¶ 20.

**Public Redacted Copy**

Not only did EMOI request Pertamina to provide security in accordance with all applicable laws, it affirmatively participated in community development projects aimed at assisting any victims of the war regardless their political affiliations. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████

While EMOI lacked any ability to control the Indonesian military, which was engaged in a war, it did what it could whenever it became aware of security incidents in or near the Arun Field by promptly reporting such incidents to Pertamina and requesting that Pertamina investigate such matters. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████ Such security reports ensure that "the government can respond" to local threats, but they "do not equal control." *Saldana v. Occidental Petroleum Corp.*, No. 12-55484, --- F.3d ---, 2014 WL 7012444, at *9 (9th Cir. Dec. 15, 2014).  The reported security incidents demonstrate that EMOI reported both military violence against civilians and EMOI, and reciprocal violence by GAM against Indonesian soldiers and police officers.  The heavy fighting between the Indonesian troops and the Aceh separatists did not cease, however, and ultimately EMOI shuttered operations in Aceh in March 2001.  PSAC ¶ 32; Dkt No. 3 ¶ 45.

10

C.    **EMC's Stewardship Of EMOI From The United States**

As noted above, EMC became the indirect parent corporation of EMOI following the merger with Mobil Corp. in late 1999. Following the merger, EMC in the United States exercised routine parent company stewardship of EMOI. EMC's oversight was focused on security issues during the relevant period, for the simple reason that EMOI was operating in an active war zone, creating—among other things—serious safety concerns for EMOI employees. EMC therefore requested and received regular reports of security incidents occurring in the Aceh region, *see* PSAC ¶¶ 46-53; offered resources and expertise from the Global Security function in the United States to assist EMOI in finding ways to improve the security situation for its employees, *see id.* ¶¶ 76-78, 84, 106-129, 150-152, 163; exercised shareholder stewardship over EMOI's cost expenditures, including costs incurred relating to security, *see id.* ¶¶ 86, 89-95, 146, 153-155; and coordinated various public affairs issues arising from the civil conflict in Aceh, which had an impact on EMC's overall corporate reputation, *see id.* ¶¶ 99-103.

The key point is that EMC's activities in the U.S. were exercised in the normal course of corporate parent supervision and to ensure the safety of EMOI's employees. Plaintiffs do not allege otherwise. Indeed, at a May 2006 discovery conference, Plaintiffs disavowed any claim that EMC or EMOI ever intended to harm them, or even knew who they were. As Plaintiffs' counsel explained:

> MR. COLLINGSWORTH: We've not said any [Exxon employees] ever met our clients, had anything to do directly with going out and ordering people to do things in terms of the security force. . . . They have nothing to do with this particular question of who ordered or who personally and directly harmed our clients.

Dkt. No. 160, at 34:20-35:3. Counsel added that "[t]here's none of these [Exxon] folks, we're certain, that have ever met our clients, that have ever ordered our clients to be harmed." *Id.* at

Public Redacted Copy

45:21-22. Rather, according to counsel, Plaintiffs' "theory of the case is primarily one of having set up a project in such a way with a security force that is dangerous." *Id.* at 45:16-18.

## ARGUMENT

Plaintiffs' motion for leave to amend should be denied because the proposed amended complaint fails to establish this Court's jurisdiction and fails to state any claims for relief under the ATS. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave to amend improper where amendment would be "futil[e]"); *Van de Berg v. Soc. Sec. Admin.*, No. 08-5528, 2009 WL 2568738, at *1 (D.C. Cir. Apr. 28, 2009) (same); *Reese v. Loew's Madison Hotel Corp.*, Civ. A. No. 13-1331, --- F. Supp. 2d ---, 2014 WL 4248195, at *4 (D.D.C. Aug. 28, 2014) (same); *see also Dickerson v. Dist. of Columbia*, 806 F. Supp. 2d 116, 118 (D.D.C. 2011) ("An amendment is futile if the proposed claim would not survive a motion to dismiss.") (quotation omitted).

When ruling on a motion to dismiss under Rule 12(b)(1) for lack of jurisdiction, courts "must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor, and presuming that general allegations embrace those specific facts that are necessary to support the claim." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 961 F. Supp. 2d 185, 193-94 (D.D.C. 2013) (Lamberth, J.) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)). The "jurisdictional analysis need not take into account allegations that, on their face, do not satisfy basic pleading requirements." *Mastafa*, 770 F.3d at 190. In a case involving claims under the ATS, the Court must also determine that the plausible allegations in the complaint "satisfy the standard for alleging a violation of the law of nations or aiding and abetting such a violation," because jurisdiction under the ATS "can only properly be asserted over conduct that is in fact a violation of customary international law or aiding and abetting a violation." *Id.* at 186.

Public Redacted Copy

Under Rule 12(b)(6), a complaint must be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)); *see also RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see also RSM Prod. Corp.*, 682 F.3d at 1048. A plaintiff cannot prevail on an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## I.    PLAINTIFFS' ATS CLAIMS MUST BE DISMISSED BECAUSE CORPORATIONS CANNOT BE HELD LIABLE UNDER THE ATS

As the Second Circuit has correctly recognized, the ATS does not permit claims against corporations. *See Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 746 F.3d 42, 49 n.6 (2d Cir. 2014). The Supreme Court's decision in *Sosa* makes clear that the ATS permits enforcement only of customary international law norms that are "specific, universal, and obligatory." 542 U.S. at 732 (quotation omitted). That restriction applies not only to "the substantive content of . . . tort[s] but also [to] the categories of defendants who may be sued." *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 81 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (citing *Sosa*, 542 U.S. at 732 n.20), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013). And "customary international law does not impose liability against corporations *at all*." *Id.* at 83 (emphasis added). Every international tribunal beginning with Nuremberg has extended liability only to natural persons. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 120 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013) ("[M]odern international law tribunals make it

13

Public Redacted Copy

abundantly clear that, since Nuremberg, the concept of corporate liability for violations of customary international law has not even begun to ripen[] into a universally accepted norm of international law."). There is accordingly no basis for holding EMOI and EMC liable under the ATS: "It is inconceivable that a defendant who is *not liable* under customary international law could be *liable* under the ATS." *Id.* at 122; *see also Doe VIII*, 654 F.3d at 85 (Kavanaugh, J., dissenting) (corporate liability under the ATS "frankly makes little sense" in light of international law consensus).

Federal common law already rejects corporate liability in the context most analogous to ATS actions: implied actions under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), to enforce constitutional guarantees against federal agents. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70-71 (2001) (no corporate liability in *Bivens* actions); *see also Sosa*, 542 U.S. at 742-43 (Scalia, J., concurring in judgment) ("*Bivens* provides perhaps the closest analogy" to ATS suits). In *Malesko*, the Supreme Court declined to extend *Bivens* to corporations acting under color of law based in part on the need for "caution toward extending *Bivens* remedies into any new context." 534 U.S. at 74. The same reasoning applies here—case after case emphasizes "the need for judicial caution" in expanding the scope of the ATS, "in light of foreign policy concerns." *Kiobel*, 133 S. Ct. at 1664; *see also Sosa*, 542 U.S. at 727-28 (courts must exercise "great caution" in "craft[ing] remedies for the violation of new norms of international law").

Finally, Congress itself established a critical guidepost for the content of federal common law under the ATS when it enacted the TVPA, which provides an express cause of action *under the ATS* for torture and extrajudicial killing. In enacting the TVPA, Congress determined that only natural persons, not corporations, should be liable. *See Mohamad v.*

14

*Palestinian Auth.*, 132 S. Ct. 1702, 1705 (2012).  The "general practice" in fashioning federal

common law under the ATS, as in any other context, "has been to look for legislative guidance

before exercising innovative authority over substantive law."  *Sosa*, 542 U.S. at 726.  In

particular, when Congress has provided policy guidance in the form of positive law addressing

the same subject matter, those positive law enactments both guide and restrict the court's

authority to establish the federal common law rules.  *See Miles v. Apex Marine Corp.*, 498 U.S.

19, 23-24 (1990).  As the Court held in *Miles*, it is imperative to keep federal common law rules

"strictly within the limits imposed by Congress," *id.* at 27, because positive law does not merely

reflect "general policies," but also the "limits" of those policies, which a court making federal

common law "is not free to go beyond," *id.* at 24.

Adhering to the approach required by *Miles*, Congress's policy judgment

concerning corporate liability in the TVPA controls the formulation of federal common law

under the ATS.  The cause of action made available in the TVPA for torture and extrajudicial

killing, 28 U.S.C. § 1350 note, § 2, is directly analogous to the implied action federal courts are

authorized to recognize under the ATS for violations of international human rights norms, except

that the TVPA applies to both aliens and U.S. citizens.  And in enacting the TVPA, Congress

established the clear policy that only *natural persons* may be sued for violating international law

norms like torture and extrajudicial killing.  Where, as here, "Congress has enacted a statute that

gives U.S. citizens a cause of action for tortious conduct that is also a violation of customary

international law, then the statutory limits on U.S. citizens' recovery under that statute should

presumptively apply to aliens' recovery under the ATS as well." *Doe VIII*, 654 F.3d at 86

(Kavanaugh, J., dissenting).  That principle "avoids the bizarre result that would ensue if aliens –

but not U.S. citizens – could bring suit in U.S. court for the same injuries caused by the same defendants." *Id.*

Accordingly, this Court should limit federal common law liability under the ATS to natural persons, just as Congress limited liability under the TVPA, and dismiss Plaintiffs' ATS claims against EMOI and EMC.

## II.   PLAINTIFFS' ATS CLAIMS MUST BE DISMISSED BECAUSE THE U.S.-BASED CONDUCT ALLEGED DOES NOT OVERCOME THE PRESUMPTION AGAINST EXTRATERRITORIALITY

### A.   Under *Kiobel,* ATS Jurisdiction Must Be Based On Actionable *Conduct* Within The United States, Not Just U.S. Corporate Citizenship

In *Kiobel*, the Supreme Court held "that the presumption against extraterritoriality applies to claims under the ATS," meaning that a "[c]ase seeking relief for violations of the law of nations occurring outside the United States is barred." 133 S. Ct. at 1669. Plaintiffs' ATS claims stem from injuries allegedly inflicted by Indonesian military personnel on Indonesian plaintiffs in Indonesia during an active civil war. Accordingly, Plaintiffs can justify federal jurisdiction only if their claims "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.*

As this Court has held, Exxon's U.S. corporate citizenship cannot displace the presumption against extraterritoriality. *Doe v. Exxon Mobil Corp.*, Civ. No. 01-1357, Civ. No. 07-1022, --- F. Supp. 3d ---, 2014 WL 4746256, at *12 (D.D.C. Sept. 23, 2014) (Dkt. No. 455); *accord Mujica v. AirScan Inc.*, 771 F.3d 580, 594 (9th Cir. 2014) (corporate citizenship "is not enough to establish that the ATS claims here 'touch and concern' the United States with sufficient force"); *Mastafa*, 770 F.3d at 188 ("[N]either the U.S. citizenship of defendants, nor their presence in the United States, is of relevance for jurisdictional purposes."); *Cardona v.*

*Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1189 (11th Cir. 2014) (Sentelle, J., sitting by designation) (same); *Balintulo v. Daimler AG*, 727 F.3d 174, 189 (2d Cir. 2013) ("citizenship of the defendants" is an "irrelevant factual distinction").

Instead, the "focal point of [the] inquiry" is Exxon's "domestic *conduct.*" *Mastafa*, 770 F.3d at 184 n.11 (emphasis added). That is, the presumption against extraterritoriality can be overcome only if the conduct that was the "focus of congressional concern" occurred within the United States. *Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247, 266 (2010). As *Kiobel* made clear, the "focus of congressional concern" under the ATS was law-of-nations violations. 133 S. Ct. at 1665. The *Kiobel* Court thus focused on whether the defendant's domestic conduct gave rise to a law-of-nations violation: The Court "framed the question presented" in terms of the defendant's domestic conduct "no fewer than three times; it repeated the same language, focusing solely on the location of the relevant 'conduct' or 'violation,' at least eight more times in other parts of its eight-page opinion; and it affirmed [a] judgment dismissing the plaintiffs' claims because 'all the relevant conduct took place outside the United States.'" *Balintulo*, 727 F.3d at 189-90; *see also Mujica*, 771 F.3d at 595. Under *Kiobel*'s analysis, as Judge Sentelle observed sitting by designation in the Eleventh Circuit, ATS jurisdiction does not attach when the alleged tort, "whether styled as torture or under some other theory, occurred outside the territorial jurisdiction of the United States." *Cardona*, 760 F.3d at 1189.

Accordingly, to state a valid ATS claim, Plaintiffs must "adequately state[] a claim" that EMC's or EMOI's actions *in the United States* were either "a direct violation of the law of nations," or "conduct that constitutes aiding and abetting another's violation of the law of nations." *Mastafa*, 770 F.3d at 185. As explained below, Plaintiffs cannot make either showing.

Public Redacted Copy

**B.**    **Plaintiffs Do Not Allege That EMOI Committed Actionable Conduct Within The U.S.**

Plaintiffs' proposed complaint generally treats "ExxonMobil Corp. and MOI/EMOI, as well as their predecessors in interest, including Mobil Corp.," as a single entity they label "ExxonMobil." PSAC ¶ 25; *see also id.* ¶¶ 26-130. But they are separate legal entities, and treating them collectively is not only legally inaccurate,[6] but obscures important substantive differences.[7] Most significantly, EMOI's principal place of business was in Indonesia, and it committed almost no conduct within the United States—certainly no conduct establishing a violation of international law. Indeed, the complaint contains only *four* allegations of *any* U.S. conduct by EMOI, none of which comes close to displacing the presumption against extraterritoriality.

*First*, Plaintiffs allege that EMOI was incorporated in Delaware. PSAC ¶ 20. As the Court already held, however, corporate citizenship does not alone suffice. *See supra* at 16-17.

*Second,* ██████████████████████████████████████████████████

██████████████████████████████████████████████ That allegation adds little to the insufficient corporate citizenship allegation—neither has anything to do with

---

[6]   *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (fundamental principle of corporate law that "a parent corporation . . . is not liable for the acts of its subsidiaries").

[7]   Plaintiffs conclusorily allege that EMOI was EMC's "agent and alter ego." PSAC ¶¶ 141-42. But agency and alter ego are legal conclusions that cannot be pleaded in conclusory terms. *See infra* at 22. Further, to pierce the veil of separateness, a plaintiff must show that the parent company does "more than exercise the broad oversight *typically* indicated by common ownership and common directorship." *Calvert v. Huckins*, 875 F. Supp. 674, 679 (E.D. Cal. 1995) (emphasis added). Plaintiffs here allege nothing more than broad, routine oversight. *See* PSAC ¶¶ 141-175. In any event, and as explained below, *see infra* at 22, *Kiobel* would preclude ATS jurisdiction over EMOI even if it were deemed to be EMC's agent, because all of EMOI's conduct that allegedly violated international law (or aided and abetted such violations) occurred abroad. *See Balintulo*, 727 F.3d at 192 n.28.

where EMOI committed any actionable *conduct*, which is what matters under *Kiobel*. Further,

Plaintiffs themselves allege that EMOI did not *itself* make any decisions of its own in the United

States—their theory instead is that EMC was the relevant U.S.-based decisionmaker. *See* █

████████████████████████████████████████████

██████ *id.* ¶ 143 ("EMOI was controlled from the United States by ExxonMobil

Corporation"); *id.* ¶ 156 ("Day-to-day operations of EMOI . . . were also controlled by high-level

Parent Company executives in the United States.").

*Third,* ████████████████████████████████

████████████████████████ Again, that allegation differs

little from U.S. corporate citizenship—it is a routine business practice that has nothing to do with

the locus of any international law violations allegedly committed by EMOI. *See Fletcher v.*

*Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995) (use of "zero-balance bank accounts" in a "cash

management system is consistent with sound business practice").

*Fourth,* and finally, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

Plaintiffs' allegations against EMOI, in short, do not establish that EMOI itself

engaged in any conduct on U.S. soil that is actionable under international law. Because whatever

actionable conduct EMOI committed—if any—"occurred outside the territorial jurisdiction of

the United States," *Cardona*, 760 F.3d at 1189, there is no basis for exercising ATS jurisdiction

over EMOI.

19

Public Redacted Copy

**C.    Plaintiffs Do Not Allege That EMC Committed Actionable Conduct Within The U.S.**

Plaintiffs also fail to allege facts establishing that EMC committed any conduct in the United States that would be actionable under international law.  Plaintiffs barely even attempt to assert that any U.S.-based conduct by EMC *directly* violated international law.  Nor do the facts they allege establish ATS jurisdiction on the basis of a theory that EMC's U.S. conduct *aided and abetted* the commission of international law violations by Indonesian soldiers.

1.    Plaintiffs Fail To Allege Facts Establishing Direct Liability Against EMC Based On Its Conduct In The United States

Plaintiffs do not and cannot allege that any international law violations occurred in the United States.  Plaintiffs also do not and cannot allege that the particular tortious acts they suffered "were planned, directed, or executed in the United States" by EMC (or anyone).  *Doe I v. Cisco Sys., Inc.*, No. 5:11-CV-02449, --- F. Supp. 2d ---, 2014 WL 4446381, at *6 (N.D. Cal. Sept. 5, 2014).  As case after case holds, EMC cannot be held directly liable under these circumstances.  *See Mujica*, 771 F.3d at 592 (no direct liability where bombing was planned and executed in Colombia, and plaintiffs offered only "speculation" about defendant's U.S. conduct); *Cardona*, 760 F.3d at 1191 (no direct liability for alleged torture that "occurred outside the territorial jurisdiction of the United States"); *Chowdhury*, 746 F.3d at 49-50 (no direct liability where tortious conduct "occurred in Bangladesh"); *Giraldo v. Drummond Co., Inc.*, No. 2:09-CV-1041, 2013 WL 3873960, at *8 (N.D. Ala. July 25, 2013) (ATS jurisdiction improper over "violations of the law of nations" that "occurred abroad, in Colombia, and *not* in the United States").

Relying heavily on *Al-Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516 (4th Cir. 2014), Plaintiffs contend that EMC's "[c]onduct in the United States need not constitute a

20

Public Redacted Copy

completed violation of the ATS in the United States to satisfy the 'touch and concern' test."

Mem. at 18. Even assuming *Al Shimari* correctly states the law (it does not), it is nothing like

this case. The plaintiffs in *Al Shimari* alleged "acts of torture committed by United States

citizens" who were hired "by CACI in the United States" to work "at a military facility operated

by United States government personnel" pursuant to a contract with the United States

government. 758 F.3d at 528-29. Here, by contrast, no U.S. citizen committed the alleged

tortious acts under U.S. direction pursuant to a U.S.-government contract—the alleged acts were

all committed by Indonesian soldiers hired by an Indonesian government agency pursuant to the

PSC.[8] Plaintiffs cite that contract as a U.S. connection, but the contract—which was executed in

Indonesia between MOI and the Indonesian government—does not establish any U.S.-based acts

by EMC that violated international law. ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Plaintiffs' allegations concerning

MOI's production contract do nothing to establish, as Plaintiffs must, that *EMC* committed acts

in the United States that constituted crimes against Plaintiffs under international law.

---

[8]   In addition, there was no risk in *Al-Shimari* of "'unwarranted judicial interference in the
conduct of foreign policy,'" or of the "problems associated with bringing foreign nationals
into United States courts to answer for conduct committed abroad," because the alleged acts
of torture were committed by United States citizens. 758 F.3d at 530 (quoting *Kiobel*, 133 S.
Ct. at 1664). Not so here.

**Public Redacted Copy**

That omission is not cured by Plaintiffs' conclusory allegation that the Indonesian soldiers who injured them in Indonesia generally "worked under the effective management, control, direction, and supervision of ExxonMobil." Mem. at 16.  The assertion that a private corporation in the U.S. can control and direct a foreign sovereign's military engaged in an active civil war is utterly implausible on its face. *See Saldana*, 2014 WL 7012444, at *9 ("[T]he notion that the [Colombian National Army] ceded control of the 18th Brigade to a Delaware corporation with headquarters in the United States is utterly fanciful."); *cf. RSM*, 682 F.3d at 1051 (affirming dismissal where corporation's alleged conduct was consistent with intent to conspire with foreign government, but was "'more likely explained by' its normal business practice" (quoting *Iqbal*, 556 U.S. at 680)).  In addition, Plaintiffs' use of "ExxonMobil" obscures their inability to allege any connection *to EMC*, rather than EMOI—the actual party to the contract.  More importantly, even assuming the statement somehow encompasses EMC, Plaintiffs cannot establish ATS jurisdiction over EMC on a theory of agency.  A court applying *Kiobel* must not "conflate the extraterritoriality analysis—which asks where the 'violation[] of the law of nations occur[red],' . . . with the question of derivative liability." *Balintulo*, 727 F.3d at 192 n.28 (quoting *Kiobel*, 133 S. Ct. at 1669).  And Plaintiffs' conclusory "control" assertion does not adequately allege agency in any event.  Agency is a *legal* conclusion, and a "court is not bound to accept as true a legal conclusion couched as a factual allegation." *RSM*, 682 F.3d at 1050 (quotation omitted); *see Sikhs for Justice, Inc. v. Nath*, No. 14-1724-cv, --- F. App'x ---, 2014 WL 7232492, at *2 (2d Cir. Dec. 19, 2014) ("conclusory assertion" that overseas corporate affiliate is agent of domestic corporation does not establish ATS jurisdiction); *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 15 (2d Cir. 2014) ("[G]eneralized and conclusory allegations . . . are plainly insufficient to state a claim of alter ego status.").

22

**Public Redacted Copy**

Plaintiffs' bare, implausible allegations are also at odds with the express objections of the Indonesian government in this case to any claims that even implicate its military's conduct in this litigation.  *See* Dkt. No. 38, at 9 (objecting to "the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution, cq the Indonesian military, for operations taking place in Indonesia").

Plaintiffs' allegations, in short, establish no basis for direct liability against EMC for its U.S.-based conduct—which is no doubt why Plaintiffs hardly argue the issue.  *See* Mem. at 16-17.

### 2.   EMC's Alleged U.S.-Based Conduct Does Not Give Rise To An Aiding And Abetting Claim

Plaintiffs also fail to establish ATS jurisdiction over their claims against EMC on a theory that EMC's conduct in the United States was actionable under international law as aiding and abetting offenses allegedly committed by Indonesian soldiers.

As a threshold matter, Defendants reiterate their contention that federal common law under the ATS does not recognize aiding and abetting liability based on the primary conduct of a foreign sovereign.  *See* Dkt. No. 444, at 10-11; Dkt. No. 426-1, at 22-23; *see also Doe I*, 393 F. Supp. 2d at 24.  The D.C. Circuit panel in the appeal of this case initially held otherwise, but its analysis has been undermined by *Kiobel*,[9] and the aiding and abetting sections of the panel

---

[9]   The *Kiobel* Court reinforced the reasons federal common law should not recognize liability for aiding and abetting the primary conduct of a foreign sovereign, emphasizing the potential for "diplomatic strife" and the "foreign policy concerns" raised by any ATS claim arising from conduct occurring on foreign soil.  133 S. Ct. at 1664, 1669.  Those concerns are necessarily magnified in the context of aiding and abetting claims involving the primary conduct of a foreign sovereign, especially where, as here, the sovereign has repeatedly objected to the litigation.  *See* Dkt. No. 38, at 9 (Government of Indonesia "cannot accept the extra territorial jurisdiction of a United States Court over an allegation against . . . the Indonesian military, for operations taking place in Indonesia.").  Tellingly, the *Kiobel* Court singled out this very case as one exemplifying the "diplomatic strife" ATS claims may create.  133 S. Ct. at 1669 (citing *Doe VIII*, 654 F.3d at 77-78 (Kavanaugh, J., dissenting)).

Public Redacted Copy

opinion were among those the panel itself subsequently vacated. *Doe v. Exxon Mobil Corp.*, 527 F. App'x. 7, 7 (D.C. Cir. 2013).

In particular, the court vacated and remanded the panel opinion's analysis of "the *standard* to be applied for aiding and abetting liability" for further consideration by this Court. *Id.* (emphasis added). That further consideration should compel rejection of Plaintiffs' claims, which do not satisfy the appropriate mens rea and actus reus standards for aiding and abetting liability under international law.

    (a)    *The Complaint Does Not Allege Facts Establishing That EMC's U.S.-Based Acts Were Committed With The Requisite Mens Rea*

        (i)    "Purpose" Is The Only Mens Rea Standard With The Required Universal Acceptance, And Plaintiffs Do Not Attempt To Allege A "Purpose" Mens Rea

To establish the mens rea required for aiding and abetting claims under the ATS, a plaintiff must allege facts establishing that the defendant acted with the *purpose* of facilitating the alleged international law violations. The purpose standard is the only standard recognized in still-valid federal appellate opinions addressing the mens rea standard, and it is the only standard consistent with the Supreme Court's requirements for enforcing international law norms under federal common law. Because Plaintiffs do not even attempt to allege that EMC acted in the United States with the purpose of facilitating Indonesian soldiers' offenses against Plaintiffs, they cannot invoke aiding and abetting liability to satisfy *Kiobel*'s jurisdictional rule.

The purpose mens rea standard follows from *Sosa*'s crucial restriction on the kind of international law norms that may be enforced through federal common law under the ATS. As explained above, courts cannot recognize "debatable violations of the law of nations," 542 U.S. at 728, but instead may only enforce norms that are "specific, universal, and obligatory," to

**Public Redacted Copy**

the same extent as the "historical paradigms familiar when [the ATS] was enacted," *id.* at 732 (quotation omitted). To exemplify the kind of norm with the required "definite content and acceptance among civilized nations" in 1791, *id.*, the *Sosa* Court cited the offense of piracy recognized in *United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820), which in turn recited an *eighteen-page-long* footnote listing *dozens* of sources uniformly establishing "that piracy is defined by the law of nations," as were the elements of the offense. *Sosa*, 524 U.S. at 732 (citing *Smith*, 18 U.S. at 163-80).

Purpose is the only mens rea norm for aiding and abetting liability that even begins to approach that measure of universal acceptance: "All international authorities agree that at least purposive action . . . constitutes aiding and abetting." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1024 (9th Cir. 2014) (quotation omitted). Most important, the Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90, imposes criminal liability on a person who "aids, abets or otherwise assists" the commission of a crime "[f]or the *purpose* of facilitating" the crime. Art. 25(3)(c) (Oh Decl., Ex. 12) (emphasis added). In other words, the Rome Statute requires a showing that the defendant affirmatively "*intended* to aid and abet violations of *customary international law*." *Mastafa*, 770 F.3d at 193; *see Nestle*, 766 F.3d at 1024 ("[T]he Rome Statute . . . requires the heightened mens rea of purpose"). The Rome Statute "has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world," meaning that it "constitute[s] an authoritative expression of the legal views of a great number of States." *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 276 (2d Cir. 2007) (Katzmann, J., concurring) (quotation omitted); *see also Talisman*, 582 F.3d at 259 (adopting analysis in *Khulumani* concurrence as circuit law). The Rome Statute's purpose requirement also accords with historical practice: "[I]nternational law at the time of the

**Public Redacted Copy**

Nuremberg trials recognized aiding and abetting liability only for purposeful conduct."
*Talisman*, 582 F.3d at 259 (citing *United States von Weizsaecker (The Ministries Case), in 14
Trials of War Criminals Before The Nuremberg Military Tribunals Under Control Council Law
No. 10*, at 662 (William S. Hein & Co., Inc. 1997) (1949)).

      In light of the universal international agreement that acting with purpose suffices
to establish the mens rea required for aiding and abetting liability, the Second, Fourth, and Ninth
Circuits have all recognized that "a purpose standard alone has gained 'the requisite acceptance
among civilized nations for application in an action under the ATS.'" *Aziz v. Alcolac, Inc.*, 658
F.3d 388, 396 (4th Cir. 2011) (quoting *Talisman*, 582 F.3d at 259); *see also Nestle*, 766 F.3d at
1024.[10]  By contrast, the lesser "knowledge" mens rea standard proposed by Plaintiffs has not
received anywhere close to the same degree of universal acceptance.  As the Ninth Circuit
observed, "it appears that the Rome Statute rejects a knowledge standard and requires the
heightened mens rea of purpose, suggesting that a knowledge standard lacks the universal
acceptance that *Sosa* demands." *Nestle*, 766 F.3d at 1024.

      Plaintiffs' sole support for the knowledge mens rea standard is the now-vacated
D.C. Circuit decision, and several decisions of the ICTY. Mem. at 11.  The ICTY decisions
obviously apply a mens rea norm that has *not* been universally accepted, as shown by the Rome

---

[10]   The Second Circuit has also observed that requiring proof of a purpose mens rea constitutes
sound federal policy (which a court must consider in fashioning federal common law)
because the purpose standard helps avoid turning the ATS's limited grant of jurisdiction *into*
"a vehicle for private parties to impose embargos or international sanctions through civil
actions in United States courts." *Talisman*, 582 F.3d at 264.  The conduct alleged here—
"providing financial assistance to the Government" of Indonesia, and "giving general
logistical support to the [Indonesian] military"—"generally accompan[ies] any natural
resource development business or the creation of any industry," and it would reach too far to
declare those acts "inherently criminal or wrongful" under the ATS. *Id.* at 261 (quotation
omitted).

Public Redacted Copy

Statute and the federal appellate precedents rejecting the knowledge standard.  And the vacated D.C. Circuit decision is of course no longer binding, and its holding that knowledge is the appropriate mens rea norm is not persuasive for reasons identified by the Second and Fourth Circuits.[11]  What is more, the D.C. Circuit's opinion simply did not address the point that only a purpose standard satisfies *Sosa*'s universality requirement.

Plaintiffs' allegations do not and cannot satisfy the purpose standard.  *See Talisman*, 582 F.3d at 262 (evidence that company "was coordinating with the military" to protect its workers from terrorist attacks "supports no inference of a purpose to aid atrocities").  Indeed, Plaintiffs have conceded that they do not accuse Exxon of directing anyone to harm them.  *See* Dkt. No. 160, at 34:20-35:3 (Exxon had "nothing to do with . . . who ordered or who personally and directly harmed our clients.").  Their theory instead is "primarily one" that EMC or EMOI "set up a project in such a way with a security force that is dangerous." *Id.* at 45:16-18.  Plaintiffs' ATS claims accordingly must be dismissed.

---

[11]  In its now-vacated opinion, the D.C. Circuit disregarded the Rome Statute on the ground that it is only a "treaty," which did not "'limit[] or prejudice[] in any way existing or developing rules of international law,'" and which was not ratified by the United States. *Doe VIII*, 654 F.3d at 35-36.  The Rome Statute is indeed a treaty—one adopted by "most of the mature democracies of the world" as a correct enunciation of the mens rea for aiding and abetting liability. *Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring).  And the point is not that the Statute *limited* international law—the point is that its near-universal adoption *reflects* existing international law. *See Mastafa*, 770 F.3d at 180 (customary international law consists of the "specific and universally accepted rules that the nations of the world treat as binding in their dealings with one another," and within "those states for their common good").  For that reason, the fact that the United States itself has not ratified the Statute "does not lessen its import as an international treaty and, thus, a primary source of the law of nations." *Aziz*, 658 F.3d at 400.

The D.C. Circuit also incorrectly stated that the Rome Statute permitted aiding and abetting liability based on mere knowledge. *Doe VIII*, 654 F.3d at 37.  The court relied upon Article 25(3)(d), which identifies the elements of *conspiratorial* (or joint criminal enterprise) liability, not accessorial liability. *See Aziz*, 658 F.3d at 401 n.13.

**Public Redacted Copy**

(ii)   Even Under The Lesser "Knowledge" Standard That Lacks Universal
Acceptance, Plaintiffs Still Fail To Allege Facts Sufficient To Establish
Mens Rea

Plaintiffs' concession is also fatal to their claims even under the lesser knowledge
standard, because their theory of liability is not enough to establish the level of knowledge
required under international law.

The ICTY and ICTR opinions adopting a knowledge standard establish that the
aider and abettor must know that his act "assists in the commission of the *crime of the principal
perpetrator*" and "be aware of the essential elements of the crime which was ultimately
committed by the principal." *Prosecutor v. Orić*, Case No. IT-03-68-A, Appeal Judgement ¶ 43
(July 3, 2008) (Oh Decl., Ex. 13) (emphasis added).  In other words, the defendant must know
that his actions aid the particular crime charged.  *See Ndindiliyimana v. Prosecutor*, Case No.
ICTR-00-56-A, Appeal Judgement ¶ 317 (Feb. 11, 2014) (Oh Decl., Ex. 14) (prosecution did not
establish mens rea where evidence provided no basis "to infer that [the defendant] knew of his
subordinates' involvement" in the particular offense alleged); *Prosecutor v. Blagojević & Jokić*,
No. IT-02-60-A, Appeal Judgement ¶ 127 (May 9, 2007) (Oh Decl., Ex. 15) (aiding and abetting
requires "knowledge that the acts performed assist the commission of the *specific crime* of the
principal perpetrator" (emphasis added)); *see also Perišić*, Appeal Judgement, ¶ 48; *Prosecutor
v. Mrkšić & Šljivančanin*, No. IT-95-13/1-A, Appeal Judgement ¶ 159 (May 5, 2009) (Oh Decl.,
Ex. 16); *Prosecutor v. Blaškić*, No. IT-95-14-A, Appeal Judgement ¶¶ 49-50 (July 29, 2004) (Oh
Decl., Ex. 17).[12]

---

[12]   Federal law regarding the mens rea standard for accomplice liability is to the same effect.
*See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (non-ATS case holding that
aiding and abetting liability requires that "the defendant knowingly and substantially assist
the principal violation"); *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537
(6th Cir. 2000) ("[T]he requirement is actual knowledge."); *Ungar v. Islamic Republic of
Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002) (evidence that Iran provided Hamas with "tens of

**Public Redacted Copy**

Consistent with their in-court admissions, Plaintiffs' complaint does not allege either component.  The complaint nowhere alleges that EMC had knowledge of the "essential elements" of the offenses allegedly being committed here.  The alleged fact that EMOI operated a facility in Arun requiring security by some Indonesian soldiers does not establish EMC's knowledge that EMC (or EMOI) would be *helping* the soldiers commit abuses.  ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Any inference that EMC knew that EMOI's security arrangement with the Indonesian government would somehow *help* Indonesian soldiers commit abuses during the ongoing civil war is completely implausible—indeed outrageous—especially given that security arrangements are an entirely "normal business practice" for private companies operating in foreign nations.  *See RSM,* 682 F.3d at 1049, 1051.

At most, the complaint alleges that some U.S.-based EMC executives knew that unknown Indonesian soldiers had committed human rights abuses at some points during the time that the Indonesian government was fighting a civil war.  *See, e.g.,* PSAC ¶ 33 (knowledge that "members of the Indonesian military" committed human rights violations); *id.* ¶¶ 45, 51 (same); Dkt. No. 160, at 45:16-18 (Exxon "set up a project in such a way with a security force that is dangerous").  As just explained, that is not the type of knowledge that matters for aiding and abetting liability—Plaintiffs cannot simply allege misconduct by Indonesian soldiers generally, especially when there were 30,000 soldiers occupying Aceh as part of the Government's war

---

millions of dollars, weapons and explosives, terrorism training, and other assistance" did not suffice to establish aiding and abetting liability because it did not establish "knowing and substantial assistance in the principal violation").

Public Redacted Copy

effort, *see* Dkt. No. 3 ¶ 37.  Plaintiffs instead must at least allege (assuming a knowledge standard applies) that EMC knew that the particular soldiers providing security for the Arun facility pursuant to the PSC were committing the "specific crime[s]" against Plaintiffs while providing such security. *Blagojević & Jokić*, Appeal Judgement ¶ 127; *see also Ndindiliyimana*, Appeal Judgement ¶ 317.  But Plaintiffs have already admitted that Exxon never met or knew anything about the Plaintiffs themselves, Dkt. No. 160, at 34:20-35:3, and they do not even allege that the soldiers who injured them were part of "Unit 113," which "had the sole and specific purpose of providing security for ExxonMobil."  PSAC ¶ 34.  It is not enough to assert the conclusory allegation that EMC "knew that its military security personnel were committing human rights abuses while protecting ExxonMobil's facilities," *id.* ¶ 63—"'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice.'" *Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678 (2009)). Plaintiffs instead must allege concrete, non-conclusory *facts* plausibly establishing such knowledge, and they cannot do so.  *See Mujica*, 771 F.3d at 592 ("[S]peculation is not an adequate basis on which to allow Plaintiffs' claims to go forward."); *Mastafa*, 770 F.3d at 190 ("[O]ur jurisdictional analysis need not take into account allegations that, on their face, do not satisfy basic pleading requirements.").[13]

Unable to meet even the lesser, disputed knowledge standard, Plaintiffs argue for a still-lesser—and even less-recognized—standard of "negligen[ce] and or reckless[ness]."

---

[13]  Plaintiffs cite several news articles stating that "ExxonMobil security personnel" committed human rights abuses against civilians, but the references appear to be to Indonesian soldiers in Arun.  PSAC ¶ 69.  Plaintiffs nowhere allege that any actual EMC or EMOI employees committed abuses against Plaintiffs.  Further, the cited articles do not suggest that EMC executives in the United States knew that soldiers were committing abuses *when they were providing security* to Arun Field, as opposed to when they were combatting rebel separatists in their ongoing civil war.

PSAC ¶ 251.  Plaintiffs thus contend that the mens rea element is satisfied by the allegation that

"ExxonMobil Corporation executives in the United States knew that their military security

personnel had committed abuses against the local population," and "anticipated that the abuses

could and would continue to occur."  Mem. at 14; *see* PSAC ¶ 61 (human rights abuses "were a

foreseeable consequence" of EMC's conduct); PSAC ¶ 188 ("Defendants had reason to know

and/or did know").  That allegation falls far short of any cognizable mens rea standard.  There is

no international law consensus—or any support at all—for holding that a defendant aided and

abetted the primary conduct of another merely by being negligent or reckless as to what the

primary actor was doing.  Two of the sources Plaintiffs cite in support of this rule, *see* Mem. at

15-16, actually require affirmative knowledge of the specific offense committed by the

principal—*i.e.*, the ICTY knowledge rule described above.  *See Halberstam*, 705 F.2d at 477

(non-ATS case holding that aiding and abetting liability requires that "the defendant *knowingly*

and substantially assist *the principal violation*" (emphasis added)); *Gacumbitsi v. Prosecutor*,

No. ICTR-2001-64-A, Appeal Judgement ¶ 124 (July 7, 2006) (Oh Decl., Ex. 18) (imposing

conviction for aiding and abetting murder because defendant knew that he would be exposing

"his tenants" to violence by expelling them).  Plaintiffs also cite the observation in *Doe I v.*

*Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002), that the aiding and abetting mens rea requirement

was satisfied by proof that "Unocal knew or should reasonably have known that its conduct"

would lead to international law violations, *id.* at 953, but Plaintiffs neglect to mention that the

*Unocal* opinion was vacated by the *en banc* Ninth Circuit, 395 F.3d 978 (9th Cir. 2003), which

declared that the opinion should "not be cited as precedent," *id.* at 979, and later granted the

parties' stipulated motion to dismiss the entire case, 403 F.3d 708 (9th Cir. 2005).  And as noted

above, the Ninth Circuit's most recent opinion on the issue recognizes *purpose* as the only

31

Public Redacted Copy

standard satisfying *Sosa*'s universality requirement, although the court ultimately declined to resolve the mens rea question conclusively. *Nestle*, 766 F.3d at 1024.

In sum, even if a "knowledge" mens rea standard were universally recognized as the basis for aiding and abetting liability under international law, Plaintiffs' complaint still fails to allege any facts sufficient to establish that EMC knew the EMOI security arrangement with the Indonesian government was helping Indonesian soldiers commit particular international law offenses against Plaintiffs.

     (b)    *The Complaint Does Not Allege Facts Establishing That EMC's U.S.-Based Acts Constituted The Necessary Actus Reus For Aiding And Abetting*

         (i)    "Specific Direction" Is The Only Actus Reus Standard With The Required Universal Acceptance, And Plaintiffs Do Not Attempt To Allege The "Specific Direction" Actus Reus

The ICTY Appeals Chamber's opinion in *Perišić* held that to establish aiding and abetting liability for international law crimes, the defendant's acts must have been "*specifically directed* to assist . . . the perpetration of a certain specific crime." Appeal Judgement, ¶ 26 (quoting *Prosecutor v. Tadić*, Case No. IT-94-1-A, Appeal Judgement ¶ 229 (July 15, 1999) (Oh Decl., Ex. 19)). The specific direction standard finds ample support in decisions both before and after *Perišić*. *See id.* ¶¶ 26, 28 n.70, 29-30, 35 (collecting prior cases); Dkt. No. 426-1, at 25-26 (post-*Perišić* cases applying specific direction standard). And it is the *only* standard with the universal acceptance required by *Sosa, see* 542 U.S. at 732—*all* ICTY opinions agree that specific direction suffices to establish actus reus, even if some of them mention or purport to apply a lesser standard. *See infra* at 33-36. Plaintiffs do not and cannot allege that EMC's acts in the United States were "specifically directed" toward the commission of international law

Public Redacted Copy

violations, as opposed to the provision of necessary security for the Arun facility.  So their aiding

and abetting claims cannot proceed under the ATS.

> The Trial Chamber in *Perišić* had convicted the defendant (a high-ranking general

in the Yugoslav army) of aiding and abetting a different military unit's commission of several

international law violations based upon the finding that Perišić's assistance "had a substantial

effect on the crimes perpetrated." *Perišić*, Appeal Judgement ¶ 17.  The Appeals Chamber

reversed, concluding that the Trial Chamber had applied the wrong actus reus standard.  In order

to sustain an aiding and abetting conviction, the Appeals Chamber explained, the prosecution

must establish that the defendant had "carrie[d] out acts *specifically directed* to assist . . . the

perpetration of a certain specific crime." *Id.* ¶ 26 (quoting *Tadić*, Appeal Judgement ¶ 229).  The

"assistance must be specifically—rather than in some way—directed towards relevant crimes."

*Id.* ¶ 27 (quoting *Tadić*, Appeal Judgement ¶ 229).  In other words, as a general matter,[14] "the

provision of general assistance which could be used for both lawful and unlawful activities will

not be sufficient, alone, to prove that . . . aid was specifically directed to crimes of principal

perpetrators," *id.* ¶ 44—"evidence *establishing a direct link between the aid provided by an*

*accused individual and the relevant crimes committed* by principal perpetrators is necessary."

*Id.* (emphasis added).

---

[14]   The Appeals Chamber carved out an exception for situations where a defendant's acts are
"geographically or otherwise proximate to, and thus not remote from, the crimes of principal
perpetrators." *Perišić*, Appeal Judgement ¶ 38 ("For example, an individual accused of
aiding and abetting may have been physically present during the preparation or commission
of crimes committed by principal perpetrators and made a concurrent substantial
contribution.  In such a case, the existence of specific direction, which demonstrates the
culpable link between the accused aider and abettor's assistance and the crimes of principal
perpetrators, will be self-evident.").  Plaintiffs' complaints do not allege any such proximity,
and Plaintiffs have disavowed that EMC (or EMOI) knew about, or had anything to do with,
the specific human rights violations alleged in the complaints. *See infra* at 35-36.

Public Redacted Copy

Plaintiffs have admitted that they cannot meet this standard.  EMC never signed the PSC—the document governing the "provision of general assistance" to Pertamina.  *Id.*  And Plaintiffs themselves have acknowledged that EMC has no ties to the "crimes of principal perpetrators."  *Id.*  As their counsel represented to the Court, "we aren't saying that [Exxon employees] went to Indonesia and ordered our clients to be harmed," Dkt. No. 160, at 45:21-22, or that "any [Exxon employees] ever met our clients, had anything to do directly with going out and ordering people to do things in terms of the security force," *id.* at 34:20-35:3.  Plaintiffs do not suggest otherwise in their amended complaint.

Instead, Plaintiffs' theory is that EMC or EMOI at most "set up a project in such a way with a security force that is dangerous."  *Id.* at 45:16-18.  In particular, Plaintiffs repeat their allegations that EMC "employed or otherwise retained members of the Indonesian military to provide security services for its facilities and operations in the Aceh province," PSAC ¶ 33; paid the military and military personnel for security services, *id.* ¶¶ 38-40; and could and did "supervise, control and direct . . . the actions and activities of its security personnel," *id.* at ¶ 41.  Plaintiffs also allege that soldiers providing security "were responsible for widespread acts of abuse" against Plaintiffs, *id.* ¶ 42, and that they used the "equipment, facilities, and other material support" provided by Exxon "in the commission of the abuses," *id.* ¶ 43.  The "control" allegations, in particular, are wholly conclusory, utterly implausible, and directly contradicted by the PSC—███████████████████████████████████████████—and by the Indonesian government itself in a submission to this Court.  *See supra* at 21-22.  But even taking them at face value, the allegations omit the facts necessary to establish the specific direction actus reus:  that EMC ordered EMOI "to specifically assist . . . criminal acts" and directed Indonesian soldiers to take actions "incompatible with lawful military

**Public Redacted Copy**

operations." *Perišić*, Appeal Judgement ¶¶ 64-65.  As *Perišić* makes clear, even allegations of

the "secondment of personnel" and the "provision of military equipment, logistical support, and

military training"—far short of the alleged conduct by EMC here—are insufficient to establish

"specific direction." *Id.* ¶¶ 62-65.

        In tacit recognition that they cannot satisfy the specific direction standard,

Plaintiffs never refer to it in their proposed complaint and supporting memorandum.  Plaintiffs

instead argue that other ICTY caselaw—specifically, the decision in *Prosecutor v. Šainović*,

Case No. IT-05-87-A, Appeal Judgement (Jan. 23, 2014) (Dkt. No. 448-1)—has "rejected

*Perišić* and confirmed that the *actus reus* standard for aiding and abetting under international

law" is "acts that have a substantial effect in bringing about the violation."  Mem. at 11

(quotation omitted).  But as Defendants have explained, the *Šainović* decision provides no basis

for adopting a "substantial assistance" standard as the controlling international law norm *under

the ATS*.  *See* Dkt. No. 451.

        *First*, *Šainović* may not even be binding precedent—the dissent in that case

explained that the majority's discussion of the actus reus for aiding and abetting liability was

needless dicta with "no pertinence" and "no bearing" on the case before it.  *Šainović*, Dissenting

Opinion ¶¶ 40, 43.  Indeed, the ICTY Appeals Chamber is not obliged to follow prior,

distinguishable decisions, *Šainović*, Dissenting Opinion ¶ 43 n.98, and *Šainović* is easily

distinguished from both *Perišić* and this case.  *Perišić* requires "explicit consideration of specific

direction" only where, as here, the defendant was physically "remote" from the crime;

substantial assistance may be enough only when the defendant is physically proximate, as in

*Šainović*.  *Perišić*, Appeal Judgement ¶¶ 38-39; *see Šainović*, Dissenting Opinion ¶ 43 & n.97.

The ICTY may well adhere to the well-established specific direction standard when confronted

Public Redacted Copy

with another case involving a physically remote defendant. In that respect, it bears emphasis that the ICTY Appeals Chamber denied Perišić's motion for reconsideration, which was *premised on Šainović. See Prosecutor v. Perišić*, Case No. IT-04-81-A, Decision on Motion for Reconsideration (Mar. 20, 2014) (Oh Decl., Ex. 20); Statement of Prosecutor Serge Brammertz in relation to the motion for reconsideration submitted by the Prosecution in the *Perišić* case (Feb. 3, 2014), *available at* http://www.icty.org/sid/11447 ("This motion was filed, after careful deliberations, by my office as a direct consequence of the *Šainović* Appeal Judgement.").

*Second, Šainović* at most confirms that there is *uncertainty* around the actus reus requirement. *See Šainović*, Appeal Judgement ¶ 1622 (choosing sides among "previous decisions that are conflicting" as to whether substantial assistance suffices). As discussed above in connection with the disputed mens rea requirement, a federal court applying the ATS can only adopt international law norms that have been universally accepted. *See supra* at 24-25. The substantial assistance standard plainly fails that standard. Specific direction is the only actus reus standard that would justify aiding and abetting liability in any international law forum or dispute, and thus is the only standard a federal court may apply under the ATS.

> (ii)    Even Under The Lesser "Substantial Assistance" Standard That Lacks Universal Acceptance, Plaintiffs Still Fail To Allege Facts Sufficient To Establish Actus Reus

Plaintiffs' claims fail even if the lesser substantial assistance standard applies. Under *Šainović*, Plaintiffs must establish that EMC provided "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." Appeal Judgement ¶ 1649. In other words, Plaintiffs must allege some material connection between EMC's own actions in the United States and the offenses allegedly committed by Indonesian soldiers against Plaintiffs. In *Šainović*, for example, the defendant was accused of

36

Public Redacted Copy

various international law violations that had taken place during "the forcible displacement of

Kosovo Albanians," and the defendant had personally implemented two "large scale plans" for

displacement—he had planned, executed, and issued the relevant orders. *Id.* ¶ 1655. The

defendant's conduct (his orders and planning) thus directly affected the commission of the

crimes suffered by the victims. Likewise, in *Ndindiliyimana*, the ICTR Appeals Chamber

sustained a defendant's conviction for aiding and abetting the killing of Belgian peacekeepers,

where the defendant "instructed [subordinates] to put down the Belgian peacekeepers'

resistance" and gave them a weapon "in order to participate in the attack." Appeal Judgement

¶ 372. Again, the link between the defendant's conduct (his instructions and supplies) and the

particular crime committed against the victims was clear and direct. On the other hand, in

*Nzabonimana v. Prosecutor*, the ICTR Appeals Chamber upheld a defendant's acquittal of aiding

and abetting genocide against the Tutsi population where the defendant had done nothing more

than "caus[e] the release of killers of Tutsis." Case No. ICTR-98-44D-A, Appeal Judgement

¶ 486 (Sept. 29, 2014) (Oh Decl., Ex. 21). Although the release of the prisoners ultimately

resulted in the crimes, there was no direct connection between the defendant's "conduct in

releasing the prisoners" and "the commission of any *specific* crimes." *Id.* ¶ 491 (emphasis

added).

Exxon's alleged acts here are nothing like the defendants' acts in *Šainović* and

*Ndindiliyimana*—Exxon did not plan or order attacks against Plaintiffs or provide Indonesian

soldiers with equipment to use in such attacks. Plaintiffs allege only that Exxon provided

general financial and logistical support to military security personnel in Indonesia, but especially

given the indisputably legitimate security need, Plaintiffs do not and cannot allege facts

connecting that alleged *general* support for the military to the *specific* crimes committed by

37

Public Redacted Copy

individual soldiers, which occurred during a civil war they would have been fighting regardless of EMC's or EMOI's security needs, and during which Indonesian soldiers and rebel separatists alike were incurring injuries and casualties. *See supra* at 34-35.[15] Nothing in the complaint suggests that the need to provide security for the Arun facility, rather than the civil war itself, was the reason Indonesian soldiers allegedly harmed the Plaintiffs. *See* PSAC ¶¶ 64-65 (describing widespread casualties and human rights abuses by Indonesian military independent of Exxon's operations).

For these reasons, it is insufficient for Plaintiffs to assert that their injuries would not have occurred "but for ExxonMobil Corporation's conduct." Mem. at 11-13. That assertion is wholly conclusory and devoid of the factual detail necessary to establish a plausible inference that it was not the civil war, but EMC's security needs, that caused their injuries. And *Nzabonimana* in any event makes clear that "but for" causation is not itself enough to establish "substantial assistance"—the defendant's release of Tutsi killers resulted in the crimes in that case, but the release was not connected to any specific crimes that occurred, and thus the defendant's act of releasing the killers did not aid and abet those crimes. Similarly here, Plaintiffs do not and cannot allege facts showing that EMC's alleged acts of supporting the military's security efforts were connected to the specific offenses committed against Plaintiffs.

Public Redacted Copy

Plaintiffs' aiding and abetting claims accordingly fail even under the inappropriate, contested "substantial assistance" standard.

## III.    THE AMENDED COMPLAINT FAILS TO ALLEGE ANY INTERNATIONAL LAW VIOLATIONS COGNIZABLE UNDER THE ATS

The PSAC alleges five international law violations, all of which require proof of state action or action under color of law. Plaintiffs have abandoned any such allegations, foreclosing ATS liability here. And three of the alleged international violations—disappearance; arbitrary detention; and cruel, inhuman, and degrading treatment—are not "specific, universal, and obligatory" as required by *Sosa* for recognition under federal common law, 542 U.S. at 727, 732. The remaining two—extrajudicial killing and torture—have been displaced by the TVPA, and as such cannot be adjudicated under federal common law by a court exercising ATS jurisdiction.

### A.    Plaintiffs' ATS Claims Must Be Dismissed Because Plaintiffs Have Abandoned Any Allegations Of State Action Or Action Under Color Of Law

The Court has already held that state action, or action under color of law, is an essential element of three of the international law violations alleged here—specifically, "torture, arbitrary detention, [and] extrajudicial killing." *Doe I*, 393 F. Supp. 2d at 25-26; *accord Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206-07 (D.C. Cir. 1985) (Scalia, J.) ("private, non-state conduct" cannot constitute torture, abduction, or extrajudicial killing under customary international law (citing *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791-96 (D.C. Cir. 1984) (Edwards, J., concurring))); *Garcia v. Chapman*, 911 F. Supp. 2d 1222, 1236 (S.D. Fla. 2012) ("Most ATS claims—including [claims for arbitrary detention]—are only cognizable when committed by state actors or under color of law."). The same requirement applies to claims for cruel, inhuman, and degrading treatment and disappearance. *See Al-Quaraishi v.*

39

*Nakhla*, 728 F. Supp. 2d 702, 747-48 (D. Md. 2010) ("[C]laims of . . . cruel, inhuman, and

degrading treatment . . . require state action or must be committed under color of law"); *Forti v.

Suarez-Mason*, 694 F. Supp. 707, 710 (N.D. Cal. 1998) (disappearance requires official act or act

"under state approval or authority").

      Plaintiffs' theory of the case, however, is that all of the acts were committed by

private parties or agents acting on their behalf.  Plaintiffs obviously cannot allege that EMOI or

EMC were state actors, and they have abandoned any "color of law" claims.  *Compare Doe VIII*,

654 F.3d at 39 n.27 (declining to address Plaintiffs "alternative contention . . . that Exxon is

subject to ATS liability as a state actor acting under color of Indonesian law"), *with* PSAC &

Mem. (no allegations of actions by EMOI or EMC under color of law).  Plaintiffs have likewise

abandoned their claims that Indonesian soldiers were acting officially under the control of the

Indonesian government, choosing instead to allege that Indonesian soldiers were effectively

operating as private actors subject to Exxon's direction, *see* Dkt. No. 83, at 11; Mem. at 16;

PSAC ¶¶ 41, 188.  Because Plaintiffs' proposed complaint alleges only offenses committed by

private actors, rather than offenses committed by state actors or under color of law, there is no

cognizable claim that EMOI or EMC violated customary international law.[16]

    **B.**    **"Arbitrary Detention," "Disappearance," And "Cruel Treatment" Are Not
             Universal And Specific As Required By *Sosa***

      Even setting aside the state action requirement, Plaintiffs' "arbitrary detention"

claim does not survive *Sosa*, which explicitly rejected an "arbitrary arrest and detention" claim.

---

[16]  Exxon preserves its argument that the act of state doctrine bars Plaintiffs' claims. Dkt. No.
426-1, at 33-35.  The Court has rejected that argument, *see* Dkt. No. 83, at 9-11, foreclosing
Plaintiffs' torture claims for the reasons just stated.  But if the Court instead concludes that
the Indonesian military did act pursuant to official Indonesian government policies—in other
words, that the Indonesian military was in control of its own operations, *see supra* at 21-22—
then Plaintiffs' claims would fail for the different reasons that Exxon has already set forth.

Public Redacted Copy

542 U.S. at 699, 738.[17]  The Court deemed that norm too abstract to justify recognizing it as a

matter of federal common law: "[I]ts implications would be breathtaking," the Court observed,

for recognizing such a claim under federal common law would necessitate allowing "a cause of

action in federal court for any arrest, anywhere in the world, unauthorized by the law of the

jurisdiction in which it took place." *Id.* at 736.  That sweeping cause of action "would go beyond

any residual common law discretion we think it appropriate to exercise." *Id.* at 738.  *Sosa*

forecloses Plaintiffs' materially identical claim that Indonesian soldiers "forcibly removed" them

and "detained [them] against their will" without being "apprised of any charges against them."

Mem. at 6; *see Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir.

2005) (applying *Sosa* to dismiss an arbitrary detention claim).

      The foregoing analysis applies equally to Plaintiffs' "disappearance" claim.  Few

federal courts have discussed that claim—a relative silence that itself demonstrates a lack of

definiteness and universal acceptance—but it appears to involve an abduction by state officers or

persons acting under the color of state authority, with "refusal by the state to acknowledge the

abduction and detention." *Forti*, 694 F. Supp. at 711.  If a claim for *unauthorized* state detention

cannot proceed under the ATS, as *Sosa* holds, it follows that a claim for *authorized* state

detention cannot proceed either.

      Plaintiffs' claims for "cruel, inhuman, or degrading treatment" are far too vague

and indeterminate to proceed under the ATS.  There is nothing "even remotely approaching

universal consensus as to the tort's content," because "conduct . . . which is humiliating or even

---

[17]  Plaintiffs' claim relies only on pre-*Sosa* trial court decisions. *See Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *7 (S.D.N.Y. Feb. 28, 2002); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1094 (S.D. Fla. 1997); *Xuncax v. Gramajo*, 886 F. Supp. 162, 170, 185 (D. Mass. 1995).

Public Redacted Copy

grossly humiliating in one cultural context is of no moment in another." *Id.* at 712.  Courts

applying *Sosa* have consistently agreed.  *See Aldana*, 416 F.3d at 1247 ("We see no basis in law

to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment or punishment."); *In re*

*Chiquita Brands Int'l, Inc. ATS & S'holder Deriv. Litig.*, 792 F. Supp. 2d 1301, 1324 (S.D. Fla.

2011) (rejecting claim); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1183

(C.D. Cal. 2005) ("It would be impractical to recognize [cruel, inhuman and degrading treatment

claims] as constituting an ATS claim because it would allow foreign plaintiffs to litigate claims

in U.S. courts that bear a strong resemblance to intentional infliction of emotional distress."),

*aff'd on other grounds*, 771 F.3d 580.

### C.   Common Law "Extrajudicial Killing" And "Torture" Claims Are Displaced By The TVPA And Are Not Universally Recognized In This Context

Plaintiffs' common law "extrajudicial killing" and "torture" claims are precluded

in several respects.  *First*, even assuming they involve universally recognized norms under

international law, they cannot proceed as federal common law claims under the ATS because

they have been displaced by the TVPA.  When "Congress addresses a question previously

governed by a decision rested on federal common law, the need for such an unusual exercise of

lawmaking by federal courts disappears." *City of Milwaukee v. Illinois*, 451 U.S. 304, 315

(1981).  Congress enacted the TVPA specifically to create "a civil action for recovery of

damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102–

256, 106 Stat. 73 (1992); 28 U.S.C. § 1350 note.  The TVPA thus "spoke directly to [the]

question" of liability for extrajudicial killing and torture, *City of Milwaukee*, 451 U.S. at 315,

thereby obviating the need to create federal common law on the same subject.  "It is hard to

imagine that the *Sosa* Court would approve of common law claims based on torture and

Public Redacted Copy

extrajudicial killing when Congress has specifically provided a cause of action for those violations and has set out how those claims must proceed." *Enahoro v. Abubakar*, 408 F.3d 877, 885-86 (7th Cir. 2005). Indeed, the TVPA would be "meaningless" if it did not displace common law remedies, because "[n]o one would plead a cause of action under the Act and subject himself to its requirements if he could simply plead under international law." *Id.* at 884-85.

    *Second*, and in any event, prohibitions on torture and extrajudicial killing are not norms recognized under customary international law with the specificity required for federal common lawmaking under *Sosa*. As explained above, customary international law only permits liability for *official* acts of torture and extrajudicial killing, and Plaintiffs have abandoned any such claim. *See Doe I*, 393 F. Supp. 2d at 25-26 (citing *Sanchez-Espinoza*, 770 F.2d at 206-07). Moreover, while modern international authorities have recognized claims of genocide, war crimes, and crimes against humanity, they have not recognized international law claims for individual extrajudicial killing unconnected to such mass, systematic acts (if they did, every unauthorized police shooting in the United States resulting in death would constitute an actionable violation of international law). Neither the ICTY nor ICTR authorize claims for extrajudicial killing distinct from the broader crimes, which Plaintiffs do not and could not allege here. *See* Statute of the Int'l Crim. Trib. for the Former Yugoslavia arts. 2, 4, 5, U.N. Doc. S/25704 annex (May 3, 1993) (Oh Decl., Ex. 22); Statute of the Int'l Crim. Trib. for Rwanda arts. 2, 3, 4, S.C. Res. 955, U.N. Doc. S/RES/955 annex (Nov. 8, 1994) (Oh Decl., Ex. 23). Nor does the Rome Statute. The tribunals at Nuremberg likewise never convicted any individual for an extrajudicial killing that was unconnected to genocide, crimes against humanity, or war crimes.

Public Redacted Copy

*Third*, and finally, allowing common law extrajudicial killing and torture claims to proceed in federal court would have "breathtaking" implications. *Sosa*, 542 U.S. at 736-37. Those claims would permit a cause of action for any killing absent "a conviction in due process of law," PSAC ¶ 244, or act of violence "for the purpose of obtaining information," *id.* ¶ 245, anywhere in the world at any time. The claims would apply to potentially legitimate police and military acts of all governments, including the United States. Especially given recent controversial police killings and the Senate Report detailing "enhanced interrogation techniques" employed by U.S. officials, *see* Senate Select Committee on Intelligence, Committee Study of the Central Intelligence Agency's Detention and Interrogation Program (Dec. 13, 2012) (Oh Decl., Ex. 24),[18] federal court recognition of internal law norms against extrajudicial killing and torture would insert the judiciary into policy spheres far outside its expertise. And as the *Kiobel* Court warned, recognizing common law claims under the ATS could even allow foreign governments to "hale our citizens into their Courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world." *Kiobel*, 133 S. Ct. at 1669. A federal court construing federal common law should not "trigger[] such serious foreign policy consequences"—it should avoid them. *Id.*

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for leave to amend their complaint should be denied, and their ATS claims should be dismissed.

---

[18] *See also Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) (suit against U.S. government officials for authorizing targeted killing).

Public Redacted Copy

Washington, DC
January 8, 2015

Respectfully submitted,

_____/s/ Alex Young K. Oh_____

Jonathan Hacker (Bar No. 456553)
jhacker@omm.com
Rakesh Kilaru (Bar No. 1015310)
rkilaru@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone:  (202) 383-5300

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
800 Bell Street
Houston, TX 77002
Telephone:  (713) 656-5074

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (*pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
Ilana D. Waxman (Bar No. 1012358)
iwaxman@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006-1047
Telephone:  (202) 223-7300

*Attorneys for Defendants Exxon Mobil Corporation
and ExxonMobil Oil Indonesia Inc.*