## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JOHN DOE I,** *et al.*,

       **Plaintiffs,**

    **v.**

**EXXON MOBIL CORPORATION,** *et al.*,

       **Defendants.**

**Civ. No. 01-1357 (RCL/AK)**
**Electronically Filed**

## DEFENDANTS' MOTION TO COMPEL DISCOVERY

Defendants Exxon Mobil Corporation ("EMC") and ExxonMobil Oil Indonesia

Inc. ("EMOI") respectfully move the Court under Fed. R. Civ. P. 37 to (i) compel production of

certain documents described below; (ii) in the event that Plaintiffs fail to produce such

documents, dismiss the case or preclude Plaintiffs' testimony at trial; and (iii) award Defendants'

expenses and fees.[1]

### PRELIMINARY STATEMENT

Fourteen years after being sued, Defendants still have little or no information

about these Plaintiffs, whether they have authorized this lawsuit, or whether their assertions have

any basis in fact. For fourteen years, Plaintiffs have hidden behind a cloak of anonymity based

solely on their counsel's *ex parte* assertions about fears for their safety—even though peace has

reigned in Aceh for nearly a decade—and remained effectively beyond the reach of Defendants'

discovery. Fourteen years after filing this lawsuit, Plaintiffs have never appeared in the United

---

[1]   Pursuant to Fed. R. Civ. P. 37 and LCvR 7(m), Defendants conferred with Plaintiffs on the
matters set forth in this motion, and Plaintiffs oppose this motion.

States or directly presented their stories to this Court, and their claims remain untested through discovery.

Defendants' post-remand efforts to seek Plaintiffs' depositions and documents, however, have been stymied and obstructed by Plaintiffs' counsel, who offer only ever shifting and implausible representations about their clients.

Defendants accordingly seek the Court's intervention.  Defendants cannot rely on the representations of Plaintiffs' lead counsel—Terrance Collingsworth and Paul Hoffman—who brought this case at the same time they were engaged in a pattern of misconduct in other Alien Tort Statute ("ATS") cases across the country.  It is well documented in court opinions and filings that Messrs. Collingsworth and Hoffman have asserted claims not authorized by any clients; sought to evade legitimate discovery requests that would expose that their clients are not who they claim or that their claims are demonstrably false; and paid witnesses to secure and influence their testimony.  As one federal court put it, "Attorneys Hoffman and Collingsworth let the Court and our system down by prosecuting this meritless case without adequate care."  Order Declining to Impose Additional Sanctions for Atty's Unreasonable and Incompetent Actions, at 2, *Gonzales* v. *Texaco*, No. C 06-02820 WHA, Dkt. No. 371 (N.D. Cal. Dec. 21, 2009) (Oh Decl., Ex. 26).[2]  A different court complained of "misinformation being relayed to the court" repeatedly by Messrs. Collingsworth and Hoffman, which did not give the court "any solace in relying upon representations from counsel."  Oh Decl., Ex. 27, at 6-7.  Here, too, neither Defendants nor the Court should take any solace in counsel's assertions, and put these Plaintiffs to their proof.

---

[2]    For the Court's convenience, certain materials referred to in this Motion are attached as exhibits to the accompanying Declaration of Alex Young K. Oh ("Oh Decl.").

Accordingly, Defendants respectfully request the Court for an order directing Plaintiffs to produce certain basic documents—copies of identification and travel documents, engagement letters, and other items that are readily available in the United States, but Plaintiffs inexplicably refuse to produce. Should Plaintiffs be unable or unwilling to produce such documents, the Court should dismiss their claims or, at a minimum, preclude their testimony at trial.

## BACKGROUND

### I.     Plaintiffs Have Remained Behind A Cloak of Anonymity for Fourteen Years

On June 19, 2001, concurrent with filing their Complaint asserting, *inter alia*, ATS and common law tort claims against Defendants, Plaintiffs moved *ex parte* to proceed using pseudonyms. Dkt. No. 1. The *ex parte* motion relied exclusively on an attorney affidavit from Mr. Collingsworth. Dkt. No. 4 (Oh Decl., Ex. 1). Since 2001, Plaintiffs have never once appeared in court—not in writing, and certainly not in person—to affirm that their concerns for their safety were valid in 2001, or that their concerns remain valid years after the peace accord was signed in 2005. Nor have their attorneys ever represented that since 2001, they have consulted with their clients about their continuing need to remain anonymous in this litigation. *See*, *e.g.*, Dkt. No. 179.

### II.    Defendants Cannot Verify Plaintiffs' Identities or Investigate Their Alleged Injuries

#### A.     Plaintiffs Refused to Disclose Full Information About Themselves During Phase I Discovery

From 2006-2008, the parties engaged in "Phase I" discovery in the United States. In this Phase, Defendants produced over 112 boxes of hard copy documents and 15,000 electronic documents, submitted verified responses to interrogatories, and made eight former and current employees available for depositions. Dkt No. 440-1 ¶¶ 15, 16. In contrast, Plaintiffs

produced only two boxes of documents, largely comprised of publicly available information having little or nothing to do with Plaintiffs, such as Defendants' SEC filings, publicly available news articles, and U.S. State Department reports, and produced no witnesses for depositions, claiming that they had no evidence of Defendants' U.S. conduct.  Oh Decl., Ex. 5; Dkt. No. 426-1, at 9 n.8.  Plaintiffs (with the exception of Jane Doe I) also submitted interrogatory responses, the only instance of verified information from Plaintiffs in the entire fourteen-year history of the case.  Oh Decl., Ex. 4.  These interrogatory responses provided only very general information about Plaintiffs' alleged injuries, failing to include any specifics about the identities of the Indonesian soldiers allegedly involved in the attacks on Plaintiffs or, in many instances, even the alleged attacks.  *See*, *e.g.*, Pl. Jane Doe III's Supplemental Resp. to ExxonMobil Oil Corps.' First Set of Interrogs., at 2-3 (Jul. 31, 2007) (Oh Decl., Ex. 4) (alleging that her husband was abducted by soldiers based solely on what she heard from unidentified local villagers).

More troubling was Plaintiffs' persistence in withholding detailed or verifiable information about their identities, making it difficult for Defendants even to confirm who they are.  For one Plaintiff, counsel unilaterally refused to provide any name at all for over two years even after a protective order was entered, Oh Decl., Exs. 2, 7, 8, and never submitted interrogatory responses on her behalf, *see* Oh Decl., Exs. 4 & 7.  For others, Plaintiffs' counsel provided a list of Plaintiffs' names and villages, but for many, the names provided are a single common name with no specific associated address, making it difficult, if not impossible, for Defendants to identify the individual.  Oh Decl., Ex. 2, at 3.  Plaintiffs also objected to producing

identification documents, providing only certain local identification materials as a "courtesy" for four of the Plaintiffs only.[3]  Oh Decl., Exs. 3, 6.

Over the years, some Plaintiffs apparently died.  While that is not surprising given the duration of this case, what is surprising is Plaintiffs' counsel's lack of awareness of, or efforts to conceal, such deaths.  Although two of the Plaintiffs apparently died in 2002 and 2003, Dkt. No. 123, Ex. A. at ¶¶ 6, 8, 67, 69, counsel failed to notify the court and moved for substitution only after *Defendants* filed a notice of death in 2006.  *See* Dkt. No. 161.  Similarly, counsel indicated as early as 2007 that a third Plaintiff "may have died," Dkt. No. 248 at 13 n.6, but refused to provide any details, only confirming last month that two additional Plaintiffs have died, without providing the names of the deceased Plaintiffs.  Oh Decl., Ex. 20, at 5-6.

**B.    Plaintiffs Resist Discovery Post-Remand**

After the Court granted in part and denied in part Defendants' motion to dismiss on September 24, 2014, the parties resumed discovery.  While Defendants have fully satisfied Plaintiffs' further requests, Plaintiffs continue to resist Defendants' discovery requests.

1.    Plaintiffs' Depositions

On October 23, 2014, Defendants served deposition notices on all eleven Plaintiffs, to take place in Washington, D.C. beginning in December.  Oh Decl., Ex. 10.  After initially refuting their obligation to appear for depositions in Washington, D.C., Plaintiffs' counsel eventually agreed that Plaintiffs would appear in D.C., but requested more time so that Plaintiffs could obtain passports and visas.  Oh Decl., Ex. 11, at 2-3; Oh Decl., Ex. 13, at 8-10. Based on counsel's agreement that Plaintiffs would appear in D.C., and that they would provide

---

[3]    Plaintiffs provided local identification documents, such as family identification cards and government-issued IDs for two original Plaintiffs, John Doe VI and John Doe VII, and for two substitute Plaintiffs, Jane Doe V and Jane Doe VI.  Oh Decl., Exs. 3, 6.

regular updates on the progress of obtaining their travel documents, Defendants agreed to take the depositions off the calendar.  Oh Decl., Ex. 13, at 6-9.

Plaintiffs' counsel, however, failed to live up to their part of the bargain.  For nearly three months, despite repeated prompts by Defendants, Plaintiffs' counsel failed to provide any status reports as to Plaintiffs' efforts to enter the United States, or even a confirmation that they were in touch with Plaintiffs, or that all were still living.  Oh Decl., Ex. 12, at 1-2; Oh Decl., Ex. 13, at 1-6.  Only in February, after filing an amended complaint for all Plaintiffs in November 2014, did counsel inform Defendants that two Plaintiffs have died, without providing any further information.  Oh Decl., Ex. 20, at 5-6.

Based on Plaintiffs' counsel's breach of the agreement, Defendants re-noticed all Plaintiffs' depositions in January.  Oh Decl., Ex. 15.  It was only then that counsel provided further information about Plaintiffs' efforts to enter the U.S. for their depositions, which raised more questions than answers.  Rather than providing the underlying travel documents, such as passports and visa applications, to demonstrate their effort, counsel instead, provided a declaration attesting that such documents existed.  Oh Decl., Ex. 18.  The only other document provided was a January 27, 2015 letter written to the U.S. Embassy by Mr. Collingsworth allegedly in support of Plaintiffs' visa applications, which inexplicably redacted the names of the visa applicants so that Defendants could not see who actually applied for visas.  Oh Decl., Ex. 17.  The Collingsworth letter explained that the unnamed individuals referenced in the letter filed a lawsuit in the District of Columbia against Defendants, and sought to enter the U.S. to give testimony at depositions *and trial*, but did not attach any official court documents that would corroborate the assertion, such as the notices of depositions that were served by Defendants.  *Id.* Counsel was also careful to note that the Collingsworth letter was not actually submitted to the

U.S. Embassy by counsel, but had merely been provided to Plaintiffs to transmit, if they so chose.  Oh Decl., Ex. 20, at 5.  In short, the only supporting document provided—apart from counsel's declaration—left Defendants entirely in the dark as to who had obtained passports, who applied for visas, and whether any visa applications were, in fact, submitted.

Plaintiffs refused to provide an unredacted copy of the Collingsworth letter, or any further information about Plaintiffs' efforts to obtain their visas.  Then, less than a month later, on February 25, Plaintiffs' counsel represented that all eleven of their clients had submitted to visa interviews, and each application was rejected on the spot, and therefore Plaintiffs could not come to the United States for their depositions.  Oh Decl., Ex. 23, at 3.  Counsel then provided form documents allegedly showing that all eleven visa applications were denied, notwithstanding that the State Department apparently grants nonimmigrant visas to ***over 90%*** of Indonesian citizen applicants.[4]  Oh Decl., Ex. 22.  The stated reason on each rejection form was that the applicant failed to identify social, economic and familial ties sufficient to demonstrate no intention to abandon Indonesia.  *Id.*  Defendants renewed their request for the passports and visa application documents, including an unredacted version of the Collingsworth letter, given that the rejection forms now contained names, but counsel again refused.[5]  Oh Decl., Ex. 23, at 1-3.

At no time during these discussions did counsel assert that redaction of Plaintiffs' names or withholding of travel documents were necessary for Plaintiffs' safety; nor could they,

---

[4]   *See* U.S. Embassy – Jakarta, Indonesia, *Nonimmigrant Visa*, available at: http://jakarta.usembassy.gov/visa/howtoapply.html. (Oh Decl., Ex. 57).

[5]   The names on the visa rejection forms contained a number of discrepancies when compared to the names of Plaintiffs provided to the Court in Mr. Collingsworth's declaration in support of the *ex parte* pseudonym order and to Defendants during Phase I discovery.  *Compare* Dkt. No. 4 (Oh Decl., Ex. 1), at 8 & Oh Decl., Ex. 2, at 3 *with* Oh Decl., Ex. 22.

as peace has reigned in Aceh since 2005, and Plaintiffs' own counsel have acknowledged that circumstances in Aceh have changed.  Oh Decl., Ex. 9, at 1.

2.    Defendants' Requests for Production of Documents

Concurrent with Defendants' attempts to secure Plaintiffs' testimony, on January 12, 2015, Defendants served document requests seeking, among other things:  engagement letters between Plaintiffs and counsel; passport, visa, and other identification documents; documents concerning any payments to potential witnesses; and documents concerning third party financing for this litigation.  Oh Decl., Ex. 14.  Defendants also sought all court filings that had been filed *ex parte*, including the June 13, 2001 declaration filed by Mr. Collingsworth in support of Plaintiffs' pseudonym motion.  Oh Decl., Ex. 16.[6]

Plaintiffs refused to produce the majority of documents requested, while confirming that many of the documents are readily available in their Washington, D.C. office.  Oh Decl., Ex. 19.  Plaintiffs agreed to produce one selectively chosen identification document for each Plaintiff, if it could be located and was not previously produced, but refused to produce their visa and passport documents.  *Id.* at 9-13.  With respect to witness payments, Plaintiffs asserted that there were none, subject to the caveat that their search did not include "expenses permitted by the D.C. Rules of Professional Conduct."  *Id.* at 19-20.[7]

---

[6]    For nearly fourteen years, Plaintiffs steadfastly refused to produce the *ex parte* affidavit that formed the basis of the pseudonym order, most recently offering the nonresponsive explanation that "FRCP 5 recognizes that certain motions may be filed ex parte," despite the protective order that safeguards its contents.  Oh Decl., Ex. 16, at 1.  Only after receiving notice that Defendants intended to move to compel the production of *ex parte* filings did Plaintiffs produce the June 13, 2001 Collingsworth declaration—nearly 14 years after it was filed with the Court.  *See* Oh Decl., Ex. 24.

[7]    Plaintiffs later changed their claim to state that no responsive documents existed at all.  Oh Decl., Ex. 21, at 1-2.

III.    **Plaintiffs' Counsel's Conduct Raises Significant Questions in Light of Their Conduct in Other Cases**

The absence of Plaintiffs from this litigation for fourteen years, their inexplicable refusal to produce basic identification documents, and the lack of clarity on their efforts to enter the U.S. for depositions, raise substantial questions about who Plaintiffs are and whether they are aware of, or have authorized their counsel to represent their interests in, this case.  Defendants do not raise these questions lightly, but are compelled to do so because of well-documented reports about troubling conduct engaged in by Messrs. Collingsworth and Hoffman in other cases. Messrs. Collingsworth and Hoffman have been found or accused in other cases to have fabricated claims and plaintiffs, engaged in gamesmanship to avoid discovery, prosecuted actions without clients' authority, and made improper payments to witnesses, as detailed below.

A.    ***Gonzales* v. *Texaco***

In *Gonzales* v. *Texaco*, No. C. 06-02820 WHA (N.D. Cal. 2006), Messrs. Collingsworth and Hoffman filed suit for Ecuadorian plaintiffs who claimed that Texaco's petroleum operations caused them physical injuries, including cancer.  However, deposition testimony revealed that three of the plaintiffs' claims were wholly fabricated—neither they (nor their family members) ever had cancer, and the claims were dismissed.  *Gonzales* v. *Texaco*, No. C. 06-02820 WHA, 2007 WL 2255217, at *1-2, 4 (N.D. Cal. Aug. 3, 2007).  The episode caused Judge Alsup of the U.S. District Court for the Northern District of California to impose sanctions on Messrs. Collingsworth and Hoffman, remarking that this was "not the first evidence of misconduct by plaintiffs' counsel in this case" and that counsel "manufactured" the case.  *Id.* at

*3.[8]   Judge Alsup noted that counsel's complaint alleged "baseless" claims without having

"interviewed any of the three plaintiffs at issue." *Gonzales* v. *Texaco Inc.*, No. C. 06-02820

WHA, 2007 WL 3036093, at *2 (N.D. Cal. Oct. 16, 2007).

As the litigation progressed, Plaintiffs' counsel received evidence that "hoisted

the warning flags yet higher and, in truth, demonstrated that the cancer claim was false,"

including medical records and updates that contradicted the claims. *Id.* at *7, 9.  Nevertheless,

*even after* receiving this information, counsel signed responses to interrogatories that were

"artfully worded" so as to perpetuate the false cancer claims. *Id.* at *8, 11.

Moreover, the court found that the "contracts" that counsel had secured from the

plaintiffs demonstrated an abject failure to obtain any consent to bring suit in the United States,

"much less informed consent." *Id.* at *3, 5.  The half-page writing stated generally that

Ecuadorian counsel would "sue companies that have caused damage and injury to the client from

actions relating to petroleum operations [and] . . . litigate so as to provide public health clinics to

the client as well as all other residents who reside in the same location as the client." *Id.*  This

purported "contract" made no reference to bringing suit in the United States, nor did it expressly

authorize any suit to be brought in the plaintiffs' names. *Id.*  And, certainly, no attorney ever

counseled the plaintiffs on the ramifications of filing suit in U.S. federal court. *Id.*  The court

---

[8]   The Ninth Circuit reversed the sanctions on appeal because the district court applied the
standard for party-initiated sanctions, and not the more stringent standard applicable under
*sua sponte* review. *Gonzales* v. *Texaco*, 344 F. App'x 304, 309 (9th Cir. 2009).  On remand,
Judge Alsup reiterated the gravity of the misconduct, noting that "[p]laintiffs' counsel failed
to reasonably and competently investigate whether these plaintiffs actually had cancer or had
authorized legal action in the United States before filing," and concluding that "Attorneys
Hoffman and Collingsworth let the Court and our system down by prosecuting this meritless
case without adequate care." *See* Order Declining to Impose Additional Sanctions for Atty's
Unreasonable and Incompetent Actions, at 2, *Gonzales* v. *Texaco*, No. C 06-02820 WHA,
Dkt. No. 371 (N.D. Cal. Dec. 21, 2009) (Oh Decl., Ex. 26).  However, in light of the
heightened standard, Judge Alsup declined to impose further sanctions. *Id.* at 1-2.

found that, as a result, these plaintiffs "never even realized litigation would be brought in their name in the United States."  *Id.* at *1.

### B.    *Drummond* Litigation

Mr. Collingsworth also sued Drummond Company, Inc., an Alabama-based mining corporation, over the past twelve years under the ATS for a variety of clients.[9]  These cases accuse Drummond of aiding and abetting an illegal group of paramilitaries in killing Colombian citizens.  Instances of Mr. Collingsworth's questionable and unethical practices permeate these litigations, ranging from presenting false information and "sham declarations" to paying witnesses in exchange for favorable testimony.

### 1.    Misrepresenting Facts to the Court

In *Romero* v. *Drummond Co., Inc.* (*Drummond I*), Mr. Collingsworth and his colleagues repeatedly made false representations to the court and defense counsel, particularly with respect to the location, availability, and expected testimony of potential witnesses.  Judge Bowdre of the U.S. District Court for the Northern District of Alabama, who presided over the *Drummond* cases, noted:

> But part of the problem with this case, throughout this case, is misinformation being relayed to the court . . . But, particularly, when plaintiffs are asking me to basically accept your word about all these newly discovered witnesses and how diligently everyone has been looking for these witnesses all these years and unable to find them.  And to then come in and find out that, once again, the court has been provided with misinformation about these witnesses doesn't give me any solace in relying upon representations from counsel about these witnesses.

Oh Decl., Ex. 27, at 5-6.

---

[9]    Five cases were consolidated in *Romero* v. *Drummond Co., Inc.*, No. 7:03-cv-0575-KOB (N.D. Ala.), and three others proceeded separately:  *Baloco* v. *Drummond Co., Inc.*, No. 7:09-cv-00557 (N.D. Ala.); *Balcero* v. *Drummond Co., Inc.*, No. 2:09-cv-01041 (N.D. Ala.); and *Melo* v. *Drummond Co., Inc.*, No. 2:13-cv-00393 (N.D. Ala.).

In a situation closely analogous to the instant case, counsel in *Drummond I* represented that one plaintiff, Jimmy Rubio, was unsuccessful in his efforts to obtain a visa to enter the United States for his deposition.  Oh Decl., Ex. 30, at 5.  But counsel refused to produce any documents relating to these efforts and even propounded a response indicating they had none, which forced defendants to engage in protracted efforts to obtain visa application documents directly from the State Department.  *Id.* at 4-5.  In reality, however, Rubio *never even applied* for a visa.  *Id.* at 4.  Judge Bowdre noted on the record that she was "very frustrated at the delay that has been caused" "by the lack of candor" "from the very beginning concerning Mr. Rubio's efforts to obtain a visa," *id.*, and that counsel had either "misled the court or have not been candid in what they have said to the court or to opposing counsel" at every step of the way, *id.* at 5.

Notwithstanding this duplicity, Mr. Collingsworth then tried to introduce Rubio as a surprise live trial witness.  The court rejected this effort, stating:  "it was close to a year that we wasted in this case trying to get Mr. Rubio's testimony and he kept disappearing and would never make himself available," and "he is not going to be allowed to testify."  Oh Decl., Ex. 29, at 2063-64.

On another occasion, Mr. Collingsworth and his co-counsel informed defense counsel at the "midnight hour" that a witness they were scheduled to depose had been unable to leave Colombia, despite prior "emphatic[]" representations to the court that he had already left. Oh Decl., Ex. 27, at 2-6.

2.    Presenting "Sham Declarations" to the Court

The jury in *Drummond I* rejected plaintiffs' claims wholesale.  Undeterred, Mr. Collingsworth filed *Baloco* v. *Drummond Co., Inc.* ("*Drummond II*"), purportedly on behalf of children of the men whose murders were adjudicated in *Drummond I.*  With Mr. Collingsworth

as counsel, however, the mothers of the *Drummond II* plaintiffs had already tried and failed—on behalf of themselves and their children—to hold Drummond liable for these deaths in *Drummond I*.[10]   *Baloco* v. *Drummond Co., Inc.*, No. 7:09-CV-00557, 2012 WL 4009432 at *6 (N.D. Ala. Sept. 12, 2012).

In an apparent effort to avoid dismissal for *res judicata*, Mr. Collingsworth had his clients submit declarations that flatly contradicted facts established in *Drummond I*. Specifically, in their *Drummond I* deposition testimony, the mothers had testified that they brought the lawsuit against Drummond on behalf of themselves and their children.  *Id.*  However, in *Drummond II*, "the mothers asserted that the comments made in deposition testimony were not made 'on my rights or those of my children as a lawyer.'"  *Id.* (quoting the declarations).  In a pointed rebuke, the court struck the declarations as "sham."  *Id.* at *9, n.14.

On appeal, the Eleventh Circuit affirmed and found that "the district court properly struck the Mothers' declarations as sham."  *Baloco* v. *Drummond Co., Inc.*, 767 F.3d 1229, 1245 (11th Cir. 2014).  The Eleventh Circuit joined the *Texaco* court and the *Drummond I* court as yet another federal court to find that Mr. Collingsworth had engaged in "disingenuous" conduct.  *Id.*

---

[10]   The mothers previously brought suit in *Rodriguez* v. *Drummond Co., Inc.*, No. 02-CV-00665 (N.D. Ala.), which was then consolidated with *Romero* v. *Drummond Co., Inc.*, No. 03-CV-575 (N.D. Ala.).

3.      Paying Witnesses for Testimony

It has also come to light that in the *Drummond* litigation, Mr. Collingsworth and

his associates made repeated and substantial payments to witnesses for testimony.[11]  Examples of

such payments include:

- monthly payments of 1,500,000 pesos to an incarcerated paramilitary and his family beginning two months before he submitted a declaration in the *Balcero* litigation, and totaling 74,681,950 pesos, or $39,162.01.  Oh Decl., Ex. 35, at ¶ 7; Oh Decl., Ex. 36.

- at least $10,000 to a witness who provided a sworn declaration for the *Balcero* litigation.  Oh Decl., Exs. 37-38.

- more than $50,000 to another witness, which was represented by Mr. Collingsworth as for "field work" when the wiring company raised questions. Oh Decl., Exs. 39-42.

- $2,084 to the wife of a witness who testified against Drummond in *Balcero*. Oh Decl., Ex. 43.

- $8,900 to a witness who testified in *Drummond I*.  Oh Decl., Ex. 30, at ¶ 28. Although these payments were allegedly for "security," no documentation confirmed that.  Oh Decl., Ex. 45, at 4.

- In total, by April 2014, over $300,000 to more than 20 individuals in Colombia and Panama.  Oh Decl., Ex. 33, at ¶ 3.[12]

---

[11]   Mr. Collingsworth is currently facing civil racketeering and conspiracy claims as a result of this conduct, in a case alleging a scheme to extort money from and otherwise damage Drummond through, among other things, bribery, fraud, witness tampering, and money laundering.  Complaint, *Drummond Co., Inc.* v. *Collingsworth*, No. 2:15-cv-506-JHH, Dkt. No. 1 (N.D. Ala. 2015) (Oh Decl., Ex. 49).  Mr. Collingsworth is also defending a defamation suit for having disseminated false information about Drummond to its customers and business partners, which is where much of this evidence was revealed.  *See Drummond Co., Inc.* v. *Collingsworth*, No. 2:11-cv-3695-RDP-TMP (N.D. Ala. 2014).  As a result of this evidence, defendants facing Mr. Collingsworth in other ATS cases have sought, or will seek, discovery as to whether his misconduct has tainted other cases as well.  *See, e.g., In re Chiquita*, No. 08-01916-MD, Dkt. No. 696 (S.D. Fla. Jan. 23, 2015); *Juana Perez 1A* v. *Dole Food Co.*, Case No. 09-011600 (05) (Fla. Circ. Ct. Jan. 8, 2015).

Mr. Collingsworth's email correspondence produced in discovery in the *Drummond* defamation case demonstrates that he feels unconstrained by any ethical rules when paying for fact testimony.  In one email, Mr. Collingsworth wrote:  "[i]n order to receive the initial draft of the information the witness requires [$20,000].  There may be another 10 later for follow up.  ***If we don't like what we see, we don't pay***."  Oh Decl., Ex. 48 (emphasis added).  In another email, Mr. Collingsworth asked his litigation funder to pay close to $100,000 for a witness's legal fees.  Oh Decl., Ex. 34, at 2-5.  When the litigation funder questioned whether such payments were ethical and worthwhile given the damage to the witness's credibility, Mr. Collingsworth retorted:  "As opposed to him saying Drummond had nothing at all to do with it?"  *Id.* at 2.

These payments apparently prompted some of Mr. Collingsworth's own co-counsel to distance themselves.  Paul Wolf, co-counsel with Mr. Collingsworth in the *In re Chiquita* litigation, submitted an affidavit attesting that he was party to at least four conversations discussing Mr. Collingsworth's payment of witnesses, including with the litigation funders and other co-counsel.[13]  Oh Decl., Ex. 46, at ¶¶ 8-23.  During one of those meetings, according to Mr. Wolf, Mr. Collingsworth opined that it was permissible to pay witnesses in some circumstances and represented that he had an "ethics opinion" about it.  *Id.* ¶ 21.  Mr. Collingsworth never provided such an opinion; instead he circulated an internal memorandum

---

[12]   Mr. Collingsworth also misrepresented the existence of payments to paramilitaries even after the court in *Balcero* v. *Drummond* ordered Mr. Collingsworth to disclose any payments to paramilitaries.  *Compare* Mem. Op. & Order, at 5-7, *Balcero* v. *Drummond Co., Inc.*, 2:09-CV-01041-RDP, Dkt. No. 332 (N.D. Ala. Mar. 8, 2012) (Oh Decl., Ex. 31) (ordering production of interrogatory responses related to the payment of witnesses by Mr. Collingsworth) *with* Oh Decl., Exs. 35-36 (bank deposit slips of payments to Jairo de Jesus Charris Castro dated July 30, 2009 through September 30, 2013).

[13]   Another counsel from the *Chiquita* case similarly recounted his disagreement with Mr. Collingsworth regarding witness payments.  *See* Oh Decl., Ex. 47.

written by an associate at his law firm regarding "the ethics of paying costs and fees for a witness." *Id.* at ¶ 26; Oh Decl., Ex. 44.  In his cover email, Mr. Collingsworth asserted "[c]learly can do," but then posited:  "question is doing in a way to minimize impact on credibility."  Oh Decl., Ex. 44.

C.   *Unocal* Litigation

Messrs. Collingsworth and Hoffman served as part of a "team" of lawyers that filed ATS claims against Unocal Corp. in California Superior Court for claims allegedly resulting from Unocal's pipeline project in Burma, including *Doe* v. *Unocal Corp., No. BC237980 (Cal. Super. Ct. 2000) and *Roe III* v. *Unocal Corp*., No. BC237769 (Cal. Super. Ct. 2000).[14]  These cases—which Mr. Collingsworth has stated are " very similar to [the instant] case," Dkt. No. 4 (Oh Decl., Ex. 1)—also demonstrate Messrs. Collingsworth and Hoffman's tendency to misrepresent the facts.

The complaint filed in *Doe* v. *Unocal* alleged that Burmese soldiers had knocked a baby into a cooking fire while rounding up slave labor in support of a pipeline, and that the baby died from the resulting injuries.  Oh Decl., Ex. 51, at ¶¶ 53-69.  However, contemporary news articles proved these allegations false, demonstrating that in fact, the incident had occurred more than a year earlier than alleged, in connection with a project wholly unrelated to Unocal, and that the baby survived its injuries.  Oh Decl., Ex. 53, at 6-7; Lisa Girion, "*Unocal Pipeline Trial to Begin*," at 2, L.A. TIMES (Dec. 8, 2003) (Oh Decl., Ex. 56).

An article in a Bangkok newspaper reported the story of a baby in rural Burma whose head had been burnt by local troops when his father showed up late for work on the Ye-

---

[14]   Mr. Collingsworth was counsel in the *Roe* litigation and Mr. Hoffman was counsel in the *Doe* litigation.  When announcing the settlement, the *Unocal* plaintiffs made clear that the cases were jointly litigated as a "team."  *See* EarthRights International, *Historic Advance for Universal Human Rights: Unocal to Compensate Burmese Villagers* (Apr. 2, 2005).

Tavoy *railroad project*—a public infrastructure project miles away from, and unrelated to, the natural gas pipeline project in which Unocal was a minority investor.  *Making Tracks*, THE NATION (Mar. 22, 1994) (Oh Decl., Ex. 55); Tentative Ruling on Doe Plaintiffs' Motion for Class Certification, at 6, *Doe* v. *Unocal*, No. 237980 (Cal. Super. Ct. Jun. 14, 2002) (Oh Decl., Ex. 52) (holding that Ye-Tavoy project was unrelated to natural gas pipeline).  According to the article, the baby survived—and did not perish.  Interestingly, the photographs of the mother and child in the Thai paper were the same pictures Messrs. Collingsworth and Hoffman submitted as the mother and the alleged murdered child in connection with their lawsuit.  Oh Decl., Ex. 53, at 6.[15]  Before this egregious deception could lead to sanctions, however, the *Unocal* case settled.[16]

\*          \*          \*

All of the above misconduct by Messrs. Collingsworth and Hoffman occurred in the early 2000s, when they also filed the instant case against Defendants for the eleven anonymous villagers residing in Aceh.  There is every reason to suspect that similar conduct may be at issue in this case.[17]

---

[15]  Misconduct such as this further reinforces the Defendants' need for photographic identification of the Plaintiffs here.

[16]  In the companion federal case against *Unocal*, however, the court did impose sanctions against Mr. Hoffman's co-counsel for, *inter alia*, presenting affidavits that had not been properly reviewed by the affiants and "egregious inconsistencies" in the plaintiffs' testimony, including the dates of their alleged injuries, and, in at least one case, whether the alleged slave labor occurred at all.  Order Granting Defs. Unocal, IMLE and Beach's Mot. To Strike Affs. of the Named Pls.; and Order Directing Pls.' Counsel to Show Cause Why They Should Not Be Sanctioned, at 6-7 *Doe* v. *Unocal*, No. CV 96-6959 RAP, Dkt. No. 188 (C.D. Cal. Oct. 28, 1997) (Oh Decl., Ex. 50).

[17]  Defendants' counsel are aware of similar conduct by Plaintiffs' counsel in other cases, including not properly investigating their clients' claims and acting without their asserted clients' full authority and consent.  The proceedings in these other matters are in certain instances subject to protective orders.  If the Court so requires, Defendants would seek to provide further information to the Court consistent with those orders.

**ARGUMENT**

**I.      The Court Should Compel Production of the Disputed Discovery**

Pursuant to Fed. R. Civ. P. 37(a), Defendants move for an order compelling

Plaintiffs to produce:  (1) retainer agreements between Plaintiffs (or potential substitutes) and

their attorneys; (2) passport, visa, and other identification documents relevant to Plaintiffs'

supposed efforts to come to the United States to prosecute this action; and (3) documents

pertaining to third-party litigation financing for the instant action.

Plaintiffs have refused to produce such documents purely on relevance grounds.

Plaintiffs do not claim any burden, acknowledging that such documents are readily accessible,

and located in counsel's offices in Washington, D.C.  Nor do Plaintiffs claim that disclosure of

such documents would raise any safety concerns.  Plaintiffs' refusal lacks merit.

Discovery may be sought as to "any matter that bears on, or that reasonably could

lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer*

*Fund, Inc.* v. *Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (citation

omitted).  Once a relevancy objection has been made, the party seeking discovery has to

demonstrate that the information sought to be compelled is discoverable.  *See Alexander* v. *Fed.*

*Bureau of Investigation*, 194 F.R.D. 316, 325 (D.D.C. 2000) (citation omitted).  "[R]elevancy is

broadly construed and encompasses any material that bears on, or that reasonably leads to other

matters that could bear on, any issue that is or may be in the case." *Id.*

**A.      Retainer Agreements Between Plaintiffs and Counsel**

Plaintiffs' claim that retainer agreements are not relevant is without merit.  As an

initial matter, Plaintiffs do not assert privilege as an objection.  Nor can they.  Retainer

agreements are non-privileged and often subject to discovery.  *See, e.g., Gaines* v. *Law Office of*

*Patenaude & Felix, A.P.C.*, No. 13-cv-1556 DHB, 2014 WL 3894348, at *5-6 (S.D. Cal. June

12, 2014) (deeming retainer agreements relevant); *Barton* v. *RCI, LLC*, Civ. A. No. 10-3657, 2013 WL 1338235, at *25-36 (D.N.J. Mar. 28, 2013) (same); *United States* v. *Naegele*, 468 F. Supp. 2d 165, 171 (D.D.C. 2007) (finding retainer agreements not privileged).  Here, the retainer agreements are particularly relevant to determining whether Plaintiffs have authorized or given informed consent to anyone to bring this case in the United States—an issue in serious dispute in light of Plaintiffs' apparent inability to travel to the United States.

The retainer agreements take on even greater importance here given how these attorneys have behaved in other ATS litigations filed on behalf of individuals living overseas about conduct that occurred entirely overseas.  In *Texaco*, when Messrs. Collingsworth and Hoffman finally produced retainer agreements and related client intake forms—after being criticized by the court for using "false statements and lame excuses" to "stonewall" the issue, Order Compelling Production of "Intake Forms," at 3, *Gonzales* v. *Texaco*, No. 3:06-cv-02820-WHA, Dkt. No. 160 (N.D. Cal. May 4, 2007) (Oh Decl., Ex. 25)—such documents revealed that they failed to obtain the plaintiffs' consent to bring suit in the United States.  *Texaco*, 2007 WL 3036093, at *3, 5.  The documents revealed to the court that Messrs. Collingsworth and Hoffman filed complaints on behalf of "[p]laintiffs [who] were not even aware that a lawsuit had been filed in their names in the United States and none of them had specifically authorized such a suit."  Order Declining to Impose Additional Sanctions for Atty's Unreasonable and Incompetent Actions, at 2, *Gonzales* v. *Texaco*, No. C 06-02820 WHA, Dkt. No. 371 (N.D. Cal. Dec. 21, 2009) (Oh Decl., Ex. 26); *see also Baloco*, 767 F.3d at 1245 (noting that Mr. Collingsworth presented "sham" declarations regarding the scope of his authority to act for the plaintiffs).

Because Plaintiffs have never appeared before this Court in fourteen years, have remained anonymous, and disclosed only the most tenuous and limited identification information

about themselves, there are genuine questions here about who engineered, and is driving, this litigation before this Court.  Even the most basic facts about Plaintiffs, such as whether they are still living, have been difficult to obtain from Plaintiffs' counsel.  *See* Tr. of Status Conference Before the Hon. Louis Oberdorfer, at 11 (May 4, 2005) (informing the Court in 2005 that two Plaintiffs died in 2002 and 2003, respectively).  Moreover, despite filing an amended complaint on behalf of all eleven Plaintiffs on November 2014, Plaintiffs' counsel advised that two more Plaintiffs have died since 2007, while refusing to identify whom, or demonstrating their authority to act for the deceased Plaintiffs.  Oh Decl., Ex. 20, at 5-6.  Without the retainer agreements, it will be impossible to determine whether Plaintiffs actually exist, and whether they have provided informed consent to these attorneys to bring this suit in the United States.[18]

In contrast, Plaintiffs do not claim any serious burden for producing such agreements or assert any privilege objections or safety concerns.  The Court should order Plaintiffs to produce the retainer agreements.

### B.      Identification and Travel Documents

Defendants requested Plaintiffs' identification and travel documents, including all passports, visas, and documents relating to their efforts to obtain any passports or visas.  Again, while asserting that they have responsive documents, Plaintiffs' counsel refused production solely on relevance.  Plaintiffs' refusal is baseless.

---

[18]   While Plaintiffs' counsel contend that their sworn representation that such retainers exist should be enough, Defendants require the actual documents so that they can ask questions about the circumstances of the execution of these documents if and when Plaintiffs actually appear for their depositions.

As a general matter, travel and identification documents are plainly

discoverable.[19]  These documents are of particular relevance here because Plaintiffs' very

identities remain unknown and unverified after fourteen years of litigation.  The limited

information disclosed about Plaintiffs so far raises more questions than it answers.  The names of

all eleven Plaintiffs, and identification documents for four of the eleven Plaintiffs, which were

provided during Phase I discovery, are woefully incomplete, lacking any of the specificity

required to identify these individuals and probe their stories.  Oh Decl., Ex. 2, at 3.  Furthermore,

the names provided to the Court and to Defendants in Phase I do not perfectly match the names

reflected on the recent visa rejection forms.  *Compare* Dkt. No. 4 (Oh Decl., Ex. 1), at 8 & Oh

Decl., Ex. 2, at 3 *with* Oh Decl., Ex. 22.  While some (but certainly not all) of these

inconsistencies may be due to the death of Plaintiffs and potential proposed substitutes, even the

fact of a relationship between the prior Plaintiffs and the newly appearing names is impossible to

verify on the existing record.  *See, e.g.*, Oh Decl., Ex. 54, at 12 (Mr. Collingsworth's clients

falsely claimed to have a father-son relationship in another ATS action).  The inability to identify

each Plaintiff with certainty is plainly prejudicial to Defendants' ability to defend against

Plaintiffs' claims.  Not knowing who Plaintiffs are significantly hampers Defendants' ability to

investigate the who, what, where, and when of the alleged attack against each Plaintiff,

especially when such attacks occurred during a period of active civil war.  Indeed, denial of such

---

[19]  *See, e.g., McBride* v. *Infinity Prop. & Cas. Corp.*, No. 3:13-CV-1737, 2014 WL 1218912, at
*3 (D. Pa. Mar. 24, 2014) (ordering production of identification documents); Order, at 2-4,
*Ran* v. *Infinite Energy, Inc.*, No. 1:07-cv-249-MP/WCS, Dkt. No. 130 (N.D. Fla. Dec. 14,
2009) (plaintiff's full legal name, city and province of birth, and birthdate are "plainly
discoverable"); *Feulufai* v. *Pac. Princess P'ship Ltd.*, No. 2:07-cv-00808-JCM-RJJ, 2009
U.S. Dist. LEXIS 108326, at *8-9 (D. Nev. Sept. 10, 2009) (passports, visas and
naturalization documents are relevant to plaintiff's ability to travel); *State Farm Mut. Ins. Co.*
v. *Policherla*, No. 08-13939, 2009 WL 2170183, at *6-7 (E.D. Mi. Jul. 20, 2009) (ordering
production of passports).

basic information about who Plaintiffs are, in a personal tort case, likely denies Defendants due process. *See, e.g., United States* v. *Microsoft*, 56 F.3d 1448, 1457 (D.C. Cir. 1995) (noting that anonymity "raises profound questions of fundamental fairness and perhaps even due process" and that it "may well confer a kind of immunity which permits a plaintiff to hurl rhetorical weapons that could cause a unique kind of harm not faced in ordinary litigation").

Plaintiffs' travel documents are also critically important to Defendants' ability to defend themselves in this case. Plaintiffs' failure to appear in the United States—their chosen forum, which they have insisted on in opposing Defendants' *forum non conveniens* arguments, *see, e.g.*, Dkt. No. 17 at 38-48, Dkt. No. 434 at 25-28—may give rise to further arguments about whether this Court is the appropriate forum to hear Plaintiffs' claims. The documents relating to Plaintiffs' efforts to obtain visas and passports are similarly relevant to determining whether Plaintiffs engaged in a good faith effort to enter the United States, or whether their efforts were a sham. *See* Oh Decl., Ex. 30, at 5 (noting in another ATS action brought by Mr. Collingsworth that "at every step of the matter involving [the plaintiff]'s efforts to obtain a visa, the plaintiffs have either misled the court or have not been candid in what they have said to the court or to opposing counsel concerning those efforts").

Counsel's course of dealing in responding to Defendants' deposition notices here does not provide any comfort that a genuine effort was made. After agreeing to appear in the United States in order to delay the deposition dates, Plaintiffs' counsel failed to live up to their part of the bargain for months. Oh Decl., Ex. 12, at 1-2; Oh Decl., Ex. 13, at 1-6. Only when Defendants were forced to re-notice Plaintiffs' depositions in January did counsel assert that Plaintiffs have obtained their passports and submitted applications for visas and been denied (seemingly overnight). Oh Decl., Ex. 20, at 5-7; Oh Decl., Ex. 22; Oh Decl., Ex. 23, at 4.

Counsel also inexplicably redacted the names of the visa applicants on the letter to the U.S. Embassy.  Oh Decl., Ex. 17.

Indeed, that all eleven Plaintiffs applied for visas on or about January 28, 2015 (the date of the Collingsworth letter to the Embassy), travelled to Jakarta to the U.S. Embassy in person with appropriate supporting documents, and were interviewed and denied by February 25, 2015—miraculously only one day after the first Plaintiff was scheduled to appear for his deposition—strains credulity.  Per the U.S. State Department, over 90% of nonimmigrant visa applications by Indonesian citizens are granted.  Oh Decl., Ex. 57.  And, a common reason for visa denials, according to the State Department, is failure to comply with the rules, such as failing to appear in person and sending a representative in one's stead or not providing documentation of permanent ties in Indonesia.[20]  The visa rejection forms indicate that each application was rejected for the same reason—for lack of residence or familial ties in Indonesia. Oh Decl., Ex. 22.  At a minimum, the current record raises substantial questions about whether Plaintiffs' effort was in good faith, or was a sham to obtain the denials, which they could then use as an excuse for not appearing in the U.S. for their depositions or trials.  Plaintiffs again have not raised burden or safety as a reason for opposing the document request.  Accordingly, the Court should order Plaintiffs to produce these documents.

C.    **Litigation Financing**

Defendants additionally requested documents concerning the contribution of financial support from third parties to Plaintiffs or Plaintiffs' counsel for this litigation, which Plaintiffs again have refused solely on relevance.

---

[20]   *See* U.S. Embassy – Jakarta, Indonesia, *Nonimmigrant Visas: Visa Ineligibilities*, available at: http://jakarta.usembassy.gov/visa/visa_ineligibilities.html. (Oh Decl., Ex. 58)

Given Mr. Collingsworth's well documented practice of paying witnesses to secure favorable testimony, such documents are plainly discoverable and critical to assessing the credibility of witnesses who may testify at trial.  Based on the records in other cases, *see supra* at Section III.B.3, it appears that evidence of such payments are most likely to be found in third party financing documents.  Recognizing the relevance and discoverability of such documents, the *Drummond* court granted a motion to compel this precise category of documents, finding that these requests "are not overbroad and are properly within the scope of discovery to the extent that the requests involve who financing was sought from, what payments were received, how the need for money was characterized, what the terms of the financing were, and information on actual money advanced or loaned or provided to prosecute the actions."  Order, at 3-4, *Drummond Co., Inc.* v. *Collingsworth*, No. 2:11-cv-3695-RDP-TMP, Order, Dkt. No. 64 (N.D. Ala. Oct. 15, 2013) (Oh Decl., Ex. 32).

Again, Plaintiffs do not assert any grounds other than relevance.  Documents concerning third-party financing more than satisfy the Federal Rules' "broadly construed" relevancy requirement.  *See Alexander*, 194 F.R.D. at 325.  The Court should order Plaintiffs to produce these documents.

## II.      If Plaintiffs Cannot, or Refuse to, Produce the Requested Documents, the Court Should Dismiss Their Claims or Preclude Their Testimony at Trial

Rule 37 provides that, as to any party who fails to obey a discovery order or to appear for his deposition, the Court may order sanctions including, among others:  dismissing the action or prohibiting the disobedient party from introducing certain evidence.  Fed. R. Civ. P. 37(b)(2)(A)(ii), (v), 37(d)(3).  Should the Court order the production of the requested documents, and Plaintiffs refuse to or cannot produce them, sanctions would be entirely appropriate.  *See Lee* v. *Mas Int'l, LLC*, 638 F.3d 1318, 1324 (10th Cir. 2011); *see also Covad Commc'ns. Co.* v.

*Revonet, Inc.*, 267 F.R.D. 14, 24 (D.D.C. 2010) ("In not showing up, despite [the defendant's]

clear statement that it intended to go forward, and by not seeking protection from the Court, [the

plaintiff] had to know it risked sanctions.").

A.     **The Court Should Dismiss Plaintiffs' Claims**

Sanctions of dismissal are appropriate where there is "'willfulness, bad faith,

or . . . fault' on the part of the plaintiff." *Founding Church of Scientology of Washington D.C.,*

*Inc.* v. *Webster*, 802 F.2d 1448, 1458 (D.C. Cir. 1986) (quoting *Societe Internationale* v. *Rogers*,

357 U.S. 197, 212 (1958)).  Courts have further justified dismissal sanctions where:  (1) the

discovery misconduct severely prejudices the ability of the non-offending party to present or

defend its case; (2) repeated delays puts an intolerable burden on the court; or (3) dismissal

would deter similar misconduct in the future.  *See Embassy of Fed. Republic of Nigeria* v.

*Ugwuonye*, 292 F.R.D. 53, 57 (D.D.C. 2013).  While there may be circumstances where a court

will consider lesser sanctions, "the District Court nonetheless enjoys authority to impose this

sanction even where a less drastic sanction might have been entertained." *Founding Church of*

*Scientology*, 802 F.2d at 1459 (citation omitted).

A refusal to produce compelled documents—when coupled with a failure to

appear for duly noticed depositions—would demonstrate ample willfulness and bad faith.

Defendants agreed to defer Plaintiffs' depositions based on representations that counsel would

make Plaintiffs available in the United States.  Counsel have breached this agreement, and

further refuse to produce Plaintiffs' passports, visa applications and other documents that would

demonstrate that they made a genuine effort to appear in the United States.  Oh Decl., Ex. 12, at

1-2; Oh Decl., Ex. 13, at 1-6.  Plaintiffs' refusal to produce compelled documents would

"severely impede[] defendants' ability to prepare a trial strategy" against these anonymous

plaintiffs.  *Stubbs* v. *Bank of Am. Corp.*, 283 F.R.D. 218, 221 (D. Del. 2012).  As the primary, if

not only, witnesses to their alleged injuries, Plaintiffs are "uniquely situated to provide information relevant to the actions." *Founding Church of Scientology*, 802 F.2d at 1459.

Should Plaintiffs persist in refusing to produce documents that would confirm their intent to prosecute their claims, dismissal with prejudice is entirely appropriate.[21]  *See, e.g.*, *Embassy of Fed. Republic of Nigeria*, 292 F.R.D. at 58 (granting default judgment where defendant's "participation in the discovery process has been woefully insufficient" and "paltry discovery" he provided would have "crippled" the plaintiff's case); *see also Gawhara for Ready Made Clothes Co.* v. *Evergreen Marine Corp.*, No. 99-5080, 2001 WL 1737458, at *4 (C.D. Cal. Jan. 25, 2001) (dismissing claims of an Egyptian plaintiff who failed to appear for deposition because he was subject to a travel ban in Egypt "fostered by the disobedient party's conduct"). Moreover, dismissal would serve to deter similar misconduct, particularly from counsel that has a penchant for playing games with foreign plaintiffs and witnesses.

**B.      Alternatively, the Court Should Preclude Plaintiffs from Testifying at Trial**

Alternatively, the Court should preclude Plaintiffs from testifying at trial if they fail to produce the requested documents.  Fed. R. Civ. P. 37(b)(2)(A)(ii).

Counsel for Plaintiffs have asserted that, despite their failure to appear for depositions, Plaintiffs intend to testify at trial.  Oh Decl., Ex. 23, at 1-4.  Had their applications for visas been made in good faith already, it is hard to conjecture what additional socio-economic or familial ties they will be able to demonstrate at the time of trial that were not already provable

---

[21]   Defendants reserve their rights to, among other things, move to dismiss for failure to prosecute under Rule 41(b) if the produced documents demonstrate no good faith effort to appear in the United States for their depositions, or if Plaintiffs are ultimately unable to appear for trial.  Fed. R. Civ. P. 41(b); *see also Reshetnikov* v. *Republic Nat'l Bank of New York*, 233 F.R.D. 644, 644 (S.D.N.Y. 2005) (dismissing the case of a foreign plaintiff for failure to prosecute, despite diligent efforts through pretrial proceedings, because he was unable to appear at trial due to the cost of traveling and an inability to secure the necessary travel documents).

for the purposes of depositions.  But leaving that aside, Plaintiffs should not be permitted to have

it both ways.  *See, e.g., Paleteria La Michoacana, Inc.* v. *Productos Lacteos Tocumbo S.A.*, 292

F.R.D. 19, 24 (D.D.C. 2013) ("A party that chooses to initiate litigation and invoke the legal

protections of the forum should expect to appear for deposition in that jurisdiction."); *Corbell* v.

*Norton*, 213 F.R.D. 43, 47 (D.D.C. 2003) (Lamberth, J.) (denying out-of-state plaintiff's motion

for a protective order against being deposed in Washington, D.C.).  Having chosen this forum,

and resisted Defendants' *forum non conveniens* arguments, Plaintiffs cannot expect to continue

to hide behind their veil of secrecy and remain beyond the reach of this Court during discovery.

If Plaintiffs cannot, or are unwilling to, demonstrate that they made a good faith effort to appear

in the United States for their depositions, then Plaintiffs should be precluded from coming to the

United States when it suits them to pursue their claims at trial.[22]

Indeed, Mr. Collingsworth and his colleagues were called out by the *Drummond*

court for engaging in this very gamesmanship.  There, counsel represented to the court that the

anonymous plaintiffs could not travel from Colombia to the United States for their depositions or

trial because it would be unsafe and impose an undue financial hardship.  *See* Oh Decl., Ex. 28,

at 24-25.  Nevertheless, as trial approached, plaintiffs sought the court's assistance in obtaining

visas to attend the trial live.  *Id.*  The court in that case saw this ploy for what it was—"the

plaintiffs are wanting to have their cake and eat it too" —and denied the request to permit the

plaintiffs to testify live at trial.  *Id.* at 25.

## III.    The Court Should Order Plaintiffs to Pay Costs and Fees

Finally, consistent with Rule 37, Plaintiffs should be required to pay the cost and

fees that Defendants have incurred as a result of filing the instant motion.  Fed. R. Civ. P.

---

[22]   Of course, precluding Plaintiffs' testimony at trial may have the practical effect of mandating
dismissal under Rule 41(b).  *See, e.g., Reshetnikov*, 233 F.R.D. at 644.

37(a)(5)(A) ("If the motion is granted . . . the court ***must***, after giving an opportunity to be heard, require the party or deponent whose conduct necessitate the motion, the party or attorney advising that that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."); *see also DL* v. *Dist. of Columbia*, 251 F.R.D. 38, 49 (D.D.C. 2008) (Lamberth, J.) (noting that an award of expenses and fees is mandatory under Rule 37 absent an applicable exception and awarding fees upon granting a motion to compel).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court to:  (i) compel production of documents; (ii) in the event that Plaintiffs refuse to produce such documents, dismiss the case or preclude Plaintiffs' testimony at trial; and (iii) award Defendants' expenses and fees.

Washington, DC
April 2, 2015

Respectfully submitted,

<u>       /s/ Alex Young K. Oh       </u>
Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (*pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
Ilana D. Waxman (Bar No. 1012358)
iwaxman@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006-1047
Telephone:  (202) 223-7300

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
1301 Fannin St., Room 1539
Houston, TX  77002
Telephone:  (832) 624-6336

*Attorneys for Defendants Exxon Mobil Corporation
and ExxonMobil Oil Indonesia Inc.*