Public Redacted Version

# <u>Exhibit 1</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, *et al.*,

             Plaintiffs,

      v.

EXXON MOBIL CORPORATION, *et al.*,

             Defendants.

Civ. No. 01-1357 (RCL/AK)

## **DECLARATION OF PROPOSED JANE DOE VII**

1.     My name is ███████████. I file this declaration because I wish to be substituted in place of my deceased husband as a Plaintiff in the case *Doe v. Exxon Mobil*, Civ. No. 01-1357 (RCL/AK).

2.     I married my husband, ███████, on September 7, 1970.

3.     My husband died on February 19, 2007.  We were married at the time of his death and had been married for almost 40 years.  We had six children together.

4.     Attached to this Declaration is an official document from my village confirming that my husband and I were married and that he has passed away.  I am the first wife.  As is common in my community, my husband took additional wives after we married.

5.     Shortly after his death, my husband's property was sold to pay off his debts.  The remainder was distributed to his heirs, including to me.  His estate has been fully distributed.

6.     I agree to maintain this action on behalf of my deceased husband. Like my husband, I wish to protect my safety by proceeding as a Doe Plaintiff.

7.     My husband, known as John Doe V in the lawsuit, was detained and tortured by ExxonMobil military security.  My son was also injured by ExxonMobil security and detained at

an ExxonMobil security post.  I am still traumatized and fearful as a result of their treatment and by the violence that continues in Aceh.

8.      Armed groups are still present in the area and there have been recent episodes of politically motivated violence.  The perpetrators of this violence, and the earlier violence, have not been brought to justice.

9.      My husband feared violent retaliation if his name were publicly revealed as a Plaintiff. He participated in this litigation in reliance on the Court granting him anonymous status.  I similarly fear not only for my life and safety but for the lives and safety of my family should my identity be publicly disclosed in connection with this litigation.

10.     I fear that members of the TNI will retaliate against me.  Indonesian military members have retaliated against people who make them look bad, including by raising human rights claims.  They have retaliated with murder and torture.  I am concerned that I and my family will be made the target of their violent action.

11.     I do not think that the American Court and American lawyers have any power in Indonesia to protect me from harm other than by protecting my identity.  I live in ██████████ ███████████████████.  I do not have the resources to relocate or protect myself and my family in response to a threat.

12.     This declaration was orally translated to me word for word.  I understand and confirm the Declaration as true, accurate, and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _March 14, 2015_
          date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, *et al.*,

                    Plaintiffs,

      v.

EXXON MOBIL CORPORATION, *et al.*,

                    Defendants.

Civil Case No. 01-1357 (RCL/AK)

<u>Declaration of Translator</u>

I, ███████████ , declare as follows:

1.      I was retained by counsel for the Plaintiffs in this case.

2.      I am fluent in English, Bahasa and Acehnese.

3.      I am a native speaker of Bahasa.  I graduated from the University in Jakarta with a degree in Political Science.

4.      I am also a native speaker of Acehnese.

5.      I studied English in Indonesia while at school and at an English Language Center in Jakarta.

6.      In 2003-2004, I worked for a translation service in the United States.  I provided certified translation for immigration cases and other cases in the courts in Boston and New York.

7.      I have worked as a journalist and an interpreter for foreign journalists in Aceh, Indonesia. I frequently translate from English to Bahasa and Bahasa to English, as well as English to Acehnese and Acehnese to English.

8.      In 2011 I became a Fellow of the Weatherhead Center for International Affairs at Harvard University.  As a fellow, I was in residence in Cambridge, MA, where I spoke English daily.

9.      Currently I am working as a Consultant for the United Nations Development Program (UNDP).  I frequently use English in my work and often have to translate between Bahasa and English.

10.     I assisted in interviews with the surviving spouses of the deceased Plaintiffs, John Doe V and John Doe VI, and in preparing their declarations.

11.     Each woman's individual statement was memorialized in a written English language declaration. I read each woman's declaration back to her, line by line, translating it back into Bahasa and Acehnese. Each person confirmed the truth, completeness, accuracy, and correctness of every line of her declaration.

12.     My translation was true, complete, accurate and correct to the best of my ability.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



# **Exhibit 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, *et al.*,

            Plaintiffs,

      v.

EXXON MOBIL CORPORATION, *et al.*,

            Defendants.

Civ. No. 01-1357 (RCL/AK)

## <u>DECLARATION OF PROPOSED JANE DOE VIII</u>

1.      My name is ███████. I file this declaration because I wish to be substituted in place of my deceased husband as a Plaintiff in the case *Doe v. Exxon Mobil*, Civ. No. 01-1357 (RCL/AK).

2.      I am the widow of ███████████.

3.      I married my husband in 1980, and he died on February 6, 2012. We were married at the time of his death and had been married for over 30 years.

4.      Attached to this Declaration is an official document from my village confirming that my husband and I were married and that he has passed away.

5.      My husband and I shared a home. We built the home on land that I inherited from my parents. When my husband died, the home and other property was inherited by me.

6.      My husband's property has been fully distributed.

7.      I agree to maintain this action on behalf of my deceased husband. Like my husband, I wish to protect my safety by proceeding as a Doe Plaintiff.

8.      My husband, known as John Doe VI in the lawsuit, was physically detained, beaten, and shot by ExxonMobil military security. He feared violent retaliation if his name were publicly

revealed as a Plaintiff, and he participated in this litigation in reliance on the Court granting him anonymity.

9.      I similarly fear not only for my life and safety but for the lives and safety of my family should my identity be publicly disclosed in connection with this litigation.

10.     I fear that members of the military will retaliate against me.  Indonesian military members have retaliated against people who protest or work for human rights, including by murder and torture.

11.     I am still traumatized by the cruelties committed by the Exxon security personnel in Aceh.  I am convinced that if my name is made public, I could be found and finished off by the security services in retaliation for soiling their reputation.

12.     There has been a lot of violence in my community, including recently.  Although there have been many killings and many human rights abuses, the perpetrators are not brought to justice.

13.     I do not think that the American Court and American lawyers have any power in Indonesia to protect me from harm other than by protecting my identity.  I live in ██████████ ██████████████████████. I do not have the resources to relocate or protect myself and my family in response to a threat.

14.     This declaration was orally translated to me word for word.  I understand and confirm the Declaration as true, accurate, and correct.

Public Redacted Version

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _March 14, 2015_
                   date



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>EXXON MOBIL CORPORATION, *et al.*,<br><br>        Defendants. | Civil Case No. 01-1357 (RCL/AK) |

<u>Declaration of Translator</u>

I, ▇▇▇▇▇▇▇, declare as follows:

1.      I was retained by counsel for the Plaintiffs in this case.

2.      I am fluent in English, Bahasa and Acehnese.

3.      I am a native speaker of Bahasa.  I graduated from the University in Jakarta with a degree in Political Science.

4.      I am also a native speaker of Acehnese.

5.      I studied English in Indonesia while at school and at an English Language Center in Jakarta.

6.      In 2003-2004, I worked for a translation service in the United States.  I provided certified translation for immigration cases and other cases in the courts in Boston and New York.

7.      I have worked as a journalist and an interpreter for foreign journalists in Aceh, Indonesia. I frequently translate from English to Bahasa and Bahasa to English, as well as English to Acehnese and Acehnese to English.

8.      In 2011 I became a Fellow of the Weatherhead Center for International Affairs at Harvard University.  As a fellow, I was in residence in Cambridge, MA, where I spoke English daily.

9.      Currently I am working as a Consultant for the United Nations Development Program (UNDP).  I frequently use English in my work and often have to translate between Bahasa and English.

Public Redacted Version

10.     I assisted in interviews with the surviving spouses of the deceased Plaintiffs, John Doe V and John Doe VI, and in preparing their declarations.

11.     Each woman's individual statement was memorialized in a written English language declaration.  I read each woman's declaration back to her, line by line, translating it back into Bahasa and Acehnese.  Each person confirmed the truth, completeness, accuracy, and correctness of every line of her declaration.

12.     My translation was true, complete, accurate and correct to the best of my ability.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



Public Redacted Version

# **Exhibit 3**

**SURAT KETERANGAN PERNAH MENIKAH**

Nomor : 0 93 /2022/        / 2015

████████████████████████████████████████ dengan ini

menerangkan bahwa :

| | |
|---|---|
| Nama | ████████████████ |
| Tempat/Tanggal Lahir | ████████████ |
| Jenis Kelamin | : Perempuan |
| Pekerjaan | : Tani |
| Agama | : Islam |
| Status | : Cerai Mati |
| Alamat | : ████████████████ |

Benar yang tersebut namanya diatas adalah penduduk ████████████

████   dan benar telah menikah dengan saudara Almarhum ████████   pada

tanggal 07 September 1970 dan suaminya telah meninggal dunia pada tanggal 19 September

2007.

Demikianlah surat keterangan ini dibuat untuk dapat dipergunakan seperlunya.

██████████████████████████████████████████████████

**AFFIDAVIT OF PREVIOUS MARRIAGE**

Number: 093/2022/    /2015

The ███████████████████████████████████████████
certifies that:

| | | |
|---|---|---|
| Name | : | ████████████████ |
| Place/Date of Birth | : | ██████████ |
| Sex | : Female | |
| Occupation | : Farmer | |
| Religion | : Islam | |
| Marital Status | : Widowed | |
| Address | : | ███████████████████████ |

It is true that the aforementioned person is a resident of the ███████████
████████ and it is true that she was married to the Deceased ████████████ on 7
September1970 and her husband passed away on 19 September 2007.

This affidavit is made to be duly used.

████████████████

████████████████

███████████████

███████████████



INNOVATIONS

Helping businesses communicate worldwide™

## TRANSLATION CERTIFICATION

This is to certify that the translation of the attached document(s) is to the best of our knowledge and ability, a true and accurate translation of the original text delivered to Language Innovations, LLC by our client. The original document was translated from **Bahasa Indonesian** into **English** by a professional translator fluent in both the source and target languages and at completion delivered to the client on **March 2, 2015.**

I hereby declare that all statements made herein are of my own knowledge and are true and that all statements made based on information or belief are believed to be true.

Language Innovations, LLC hereby agrees to keep the content of this translation confidential according to ethical and legal standards of the profession of Translation. Language Innovations, LLC agrees not to discuss, evaluate, distribute or reproduce any material included in or related to the translation of this document.

Date: _March 2nd 2015_

Signature: ███████████████

Lindsey Crawford
Language Innovations, LLC

Subscribed and sworn before me this _2nd_ day of _March_ 20 _15_ , at Washington, DC.

███████████████

Notary Public

My Commission expires: _BRIAN FRIEDMAN_
Notary Public District of Columbia
My Commission Expires July 14, 2018

1725 I Street, NW   Suite 300   Washington, DC 20006   202.349.4180 tel   888.349.4180 toll free   202.349.4182 fax

translate@languageinnovations.com email   www.languageinnovations.com web

Public Redacted Version

# **<u>Exhibit 4</u>**



## SURAT KETERANGAN PERNAH MENIKAH

Nomor : *09* /*2008*/ *11* / 2015

dengan ini menerangkan bahwa :

Nama

Tempat/Tanggal Lahir

Jenis Kelamin       : Perempuan

Pekerjaan           : Mengurus Rumah Tangga

Agama               : Islam

Status              : Cerai Mati

Alamat

Benar yang tersebut namanya diatas adalah penduduk

dan benar telah menikah dengan saudara Almarhum

pada tahun 1980 dan suaminya telah meninggal dunia pada tanggal 06 Februari 2012.

Demikianlah surat keterangan ini dibuat untuk dapat dipergunakan seperlunya.





## AFFIDAVIT OF PREVIOUS MARRIAGE

Number: 09 / 2008 / 11 / 2015

The ████████████████████████████████████████████ ████ Regency certifies that:

| | | |
|---|---|---|
| Name | : | ██████ |
| Place/Date of Birth | : | ████████████████████ |
| Sex | : Female | |
| Occupation | : Homemaker | |
| Religion | : Islam | |
| Marital Status | : Widowed | |
| Address | : | ████████████████████████ |

It is true that the aforementioned person is a resident of the ████████████████ ████████████████ and it is true that she was married to the Deceased ████████████ in 1980 and her husband passed away on 6 February 2012.

This affidavit is made to be duly used.



I N N O V A T I O N S
Helping businesses communicate worldwide™

## TRANSLATION CERTIFICATION

This is to certify that the translation of the attached document(s) is to the best of our knowledge and ability, a true and accurate translation of the original text delivered to Language Innovations, LLC by our client. The original document was translated from **Bahasa Indonesian** into **English** by a professional translator fluent in both the source and target languages and at completion delivered to the client on **March 2, 2015.**

I hereby declare that all statements made herein are of my own knowledge and are true and that all statements made based on information or belief are believed to be true.

Language Innovations, LLC hereby agrees to keep the content of this translation confidential according to ethical and legal standards of the profession of Translation. Language Innovations, LLC agrees not to discuss, evaluate, distribute or reproduce any material included in or related to the translation of this document.

Date: _March 2nd 2015_

Signature: ▓▓▓▓▓▓▓▓▓▓
Lindsey Crawford
Language Innovations, LLC

Subscribed and sworn before me this _2nd_ day of _March_ 20 _15_ , at Washington, DC.

▓▓▓▓▓▓▓▓▓▓
Notary Public

My Commission expires: __BRIAN FRIEDMAN__
Notary Public District of Columbia
My Commission Expires July 14, 2018

1725 I Street, NW   Suite 300   Washington, DC 20006   202.349.4180 tel   888.349.4180 toll free   202.349.4182 fax
translate@languageinnovations.com email   www.languageinnovations.com web

Public Redacted Version

# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, *et al.*,

                  Plaintiffs,

       v.

EXXON MOBIL CORPORATION, *et al.*,

                  Defendants.

Civil Case No. 01-1357 (RCL/AK)

## DECLARATION OF M. NUR DJULI

My name is M. Nur Djuli.  I list my qualifications below.

I have prepared this opinion on the current security situation in Aceh in support of the request of 11 Acehnese in the Litigation Case against Exxon-Mobil to remain anonymous for fear of their safety.  In my opinion, this fear is justifiable from several considerations, foremost being the current security situation in Aceh, and also their social status of being very poor villagers deprived of any protection and any means of escape, who would fall prey easily to any unsavory elements in their surroundings if it were to be known openly that they have filed a case against a giant oil company.  The villagers are easy targets for individuals who wish to foment unrest in the region, not to mention the likely media interest with which they are definitely not capable to cope.  In addition, some of the 11 Acehnese are living right in the middle of the past and current "hot spot" of the conflict, ███████████████████████ This fact too supports their fear.  As far as the law and order system is concerned, this area is practically a no-man's-land.

In Indonesia, things are rarely as what they seem, especially in areas far removed from Jakarta, the capital of the Republic.

The 30 year bloody conflict in Aceh between the Central Government and the Free Aceh Movement (GAM) had ended a decade ago.  On the surface, things look good; the Central Government is actively promoting the peace process in Aceh as a model for conflict solution and post-conflict peace management for other conflict areas in the world.  But there's a dangerous undercurrent going on in several of the Republic's far-flung provinces, especially in such conflict and post-conflict areas like Aceh, Poso, Ambon, and Papua, due to the struggle for power between the military and the democratic forces in the post-"*Reformasi*" Movement era. "*Efforts to enhance Indonesia's military strength have also been hampered by resource constraints, which are partly a function of politics. Since Indonesia's democratic opening in 1998, reforming the military and bringing it under civilian control has been a key objective of*

1

*political reformers. Enhancing its capacity has not. Furthermore, the TNI traditionally funded a significant portion of its budget from an empire of military-run businesses. Although a 2004 law required the TNI to transfer these businesses to the state by 2009, the TNI succeeded in making military cooperatives and many military foundations exempt, while also selling many profitable businesses. The Indonesian parliament's knowledge that the TNI continues to have access to off-budget financing is one reason that it has never funded the military at the level the Defense Department contends is required to meet the country's minimum defense needs.*[1]

In Aceh, the TNI has opposed from the beginning the Helsinki peace negotiations, forcing the then President, Susilo Bambang Yudhoyono, to require the then C-in-C of the Army, General Ramizad Ryacudu, to take an early retirement in order to allow the negotiations to continue. The General is now back as the Minister of Defense. His disdain of democracy and human rights is well known; in one of his statements he said: *"... democracy and human rights are a threat to the Unitary Republic of Indonesia."* He also declared a hero the killer of Eluay Theys, a pro-peace Free Papua Organization leader who was gun down after attending a dinner invitation at an Indonesian local military home.[2]

Recently, on March 23, 2015, two military intelligence petty officers were kidnapped in a small village in the remote sub-district of Nisam, North Aceh and were brutally murdered. Deputy President Jusuf Kalla issued a statement denying local military commanders' insinuations that the perpetrators were from a separatist group. Kalla said the Acting National Chief of Police had confirmed the killings were purely a criminal case related to drugs trade.[3] But there were swift reactions from the TNI. Jet fighters were circling the capital of the province, Banda Aceh, in a clear show of force. The military commander of the province took a helicopter and flew to the village. 1000 troops were deployed to surround the village. Roads were blocked, houses were searched, reminiscent of the time when Aceh was under the 10 year DOM (Military Operation Area, 1989-1998), and the 2 year-Martial Law rule prior to the signing of the Helsinki Peace Agreement in August 2005. In Jakarta, the Chief of the Army, General Moerdoko, declared the TNI's readiness *"to take arms against the new separatist group formed by some ex-GAM leaders."* He said the TNI was ready to enforce the DOM again, *"if the Government so decides,"* which was echoed the next day by the Commander of the most feared military corps in Indonesia, the KOPASSUS.[4]

---

[1] Ann Marie Murphy, World Politics Review, *"Strategic Posture Review: Indonesia,"* Sept. 20, 2011.
*http://www.worldpoliticsreview.com/articles/10066/strategic-posture-review-indonesia*
[2] Haria Azhar, Human Rights Activist, Jakarta, Interview with the BBC, October 27, 2014.
  http://www.bbc.co.uk/indonesia/berita_indonesia/2014/10/141027_kabinet_ryami zard_kritik
[3] http://m.republika.co.id/berita/koran/hukum-koran/15/03/28/nlwu2t-pembunuhan-anggota-tni-aksi-kriminal
[4] http://hankam.kompasiana.com/2015/04/01/panglima-tni-ancam-eks-gam-715706.html

On the other side of the coin, the lower ranking GAM ex-combatants are unhappy with the non-fulfilled pledges made by the Government in exchange for their surrendering their weapons to be destroyed.[5]

Indeed, the core of the problem in Aceh, and other post-conflict and on-going conflict areas in Indonesia, is the failure of the Government to implement the laws it had passed and the pledges it had made to the people in the post-dictatorial regime of General Suharto. Amnesty International in its report of April 2013 entitled: "*Time to Face the Past,*" documents the "*failure of local and central authorities to establish the truth of what happened during the years of violence which left between 10,000 and 30,000 people dead, many of them civilians. Many of those who had their lives torn apart by the conflict are still suffering immensely. 'The Indonesian government's failure to provide genuine truth, justice and reparation for victims and their families is causing immense suffering for people in Aceh today.' Isabelle Arradon, Amnesty International's Deputy Asia Pacific Director, said. 'Family members still do not know what has happened to disappeared loved ones and are struggling to get by, while those responsible walk free. The situation is breeding resentment that could sow the seeds of a future return to violence.'*"[6]

There is a sharp difference between the situations in the urban and rural areas. In the big towns people are protesting openly, even mocking the childish over-reactions of the military authorities. In the villages, life has become very scary for ordinary people. In some ways, it is worse than during the conflict, when the villagers knew who were who entering their village on operation; even from the sounds of their weapons the villagers could ascertain if they were the Indonesian military or police or the GAM fighters. They were prepared, as prepared as one could be in time of war. What to do, what to say when confronted. But today everything is murky. You could be accosted by anyone and be brutalized or killed, and nobody cares, beyond some ineffective statements and reports by some human rights activists.

In another former conflict area, Poso, in North Sulawesi, the anti-terrorist police force, Dansus 88, while searching for terrorists who had killed 4 soldiers, detained 14 villagers for two weeks and severely tortured them while in detention, only to find out that they were just ordinary civilians, some are teachers, others are farmers and petty traders, not involved at all in the killing or in any other unlawful actions. No apology or explanation, they were just let out from detention into the street of Poso far from the village where they were picked up while gathering in a religious course. Most of them are still in the town today, too traumatized to go back to their village, 4 victims are still under medical treatment.[7]

---

[5] Djuli, M. Nur, Jakarta Post, *"Aceh: Ex Combatants Have Not Even Begun Vital Reintegration in Aceh,"* December 24, 2014.
http://m.thejakartapost.com/news/2014/12/24/ex-combatants-have-not-even-begun-vital-reintegration-aceh.html

[6] https://www.amnesty.org/en/articles/news/2013/04/indonesia-victims-aceh-conflict-still-waiting-truth-justice-and-reparation/

[7] "*14 Poso villagers became victims of wrong detention by [anti-terrorist police corps] Densus 88.*" http://www.merdeka.com/tag/d/densus-88/14-warga-poso-jadi-korban-salah-tangkap-densus.html

3

For the people living in post conflict areas like Aceh and Poso, especially in rural areas, the fear is of uncertainty, of unknown dark forces referred to as PETRUS, an Indonesian abbreviation meaning "mysterious shooters." During the legislative electoral campaign last year, not just those active in politics who had been assassinated, but completely innocent civilians. Six roadwork laborers who had just arrived from Java were murdered execution style in broad daylight. It was rumored that the perpetrators were former GAM members, as warning to the Central Government that if they lost the elections there would be trouble. But then again, the lack of any serious investigation by the authorities, has led to all sorts of conspiracy theories. This incident and others that include arsons, kidnapping and murders, were just let pass without much investigations, let alone judicial action. The killer of an electoral candidate who had admitted his deed was sentenced to 4 years imprisonment, most likely he would be free after a couple of years in prison; no attempt was made to find out who were the puppet masters behind the action of this killer, although the man told the court that he murdered the school teacher electoral candidate because he insulted his boss, a well-known leader of the rival party.

In the minds of the ordinary people in Aceh and other post-conflict areas in Indonesia, one simply does not want to mess with the Indonesian military and police in anyway, as the reaction will be severe, un-proportional and with impunity.

I write this report based on my years of experience, including as the 2006-2010 Executive Director of the governmental Aceh-Peace Reintegration Agency (BRA) and the Coordinator of the USAID financed Aceh-Peace Resource Center (APRC); the Co-Founder/Chairman of the Aceh-School for Peace and Democracy (SPD-A); a former member of GAM Peace Negotiating Team for Geneva, Tokyo and Helsinki Peace Talks; the 2011-2012 Fellow at the Harvard Weatherhead Center for International Affairs; and a holder of the French award, "Chevalier de l'Ordre des Arts et des Lettres." I am currently a member of the Board of Leadership of the Aceh National Party (PNA) and an International Independent Consultant on Conflict Resolution and Post-Conflict Peace Management.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Banda Aceh on April 9, 2015

M. Nur Djuli

Public Redacted Version

# **<u>Exhibit 6</u>**

9 April 2015

To Whom It May Concern,

<u>Re: Statement on the Security of Court Witnesses in Aceh, Indonesia</u>

This letter is to clarify the current status of security in Aceh, Indonesia in relation to the personal safety of its individual residents, particularly those involved in court cases. It offers a point-by-point analysis of key issues relating to the security context, political stability and witness protection and concludes with a recommendation.

The analysis and recommendation set out in this letter are based on my involvement in Aceh since 1999 as a researcher on the Aceh conflict and advocate for the protection of Acehnese civilians and refugees, a humanitarian professional working in post-tsunami recovery in Aceh from 2004-2007, a former member of the Governor of Aceh's advisory team on post-conflict transition from 2007-2010, and as advisor to several local civil society organisations working on humanitarian action, child protection, community development and peace-building. My curriculum vitae is attached.

## 1. Security in Aceh has been steadily declining

Aceh has seen a decline of security since the international agencies left Aceh in 2009. The distribution of illegal firearms in the province, some left over from the conflict and others rented or self-made, combined with the existence of poor and unemployed former combatants, have made crimes in Aceh more dangerous than before. Intimidation and extortion, usually in the form of collecting illegal tax, have been rampant even after the signing of the Memorandum of Understanding (MoU) between the Government of Indonesia and the Free Aceh Movement (*Gerakan Aceh Merdeka*, or GAM) in August 2005. Police handling of such cases has generally been slow. Only high-profile cases that made it into the media have been handled seriously. In most cases, victims usually end up capitulating to the perpetrator's demands.

Kidnapping is a crime that has been compounded by the conflict. During the period of DOM (*Daerah Operasi Militer* or the military operations area status imposed on Aceh between 1989 and 1998), the Indonesian military (Tentera Nasional Indonesia, or TNI) regularly kidnapped civilians suspected of being GAM sympathizers. Victims often ended up tortured or dead.

Kidnapping cases in post-MoU Aceh have been more difficult to investigate. Over the past five years, cases of kidnappings have been on the rise again in Aceh. Although the total number is nowhere near the level during the armed conflict, the trend is significant enough to raise considerable concern among local businesses and foreign investors. The driving motivation for these kidnappings is no longer primarily related to separatist ideology, personal vendetta, or even election politics; rather, it seems that most are motivated by economic profit via ransom.[1] It is a high-risk and high-yield venture in Aceh[2] and if the current rate of kidnapping cases continues, then 2015 is on its way to having the highest number of kidnapping cases in Aceh since the signing of the MoU.

---

[1] Serambi. 2015. "Kelompok Penculik Sudah Keenakan Duit Tebusan" in *Serambi* 10 Feb 2015. URL: http://aceh.tribunnews.com/2015/02/10/kelompok-penculik-sudah-keenakan-duit-tebusan

[2] In the first two months of 2015 alone there were four cases of such kidnapping, nearly one-third of the number of total cases in 2014, and more than half the cases in 2013.

Kidnappers in Aceh no longer abduct higher-risk uncertain-profit targets (e.g. foreigners).[3] Since 2014, kidnapping victims have been Indonesian nationals, mainly Acehnese. The advantage of having a local as a hostage is that it will make assessment of target families' resources more realistic and the negotiations for ransom more manageable. It also attracts less serious attention from the authorities. The perpetrators are likely disgruntled former GAM combatants who still possess firearms that were supposed to have been destroyed during the de-armament phase of the peace process (2006-2007). Murder and assassinations are also on the rise in Aceh, particularly related to elections. There are also transnational, national, or local groupings of highly centralized enterprises in Aceh who engage in illegal activity for mainly monetary profit. Some of them are politically motivated, others are purely economic. For example, organised drug traffickers operate in Aceh. Their business is so lucrative that they are able to fund weapons, disgruntled former combatants, bribes to the authorities, and other necessary logistics, to the point that they have begun to order assassinations of soldiers and police.

## 2. Political stability in Aceh is deteriorating

Political relations between the central government and the provincial government of Aceh are not at their best, particularly in relation to security. The 2014 national election saw the rise of President Joko Widodo via the PDI-P party platform. It should be noted that he lost the election in Aceh. In addition, the PDI-P was the ruling party when the central government imposed martial law in Aceh in 2003-2004. It is a nationalist party which still harbors resentment that former GAM leaders have now taken power in Aceh. This deteriorating relation between the central government and the provincial government of Aceh is directly related to the security and stability of Aceh. Given the poor status of law enforcement in Aceh, the TNI must occasionally support the police force in their operations, especially those dealing with armed groups. Unless the police presence in Aceh is increased, they and the TNI will increasingly use tactics used during the armed conflict era (e.g. road blocks, rough interrogation techniques).

Unfortunately, the new Minister of Defense is a hardline PDI-P loyalist, Gen. (Ret) Ryamizard Ryacudu. His relationship with Aceh is defined by counter-insurgency operations and opposition to the MoU. He was the Army Chief (KASAD) who oversaw the implementation of the military operations between 2002 and 2004. A strong nationalist, he saw the GAM movement as an act of unforgivable rebellion and treason that must be crushed. He objected to the peace negotiations that led to the signing of the Helsinki peace agreement, and continued to voice deep suspicions of the GAM leaders taking power in Aceh, a view still shared by many among national legislators and TNI leaders. His handling of the military operation in Aceh significantly boosted his credentials and nearly earned him the post of TNI Commander.[4] Ryacudu's attitude towards GAM seems unchanged. During his first visit to Aceh as Minister on 19 November 2014, he did not meet with any civilian leaders as befitting a ministerial-level visit throughout his stay in Aceh, including the Governor (ex-GAM leader), the Vice-Governor (ex-GAM military commander) or even the Provincial Secretary. Following the recent murder of two TNI soldiers in Aceh, he even issued an off-the-cuff statement that should any more TNI soldiers be killed, he would re-implement martial law on the province. Ryacudu will most likely press for more TNI soldier presence in Aceh rather than police. Without an improvement in the status of law enforcement in Aceh, the province may soon be over-run by armed gangs – uniformed or not – that run organised criminal activities.

---

[3] The last high-profile kidnapping case involving foreign victims was the kidnapping of Malcom Primrose (60 y.o.), a Scottish staff of PT Medco E&P Malaka, on 11 June 2013 in Aceh Timur. The result of that kidnapping was that it provoked both the police and the TNI into action – thus increasing the risk of violent and lethal confrontation – and reduced the chances of obtaining any ransom to nil.

[4] It was widely rumored that his strong candidacy for the post was vetoed by then-newly elected President Susilo Bambang Yudhoyono.

Under such conditions where the police still rely on the TNI to maintain the peace, court witnesses will be fearful of giving evidence because they believe that they or their family may be at risk of harm – be it the risk of kidnapping, torture, or murder – if their identity is revealed to the defendant or their associates during or following court proceedings.  This is often the case in judicial proceedings that implicate members of the armed forces (TNI) or the police.  In the days of the armed conflict, one could pay off TNI or GAM members to make witnesses disappear.  Nowadays, any criminal can do it for the right price.

## 3. Witness Protection in Aceh is Dysfunctional

There is a reason why the vast majority of Acehnese shun the courts and prefer to settle cases out-of-court whether using mediation proceedings or traditional reconciliation mechanisms.  Simply put, testifying in the open will have long-term negative impact on the witness even if the defendant is found guilty and is put away in prison.  Aceh is still a highly communalistic society, which means a court trial is never truly between individuals, but between entire networks related to those individuals.  A court case against an organization or institution in Aceh is commonly viewed as filed by a party's entire community, not by the individual alone.  A court case in Aceh, by any other name, is a war between groups of people.  There is no neutral witness in the eyes of the plaintiffs and defendants.  Open testimonies are therefore always against the interest of witnesses in Aceh because they will be forced to face immediate and long-term retaliation not just from one or two people but from an entire network of people.  Their lives will be changed should they testify openly.

This situation is made worse because there is no reliable witness protection scheme in Indonesia. Indonesia's Witness and Victims Protection Agency (LPSK)[5] was only formed in 2006[6] and it is still ill equipped to protect witnesses and victims of crimes committed by members of the authorities. This is because the LPSK was not created as an initiative of law enforcer agencies but by the pressure of civil society organisations.  As a result, in many cases across Indonesia, law enforcers have always been reluctant to accommodate their work especially if the crimes are related to one of their own members.  Names of witnesses can still easily be leaked given the right bribes or the proper intimidation or pressure.[7]  This is especially rampant in Aceh, given that the police and the TNI still hold considerable influence on the general population.  Testifying against them – whether openly or not – will still result in intimidation, threats of violence, and even violence itself.

Normally, if witnesses in criminal proceedings are considered to be 'intimidated' then special measures can be taken, which may involve screening the witnesses from the defendant, allowing them to give evidence by live television link and allowing them to give evidence in private. Unfortunately, ordinary villagers in Aceh will find such measures as adding to intimidation.  They are already aware of weaknesses of daily technology like mobile phones and internet, and they will consider technology in court as very untrustworthy and will disadvantage their case.  In fact, they know that all it takes to track and kidnap them is their administrative details like mobile phone number, which would be easily available if they testify openly.

In really serious cases, often involving gun crime or homicide, the risk to witnesses might be great enough to necessitate their relocation and a change of identity.  Witness protection is normally arranged when witnesses are at risk of serious personal harm as a result of providing crucial evidence, which a witness living in rural Aceh will certainly face if they reveal their identity in court.

[5] LPSK address is: Gedung Perintis Kemerdekaan (Gd. Pola) Lt. 1, Jl. Proklamasi No. 56 Jakarta Pusat 10320. Phone: +62-21-31927881. Fax: +62-21-31927881. Email: lpsk_ri@lpsk.go.id
[6] Law no.13/2006 on Witness and Victim Protection (*Undang-Undang Nomor 13 Tahun 2006 tentang Perlindungan Saksi dan Korban*).
[7] Interview with anonymous member of LPSK on 13 Jan 2015.

In addition, they will not consider trading in their old life for a new one as worth the effort of testifying, given this would mean they will have to give up living in the very land they are fighting for in court.  Their family relationships and friends will be lost, which is extremely important in a communalistic society like Aceh.  This type of witness protection is therefore is not recommended for a case involving a rural communities in Aceh.

**Recommendation**

An open trial is very unpopular and can be dangerous to people in Aceh who give testimony, particularly when the case involves allegations against members of the Indonesian military.  It presents very real and considerable risks to the personal safety of individuals who are required to testify openly in court.  They will become subject to intimidation, coercion, and even violence from all kinds of parties, some of which may be members of law enforcement and security apparatus. Considering the lack of law and order, poor government protection, and the lack of trust in the witness protection scheme, an open trial will place Plaintiffs and witnesses in unnecessary risk of repercussions that may potentially be violent and lethal.

Therefore, this letter strongly recommends that unless the court can guarantee the safety of the Plaintiffs and witnesses, their families and close kin, throughout the period of the trial and afterwards, without leaving their homes and livelihoods, then the Plaintiffs and witnesses must be allowed to testify without revealing their identities.

Please do not hesitate to contact me if further clarification is required.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April  9 , 2015

Lilianne Fan
Research Fellow
Humanitarian Policy Group
Overseas Development Institute
203 Blackfriars Road
London SE1 NJ8
United Kingdom
l.fan@odi.org.uk

# <u>**Attachment A**</u>

# LILIANNE FAN

**CURRICULUM VITAE**

lilianne_fan@gmail.com

**NATIONALITY:** Malaysian

**THEMATIC EXPERTISE**

- Peace-building, conflict analysis and conflict prevention
- Human rights, pluralism, ethnic and religious tolerance
- Humanitarian principles, humanitarian access, protection of civilians
- Displacement, forced migration, return, reintegration
- Post-disaster recovery policy, coordination and aid management

**COUNTRY/REGIONAL EXPERTISE**

Myanmar, Indonesia (Aceh), the Philippines (Haiyan response), ASEAN, Haiti, Syrian refugee crisis

**RELEVANT SKILLS**

- More than 10 years experience, including seven field-based, in providing strategic policy advice, analysis and coordination in crisis-affected, post-disaster and post-conflict contexts on a range of humanitarian, peace-building, and post-crisis recovery issues including: refugees, internal displacement and statelessness; civil-military coordination; women, peace and security; housing, land and property and natural resource management issues; local-level peace-building, transitional governance and civil society capacity building. Relevant field experience includes Myanmar, Aceh, and Haiti.

- Experience in providing real-time strategic advice, coordination services, and liaison support to host government, donors, regional inter-governmental organisations, international agencies and local civil society in post-disaster and post-conflict contexts.

- Strong track record of engaging and providing rigorous analysis to international, national and local decision-makers, including donors and high-level UN officials, national and local governments, parliamentarians, civil society and media on a wide

range of humanitarian, recovery, and development policy issues and practice based on deep understanding of local context.

- Strong coordination, training and facilitation skills with solid track record of coordinating working groups of diverse stakeholders to deliver programme or policy impact in post-crisis contexts.

- Excellent writing, analytical and communication skills on peace, security, human rights, humanitarian and development issues in a way that underlines their interconnectedness and brings together up-to-date knowledge of key debates and on-the-ground realities. Ability to analyse and synthesise key humanitarian, security and development policy issues within complex and rapidly changing situations, and to develop power analyses of general political contexts as well as specific sectors in order to identify levers of change.

- Ability to create, expand and sustain partnerships with a diverse range of local and international actors and coordinate multi-stakeholder platforms to work towards a specific shared goal.

- Ability to work independently and under pressure in complex, stressful and hard-to-work environments.

**RELEVANT EXPERIENCE**

**Myanmar**

- Provide regular analysis and highly appreciated advice to UK, US and ASEAN governments on peace, security and humanitarian issues in Myanmar, especially the crisis in Rakhine, intercommunal violence and the ethnic peace process. *(2012-present)*

- Convened two closed-door high-level roundtables at the Overseas Development Institute in London bringing together members of the diplomatic community, humanitarian agencies, human rights actors, ASEAN, OIC, and religious organisations to share analysis on the humanitarian crisis in Rakhine, growing inter-communal violence, and the ethnic peace process and establish a platform for coordinated and regular communication. *(September 2012 and July 2013)*

- Convened closed-door roundtable with the Centre for Strategic International Studies Indonesia on 'Regional Organisations and Humanitarian Action: The Role of ASEAN', Jakarta, Indonesia, focusing on ASEAN's role in Myanmar and the Philippines and identifying ways forward for strengthening ASEAN's engagement in humanitarian action in both natural and man-made disasters. The roundtable was part of a 2-year research project 'Zones of Engagement: The Role of Regional Organisations in Humanitarian Action'. *(March 2014)*

- Provided oral and written evidence to the UK Parliament International Development Committee's Inquiry on Democracy and Development in Burma, a review of DFID's engagement in Myanmar. Submissions were strongly reflected in the final report. *(November 2013)*

- Served as advisor to the ASEAN Special Envoy on Post-Nargis Recovery in Myanmar. Developed strategy for ASEAN Special Envoy to link humanitarian efforts to Myanmar's longer-term development plans and to transfer post-Nargis systems and processes to the Government of Myanmar and international partners. Supported ASEAN in strategic planning for the ASEAN Humanitarian Assistance (AHA) Centre. *(September 2009-July 2010)*

- Developed the advocacy strategy for Oxfam GB following Cylcone Nargis in Myanmar, focusing on supporting local civil society and community-based organisations, training them in standards, principles and good practice, and strengthening their engagement with national and international actors. *(May-August 2008)*

**Aceh**

- Advised the Free Aceh Movement (*Gerakan Aceh Merdeka*, GAM) and Acehnese civil society on engagement in the peace process, political dialogue, and post-MoU transition. Catalysed the training of GAM leaders on peace negotiations at the Olof Palme International Centre, Sweden, at the time of the Helsinki talks between the Government of Indonesia and GAM. (2003-2008)

- Core member of the Governor of Aceh's Advisory Team, tasked with supporting the Governor with the development of a sustainable development strategy *("Aceh Green")*

and the establishment of an Aceh Green Secretariat within the Office of the Governor (2007-2010)

- Co-authored a UNDP project document on *Aceh Green Economic Development and Investment Program ("Aceh Green")*, in support of Aceh Governor Irwandi Yusuf's holistic and sustainable economic development and natural resource management vision for Aceh province. The document presents strategies for the environmentally sound development of multiple sectors, including energy security and renewable energy; food security, agriculture, and fisheries; land use, land use change and forestry (LULUCF) management; legal and regulatory reform; and capacity building for local government. *(September-December 2008)*

- Developed and lead Oxfam's Policy and Advocacy Unit in Aceh-Nias, from 2005-2008. Provided successful leadership and management of a team of international and national policy researchers, legal aid officers, technical experts, and consultants conducting policy analysis and technical assistance to the Government of Indonesia in Aceh and Nias on a range of humanitarian, recovery, and development issues, including housing, land and property rights of disaster victims; post-disaster and post-conflict recovery; poverty reduction and pro-poor economic development; governance and decentralization; and women's empowerment, gender equality, social protection and inclusion. *(February 2005-April 2008)*

- Played high-level representational role in key strategic meetings with the Government of Indonesia's Reconstruction Agency for Aceh and Nias, the Government of Aceh, United Nations agencies, international NGOs, and local civil society. Regularly briefed high-level international leaders on key rehabilitation and reconstruction issues in Aceh and Nias, including Prime Minister of the United Kingdom, Tony Blair *(Jakarta, April 2006);* President of the World Bank, Paul Wolfowitz *(Banda Aceh, April 2006),* and Deputy Special Envoy on Tsunami Recovery, Eric Schwartz *(New York, November 2006).*

**Haiti**

- Coordinated the Protection Cluster's Housing, Land and Property Working Group in the IASC Cluster system in Haiti (working closely with the Camp Management Camp

Coordination Cluster, the Shelter Cluster, and the Early Recovery Cluster), focusing on forced evictions, land tenure mapping, renters rights and resettlement policies. Key achievements in this capacity include setting up regular working meetings on land tenure mapping methodologies with the Government of Haiti's Inter-ministerial Commission on Regional Planning; briefings to the United Nations Special Rapporteur on the Human Rights of Internally Displaced People; leading a working group of humanitarian and legal actors on the development of Standard Operating Procedures on responding to forced evictions of IDPs; and supporting the Interim Haiti Reconstruction Commission on the drafting of a policy paper on land issues for the incoming Government of Haiti. *(August 2010-April 2011)*

- Conducted policy research in post-earthquake Haiti on housing, land and property rights, focusing on challenges to recovery and reconstruction for earthquake-affected displaced persons. (*March 2010- July 2010*)

**The Philippines (Typhoon Haiyan response)**
- Led 2-week field research in the Philippines (Manila, Tacloban and Leyte Province) as part of the Humanitarian Policy Group's 'Zones of Engagement' research project, and lead author of forthcoming report on the role of ASEAN in the Haiyan response; peer reviewed the Independent Commission for Aid Impact (ICAI) review of the UK's Haiyan response; provided strategic advice to the Head of the President of Indonesia's Delivery Unit for Development Monitoring and Oversight (UKP4) on the Government of Indonesia's response to Typhoon Haiyan; numerous international media interviews on Typhoon Haiyan, including BBC, CBC, and The Discovery Channel. *(November 2013-March 2014)*

**Syria refugee crisis**
- Led and managed a 3-member team from the Overseas Development Institute to support the Office of the United Nations Regional Humanitarian Coordinator in the development and completion of a Comprehensive Regional Strategic Framework for the Syria Crisis. *(January 2014-April 2014)*

---

**PROFESSIONAL EXPERIENCE**

April 2014-present        Research Fellow (part-time)
                          Humanitarian Policy Group

Overseas Development Institute, United Kingdom
(based in Bangkok, Thailand)

April 2012- April 2014  Research Fellow (full-time)
Humanitarian Policy Group
Overseas Development Institute, United Kingdom

Jun 2011-Mar 2012    Research Consultant
Humanitarian Policy Group
Overseas Development Institute, United Kingdom

Aug 2010-Mar 2011    Housing, Land and Property Coordinator
IASC Shelter and Protection Clusters
MINUSTAH
Port-au-Prince, Haiti

Sept 2009-Jul 2010    Recovery and Development Advisor to the ASEAN Special Envoy
Coordinating Office for the ASEAN Humanitarian Task Force
Yangon, Myanmar

Aug 2009-Dec 2009    Aceh Green Donor Liaison
Aceh Government Transformation Programme (UNDP)
Office of the Governor of Aceh
Aceh, Indonesia

Jul 2008- Jul 2009    Aceh Green Coordinator
International Finance Corporation-World Bank Group
Aceh and Jakarta, Indonesia

April-July 2008    Humanitarian Policy Coordinator
Oxfam GB- Myanmar
Yangon, Myanmar

Jan 05 – April 08    Senior Policy Coordinator
Oxfam International
Aceh and Nias Programme
Banda Aceh, Indonesia

May 03-Sept 03    Advisor on Special Projects (Acehnese and Burmese Refugees)
United Nations High Commission for Refugees (UNHCR)
Kuala Lumpur, Malaysia

Sept 2001-Sept 2002  Researcher on Refugees in Malaysia
Independent Consultant
Kuala Lumpur, Malaysia

---

**SELECTED TRAININGS**

November 2013. Training on humanitarian principles and disaster management for local authorities in Aceh, Indonesia.

October 2013. Humanitarian Policy Group's Advanced Course in Crisis, Transition and Recovery, Tsinghua University, Beijing, China.
Taught a module on 'Regional Organisations and Crisis Response' which built on a case-study on ASEAN's role in the post-Nargis recovery effort.

July 2013. International Development Expertise Sharing Programme (IDESP) for Chinese Public Sector Officials, at the Overseas Development Institute, London.
I prepared and taught two training modules: Introduction to the International Humanitarian System and Managing Complex Emergencies, which were rated the second and third best modules out of sixteen modules by Chinese participants, with 93% describing the modules as 'excellent' or 'very good'. The specific objectives for IDESP were to address the knowledge needs of China's Ministry of Commerce (MOFCOM) and other key development-related institutions in the following areas:

(a) Specific international development policy issues;
(b) International aid programme design and management; and
(c) The UK Government's approach to international aid, including the UK's decision-making process on key development issues.

October 2012. Humanitarian Policy Group's Advanced Course in Crisis, Transition and Recovery, Transition and Recovery, the Chinese Academy of Governance, Beijing, China.
Lead organization of the course and taught a module on the political settlements and humanitarian response, building on a case-study of Aceh.

November 2010-March 2011. Led and coordinated the preparation of highly appreciated and widely used Standard Operating Procedures on Responding to Forced Evictions for the Protection Working Group in Haiti.
Conceptualised and drafted the main SOP document, coordinated sub-working groups to prepare annexes. The process included coordinating humanitarian agencies, UNPOL, training for camp managers and local lawyers for monitoring, mediation and protection of IDPS in forced eviction cases.

2005-2006. Trainings for customary leaders, religious leaders, community leaders and local authorities on the post-disaster and post-conflict housing, land and property rights in 8 sub-districts in post-tsunami Aceh, Indonesia. Training brought together principles of international law, norms and standards, national and sub-national law, Islamic law and customary Acehnese law.

---

**SELECTED PUBLICATIONS**

April 2014. "Aid agencies need to re-evaluate in Rakhine State". Bangkok Post, Opinion section, 11 April 2014.

March 2014. "MSF's expulsion from Rakhine can only harm Myanmar's reform process". Bangkok Post, Opinion section, 6 March 2014.

February 2014. "Humanitarian crises, emergency preparedness and response: the role of business and the private sector – Indonesia case study". Humanitarian Policy Group, Overseas Development Institute.

February 2014. "Conflict, climate change and politics: Why a techno-centric approach fails the resilience challenge". Humanitarian Policy Group Working Paper, Overseas Development Institute.

November 2014. "In the wake of Haiyan: Lessons from Indonesia and Haiti". Rappler, Opinion section, 16 November 2014.

November 2013. "Disaster as Opportunity: Building Back Better in Aceh, Myanmar and Haiti". Humanitarian Policy Group Working Paper, Overseas Development Institute, London.

September 2013. "Cooperation from Crisis? Regional Responses to Humanitarian Emergencies. International Peace Institute, NY. (Co-authored with Jeremie Labbe and Walter Kemp)

June 2010. "Scoping Study on Housing, Land, and Property Rights in Post-Earthquake Haiti: Securing Tenure, Preventing Evictions, Facilitating Return, and Strengthening Access to Justice", report for Oxfam International.

December 2008. "ASEAN's role in the Cyclone Nargis response: implications, lessons and opportunities", Humanitarian Exchange, Issue 41. (Co-authored with Yves-Kim Creac'h)

May 2007. "Land Rights in Post-Disaster and Post-Conflict Aceh", in Moser, Caroline (ed), *Asset-based Approaches to Poverty Reduction*, The Brookings Institution, Washington DC. (Author)

February 2007. "Housing Rights for Renters and Squatters in Tsunami-Affected Indonesia", Daniel Fitzpatrick, Oxfam Land Rights Series, Paper no 1. (Co-editor*)*

November 2006. *Two Years After the Tsunami: Land Rights in Aceh.* Oxfam Briefing Note. (Co-author)

---

**EDUCATION**

2004   Master of Arts in Anthropology
       Columbia University, New York, NY
       Graduate School of Arts and Sciences, Department of Anthropology
       Thesis: Islam, Indigenous and Migrant Identities in Post-colonial Malaysia; GPA: 3.8

2000   Bachelors of Arts in History
       The New School for Social Research, New York, NY

---

**LANGUAGES**

English (first language)
Bahasa Indonesia (fluent)
French (advanced)
Mandarin (intermediate)

---

**COMPUTER SKILLS**

Microsoft Word
Microsoft Excel
Microsoft Power Point

Public Redacted Version

# **Exhibit 7**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

JOHN DOE I, *et al*.,

                Plaintiffs,

      v.

EXXON MOBIL CORPORATION, *et al.*,

          Defendants.

Civil Case No. 01-1357 (RCL/AK)

---

## **DECLARATION OF ROSS CLARKE**

1.    My name is Ross Clarke.  I previously submitted declarations for the Plaintiffs in October 2007 and February 2014 regarding transitional justice developments in Aceh, Indonesia and the lack of effective remedies for human rights violations in the region.  I have continued to  follow developments in Aceh, and base this declaration upon my personal knowledge and study of developments in Aceh.  My curriculum vitae is attached (Attachment A).

2.    In 2007, I was deeply involved in analyzing and reporting on the transitional justice initiatives taking place in Aceh, culminating in the 2008 report titled "Considering Victims: The Aceh Peace Process from a Transnational Justice Perspective."  At the time, despite the Helsinki Memorandum of Understanding which officially ended the conflict in Aceh, the region continued to be plagued with violence.  My own report noted "rising tensions" in the region and a "steady increase in local conflicts."  The roots of this violence were complex, but included, among other things, difficulties reintegrating former combatants, community friction over reintegration assistance, political violence

related to disputed election results, and increased illegal activity.  I also noted a number of factors likely to contribute to ongoing violence and conflicts, including the relative lack of reform within the Indonesian military and police; corruption; and the failure to implement several transitional justice mechanisms, such as establishing a Human Rights Court and providing it with jurisdiction over human rights abuses that occurred during the conflict.  Unfortunately, many of these factors continue to persist today.

3.    At the time of my report, victims of human rights abuses by the Indonesian security forces expressed ongoing fear of speaking out about what had happened to them, believing that the security forces would retaliate against victims who speak out.  For example, one woman I spoke with and who was quoted in my report stated:  "I am afraid to speak, afraid to talk about what happened—they have guns, they may come."  Another expressed similar sentiments:  "People feel afraid.  If perpetrators are found or if their crimes are uncovered, the perpetrators may take revenge [against the victims who speak out]."  NGOs reported experiencing scrutiny and intimidation by security forces when they attempted to work on human rights issues.

4.    Since 2008, when my report was published, I have continued to follow and work on developments in Aceh.  For example, in 2011, I published another report entitled "Customary Legal Empowerment:  Towards a More Critical Approach."  That report included a case study of legal empowerment interventions in Aceh based not only on my earlier work in Aceh but also on subsequent monitoring and evaluation of project implementation and interviews with staff in Aceh.  In 2011, I also contributed to the report "Derailed:  Transitional Justice in Indonesia Since the Fall of Soeharto."  That report noted "continued reports of serious violations committed by state against civilians

in places such as Papua and Aceh." It also found that "[w]itnesses in human rights cases have consistently reported both direct and indirect intimidation," including death threats. I also remain in contact with individuals and organizations working on human rights issues in Aceh and am familiar with their research and concerns.

5.      Based on mywork and research on Aceh, and my continued following of current events and developments,  it is my expert opinion that individuals and organizations seeking to combat human rights violations in Indonesia continue to face immense difficulties.

6.      For example, in its 2013 report on Indonesia, which is the most recent report currently available, the United States Department of State found, and I concur, that individuals who advocate for human rights in Aceh are often monitored, harassed, and threatened.  Other organizations, such as the Asian Legal Resource Centre in its 2011 submission to the United Nations Universal Periodic Review, 13th Session, have likewise decried the hostile environment for defenders of human rights in Indonesia and documented threats against human rights defenders that continue to go uninvestigated.  In a 2013 report entitled, "Time to Face the Past: Justice for Past Abuses in Indonesia's Aceh Province," Amnesty International affirmed the continuation of a climate of fear, trauma and revenge for victims of past human rights violations and those who work for accountability for these violations.

7.      The risks to individuals who advocate for human rights in Indonesia come, in large part, from the government and security forces.  The United States Department of State observed in its 2013 report that government officials in Aceh subject human rights organizations to monitoring, harassment, interference, threats, and intimidation.  Local and regional organizations, such as the Commission for the Disappeared and Victims of

Violence (KontraS), continue to document a significant number of instances of torture and other abuses by the military and police. Amnesty International has also documented several recent incidents in which individuals advocating for their rights were tortured and killed by the military.

8.     Other incidents demonstrate that the military retaliates against individuals that it perceives as enemies. For example, in its 2013 report on Human Rights in Indonesia, the United States Department of State reported that in March of that year at least a dozen soldiers forcibly entered a prison and murdered four prisoners who were believed to have killed a soldier.

9.     It is my expert opinion that these kinds of human rights abuses by the military continue, at least in part, because of a culture of impunity in Indonesia that protects rather than punishes human rights violators. Although Indonesia's democratic transition since 1998 has been a remarkable one, and positive progress has been made in many areas of governance – not least the free and fair election in 2014 of Joko Widodo, Indonesia's first president not from the established ruling class – military impunity remains a major concern.Many of military officials involved in severe human rights abuses in Aceh and other parts of Indonesia were promoted, not prosecuted. In addition, the Human Rights Court in Aceh, which was authorized in both the Helsinki MoU and the Law on Governance in Aceh, has still not been formed, nor is there any firm timeline for its creation. Recent cases of military perpetrated human rights violations have continued to go unpunished or the perpetrators have received nominal punishments. For example, in 2011, soldiers were found guilty of disobeying orders and sentenced to eight to ten months' imprisonment after a video surfaced showing them horribly torturing a man by

kicking him in the face, burning his face with a cigarette, and applying burning wood to his genitals. There was considerable outcry over the punishment, which was widely viewed as grossly inadequate. .

10. The risks faced by victims and witnesses of human rights abuses in coming forward are compounded by the lack of an effective program for victim and witness protection in Indonesia. Although Indonesia established a Witness and Victim Protection Agency in 2006, the law establishing it has been criticized for containing a narrow definition of witness, an unclear definition of what constitutes a threat, and no specific plan for how the state should protect such individuals. In addition, the Witness and Victim Protection Agency is based only in Jakarta, and thus offers little protection to witnesses and victims in other parts of the country, such as Aceh. As a result, this law is rarely used. Moreover, the law would not protect victims or witnesses in this case, as it applies only to criminal cases.

11. Instances of violence against individuals who seek to promote human rights often go uninvestigated and unpunished. Perhaps as a result, human rights victims and witnesses of abuses continue to express fear of testifying against members of the military, citing concerns of retaliation similar to those I documented in my 2008 report. For example, Amnesty International reported that victims of the torture captured on the video described above were too afraid to testify at trial.

12. In my expert opinion, there is a significant possibility that the Plaintiffs in this case could face retaliation for pursuing human rights claims against the Indonesian military if their identities were public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 15th, 2015

---
Ross Clarke

# **Attachment A**

Public Redacted Version

# Ross Clarke

Nationality: Australian and British
Email: roscoclarke@gmail.com
Phone: +44 7779 909 705

**Skill Summary**

- Over 10 years of project development, management, research, monitoring and evaluation related to transitional justice, access to justice, legal empowerment and rule of law projects particularly in post-conflict and post-emergency contexts.
- Over 7 years of progressive field-based technical and management experience in 6 post-conflict contexts (Sri Lanka, Indonesia, East Timor, Kenya, Rwanda and Uganda) with UNDP, the International Center for Transitional Justice, Oxfam, a UN Peacekeeping Mission and with renowned international and national legal development organisations.
- Advanced technical, programmatic and advisory skills related to the design and management of access to justice activities related to legal awareness raising, provision of legal aid, sexual and gender based violence, land and property rights, lawyer and judiciary capacity building, legislative and constitutional reform and civil society engagement.
- Extensive results based management experience, including supervision of 20 staff across multiple offices, responsibility for ATLAS functions and financial oversight of multi-million dollar budgets.
- Advanced interagency coordination skills in post-conflict contexts, including leading coordination working groups.
- Masters degree (LLM) with distinction on law and development from the University of London.
- Qualified Australian lawyer and trained mediator.

## Qualifications

**Solicitor and Barrister of the Supreme Court of Victoria, Australia:** Admitted to practice in 2006.

**Masters of Law (distinction):** (2009) *School of Oriental and African Studies, University of London,* UK.

**Graduate Diploma in Legal Practice:** (2005-2006) *College of Law*, Australia.

**Bachelor of Laws (honours):** (1998-2003) *University of Melbourne,* Australia.

**Bachelor of Arts:** (1998-2003) *University of Melbourne,* Australia.

- Masters law degree with distinction focusing on development and human rights, political economy of violence and conflict, governance and legal reform, climate change and environmental law.
- Undergraduate law degree focusing on international law, human rights law and humanitarian law.

## Employment

Law and Justice Advisor
**Oxfam**
UK, Uganda, Rwanda, Vietnam, Kenya, Tanzania

*February 2013– Present*

- Needs assessment and mapping of access to justice and legal empowerment related work across Oxfam International.
- Technical advice to identify, develop and implement an access to justice strategy across Oxfam International.
- Advice and programme development to integrate and strengthen access to justice approaches in Oxfam programming on land rights, gender justice and climate change across over 20 country programmes.
- Technical support to Oxfam civil society partner organisations on legal aid provision, the legal protection of women, awareness raising, monitoring and evaluation and utilisation of innovative ICT solutions.
- High-level support to the resolution of land disputes, including through legal research and analysis, strategy development and mediation advice.
- Development of large-scale access to justice proposals for major donors such as the Dutch Ministry of Foreign Affairs and DfID.
- Development of strategic partnerships to build Oxfam's engagement in the access to justice sector, including with Namati, Transparency International, Greenpeace International and Avocats Sans Frontieres.

Project Management Analyst
**UNDP**
**Equal Access to Justice Project**
Trincomalee and Colombo, Sri Lanka

*February 2010 – February 2012*

· Strategic management advice, project development, M&E and contextual analysis for a USD $7.7 million BCPR project to build access to justice and legal sector development in a post-conflict context.
· Needs assessment, project design, technical assistance and policy advice on legal aid mapping and policy, civil society strengthening, capacity building, legal awareness raising and gender based violence.
· Implementation of the Human Security Trust Fund Sri Lanka Project in conjunction with Unicef and ILO.
· Chair of district level interagency IDP Protection Working Group.
· Partnership development, capacity development and technical advice to the Ministry of Justice, Judicial Service Commission, Bar Association, Legal Aid Commission and over 10 human rights NGO partners.
· Management and support to 20 staff across 5 offices.
· Ensuring integrity of budgeting and financial reporting.
· *Acting Project Manager: March-July 2011*

Monitoring & Evaluation Officer
Consultant
**UNDP**
**Aceh Justice Project**
Aceh, Indonesia

*August 2007 – August 2008*

· Design and implementation of the monitoring and evaluation framework for the Aceh Justice Project, an over US $5 million governance project funded by the European Union.
· Input into the design and implementation of project components on legal aid provision, lawyer capacity building, legal awareness raising, training for informal justice providers and transitional justice.
· Design, implementation and management of M&E tools including logical framework, baseline and end-line surveys, complex quantitative and qualitative survey tools, monitoring reports and processes.
· Consultancy to establish and develop the Aceh Justice Resource Centre, a legal research, information dissemination and human rights monitoring body established with local law faculties. Needs assessment, strategic planning, development of a long-term action plan, mentoring and capacity building for staff.

Consultant
**International Center for Transitional Justice**
Aceh, Indonesia

*August 2008 – December 2009;*
*June – October 2007*

· Writer, editor and researcher for a series of reports related to transitional justice in Asia, with a particular focus on Indonesia and East Timor.
· Reports covered thematic topics in post-conflict contexts including security sector reform, peace negotiations and post-conflict justice.
· Co-authored '*Considering Victims: The Aceh Peace Process from a Transitional Justice Perspective*' (2008), a report examining transitional justice initiatives in Aceh based on extensive research with victim groups and key stakeholder interviews. Indepth analysis of security sector reform and the planned Truth and Reconciliation Commission for Aceh.
· Collaboration with local human rights organisations to develop and implement a large-scale qualitative research project, including management of a large research team, focus group discussions with victim groups and in-depth interviews with key stakeholders.

Legal Officer
**International Development Law Organization**
Aceh, Indonesia

*June 2006 – June 2007*

· Design, implementation, reporting, monitoring and evaluation of the *Community Legal Skills and Mediation Program*, including direct management of 10 staff. Activities include training of community leaders in up to 400 villages on land law, inheritance, guardianship and mediation to respond to the post-tsunami emergency context.
· Design of evaluation tools, training of research teams, implementation of baseline and evaluation surveys.
· Research, policy analysis, report writing and support to other post-tsunami legal projects.

Public Redacted Version

| | |
|---|---|
| <u>Program Officer</u><br>**Avocats Sans Frontieres**<br>Dili, East Timor<br><br>*June 2005 – May 2006* | · Design, implementation, reporting, monitoring and evaluation of the *Access to Justice* Program, an over USD $1 million project funded by the Danish government. Program activities include collaborating with civil society organisations to establish and train a network of community paralegals to provide legal aid and raise awareness on legal process, human rights and mediation through grassroots legal workshops.<br>· Direct management of 12 staff and partnership with 2 local human rights NGOs based in rural districts.<br>· Design, implementation and management of the *Prevention of Gender-based Violence* project which provided training to community leaders on the legal requirements and customary law considerations of such cases. |
| <u>Legal Officer, Serious Crimes Unit</u><br>**UN Mission of Support in East Timor**<br>Dili, East Timor<br><br>*January – June 2005* | · Preparation of crimes against humanity cases for prosecution before the UN Special Panel for Serious Crimes.<br>· Drafting of arrest warrants, indictments, appeal statements, legal submissions and motions.<br>· Design and implementation of prosecution strategy case management work processes, including handover to national authorities. |
| <u>Writer, Editor, Mentor</u><br>**Commission for Reception, Truth and Reconciliation (CAVR)**<br>Dili, East Timor<br><br>*September – December 2004* | · Research, analysis and writing for the Final Report of East Timor's Truth and Reconciliation Commission.<br>· Responsible for the drafting the Final Report's chapter on *Political Trials*.<br>· Collaborative research and writing with national staff, including detailed analysis of Indonesian legal texts.<br>· Mentoring, training and capacity building of national staff on research and writing techniques. |
| <u>Legal Officer</u><br>**Judicial System Monitoring Program (JSMP)**<br>Dili, East Timor<br><br>*August 2003 – September 2004* | · Court monitoring of key trials, including crimes against humanity cases.<br>· Assessment and development of judicial case management systems.<br>· Writing of legislative analysis, thematic and case reports regarding major human rights and fair trial issues.<br>· Advocacy, public outreach and education regarding justice issues, human rights and the legal system.<br>· Media work, including drafting of press releases and press conferences. |

## Select Consultancies

· **International Development Law Organization (IDLO)** (*March 2012 – February 2013*): Program management, development and oversight of IDLO's Climate Law and Finance Program, with direct management of country teams in Kenya and Vietnam on projects related to access to environmental justice, legal analysis, capacity building and regulatory reform on climate change and sustainable development law.
· **UNDP Indonesia** (*August-December 2007*)**:** Consultancy to establish and develop the Aceh Justice Resource Centre, a legal research, information dissemination and human rights monitoring body established with local law faculties. Needs assessment, strategic planning, development of a long-term action plan, mentoring and capacity building for staff.

## Languages

| | |
|---|---|
| · English: Mother tongue. | Indonesian: Fluent spoken and written. |
| · French: Basic but actively learning. | Tetum (language of East Timor): Intermediate ability. |

## Select Publications

· Clarke, R, "Customary Legal Empowerment: Towards a More Critical Approach", *International Development Law Organization*, February 2011, forthcoming compilation. Available at: http://www.idlo.int/Publications/WP2Clark.pdf
· Clarke, R; Samsidar; Wandita, G, "Considering Victims: The Aceh Peace Process from a Transitional Justice Perspective", *International Center For Transitional Justice (ICTJ) Report*, January 2008, http://www.ictj.org/images/content/7/7/771.pdf

# **<u>Exhibit 8</u>**

Public Redacted Version

# Lathifa Foundation

**Justice and Peace**

Office : Jl. Gunung Lauser Blok B 5 Komplek Perumahan Persahabatan Indonesia–Tiongkok Gampong Neuheun Kec. Mesji Raya-Aceh Besar.

Hand Phone (+62) 81360633022

E-mail : lathifapeace@yahoo.com

## DECLARATION OF LATHIFA FOUNDATION

1.     The Lathifa Foundation is a non-profit civil-society organization active in the fields of peace building, justice, and reconciliation in international and national conflict areas, especially in Aceh.

2.     Founded on August 29, 2001, it was registered on August 10, with the Notary Public Nizar Zainun SH., under the No.: 23/2002. On November 21, 2007, it was re-registered with the Notary Public Sabaruddin Salam S.H., SpN., under the number 184.

In addition to focusing its activities on justice and peace issues, it is also concerned with providing civil society advocacy, peace education and social empowerment, health, good governance, participative economic and socio-cultural developments, gender equality as well as community based development programs.

From 2002 until now, the Lathifa Foundation has carried out many activities that include anti-martial law campaigns, trainings of human rights activists, and wives of civil servants. During the Aceh Conflict we provided advocacy to victims of violence, we held discussions, studies, seminars, workshops and conferences relevant to our ideals and published booklets on peace journalism. We held training/empowerment programs for women and young peace leaders.

3.     A decade after the peace agreement was signed in Helsinki that is supposed to be the catalyst for a brighter and more peaceful future for Aceh that is free from fear and trauma, in reality this hope is still very far from being achieved in the political, economic, educational, religious and security aspects of the life of the ordinary people. Cases after cases of violence, physical as well as psychological, kidnapping, shooting, murder, are still coloring the people's daily lives.

Public Redacted Version

# Lathifa Foundation

*Justice and Peace*

Office : Jl. Gunung Lauser Blok B 5 Komplek Perumahan Persahabatan Indonesia–Tiongkok Gampong Neuheun Kec. Mesji Raya-Aceh Besar.

Hand Phone (+62) 81360633022

E-mail : lathifapeace@yahoo.com

4.   The impact of the ongoing violence is amplified by the decades of human rights violations and widespread violence already suffered by the people during the time of the dictatorial *New Order* regime as well as in the post-reformation period in Indonesia generally and in Aceh especially. People are wary as the result of decades of violence perpetrated against pro-democracy, law and order and human rights leaders and activists.

5.   A few examples of  the violence that continues to occur post-signature of the Helsinki MoU, includes: the killing of a number of civilians in Aceh during the local government heads election in 2012; the kidnapping and murder of several PNA (Aceh National Party) leaders in North Aceh Utara in 2012; the kidnapping and torture of  Ibrahim Din Kader, a leader of SIRA Party in 2009; the assassination of Saiful alias Cagee, ex-GAM regional commander on 22 July 2011; the kidnapping and killing of 2 TNI soldiers and an ex-GAM local commander in North Aceh on March 2015 that swiftly led to military sweeping operations in the area of Nisam by hundreds of TNI troops.

6.   There are many other unreported incidents of violence in Aceh in the post-signature period of the Helsinki MoU peace agreement.

7.   The incidents of violence listed above, by no means comprehensive, show clearly the very weak law and order protection for the ordinary citizens in Aceh and other former conflict areas in Indonesia, especially as concern pro-democracy, human rights activists and that real peace is not yet established.

**Banda Aceh, 7 April 2015**

**Peace and Justice for Aceh Institution**

**(Lathifa Foundation)**

# Lathifa Foundation

**Justice and Peace**

Office : Jl. Gunung Lauser Blok B 5 Komplek Perumahan Persahabatan Indonesia–Tiongkok Gampong Neuheun Kec. Mesji Raya-Aceh Besar.

Hand Phone (+62) 81360633022

E-mail : lathifapeace@yahoo.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April __11__, 2015



**Maitanur**
**Chair Person**