UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN DOE I, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| EXXON MOBIL | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

Civil No. 01-1357 (RCL)
~~UNDER SEAL~~

## MEMORANDUM OPINION

Plaintiffs have moved for leave to amend their complaint. ECF No. 461-2. In response,

defendants Exxon Mobil Corporation ("EMC") and Exxon Mobil Oil Indonesia Inc. ("EMOI")

(collectively "Exxon") have moved to dismiss plaintiffs' Alien Tort Statute ("ATS") claims for

lack of subject matter jurisdiction and for failure to state a claim. ECF No. 468. For the reasons

that follow, the Court will grant in part and deny in part Exxon's motion to dismiss and plaintiffs'

motion for leave to amend.

## I.    BACKGROUND

This case arises out of human rights abuses allegedly committed at or near natural gas

development facilities operated by Exxon in the Aceh Province of Indonesia in 2000 and 2001.[1]

Exxon operated these facilities pursuant to an agreement with the Indonesian government, which

granted Exxon the exclusive right to develop and produce natural gas in the area and granted it a

share of the profits from the endeavor.

---

[1] The factual background described in this opinion is based on and assumes the truth of the allegations in the Proposed Second Amended Complaint, ECF No. 465. *See Ashcroft v  Iqbal*, 556 U.S. 662, 678 (2009) (courts must assume the truth of factual allegations in the complaint at the motion to dismiss stage).

Security at the facility was provided by Indonesian soldiers, assigned to that task by the Indonesian government. Security was of the utmost concern at the time; there was an ongoing internecine conflict akin to a civil war in the Aceh Province. In support of the soldiers serving as security personnel at the facilities, Exxon paid stipends and provided housing, supplies, and vehicles. Exxon also provided instructions and tactical assistance for security operations at the facilities. Although it is a matter of considerable disagreement among the parties, plaintiffs allege, and the Court accepts as true for purposes of this motion, that Exxon exercised substantial control over the activities of these soldiers, including approving and planning specific operations and deployment locations.

Plaintiffs lived near Exxon's natural gas facilities at the time of the events giving rise to this lawsuit. They allege that Exxon's security personnel inflicted grievous injuries on them through various combinations of sexual assault, kidnapping, torture, and other acts of cruel and inhumane treatment. Some plaintiffs, proceeding on behalf of deceased persons, allege that Exxon security personnel killed their loved ones. Plaintiffs also allege that Indonesian soldiers, including the specific soldiers detailed to provide security at Exxon's facilities, had a history of committing similar human rights abuses and that Exxon was aware of that history prior to the incidents which caused plaintiffs' injuries.

Plaintiffs filed suit in 2001, alleging common law tort claims and claims arising under the ATS for violations of international law. In the years since, the case has followed a tortuous path, making multiple trips between this Court and the Court of Appeals. Most recently, the Court granted in part and denied in part Exxon's motion to dismiss in this case and the related case of *Doe VIII v. Exxon Mobil Corp.*, Civil No. 07-1022. *See Doe v. Exxon Mobil Corp.*, ---F. Supp. 3d---, 2014 WL 4746256 (D.D.C. Sept. 23, 2014). The Court denied Exxon's motion to dismiss

2

as to plaintiffs' ATS claims so that plaintiffs could file for leave to amend their complaint in light of intervening changes in the relevant law. *Id.* at *14.

Now pending before the Court are plaintiffs' motion for leave to file their Proposed Second Amended Complaint ("Current Compl."), ECF No. 465, and Exxon's motion to dismiss plaintiffs' ATS claims, filed in response. Plaintiffs' ATS claims allege that Exxon security personnel injured them by violating five norms of customary international law: the norms against torture; extrajudicial killing; cruel, inhuman, and degrading treatment ("CIDT"); arbitrary detention; and disappearance. Plaintiffs allege that Exxon is secondarily liable for these offenses.

## II.   DISCUSSION

Exxon has moved to dismiss plaintiffs' ATS claims for lack of subject matter jurisdiction and for failure to state a claim.

### A.   Subject Matter Jurisdiction

The Alien Tort Statute states that the "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. This statute is strictly jurisdictional; it does not create any causes of action itself. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). Instead, the Supreme Court has held that Congress "understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Id.* The ATS only confers jurisdiction on the federal courts to hear causes of action based in norms of customary international law that are well defined and treated as binding by the civilized word. *Id.* at 737–38. This standard requires that customary international law norms be "specific, universal, and obligatory" before they are recognized as federal causes of action. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659, 1665 (2013) (quoting *Sosa*, 542 U.S. at 732).

3

In light of these authorities, the Court must make a number of jurisdictional inquiries in considering plaintiffs' ATS claims. First, the defendants must have the capacity to be held liable under the ATS. Thus, in this case, the Court must consider whether corporations may be held liable under the ATS. Second, the complaint must plead violations of customary international law that are cognizable under the ATS. Third, the presumption against extraterritorial application of the ATS must be displaced or satisfied as to plaintiffs' claims. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 179 (2d Cir. 2014) (stating a substantially similar set of jurisdictional inquiries). The Court will now consider these questions as to both defendants, EMC and EMOI.

### 1.    Corporations may be held liable under the ATS

Exxon again presses its argument that corporations may not be held liable for causes of action arising under the ATS. The Court concludes that this argument is without merit for the reasons stated by the Court of Appeals on prior appeal in this case. *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated in part*, 527 F. App'x 7 (D.C. Cir. 2013). Although that portion of the Court of Appeals' opinion has since been vacated, the expressed reasons for the order vacating the opinion had nothing to do with the issue of corporate liability under the ATS. *See Doe v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) (unpublished op.) (vacating the judgment in light of intervening changes in the law governing the extraterritorial reach of the ATS and the standard for aiding and abetting liability). The Court sees no basis to revisit the question. Corporations, such as defendants, may be held liable for causes of action arising under the ATS.

### 2.    The complaint pleads violations of customary international law cognizable under the ATS

Exxon presents a number of arguments under the general heading that the complaint does not plead violations of customary international law cognizable under the ATS.

4

First, Exxon argues that all of the primary violations of customary international law that Exxon is alleged to have aided and abetted are only cognizable if they were committed by a state actor or under color of law. Regardless of whether all of the violations alleged do include such a requirement, the Court concludes that the plaintiffs have sufficiently alleged state action. Plaintiffs have alleged that their injuries were inflicted by members of the Indonesian military, working for Exxon as security personnel. Current Compl. ¶ 250. They have alleged that these soldiers were provided for Exxon's use as security personnel by the Indonesian government via Pertamina, a state-owned oil and gas company. *Id.* ¶¶ 32, 77, 79.

The Supreme Court has found state action in analogous scenarios. *See Griffin v. State of Maryland*, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law."); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (internal quotation marks omitted) (holding state action may be found where a challenged activity "results from the State's exercise of coercive power").[2] Given that the state action inquiry is fundamentally fact-based, plaintiffs have sufficiently alleged state action to meet their burden at the motion to dismiss stage. *See id.* at 298 (internal quotation marks omitted) (characterizing the state action inquiry as "necessarily fact-bound").

Second, Exxon argues that three of the international law norms alleged—arbitrary detention, disappearance, and CIDT—are not cognizable as violations of customary international

---

[2] In deciding the state action question under the ATS, courts look to the standards for finding state action or action under color of law for claims brought under 42 U.S.C. § 1983. *Abdullahi v Pfizer, Inc*, 562 F.3d 163, 188 (2d Cir. 2009). For this reason, the Court may also consider standards for finding state action for claims brought under the Fourteenth Amendment because a defendant's conduct necessarily meets the state action requirement of section 1983 if the acts complained of meet the state action requirement of the Fourteenth Amendment. *See West v Atkins*, 487 U.S. 42, 49 (1988).

law giving rise to causes of action under the ATS.  Exxon argues that these abuses do not meet *Sosa*'s standard requiring that torts under the ATS be specific, universal, and obligatory.

The Court concludes that these arguments are without merit as to arbitrary detention and CIDT.  Numerous federal courts and international authorities have concluded that the norms against arbitrary detention and CIDT are sufficiently widespread and precise to constitute actionable conduct under the ATS.  Many courts have applied *Sosa* in so holding.  *See Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 756–60 (D. Md. 2010), *rev'd on other grounds sub nom.*, *Al-Quaraishi v. L-3 Servs., Inc.*, 657 F.3d 201 (4th Cir. 2011), *appeal dismissed sub nom.*, *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205 (4th Cir. 2012) (CIDT); *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 n.4 (S.D.N.Y. 2009) (CIDT and arbitrary detention); *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 253–54 (S.D.N.Y. 2009) (CIDT); *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1092–95 (N.D. Cal. 2008) (CIDT); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1320–22, 1325–26 (N.D. Cal. 2004) (CIDT and arbitrary detention); *see also* William J. Aceves Decl. 8–11, ECF No. 475-3 (collecting international authorities).

The Court observes that to the extent the definitions of CIDT and arbitrary detention are insufficiently precise at the margins, *Sosa* indicates that a norm with unclear boundaries is still actionable under the ATS if the conduct specifically alleged and later proven clearly constitutes a violation of customary international law.  *See Sosa*, 542 U.S. at 737 (stating that any invocation of a norm against arbitrary detention "requires a factual basis" more evidently egregious than the one presented in that case); *Qi*, 349 F. Supp. 2d at 1322 (interpreting the preceding portion of *Sosa* as supporting a case-by-case approach to setting norms under the ATS).  On these bases, the Court concludes that CIDT and arbitrary detention are norms cognizable under the ATS.

Based on the submissions of the plaintiffs, it appears that the norm against forced disappearance has not achieved nearly the same level of stature in the federal courts or in international law as those for CIDT and arbitrary detention. Plaintiffs have cited only three federal cases supportive of its existence as a norm of customary international law cognizable under the ATS. None was decided under *Sosa*'s more restrictive regime for recognition of ATS claims. *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994); *Xuncax v. Gramajo*, 886 F. Supp. 162, 184–85 (D. Mass. 1995); *Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987), *amended by* 694 F. Supp. 707, 710–11 (N.D. Cal. 1988)).

Plaintiffs have cited three international instruments recognizing disappearance as a violation of international law: the United Nations International Convention for the Protection of All Persons from Enforced Disappearance, the Inter-American Convention on the Forced Disappearance of Persons, and the Rome Statute of the International Criminal Court. Each of these authorities has significant flaws as sources of customary international law. The Court of Appeals has held that the Rome Statute is not a persuasive source as to the content of customary international law. *Exxon Mobil*, 654 F.3d at 35–36. The U.N. convention was entered into force less than five years ago and has not been signed by the United States or United Kingdom. International Convention for the Protection of All Persons from Enforced Disappearance ("ICED"), Dec. 20, 2006, 2716 U.N.T.S. 3; *see also* Database Page for the ICED, United Nations Treaty Collection, https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-16&chapter=4&lang=en (last visited June 30, 2015) (showing current signatories). The Inter-American convention was entered into force less than 20 years ago, has been ratified by only 15 countries, and has not been signed by the United States. *See* General Information Page for the Inter-American Convention on the Forced Disappearance of Persons, Dep't of Int'l Law,

Organization of American States, http://www.oas.org/juridico/english/Sigs/a-60.html (last visited June 30, 2015).

In light of the cautious analysis that *Sosa* requires, the Court concludes that claims for "disappearance" are not cognizable under the ATS and, therefore, Jane Doe III's claim against Exxon for aiding and abetting disappearance must be dismissed. *Cf. Sosa*, 542 U.S. at 734–35 (finding that a binding norm of customary international law was not established by a U.N. declaration that did not create obligations under international law or a treaty ratified by the United States on the express understanding that it was not self-executing).

Third, Exxon argues that the Torture Victim Protection Act of 1991 ("TVPA") has preempted ATS claims for torture and extrajudicial killing. The Supreme Court observed in *Sosa* that the TVPA "supplement[ed]" the relief available under the ATS. *See Sosa*, 542 U.S. at 731. Along similar lines, courts have held that the TVPA does not preempt claims for torture and extrajudicial killing under the ATS, reasoning that an intent to amend the ATS is not apparent from the face of the TVPA and amendments of prior statutes by implication are disfavored. *See, e.g., Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1250–51 (11th Cir. 2005); *see also Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 36 n.10 (D.D.C. 2010) (citing cases). The Court finds these cases persuasive and rejects this portion of Exxon's motion.

Fourth, Exxon argues that the norm against extrajudicial killing in customary international law only extends to killings connected to a mass, systemic program. This argument is contrary to authorities indicating that such a limitation is not present in the norm against extrajudicial killing. These authorities include the Geneva Convention, which defines extrajudicial killing without such a limitation, and the TVPA, which states a similar definition and which was passed on the understanding that it codified a norm of customary international law, according to the Senate

8

Judiciary Committee report for the bill. *See Wiwa*, 626 F. Supp. 2d at 382 n.4 (citing the Geneva Convention Relative to the Treatment of Prisoners of War, art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 & S. Rep. No. 102-249, pt. IV.A (1991)).  The Court rejects Exxon's argument on this point as well.

Finally, Exxon reiterates its argument that a defendant may not be held liable for aiding and abetting the conduct of a foreign sovereign under the ATS.  The Court of Appeals disagreed, holding that plaintiffs' ATS claims could go forward on an aiding and abetting theory of liability. *Exxon Mobil*, 654 F.3d at 32.  In so holding, it has joined a number of other courts of appeals in recognizing the existence of aiding and abetting liability under the ATS where the primary violations of customary international law were committed by state actors. *See, e.g.*, *Mastafa*, 770 F.3d at 174, 181; *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 389, 396 (4th Cir. 2011).  In light of these decisions, the Court rejects Exxon's argument that it may not be liable for aiding and abetting the acts of Indonesian soldiers serving as security personnel.

### 3.    Presumption against extraterritoriality is displaced in part

A district court only has subject matter jurisdiction over a claim arising under the ATS if the presumption against extraterritoriality is displaced or satisfied.  As previously discussed at length in the Memorandum Opinion signed September 23, 2014, the Supreme Court held in *Kiobel* that the ATS is presumed not to apply extraterritorially.  Thus, it is presumed not to regulate conduct occurring outside of the United States.  For example, the *Kiobel* Court held that the presumption against extraterritoriality precluded ATS liability in a case where all relevant conduct had occurred outside of the United States and the defendant was a foreign citizen corporation. *Kiobel*, 133 S.Ct. at 1669.

The Court noted, however, that in some cases a plaintiff's claims might "touch and concern" the United States with "sufficient force to displace the presumption." *Id.* The only guidance the Court provided as to this test was that the mere corporate presence of a defendant in the United States does not satisfy it. *Kiobel* left open questions regarding how the presumption against extraterritoriality and the "touch and concern" test operate in ATS cases where there is some relevant U.S. conduct or a U.S. citizen defendant.

### a.     Relevant considerations to the extraterritoriality inquiry

Before applying the presumption to the present facts, the Court will briefly set forth the factors relevant to determining whether the presumption against extraterritorial application of the ATS is displaced.

### i.     United States conduct

The primary inquiry in deciding whether the presumption against extraterritoriality is displaced is the location of the conduct at issue in the case. *See Exxon Mobil*, 654 F.3d at 75 (Kavanaugh, J., dissenting in part) ("The presumption against extraterritoriality is focused on the site of the conduct, not the identity of the defendant."). This principle emerges in part from the nature of the presumption itself, *see id.*, and from the *Kiobel* Court's repeatedly expressed concern about the ATS being applied to regulate conduct occurring "in the territory of a foreign sovereign." *See Kiobel*, 133 S.Ct. at 1664, 1666, 1668; *see also Mastafa*, 770 F.3d at 184 n.11 ("[T]he site of the alleged violation should be the central inquiry for lower courts asked to apply the *Kiobel* presumption to facts allegedly sufficient to overcome it.").

Some cases, such as this one, involve conduct occurring in the United States and abroad. The way to apply the touch and concern test in such a situation is shown, in part, by the *Kiobel* Court's citation of *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). *See Kiobel*, 133

S.Ct. at 1669 (citing *Morrison*, 561 U.S. at 266–73). The *Morrison* Court concluded that the presumption against extraterritoriality barred a complaint that alleged both domestic and foreign conduct. 561 U.S. at 266, 273. It so held in light of the fact that the domestic conduct at issue was not the "focus" of congressional concern. *Id.* at 266.

Given the *Kiobel* Court's citation of *Morrison*, that case's "focus" test informs this Court's interpretation of the touch and concern test. The primary focus of congressional concern in passing the ATS was the prohibition of violations of customary international law. *See Sosa*, 542 U.S. at 724 (holding that the "First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations"). Therefore, actions that are part of a course of conduct constituting a violation of customary international law are relevant to the congressional focus in passing the ATS and they are relevant in determining whether a plaintiff's claims sufficiently touch and concern the United States to displace the presumption against extraterritoriality.

What level of conduct will displace the presumption? The Court previously concluded that, at a minimum, the presumption will be displaced where a violation of international law giving rise to a cause of action under the ATS is committed in the United States. *Exxon Mobil*, 2014 WL 4746256 at *12. This conclusion is in line with the most limited reading of the touch and concern test, the one articulated in Justice Alito's concurrence in *Kiobel*. 133 S.Ct. at 1670 (Alito, J., concurring) (concluding that the presumption against extraterritoriality bars an ATS cause of action "unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations").

The Eleventh Circuit holds, more broadly, that the presumption against extraterritoriality is only displaced "if the claims have a U.S. focus and adequate relevant conduct occurs within the

11

United States." *Doe v. Drummond Co.*, 782 F.3d 576, 592 (11th Cir. 2015). "Relevant conduct" is the conduct alleged "in support of those claims." *Id.* at 598. The conduct will be "adequate" to displace the presumption if "enough" of it occurs in the United States. *Id.* While this standard is fairly opaque, it appears to require that there be specific, substantial allegations of conduct occurring in the United States that supports an ATS cause of action. Although the U.S.-based conduct need not allege a completed tort under the ATS, the domestic conduct must indicate a U.S. focus to the claims and must be relevant to the claims, i.e. must support the claims.

The Court agrees with this approach and concludes that the presumption against extraterritoriality may be displaced if, in combination with other factors discussed below, the plaintiff alleges substantial and specific domestic conduct relevant to a violation of the ATS. This approach coheres with *Morrison*'s "focus" test by limiting its consideration to domestic conduct that is part of a violation of customary international law. It also takes account of the foreign policy concerns underlying *Kiobel*'s holding by requiring that courts only assume jurisdiction in cases that have a substantial domestic focus.

This approach does not, however, adopt Justice Alito's concurrence stating that the domestic conduct must allege a completed ATS cause of action on its own. Justice Alito's view, aside from having failed to win a majority of the Court, appears to be out of step with *Morrison*, which gave guidance to courts faced with cases involving both domestic and foreign conduct. This is just such a case.

### ii.    United States citizenship or corporate status

Plaintiffs urge the Court to consider the citizenship or corporate status of the defendants as a dispositive or at least relevant factor in applying the touch and concern test. The Court has already decided that corporate citizenship is not sufficient, on its own, to displace the presumption

against extraterritoriality. *Exxon Mobil*, 2014 WL 4746256 at \*12. Plaintiffs have not raised a persuasive reason to revisit that conclusion. The Second Circuit has gone a step further and held that a court should ignore the citizenship or corporate status of a defendant entirely because the "Supreme Court made clear in *Kiobel* that the full focus of the ATS was on conduct." *Mastafa*, 770 F.3d at 189 (internal quotation marks omitted).

Other courts of appeals have held that a defendant's United States citizenship, while not sufficient on its own to displace the presumption against extraterritoriality, is a relevant factor. *Drummond Co.*, 782 F.3d at 595; *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 530 (4th Cir. 2014); *see also Mujica v. AirScan, Inc.*, 771 F.3d 580, 594 & n.9 (9th Cir. 2014) (holding that while a defendant's U.S. citizenship may be relevant, it is not "dispositive"). These courts have reasoned that the risk of international discord—fundamental to the extraterritoriality concerns expressed in *Kiobel*—is substantially reduced when the defendant is a U.S. citizen because the plaintiff in such a case "would not be haling foreign nationals into U.S. courts to defend themselves." *Drummond Co.*, 782 F.3d at 595; *Al Shimari*, 758 F.3d at 530.

Also, the United States may have an interest in policing the international law violations of its citizens as a matter of foreign policy. *See Drummond Co.*, 782 F.3d at 595 (noting that the "acts of U.S. citizens may impact the United States, whether their actions occur extraterritorially or within the United States"). As to this point, some have argued persuasively that this was a focus of congressional concern in passing the ATS. *See, e.g., Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 783 (D.C. Cir. 1984) (Edwards, J., concurring) ("The focus of attention, then, was on actions occurring within the territory of the United States, or perpetrated by a U.S. citizen, against an alien."). Therefore, consideration of a defendant's citizenship would coincide with the *Morrison* focus test. *See Kiobel*, 133 S.Ct. at 1670 (Alito, J., concurring) (quoting *Morrison*, 561

13

U.S. at 266) (emphasis added) (interpreting *Morrison* as holding that the presumption against extraterritoriality does not bar a statute's operation if the "event *or relationship* that was 'the focus of congressional concern' under the relevant statute takes place within the United States").

In accord with the Eleventh and Fourth Circuits, the Court holds that a defendant's U.S. citizenship or corporate status is a relevant consideration in applying the touch and concern test. Nonetheless, the Court agrees with the Second Circuit that given the Supreme Court's conduct-focused reasoning in *Kiobel*—particularly with regard to the matter of regulating conduct occurring in the "territory of a foreign sovereign"—the location of the relevant conduct is the fundamental criterion in conducting this analysis. Only when substantial and specific domestic conduct relevant to the ATS claims is alleged can the claims sufficiently touch and concern the United States to displace the presumption against extraterritoriality. Therefore, a defendant's citizenship can only operate to push across the finish line, so to speak, an ATS claim that alleges enough relevant conduct in the United States.

### iii.    Other relevant connections to the United States

Given the vague language used by the Supreme Court in *Kiobel*, courts have occasionally held that certain United States connections other than citizenship and relevant conduct may contribute to displacing the presumption against extraterritoriality. In *Al Shimari*, the Fourth Circuit evaluated claims of torture at Abu Ghraib prison in Iraq. 758 F.3d at 521–22. The acts of torture were allegedly committed by Americans acting pursuant to a contract with the United States government to provide interrogation services. *Id.* The court held that the plaintiffs' claims touched and concerned the United States with sufficient force to displace the presumption because, among other reasons, the contract was issued in the United States by the Department of the Interior and it required the defendant's employees to obtain security clearances from the Department of Defense.

14

*Id.* at 530–31. The court held that other factors, including citizenship and relevant conduct, contributed to displacement of the presumption as well. *Id.*

In *Mwani v. Bin Laden*, 947 F. Supp. 2d 1 (D.D.C. 2013), another judge of this district evaluated whether the presumption foreclosed the court's jurisdiction to hear ATS claims brought against Osama Bin Laden and al Qaeda for their roles in the August 1998 attack on the U.S. Embassy in Nairobi, Kenya. *Id.* at 5. The court concluded that the claims could go forward because there was relevant domestic conduct—the attack was plotted in part within the United States—and because the attack was "directed at a United States Embassy and its employees." *Id.* As to the latter point, the court observed that an attack on the American government, launched with the intent of harming our country and our citizens, is tied "closely to our national interests." *Id.*

To the extent these cases allow for the synthesizing of broader rules, they counsel that when the American connections to a claim implicate important national interests, the federal courts may assume jurisdiction under the ATS if the presence of these interests, in combination with other factors, indicates that the claims sufficiently touch and concern the United States to displace the presumption against extraterritoriality. Such national interests might be triggered by the fact that the United States government is in some way culpable or, at least, integrally involved in the conduct giving rise to the claims at issue. This factor heightens the U.S. interest in policing international law violations to a much greater degree than the mere U.S. citizenship of the defendants. The direction of attacks against American citizens and property might be another relevant factor because it implicates our national interest in punishing and deterring such attacks.

15

*iv.*     *Conclusion*

The Court concludes that the presumption against extraterritoriality will not prevent an ATS claim from going forward in two situations. First, the presumption does not bar a claim where the complaint alleges conduct in the United States constituting a tort cognizable under the ATS. Second, the presumption may be displaced where the claims sufficiently touch and concern the United States by virtue of some combination of (1) substantial and specific domestic conduct relevant to the ATS claims, (2) United States citizenship or corporate status of the defendant, and (3) the presence of important national interests. A defendant's United States citizenship is insufficient on its own to displace the presumption. Also, unless an exceptional case is presented, the presumption will not be displaced without allegations of substantial and specific U.S.-based conduct relevant to the ATS claims.

*b.*     *Aiding and abetting liability under customary international law*

Before applying the presumption against extraterritoriality as described above, the Court must consider the matter of what conduct will state a claim for aiding and abetting a customary international law violation under the ATS. These standards will point the way to deciding what conduct is relevant to the displacement of the presumption.

Plaintiffs have pled claims according to an aiding and abetting theory of liability. The Court of Appeals previously stated that the standard of liability for aiding and abetting is based on customary international law as interpreted by "international tribunals mandated by their charter to apply only customary international law." *Exxon Mobil*, 654 F.3d at 33. Two "authoritative" tribunals on the subject are the International Criminal Tribunals for the Former Yugoslavia and for Rwanda ("ICTY" and "ICTR"). *Id.* The decisions of the International Military Tribunal at

Nuremberg and the other post-World War II Nuremberg tribunals also provide authoritative guidance about the content of customary international law. *Id.* at 30.

Customary international law, as interpreted by the decisions of these courts, holds that aiding and abetting liability has two elements, one objective and one subjective. These elements are identified by the terms *actus reus* and *mens rea*. The criminal law terminology used reflects the roots of this theory of international legal liability in war crimes prosecutions. The Court will briefly discuss the standards applicable to each element.

        *i.*      Actus reus

The *actus reus* for aiding and abetting under customary international law is established by "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." *Prosecutor v. Šainović*, Case No. IT-05-87-A, Appeal Judgement, ¶ 1649 (ICTY Jan. 23, 2014).

While the effect of a defendant's assistance must be "substantial," it need not be proved that there was a "cause-effect relationship" between the defendant's conduct and the primary violation of international law. *Ndahimana v. Prosecutor*, Case No. ICTR-01-68-A, Appeal Judgement, ¶¶ 147, 149 (Dec. 16, 2013); *Prosecutor v. Blaškić*, Case No. IT-95-14-A, Appeal Judgement, ¶ 48 (ICTY July 29, 2004). In other words, the aider and abettor's conduct need not be a "condition precedent" to the primary crime. *Ndahimana* ¶ 149. Nonetheless, there must be a "link" or "connection" between the aider and abettor's actions and the underlying crime. *Nzabonimana v. Prosecutor*, Case No. ICTR-98-44D-A, Appeal Judgement, ¶ 489 (Sept. 29, 2014). As a result, aiding and abetting liability may only be found where assistance is provided to a criminal's human rights abuses, not simply the criminal him or herself. *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d at 257. Courts have concluded, for example, that merely providing

financing as part of an ordinary commercial transaction does not satisfy the *actus reus* requirement. *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1350 (S.D. Fla. 2011).   There must be some sort of direct relationship between the underlying violation and the assistance rendered.

An influential trial decision from the ICTY has concluded that assistance is substantial when the underlying crime "probably would not have occurred in the same way had not someone acted in the role that the accused [aider and abettor] in fact assumed." *Prosecutor v. Tadić*, Case No. IT-94-1-T, Trial Opinion and Judgment, ¶ 688 (ICTY May 7, 1997).   In accordance with this principle, a defendant may render substantial assistance by providing "the means by which a violation of the law is carried out." *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d at 259.   For example, in *The Zyklon B Case*, the International Military Tribunal at Nuremberg found the manufacturer of the gas used in Nazi death camps guilty of aiding and abetting crimes against humanity on the basis of having supplied the gas. *Id.* at 258 (citing *Trial of Bruno Tesch and Two Others*, *in* 1 *Law Reports of Trials of War Criminals* 93–103 (1947) ("*The Zyklon B Case*")).

Facilitating the commission of an international law violation may also satisfy the *actus reus* requirement for aiding and abetting liability when the defendant's acts have a substantial effect on the primary violation. *See Prosecutor v Blagojević & Jokić*, Case No. IT-02-60-A, Appeal Judgement, ¶ 127 (ICTY May 9, 2007) (stating that "the *actus reus* of aiding and abetting liability may be satisfied by a commander permitting the use of resources under his or her control, including personnel, to facilitate the perpetration of a crime").   For example, the ICTY found the *actus reus* requirement met in a case where the defendant permitted resources under his control to be used in a bussing operation that ultimately led to the persons transported being killed. *Prosecutor v. Krstić*, Case No. IT-98-33-A, Appeal Judgement, ¶¶ 137, 144 (ICTY Apr. 19, 2004).   Thus, an aider and

18

abettor need not provide the actual tools used in carrying out a violation of customary international law if they facilitate directly the ultimate commission of the underlying offense.

*ii.*   Mens rea

The second element of aiding and abetting liability requires an evaluation of the defendant's state of mind, their *mens rea*. A defendant is only liable for aiding and abetting if they know that their acts assist the commission of the principal offense. *Šainović* ¶ 1649.[3] It is not required, however, that the defendant has certain knowledge that a particular crime will be committed using the assistance rendered. A defendant may still be liable so long as they are "aware that one of a number of crimes will probably be committed, and one of those crimes is committed." *Prosecutor v. Popović*, Case No. IT-05-88-A, Appeal Judgement, ¶ 1732 (ICTY Jan. 30, 2015); *Karera v. Prosecutor*, Case No. ICTR-01-74-A, Appeal Judgement, ¶ 321 (Feb. 2, 2009).

A defendant "must be aware of the essential elements of the crime" to possess the *mens rea* required for aiding and abetting liability. *Prosecutor v. Lukić & Lukić*, Case No. IT-98-32/1-A, Appeal Judgement, ¶ 428 (ICTY Dec. 4, 2012). This includes a requirement that the defendant know the intent of the principal perpetrator. *Popović* ¶ 1732. The defendant, however, does not need to "know every detail of the crime that was eventually committed." *Šainović* ¶ 1773. The level of knowledge required "will depend on the circumstances of the case, including the scale of the crimes and the type of assistance provided." *Id.* Knowledge of the same or similar actions in the past by the principal perpetrator is sufficient to establish this component of the *mens rea* element. *See Popović* ¶ 1734 (emphasis in original) (holding that the evidence supported finding the defendant "knew that it was *probable* that the [victims] would be killed and that if he failed to

---

[3] This recent statement from the ICTY is in line with the Court of Appeals' interpretation of the relevant customary international law authorities. *Exxon Mobil*, 654 F.3d at 39. The Court rejects Exxon's argument that it should apply a *mens rea* standard of purpose.

act, his omission would assist in their murder" on the basis that defendant knew of prior killings by the same individual).

### iii.   Specific direction

Before proceeding to an application of these standards to the extraterritoriality inquiry, the Court will briefly discuss whether "specific direction" is a component of the *actus reus* element of aiding and abetting liability.

Recently, an appeal judgment of the ICTY articulated a different *actus reus* standard for aiding and abetting liability than the one described above. The court concluded that customary international law requires that acts which allegedly aid and abet an international law violation must be "specifically directed" to assisting, encouraging, or supporting that offense. *Prosecutor v. Perišić*, Case No. IT-04-81-A, Appeal Judgement, ¶ 36 (ICTY Feb. 28, 2013). In cases where the secondary offender is physically close to the commission of the primary crime, specific direction may be established implicitly by establishing the other elements of aiding and abetting liability. *Id.* ¶ 38. On the other hand, where secondary liability is premised on conduct "remote" to the primary crime, "specific direction must be explicitly established." *Id.* ¶ 73. Usually, specific direction is not shown through "the provision of general assistance which could be used for both lawful and unlawful activities." *Id.* ¶ 44.

The Court of Appeals remanded to this Court with explicit instructions to consider the *Perišić* decision and what effect it may have on the standard for aiding and abetting liability. *Exxon Mobil*, 527 F. App'x at 7. The Court concludes that "specific direction" is not an element of aiding and abetting liability under customary international law and that the standard articulated by the Court of Appeals previously in this case and by this Court today remains unchanged. The Court's view is rooted in the ICTY's own subsequent decision in *Šainović*, which explicitly repudiated the

*Perišić* decision and concluded that its statement of the *actus reus* was error. *Šainovic* ¶ 1649. The *Šainović* court made the "compelling conclusion"—after extensively surveying its own case law, decisions from military tribunals in the wake of World War II, domestic criminal law from numerous countries, and international instruments on the subject—that "'specific direction' is not an element of aiding and abetting liability under customary international law." *Id.* Addressing the apparent conflict with its prior opinion, the Court firmly stated: "Consequently, the Appeals Chamber, Judge Tuzmukhamedov dissenting, unequivocally rejects the approach adopted in the *Perišić* Appeal Judgment as it is in direct and material conflict with the prevailing jurisprudence on the *actus reus* of aiding and abetting liability and with customary international law in this regard." *Id.* ¶ 1650.

ICTY decisions both before and after *Perišić* are also in agreement that specific direction is not a component of aiding and abetting liability. Two cases, evaluating the ICTY decisions that first referenced "specific direction," concluded that "specific direction is not an essential ingredient of the *actus reus* of aiding and abetting." *Prosecutor v. Mrkšić*, Case No. IT-95-13/1-A, Appeal Judgement, ¶ 159 (ICTY May 5, 2009); *Lukić & Lukić* ¶ 424. The ICTY after *Perišić* also held in *Popović* that specific direction is not a component of the *actus reus* for aiding and abetting liability. *Popović* ¶ 1758.

The Court notes that a number of ICTR decisions hold that an aider and abettor's conduct must be "specifically directed" or "specifically aimed" at assisting the principal violation. *See, e.g., Ndahimana* ¶ 147; *Ntawukulilyayo v. Prosecutor*, Case No. ICTR-05-82-A, Appeal Judgement, ¶ 214 (Dec. 14, 2011); *Kalimanzira v. Prosecutor*, Case No. ICTR-05-88-A, Appeal Judgement, ¶ 74 (Oct. 20, 2010). The Court has reviewed these cases and the decisions cited therein as support for a "specific direction" element and concludes that they do not persuasively

demonstrate that any independent basis exists in the ICTR's jurisprudence for inclusion of a specific direction element.

First, some of the cases cited as support for a "specific direction" standard do not actually discuss that term and do not define the *actus reus* for aiding and abetting liability in terms meaningfully different from the ICTY decisions already highlighted. Thus, these cases provide no support for a different standard. *See Ndindabahizi v. Prosecutor*, Case No. ICTR-01-71-A, Appeal Judgment, ¶ 117 (Jan. 16, 2007); *Karera* ¶ 321; *Mrkšić* ¶ 81.

Second, some of the cases cited incorporate or note the specific direction language but then affirm as accurate trial court statements of the law omitting this language from the *actus reus* standard. *Blaškić* ¶¶ 45–46; *Prosecutor v. Aleksovski*, Case No. IT-95-14/1-A, Appeal Judgement, ¶ 163–64 (ICTY Mar. 24, 2000). Third, one of the ICTR cases sometimes cited for the specific direction standard uses that language but cites no authority for it and ascribes no doctrinal significance to the term. *Prosecutor v. Ntakirutimana*, Case Nos. ICTR-96-10A, ICTR-96-17-A, Appeal Judgement, ¶ 530 (Dec. 13, 2004). On this basis, it also provides minimal support for a different *actus reus* standard.

Finally, many of the cases incorporating "specific direction" language cite the ICTY's appeal judgments in *Blagojević & Jokić* and *Tadić. See, e.g., Kalimanzira* ¶ 74; *Prosecutor v. Ntagerura*, Case No. ICTR-99-46-A, Appeal Judgement, ¶ 370 (July 7, 2006). The ICTY has found repeatedly that these cases incorrectly stated that specific direction is a component of aiding and abetting liability. *Mrkšić* ¶ 159; *Šainovic* ¶¶ 1649–50; *Popović* ¶ 1758. Indeed, the *Blagojević & Jokić* court itself appeared to backtrack from the inclusion of specific direction as a component of the *actus reus* for aiding and abetting liability under customary international law. The court observed that "specific direction has not always been included as an element of the *actus reus* of

22

aiding and abetting," a phenomenon "explained by the fact that such a finding will often be implicit in the finding that the accused has provided practical assistance to the principal perpetrator which had a substantial effect on the commission of the crime." *Blagojević & Jokić* ¶ 189.

A Ninth Circuit panel recently observed in dicta that this controversy appears to be a fight about the name to be applied in describing the "widespread substantive agreement about the *actus reus* of aiding and abetting." *Doe v. Nestle USA, Inc.*, 766 F.3d 1013, 1026 (9th Cir. 2014). That widespread agreement, in the *Nestle* court's view, is that there must be a "causal link between the defendants and the commission of the crime." *Id.* While the Court does not adopt the precise formulation of the *actus reus* requirement stated in *Nestle*, it does agree that terms like "specific direction" or "specifically aimed" are better understood as glosses on the underlying *actus reus* standard. Instead of being a functional component of the doctrine, the Court concludes that "specific direction" is a description for a type of behavior that is the usual basis for aiding and abetting liability. It is not, however, the only type of behavior that may establish liability and is, therefore, not an elemental component of aiding and abetting liability.

### c. *Application of the presumption in this case*

The Court will now apply the extraterritoriality doctrines just described to the facts alleged with respect to each defendant, EMOI and EMC.

Before doing so, the Court notes that this is not an exceptional case implicating important national interests that might warrant an expansive application of the touch and concern test. Whatever the full scope of that portion of the touch and concern test, the Court concludes that the facts of this case do not warrant exploration of its outer boundary. Aside from the fact that the defendants have U.S. corporate citizenship, no other major national interests like those considered in *Al Shimari* or *Mwani* are present. The plaintiffs are foreign and there is no allegation that the

alleged crimes were directed against Americans. The primary actors were foreign. The United States government has no direct relationship to the claims. Thus, the Court concludes that plaintiffs' ATS claims will rise or fall according to a combination of the relevant domestic conduct and the citizenship of the defendants.

> i.   *Exxon Mobil Oil Indonesia Inc.*

Exxon argues that the Proposed Second Amended Complaint fails to allege any sufficient basis to displace the presumption against extraterritoriality as to plaintiffs' ATS claims against EMOI. In reply, plaintiffs appear to largely concede the point, stating that if the Court maintains its prior conclusion that corporate citizenship alone is insufficient to displace the presumption against extraterritoriality, the "non-federal claims will remain against EMOI" and plaintiffs "preserve this issue for appeal, if necessary." Pls.' Reply 14, ECF No. 478.

Exxon is correct in its evaluation of the Proposed Second Amended Complaint as to EMOI. Although EMOI was incorporated in Delaware at the time the complaint was filed, this fact is insufficient on its own to permit the ATS claims against EMOI to go forward.[4] Current Compl. ¶ 20. The Proposed Second Amended Complaint alleges insufficient instances of U.S.-based conduct by EMOI officers or employees relevant to the ATS claims. A survey of the complaint's allegations reveals only one allegation specifically related to security in Indonesia: that EMOI security advisors attended conferences on security issues in the United States. *Id.* ¶ 160. This paragraph of the complaint states no specific conduct relevant to the *actus reus* or *mens rea* of plaintiffs' ATS claims. This lack of specificity is fatal to plaintiffs' attempt to displace the

---

[4] The record in the case reflects that EMOI reincorporated in the Cayman Islands in 2005. *Exxon Mobil*, 2014 WL 4746256 at *16. At that time, EMOI may have become a foreign citizen for purposes of the extraterritoriality inquiry. *But cf. Freeport-McMoRan, Inc. v K N Energy, Inc* , 498 U.S. 426, 428 (1991) (internal quotation marks omitted) (stating the "well-established rule" that diversity jurisdiction is assessed at the time the action is commenced and is not "divested by a subsequent change in the citizenship of the parties"). The Court need not decide the issue, however, because even if EMOI is treated as a United States corporation, the presumption against extraterritoriality is not displaced, as elaborated above.

presumption as to EMOI. *Drummond Co.*, 782 F.3d at 598–99 (holding insufficient to displace the presumption allegations of domestic conduct that were not "particularly extensive or specific").

Plaintiffs have also generally alleged that EMOI's board of directors was operated and controlled from the United States and that EMOI relied on U.S.-based corporate departments for various routine business operations. Current Compl. ¶¶ 133, 172. These generalized allegations do not demonstrate that any relevant conduct occurred in the United States. The Court may not presume that conduct relevant to the ATS claims occurred as part of these routine business practices. *See Drummond Co.*, 782 F.3d at 598–99.

Finally, plaintiffs allege that EMOI's revenues were "routinely swept" into the U.S. bank accounts of its parent companies. Current Compl. ¶ 154. Therefore, plaintiffs argue, EMOI's financial support for the security forces necessarily came from the United States. Pls.' Reply 28. Regardless of the relevance of this contact, the Court again concludes that it cannot find the presumption against extraterritoriality displaced on the basis of such a generalized allegation. Plaintiffs did not specifically allege in their complaint that any of EMOI's support originated in the United States. Furthermore, plaintiffs have not alleged that any of the relevant decision making by EMOI employees and executives occurred in the United States.

The allegations of the complaint do not set forth the sort of specific and substantial U.S.-based conduct that may permit the Court to exercise jurisdiction. Therefore, the Court will dismiss plaintiffs' ATS claims against EMOI and deny leave to amend as to these claims.

### ii. *Exxon Mobil Corp.*

The Proposed Second Amended Complaint does, however, set forth ATS claims against EMC that sufficiently touch and concern the United States to displace the presumption against extraterritoriality.

First, plaintiffs have sufficiently alleged the *mens rea* for aiding and abetting liability based on the knowledge of EMC executives within the Unites States. Plaintiffs have alleged that EMC executives in the United States received briefings on abuses committed by Exxon security personnel in Aceh against the local population. Current Compl. ¶¶ 46–47, 49. Plaintiffs allege that this information was heard prior to plaintiffs' injuries. *Id.*

In particular, plaintiffs allege that EMC executives in the United States received reports that Exxon security personnel engaged in rape, torture, unlawful detention, assault, and killings. *Id.* ¶¶ 50–51. They also allege that EMC executives in the United States received reports from employees and advisors that the Indonesian military had a "poor reputation . . . especially in the area of respecting human rights" and that their deployment in support of Exxon's operations risked "more of a possibility of an unfortunate incident." *Id.* ¶¶ 46, 48.

Plaintiffs' allegations that EMC executives knew of past crimes by Exxon security personnel like those at issue in this suit satisfies the requirement that EMC have known the essential elements of the crimes committed and the intent of the principal perpetrators. *See Popović* ¶ 1734 (holding *mens rea* established where the defendant was aware that the principal perpetrator had previously killed persons in similar circumstances). The allegations also sufficiently demonstrate that EMC executives were aware of the probability that the crimes allegedly committed against plaintiffs would occur. *See id.* ¶ 1732 (holding that the defendant need only be "aware that one of a number of crimes will probably be committed, and one of those crimes is committed").

Plaintiffs have also alleged that EMC executives in the United States received reports that Exxon security personnel were committing human rights violations on Exxon property, using Exxon equipment. Current Compl. ¶¶ 50, 52. Additionally, staff allegedly warned EMC

executives in the United States that supplying additional vehicles to the security personnel could lead to a greater likelihood of abuses by security personnel. Current Compl. ¶ 70. These allegations, altogether, sufficiently establish that EMC executives in the United States knew that their actions would have a substantial effect on the commission of the underlying offenses.

Second, plaintiffs have set forth substantial and specific allegations of U.S.-based conduct relevant to the *actus reus* for aiding and abetting liability.

The Court first notes that these allegations are likely insufficient, without allegations of Indonesia-based conduct, to state a claim for aiding and abetting liability. This is because all of the support that EMC allegedly provided only reached the security personnel in Indonesia. Nonetheless, the nature of aiding and abetting liability demonstrates that the site of decision making is relevant to the *actus reus* of the offense and, therefore, to the extraterritoriality inquiry. *See Drummond Co.*, 782 F.3d at 597 (citing *Mastafa*, 770 F.3d at 182–83, 185, 195). Decisions to provide assistance that will have a substantial effect on a violation of customary international law are part of a course of conduct that gives rise to a claim for aiding and abetting under the ATS. Therefore, the site of these decisions is relevant to the Court's application of the presumption against extraterritoriality and the touch and concern test.

Plaintiffs have made numerous and detailed allegations of U.S.-based decision making. First, plaintiffs have alleged that EMC executives in the United States "planned and authorized the deployment of military security personnel." Current Compl. ¶ 106. EMC executives were allegedly involved in planning and authorizing the location of deployments, the tasks undertaken by the personnel, and the logistical support provided. *Id.*; *see also id.* ¶ 82 (describing specific deployment plans). Plaintiffs allege that "[t]hese deployments placed military security in proximity to and in contact with the local community, including Plaintiffs." *Id.* ¶ 83. Second,

27

plaintiffs have alleged that U.S.-based EMC executives ordered the provision of supplies and vehicles for the Indonesian security personnel and that the underlying international law violations were committed using these supplies and vehicles. *Id.* ¶¶ 43, 89–91. Plaintiffs also allege that EMC employees in the United States sourced and priced the supplies provided. *Id.* ¶ 97.

The Court concludes that these allegations of U.S.-based decision making constitute substantial and specific allegations of domestic conduct relevant to the *actus reus* of aiding and abetting a violation of customary international law. The allegations set forth decisions to facilitate the underlying offenses and to provide the means by which those offenses were carried out. *See Tadić* ¶ 688; *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d at 258 (citing *The Zyklon B Case* 93–103); *Blagojević & Jokić* ¶ 127; *Krstić* ¶¶ 137, 144.

These substantial and specific allegations, in combination with the fact of EMC's U.S.-based incorporation and principal place of business, Current Compl. ¶ 17, demonstrate that plaintiffs' claims against EMC sufficiently touch and concern the United States to displace the presumption against extraterritorial application of the ATS.

## B.     Failure to State a Claim

Exxon has also moved to dismiss plaintiffs' ATS claims pursuant to Rule 12(b)(6) for failure to state a claim. The Court need not consider this ground for dismissal as to EMOI because plaintiffs' ATS claims against EMOI will be dismissed for failure to displace or satisfy the presumption against extraterritoriality.

The Court concludes that plaintiffs have met their burden under Rule 12(b)(6) as to their ATS claims against EMC. Because the extraterritoriality inquiry under the ATS includes a peek at the merits, the Court has already undertaken substantially the same analysis applicable to this ground for dismissal in its discussion in part II.A.3. For the reasons stated in part II.A.3.*c.ii*,

plaintiffs have sufficiently alleged the *mens rea* for aiding and abetting liability against EMC. The *actus reus* has also been sufficiently alleged. As discussed above, plaintiffs have made various allegations of decision making by EMC executives that caused the provision of supplies and vehicles to Exxon security personnel. They have also alleged that EMC executives planned and approved the deployments of security personnel and that these plans put EMC personnel in close proximity with local villagers. Finally, plaintiffs have alleged that Exxon security personnel used Exxon facilities, supplies, and vehicles to commit various human rights abuses. Current Compl. ¶¶ 43, 177, 179–80, 182. These allegations sufficiently allege the *actus reus* of aiding and abetting liability to survive a motion to dismiss. Specifically, the complaint alleges that EMC provided assistance having a substantial effect on the underlying violations of customary international law by facilitating those offenses and providing the tools by which those offenses were carried out. In short, plaintiffs' allegations, if proven, demonstrate that the principal violations of customary international law claimed would not have occurred as they did without the assistance provided. *See Tadić* ¶ 688.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that Exxon's motion to dismiss should be granted in part and denied in part. Plaintiffs' ATS claims against EMOI are dismissed and Jane Doe III's ATS claim for forced disappearance against both defendants is also dismissed. The Court will grant plaintiffs' motion for leave to amend their complaint subject to the dismissals described in the preceding sentence. An Order in accord with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on July 6, 2015.