## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JOHN DOE I, et al.** | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) **Case No: 01-cv-1357-RCL** |
|  | ) |
| **EXXON MOBIL CORPORATION, et al.** | ) **UNDER SEAL** |
|  | ) |
| **Defendants.** | ) |
|  | ) |

## MEMORANDUM OPINION

### I.   INTRODUCTION

This case comes to the Court in the midst of several discovery disputes.  Currently pending before the Court are defendants' Motion to Compel, ECF No. 558 and plaintiffs' Cross-Motion to Compel, ECF No. 567.  For the reasons stated below, the Court will grant in part and deny in part defendants' motion and will deny plaintiffs' cross-motion.

### II.   BACKGROUND

This case was filed fifteen years ago by unidentified John and Jane Doe plaintiffs against defendants Exxon Mobil Corporation and ExxonMobil Oil Indonesia, Inc. (collectively, "defendants" or "Exxon").  Plaintiffs are Indonesian citizens who claim to have been injured or killed by guards hired by Exxon in Indonesia.  After a protracted period of motions practice, the parties commenced discovery.  On July 6, 2015, this Court granted Exxon's first motion to compel, ordering, in part, plaintiffs to produce "any and all documents concerning plaintiffs' efforts to obtain any passports or visas from the governments of Indonesia or the United States during the pendency of this litigation."  *See* Court's July 6, 2015 Order, ECF No. 514.  Exxon now moves

again to compel, and plaintiffs both oppose Exxon's motion and cross move to compel, *see* Pls.'
Opp'n to Mot. to Compel & Cross-Mot., ECF No. 567.  Exxon, in response to the cross-motion,
also asks this Court to dismiss this action on various grounds.  *See* Defs.' Reply and Opp'n to Pls.'
Cross-Mot., ECF No. 571-2.

Defendants have asked for leave to file a surreply, ECF No. 581-2.  Surreplies are generally
disfavored, but leave to file a surreply is "'routinely' granted 'when a party is unable to contest
matters presented to the court for the first time in the last scheduled pleading.'"  *Doe v. Exxon*
*Mobil Corp.*, 69 F. Supp. 3d 75, 85 (D.D.C. 2014).  In determining whether to grant leave, courts
"should consider 'whether the movant's reply in fact raises arguments or issues for the first time,
whether the nonmovant's proposed surreply would be helpful to the resolution of the pending
motion, and whether the movant would be unduly prejudiced were leave to be granted.'"  *Id.*

Plaintiffs argue that the arguments raised in defendants' proposed surreply could have been
raised in their opposition.  Those arguments pertain to the destruction of Martin Massey's
notebooks and the loss of Alex Dodds' hard drive; the boxes of financial documents; the payment
of witness attorneys' fees; and the identities of the parties' agents, all described in detail below.
Pls.' Opp'n to Defs.' Mot. for Surreply, ECF No. 583.  Plaintiffs have consented to defendants'
motion "insofar as the surreply addresses [p]laintiffs' request for documents concerning KPMG's
efforts to restore Mr. Dodds' crashed hard drive, but oppose the remainder of the motion."  Defs.'
Mot. for Surreply at 3 n.3.  The Court agrees with plaintiffs and will deny defendants' motion with
respect to the entire surreply except the section devoted to plaintiffs' request for documents
concerning KPMG's efforts to restore Mr. Dodd's hard drive.  The other issues—Mr. Massey's
notebooks, the boxes of financial documents, the payment of witness attorneys' fees, and the
identities of the parties' agents—were all raised in plaintiffs' opposition and were addressed in

defendants' original reply. These issues are not "truly new." *See United States v. Baroid Corp.*, 346 F. Supp. 2d 138, 143 (D.D.C. 2004). They are not necessary to the resolution of the pending motion. *See Doe*, 69 F. Supp. 3d at 85.

The Court will address arguments regarding written or physical discovery, then will turn to the issue of depositions and dismissal. The Court first notes, however, that defendants have reserved their rights to move to dismiss for failure to prosecute if further discovery demonstrates that plaintiffs did not make a good faith effort to appear in the United States for depositions. *See* Defs.' Mot. to Compel at 20 n.11. This Court is ruling on the present evidence and the facts as they currently exist, neither of which provide a basis to conclude that plaintiffs did not make a good faith effort to obtain visas. The discovery that defendants seek, and which will be produced as a result of this Court's decision, may show that plaintiffs did in fact fail to make such an effort. If so, defendants may at that point move to dismiss for failure to prosecute.

### A.      Written/Physical Discovery

Both parties seek written discovery from each other. Defendants are seeking 1) documents relating to plaintiffs' efforts to obtain passports and visas; 2) the names of plaintiffs' counsels' agents; 3) documents relating to witness payments; and 4) documents relating to the loss of several years' worth of emails from one of plaintiffs' counsel's email accounts. Plaintiffs are seeking information regarding 1) a destroyed notebook belonging to an Exxon employee; 2) a broken hard drive belonging to an Exxon employee; 3) almost 1,000 boxes of Exxon financial records; and 4) payments to witnesses.

### 1.      *Defendants' Arguments*

Defendants first argue that that plaintiffs have not produced or have groundlessly asserted privilege or work product protection over documents concerning plaintiffs' efforts to obtain

passports or visas. Defs.' Mot. to Compel at 3. Specifically, defendants ask for 1) the actual visa applications; 2) communications between or among plaintiffs, their counsel, and their third party agents retained to assist with the applications; 3) records relating to the purchase of airline tickets to and hotel stays in Jakarta for the visa interviews; 4) records relating to plaintiffs' counsel's retention of an agent to manage the visa process; and 5) records demonstrating who paid for visa/passport and travel expenses. *Id.* at 4–5. Defendants argue that these documents are relevant to whether plaintiffs have made a good faith effort to enter the United States to prosecute their claims. *Id.* at 9–10.

Second, defendants argue that plaintiffs have improperly asserted privilege over communications with third party agents, as well as the names of such agents (which are disclosed on the privilege log by identifiers such as "Agent 1"). *Id.* at 5–6. Third, defendants claim that spoliation occurred when plaintiffs' counsel (Mr. Terrence Collingsworth) lost six years' worth of emails from relevant accounts, then failed to alert defendants prior to certifying compliance with this Court's Order to Compel. *Id.* at 7–8. Finally, defendants ask for documents relating to payments to witnesses, including those that reflect *de minimis* payments. *Id.* at 10–11.

Defendants therefore seek the following specific relief: 1) an order compelling the production of the documents listed above, including the names of the agents withheld and documents related to possible spoliation; 2) declarations from plaintiffs' counsel certifying compliance with their discovery obligations; and 3) an order directing plaintiffs to pay defendants' reasonable expenses. *Id.* at 17–21.

### 2.    *Plaintiffs' Arguments*

Plaintiffs oppose nearly all of defendants' positions. First, regarding the passport and visa documents, plaintiffs argue that they have produced all documents located in the United States,

not in the possession of the Government, and have otherwise identified privileged documents on

their privilege log. *See* Pls.' Opp'n and Cross-Mot. at 6–7, 14–19. They argue that there are no

other non-privileged documents to produce and "Exxon has had all the discovery it needs to

confirm that [p]laintiffs made a genuine, good faith effort to obtain passports and visas." *Id.* at 3,

17–18. Regarding privilege, plaintiffs argue that its counsels' agents were hired to assist with a

variety of litigation support services, and their communications often include a discussion of

multiple litigation topics, and that a privilege log need not disclose the name of every individual

listed, such as here where the names are not relevant to any claim or defense nor do they assist in

evaluating the assertion of privilege. *Id.* at 21–23. They argue that defendants are trying to obtain

internal privileged and/or protected communications among plaintiffs' counsel, and between

plaintiffs' counsel and its agents who were assisting counsel with a variety of litigation support

services. *Id.* at 24–29.

    With respect to the identities of plaintiffs' agents, plaintiffs argue that defendants are trying

to force plaintiffs to turn over the names of their agents when defendants have moved to modify

the protective order to protect the identities of its own agents, and that agents of plaintiffs' counsel

have previously been the target of retaliation. *Id.* at 20–21. Concerning spoliation, plaintiffs argue

that they have not spoliated any evidence because the loss of Mr. Collingsworth's emails was

inadvertent. *Id.* at 31–33. Finally, plaintiffs claim they have made no improper witness payments

beyond those related to legitimate, litigation expenses such as transportation costs and the costs of

obtaining passports, and *de minimis* payments such as for coffee or lunch. *Id.* at 34–37.

    Plaintiffs have nonetheless offered three discovery concessions. First, they offer to

produce redacted versions of plaintiffs' counsels' privileged communications with their agents,

provided that Exxon agrees that there will be no waiver and that it will not seek further discovery

of plaintiffs' agents. *Id.* at 30–31. Plaintiffs also offer to submit the forensic reports generated for a separate case regarding Mr. Collingsworth's loss of emails for *in camera* review. *Id.* at 32. Finally, plaintiffs' counsel have submitted the declarations requested by defendants. *See* Decl. of Alysson Ford Ouoba, ECF No. 567-2; Decl. of Terrence P. Collingsworth, ECF No. 567-3.

However, plaintiffs now also seek certain discovery from defendants. Plaintiffs argue that defendants have lost or destroyed evidence, specifically a book of handwritten notes by Martin Massey, one of Exxon's managers in Indonesia, which he instructed be discarded, and the hard drive of Alex Dodds, one of Exxon's managers in Aceh, which broke. Pls.' Opp'n and Cross-Mot. at 32–33. They also argue that Exxon failed to inform plaintiffs of nearly 1,000 boxes of potentially responsive financial documents. *Id.* at 33. Finally, they argue that Exxon has refused to produce documents regarding its own witness payments. *Id.* at 37–38. Plaintiffs accordingly seek an order requiring defendants to 1) submit a declaration regarding the destruction of the notebook and hard drive, the 1,000 boxes of financial documents, and witness payments; and 2) pay costs and fees. *Id.* at 33–34, 38–40.

### 3.   *Defendants' Response*

In response to plaintiffs' arguments, defendants make the following points. First, they argue that plaintiffs have conceded that they have failed to produce all documents relating to efforts to obtain passports and visas by offering to produce redacted versions of documents, and that plaintiffs cannot condition this production on an agreement not to waive privilege or seek further discovery from plaintiffs' agents. Defs.' Reply and Opp'n to Pls.' Cross-Mot. at 14. They argue that the documents are not privileged, regardless of who the sender or recipient, because they could not have been made in confidence and plaintiffs are relying on blanket claims of privilege. *Id.* at 15–18. Regarding the names of plaintiffs' counsels' agents, defendants argue that plaintiffs have

conceded that the names are not privileged and that they should be disclosed due to plaintiffs' counsels' history of improperly using agents. *Id.* at 19–22. Taking plaintiffs' offer regarding the forensic reports, defendants ask that this Court examine the forensic reports regarding the loss of Mr. Collingsworth's emails, and order plaintiffs to produce such reports. Turning to witness payments, defendants reiterate that plaintiffs have made undisclosed payments, such as for school fees and a mattress. *Id.* at 22–23.

In response to plaintiffs' cross-motion, defendants argue that they disclosed the issues surrounding Mr. Massey's notebooks and Mr. Dodd's hard drive nine years ago, and that defendants would have been happy to discuss the issue if raised by plaintiffs in a meet and confer. *Id.* at 25–26. Regarding the boxes of financial records, defendants explain that they reviewed a sample of 100 boxes, finding that a very small number related to Indonesia and that no documents were relevant to this litigation. *Id.* at 27. Defendants explained the review process to plaintiffs, who copied and inspected the Indonesia-related documents, and offered to make the entire set of boxes available to plaintiffs. *Id.* at 28. Finally, defendants argue that they have not made any improper witness payments, and that defendants have not paid any witness's attorneys' fees; outside counsel for Exxon defended all of the depositions and no witnesses had separate counsel. *Id.* at 29–30.

## B.    Depositions

In October of 2014, defendants noticed plaintiffs—who are Indonesian citizens residing in Indonesia—for depositions in Washington, D.C. Defs. Mot. to Compel at 3. On February 25, 2015, plaintiffs' counsel informed defendants that the plaintiffs' visa applications had been denied for failure to identify social, economic, and familial ties sufficient to demonstrate the lack of any intention to abandon Indonesia. *Id.* at 4. Defendants subsequently sought discovery relating to

plaintiffs' efforts to obtain passports and visas out of concern that plaintiffs are attempting to avoid being deposed in the United States while reserving the opportunity to appear at trial. *Id.* at 9. Plaintiffs refused to reapply for visas and the parties came to an impasse regarding the depositions. *Id.* at 10.

Plaintiffs responded that they have repeatedly offered to make themselves available for depositions overseas or by videoconference, an offer that defendants have declined. Pls.' Opp'n to Mot. to Compel & Cross-Mot. at 8. They argue that there is nothing unusual about the denial of plaintiffs' visa applications because as indigent villagers, they lack the type of salaried employment and assets in Indonesia to overcome the presumption of an intent to immigrate. *Id.* at 11–12.

Based on plaintiffs' statements regarding the denial of visas, defendants now ask this Court to dismiss this action. Defs.' Reply and Opp'n to Pls.' Cross-Mot. at 4. They argue that despite plaintiffs' insistence that the District of Columbia is the most convenient forum for this lawsuit, plaintiffs' "admission" that plaintiffs will not be able to obtain visas and enter the United States for depositions or trial shows that Indonesia is the proper forum. *Id.* at 4–6. Accordingly, because plaintiffs cannot prosecute their claims in the United States, those claims should be dismissed. *Id.* at 6. Defendants alternatively request that if the Court should require defendants to take plaintiffs' depositions abroad, the Court should order that the depositions be governed by the Federal Rules of Civil Procedure and that plaintiffs pay the costs. *Id.* at 7. Defendants argue that depositions via videoconference would be severely prejudicial due to time and language constraints and other concerns. *Id.* at 11–12. Finally, defendants argue that if plaintiffs do not appear for depositions in the United States, they should be prohibited from testifying at trial. *Id.* at 13–14.

The Court will first address issues regarding written discovery sought by each party, and will then turn to the issue of whether to order depositions and whether to dismiss this case.

## III.    WRITTEN DISCOVERY

The Court takes in turn the following written discovery disputes: 1) documents relating to plaintiffs' efforts to obtain visas and passports and the privileges asserted over them; 2) the identities of plaintiffs' agents; 3) forensic reports regarding the loss Mr. Collingsworth's emails; 4) payments to witnesses; and 5) plaintiffs' cross-motion for information related to Mr. Massey's notebooks, Mr. Dodd's hard drive, and the boxes of financial documents.

### A.    Documents Relating to Efforts to Obtain Visas and Passports

#### 1.    Background

The dispute over documents relating to plaintiffs' efforts to obtain visas and passports largely boils down to a question of privilege—whether communications among plaintiffs' counsel and between plaintiffs' counsel and their agents are privileged or protected as work product. Defendants argue that "[p]laintiffs' privilege log makes clear that counsel was communicating with third parties, not individual clients or co-counsel, for the purpose of non-legal assistance in obtaining Plaintiffs' passports and visas," and thus no privilege or work product protection applies. Defs.' Mot. to Compel at 12–13. Plaintiffs respond that communications solely between plaintiffs' counsel are privileged and protected by the work product doctrine, as are communications between plaintiffs' counsel and their agents who "were assisting Plaintiffs' counsel with a variety of litigation support services, including their communications with clients and their fact investigation." Pls.' Opp'n at 28. Plaintiffs offer to "produce such redacted communications [made among plaintiffs' counsel and between plaintiffs' counsel and their agents] provided that Exxon confirms in writing that Exxon will not take the position in the future that such production

constitutes a waiver or serves as precedent and will not subject Plaintiffs' agents to further discovery." Pls.' Opp'n at 30–31.

The parties have not addressed an issue that the Court finds relevant—whether plaintiffs have waived their privilege arguments due to failure to raise them in response to defendants' first motion to compel. In their third document request, defendants requested "any and all documents concerning your efforts to obtain any passports or visas at any time up until and including the present, including but not limited to any applications for a passport or visa, and communications with Indonesian officials, United States officials, or any other parties concerning any passport or visa sought in connection with this litigation." Plaintiffs objected on several grounds, including that the documents sought were "protected by the attorney-client privilege, attorney work product doctrine, or other applicable privilege, including any privilege or protection provided by Indonesian law, or documents prepared in anticipation of litigation or for trial." Pls.' Objs. & Responses to Defs.' Third Req. for Prod. of Docs. at 11, ECF No. 485-3.

After defendants moved to compel the first time, however, *see* Defs.' First Mot. to Compel, ECF No. 484, plaintiffs did not raise any privilege arguments in their opposition to defendants' motion. Instead, plaintiffs argued that the documents sought were not relevant to any party's claim or defense. Pls.' Opp'n at 23–25, ECF No. 492. The only claim of privilege mentioned in plaintiffs' opposition is with regard to documents relating to third party funding. *Id.* at 26 ("As Plaintiffs explained to [d]efendants, such documents are irrelevant and subject to the work product privilege."). This Court granted defendants' motion to compel and ordered plaintiffs to produce "any and all documents concerning plaintiffs' efforts to obtain any passports or visas from the governments of Indonesia or the United States during the pendency of this litigation." July 6, 2015 Order at 2. Plaintiffs subsequently produced documents and a privilege log, but defendants again

moved to compel, filing the current motion and arguing in part that plaintiffs have improperly asserted privilege. Defs.' Second Mot. to Compel at 2. The Court considers this issue *sua sponte*. *Cf. Nester v. Textron, Inc.*, No. A-13-CA-920-LY, 2015 WL 1020673, at *5 (W.D. Tex. Mar. 9, 2015) (considering *sua sponte* whether the defendant had waived privilege).

     2.  *Legal Standards*

   Although the D.C. Circuit follows a "strict rule on waiver of privileges," particularly in the attorney client context, *S.E.C. v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997), such privilege may be waived in certain circumstances. Privilege is most often waived due to inadvertent or involuntary disclosure, but may also be waived due to failure to make a timely assertion of the privilege. *Gen. Elec. Co. v. Johnson*, No. CIV.A. 00-2855(JDB), 2007 WL 433095, at *3 (D.D.C. Feb. 5, 2007). In such cases "a party's failure 'to assert a privilege on its privilege log or in any of its pleadings' amounts to a waiver of the privilege." *Id.*; *accord United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 142 F. Supp. 3d 37, 46–47 (D.D.C. 2015) (finding that the claimant's common law privilege objection was waived due to failure to raise the privilege in his responses to the discovery requests); *Walker v. Ctr. for Food Safety*, 667 F. Supp. 2d 133, 138 (D.D.C. 2009) (finding that the plaintiffs, who failed to assert claims of privilege and produce a privilege log, waived their claims to the privilege); *Peskoff v. Faber*, 244 F.R.D. 54, 64 (D.D.C. 2007) ("Courts have found that failure to state any objections to the production of documents in a timely manner constitutes a waiver of any objections."). This rule "is derived from both the requirements imposed by Fed. R. Civ. P. 26(b)(5) and the more general principle that '[f]ailure to assert [a] privilege within a reasonable time, without a showing of good cause, constitutes a waiver of the privilege.'" *Gen. Elec. Co.*, 2007 WL 433095, at *3.

3.    *Analysis*

The court finds that because plaintiffs failed to raise their privilege arguments in response to defendants' first motion to compel, which sought the same documents currently sought, they have waived those arguments. The following two cases are illustrative. In *General Electric Co. v. Johnson*, defendant EPA was "directed to review its privilege assertions, produce all of the documents that the Court had determined were improperly withheld, and create a final privilege log that included only those documents that would qualify as protected under the legal principles explained (and illustratively applied) by the Court," in a previous ruling that assessed EPA's claims of deliberative process privilege, work product protection, and attorney client privilege. 2007 WL 433095, at *1. EPA subsequently continued to assert various privileges, including new privilege claims. *Id.* The plaintiff argued that "EPA has waived the new privilege claims that it now asserts by failing to raise them in any of the three previous privilege logs that it compiled or in any of its prior filings." *Id.* The court found that EPA had waived its privilege arguments because its "fresh privilege claims follow on the heels of a legal ruling rejecting the other bases for withholding the requested documents," and "[t]his smack[ed] of an attempt by EPA to get a second bite at the apple by 're-engineering' its privilege log to advance legal arguments that it failed to make at earlier stages of the litigation." *Id.* at *4. Adopting the reasoning of another court in this District, the court focused on the fact that "EPA failed to assert the privilege claims at issue until after it had submitted three prior privilege logs and ninety-nine documents for in camera review by the Court, and until after the Court had conducted that review and issued a lengthy ruling partially resolving the dispute." *Id.* (citing *Banks v. Office of Senate Sergeant-at-Arms*, 233 F.R.D. 1 (D.D.C. 2005)).

In *Walker v. Center for Food Safety*, The Center for Food Safety ("CFS", a non-party) was served with a subpoena for documents. 667 F. Supp. 2d at 135. CFS asserted that the requested

documents were privileged and did not produce any documents or a privilege log. *Id.* The petitioners moved to compel, which was granted. *Id.* CFS continued to assert privilege and refused to produce the documents. *Id.* The petitioners filed a motion for contempt. *Id.* The court, in finding that CFA was in civil contempt, found that it had waived the asserted privileges because the "[p]laintiffs, along with CFS, had numerous opportunities to assert their claims of privileges and produce an adequate privilege log before the Court entered its order compelling production, and they failed to do so." *Id.* at 138.

Here, plaintiffs had an opportunity to raise their privilege arguments in response to defendants' first motion to compel. Like the EPA in *General Electric* and CFS in *Walker*, plaintiffs are now asserting their privilege arguments after this Court ruled against them on the basis of other arguments—namely, relevancy—and ordered the compelled disclosure of the documents at issue. Furthermore, although defendants focused in large part on the relevancy of the documents sought in their first motion to compel, plaintiffs appear to have been aware that a privilege argument could have been made. With regard to the third party funding documents, plaintiffs argued that the documents were protected by the work product privilege. Pls.' Opp'n at 26. In contrast, they did not make any privilege arguments with respect to the visa and passport documents.

Finally, the Court acknowledges that plaintiffs did raise privilege objections in their responses to defendants' discovery requests, and did ultimately produce a privilege log after they were ordered to produce the documents at issue. This does not, however, change the Court's conclusion. The proponent of a privilege "bears the burden of demonstrating the applicability of any asserted privilege," and "must establish the claimed privilege with 'reasonably certainty.'" *In re Veiga*, 746 F. Supp. 2d 27, 33 (D.D.C. 2010). Blanket or categorical claims of privilege do not suffice; the proponent must show "each of the essential elements necessary to support a claim of

privilege." *Id.* (internal quotation marks omitted).  Plaintiffs' bare bones assertion of various privileges in response to defendants' document requests are not adequate to demonstrate the applicability of the privileges claimed.  Again, plaintiffs had an opportunity to effectively argue their privilege claims in response to defendants' first motion to compel.  Because they did not do so, the Court finds that those arguments are waived.

Defendants also argue that plaintiffs are withholding other, sometimes non-privileged, documents relating to the visa and passport application process: the visa applications; records relating to the purchase of airline tickets for the flight to Jakarta, as well as a hotel stay in Jakarta for the interview process;" records relating to plaintiffs' counsel "retain[ing] an agent to manage the process for the individual plaintiffs;" and records showing who paid for these expenses. Defs.' Mot. to Compel at 4–5. Plaintiffs respond that they "have produced all non-privileged documents." Pls.' Opp'n at 1.  Plaintiffs' privilege log shows that the records relating to plaintiffs' counsels' retention of agents, and the records relating to who paid for the passport and visa applications exist, but were withheld under claims of privilege or work product protection. *Id.* at 18–19.  Again, privilege has been waived and plaintiffs must produce these documents.

The only category of documents identified by defendants as not produced that are not apparently listed on plaintiffs' privilege log are records relating specifically to the purchase of hotel stays and airline tickets.  Defendants point to plaintiffs' response to defendants' previous motion to compel as evidence that these documents exist.  It states that the visa application process "entailed significant costs, including passport fees, visa application fees and the purchase of airline tickets for the flight to Jakarta, as well as a hotel stay in Jakarta for the interview process." Pls.' Response to Defs. First Mot. to Compel at 13, ECF No. 490-2.  Plaintiffs do not directly address this category of documents in their response to defendants' present motion.  However, the Court

14

agrees with defendants that such documents are responsive to this Court's order compelling the production of any and all documents related to plaintiffs' efforts to seek visas. To the extent that such documents exist in the United States, plaintiffs must produce them.[1] However, plaintiffs need not produce the documents that do not exist in the United States or are in possession of the Government, such as passport and visa applications.

## B. Plaintiffs' Agents' Identities

Defendants have asked this Court to order plaintiffs to disclose the identities of the agents listed on plaintiffs' privilege log, who are currently identified only as "Agent 1," "Agent 2", etc. Plaintiffs generally rely on three arguments in opposing defendants' request: 1) defendants are trying to force plaintiffs to turn over the names of their agents when defendants insisted on modifying the protective order so that defendants would not have to disclose the names of their own agents; 2) the identities of plaintiffs' counsel's agents are not relevant to any claim or defense nor do they assist in evaluating privilege; and 3) plaintiffs' agents have been the target of retaliation, which impedes plaintiffs' ability to litigate this case. Pls.' Opp'n at 18–24. Plaintiffs state that "this Court can order both sides to reveal the names of their agents, subject to the protections of the Highly Confidential provisions of the Protective Order. In the alternative, [p]laintiffs are willing to provide the agents' names to the Court *in camera*." Pls.' Reply in Supp. of Cross-Mot. at 14, ECF No. 580-2.

The Court first finds that plaintiffs are relying on a false equivalency when arguing that defendants are asking for the identities of plaintiffs' agents when the identities of their own agents are protected. Defendants previously argued that a provision in the protective order that required defendants "to disclose the identity of any investigator or medical examiner to the opposing party

---

[1] Defendants have only sought documents located in the United States. Pls.' Opp'n at 14–15; Defs.' Mot. to Compel at 5 n.4. Therefore, this Court will order only the production of documents located in the United States.

and provid[ed] the opposing party with an opportunity to object . . . effectively grant[ed] Plaintiffs detailed insight into and veto power over Defendants' investigation and 'amount[ed] to an early disclosure of experts, which is not required under the Federal Rules of Civil Procedure.'" Defs.' Mot. to Modify Protective Order at 21, ECF No. 534-2. The protective order was amended to remove this provision. *See* Amended Protective Order ¶ 25, ECF No. 549. Defendants do not, therefore, have an unfettered right under the protective order to withhold the identities of their agents in any situation. Plaintiffs have not argued that the names of defendants' agents are otherwise relevant.

The Court further finds that the identities of plaintiffs' agents are relevant and should be disclosed. While the Court agrees that the names of plaintiffs' agents are generally unnecessary for evaluating whether privilege has properly been invoked,[2] the identities of plaintiffs' agents are relevant to other issues. First, defendants are seeking information relating to plaintiffs' efforts to obtain passports and visas, and plaintiffs themselves state that their agents provided a variety of litigation support services, including assisting plaintiffs in obtaining passports and visas. Pls.' Opp'n at 20. The agents' identities are relevant to this issue. Defendants are further concerned that plaintiffs' agents are being used improperly to recruit "plaintiffs and witnesses to support false claims and provide manufactured testimony," an issue relevant to any defenses it may raise. Defs.' Reply at 19. It also appears that defendants may in the future seek discovery from plaintiffs' agents, which is clearly impossible without knowing their identities.[3] Furthermore, plaintiffs do

---

[2] The court need not, therefore, address plaintiffs' arguments regarding the use of identifiers on privilege logs to establish privilege. Pls.' Opp'n at 22–23.

[3] Plaintiffs ardently protest the possibility of defendants interviewing plaintiffs' agents, stating "[t]here is no legal basis for permitting such a severe intrusion into the inner workings of an attorney's legal team, and Exxon has provided none." Pls.' Opp'n at 24. As defendants note, however, plaintiff has described their agents as "go-betweens, assisting [p]laintiffs' counsel in breaching the physical distance and language barrier and assisting with tasks such as taking [p]laintiffs through the passport and visa process." Defs.' Reply at 18 n.14. More importantly,

not argue that the *identities* of the agents—as opposed to communications with the agents—are privileged or protected by the work product doctrine.  Pls.' Opp'n at 20 – 24 (noting that "*communications* between [p]laintiffs' counsel and their agents frequently include a discussion of multiple litigation topics, including litigation updates, litigation strategy, meetings or discussions with Plaintiffs, and how the case is to be managed, among others" and that "*communications* between a counsel and its agents are entitled to protection").

Although the Court holds that plaintiffs must disclose the names of their agents to defendants, the Court does not take lightly the risk of danger to plaintiffs' agents should their identities be disclosed.  It appears that plaintiffs' agents fear retaliation from the Indonesian government, not from defendants.  Therefore, the Court will order that the names of plaintiffs' agents be disclosed to defendants, but shall be designated as "highly confidential" under Paragraph 3 of the Amended Protective Order.  *See* Amended Protective Order ¶ 3.  The Court concludes that this designation will protect plaintiffs' agents from public identification, while granting defendants the right to know the identities of plaintiffs' agents.  Therefore, the Court will order plaintiffs to disclose the identities of their agents, but such disclosure shall be marked "highly confidential" and will be subject to the protections of the Amended Protective Order.

### C.    Forensic Reports of Mr. Collingsworth's Missing Emails

In September 2015 another Court (in the *Dole* litigation) ordered a forensic examination of Mr. Collingsworth's electronic devices.  Defs.' Mot. to Compel at 8.  It was determined that several years' worth of e-mails had been lost.  Defendants therefore ask this Court to compel the production of "documents related to the possible spoliation of six years' worth of Mr.

---

defendants have not yet sought this discovery.  If they do, plaintiffs should raise any work product or privilege based objections at that time.

Collingsworth's emails and the related *Dole* forensic investigation." *Id.* at 16.  Defendants claim that the missing emails span from 2007 to 2013, "during which time [p]laintiffs were purportedly making efforts to obtain passports and visas." *Id.* at 8.  Plaintiffs claim that "[t]he e-mail gaps identified by Mr. Collingsworth do not overlap with Plaintiffs' efforts to obtain passports in 2008 and again in 2014–15, nor with Plaintiffs' efforts to obtain visas in 2015." Pls.' Opp'n at 31. Plaintiffs also aver that 800 e-mails were recovered and searched, and that no responsive documents were located. *Id.* at 32.  Plaintiffs have offered to make the forensic reports generated in the *Dole* action available to this Court for *in camera* review.  Given the continued disagreement between the parties, the Court will accept plaintiffs' offer and will review the reports *in camera*.

### D.    Witness Payments

Both parties ask for discovery relating to improper payments to witnesses.  First, defendants claim that plaintiffs have not disclosed records of *de minimis* payments to witnesses, and that they have "established a witness payment 'carve' out' for themselves, the contours of which are left up to them." Defs.' Mot. to Compel at 10.  Defendants argue that plaintiffs have admitted to the possible existence of *de minimis* payments in a suspicious manner, and that, in another case, plaintiffs' counsel's conduct regarding witness payments amounted to a fraud on the court.  *Id.* at 11.  Plaintiffs counter that they have made no improper payments to witnesses, *de minimis* or otherwise, and therefore no documents reflecting such payments exist.  Pls.' Opp'n at 33–34.  Regarding any *de minimis* payments, plaintiffs argue that they

> are not withholding any documents on the basis that they represent *de minimis* payments to witnesses.  Rather, as Plaintiffs explained to Exxon, Plaintiffs included the *de minimis* expense objection in order to reduce the record-keeping burden on the parties to obtain and keep receipts for legitimate litigation expenses, particularly in light of Aceh's mostly informal economy where paper receipts are infrequently used.  Plaintiffs had in mind cups of coffee or a lunch during an interview, and envisioned an amount of $10-20 as a reasonable threshold.

*Id.* at 35–36. Plaintiffs' declarations confirm that they are covering legitimate, litigation related expenses, such as witness transportation for interviews, food during meetings, and expenses attendant to obtaining passports for witnesses. *See* Decl. of Alysson Ford Ouoba ¶¶ 19–23; Decl. of Terrence P. Collingsworth ¶ 17.

Defendants respond that plaintiffs' declarations actually show that plaintiffs have made improper, non-litigation related payments, including school fees and a mattress for an indigent plaintiff. Defs.' Reply at 22. Plaintiffs reply that these purchases were "made by a person retained to assist with keeping [p]laintiffs informed about the case and was made without counsels' authorization," that they likely totally between $50 and $70, and that "there are no further documents regarding the mattress or school fees (or any similar such expenses) to produce." Pls.' Reply at 24–25.

Plaintiffs also argue that defendants have "refused to produce the very same types of legitimate witness-related litigation expenses." Pls.' Opp'n at 37. This includes the payment of attorneys' fees for witnesses, as well as travel expenses. *Id.* Defendants respond that they have not made improper payments, only paying for travel expenses to attend a deposition and meals during which litigation was discussed. Defs.' Reply at 29. Defendants assert that "ExxonMobil has not paid any witness's attorneys' fees in connection with this litigation. As is evident from the deposition transcripts, outside counsel for ExxonMobil defended all depositions in this case and no witness had separate counsel." Defs.' Reply at 30. Plaintiffs reply that "[i]t is well established that payment of attorneys' fees when a current or former employee is called as a witnesses may bias the witness's testimony and that inquiry into those fees is therefore appropriate." Pls.' Reply at 8.

The Court will first address the issue of allegedly improper payments, including *de minimis* payments, made by plaintiffs' counsel. The Court will not order the production of records of such payments. First, the Court notes that it does not credit defendants' argument regarding Mr. Collingsworth's actions in a prior case as reason to order discovery on this issue in this case. Defendants have not introduced evidence of bribery in this case by any of plaintiffs' counsel. The Court will not assume that any type of bribery or improper payments have occurred here simply because Mr. Collingsworth was reprimanded in a different case, in a different country, with different witnesses. Furthermore, defendants argue that "under the suspicious manner in which they have admitted to the possible existence of '*de minimis*' payments," the Court should not credit plaintiffs' assertions that no improper payments have been made. Defs.' Mot. to Compel at 11. Aside from assertions regarding Mr. Collingsworth's conduct in another case, however, defendants do not elaborate on the "suspicious manner" section of their argument and the Court is left wondering about the circumstances of the alleged admission. Defendants apparently concede that "an exception for '*de minimis*' or 'reasonable and permissible' expenses might generally be an acceptable practice," Defs.' Mot. to Compel at 10–11, and the Court agrees that such payments are in fact generally proper.

Second, plaintiffs have repeatedly averred that no improper payments were made. Defendants point to payments for a mattress and school fees as evidence of improper payments, claiming that this runs contrary to plaintiffs' assertions that no payments were made for any purpose by anyone to any witness. Defs.' Reply at 23. Plaintiffs respond, however, that such payments were made by a person retained by plaintiffs' counsel without counsels' authorization, and that plaintiffs' counsel "reminded the Indonesia agents of the requirements of the District of Columbia rules and of the need to seek authorization before incurring any expenses." Pls.' Reply

24–25. Defendants have not pointed to other evidence of improper payments in this case and plaintiffs state that "there are no further documents regarding the mattress or school fees (or any similar such expenses) to produce." *Id.* at 25. Given that defendants have not convinced the Court that plaintiffs are hiding improper witness payments *in this case*, and that plaintiffs' counsel have declared that no such records exist to produce—and the Court has no reason at this time to doubt these statements—the Court concludes that defendants are not entitled to discovery on the issue of witness payments at this time.

Turning now to plaintiffs request that the Court order defendants to explain all payments made to or on behalf of witnesses, including witnesses' attorneys' fees, the Court will also deny this request. The Court notes that plaintiffs appear to be asking for this discovery simply in retribution for defendants' requests for discovery regarding witness payments; the fact of defendants' counsel representing Exxon employees in depositions, and that the witnesses travelled to their depositions, was known to plaintiffs eight years ago yet they did not raise the issue until now. Nonetheless, the Court finds that this discovery is unwarranted. First, with regard to payments made for travel expenses and meals, the Court agrees that such expenses were legitimate. Just as the Court found that it would not order the production of materials related to legitimate litigation expenses paid by plaintiffs' counsel, it will also not order the production of such materials related to legitimate litigation expenses paid by defendants' counsel.

Second, with regard to attorneys' fees, it also appears that such expenses were legitimate— defendants provided the same outside counsel that is defending this action to its employees for their depositions, as evidenced by the deposition transcripts. Providing common counsel to represent all witness-employees is generally a routine and acceptable practice. *See Defending Corp. & Indiv. in Gov. Invest.* § 3:18 ("It is common for a company to retain a single law firm to

represent all similarly-situated employees who are merely witnesses, that is, are not believed to have any potential personal exposure, and whose interests do not otherwise conflict."); Anne M. Chapman & Kathleen E. Brody, Attorney-Client Privilege in Internal Investigations: Best Practices and Lessons from Recent Cases, Champion, September/October 2015, at 28 (advising companies to "[c]onsider whether the company should pay for counsel (whether pool counsel or separate attorneys) to represent employees during the interviews" in internal investigations); 1 Corporate Counsel Guidelines § 4:18 (2016) (acknowledging that "the company and the employee can, in civil litigation, theoretically be represented by the same lawyer in many instances"). Plaintiffs have also not claimed that defendants' counsel acted improperly in these depositions in any way. *Cf. Cohen v. Trump*, No. 13-CV-2519-GPC WVG, 2015 WL 3617124, at *2–3 (S.D. Cal. June 9, 2015) (sanctioning defendants' counsel for improperly objecting to a line of questioning and instructing witnesses not to answer).

Nor does this Court find that pretrial discovery is warranted due to generic claims of potential bias without any evidence of actual bias. The only other case the plaintiffs cite is distinguishable. In *United States v. Pacific Gas & Electric Co.*, the government sought, via a Federal Rule of Criminal Procedure 17(c) subpoena, records regarding the retention of counsel for employees of the defendant who were potential witnesses in order to demonstrate potential bias. *United States v. Pac. Gas & Elec. Co.*, No. 14CR00175TEH1MEJ, 2016 WL 1212091, at *4 (N.D. Cal. Mar. 28, 2016). The court found, however, that bias is a form of impeachment evidence, and that "[i]mpeachment evidence is typically admissible, but in the context of Rule 17(c), 'generally, the need for evidence to impeach witnesses is insufficient to require its production *in advance of trial*.'" *Id.* at *6 (quoting *United States v. Nixon*, 418 U.S. 683, 701 (1974)). The court found that because the only valid basis for seeking this evidence was to show bias for impeachment purposes,

it would not order the defendant to produce the retention documents (although it did order their production for *in camera* review and use when the issue of impeachment became ripe). *Id.* at *7. The parties here are not operating under a Rule 17(c) subpoena. Even if they were, under the case cited by plaintiffs, these documents are only sought for impeachment purposes—to show bias on the part of defendants' employee witnesses—and the Court would not order their production anyway. If plaintiffs are seeking to impeach defendants' witnesses on this basis, they may attempt to do so, but not at this time.

### E.    Plaintiffs' Cross-Motion

Plaintiffs ask the Court to order defendants to submit a declaration regarding Mr. Massey's notebooks (and the potential destruction of other documents), Mr. Dodd's hard drive, the boxes of financial records, and payments made by Exxon to witnesses (addressed above).[4] The Court will not order defendants to submit a declaration.

First, regarding Mr. Massey's notebooks and Mr. Dodd's hard drive, the Court notes that plaintiffs were aware of both of these issues in 2007, but failed to raise them. While the Court acknowledges that there is no limitation on when such issues must be raised, it seems that plaintiffs are now merely engaging in a tit for tat with defendants. The issue of the notebooks and the hard drive were not raised until defendants' present Motion to Compel. In addition, defendants have largely answered plaintiffs' questions in their reply brief. They have explained that Mr. Massey was under a litigation hold and that his electronic and hard copy documents have been collected and preserved. Defs.' Reply and Opp'n to Pls.' Cross-Mot. at 25–26. They also detail the attempts to restore Mr. Dodd's hard drive. *Id.* at 26. Most importantly, defendants have stated that they

---

[4] Defendants also asked plaintiffs' counsel to provide declarations certifying compliance with their discovery obligations. Plaintiffs have produced the requested declarations.

"would have been happy to" meet and confer about these issues. *Id.* at 25. Therefore, if plaintiffs are still unsatisfied by defendants' responses to its questions regarding the notebooks and the hard drive, the court will expect the parties to meet and confer regarding these issues and strongly encourages them to work toward a mutually agreeable solution.

Regarding the boxes of documents, the Court again finds that plaintiffs are attempting to engage in an issue that has largely been resolved. Although the parties appear to agree that defendants made the boxes available to plaintiffs for copying and inspection, and that plaintiffs did in fact review Indonesia-related documents from a 100 box sample set, plaintiffs argue that defendants have not expressly confirmed whether the boxes contained relevant documents. Pls.' Reply at 6. The exhibits attached to plaintiffs' own reply brief show that defendants' counsel told plaintiffs' counsel that the documents were not responsive. *See* Pls.' Reply Ex. 1, ECF No. 580-4 ("[W]e do not believe these documents are responsive or relevant to any requests."). Defendants' offer allowing plaintiffs to inspect the boxes remains open. Defs.' Reply at 28. The Court suggests that if plaintiffs are truly concerned about the contents of the boxes, they accept the offer.

Having addressed the issue of witness payments above, and given defendants' assertion that it will disclose to plaintiffs' counsel if any potentially relevant documents were discarded or destroyed, *id.* at 25 n.17, the Court concludes that a declaration here is not warranted.

### F.   Costs and Fees

Finally, both parties ask this Court to order the other to pay costs and fees. Defendants assert that plaintiffs violated this Court's prior discovery order and therefore, under Rule 37(b)(2)(C), the Court must order plaintiffs to pay the reasonable expenses. Defs.' Mot. to Compel at 19. Plaintiffs argue that defendants' motion to compel was unjustified and therefore

the Court should order defendants to pay plaintiffs' expenses in accordance with Rule 37(a)(5)(B).  Pls.' Opp'n 567 at 38.

The Court finds that that plaintiffs must pay defendants costs.  First, under Rule 37(a)(5)(B), on which plaintiffs rely, "[i]f the motion [to compel] is denied, the court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees."  Fed. R. Civ. P. 37(a)(5)(B).  Defendants' motion to compel has not been denied.  Therefore, Rule 37(a)(5(B) does not apply and the Court will not order defendants to pay plaintiffs' expenses.

Defendants rely on Rule 37(b)(2)(C) which states that "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to obey a court order]."  Fed. R. Civ. P. 37(b)(2)(C).  Plaintiffs failed to comply with the Court's July 6, 2015 Order directing them to produce "any and all documents concerning plaintiffs' efforts to obtain any passports or visas from the governments of Indonesia or the United States during the pendency of this litigation." Because plaintiffs waived their privilege arguments by not raising them in their opposition to defendants' first motion to compel, they should have produced all of the identified documents. Even if for some reason plaintiffs later realized that the documents were privileged after the Court issued its Order, they should have raised this issue with the Court instead of waiting for defendants to move to compel.  Therefore, the Court will order plaintiffs to pay defendants' reasonable expenses associated with their arguments regarding plaintiffs' efforts to obtain passports or visas.  Defendants will be ordered to estimate the hours they spent on this issue, and plaintiffs will have an opportunity to respond to such estimates.

## IV.    DEPOSITIONS AND DISMISSAL

The Court now turns to the issue of depositions of the Indonesian plaintiffs in this case and defendants' request that the case be dismissed.  Defendants have been attempting to depose plaintiffs for many months.  Due to plaintiffs' inability to obtain visas and appear for deposition in the United States, however, the parties have reached an impasse.  Plaintiffs have offered to make themselves available for depositions via videoconference or in a location that did not require that plaintiffs to obtain visas, such as Singapore or Kuala Lumpur.  Defendants rejected these offers.

Defendants now argue that because plaintiffs have chosen to file suit in the District of Columbia, they must appear for their depositions in this forum.  571-2 at 6.  If they cannot appear here, defendants argue that their case should be dismissed under Rule 37.  *Id.* at 7; *see* Fed. R. Civ. P. 37 (providing sanctions, including dismissal, for failing to appear for depositions).  Defendants further contend that plaintiffs' case should be dismissed for failure to prosecute because plaintiffs will be unable to attend trial in D.C., given that they were denied visas for depositions and, in defendants' view, the circumstances surrounding such denial will not change.[5]

In the alternative, defendants ask that if they are required to take plaintiffs' depositions abroad, they must be U.S. style depositions in a mutually agreeable location, and plaintiffs should pay defendants' costs.  571-2 at 7–11.  Defendants argue that depositions via videoconference would result in severe prejudice due to the fact that one party would be forced to participate in the depositions in the middle of night, and that the depositions will need to be taken through a translator.  *Id.* at 11–12.   They also argue that depositions via videoconference threaten to deny

---

[5] Defendants also argue that this case should be dismissed on *forum non conveniens* grounds because the United States is not the most convenient forum for this litigation.  In 2014, this Court found that dismissal for *forum non conveniens* was not warranted because no alternative forum existed.  *See Doe*, 69 F. Supp. 3d at 88–89.  Defendants here do not argue that an alternative forum, *i.e.*, Indonesia, is now available.  Because no alternative forum apparently exists, the Court again will not dismiss for *forum non conveniens*. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, n.22 (1981).

defendants due process "where Defendants have not seen Plaintiffs in person even once after 15 years of litigation; Indonesian discovery has been, and remains, barred; a strict Protective Order limits Defendants' ability to investigate Plaintiffs' claims; and Plaintiffs' credibility will be of critical importance because they are likely to be the only—or at least the primary—source of any evidence that could substantiate their allegations concerning their purported injuries at the hands of Indonesian soldiers." *Id.* at 12.  Finally, defendants ask that if plaintiffs do not appear in the United States for depositions, but are able to attend trial, they should be prohibited from testifying live at trial. *Id.* at 13–14.

Plaintiffs continue to offer to appear for depositions via videoconference or abroad.  They argue that "[c]ourts routinely permit plaintiffs to conduct their depositions overseas or by videoconference when they are unable to appear in the United States for deposition, rather than dismiss." Pls.' Reply in Supp. of Cross-Mot. at 18.  Should the Court order depositions abroad, plaintiffs argue that defendants' request that plaintiffs bear the burden of costs is inappropriate given that if defendants had agreed to depositions overseas as offered, plaintiffs would not have had to incur significant costs trying to obtain visas. *Id.* at 22.  In addition, plaintiffs have offered to conduct depositions via videoconference and "where, as here, a cheaper alternative exists but has been refused, imposition of costs would be inappropriate." *Id.*

Regarding trial, plaintiffs "remain hopeful" that they will obtain visas, explaining via an expert declaration that "visas for depositions are considerably harder to obtain than those for trial because the State Department knows that depositions can be held overseas." *Id.* at 17.  If plaintiffs are ultimately unable to obtain visas, defendants can "face" plaintiffs at trial through the use of videoconference technology. *Id.*  Plaintiffs also argue that there is no basis to bar plaintiffs from testifying live at trial if they are unable to appear in the United States for depositions. *Id.* at 23.

The Court first considers the deposition issue—whether plaintiffs are required to appear for depositions in the forum in which they have brought suit, and if not, whether it should order depositions via videoconference or abroad. It will then consider whether dismissal is warranted at this time.

### A.      Depositions

####       1.       *Plaintiffs Need Not Always Appear for Depositions in the Forum*

#####                a)       *Legal Standards*

There is no settled caselaw at the appellate level in this Circuit regarding whether plaintiffs *must* appear in the forum district for depositions, given that they choose where to bring suit. Writing on a fairly clean slate, therefore, this Court could apply the rule that if plaintiffs do not appear in the forum for depositions, they cannot maintain their action in that forum. District courts across the country, however, have not implemented such a rule. Instead, courts have generally found that when a plaintiff chooses to litigate in a specific forum, he or she *should expect* to appear for a deposition in that jurisdiction. *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 292 F.R.D. 19, 24 (D.D.C. 2013) ("A party that chooses to initiate litigation and invoke the legal protections of the forum should expect to appear for deposition in that jurisdiction."); *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 470–71 (E.D. Va. 2010) ("[C]ourts ordinarily presume that a plaintiff may be deposed in the judicial district where the action was brought, inasmuch as the plaintiff, in selecting the forum, has effectively consented to participation in legal proceedings there."); *Abdullah v. Sheridan Square Press, Inc.*, 154 F.R.D. 591, 592 (S.D.N.Y. 1994) ("Ordinarily, a defendant is entitled to examine a plaintiff in the forum where plaintiff has chosen to sue."); *Ellis Air Lines v. Bellanca Aircraft Corp*, 17 F.R.D. 395, 396 (D.

Del. 1955) ("There is a principle that a plaintiff having selected a particular forum for the adjudication of his case should be prepared to answer a notice of deposition in that locality.").

However, this is not a mandatory rule, but rather a general presumption that may be overcome in certain circumstances such as hardship, undue burden, or impossibility.  In *Abdullah* the court quoted with approval an earlier case stating that "if special circumstances are shown, such as hardship or burden to the plaintiff, which outweigh any prejudice to the defendant, the general rule may yield to the exigencies of the particular case.  The matter rests in the discretion of the court and there must be a careful weighing of the relevant facts."  154 F.R.D. at 592; *see also In re Outsidewall Tire Litig.*, 267 F.R.D. at 471 ("This presumption is not irrebuttable, but to overcome it, a foreign plaintiff must persuasively demonstrate that requiring him to travel to the forum district for his deposition would, for physical or financial reasons, be practically impossible, or that it would be otherwise fundamentally unfair."); *Stephens v. 1199 SEIU*, No. CV 07-0596 JFB AKT, 2011 WL 2940490, at *1 (E.D.N.Y. July 19, 2011) ("Although as a general practice, a Plaintiff is deposed in the forum where the action was brought, there is 'no absolute rule as to the location of the deposition of a nonresident plaintiff.'").  One such consideration is "external constraints on the plaintiff's choice of forum."  *Abdullah*, 154 F.R.D. at 592; *see also Ellis Air Lines*, 17 F.R.D. at 396 ("This principle loses some weight where the plaintiff has no choice of forum but, as here, must bring his suit in one particular jurisdiction or none at all.").[6]

---

[6] Defendants cite one case which took a stricter approach, stating "[w]hen a plaintiff elects to file a lawsuit in a particular jurisdiction, it assumes the responsibility of making itself available to the forum.  Unless an opposing party prevents the plaintiff from appearing in the forum, a plaintiff's failure to make itself available to the proceedings in the forum justifies the dismissal of the complaint."  *Gawhara for Ready Made Clothes Co. v. Evergreen Marine Corp.*, No. CV 99-5080, 2001 WL 1737458, at *4 (C.D. Cal. Jan. 25, 2001).  This, however, appears to be an outlier.  The other cases cited by defendants, and those examined by the Court, all acknowledge that plaintiffs need not appear in the forum if they can show sufficient hardship, burden, or impossibility.

In addition, the facts of *Gawhara* are distinguishable.  There, "Egyptian Chamois was warned by this Court that its case would be dismissed if it did not produce its witnesses in California as ordered by this Court.  Despite its knowledge of the consequences, Egyptian Chamois made an informed decision to not comply with this Court's order."  *Id.* at *5.  It was also "repeatedly advised that the travel ban was not a valid excuse for its failure to comply

Courts in this district also recognize a presumption that plaintiffs should appear for depositions in the forum, but that this presumption may be overcome. The two cases most often cited are *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.* and *Cobell v. Norton*. In *Paleteria*, the plaintiff/counter-defendant noticed depositions of the defendant/counter-claimant in D.C., and the defendant/counter-claimant insisted that the deposition take place in Mexico City, where the deponents (corporate officers) resided. 292 F.R.D. at 21–22. The court found that there "there is a general presumption that the deposition will occur at the corporation's principal place of business," but that this presumption may be overcome after a consideration of the following factors: "location of counsel for both parties; size of defendant corporation and regularity of executive travel; resolution of discovery disputes by the forum court; . . . the nature of the claim and the relationship of the parties; . . . legal impediments to holding a deposition in the foreign nation[;] and the potential affront to that nation's sovereignty." *Id.* at 22. The court considered which party should be viewed as the "plaintiff", finding that the defendant/counter-claimant had "availed itself of not only United States law, but of District of Columbia law" because it had initiated the overall legal dispute and had cross-appealed and asserted other causes of action under federal and D.C. law. *Id.* at 23–24. Thus, the court found that "[a] party that chooses to initiate litigation and invoke the legal protections of the forum should expect to appear for deposition in that jurisdiction." *Id.* at 24. This, however, was just one consideration in determining where to hold the dispositions. The court went on to state "[b]ecause [defendant/counter-claimant] initiated litigation in the United States and asserts additional affirmative federal and D.C. causes of action before this Court, the nature of this action and the relationship of the parties *strongly*

---

with the discovery orders." *Id.* at \*6. Here, plaintiffs have not failed to comply with a court order to appear for depositions, and there are actual impediments to their ability to travel to the United States.

*favors* a United States deposition of [defendant/counter-claimant]," and to consider several other factors. *Id.* (emphasis added). Thus *Paleteria* does not stand for an absolute rule that plaintiffs must appear for depositions in the forum in which they chose to sue.

In *Cobell*, which was decided by this Court, the defendants sought to depose the plaintiffs' class representative, Earl Old Person. 213 F.R.D. 43, 44 (D.D.C. 2003) (Lamberth, J.). The Court denied plaintiffs' request that Old Person be deposed in a district different from the forum because plaintiffs "have failed to submit an affidavit from Old Person providing specific reasons why it would constitute an undue hardship for him to appear for a deposition in Washington, D.C." *Id.* at 47. It also stated, however, "if Old Person is physically or financially unable to travel to Washington, D.C., the Court will certainly afford due weight to an affidavit filed by Old Person or a physician explaining with specificity why travel to Washington would constitute an undue physical or financial hardship." *Id.* Thus, *Cobell* also does not stand for the proposition that a plaintiff must always attend a deposition in the forum district.

Other cases in this district affirm this conclusion. In *Guy v. Vilsack*, the court, which had previously ordered that the plaintiff attend a deposition in the forum in which he filed suit, considered whether to enforce the order given that plaintiff argued he could not appear in D.C. due to severe anxiety. 293 F.R.D. 8, 13 (D.D.C. 2013). It acknowledged that "although the Federal Rules of Civil Procedure do provide that a deposition may be taken by remote means, *see* Fed. R. Civ. P. 30(b)(4), the Court does not believe that it would be appropriate to deny defendant the benefit and convenience of an in-person deposition *in this case*." *Id.* (emphasis added). Instead, it found that "there are less restrictive methods of managing plaintiff's anxiety than permitting a telephone or video deposition." *Id.* And, in *United States v. One Gulfstream G-V Jet Aircraft Displaying Tail No. VPCES*, the court, in a forfeiture proceeding, found that "it is of course within

this Court's discretion to order the deposition in the forum district, doing so is far from obligatory—even when the claimant availed himself to the forum by filing a claim." 304 F.R.D. 10, 13 (D.D.C. 2014).

Finally, the Federal Rules of Civil Procedure appear inconsistent with a hard and fast rule that the plaintiff must appear in the chosen forum for a deposition. Rule 30(b)(4) expressly provides that courts may order depositions "by telephone or other remote means." Fed. R. Civ. P. 40(b)(4). Furthermore, Rule 43 provides that at trial, "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." Fed. R. Civ. P. 43(a). It would make little sense if courts can order trial testimony be given via videoconference when a party is unable to appear in the forum for trial, but must dismiss cases if the party cannot appear in the forum for a deposition.

### b)    Analysis

Here, although plaintiffs have availed themselves of this forum, they are unable to appear for depositions. The record shows that plaintiffs applied for and were denied visas for depositions. Nothing indicates that they would obtain visas (for depositions) if they reapplied. It is not only "practically impossible," for plaintiffs to appear for depositions in the United States, *see In re Outside Tirewall Tire Litig.*, 267 F.R.D. at 471, it is actually impossible at this time. Defendants' caselaw is not to the contrary. It supports the conclusion that courts should consider whether the plaintiff has shown hardship or inability to attend the deposition in determining whether to require plaintiffs to attend depositions in the forum. *See Aerocrine AB v. Apieron Inc.*, 267 F.R.D. 105, 108 (D. Del. 2010) ("The general rule with respect to the location of depositions is that the plaintiff must produce its witnesses in the district in which the plaintiff

instituted the action, 'unless the plaintiff has shown financial hardship or inability to attend the deposition in that district.'"); *Caraway v. Chesapeake Expl. LLC*, 269 F.R.D. 627, 628 (E.D. Tex. 2010) ("A plaintiff should ordinarily be deposed in the forum in which he has chosen to sue. . . . Absent a specific showing of hardship tied to an individual's circumstances, a general order requiring that the depositions of out-of-town plaintiffs be taken telephonically is not warranted."); *Xavier v. Belfor USA Grp., Inc.*, No. CIV.A. 06-0491, 2009 WL 3231547, at *5 (E.D. La. Oct. 2, 2009) (stating that "[w]hile Belfor is correct that a plaintiff should be deposed in the forum in which he has chosen to sue, plaintiffs are also correct that courts in the past have weighed the party's preference to depose at the forum against (1) the actual need for oral examination at the forum, and (2) the resulting burden to the opponent," but finding that "generic and naked assertions by plaintiffs' counsel of undue hardship are inadequate—plaintiffs should have submitted affidavits with specific evidence of such hardship"). The Court therefore finds that because plaintiffs are unable to travel to the United States for depositions due to visa restrictions, the presumption that they must appear for depositions in the forum has been overcome.

Furthermore, this is apparently not a case where plaintiffs chose to bring suit in this forum among a variety of other jurisdictions. As this Court previously found, Indonesia was not available as an alternative forum because the U.S. based Exxon defendants are not amenable to process there. *Doe*, 69 F. Supp. 3d at 89. Therefore, plaintiffs could not have brought suit in Indonesia. Similarly, the United Kingdom-based plaintiff in *Abdullah* "had no genuine choice of forum," because the defendants were not subject to jurisdiction in the United Kingdom, and because "a judgment rendered by a British court on a claim of libel might not be enforceable against them in the United States." 154 F.R.D. at 593. Thus, the court ordered that the plaintiff's deposition be

held in London, where he was located.  *Id.*; *see also Ellis Air Lines*, 17 F.R.D. at 396 (finding that

the principle that plaintiffs should appear for depositions in the forum state "loses weight where . . .

the plaintiff must bring his suit in one particular jurisdiction or not at all").

The Court will not dismiss this action based on plaintiffs' inability to obtain visas and

attend depositions in the United States, and will order their depositions taken by alternative means.

2.     *Depositions Via Videoconference or Abroad*

Courts may order depositions via remote transmission, *e.g.*, by videoconference or

telephone.  Fed. R. Civ. P. 30.  The commentary to Rule 30, after summarizing relevant caselaw,

states that "requests for leave to take a deposition via remote transmission should be and are freely

granted when doing so makes sense and will not cause any real prejudice."  Fed. R. Civ. P. 30

cmt..  Thus, the party who is seeking a deposition via remote means must establish good cause or

a reason for doing so, which the opposing party may rebut with a showing of prejudice or burden.

*See, e.g.*, *United States v. Li*, No. CV-12-00482-PHX-DGC, 2013 WL 6729895, at *3 (D. Ariz.

Dec. 19, 2013) ("The Court has already found that Chen's removal to China makes video-

teleconferencing the most reasonable, cost-efficient manner in which to finish his deposition.

Defendant—the party opposing the video deposition—now bears the burden of showing

prejudice."); *Gee v. Suntrust Mortg., Inc.*, No. 10-CV-01509 RS NC, 2011 WL 5597124, at *2–3

(N.D. Cal. Nov. 15, 2011) (finding that defendants failed to show good cause as to why the

depositions should not be taken via videoconference); *Estate of Gerasimenko v. Cape Wind

Trading Co.*, 272 F.R.D. 385, 389 (S.D.N.Y. 2011) (comparing hardship to deponent with

prejudice to the defendants); *Brown v. Carr*, 253 F.R.D. 410, 412 (S.D. Tex. 2008) (The party

seeking to take depositions by video-teleconferencing must establish a legitimate reason for its

motion.  Any party opposing such depositions has the burden to establish good cause as to why

they should not be conducted in such manner."); *Loughin v. Occidental Chem. Corp.*, 234 F.R.D. 75, 76 (E.D. Pa. 2005) ("The party opposing a telephonic deposition bears the burden of demonstrating good cause why the deposition should not be conducted by telephone.");

Plaintiffs have shown good cause for taking the depositions via remote transmission. As already noted, they are located in Indonesia and are legally unable to travel to the United States. Not only would in person depositions in the United States be unduly burdensome, they are factually impossible at this time. *Cf. Estate of Gerasimenko*, 272 F.R.D. at 389 (finding that the deponent, a Latvian resident, "adequately establishe[d] her tenuous financial position and the burden that travel to New York for the deposition would impose on her," and concluding that "having to expend these funds to travel to New York to be deposed constitutes a hardship"); *Brown*, 253 F.R.D. at 412 (finding that plaintiff, an incarcerated inmate, "established a legitimate basis for taking [witness] depositions by video-conference" because he was unable to leave prison, but was entitled to explore the information the witnesses possessed); *One Gulfstream G-V Jet Aircraft Displaying Tail No. VPCES*, 304 F.R.D. at 12 (finding that a videoconference deposition was appropriate in part because the deponent was located in Equatorial Guinea).

Defendants argue that depositions should not be taken via videoconference for the following reasons: (1) due to time difference, one party will have to take depositions in the middle of the night; (2) the depositions will be taken through a translator; and (3) defendants have not seen plaintiffs in person throughout this litigation and their credibility is of critical importance. None of these persuade the Court that defendants would be unduly prejudiced by depositions via videoconference if the appropriate safeguards are in place. First, the Court acknowledges that the time difference is not so extreme that one party will necessarily be forced to participate "in the middle of the night." The greatest time difference between the District of Columbia and Indonesia

is 14 hours—for example, in Jayapura on the far Eastern border of the country.  The time difference

in Jakarta is 12 hours, as is the time difference in Aceh.  If the deposition begins at 7:00 AM in the

District of Columbia, it will begin between 7:00 and 9:00 PM in Indonesia.  While inconvenient,

the time difference would certainly not severely prejudice defendants, particularly if the deposition

takes place at a convenient time for them.  *United States v. Philip Morris USA, Inc.*, No. CIV.A.

99-2496 (GK), 2004 WL 3253681, at *1 (D.D.C. Aug. 30, 2004) ("While there undoubtedly will

be some difficulties caused by the time differences between Australia and the United States, they

pale in comparison with the logistical difficulties of bringing these two men to the United States

from Australia, with their attorneys, and keeping them here for five business days between the

taking of their depositions and the giving of their testimony at trial.").  The Court furthermore

strongly encourages the parties to come to a mutually satisfactory agreement regarding timing that

is not unduly harsh for one side.

  Second, the fact that the depositions will be taken via translator is not prejudicial enough

to outweigh the convenience of videoconference depositions.  Translation issues will be present in

any deposition of the plaintiffs, via videoconference or otherwise.  Courts have upheld the use of

translators in depositions as not unduly burdensome.  *See Li*, 2013 WL 6729895, at *3 (finding

that "[d]efendant's arguments that she would be prejudiced by finishing the deposition [of an

individual located in China] by remote video are not persuasive" because "[c]oncerns about

accuracy due to language or translation barriers would exist in any deposition of Chen, and the

Court is not persuaded that modern video-conference technology will present audio problems");

*United States v. West*, No. 08 CR 669, 2010 WL 3324886, at *3 (N.D. Ill. Aug. 18, 2010) (rejecting

defendants' argument that "if they are not physically present at the depositions, the use of

translators—who are needed here for the witnesses and for at least two of the Defendants who do

not speak English—will be too cumbersome to allow reliable testimony," and finding that "[t]he translation process in the instant case will undoubtedly create some delay, but the Defendants have not shown how it will be . . . burdensome . . . , or how it will make the witnesses' testimony inherently unreliable.").

The only case that defendants cite does not support their argument that the need for a translator is unduly prejudicial. In *United States v. Approximately $57,378 in U.S. Currency*, the court found that a videoconference deposition would be prejudicial because the deponent was "representing herself and her English is limited," which would complicate the necessary process of examining multiple exhibits. *See* No. C08-5023 MMC BZ, 2010 WL 4347889, at *1 (N.D. Cal. Oct. 27, 2010). There was no discussion of the use of a translator in that case, and such concerns regarding exhibits have not been raised by defendants here. If appropriate translation services are implemented, this Court sees no reason why defendants would be unduly prejudiced by their use.

Finally, defendants raise concerns regarding plaintiffs' credibility. It is unclear, however, why such concerns would be present in a videoconference deposition, but would not be present in an in person deposition. In a videoconference deposition defendants will be able to see plaintiffs and presumably affirm that they exist. They will be able to observe plaintiffs' mannerisms, body language, demeanor, and nonverbal responses, all of which defendants may use to assess credibility. Other courts have routinely praised the use of videoconferencing precisely because it allows such observations. *See One Gulfstream G-V Jet Aircraft Displaying Tail No. VPCES*, 304 F.R.D. at 12 ("[M]odern videoconference technology will allow the Government to observe Nguema and ask follow up questions as is necessary to obtain the relevant testimony."); *WIHO, LLC v. Hubbauer*, No. 12–CV–1386, 2013 WL 6044424, at *2 (D. Kan. Nov. 14, 2013) ("Conducting the depositions by videoconference addresses the concerns associated with

telephonic depositions, such as depriving the opposing party of the opportunity for face-to-face confrontation or the opportunity to evaluate the deponent's nonverbal responses and demeanor."); *Shockey v. Huhtamaki, Inc.*, 280 F.R.D. 598, 602 (D. Kan. 2012) ("Taking the depositions via videoconferencing, as proposed by Plaintiffs here, addresses Defendant's objection that the deponent's nonverbal responses and demeanor cannot be observed."); *Gee*, 2011 WL 5597124, at *2–3 ("Suntrust's argument that conducting the depositions via videoconference would be detrimental to its ability to question and observe the deponents is unconvincing. Parties routinely conduct depositions via videoconference, and courts encourage the same, because doing so minimizes travel costs and 'permits the jury to make credibility evaluations not available when a transcript is read by another.'"); *Sloniger v. Deja*, No. 09CV858S, 2010 WL 5343184, at *11 (W.D.N.Y. Dec. 20, 2010) ("Unlike a telephonic deposition plaintiff opposes, the parties can see each other and Deja's responses and mannerism can be captured on the video recording.").

The Court does not find defendants' cases persuasive. As previously noted, in *United States v. Approximately $57,378 in U.S. Currency*, there was an added concern that the deponent, who was representing herself, spoke limited English and, due to the nature of the proceedings, had to examine multiple exhibits making a videoconference deposition impracticable. *See* 2010 WL 4347889, at *1. In addition, the court found that the deponent had "purposefully submitted to this Court's jurisdiction by filing her third-party ownership claim to money that has already been forfeited," and that it was not unduly burdensome for her to travel to San Francisco as she had recently travelled there for a status conference. *Id.* at *2. In *Music Grp. Macao Commer. Offshore Ltd. v. Foote*, the court found in part that a videoconference deposition would be insufficient due in part to the need "to review a copious number of documents." *See* No. 14-cv-3078, 2015 U.S.

Dist. LEXIS 105465, at *8 (N.D. Cal. Aug. 11, 2015) (also finding that the deponent's busy schedule did not constitute good cause for avoiding an in person deposition).

Defendants also raise the following factors to show that they will be prejudiced by videoconference depositions: 1) "Indonesian discovery has been, and remains, barred; [and 2)] a strict Protective Order limits Defendants' ability to investigate Plaintiffs' claims." Defs.' Reply at 12. It is not clear to this Court how either of these issues create prejudice in the event of videoconference depositions as opposed to in person depositions taken abroad. Neither appear to have much relevance to the issues presented here. Finally, defendants identify various alleged inconsistencies and discrepancies among plaintiffs' allegations, sworn interrogatory responses, and documents with identifying information. *Id.* at 7–8. They argue that "[t]he veracity of Plaintiffs' allegations and whether Plaintiffs are the ones actually prosecuting these claims is called into question by these and other inconsistencies that Defendants have identified, warranting in-person examinations conducted in the manner that the Federal Rules prescribe." *Id.* at 10. As already found, however, defendants should be able to test plaintiffs' credibility and the veracity of their allegations in videoconference depositions. They will certainly be able to test plaintiffs' answers and inquire about inconsistencies. This is not reason to preclude videoconference depositions.

Because plaintiffs have shown good cause for videoconference depositions, and because defendants have failed to demonstrate that they will be severely or unduly prejudiced by videoconference depositions, the Court will order the parties to conduct plaintiffs' depositions via videoconference. The depositions will be "U.S. style," conducted pursuant to the Federal Rules of Civil Procedure. The parties should discuss other necessary safeguards and procedures, such as translation services, choice of technology, and who shall be present during the depositions. *See,*

*e.g.*, *Sloniger*, 2010 WL 5343184, at \*11 ("A conventional stenographic transcript of the deposition shall be made. The videographer shall be sworn and the videographer shall certify as to the completeness of the video recording. Prior to the examination, the parties shall stipulate to the zoom, angle, background, and other filming details. The plaintiff, as noticing party, shall file the original video recording with the Court Clerk. The videotape shall run continuously throughout the deposition from beginning to end, videotaping shall not be discontinued during colloquy among counsel. Later editing can remove any portions that are not proper for the fact finder to see and/or hear. Plaintiff, as the party conducting the videotape deposition, shall cause to be prepared a log index, which shall include the subject matter being explored, cross-referenced to the digital reading on the digital counter of the videotape equipment, a list of exhibits, and the names of all persons and parties present at the videotape deposition, as well as pay the costs of recording and transcription. Only the parties, their counsel, translator(s), and persons necessary to conduct the deposition or to assist the parties and counsel, shall be permitted to attend the videotape deposition."); *Delahanty v. Hinckley*, No. CIV. A. 82-0409, 1990 WL 99337, at \*1 (D.D.C. July 3, 1990) (ordering that the depositions be conducted in the following manner: "(1) absent a Court order, the deposition shall not be edited or modified in any manner; (2) the deposition shall have a clock appear on the screen; (3) a court reporter shall record the proceedings; (4) the video film shall include all parties present at the proceedings, with specific focus on the questioner and the defendant").

Defendants' counsel are not, of course, prohibited from travelling to Indonesia if they wish to attend the depositions in person. *See One Gulfstream G-V Jet Aircraft Displaying Tail No. VPCES*, 304 F.R.D. at 12 ("[I]f the Government still believes that these remote alternatives are inadequate, it is entitled to conduct an in-person deposition of Nguema in Equatorial Guinea.").

At this time, however, the Court will not order plaintiffs to pay defendants' travel expenses. Because the Court has found that depositions via videoconference are appropriate here, there shall be no travel expenses and it need not determine who should pay for such expenses. *Cf. Sloniger*, 2010 WL 5343184, at *11 ("Essentially, a video deposition would allow Deja, plaintiff, and all those necessary to attend the deposition to remain in their respective places while conducting that examination, avoiding extensive travel expenses to one location."). However, should the parties fail, after good faith negotiations, to reach an agreement regarding the procedures for the videoconference depositions, and should this Court agree that an in person deposition is at that point necessary, it will revisit the issue of who should pay travel expenses upon motion by either party.

Finally, defendants have asked that if plaintiffs are unable to appear in the District of Columbia for depositions, they be prohibited from testifying live at trial. The Court will not implement such a ruling. As explained above, plaintiffs need not always appear in the forum for depositions. None of those cases hold that in such circumstances, however, the plaintiff will not be allowed to testify live at trial. The only case that defendants cite in support states that "[t]his Court will not permit Egyptian Chamois to produce its witnesses and documents for the first time at trial." *Gawhara for Ready Made Clothes v. Evergreen Marine Corp.*, No. CV 99-5080, 2001 WL 1737458, at *6 (C.D. Cal. Jan. 25, 2001). Here, in contrast, defendants will not face plaintiffs' witnesses for the first time at trial. This Court has just held that plaintiffs' depositions be taken via videoconference, and defendants have the right to travel to Indonesia to attend the depositions in person if they so wish. Therefore, plaintiffs will not be barred from testifying at trial due to their inability to travel to the United States for depositions.

### B.     Dismissal

Defendants argue that this case should be dismissed due to plaintiffs' inability to attend trial, raising both failure to prosecute arguments and due process arguments.[7]  They argue that "Plaintiffs' failure to come to their chosen forum for their depositions and their tacit admission that they will also be unable to attend for trial effectively negates their ability to prosecute this case." *See* Defs' Reply at 6.

It is clear that when plaintiffs do not appear for trial, their case may be dismissed for failure to prosecute.  *See, e.g.*, *Joseph v. D.C., Office of Corp. Counsel*, No. 92-5317, 1993 WL 312008, at *1 (D.C. Cir. Mar. 17, 1993) ("Under the circumstances of this case, we conclude that dismissal was not an abuse of discretion; appellant failed to appear at trial after being informed that the trial date would not be continued and never informed the court or the appellees of his intention not to appear."); *Rance v. Rocksolid Granit USA, Inc.*, 489 F. App'x 314, 317 (11th Cir. 2012) (finding dismissal for failure to prosecute appropriate when the plaintiff "was inexplicably and inexcusably absent" at trial); *Jones v. Burns*, 373 F. App'x 658 (8th Cir. 2010) (dismissal for failure to prosecute was appropriate when the plaintiff did not attend pretrial conference or trial); *Knoll v. AT & T Co.*, 176 F.3d 359, 365 (6th Cir. 1999) ("Where a plaintiff does not appear at the trial date or, as in this case, is inexcusably unprepared to prosecute the case, Rule 41(b) dismissal is particularly appropriate.   Indeed, such behavior constitutes the epitome of a 'failure to prosecute.'"); *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993) ("The remedy [of dismissal for failure to prosecute] is usually applied when the plaintiff is not ready for trial or fails to appear."); *Levine v. Colgate-Palmolive Co.*, 283 F.2d 532, 532 (2d Cir. 1960) ("Judge Dawson

---

[7] Defendants also argue that the case should be dismissed under Rule 37, which provides that a court may dismiss a case for failure to appear for depositions.  Plaintiffs have not failed to appear for depositions and this Court has held that depositions may be taken via videoconference.  This argument is therefore currently without merit.

had ample discretion to dismiss plaintiff's action when plaintiff did not appear for trial at the time previously set in pre-trial conference.").

It is less clear, however, whether a case may be dismissed for failure to prosecute when a plaintiff anticipates that he or she will not be able to attend trial.  The only case that defendants cite in support of their argument that this situation warrants dismissal is *Reshetnikov v. Republic Nat'l Bank of N.Y.*, 233 F.R.D. 644 (S.D.N.Y. 2005).  As plaintiffs note, *Reshetnikov* dealt with a pro se plaintiff who would both be unable to be cross examined as a witness, and cross examine any witnesses as his own representative.  *Reshetnikov* is therefore be distinguishable from the case here, where plaintiffs are not representing themselves and where plaintiffs' counsel has not indicated any inability to appear for trial.  The Court has found no cases addressing circumstances similar to those here.

In fact, the Federal Rules of Civil Procedure state that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."  Fed. R. Civ. P. 43(a).  The D.C. Circuit has held that a foreign plaintiff may testify via live videoconference if unable to attend trial.  In *El-Hadad v. United Arab Emirates*, the D.C. Circuit considered whether the plaintiff's "testimony from Egypt by Internet video violated Federal Rule of Civil Procedure 43(a), which requires 'good cause' and 'appropriate safeguards' before a witness is permitted to testify 'by contemporaneous transmission from a different location.'"  *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 668–69 (D.C. Cir. 2007).  The court found that this did not violate Rule 43(a) because the "district court insisted that El–Hadad prove he had pursued and repeatedly been denied a visa to the United States (as well as show careful preparations for translation and teleconferencing)."  *Id.* at 669.  Other courts have held similarly.  In *Alcala v. Hernandez*, the court found that the petitioner, a Mexican

citizen who was likely unable to obtain a visa, could testify via skype or telephone. *Alcala v. Hernandez*, No. 4:14-CV-04176-RBH, 2015 WL 1893291, at *2 (D.S.C. Apr. 27, 2015) (noting the following visa issues: "Petitioner would be required to travel to the nearest consular office to apply for a visa. Once he arrived and paid the application fee, there is no guarantee that he would have received a visa. In fact, Buffett opines that is likely that Petitioner would be denied a visa outright because of his limited financial resources. Furthermore, because Petitioner currently does not have a valid passport, he would not be able to even apply for the visa."); *see also Barnes v. Black*, 544 F.3d 807, 810 (7th Cir. 2008) (stating that the district court, after the plaintiff had asked for a writ of *habeas corpus ad testificandum*, had found that '[w]ritting' prisoners to a distant court entails cost and even danger, and the district judge deemed these compelling circumstances for allowing (with appropriate safeguards) video conferencing as an alternative" (internal citation omitted)).

Thus, if this Court finds that there is both good cause shown and appropriate safeguards put in place, it may allow the plaintiffs to testify via live video at trial. Because, however, this case has not yet been set for trial it is premature for the Court to determine whether testimony via video transmission is appropriate here. If plaintiffs' visa issues remain outstanding at the time this case is approaching a trial, the Court will address any remaining issues regarding their trial testimony. Furthermore, the Court makes no ruling at this time regarding any potential violations of defendants' constitutional due process rights if plaintiffs are unable to appear for trial. Should this visa issue persist, the Court will consider, at the appropriate time, issues such as the kinds of evidence plaintiffs plan to present, the importance of plaintiffs' live testimony, and the topics about which plaintiffs plan to testify (*e.g.*, liability versus damages). These factors, and others, will inform the Court's decision regarding whether video testimony is appropriate under Rule 43 and

whether plaintiffs' inability to attend trial constitutes a deprivation of the process due to defendants.

In sum, the Court will order plaintiffs' depositions be taken via videoconference, using appropriate agreed upon safeguards and procedures. The Court will not prohibit plaintiffs from testifying live at trial. The Court will not dismiss this case for failure to appear in the District of Columbia for depositions, or for failure to prosecute, or for due process violations at this time.

## V.     CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part defendants' Motion to Compel. It will order plaintiffs to produce the identities of their agents identified in their privilege log and to produce the forensic reports regarding Mr. Collingsworth's emails to this Court for *in camera* review. Because plaintiffs have waived their privilege arguments with respect to the documents regarding plaintiffs' efforts to obtain visas and passports, plaintiffs will be ordered to produce such documents. Plaintiffs will also be ordered to produce any documents located in the United States relating to the purchase of airline tickets for the flight to Jakarta, as well as a hotel stay in Jakarta for the interview process; plaintiffs' counsel's retention of agents to manage the visa/passport application process; and the payment of visa/passport application expenses. Finally, the parties must engage in a meet and confer regarding the issues of Mr. Massey's notebooks and Mr. Dodd's hard drive before the Court will consider any motion to compel as to those issues. Plaintiffs' Cross-Motion to Compel will be denied. Plaintiffs will be ordered to pay defendants' reasonable expenses pursuant to Rule 37(b)(2)(C) for expenses associated with their arguments regarding plaintiffs' efforts to obtain passports or visas.

In addition, the plaintiffs shall be deposed via videoconference. The parties will be ordered to meet and confer regarding the appropriate safeguards and procedures for these depositions. The

Court will not order that the depositions be taken abroad at this time, nor will it prohibit plaintiffs from testifying live at trial. Finally, the Court declines to dismiss this case at this time for any of the reasons set forth by defendants.

Defendants' Motion for Leave to File a Surreply will be granted in part and denied in part. It is denied except with respect to the section devoted to plaintiffs' request for documents concerning KPMG's efforts to restore Mr. Dodd's hard drive.

A separate order shall issue this date.

Date: December **6**, 2016

Royce C. Lamberth
United States District Judge