# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE I *et al.*, | ) | |
| Plaintiffs, | ) | |
|  | ) | |
|  | ) | |
| v. | ) | Civil No. 01-cv-1357-RCL |
|  | ) | |
| EXXON MOBIL CORPORATION *et al.*, | ) | |
| Defendants. | ) | |
|  | ) | |
|  | ) | |

## MEMORANDUM OPINION

Pursuant to an agreement with the Indonesian government, Exxon Mobil Corporation, a United States corporation, and several of its wholly owned subsidiaries (hereinafter Exxon) operated a large natural gas extraction and processing facility in the Aceh Province of Indonesia. Plaintiffs are Indonesian citizens who claim that Exxon's security forces engaged in extrajudicial killing; torture; cruel, inhuman, and degrading treatment; and arbitrary detention in violation of the Alien Tort Statute (ATS) and committed various common law torts. Now before the Court is Exxon's motion to dismiss the ATS claims. Def.'s Mot. to Dismiss the ATS Claims, ECF No. 634. For the reasons set forth below, the Court declines to recognize domestic corporate liability under the ATS in circumstances where, as here, the claims have caused significant diplomatic strife. The Court will therefore dismiss plaintiffs' ATS claims against Exxon.

Plaintiffs only remaining claims are the claims for wrongful death; battery; assault; arbitrary arrest, detention, and false imprisonment; negligence, negligent hiring; negligent supervision; and conversion. Second Am. Compl. ¶¶ 193–240, ECF No. 465 [hereinafter Second Am. Compl.]. These tort claims are governed by Indonesian law. *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) (vacating *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011),

1

but expressly preserving the part of the 2011 opinion discussing plaintiffs' non-federal tort claims); *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75 (D.D.C. 2014) (dismissing plaintiffs' claims for intentional infliction of emotional distress and negligent infliction of emotional distress).

## I.    Factual Background

This case arises out of alleged human rights abuses committed at or near natural gas development facilities operated by Exxon in the Aceh Province of Indonesia in 2000 and 2001. Second Am. Compl. ¶¶ 176–86. Plaintiffs allege that they, or their decedents, were detained, tortured, sexually assaulted, killed, or otherwise abused by Exxon's paid military security personnel, who were under Exxon's direction and control. *Id.* The Court must accept the allegations of the plaintiffs' complaint as true and construe the complaint in favor of the plaintiffs at the motion to dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Exxon operated the facilities in the Aceh Province pursuant to an agreement with the Indonesian government, which granted Exxon exclusive rights to develop and produce natural gas in the area. Second Am. Compl. ¶¶ 22–35. Plaintiffs claim that Exxon's security forces were comprised of members of the Indonesian military. *Id.* ¶ 33. Security at the facilities was an enormous concern at the time, as there was an ongoing internal conflict in the Aceh Province. Exxon and its subsidiaries, which were incorporated at the time of the first complaint in New Jersey and Delaware, retained these soldiers as guards for its natural gas facility even though Exxon was allegedly aware that the Indonesian military had committed human rights abuses in the past and that performing the security contract would lead to human rights violations by the Indonesian soldiers against the Aceh residents. *Id.* ¶¶ 33–55.

According to the complaint, the Indonesian military's actions could be attributed to Exxon because they were committed by a unit dedicated solely to providing security for Exxon, and

Exxon had the authority "to direct[] and control" the soldiers' actions. *Id.* ¶¶ 34–41. Plaintiffs allege that Exxon's executives in the U.S. received briefings on abuses committed by Exxon security personnel in Aceh against the local population. *Id.* ¶¶ 46–47, 49. Plaintiffs allege that this information was reported prior to their injuries. *Id.* ¶¶ 45–55. In particular, plaintiffs allege that Exxon's executives in the U.S. received reports that Exxon security personnel engaged in rape, torture, unlawful detention, assault, and killings. *Id.* ¶¶ 50–51. They also allege that Exxon's executives in the U.S. received reports from employees and advisors that the Indonesian military had a "poor reputation . . . especially in the area of respecting human rights" and that their deployment in support of Exxon's operations risked "more of a possibility of an unfortunate incident." *Id.* ¶¶ 46, 48. Plaintiffs allege that Exxon's executives in the U.S. received reports that Exxon security personnel were committing human rights violations on Exxon property, using Exxon equipment. *Id.* ¶¶ 50, 52. Also, staff allegedly warned Exxon's executives in the U.S. that supplying additional vehicles to the security personnel could lead to a greater likelihood of abuses by security personnel. *Id.* ¶ 70. Plaintiffs allege that U.S.-based Exxon executives nevertheless ordered the provision of supplies and vehicles for the Indonesian security personnel and that the underlying international law violations were committed using these supplies and vehicles. *Id.* ¶¶ 43, 89–91.

## II.     Procedural History

Judge Oberdorfer, who initially presided over this case, dismissed all of plaintiffs' ATS claims in 2005 following the Supreme Court's decision in *Sosa*, reasoning in part that adjudicating such claims could create diplomatic friction with Indonesia. *See Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 22–27 (D.D.C. 2005). In response to Judge Oberdorfer's request, the U.S. State Department had submitted a Statement of Interest in 2002 warning that the lawsuit would "in fact

risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." *Id.* at 22; *see* Letter from William H. Taft, IV, Legal Adviser, Dep't of State, to the Honorable Louis F. Oberdorfer, U.S. Dist. Judge, U.S. Dist. Court for D.C. 1–2 (July 29, 2002), Amicus Curiae United States' Statement of Interest, ECF No. 38 [hereinafter Letter from William H. Taft, IV, Legal Adviser, Dep't of State, to the Honorable Louis F. Oberdorfer, U.S. Dist. Judge, U.S. Dist. Court for D.C. 1–2 (July 29, 2002), ECF No. 38]. The Government of Indonesia also objected to the litigation in a diplomatic note, stating that Indonesia "cannot accept the extra territorial jurisdiction of a United States court over an allegation against an Indonesian government institution, eq [sic] the Indonesia military, for operations taking place in Indonesia." *Id.* The concerns about diplomatic strife with Indonesia, among other reasons, led Judge Oberdorfer to dismiss the ATS claims against Exxon. *Id.* at 22–27.

Plaintiffs appealed Judge Oberdorfer's dismissal of the ATS claims to the D.C. Circuit. Exxon argued for the first time that a corporation is immune from liability under the ATS in a cross-appeal. *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 15 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013). The D.C. Circuit reversed and restored the ATS claims in 2011. *Id.* The D.C. Circuit held that the ATS generally permitted corporate liability, over then-Judge Kavanaugh's dissent. *Id.* at 39–57, 71–91. This opinion was vacated in 2013 based on intervening changes in the law governing the extraterritorial reach of the ATS and the standard for aiding and abetting liability. *Doe*, 527 F. App'x at 7 (D.C. Cir. 2013).

Exxon again argued that corporations may not be held liable for causes of action arising under the ATS in 2015. *Doe v. Exxon Mobil Corp.*, No. CV 01-1357, 2015 WL 5042118, at *2 (D.D.C. July 6, 2015). This Court rejected this argument based on the reasoning provided in the

D.C. Circuit's 2011 opinion. *Id.* This Court reasoned that the D.C. Circuit's opinion on the matter was vacated because of issues unrelated to the question of corporate liability under the ATS, so there was no basis to revisit the question at that time. *Id.* But the 2015 opinion did dismiss the claim for disappearance under the ATS because this claim was not a "specific, universal, and obligatory" norm under customary international law. *Id.* at *4.

Shortly after the Supreme Court granted the petition for *certiorari* in *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018), the parties jointly proposed a stay until *Jesner* was decided. Joint Notice of Filing of Proposed Scheduling Order, ECF No. 625. The Court agreed. Scheduling Order, ECF No. 630.

In April 2018, the Supreme Court issued its most recent ATS decision in *Jesner*. 138 S. Ct. at 1386. The Court categorically foreclosed ATS liability for foreign corporations. *Id.* Exxon contends that the *Jesner* Court's rationale and the various opinions of the five Justices comprising the majority in that opinion are not limited to foreign corporations. Def.'s Mot. to Dismiss the ATS Claims, ECF No. 634. Exxon argues *Jesner* should be read to extend to domestic corporate liability under the ATS in circumstances where such claims threaten, or have already created, diplomatic strife. *Id.* This led Exxon to bring its present motion to dismiss the ATS claims. *Id.*; Mot. to Set a Briefing Schedule and Stay Further Proceedings, ECF No. 631. The Court stayed all further proceedings pending the resolution of this motion to dismiss. Order, ECF No. 632.

## III.    Discussion

### A.    The Alien Tort Statute

The ATS provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS is merely a jurisdictional grant. *Sosa v. Alvarez-Machain*, 542

U.S. 692, 713–14 (2004). The statute, which was passed by the First Congress, does not provide a statutory cause of action or explain the definition of a cause of action for violations of international law. *Id.*

The Supreme Court has articulated the historical backdrop that created the impetus for passing the ATS. Under the Articles of Confederation, the Continental Congress lacked authority to "cause infractions of treaties, or of the law of nations to be punished." *Id.* at 716 (quoting J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed. 1893)). Concerns with the international relations tensions resulting from the lack of ability to punish violations of treaties and the law of nations "persisted through the time of the Constitutional Convention." *Id.* at 717. The inability of the central government under the Articles of Confederation to ensure adequate remedies for foreign citizens caused substantial foreign relations problems. *Jesner*, 138 S. Ct. at 1396. In 1784, the French Minister lodged a formal protest with the Continental Congress after a French adventurer assaulted the Secretary of the French Legion in Philadelphia. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 120 (2013). In 1787, a New York constable caused an international incident when he entered the Dutch Ambassador's house and arrested one of his diplomatic servants. *Id.* Under the Articles of Confederation, "there was no national forum available to resolve disputes like these under any binding laws that were or could be enacted or enforced by a central government." *Jesner*, 138 S. Ct. at 1396.

The Framers addressed these issues at the 1787 Philadelphia Convention. *Id.* Article III of the Constitution extends federal judicial power to "all cases affecting ambassadors, other public ministers and consuls," and "to controversies . . . between a state, or the citizens thereof, and foreign states, citizens, or subjects." U.S. Const. art. III, § 2. The First Congress passed the Judiciary Act of 1789 to implement these constitutional provisions. The Judiciary Act of 1789

authorized federal jurisdiction over suits involving disputes between aliens and U.S. citizens and suits involving diplomats. Judiciary Act of 1789, ch. 20, §§ 9, 11, 1 Stat. 73, 76–79. The Judiciary Act also included what is now known as the ATS. *Id.* § 9.

Although the ATS is "strictly jurisdictional," the Supreme Court has recognized that it "was not enacted to sit on a shelf waiting further legislation." *Jesner*, 138 S. Ct. at 1398 (citing *Sosa*, 542 U.S. at 713–14). Instead, Congress enacted it with the understanding that the common law would provide causes of action for a modest number of international law violations. *Sosa*, 542 U.S. at 724.

In the 18th century, international law primarily governed relationships between and among nation-states. *Jesner*, 138 S. Ct. at 1397. But international law governed individual conduct occurring outside national borders in a few instances. *Id.*; *Sosa*, 542 U.S. at 714–15. There was also a narrow domain in which "rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships." *Sosa*, 542 U.S. at 715. Blackstone understood this sphere to include "three specific offenses against the law of nations addressed by the criminal law of England: violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* (citing 4 William Blackstone, Commentaries on the Laws of England 68 (1769)). "It was this narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on the minds of the men who drafted the ATS." *Id.*

The ATS's primary objective, when first enacted, was to avoid foreign entanglements by ensuring that a federal forum was available where the failure to provide a forum might cause another nation to hold the U.S. responsible for a foreign citizen's injury. *Id.* at 1397; *see Kiobel*, 569 U. S. at 123–24; *Sosa*, 542 U.S. at 715–19.

B.   *Sosa, Kiobel,* and *Jesner*

In the nearly eighteen years since plaintiffs filed this action under the ATS, the Supreme

Court has drastically curtailed the scope and reach of the ATS. In *Sosa*, the Court narrowed the

types of claims that could be recognized under the ATS to only those that are "specific, universal,

and obligatory" under customary international law norms. *Sosa*, 542 U.S. at 732. The only claims

that federal courts should recognize under the ATS are those that are widely recognized by the

civilized world as violations of international norms and can be defined with the same specificity

as the "historical paradigms familiar when § 1350 was enacted," such as norms concerning safe

conducts, rights of ambassadors, and piracy. *Id.* The *Sosa* Court explained that "the determination

whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably

must)' involve an element of judgment about the practical consequences of making that cause

available to litigants in the federal courts." *Id.* at 732–33. Further, "a related consideration is

whether international law extends the scope of liability for a violation of a given norm to the

perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Id.*

at 732 n.20. The Court also stressed that ATS litigation implicates serious separation of powers

and foreign relations concerns. *Id.* at 727–28.

In *Kiobel*, the Court barred any extraterritorial application of the ATS unless the claims

"touch and concern" the territory of the United States with sufficient force to displace the

presumption against extraterritoriality. *Kiobel*, 569 U.S. at 124–25.

The Supreme Court recently addressed the scope of the ATS again in *Jesner*. In *Jesner*,

foreign nationals who were allegedly victims of terrorist attacks abroad sued Arab Bank, a foreign

corporation based in Jordan, under the ATS alleging the Bank's officials allowed the Bank to be

used to transfer funds to terrorist groups, which enabled or facilitated the terrorist acts. 138 S. Ct.

at 1393–95. The Court held that foreign corporations could not be sued under the ATS. *Id.* at 1407. The Court emphasized that the ATS was enacted "to avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." *Id.* at 1397. ATS litigation raises serious separation of powers and foreign relations concerns, and therefore must be "subject to vigilant doorkeeping." *Id.* at 1398. The Court expressed great reluctance to extend judicially created private rights of actions. *Id.* at 1402–03. The litigation in *Jesner* had "'caused significant diplomatic tensions' with Jordan, a critical ally in one of the world's most sensitive regions." Jordan considered the litigation to be a "grave affront" to its sovereignty. *Id.* at 1406–07. The Supreme Court recognized that courts should generally refrain from creating or extending new grounds for lawsuits, especially when such a determination would trigger serious foreign policy consequences, and should instead defer such decisions to the legislative and executive branches. *Id.* at 1402–03, 1406–07. "The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Id.* at 1403. This led the Court to determine that foreign corporations may not be defendants in ATS suits.

A plurality in *Jesner* would have applied the two-part test established in *Sosa*. *Id.* at 1399; *see Sosa*, 542 U.S. at 732–33. First, courts must ask whether a plaintiff can demonstrate that the alleged violation is a norm that is specific, universal, and obligatory. *Jesner*, 138 S. Ct. at 1399; *see Sosa*, 542 U.S. at 732. Second, even if there is a specific norm under international law that is controlling, courts must determine whether allowing the case to proceed under the ATS is a proper exercise of judicial discretion, "or instead whether caution requires the political branches to grant specific authority before corporate liability can be imposed." *Jesner*, 138 S. Ct. at 1399; *see Sosa*,

542 U.S. at 732–33, 732 n.20, 733 n.21. Justice Kennedy in the plurality opinion acknowledged that these two inquiries inform each other. *Jesner*, 138 S. Ct. at 1399.

The *Sosa* Court stated that a consideration related to whether an international norm is sufficiently definite to support a cause of action is "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa*, 542 U.S. at 732 n.20. The plurality in *Jesner* read this footnote to likely mean the Court must ask whether there is an international law norm imposing liability on corporations for their employees' actions that violate fundamental human rights. *Jesner*, 138 S. Ct. at 1399–1401. Therefore, international law must inform the determination of which subjects can be held accountable in addition to the conduct that is prohibited. While international law now imposes duties on individuals as well as nation-states, the plurality determined that "[i]t does not follow . . . that current principles of international law extend liability—civil or criminal—for human-rights violations to corporations or other artificial entities." *Id.* at 1400. International criminal tribunals' charters, from the Nuremberg Tribunal to more recent international tribunals, often exclude corporations from their jurisdictional reach. *See id.* at 1400–01. This led the plurality in *Jesner* to conclude "[t]he international community's conscious decision to limit the authority of these international tribunals to natural persons counsel against a broad holding that there is a specific, universal, and obligatory norm of corporate liability currently prevailing in international law." *Id.* at 1401.

The plurality acknowledged that corporations are often subject to liability for their employees' conduct in the American legal system, which may make it "seem necessary and natural that corporate entities are liable for violations of international law under the ATS." *Id.* at 1402. Further, the plurality recognized that "the enormity of the offenses that can be committed against

persons in violation of international human-rights protections can be cited to show that corporations should be subject to liability for the crimes of their human agents." *Id.* However,

> the international community has not yet taken that step, at least in the specific, universal, and obligatory manner required by *Sosa*. Indeed, there is precedent to the contrary in the statement during the Nuremberg proceedings that "[c]rimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced."

*Id.* (quoting *The Nurnberg Trial*, 6 F.R.D. 69, 110 (1946).

While the petitioners in *Jesner* argued that corporate liability is a remedial consideration left for determination under domestic law rather than a substantive principle that must be supported by a universal and obligatory international norm to be implemented under the ATS, the plurality found this to be "far from obvious." *Id.* The plurality did not reach a conclusion on "whether corporate liability is a question that is governed by international law, or, if so, whether international law imposes liability on corporations." *Id.* There was sufficient doubt on this point to continue to the second prong of *Sosa*'s test—"whether the Judiciary must defer to Congress, allowing it to determine in the first instance whether that universal norm has been recognized and, if so, whether it is prudent and necessary to direct its enforcement in suits under the ATS." *Id.*

In analyzing the second prong of the *Sosa* test, the *Jesner* opinion stressed the Court's reluctance to extend or create private causes of action because "the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Id.* (quoting *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1857 (2017)). The plurality then turned to the Torture Victim Protection Act (TVPA) as a statutory analogue for guidance in interpreting the boundary of ATS common-law causes of action. *Id.* at 1403–05. The TVPA is the only cause of action under the ATS that was created by Congress as opposed to the courts. *Id.* at 1403. The TVPA limits liability to "individuals," which the Supreme Court in *Mohamad v. Palestinian*

*Authority* held unambiguously limits liability to natural persons. 556 U.S. 449, 453–56 (2012); *see*

28 U.S.C. § 1350 note. The plurality in *Jesner* declared "[t]he TVPA reflects Congress' considered

judgment of the proper structure for a right of action under the ATS. Absent a compelling

justification, courts should not deviate from that model." *Jesner*, 138 S. Ct. at 1403. The plurality

found that

> Congress' decision to exclude liability for corporations in actions brought under the
> TVPA is all but dispositive of the present case. That decision illustrates that
> significant foreign-policy implications require the courts to draw a careful balance
> in defining the scope of actions under the ATS. It would be inconsistent with that
> balance to create a remedy broader than the one created by Congress.

*Id.* at 1404.

Finally, the plurality focused on three practical reasons that counseled against courts

allowing liability under the ATS for foreign corporations. *Id.* at 1405–08. First, corporate liability

under the ATS is not essential to serve the goals of the statute because the ATS will rarely be the

only way for plaintiffs to hold alleged perpetrators liable and plaintiffs can sue the individual

corporate employees responsible for violating international norms under the ATS. *Id.* at 1405.

Second, allowing foreign corporations to be sued under the ATS could establish a precedent "that

discourages American investment abroad, including in developing economies where the host

government might have a history of alleged human-rights violations, or where judicial systems

might lack the safeguards of United States courts." *Id.* at 1405–06. This could deter the corporate

investment that contributes to economic development, which is often an important aspect to

improving human rights. *Id.* at 1406. Third, the Court recognized that allowing foreign

corporations to be sued under the ATS risked significant diplomatic strife. *Id.* at 1406–07.

Ultimately, the plurality believed the political branches were better suited than the Judiciary to

determine whether corporations should be liable for violations of international law. *Id.* at 1407–08.

Justices Alito, Gorsuch, and Thomas each concurred separately. Justice Alito stressed that creating causes of action against foreign corporate defendants under the ATS would lead to diplomatic strife, which was what the ATS was intended to prevent. *Id.* at 1408–12. Therefore, Justice Alito believed that judicial caution and the separation of powers required the Court to decline to extend the ATS to foreign corporate defendants. *Id.* Justice Gorsuch cautioned that the separation of powers requires the Judiciary to refrain from creating new causes of action without congressional legislation. *Id.* at 1412–19. Justice Gorsuch declared "[i]f *Sosa* is right—and I am sure it is—that federal courts must 'inevitably' exercise 'an element of judgment' about delicate questions of foreign affairs when deciding whether to create a new cause of action, then judges should exercise *good* judgment by declining the project before we create real trouble." *Id.* at 1414. Justice Thomas concurred, stating he agreed with Court's opinion in full and Justices Alito and Gorsuch's concurrences. *Id.* at 1408. Justice Thomas wrote that "[c]ourts should not be in the business of creating new causes of action under the Alien Tort Statute . . . especially when it risks international strife." *Id.*

The reasoning of the five Justices in *Jesner* leads this Court to believe it is appropriate to re-examine whether Exxon can be held liable under the ATS in this suit. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.") (citations

omitted); *see also Shea v. Clinton*, 850 F. Supp. 2d 153, 158 (D.D.C. 2012) (reconsideration may be granted "where a significant change in the law occurred after the decision was rendered").

C.    Exxon cannot be held liable under the ATS in this case

The Court takes two different approaches to examine whether Exxon can be liable under the ATS in this case. The first inquiry tracks the portion of *Jesner*'s analysis that was signed onto by five justices. Second, the Court analyzes this issue using the approach adopted by the plurality in *Jesner*, which looks at both prongs of *Sosa*'s two-part test. These separate lines of inquiry each lead this Court to the same conclusion: Exxon cannot be held liable under the ATS in this case.

1.    *Separation of powers and foreign relations concerns lead the Court to decline to recognize domestic corporate liability under the ATS in circumstances where, as here, the claims have caused significant diplomatic strife*

The Supreme Court's reasoning in *Jesner* leads this Court to decline to recognize domestic corporate liability under the ATS in circumstances where, as here, the claims have caused significant diplomatic strife.

The Supreme Court has been reluctant to extend judicially created causes of action. The Court has repeatedly stated that the decision of whether to create a private right of action is best left to the legislative branch. *See, e.g., Sosa*, 542 U.S. at 727; *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). The *Jesner* Court recognized that separation of powers concerns are particularly acute in the ATS context. *Jesner*, 138 S. Ct. at 1402. ATS suits such as this one implicate serious foreign relations concerns. This Court must therefore take seriously the Supreme Court's command that the federal courts exercise "great caution" before recognizing new forms of liability under the ATS. *Sosa*, 542 U.S. at 727; *see also Jesner*, 138 S. Ct. at 1403. "The political branches, not the Judiciary, have the

responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner*, 138 S. Ct. at 1403.

This case has caused significant diplomatic strife. The executive branch has repeatedly explained that adjudication of plaintiffs' ATS claims against Exxon in this case would harm U.S. foreign policy interests. In 2002, the State Department filed a Statement of Interest with this Court:

> [T]he Department of State believes that adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism. It may also diminish our ability to work with the Government of Indonesia ("GOI") on a variety of important programs, including efforts to promote human rights in Indonesia. . . .
>
> With respect to this litigation, it is the Department's considered opinion that adjudication at this time could adversely affect United States interests in two ways, recognizing that such effects cannot be determined with certainty. First, the GOI may respond to the litigation by curtailing cooperation with the United States on issues of substantial importance to the United States. Second, the litigation's potential effects on Indonesia's economy could in turn adversely affect important United States interests.

Letter from William H. Taft, IV, Legal Adviser, Dep't of State, to the Honorable Louis F. Oberdorfer, U.S. Dist. Judge, U.S. Dist. Court for D.C. 1–2 (July 29, 2002), ECF No. 38 (internal footnotes omitted). In 2003, the Department of Justice submitted a Supplemental Statement of Interest that stressed "[i]t remains the United States' position that adjudication of this case would raise foreign policy and national security concerns for the reasons articulated in the State Department's letter. Those concerns can be avoided by holding, as the United States contends, that the ATS does not create an independent right of action." Suppl. Statement of Interest of the U.S. 2, ECF No. 62. The State Department again reiterated these concerns in a 2005 letter focused on a proposed discovery plan in this case. Letter from John B. Bellinger, III, Legal Adviser, Dep't of State, to the Honorable Louis F. Oberdorfer, U.S. Dist. Judge, U.S. Dist. Court for D.C. 1 (July 15, 2005), ECF No. 91-1 [hereinafter ECF No. 91-1]. Indonesia has also submitted letters to the

United States, stating that it "cannot accept the extra territorial jurisdiction of a United States court over an allegation against an Indonesian government institution, eq [sic] the Indonesia military, for operations taking place in Indonesia." Letter from Soemadi Brotodiningrat, Ambassador of Indon., Republic of Indon., to Richard L. Armitage, Deputy Sec'y of State, Dep't of State (July 15, 2002), ECF No. 244-5 [hereinafter ECF No. 244-5].

The Executive Branch's foreign policy concerns led Judge Oberdorfer to originally dismiss plaintiffs' ATS claims. *Exxon Mobil Corp.*, 393 F. Supp. 2d at 22–27. Exxon then asked the D.C. Circuit to entertain an interlocutory appeal or to grant a writ of mandamus compelling this Court to dismiss plaintiffs' common law tort claims. The D.C. Circuit declined. *Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007). Exxon petitioned for certiorari with respect to the common law tort claims, and the U.S. government filed an amicus brief urging the Supreme Court to deny the petition. The government's brief reiterated its position that the District Court "reach[ed] the result the United States had advocated with respect to respondents' ATS claims" when it dismissed those claims. Brief for the United States as Amicus Curiae at 8, 16–18, *Exxon Mobil Corp. v. Doe*, 554 U.S. 909 (2008) (No. 07-81). The U.S. government's 2008 brief makes clear the executive branch opposed plaintiffs' ATS claims and supported Judge Oberdorfer's dismissal of those ATS claims in light of the executive branch's concerns.

Thus, the executive branch has repeatedly articulated its concern that allowing plaintiffs' ATS claims to proceed would harm U.S. foreign policy interests. Recently, Indonesia reaffirmed its position that it considers this litigation to be a severe affront to its sovereignty. Letter from the Embassy of the Republic of Indon. to W. Patrick Murphy, Principal Deputy Assistant Sec'y for Southeast Asia, Dep't of State (Sept. 25, 2018), ECF No. 644 [hereinafter 2018 Letter from the Embassy of the Republic of Indonesia]. Indonesia has expressed a fear that this litigation will have

a negative economic impact on the country and could destabilize hard-won peace and reconciliation efforts in the Aceh Province. *See id.*; ECF No. 91-1, at 2; ECF No. 244-5; Diplomatic Note No. 120/II/07/05/DN (Feb. 1, 2007), Ex. O, *John Doe VIII v. Exxon Mobil Corp.*, 658 F. Supp. 2d 131 (D.D.C. 2009) (No. 07-1022), ECF No. 20-16 [hereinafter Diplomatic Note No. 120/II/07/05/DN (Feb. 1, 2007)]; Letter from the Embassy of the Republic of Indonesia to Kurt Campbell, Assistant Sec'y of State, Dep't of State (Jan. 24, 2011), *John Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011) (No. 09-7125), Doc. No. 1289979 [hereinafter 2011 Letter from the Embassy of the Republic of Indonesia]. Further, Indonesia has repeatedly stated that this litigation will harm U.S.–Indonesian relations. *See* 2018 Letter from the Embassy of the Republic of Indonesia; ECF No. 91-1, at 2; ECF No. 244-5; Diplomatic Note No. 120/II/07/05/DN (Feb. 1, 2007); 2011 Letter from the Embassy of the Republic of Indonesia.

The "courts are not well suited to make the required policy judgments that are implicated by corporate liability in cases like this one." *Jesner*, 138 S. Ct. at 1407. As the Supreme Court recognized in *Sosa*, *Kiobel*, and *Jesner*, judicial caution should lead courts to defer to the political branches in cases like this, rather than triggering serious foreign policy consequences. Indeed, foreign policy and national security decisions are delicate and complex, and the Judiciary does not have the institutional capacity or responsibility to weigh foreign policy concerns. *See id.* at 1414; *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). Foreign affairs questions are reserved for the political branches. These separation of powers concerns caution this Court against recognizing domestic corporate liability under the ATS in circumstances where, as here, the claims have raised serious foreign relations concerns.

This case has already caused significant diplomatic strife. This is the type of foreign relations tension the First Congress sought to avoid when passing the ATS. The First Congress

enacted the ATS to "provide a forum for adjudicating that 'narrow set of violations of the law of nations' that, if left unaddressed, 'threaten[ed] serious consequences' for the United States." *Jesner*, 138 S. Ct. at 1410 (Alito, J., concurring) (quoting *Sosa*. 542 U.S. at 715). Accordingly, the ATS's purpose was to avoid diplomatic tensions. However, these ATS claims against Exxon have provoked diplomatic strife. Thus, allowing these ATS claims against Exxon to proceed would be contrary to the fundamental purpose of the ATS. The Court must decline to extend a judicially created cause of action to Exxon in this case.

    2.    *Sosa*'s *two-part test requires the Court to find that Exxon cannot be held liable under the ATS*

Both prongs of *Sosa*'s two-part test require the Court to decline to recognize domestic corporate liability under the ATS in this suit.

    a.    *Sosa*'s step one

The Court must determine whether plaintiffs can demonstrate that the alleged violation is a specific, universal, and obligatory international norm. The *Sosa* Court specified in a footnote that "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa*, 542 U.S. at 732 n.20. This footnote has sparked significant disagreement. The Second Circuit in *Kiobel* interpreted this footnote by looking to international law to determine whether there is a norm of corporate liability. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 125–31 (2d Cir. 2010). Other circuits—including the D.C. Circuit in its now vacated opinion in this case—have instead determined that corporate liability is a remedial consideration rather than a substantive principle, and found international law leaves questions of remedies open for determination under domestic law. *See Exxon Mobil Corp.*, 654 F.3d at 41; *Flomo v. Firestone Nat. Rubber Co.*, 643 F.3d 1013, 1017–21 (7th Cir. 2011); *Romero v.*

*Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008); *Serei v. Rio Tinto, PLC*, 550 F.3d 822, 831 (9th Cir. 2008) (en banc). Although the Supreme Court did not resolve this dispute in *Jesner*, the plurality opinion cast significant doubt on the interpretation that corporate liability is a remedial consideration. The *Jesner* Court stated "[t]here is considerable force and weight to the position articulated by Judge Cabranes" in the Second Circuit's *Kiobel* opinion, and explained "it is far from obvious why the question whether corporations may be held liable for international crimes of their employees is a mere question of remedy." *Jesner*, 138 S. Ct. at 1400, 1402.

The Court interprets the *Sosa* footnote to mean that this Court must look to international law to determine who can be sued under the ATS. The Supreme Court declared that the "scope of liability" is governed by international law. *Sosa*, 542 U.S. at 732 n.20. This means that courts are required to look to international law to assess their jurisdiction over ATS claims against a particular class of defendant, such as corporations. *Kiobel*, 621 F.3d at 127–28; *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 81–85 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013). "It is inconceivable that a defendant who is *not liable* under customary international law could be *liable* under the ATS." *Kiobel*, 621 F.3d at 122.

Moreover, if corporate liability depended on domestic law instead of international law, this could result in a lack of uniformity among nations, defying *Sosa*'s concerns about international comity. *See Sosa*, 542 U.S. at 733 n.21 (suggesting it may be necessary for courts to apply limiting doctrines designed to promote international comity, such as the act of state doctrine and a requirement of exhaustion of local remedies); *see also id.* at 760–63 (Breyer, J., concurring) (emphasizing the importance of comity considerations in ATS cases).

International law does not extend liability for human rights violations to corporations. Classical international law was state-centered, and viewed public international law as consisting

of legal obligation between states. The Nuremberg tribunals in the aftermath of World War II marked a significant shift in international law. The Nuremberg trials "for the first time made explicit and unambiguous" that "individuals are responsible" for the commission of international crimes. Robert H. Jackson, Final Report to the President Concerning the Nurnberg War Crimes Trial, *reprinted in* 20 Temp. L.Q. 338, 342 (1946). Contemporary public international law now purports to regulate the conduct of individuals directly. "'The singular achievement of international law since the Second World War has come in the area of human rights,' where international law now imposes duties on individuals as well as nation-states." *Jesner*, 138 S. Ct. 1400 (quoting *Kiobel*, 621 F.3d at 118). The current principles of international law do not extend liability for human rights violations to corporations.

International human rights treaties, such as the Genocide Convention, the Convention Against Torture, the Apartheid Convention, the Convention on the Elimination of All Forms of Discrimination Against Women, and the Convention on the Rights of the Child, do not impose liability on corporations. *See* Convention on the Prevention and Punishment of the Crime of Genocide, art. IV, Dec. 9, 1948, 78 U.N.T.S. 277 ("Persons committing genocide or any other acts enumerated in article III shall be punished, whether they are constitutionally responsible rulers, public officials, or private individuals."); United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, arts. 4(1), 6(1), 6(3), Dec. 10, 1984, 1465 U.N.T.S. 85; International Convention on the Suppression and Punishment of the Crime of Apartheid, art. 3, Nov. 30, 1973, 1015 U.N.T.S. 243 (the U.S. is not a party) ("International criminal responsibility shall apply . . . to individuals, members of organizations and institutions and representatives of the State."); *see generally* Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, 1249 U.N.T.S. 13 (the U.S. is not a party)

(obligations directed to State Parties); Convention on the Rights of the Child, Nov. 20, 1989, 1577 U.N.T.S. 3 (the U.S. is not a party) (same). The Geneva Conventions do not provide for corporate liability either. *See* Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, art. 49, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, art. 50, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War, art. 129, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 146, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. The lack of duties imposed on corporations and lack of corporate liability in these treaties indicates that states have not intended for corporations to be held liable for human rights violations.

Further, customary international law does not impose liability on corporations. Customary international law, which was historically referred to as part of the "law of nations," "results from a general and consistent practice of states followed by them from a sense of legal obligation." Restatement (Third) of Foreign Relations Law § 102(2) (Am. L. Inst. 1987) [hereinafter Restatement (Third)]. States have consistently excluded corporations from the jurisdictional reach of the charters of international criminal tribunals. For example, the charter that established the International Military Tribunal at Nuremberg only provided jurisdiction to "try and punish" those "persons who, acting in the interests of the European Axis countries, whether as individuals or as members of organizations," committed specified international crimes. Agreement for Prosecution and Punishment of Major War Criminals of the European Axis, art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.TS. 280, 288. No corporations were charged or convicted in the Nuremberg trials even though many corporate executives were individually tried. *See* Jonathan A. Bush, *The Prehistory*

*of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said*,
109 Colum. L. Rev. 1094, 1098 (2009). Subsequently, a U.S. Military Tribunal prosecuted twenty-four executives of the German corporation I.G. Farben. 7 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 11–60 (1952). I.G. Farben's employees operated a slave-labor camp at Auschwitz and "knowingly and intentionally manufactured and provided" the poison gas used in the Nazi gas chambers, among other crimes. *Jesner*, 138 S. Ct. at 1400 (quoting *Kiobel*, 621 F.3d at 135). The Tribunal specifically emphasized:

> the corporate, Farben, is not before the bar of this Tribunal and cannot be subjected to criminal penalties in these proceedings. We have used the term "Farben" as descriptive of the instrumentality of cohesion in the name of which the enumerated acts of spoliation were committed. But corporations act through individuals and, under the conception of personal individual guilt . . . the prosecution, to discharge the burden imposed upon it in this case, must establish by competent proof beyond a reasonable doubt that an individual defendant was either a participant in the illegal act or that, being aware thereof, he authorized or approved it.

8 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1153 (1952).

Recent international tribunals have also limited liability to "natural persons." *See* Statute of the International Criminal Tribunal for the former Yugoslavia, arts. 2-6, S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993); Statute of the International Criminal Tribunal for Rwanda, arts. 2-5, S.C. Res. 955, U.N. Doc. S/RES/955 (Nov. 8, 1994). The Rome Statute of the International Criminal Court limits that tribunal's jurisdiction to "natural persons," too. *See* Rome Statute of the International Criminal Court, art. 25(1), July 17, 1998, 2187 U. N. T. S. 90. The drafters of the Rome Statute considered a proposal to give the International Criminal Court (ICC) jurisdiction over corporations, but ultimately rejected this proposal. *Jesner*, 138 S. Ct. at 1401; Albin Eser, *Individual Criminal Responsibility, in* 1 The Rome Statute of the International Criminal Court: A Commentary 767, 778–79 (Antonio Cassese et al. eds. 2002). The absence of jurisdiction over

corporations in these international tribunals and in the ICC reflects a decision by the international community not to extend criminal liability to corporations for war crimes and human rights violations.

In addition, a U.N. Report from 2007 concluded that "States have been unwilling to adopt binding international human rights standards for corporations." John Ruggie (Special Representative of the Secretary-General), *Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and Other Business Enterprises*, ¶ 44, U.N. Doc. A/HRC/4/35 (Feb. 19, 2007).

Finally, while many nations may subject corporations to liability in their domestic legal systems, there is no indication that nations have enacted domestic corporate liability rules out of a sense of mutual legal obligation towards other states. *See Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980) ("[T]he mere fact that every nation's municipal law may prohibit theft does not incorporate 'the Eighth Commandment, 'Thou Shalt not steal' . . . (into) the law of nations.' It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the [ATS] statute.") (quoting *IIT v. Vencap*, 519 F.2d 1001, 1015 (2d Cir. 1975)); Restatement (Third) § 102 cmt. c (1987) ("For a practice of states to become a rule of customary international law it must appear that the states follow the practice from a sense of legal obligation (*opinio juris sive necessitatis*).").

Thus, international law has not extended the scope of liability to corporations. Accordingly, there is not a specific, universal, and obligatory norm of corporate liability under currently prevailing international law as required by *Sosa* for ATS cases. Plaintiffs cannot maintain their ATS claims against Exxon, a corporation.

b.    *Sosa*'s step two

Under the second part of *Sosa*'s test, the Court must determine whether allowing the case to proceed under the ATS is a proper exercise of judicial discretion, "or instead whether caution requires the political branches to grant specific authority before corporate liability can be imposed." *Jesner*, 138 S. Ct. at 1399.

As noted in Section III(B), the Supreme Court has repeatedly expressed reluctance to extend judicially created private rights of action. "[A] decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Sosa*, 542 U.S. at 727. In *Jesner*, the Court noted "[t]his caution extends to the question whether the courts should exercise the judicial authority to mandate a rule that imposes liability upon artificial entities like corporations." *Jesner*, 138 S. Ct. at 1402–03. The *Jesner* Court specifically looked to its own refusal to extend *Bivens* actions, which are implied causes of action for damages against federal officers alleged to have violated a citizen's constitutional rights, to encompass corporate liability as an example of this reluctance. *Id.*; *see Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). Indeed, *Bivens* actions are similar to ATS suits in that both involve judicial inferences of causes of action. *See Sosa*, 542 U.S. at 742 (Scalia, J., concurring).

In *Malesko*, the plaintiff sought to bring a *Bivens* action against a corporation operating a halfway house. *Malesko*, 534 U.S. at 63–66. The Court determined that *Bivens* actions against an individual are "fundamentally different from" claims against the individual's corporate employer. *Id.* at 70. Allowing corporate liability would have been "a marked extension of *Bivens,* to contexts that would not advance *Bivens'* core purpose of deterring individual officers from engaging in unconstitutional wrongdoing." *Id.* at 74. Thus, the *Malesko* Court held that corporate defendants

could not be held liable in *Bivens* actions. *Id.* The Court determined that the question of whether to subject corporate defendants to suit was "a question for Congress, not us, to decide." *Id.* at 72.

Further, courts often look to analogous statutes for guidance in interpreting the boundaries of judge-made causes of action. *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 24 (1990); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 (1975). In *Sosa*, the Supreme Court emphasized that courts should "look for legislative guidance before exercising innovative authority over substantive law" in ATS cases. *Sosa*, 542 U.S. at 726. The relevant statute here, as the plurality opinion in *Jesner* noted, is the TVPA. The TVPA is the only cause of action under the ATS that Congress, rather than the courts, created. The TVPA supplies a civil cause of action to U.S. citizens and aliens for torture and extrajudicial killing. Torture Victim Protection Act of 1991, Pub. L. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). The plurality in *Jesner* declared "[t]he TVPA reflects Congress' considered judgment of the proper structure for a right of action under the ATS. Absent a compelling justification, courts should not deviate from that model." *Jesner*, 138 S. Ct. at 1403.

The TVPA limits liability to "individuals." 28 U.S.C. § 1350 note. The TVPA authorizes a civil action for recovery of damages from "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation—(1) subjects an individual to torture . . . ; or (2) subjects an individual to extrajudicial killing." *Id.* The Supreme Court in *Mohamad* determined that the word "individual" in the TVPA carried its ordinary meaning, and therefore held the TVPA limits liability to natural persons. *Mohamad*, 556 U.S. at 453–56. The Court agrees with the *Jesner* plurality that it is proper to follow "Congress' decision to exclude liability for corporations in actions brought under the TVPA" in this case. *Jesner*, 138 S. Ct. at 1404. It would be inconsistent

with the delicate foreign policy decisions that Congress made in defining the scope of the TVPA if this Court created a remedy broader than the one established by Congress in this case. *Id.*

Also, judicially recognizing causes of action against corporations under the ATS—at least in regard to torture and extrajudicial killing—would create a significant anomaly. The TVPA reflects Congress' decision to limit the circumstances under which U.S. citizens and aliens can sue for torture and extrajudicial killing. "It would be odd and incongruous to disregard those limits in defining when aliens may sue for torture and extrajudicial killing under the ATS. Put simply, *Sosa* told courts in ATS cases to look to Congress for guidance, and Congress has specifically delineated what limits should attach to civil suits for torture and extrajudicial killing." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 88 (D.C. Cir. 2011), (Kavanaugh, J., dissenting), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013). This leads the Court to believe "it makes eminent sense to fashion the ATS so that aliens cannot recover in U.S. court for torture and extrajudicial killing in circumstances where U.S. citizens could not recover in U.S. court for torture and extrajudicial killing." *Id.*

In addition, the Court finds that many of the points made by the *Jesner* plurality about the practical reasons that counsel against courts permitting foreign corporate liability under the ATS also applies to domestic corporate liability. First, corporate liability under the ATS is not essential to serve the goals of the statute. *Jesner*, 138 S. Ct. at 1405. Plaintiffs can still sue individual corporate employees responsible under the ATS for a violation of international law. If courts allow corporations to be liable under the ATS for violations of international law, "then plaintiffs may well ignore the human perpetrators and concentrate instead on multinational corporate entities." *Id.* Second, allowing plaintiffs to sue corporations under the ATS could discourage U.S. corporations from investing abroad, including in developing economies where the governments

may have histories of alleged human-rights violations. "And, in consequence, that often might deter the active corporate investment that contributes to the economic development that so often is an essential foundation for human rights." *Id.* at 1406. Third, Congress is better suited than the Judiciary to examine the difficult and complex policy questions about whether to impose liability on corporations. As the plurality in *Jesner* pointed out, "natural persons can and do use corporations for sinister purposes, including conduct that violates international law . . . [s]o there are strong arguments for permitting the victims to seek relief from corporations themselves." *Id.* The multifaceted nature of this issue makes it especially important that Congress determine whether corporations can be sued for violating international law. "Congress, not the Judiciary, is the branch with 'the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident.'" *Id.* (quoting *Kiobel*, 569 U.S. at 116). Therefore, Congress is in a better position to determine whether to impose corporate liability, and how to do so if it so chooses. *Id.* at 1406–08.

Finally, as discussed in detail in Section III(C)(i), this case has caused significant diplomatic strife. This is the type of foreign relations tension the First Congress sought to avoid when passing the ATS. Plaintiffs have caused foreign relations tensions by using the ATS as a sword in this case, but the ATS was enacted to shield the U.S. from such diplomatic imbroglios. As the Supreme Court stated in *Jesner*, "judicial caution under *Sosa* 'guards against our courts triggering . . . serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches.'" *Id.* at 1407 (quoting *Kiobel*, 569 U.S. at 124).

Therefore, under *Sosa*'s second question, this Court finds that caution requires the political branches to grant specific authority before domestic corporate liability against Exxon can be imposed. Recognizing corporate liability under the ATS in this case could have adverse foreign

policy consequences and raises significant separation of powers concerns. The Court declines to extend liability under the ATS to corporate defendants absent congressional instructions in circumstances where, as here, the claims have cause significant diplomatic strife.

## IV. Conclusion

The Supreme Court's prior precedents counsel against creating a private right of action in this case. International law has not extended the scope of liability to corporations. Accordingly, there is not a specific, universal, and obligatory norm of corporate liability under currently prevailing international law as required by *Sosa* for ATS cases. Also, separation of powers and foreign relations concerns lead the Court to decline to recognize domestic corporate liability under the ATS in circumstances where, as here, the claims have caused significant diplomatic strife. The Court will **DISMISS** plaintiffs' ATS claims against Exxon. Plaintiffs only remaining claims are therefore the claims for wrongful death; battery; assault; arbitrary arrest, detention, and false imprisonment; negligence, negligent hiring; negligent supervision; and conversion. These tort claims are governed by Indonesian law. A separate order will follow.

SIGNED this ___3rd___ day of June, 2019.

Royce C. Lamberth

United States District Judge