REDACTED PUBLIC COPY

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, *et al.*, | ) |
| | ) |
| Plaintiffs, | )   Civil Action No. 01-1357 (RCL/AK) |
| | ) |
| v. | ) |
| | ) |
| EXXON MOBIL CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
### OF MOTION TO COMPEL DISCOVERY AND IMPOSE SANCTIONS
### AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SANCTIONS

REDACTED PUBLIC COPY

## TABLE OF CONTENTS

I.  THE CONDUCT AT THE EMOI RULE 30(B)(6) DEPOSITION. ................................. 3

    A.  The Events Preceding the Deposition. .................................................... 3

    B.  The Rule 30(b)(6) Deposition. ............................................................... 5

II.  THE REQUESTED SANCTIONS PROVIDE APPROPRIATE RELIEF. ..................... 36

III.  DEFENDANTS' CROSS-MOTION FOR SANCTIONS IS FRIVOLOUS. .................. 39

REDACTED PUBLIC COPY

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alexander v. FBI*,
    186 F.R.D. 144 (D.D.C. 1999) ....................................................................................35

*Brazos River Auth. v. GE Ionics, Inc.*,
    469 F.3d 416 (5th Cir. 2006) .....................................................................................35

*Cobell v. Babbitt*,
    37 F. Supp. 2d 6 (D.D.C. 1999) .................................................................................36

*Covad Comm. Co. v. Revonet, Inc.*,
    267 F.R.D. 14 (D.D.C. 2010) ....................................................................................35

*Kirschner v. Broadhead*,
    671 F.2d 1034 (7th Cir. 1982) ...................................................................................42

*In re Neurontin Antitrust Litig.*,
    MDL No. 1479, 2011 WL 2357793 (D.N.J. June 9, 2011) ...............................19, 35

*NGM Ins. Co. v. Walker Constr. & Dev., LLC*,
    No. 1:11-CV-146, 2012 WL 6553272 (E.D. Tenn. Dec. 13, 2012) ..........................42

*QBE Insur. Corp. v. Jorda Enterprises, Inc.*,
    277 F.R.D. 676 (S.D. Fla. 2012) .................................................................................6

*REC Marine Logistics, LLC v. Richard*,
    No. 19-11149, 2020 WL 2508006 (E.D. La. May 15, 2020) .....................................35

*Sony Elec., Inc. v. Soundview Tech., Inc.*,
    217 F.R.D. 104 (D. Conn. 2002) ...............................................................................35

*Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*,
    No. 13-0366, 2015 WL 9311968 (E.D. La. 2015) ....................................................41

*U.S. EEOC v. Mattress Firm, Inc,.*
    No 2:13-c745-GMN-VCF, 2014 WL 5470470 (D. Nev. Oct. 27, 2014) ....................1

*United States v. All Assets Held, etc.*,
    No. 04-cv-798, 2017 WL 4183450 (D.D.C. Sept. 20, 2017) ....................................35

*United States v. Taylor*,
    166 F.R.D. 356 (M.D.N.C. 1996) ...............................................................................6

REDACTED PUBLIC COPY

*In re Vitamins Antitrust Litig.*,
   216 F.R.D. 168 (D.D.C. 2003)..............................................................................6

*Webb v. Dist. of Columbia*,
   146 F.3d 964 (D.C. Cir. 1998)...........................................................................36

**OTHER AUTHORITIES**

7 Moore's Fed. Prac., § 30.25 (2021 ed.) ................................................................6, 35

Fed. R. Civ. P. 30(c)(1)...................................................................................1, 8, 41

Fed. R. Civ. P. 30(c)(2)..........................................................................................37

Fed. R. Civ. P. 30(d)(2)..........................................................................................21

Fed. R. Civ. P. 30(b)(6)..............................1, 3, 4, 5, 6, 7, 13, 19, 35, 36, 38, 39, 40, 43

Thomas A. Mauet, Trial Techniques and Trials (6th ed. 2002)..........................................8

**REDACTED PUBLIC COPY**

The fundamental commands of Rule 30 of the Federal Rules of Civil Procedure could not be clearer:

> Rule 30 implements Rule 1's goals by prescribing how attorneys should behave in connection with depositions. The Rule provides that "*examination and cross-examination of a deponent proceed as they would at trial*." Fed. R. Civ. P. 30(c)(1). Two things are implicit in the Rule 30's command that depositions must "proceed as [it] would at trial." First, attorneys must follow the same procedures as they would at trial. *See* Advisory Committee Notes, 1993 Amendments (discussing direct examination, cross examination, and objections). Second, attorneys must conduct themselves as they would at trial. *Id.* ("[C]ounsel should not engage in any conduct … that would not be allowed in the presence of a judicial officer.").[1]

Defendant EMOI, its Rule 30(b)(6) representative and its counsel repeatedly violated these commands. They engaged in conduct that would never be permitted in a courtroom or in the presence of a judicial officer. And the fundamental tactics they employed were pre-planned and continued throughout the deposition despite numerous cautions to correct this behavior.

In more than 35 years of practice on behalf of both plaintiffs and defendants, Plaintiffs' counsel, Mr. Pierson, has dealt with a broad spectrum of litigation behavior. "Ordinary" misbehavior from counsel is usually dealt with among attorneys, with letters and conversation. In his career, he has *never* filed a sanctions motion before now, and Plaintiffs do not do so lightly here. But Defendant's conduct, if countenanced, would completely defeat the purposes of a Rule 30(b)(6) deposition. And it not only obstructed that deposition, it made it impossible to proceed with the scheduled EMC Rule 30(b)(6) deposition authorized by the Court, which would have featured the same witness and Defense counsel. In fact, the Opposition Brief's ("Opp. Brief's") attempt to recharacterize what occurred at the EMOI deposition – and its inclusion of a frivolous

---

[1] *U.S. EEOC v. Mattress Firm, Inc.*, No 2:13-c745-GMN-VCF, 2014 WL 5470470, at *1 (D. Nev. Oct. 27, 2014) (emphasis added) (alterations in original).

cross-motion for sanctions – eliminates any doubt they would have engaged in exactly the same misconduct at the EMC deposition.

The discussion that follows will review in detail the way this deposition unfolded and respond to the myriad claims asserted in the Opp. Brief.  But both the transcript and the video of the deposition make each of the following points clear:

1.      The Defendant's witness *repeatedly* ignored the actual questions posed and instead read scripted answers that were clearly improper.  This evasive and improper strategy was pre-planned and repeatedly encouraged and assisted by Defense counsel.  It persisted despite multiple requests to answer the specific questions posed.

2.      The witness implemented this strategy, reading verbatim from *undisclosed* materials apparently in front of him, with the knowledge of Defense counsel, in direct violation of this Court's Order governing the conduct of depositions.

3.      The witness's evasion was compounded by repeated failures to provide straightforward and honest answers to the simple follow-up questions posed about his lengthy narratives:  was the witness reading his answer verbatim and, if so, who wrote the words he was uttering?  The witness – an attorney – and his counsel knew the honest answer to these questions, but the witness went to great length to claim he was just "relying on his notes" or simply quoting from deposition transcripts.  These words were carefully chosen, and repeated over and over, in an effort to suggest the witness had not simply read his answer, which he *knew* was exactly what he had done.

4.      Defense counsel was not only complicit in this, but also engaged in highly improper conduct which included, *inter alia*, representing on the record that Plaintiffs' counsel was ███████, ███████ and ██████ at Defense counsel.  This was false.  The Opp. Brief

**REDACTED PUBLIC COPY**

does not dispute this or make any effort to defend this conduct.  Instead, it doubles-down, now representing that Plaintiffs' counsel was "unhinged" among many other recriminations.  None of this is true.

5.      Although all of this is sanctionable, the Opp. Brief makes this even worse by adding – almost as an afterthought – frivolous claims seeking sanctions against *Plaintiffs'* counsel.  The Opp. Brief asserts these baseless claims despite Defendant's knowledge that ██████████████████████████████████████████████████ Plaintiffs' Brief ("Pls.' Br."), Dkt. 777, Exh. B, Snell Dep. Tr. at 58:19-21 (hereinafter "Dep.").

The following discussion begins by reviewing in detail the conduct at the deposition and the defenses and accusations in the Opp. Brief and cross-motion.  *Point I*. We then address the appropriate sanction for Defendant's misconduct.  *Point II*.  We close with additional comments on Defendant's frivolous cross-motion for sanctions.  *Point III*.

## I.      THE CONDUCT AT THE EMOI RULE 30(B)(6) DEPOSITION.

### A.      The Events Preceding the Deposition.

The Opp. Brief does not seriously dispute the relevant events that preceded the EMOI Rule 30(b)(6) deposition.  When Phase 2 discovery commenced, Plaintiffs served deposition notices for EMOI and EMC Rule 30(b)(6) depositions.  In the conferences and communications that followed, Defendants declined to discuss the scope of the deposition topics, stating that this was "non-negotiable" and categorically opposing the depositions.  This necessitated a motion to compel, the Court's Order of August 10, 2020 (Dkt. 720), and the Court's subsequent Order of October 14, 2020 (Dkt. 758).[2]

---

[2] The Opp. Brief makes other claims about events preceding the deposition (Opp. Br. at 5), that simply repeat arguments Defendants' made when they unsuccessfully tried to prevent these

The Opp. Brief does not dispute any of the events that followed:

\*        On October 22, 2020, the parties conferred about the Rule 30(b)(6) depositions pursuant to this Court's Order.  Defendants declined to agree to *any* of the noticed topics (which had now been pending before them since February), and would not discuss the scope of any of the topics.

\*        Confronted with this, Plaintiffs spent the weekend unilaterally revising and narrowing the topics.  The Defendants subsequently acknowledged they were "gratified" that Plaintiffs had "served drastically revised Rule 30(b)(6) notices from the originals served in February." Pls.' Br., Exh. J at 1. Plaintiffs also agreed, with limited exceptions, to restrict questioning to matters in a confined time period.  Despite this, when the parties conferred a second time – on October 26 – the Defendants were again unwilling to discuss the scope of any of the noticed topics.

\*        On October 30, the Defendants served objections.  Defendants stated that subject to their general objections, "EMOI will designate a witness to respond to questions [on each Topic] that are not duplicative of those asked at the Previous Deposition."[3] *Id.*

\*        The Court's Order established a November 9, 2020 deadline for "any motion for a protective order to further limit the scope of the Rule 30(b)(6) depositions."  Dkt. 758 at 5. Defendants did not file a motion.

depositions from going forward.  These arguments have been addressed previously.  *See* Dkt. 702 & Dkt. 706.

[3] The Court's October 14, 2020 Order provides that "plaintiffs may not re-ask questions to which a responsive answer was provided in a previous 30(b)(6) deposition of the same corporation."  Dkt. 758 at 4.  Plaintiffs have strictly complied with this.

**REDACTED PUBLIC COPY**

Given these facts, there is no basis in law for Defendants to complain about the scope of any noticed topic.[4] Defendants had repeated opportunities and *invitations* to confer about any of the noticed topics and would not do so. They had a Court-ordered deadline to file an motion to "further limit the scope of the Rule 30(b)(6) depositions" and decided this was unwarranted. Instead, they agreed to go forward with the depositions as noticed.

### B.    The Rule 30(b)(6) Deposition.

At the deposition, Defendant EMOI made a tactical decision to use an attorney as its witness who was not in Indonesia until many years after the period at issue and had no personal knowledge of the relevant facts (the vast majority of which pertain to events during a limited 2 l/2-year time period). Contrary to the claim in the Opp. Brief, Defendants had ready access to employees knowledgeable about that period.[5] But if they had been proffered under Rule

---

[4] As Defendants do not dispute this history, the assertion that "Plaintiffs demanded that Exxon prepare the witness to respond" to each of the "broad" noticed topics (Opp. Br. at 27) is highly misleading. As explained above, Plaintiffs urged Defendants on multiple occasions to confer about *any* noticed topic that raised concern and Defendants repeatedly declined to do so.

[5] EMOI's CEO, Ron Wilson, was in Indonesia *throughout* the relevant period but, when he was deposed as a fact witness, Mr. Wilson went to extraordinary lengths even to question the authenticity of documents bearing his signature and e-mails from Defendants' records that he had sent or received. *See, e.g.*:

- Exh. A (Deposition of Ron Wilson) at 86:20-25 (Letter on MOI stationary signed by Wilson and discussing ███████████████████ Wilson testifies that ████████████████████████████████████████████████ ;

- *id.* at 98:9-10 (Wilson is asked whether e-mail from him produced from Exxon's records is an e-mail he wrote on May 9, 1999; he testifies that ████████████████████ ███ );

- *id.* at 112:2-8 & 114:14-115:4 (Wilson is asked about e-mail from him produced from Exxon's records is an e-mail he wrote and testifies ████████████████████ ████████████ );

- *id.* at 121:15-21 (Wilson is asked about another e-mail he authored and testifies ███████ ████████████████████████████████ );

30(b)(6), they would have been required to provide "full, complete and *non-evasive answers*" to

questions posed regarding the relevant subject matter.[6]  Instead, Defendants made a tactical

---

- *id.* at 140:8-10 (Wilson is asked about letter with his signature and testifies ████████ ████████ );
- *id.* at 174:18-19 (Wilson is asked about e-mail from him produced from Exxon's records and testifies ████████ ████████ ).

As Defendants are aware, if Mr. Wilson had appeared as *a Rule 30(b)(6) witness* to testify about the 2 l/2 year period at issue, he would have been *obligated* to respond to questions with factual information "known or reasonably available" to both EMOI and himself during the 2 l/2 year period covered, rather than question the authenticity of his own records.  Defendants avoided this by using an attorney with no personal knowledge, who spoke with Mr. Wilson, but then conveyed little or no substantive information beyond the scripts that were written by or with defense counsel.

Similarly, Defendants' Rule 26(a)(1) disclosures also identified witnesses such as Maman Budiman, Tommy Chong, Ahmad Judin and Karimuddin Thahir as "likely to have discoverable information" about this 2 l/2 year period, including "Defendants' activities (or lack thereof) in or relating to Aceh, Indonesia; Defendants' involvement (or lack thereof) in the events alleged by Plaintiffs; Defendants' relationship (or lack thereof) with the Indonesian military; security and stability in Aceh, Indonesia" and the "relationship and communications (or lack thereof) between Defendants."  Exh. B.  Defendants previously advised Plaintiffs that they had attorney-client relationships with each of these fact witnesses and would produce them for depositions.  But Defendants subsequently retracted that position and their Rule 30(b)(6) designee did not speak with any of these individuals.  *See, e.g., In re Vitamins Antitrust Litig.*, 216 F.R.D. 168, 173 (D.D.C. 2003) (citing cases indicating that Rule 30(b)(6) designee must be prepared to testify about matters reasonably available to corporation, "whether from documents, past employees, or other sources" (quoting *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C.1996))); *see generally* 7 Moore's Fed. Prac., § 30.25 at 5 (setting forth responsibilities of Rule 30(b)(6) designee); *accord QBE Insur. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 689 (S.D. Fla. 2012) (cited in Opp. Brief) (indicating, *inter alia*, that corporation must prepare witness to testify "non-evasively" and witness must provide responsive information "reasonably known" to the organization).

In short, Defendants have avoided Rule 30(b)(6) testimony by knowledgeable witnesses who would be subject to the Rule's requirements about events in a relatively confined time period, and instead complained that the witness it selected cannot be expected to know these matters.  That witness has then simply parroted the defense themes by reading non-responsive narratives apparently written in whole or in part by counsel.  This is completely antithetical to the purposes of Rule 30(b)(6).

[6] 7 Moore's Fed. Prac. § 30.25 at 6 (2021 ed.).

decision not to have knowledgeable witnesses used and utilized an attorney with no personal knowledge of the events at issue.

The Opp. Brief's characterization of what then ensued is flatly at odds with both the transcript and deposition video.  The Opposition would have the Court believe that the witness's testimony was "fully responsive" and provided substantive answers "to the questions posed" (Opp. Br. at 11); the witness was forthcoming about his use of "notes"; his word-for-word recitation of scripted, non-responsive answers was a minor and largely incidental feature of the deposition; and Defense counsel's conduct was appropriate and any suggestion to the contrary is "offensive" (*id.* at 23).  None of this is accurate.

Because of the seriousness of this misconduct – and its implications for the EMOI Rule 30(b)(6) deposition and resulting postponement of the EMC Rule 30(b)(6) deposition – we review this conduct in detail as it unfolded, citing the relevant deposition pages and video:

\*        **Pages 1-24.**  As the deposition began, Plaintiffs' counsel asked general background questions and defined relevant terms.  Plaintiffs' counsel then showed the witness a map of the EMOI facilities at issue simply to identify the locations that would necessarily be discussed throughout the deposition.  The witness and counsel immediately insisted that counsel identify the topics this was relevant to – a demand that was nonsensical because, as Plaintiffs' counsel explained to the witness, the purpose of the questioning was simply to identify locations that would obviously ███████████████████[7]  Dep. at 16:10-11.  Defense counsel then

───────────────────

[7] For example, multiple topics referenced the "Arun Project," which was defined to include, *inter alia*, specific Exxon facilities and housing locations at issue.  Plaintiffs could not have questioned the witness in depth about these topics without first identifying what and where those

accused Plaintiffs' counsel of ███████████████████████████████████

████████████████████████   *Id.*at 16:20-17:3; Pls.' Br., Exh. C Video 1 at 14:10-32.

\*        **Pages 25-73.**  As the questioning proceeded beyond preliminary matters, the

Defendants' "two-step" strategy quickly emerged:  (a) instead of addressing the specific question

that had been posed, the witness and Defense counsel would insist that Plaintiffs' counsel

identify the broader topic area the question fell within; and (b) the witness would then recite a

lengthy, scripted answer that often did not respond to the specific question at all, and was always

replete with *non-responsive* talking points  that would make the answer unusable or simply flood

the record with argumentation in support of EMOI's defenses.

This tactic clearly contravenes Rule 30(c)(1)'s command that "[t]he examination and

cross-examination of a deponent proceed as they would at trial under the Federal Rules of

Evidence, except Rules 103 and 615."  Needless to say, it is entirely improper for a witness to

ignore the actual question asked and instead embark on a lengthy narrative replete with non-

responsive and self-serving information.  Although this is so well-accepted and fundamental to

proper testimony that it hardly requires citation, this core principle is succinctly stated in

Professor Mauet's treatise on *Trial Techniques:*

> An answer that does not directly respond to a question is objectionable as
> unresponsive.  Where the answer goes beyond what is necessary to answer the question,
> that surplusage of the answer is objectionable.[8]

The witness and his counsel ignored these basic requirements as soon as substantive

questioning began and instead implemented their two-step strategy.  At page 25, Plaintiffs'

counsel asked: ████████████████████████████████████████████████

---

locations were (on a map provided to the witness), nor would such questioning have been
comprehensible by a jury without covering these basic background facts first.

[8] Thomas A. Mauet, Trial Techniques and Trials 488 (6th ed. 2002).

 Dep. at 25:22-25. When the witness asked which topic this fell within, Plaintiffs' counsel correctly informed him that the question fell within topics "(2) and 3(d) among others." *Id.* at 25:10-11. Defense counsel then asked that the topic be identified a second time, and then a third time. *Id.* at 26:2-3 & 26:11-14. As Plaintiffs' counsel tried to move the deposition forward, Defense counsel interjected

*Id.* at 26:18-23; Video 1 at 24:46-25:03. As the video makes perfectly clear, Defense counsel's statements were inappropriate and, in fact, just as inaccurate as Defense counsel's later representation that Plaintiffs' counsel was , and at Defense counsel. Dep. at 208:24, 210:12; Video 4 at 00:54-03:09.

As Plaintiffs' counsel was finally permitted to pose his question –

"[9] – the witness ignored the question actually posed and instead provided a litany of non-responsive statements designed to bolster EMOI's defenses, including the following assertions:

- – by which the witness meant, as made clear later in his answer, *not* who were the subject of the question – [10] .

-

---

[9] Dep. at 27:18-22 (emphasis added).

[10] At trial, Plaintiffs will show that the Defendants had legal responsibility for the conduct of the military personnel they engaged for the EMOI operations and facilities based on the doctrine of *respondeat superior* and other applicable law.

- The witness asserted that  a claim Exxon is making to support defenses about who caused Plaintiffs' injuries;

Dep. at 27:24-29:23.

*None of this information was responsive to the question that had been posed* and a non-responsive, self-serving narrative of this kind (replete with surplusage designed to bolster EMOI's defenses) would obviously be objectionable at trial. Without any plausible basis to claim this scripted narrative was proper, the Opp. Brief now asserts that the answers Snell was reciting were "fact-based, non-argumentative, and accurate." Opp. Br. at 20. This is demonstrably untrue and entirely misses the point. A witness *cannot* ignore the actual question asked and instead embark on a scripted narrative filled with non-responsive information or surplusage, regardless of how allegedly "non-argumentative" or "fact-based" those self-serving comments may be. The witness and counsel were perfectly aware of the witness's obligation to provide responsive, concise answers to the questions asked; they ignored this obligation to pad the record with non-responsive argument designed to bolster defenses that are very much in dispute.

   &ast;   The Opposition *does not dispute* that this entire speech was read from a script that *had not been disclosed* and was not visible on the screen. The Court's Order establishing the protocol for all depositions in this case could not have be clearer:

**REDACTED PUBLIC COPY**

16.    **Records Available to Witness.**  *While the deposition is on the record, the witness shall not have access to any form of information related to the litigation other than exhibits specifically marked and identified for the record by either side*, including but not limited to the internet, phones or other devices or *materials that contain any notes, files or documents that relate to the subject matter of the litigation*. …

Dkt. 750 at 8.  The failure to comply with this could hardly be more egregious, as this witness did not simply have access to "information related to the litigation" while the deposition was on the record, but was reading his testimony verbatim from his undisclosed script.[11]

The Opp. Brief has no colorable basis for defending this conduct.  It is undisputed that this script was neither disclosed nor marked when the deposition went "on the record."  It is undisputed that as the deposition then continued on the record, the script remained undisclosed even as the witness read his answer verbatim at pages 27-29 of the transcript.  It was *only* after Plaintiffs' counsel observed the witness looking at something off camera (and giving such a lengthy and non-responsive narrative) that *Plaintiffs' counsel* confronted the witness and asked if he was ███████████████  (Dep. at 30:8-9).  This was a fact the witness could not deny without perjuring himself.

Without disputing any of this, the Opp. Brief claims that the Order's explicit prohibition against using undisclosed materials "[w]hile the deposition is on the record" means something other than the obvious.  The Opp. Brief seems to suggest that the Court's Order permits a witness to have access to whatever material they like while the deposition is ongoing – including an undisclosed script used to answer questions verbatim – as long as the material is disclosed after all questioning is completed and the deposition is over.  That is so obviously contrary to the

---

[11] In addition to being a violation of the Court's Order, this failure to disclose is also a particularly cynical and inexcusable exploitation of the circumstances of a global pandemic. Remote depositions require heightened professional courtesy and trust between opposing counsel, and this behavior is a radical breach of both.

explicit terms and purpose of this Court's Order that it requires no further response. To state the matter succinctly: the witness knowingly and deliberately had access to undisclosed information "[w]hile the deposition [was] on the record" and, in fact, read at length from that undisclosed information, verbatim, in the guise of testimony. And counsel knew he was doing this. That is a clear violation of this Court's Order.[12]

        *       After observing the witness looking down while answering, Plaintiffs' counsel quite appropriately tried to determine if the witness was reading his answer and, if so, who had written the words he was uttering. Dep. at 30:8-31:16. Asked if he was ███████████ ████████████, he responded ████████████[13] Id. at 30:10. After testifying that these "notes" were a ██████████████████████████████████████████ he was asked if the answer he just read was ████████████████████████ and responded ████████████████ ████████████████ Id. at 30:16-17, 31:9-10. He was then asked specifically if he wrote the words he had just testified ████████████████████████ Id. at 31:11-12. He did not answer the question directly and instead repeated that the "notes" were ████████████████████████████████████ Id. at 31:14-16.

---

[12] The Opp. Brief asserts that "Plaintiffs grudgingly admit that Mr. Snell's notes were marked for the record, as required by the Deposition Protocol. That is the end of the matter." Opp. Br. at 15 (citation omitted). What the Opp. Brief characterizes as an "admission," is *exactly the opposite*. Notwithstanding the clear terms of this Court's Order, the transcript makes clear that (a) the witness was using these materials while the deposition was on the record without disclosure by the witness or defense counsel marking them as exhibits; (b) the existence of these materials was only admitted because of Plaintiffs' counsel observations of the witness and ensuing questions; and (c) the materials were not produced until all questioning was completed and the deposition was off the record. Dep. at 362:14-15. The Opp. Brief's alternative claim that "defense counsel, unprompted" offered to produce the script (Opp. Br. at 10) is equally specious and is addressed *infra* at n.18 as we describe the events as they unfolded.

[13] Note that this answer does not squarely address the question of whether he was reading his answer verbatim from a script, *contra* Opp. Br. at 3, 10. The ordinary usage of "notes" in this context would suggest a loose collection of reminders, not a word-for-word script. The answer is evasive, not "fully transparent," Opp Br. at 10.

Plaintiffs' counsel then tried again to get a responsive answer to the previous question regarding information about human rights abuses by the Indonesian military provided to EMOI's senior management. Instead of answering the question, the witness *again* looked down and apparently read verbatim from his script with still more non-responsive statements designed to bolster EMOI's defenses.[14]

The Defendant's "two-step" – and, in particular, the use of scripted testimony to flood the record with non-responsive statements that may aid the defense – had now become obvious and would impact everything that followed in this deposition. As this became clear, Plaintiffs' counsel objected that these long, scripted narratives were non-responsive, amounted to filibustering and were improper and sanctionable. The witness was asked ██████████████ ████████████████████ Dep. at 34:23-24. Defense counsel responded that ████████ ████████████████████████ (*Id.* at 35:7-9; Video 1 at 33:10-14) and made it clear that this conduct would continue.

At page 37, Plaintiffs' counsel again attempted to ask a specific and entirely appropriate question about whether EMOI took steps to inform its senior management of the information published by the State Department in its annual report about human rights practices in Indonesia.[15] Defense counsel again commenced their two-step, asking counsel to identify the

---

[14] While the witness has been asked directly about information about human rights abuses by the military that was provided to EMOI's senior management, he ignores this question and asserts that █████████████████████████████████████████████████████ ████████████████████████████████████████████████████ and (d) the witness then began to provide non-responsive examples to support these defenses. Dep. at 32:19-34:8. None of this was responsive to the pending question.

[15] This question was plainly within the scope of Topic 2: "Your knowledge of abuses, including human rights abuses" by "Indonesian military personnel, including any history or reputation for such abuses." Pls.' Br., Exh. E at 3. The specific question posed concerned the

**REDACTED PUBLIC COPY**

topic number this fell under.  Plaintiffs' counsel appropriately responds that ███████

███████████████████████████████████████████

███████████  Dep. at 39-12-15.  Defense counsel then interjected ███████

████████████████████████████████████████

███████  *Id.* at 39:16-19; Video 1 at 36:18-25.  As Plaintiffs' counsel continued to try to get an

answer, Defense counsel – with the witness's cooperation – spent the next five pages of the

deposition interrupting, preventing the witness from answering the question, and otherwise

impeding the fair examination of the witness.

At page 45, Plaintiffs' counsel again tried to determine if the information in the State

Department's 1998 Report about human rights violations by the Indonesian military was reported

to EMOI's senior management.  The witness continued to evade the question with the help of

Defense counsel's continuing improper objections and interjections.  Dep. at 47:11-51:19.  When

Plaintiffs' counsel tried to get an answer to the actual question being asked,[16] the witness

returned to the defense strategy of (apparently) reading a long, scripted narrative that was not

responsive to the pending question.  The witness did not answer whether senior management was

given the information in the State Department's 1998 Country Report and instead:

- Read from his script about ████████████████████████

- Read from the script about ██████████████████████████
  ████████████████████████

_____

U.S. Department of State's Indonesia Country Report on Human Rights Practices for 1998 (Feb.
26, 1999), a document released annually, available on the internet, and produced from Exxon's
records.  (CA0001045038).

[16] Dep. at 51:25-52:6 ████████████████████████████
████████████████████████████████████████ .



- Read from the script that EMOI ███████████████████████ ███████

- Read from the script that ███████████████████████ ███████████

- Read from the script that ███████████████████████ ███████████████████████████

- Read from the script that ███████████████

- Read from the script that ███████████████████████ ██████

- Read from the script about ████████████████████

*Id.* at 52:10-56:18; Video 1 at 54:35-59:01.

This scripted statement – replete with assertions that are non-responsive to the pending question about the State Department's 1998 Country Report – was read verbatim for almost five full pages of the transcript.  Dep. at 52:10-56:18   Plaintiffs' counsel again objected to this conduct and asked Defense counsel ███████████████████████ ███████████████████████  Plaintiffs' counsel put Defense counsel on notice that if this conduct continues, ███████████████████████ Dep. at 56:21-57:7. Defense counsel responded, *inter alia*, ███████████████████████ ███████████████████ *Id.* at 58:19-21; Video 1 at 1:01:06-1:01:15.

As the witness's five pages of narrative testimony suggested that he was not simply using "notes" to help his recollection, but instead must be reading, probably verbatim, long, scripted statements from materials not visible on the screen, Plaintiffs' counsel tried to determine if the witness had been ████████ his testimony ███████████████████████

15

Dep. at 59:8-11.  Defense counsel again interjected to prevent this question – a question both the

witness and Defense counsel obviously know the answer to – from being answered:



Plaintiffs' counsel declined to take a break while a question is pending and again asked

the witness ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮   Dep. at 60:16-20.  The witness responded that he is ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and as ▮▮▮▮▮▮▮▮

*Id.* at 60:16-61:8. Plaintiffs' counsel then asked if – when the witness referred to "notes" – he

was just reading verbatim a prepared script.  Although the witness knew the honest answer – as

he had just read from his script *verbatim* for the last five pages of testimony – he again avoided a

direct response and states ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at

61:9-19.

Only after this exchange did Defense counsel, for the first time – and in clear violation of

this Court's Order establishing the protocol for all depositions – state that ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 61:20-23

---

[17] Dep. at 59:8-60:13 (emphasis added); Video 1 at 1:01:39-1:02:26.

(emphasis added).  Defense counsel did not produce the notes until all questioning at the

deposition has been completed.  *Id.* at 362:14-15.[18]

As questioning continued, Plaintiffs' counsel tried to determine if the five-page answer

the witness just gave was read verbatim from his "notes."  Although the witness obviously knew

the answer was "yes," the witness responded with a series of evasive and misleading answers,

first suggesting that he was only doing this when he was reciting deposition testimony (Dep. at

62:4-8) – a claim even the Opp. Brief *disproves*[19] – and then repeatedly responding that he was



_____ Dep. at 62:8 (_____); 62:24-25

_____); 63:6-8 ("_____); 63:23-25 ("_____");

---

[18] The Opp. Brief asserts that "defense counsel, unprompted, offered to mark the notes and
introduce them as an exhibit to the deposition," and then attempts to blame *Plaintiffs* for their
failure to do so.  Opp. Br. at 10.  In reality, the transcript makes the following very clear:

- Both Defendant and the witness failed to disclose the existence or use of this script until
  the deposition was well underway and Plaintiffs' counsel specifically asked the witness
  if his testimony was being read from materials not visible on the screen;

- When this issue was probed again at page 60 of the transcript, Defense counsel
  instructed the witness that _____ and attempted to
  take a break (Dep. at 60:6-13) (emphasis added);

- When Plaintiffs' counsel declined to take a break and continued to try to ascertain
  whether the witness was reading his testimony verbatim – and was told by the witness
  that he was _____ (*id.* at 60:25-61:2), Defense counsel
  finally said _____
  _____ *Id.* at 61:20-23 (emphasis added).  This was, of course,
  entirely within Defense counsel's control, as counsel and the witness controlled these
  materials and could have disclosed and produced them at any time.  Consistent with
  Defense counsel's statement that the materials would be produced after the witness has
  "_____" Defendant only provided these materials after all
  questioning had been completed.  *Id.* at 362:14-15.

Although the Court's Order clearly required that these materials be disclosed and made
available to Plaintiffs' counsel as soon as the deposition was on the record, even the Opp. Brief's
rewriting of the actual Order would not allow the conduct it now tries to claim was permitted –
i.e., only producing the materials read by the witness *after* he has answered questions.

[19] *See* Opp. Br. at 11 n.10 (indicating that only a small portion of the witness's verbatim
readings actually involved "adopting and reciting" prior testimony).

65:13-14 ("████████████████████████").  Video 1 at 1:03:50; 1:04:17; 1:04:27;

1:04:58; 01:06:33.  As the witness obviously knew, there is a fundamental difference between

reading a prepared script word-for-word in the guise of testimony and simply using "notes" to

assist one's memory.  These are carefully chosen words that this witness, with no correction by

Defense counsel, would repeat throughout the deposition to avoid admitting the lengthy

testimony he had just uttered had been read word-for-word from a script.

Plaintiffs' counsel then tried to determine who wrote the actual words the witness was

uttering.  The answer, of course, is fundamental to how the jury should evaluate his testimony:

were these really his words, or was he simply mouthing words written by the defense team?  For

several pages of testimony, the witness tried to avoid a direct answer (although he obviously

knew whether he wrote the words or someone else did), claiming again they are a "████████"

and ██████████████████████████ Dep. at 66:10, 66:22-23.  When asked

████████████████████████ he responded, "████████████████

████████████"  Id. at 68:12-16; Video 1 at 1:09:00-11.  He again tried to avoid

acknowledging that he was actually reading a scripted answer word-for-word: "████████

████"  Dep. at 68:24.  Although the witness was given multiple opportunities to answer whether

the actual words of his lengthy narrative were written by the defense team – or instead were his

own words – the Court will find no clear answer in the transcript.  Id. at 69:15-73:19; Video 1 at

1:09:56-1:13:17.[20]

---

[20] The witness's evasion, his admission that ████████████████████, and the
testimony and argument that the script was "developed collaboratively" with and "ultimately
memorialized by" counsel, Opp. Br. at 3, strongly suggest that the words were simply written by
defense counsel.  These factors and the self-serving and non-responsive nature of the answers
also cast considerable doubt on the witness's testimony that ████████████████████
████████████ and the Opp. Br.'s argument that the notes "were his own responses." Id. at 21.
In other words, the testimony strongly suggests the witness's testimony was not EMOI's, but

    \*      **Pages 74-96.**  As the deposition resumed after a break, Plaintiffs' counsel tried to follow up on the witness's earlier scripted testimony referring to an article by Michael Shari, the Singapore Bureau Chief for Business Week, in an article entitled *What did Mobil Know?*[21]  (Mr. Shari met with EMOI management before the article was published and provided information about the military's human rights abuses in close proximity to EMOI's operations both in these meetings and the published article.).  Although this question followed up on the witness's earlier reference to the Business Week article (Dep. at 29:10-14) and was obviously within the scope of the notice,[22] the witness and Defense counsel again initiated the two-step tactic.  From pages 74-81, the witness declined to answer questions until the topic number was identified for him.  When counsel asked the witness to answer the pending question, **the witness then took *seven minutes and forty seconds*, on the record, to look at his "notes" before providing *any response to the pending question.***  Dep. at 80:10; *see* Video 2 at 09:57-18:00.[23]  The Opp. Brief does not deny this or defend it.  When questioning finally proceeded after this extended delay, defense counsel interjected another baseless objection[24] and asserted, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dep. at 80:25-81:1.

---

counsel's. *Compare In re Neurontin Antitrust Litig.*, MDL No. 1479, 2011 WL 2357793, at \*4 (D.N.J. June 9, 2011) ("[T]he use of an outline created entirely by litigation counsel contradicts the purpose of Rule 30(b)(6) … the corporation and its counsel have inverted their respective roles and duties. … [C]ounsel have 'manufacture[d] the corporation's contentions.'").

[21] Appended as Exhibit C.

[22] *See* Pls.' Br., Exh. E, Topic 2.

[23] Although deponents sometimes may try to game depositions or run down the clock, the actions of this witness – delaying *7 minutes and 40 seconds* before even responding to a question – goes *far* beyond anything Plaintiffs' counsel has ever seen at a deposition.

[24] Defense counsel objected that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dep. at 80:19-81:2 (emphasis added); Video 2 at 18:19-40.  As explained above, the question about information about the military's human rights abuses that was provided to EMOI management by the author of the Business Week article both follows-up

Finally, at pages 82-89, Plaintiffs' counsel was able to proceed with questioning. The witness was not permitted to answer any questions about any legal investigation done by Defendants and testified there was no investigation other than a legal investigation. In other words, the witness essentially answered a single question: there was no investigation independent of the legal investigation he cannot testify about.[25]

At page 90, Plaintiffs' counsel asked about steps EMOI took when it became aware of credible information that military guards at Arun field threatened EMOI's *own* employees (as opposed to the local population). After further objections, the witness again read verbatim from his script from pages 91:20-94:12 of the transcript. Video 2 at 29:34-32:12. The witness was asked if his long narrative answer had again simply been read from materials in front of him (Dep. at 94:15-16) and the witness repeated the carefully chosen words about his "notes." *Id.* at 94:18 ("███████████████"). Plaintiffs' counsel asked if the witness had been "███████" *Id.* at 94:23-25. Although the witness knew he had just spent the last several minutes reading word-for-word from his script, he again failed to answer the question directly and incanted that he was "███████." *Id.* at 95:12-15. Plaintiffs' counsel then tried to ascertain who wrote the words the witness had uttered and the witness stated that this answer also was a ████████████████████" but did not answer whether they were his own words or were written by someone else. *Id.* at 96:11-17. Needless to say, if these words were actually written by the witness – rather the defense team – the witness would have had no difficulty saying so.

---

on the witness's own testimony and clearly falls within the scope of Topic 2 ("knowledge of abuses" by "Indonesian military personnel, including any history or reputation for such abuses").

[25] Although Defendants can invoke a privilege this may, of course, have a bearing on what they are permitted to do at trial.

\*      **Pages 97-153.**  By this point in the deposition, the defense strategy to ignore the actual question, and instead read a non-responsive answer flooding the record with "evidence" that will make the testimony either useless or helpful to EMOI's defenses, was obvious.  This calculated evasion required Plaintiffs' counsel to completely revise the goals for the deposition – jettison large portions of the intended examination – and focus on questions that *might* elicit responsive information.  Given this reality, the Opp. Brief's assertion that "the witness's testimony *aligns* with his notes" for "approximately 10% of the examination" (Opp. Br. at 3) (emphasis added), is simply a misleading irrelevance.  First, this is not a matter of testimony simply "aligning" with notes – this witness was *reading answers*, for multiple pages of testimony, word-for-word.  Second, as this highly improper conduct became apparent, it impacted *everything that followed* as Plaintiffs' counsel had to completely revise all questioning in the hope of securing responsive testimony rather than non-responsive, self-serving narratives scripted by the defense team. Regardless of how many minutes the witness wasted reading Exxon's talking points into the record, his technique polluted the "fair examination of the deponent" for the entire period. Fed. R. Civ. P. 30(d)(2).

In an effort to extract some value from the deposition, Plaintiffs' counsel then tried to focus on the specific allegations of each Plaintiff – questions that are obviously relevant and encompassed by Topic 5 (which was not time-limited).  Because the witness had testified that he had "███████████████████████████████████████████" (Dep. at 97:16-18), these questions first tried to determine if the witness was aware of the specific allegations and testimony relating to an individual plaintiff, and then tried to ascertain what, if anything, the Defendant had done to investigate these allegations and any facts Defendant was

aware of that support the potential defenses pursued during Defendants' questioning of that plaintiff in earlier depositions.

Remarkably, the Opp. Brief claims that it was improper "to ask what EMOI knew about, or did, to investigate every instance of abuse alleged by each Plaintiff." Opp. Br. at 12. Despite the obvious relevance of this, the Opposition claims that because Plaintiffs or their decedents – who had literally been tortured, dismembered, sexually abused or killed by military personnel engaged by Exxon – did not then go to Exxon to complain, deposition questions about what, if anything, Exxon did, either contemporaneously or in its subsequent defense of this case, are somehow impermissible. Defendants take that position even though there is now voluminous testimony in this case, from both the Plaintiffs and third-party witnesses, showing that these actions were done by the military personnel engaged by Exxon to guard its operations and were often done at Exxon facilities, immediately in front of Exxon facilities, or at camps or locations in close proximity where Exxon was told the guards were engaging in torture or sweeping operations for the avowed purpose of protecting Exxon's operations.

Although the testimony from other EMOI witnesses that it was doing *nothing* to monitor the actions of these military guards[26] – despite the company's knowledge of the military's long history of torture and other abuses – may "explain" the company's subsequent failure to investigate these abuses, the appropriateness of these questions is obvious. In each case, however, the witness had nothing to say other than repeatedly parroting the same scripted words from the text before him. And, once again, when the witness was asked "█████████████████

---

[26] Exh. D (testimony of Neil Duffin at 95:19-24) ("███████████████████████████
█████████████████████████████ ).



"[27] Defense counsel objected and – despite having just read his script word-for-word – the witness again incanted that he was " █████████████ " Dep. at 99:7.  When asked " ███

█████████████████████ " he responded, " ██████████████████████████████████████ "

*Id.* at 100:10-11.  As questioning proceeded about each of the Plaintiffs' specific allegations, the witness said virtually nothing of substance beyond his scripted testimony.[28]

> \*       **Pages 154-206.**  After a break, Plaintiffs' counsel tried to determine which Exxon
employees and witnesses this witness had actually spoken with to prepare for his deposition.
The witness was specifically asked about Mr. Chong, Mr. Budiman, Mr. Judin and Mr. Thahir.
As discussed *supra*, these are four of the (few) witnesses identified in Defendants' Rule 26(a)(1)
disclosures who actually worked in Indonesia for most or all of the period at issue (and the
Defendants had previously claimed to represent, and said would make available for depositions,
before reversing that position).  The witness, however, had not spoken with any of these
witnesses.  With respect to Mr. Chong – who was working virtually full-time on security matters

---

[27] The Opp. Br. asserts that Plaintiffs' counsel was "repeatedly badgering" the witness with questions about his scripted answers. But of course, for any scripted deposition answer that might be played at trial, it is important to elicit the fact that *that answer* was prepared in advance and read verbatim. It is the witness's insistence on such tactics, and on evading straight answers, that led to Plaintiffs' counsel's repeated questions.

[28] *See* Dep. at 112:24-113:19



; 131:2-132:8 ; 133:3-14 ; 136:3-12 137:20-138-7 ; 141:11-25 150:9-22 .  In each of these responses and the language that then follows, the witness is again simply reading the words from his prepared script.  *See* Pls.' Br., Exh. D (Script at 42)

in Aceh when EMOI doubled its use of military guards – the witness testified 

Dep. at 164:6-165:6.  The witness then read a long, scripted answer

designed to explain away contemporaneous documents and statements by Mr. Chong that were

starkly at odds with EMOI's defenses in this litigation.  *Id.* at 170:7-172:21; Video 3 at 19:16-

22:09.

Although the script produced after the deposition confirms the witness was again just

reciting the script word-for-word, he again dissembled about this immediately after reading his

lengthy answer: 

Dep. at 172:24-173:3; Video 3 at 22:13-18.  The witness was reminded that

" and is again asked twice if he "                                              " Dep. at 173:4-6,

173:24-174:3.  The witness falsely responded: "

" *Id.* at 174:5-8).

This answer was not truthful.  As the witness knew, the entire statement he had just read was

recited directly from his script.  *Compare* Dep. at 170:7-172:21 *with* Pls.' Br., Exh. D  at 63-66

(identical language in script).

At pages 179-206, the witness was asked questions about the corporation relationship

between Exxon's regional team in Singapore (which, along with EMC officials in the United

States, played a critical role in the events at issue here) and EMC.  Although the Defendants'

gamesmanship continued,[29] the witness was at least able to provide minimal testimony about the

corporate entities involved.

---

[29] As this questioning commenced, Plaintiffs' counsel introduced a 77-page document (Exh.
E) (CA0001355089), simply for purposes of understanding the role of some of the individuals
identified at page CA0001355125 (and described on a few pages that follow).  The witness was

**Pages 207-237.** The deposition proceeded after a meal break and Plaintiffs' counsel tried to determine if Exxon's senior management was aware of information from a Wall Street Journal reporter in July 2000 about the torture of four local villagers at the A13 camp near the EMOI operations where its military guards were being housed. Defense counsel immediately returned to the two-step strategy and, after yet another objection, asked "" Plaintiffs' counsel responded: "

" [i.e., EMOI's knowledge of human rights abused by the military]. Dep. at 207:19-24; Video 4 at 00:39-52.

Before permitting the witness to answer, Defense counsel made the following statements:



told the relevant topic and pages. Dep. at 180:2-9 & 184:4-7. The witness and defense counsel, however, insisted that the witness take the time to review the entire 77-page document and declined to go off the record to do this. Although such matters are normally handled in good faith between counsel, this defense strategy is part and parcel of its conduct in this deposition (such as the witness's earlier action delaying 7 minutes and 40 seconds before even answering a question).



Dep. at 208:2-211:2 (emphasis added); Video 4 at 00:54-03:09.  As the video of the deposition

makes clear, Defense counsel's repeated statements on the record that Plaintiffs' counsel was

█████████ , ████████ and █████████ were false.  Tellingly, the Opp. Brief has nothing to say

about this.

Plaintiffs' counsel again tried to get an answer to the pending question about information

provided by the Wall Street Journal reporter to senior management.  Plaintiffs' counsel repeated

that the question fell within topic 2 and again posed very specific questions in an effort to get a

responsive answer, rather than another long, scripted narrative.  After the witness confirmed that

he was aware the Wall Street Journal reporter "████████████████████████████

████████████████████████████████ " (Dep. at 212:5-8; Video 4 at 04:22-29), he was

asked follow-up questions to determine what Exxon senior management learned from this

investigative reporter (in particular, information from the Wall Street Journal article that local

villagers were being physically abused "██████████████████████████

██████████████████████████ " was "████████████████████

 ") (Dep. at 222:11-19).  Instead of answering the

question, the witness again implemented Defendants' two-step strategy, reading verbatim a

lengthy script full of non-responsive information to bolster Exxon's defenses:



- The witness read that
- He read about
- He read that
- He read that
- He read that
- He read that
- He read that
- He read that

*Id.* at 222:21-225:17; Video 4 at 29:04-32:22.  This is simply a lengthy recitation of EMOI's

defenses, scripted for the witness, rather than a responsive answer to the actual question the

witness was asked. It is also nearly the *exact same* non-responsive answer as the one given to a

*completely different question* cited above.  *See supra* at 9-10.



Plaintiffs' counsel then asked if the witness was "

" Dep. at 226:13-18; Video 4 at 33:04-18.  After one more

objection, the witness falsely testified, "                               " (Dep. at 226:20-21) and

again stated                               *Id.* at 227:16-17.  After efforts to determine who

wrote the words the witness has just read, Plaintiffs' counsel attempted to get an answer to the

actual question that was posed. *Id.* at 230:11-13. Following still more objections by Defense

counsel, the witness again ignored the actual question and said, ███████████████

███████████████ *Id.* at 230:19-20. The witness then continued to read

verbatim non-responsive information from his script for the next several pages of the transcript:

- He rea ███████████████████████████
  ███████████████

- He read language from an earlier deposition that had nothing to do with the Wall
  Street Journal article;

- He quoted testimony from an Exxon executive about events eight years earlier (1989-
  90), stating that ███████████████████████

- He read from his script ███████████████████
  ███████████████████

*Id.* at 230:19-233:8; Video 4 at 37:15-39:57. As the witness states that he has "███████████

███████" (a statement later confirmed by his script, which continues for additional pages

with non-responsive material[30]), Plaintiffs' counsel again requested that the witness answer the

questions posed rather than continuing to recite non-responsive speeches. Dep. at 233:10-

244:18.

**Pages 237-319.** After further colloquy, Plaintiffs' counsel returned to the specific events

impacting other individual plaintiffs in the hope that here, at least, a clear record could be

established that Defendants have never investigated the specific allegations and have no factual

support for the defenses they have pursued during the individual plaintiff depositions. The

witness again had no information to provide and instead continued to recite his scripted answer.[31]

---

[30] Pls.' Br., Exh. D at 6-9.

[31] Dep. at 243:16-23 ("███████████████████████████"); 244:15-245:3
███████████████████ 247:16-24 ███████████

(Specific allegations by the remaining Plaintiffs are also explored at pages 320-332, where the witness again repeated the same scripted answers[32]).

Plaintiffs' counsel continued to ask precise questions in an effort to get responsive answers. The witness was asked about EMOI's doubling of the military guards at its operations between July and December 1999 (an action it implemented even as Pertamina "███████

██████████"[33]). This is a matter specifically discussed in communications to and from Tommy Chong, documents the Defendant and witness *knew* would be a subject of the deposition.[34] The witness, however, had never spoken with Mr. Chong[35] and it was evident he knew nothing about this, even though it is one of the central events in Defendants' decision to significantly increase the use of military guards at their facilities. As a result, the witness recited a scripted, non-responsive answer that did not relate to the time period in question and was inconsistent with Defendants' own records.[36] The witness was then asked about another critical



[32] Dep. at 328:3-15 █████████████████████████████████; 328:20-329:8 ████████████████████████████; 329:21-330:10 █████████████.

[33] *See* Exh. F (CA0001179798) (reporting that approval has been obtained from Exxon Vice President Lance Johnson in the United States "███████████████████████████" even though "████████████████████████████████████" and Tommy Chong "████████████████████████████████████████").

[34] *See* Pls.' Br., Exh. E at 7 (Topics 8(b) regarding activities undertaken by Tommy Chong on security matters related to the Arun Project) and 8(c) regarding e-mails and communications to or from Mr. Chong relating to Arun Project security). *See, e.g.,* Exh. G CA0001047716 (December 21, 1999 e-mail from Tommy Chong on "███████████████████████████████████████" reporting that "████████████████████████████████████" and explaining that these personnel "████████████████████████████████████████" at various Mobil Oil facilities and operations).

[35] Dep. at 165:6.

[36] Dep. at 261:10-264:18; Video 5 at 05:21-08:49. *Compare with* identical language in Pls.' Br., Exh. D at 25.

**REDACTED PUBLIC COPY**

meeting in April 2000 in which EMOI and the military again discussed another large increase in the use of military guards at the EMOI operations. After some questions about the report of the meeting by Exxon's representative – a report the Defendant and witness again *knew* would be covered[37] – the witness briefly responded to the actual question posed and then read verbatim a non-responsive answer from his script.[38] When asked if he was again reading the words he has just used in his testimony, the witness declined to admit this and again recited he was "████████ ████" Dep. at 283:9.

Although these questions involved critical events (memorialized in documents the Defendant was clearly aware of, *see supra* nn. 33 & 37), the Opp. Brief suggests it was somehow improper to review these documents and the events described therein with the witness. Opp. Br. at 13. There were obvious reasons to do this:

- When the witness was questioned about the April 2000 meeting, he specifically asked "████████████████████████████████?" Dep. at 272:22-23.

- In prior depositions, when an attorney has not quoted from a document at issue, the same Defense counsel has accused counsel of "████████████████ ████████████████████████" or otherwise acting improperly.[39]

---

[37] Exh. H, CA0001078966 (report on "████████████████████████████" discussed at meeting attended by K. Jayadev and sent to Chee Khoon Oh and others); *see* Pls.' Br., Exh. E (Notice of Deposition) at 8 (Topic 9(b) regarding matters discussed in documents produced by Defendants in this litigation" to or from "Mr. Oh and/or K. Jayadev relating to the Arun project").

[38] Dep. at 281:17-283:3. *Compare with* identical language in Pls.' Br., Exh. D at 10.

[39] *See, e.g.*, Exh. I, Boydell Dep. at 86:21-23 ████████████████████ ████; 133:17-134:3 ████████████████████; 134:21-24 ████ *id.* at 135:5-6 (objecting that counsel's question "████████████ ████"); 275:11-14)██████████

- Because EMOI witnesses have previously questioned whether documents *from Defendants' files* bearing their signature or sent by them are inaccurate, falsified or otherwise inauthentic, it has become necessary to confirm that the statements written and memorialized in Defendants' documents were, in fact, written and reported by EMOI employees and agents.

As Plaintiffs' counsel continued to try to get answers to the actual questions posed, the witness was then asked a very precise question (and one explicitly covered by the Notice[40]) that only required a "yes" or "no" answer: "███████████████████████████████████ ████████████████████████████████████████" Dep. at 287:12-16; Video 5 at 38:19-33. Once again, the witness did not answer this straightforward question, but instead embarked on another lengthy and non-responsive narrative, now reading verbatim from his script for *almost six pages* of the deposition transcript. Dep. at 287:17-293:4; Video 5 at 38:33-44:29.[41] The witness was then asked if he was "█████████████████████████████████ ██████████" (Dep. at 294:12-13). The witness responded that his answer was an "███████ ██████████████████████████" again misleadingly implying to anyone viewing the video (including the jury at trial) that this is the only portion of his answer that was read. *Id.* at 294:23-24. He was then asked if his "██████████" was "███████████████████████ ███████████" and again falsely implied that he was only reading the portion of his answer that was quoting deposition testimony. *Id.* at 295:6-296:9.[42]

---

[40] *See* Pls.' Br., Exh. E at 6 (Topic 8 covering, *inter alia*, "risk assessments regarding security issues related to the Arun Project).

[41] *Compare* Dep. at 287:19-293:4 with identical language in Pls.' Br., Exh. D at 59-61.

[42] The witness was also asked about the code of conduct for the military that was explicitly recommended in the risk assessment (but never even drafted by EMOI). The witness admitted that he had never read the risk assessment and "█████████████████████████████████████ ██████"). Dep. at 294:6-9 and 300:2-5.

At page 311, Plaintiffs' counsel tried to ask the witness if EMOI's five-fold increase in the number of military guards in June 2000 was reported to Exxon officials in the United States. Dep. at 311:5-15; Video 5 at 1:07:28-52. Defense counsel once again initiated the two-step, asking " ████████████ " Dep. at 311:11-12. After this was answered by Plaintiffs' counsel (*id.* at 311:13-15), Defense counsel once again interposed multiple objections. *Id.* at 312:7-313:10; 313:24-25; 315:21-22. Staying on script, the witness disregarded the actual question about whether EMOI's dramatic increase in use of the military was reported in June 2000, and instead spent the next four pages of the transcript reading another non-responsive statement verbatim. *Id.* at 315:23-319:13; Video 5 at 1:11:47-1:15:27.[43] The witness was asked if he was " ████████████████ " Dep. at 319:20-22. He responded " ████████████ ████████████ " – again falsely implying to counsel (and the jury) that he was only reading from the materials in front of him when he was " ████████████ ████████████ " *Id.* at 319:25-320:3.

**Pages 320-end.** After a final break, Plaintiffs' counsel asked specific questions relating to the remaining individual plaintiffs (pages 320-332) and the witness continued to repeat the language from his script that he had used for other plaintiffs.

With the deposition nearing the time limit, Plaintiffs' counsel asked the witness about an EMOI document stating that by October 2000:



<hr />

[43] *Compare* Dep. at 315:23-319:13 *with* identical language in Pls.' Br., Exh. D at 37-38.

Dep. at 334:17-335:4; Exh. J at 2 (emphasis added).  The witness was then asked about these events as Defense counsel again interposed multiple objections (Dep. at 338:16; 338:24; 339:9; 339:15; 341:10; 341:19-20 & 341:233), and the witness questioned the accuracy of the language in EMOI's document.[44]

After discussion of one final document, the time limit – which Defense counsel had made clear would be enforced – was reached.  In closing colloquy, Defense counsel stated, *inter alia*, that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*Id.* at 362:8-13; Video 6 at 55:50-54.  Only then did counsel produce and mark the script that the witness had been using throughout the deposition.  Dep. at 362:14-15.

\* \* \* \* \*

As the transcript and video make clear, the misconduct of both the witness and Defense counsel permeated this deposition from beginning to end.  It persisted despite repeated requests that the witness simply answer the questions posed – questions that were clearly encompassed by the deposition notice.  These requests were ignored by both the witness and counsel.  And this misconduct is compounded by counsel's hundreds of objections, insulting remarks and demonstrably false claims that Plaintiffs' counsel was "████████" "████" and "████" at Defense counsel – false and inappropriate statements that are further compounded by the equally false claim in the Opp. Brief that, among other things, Plaintiffs' counsel was "unhinged." Opp. Br. at 18 n.20.

---

[44] Dep. at 338:17-20 (stating that the language used by Exxon's security advisor, Mr. Connor, "████████████") & 346:2-5 (stating that he "████████████████████████ ████████████").

REDACTED PUBLIC COPY

With such a clear record of misconduct, the various claims and defenses in the Opp. Brief unravel.  Even if this witness were credible (which he is not), the fact that Defense counsel prepared a lengthy script and the witness prepared for hours to parrot his non-responses is of no moment.  The witness's testimony speaks for itself about what he was "prepared" to do – the witness engaged in a clear and persistent pattern of evasion; his answers to the most fundamental questions (Was he reading answers verbatim?  Who wrote the words he was uttering in the guise of testimony?) were misleading at best and false at worst; and he provided little, if any, substantive information beyond the non-responsive words that he literally read from his text.  Although the basis for the Opp. Brief's claim that he answered more than "300" substantive questions is a mystery,[45] the record could not be clearer that, with limited exceptions, he had no ability to offer anything of substance beyond his scripted words.

By the same token, the Opp. Brief's claim that the witness spent "approximately forty-four minutes on the record" reciting words from the script (Opp. Br. at 11), is not only damning in itself, it simply misses the point.  As explained above, it became clear as soon as substantive questioning began, that the core strategy being implemented by the witness and his counsel was to ignore the actual question posed and instead embark on a scripted and non-responsive answer designed simply to advance various defense claims.  This impacted *everything* that followed in the deposition, including the questions Plaintiffs' counsel could pose and the ensuing efforts to obtain responsive answers.

---

[45] Opp. Br. at 11 & n.9.  The Opp. Brief provides no serious explanation of how it arrived at this sum other than its brief mention about items that were "excluded."  The suggestion that this witness was making a good faith effort to provide responsive and substantive answers to the questions before to him is squarely contradicted by the transcript and the detailed analysis above, which shows that the witness's ability to answer substantive questions beyond his scripted answers was limited to a few subject areas, largely outside the relevant time period (such as questions about corporate structure).

REDACTED PUBLIC COPY

These tactics, compounded by the witness's dissembling answers and his counsel's inappropriate statements, cannot be countenanced.  It is hornbook law that a Rule 30(b)(6) deponent must answer the actual questions posed, rather than respond evasively or with a long non-responsive narrative replete with self-serving testimony.[46]  The Opp. Brief virtually ignores the well-established law cited in support of Plaintiffs' motion, holding that such conduct is sanctionable.[47]

---

[46] *See* Pls.' Br. at 34 n.22 (citing cases holding that providing evasive or non-responsive answers is tantamount to a failure to appear and is sanctionable); *see, e.g.,* 7 Moore's Fed. Prac. § 30.25 (2021 ed.) (citing cases holding that organization has affirmative duty to prepare Rule 30(b)(6) deponent to provide complete and non-evasive answers "**to questions posed** regarding the relevant subject matter") (emphasis added); *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433-34 (5th Cir. 2006) (same); *REC Marine Logistics, LLC v. Richard*, No. 19-11149, 2020 WL 2508006, at *2 (E.D. La. May 15, 2020) (same); *Sony Elec., Inc. v. Soundview Tech., Inc.*, 217 F.R.D. 104, 112 (D. Conn. 2002).

[47] *See* Pls.' Br. at 34 n.22; *id.* at 36 n.23 (citing cases holding that witness "cannot simply be a conduit for counsel's contentions" and "[p]reparing a designated corporate witness with only the self-serving half of the story that is the subject of his testimony is not an act of good faith"); and 40 n.24 (citing cases holding that witness's counsel cannot "just sit idly by and do nothing" and has a responsibility to "advise his client of his obligation to answer the questions which were asked."). The few cases cited in the Opp. Brief simply involve situations where a party had not engaged in misconduct at the deposition at issue and, as a result, there was no basis for sanctions. *United States v. All Assets Held, etc.*, No. 04-cv-798 (PLF/GMH), 2017 WL 4183450, at *5 (D.D.C. Sept. 20, 2017); *Covad Comm. Co. v. Revonet, Inc.*, 267 F.R.D. 14, 26 (D.D.C. 2010) (conduct at deposition was "par for the course"). (The Opp. Brief's reference to *Alexander v. FBI*, 186 F.R.D. 144, 147 (D.D.C. 1999) (Lamberth, J.) relates to the award of costs where a motion (or opposition) is not substantially justified. Here, such an award is appropriate against Defendants based on each of the authorities cited in Pls.' Br. at 40-41, which are not discussed in the Opp. Brief).

Disregarding the well-established law cited in Plaintiffs' Brief, the Opp. Brief tries to distinguish the imposition of sanctions in the *Neurontin* case where the witness had met with counsel and reviewed documents and then used an outline prepared by counsel at his deposition. In *Neurontin*, the witness was at least straightforward and honest about the process involved. *Neurontin*, 2011 WL 2357793, at *2. Here, there is no basis for this Court to conclude that the witness "developed his notes in close collaboration with counsel" and "his notes reflected his own knowledge based on his preparation." Opp. Br. at 21 n.22. To the contrary, only three things can be ascertained from this witness's testimony. First, these are *not* "notes" – this is a script that the witness repeatedly read *verbatim*. Second, there is no way to determine which words, if any, were the witness's own and which were selected and written by counsel, because the witness would not provide a direct answer to this straightforward question. Stated in clear

As these cases recognize, if a Rule 30(b)(6) witness could simply ignore the question posed, and instead launch into a non-responsive speech replete with self-serving testimony – presumably written in whole or in part by his counsel to advance defense themes – the purpose of the rule is utterly defeated.  And, while the calculated and repeated implementation of this strategy is itself sanctionable, it was gravely compounded here by the failure even to disclose this script in clear violation of this Court's Order, the witness's evasive and misleading responses to questions about what he was doing (questions he knew the honest answers to), counsel's complicity in these actions, and counsel's untrue and highly inappropriate insults.[48]

## II.     THE REQUESTED SANCTIONS PROVIDE APPROPRIATE RELIEF.

We will comment briefly on the relief that is requested in Plaintiffs' motion, *see* Dkt. 777, Exh. A (Proposed Order), in light of the positions taken in Defendants' Opposition:

1.       Plaintiffs have requested leave to proceed with the deposition of EMOI's Rule 30(b)(6) witness and the deposition of EMC's Rule 30(b)(6) deposition, at dates agreed to by the parties.  These depositions should proceed promptly, but do not require any change in other deadlines set by the schedule.

At the EMOI deposition, Defendant EMOI took the position that Plaintiffs had "forfeited" their right to secure further testimony from its witness.  The Opp. Brief, remarkably, criticizes Plaintiffs for being unable to pursue or secure testimony on each noticed topic, even

---

terms:  this witness was *not* credible.  Third, on the substantive issues in the case, with the exception of only a few topics, this witness rarely had much if any substance to offer beyond the scripted words that had been prepared for him.

[48] The witness's and counsel's failure to disclose the presence of "information related to the litigation" including "notes" is independently sanctionable conduct. *See Cobell v. Babbitt*, 37 F. Supp. 2d 6, 9 (D.D.C. 1999) (Lamberth, J.) ("[T]he court has 'inherent power to protect [its] integrity and prevent abuses of the judicial process' by holding parties in contempt and ordering sanctions for violations of the court's orders." (quoting *Webb v. Dist. of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998))).

though the actions of the witness and Defense counsel obviously made that impossible. Moreover, Defendant's insistence that this misconduct was proper makes it absolutely clear that it would have been pointless, or worse, to proceed with the scheduled EMC 30(b)(6) deposition authorized by the Court (which would have involved the same witness and Defense counsel) until these issues were brought to the Court's attention.

Plaintiffs' motion requests leave "to proceed with ten hours of questioning of these witnesses, to be allocated between these depositions as Plaintiffs' counsel considers necessary." Dkt. 777, Exh. A. Notably, if the EMC deposition had proceeded, Plaintiffs would have been entitled to seven additional hours of questioning under the Federal Rules. Because of the misconduct and interference at the EMOI deposition, requesting a total of ten hours for the two depositions after they resume is appropriate. And, both because of the misconduct, and the fact that the same witness and counsel will be involved for both depositions, it is appropriate for Plaintiffs to decide how that time can best be allocated between the two depositions.

2.      Plaintiffs have requested that Defendants' 30(b)(6) witnesses be directed to give responsive and reasonably concise answers to the questions posed and counsel be directed that objections to a question (other than privilege) be stated "concisely in a nonargumentative and nonsuggestive manner." Fed. R. Civ. P. 30(c)(2). The Opp. Brief's insistence that the actions by witness and counsel were appropriate confirms the need for this relief.

3.      Plaintiffs have requested that if the witness may have access to information subject to Paragraph 16 of the Protocol while the deposition is on the record, those materials should be made available to Plaintiffs' counsel at least one hour before the deposition begins so

they can be printed and reviewed before the deposition begins.  Given the actions at the EMOI deposition, the need for this is self-explanatory.[49]

4.    Plaintiffs have requested that Defense counsel pay Plaintiffs' fees and expenses incurred in (a) filing Plaintiffs' motion and addressing responsive pleadings submitted by Defendants; and (b) preparation for and taking the resumed deposition of EMOI's Rule 30(b)(6) witness.  Although that relief is well supported by the law, the Opposition and cross-motion submitted by Defendants makes the justification for such relief even more appropriate.  Rather than acknowledging the misconduct, Defendants have doubled-down on its defense, and even beyond that have represented to the Court's that Plaintiffs' counsel was "unhinged" (among many other recriminations in the Opp. Brief) and Defendants have filed a frivolous cross-motion for sanctions.  Although that motion is completely meritless, the mere fact of the filing has reinforced the need for Plaintiffs to file a careful and meticulous explanation of what occurred at the deposition and Defendants' attempt to recharacterize those events and even blame the Plaintiffs.

---

[49] The Opp. Brief repeatedly states that Plaintiffs have "conceded that a witness can use notes."  *E.g.,* Opp. Br. at 19.  Reading from scripted materials verbatim for multiple pages is *not* "relying on notes" (for example, imagine parents reading a story to their child and then saying they were simply "relying on their notes" – although that would be absurd on its face, this is the essence of the position *repeatedly* stated by the witness under oath and now defended by EMOI and its counsel as honest testimony).  The question here is not whether a witness could ever refer to notes in any manner, Opp. Br. at 21 & n.22, but whether a witness can fail to disclose a script in direct violation of a court order, and then repeatedly read non-responsive and self-serving narratives verbatim from his script and then providing evasive, misleading and/or false testimony about his scripted answers.

### III.   DEFENDANTS' CROSS-MOTION FOR SANCTIONS IS FRIVOLOUS.

After arguing that sanctions should be imposed sparingly, and despite their own recognition that "frivolous threats of sanctions against counsel is itself sanctionable," Defendants have gone on the offense by filing a meritless cross-motion for sanctions:

\*       Defendant's cross-motion asserts that it was somehow sanctionable not to identify the broader topic number that the witness (and counsel) sought in order to initiate their two-step strategy.  Tellingly, Defendant does not make any serious argument that *a single question in this deposition* was outside the scope of the noticed topics.[50]  Nor do they cite a single case, anywhere, that has ever required questioning counsel to identify the topics to which their questions pertain, let alone *sanctioned* an attorney for "failing" to do so.[51] If Defense counsel believe a question is outside the noticed topics, the solution is to lodge an objection, as they have

---

[50] The *only* question the Opp. Brief even argues was outside the scope of the notice was Plaintiffs' effort to determine if EMOI's senior management had knowledge of the State Department's annual reports about human rights abuses by the Indonesian military.  Opp. Br. at 28.  That question was both relevant and *clearly* encompassed by Topic 2 ("Your knowledge of abuse, including human rights abuses, assaults, batteries, sexual abuse, torture, violence, and other torts by … Indonesian military personnel, including any history or reputation for such abuses."). Pls.' Br., Ex. E at 3.

The Opposition Brief notes that questioning in a Rule 30(b)(6) deposition can also properly include questions outside the notice.  Opp. Br. at 16 n.16.  That is true, but irrelevant here:  there is no colorable argument that *any* of the questions asked at this deposition were outside the notice.

[51] Instead of citing any legal authority, the Opposition Brief merely argues that *some* counsel (including a junior associate earlier in this case) proceed topic-by-topic in a Rule 30(b)(6) deposition.  While counsel can choose to proceed in that manner if they believe it is helpful, it is certainly not required, particularly where the underlying events unfolded in chronological manner and a particular question often falls under multiple topics.  Needless to say, it is not "sanctionable" for counsel to conclude that there are better ways to pursue questions (all of which fall within the noticed topics), and the Opp. Brief does not cite a single case that would remotely support a contrary conclusion.

done without hesitation in earlier Rule 30(b)(6) depositions. [52] Plaintiffs' counsel is *especially* not required to identify topics once it has become clear that the request is a ploy to assist the witness in deploying scripted, self-serving, non-responsive answers.  In fact, when this question was first broached by the witness and Defense counsel – three times – it was answered directly. But when it became clear, as it quickly did, that this was simply being used as a tool by the witness, aided by defense counsel, to *avoid* responsive answers and instead read from an undisclosed script in clear violation of this Court's Order, Plaintiffs were certainly under no obligation to facilitate this.

    \*      The Opp. Brief represents that Plaintiffs' counsel was "unhinged" and adds many other adjectives to the same effect.[53]  This invective, like Defense counsel's earlier accusations that Plaintiffs' counsel was "█████," "█████" and "█████" at opposing counsel, is demonstrably untrue.  We invite the Court to review any part of the videotaped deposition, which will confirm that Plaintiffs' counsel exercised restraint and professionalism, as this Court rightfully expects, in the face of misconduct that continued until the deposition's conclusion at 5 a.m.

---

[52] *See* Exh. I, Boydell Dep. at 57:17-20 (██████████████████████ ████████████████████████████████; *id.* at 74:11-75:5 ("█████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████").

[53] Opp. Br. at 18 n.20.  *See also id.* at 1 ("badgering" "charade" "bad faith effort"); at 3 ("false claims"); at 4 ("bludgeon" "harass"); at 10 ("berated" "threatened" "intimidate"); at 11 ("badgering"); at 13 ("belittled"); at 18 ("conceal" "lashed out" "embarrassed"); at 18 n.20 ("unhinged" "browbeating" "disrespectful"); at 27 ("stunt"); at 28 ("snapped"); at 29 ("badgering"); at 31 ("berated" "accosting").

\*        The Opp. Brief represents that Plaintiffs' counsel "repeatedly" interrupted the witness and cites four occasions in the course of seven hours of questioning where this purportedly occurred.  Opp. Br. at 29.[54]  As the transcript demonstrates, on each occasion the witness had read a scripted, non-responsive answer for multiple pages and – after being asked if he was simply reading verbatim – continued to do so for multiple pages of additional "testimony."[55]  Defendant's apparent position is that it is appropriate for a witness to engage in such conduct for whatever period of time is required – Five minutes?  Ten minutes?  More?  Needless to say, this would never be tolerated in a courtroom.  *See* Fed. R. Civ. P. 30(c)(1) ("examination and cross-examination of a deponent proceed as they would at trial").

---

[54] The only case even cited in the cross-motion involved a magistrate judge's finding that an attorney engaged in conduct that "would not be allowed in any courtroom by any judge in this District."  *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-0366, 2015 WL 9311968, at \*3 (E.D. La. 2015).  While that case provides no support for the cross-motion here, its reference to conduct that "would not be allowed in any courtroom" certainly applies to the actions by EMOI's witness and defense counsel described in detail *supra.*

[55] These are the parts of the deposition that Defendants' claim to support their cross-motion: (1) at page 34:9-14, the witness had read verbatim from his undisclosed script from pages 27:24-29:23 (Video 1 at 26:14-28:38) of the transcript and continued to do so from pages 32:19-34:8 of the transcript; (2) at pages 227:3-228:3 and 233:9-234:8 the witness had again been reading verbatim from his script from pages 222:21-225:17 (Video 4 at 29:04-32:22) and continuing at 230:19-233:8 of the transcript; and (3) at 283:4-5, the witness had again been reading a non-responsive, scripted answer from pages 281:17-283:3 (Video 5 at 32:14-33:55) of the transcript.

REDACTED PUBLIC COPY

\*      In contrast to the literally *hundreds* of objections interposed by Defense counsel, the Opp. Brief discusses only *one* objection to strike the witness's testimony. Opp. Br. at 30-31. That objection was both appropriate[56] and consistent with best practice.[57]

\*      The Opp. Brief asserts that Plaintiffs' counsel "berated" and "accost[ed]" the witness and "falsely suggest[ed] that the use of notes was improper, in order to intimidate him …". Opp. Br. at 31. This is, again, squarely contradicted by the record. When the witness appeared to be reading a script, Plaintiffs' counsel certainly questioned him to determine if he had just read his answer and, if so, who wrote the words. This was entirely appropriate.

There is nothing more that needs to be said about this cross-motion. The Defense counsel's own words are most apt: "frivolous threats of sanctions against counsel is itself sanctionable."

---

[56] In the only occasion discussed in the Opposition Brief, Plaintiffs' counsel made clear that he was asking whether EMOI was informing officials in the United States about EMOI's increased use of military guards at its operations (which increased five-fold in and after June 2000). *See* Dep. at 313:18-23; 314:5-12; and 315:12-20 ███████████████ ████████████████████████████████████████████ (emphasis added). The witness ignored this question and instead launched another scripted, non-responsive answer "███████████" – rather than answering the actual question – that he continued to read verbatim from page 315:23 until page 319:13 of the transcript. Video 5 at 1:11:47-1:15:26.

The only other citations in the Opp. Brief (without any actual analysis) involve scripted, non-responsive answers (Dep. at 91:20-94:14; 170:7-172:21); an exchange in which the witness is given ample opportunity to explain his answer (*id.*at 199:9-205), and an exchange in which counsel simply misheard the answer (hearing the witness to say "████████" rather than "████████") and the witness was again given ample opportunity to explain himself.

[57] *See, e.g.,* C. Martiniak, Deposition Practice Handbook: How to Take and Defend Depositions 107 (2d. ed. 1999) ("Faced with [a non-responsive answer at a deposition], you should state on the record that you `move to strike the answer on the ground that it is non-responsive"). Although the issue is not entirely settled, there is a risk that failure to do so may lead to waiver arguments. *See, e.g., Kirschner v. Broadhead*, 671 F.2d 1034, 1038 (7th Cir. 1982); *NGM Ins. Co. v. Walker Constr. & Dev., LLC*, No. 1:11-CV-146, 2012 WL 6553272, at *2 (E.D. Tenn. Dec. 13, 2012).

REDACTED PUBLIC COPY

## **CONCLUSION**

The imposition of sanctions on Defendant and its counsel for the misconduct described in Plaintiffs' motion is appropriate.  This Court authorized the EMOI and EMC Rule 30(b)(6) depositions, after extensive briefing, over Defendants' vigorous opposition.  The Defendants then effectively ignored the process set out by the Court – repeatedly declining to negotiate in good faith about the depositions and disregarding the deadline set by the Court – and instead implementing a strategy of "self-help."  The actions of Defendant, the witness and their counsel made a mockery of Rule 30(b)(6), by allowing the witness to simply read self-serving scripts, apparently drafted by defense counsel, into the record in the guise of testimony.  This would never be permitted in a courtroom or allowed in the presence of a judicial officer, and it should not be tolerated here.

Defendants have gone to great length to avoid forthcoming testimony about their actions in Aceh – actions that had tragic consequences for the Plaintiffs.  If the conduct described herein is countenanced – and is permitted to destroy the utility of the EMOI Rule 30(b)(6) deposition authorized by the Court over Defendants' opposition and effectively prevent the EMC 30(b)(6) deposition from proceeding at all – Defendants would be rewarded for their misconduct and will simply have substituted attorney-written talking points for genuine testimony.  Plaintiffs respectfully request that their motion be granted, so they will have the opportunity to secure the actual facts known or reasonably available to Defendants about the actions that will ultimately be evaluated by the jury in this case.

REDACTED PUBLIC COPY

Dated:  March 23, 2021                         Respectfully submitted,

/s/ Kit A. Pierson
Agnieszka M. Fryszman (#495208)
Kit A. Pierson (#398123)
Nicholas J. Jacques (#1673121)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., N.W.
Suite 500, East Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
afryszman@cohenmilstein.cm
kpierson@cohenmilstein.com

Poorad Razavi
Cohen Milstein Seller & Toll PLLC
2925 PGA Blvd., Suite 200
Palm Beach Gardens, FL. 33410
Tel: (561) 515-1400
Fax: (561) 515-1401
prazavi@cohenmilstein.com

Paul L. Hoffman (Pro Hac Vice)
Schonbrun Seplow Harris & Hoffman LLP
11543 W. Olympic Blvd
Los Angeles, CA
Tel: (310) 396-0731
hoffpaul@aol.com

Terrence P. Collingsworth (# 471830)
International Rights Advocates 621
Maryland Ave., N.E.
Washington, DC 20002 Tel:
(202) 255-2198
*Attorneys for Plaintiffs*

REDACTED PUBLIC COPY

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2021, I electronically filed Plaintiffs' Reply Memorandum in Support of Motion to Compel Discovery and Impose Sanctions and Opposition to Defendants' Cross-Motion for Sanctions with the Clerk of the Court using the ECF, who in turn sent notice to counsel of record in this matter.

Dated:    March 23, 2021                          /s/ Kit A. Pierson