## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**JOHN DOE I**, et al.,

 *Plaintiffs,*

**v.**

**EXXON MOBIL CORPORATION**, et al.,

 *Defendants*.

**Case No. 1:01-cv-1357-RCL**

<u>**UNSEALED**</u>

<u>**MEMORANDUM OPINION**</u>

At his deposition, the corporate representative of defendant Exxon Mobil Oil of Indonesia ("EMOI") refused to answer most of the substantive questions posed to him. Instead, he repeatedly read nonresponsive statements verbatim from pre-prepared notes.

After the deposition, the plaintiffs sought sanctions and to compel responsive answers. Astonishingly, the defendants—EMOI and its parent company ExxonMobil Corporation—cross-moved for sanctions. Given the deponent's recalcitrance, the plaintiffs' motion has merit. The defendants' motion, however, is meritless.

Upon consideration of the motions (ECF Nos. 777, 782) and the parties' briefs and evidentiary submissions (ECF Nos. 777, 782, 790/791, 792), by separate order the Court will **GRANT** the plaintiffs' motion to compel and motion for sanctions and **DENY** the defendants' motion for sanctions.

## I. BACKGROUND

The Court refers to its previous decisions, which extensively discuss this case's factual background and extended procedural history. *See Doe v. Exxon Mobil Corp.*, Mem. Op. (Aug. 10, 2020), ECF No. 719; *Doe v. Exxon Mobil Corp.*, 391 F. Supp. 3d 76 (D.D.C. 2019); *Doe v. Exxon Mobil Corp.*, No. 01-cv-1357-RCL, 2019 WL 2348100, (D.D.C. June 3, 2019); *Doe v. Exxon*

*Mobil Corp.*, Mem. Op. (Dec. 7, 2016) (ECF No. 586); *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75 (D.D.C. 2014); *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16 (D.D.C. 2008); *Doe v. Exxon Mobil Corp.*, No. 01-cv-1357-LFO, 2006 WL 1193855, (D.D.C. May 3, 2006); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005).

Briefly, this case arises out of human rights abuses that the plaintiffs allege they (or their next-of-kin) suffered because of the defendants' efforts to secure a natural gas facility in Aceh, Indonesia.  The remaining claims are for torts governed by Indonesian law.  *See Doe*, 391 F. Supp. 3d at 93.

### A.  Relevant Procedural History

Last summer, the parties brought several discovery disputes before the Court.  *See generally* Mem. Op. (Aug. 10, 2020).  As relevant here, the Court granted leave to take remote depositions because of the COVID-19 pandemic, *id.* at 7–8, and compelled the defendants to designate representatives to give additional 30(b)(6) depositions, *id.* at 5–6.  It at first limited the depositions by forbidding the plaintiffs from questioning the deponents about documents the plaintiffs had access to before September 18, 2007.  Order 1 (Aug. 10, 2020), ECF No. 720; *see also id.*  Upon reconsideration, the Court modified the restrictions on the depositions to prohibit the plaintiffs only from re-asking questions to which a 30(b)(6) deponent previously provided a responsive answer.  Order 4 (Oct. 14, 2020), ECF No. 758.

To ensure that it had time to handle any disputes, the Court also set a detailed timeline for litigating the scope of the depositions.  It set deadlines for the parties to meet and confer about scope and scheduling, for the plaintiffs to notice the depositions, and for the defendants to seek a protective order.  *Id.* at 4–5.  The parties conferred and the plaintiffs noticed the depositions.  *See* Pls.' Mot., Ex. E, H, I–J.  The defendants did not seek a protective order.

The Court also entered an order establishing a protocol for conducting remote depositions. *See* Order 3–9 (Sept. 24, 2020), ECF No. 750.  The protocol requires counsel to act collegially, cooperatively, and reasonably.  *Id.* at 7–8.  It also tries to safeguard the integrity of remote depositions by limiting deponents' ability to consult with other persons, *id.* at 5–7, and by forbidding deponents, while depositions are on the record, from "hav[ing] access to any form of information related to the litigation other than exhibits specifically marked and identified for the record by either side, including . . . materials that contain any notes, files or documents that relate to the subject matter of the litigation," *id.* at 6.

## B.  Relevant Factual Background

On February 15, 2021 (Singapore Standard Time), the plaintiffs deposed Mark Snell, ExxonMobil's Asia Pacific regional general counsel.  Kit Pierson questioned Mr. Snell for the plaintiffs; Alex Young K. Oh defended the deposition.[1]

One telling excerpt from the first hour provides an example of how the deposition proceeded:

> Plaintiffs' Counsel (Mr. Pierson): Now, I want to begin by asking you about the information that was provided to EMOI officials about the human rights record of the Indonesian military in Aceh.
>
> Defense Counsel (Ms. Oh): What topic does this relate to?
>
> Plaintiffs' Counsel: 2 and 3(d), among others.  Now, my first question, sir —
>
> Witness (Mr. Snell): Well, you have 34 topics, so it is probably better to be as specific as possible so that I can answer your questions accurately.
>
> Plaintiffs' Counsel: Well, sir, I will pose my questions clearly. I will pose my questions clearly.  But in general this is encompassed, among other things, by 2 and 3(d). Did EMOI take steps to make

---

[1] Other attorneys appeared for both sides, but none of the others spoke on the record.  *See* Pls. Mot., Ex. B ("Snell Tr.") 5:16–6:12.

sure that senior management was informed about the human rights record of the Indonesian military in Aceh?

Defense Counsel: So that's topic 2 and 3(d) you said, Mr. Pierson?

Plaintiffs' Counsel: Go ahead, sir.

Defense Counsel: Is that correct?

Plaintiffs' Counsel: Alex, I'm not going to spend the deposition answering your questions. If you have an objection, make an objection. Go ahead, sir.

Defense Counsel: I'm trying to make things clear, Mr. Pierson, unless you want it extremely muddy.  Is it topic 2 and 3(d) that you just said?

Plaintiffs' Counsel: Alex, I'm not playing those games with you. Sir, the question is —

Defense Counsel: You know what, I'm sorry, you need to check your tone and conduct and remain a professional here, okay?  I do not appreciate your tone.  You need to calm down, take a deep breath and be a professional here, Mr. Pierson.[2]

Plaintiffs' Counsel: You know, that's a highly inappropriate remark, but I'm simply going to pose my question to the witness. Did EMOI take steps to make sure that senior management was informed about the human rights record of the Indonesian military in Aceh?

Defense Counsel: Objection to form.

Witness: If this is a reference to topic 3(d), topic 3(d) is your policies and practices regarding security for the Arun Project between 1 January 1999 and 30 June 13 2001 regarding planning, directions or instructions provided to security personnel, including any restrictions or limits placed on their conduct. It doesn't reference management.

Plaintiffs' Counsel: Sir, my question is, did EMOI take steps to make sure that senior management was informed about the human rights record of the Indonesian military in Aceh? Will you answer that question?

Defense Counsel: Objection to form.

---

[2] Plaintiffs' counsel's voice was calm and controlled during this exchange.  *See* 1 Snell Video at 24:24–25:18.

Witness: So in response to topic 2, EMOI is not aware of any human rights abuses, assaults, batteries, sexual abuse, torture, violence and other torts committed by any EMOI security employees at the Arun field operations. There was a violent civil war raging in Aceh during the relevant time periods between the government of Indonesia and the Aceh separatists who wanted independence from Jakarta, the Free Aceh Movement, or the Gerakan Aceh Merdeka, usually referred to as GAM. The decades-long conflict between the government of Indonesia and GAM erupted in terrible violence after the Suharto regime fell in 1998. I understand that a significant number of GAM fighters came into Aceh from other countries after 1998, and the government of Indonesia also deployed approximately 30,000 to 40,000 Indonesian soldiers to the area to fight GAM and to protect their vital objects. The violence between the warring parties continued throughout the relevant time period. As a civilian contractor, EMOI was caught in the midst of this civil war. By Indonesian law, EMOI was required to accept Indonesian military soldiers assigned by Pertamina and the government of Indonesia to protect facilities that EMOI operated. EMOI did not hire or employ such Indonesian soldiers as security personnel and had no control over them. EMOI became aware of published reports in 1998, after the fall of Suharto, in publications such as Business Week, alleging that Indonesian military personnel committed human rights abuses. I have not seen any evidence in the preparation for this deposition that EMOI was aware of such allegations prior to 1998. I did see evidence that during the relevant time period EMOI repeatedly requested of Pertamina that the assigned government security for the facilities only serve in a defensive function and observe all laws in their conduct.

Plaintiffs' Counsel: I will move to strike as nonresponsive. Sir, let me ask you —

Defense Counsel: Excuse me, the witness is not done.

Witness: I'm addressing topic 2, correct? So I would like to give you a full answer.

Plaintiffs' Counsel: Sir, let me ask you a question. Are you reading your answer?

Witness: Yeah, I have notes.

Plaintiffs' Counsel: Are you reading an answer that was prepared for you by counsel?

Witness: These notes have been prepared as a consequence of the extensive period of preparation that I have referred to, and they are a distillation of notes that I have to aid my recollection.

Plaintiffs' Counsel: Was that whole speech you just gave, was that written by defense counsel for you?

Defense Counsel: Objection to form.  Objection to form.

Mr. Snell: So there were 34 topics, including a number of subtopics. The topics are very extensive, very wide-ranging.  To reasonably and accurately respond to the topics that you have identified in your notice, I have notes that will enable me to do that.

Plaintiffs' Counsel: My question, sir — my question, sir, was what you just read prepared by counsel, by the defense team?

Witness: No, these notes were prepared in consultation with counsel.

Plaintiffs' Counsel: And did you write those words yourself or did counsel write them for you, sir?

Witness: As I said, these notes were prepared in consultation with counsel and with their assistance.

Plaintiffs' Counsel:  Okay, now, sir, I'm not interested in the long narrative that someone has written — that you or someone else has written for you. My question —

Defense Counsel: Objection to form.

Plaintiffs' Counsel:  Alex, let me finish making my question.  You want to talk about professional conduct.  Let me ask my question before you interrupt or you object. My question is quite specific, sir. Did EMOI take steps to make sure that senior management was informed about the human rights record of the Indonesian military in Aceh?

Defense Counsel: Objection to form.

Witness:  I was in the middle of responding to your reference to topic 2.

Plaintiffs' Counsel:  Sir, put topic 2 aside. I'm asking a very specific question. Did EMOI take steps to make sure that senior management was informed about the human rights record of the Indonesian military in Aceh?

Defense Counsel: Objection to form. Please continue.

Mr. Snell: Yes, so continuing where I left off, I also saw that when EMOI became aware of allegations of misconduct on the part of military, EMOI would, as a practice, elevate those concerns to Pertamina, the Indonesian military, and the Indonesian government, and request that the military abide by law and show respect for human rights, and to investigate the matter.  Although this is not an exhaustive list, for example, Ron Wilson, who is the highest-ranking EMOI employee in Indonesia, notified Pertamina that there were rumors that the Indonesian military allegedly tortured civilians, made clear that EMOI does not condone the reported acts, if true, and urged Pertamina to ensure the safety of all citizens in Aceh. Similarly, when an EMOI security guard was killed, Jim Russell and Ron Wilson informed several colonels and lieutenant colonels in the Indonesian military, that quote, "MOI management was extremely concerned about the safety and security of its employees and has requested security authorities to conduct a thorough investigation." Several witnesses in the past have been questioned extensively by the plaintiffs about this topic.  Just as examples, I will incorporate some of Lance Johnson's and Ron Wilson's deposition testimony on this point.  Of course this testimony is not exhaustive on this subject.  I reference Johnson deposition conducted January 11, 2008, beginning at transcript page 242, line 15 —

Plaintiffs' Counsel: Sir, I'm going to interrupt.

Defense Counsel: Excuse me, the witness is not done yet.

Plaintiffs' Counsel:  I am going to interrupt.  This is filibustering.  It is improper —

Defense Counsel: No, no, no.

Plaintiffs' Counsel:  Let me finish.

Defense Counsel: That —

Plaintiffs' Counsel:  Alex, let me finish. This is filibustering.  It is improper and it is sanctionable. I would ask — I'm going to move to strike the whole answer as nonresponsive.

Snell Tr. 25:4–34:22.  Mr. Snell read his long answers from a set of notes he had before him.

*Compare id.* at 27:18–29:23, 32:19–34:8, *with* Pls.' Mot., Ex. D at 6–7.  Those notes were not

identified and marked as an exhibit until the very end of the deposition.  Snell Tr. 362:14–15

Much of the deposition followed this pattern.  And even when Mr. Snell did not read from his notes, he often gave nonresponsive answers.

To enable thorough analysis of Mr. Snell's conduct at his deposition, the Court categorizes each of the questions the plaintiffs' counsel asked him and each of the responses he gave.[3]  *See infra* Appendix.  The Court categorizes questions as either (1) preliminary to the deposition, (2) foundational (or about the record), or (3) substantive.  It categorizes answers as (1) responsive, (2) nonresponsive, (3) asserting insufficient knowledge to answer, or (4) precluded by an instruction not to answer.[4]  The appendix to this opinion contains a full categorization of all the questions and answers.  As the following table summarizes, the Court's analysis establishes that Mr. Snell provided non-responsive answers to more than one hundred questions.

| | **Question Type** | | |
| --- | --- | --- | --- |
| *Answer Type* | **Preliminary** | **Foundational** | **Substantive** |
| *Responsive* | 40 | 88 | 61 |
| *Nonresponsive* | 1 | 38 | 68 |
| *Insufficient Knowledge* | 0 | 3 | 15 |
| *Instructed Not to Answer* | 0 | 0 | 2 |

*See id.*  Although categorizing questions and answers is an imprecise art, the sheer scale of the nonresponsive answers cannot be disputed.

The Court discusses the deposition in more detail later in this opinion.

---

[3] The Court's analysis excludes logistical questions (*e.g.*, questions about whether the deponent had finished reading exhibits).

[4] When Mr. Snell provided an incomplete or evasive answer, that answer is categorized as nonresponsive.  *See* Fed. R. Civ. P. 37(a)(4).  When Mr. Snell at first provided a nonresponsive answer but eventually provided a responsive answer, that answer is categorized as responsive.

After the deposition, the plaintiffs canceled the Rule 30(b)(6) deposition of ExxonMobil's designated representative, who was also Mr. Snell.  Pls.' Mot., Ex. P.

On April 22, 2021, Ms. Oh withdrew her appearance on behalf of the defendants, stating that she would resign from her firm to take a job with the federal government.  Notice of Withdrawal, ECF No. 797.

## II.   LEGAL STANDARDS

### A.  Motions to Compel Deposition Answers

Federal Rule of Civil Procedure 37 governs motions to compel.  It allows a party—after conferring in good faith with the opposing party—to seek an order to compel a discovery response. *See* Fed. R. Civ. P. 37(a)(1), (3).  If a deponent fails to answer questions, the deposing party may move to compel responses following the adjournment or completion of a deposition.  Fed. R. Civ. P. 37(a)(3)(B)(i), (C).  An "evasive or incomplete" answer must be treated as a failure to answer. Fed. R. Civ. P. 37(a)(4).

A party that prevails on a motion to compel is entitled to reimbursement for its reasonable expenses in making the motion, unless it failed to attempt in good faith to obtain the information on its own, the opposing party's failure to respond was "substantially justified," or an award of expenses would otherwise be unjust.  Fed. R. Civ. P. 37(a)(5)(A), (C).  Although the opposing party must have a chance to be heard on whether expenses should be awarded, a party's written opposition to a motion requesting expenses provides that opportunity.  *Alexander v. FBI*, 186 F.R.D. 78, 98 (D.D.C. 1998).

### B.  Discovery Sanctions

When a party engages in a specified type of misconduct, courts may also impose discovery sanctions.  With depositions, Rule 37 authorize courts to sanction a party's failure to appear or to comply with a discovery order.  Fed. R. Civ. P.  37(b)(2), (d)(1)(A)(i).  The Rules also authorize

courts to sanction any person who "impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 37(d)(2).

In addition to the authority conferred in the Rules, Courts also have inherent authority to sanction bad-faith and abusive litigation practices. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44– 45 (1991). Courts must use that authority "with restraint and discretion," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980), and only after establishing the misconduct by clear and convincing evidence, *Ali v. Tolbert*, 636 F.3d 622, 627 (D.C. Cir. 2011); *see also* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 26(A)(3) (6th ed. 2020). Inherent sanctions are reserved for severe misconduct. Courts have awarded inherent sanctions, for example, against counsel for dissuading witnesses from testifying, *see, e.g.*, *Cleary Gottlieb Steen & Hamilton LLP v. Kensington Int'l Ltd.*, 284 F. App'x 826, 828–29 (2d Cir. 2008), and for inducing witnesses to give false testimony, *see, e.g.*, *Ibarra v. Baker*, 338 F. App'x 457, 465–69 (5th Cir. 2009).

## III.   ANALYSIS

The Court will address in turn the plaintiffs' motion to compel, the plaintiffs' motion for sanctions, and the defendants' cross-motion for sanctions. It will then turn to various allegations the defendants' made about Mr. Pierson in their filings.

### A.  Plaintiffs' Motion to Compel

To determine whether the plaintiffs' motion to compel should be granted, the Court must determine whether Mr. Snell failed to answer questions at his deposition. *See* Fed. R. Civ. P. 37(a)(3)(B)(i), (a)(4). The answer is a clear "yes." *See* Appendix. Mr. Snell failed to answer 110 questions, and the defendants have not raised privilege objections to any of those questions. *See id.* The motion to compel, therefore, must be granted.

The Court will order the defendants to produce Mr. Snell to respond under oath to every question for which the Court categorized Mr. Snell's answer as nonresponsive in the Appendix.  If defense counsel objected to any of those questions during Mr. Snell's initial deposition, counsel may restate those objections briefly and without argument.

Because the Court will grant the motion to compel, it must award the plaintiffs their reasonable expenses (including attorney's fees) in making the motion unless (i) the plaintiffs failed to make a good faith attempt to obtain the answers without court action, (ii) Mr. Snell's failure to respond was substantially justified, or (iii) awarding expenses would otherwise be unjust.  *See* Fed. R. Civ. P. 37(a)(5)(A).  The plaintiffs sought repeatedly during the deposition to obtain answers, the defendants' offer no justification for Mr. Snell's failure to respond, and there is no reason to think awarding expenses would be unjust.  The plaintiffs are thus entitled to an award of their expenses.

### B.  Plaintiffs' Motion for Sanctions

The plaintiffs seek sanctions, arguing that the defendants' conduct violated the Court's order establishing the deposition protocol and that both witness Snell and defense counsel Oh engaged in sanctionable conduct.

#### 1.  Violation of Deposition Protocol

By order, the Court required that all depositions adhere to a protocol it established.  Order 3 (Sept. 24, 2020).  The protocol set express limits on what records a witness may access during a deposition:

> **Records Available to Witness.**  While the deposition is on the record, the witness shall not have access to any form of information related to the litigation other than exhibits specifically marked and identified for the record by either side, including but not limited to the internet, phones or other devices or materials that contain any notes, files or documents that relate to the subject matter of the

litigation.  For the avoidance of doubt, this paragraph is not intended
to apply to breaks when the deposition is off the record.

*Id.* at 8.  Those limits were intended to safeguard the integrity of remote depositions.  The plaintiffs

argue that Mr. Snell violated the protocol when he had access to eighty-five pages of detailed notes

during the deposition.  Pls.' Mot. 34.  The notes were not marked as an exhibit or provided to the

plaintiffs until the final minutes of the deposition.  Snell Tr. 362:14–15.  The defendants, in turn,

argue that by marking the notes at the end of the deposition, they complied with the protocol.  The

defendants also state that "defense counsel offered the notes to the questioning attorney within the

first hour of the EMOI deposition."  Defs.' Reply 15; *see also* Defs.' Opp'n/Cross Mot. 2, 10, 11–

12, 14, 15 n.14.  But the record does not support that claim.  What Ms. Oh said was "We are

prepared to mark these notes *after he has reviewed them and answered your questions*."  Snell Tr.

61:20–23 (emphasis added).  Her offer was not to immediately remedy the violation of the

protocol.  Rather, she offered to do what she eventually did: allow Mr. Snell to "review" the notes

and answer the questions and then mark the notes as an exhibit at the end of the deposition.  Defs.'

Opp'n/Cross-Mot. 14–15.  The plaintiffs' argument must prevail.

Start with the protocol's text.  It governs a witness's access to materials while the

deposition is "on the record," not what happens at the very end of the deposition.  Furthermore,

the only exception to the general prohibition on access is for "exhibits specifically marked and

identified for the record by either side."  Marked and identified are in the past tense, indicating

that exhibits must be formally presented before the exception applies.  Thus, until an exhibit has

been marked and identified, a witness may not access it while the deposition is on the record.

That plain-text reading of the protocol supports the protocol's purpose: ensuring the

integrity of remote depositions.  As defense counsel has acknowledged, a remote deposition poses

challenges that a live deposition does not.  *See* Snell Tr. 181:15–24.  One of those challenges is

ensuring that witnesses testify without improper coaching or access to materials.   Indeed, the defendants objected to the deposition protocol because they felt it did not go far enough to protect the integrity of the depositions.   *See* Defs.' Opp'n to Pl.'s Mot for Extension & Entry of Dep. Protocol 7–9, ECF No. 747.   The prohibition on witness access to records provides a crucial integrity safeguard: it prevents witnesses from surreptitiously reading answers from notes.   Virtual depositions make such a rule necessary because the examining attorney may be unable to see what materials the witness has before him.   *See* Snell Tr. 236:9–237:6.   *But see* Order 5 (Sept. 24, 2020) ("Each party reserves the right to request the videographer display . . . the video from a sufficient number of camera angles, if practicable, to safeguard the integrity of the deposition, and to ensure that all activities occurring in the room are visible to all remote participants, including the Court, if necessary.").   Marking exhibits at the end of the deposition would hamper the effectiveness of the requirement because it would deprive the opposing party of the ability to question the defendants about the exhibits.   Text and purpose both confirm that the protocol requires the marking and identifying of exhibits before a witness may have access to information.

Mr. Snell violated the protocol.   His notes contained nothing but information related to the litigation.   They were not marked until the closing minutes of the deposition.   And he had access to them while the deposition was on the record and before they were marked and identified.   Thus, he contravened the Court's Order implementing the protocol.

The next question is whether that violation is sanctionable.   The answer turns on whether the Order entering the protocol, itself essentially a Rule 26(c) protective order, is an "an order to provide or permit discovery."[5]   Fed. R. Civ. P. 37(b)(2)(A).   It is.

---

[5] Upon a showing of bad faith, violation of the order could also be sanctionable under the Court's inherent powers or under 28 U.S.C. § 1927.   The Court need not and does not decide whether those forms of sanctions apply.

The Court acknowledges a split between the Circuits on whether all protective orders fit within the scope of Rule 37(b). *Compare Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 489–90 (5th Cir. 2012); *Blum v. Schlegel*, 108 F.3d 1369 (2d Cir. 1997); *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 630, 630–31 (8th Cir. 1984); *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 783–84 (9th Cir. 1983), *with Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1323 (11th Cir. 2001); *see generally* Joseph, *supra* § 48(A)(3).   And it also acknowledges that the D.C. Circuit has not yet addressed this question.   But given the type of protective order here, the Court holds that Rule 37(b) allows sanctions.

The Order entering the protocol provided that discovery may be had on certain terms.   It was thus an order permitting discovery.   While some protective orders—for example protective orders prohibiting certain conduct—may not fit within Rule 37(b), a protective order that allows discovery to go forward does. *See Smith & Fuller*, 685 F.3d at 489; *cf.* Joseph, *supra* § 48(A)(3) (arguing that all orders that set terms of discovery fit within 37(b)). That reading also agrees with the relevant advisory committee note, which explains that "[t]he scope of Rule 37(b)(2) [has been] broadened by extending it to include *any order* 'to provide or permit discovery,' including orders issued under Rules 37(a) and 35. Various rules authorize orders for discovery—*e.g.*, Rule 35(b)(1), *Rule 26(c)* as revised, Rule 37(d). Various rules authorize orders for discovery—*e.g.*, Rule 35(b)(1), *Rule 26(c)* as revised, Rule 37(d)." Fed. R. Civ. P. 37, advisory committee's note to 1970 amendment (emphasis added).   Therefore, Mr. Snell's violation of the discovery protocol subjects the defendants to sanctions.

## 2. Deponent's Conduct

Sanctions for a deponent's "imped[ing], delay[ing], or frustrat[ing] the fair examination of [himself]," Fed. R. Civ. P. 30(d)(2), are awarded when a deponent's conduct is "severe, repeated, and pervasive." *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 196–97 (E.D. Pa. 2008).

The plaintiffs argue that Mr. Snell impeded his deposition when he repeatedly provided nonresponsive and evasive answers, when he read nonresponsive answers verbatim from a script, and when he misled the plaintiffs' counsel about whether he was reading from a script.

### (i) Nonresponsive Answers

Mr. Snell's nonresponsive answers impeded his deposition. He failed to answer most of the substantive questions he was asked. *See* Appendix (showing that Mr. Snell provided sixty-one responsive and sixty-seven nonresponsive answers to substantive questions). Many of those questions went to the core of the plaintiffs' case. *See, e.g.*, Snell Tr. 25:22–29:25 (failing to respond to question about whether EMOI tried to inform senior management about the human rights record of the Indonesian military in Aceh), 341:15–342:16 (failing to respond to question about whether EMOI had knowledge about troop activities in local villages), 356:15–358:8 (failing to respond to question about whether EMOI briefed soldiers abut use of force and torture). Mr. Snell's failure to answer them materially deprived the plaintiffs of information to which they are entitled.

Perhaps more egregiously, even when Mr. Pierson asked him simple foundational questions, Mr. Snell did not provide responsive answers to almost one-third of them. *See id.* Mr. Snell's refusal to answer such basic questions responsively suggests that he consciously intended to delay the deposition. He repeatedly refused to answer whether he had read testimony in preparation for his deposition. *See, e.g.*, Snell Tr. 108:9–109:3. And he also hampered examining

counsel's attempts to lay foundation for his questions by refusing to establish the content of exhibits on the record. *See, e.g.*, *id.* at 284:13-285:4.

Moreover, the Court's analysis of Mr. Snell's responsiveness *understates* his obstructive conduct. Indeed, the Court credited Mr. Snell if he provided a responsive answer at any time during the deposition. Thus, within many of Mr. Snell's "responsive" answers are egregious and intentional delays. *See, e.g.*, *id.* at 285:16–294:9 (long colloquy to establish that Mr. Snell had not read EMOI risk assessments to prepare for deposition); *see also* 5 Snell Video at 36:27–45:28 (reflecting that exchange took nine minutes).

Upon through review of both the transcript and video, the Court has no doubt that Mr. Snell severely, repeatedly, and perversely obstructed his own deposition. That conduct merits sanctions.

### (ii) Scripted Answers

Over the course of the deposition, Mr. Snell repeatedly read long answers directly from his notes. *Compare* Snell Tr. 24:27–29:23, 32:19–34:8, 223:2–225:17, 230:21–233:8, *with* Pls. Mot., Ex. D at 6–8; *compare* Snell Tr. 281:18–282:24, *with* Pls. Mot., Ex. D at 10–11; *compare* Snell Tr. 261:10–23, 262:19–25, 264:4–18, *with* Pls. Mot., Ex. D at 25; *compare* Snell Tr. 52:10–56:18, 315:25–319:13, *with* Pls. Mot., Ex. D at 35–36; *compare* Snell Tr. 98:8–22, 112:24–113:16, 116:12–23, 131:21–132:28, 137:20–138:7, 141:14–25, 243:16–23, 244:20–245:3, 247:17–24, 256:14–23, 328:7–15, 328:24–329:8, *with* Pls. Mot., Ex. D at 40; *compare* Snell Tr. 170:11–172:22, *with* Pls. Mot., Ex. D at 41–42; *compare* Snell Tr. 287:17–293:2, *with* Pls. Mot., Ex. D at 57–59. While a handful of those answers were responsive, *see* Snell Tr. 244:20–245:3, 247:17–24, 256:14–23, 328:7–15, 328:24–329:8, most were not. Mr. Snell's reading of nonresponsive answers impeded his deposition by wasting time and depriving the plaintiffs of information to which they were entitled.

To be sure, Rule 30(b)(6) deponents may rely on notes, *see Alexander*, 186 F.R.D. at 143, if they otherwise comply with the appropriate deposition procedures, *see, e.g.*, *supra* Section III.B.1.   But of course, there is a difference between relying on notes and reading verbatim nonresponsive answers.   Beyond the impropriety of reading, witnesses may not use notes to provide nonresponsive answers.   And while Rule 30(b)(6) depositions must generally stick to the noticed topics, witnesses are not free to provide only general answers to the noticed topics.   They must answer the specific questions posed to them.   Here, Mr. Snell treated the topics listed in the notice of deposition like interrogatories calling for an oral response, and he used his notes to filibuster.   That was improper.   And it pervasively disrupted the deposition, meriting sanctions.[6]

### (iii) Misleading Answers

During the deposition, Mr. Snell repeatedly provided inaccurate answers to the question of whether he was reading from his notes.[7]   *See* Snell Tr. 30:8–17, 59:8–63:25, 68:25–70:9, 94:15–95:12, 99:5–12, 113:20–114:3, 124:13–17, 133:16–19, 142:2–21, 172:25–174:8, 226:2–228:12, 283:6–9, 293:5–15, 294:10–295:15, 319:20–320:3.   He also provided evasive answers to the question of who prepared his notes.   *See id.* at 30:11–31:20, 64:2–68:24, 70:10–73:13, 95:13–96:20, 99:13–100:5, 228:13–25, 283:10–15, 295:16–296:9, 320:4–10.

---

[6] Because that is so, the Court need not and does not reach whether the notes were prepared improperly.   As it stands, the record is not clear enough to determine who played what role in drafting the notes.   *See infra* Part III.B.2.iii.

[7] The defendants assert that Mr. Snell said that he was reading from his notes.   Defs.' Opp'n/Cross Mot. 24 (citing Snell Tr. 30:8–10).   The portion of the transcript the defendants cite consists of Mr. Pierson asking, "Are you reading your answer?" and Mr. Snell replying "Yeah, I have notes."   Snell Tr. 30:8–10.   At best, that answer is ambiguous as to whether Mr. Snell had read his answer from his notes.   The more favorable interpretation to him is that he meant "Yes, I am reading from my notes."   But the other way to read it is that he meant simply "Yes, I do have notes."   The lack of a pause between the words "yeah" and "I" supports the later reading, *see* 1 Snell Video 28:52–54, as does Mr. Snell's repeated obfuscation every other time Mr. Pierson posed that question to him, *see* Snell Tr. 59:8–63:25, 68:25–69:7, 94:15–95:12, 98:25–99:12, 113:20–114:3, 124:13–17, 133:16–19, 142:2–21, 172:24–174:8, 226:2–228:12, 283:6–9, 293:5–15, 294:10–295:15, 319:20–320:3.   Based on the entire record, the Court does not credit the defendants' interpretation of Mr. Snell's statement.   Instead, it concludes that his answer was nonresponsive.

When Mr. Snell said he was "relying on [his] notes" or using his notes as an "aide-mémoire," *see, e.g.*, *id.* at 67:23–25, he provided misleading testimony because he failed to acknowledge that he was reading his answers.  And because Mr. Snell knew that he was reading long portions of his notes verbatim, he must have knowingly provided misleading testimony.  Mr. Snell may have scrupulously avoided denying that he had been reading from his notes.  But candor required him to answer the oft-asked question in the affirmative.  Because Mr. Snell repeatedly answered that question in a deliberately misleading manner, the Court determines that his conduct is sanctionable.

As for Mr. Snell's responses as to who prepared his notes, the record does not provide enough information to determine whether those responses were candid.  To be sure, that lacuna in the record results from Mr. Snell's misconduct.  And while the Court cannot conclude that these answers merit sanctions, its order granting the motion to compel should produce a clear answer to the question shortly.

### 3.  Defense Counsel's Conduct

The plaintiffs argue that defense counsel's conduct was sanctionable in two ways.  First, they argue that defense counsel planned and helped implement Mr. Snell's conduct.  Pls. Mot. 38–40.  Second, they argue that Ms. Oh made false and disparaging statements about Mr. Pierson during the deposition.  *Id.* at 39.

#### (i)  Abetting Misconduct

Sanctions for a defending attorney's "imped[ing], delay[ing], or frustrat[ing] the fair examination of [a] deponent," Fed. R. Civ. P. 30(d)(2), are awarded when counsel's conduct repeatedly disrupts the deposition and prevents it from proceeding fairly.  *See, e.g.*, *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 333 F.R.D. 302, 305 (S.D.N.Y. 2019); *Chawla v. Metro. Oral*

*Surgery Assocs., P.C.*, No. 11-cv-6248-RRM-VMS, 2014 WL 4678023, at *7 (E.D.N.Y. Sept. 19, 2014) (collecting cases).  Defense counsel meets that standard in two ways.

First, the record suggests that defense counsel preplanned Mr. Snell's conduct.  The clearest indication comes after the first answer Mr. Snell read.  Mr. Snell finished a paragraph and stopped speaking.  1 Snell Video 23:35–38; *see also* Snell Tr. 29:17–23.  Mr. Pierson moved to strike the answer as non-responsive.  Snell Tr. at 29:24–25.  And then Ms. Oh jumped in in to say, "Excuse me, the witness is not done."  1 Snell Video 23:41–43; *see also* Snell Tr. 30:3–4.  Mr. Snell then said, "I'm addressing topic 2, correct?  So I would like to give you a full answer."  Snell Tr. 30:5–7.  The only way that Ms. Oh could have known that Mr. Snell was not finished with his "full answer" would be if she had expected him to read the entire topic-two portion of his notes.  And because this was the first time Mr. Snell read from his notes and the first time Mr. Pierson interrupted that reading, Ms. Oh must have learned before the deposition started that Mr. Snell intended to read entire nonresponsive portions of his notes to answer specific questions.  Thus, the Court finds by the preponderance of the evidence that defense counsel and Mr. Snell planned for Mr. Snell to read long and general answers into the record from a set of notes in violation of the discovery protocol.

Second, an attorney defending a deposition has a duty to try to curb his client's misconduct in the deposition.  *See GMAC Bank*, 248 F.R.D. at 195–96.  Despite Mr. Pierson's repeated requests, *see* Snell Tr. 56:25–57:7, 227:20–24, 223:23–234:8, Ms. Oh apparently never did anything to encourage Mr. Snell to answer questions responsively.  Nothing in the transcript and nothing in the defendants' filings suggests that she ever instructed Mr. Snell to provide direct answers to specific questions.   Ms. Oh is therefore responsible alongside Mr. Snell for his misconduct.

Because the record establishes that defense counsel was responsible for "imped[ing], delay[ing], or frustrat[ing] the fair examination of [a] deponent," Fed. R. Civ. P. 30(d)(2), sanctions are appropriate.

### (ii) False and Disparaging Statements

In their filings, defense counsel repeated many of the statements from the deposition to which the plaintiffs object.   The Court comprehensively addresses the statements in the defendants' filing below.   *See infra* Part III.D.   That analysis—which finds that the statements lack support in the record—suffices to address the grievances the plaintiffs raised in their motion for sanctions.

\* \* \*

Having determined that the defendants' conduct was sanctionable, the Court turns to the proper sanctions.   Sanctions must be proportional to the degree of misconduct.   *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996).   A sanction is proportional if it accounts for prejudice to the opposing party and to the justice system and if it meets the need to deter similar misconduct in the future.   *See id.*

The plaintiffs seek four sanctions: (1) an order permitting plaintiffs to proceed with ten hours of questioning of the 30(b)(6) representatives of EMOI and ExxonMobil, (2) an order requiring responsive and concise answers and concise and nonargumentative objections in the resumed depositions, (3) an order compelling the defendants to provide any notes to defense counsel at least one hour before the depositions, and (4) an order requiring the defendants to pay their fees and costs of litigating these motions and in preparing for the resumed deposition.   Pls.' Mot. 42–43.

The plaintiffs' requests are limited in scope.  They ask for the chance to fairly depose the defendants' corporate representatives and they ask the defendants to bear the costs associated with their misconduct.  They are entitled to that relief.   The Court will also allow the plaintiffs a full seven hours both to redepose the EMOI 30(b)(6) representative and to depose the ExxonMobil 30(b)(6) representative.  *See* Fed. R. Civ. P. 30(d)(2).  The defendants' conduct should not permit them to truncate the ExxonMobil deposition; that would be an improper windfall.

Indeed, if anything, the Court is concerned that these sanctions may not go far enough to deter future misconduct.  Ultimately, though, the Court is confident that it has made clear what it expects and that the defendants will abide by the Court's orders.  If not, the Court will not hesitate to avail itself of the full panoply of Rule 37(b)(2)(A) sanctions.

### C.  Defendants' Cross-Motion for Sanctions

The defendants' cross-motion for sanctions alleges that the plaintiffs served their 30(b)(6) deposition notice in bad faith, that Mr. Pierson impeded his own examination of Mr. Snell, and that the plaintiffs' improperly canceled the Rule 30(b)(6) deposition of ExxonMobil Corporation at which Mr. Snell was scheduled to appear.  None of those contentions has merit.

#### 1.  Notice of Deposition

The Court may sanction bad faith conduct in litigation if it finds by clear and convincing evidence that misconduct occurred.  *Ali*, 636 F.3d at 627.

The defendants argue that the plaintiffs served their notice of deposition in bad faith because the notice identified thirty-four topics and subtopics and Mr. Pierson did not ask questions

21

about most of those topics during the deposition.[8]  Defs. Opp'n/Cross Mot. 27–29; Defs.' Reply 10–14.

The record of the deposition does not support the defendants' contention.  Instead, it shows that Mr. Snell's delaying tactics and nonresponsive answers consumed much of the time allocated for the deposition.  Even the defendants admit that Mr. Snell spent more than ten percent of the deposition reading largely nonresponsive answers from his notes.  Defs.' Reply 15.  They say almost as much time went to the still-unanswered questions about Mr. Snell's notes.  *See id.* at 12.  Given the time Mr. Snell spent fighting Mr. Pierson's efforts to lay foundation, the time Mr. Pierson had to ask substantive questions becomes vanishingly small.  In short, the defendants are in no position to say that the plaintiffs' deposition conduct reflects bad faith when it was the defense witness and defense counsel who derailed the deposition.[9]  Far from clear and convincing evidence of misconduct, the defendants have not even produced enough evidence to show by a preponderance that the plaintiffs' counsel served the deposition notice in bad faith.

---

[8] The defendants also argue that the plaintiffs' counsel should have identified each question by notice topic.  Defs.' Opp'n/Cross-Mot. 16–19; *but see* Defs.' Reply at 14 (backing away from that argument).  They cite no authority for that proposition, and the Court has located none to support it.  The topics in a Rule 30(b)(6) notice exist to "enable the responding organization to identify the person who is best situated to answer questions about the matter, or to make sure that the person selected to testify is able to respond regarding that matter."  8A Richard L. Marcus, *Federal Practice and Procedure* § 2103 (3d ed., Apr. 2021 update).  Nothing in the rules oblige an examining attorney to link his questions to a topic, though Mr. Pierson at times did so.  *See, e.g.*, Snell Tr. 25:8–11, 197:5–8.  The defendants also argue that they were led to believe that the plaintiffs' counsel would question by topic because they had done so during the 2007 Rule 30(b)(6) depositions.  But those depositions are easily distinguished because the defendants designated different representatives to testify on different topics.  *See* Boydell Tr. 13:8–16:3; Fitzpatrick Tr. 19:13–15; Boydell Tr. 16:8–11; *see also* Fitzpatrick Dep., Ex. 4.  Identifying topics in that context makes perfect sense because it helps clarify whether the questions are appropriately posed to the witness.

[9] The Court trusts that when the deposition resumes, plaintiffs' counsel will examine the witness on all or almost all the topics in the notice.  Failure to do so may support a renewed motion for sanctions.

### 2.   Improper Questioning and Deposition Conduct

The defendants advance three arguments as to why Mr. Pierson impeded the deposition.[10] They point to alleged instances of Mr. Pierson interrupting Mr. Snell's answers, moving to strike responsive answers, and asking repetitive or harassing questions.   The defense's case does not hold water.

#### (i)   Interruptions

Sanctions for excessive interruptions on the part of deposing counsel are rare and reserved for extraordinary misconduct.   *See, e.g.*, *Tajonera v. Black Elk Energy Offshore Operations, LLC*, No. 13-cv-366, 2015 WL 13533520, at *7–14 (E.D. La. Sept. 30, 2015) (sanctioning examining counsel for "repetitive and harassing questioning" and "interrupting, arguing with[,] and lecturing the witness").   The defendants have not established that here.

The defendants offer seven examples of interruptions they believe to be improper.   *See* Defs.' Opp'n/Cross-Mot. 32 (citing Snell Tr. 34:9–14, 227:3–228:3, 233:9–234:8, 283:4–5), 33 (citing Snell Tr.  276:19–277:19; 336:3–16, 351:24–352:19).

In two of the defendants' examples, Mr. Pierson stopped Mr. Snell from reading long non-responsive answers from his notes.   In the first example, Mr. Pierson asked Mr. Snell "Did EMOI take steps to make sure that senior management was informed about the human rights record of the Indonesian military in Aceh?"   Snell Tr. 32:13.   After Mr. Snell resumed reading a non-responsive answer from his notes, *see id.* at 32:19–34:8 (describing how EMOI raised allegations of misconduct to Indonesian officials); *see also* Pls.' Mot., Ex. D at 7 (verbatim text of testimony), Mr. Pierson interrupted, Snell Tr. 34:9.   Similarly, in the the third example, the Mr. Pierson asked

---

[10] The defendants also argue in passing that the plaintiffs' counsel baselessly threatened sanctions Defs.' Opp'n/Cross-Mot. 30.   Any threats the plaintiffs' counsel made to seek sanctions had merit.   *See supra* Part III.B.

Mr. Snell "Did EMOI's management become aware of the intonation reported in the first two paragraphs [of a December 7, 2000 *Wall Street Journal* article] under Claims of Abuse in the year 2000?" *Id.* at 230:11–14. Again Mr. Snell began reading a nonresponsive answer verbatim from his notes.[11] *Id.* at 230:19–233:8 (describing how EMOI raised allegations of misconduct to Indonesian officials); *see also* Pls.' Mot., Ex. D at 7 (verbatim text of testimony). Mr. Pierson asked Mr. Snell if he was finished and, upon being told that Mr. Snell had a lot more to add, moved to strike the answer as nonresponsive. Snell Tr. 233:9–14.

In one example, Mr. Pierson may have short-circuited a wholly nonresponsive answer. In the second example, Mr. Pierson arguably interrupted Mr. Snell—and only when Mr. Snell offered an answer to a different question than he was asked. *Id.* at 226:22–227:20 ("Q: Were you reading it from the materials in front of you . . . A: Yeah, so, again I'm about to give you some examples.").

In one example, Mr. Pierson interrupted when Mr. Snell provided long and irrelevant answer to a foundational question. In the fourth example, Mr. Pierson asked Mr. Snell to establish the contents of the text of an exhibit. *Id.* at 281:10–16 ("That's the first condition he specifies, correct?"). Mr. Snell answered that binary question, *id.* at 281:17 ("Yeah[.]"), and then embellished his response with a reading from his notes, *id.* at 281:17–283:3 (describing requirements of Indonesian law for facility protection); *see also* Pls.' Mot., Ex. D at 10 (near verbatim text of testimony). Mr. Pierson cut off his recital and moved to strike the answer as non-responsive. Snell Tr. 283:4–5.

Finally, three examples contain no interruptions at all. In both the fifth and sixth examples, Mr. Pierson moved to strike nonresponsive addenda to yes-or-no foundational questions. *See id.*

---

[11] Notably, this was exactly the same text he had begun to read in the defendants' first example. *Compare* Dep. Tr. 32:19–34:8 *with id.* at 230:19–233:8; *see also* Pls.' Mot., Ex. D at 7 (verbatim text of testimony).

at 276:19–277:13, 336:3–16.   In the seventh example, Mr. Pierson clarified the scope of his foundational question following Mr. Snell's lengthy response.  *See id.* at 351:24–352:19.

The defendants' examples are just that: examples.  But if these are the best instances of improper interruptions the defendants can produce—and the Court has found no better in the record—then the Court has no basis to sanction Mr. Pierson.  Mr. Pierson's interruptions did not impede the deposition because Mr. Snell's nonresponsive answers themselves delayed and frustrated the deposition.  *See* Fed. R. Civ. P. 30(d)(2).  Mr. Pierson's interruptions only cut off witness-induced delay.

To be sure, all counsel must refrain from engaging in any conduct intended to disrupt a deposition.  D.C. R. Prof. Conduct 3.5(d).  Principles of decorum, courtesy, and professionalism prohibit unnecessary interruptions.  While some interruptions are unavoidable, counsel should strive to minimize them.  But though the Court generally disapproves of any counsel interrupting a deponent, the defendants have not shown that Mr. Pierson's interruptions were improper.

### (ii) Improper Motions to Strike

A motion to strike a non-responsive answer is essentially an objection, so sanctions are appropriate for improper motions to strike appropriate where the motions "essentially destroy[] a deposition."  *Fashion Exch.*, 333 F.R.D. at 305.

The defendants offer five examples of motions to strike they believe to be improper.  *See* Defs.' Opp'n/Cross-Mot. 30–31 (citing Snell Tr. 91:5–94:14, 217:7–17, 315:7–319:19), 31 n.32 (citing Snell Tr.  169:22–172:23; 199:9–200:10).  They also say that Mr. Pierson moved to strike Mr. Snell's testimony twenty-five times.  Defs.' Reply 13 n.6.

In four of the five examples, Mr. Pierson moved to strike on-topic but nonresponsive responses to specific questions.  *See* Snell Tr. 169:12–172:23 (question about whether Mr.

25

Chong's role in Aceh facilities was incidental; answer about Mr. Chong's communications to MOI management), 197:2–200:10 (question about Mr. Connor's employer during specific period; answer about Mr. Connor's reporting relationship during part of that period), 315:7–319:19 (question about whether EMOI provided weekly reports to Exxon management in the United States; answer about ad hoc and unspecified periodic reports).  Consider one of these examples:

> Plaintiffs' Counsel: Now, is it true, sir, that during the 1999–2001 period we're talking about, if EMOI became aware of credible information that the military guards at Arun Field threatened or harmed EMOI's own employees, EMOI's policy was to take a number of steps to address this?

> Defense Counsel: Objection.  I request identification of the topic.

> Plaintiffs' Counsel: Go ahead, sir.

> Defense Counsel: You refuse to provide it?

> Plaintiffs' Counsel: Go ahead.

> Witness: Again, if you are kind enough to identify the topic, it will be able to move things along greatly.  Again, I'm a 30(b)(6) deponent.  I don't have any direct knowledge of this and I need to be in a position to respond to the topic accurately, and for that reason I will continue to review my notes in order to be able to identify the topic that you are referencing and you are not actually telling me.

> Plaintiffs' Counsel: Sir, is it the case — was it the case in the 1999-2001 time period that if EMOI became aware of credible information that the military guards at Arun Field threatened or harmed EMOI's own employees, EMO I's policy was to take a series of steps to address this?

> Defense Counsel: Objection.

> Witness: So I believe I've responded to this topic previously, because this is topic 3(k) and 3(1). I'm happy to respond to this topic again.

> Plaintiffs' Counsel: Sir, I want you to answer the question that I'm asking, please. The question is —

> Witness: As I explained it earlier, EMOI had systems and practices in place to report all incidences relating to safety, health and

environmental issues, which of course would capture allegations of physical abuses or human rights abuses.  In the course of preparing for this deposition, I have seen documents that report such security incidents on a weekly or daily basis during the relevant time period. The number and frequency appears to be dependent on the state of the civil war at the time. The incidences reported appear to capture violence inflicted on both sides of the war, against GAM, against soldiers, and against civilians.  The reports were generally made from EMOI employees or security advisors in the Arun Field facilities to EMOI management, who then elevated the incidences to Pertamina, the military, the government of Indonesia. EMOI management requested investigation or discipline, as appropriate. EMOI was not in a position to investigate allegations of abuses in Aceh as a civilian contractor operating in a war zone. EMOI had no ability to investigate any allegations of misconduct against the military or against GAM.  Often the allegations appeared to be nothing more than rumors. The only option for EMOI was to report the incident to official authorities and request that they take appropriate action.  With respect to topic 3(l), in preparing for this deposition, I did not see any complaints made about the behavior of any EMOI security employees.  In respect to Indonesian military assigned by Pertamina to protect the Arun Field facilities, they were not EMOI security personnel.  Even so, I did see in a few instances that when specific complaints about an Indonesian soldier regarding the7 facility were brought to EMOI's attention, EMOI's practice was to report the allegation up the chain to management, up to and including Ron Wilson, who was the country manager at the time. Ron Wilson would then raise the complaint with Pertamina or the military, as appropriate, and this was the proper channel under the PSC.  I saw one instance where EMOI responded to — where the military responded to EMOI's complaint about a particular soldier by reassigning the soldier. I did not see any other instances where Pertamina or the military responded to EMOI's complaints, but I would note that my review was limited to the information outside of Indonesia, per your notice.  Also, EMOI did conduct a legal investigation that we have covered.

Plaintiffs' Counsel: I will move to strike as nonresponsive.

Snell Tr. 90:5–94:14.  Mr. Pierson asked a yes-or-no question.  Mr. Snell provided a 398-word

response.  At best, the first sentence evasively responded to part of Mr. Pierson's question.  But

the defendants' claim that the answer fit a pattern in which "[e]very aspect of Mr. Snell's answer

was directly responsive to the question posed," *see* Defs.' Opp'n/Cross-Mot. 30–31, is simply not true.

In another example, Mr. Pierson moved to strike a wholly non-responsive answer.  *See* Snell Tr. 217:7–17 (question about whether reporter had communicated information to EMOI management in the summer of 2000; answer about the contents of reporter's email)

Looking at each of the motions to strike Mr. Pierson made in the deposition, the Court finds a single instance in which he sought to strike a responsive answer.[12]  Even that time, part of Mr. Snell's answer was nonresponsive:

> Mr. Pierson:  Have you read [Individual 7's] testimony about Exxon soldiers from Cluster II beating and shooting [Individual 8] in the year 2000?
>
> Ms. Oh: Objection, no foundation.
>
> Mr. Snell: So, again, you know, EMOI has no knowledge of any facts whatsoever relating to any alleged events impacting any of the plaintiffs or their deceased relatives.  So, I mean, and, again, I have read extensive materials in preparation for this deposition, transcripts, so on and so forth.  *I don't specifically recollect specific allegations that you are referencing.*
>
> Mr. Pierson: I will move to strike as nonresponsive.

Snell Tr. 135:21–136:14 (emphasis added).  While Mr. Snell provided some impertinent information, he also responded to the question by informing Mr. Pierson that he did not recall reading the testimony.  That single example of an improper objection, however, is hardly comes close to meriting sanctions.

---

[12] The Appendix may appear to demonstrate additional examples of motions to strike responsive answers because the Court credited Mr. Snell for a responsive answer if he provided one at any point.  For example, if Mr. Pierson asked a question, Mr. Snell answered nonresponsively, Mr. Pierson moved to strike the answer and reposed the question, and Mr. Snell then answered responsively, that answer would be categorized as responsive.  *See, e.g.*, Appendix 13a (question 187); *see also* Dep. Tr. 217:7–25.

*(iii)Improper Questions*

When an attorney repeatedly asks questions that the witness has already answered, he frustrates the deposition.  *See E.E.O.C. v. Freeman*, 288 F.R.D. 92, 103 (D. Md. 2012).  But the same is not true if the question has been asked but not answered.

The defendants object to the number of times Mr. Pierson asked Mr. Snell whether he was reading from his notes and who wrote his notes.  Defs.' Opp'n/Cross Mot. 31.  The problem with that objection is that Mr. Snell never answered either question.  *See* Snell Tr. 30:8–31:20, 59:8–63:25, 64:2–73:13, 94:15–96:20, 99:5–100:5, 113:20–114:3, 124:13–17, 133:16–19, 142:2–21, 172:25–174:8, 226:2–228:25, 283:6–15, 293:5–296:9, 294:10–295:15, 319:20–320:10.  "Are you reading your answer?" is a yes-or-no question.  Avoiding answering it by claiming to use notes as "an aide-mémoire" provide an evasive and nonresponsive answer.  So does responding to the question "who wrote your notes?" by saying "The documents were word processed by counsel." Snell Tr. 66:22–23.  The conduct that the defendants object to just highlights how Mr. Snell impeded the deposition.

Because Mr. Snell never answered either question, Mr. Pierson was entitled to pursue a response.  Asking those two questions repeatedly was not improper.

### 3.  Cancelation of ExxonMobil Corporation Deposition

If the party noticing a deposition cancels it unilaterally, it must give appropriate notice to the other party.  Failure to do so may result in sanctions.  *Donini Int'l, S.P.A. v. Satec (U.S.A.), LLC*, No. 03-cv-9471-CSH, 2006 WL 695546, at *7 (S.D.N.Y. Mar. 16, 2006).  What notice is appropriate depends on the circumstances of cancellation.  *See Hudson v. L & W Supply Corp.*, No. H-08-cv-2471, 2009 WL 1941498, at *3–5 (S.D. Tex. July 2, 2009).

The defendants argue that the plaintiffs gave inadequate notice when they canceled the Rule 30(b)(6) deposition of ExxonMobil Corporation's designated representative—Mr. Snell.   *See* Defs.' Opp'n/Cross Mo. 31–32; Defs' Reply 15–17.

As the defendants note, the plaintiffs canceled the deposition hours after the EMOI deposition ended.   Defs.' Reply 15.   That left the ExxonMobil three days to respond to the cancelation.   *Id.*   The plaintiffs stated that they were postponing the deposition to allow them time to bring the defendants' conduct in the EMOI deposition before the Court.   *See* Pls.' Mot., Ex. P. Given the conduct detailed at length in this opinion and given that Mr. Snell would be the witness for ExxonMobil, the Court cannot say that the plaintiffs' decision was unreasonable.   Taking another deposition like the EMOI one would waste everyone's time.   The plaintiffs had no reason to believe the ExxonMobil deposition would have proceeded any differently.   And they gave ExxonMobil notice within hours of the conclusion of the EMOI deposition.   Given the circumstances, that notice was reasonable.

\* \* \*

In short, none of the defendants' allegations of misconduct stand up to scrutiny.   Their motion for sanctions, therefore, must be denied.

### D.  Allegations about Opposing Counsel in the Defendants' Filings

In their filings in support of their cross-motion and in opposition to the defendants' motion, the defendants make many allegations about Mr. Pierson's demeanor.   The defendants say:

- Mr. Pierson was "agitated and combative."  *Id.* at 12 (citing Snell Tr. 47:16–25, 75:6–13, 207:10–210:2, 322:10–17), 13 (citing Snell Tr. at 34:9–22).

- Mr. Pierson "lashed out at the witness."  *Id.* at 21 & n.20 (citing Snell Tr. 41:9– 42:18; 47:16–48:25; 75:6–76:22).

- Mr. Pierson was neither calm nor professional but rather "became unhinged . . . and repeatedly attacked and baselessly threatened to seek sanctions against the witness and counsel." *Id.* at 21 n.20 (citing Snell Tr. 32:19–34:22; 51:20–57:7; 143:20–144:5).

- Mr. Pierson engaged in "browbeating and disrespectful behavior." *Id.* at 21 n.20 (citing Snell Tr. 56:19–59:5, 64:2–70:1, 80:11–81:25).

- Mr. Pierson became "indignant and adversarial." *Id.* at 32.

- Mr. Pierson became "agitated and aggressive." Defs.' Reply at 11.

- Mr. Pierson "demonstrated a general lack of respect towards a professional adversary." *Id.* at 16–17 (citing Snell Tr. 26:2–27:3, 29:24–32:18, 34:6–38:6, 174:9–175:6, 184:4–185:13, 207:17–209:14).

Upon thorough review of both the transcript and video of the deposition, the Court cannot locate support for these claims.[13]   There are three instances on the video when Mr. Pierson raises his voice to speak over Ms. Oh and ask her not to interrupt him.  *See* 1 Snell Video 19:56–59 (raising his voice to say, "Alex, stop interrupting"); 3 Snell Video 24:05–085 (raising his voice to say, "Alex, let me finish.  Let me finish please."); 4 Snell Video 1:24–28 (raising his voice to say, "Alex, please don't interrupt me Alex.").  At no other point during the video does Mr. Pierson raise his voice.  By all indications,[14] he maintained a calm demeanor throughout the deposition.  That includes moments when Ms. Oh accused him on the record of being unprofessional or of shouting.

---

[13] By enumerating the times when the Court has found statements about Mr. Pierson without support in the record, the Court does not suggest that all other statements in the defendants' pleadings are accurate.  *Compare, e.g.*, Defs.' Reply 13–14 ("[T]he questioning attorney did not pose any questions about the referenced exhibits beyond whether he read from them accurately . . . ."), *with, e.g.*, Snell Tr. 358:9–359:20 (asking follow-up questions about notice boards reference in exhibit).  Rather, the Court focuses on the statements about Mr. Pierson because it recognizes the pernicious danger posed by attacks on an attorney's integrity.

[14] The video of the deposition does not show Mr. Pierson's face or body, so the Court must rely only on audio to characterize his conduct.

*See* 1 Snell Video 24:24–25:18; 4 Snell Video 0:35–1:45.  Thus, the record does not support the allegations defense counsel made in their filings.

An attorney may not file a document in a civil case unless he has made a reasonably inquiry and believes that "the factual contentions have evidentiary support."  *See* Fed. R. Civ. P. 11(b)(3). Because none of the evidence the defendants have cited supports their claims about Mr. Pierson's demeanor and because the Court can locate no support for those claims in the record, the Court has reason to believe that defense counsel violated Rule 11(b)(3).  For that reason, the Court will order Ms. Oh and Paul, Weiss, Rifkind, Wharton & Garrison LLP to show cause why it should not impose Rule 11 sanctions on them.[15]  *See* Fed. R. Civ. P. 11(b)(3), (c)(1), (c)(3).

## IV.    CONCLUSION

The stakes in this case are high for both parties.  The plaintiffs allege that the defendants are responsible for atrocities.  The defendants have been accused of complicity in heinous acts and, if found responsible, could be liable for millions of dollars in damages.  Highs stakes naturally lead the parties—and their counsel—to seek whatever marginal advantages they can.  But whoever prevails here will do so based on the law and the fully developed record, not discovery games.

The Court implores counsel to conduct themselves in a manner befitting their profession. For the law *is* a noble profession.  "With all their faults, [lawyers] stack up well against those in every other profession.  They are better to work or play with or fight with or drink with than most other varieties of mankind."  Harrison Tweed, Address Accepting the Presidency of the New York City Bar Association (May 10, 1945).  But that only remains true when attorneys uphold their

---

[15] The Court retains jurisdiction to issue that order despite Ms. Oh's withdrawal.  *See Lepuki v. Van Wormer*, 765 F.2d 86, 87 n.1 (7th Cir. 1985); *see also* Joseph, *supra* §§ 5(E)(2), 17(B)(1).

ethical obligations.  *See Alexander*, 186 F.R.D. at 53 (quoting Model Code of Professional Responsibility Preamble (1980)).  Counsel should behave accordingly.

Based on the foregoing, by separate order the Court will **GRANT** the plaintiffs' motion to compel and for sanctions and **DENY** the defendants' motion for sanctions.

Date: _4/26/21_

Royce C. Lamberth
United States District Judge

## APPENDIX

## QUESTIONS POSED IN SNELL DEPOSITION

| Paraphrased Question | Type | Answer | Citation |
|---|---|---|---|
| **1.** How are you today? | Preliminary | Responsive | 4:18–19 |
| **2.** Could you state your full name for the record? | Preliminary | Responsive | 4:20–23 |
| **3.** Are you testifying this morning from Singapore? | Preliminary | Responsive | 4:24–5:4 |
| **4.** Is the date in Singapore is February 15th, 2021? | Preliminary | Responsive | 5:3–5 |
| **5.** Do you understand that you are under oath today? | Preliminary | Responsive | 5:6–8 |
| **6.** Do you understand that the video of your testimony today may be presented to a jury at trial? | Preliminary | Responsive | 5:9–12 |
| **7.** Are you represented by three attorneys today? | Preliminary | Responsive | 5:13–14 |
| **8.** Do the lawyers representing you today include Ms. Oh? | Preliminary | Responsive | 5:16–18 |
| **9.** And include Mr. Conlon from Exxon Mobil Corporation? | Preliminary | Responsive | 5:19–21 |
| **10.** And include Emily Cox? | Preliminary | Responsive | 5:22–23 |
| **11.** Do you understand the acronym EMOI? | Preliminary | Responsive | 6:25–7:11 |
| **12.** Do you understand the acronym MOI? | Preliminary | Responsive | 7:12–15 |
| **13.** Do you understand how objections work? | Preliminary | Responsive | 7:16–21 |
| **14.** Who is your current employer? | Preliminary | Responsive | 7:22–25 |
| **15.** What is your job? | Preliminary | Responsive | 8:2–4 |
| **16.** Are you an attorney? | Preliminary | Responsive | 8:5–6 |
| **17.** How long have you been in that position at ExxonMobil Asia Pacific? | Preliminary | Responsive | 8:7–9 |
| **18.** Were you working for Exxon Mobil before that? | Preliminary | Responsive | 8:10–14 |
| **19.** Have you ever worked in Jakarta or Aceh, Indonesia? | Preliminary | Responsive | 8:15–25 |
| **20.** When did you work in Jakarta? | Preliminary | Responsive | 9:2–4 |

| | | | |
|---|---|---|---|
| **21.** Do you understand that the defendants have asked you to testify as EMOI's corporate representative today? | Preliminary | Responsive | 9:8–11 |
| **22.** Is it the case that later this week you will appear as the corporate representative for the other defendant, Exxon Mobil Corporation? | Preliminary | Responsive | 9:12–16 |
| **23.** Have you read the notice of deposition? | Preliminary | Responsive | 9:17–22 |
| **24.** Have you reviewed the list of topics? | Preliminary | Responsive | 10:4–10 |
| **25.** Have you read the instructions? | Preliminary | Responsive | 10:11–16 |
| **26.** How long ago did you begin preparing for this deposition? | Preliminary | Responsive | 10:21–23 |
| **27.** How many meetings or calls have you had to prepare? | Preliminary | Responsive | 10:24–11:6 |
| **28.** When were those meetings or calls? | Preliminary | Responsive | 11:7–12 |
| **29.** Were those meetings by Zoom, phone, or in person? | Preliminary | Responsive | 11:17–20 |
| **30.** Have you reviewed records? | Preliminary | Responsive | 12:2–11 |
| **31.** Did you review any records other than those the defense team chose to show you? | Preliminary | Responsive | 12:12–16 |
| **32.** Do you understand terms Exxon Mobil Corp., Mobil Corp., and EMC? | Preliminary | Responsive | 12:17–13:3 |
| **33.** Do you understand terms Exxon and Exxon Mobil? | Preliminary | Responsive | 13:4–11 |
| **34.** Do you understand an example about Exxon as term? | Preliminary | Nonresponsive (Evasive) | 13:12–18 |
| **35.** Do you understand the relevant time period? | Preliminary | Responsive | 13:19–25 |
| **36.** Do you understand the term relevant time period? | Preliminary | Responsive | 14:2–6 |
| **37.** Do you understand terms defined on pages 2–3 of notice? | Preliminary | Responsive | 14:7–15:20 |
| **38.** Is the shaded area on the map the Arun Field? | Record/Foundation | Responsive | 17:18–18:6 |
| **39.** Did EMOI have operations in the circled area? | Substantive | Responsive | 18:7–13 |
| **40.** Is that known as the remote area? | Substantive | Responsive | 18:14–17 |

| | | | |
|---|---|---|---|
| **41.** Is that where PASE and SLS EMOI operations were located? | Substantive | Responsive | 18:18–24 |
| **42.** Did EMOI have many office buildings at Point A? | Substantive | Responsive | 18:25–19:4, 23:7–12 |
| **43.** Do you see Point A? | Record/Foundation | Responsive | 22:19–22 |
| **44.** Do you see Clusters II and III? | Record/Foundation | Responsive | 22:22–23:6 |
| **45.** Do you see A1? | Record/Foundation | Responsive | 23:13–17 |
| **46.** Is A1 across from Cluster III? | Record/Foundation | Lacks Knowledge | 23:18–22 |
| **47.** Do you see A13? | Record/Foundation | Nonresponsive (Evasive) | 23:23–24:9 |
| **48.** Is A13 to the east of Cluster III? | Substantive | Responsive | 24:10–23 |
| **49.** Is Bachelor Camp down the road? | Record/Foundation | Responsive | 24:24–25:3 |
| **50.** Did EMOI take steps to make sure that senior management was informed about the human rights record of the Indonesian military in Aceh? | Substantive | Nonresponsive | 25:22–29:23 |
| **51.** Are you reading your answer? | Substantive | Nonresponsive | 30:8–17, 59:8–63:25, 68:25–69:7, 94:15–95:12, 98:25–99:12, 113:20–114:3, 124:13–17, 133:16–19, 142:2–21, 172:24–174:8, 226:2–228:12, 283:6–9, 293:5–15, 294:10–295:15, 319:20–320:3 |
| **52.** Did counsel write your statement? | Substantive | Nonresponsive | 30:11–31:16, 64:2–68:24, |

| | | | 69:9–73:13, 95:13–96:20, 99:13–100:11, 228:13–229:25, 283:10–15, 295:16–296:9, 320:4–10 |
|---|---|---|---|
| **53.** Did EMOI take steps to make sure that senior management was informed about the human rights record of the Indonesian military in Aceh? | Substantive | Nonresponsive | 32:3–34:8 |
| **54.** Did EMOI take steps to inform senior management of the information published by the State Department every year about human rights practices in Indonesia? | Substantive | Responsive | 37:16–45:3 |
| **55.** Was EMOI's senior management informed that the State Department's 1998 report for Indonesia had reported that in Aceh there were credible reports of mass graves and killings carried out by the security forces in the past and into 1998? | Substantive | Nonresponsive | 45:4–46:11 |
| **56.** Was EMOI's senior management informed of the State Department report about investigations of mass graves, extrajudicial killings, disappearances, rape and torture in Aceh during 1989 to 1991 and 1997 to 1998? | Substantive | Nonresponsive | 46:12–51:19 |
| **57.** Did EMOI's senior management have knowledge of the information that was provided in the State Department's Indonesia country report on human rights practices for 1998? | Substantive | Nonresponsive | 51:25–56:18 |

4a

| | | | |
|---|---|---|---|
| **58.** Have you testified as a 30(b)(6) witness before? | Preliminary | Responsive | 74:7–9 |
| **59.** Do you recall testifying about a 1998 Business Week article? | Record/Foundation | Responsive | 74:10–16 |
| **60.** Did Michael Shari give MOI information about military's use of mass graves and mass executions in Aceh, before publication? | Substantive | Lacks Knowledge | 74:17–24 |
| **61.** Who at Mobil investigated the information Shari provided about mass executions and graves? | Substantive | Lacks Knowledge | 74:25–82:23 |
| **62.** Who performed the legal investigation? | Substantive | Lacks Knowledge | 83:21–84:9 |
| **63.** When was the legal investigation performed? | Substantive | Nonresponsive | 84:10–86:10 |
| **64.** Who was interviewed? | Substantive | Instructed Not To Answer | 86:11–16 |
| **65.** Was a report prepared? | Substantive | Instructed Not To Answer | 86:17–20 |
| **66.** Independent of the legal investigation, did MOI investigate information Shari provided? | Substantive | Lacks Knowledge | 87:1–90:4 |
| **67.** If EMOI became aware of credible information that the military threatened or harmed EMOI's own employees, was it EMOI's policy to take steps to address that? | Substantive | Nonresponsive | 90:5–94:12 |
| **68.** Do you remember I asked you questions earlier about A1? | Record/Foundation | Responsive | 97:5–8 |
| **69.** Have you reviewed testimony of [Individual 1] about torture at A1? | Record/Foundation | Nonresponsive | 97:9–98:22 |
| **70.** Have you reviewed testimony of [Individual 1] about beating at A1? | Record/Foundation | Responsive | 100:12–18 |
| **71.** Have you reviewed testimony of [Individual 1] about beating with rifle? | Record/Foundation | Nonresponsive | 100:19–25 |
| **72.** In March 2000, was EMOI aware of torture of detainees in Aceh? | Substantive | Nonresponsive | 101:2–102:9 |

| | | | |
|---|---|---|---|
| **73.** Did EMOI take any steps to determine if guards used by EMOI were responsible for torture of [Individual 1]? | Substantive | Nonresponsive | 102:10–104:12 |
| **74.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for torture of [Individual 1]? | Substantive | Responsive | 104:13–21 |
| **75.** Are you aware if [Individual 1] had connections to GAM? | Substantive | Lacks Knowledge | 104:22–105:3 |
| **76.** Did EMOI make a complaint about torture of [Individual 1]? | Substantive | Nonresponsive | 105:4–106:2 |
| **77.** Did EMOI request investigation about torture of [Individual 1]? | Substantive | Nonresponsive | 106:3–15 |
| **78.** Did EMOI investigate torture of [Individual 1]? | Substantive | Nonresponsive | 106:16–24 |
| **79.** Are you aware whether EMOI did anything to address torture of [Individual 1]? | Substantive | Nonresponsive | 106:25–107:11 |
| **80.** Is Point A a fenced area with offices? | Substantive | Nonresponsive (Evasive) | 107:19–23 |
| **81.** Were a substantial number of military guards assigned to Point A? | Substantive | Nonresponsive | 107:24–108:5 |
| **82.** Have you read testimony of [Individual 2]? | Record/Foundation | Nonresponsive | 108:9–109:3 |
| **83.** Have you read testimony about cuts and burns on [Individual 3]? | Record/Foundation | Responsive | 109:4–9 |
| **84.** Have you read testimony about [Individual 3]'s electrocution and burning? | Record/Foundation | Nonresponsive | 109:10–109:24 |
| **85.** Was EMOI management aware of information from the State Department that the Indonesian military had used cigarettes to burn someone they were interrogating? | Substantive | Nonresponsive | 109:25–111:11 |
| **86.** Was EMOI management aware of information that the Indonesian military had used electrocutions during interrogations? | Substantive | Nonresponsive | 111:12–22 |

| | | | |
|---|---|---|---|
| **87.** Did EMOI take any steps to determine which soldiers deployed for EMOI operations were responsible for torture of [Individual 3]? | Substantive | Responsive | 111:23–113:19 |
| **88.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for torture of [Individual 3]? | Substantive | Responsive | 114:4–115:2 |
| **89.** Are you aware if [Individual 3] had connections to GAM? | Substantive | Responsive | 115:3–11 |
| **90.** Did EMOI make a complaint about torture of [Individual 3]? | Substantive | Nonresponsive | 115:12–20 |
| **91.** Did EMOI investigate torture of [Individual 3]? | Substantive | Nonresponsive | 115:21–116:4, 116:24–117:19 |
| **92.** Are you aware whether EMOI did anything to address torture of [Individual 3]? | Substantive | Responsive | 116:5–23 |
| **93.** Were military guards assigned to Cluster IV? | Substantive | Responsive | 117:23–118:11, 118:16–22 |
| **94.** Did EMOI have gas wells at Cluster IV? | Substantive | Responsive | 118:12–15 |
| **95.** Have you read [Individual 4]'s testimony about beatings near Cluster IV? | Record/Foundation | Responsive | 118:23–119:5 |
| **96.** Have you read [Individual 4]'s testimony about 51 days of torture? | Record/Foundation | Responsive | 119:6–120:4 |
| **97.** Have you read testimony of [Individual 5]? | Record/Foundation | Responsive | 120:5–17 |
| **98.** Did EMOI take any steps to identify soldiers who beat [Individual 4]? | Substantive | Nonresponsive | 120:18–121:3 |
| **99.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for beating of [Individual 4]? | Substantive | Responsive | 121:4–12 |
| **100.** Are you aware if [Individual 4] had connections to GAM? | Substantive | Responsive | 121:13–17 |

7a

| **101.** Did EMOI make a complaint about beating of [Individual 4]? | Substantive | Nonresponsive | 121:18–123:21 |
|---|---|---|---|
| **102.** Did EMOI investigate beating of [Individual 4]? | Substantive | Nonresponsive | 123:22–124:12, 124:18–125:17 |
| **103.** Did MOI install CCTV at Cluster IV? | Substantive | Lacks Knowledge | 125:18–127:2 |
| **104.** Have you read [Individual 6]'s testimony about being taken by soldiers near Cluster IV? | Record/Foundation | Responsive | 127:3–128:3 |
| **105.** Have you read [Individual 6]'s testimony about being taken to A13? | Record/Foundation | Responsive | 128:4–129:9 |
| **106.** Have you read [Individual 6]'s testimony about 24 days of torture? | Record/Foundation | Responsive | 129:10–130:18 |
| **107.** Did EMOI take any steps to identify soldiers who beat [Individual 6]? | Substantive | Nonresponsive | 130:19–132:8 |
| **108.** Did EMOI investigate beating of [Individual 6]? | Substantive | Responsive | 132:9–133:14 |
| **109.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for beating of [Individual 6]? | Substantive | Responsive | 133:20–134:4 |
| **110.** Are you aware if [Individual 6] had connections to GAM? | Substantive | Responsive | 134:5–12 |
| **111.** Did EMOI investigate torture of [Individual 6]? | Substantive | Responsive | 134:13–24 |
| **112.** Did EMOI operate wells at Cluster II? | Substantive | Responsive | 135:6–9 |
| **113.** Were military guards assigned to Cluster II? | Substantive | Responsive | 135:10–16 |
| **114.** Have you read testimony of [Individual 7] about beating and shooting of [Individual 8] by Cluster II soldiers? | Record/Foundation | Responsive | 135:21–137:5 |
| **115.** Have you read testimony of [Individual 22] about beating and shooting of [Individual 8] by Cluster II soldiers? | Record/Foundation | Responsive | 137:6–13 |

| | | | |
|---|---|---|---|
| **116.** Did EMOI take any steps to identify soldiers who shot and beat [Individual 8]? | Substantive | Responsive | 137:14–139:4 |
| **117.** Did EMOI review CCTV footage at Cluster II? | Substantive | Lacks Knowledge | 139:4–23 |
| **118.** Are you aware of evidence that EMOI or MOI ever used CCTV to monitor guards? | Substantive | Lacks Knowledge | 139:24–141:2 |
| **119.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for beating and shooting of [Individual 8]? | Substantive | Responsive | 141:3–25 |
| **120.** Did EMOI investigate beating and shooting of [Individual 8]? | Substantive | Responsive | 142:23–143:10 |
| **121.** Did EMOI request an investigation of the beating and shooting of [Individual 8]? | Substantive | Responsive | 144:14–146:7 |
| **122.** Did EMOI have facilities at Bachelor Camp? | Substantive | Responsive | 146:25–147:11 |
| **123.** Were military guards assigned to Bachelor Camp? | Substantive | Nonresponsive (Evasive) | 147:12–148:13 |
| **124.** Did you read testimony of [Individual 9] about shots fired from Bachelor Camp? | Record/Foundation | Nonresponsive | 148:14–23 |
| **125.** Did you read testimony of [Individual 9] about his beating? | Record/Foundation | Nonresponsive | 148:24–149:12 |
| **126.** Did you read testimony of [Individual 9] about motionless bodies? | Record/Foundation | Responsive | 149:13–21 |
| **127.** Did you read testimony of [Individual 22] about never seeing her husband [Individual 10] after the shooting? | Record/Foundation | Responsive | 149:22–150:3 |
| **128.** Are you aware of any steps EMOI took to investigate actions of Bachelor Camp soldiers? | Substantive | Responsive | 150:4–22 |
| **129.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for shooting of [Individual 10]? | Substantive | Nonresponsive (Evasive) | 150:23–151:10 |

| | | | |
|---|---|---|---|
| **130.** Are you aware if [Individual 9] or [Individual 10] had connections to GAM? | Substantive | Responsive | 151:11–15 |
| **131.** Did EMOI request an investigation of the beating and shooting of shootings near Bachelor Camp? | Substantive | Nonresponsive | 151:18–25 |
| **132.** Did EMOI monitor CCTV near Bachelor Camp? | Substantive | Lacks Knowledge | 152:2–11 |
| **133.** Was anyone at EMOI assigned to monitor guards near Bachelor Camp? | Substantive | Nonresponsive | 153:2–11 |
| **134.** Do you see that your attorneys prepared Exhibit 4? | Record/Foundation | Responsive | 155:14–20 |
| **135.** Do you see footnote 1 in Exhibit 4? | Record/Foundation | Responsive | 156:2–23 |
| **136.** Do you see a reference to Maman Budiman? | Record/Foundation | Responsive | 156:24–157:4 |
| **137.** Was Budiman an EMOI employee? | Substantive | Responsive | 157:5–18 |
| **138.** Do you see listing of information Budiman has? | Record/Foundation | Nonresponsive (Evasive) | 157:19–158:9 |
| **139.** Did you speak to Budiman to prepare for this deposition? | Record/Foundation | Responsive | 158:10–159:8, 159:12–18 |
| **140.** Which EMOI employees did you meet with? | Record/Foundation | Responsive | 159:9–11 |
| **141.** Did you try to reach out to Budiman? | Record/Foundation | Responsive | 159:20–160:11, 161:20–162:21 |
| **142.** Is there any reason you couldn't have spoken to Budiman? | Record/Foundation | Nonresponsive | 160:12–161:3 |
| **143.** You have had six months to prepare for this deposition? | Preliminary | Responsive | 161:4–19 |
| **144.** You only got the information about Budiman from the defense team? | Record/Foundation | Responsive | 162:22–164:5 |
| **145.** Does Tommy Chong live in Singapore? | Record/Foundation | Lacks Knowledge | 164:6–15 |
| **146.** Did you try to call Chong? | Record/Foundation | Responsive | 164:16–165:6 |
| **147.** Is there any reason you couldn't have spoken to Chong? | Record/Foundation | Nonresponsive | 165:7–21 |

| **148.** You only got the information about Chong from the defense team? | Record/Foundation | Nonresponsive | 165:22–166:22 |
|---|---|---|---|
| **149.** Did you think it would be helpful to call Chong? | Record/Foundation | Nonresponsive | 166:23–167:9 |
| **150.** Did you talk to Neil Duffin? | Record/Foundation | Responsive | 167:12–25 |
| **151.** Did you speak to Mr. Farmer? | Record/Foundation | Nonresponsive (Evasive) | 168:2–17 |
| **152.** Has Chong been deposed? | Record/Foundation | Responsive | 168:21–24 |
| **153.** Did the lack of a Chong deposition make you think that you should talk to him? | Record/Foundation | Responsive | 168:24–169:11 |
| **154.** Are you testifying that Chong had only incidental involvement in Aceh issues? | Substantive | Nonresponsive | 169:12–172:21 |
| **155.** Do you see Ahmad Judin identified as a knowledgeable person? | Record/Foundation | Responsive | 176:9–13 |
| **156.** Have you made an effort to talk to Judin? | Record/Foundation | Nonresponsive (Evasive) | 176:9–21 |
| **157.** Have you spoken to Judin in the last six months? | Record/Foundation | Responsive | 176:22–177:2 |
| **158.** Have you tried to talk to Mr. Thahir? | Record/Foundation | Responsive | 177:3–9 |
| **159.** Until the end of 1999, was Farmer the global security manager for Mobil? | Substantive | Responsive | 177:16–20 |
| **160.** Did Farmer work for Mobil Business Resources Corp.? | Substantive | Responsive | 177:24–178:4 |
| **161.** When Exxon and Mobil merged, did Farmer become global security manager for EMC? | Substantive | Responsive | 178:5–179:14 |
| **162.** Does the heading on the chart in Exhibit 5 read Exxon Mobil Corporation Security — International? | Record/Foundation | Responsive | 190:5–11 |
| **163.** Were there business centers under Exxon Mobil Corporation Security — International? | Substantive | Nonresponsive (Evasive) | 190:12–17 |
| **164.** Was one of those business centers in Singapore? | Substantive | Responsive | 190:18–191:10 |
| **165.** Was Oh Chee Khoon the manager for the Singapore Security Business Center? | Substantive | Responsive | 191:13–17 |

| | | | |
|---|---|---|---|
| **166.** Is the reference on the chart to T. Chong a reference to Tommy Chong? | Record/Foundation | Responsive | 191:18–20 |
| **167.** Was Chong a security advisor for the Singapore Security Business Center? | Substantive | Nonresponsive (Evasive) | 191:21–192:6 |
| **168.** Who owned MAPPL? | Substantive | Responsive | 192:7–194:15 |
| **169.** Was K. Jayadev part of the Singapore Security Business Center? | Substantive | Nonresponsive (Evasive) | 194:23–195:17 |
| **170.** Why is the Singapore Security Business Center listed under Exxon Mobil Corporation Security — International? | Substantive | Nonresponsive | 195:18–196:4 |
| **171.** Do you see A. Wong on the chart? | Record/Foundation | Responsive | 196:5–16 |
| **172.** Was Adrian Wong a security advisor for the Singapore Security Business Center? | Substantive | Lacks Knowledge | 196:17–21 |
| **173.** Was Jack Connor a security advisor for the Singapore Security Business Center? | Substantive | Responsive | 196:22–25 |
| **174.** Who employed Connor? | Substantive | Nonresponsive | 197:2–200:23 |
| **175.** Was Connor ever employed by MAPPL? | Substantive | Nonresponsive | 201:5–204:22 |
| **176.** Did Connor start working for EMOI only in April 2000? | Substantive | Lacks Knowledge | 204:23–205:11 |
| **177.** Prior to 2000, was Connor an employee or agent of the Singapore Security Business Center? | Substantive | Responsive | 205:12–19 |
| **178.** In July 2000 did Exxon's senior management in the United States and Aceh receive information from a reporter about four villagers who said they were tortured by Indonesian troops at A13? | Substantive | Nonresponsive | 207:10–212:20 |
| **179.** Is Exhibit 6 an email forwarding information provided by Jay Solomon of the Wall Street Journal? | Record/Foundation | Responsive | 214:20–215:2 |
| **180.** Is Ron Wilson a recipient of Exhibit 6? | Record/Foundation | Responsive | 215:3–11 |

12a

| | | | |
|---|---|---|---|
| **181.** Is Mike Farmer a recipient of Exhibit 6? | Record/Foundation | Responsive | 215:12–14 |
| **182.** Is Chee Khoon Oh a recipient of Exhibit 6? | Record/Foundation | Responsive | 215:15–17 |
| **183.** Does Exhibit 6 bear a legend restricting further dissemination? | Record/Foundation | Responsive | 215:18–23 |
| **184.** Does Solomon say that he has spoken to four people who say they were tortured by Indonesian troops at A13? | Record/Foundation | Responsive | 216:12–18 |
| **185.** Does Solomon say that he has spoken to people who had to flee their villages because of military sweeps? | Record/Foundation | Responsive | 216:16–24 |
| **186.** Does Solomon say that the military explained the sweeps as protecting Mobil installations? | Record/Foundation | Responsive | 216:25–217:6 |
| **187.** Did Solomon provide this information to EMOI management in the summer of 2000? | Record/Foundation | Responsive | 217:7–25 |
| **188.** Was this information forwarded to Exxon management and EMOI management? | Record/Foundation | Nonresponsive (Evasive) | 218:2–9 |
| **189.** Does Connor say that the Wall Street Journal is preparing to run a negative article about the military's role in Aceh and ties to Exxon? | Record/Foundation | Responsive | 218:10–219:15 |
| **190.** Has it been shared so that management in the US and Indonesia are aware the article is coming and can take a close look at it? | Substantive | Responsive | 219:16–220:3 |
| **191.** Did EMOI's management read the article? | Substantive | Responsive | 221:23–222:7 |
| **192.** Was it brought to the attention of EMOI senior management in 2000 that some villagers claimed they were abused by troops assigned to Mobil duty including troops from A13? | Substantive | Nonresponsive | 222:11–225:17, 230:4–233:11 |

| | | | |
|---|---|---|---|
| **193.** Are you giving an answer that is identical word-for-word to a previous answer? | Preliminary | Responsive | 225:18–23 |
| **194.** Have you read testimony of [Individual 11] that he saw [Individual 12] shot, beaten, and taken away by soldiers? | Record/Foundation | Responsive | 238:3–239:9 |
| **195.** Have you read testimony of [Individual 11] that he knew many of the soldiers because they ate together at Bachelor Camp? | Record/Foundation | Responsive | 239:15–20 |
| **196.** Have you read testimony of [Individual 11] that he reported to an Exxon supervisor that [Individual 12] had been shot? | Record/Foundation | Responsive | 239:21–240:4, 241:7–11 |
| **197.** Are you aware of any evidence that [Individual 12] had any involvement with GAM? | Substantive | Nonresponsive | 240:5–14 |
| **198.** After [Individual 11] reported the shooting of [Individual 12], are you aware of any steps that EMOI took to investigate? | Substantive | Nonresponsive (Evasive) | 240:18–241:3, 241:12–242:4 |
| **199.** Have you read testimony of [Individual 11] that he saw soldiers instruct [Individual 13] to dig a ditch? | Record/Foundation | Nonresponsive | 242:5–16 |
| **200.** Have you read testimony of [Individual 11] that he saw people taken to the ditch and buried alive? | Record/Foundation | Nonresponsive | 242:17–24 |
| **201.** Have you read testimony of [Individual 11] that he saw soldiers shoot [Individual 13] when he refused to dig a second ditch? | Record/Foundation | Nonresponsive | 242:25–243:3 |
| **202.** Are you aware of whether [Individual 11] reported these events to Reza Kota? | Substantive | Responsive | 243:6–9, 243:24–244:8 |
| **203.** Are you aware of any steps EMOI took to investigate the events [Individual 11] reported? | Substantive | Responsive | 243:10–23, 244:9–245:2 |

| | | | |
|---|---|---|---|
| **204.** Did Cluster IV have an entrance gate and was it surrounded by a fence? | Substantive | Nonresponsive | 245:12–17 |
| **205.** In December 2000, was Cluster IV guarded by a large number of soldiers? | Substantive | Nonresponsive | 245:18–246:4 |
| **206.** Did you review testimony of [Individual 14] about [Individual 15]? | Record/Foundation | Nonresponsive | 246:5–12 |
| **207.** Have you read testimony of [Individual 14] about a military truck coming from and returning to Cluster IV? | Record/Foundation | Nonresponsive (Evasive) | 246:13–18 |
| **208.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for killing [Individual 15]? | Substantive | Nonresponsive | 246:19–247:2 |
| **209.** Are you aware if [Individual 15] had connections to GAM? | Substantive | Responsive | 247:3–10 |
| **210.** Can you identify any steps EMOI took to investigate killing of [Individual 15]? | Substantive | Responsive | 247:11–24 |
| **211.** Did EMOI have a CCTV system to monitor behavior at Cluster IV? | Substantive | Lacks Knowledge | 247:25–249:15 |
| **212.** Have you read the testimony of [Individual 16] that [Individual 17] was shot and killed by soldiers near Cluster IV? | Record/Foundation | Nonresponsive | 249:20–250:3 |
| **213.** Have you read the testimony of [Individual 18] that he saw soldiers from Cluster IV shoot [Individual 17]? | Record/Foundation | Nonresponsive | 250:4–10 |
| **214.** Are you aware of evidence that anyone other than soldiers assigned to EMOI operations were responsible for killing [Individual 17]? | Substantive | Nonresponsive | 250:13–21 |
| **215.** Are you aware if [Individual 17] had connections to GAM? | Substantive | Responsive | 250:22–251:2 |

| **216.** Did EMOI take any steps to investigate killing of [Individual 17]? | Substantive | Responsive | 251:3–23 |
|---|---|---|---|
| **217.** Did EMOI take any steps to respond to killing of [Individual 17]? | Substantive | Responsive | 251:24–252:7 |
| **218.** Have you read the testimony of [Individual 19] that [Individual 20] was taken by soldiers to Point A and tortured? | Record/Foundation | Nonresponsive | 252:11–15, 255:3–256:6 |
| **219.** In January 2001, were many soldiers guarding EMOI's operations still stationed at Point A? | Substantive | Nonresponsive | 252:16–255:2 |
| **220.** Are you aware of anything EMOI did to determine which soldiers took [Individual 20] to Point A? | Substantive | Responsive | 256:7–23 |
| **221.** Are you aware of evidence that anyone other than soldiers assigned to Point A were responsible for torture of [Individual 20]? | Substantive | Responsive | 256:24–257:8 |
| **222.** Are you aware of anything EMOI did to determine who was involved in torture of [Individual 20]? | Substantive | Responsive | 257:9–20 |
| **223.** Did EMOI ask anyone to investigate what happened to [Individual 20]? | Substantive | Responsive | 257:21–258:13 |
| **224.** Do you know anything about the conduct that caused [Individual 20] to lose an eye and a hand? | Substantive | Responsive | 258:14–21 |
| **225.** Between July and December 1999, did the number of soldiers assigned to protect EMOI facilities increase from approximately 100 to approximately 200? | Substantive | Nonresponsive | 259:10–262:25, 265:7–11 |
| **226.** Do you know how many soldiers were deployed in July 1999? | Substantive | Responsive | 263:2–265:6 |
| **227.** In April 2000, did EMOI ask for more troops? | Substantive | Nonresponsive | 265:16–266:10 |

| | | | |
|---|---|---|---|
| **228.** Is Exhibit 8 an April 10, 2000 document addressed to a senior official at Pertamina? | Record/Foundation | Responsive | 268:13–269:22 |
| **229.** In Exhibit 8, does Wilson request additional security support? | Record/Foundation | Responsive | 269:23–270:18 |
| **230.** Does the cover email in Exhibit 8 request Johnson's concurrence? | Record/Foundation | Responsive | 270:22–271:19 |
| **231.** Did Johnson indicate that he concurs? | Record/Foundation | Responsive | 271:20–24 |
| **232.** Is Exhibit 9 a memo written by Adrian Wong? | Record/Foundation | Responsive | 273:17–21 |
| **233.** Does Wong identify himself as a security advisor for APSBC? | Record/Foundation | Responsive | 273:22–274:4 |
| **234.** Does APSBC stand for Asia Pacific Security Business Center? | Substantive | Lacks Knowledge | 274:3–8 |
| **235.** Is the subject of Exhibit 9 "increase in military deployment"? | Record/Foundation | Responsive | 274:9–13 |
| **236.** In Exhibit 9, does Wong report about what happened at an April 20, 2000 meeting between Exxon representatives and the military? | Record/Foundation | Responsive | 274:14–19 |
| **237.** Does Exhibit 9 list K. Jayadev as an attendee? | Record/Foundation | Responsive | 274:20–25 |
| **238.** Was Jayadev from EMC's Global Security International Group? | Substantive | Nonresponsive | 275:2–8 |
| **239.** Did Jayadev also work for the Asia Pacific Security Business Center? | Substantive | Responsive | 275:9–276:8 |
| **240.** Does Exhibit 5 list K. Jayadev? | Record/Foundation | Responsive | 276:16–18 |
| **241.** Does Exhibit 5 identify K. Jayadev as the Risk Management Coordinator, Security Business Center — Asia Pacific? | Record/Foundation | Responsive | 276:19–277:10 |

| | | | |
|---|---|---|---|
| **242.** Does Exhibit 9 say that Exxon representatives briefed the military on the need to get back into normal operational conditions and immediate project requirements? | Record/Foundation | Responsive | 277:24–278:12 |
| **243.** Does a chart in Exhibit 9 indicate that Exxon representatives and the military reviewed Major Iskander's proposal? | Record/Foundation | Lacks Knowledge | 278:13–22 |
| **244.** Does Exhibit 9 say that deployment and operational strategy depend on manpower resources that need to be agreed upon by senior military and MOI leaders? | Record/Foundation | Responsive | 279:6–22 |
| **245.** Did you speak to Wong to prepare for this deposition? | Record/Foundation | Responsive | 279:25–280:4 |
| **246.** Does Exhibit 9 say that the military would accept housing provided by MOI located outside of MOI facilities? | Record/Foundation | Responsive | 280:5–12 |
| **247.** Does Exhibit 9 say that timing of additional manpower of 500–600 soldiers will depend on agreement of senior military and MOI leaders? | Record/Foundation | Responsive | 280:13–23 |
| **248.** In Exhibit 9, does Wong indicate that the deployment should be supported if conditions are met? | Record/Foundation | Responsive | 280:24–281:9, 283:16–24 |
| **249.** Is the first condition listed in Exhibit 9 that the military allows MOI to influence the security plan and development strategy? | Record/Foundation | Responsive | 281:10–283:3, 283:25–284:12 |
| **250.** Is the second condition listed in Exhibit 9 that MOI and the military constantly monitor the military operation plan? | Record/Foundation | Nonresponsive | 284:13–285:4 |
| **251.** Is the third condition listed in Exhibit 9 that the military agree to a code of conduct (per risk assessment recommendations)? | Record/Foundation | Responsive | 285:5–15, 296:10–21 |

| | | | |
|---|---|---|---|
| **252.** Did you review EMOI risk assessments to prepare for this deposition? | Record/Foundation | Responsive | 285:16–293:4, 293:19–294:9 |
| **253.** Did the February or March 2000 EMOI risk assessment recommend that a code of conduct be established for the military? | Substantive | Lacks Knowledge | 296:22–297:14 |
| **254.** Was the code of conduct that was described in that risk assessment ever drafted by anyone at EMOI? | Substantive | Nonresponsive | 297:15–297:25 |
| **255.** Have you read Connor's testimony? | Record/Foundation | Nonresponsive (Evasive) | 298:2–18 |
| **256.** Are you aware that Connor testified that he is not aware of a code being drafted? | Record/Foundation | Nonresponsive | 298:19–299:17 |
| **257.** Are you aware of any evidence that would lead you to disagree with Connor's testimony? | Substantive | Nonresponsive (Evasive) | 299:18–300:5 |
| **258.** Does Exhibit 10 indicate that in early June Massey reported to Johnson that there would be 900 military personnel dedicated to MOI security? | Record/Foundation | Responsive | 303:25–305:6 |
| **259.** At this time, was Massey the number two person in charge of EMOI? | Substantive | Responsive | 305:7–12 |
| **260.** Had Massey replaced Duffin? | Substantive | Responsive | 305:13–16 |
| **261.** Did Massey forward more detailed information he received from Connor? | Record/Foundation | Responsive | 305:17–306:3 |
| **262.** Does Exhibit 10 indicate that 500 of 900 soldiers will take over the inner ring of security? | Record/Foundation | Nonresponsive (Evasive) | 306:4–11 |
| **263.** Does the inner ring of security refer to soldiers deployed immediately around Point A and the clusters? | Substantive | Nonresponsive (Evasive) | 306:12–18 |
| **264.** Does the outer ring of security refer to soldiers deployed further out? | Substantive | Nonresponsive | 306:19–25 |

| | | | |
|---|---|---|---|
| **265.** Does Exhibit 10 indicate that 400 soldiers will be deployed inside the MOI facilities? | Record/Foundation | Responsive | 307:2–7 |
| **266.** Does Exhibit 10 indicate that 400 soldiers will take over the outer ring of security? | Record/Foundation | Responsive | 307:8–14 |
| **267.** Is Exhibit 11 an email from Laureys? | Record/Foundation | Responsive | 308:12–17 |
| **268.** Is Laureys a security group employee from the Houston Business Center? | Substantive | Nonresponsive (Evasive) | 308:18–23 |
| **269.** Is the subject of Exhibit 11 "meeting with representatives of Bn 113 (outer ring security)"? | Record/Foundation | Nonresponsive (Evasive) | 309:4–16 |
| **270.** Per Exhibit 11, is outer ring security being provided by Battalion 113? | Record/Foundation | Responsive | 309:17–20 |
| **271.** In Exhibit 11, does Laureys report to EMOI senior management and others that he has met with representatives of Battalion 113 and that they will be able to deploy along the pipeline road as soon as they get support? | Record/Foundation | Responsive | 309:21–310:4 |
| **272.** Was Exhibit 11 forwarded to Farmer? | Record/Foundation | Responsive | 310:5–311:4 |
| **273.** Were EMOI officials updating Exxon officials in the United States weekly when the use of military guards was increasing in June 2000? | Substantive | Nonresponsive | 311:5–319:13 |
| **274.** Have you reviewed the testimony of [Individual 21] that she was sexually assaulted by a member of Battalion 113 in March 2001? | Record/Foundation | Nonresponsive | 321:9–22 |
| **275.** Was EMOI's senior management aware in 2000 that the State Department had reported that there were credible allegations that hundreds of Acehnese women had been raped during military operations between 1989–1998? | Substantive | Nonresponsive | 321:23–323:16, 325:25–326:15 |

| | | | |
|---|---|---|---|
| **276.** When EMOI requested more military guards, did it do anything to determine whether military personnel had a long history of engaging in rape in Aceh? | Substantive | Nonresponsive | 323:17–324:15 |
| **277.** In 2000, was EMOI's senior management aware of the history of military rape in Aceh? | Substantive | Nonresponsive | 324:19–325:24 |
| **278.** Are you aware of any actions EMOI took to investigate the rape of [Individual 21]? | Substantive | Responsive | 326:16–329:8 |
| **279.** You are not aware of anything EMOI did to investigate any of the plaintiffs' claims? | Substantive | Responsive | 329:9–331:22, 343:6–25 |
| **280.** Are you aware of any investigation EMOI ever did of torture of local villagers by soldiers assigned to EMOI? | Substantive | Nonresponsive | 331:23–332:11 |
| **281.** Is Exhibit 12 an email from Connor to Jayadev and Oh? | Record/Foundation | Responsive | 333:24–334:4 |
| **282.** Does Connor indicate in Exhibit 12 that the information is sensitive but can be shared on a need-to-know basis? | Record/Foundation | Responsive | 334:5–11 |
| **283.** Does Exhibit 12 indicate that troops have been deployed and that Johnson overrode the military on the deployment? | Record/Foundation | Responsive | 334:17–335:7 |
| **284.** Is the L. Johnson referenced in Exhibit 12 Lance Johnson? | Substantive | Responsive | 335:8–14 |
| **285.** Did you speak to Johnson to prepare for this deposition? | Record/Foundation | Responsive | 335:15–19 |
| **286.** Does Exhibit 12 indicate that troopers are patrolling at Point A, 1–4, and BI? | Record/Foundation | Responsive | 335:20–356:22 |
| **287.** At this time, did EMOI have facilities at Point A, Clusters I–IV, and a housing facility called Bukit Indah? | Substantive | Responsive | 336:23–337:21 |
| **288.** Does Exhibit 12 report that 30% of troops are stationed in the jungle? | Record/Foundation | Responsive | 337:22–338:20, 339:17–21 |

| | | | |
|---|---|---|---|
| **289.** Were you in Indonesia from 1991–2001? | Preliminary | Responsive | 338:21–339:10 |
| **290.** Was Connor living in Aceh at the time? | Substantive | Responsive | 339:11–16 |
| **291.** Does Exhibit 12 say "that's where they moved after we built them accommodations"? | Record/Foundation | Nonresponsive | 339:22–340:14 |
| **292.** Does Exhibit 12 indicate that 300 troops were operating outside the fences surrounding EMOI operations? | Record/Foundation | Nonresponsive | 340:15–25 |
| **293.** Was EMOI aware in the fall of 2000 that the troops were conducting sweeps of local villages? | Substantive | Nonresponsive | 341:15–342:16 |
| **294.** Had EMOI been told by Solomon in July 2000 that the military claimed that they were sweeping villages to protect EMOI's facilities? | Substantive | Nonresponsive | 342:17–343:5 |
| **295.** Did you request any investigation of injuries alleged by the plaintiffs? | Substantive | Nonresponsive | 344:2–10 |
| **296.** Does Exhibit 12 discuss where Connor is getting instructions? | Record/Foundation | Nonresponsive (Evasive) | 344:11–345:18 |
| **297.** Can you explain what Connor means by "getting instructions right from the top"? | Substantive | Lacks Knowledge | 345:19–346:21 |
| **298.** After additional soldiers were deployed in June 2000, did EMOI employees provide briefing on the rules the guards would be subject to? | Substantive | Nonresponsive (Evasive) | 348:23–349:11 |
| **299.** Is Exhibit 13 an email from Sjukri to Dodds and others? | Record/Foundation | Responsive | 349:12–15 |
| **300.** Is the subject of Exhibit 13 "Rules for military personnel deployed at Clusters and Point A"? | Record/Foundation | Nonresponsive (Evasive) | 349:16–20 |
| **301.** Does Exhibit 13 report that Sjukri and another EMOI employee have met with military personnel to explain the rules? | Record/Foundation | Nonresponsive | 349:21–350:8 |
| **302.** Does Exhibit 13 list those rules? | Record/Foundation | Nonresponsive (Evasive) | 350:9–351:14 |

| | | | |
|---|---|---|---|
| **303.** Is the first rule in Exhibit 13 about confining military activities to open roads in the clusters and Point A? | Record/Foundation | Responsive | 351:15–23 |
| **304.** Is the third rule in Exhibit 13 about observing safety precautions posted on notice boards? | Record/Foundation | Responsive | 351:24–352:17 |
| **305.** Is the fourth rule in Exhibit 13 that office areas and workshops are out-of-bounds? | Record/Foundation | Nonresponsive | 352:20–353:11 |
| **306.** Was Sjukri present in Aceh at the time he wrote this email? | Substantive | Nonresponsive | 353:12–21 |
| **307.** Was Dodds the operation manager for EMOI facilities? | Substantive | Responsive | 353:22–354:10 |
| **308.** Does Exhibit 13 indicate that Dodds responded "Many thanks for the note Sjamun, this initiative is very important and I pleased you have taken this action"? | Record/Foundation | Nonresponsive | 354:11–355:10 |
| **309.** Is the fifth rule in Exhibit 13 about smoking areas? | Record/Foundation | Responsive | 355:11–14 |
| **310.** Is the sixth rule in Exhibit 13 about evacuation procedures? | Record/Foundation | Responsive | 355:15–356:4 |
| **311.** Is the seventh rule in Exhibit 13 about speed limits? | Record/Foundation | Nonresponsive | 356:5–14 |
| **312.** Did EMOI personnel say anything during these briefings about the use of physical force? | Substantive | Nonresponsive | 356:15–357:4 |
| **313.** Did EMOI personnel say anything during these briefings about the use of excessive force? | Substantive | Nonresponsive | 357:5–12 |
| **314.** Did EMOI personnel say anything during these briefings about the use of torture? | Substantive | Nonresponsive | 357:13–358:8 |
| **315.** Are you aware of any evidence that rules about the use of force were posted on notice boards? | Substantive | Nonresponsive | 358:9–359:13 |
| **316.** Were any rules about the use of torture posted on the notice boards? | Substantive | Nonresponsive | 359:14–20 |