**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE I, *et al.*, | |
| Plaintiffs, | |
| v. | Civ. No. 01-1357 (RCL) |
| EXXON MOBIL CORPORATION, *et al.*, | |
| Defendants. | |

<u>**Declaration of Alex Young K. Oh**</u>

1. I practiced law at the firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") from October 2000 (since January 1, 2004, as a partner) until April 22, 2021.  I was counsel for defendants Exxon Mobil Corporation ("EMC") and ExxonMobil Oil Indonesia Inc. ("EMOI") in the above-captioned matter from 2007 until April 22, 2021, when I filed a Notice of Withdrawal.  Dkt. 797.

2. On that same date, I also resigned from Paul, Weiss to accept a position in the federal government.  I resigned from that position on April 28, 2021, following the issuance of this Court's Order ("Order") and Memorandum Opinion ("Opinion") dated April 26, 2021, docket nos. 798 and 799.  I submit this declaration in support of my Response to the Court's Order and Opinion and in support of the Response of Paul, Weiss, Rifkind, Wharton & Garrison LLP, to the Order to Show Cause Dated April 26 2021 (May 6, 2021).

**Introduction**

3. I take to heart the Court's admonition that the law is a noble profession, and that attorneys should conduct themselves in a manner befitting that profession.  I believe that

I have lived by that maxim throughout my 27-year legal career.  Other than by plaintiffs' counsel here, I am not aware of any accusations of sanctionable conduct—discovery or otherwise—against me by anyone.

4.  That said, I acknowledge and regret my role in the breakdown of civility that occurred during and after this unfortunate deposition.  I have worked on this case for nearly 14 years, firmly believe in the merits of my former clients' case, and have sought to serve my former clients through zealous advocacy.  Regrettably, on this occasion, I allowed my strong convictions to get the better of me.  I believed in good faith that my approach to the deposition was appropriate, and that my characterizations of opposing counsel's demeanor, based on my personal observations, were fair and supported by evidence.  But I regret using the language in question and should have let myself be guided by a higher standard.

5.  I appreciate the Court's criticism.  I have faced the consequences of my actions, and I will undertake to do better in the future.  With the Court's indulgence, however, I would like to explain my mindset going into the deposition and my recollection of what happened, in order to place my comments about plaintiffs' counsel's demeanor in context.

**My Preparation and Expectations for the EMOI's Rule 30(b)(6) Deposition.**

6.  I was lead counsel preparing for, and defending, the Rule 30(b)(6) deposition of the corporate designee of EMOI, beginning on February 14, 2021.  The deposition took place pursuant to a Notice of Deposition served by plaintiffs to EMOI ("EMOI Notice").  The EMOI Notice listed 34 topics, including subtopics.

7.  As the Court is aware, a Rule 30(b)(6) deposition is unique in that the witness, who is designated by the corporation to speak for it, is not testifying to personal knowledge of the relevant facts, but must provide information that is reasonably known to the corporation in response to topics identified in the deposition notice.

8.  Based on research and my knowledge of case law and practice, my assumption in preparing for, and defending, the deposition was that it was permissible for a Rule 30(b)(6) designee to rely on notes during the deposition.

9.  Also based on research and my knowledge of case law, I was aware that courts have treated a corporate representative's inability to provide accurate and substantive answers at a Rule 30(b)(6) deposition as tantamount to the representative failing to appear, which is sanctionable under Federal Rule of Civil Procedure 37.

10. I believed notes to be necessary in the unique context of this case, including that the events relevant to the topics in the EMOI Notice occurred over two decades ago, from January 1998 through June 30, 2001; that, to my knowledge, there were no employees currently at the company who could testify based on personal knowledge; that former employees who may have relevant knowledge responsive to certain topics were unresponsive or unwilling to spend the time to sit for depositions; and that, due to the large number of topics in the EMOI Notice, a witness lacking personal knowledge could not possibly recall all information responsive to all topics by memory.  In these circumstances, I concluded that it would be reasonable and defensible for EMOI to equip its designated witness with notes gathered by the company and its counsel that were responsive to the topics in the EMOI Notice.

11. I also believed, based on research and my knowledge of case law, that there was no prohibition on a corporate designee reading from notes to provide responsive information during the deposition.  I anticipated that the witness would answer on the basis of the notes where necessary and without them where not.

12. In addition, based on my prior experience defending three Rule 30(b)(6) depositions in this case (which were also noticed and taken by attorneys from the Cohen Milstein law firm), I assumed that the questioning attorneys would follow the basic outline of the deposition notice — that is, ask opening questions roughly paraphrasing particular, identified, topics or subtopics.  The three prior Rule 30(b)(6) depositions occurred in December 2007, closer in time to the events at issue, with corporate designees who had general familiarity with some of the noticed topics and therefore did not require notes for their depositions.  The questioning attorneys during those depositions did, however, roughly follow the topics, identifying their questions by topics—sometimes on their own, and at others times in response to my requests—and certainly did not suggest that requesting to identify the topics was improper in any way.  ECF No. 780-2, at 16-17 & n.17-19.

13. Based on this prior experience, I expected the EMOI deposition to unfold in the following manner:  first, the questioning attorney would identify the topic or subtopic that he wanted to discuss (which would assist the witness and me to identify the relevant section of the notes) and would ask a question about that topic; second, the witness would provide responsive information with the benefit of the notes (either by reading responsive parts of the notes or in his own words); and third, the questioning attorney would ask

follow-up questions about the answer and the witness would respond with or without the aid of notes.

14. With that expectation for the deposition, I and others at my law firm collectively spent hundreds of hours gathering materials responsive to the EMOI Notice, and also spent approximately 30 hours in meetings with the witness to prepare him for the deposition.

15. As for how the notes were prepared, the first draft was prepared by an associate at Paul Weiss, based on a review by her and other members of the legal team of the preparatory materials gathered in response to the EMOI Notice—which included relevant documents, prior deposition testimony and exhibits, and notes of discussions with witnesses about responsive information. The associate circulated the notes in advance of prep meetings that she and I had with the witness and an in-house attorney at Exxon, so that we could review the draft notes along with the relevant preparatory materials and discuss edits to the notes. The notes were revised iteratively over the course of the numerous prep meetings with the witness and finalized shortly before February 14.

16. The 85 pages of notes thus created contained, in my view, detailed, factual information responsive to each of the 34 topics and subtopics in the EMOI Notice:  for example, descriptions of relevant Indonesian law that governed designation of the Arun Field operations as a Vital Object of the Indonesian government; detailed information about relevant contracts and documents, including the Production Sharing Contract between EMOI and the Indonesian government, which governed the provision of security for the Arun Field operations; information about corporate structure, ownership and employment history of relevant individuals; and prior sworn deposition testimony of witnesses who had first-hand personal knowledge of the relevant events that were taken in or about

2007-2008, much closer in time to the relevant events.  In short, I and others believed in good faith that the notes contained factual information responsive to the noticed topics.[1]

**The Deposition**

17. Once the deposition began on the evening of February 14, it quickly became apparent that plaintiffs' counsel entered the deposition with expectations radically different from mine.  Plaintiffs' counsel dismissed the notes out of hand when the witness first read from them, as a "speech . . . written by defense counsel for you," Deposition Tr. of Mark Snell at 30; *see also* Tr. 51 ("I'm not interested in a long narrative that you and your counsel have drafted").  Plaintiffs' counsel appeared to take the view that the notes were inherently problematic, that it was impermissible for the witness to read from notes, and repeatedly stated that reading constituted sanctionable conduct.

18. In addition, plaintiffs' counsel (who had joined the plaintiffs' team recently and had not participated in any of the prior Rule 30(b)(6) depositions in the case) further took the position that, in examining the witness, he was under no obligation to identify or even to ask about any topics.  In short, I perceived plaintiffs' counsel as putting the deposition notice aside entirely, and even to seek to prevent the witness from providing any response that EMOI had prepared, in good faith, in response to the EMOI Notice.

19. On the few occasions where the manner of questioning at the deposition occurred as I had expected, the result was answers that this Court found responsive.  For example,

---

[1] I do not here contest the Court's finding that the notes should have been disclosed prior to the deposition under the Deposition Protocol.  Based on my participation in the negotiation, and my review, of the Deposition Protocol, as well as the parties' prior practice regarding exhibits to be marked at the deposition—which was not to disclose exhibits prior to deposition—I believed, in good faith, that the notes did not have to be disclosed prior to the deposition.

plaintiffs' counsel asked "who owned MAPPL," Tr. 192—a Mobil affiliate in Asia—
which closely aligned with EMOI Notice Topic 8(a) ("MAPPL's ownership, the general
nature of its business," *etc*.), ECF No. 780-3.  The witness identified the topic quickly as
Topic 8(a), and read his prepared notes that included the responsive information without
objection.  Tr. 192-94; *see also* Opinion Appendix at 12a (Question 168) (concluding that
the answer was responsive to the question).

20. I do not here contest the Court's finding that, on many occasions, the witness responded
by reading from the notes information that was not responsive to the specific question
posed by plaintiffs' counsel.

21. But that was never my intention.  At no time did I plan or instruct the witness to use the
notes to impede or hinder the deposition or to "filibuster" by reading them regardless of
their responsiveness to a question.  Nor do I believe that it was the witness's intention to
do so.  Rather, I believe the witness was placed in a difficult position of having to
identify on his own the portion of his lengthy notes that contained responsive
information, often without being guided to a specific topic number, or on occasion guided
to topic numbers that did not match up with the question posed.  The witness was forced
to perform this task on the record while under some pressure from the questioning
attorney to respond quickly.

22. Without here contesting the Court's conclusion, I believe the example cited by the Court
at page 19 of the Opinion, demonstrates the witness's good faith effort to respond to
questions under difficult circumstances rather than any plan "to read long and general
answers into the record from a set of notes in violation of the discovery protocol."
Opinion at 19.

23. On that occasion, which was the first time the witness read from the notes, plaintiffs'
counsel had posed a specific question—"did EMOI take steps to make sure that senior
management was informed about the human rights record of the Indonesian military in
Aceh"—and added, upon request, that his question related to Topics 2 and 3(d).  Tr. 25.

24. If the witness had a "plan" to filibuster, then he could have simply read the notes for both
Topic 3(d) and Topic 2 in response.  Instead, the witness first reviewed the notes for
Topic 3(d), and explained on the record that the topic did not, actually, relate to the
question.  Tr. 27 ("If this is a reference to [T]opic 3(d), [T]opic 3(d) is your policies and
procedures regarding security for the Arun Project between 1 January 1999 and 30 June
2001 regarding planning, directions or instructions provided to security personnel,
including any restrictions or limits places on their conduct.  It does not reference
management.").

25. The witness next turned to Topic 2, which requested information about EMOI's
"knowledge of abuses, including human rights abuses, assaults, batteries, sexual abuse,
torture, violence, and other torts by (a) security personnel at the Arun Project; or
(b) Indonesian military personnel, including any history or reputation for such abuses."
The witness, presumably believing that the notes under this topic would be more likely to
be responsive, then began to read the answer to Topic 2.  Tr. 27-29.

26. I had a copy of the notes with me, and knew that some information in the notes did
address the question of what senior management of EMOI knew about the Indonesian
military's human rights record.  Accordingly, I objected when plaintiffs' counsel cut the
witness off before he reached that portion.  Tr. 30; *see* DX 32 at Topic 2 at 2 ("Although
this is not an exhaustive list, for example: Ron Wilson, who was the highest-ranking

EMOI employee in Indonesia, notified Pertamina that there were rumors that the Indonesia military allegedly tortured civilians, made clear that EMOI does not condone the reported acts, if true, and urged Pertamina to ensure the safety of all citizens in Aceh.").

27.   As the deposition continued, I sought to intervene periodically to help the witness to identify responsive portions in his notes.  For example, in the first hour of the deposition, plaintiffs' counsel asked a series of questions about whether State Department Human Rights Reports were provided to EMOI management, which reports were not mentioned in the EMOI Notice.  Tr. 44-49.  Plaintiffs' counsel declined to identify the topic to which his question related, and the witness spent several minutes on the record looking through his notes in search of the relevant topic and for references to such reports.  Tr. 49.  I therefore requested a break, explaining that there was genuine confusion, *id.*, but plaintiffs' counsel declined to take a break.  The witness then located his notes to Topics 3k and 3l, which he presumably believed were the closest matches to the question posed, and read his answers. Tr. 52-57.  This led to another series of accusations from plaintiffs' counsel that the witness was engaged in sanctionable conduct, and that he be instructed to answer the question.  Tr. 56-57 (*see also* Opinion at 19, noting Tr. 56-57 as an example of plaintiffs' counsel asking me to encourage the witness to answer the question). Plaintiffs' counsel did not, however, agree to my request for a break until later, *see* Tr. 73.  *See also* Tr. 253 (I requested a break again in order to confer with the witness, but plaintiffs' counsel refused until later, *see* Tr. 258).

28.   In addition to requesting breaks so that I could help to clarify counsel's questions for the witness, I also sought to guide the witness on the record when I felt the question was too

broad or off-topic, but plaintiffs' counsel threatened to seek sanctions against me on such occasions for making "speaking objections." *See* Tr. 81 (threatening sanctions for making speaking objections when I suggested in my objection that the question did not relate to any topics in the EMOI Notice, and hence the notes would not contain any responsive information); Tr. 192-93 (telling me to stop making improper "speaking objections" when I tried to suggest that the pending question of "who owned MAPPL" related to a sub-topic in the notice).

29. Again, I do not mean to suggest that the above examples excuse answers that were not responsive, but provide the preceding detail to explain that I did not preplan with the witness to provide nonresponsive answers at the deposition.

**My Recollection of Plaintiffs' Counsel's Demeanor During the Deposition and My Characterizations of His Demeanor in Motions Filed After the Deposition.**

30. Due to COVID travel restrictions, the deposition was conducted remotely through video technology. Because the witness was in Singapore and counsel in the U.S., the deposition began at 7 p.m. Eastern on Sunday, February 14, and concluded at approximately 6 a.m. Eastern on Monday, February 15.

31. Although the video recording of the deposition reflects only the video of the witness, while we were on the record during the deposition, I could see a video of plaintiffs' counsel and therefore observed first-hand his facial expressions and body language.

32. One note about the audio recording that the Court reviewed: the audio reflects my voice as louder than the rest of the speakers. I do not believe the audio fairly captures the sound levels of speakers as I perceived them, which may have been due to the fact that I was using noise-cancelling headphones with an attached microphone. In addition, I have a vivid memory of perceiving the video of plaintiffs' counsel's face and body language as

- 10 -

showing anger and irritation in a non-verbal manner, including when counsel appeared to be glaring, shook his head, wore an angry or an irritated expression, and leaned forward. Perhaps if this had not been a "Zoom" deposition but a traditional deposition in which counsel sit across from one another in a single room, I would have perceived the events differently.  But, based on the audio and video as I experienced them that evening, my perceptions were honestly felt.

33. I recall the deposition being contentious from the beginning due to the two sides' differing expectations on the use of notes and questioning by topics.  For example, when I and the witness first asked plaintiffs' counsel to identify the topic related to his line of inquiry, counsel refused, and appeared to me on video to be irritated and dismissive of our repeated requests.  *See*, *e.g.*, Tr. 16 ("Sir, I'm just going to ask the questions, and if you say you can't answer the question, then don't answer the question, but I'm going to pose the questions as I want to pose them"); Tr. 17 ("Alex . . . , I'm not interested in getting involved in a colloquy with you, and I'm not going to"); Tr. 21 ("Alex, stop interrupting"); Tr. 26 ("Alex, I'm not going to spend the deposition answering your questions"); Tr. 26 ("Alex, I'm not playing those games with you"); Tr. 31-32 ("Alex, let me finish making my question.  You want to talk about professional conduct.  Let me ask my question before you interrupt or you object.").

34. Rightly or wrongly, I perceived counsel's response—including his blunt refusal to entertain my request and dismissal of it as mere "games," his clipped tone, his apparent irritation, his immediate threat of sanctions that followed the first reading of the notes, and his calling me by my first name when I addressed him up to that time by his last name—as a conscious and aggressive strategy to intimidate me from zealously

advocating for my clients.  *See* ECF No. 780-2, at 9, 18 n.20; Tr. 46-59, 64-70, 75, 80-81, 207-10, 322.

35. The tensions escalated quickly and there were even more heated and combative exchanges when the witness began to read his notes some minutes later.  Tr. 27-29.  I recall plaintiffs' counsel raising his voice and speaking in a faster cadence than normal.  Tr. 30-31.  I genuinely believed, at the time, that plaintiffs' counsel was engaged in what I described as "badgering" or "lashing out" at the witness—interrupting the witness and preventing him from completing his response, asking in accusatory tones whether he was reading a "speech" written by counsel, and accusing me and the witness of engaging in improper, sanctionable conduct, filibustering, and of violating an unidentified order of the Court.  *See* ECF No. 780-2, at 18, 18 n.20, 29; Tr. 32-37, 41-42, 47-48, 51-57, 75-76, 143-44.  Plaintiffs' counsel repeated his threats and accusations that I and the witness were engaged in improper and sanctionable conduct by relying on notes at other times in the deposition.  *See*, *e.g.*, ECF No. 780-2, at 18 n.20; Tr. 32-34, 51-57, 59; 94-96, 99-100, 143-44, 172-76, 225-29.

36. I became offended by plaintiffs' counsel's dismissive responses and accusations of sanctionable conduct because I believed that I and others had approached and prepared for the deposition in good faith, and consistent with the law.  This conviction led me, in an effort to zealously represent my client, to raise my own voice in response and accuse plaintiffs' counsel of impropriety.  I regret my sharp language but I genuinely believed at the time that counsel was engaged in an improper strategy to prevent the witness from providing information responsive to the EMOI Notice.

37. I recall other "heated" exchanges with plaintiffs' counsel about issues beyond the topics and the use of notes.  For example, in Tr. 20-25, I recall a lengthy exchange with raised voices on both sides about whether plaintiffs' counsel would allow the witness to review an exhibit in its entirety while on the record.  I felt that plaintiffs' counsel's tone and facial expression were unprofessional as he told me to "stop interrupting," Tr. 21, and ultimately took the deposition off the record unilaterally.  Tr. 21-22.  I believed at the time that plaintiffs' counsel's behavior was dismissive and reflected a lack of respect for his professional adversary.

38. On another occasion, when the witness needed time to review a 50-page exhibit, plaintiffs' counsel, as I perceived him, raised his voice, appeared angry, and threatened to go off the record again unilaterally because he did not want the witness to waste his allocated deposition time by reading the document.  Tr. 182-83.  When I refused to consent to going off the record, Tr. 184, plaintiffs' counsel appeared to me to be stating loudly that my views did not matter, and that my position was "ridiculous, . . . just absolutely ridiculous."  Tr. 184-85.  I believed at the time that this exchange, too, demonstrated a lack of professional respect.  *See* ECF No. 792-2, at 13-14; Tr. 26-27, 29-32, 34-38, 174-75, 184-85, 207-09.

39. In the weeks following this contentious deposition, the parties moved and cross-moved for sanctions relating to the deposition.  At this time, fresh from my experience of the deposition, I genuinely believed that plaintiffs' counsel had not been "calm and professional" throughout, and that plaintiffs' counsel had engaged in an inappropriate strategy to impose an unfair burden on my client under Rule 30(b)(6) to prepare for a large number of topics in which he demonstrated little interest.

40. This conviction led me to make the unfortunate characterizations of plaintiffs' counsel's demeanor in the briefs at issue.  Although the Court disagrees that the language I used to characterize plaintiffs' counsel's demeanor has evidentiary basis, *see* Opinion at 30-31, I genuinely believed when I made those assertions that my descriptions were supported by my own recollection, the transcript, and the video of the deposition.  I have learned from this experience that, when tempers have risen in litigation, greater care is required in the words that I choose.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 6, 2021

_____

Alex Young K. Oh