**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE I, *et al.*, | ) |
| | ) |
| Plaintiffs, | )   Civil Action No. 01-1357 (RCL/AK) |
| | ) |
| v. | ) |
| | ) |
| EXXON MOBIL CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM ADDRESSING
<u>RESPONSES TO COURT'S APRIL 26, 2021 ORDER TO SHOW CAUSE</u>**

Plaintiffs respectfully submit this memorandum addressing (a) the Response of Paul, Weiss, Rifkind, Wharton & Garrison LLP to the Order to Show Cause Dated April 26, 2021 ("PW Response"); and (b) the Response of Alex Young K. Oh to the Court's April 26, 2021, Order to Show Cause ("Oh Response").

This Court has already determined that the misconduct by Defendant's corporate representative and defense counsel was egregious and sanctionable, conclusions that are strongly supported by the record. Dkt. 803. The issue now before the Court is whether additional sanctions should be imposed pursuant to the Court's Show Cause Order, based on Defendants' cross-motion for sanctions and, in particular, Defendants' baseless characterizations of plaintiff counsel's conduct.

Whether additional sanctions should be imposed is a matter for the Court to decide, but we will give the Court our candid assessment of the matter. The following points are particularly germane:

1.     The PW Response and Oh Response can, perhaps, be most fairly described as "half apologies." The PW Response states that it apologizes that "it took an approach the Court

disapproves of" and does "not contest the discovery remedies imposed by the Court," PW Response at 1 & 3, but then argues at length that its conduct was reasonable (but conveyed with "sharp and pointed language"[1]). The PW Response also continues to impugn the conduct and demeanor of opposing counsel (or, at a minimum, claims that Defendants' prior aspersions were reasonable and supported by the record). Similarly, the Oh Response states "regret" for "the breakdown of civility" and for "characterize[ing] the record in a way with which the Court did not agree," but then argues that her mischaracterizations of plaintiff counsel's demeanor "were fair and supported by evidence."[2]

2. In many ways, the Responses re-litigate matters already considered by the Court and, more importantly, either disregard the seriousness of the Court's findings about the misconduct or continue to try to justify and defend this misconduct. In this respect, they bear on a fundamental point raised by the Court's Show Cause Order: do the Defendants and their counsel fully appreciate the nature, gravity and pervasiveness of the misconduct found in the Court's sanctions Opinion and Order to Show Cause, or are further sanctions required to make this clear and address the completely baseless attacks on plaintiffs' counsel in Defendants' cross-motion (which, as explained below, continue to play a prominent role in the Responses)?

3. In evaluating this, it is important to be clear about the misconduct by the Defendant, its corporate representative and defense counsel that warranted these sanctions. As the Court's opinion made clear, the misconduct here was *not* the witness's use of notes *per se* at a deposition. Dkt. 803 at 17.[3] The Responses' invocation of law allowing witnesses to rely on

---

[1] PW Response at 4.

[2] Oh Decl. at ¶ 2.

[3] *See In re Neurontin Antitrust Litig.,* M.D.L. 1479, 2011 WL 2357793, at **6, n.8 (D.N.J. June 9, 2011) ("The question is not whether [a witness] … is permitted to use an outline to assist him during his testimony. The question is the extent to which [the witness] is merely a

notes to give responsive answers on behalf of a corporation is wholly inapposite.  *See* PW Response at 6-8; Oh Decl. at ¶¶ 8, 11.  Indeed, merely by referring to Mr. Snell's *attorney-scripted testimony* merely as "notes," the Responses mischaracterize the issues.

Instead, the sanctions resulted from pervasive defense misconduct that proceeded from the beginning of the deposition until its end.  It continued in the presence of two Paul Weis attorneys and Exxon's long-time in-house counsel who were all representing the witness.  And it persisted despite repeated requests that defense counsel advise their client to provide responsive and proper testimony.  As the Court found, following an exhaustive review of the record that included "both the transcript and the video of the record" (Dkt. 803 at 31), this misconduct included:

- The witness and defense counsel violated a Court-ordered "prohibition on witness access" to undisclosed and unmarked materials that "provides a crucial integrity safeguard: it prevents witnesses from surreptitiously reading answers from notes." Dkt. 803 at 13.  Although defense counsel claimed that the failure to disclose these scripted "notes" at the start of the deposition – or produce them until the deposition was concluded – was reasonable and appropriate, this conduct violated the unambiguous terms of this Court's discovery order.

- The witness "failed to answer most of the substantive questions he was asked," many of which "went to the core of the plaintiffs' case."  Dkt. 803 at 15.  The Court's opinion meticulously identifies *110 times* the witness provided non-responsive answers and explains that this "*understates*" Mr. Snell's "obstructive conduct."  *Id*. at 15 & 34-56.

- In reading non-responsive and self-serving statements into the record, delaying as much as eight minutes before answering a pending question, and engaging in "egregious and intentional delays" with other answers, Mr. Snell repeatedly impeded

---

mouthpiece for [] [c]ounsel, unable to provide helpful answers to questions about what the *corporation* knew."); *In re: Neurontin Antitrust Litig.,* 2:02-cv-01390-MCA-JBC, Dkt. 414, at 21-22 (D.N.J. Jan. 25, 2011) (appended to Dkt. 790, as Exh. U) (imposing sanctions and explaining that a Rule 30(b)(6) witness "cannot simply be a conduit for counsel's contentions"); *United States v. Taylor*, 166 F.R.D. 356, 361-62 (M.D.N.C. 1996) (imposing sanctions based on testimony of Rule 30(b)(6) witness and explaining that "[t]he attorney for the corporation is not at liberty to manufacture the corporation's contentions. … Otherwise, it is the attorney who is giving the evidence, not the party.").

the deposition.  As the Court found, "[u]pon thorough review of both the transcript and video, the Court has no doubt that Mr. Snell severely, repeatedly, and perversely obstructed his own deposition."  Dkt. 803 at 16.

- "Over the course of the deposition, Mr. Snell repeatedly read long answers directly from his notes."  Dkt. 803 at 16.  Notwithstanding repeated requests that this misconduct cease, this misconduct continued for many hours and persisted even as the deposition neared its conclusion (when, even then, the witness continued to read lengthy, scripted and non-responsive  statements into the record.  *See, e.g.,* Dep. Tr. at 287:5-293:4; *id*. at 315:7-319:17).  *See* Dkt. 803 at 52-56 (identifying "non-responsive" and/or "evasive" testimony by witness during the last phases of the deposition).

- The issue was *not* – as the Responses continue to suggest – whether a deponent could rely on notes.  As the Court explained:  "of course, there is a difference between relying on notes and reading verbatim nonresponsive answers."  And witnesses "must answer the specific questions posed to them.  Here, Mr. Snell treated the topics listed on the notice of deposition like interrogatories calling for an oral response, and he used his notes to filibuster.  That was improper.  And it pervasively disrupted the deposition, meriting sanctions."  Dkt. 803 at 17.

- Because it appeared the witness was reading answers from undisclosed notes, Mr. Snell was asked straightforward questions to determine if he was doing so.  "Mr. Snell repeatedly provided inaccurate answers to the question of whether he was reading from his notes."  Dkt. 803 at 17.  These answers – which were repeated throughout the deposition -- were "deliberately misleading."  *Id.* at 18.

- As Mr. Snell continued to read answers, in whole or in part, verbatim, he was repeatedly asked who had written the words he was uttering.  He again "provided evasive answers to the question of who prepared his notes."  Dkt. 803 at 17.  We now know these "notes" were in fact drafted by Paul Weiss attorneys, Oh Decl. ¶ 15, and were repeatedly used by the witness as a verbatim script.

- The Court found that defense counsel preplanned Mr. Snell's conduct and failed to curb Mr. Snell's misconduct during the deposition.  "Despite Mr. Pierson's repeated requests, Ms. Oh apparently never did anything to encourage Mr. Snell to answer questions responsively.  Nothing in the transcript and nothing in the defendants' filings suggests that she ever instructed Mr. Snell to provide direct answers to specific questions.  Ms. Oh is therefore responsible alongside Mr. Snell for his misconduct."  Dkt. 803 at 18-19.  (We offer further observations about this misconduct below).

4.     Although the Responses continue to refer to Mr. Snell's "notes" (or, in the words,

Mr. Snell repeatedly used: "my notes"), they plainly served as a script.  This became indisputable

when they were belatedly produced and a comparison showed that Mr. Snell repeatedly read from this script verbatim.[4]

The Responses now acknowledge, for the first time, that "the first draft was prepared by an associate at Paul Weiss." Oh Decl. at ¶ 15. The Responses add that these scripted answers were "revised iteratively" in later sessions, but share no information with the Court about the extent to which this is true or whether *any* revisions to the script were made by Mr. Snell (a witness whom they say "lacked personal knowledge of the vast majority" of the topics and "did not join EMOI until almost a decade after the events in question transpired."[5]).

Several conclusions seem inescapable. First, in numerous instances, Mr. Snell was simply parroting words scripted by the defense team and doing so at great length regardless of whether they actually responded to a question. Second, Mr. Snell knew his attorneys had written these words, but instead "provided evasive answers to the question of who prepared his notes." Dkt. 803 at 17. Third, Ms. Oh and presumably the two other attorneys representing Mr. Snell at his deposition must have known this as well. Despite this, these "evasive" answers continued for the entirety of the deposition. Any attorney should know this was improper.

5. The Responses also make clear that defense counsel knew Mr. Snell was reading numerous answers verbatim from his script and then "repeatedly provid[ing] inaccurate answers to the question of whether he was reading from his notes." Dkt. 803 at 17. *See also id.* at 18 (explaining that "because Mr. Snell knew that he was reading long portions of his notes verbatim, he must have knowingly provided misleading testimony"); *id.* (Mr. Snell repeatedly answered [the question of whether he was reading his answers] in a deliberately misleading

---

[4] *See* Plaintiffs' Motion to Compel Discovery and Impose Sanctions, Exhibit F (comparing Mr. Snell's testimony with identical language in "notes/script."

[5] PW Response at 2.

manner."). Not only had one of the Paul Weiss representing Exxon drafted the answers that were being read verbatim, the Oh Declaration acknowledges that "I had a copy of the notes with me." Oh Decl. at ¶ 26. Thus, when Mr. Snell "repeatedly provided inaccurate answers to the question of whether he was reading from his notes" – misconduct that continued for seven hours – defense counsel knew this and did nothing to correct it.

6.     The same is true of the other misconduct. The witness's obligation to answer the question posed – rather than flood the record with non-responsive and self-serving information – is a bedrock principal of testimony. And yet the witness disregarded this on countless occasions during the deposition, again without any effort by defense counsel to correct this misconduct and despite multiple and entirely appropriate requests by plaintiffs' counsel that they do so.

7.     Although the Responses have little, if anything, to say about this pervasive misconduct and "deliberately misleading," "evasive" and "inaccurate" testimony, they argue at some length that their approach to the deposition was reasonable. Several comments are in order.

First, the predicates for this claim are addressed at length in earlier briefs and that analysis is fully applicable here.[6]

---

[6] These points are addressed in detail in Plaintiffs' Motion to Compel Discovery and Impose Sanctions (Dkt. 777) and Plaintiffs' Reply Memorandum in Support of Motion to Compel Discovery and Impose Sanctions and Opposition to Defendants' Cross-Motion for Sanctions (Dkt. 790). As the Responses try to revisit many of these issues, a few brief comments are in order:

First, the Responses' claims about the breadth of the noticed topics – which focus almost entirely on a 2 l/2 year period in a single location – again disregard the fact that defense counsel repeatedly rejected invitations to confer about the scope of any of the topics and then disregarded the process and deadline established by the Court for addressing any such concerns.

Second, the Responses' contention that Exxon could not produce anyone with personal knowledge of these events -- and instead had to rely on an attorney who "did not join EMOI until almost a decade after the events in question transpired," PW Response at 2) -- is hard to square with (a) the fact that Mr. Wilson ("the country manager for the entire relevant time period") and

Second, the conduct by defense counsel almost from the outset of this deposition makes it exceedingly difficult to believe that the "two-step" described in Plaintiffs' sanction papers was not pre-planned.  Defendants do not contend that plaintiffs' counsel asked *a single question* at this deposition that was outside the scope of the noticed topics.  Nevertheless, the witness embarked on the "two-step" strategy as soon as substantive questions began.  Almost immediately thereafter defense counsel actively abetted this strategy:

- Accusing Plaintiffs' counsel of "trying to conceal and mislead the witness by concealing the topic that you are asking about."  (Snell Dep. at 16:20-17:3).

- Telling Plaintiffs' counsel "[y]ou need to calm down, take a deep breath and be a professional here, Mr. Pierson."  (*Id.* at 26:18-23).

- Stating to Plaintiffs' counsel "Are you ashamed of your notice?  Are you walking away from your notice?"  (*Id.* at 39:16-19).

---

Mr. Connor ("the principal security adviser on the ground in Aceh"), met, presumably by zoom, with defense counsel and the witness to prepare Mr. Snell, *see, e.g.,* PW Response at 6, and (b) are both on Defendants' Rule 26(a) short list of witnesses Defendants may call at trial.  If either had been used as a Rule 30(b)(6) witness, however, he would have been obligated to testify about information known or reasonably available to EMOI during the 2 l/2 year period encompassed by most of the topics.  Similarly, when Defendants' produced 30(b)(6) witnesses during Phase 1 of discovery in 2008, they selected individuals with no personal knowledge of events in Aceh (even though Defendants subsequently claimed – in unsuccessfully opposing additional 30(b)(6) depositions – that the depositions substantially overlapped with Phase 2 topics about events in Aceh).  In short, this is simply the strategy Defendants have elected to use for 30(b)(6) depositions.  While it is their prerogative to do so, it provides no justification for the obstruction that occurred at Mr. Snell's deposition.

Third, the Oh Declaration asserts that plaintiffs' counsel "took the position" that "he was under no obligation to identify or even ask about any topics" and led defense counsel to conclude that he was "putting the deposition notice aside entirely."  Oh Decl. at ¶ 18.  This disregards: (a) the Court's resolution of this claim, Dkt. 803 at 22 n.8; (b) Mr. Pierson's actual conduct at the deposition before the witness's obstructive strategy became clear, *see* Dep. at 16:10-11 (introducing a map identifying relevant locations and correctly explaining that the ensuing questions would "relate to multiple topics") and *id.* at 25:10-11 & 19-21; and (c) the fact that all of the questions asked at the deposition were squarely within the topics encompassed by the notice (a fact Defendants have never disputed).

.

- And, when Plaintiffs' counsel tried to get an answer to the most basic question ("Sir, … you just read your answer from something that is in front of you, correct?"), telling Plaintiffs' counsel that "you can't just bluff your way through it" and instructing the witness "you don't have to answer the question." (*Id*. at 60:2-13).

Third, and most fundamentally, the witness's misconduct persisted throughout the entirety of the deposition, with defense counsel doing nothing to address it and repeatedly ignoring requests that it be corrected.  Thus, while there is every reason to believe that this strategy was "pre-planned," this is almost beside the point.  No reasonable counsel could believe it was appropriate for the witness to read answers verbatim from an undisclosed script; to fail to "answer most of the substantive questions he asked"; to engage in "egregious and intentional delays"; to read lengthy, non-responsive statements into the record; to "repeatedly provide[d] inaccurate answers"; and to provide "evasive answers to the question of who prepared his notes." And yet this misconduct continued for seven hours of testimony.  Regardless of the degree to which this was pre-planned, or whether the witness's three defense counsel instead simply allowed it to continue for seven hours, it was plainly sanctionable.

8.     If the Defendants had responded to the sanctions' motion by offering the apology now found in their Responses – and acknowledged, as they now do, that relief was appropriate – that would be one thing.  But the Defendants selected a different path.  They told the Court that all of this conduct was perfectly reasonable.  And they went even further by filing a cross-motion urging the Court to impose sanctions *on Plaintiffs' counsel* and award costs.  In doing so, they filed pleadings that were replete with invective impugning the integrity, demeanor and conduct of Plaintiffs' counsel, who they described – in a word – as "unhinged."

We want to reiterate the following as clearly as possible:  the actions of Plaintiffs' counsel at this deposition were *entirely appropriate and professional*.  Plaintiffs' counsel conducted himself exactly as this Court should rightfully expect.  Indeed, if anything, Plaintiffs'

counsel showed an extraordinary degree of composure and restraint when confronted with a witness who "severely, repeatedly, and perversely obstructed" the deposition for its full seven hours (until 5 a.m. in the morning), often aided by his counsel.  This Court has now conducted a "thorough review of both the transcript and video of the deposition" and determined that "[*b*]*y all indications, [Plaintiffs' counsel] maintained a calm demeanor throughout the deposition*." Dkt. 803 at 31 (emphasis added).  That is exactly right.  Mr. Pierson tried to get responsive answers to straightforward questions – as any good counsel would do – and was a consummate professional throughout this deposition.  It is wholly improper and sanctionable for defense counsel to make claims to the contrary.[7]

Although there are many respects in which we disagree with the claims in the Responses and attorney Oh's declaration,[8] this point is particularly troubling and deserves special emphasis. Although couched in some respects as apologies, both Responses repeatedly claim that Defendants had a reasonable basis for impugning the temperament and integrity of plaintiffs' counsel.  In this sense, they are essentially doubling-down on their aspersions (in papers that were filed on the public record and with the understanding they will receive – as Defendants' unfounded allegation of "unhinged" conduct by plaintiffs' counsel has already received --

_____

[7] At many points, the Responses suggest a false equivalency in the actions of counsel at the deposition.  But this Court has already found that the conduct of Mr. Snell and his counsel was improper and sanctionable and "[a]ny threats the plaintiffs' counsel made to seek sanctions had merit."  Dkt. 803 at 23 n.10.  The efforts of plaintiffs' counsel to secure responsive and honest testimony – and object to conduct this Court has found sanctionable – are entirely different than the defense misconduct at the deposition.

[8] At this point, we believe there would be little value to the Court in a point-by-point rebuttal of the claims made in the Oh Declaration.  Accordingly, we focus on the central claims made in that declaration.

widespread national press attention).[9]  And they do so notwithstanding this Court's admonition

about the "pernicious danger posed by attacks on an attorney's integrity."  (Dkt. 803 at 31, n.14).

In the Court's April 26, 2021 Order, the Court explained that in Defendants' opposition

papers and cross-motion for sanctions "the defendants make many allegations about Mr.

Pierson's demeanor.  The defendants say:

- Mr. Pierson was "agitated and combative."

- Mr. Pierson "lashed out at the witness."

- Mr. Pierson was neither calm nor professional but rather "became unhinged …
  and repeatedly attacked and baselessly threatened to seek sanctions against the
  witness and counsel."

- Mr. Pierson engaged in "browbeating and disrespectful behavior."

- Mr. Pierson became "indignant and adversarial."

- Mr. Pierson became "agitated and aggressive."

- Mr. Pierson "demonstrated a general lack of respect towards a professional
  adversary."[10]

None of this is true.  In fact, plaintiffs' counsel did no more than seek honest and responsive

answers to perfectly appropriate questions.  When both the witness and counsel tried to obstruct

this, plaintiffs' counsel did exactly what any good attorney would do.  He did not allow himself to

---

[9] *See, e.g.,* Exhibit A (National Law Journal article) and Exhibit B (Law360 article).  Both
the PW Response and the Oh Response were filed on the public record almost immediately after
the Court's opinion was unsealed.  Without dwelling on the matter, it is safe to say this was not
coincidental.

[10] Dkt. 798 at 31 (citations omitted).  *See also* Defendants' Memorandum Opposing
Plaintiffs' Motion to Compel Discovery and Impose Sanctions and Supporting Defendants'
Cross-Motion for Sanctions (Dkt. 781) at 1 ("badgering" "charade" "bad faith effort"); at 3
("false claims"); at 4 ("bludgeon" "harass"); at 10 ("berated" "threatened" "intimidate"); at 11
("badgering"); at 13 ("belittled"); at 18 ("conceal" "embarrassed"); at 18 n. 20 ("unhinged"); at
27 ("stunt"); at 28 ("snapped"); at 29 ("badgering"); at 31 ("berated" "accosting").

get side-tracked by obstructive behavior from either the witness or defense counsel, pursued answers to legitimate questions and – as this became impossible – correctly cautioned opposing counsel that the witness's actions (i.e., "severely, repeatedly, and perversely obstruct[ing]" the deposition) were improper and sanctionable.  These are exactly the same conclusions this Court later reached.  And plaintiffs' counsel gave the defense attorneys and the witness repeated opportunities to correct the misconduct.  They repeatedly declined to do so.  While trying to salvage the deposition in the face of this misconduct, Plaintiffs' counsel "maintained a calm demeanor throughout the deposition." Dkt. 803 at 31.  This is perfectly clear from the actual record of the deposition, including the video and audiotape.

Thus, the suggestion in the Responses that the deposition became contentious – hardly surprising when a witness is "severely, repeatedly, and perversely obstruct[ing]" the deposition – is entirely beside the point.  Depositions often are contentious.[11]  The salient point is that Plaintiffs' counsel did *nothing* inappropriate and Defendants could have no good-faith basis for asserting the contrary.  He stayed calm and professional; he posed appropriate questions and sought honest answers; and he made a record of the misconduct and urged defense counsel to correct the misconduct.  This is exactly how counsel are supposed to conduct themselves and there is nothing remotely sanctionable about this.

---

[11] See, for example, the same defense counsel's actions at the prior Rule 30(b)(6) deposition of Mr. Boydell.  Dkt. 790, Exh. I (Boydell Dep. at 57:17-20) ("Mr. Landau, if you insist on going outside the agreed-to time datelines and the topics in your notice, I am going to have to take the witness and leave …"); *id.* at 74:11-75:5 ("This is a Rule 30(b)(6) deposition that has been carefully litigated over, choreographed, agreed to on scope, okay.  Let's not pretend that we are here with some unguided list of topics and unbounded time boundaries. … [Y]ou don't dispute that there is this agreement in place, and yet you insist on doing this.  If you continue to do so, I am going to have to stop and seek a protective order because you are violating your agreement.").

Because the actual record of the deposition confirms that the conduct of Plaintiffs' counsel conduct was appropriate, the Responses make three rather extraordinary – and baseless – claims in a continuing effort to justify their aspersions.

First, the Oh declaration states that "I do not believe the audio fairly captures the sound levels of speakers as I perceived them, which may have been due to the fact that I was using noise-cancelling headphones with an attached microphone." Oh Decl. ¶ 32. Presumably this is intended to address defense counsel's demonstrably untrue representations on the record that plaintiffs' counsel was "yelling," "screaming" and "shouting." But whatever the relevance of defense counsel's "noise-cancelling headphones," the witness was also represented at the deposition by a second Paul Weiss attorney and an experienced in-house counsel from Exxon. Both of those attorneys knew the statements by defense counsel were false. And, when Plaintiffs' sanctions briefs pointed to these untrue accusations as some of the many examples of misconduct, the Defendants' response briefs, then filed by five Paul Weise attorneys as well as Exxon's counsel, simply remained silent. They again did nothing to correct these untrue statements.

Second, finding no support in the video/audio for their aspersions, the Oh Declaration now asserts – *for the first time in the almost three months that have followed this deposition* – that she perceived "the video of plaintiffs' counsel's face and body language as showing anger and irritation in a non-verbal manner, including when counsel appeared to be glaring, shook his head, wore an angry or an irritated expression, and leaned forward." Oh Decl. ¶ 33. The Court can assess these latest aspersions in light of the following:

- Although defense counsel had no hesitation at the deposition in asserting any conceivable ground for challenging the actions of Plaintiffs' counsel, defense counsel did not, at any point during seven hours of questioning, even *hint* that Plaintiffs'

counsel was engaging in *any* non-verbal conduct such as glaring, leaning forward aggressively, or anything else now being alleged.

- The only comparable claim that defense counsel actually made at the deposition – the representation that Mr. Pierson was "screaming," "yelling" and "shouting" at defense counsel – is not true and is conclusively disproved by the actual audio/video.

- During the parties' two meet and confer sessions – i.e., the session that preceded Plaintiffs' motion and a second session that preceded Defendants' cross-motion – defense counsel made zero mention of any of the purported "non-verbal" conduct they now allege as a basis for sanctions.

- When the Defendant subsequently filed a 33-page brief that included a cross-motion for sanctions asserting without the slightest basis that Plaintiffs' counsel was "unhinged," they again did not make the slightest mention of *any* "non-verbal" conduct by Plaintiffs' counsel that could possibly be considered inappropriate, let alone sanctionable.

- After Plaintiffs' counsel opposed the cross-motion and explained that defense counsel's aspersions were factually untrue, unsupported by the video, and provided a further justification for sanctions, defense counsel's 18-page response against did not include a single word claiming that Defendants' position might somehow be justified by *any* "non-verbal" conduct.

- Only now, months later – and after this Court ruled that "[u]pon thorough review of both the transcript and video of the deposition, the Court cannot locate support for [Defendants'] claims" and "[b]y all indications, [Plaintiffs' counsel] maintained a calm demeanor throughout the deposition" – does defense counsel assert that their aspersions were actually justified by some heretofore unmentioned "non-verbal" conduct.

- This latest claim of "misconduct" conveniently follows the Court's acknowledgment that "the Court must rely only on audio to characterize his conduct" because the video does not show counsel's "face or body." 31 n.14. Seizing on this, defense counsel now suggests, for the first time, that Plaintiffs' counsel was "glaring," "angry" and otherwise exhibiting some sanctionable "non-verbal" behavior, apparently while "maintain[ing] a calm demeanor throughout" the entire seven-hour deposition. This is not only inaccurate,[12] it is implausible on its face.

---

[12] *See* Exhibit C (Declaration of Kit A. Pierson); Exhibit D (Declaration of Agnieszka Fryszman); and Exhibit E (Declaration of Naomi Chasek-Macfoy). As this matter was briefed by the parties, Plaintiffs filed the full video and audio of the deposition with the Court. The Court has now had an opportunity to conduct a "thorough review of both the transcript and video of the deposition." Dkt. 803 at 31. Contrary to the Responses' claims, there is no point in the deposition at which Plaintiffs' counsel was "angry," nor did plaintiffs' counsel ever "glare" at anyone or otherwise act inappropriately. Indeed, what is quite evident from the transcript (and

Third, in a comment that is trivial but also revealing, the Oh Declaration cites as an example of a "conscious and aggressive strategy to intimidate me" and apparently sanctionable conduct, plaintiffs' counsel "calling me by my first name when I addressed him up to that time by his last name." Oh Decl. at ¶ 34. Unmentioned is the fact that use of counsel's first name is *exactly* what Paul Weiss attorneys (as well as Plaintiffs' attorneys) have done in countless letters and e-mails exchanged in this case. It is also exactly the way *another* Paul Weiss partner (quite appropriately), as well as the witness, addressed Mr. Pierson at the last deposition Mr. Pierson conducted, the deposition of Neil Duffin.[13] The fact that defense counsel now points to this as conduct that might conceivably lend support to, or help justify, a sanctions motion speaks for itself.

Stated bluntly, both of the Responses continue to characterize the conduct of Plaintiffs' counsel in a manner that is essentially the opposite of what occurred. The gist of both Responses is that defense counsel reasonably and accurately perceived plaintiffs' counsel to be acting in a

---

we are confident would be confirmed by any portion of the video or audio) is that plaintiffs' counsel was methodical, calm and highly professional throughout the deposition. That remained true even as the witness "severely, repeatedly, and perversely obstructed his own deposition" (*id.* at 16), and notwithstanding defense counsel's interruptions and inappropriate statements that seemed designed to distract counsel and/or (unsuccessfully) provoke a response. *See, e.g.,* Snell Dep. at 16:19-17:3; 26:19-23; 39:16-19; 59:22-60:5; 70:13-16; and 208:23-24; 210:11-13.

[13] *See* Exhibit P to Plaintiff's Motion Requesting Relief Regarding EMOI and EMC Rule 30(b)(6) Depositions, Dkt. 762 (Duffin Dep.) at 30:1-2 (Mr. Anderson: "Kit, are you offering this as Exhibit 3?"); *id.* at 54:15-18 (The Witness: "Kit, … Why don't we take a break there and stretch our legs …"); 133:2-3 (Mr. Anderson: "That's not the question you asked, Kit."); *id.* at 144:3-4 (Mr. Anderson: "Kit, … I've not told him not to answer your question."); *id.* at 166:19-20 (Mr. Anderson: "And, Kit, is the next document in sequence of a similar style?"); *id.* at 211:10-11 (Mr. Anderson: "Is this a good time for a break, Kit?").

Needless to say, if defense counsel had expressed the slightest concern about this – which did not happen -- Plaintiffs' counsel would have been happy to address counsel in whatever manner was preferred.

highly unprofessional, intemperate and, in fact, sanctionable manner[14] and their characterization of Plaintiffs' counsel as "unhinged," while perhaps expressed in language too "sharp and pointed" (PW Response at 4), was at least close to the mark.  This is simply not true and has no place in pleadings filed with this Court.

The Court's opinion rightly emphasizes "the pernicious danger posed by attacks on an attorney's integrity."  Dkt. 803 at 31 n.13.  The aspersions cast by defense counsel here were not simply an exercise in name-calling or overheated rhetoric (and, to be sure, all counsel can and should be expected to have thick skin in the course of litigation).  Here, baseless defense accusations were made in an effort to respond aggressively and inappropriately to a meritorious sanctions motion.  The accusations falsely impugned the integrity of Plaintiffs' counsel and, in essence, counsel's temperament to practice law.  And they were made not in the heat of the moment, but in a pleading bearing the names of five Paul Weiss attorneys and Exxon's in-house

---

[14] *See* PW Response at 3 (claiming that defense counsel "based on her personal experience and perception of the conduct at the deposition, believed [plaintiffs' counsel' to be acting aggressively and condescendingly"); *id.* at 4 (claiming that "defense counsel genuinely believed that its descriptions fairly captured" the exchanges at the deposition); *id.* (claiming that "the first-hand experience" of the deposition "was not entirely captured by the video the Court reviewed"); *id.* (claiming that defense counsel would not have made the statements about Plaintiffs' counsel "if they did not believe the statements were supported"); *id.* (claiming that "defense counsel's statements described plaintiffs' counsel's behavior as defense counsel honestly and in good faith perceived and remembered it"); *cf.* ("Defense counsel's statements were not statements of historical fact; they were argumentative statements of opinion made in the zealous representation of its client").  *See also* Oh Declaration at ¶ 4 ("my characterizations of opposing counsel's demeanor, based on my personal observations, were fair and supported by evidence"); *id.* at ¶ 32 ("I do not believe the audio fairly captures the sound levels of speakers as I perceived them"); *id.* at 32 (making claims about inappropriate "non-verbal" by plaintiffs' counsel); actions justified defense counsel's perceptions and characterizations); *id.* at ¶ 34 (alleging that behavior of plaintiffs' counsel led defense counsel to perceive, "[r]ightly or wrongly" that plaintiffs' counsel was engaging in " a conscious and aggressive strategy to intimidate me from zealously advocating for my clients"); *id.* at ¶ 35 (again alleging inappropriate conduct by plaintiffs' counsel); *id.* at ¶ 36 (stating that defense counsel "genuinely believed at the time that [plaintiffs'] counsel was engaged in an improper strategy to prevent the witness from providing information responsive to the EMOI Notice").

counsel, filed weeks after the deposition was completed and with a full opportunity to review both the transcript and the videotape.  This was sanctionable conduct.

9.      The PW Response argues that Rule 11 sanctions should be unavailable because Defendants' cross-motion for sanctions was a "discovery motion" exempted from Rule 11's strictures by Rule 11(d).  PW Response at 12-13.  Defendants' arguments require a reading of Rule 11 that would undermine its purpose and the purpose of Rules 26 through 37.   To the extent the PW Response is contending that the Court cannot impose further sanctions – even if it determines that the Defendants lacked record evidence supporting a sanctions motion claiming the opposing counsel was "agitated, respectful, and unhinged during the deposition" (Dkt. 799 at 3) – that conclusion is not required by the cases cited.  To the contrary, three options would be available for the Court's consideration.

First, it is by no means certain that Defendants' cross-motion for sanctions is a "discovery . . . motion[] under Rules 26 through 37." Fed. R. Civ. P. 11(d). Though styled as a request under Rule 30(d)(2), the gravamen of Defendants' cross-motion sounds less in that Rule than in the sanctions provisions of 28 U.S.C. § 1927, which permits courts to sanction an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously." Defendants argued that plaintiffs' counsel "impeded" *his own examination*, but the thrust of their complaint is actually that they wasted time and money in preparing for a deposition that Defendants essentially argue was not taken.  *See* Dkt. 782, at 32. Notably, the remedy requested is not that Plaintiffs allow the witness to read his script into the record, but to compensate Defendants for the costs of their preparation. *Id.* It would be within the Court's discretion to characterize all or a portion of Defendants' cross-motion as outside the scope of Rule 30(d)(2), mooting the question of whether such a motion is exempt from Rule 11 sanctions. *Cf. Patelco*

*Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001) (affirming Rule 11 sanctions while recognizing that the motion at issue could also be sanctioned under Rule 37).

Second, even if the Court accepts Defendants' styling of their cross-motion for sanctions as a Rule 30(d)(2) motion, it is unclear that Rule 11(d) actually exempts such a motion from Rule 11(b)(3)'s obligation that "the factual contentions" in a pleading submitted to the Court "have evidentiary support," or from Rule 11(c)'s sanctions proceedings. The 1993 Advisory Committee Note on Rule 11(d) justifies the provision because "Rules 26(g) and 37 establish certification standards and sanctions that apply to discover requests, responses, objections, and motions. It is appropriate that Rules 26 through 37, which are specially designed for the discovery process, govern such conduct rather than the more general provisions of Rule 11." But no discovery rule establishes certification standards for factual contentions in discovery *motions* (in contrast to disclosures, discovery requests, responses, and objections, *see* Rule 26(g)). Similarly, though Rule 37 establishes a sanctions regime of default award of attorneys' fees for *motions to compel*, no separate sanctions regime is provided for *motions for sanctions* under Rule 30(d)(2).[15] Reading Rule 11(d) to apply to Defendants' motion would therefore create a lacuna in counsel's obligations: under Defendants' reading, Rule 11(d) exempts their motion from the obligations of Rule 11(b)(3), but they are subject to no other obligation to have any basis of support the factual assertions in their briefs.[16]

---

[15] Rule 30(d)(2) *does* provide a separate sanctions regime for impeding a deposition, but it does not govern a motion for sanctions. Rule 30(d)(2) specifies no remedy for false factual assertions in a Rule 30(d)(2) motion.

[16] Sanctions would still be available under the Court's inherent powers, but as the PW Response point out, such sanctions ordinarily require clear and convincing evidence of bad faith. PW Response at 15. Under Defendants' reading, discovery motions are subject to a lesser standard of candor than other motions; Plaintiffs submit this is contrary to the Rules' intent.

The Court need not accept such a reading. The more cohesive reading of Rule 11(d) is that where Rules 26-37 impose specific certification or sanctions standards, Rule 11 does not apply. None of the cases cited in the PW Response consider whether Rule 11 applies to the *factual contentions* contained in a *motion for sanctions* styled under Rule 30(d)(2) (nor are any binding on courts in this Circuit). Rather, the cases consider whether Rule 11 sanctions are available for assertions made in connection with discovery practice *actually outlined* in Rules 26 and 37.[17]

Third, if the Court determines that Rule 11(d) does foreclose Rule 11 sanctions, it has the power to rely on its inherent authority instead. Such sanctions are available "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975). Whereas Rule 11 and other sanctions "reach[] only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." *Id.* at 47. As the Court noted in its opinion, inherent authority has been used to sanction attorneys for dissuading witnesses from testifying or inducing witnesses to give false testimony. Dkt. 803 at 10.

---

[17] *See DR Distributors, LLC v. 21 Century Smoking, Inc.*, 2021 WL 185082, at *3 (N.D. Ill. Jan. 19, 2021) (declining to apply Rule 11 in motion for sanctions "relating to the failure to timely produce ESI and for the spoliation of ESI as well as other alleged misdeeds);[17] *Leeks v. GeoPoint Surveying, Inc.*, 2020 WL 3316002, at *3 (M.D. Fla. June 19, 2020) (sanctions not appropriate for motion under Rule 37); *I re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 12919129, at *3 (N.D. Cal. Nov. 30, 2012) (declining to impose sanctions for alleged misrepresentations in opposition to motion for protective order); *Moeck v. Pleasant Valley Sch. District*, 844 F.3d 387, 391 (3d Cr. 2016) (noting that Rule 11 sanctions inapplicable to "alleged misrepresentations [that] occurred during depositions, in response to interrogatories, and to and about health care providers, or involved counsel's act of changing the e-mail into a document that resembles a letter."); *Patelco*, 262 F.3d at 903, 913 (affirming Rule 11 sanctions for motion in limine, while affirming that Rule 37 sanctions could also be imposed because of discovery-motion aspect to motion).

As explained above, the Court could find clear and convincing evidence of Defendants' bad faith in bringing their cross-motion for sanctions. Defense counsel mischaracterized plaintiff counsel's behavior both during and after the deposition, in spite of the available record evidence. Their arguments depended on a view of the law that Defendants were entitled to script their witness's answers and then remain silent (or worse) while their client read these scripted and non-responsive answers verbatim, engaged in intentional delay, "knowingly provided misleading testimony," "repeatedly provided inaccurate answers," and "severely, repeatedly, and perversely obstructed" the deposition for seven hours.  Dkt. 803 at 17, 18. That position could not be held in good faith by any counsel, let alone counsel with years of litigation and trial experience. They asserted, without evidence and contrary to practice throughout the profession—that plaintiffs' counsel was impeding *his own examination* by refusing to cooperate with Defendants' testimonial theater. The Court may find that these circumstances clearly and convincingly evince Defendants' bad faith, warranting sanctions.[18]

Nor is the Court required to offer Defendants an additional chance to excuse their behavior. The Court's opinion clearly laid out its inherent authority to issue sanctions. Defendants anticipated the possibility that, given their arguments on Rule 11(d), the Court would revert to its inherent authority. Dkt. 804, at 15. Defendants cannot say they lack notice of the possibility of such sanctions.

---

[18] The PW Response's suggestion that the inclusion of record citations in advancing claims against opposing counsel forecloses sanctions is also unsound.  If this were the case, the mere inclusion of a citation, would insulate counsel from any sanction even if the argument being advanced was frivolous and unsupported by the citation.

In short, while the Court will now determine based on its continued examination of the record whether further sanctions are dictated, it is certainly within the Court's power to impose such sanctions.

10.     There is one point in which the parties are entirely in agreement.  This litigation must and will move forward in a collegial and professional manner.  This is, in fact, the way that Plaintiffs' counsel proceed in all litigation and it is assuredly the way this case will proceed. This is a matter we have discussed directly with defense counsel, who have conveyed their shared commitment to this.

* * * * *

The Court will, of course, now decide whether further sanctions are appropriate. Plaintiffs' overriding interest has always been, and remains, moving this matter forward to trial so that a jury can evaluate Exxon's conduct in Aceh and related actions in the United States, and the consequence of that conduct for Plaintiffs and their deceased spouses.

Plaintiffs have filed this memorandum addressing the Responses at some length for two principal reasons.  First, the Court should decide the issues raised by the Show Cause Order on a clear and accurate record.  Second, because the Responses continue, now with a lighter touch, to cast aspersions on the actions of plaintiffs' counsel, this simply cannot go unanswered.  As we have emphasized, the actions of plaintiffs' counsel at the deposition were completely appropriate and, in fact, reflected a high degree of both restraint and professionalism in the face of a witness who "severely, repeatedly, and perversely obstructed" the deposition with significant help from his counsel.  Plaintiffs' respectfully submit that resolution of the pending issues should again make this clear, just as the Court's thorough analysis of Defendants' allegations in its prior

opinion found that "none of the defendants' allegations of misconduct stand up to scrutiny."

Dkt. 803 at 30.

Dated:  May 10, 2021                                   Respectfully submitted,

 /s/ Kit A. Pierson
Agnieszka M. Fryszman (#495208)
Kit A. Pierson (#398123)
Robert W. Cobbs (#1045579)
Nicholas J. Jacques (#1673121)
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., N.W.
Suite 500, East Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
afryszman@cohenmilstein.com
kpierson@cohenmilstein.com
rcobbs@cohenmilstein.com
njacques@cohenmilstein.com

Poorad Razavi
**Cohen Milstein Seller & Toll PLLC**
2925 PGA Blvd., Suite 200
Palm Beach Gardens, FL. 33410
Tel: (561) 515-1400
Fax: (561) 515-1401
prazavi@cohenmilstein.com

Paul L. Hoffman (Pro Hac Vice)
**Schonbrun Seplow Harris & Hoffman LLP**
11543 W. Olympic Blvd
Los Angeles, CA
Tel: (310) 396-0731
hoffpaul@aol.com

Terrence P. Collingsworth (# 471830)
**International Rights Advocates**
621 Maryland Ave., N.E.
Washington, DC 20002 Tel:
(202) 255-2198
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2021, I caused *Plaintiffs' Memorandum Addressing Responses to Court's April 26, 2021 Order to Show Cause* to be filed electronically with the Clerk of the Court using the ECF, who in turn sent notice to counsel of record in this matter.

Dated:    May 10, 2021                                        /s/ Kit A. Pierson
                                                             Kit A. Pierson