**Public Redacted Copy**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE I, *et al.*,

               Plaintiffs,

       v.

EXXON MOBIL CORPORATION, *et al.*,

               Defendants.

**Case No. 01-cv-1357 (RCL)**

## MOTION OF DEFENDANTS EXXON MOBIL CORPORATION AND EXXONMOBIL OIL INDONESIA INC. FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h),

Defendants Exxon Mobil Corporation and ExxonMobil Oil Indonesia Inc. respectfully move for

summary judgment on all of Plaintiffs' remaining claims and for other and further relief as the

Court deems just and proper. On the basis of facts about which there is no genuine dispute,

Defendants are entitled to judgment as a matter of law and dismissal. In support, Defendants submit

a memorandum of points and authorities, a statement of material facts not in genuine dispute with

corresponding exhibits, the declarations of Timothy Lindsey, Patrick Conlon, and Justin Anderson,

and a proposed order, which are being filed contemporaneously with this Motion.

Pursuant to Local Civil Rule 7(f), Defendants request an oral hearing on this

Motion.

Washington, D.C.                    Respectfully submitted,
July 29, 2021


                                    _/s/ Justin Anderson_

Patrick J. Conlon (Bar No. 414621)    Theodore V. Wells, Jr. (Bar No. 468934)
patrick.j.conlon@exxonmobil.com       twells@paulweiss.com
EXXON MOBIL CORPORATION               Jaren E. Janghorbani (admitted _pro hac vice_)
22777 Springwoods Village Parkway     jjanghorbani@paulweiss.com
N1.4B.388                             PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Spring, TX  77389                     1285 Avenue of the Americas
Telephone:  (832) 624-6336            New York, NY  10019-6064
                                      Telephone: (212) 373-3000

                                      Justin Anderson (Bar No. 1030572)
                                      janderson@paulweiss.com
                                      Mitchell Webber (Bar No. 1024005)
                                      mwebber@paulweiss.com
                                      PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                                      2001 K Street, N.W.
                                      Washington, DC  20006-1047
                                      Telephone:  (202) 223-7300

                                      _Attorneys for Defendants Exxon Mobil Corporation_
                                      _and ExxonMobil Oil Indonesia Inc._

**Public Redacted Copy**

## CERTIFICATE OF SERVICE

I, Justin Anderson, hereby certify that on July 29, 2021, true and accurate copies of

the foregoing Motion of Defendants Exxon Mobil Corporation and ExxonMobil Oil Indonesia

Inc. for Summary Judgment and the Proposed Order attached thereto and the declarations of

Timothy Lindsey and Patrick Conlon were electronically filed through the Court's ECF filing

system.  Public, redacted versions of Defendants' memorandum of points and authorities,

Defendants' statement of material facts not in genuine dispute with corresponding exhibits, and the

declaration of Justin Anderson were also electronically filed through the Court's ECF filing

system.

*/s/ Justin Anderson*
Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC  20006-1047
Telephone:  (202) 223-7300

**Public Redacted Copy**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE I, *et al.*,

      Plaintiffs,

    v.

EXXON MOBIL CORPORATION, *et al.*,

      Defendants.

Case No. 01-cv-01357 (RCL)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX 77389
Telephone: (832) 624-6336

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300

Public Redacted Copy

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 4

I.      THE NATURAL GAS FIELD IN ACEH .......................................................... 5

II.     THE CIVIL WAR BETWEEN ACEHNESE SEPARATISTS AND THE
        INDONESIAN MILITARY ................................................................................ 7

        A.      The Acehnese Civil War Was Long Simmering and Marked by Periods of
                Intense Violence .................................................................................. 7

        B.      EMOI Was Caught in the Middle of the Conflict and Temporarily
                Suspended Its Operations in 2001 ........................................................ 8

III.    PLAINTIFFS' ALLEGATIONS ......................................................................... 9

PROCEDURAL HISTORY .................................................................................................. 10

LEGAL STANDARD ........................................................................................................... 11

ARGUMENT ........................................................................................................................ 12

I.      PLAINTIFFS CANNOT PROVE CAUSATION. ............................................. 13

        A.      Indonesian Law Requires that Plaintiffs Prove Causation ..................... 14

        B.      The Court's 2008 Summary Judgment Opinion Does Not Preclude
                Dismissal for Failure to Prove Causation. ............................................ 16

        C.      Plaintiffs Have Failed to Establish That the Indonesian Soldiers Who
                Allegedly Injured Them Did So in the Course of Protecting Arun Field. ............ 17

                1.      Jane Doe I ............................................................................... 17

                2.      Jane Doe II .............................................................................. 18

                3.      Jane Doe III ............................................................................ 19

                4.      Jane Doe IV ............................................................................ 20

                5.      Jane Doe V .............................................................................. 21

                6.      Jane Doe VI ............................................................................ 22

                7.      Jane Doe VII ........................................................................... 24

                8.      Jane Doe VIII .......................................................................... 25

                9.      John Doe II .............................................................................. 26

**Public Redacted Copy**

        10.    John Doe IV ........................................................................ 27

        11.    John Doe VII ....................................................................... 28

II.     PLAINTIFFS LACK EVIDENCE SUFFICIENT TO PROVE QUANTIFIABLE LOSS. ................................................................................................. 30

     A.     Indonesian Law Requires Proof of Quantifiable Loss for All Civil Claims. ......... 30

     B.     Plaintiffs Failed to Adduce Evidence of Quantifiable Loss During Fact or Expert Discovery. .................................................................................. 31

III.    EMC IS NOT VICARIOUSLY LIABLE FOR PLAINTIFFS' INJURIES. ................... 34

     A.     EMC Is Not Liable for Plaintiffs' Injuries Under an Agency Theory. ................. 34

     B.     Plaintiffs Cannot Pierce the Corporate Veil Between EMC and EMOI. .............. 36

IV.    DEFENDANTS HAVE BEEN DENIED A FAIR OPPORTUNITY TO ANSWER PLAINTIFFS' ALLEGATIONS, IN VIOLATION OF THEIR DUE PROCESS RIGHTS. ........................................................................................ 39

     A.     Plaintiffs' Inability to Appear in the United States Violates Defendants' Due Process Right to Cross-Examine Witnesses. .................................................. 39

     B.     Defendants Have Been Deprived of a Fair Opportunity to Rebut Plaintiffs' Claims. ........................................................................................... 40

V.     THE CLAIMS OF JOHN DOE II, JOHN DOE IV, AND JANE DOE VII ARE TIME-BARRED AND SHOULD BE DISMISSED. ........................................ 43

CONCLUSION ................................................................................. 44

**Public Redacted Copy**

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen* v. *Brown*,
　435 F. Supp. 3d 16 (D.D.C. 2020) ........................................................................................29

*Athridge* v. *Aetna Cas. & Sur. Co.*,
　604 F.3d 625 (D.C. Cir. 2010) ...........................................................................................17

*Azimi* v. *Johns*,
　254 P.3d 1054 (Alaska 2011)..............................................................................................34

*Bankers Standard Ins. Co.* v. *Anand*,
　2020 WL 4698363 (D.D.C. Aug. 13, 2020) .......................................................................11

*Byrne* v. *Clinton*,
　410 F.Supp.3d 109 (D.D.C. 2019) ......................................................................................43

*In re Complaint of Bankers Tr. Co.*,
　752 F.2d 874 (3d Cir. 1984)................................................................................................39

*Demo* v. *Red Roof Inns, Inc.*,
　274 F. App'x 477 (6th Cir. 2008) ........................................................................................29

*Doe I* v. *Exxon*,
　573 F. Supp. 2d. 16 (D.D.C. 2008) .....................................................................................10

*Doe I* v. *Exxon Mobil Corp.*,
　391 F. Supp. 3d 76 (D.D.C. 2019) ......................................................................................11

*Doe I* v. *Exxon Mobil Corp.*,
　393 F. Supp. 2d 20 (D.D.C. 2005) ......................................................................................10

*Doe VIII* v. *Exxon Mobil Corp.*,
　654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C.
　Cir. 2013) ......................................................................................................................10, 14

*Doe VIII* v. *Exxon Mobil Corp.*,
　658 F. Supp. 2d 131 (D.D.C. 2009) ....................................................................................10

*United States* v. *Dynamic Visions, Inc.*,
　220 F. Supp. 3d 16 (D.D.C. 2016), *aff'd*, 971 F.3d 330 (D.C. Cir. 2020).....................16, 22

*East* v. *Graphic Art Indus. Joint Pension Tr.*,
　718 A.2d 153 (D.C. 1998) ..................................................................................................43

**Public Redacted Copy**

*Fletcher* v. *Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995) ........................................................................................ 37

*Gardel* v. *SK & A Structural Eng'rs PLLC*,
    286 F. Supp. 3d 120 (D.D.C. 2017) ........................................................................... 43

*Gilmore* v. *Palestinian Interim Self-Gov't Auth.*,
    53 F. Supp. 3d 191 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016) .............. 22

*Greene* v. *Dalton*,
    164 F.3d 671 (D.C. Cir. 1999) .................................................................................... 11

*Harper* v. *United States Beef Corp.*,
    2018 WL 3863526 (C.D. Ill. July 23, 2018) .............................................................. 29

*Jenkins* v. *McKeithen*,
    395 U.S. 411 (1969) ..................................................................................................... 39

*Kirton* v. *Mayorkas*,
    No. 1:18-cv-1580-RCL, 2021 WL 981241 (D.D.C. Mar. 16, 2021) ........................ 11

*Morgan* v. *United States*,
    304 U.S. 1 (1938) ......................................................................................................... 39

*Pappas* v. *District of Columbia*,
    No. 19-cv-2800 (RC), 2021 WL 106468 (D.D.C. Jan. 12, 2021) ............................. 44

*United States ex rel. PCA Integrity Assocs., LLP* v. *NCO Fin. Sys., Inc.*,
    No. CV 15-750 (RC), 2020 WL 686009 (D.D.C. Feb. 11, 2020) ............................ 37

*Rusu* v. *I.N.S.*,
    296 F.3d 316 (4th Cir. 2002) ...................................................................................... 39

*Rynn* v. *Jaffe*,
    457 F. Supp. 2d 22 (D.D.C. 2006) ............................................................................. 43

*Schattner* v. *Girard, Inc.*,
    668 F.2d 1366 (D.C. Cir. 1981) .................................................................................. 36

*United States ex rel. Small Bus. Admin.* v. *Pena*,
    731 F.2d 8 (D.C. Cir. 1984) .................................................................................. 35, 36

*Solis* v. *Schweiker*,
    719 F.2d 301 (9th Cir. 1983) ...................................................................................... 39

*Stevens by & through Mathis* v. *Progress Rail Servs. Corp.*,
    No. 1:17-CV-140 (LAG), 2019 WL 7403652 (M.D. Ga. Sept. 5, 2019) .................. 29

**Public Redacted Copy**

*TCL Comm'ns Tech. Holdings, Ltd.* v. *Telefonaktienbolaget LM Ericsson*,
2016 WL 6562075 (C.D. Cal. Aug. 9, 2016) ............................................................34

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017) .........................................................................................38

*Weinberg* v. *Whatcom Cnty.*,
241 F.3d 746 (9th Cir. 2001) ......................................................................................33

*Whetstone Candy Co., Inc.* v. *Nat'l Consumers League*,
360 F.Supp.2d 77 (D.D.C. 2004) ...............................................................................34

*Williams* v. *Hawkins*,
594 S.W.3d 189 (Ky. 2020) .......................................................................................44

**STATUTES**

Civil Code of Indonesia, Article 1365 ............................................................14, 15, 30

D.C. Code § 12-301 .................................................................................................24, 43

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 56 ..........................................................................1, 11

**Public Redacted Copy**

Defendants Exxon Mobil Corporation ("EMC") and ExxonMobil Oil Indonesia, Inc. ("EMOI") respectfully submit this memorandum of points and authorities in support of their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

More than twenty years ago, eleven individual plaintiffs, claiming to have been injured by the Indonesian military during a brutal civil war in the Indonesian province of Aceh, filed suit against EMOI, a private company operating a natural gas plant in Aceh at the time, and others.  Prior to filing their lawsuit, no one—not Plaintiffs, their family members, friends, fellow villagers, or the local authorities—reported Plaintiffs' alleged injuries to Defendants, let alone suggested that Defendants bore any responsibility for those injuries.  Over the course of more than two decades of litigation, Plaintiffs have kept their lawsuit alive by promising, but never producing, evidence showing a causal connection between Defendants' operation of a government-owned natural gas plant in Indonesia and Plaintiffs' alleged injuries caused by Indonesian soldiers during a civil war.

In 2008, following an initial round of discovery on two discrete issues, Judge Oberdorfer denied in part Defendants' then-pending motion for summary judgment.  *See* ECF No. 365.  Without the benefit of a complete evidentiary record, the Court credited Plaintiffs' pleadings and limited written discovery responses on central elements of Plaintiffs' claims, including whether EMOI took action that caused Plaintiffs' alleged injuries at the hands of Indonesian soldiers.  The Court gave Plaintiffs the benefit of the doubt that they would adduce evidence consistent with their allegations that Defendants caused their injuries.

That evidentiary record is now closed, and Plaintiffs are no longer entitled to the benefit of the doubt.  In just the last year, Plaintiffs, their percipient witnesses, and their experts

have provided sworn testimony.  The parties have completed discovery on the remaining merits

issues.  And, significantly, since the 2008 decision, it has been established that Indonesian law,

rather than D.C. or Delaware law, governs Plaintiffs' tort claims.  It is now apparent that

Plaintiffs are unable to support any of their causes of action against Defendants.

*First*, causation is an essential element of each of Plaintiffs' claims, but they have

no evidence showing that Defendants' actions caused their alleged injuries.  There is no evidence

that anyone at EMOI or EMC played any role in Plaintiffs' alleged injuries.  Plaintiffs have not

identified a single EMOI or EMC employee who directed, participated, conspired, caused, or

even was present when Plaintiffs suffered their alleged injuries.  Every one of Plaintiffs'

allegations involve military operations (often occurring miles away from the government–owned

gas plant EMOI operated) undertaken by one or more of the 40,000 Indonesian soldiers the

government deployed to Aceh to fight a separatist insurgency.

Plaintiffs attempt to create a causal link between those military operations and

Defendants by way of the government-owned gas field that EMOI operated and some members

of the Indonesian military guarded.  But there is no evidence that Defendants played any part in

directing or overseeing the Indonesian soldiers who allegedly injured Plaintiffs.  Nor is there any

evidence permitting a reasonable jury to infer that the comparatively few Indonesian soldiers

who guarded the gas plant were even the same soldiers who injured Plaintiffs, much less that the

soldiers injured any of the plaintiffs in connection with guarding the gas plant.

Not a single plaintiff claims to have been injured inside the gas plant or while

trying to enter it.  In fact, Plaintiffs have not identified which Indonesian soldiers allegedly

injured them, who commanded those soldiers, which branch of the military they served in, and

under what orders they were operating at the time of the alleged injuries.  The record thus

Public Redacted Copy

contains no evidence supporting Plaintiffs' allegation that the soldiers who allegedly injured

them did so while protecting the gas plant EMOI operated.  Attempting to plug this gap in the

evidentiary record, Plaintiffs and their witnesses refer to the soldiers—all of whom were

indisputably members of the Indonesian military deployed to a war zone—as "Exxon soldiers."

Summary judgment, however, is not defeated by labels and conclusory assertions.  Plaintiffs

have no competent evidence that the Indonesian soldiers who allegedly injured them did so in the

course of protecting the gas plant—and have neither alleged nor provided evidence of any other

connection between Defendants and the Indonesian military.  Even if Plaintiffs could establish a

link between the alleged injuries and the protection of the gas field, causation would still be

lacking because the record does not support a factual finding that either Defendant took any

action that caused the Indonesian soldiers to engage in the alleged conduct.  Plaintiffs cannot

establish causation and, for that reason alone, all of their claims must fail.

  *Second*, Plaintiffs lack evidence sufficient to prove the necessary element of

quantifiable loss.  Under Indonesian law, each plaintiff must quantify his or her alleged losses

and produce evidence substantiating those alleged losses.  With the exception of one illegible

receipt, Plaintiffs introduced no documentary evidence of damages.  They have no hospital bills.

They have no wage statements.  Even worse, plaintiff after plaintiff testified that, even after

filing their lawsuit, they misplaced or destroyed any records that could substantiate their claims

for lost wages or medical expenses.  What little testimony Plaintiffs provided on loss is incapable

of reliable quantification.  With no meaningful evidence with which to quantify their alleged

losses, a number of plaintiffs even disclaimed damages altogether, testifying that they are not

seeking, and do not want, compensation from Defendants.  Having failed to produce evidence

sufficient to prove and quantify their alleged losses during fact discovery, Plaintiffs promised "█

**Public Redacted Copy**

██████████████████████████.”  *See* Defendants' Statement of Material Facts Not in Genuine Dispute ("SOF") ¶ 147.  They did not do so.  Plaintiffs' inability to prove quantifiable loss is fatal to all of their claims.

*Third*, EMC cannot be held vicariously liable under Indonesian law for the actions of its affiliate, EMOI.  To the extent that Plaintiffs allege agency liability, Indonesian law respects the corporate form and does not recognize general parent company liability for the actions of an affiliate based solely on their corporate relationship.  Plaintiffs' attempt to pierce the corporate veil is likewise unavailing.

*Fourth*, over the course of twenty years, Defendants have been deprived of the opportunity to meaningfully investigate, examine, and rebut Plaintiffs' claims, in violation of Defendants' due process rights.  Plaintiffs and their counsel have kept Defendants in the dark about their claims by, among other things, refusing to provide basic information about their allegations; modifying and adding new allegations at each stage of discovery; claiming to represent all non-party witnesses so that Defendants could not speak with them directly; and failing to ever appear in the United States—Plaintiffs' chosen forum—to give testimony.

*Finally*, the claims of several plaintiffs are time-barred.  The equitable tolling that Plaintiffs have requested is not available in D.C. courts, and they have not shown why some plaintiffs were unable to file timely claims while the rest were able to do so.

## FACTUAL BACKGROUND

From the early 1970s through 2015, Mobil Oil Indonesia, Inc., later EMOI (collectively, "EMOI") operated the Arun Field liquid natural gas facilities in Aceh pursuant to contracts with Pertamina, Indonesia's state-owned oil and gas company.  Under Indonesian law and the parties' agreements, Pertamina and the Indonesian government at all times retained the exclusive authority to provide security for Arun Field, which was state-owned and controlled.

Public Redacted Copy

In the late 1990s and early 2000s, violence escalated between Acehnese separatists and the Indonesian military.  As the civil war deepened, EMOI was a victim of violence by both parties to the conflict, with no ability to control the actions of the combatants and only a limited ability to protect even its own employees.  Plaintiffs' allegations arise out of this civil war, in which EMOI took no side and played no part.

## I.    THE NATURAL GAS FIELD IN ACEH

Mobil Oil Indonesia first discovered liquid natural gas in Aceh in the early 1970s, and began developing extraction facilities as a contractor for Pertamina.  SOF ¶¶ 1–2.[1]  In its four-and-a-half decades operating the gas facilities in Aceh, EMOI provided economic opportunities and social services that would have otherwise been unavailable to the estimated 160 villages in the region.[2]

Although EMOI operated the Arun Field facilities, Pertamina, on behalf of the Government of Indonesia, was the owner and manager of the facilities and had ultimate control over all on-site activities.  SOF ¶¶ 3, 6–7.  EMOI did not own any part of the natural resources it extracted or the facilities it operated, which, by law and contract, were owned and protected exclusively by the Government of Indonesia.  SOF ¶¶ 6, 8, 11–12, 16.

---

[1]   Mobil Corporation, later Exxon Mobil Corporation (collectively, "EMC"), is a corporate entity distinct from EMOI.  SOF ¶¶ 149–53.  EMC had no operations in Indonesia and was never a signatory to the production sharing contracts with Pertamina.  SOF ¶ 5.

[2]   Indonesia suffered from high rates of poverty.  SOF ¶ 17.  EMOI offered the Northern Aceh region a significant economic boost, with high-paying jobs and meaningful technical training.  SOF ¶ 17.  During the time period relevant to Plaintiffs' lawsuit, EMOI employed over 1,000 Indonesian nationals at Arun Field, including many local employees in senior management positions.  SOF ¶ 17.

EMOI also contributed significantly to community development projects.  SOF ¶¶ 18–19.  EMOI built and funded schools and created scholarships for students to attend university.  SOF ¶ 18.  It constructed roads and other infrastructure.  SOF ¶ 18.  It contributed to regional environmental causes and religious festivals.  SOF ¶ 18.  It built a medical clinic, which, by the early 2000s, was serving more than 100,000 local residents each year.  SOF ¶ 19.

Public Redacted Copy

Under Indonesian law, all natural resources, including liquid natural gas, and the facilities and equipment related to their extraction, are owned by the national government. SOF ¶ 6.  Accordingly, as set forth in the Constitution of Indonesia, it was the responsibility of the Government of Indonesia to secure and protect those natural resources, including through use of the military.  SOF ¶ 8.[3]

In October 1998, a renewed Production Sharing Contract (the "PSC") took effect between EMOI and Pertamin, succeeding an earlier Production Sharing Contract governing the terms and conditions under which EMOI operated the Arun Field extraction facilities during the term of the agreement.  SOF ¶ 4.  The PSC reaffirmed that EMOI was a "Contractor" responsible for operating the liquid natural gas extraction at Arun Field on behalf of the Indonesian government.  SOF ¶¶ 3, 6.  As a contractor and operator, EMOI did not own any natural resources, facilities, or equipment associated with the extraction operations in Aceh.  SOF ¶ 6. Nor was EMOI responsible for, or permitted to, provide security for the facilities and operations in Aceh.  SOF ¶ 11.  According to the PSC, and consistent with Arun Field's designation as a Vital National Object, it was the sole responsibility and prerogative of Pertamina and the Government of Indonesia to provide "security" for the Arun Field facilities.  SOF ¶¶ 8–12.

EMOI had no say in choosing, much less any control over, the government-selected security assigned by Pertamina to guard the Arun Field facilities.  The Government of Indonesia decided at its sole discretion which military personnel were deployed to protect Arun

---

[3]   The Arun Field facilities were afforded an additional level of protection by the Government of Indonesia when, in 1983, the Commander-in-Chief of the Armed Forces designated Arun Field a "Vital National Object."  SOF ¶ 9.  As a Vital National Object—a designation indicating Arun Field's critical importance to the country's economy and national security—Arun Field was similarly subject to the protection of the Government of Indonesia. SOF ¶ 10.

Public Redacted Copy

Field.  SOF ¶ 12.  EMOI could not and did not control the Indonesian armed forces guarding the Arun Field facilities, let alone those operating elsewhere in the region.  SOF ¶¶ 12, 33.  EMOI had no authority to hire, train, give orders to, oversee, transfer, or terminate any Indonesian soldiers assigned to protect Arun Field.  SOF ¶ 12.[4]

## II.    THE CIVIL WAR BETWEEN ACEHNESE SEPARATISTS AND THE INDONESIAN MILITARY

### A.    The Acehnese Civil War Was Long Simmering and Marked by Periods of Intense Violence.

Plaintiffs' claims arise out of a decades-long conflict in Aceh between regional separatists and the Indonesian national government.  SOF ¶¶ 20–27.  Since the nineteenth century, Aceh has experienced recurring episodes of political violence, resulting primarily from conflicts between the indigenous Acehnese population and a succession of occupying powers.  SOF ¶¶ 20–26.  Aceh fought wars of independence against Dutch colonizers in the nineteenth century, and against the occupying Japanese Imperial Army during the Second World War.  SOF ¶¶ 20–21.

In 1949, Indonesia declared independence from the Dutch.  SOF ¶ 21.  By 1957, Indonesia had established an authoritarian government under the control of President Sukarno and the Indonesian Army.  SOF ¶ 21.  In 1965, following a coup, General Suharto seized control of the Indonesian government.  SOF ¶ 23.

Beginning in the 1950s, the Acehnese fought a series of insurgencies seeking independence from the central Indonesian government.  SOF ¶ 22.  Following the resignation of

---

[4]    While EMOI was obligated under the PSC to provide logistical support and certain resources for Indonesian military personnel assigned to protect the government-owned facilities at Arun Field, as requested by Pertamina, any resources or funds provided were cost-recovered under the PSC.  SOF ¶ 13.

Public Redacted Copy

President Suharto in 1998, a brief period of relative peace prevailed, but the calm lasted for only a matter of months.  SOF ¶¶ 26–27.  By early 1999, the conflict in Aceh had resumed and the insurgency entered a new phase, with fighting between militants and the Indonesian military increasing in intensity.  SOF ¶ 27.  By no later than 2001, the Indonesian military had deployed as many as 40,000 Indonesian soldiers and national police to Aceh to repress the insurgency. SOF ¶ 27.  Violence and atrocities were committed by both sides of the conflict.  SOF ¶ 29.

### B. EMOI Was Caught in the Middle of the Conflict and Temporarily Suspended Its Operations in 2001.

EMOI was caught between the combatants as the civil war deepened.  The Arun Field facilities became a high-profile target for Aceh insurgents, who threatened, shot at, abducted, and on a few occasions even killed EMOI employees and contractors.  SOF ¶ 30.[5] Aceh militants, known as "GAM," targeted the government-owned Arun Field in order to, among other things, attempt to interrupt the Government of Indonesia's gas revenues; provoke military reprisals that they believed would increase local sympathy and support for GAM; and extort protection money from EMOI.  SOF ¶¶ 31–32.

During the relevant time period, the Indonesian government deployed approximately 40,000 Indonesian soldiers to Aceh, only a small number of which—from fewer

---

[5] Plaintiffs' expert Geoffrey Robinson reported that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ " Expert Report of G. Robinson, dated April 5, 2021 at 14.  An Exxon witness provided first-hand testimony of this campaign of violence and intimidation:



Connor Dep. Tr. 19:7–16.

**Public Redacted Copy**

than 90 to 2,000 between 1999 and early 2001—were assigned to guard Arun Field.

SOF ¶¶ 27–28.  EMOI faced threats, mistreatment, and property theft by soldiers and military

police, who freely accessed the Arun Field facilities and equipment.  SOF ¶ 33.  By early 2001,

the situation had become so unsafe that EMOI determined it was no longer possible to operate in

Aceh.  SOF ¶ 34.

### III.     PLAINTIFFS' ALLEGATIONS

It is undisputed that EMOI had no knowledge of the alleged military attacks

against Plaintiffs, and that Plaintiffs never reported any of the alleged military abuses to

Defendants, until Plaintiffs filed their complaint in June 2001.  SOF ¶ 37.  Although there were

reports from media and international human rights organizations about human rights violations

occurring on both sides of the conflict, SOF ¶ 35,[6] none of these reports (or any information

conveyed to EMOI) pertained to the specific allegations against the military that Plaintiffs raise

here.  SOF ¶ 37.  Even after filing their complaint, Plaintiffs refused to disclose their names or

the names of their villages—the locations where most of the relevant military operations

occurred—until six years after their original complaint was filed.  SOF ¶ 37.[7]  Still today, after

more than twenty years of litigation, it is often unclear exactly what Plaintiffs claim the

---

[6]     As violence was escalating in the late 1990s, after the resignation of President Suharto, the
Indonesian government's veil of secrecy around human rights violations began to lift, and
media and international human rights organizations published reports about allegations of
war crimes and human rights abuses during the previous decades.  SOF ¶ 35.  On a number
of occasions, EMOI inquired about the military's conduct and urged the government to
comply with the law and human rights standards.  SOF ¶ 36.  Defendants have never
condoned any of the human rights abuses that were committed by the Indonesian military,
and make no excuses for its conduct, including to the extent that Plaintiffs were harmed in
the conflict.

Nevertheless, the question posed in this litigation is whether Defendants are responsible for
Plaintiffs' alleged injuries.  They are not.

[7]     Plaintiffs refused to provide Jane Doe I's name or village until September 2009.  SOF ¶ 37.

Indonesian military did to them and what, if any, role they allege EMOI played in causing the alleged injuries.  *See* Argument: Section I, *infra*.

## PROCEDURAL HISTORY

Plaintiffs' remaining causes of action consist of eight tort claims, governed by Indonesian law, against two remaining defendants, EMOI and EMC.

In June 2001, Plaintiffs filed their original complaint against EMC, EMOI, and later-dismissed defendants Mobil Corporation, Exxon Mobil Oil Corporation, and PT Arun LNG.  *See* ECF No. 3.  Plaintiffs brought causes of action under the Alien Tort Statute ("ATS") and the Torture Victim Protection Act ("TVPA"), as well as a number of state tort claims.  *Id.*

In October 2005, the Court dismissed Plaintiffs' ATS and TVPA claims, while permitting Plaintiffs' "state-law" tort claims to proceed as long as the lawsuit avoided "interfering with U.S. foreign policy and Indonesia's sovereignty."  ECF No. 103 at 1–2; *Doe I* v. *Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 21–22 (D.D.C. 2005).  Plaintiffs filed their First Amended Complaint in February 2006.  *See* ECF No. 129–1.

In March and May of 2006, the Court ordered discovery on two specific issues: (i) personal jurisdiction over EMOI, *see* ECF No. 138 at 4; and (ii) Defendants' knowledge of, and proximate causation of, Plaintiffs' alleged injuries, *see* ECF No. 158 at 1.  In 2008, Defendants moved for dismissal and summary judgment on Plaintiffs' remaining claims.  *See* ECF Nos. 268, 269.  The Court denied Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, *see* ECF No. 339, and denied in part Defendants' Motion for Summary Judgment, *see* ECF Nos. 365, 366; *Doe I* v. *Exxon*, 573 F. Supp. 2d. 16, 20 (D.D.C. 2008).

The following year, in September 2009, the Court dismissed all of Plaintiffs' claims, finding that Plaintiffs lacked standing.  *See* ECF No. 412 at 1; *see also Doe VIII* v. *Exxon Mobil Corp.*, 658 F. Supp. 2d 131, 132 (D.D.C. 2009).  The U.S. Court of Appeals for the

Public Redacted Copy

District of Columbia Circuit affirmed the dismissal of the TVPA claims and reversed the dismissal of the ATS and tort claims.  *See Doe VIII* v. *Exxon Mobil Corp.*, 654 F.3d 11, 15 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013).  The Circuit Court held that Plaintiffs' remaining tort claims are governed by Indonesian law.  *Id.* at 70 ("[W]e hold that Indonesian law applies to appellants' non-federal claims.").

In June 2019, the Court again dismissed Plaintiffs' ATS claims, "declin[ing] to recognize domestic corporate liability under the ATS in circumstances where, as here, the claims have caused significant diplomatic strife."  ECF No. 647 at 1; *Doe I* v. *Exxon Mobil Corp*., 391 F. Supp. 3d 76, 78 (D.D.C. 2019).

## LEGAL STANDARD

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "The moving party bears the burden of showing its entitlement to summary judgment," and can meet that burden "simply [by] show[ing] that the non-moving party has not produced enough evidence to meet its burden at trial."  *Kirton* v. *Mayorkas*, No. 1:18-cv-1580-RCL, 2021 WL 981241, at *4 (D.D.C. Mar. 16, 2021) (Lamberth, J.) (citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322–23 (1986)).

A dispute is not "genuine" and sufficient to defeat summary judgment in the absence of evidence that would permit "a reasonable jury [to] return a verdict for the nonmoving party."  *Bankers Standard Ins. Co.* v. *Anand*, No. 1:19-cv-1661-RCL, 2020 WL 4698363, at *3 (D.D.C. Aug. 13, 2020) (Lamberth, J.) (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* (quoting *Anderson*, 477 U.S. at 249–50); *see also Greene* v. *Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (holding that conclusory allegations offered without

any evidentiary support do not establish a genuine issue for trial).

## ARGUMENT

After twenty years of litigation, the record in this case is now closed and it shows Plaintiffs' failure to produce even the bare minimum of evidence supporting their complaint. Defendants should be granted summary judgment on the following grounds:

(i)   **Causation.**  Plaintiffs failed to produce evidence showing that Defendants caused their injuries.  There is no evidence that any EMOI or EMC employee caused or instructed others to cause any of Plaintiffs' alleged injuries.  Every plaintiff alleged that members of the Indonesian military caused the injuries at issue in this litigation.  But nothing in the record supports a finding that the Indonesian soldiers who injured Plaintiffs did so in the course of protecting the Arun Field facilities, much less while acting under the supervision or direction of Defendants. With no prospect of connecting Defendants to Plaintiffs' alleged injuries, the causal chain cannot reach Defendants.

(ii)   **Quantifiable Loss.**  Plaintiffs have failed to produce evidence sufficient to prove quantifiable loss—a necessary element under Indonesian law of all of their remaining claims.

(iii)   **Corporate Separateness.**  EMC cannot be held civilly liable for the actions of its affiliate, EMOI, whether under a theory of agency liability or by piercing the corporate veil.

(iv)   **Due Process.**  Defendants have been denied a fair opportunity to investigate and challenge Plaintiffs' allegations, in violation of their due process rights.

(v)   **Statute of Limitations.**  Several of Plaintiffs' claims are time-barred. With the record now closed, Plaintiffs' pleadings and conclusory allegations will

Public Redacted Copy

no longer suffice.  Defendants are entitled to summary judgment on these five grounds, as

described below.

## I.        PLAINTIFFS CANNOT PROVE CAUSATION.

There is no competent evidence connecting Plaintiffs' alleged injuries to

Defendants, and therefore all of Plaintiffs' remaining claims must be dismissed.

Throughout this litigation, Plaintiffs have employed rhetorical devices to try to

sidestep pleading requirements and their burden of proof.  Even though members of the

Indonesian military allegedly caused each and every one of the injuries at issue here, Plaintiffs

deployed misleading labels to imply the soldiers were under Defendants' authority.  For

example, in order to survive an earlier round of motions to dismiss and for summary judgment,

Plaintiffs edited their complaint to replace all mention of the Indonesian military with the phrase

"ExxonMobil security personnel," even though it is undisputed that the actions of EMOI's

unarmed security guards are not the subject of this litigation, and all alleged tortfeasors are

members of the Indonesian military.  *See* ECF No. 129-1.  Similarly, during their depositions,

Plaintiffs and their non-party witnesses uniformly referred to "Exxon soldiers" when describing

the members of the Indonesian military who allegedly harmed them.  Under questioning, they

conceded that the "Exxon soldiers" to whom they referred were in fact uniformed members of

the Indonesian military.  *See, e.g.*, SOF ¶¶ 15, 71, 89.  The only link they could draw between the

military and Defendants is that some members of the Indonesian military guarded the Arun gas

field that EMOI operated, but none claimed that they were injured in the gas field or while

attempting to enter or exit it.

Plaintiffs will undoubtedly attempt to survive summary judgment by pointing to

misleading labels—such as calling Indonesian military personnel "Exxon soldiers"—but

conclusory language is not evidence.  It is also not enough for Plaintiffs to say Indonesian

soldiers injured them and Indonesian soldiers guarded the Arun Field without linking their injuries to the guarding of Arun Field.  It is undisputed that Plaintiffs were injured in the midst of a brutal civil war between the Government of Indonesia and an insurgent movement in Aceh. SOF ¶¶ 27–34.  It is undisputed that there were tens of thousands of troops in Aceh during the relevant time period.  SOF ¶ 27.  Plaintiffs have no evidentiary basis to ask a jury to conclude that the Indonesian soldiers who allegedly injured them did so while protecting Arun Field, let alone that Defendants did anything to cause their injuries.  Accordingly, Defendants are entitled to summary judgment on all remaining claims based on Plaintiffs' failure to produce evidence of causation.

### A.  Indonesian Law Requires that Plaintiffs Prove Causation.

Plaintiffs assert eight remaining tort claims to be decided under Indonesian law. *Doe VIII*, 654 F.3d at 70 ("[W]e hold that Indonesian law applies to appellants' non-federal claims.").

Civil liability in Indonesia arises under Article 1365 of the Civil Code of Indonesia, which requires those who perform an "unlawful act" that causes loss to another to provide compensation for that loss.  Lindsey Decl. ¶ 7.  The causation element of Article 1365 is critical to any showing of liability.  *Id.* ¶ 19.  Under Indonesian law, a plaintiff bears the burden of proving that the defendant's unlawful act was the clear and direct factual cause of the plaintiff's alleged loss.  *Id.* ¶¶ 19–26.[8]

---

[8] The plaintiff also must demonstrate that the loss alleged by the plaintiff could have been expected as a result of the defendant's unlawful act.  *Id.*  But here, Plaintiffs have failed to show that anything Defendants did or did not do is even the "but-for" cause of Plaintiffs' alleged injuries, let alone that Defendants committed unlawful acts of the type that could be expected to cause Plaintiffs' alleged injuries.

Public Redacted Copy

Plaintiffs' tort claims are of two main species—direct and indirect liability.[9]  With respect to their direct claims, in order to show causation under Article 1365, Plaintiffs must prove that Defendants negligently hired or supervised the actual soldiers who allegedly caused Plaintiffs' injuries.  The unrebutted evidence shows that EMOI had no legal authority to exercise command or control over the sovereign military of the Government of Indonesia, including over the Indonesian soldiers assigned to guard Arun Field—and moreover that it did not do so.  However, even if Plaintiffs were able to show that EMOI had some measure of control over the activities of the Indonesian soldiers assigned by Pertamina to guard the Arun Field facilities, Plaintiffs still must show that the particular soldiers who injured them were then acting under the direction or control of EMOI.  They have not done so; they have not even showed that the relevant soldiers were protecting Arun Field at the time of the alleged injuries.

Likewise, with respect to their indirect or vicarious liability claims, Plaintiffs must prove that the Indonesian soldiers alleged to have injured Plaintiffs *were the same soldiers* over whom Defendants allegedly exercised control at the time of Plaintiffs' alleged injuries.  Plaintiffs have no evidence that this was the case.  Crucially, under Indonesian law, a defendant cannot be held vicariously liable unless the plaintiff identifies:  (i) the specific perpetrator of the offense; and (ii) what, specifically, the defendant did to cause the perpetrator to engage in the alleged conduct.  *See* Lindsey Decl. ¶¶ 35–37.  No plaintiff is able to do so, and, for this reason alone, all of Plaintiffs' vicarious liability claims are fatally deficient.

---

[9]   The direct claims are for negligence, negligent hiring, and negligent supervision.  *See* 2nd Am. Compl. ¶¶ 212–35.  The intentional tort causes of action are assault, battery, wrongful death, conversion, and arbitrary arrest, detention and false imprisonment.  *See* 2nd Am. Compl. ¶¶ 193–211, 236–40.

**Public Redacted Copy**

**B.     The Court's 2008 Summary Judgment Opinion Does Not Preclude Dismissal for Failure to Prove Causation.**

In 2008, applying D.C. law to Plaintiffs' tort claims—before the D.C. Circuit held that Indonesian law applies—Judge Oberdorfer held that, "in light of the limited discovery," Plaintiffs had "sufficiently state[d] . . . that EMOI's paid security forces committed the alleged torts."  ECF No. 365 at 9.  He relied for this conclusion on: (i) allegations in Plaintiffs' Amended Complaint ("allegations of injuries caused by ExxonMobil security forces"); and (ii) the supplemental interrogatory responses of John Doe II.  *Id.*  Judge Oberdorfer's *respondeat superior* analysis similarly assumed that it was "EMOI's paid security forces" that injured Plaintiffs.  *Id.* at 9–17.

The Court's reliance on Plaintiffs' pleadings and limited written discovery in 2008, while necessary at the time (because only limited discovery had been conducted), does not foreclose summary judgment on causation today.  The parties have now completed discovery, including depositions of the individual plaintiffs and their witnesses.  The record is closed—with all plaintiffs, their non-party witnesses, and their experts sitting for depositions within the past twelve months—and at this stage the Court must consider only competent evidence.  *See United States* v. *Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 19–20 (D.D.C. 2016) ("In order to establish that a fact is or cannot be genuinely disputed, a party must . . . cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence."), *aff'd*, 971 F.3d 330 (D.C. Cir. 2020).[10]  The completed factual

---

[10]  As with Plaintiffs' pleadings, John Doe II's supplemental interrogatory responses also do not create a material issue of fact with which Plaintiffs can defeat summary judgment. John Doe II admitted in his deposition that he did not recognize any of the Indonesian soldiers who allegedly injured him and did not know who was in charge of the soldiers. SOF ¶ 122–23.  John Doe II's claim, in his supplemental interrogatory responses, that he was assaulted by ███████████████" was revealed to be mere speculation, SOF ¶ 122–23, and "[t]he possibility that a jury might speculate in the plaintiff's favor . . . is

Public Redacted Copy

record shows that Plaintiffs have not presented anything other than bald assertions to support their claims that it was "EMOI's paid security forces" that committed the alleged torts.

### C. Plaintiffs Have Failed to Establish That the Indonesian Soldiers Who Allegedly Injured Them Did So in the Course of Protecting Arun Field.

No individual plaintiff has satisfied the causation element of the remaining causes of action. The only link Plaintiffs allege between Defendants and the Indonesian military is Arun Field: EMOI operated the state-owned facilities there and the Indonesian military provided security. The only causal pathway to Defendants for actions the Indonesian military committed must therefore run through Arun Field. But, without any evidence that the soldiers who allegedly injured Plaintiffs did so in the course of protecting the Arun Field facilities, Plaintiffs' claims for both direct and vicarious liability must fail.

#### 1. Jane Doe I

In Plaintiffs' operative complaint, Jane Doe I alleges that she was threatened, beaten, and sexually assaulted by "a member of ExxonMobil's security personnel" in March 2001. *See* 2nd Am. Compl. ¶ 183. Jane Doe I brings causes of action for assault, battery, negligence, negligent hiring, and negligent supervision. *See* 2nd Am. Compl. ¶¶ 199–207, 212–235. Yet even if every piece of evidence presented by Jane Doe I were credited, all she has shown is that she was sexually assaulted ███████ by an unknown Indonesian soldier in the midst of a civil war, without naming a single EMOI or EMC employee or connecting her assault to Defendants in any way.

During her deposition, Jane Doe I testified unambiguously that she was assaulted

---

simply insufficient to defeat summary judgment." *Athridge* v. *Aetna Cas. & Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010) (quoting *Montgomery* v. *Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008)).

**Public Redacted Copy**

████████, SOF ¶ 39, that that she did not know the identity of the Indonesian soldier who allegedly assaulted her, SOF ¶ 40, and that she had no knowledge of whether the soldier was in any way affiliated with Exxon, SOF ¶ 42.[11]  Jane Doe I's neighbor and only corroborating witness, ████, likewise did not know the identity of the soldier.  SOF ¶ 40.  Neither Jane Doe I nor ████ knew who supervised, commanded, directed, or paid the soldier who allegedly assaulted Jane Doe I.  SOF ¶ 41.

There is no causal connection between Defendants and Jane Doe I's alleged injuries, and her claims must fail.[12]

### 2.      Jane Doe II

Jane Doe II alleges that, in or around December 2000, her husband, John Doe VIII, was working in his rice field when he was shot and killed by "members of ExxonMobil's security personnel."  *See* 2nd Am. Compl. ¶ 184.  Jane Doe II brings claims for the wrongful death of John Doe VIII, as well as for negligence, negligent hiring, and negligent supervision. *See id.* ¶¶ 193–198, 212–235.  But not only does Jane Doe II not know who shot her husband, the shooting took place miles away from Arun Field and there is no evidence that it was in any way connected to Defendants.

Jane Doe II testified that she did not know the identity of the Indonesian soldier or

---

[11]  Jane Doe I Tr. 67:4–8 ("**Q.** So you yourself have no idea whether the soldier who came into your house had any connection to Exxon, correct? []  **A.** For myself, I do not know.").

[12]  Plaintiffs may try to avoid summary judgment with the absurd claim that the Indonesian soldier arrived in a military truck—"the same size and color as all of the other Indonesian green military trucks," SOF ¶ 43—with a sticker containing a common Arabic expression ("God is great") that ████ claimed to have also seen on a military truck entering Arun Field on some unspecified date.  SOF ¶ 44.  Needless to say, this does not come anywhere close to showing that the Indonesian soldier who allegedly assaulted Jane Doe I was directed to do so by Defendants, or that he was guarding Arun Field at the time of the alleged incident (in Jane Doe I's home).

Public Redacted Copy

soldiers who allegedly shot her husband.  SOF ¶ 50.  She testified that she did not know who supervised or gave the orders to the soldier or soldiers who allegedly killed her husband. SOF ¶ 51.  She testified that her husband was shot in their village ████████████████ ████████.  SOF ¶ 49.  Jane Doe II's only corroborating witness also did not observe the shooting of John Doe VIII and did not know the identity of the soldier who allegedly shot and killed John Doe VIII or the soldier's commander.  SOF ¶ 52.  He was told secondhand that John Doe VIII had been shot by Indonesian soldiers.  SOF ¶ 53.

Jane Doe II has presented evidence that her husband was shot and killed miles from Arun Field by any one of the 40,000 Indonesian troops in Aceh at the time.  She has not connected the shooting to Defendants in any conceivable way, and her claims must be dismissed.

### 3.      Jane Doe III

Jane Doe III alleges that, in September 2000, "members of ExxonMobil's security personnel" kidnapped and "disappeared" her husband, John Doe IX.  *See* 2nd Am. Compl. ¶ 185. Jane Doe III brings claims for wrongful death, negligence, negligent hiring, and negligent supervision.  *See* 2nd Am. Compl. ¶¶ 193–198, 212–235.  Jane Doe III has no evidence of which Indonesian soldiers allegedly abducted John Doe IX, where they took him, what their assignment was, the identity of their commander, or who was directing their activities.

Jane Doe III claimed in her 2007 sworn interrogatory responses that John Doe IX ████████████████████████████.  SOF ¶ 57.  During her deposition, she testified that she did not in fact witness her husband's abduction and did not know the identities of the people who took him.  SOF ¶ 58.  Jane Doe III's only corroborating witness—who claimed to have seen some of the soldiers who abducted John Doe IX coming from a part of Arun Field where third-party contractors and Indonesian soldiers sometimes ate meals, SOF ¶¶ 59, 60—likewise did not

know the identities of the soldiers who allegedly harmed John Doe IX.  SOF ¶ 61.[13]  Neither

Jane Doe III nor her non-party witness knew who supervised, directed, or paid the soldiers who

allegedly abducted John Doe IX.  SOF ¶ 63.

      Jane Doe III has provided no evidence of who allegedly took her husband, where

he was taken, why he was taken, or under whose orders he was taken.  No reasonable jury could

find that Defendants were the cause of Jane Doe III's injuries.

      **4.**        **Jane Doe IV**

      Jane Doe IV, like Jane Doe II, alleges that, in or around December 2000,

"ExxonMobil's security personnel" shot and killed her husband, John Doe X, in a field near their

home.  *See* 2nd Am. Compl. ¶ 186.  Jane Doe IV brings claims for wrongful death, negligence,

negligent hiring, and negligent supervision.  *See* 2nd Am. Compl. ¶¶ 193–198, 212–235.  Jane

Doe IV's allegations are completely devoid of any evidence that could tie Defendants to the

death of her husband, who was shot as part of a military operation far from Arun Field.

      Jane Doe IV testified that she did not know the identities of any of the soldiers

present when her husband was allegedly shot, ███████████ from the nearest Arun Field

facility, nor did she see which, if any, of the soldiers actually shot her husband.  SOF ¶¶ 67, 70.

Neither of Jane Doe IV's non-party witnesses, her son and neighbor, could identify any of the

soldiers involved in the shooting.  SOF ¶ 70.  Neither Jane Doe IV nor her corroborating

witnesses knew who supervised, commanded, directed, or paid the soldier who allegedly killed

---

[13]  Although Jane Doe III claims that her husband was "███████," Jane Doe III's non-party
witness claimed to have later seen John Doe IX lying on a road.  SOF ¶ 59.  He did not know
how John Doe IX had gotten there or anything about the intervening events since his
abduction, including which, if any, soldiers allegedly harmed John Doe IX.  SOF ¶ 61–62.  In
fact, he could not definitively testify that John Doe IX was deceased or if he was injured in
any way.  ███████ Tr. 78:7–12 ("**Q.** And you don't know what happened, actually, to ███████
███████, correct, why he was on the ground?  [] **A.** Yes, I don't know.").

Jane Doe IV's husband.  SOF ¶ 71.

Jane Doe IV has presented evidence of nothing more than a gunfight in Aceh during a civil war in which her husband was shot by an Indonesian soldier with no known connection to Defendants.  She has not shown causation and her claims must be dismissed.

### 5.      Jane Doe V

Jane Doe V alleges that, in January 2001, her husband, John Doe I was "accosted by ExxonMobil's security personnel" and held and tortured for nine days.  *See* 2nd Am. Compl. ¶¶ 1, 176.  Jane Doe V brings claims on behalf of her husband for battery, assault, arbitrary arrest, detention and false imprisonment, negligence, negligent hiring, and negligent supervision.[14]  *See* 2nd Am. Compl. ¶¶ 199–235.  Despite blaming Defendants, Jane Doe V provided no evidence identifying who allegedly took her husband or where he was taken, and could not connect the Indonesian soldiers to Defendants.

Jane Doe V testified that she had no personal knowledge of who abducted her husband.  SOF ¶ 78.  She offered her husband's hearsay statement that they were "Exxon soldiers," but that he only thought they were "Exxon soldiers" because he had previously seen some of them on a road near Arun Field, along with many other soldiers whom he saw on that road and in the area.  SOF ¶ 81.  John Doe I never told his wife the identities of the Indonesian soldiers who abducted him (she did not know if he even knew who they were), who they worked for, or anything else about them.  SOF ¶ 81.  Jane Doe V herself never learned who employed the soldiers who allegedly took her husband.  SOF ¶ 79.  She did not know where her husband was allegedly taken or why he was taken there.  SOF ¶ 80.  Jane Doe V put forth no corroborating

---

[14]   John Doe I was originally a plaintiff in this case, but Jane Doe V was substituted as a plaintiff in 2007, after John Doe I's death in 2003.  *See* ECF No. 98, Ex. B; ECF No. 200.

Public Redacted Copy

witness testimony or other evidence regarding the identity or employment of the Indonesian

soldiers who allegedly accosted and abducted John Doe I.  SOF ¶ 77.

Even if Jane Doe V's testimony regarding her husband's observations of

Indonesian soldiers on a road near Arun Field (at unknown times and for unknown reasons) were

admissible evidence,[15] it certainly does not connect Defendants to John Doe I's alleged

abduction and torture.  Jane Doe V has presented no evidence that the unidentified Indonesian

soldiers were guarding Arun Field at the time they took her husband, let alone that they were

*ever* assigned to guard Arun Field or associated with Defendants in any way, and has thus failed

to prove causation.

### 6.    Jane Doe VI

In her pleadings, Jane Doe VI alleges that, in or around July 2000, her son, John

Doe III, was shot by "ExxonMobil's security personnel," who also detained and tortured him for

approximately one month.  2nd Am. Compl. ¶ 178.  Jane Doe VI brings claims on behalf of John

Doe III for battery, assault, arbitrary arrest, detention and false imprisonment, negligence,

negligent hiring, and negligent supervision.[16]  *See* 2nd Am. Compl ¶¶ 199–235.  Jane Doe VI has

---

[15]   Plaintiffs cannot create a dispute of material fact with inadmissible hearsay.  *See, e.g.*, *Gilmore* v. *Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 201 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016) ("Our Court of Appeals has held that, absent an applicable exception, hearsay is not capable of being converted into admissible evidence and therefore 'counts for nothing on summary judgment.'  Consequently, it is proper for the Court to rule on the admissibility of hearsay evidence in the context of a motion for summary judgment and to grant the motion if it finds that Plaintiffs' proffered evidence consists only of inadmissible hearsay.") (quoting *Greer* v. *Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007); *United States* v. *Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 19 (D.D.C. 2016), *aff'd*, 971 F.3d 330 (D.C. Cir. 2020) (finding that for a dispute of fact to be "genuine," there "must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.") (citing *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[16]   John Doe III was originally a plaintiff in this case, but Jane Doe VI was substituted as a plaintiff in 2007 due to John Doe III's death in 2002. *See* ECF No. 198, Ex. B; ECF No. 200.

Public Redacted Copy

changed her story in several key respects, but still does not have any evidence that any employee of EMC or EMOI caused her son's injuries or directed others to do so.  She also cannot identify the Indonesian soldiers who assaulted her son, whether they were assigned to Arun Field at the time of the allegations, and whether they received any instructions whatsoever from Defendants at the time of the assault.

In July 2007, Jane Doe VI submitted sworn testimony in which she did not █████████████████████████████████████████████████████████████████████ ███████████████████████.  SOF ¶ 86.  Thirteen years later, in her deposition, Jane Doe VI changed her story, claiming to have personally witnessed the assault.  SOF ¶ 86.  Nevertheless, while Jane Doe VI and her daughter, ██████████, testified that John Doe III was beaten and shot by Indonesian soldiers ████████████████████████████ after the soldiers came out of the facility, SOF ¶ 85, neither Jane Doe VI nor ██████████ knew the identities of the soldiers involved, SOF ¶ 88.  And neither Jane Doe VI nor her daughter could identify who commanded or was paying the soldiers who allegedly assaulted John Doe III, or what their orders were on the day John Doe III was allegedly attacked.  SOF ¶ 92.

Neither Jane Doe VI nor her daughter named anyone at EMOI or EMC who was in any way involved in the assault, and in fact admitted to not knowing anyone who has ever worked for Exxon (Jane Doe VI, SOF ¶ 90) and having never met anyone affiliated with Exxon or Mobil (██████████, SOF ¶ 91).  ██████████ testified that she only referred to the Indonesian soldiers who allegedly assaulted John Doe III as "Exxon soldiers" because she saw them ████ ████████████████████████████.  SOF ¶ 91.  Finally, although Jane Doe VI alleges in the operative complaint that John Doe III was tortured by the Indonesian soldiers, she subsequently claimed in her sworn interrogatory responses and testified at her deposition that

Public Redacted Copy

John Doe III was held by the Indonesian police, not by Indonesian soldiers.  SOF ¶ 87.

On this record, no reasonable jury could conclude that the Indonesian soldiers (or police) who allegedly shot, detained, and tortured John Doe III did so while protecting the Arun Field facilities, let alone at the direction and under the supervision of Defendants.

### 7.   Jane Doe VII

Jane Doe VII alleges, in the operative complaint, that in or around December 2000 "ExxonMobil's security personnel" burned down the house of John Doe V, her husband.[17] 2nd Am. Compl. ¶ 180.  Jane Doe VII brings claims on behalf of John Doe V for conversion, negligence, negligent hiring, and negligent supervision.[18]  *See* 2nd Am. Compl ¶¶ 212–240.  She does not know who allegedly burned down the house and has no evidence any Defendant or anyone employed by or acting under the direction of Defendants did so.

Jane Doe VII testified that she had no first-hand knowledge of the identities of the Indonesian soldiers who burned down her house.  SOF ¶ 101.  She testified that her husband called them "Exxon soldiers" because they were "stationed near the Exxon facilities."

---

[17]   Jane Doe VII further alleges that, in 2003, John Doe V was "again abused by ExxonMobil's security personnel."  2nd Am. Compl. ¶ 180.  This allegation was first mentioned in a sworn interrogatory response by John Doe V in July 2007, and first included in a pleading when the Second Amended Complaint was filed on November 24, 2014.  Thus, any claim based on these allegations is time-barred by the applicable one-year statute of limitations.  *See* D.C. Code § 12-301. Jane Doe VII's husband, John Doe V, also alleged that at the same time the soldiers burned the house, "the security personnel" also beat John Doe V's son.  2nd Am. Compl. ¶ 180.  John Doe V's son is not a plaintiff in this case, and Plaintiffs have not alleged any cause of action related to the son's alleged beating.

[18]   Jane Doe VII was substituted as a plaintiff in 2015, after John Doe V's death in 2007.  *See* ECF Nos. 495-4, Ex. 1, 513.  At her deposition, Jane Doe VII testified that she was the second wife of John Doe V, not his first wife, as she represented in her substitution motion. SOF ¶ 97; ECF No. 495-4, Ex. 1 ¶ 4.  She further testified that she did not inform all of John Doe V's other wives and children about the litigation, despite the Court's order directing Plaintiffs to do so and an attorney's sworn declaration that they were told.  *See* ECF No. 513 at 4; ECF No. 531-1; SOF ¶ 98.  Jane Doe VII's claims must be dismissed for the additional reason that she was improperly substituted as a plaintiff.

Public Redacted Copy

SOF ¶ 103.  Neither Jane Doe VII nor her son knew the identities of any of the soldiers involved in the incident.  SOF ¶ 101.  Jane Doe VII also did not know who commanded the soldiers or who gave them orders to burn down her house.  SOF ¶ 102.  Jane Doe VII had no knowledge of any connection between the soldiers and Arun Field or Defendants.  SOF ¶ 103.

Jane Doe VII's claim that her husband called the Indonesian soldiers "Exxon soldiers" is inadmissible hearsay and cannot be used to defeat summary judgment.  *See* Section I(C)(5), *supra*.  Even if the testimony were admissible, the fact that Jane Doe VII's husband called the Indonesian soldiers "Exxon soldiers," because he thought they were stationed *near* Arun Field—not even *at* Arun Field—says nothing about whether they were assigned to guard Arun Field, whether they were doing so when they allegedly burned down John Doe V's house, or by whose command they were acting.  She has adduced no evidence whatsoever that the soldiers who burned down the house were directed to do so by Defendants or were under the direction of Defendants when they did so.  Jane Doe VII has failed to produce evidence of causation and her claims must be dismissed.

### 8.      Jane Doe VIII

Jane Doe VIII alleges that, in or around November 2000, "ExxonMobil's security personnel" took her husband, John Doe VI, into custody and tortured him, after which he was held by police for four months.  2nd Am. Compl. ¶ 181.  Jane Doe VIII brings claims on behalf of John Doe VI for battery, assault, arbitrary arrest, detention and false imprisonment, negligence, negligent hiring, and negligent supervision.[19]  *See* 2nd Am. Compl. ¶¶ 199–235.

---

[19] ██████████████████████████████████████████████████████████████.  *See* ECF No. 495-4, Ex. 2; ECF No. 513.

**Public Redacted Copy**

Jane Doe VIII did not appear for her noticed deposition. SOF ¶ 111.[20] Jane Doe VIII's daughter, ███████, appeared in her place. ███████ did not witness John Doe VI's assault or know the identities of any of the Indonesian soldiers involved. SOF ¶ 112. She testified that she was told by the head of a neighboring village that John Doe VI had been assaulted and detained by "Exxon soldiers." SOF ¶ 114. However, ████████████████████ ███████—Jane Doe VIII's only corroborating witness—testified affirmatively that he did *not* know if any of the soldiers involved in the incident worked for Exxon. SOF ¶ 114.[21]

Jane Doe VIII has not provided any evidence that the soldiers who allegedly shot and detained her husband did so at the direction of EMOI or even while protecting Arun Field, and thus has failed to show any connection between the soldiers and Defendants.

### 9.    John Doe II

John Doe II alleges that, in August 2000, he was "stopped on the road by ExxonMobil's security personnel" who detained and tortured him for three months before burning down his house—testimony he later changed to his kiosk.[22] 2nd Am. Compl. ¶ 177. John Doe II brings claims for battery, assault, arbitrary arrest, detention and false imprisonment,

---

[20]  Just two days before Jane Doe VIII's noticed and agreed-upon deposition date, Plaintiffs claimed that she was "too frail" to sit for a deposition. SOF ¶ 111. This failure to appear raises significant questions about whether her claims should be permitted to proceed, especially in light of the due process violations set forth in Section IV, *infra*.

[21]  Rather, Jane Doe VIII's non-party witness testified only that he had witnessed the incident and recognized some of the approximately twenty soldiers in the area that day, ████████████████ ████████████████████████████████████████████████████████████████████████. SOF ¶ 115. He could not identify by name any of the soldiers he recognized, SOF ¶ 115, and did not identify which of the approximately twenty soldiers in the village allegedly assaulted and shot John Doe VI. SOF ¶ 115.

[22]  Contrary to the operative complaint, John Doe II testified that it was actually his "kiosk" and not his house that was burned down by the Indonesian soldiers, and that he did not witness the incident. SOF ¶ 125. ███████████████████████████████████████████ ████████████████████████   SOF ¶ 126.

Public Redacted Copy

conversion, negligence, negligent hiring, and negligent supervision. *See* 2nd Am. Compl. ¶¶ 199–240. John Doe II brings these claims despite his own and his non-party witness's unambiguous testimony that they have no idea who assaulted and detained him or who burned down his kiosk.

John Doe II initially testified that he believed some of the Indonesian soldiers who assaulted him had been stationed at Arun Field, but later testified that he did not, in fact, recognize any of the soldiers involved in the incident: "I couldn't even see their faces at the time when I got beaten." SOF ¶ 122. John Doe II's non-party witness testified that she did not actually witness John Doe II being detained, because she had fled and was hiding in her house before the Indonesian soldiers allegedly took John Doe II. SOF ¶ 124. Neither John Doe II nor his non-party witness knew who commanded or gave orders to the soldiers who allegedly assaulted and detained John Doe II. SOF ¶ 123. John Doe II further testified that he did not witness his kiosk being burned, but was later told that unidentified Indonesian soldiers were responsible. SOF ¶ 125.

John Doe II has not put forward any evidence that would connect Defendants with the Indonesian soldiers who he claims assaulted and detained him, and who burned his kiosk.

### 10. John Doe IV

John Doe IV alleges that, in July 2000, he was "accosted by ExxonMobil security personnel" who detained and tortured him for several weeks. 2nd Am. Compl. ¶ 179. John Doe IV brings claims for battery, assault, arbitrary arrest, detention and false imprisonment, negligence, negligent hiring, and negligent supervision. *See* 2nd Am. Compl. ¶¶ 199–235. John Doe IV does not know who assaulted him, where he was detained, or anything else that could possibly tie his assault and abduction to Defendants.

John Doe IV never saw the faces of the soldiers who allegedly detained and

assaulted him.  SOF ¶ 131.  He did not know where he was taken and detained.  SOF ¶ 133.  Nor

did he have any knowledge of who commanded, paid, or gave the orders to the Indonesian

soldiers who he claims assaulted and detained him.  SOF ¶ 132.  John Doe IV's only non-party

witness did not observe any of the acts alleged by John Doe IV and only learned about the

incidents second-hand from John Doe IV.  SOF ¶ 134.  Like other plaintiffs and witnesses, John

Doe IV called the soldiers who injured him "Exxon soldiers," but admitted that he called them

that only because he had seen *other* Indonesian soldiers—not the soldiers who assaulted and

detained him, whom he did not recognize—stationed in an area where Exxon had operations,

going in and out "from that Exxon area."  SOF ¶ 132.  In other words, the only supposed

connection John Doe IV has offered between Defendants and the Indonesian soldiers who

allegedly attacked and detained him is that he had previously seen *different* Indonesian soldiers

*at other times* near the Arun Field facilities.

       John Doe IV has plainly failed to offer any evidence supporting causation.

### 11.    John Doe VII

       John Doe VII alleges that, in January 2001, he was "accosted by members of

ExxonMobil's security personnel" who took him "to an office inside the ExxonMobil

compound" and beat him before releasing him the next day."  2nd Am. Compl. ¶ 182.

John Doe VII brings claims for battery, assault, arbitrary arrest, detention and false

imprisonment, negligence, negligent hiring, and negligent supervision.  *See* 2nd Am. Compl. ¶¶

199–235.  Yet, John Doe VII admitted that he had no first-hand evidence linking his injuries to

Defendants.  SOF ¶ 138.[23]

---

[23]   John Doe VII Tr. 62:7–16 ("**Q.**  So, you claim you have injuries but you have no evidence
that would establish that Exxon Mobil is responsible for those injuries, is that correct?

**Public Redacted Copy**

Neither John Doe VII, his friend, nor his friend's mother knew who gave the orders to the Indonesian soldiers who allegedly assaulted and detained John Doe VII. SOF ¶ 142.  They did not identify anyone at EMOI or EMC who was in any way involved in John Doe VII's assault or abduction.[24]  John Doe VII's non-party witnesses testified that they believed the soldiers who abducted John Doe VII were "Exxon soldiers" because they believed the location where John Doe VII was taken by the Indonesian soldiers was owned by Exxon. SOF ¶ 139.  But the undisputed record shows they were mistaken:  The location they identified, ██████████, was owned by the Government of Indonesia, not either Defendant.  SOF ¶ 140. But even if they were right about ownership, it would not support a finding that the soldiers who took John Doe VII there did so under the direction or supervision of Defendants.

On this record, no reasonable jury could conclude that Defendants caused John Doe VII's injuries.[25]

---

A. The evidence is my head, um, um, my head is in pain sometimes, um, this one, um, and that is it.  If a concrete evidence, I do not have.").

[24] John Doe VII's friend testified that he recognized one of the Indonesian soldiers as having been on patrol outside of Arun Field at some point in time, but did not say when.  SOF ¶ 141.

[25] While Indonesian law applies, Plaintiffs' claims would fail for lack of causation under U.S. law as well.  With no evidence that the Indonesian soldiers who allegedly injured them were guarding Arun Field at the time, Plaintiffs could only satisfy the causation elements of their claims if a jury were to make improbable inferences in Plaintiffs' favor.  That is not sufficient to survive summary judgment.  *See, e.g.*, *Allen* v. *Brown*, 435 F. Supp. 3d 16, 22, 23–24 (D.D.C. 2020) (holding that without evidence to support their proffered inference, plaintiffs' "conclusion is nothing more than speculation, and '[t]he possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment.'") (citation omitted); *Demo* v. *Red Roof Inns, Inc.*, 274 F. App'x 477, 478 (6th Cir. 2008) ("A mere possibility of . . . causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."); *Stevens by & through Mathis* v. *Progress Rail Servs. Corp.*, No. 1:17-CV-140 (LAG), 2019 WL 7403652, at *4 (M.D. Ga. Sept. 5, 2019) ("Where the evidence presents, however, only 'a mere possibility' that a defendant's conduct was either the cause in fact or proximate cause of the alleged injuries, 'such that the question of causation remain[s] one of pure speculation or conjecture[,]' then

**Public Redacted Copy**

## II.   PLAINTIFFS LACK EVIDENCE SUFFICIENT TO PROVE QUANTIFIABLE LOSS.

Quantifiable loss is a necessary element of all of Plaintiffs' remaining claims. However, not one plaintiff has presented evidence sufficient to meet their burden of proving quantifiable loss at trial.  What little testimonial evidence there is of loss is vague and generic and wholly insufficient to reliably quantify, as required under Indonesian law, any alleged losses that Plaintiffs may be claiming.  No plaintiff has produced *any* documentation that could be used to measure damages resulting from their alleged injuries.  Having failed to adduce any sufficient evidence as to the measure of their alleged losses during fact discovery, Plaintiffs promised "█

████████████████████████████," SOF ¶ 147, but then failed to do so.  As a result of Plaintiffs' failure to produce evidence supporting this essential element, their claims must fail as a matter of law.

### A.   Indonesian Law Requires Proof of Quantifiable Loss for All Civil Claims.

Under Indonesian law, quantifiable loss is an essential element of Plaintiffs' claims.  Any showing of liability under Article 1365 requires that the plaintiff prove loss, that the loss be quantifiable, and that Plaintiffs provide evidence substantiating their quantification of their alleged loss.  Lindsey Decl. ¶ 27.

The Civil Code of Indonesia recognizes both material and immaterial loss. Material loss includes lost wages, medical expenses, out-of-pocket costs resulting from injury, and, in cases of wrongful death, lost financial support.  *Id.* ¶ 30.  Immaterial loss includes intangible personal injury, such as mental illness suffered because of an unlawful act.  *Id.*

---

the defendant is entitled to summary judgment.") (citations omitted); *Harper* v. *United States Beef Corp.*, No. 15-CV-3112, 2018 WL 3863526, at *5 (C.D. Ill. July 23, 2018) ("An inference equally likely to another inconsistent inference is speculation or conjecture, and will not avoid summary judgment.").

Under Indonesian law, both material and non-material losses must be quantified by plaintiffs seeking civil remedies.  In order to assert quantifiable losses, a plaintiff must set forth the precise amounts that he or she seeks, for each type of alleged loss, and both the losses themselves and the plaintiff's quantification of those losses must be supported by evidence.  *See Id.* ¶ 31.[26]  If a plaintiff's alleged losses are not quantified, or if a plaintiff's quantification is not supported by sufficient evidence, that plaintiff's claims must fail.  *Id.* ¶ 34.

**B.    Plaintiffs Failed to Adduce Evidence of Quantifiable Loss During Fact or Expert Discovery.**

Plaintiffs failed to present any evidence that would allow them to meet their burden to prove quantifiable loss at trial.  Indeed, while Plaintiffs make sweeping allegations as to their alleged losses in their complaint and unsworn disclosures, those allegations remain unsubstantiated.  Plaintiffs' testimony lacks sufficient detail to measure their alleged losses and is entirely uncorroborated.  In fact, even though Defendants have been requesting relevant documents since May 2006, SOF ¶ 146, Plaintiffs have failed to produce *any* documentation whatsoever reflecting wages, ownership, medical expenses, funeral expenses, or any other losses for which they may be seeking compensation.  With no meaningful evidence of loss, four out of the eleven plaintiffs—Jane Doe I, Jane Doe VII, John Doe IV, and John Doe VII—have disclaimed compensation altogether, testifying that they do not want and are not seeking any money damages for their alleged losses.  SOF ¶¶ 45, 108, 135, 143.

There is no possibility that any of the individual plaintiffs could meet their burden of establishing quantifiable loss at trial.  The state of the record as to each plaintiff is as follows:

- **<u>Jane Doe I</u>** stated several times that she was not even seeking money damages from

---

[26]   Indonesian courts are not permitted to accept the testimony of a single witness to prove quantifiable loss.  *Id.* ¶ 32–33.  Thus, if a witness's testimony is to be used to demonstrate loss, it must be corroborated by at least one additional piece of evidence.  *Id.*

**Public Redacted Copy**

Exxon.  SOF ¶ 45.  At most, she indicated that she was seeking compensation for ███████, but failed to provide any evidence connecting ████████ to her alleged assault by an Indonesian soldier, and did not produce any documents or other evidence quantifying any expenses incurred for her own treatment or that of her child.  SOF ¶¶ 46–47.

- **Jane Doe II** produced no documents demonstrating the amount of damages she may be seeking in this lawsuit.  SOF ¶ 55.  Despite alleging in damages disclosures that ████ —without any additional data points, including how many days per year her husband worked and whether his work was steady from year to year—Jane Doe II admitted during her deposition that she did not know what her husband earned because he did not tell her. SOF ¶ 55.

- **Jane Doe III** testified that her husband, John Doe IX, made "about" 200,000 to 300,000 rupiah per day prior to his disappearance, but had no documentation or other evidence reflecting those wages.  SOF ¶ 65.  She provided no evidence of whether his work was steady or seasonal, or any other information that would allow a jury to extrapolate lost wages from his daily wage.  SOF ¶ 64.

- **Jane Doe IV** testified that her husband, John Doe X, "sometimes" earned anywhere from 500,000 to 2 million rupiah for construction projects, but provided no evidence of how many projects he worked on in any given period of time and admitted that she had no documentation or witnesses who could substantiate how much her husband earned. SOF ¶¶ 72–74.  Despite requesting ████████████, Jane Doe IV admitted in her deposition that she did not pay *anything* in connection with her husband's funeral.  SOF ¶ 75.

- **Jane Doe V** testified that her husband, John Doe I, earned between 20,000 and 150,000 rupiah per day prior to his abduction, but produced no documents reflecting those wages, or any other damages she may be seeking.  SOF ¶¶ 82–83.

- **Jane Doe VI** testified that her son, John Doe III, "sometimes" earned 200,000 rupiah per day prior to his injuries, but did not say and produced no documentation reflecting when and how often he worked.  SOF ¶ 93.  Similarly, while Jane Doe VI claimed to have documentation reflecting 2.5 million rupiah in medical expenses, she produced only a single illegible photocopy ████████  SOF ¶ 94.  Despite claiming an additional ████████, Jane Doe VI produced no evidence showing that John Doe III's death was the result of the alleged assault by Indonesian soldiers several years earlier, and, in any event, testified that she is not seeking to recover funeral expenses in this litigation.  SOF ¶ 95.

- **Jane Doe VII** testified that her husband John Doe V made "about" 3 million rupiah per month at some unspecified time before he stopped working "in the 1980s," and had no job throughout the 1990s.  SOF ¶ 104.  Jane Doe VII also testified that she incurred

"about" 10 million rupiah in funeral expenses. SOF ¶ 107. However, she had no documents reflecting her husband's lost wages—again, he had stopped working more than a decade before the alleged incident—funeral expenses, or any other damages, and Jane Doe VII testified affirmatively that she is not seeking money damages at all in this litigation. SOF ¶¶ 104–108.

- **Jane Doe VIII** did not sit for a deposition, and her daughter, , testified that John Doe VI ran ███████████, which at one point generated "sale[s]" of "about" 400,000 to 500,000 rupiah a day (with no indication of expenses) and performed odd jobs but did not indicate how much he earned, or when and how often he worked. SOF ¶¶ 116–17. She further testified that after her father's alleged assault, she and her mother ███████, but that after 2000 they did not open the kiosk on a regular basis. SOF ¶ 119. ███████ testified that she had no documents reflecting her father's wages or the kiosk revenues. SOF ¶ 118.

- **John Doe II** testified that he did not pay his own medical expenses, despite seeking to recover those expenses as damages. SOF ¶ 127. He further testified that, prior to his injuries, he ███████████████, earning anywhere from 300,000 to 3 million rupiah per project. SOF ¶ 128. However, John Doe II produced no documentation whatsoever reflecting those earnings—including, for example, ███████████ he worked on in a year—or any other damages he may be seeking. SOF ¶ 128.

- **John Doe IV** testified that he is not seeking money damages in this litigation. SOF ¶ 135. He has no documents that could quantify any of the damages he claimed to have been seeking in his disclosures, including ████████████████████████. SOF ¶ 136. In fact, John Doe IV testified that he did not remember what his wages were at any time in his life. SOF ¶ 136.

- **John Doe VII** testified that he is not seeking money damages in this litigation. SOF ¶ 143. He has no documentation showing his earnings prior or subsequent to his injury, and he admitted that he did not pay for his medical expenses. SOF ¶¶ 144–45.

Having plainly failed to adduce sufficient evidence of quantifiable loss during fact

discovery—despite document requests for such information outstanding for over 15 years—

Plaintiffs promised that they would remedy that critical omission during expert discovery,

claiming that they would submit "████████████████████████████

████████████████████████." SOF ¶ 147. They failed to do so.

Although Plaintiffs submitted seven expert reports from six different experts, not one of them

addressed loss or damages.

The record has thus closed with no evidence with which a jury could reliably quantify losses for any plaintiff.  What little testimonial evidence Plaintiffs have presented would be insufficient to survive summary judgment under U.S. law.  *See Weinberg* v. *Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001) ("[S]ummary judgment is appropriate where [plaintiffs] have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages.").[27]  It certainly falls short of Plaintiffs' burden to show *quantifiable* loss under Indonesian law.  Plaintiffs' failure to adduce evidence sufficient to prove this necessary element is fatal to all of their tort claims.

## III.   EMC IS NOT VICARIOUSLY LIABLE FOR PLAINTIFFS' INJURIES.

Indonesian law respects the corporate form and does not recognize general parent company liability for the actions of a subsidiary based on their corporate relationship.  *See* Lindsey Decl. ¶ 43.  EMC's liability is therefore a separate question from EMOI's.[28]  Plaintiffs attempt to collapse those two questions by asserting an agency theory of liability and by piercing the corporate veil.  Neither argument can be credited.

### A.   EMC Is Not Liable for Plaintiffs' Injuries Under an Agency Theory.

---

[27]  *See also, e.g., TCL Comm'ns Tech. Holdings, Ltd.* v. *Telefonaktienbolaget LM Ericsson*, SACV 14-0341 JVS (DFMx), 2016 WL 6562075, at *9 (C.D. Cal. Aug. 9, 2016) (granting partial summary judgment where "[t]he only evidence in the record regarding damages" was plaintiff's witnesses' deposition testimony, "unsupported by anything but the witnesses' speculation"); *Whetstone Candy Co., Inc.* v. *Nat'l Consumers League*, 360 F. Supp. 2d 77, 82 (D.D.C. 2004) (granting summary judgment where plaintiff "merely put forward conclusory statements unsupported by specific facts as to the nature and extent of damages"); *Azimi* v. *Johns*, 254 P.3d 1054, 1064–65 (Alaska 2011) (granting partial summary judgment where plaintiff failed to provide "relevant data and specific facts" supporting his claim for lost wages).

[28]  As described above, Plaintiffs have failed to provide evidence connecting either Defendant to Plaintiffs' alleged injuries.  Even if they could somehow show that EMOI in some way directed the specific Indonesian soldiers that allegedly injured Plaintiffs—and they cannot— EMC is still another several levels removed in the chain of causation.  *See infra*, p. 38 n.33.

Public Redacted Copy

To the extent that Plaintiffs argue, as they did in opposition to Defendants' prior motion for summary judgment, ECF No. 293 at 41–44, that EMC is liable for their injuries based on an agency theory of liability, that argument has no basis in the relevant law or the factual record and should be rejected.

In 2008, Judge Oberdorfer, applying D.C. law and based on an incomplete discovery record, found that "[a] reasonable trier of fact could conclude that EMOI acted as Exxon Mobil [Corporation]'s agent with regard to the military security for the huge Arun gas field." ECF No. 365 at 23. Respectfully, Judge Oberdorfer's 2008 opinion did not apply the correct legal standard. Indonesian law, not D.C. law, controls the question of EMC's alleged agency liability.[29]

Under Indonesian law, allegations of "agency liability" are evaluated under the vicarious liability provision in the Civil Code. *See* Lindsey Decl. at 15 n.36. Where, as here, there is no employment relationship between the defendant (EMC) and the company alleged to have committed the unlawful act (EMOI), *see id.* ¶ 41, Plaintiffs must show that either: (i) EMC could instruct EMOI to carry out work and the manner in which the work was to be performed; or (ii) EMOI was "appointed" by EMC to represent EMC to third parties. *See id.* ¶¶ 36, 41. There is no evidence that either relationship existed between EMC and EMOI, which were separate companies with distinct directors, officers, business lines, responsibilities, and authorizations. *See, e.g.*, SOF ¶¶ 149–66.

Even if Plaintiffs could establish such a relationship between EMC and EMOI, it is not sufficient merely to show that EMC could have—or even that it *did*—exercise control over

---

[29]   Questions of corporate separateness are "controlled by the substantive law" of the jurisdiction "that creates the cause of action." *United States ex rel. Small Bus. Admin.* v. *Pena*, 731 F.2d 8, 11 (D.C. Cir. 1984).

Public Redacted Copy

EMOI in certain respects and for certain purposes.  In order to hold EMC vicariously liable for EMOI, Plaintiffs must also prove that EMC "specifically instructed" EMOI to perform the work that resulted in Plaintiffs' alleged injuries.  *See* Lindsey Decl. ¶ 38.  Under Indonesia's vicarious liability statute, EMOI must have been performing work that EMC specifically instructed it to perform when EMOI caused Plaintiffs' alleged injuries, such that there was a clear connection between EMC's instructions to EMOI and the allegedly unlawful act that EMOI performed to cause Plaintiffs' alleged injuries.  *See id.* ¶¶ 41–42.  Here, there is no evidence, nor do Plaintiffs appear to even allege, that EMC instructed EMOI to do anything that, in turn, resulted in the Indonesian military inflicting Plaintiffs' alleged injuries.  *See* SOF ¶¶ 37–145.

With no evidence whatsoever that EMOI took any action to harm Plaintiffs, let alone that EMC specifically instructed EMOI to perform any actions giving rise to Plaintiffs' alleged injuries, the alleged conduct of EMOI cannot be imputed to EMC under a theory of agency liability.

**B.      Plaintiffs Cannot Pierce the Corporate Veil Between EMC and EMOI.**

Recognizing the remoteness of EMC's connection to EMOI and any conduct giving rise to Plaintiffs' alleged injuries, Plaintiffs attempt to pierce the corporate veil between EMC and EMOI.  Their effort is unavailing.

Under Indonesian law, which governs Plaintiffs' attempt to impute EMOI's alleged liability onto EMC,[30] veil piercing is available rarely and only in extraordinary circumstances not present here.  The "corporate veil" of limited liability may be "pierced" to

---

[30]   *See Pena*, 731 F.2d at 11 (noting that, where the causes of action arise under District of Columbia law, the district court should have "looked only to District of Columbia precedents to determine the circumstances under which the local courts would pierce the corporate veil").

Public Redacted Copy

hold a shareholder (including a parent or holding company) liable only in certain, statutorily-defined circumstances in which the shareholder uses the corporation in such a way that the corporation ceases to maintain its separate corporate personality.  *See* Lindsey Decl. ¶¶ 46–49.[31]

The unrebutted evidence, as set forth by Defendants' expert Professor Jonathan Macey, establishes that EMOI was a separate corporate entity from EMC and observed all of the corporate formalities required to preserve corporate separateness.  EMOI had its own articles of incorporation and bylaws, separate from those of EMC, SOF ¶ 154; EMOI had its own Board of Directors, which was separate and independent of EMC's Board of Directors, and held its own regular meetings and properly memorialized its meetings and other activities, SOF ¶¶ 155–57; EMOI held shareholder votes as required by its bylaws, SOF ¶ 157; EMOI filed separate tax returns, SOF ¶ 161; EMOI had its own bank accounts, all of which were maintained in its own name, SOF ¶ 160; EMOI had its own employees, and made its own decisions as to hiring, firing, training, and supervision of all employees, SOF ¶ 166; EMOI's management, directors, and personnel were located in Indonesia, while EMC's were located in the United States, *see* SOF ¶ 158; and EMOI was "███████████████████████████████████████████ ███████," SOF ¶ 163.  Courts do not pierce the corporate veil where all, or even most, of these core markers of corporate separateness are present.  *See, e.g.,* SOF ¶ 148; *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995) (declining to pierce veil on summary judgment, where unrebutted evidence established that Delaware-incorporated subsidiary "followed corporate

---

[31]   Veil-piercing is similarly disfavored under U.S. law.  Veil-piercing is "an extraordinary procedure that is not to be used lightly[.]" *Schattner* v. *Girard, Inc.*, 668 F.2d 1366, 1370 (D.C. Cir. 1981).  To pierce the corporate veil, a plaintiff must show that "the parent 'so dominated the subsidiary corporation as to negate its separate personality.'"  *United States ex rel. PCA Integrity Assocs., LLP* v. *NCO Fin. Sys., Inc.*, No. CV 15-750 (RC), 2020 WL 686009, at *15 (D.D.C. Feb. 11, 2020).  Plaintiffs do not even approach satisfying this standard.

Public Redacted Copy

formalities," including holding regular board meetings, maintaining separate board minutes and financial records, filing separate tax returns, and retaining its own employees).

The unrebutted evidence further establishes that EMC did not exercise improper or unusual control over EMOI. Plaintiffs' own expert, Harris Devor, admitted that he had not concluded that there was ███████████████████████████ about the EMC-EMOI relationship. SOF ¶ 169.[32] Indeed, despite it being black-letter law in both Indonesia and the United States that a plaintiff must "establish[] a chain of liability" from the original alleged tortfeasor to the ultimate corporate parent, proving "veil-piercings or findings of alter ego liability" for every corporate owner in between, *In re Tronox Inc.*, 855 F.3d 84, n.27 (2d Cir. 2017); *see* Lindsey Decl. ¶ 49, Mr. Devor admitted that he did not analyze *any* of the layers of corporate ownership separating EMOI and EMC.[33]

With no evidence that EMC directed, much less was even aware of, the operations that allegedly caused injury to Plaintiffs, and with Plaintiffs' own expert declining to opine that EMOI and EMC were anything other than ordinary and distinct corporate affiliates—separated by multiple layers of ownership, none of which Plaintiffs or their expert purported to evaluate— there are simply no grounds for veil-piercing. EMC cannot be liable for Plaintiffs' alleged injuries.

---

[32] In his report, ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████  SOF ¶ 168.

[33] Here, there are three layers of separation between EMOI and EMC. ██████████
████████████████████████████████████
    *See* SOF ¶ 152–53.

IV. **DEFENDANTS HAVE BEEN DENIED A FAIR OPPORTUNITY TO ANSWER PLAINTIFFS' ALLEGATIONS, IN VIOLATION OF THEIR DUE PROCESS RIGHTS.**

Due process mandates that Defendants have "an opportunity to be heard on the *critical and decisive* allegations which go to the *core*" of Plaintiffs' claims, and "to present evidence on the contested facts." *In re Complaint of Bankers Tr. Co.*, 752 F.2d 874, 890 (3d Cir. 1984) (emphasis in original). Plaintiffs' conduct throughout this case has deprived Defendants of that fair opportunity.

A. **Plaintiffs' Inability to Appear in the United States Violates Defendants' Due Process Right to Cross-Examine Witnesses.**

The Court previously recognized the risk that Plaintiffs' inability to appear in the United States for trial could violate Defendants' due process rights. *See* ECF No. 586 at 44–45. While the Court at that time reserved ruling on the issue, it advised that it would "consider, at the appropriate time . . . whether plaintiffs' inability to attend trial constitutes a deprivation of the process due to defendants." *Id.*

Today, it is apparent that Plaintiffs will not appear at trial, in their own chosen forum, *see* SOF ¶ 170, and their failure to do so threatens to deprive Defendants of their due process right "to confront and cross-examine witnesses." *Jenkins* v. *McKeithen*, 395 U.S. 411, 428 (1969) (plurality opinion). Plaintiffs' testimony will be the primary—if not *only*—source of evidence that could potentially substantiate Plaintiffs' allegations. The inability to test the credibility of those witnesses in court—to explore the many gaps and inconsistencies in the various iterations of their allegations—would thus severely handicap Defendants. *See Rusu* v. *I.N.S.*, 296 F.3d 316, 322 (4th Cir. 2002) (noting the importance of in-person testimony in allowing credibility determinations); *Solis* v. *Schweiker*, 719 F.2d 301, 302 (9th Cir. 1983) ("[B]ias is better elicited through rigorous in-court scrutiny.").

**B.      Defendants Have Been Deprived of a Fair Opportunity to Rebut Plaintiffs' Claims.**

Plaintiffs have denied Defendants the opportunity to meaningfully investigate and rebut their claims by concealing and obfuscating the very nature of their claims. *See Morgan* v. *United States*, 304 U.S. 1, 18 (1938) (due process requires "a reasonable opportunity to know the claims of the opposing party and to meet them").

Indeed, the specifics of Plaintiffs' allegations have repeatedly shifted over the course of the litigation. The countless discrepancies between Plaintiffs' amended complaints, sworn discovery responses, and deposition testimony—not to mention brand new allegations that have suddenly surfaced after years of litigation—have prevented Defendants from meaningfully investigating the claims against them. In this regard, Jane Doe VII's claims are illustrative:

- In Plaintiffs' original complaint, filed in 2001, Jane Doe VII's husband, John Doe V, alleged that he was abducted and tortured by soldiers in 1990—a claim that, as Plaintiffs later conceded, was time-barred. *See* Compl.¶ 52, ECF No. 3; ECF No. 110 at 8.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SOF ¶ 100. These allegations were not included in the 2006 Amended Complaint, but were included eight years later, in 2014, in the Second Amended Complaint. *See* Am. Compl. ¶ 71, ECF No. 129–1; 2d Am. Compl. ¶ 180, ECF. No. 465.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮. *See* ECF No. 495–2 at 7.

- Jane Doe VII later served her own interrogatory responses, claiming, in another about-▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SOF ¶ 99.

Jane Doe VII/John Doe V's allegations are not unique in this regard.[34] Ever-

---

[34] To provide a few other examples:

- **Jane Doe IV.** In her 2007 interrogatory responses, Jane Doe IV represented that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" SOF ¶ 68.

**Public Redacted Copy**

shifting allegations like these have forced Defendants to tilt against a moving target for years,

undermining their ability to answer Plaintiffs' claims.

Defendants have also been prevented from meaningfully rebutting Plaintiffs'



SOF ¶ 69.

At her deposition, Jane Doe IV admitted that: ;
she did not see soldiers leaving or returning to Cluster IV on the day her husband was
shot; and she could not see Cluster IV from her house.  SOF ¶ 69.

- **Jane Doe VI/John Doe III.**  In her 2007 responses interrogatory responses, Jane Doe VI
  claimed that . SOF ¶ 86.

  In her 2016 interrogatory responses, Jane Doe VI claimed that . SOF ¶ 86.

  At her deposition, Jane Doe VI testified that she had directly witnessed her son being
  assaulted and shot.  SOF ¶ 86.  Later in the deposition, she testified that she did *not*
  witness the shooting or assault, only to reverse herself once again and testify that she had
  seen the shooting and assault.  SOF ¶ 86.

- **Jane Doe VIII/John Doe VI.**  In the initial complaint, John Doe VI alleged that he was
  "accosted by soldiers assigned to Exxon Mobil's TNI Unit 113," who took him to their
  camp and tortured him for several hours; then took him to his village where they further
  beat him and shot him in the leg.  Compl. ¶ 53, ECF No. 3.  John Doe VI alleged that he
  was taken to the hospital for a week, then taken to police headquarters in North Aceh
  where he was detained and tortured for four months.  *Id.*

  In the amended complaint, John Doe VI alleged that he was accosted by "ExxonMobil's
  security personnel," and removed all allegations of being taken back to his village.  Am.
  Compl. ¶ 72, ECF No.129–1.

  In his 2007 interrogatory responses, John Doe V

  SOF ¶ 109.

  . SOF ¶ 110.

  In 2020, , the only percipient witness to testify about the assault of John Doe
  VI, claimed that Indonesian soldiers brought John Doe VI, "his very close friend," to
  house in , a separate village, and shot him in front
  of his ( ) house.  SOF ¶ 113.

41

Public Redacted Copy

claims as a result of certain obstructive tactics that Plaintiffs' counsel has relied on throughout

this litigation.  To note just one example, Plaintiffs' counsel has sought to influence Plaintiffs'

non-party witnesses, whose testimony is the *only* corroborating evidence for most plaintiffs.

After hiring a team of paid agents to scour the Aceh region for potential non-party witnesses—

and secure their cooperation—Plaintiffs' counsel then claimed an attorney-client relationship

with each of those witnesses, preventing Defendants from contacting the witnesses directly.

SOF ¶¶ 172–73.  Plaintiffs' counsel took further advantage of those supposed attorney-client

relationships by instructing those witnesses, on several occasions during their depositions, not to

answer questions about critical facts that were plainly not subject to any privilege.  SOF ¶ 172.

      Plaintiffs have further obstructed Defendants by, among other things, failing to

preserve documents and other evidence necessary to substantiate their allegations, SOF ¶ 174,[35]

refusing to produce even basic information demonstrating that Plaintiffs and their witnesses are

who they claim to be, SOF ¶ 175,[36] and routinely serving Defendants with interrogatory

responses and documents shortly before depositions, leaving defense counsel with barely any

time to review brand new allegations and just-produced documents before deposing the

producing plaintiffs and non-party witnesses.  SOF ¶ 176.[37]

      Through this conduct, Plaintiffs' counsel has only further undermined

---

[35]   Several plaintiffs affirmatively testified that they were never instructed to preserve documents relevant to their claims and alleged losses, and that they destroyed documents even after their complaint was filed.  SOF ¶ 174.

[36]   For example, Plaintiffs refused to produce original photographs purporting to be John Doe VII, which would have allowed Defendants to confirm their provenance based on metadata. SOF ¶ 175.  Plaintiffs' refused to produce government-issued identification for *any* non-party witnesses (despite purporting to represent them).  SOF ¶ 175.

[37]   For example, Plaintiffs' counsel served Jane Doe VII's supplemental interrogatory responses, which contained entirely new factual allegations, less than 48 hours before her deposition. SOF ¶ 176.

Defendants' opportunity to test the factual basis of Plaintiffs' claims.  Defendants have been

denied a fair opportunity to answer Plaintiffs' claims, in violation of their due process rights.

## V.      THE CLAIMS OF JOHN DOE II, JOHN DOE IV, AND JANE DOE VII ARE TIME-BARRED AND SHOULD BE DISMISSED.

The claims brought by John Doe II, John Doe IV, and Jane Doe VII are time-

barred and should be dismissed.

Under D.C. law,[38] the limitations period for intentional tort claims and negligence

claims "intertwined with" such claims is one year.  *See* D.C. Code § 12-301(4); *Rynn* v. *Jaffe*,

457 F. Supp. 2d 22, 24 (D.D.C. 2006) (quoting *Mittleman* v. *United States*, 104 F.3d 410, 415

(D.C. Cir.1997)).  Plaintiffs allege in their complaint that John Doe II, John Doe IV, and Jane

Doe VII's husband, John Doe V, were injured in ▮▮▮ (2d Am. Compl. ¶¶ 177, 179–80), but

discovery has shown that their alleged injuries would have occurred in ▮▮▮, more than one year

before Plaintiffs filed their original complaint in June 2001.[39]

There are no grounds for equitably tolling the statute of limitations as to John Doe

II, John Doe IV, and Jane Doe VII.[40]  District of Columbia courts recognize two forms of

equitable tolling: the lulling doctrine and the discovery rule.  *See East* v. *Graphic Art Indus.*

---

[38]   Under D.C. law, the applicability of a statute of limitations is a procedural issue, and is thus governed by the law of the forum.  *See, e.g.*, *Byrne* v. *Clinton*, 410 F. Supp. 3d 109, 122 (D.D.C. 2019) ("District of Columbia choice-of-law rules provide (1) that the forum state's law applies to all procedural matters, and (2) that the statute of limitations is a procedural matter."); *Gardel* v. *SK & A Structural Eng'rs PLLC*, 286 F. Supp. 3d 120, 125 (D.D.C. 2017) ("The District of Columbia 'treat[s] statute of limitations as procedural, and therefore almost always mandate[s] application of the District's own statute of limitations.'").

[39]   John Does II, IV, and V each stated in their sworn interrogatory responses that their alleged injuries occurred in ▮▮▮.  *See* SOF ¶¶ 99, 120, 129.  That their alleged injuries occurred in ▮▮▮ was further confirmed by their deposition testimony and the documentary record. SOF ¶¶ 99, 120, 129.

[40]   In 2008, the Court denied Defendants' motion for summary judgment on statute of limitations grounds without prejudice to Defendants' re-raising the argument later in the litigation.  *See* ECF No. 365 at 30.

Public Redacted Copy

*Joint Pension Tr*., 718 A.2d 153, 156–57 (D.C. 1998).  Neither doctrine applies here.  Plaintiffs have effectively conceded as much, previously arguing that equitable tolling is warranted because of "extraordinary circumstances."  ECF No. 365 at 28.  But D.C. courts do not recognize equitable tolling for "extraordinary circumstances."  *See Pappas* v. *District of Columbia*, No. 19-cv-2800 (RC), 2021 WL 106468, at *9 (D.D.C. Jan. 12, 2021) ("The D.C. Court of Appeals recognizes only two limited exceptions to [its] generally strict application of statutes of limitations: the lulling doctrine and the discovery rule.").

Even in jurisdictions that do toll for "extraordinary circumstances," plaintiffs must still demonstrate why they were unable to file timely claims.  *See Williams* v. *Hawkins,* 594 S.W.3d 189, 194 (Ky. 2020) (quoting *Pace* v. *DiGuglielmo*, 544 U.S. 408, 418 (2005)) ("Thus, in order to establish that equitable tolling is warranted, [plaintiff] bears the burden of showing that: (1) she 'has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way.'").  Here, that is a particular challenge for John Doe II, John Doe IV, and Jane Doe VII, because all other plaintiffs were able to file timely claims.  Plaintiffs have offered no explanation as to why these three plaintiffs were unable to bring suit within the limitations period, when all other plaintiffs were able to do so.  Their failure renders them ineligible for the exception, even if it were available (and it is not).

The time-barred claims should therefore be dismissed.

## CONCLUSION

Plaintiffs have utterly failed to produce evidence supporting a causal connection between anything the Defendants did (or failed to do) and the Indonesian soldiers who allegedly caused the injuries at issue here.  They simply have not produced evidence sufficient to show that the Indonesian soldiers who injured them were guarding Arun Field at the time of the alleged incidents—let alone working at Defendants' direction—as opposed to acting as part of

Public Redacted Copy

the general counterinsurgency force engaged at the time in an ongoing civil war in the region. They also have failed, as to each plaintiff, to produce evidence sufficient to prove quantifiable loss. There are no grounds for holding EMC liable for Plaintiffs' injuries, when EMOI is not an agent of EMC and there is no basis for piercing the corporate veil between the two companies. To the extent any of Plaintiffs' claims are permitted to survive these deficiencies, Defendants have been deprived a meaningful opportunity to investigate and answer Plaintiffs' claims in violation of Defendants' due process rights. And several Plaintiffs' claims are time-barred.

Defendants are entitled to summary judgment on all of Plaintiffs' remaining claims.

Washington, D.C.
July 29, 2021

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX 77389
Telephone: (832) 624-6336

Respectfully submitted,

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300

*Attorneys for Defendants Exxon Mobil Corporation and ExxonMobil Oil Indonesia Inc.*

Public Redacted Copy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, *et al.*,

    Plaintiffs,

      v.

EXXON MOBIL CORPORATION, *et al.*,

    Defendants.

Case No. 01-cv-01357 (RCL)

## DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX  77389
Telephone:  (832) 624-6336

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C.  20006-1047
Telephone: (202) 223-7300

**Public Redacted Copy**

## TABLE OF CONTENTS

I.  EMOI'S OPERATIONS IN ACEH ........................................................................ 1

   A.  EMOI Was a Contractor for the Government of Indonesia ............................... 1

   B.  The Government of Indonesia Had Sole Responsibility for Protecting Arun Field ......... 3

   C.  EMOI Made Positive Contributions to Local Acehnese Communities ......................... 10

II.  THE HISTORY OF VIOLENT CONFLICT IN ACEH ....................................... 13

   A.  Colonial Background and Acehnese Independence Movements ................................... 13

   B.  Renewed Violence in Aceh during the Relevant Period ................................. 15

III.  PLAINTIFFS' FAILURE OF EVIDENCE............................................................ 23

   A.  Jane Doe I ........................................................................................ 24

   B.  Jane Doe II........................................................................................ 27

   C.  Jane Doe III ...................................................................................... 29

   D.  Jane Doe IV ...................................................................................... 34

   E.  Jane Doe V [John Doe I] .................................................................. 39

   F.  Jane Doe VI [John Doe III] .............................................................. 41

   G.  Jane Doe VII [John Doe V] .............................................................. 47

   H.  Jane Doe VIII [John Doe VI] ........................................................... 51

   I.  John Doe II ........................................................................................ 55

   J.  John Doe IV........................................................................................ 59

   K.  John Doe VII .................................................................................... 61

   L.  Quantifiable Loss .............................................................................. 65

IV.  CORPORATE SEPARATENESS ....................................................................... 65

   A.  Defendants Are Separate and Independent Corporations................................. 65

   B.  EMOI Observed Corporate Formalities ......................................................... 67

   C.  EMOI Was Financially Self-Sufficient and Adequately Capitalized............................. 69

i

**Public Redacted Copy**

D.  EMC Did Not Control or Dominate EMOI................................................................... 69

E.  Plaintiffs' Expert Opinion Does Not Support Piercing the Corporate Veil between EMC
and EMOI ....................................................................................................................... 72

V.  THE VIOLATION OF DEFENDANTS' DUE PROCESS RIGHTS................................... 73

Defendants Exxon Mobil Corporation ("EMC") and ExxonMobil Oil Indonesia Inc.

("EMOI") respectfully submit this statement of material facts as to which there is no genuine

dispute, in support of their motion for summary judgment, pursuant to Rule 56 of the Federal

Rules of Civil Procedure and Local Civil Rule 7(h).

     1.     All facts provided herein pertain to the time period January 1, 1998 through June

19, 2001 (the "Relevant Period"), unless stated otherwise.[1]

## I.   EMOI'S OPERATIONS IN ACEH

## A.   EMOI Was a Contractor for the Government of Indonesia

     1.     ██████████████████████████████████

██████████. [Expert Report of Geoffrey Robinson, dated Mar. 31, 2021 ("Robinson Rept.")

at 6, Ex. 2[2]; CA0001045992 ("MOI Certificate of Incorporation"), Ex.  3.[3]]

     2.     ██████████████████████████████████

██████████████████████████████████████. [Robinson Rept. at 8–10, Ex.  2.]

     3.     From the early 1970s through 2015, MOI, later EMOI (collectively, "EMOI"),

operated the Arun Field facilities, pursuant to a series of production sharing contracts, as a

contractor for Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"), a 100%

---

[1]   The parties agreed that discovery would not extend to time periods prior to January 1, 1998. [*See* Letter from A. Baker to R. Meyer (Aug. 3, 2006) at 2, Ex. 1.]  The initial complaint in the case was filed on June 19, 2001.  [*See* Compl., ECF No. 3.]

[2]   "Ex." refers to exhibits attached to this Statement of Material Facts Not in Genuine Dispute.

[3]   For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.

Indonesian state-owned entity.[4]  [*See generally* Production Sharing Contract ("PSC")
CA0001186134, Ex. 5; *see also* Deposition of Lance Johnson, dated Jan. 11, 2008 ("Johnson
Dep.") 38:9–38:13, Ex. 6 ("███████████████████████████████████████████████
███████████████████████████████████████████████████.");[5] Deposition
of John Connor, dated Jan. 14, 2008 ("Connor Dep.") 21:23–24, Ex. 7 (Pertamina was the
████████████████████████████████████████).]

4.      The operative production sharing contract during the Relevant Period (the "PSC")
was effective as of October 4, 1998, [PSC, CA0001186134, Ex. 5[6]], succeeding an earlier
production sharing contract that expired on October 3, 1998. [*Id.* at -137.]

5.      EMC has never been a party to a production sharing contract for the extraction of
gas in Aceh.  [*See generally id.*]

6.      As a contractor and operator, EMOI did not own any natural resources, facilities,
or equipment associated with the operations at Arun Field.  [PSC, CA0001186134 at -136, Ex. 5
("████████████████████████████████████████████████████████████████
████████████████████████████████"); *id.* ¶¶ 5.3(f), 9.1 (███████████████████
████████████████████████); Deposition of Mark R. Ward under Rule 30(b)(6) for
Exxon Mobil Corporation, Mobil Corporation, and Mobil Oil Corporation, dated Dec. 12, 2007
("EMC/MC/MOC 30(b)(6) (Ward) Dep.") 255:5–11, Ex. 8 ("[████████████████████

---

4    After a government reorganization in 2003, Pertamina's rights and responsibilities under the
     PSC were ceded to another 100% Indonesian state-owned entity, BPMIGAS.  [Declaration of
     Peter J. Coleman, dated Sept. 17, 2007 ("Coleman Decl.") ¶ 5, Ex. 4.]

5    Unless otherwise indicated, all objections have been omitted from quotations to deposition
     transcripts.

6    For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.



."); *id.* at 253:10–18 ("

"); Deposition of John Boydell under Rule 30(b)(6) for ExxonMobil Oil Indonesia Inc., dated Dec. 7, 2007 ("EMOI 30(b)(6) (Boydell) Dep.") at 101:5–7, Ex. 9 ("

."); Deposition of Michael Farmer, dated Dec. 18, 2007 ("Farmer Dep.") 153:13–14, Ex. 10 ("

."); Johnson Dep. at 38:3–8, Ex. 6 ("

."); *id.* at 43:12–13 ("

").]

7.      In accordance with the PSC, Pertamina also had control over management of the operations.  [PSC 1.1, CA0001186134 at -138, Ex. 5 (

).]

**B.      The Government of Indonesia Had Sole Responsibility for Protecting Arun Field**

8.      The Constitution of Indonesia provides that it is the responsibility of the Government of Indonesia to secure and protect the country's natural resources, including through use of the military.  [Expert Report of Timothy Lindsey, dated May 20, 2021 ("Lindsey Rept.") ¶¶ 55–56 & n.24, Ex. 11.]  EMOI was not responsible for, or permitted to, secure the facilities and operations in Aceh.  [*Id.* ¶¶ 61–70.]

9.     Arun Field was designated a Vital National Object by the Commander-in-Chief of the Armed Forces of Indonesia in 1983.  [Declaration of Dyah Soewito, dated Apr. 16, 2008 ("Soewito Decl.") ¶¶ XIV–XV, Ex.  12.]

10.     Designation as a Vital National Object provided Arun Field another reason for protection by Indonesia's armed forces.  [*Id.* at ¶¶ XIV–XVI; Declaration of Robert N. Hornick, dated Feb. 3, 2006 ("Hornick Decl.") ¶ 35 & Ex. C, Ex. 13 ("Under Indonesian law, the Armed Forces are mandated to protect against domestic as well as foreign threats, including armed rebellion, civil war, and sabotage of vital national objects (such as natural gas fields).  *See* Law No. 3/2002 dated Jan. 8, 2002 re: National Defense, arts. 4, 7 and 10 and Official Elucidation thereto.  This was also the law at the time that the wrongful conduct alleged here purportedly occurred.") (footnote omitted); Nov. 11, 1999 Security request from Pertamina to Commander of TNI [Indonesian armed forces] Jakarta, CA0001078227, Ex. 14 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Letter from Acting Head of BPPKA [Pertamina] to EMOI President and GM, CA0002019862 at -862, Ex. 15[7] (▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); May 26, 2000 Email from M. Budiman to R. Wilson, CA0001005884 at -884, Ex. 16[8] (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮"); "Aceh: Exxon Mobil shuts down," Down to Earth Newsletter (May 2001), DOE004404 at -404, Ex.  17 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮"); Deposition of Ron Wilson, dated Jan. 24, 2008 ("Wilson Dep.") 119:23–120:8, Ex. 18 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[7]    For authentication and business record certification, *see* ECF No. 268-1, Ex. 75.

[8]    For authentication and business record certification, *see* ECF No. 268-1, Ex. 75.

4



).]

    11.    Under the PSC, it was Pertamina's exclusive responsibility to provide security for

Arun Field.  [PSC ¶ 5.3(c), CA0001186134 at -157, Ex.  5.]  According to the PSC:

[*Id.* (emphasis added); *see also* Wilson Dep. at 96:24–25, Ex. 18 ("

"); EMOI 30(b)(6) (Boydell) Dep. at 199:13–15, Ex. 9 ("

");

EMC/MC/MOC 30(b)(6) (Ward) Dep. at 247:8–12, Ex. 8 ("

"); Deposition of

Robert Haines, dated Nov. 16, 2007 ("Haines Dep.") 40:18–41:1, Ex. 19 ("

"); *id.* at 231:21–232:2 ("

"); *id.* at 233:14–17 ("

."); Farmer Dep. at 249:10–14, Ex. 10 ("

."); Johnson Dep. at 38:11–13, Ex. 6 ("

."); *id.* at 49:21–23 ("

").]

12.     The Government of Indonesia alone selected and deployed military personnel to secure Arun Field.  [PSC ¶ 5.3(c), CA0001186134 at -157, Ex. 5; Lindsey Rept. ¶¶ 69–70, Ex. 11; Letter from BPPKA to EMOI, CA0002019862 at -862, Ex. 15 (

).]  EMOI had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military assigned to protect Arun Field.  [*See* Farmer Dep. at 132:3–5, Ex. 10 ("

."); Deposition of Mark Snell under Rule 30(b)(6) for ExxonMobil Oil Indonesia Inc., dated May 24, 2021 at 701:2–4, Ex. 20 ("

"); Lindsey Rept. ¶¶ 69–70, Ex. 11 ("

█████████████████████████████████████████████████████████████

████████████████████████████████████████████ ").]

13.     The PSC reimbursed EMOI for any logistical support or resources EMOI was

contractually required to provide the Indonesian military personnel protecting the government-

owned facilities at Arun Field, as requested by Pertamina.  [PSC ¶ 6, CA0001186134 at -160–

167, Ex. 5; June 7, 2000 Letter, CA0001003149 at -150, Ex. 21[9] ("████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████ ."); Wilson Dep.

at 131:4–19, Ex. 18 ("██████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████ ."); *id.* at 251:8–252:1 ("███████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[9]     For authentication and business record certification, *see* ECF No. 268-1, Ex. 75.

7



14.     EMOI employed no armed security guards at Arun Field.  EMOI's unarmed

security guards were essentially part of a community relations project through which EMOI

provided jobs to local communities.  [Johnson Dep. at 44:17–18, Ex. 6 ("

."); *id.* at 96:16–24 ("Our

security was unarmed."); *id.* at 98:10–20 ("

").]  The unarmed guards provided certain limited access

control services for EMOI.  [Connor Dep. at 37:2–38:3, Ex.  7 ("

").]

15.     Plaintiffs' allegations in this matter do not relate to EMOI's unarmed security

guards.  [*See* 2nd Am. Compl. ¶ 1, ECF No. 465 (allegations relate to "conduct inflicted by

members of the Indonesian military"); ECF No. 160 at 34–35, 45 (statement of Terry

Collingsworth, Esq., counsel for Plaintiffs, at a May 16, 2006 discovery conference:  "We've not

said any [Exxon employees] ever met our clients, had anything to do with going out and ordering

people to do things in terms of the security force. . . . They have nothing to do with this particular question of who ordered or who personally and directly harmed our clients. . . . There's none of these [Exxon] folks, we're certain, that have ever met our clients, that have ever ordered our clients to be harmed[.]").]  Plaintiffs admitted that the soldiers involved in the incidents that form the basis for their claims were wearing military uniforms. [*See, e.g.,* Pls.' Objs. & Resps. to Defs.' 1st Req. for Admis. (Apr. 28–May 14, 2016), Ex. 22 (██████████████████████ ██████████████████████████).]  EMOI's unarmed guard force did not wear military uniforms.  Rather, they wore blue pants, white shirts, and caps.  [Connor Dep. at 37:2–38:3, Ex. 7 ("██████████████████████ ██████████████"); Wilson Dep. at 88:22–89:4, Ex. 18 ("██████████ ████████████████████████████████ ██████████████████████████████ ██████████████").]

16.     The Indonesian government and military exercised "very strict" control over Arun Field specifically and the area generally because it "contained five major industries important to the nation's economic growth" and "the slightest disturbance would have a national impact." [Geoffrey Robinson, "Rawan Is as Rawan Does:  The Origins of Disorder in New Order Aceh," 66 Indonesia 127, 137 (1998) ("Robinson, Rawan"), Ex. 23 (quoting Colonel Sofyan Effendie, the Commander of Korem 011 in Lhokseumawe); *see also* Soewito Decl., Ex. 12.]  ██████ ██████████████████████████████ ██████████████████████████████ ██████████████" [Letter from BPPKA to EMOI, CA0002019862 at -862, Ex.

15.]   By law, the Indonesian military's national defense mandate also included "████████

████████████████." [Lindsey Rept. ¶¶ 59–60, Ex. 11 (quoting Law 20 of 1982).]

**C.   EMOI Made Positive Contributions to Local Acehnese Communities**

17.    During the Relevant Period, Indonesia struggled with high rates of poverty.  [Hal

Hill, "What's Happened to Poverty and Inequality in Indonesia over Half a Century?" 38 Asian

Dev. R. 68, 73 (2021), Ex. 24; *see also* World Bank Group, *Indonesia Poverty & Equity Brief* 2

(Apr. 2020), Ex. 25 (poverty rates in Indonesia were between 35% and 40% in 2000–2001).]

The natural gas operations in Aceh were a "critical element" of the Acehnese economy.

[Robinson Rept. at 9, Ex. 2.]  EMOI offered high-paying jobs and meaningful technical training,

which improved the economic fortunes of the Acehnese.  [ExxonMobil Oil Indonesia Inc.

Operations Fact Sheet ("EMOI Fact Sheet"), CA0001056717 at -722, Ex.  26 ("████

████████████████████████████████████

████████████████████████████████

████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████."); ExxonMobil

Oil Indonesia Inc. Economic and Community Update ("EMOI Community Update"),

CA0001045562 at -564, Ex. 27 ("████████████████████████████

████████████████████████████████

████████████████████.").]  Through the economic boon attributable to the natural

10

gas facilities, "█████████████████████████████████████

█████████████████████████." [Robinson Rept. at 9, Ex. 2.] EMOI provided economic

opportunities and social services to the Acehnese people. [*See generally* EMOI Fact Sheet,

CA0001056717, Ex. 26 ("████████████████████████



████.").] From 1998 to 2001, EMOI employed more than 1,000 Indonesian nationals at

Arun Field, including many local employees in senior management positions. [EMOI Fact

Sheet, CA0001056717 at -722, Ex. 26 ("███████████████████

██████████████████████████████████████

██████████████████████████████████

███████████████████████.").]

18.     In additional to employment opportunities, EMOI contributed to a number of

local causes, from community health to education to cultural resources, among others. In 1999

alone, EMOI spent over US $1.2 million on its community relations program. [ExxonMobil Oil

Indonesia Inc. North Sumatra Operations Community Relations Presentation, CA0001004081 at

-085, Ex. 28.] EMOI built and funded schools; created scholarships for local Acehnese students

to attend university; constructed roads and other infrastructure; built medical clinics; and

contributed to regional environmental causes and local religious festivals. [EMOI Fact Sheet,

CA0001056717 at -720–21, Ex. 26 ("█████████████████████

█████████████████████████████████████████

Public Redacted Copy

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████.”); Mobil Oil Indonesia Government Relations

Contact Plan for Indonesia, CA0001146940 at -945, Ex. 29 (“████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████.”); Letter from R.

Wilson to L. Johnson, dated June 22, 2000, CA0001083002, Ex. 30 (██████████████████████

████████████████████████████████████████████████

████████████████).]

19.    The MOI-built medical clinic was serving more than 100,000 local residents each

year by the early 2000s.  [EMOI Community Update, CA0001045562 at -564, Ex. 27 (“████████

████████████████████████████████████████████████

████████████████████.”).]  Overall, the clinic treated more than two million

patients from its inception through the end of the Relevant Period.  [EMOI Fact Sheet,

CA0001056717 at -720, Ex. 26.]

## II.     THE HISTORY OF VIOLENT CONFLICT IN ACEH

### A.     Colonial Background and Acehnese Independence Movements

20.     ██████████████████████████████████████████

████████████. [Robinson Rept. at 4, Ex. 2.]  Aceh fought "brutal" wars of independence

against Dutch Colonizers in the nineteenth century, in which tens of thousands of people were

killed.  [*See* Michael L. Ross, "Resources and Rebellion in Aceh, Indonesia," in

UNDERSTANDING CIVIL WAR 35 (World Bank, 2005) ("Ross Chapter") at 38–39, Ex. 31;

Robinson Rept. at 4, Ex. 2 ("████████████████████████████████████

██████████████████████.").]  By the early 1900s, the Dutch claimed sovereignty

over all of modern-day Indonesia.  [Ross Chapter at 38, Ex. 31; Robinson Rept. at 4, Ex. 2.]

21.     ████████████████████████████████. [Shigeru Sato,

"Indonesia 1939–1942:  Prelude to the Japanese Occupation," 37 J. Southeast Asian Studies 225,

226 (2006), Ex. 32; Robinson Rept. at 4, Ex. 2.] ██████████████████████

██████████████████████████████

████████████████. [Robinson Rept. at 4, Ex. 2.] ██████████████████

██████████████████████████████. [*Id.*] ████████

██████████████████████████████████████

████████████████████. [*Id.* at 4–5.]

22.     ██████████████████████████████████

████████████████████████. [Int'l Crisis Group, *Aceh: Why*

*Military Force Won't Bring Lasting Peace* 2 (2001) ("Int'l Crisis Group"), Ex. 33; *see also*

Robinson Rept. at 5, Ex. 2.] ████████████████████████████. [Int'l

Crisis Group at 2, Ex. 33; Robinson Rept. at 5, Ex. 2.] ██████████████████████

████████████████████████ [Robinson Rept. at 5, Ex. 2.] ███

13

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████.” [*Id.*]

    23.   ██████████████████████████████████████

████████. [Robinson Rept. at 5, Ex. 2.]

    24.   ██████████████████████████████████████████

███████████████████████████. [Int'l Crisis Group at 3, Ex. 33; Robinson Rept. at

5, Ex. 2.]  Although the movement gained some popular support, it did not achieve its goal of

Acehnese independence, with most of its leaders subdued by the early 1980s.  [Ross Chapter at

39–41, Ex. 31.]

    25.   ████████████████████████████████████████

███████████████████████████. [Ross Chapter at 42–43, Ex. 31; Robinson

Rept. at 6, Ex. 2.]  Beginning in 1990, the Government of Indonesia designated Aceh a Military

Operations Area (or "DOM").  [Ross Chapter at 44, Ex. 31.]  █████████████████

█████████████████████████████████. [Deposition of Geoffrey Robinson,

dated June 2, 2021 ("Robinson Dep.") at 89:4–15, Ex. 34.]  ███████████████████

███████████████████████████████████████████████████████

██████████████████████████████. [Robinson Rept. at 6, Ex. 2.] ███████████

██████████████████████████████. [*Id.*]  Estimates of the

death toll from 1990 to 1992 range from 2,000 to 10,000, the majority of which were caused by

the Indonesian military.  [Ross Chapter at 44, Ex. 31.]  By the time the DOM status was lifted in

1998, "many hundreds and possibly thousands more civilians had been killed."  [*See* Amnesty

International, "New military operations, old patterns of human rights abuses in Aceh" (Oct. 7,

2004) at 6, Ex. 35.]

26. ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ [Robinson Dep. at 100:6–12, Ex. 34

("████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.").]

**B.    Renewed Violence in Aceh during the Relevant Period**

27. ██████████████████████████████████████████

████████████████████████████████████████. [Robinson Rept. at 6,

Ex. 2.]  By no later than 2001, the Indonesian military had deployed approximately 30,000 to

40,000 Indonesian military personnel to Aceh to respond to the insurgency.  [*See* Human Rights

Watch, "Indonesia:  The War in Aceh" (Aug. 2001) ("Human Rights Watch 2001 Report") at 5,

Ex. 36 ("On one side are the Indonesian government forces, both police (Polisi Republik

Indonesia, or Polri) and military (Tentara Nasional Indonesia, or TNI), with some 30,000

personnel in the field, poorly trained and poorly paid.") (citation omitted); Deposition of Jane

Doe IV, dated Nov. 6, 2020 ("Jane Doe IV Dep.") 72:25–73:7, Ex. 37 ("**Q.** Other witnesses have

said that there were as many as 40,000 Indonesian military in North Aceh in this time period in

2000.  Do you agree with that?  **A.** Yes, I agree with that.  That's what I heard."); Deposition of

███████, dated Oct. 20, 2020 ("███████ Dep.") 49:5–9, Ex. 38 ("**Q.** There were tens of

thousands of such soldiers, correct?  **A.** Yes, that is correct.  I was taught there were about

40,000 soldiers in Aceh at that time."); Deposition of ██████, dated Feb. 4, 2021 ("██████

Dep.") 45:8–15, Ex. 39 ("**Q.** And there were about 40,000 members of the Indonesian military

fighting GAM around 1999; isn't that right?  **A.** That is correct."); Deposition of ██████, dated

Mar. 3, 2021 ("█████ Dep.") 43:17–22, Ex. 40 ("**Q.** At the time of the attack on you and

Irwanda, there were, approximately, 40,000 Indonesian troops in Aceh, correct?  **A.** That is

correct.").]

28.    A small number of these Indonesian military personnel were assigned to guard the

government-owned facilities at Arun field. ██████████████████████



████████████████████████.  [EMOI Daily

Security Report, dated Nov. 2–3, 1999, CA0001121094, Ex. 41.] █████████████

███████████████████████████████

██████████.  [EMOI Daily Security Report, dated Dec. 12, 2000, CA0001333753, Ex.  42

(██████████████████████████████████

████████████████████████████████

███████████).] ██████████████████████████

███████████████████████████ [Deposition

of Mark Snell under Rule 30(b)(6) for ExxonMobil Oil Indonesia Inc., dated Feb. 14, 2021

("EMOI February 2021 30(b)(6) (Snell) Dep.") at 263:23–264:18, Ex. 43 ("███████████

████████████████████████████████

██████████████████████████████

███████████.").]

29.    Both the Indonesian military and the Acehnese separatists engaged in violence,

including against unarmed civilians, during the civil war.  GAM abuses included "killings of . . .

suspected military informants, as well as of family members of police and military personnel,

unlawful detentions, forced expulsions, and other terrorizing of non-Acehnese."  [Human Rights

Watch 2001 Report at 22, Ex. 36.]  The Indonesian military also committed human rights abuses

16

and atrocities.  According to Human Rights Watch, there was "ample evidence . . . that Indonesian forces deliberately and systematically employ[ed] executions to deter villagers from supporting GAM."  [*Id.* at 15.]  Further, "[t]orture by the police and army appear[ed] to be routine," and the Indonesian military "frequently punish[ed] entire villages for GAM attacks on police or military" during this period.  [*Id.* at 18.]  There was additional violence committed by "bandits" and "renegade rebels" who sparred with Indonesian troops in Aceh and committed acts of violence.  [*See* Wayne Arnold, "Exxon-Mobil, in Fear, Exits Indonesian Gas Fields," *New York Times* (Mar. 24, 2001), Ex.  44.]

30.     The Arun Field facilities became a high-profile target for GAM, which threatened, shot at, abducted, and on a few occasions even killed EMOI employees and contractors.  [Ross Chapter at 48, Ex. 31 ("Members of GAM have also tried to raise money from the Lhokseumawe natural gas facility, through both direct and indirect forms of extortion. Between 1999 and March 2001, ExxonMobil reported a growing tally of violence and threats. Its company vans and pickups had been hijacked about 50 times; company airplanes were twice hit by ground fire when they tried to land; facilities were repeatedly attacked with gunfire and grenades; company buses were bombed, or stopped and burned, as they brought employees to work; four employees were killed while off-duty; and other employees were threatened."); Robinson Rept. at 14, Ex. 2 ("



."); Connor Dep. at 19:7–16, Ex. 7 ("

."); *id.* at 239:23–

**Public Redacted Copy**

240:4 (" ██████████████████████████████████████████

██████████████████████████ ."); Farmer Dep. at 301:10–303:20, Ex. 10 (" ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████.”); APO Communications and

Government Relations Plan, dated Mar. 16, 2001, CA0002170119 at -119, Ex. 45[10] (“█████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████.”).]

31.     GAM targeted Arun Field in order to, among other things, attempt to provoke

military reprisals that they believed would increase support for GAM.  [Ross Chapter at 49, Ex.

31 (“In an interview with a British journalist, Ilias Pase, a GAM commander, suggested that

GAM has at times provoked military reprisals in order to boost its support.”).]

32.     GAM also targeted EMOI employees in an attempt to interrupt the Government of

Indonesia’s gas revenues from Arun Field and to extort money from EMOI.  [Ross Chapter at 48,

Ex. 31 (“To fund itself, GAM used a combination of voluntary donations, taxes, extortion,

kidnapping, and the sale of timber and cannabis. . . . From March to July 2001, [ExxonMobil]

was forced to shut down the LNG facility because of a lack of security. . . . [M]any of these

incidents were part of efforts by GAM to extort money from ExxonMobil, to reduce the

government’s gas revenues, or both. . . . In March 2001, the GAM regional commander in the

Lhokseumawe area, Muzakir Mualim, explained, ‘We expect them [ExxonMobil] to pay income

---

[10]     For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.

tax to Aceh.  We're only talking about a few percent of the enormous profit they have made from drilling under the earth of Aceh.'") (citations omitted).]

33.     Members of the Indonesian military also threatened, and even assaulted, EMOI employees.  Indonesian soldiers seized supplies and equipment from the Arun Field facilities, sometimes at gunpoint.  [*See, e.g.*, Letter from R.I. Wilson to Mr. Susilo Bambang Yudhoyono, Minister of Mines and Energy, dated Feb. 20, 2000, CA0002020283, Ex. 46 ("███████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████."); EMOI Daily

Security Report, dated Apr. 22–23, 2000, CA0001334368, Ex. 47 ("████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████."); EMOI Security Incident

Reports, dated Jan. to Mar. 2001, CA0001046718 at -770, Ex. 48 ("███████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████.")"); *id.* at -812 ("██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████.")"); Farmer Dep. at 204:18–206:2, Ex. 10 ("████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

21

████████████████████████████████████████████████████████████

████████████████████.").]

34.      In March 2001, the situation had become so dangerous that EMOI shut down its

facilities altogether and evacuated its employees and contractors.  [*See* Human Rights Watch

2001 Report at 10, Ex. 36 ("On March 9, 2001 . . . Exxon Mobil, the region's largest foreign

investor, closed three of its gasfields in North Aceh, citing attacks on its employees."); Connor

Dep. at 26:24–27:18, Ex. 7 ("████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████."); Wayne Arnold, "Exxon-

Mobil, in Fear, Exits Indonesian Gas Fields," *New York Times* (Mar. 24, 2001), Ex. 44 ("'We

went from a situation where our people were in a dangerous area to where it actually appeared

that our employees and contractors were being targeted,' said William J. Cummings, a

spokesman for Exxon Mobil's subsidiary in Jakarta.  Four off-duty employees have been killed

in the last two years.  The company decided that 'continuing the production imperiled our people

and operations and put adjoining communities at unacceptable risk,' Mr. Cummings said.").]

35.      After the resignation of President Suharto, media and international human rights

organizations published reports about allegations of war crimes and human rights abuses during

the previous decades.  [*See, e.g.*, Human Rights Watch, "Indonesia:  Aceh Trial–Amnesty

International and Human Rights Watch Call for Full Accountability" (May 16, 2000), Ex. 49;

Human Rights Watch, "Aceh Under Martial Law:  Inside the Secret War" (Dec. 17, 2003), Ex. 50.]

36.     On a number of occasions, EMOI inquired about the military's conduct and urged the government to comply with the law and human rights standards.  [Letter from R.I. Wilson to Pertamina, dated June 7, 2000, CA0001003149 at -151, Ex. 21 (" 

."); Letter from R.I. Wilson to Bapak Iin A. Takhyan, Director of Production Sharing Management, Pertamina, dated Apr. 23, 2001, CA0001092701 at -701, Ex. 51[11]

("

."); Connor Dep. at 163:9–14, Ex. 7 ("

."); *id.* at 171:6–9 ("

.").]

## III.     PLAINTIFFS' FAILURE OF EVIDENCE[12]

37.     EMOI had no knowledge of any of the alleged facts related to Plaintiffs' claims until they filed their initial complaint in June 2001.  [EMOI February 2021 30(b)(6) (Snell) Dep.

---

[11]   For authentication and business record certification, *see* ECF No. 268-1, Ex. 75.

[12]   For ease of reading, Defendants have omitted "claimed" and "alleged" from their descriptions of Plaintiffs' and their non-party witnesses' testimonies regarding Plaintiffs'

at 112:24–113:8, Ex. 43 (" █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ .").]  EMOI also had no knowledge of any reports or

complaints regarding the alleged incidents underlying Plaintiffs' claims.  [EMOI February 2021

30(b)(6) (Snell) Dep. at 113:9–16, Ex. 43 (" █████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████ .").]  Even after filing their complaint, Plaintiffs still refused to

disclose their names or the names of their villages until six years after their original complaint

was filed.  [Letter from A. Fryszman to N. Singhvi, dated May 17, 2007, Ex. 52; Letter from A.

Fryszman to N. Singhvi, dated June 5, 2007, Ex. 53.]  Plaintiffs did not disclose Jane Doe I's

name or village for another two years after that.  [Letter from K. Konopka to A. Oh, dated

Sept. 9, 2009, Ex. 54.]

## A.    **Jane Doe I**

38.    Jane Doe I and her neighbor, ██████ , provided testimony regarding Jane Doe I's

allegations.  [*See generally* Deposition of Jane Doe I, dated Dec. 3, 2020 ("Jane Doe I Dep."),

Ex. 55; Deposition of ██████ , dated Feb. 8, 2021 (" ██████ Dep."), Ex. 56.]

39.    Jane Doe I was assaulted by an Indonesian soldier ██████ .  [Jane Doe I Dep.

at 49:10–12, Ex. 55 ("**Q.** Did the attack happen ███████████ , [Jane Doe I]?  **A.** Yes."); *id.* at

---

alleged injuries and surrounding events.  Defendants do not concede that any of the alleged
incidents occurred as described by Plaintiffs and their witnesses.

52:17–21 ("**Q.** Was the soldier who ███████████ wearing a military uniform?  **A.** Yes.
**Q.** Was he Indonesian?  **A.** Yes.").]

40.     Neither Jane Doe I nor ██████ knew the identity of the Indonesian soldier who
assaulted Jane Doe I.  [Jane Doe I Dep. at 61:5–24, Ex. 55 ("**Q.** Did you tell ██████ the name of
the soldier that ████████████?  **A.** No, because I didn't see his name either.  **Q.** So you
don't know the name of the soldier who ████████████████████?  **A.** What I
can see, the letter N in this area (indicating), because it was covered by the string of his weapon.
. . . **Q.** But apart from the letter N, you don't know what his name is, correct?  **A.** Yes, that is
correct.");█████ Dep. at 23:2–7, Ex. 56 ("**Q.** Do you agree that you do not know the name of
the soldier who attacked [Jane Doe I]?  **A.** . . . I do not know the soldier's name.").]

41.     Neither Jane Doe I nor █████a knew who supervised, commanded, directed, or
paid the soldier who allegedly assaulted Jane Doe I.  [Jane Doe I Dep. 62:10–63:9, Ex. 55
("**Q.** The soldier did not tell you what his mission was that day, did he? . . . .  **A.** That is
correct.  **Q.** He did not tell you who his commanders were, correct?  **A.** Yes, he did not.  **Q.** He
did not tell you who was paying him that day, correct?  **A.** That is correct.  **Q.** He did not tell you
who was directing him that day, correct?  **A.** Yes.  **Q.** And you don't know what military unit the
soldier was assigned to, correct? . . . .  **A.** Yes."); █████ Dep. 23:8–10, Ex. 56 ("**Q.** Do you know
the name of the commander of the soldier who attacked [Jane Doe I]?  **A.** I do not."); *id.* at
50:18–20 ("**Q.** Did you hear anybody give an order for them to group together?  **A.** I did not.").]

42.     Jane Doe I had no knowledge of whether that soldier was affiliated with Exxon.
[Jane Doe I Dep. at 67:4–8, Ex. 55 ("**Q.** So you yourself have no idea whether the soldier who
came into your house had any connection to Exxon, correct? . . . **A.** For myself, I do not
know.").]

25

43.     The soldier who assaulted Jane Doe I came in a truck that was "the same size and color as all of the other Indonesian green military trucks." [Jane Doe I Dep. at 92:25–93:16, Ex. 55 ("**Q.** And then back to the incident for a minute, at the time of the incident, did you see the truck that the soldiers came in? . . . **A.** Yes, I did.  **Q.** Can you tell me when you saw the truck? **A.** Okay, so at that time I was trying to run to the front room to right—to adjust my underwear, but then the soldier pulled me back again into the room, and then at that time I saw the truck with the group of soldiers, and I think he saw the truck as well and then he got ready to get out as well."); ▬▬▬ Dep. at 52:25–56:6, Ex. 56 ("**Q.** Was the truck the same size and color as all of the other Indonesian green military trucks that you've seen? . . . **A.** For a truck version, it's the same.").]

44.     The truck had a sticker with a common Arabic expression on the windshield. [Jane Doe I Dep. at 93:17–20, Ex. 55 ("**Q.** Do you remember anything about the truck, what did it look like?  **A.** I saw on the windshield there was Arabic writing."); ▬▬▬ Dep. at 9:7–12, Ex. 56 ("**Q.** Can you describe the truck?  **A.** So the truck was green, army green, and there was the writing Allahu Akbar . . . on the windshield."); *id.* at 54:4–7 ("**Q.** Is that expression [on the truck] a common expression used between people to talk about God is great?  **A.** Yes.").] ▬▬▬ claimed to have seen a truck with the same expression entering Arun Field on an unspecified date.  [▬▬▬ Dep. at 11:23–12:3, Ex. 56 ("**Q.** The truck that you described with the Arabic saying, did that truck go in and out of the Exxon facility? . . . **A.** Yes it did.").]

45.     Jane Doe I is not seeking money damages from Exxon. [Jane Doe I Dep. at 74:5–7, Ex. 55 ("**Q.** Are you expecting to be paid if you win this case?  **A.** No."); *id.* at 78:13–79:9 ("**Q.** Are you saying in this lawsuit that Exxon should pay the expenses that you incurred to go to Bandung for three months?  **A.** No.  . . . **Q.** Did your husband not work during the period that he

went to Bandung with you?  **A.** Yes, he was no longer able to work because of that conditions I

mentioned earlier, the Exxon is closed.  . . . **Q.** Are you saying in this lawsuit that Exxon should

pay him for the three months that he did not work because Exxon was closed?  **A.** No.").]

46.     Jane Doe I may be seeking compensation because her child was born "███

████."  [Jane Doe I Dep. at 79:10–80:4, Ex. 55 ("**Q.** As a result of what the soldier did to you,

[Jane Doe I], on March 20, 2001 in your house, are you seeking any other damages that you

think Exxon should pay for? . . . **A.** Yes, because the result, ████████████████

████.").]

47.     Jane Doe I did not produce any documents or records corroborating or quantifying

any expenses incurred for her own medical treatment or that of her child.  [Jane Doe I Dep. at

76:8–11, Ex. 55 ("**Q.** Do you have any documentation of your hospital visit in Bandung?  **A.** Not

anymore.  It was a long time ago."); *id.* at 80:14–21 ("**Q.** Do you have any documentation of

these hospital visits for your child?  **A.** No, not anymore.  I didn't think about it because it is a

long time ago.  **Q.** No one told you to preserve these document[s] for this lawsuit?  **A.** No."); *id.*

at 81:7–10 ("**Q.** Do you have any written documentation of this opinion from this doctor?  **A.**

No. . . .").]

## B.    **Jane Doe II**

48.     Jane Doe II and non-party witness ████████ provided testimony regarding Jane

Doe II's allegations.  [*See generally* Deposition of Jane Doe II, dated Sept. 30, 2020 ("Jane Doe

II Dep."), Ex. 57; Deposition of ████████, dated Mar. 3, 2021 ("████████ Dep."), Ex. 58.]

49.     The village in which Jane Doe II's husband, John Doe VIII, was shot ████████

████████████████.  [Jane Doe II Dep. at 10:25–11:15, Ex. 57 ("**Q.** So going to the

house that you lived in in 2000, was that house near any Exxon Mobil facilities?  ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████.").]

50.     Jane Doe II did not know the identity of the Indonesian soldier or soldiers who shot her husband.  [Jane Doe II Dep. at 46:19–47:10, Ex. 57 ("**Q.** Were the soldiers on that truck Indonesian military soldiers?  **A.** I'm not really sure about that.  **Q.** Do you know who shot your husband?  **A.** I just know they are soldiers, but I don't know their names. . . .  **Q.** Do you know the name of the soldier who shot your husband?  **A.** I don't know the name of the soldiers.  I wasn't able to see. The people around there were not able to see.").]

51.     Jane Doe II did not know who supervised or gave orders to the soldier or soldiers who killed her husband.  [Jane Doe II Dep. at 49:6–18, Ex. 57 ("**Q.** So you don't know who shot your husband.  Is it also accurate to say that you do not know the name of the Indonesian commander of that soldier?  **A.** I don't know the name.  **Q.** And since you don't know the name or the commander of the soldier who shot your husband, do you also agree that you do not know what assignment that soldier had in Aceh and what troop he belonged to?  **A.** Yes, I don't understand about that too.").]

52.     ███████ did not see the shooting and did not testify to the identity of the soldier or soldiers who allegedly killed Jane Doe II's husband, or his or their commander. [███████ Dep. at 19:5–9, Ex. 58 ("[W]hat I witness on that day, after I get to the location, I saw the body was already in the mud, and then the mud—the blood has already mixed with the mud at that time.").]

53.     ███████ was told secondhand that John Doe VIII was shot by soldiers. [Saifulbahri Dep. at 16:21–17:3, Ex. 58 ("Yes, so I learned the death of [John Doe VIII] from

Public Redacted Copy



, a woman called my ████████. . . . And then she said, to me, oh, my little, younger

brother, [John Doe VIII] is dead.  He has been shot by the soldiers.").]

54.     Jane Doe II alleged in her damages disclosures that ████████████████

████████████████.  [Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures,

dated Dec. 3, 2019, at 5, Ex. 59.]

55.     Jane Doe II produced no documents demonstrating the amount of damages she

may be seeking in this lawsuit, and she testified that she did not know how much money her

husband earned prior to his death because he never told her the amount.  [Jane Doe II Dep. at

26:22–27:10, Ex. 57 ("**Q.** Do you know how much he made when he was a tractor driver in the

rice paddy?  **A.** I cannot calculate how much because he didn't mention how much.  I only

received the money for shopping.  **Q.** So would it be fair to say your husband never told you how

much he made when he worked, he just gave you a portion of money so that you could buy food

for the family?  . . . **A.** Yes.").]

**C.     Jane Doe III**

56.     Jane Doe III and non-party witness ████████ provided testimony regarding Jane

Doe III's allegations.  [*See generally* Deposition of Jane Doe III, dated Sept. 21, 2020 ("Jane

Doe III Dep."), Ex. 60; ████████ Dep., Ex. 38.]

57.     Jane Doe III claimed in her 2007 sworn interrogatory responses that ████████████

████████████████.  [Pl. Jane Doe III's Suppl. Resp. to ExxonMobil Oil Corporation's 1st

Set of Interrogs., dated July 28, 2007, at 2, Ex. 61 ("████████████████████████████████

████████████████████████.").]

58.     Jane Doe III did not witness the abduction of her husband, John Doe IX, and did

not know the identities of the people who took him.  [Jane Doe III Dep. at 46:6–20, Ex. 60 ("**Q.**

You did not see what happened to him; is that right?  **A.** No, she didn't see anything.  **Q.** You did

not see who the people who took your husband were, correct?  **A.** No, she didn't see anyone.  **Q.**
You don't know their names who took your husband?  **A.** No.  **Q.** And no one told you their
names, correct?  **A.** No.  **Q.** So you don't know who took your husband; is that right?  **A.** She
didn't know.").]

      59.     Non-party witness ███████ testified that he did witness the abduction of
John Doe IX.  He was working in his kiosk when a vehicle carrying members of the Indonesian
Marine Corps crashed into a ditch due to a tire blowout.  [███████ Dep. at 22:6–18, Ex. 38 ("**Q.**
I'm going to ask you some questions about the day of the incident. Were you at your kiosk that
day?  **A.** Yes, I was.  **Q.** Can you tell us what happened?  **A.** So there was a tire explosion.  **Q.**
And what happened next?  **A.** So after the tire explosion, they were . . . upsidedown, I don't the
ditch [sic].  **Q.** So after the tire explosion, a week [sic] went upsidedown into the ditch?  **A.** Yes,
into the Exxon's ditch."); *id.* at 32:4–23 ("**Q.** Earlier, you also testified about a truck, I think, that
went into a ditch.  Is that right?  **A.** Yes.  **Q.** Who was in that truck?  **A.** Marine corps.  **Q.** And
how many marine corps were in that truck?  **A.** It's about 10 or 12, around that number.  **Q.** And
what happened to the marine corps that were in the truck?  **A.** So the front tire exploded.  **Q.** And
then what happened?  **A.** And they fell into the ditch of Exxon.  **Q.** And were any of them
injured?  **A.** Yes, I think.  I didn't really see it, but they said there were two of them who died.").]
According to ███████, following the crash, a number of soldiers emerged from ███████████
and some of them rounded up the people nearby, including ███████. [*Id.* at 22:19–23:8 ("**Q.**
And what happened next?  **A.** So after that, I heard gunshot, like consecutive gunshot from the
███████████. Maybe they thought there was an attack from this side.  **Q.** After you heard the
gun fire from back inside ███████████, what happened next?  **A.** Then after that, they
gathered all of us.  **Q.** When you say they, who do you mean?  **A.** The soldiers who came out

from ███████████.").] ███████ testified that he was beaten by these soldiers for about fifteen

minutes and then was taken to a second location. [*Id.* at 27:19–28:4 ("**Q.** You said the beating

lasted about 15 minutes; is that right? **A.** Yes, that's correct. **Q.** After that 15 minutes, did you

see [John Doe IX]? **A.** Yes.  Yes, because after I was beaten, I was taken to the location where

[John Doe IX] was.  And when I got there, I saw where they stick other people, where I saw

[John Doe IX] was laying on the road.").]  At the second location, he saw a mix of soldiers

composed of the marines and the soldiers that had exited ███████████ standing near six

people lying on the road, one of whom was John Doe IX.  [*Id.* at 28:15–17 ("**Q.** So including

[John Doe IX], how many people were lying on the road? **A.** Six."); *id.* at 29:11–22 ("**Q.** Was

anyone standing nearby? **A.** People, the orbit—there were no ordinary people.  It was just

soldiers. **Q.** So how many soldiers were standing nearby? **A.** I cannot really remember the

number of the soldiers standing there. **Q.** Were the soldiers standing there, the soldiers from

███████████?  . . . **A.** I think it was mixed.  They were mixed already."); *id.* at 35:10–16

("**Q.** Were ███████████ soldiers in that mix?  . . . **A.** Yes, there was. **Q.** And were there also

some of the marine soldiers in the mix? **A.** Yes.").] ███████ said that he saw the six people,

including John Doe IX, placed into a military truck.  [*Id.* at 30:4–19 ("**Q.** What happened next?

**A.** Not very long after I was there, I was taken back to my place, but then, I had the opportunity

to—to look—to see that there were trucks, military trucks coming.  And they were taken on the

truck. **Q.** When you say they were taken on the truck, what do you mean?  Is the they the bodies

(indicating)? **A.** Yes, the bodies that—the six bodies that laid on the road. **Q.** So who put the six

bodies on the truck? **A.** The soldiers.").]

      60.   ████████████████████████████████████████████████

████████████████████████████████████.  [Deposition of ███████, dated Oct. 27, 2020



(" ▮▮▮▮▮ Dep."), 17:10–18:4 Ex. 62 ("

.").]

61.   ▮▮▮▮ did not know the identities of any of the people who took John Doe IX, despite testifying that he had seen some of the soldiers coming from ▮▮▮▮▮ . [▮▮▮▮ Dep. at 23:9–15, Ex. 38 ("**Q.** So did you see the soldiers come out from ▮▮▮▮▮ ? **A.** Yes, I do. **Q.** And those were the soldiers, walking, guarding Exxon; is that correct? . . . **A.** Yes, that's correct."); *id.* at 75:21–76:14 ("**Q.** The 30 or 40 soldiers that you said came out of the direction of the ▮▮▮▮▮ , did you know any of their names? **A.** I don't know their names. I just know their face. **Q.** Can you describe their faces now? **A.** I can't imagine that anymore. **Q.** Did you ever describe them to anyone in this case? **A.** No. **Q.** What about the mix of soldiers and marines that you've described around the people on the ground? Did you know any of their names? **A.** No, I don't—I didn't know their name. I don't know their names.").]

62.   ▮▮▮▮ did not know, when he saw John Doe IX, what had happened to him or whether he was deceased.  [*Id.* at 78:7–12 ("**Q.** And you don't know what happened, actually, to

32

[John Doe IX], correct, why he was on the ground? . . . **A.** Yes, I don't know."); *id.* at 29:23–30:3 ("**Q.** Did you think the men that were lying on the ground were dead?  **A.** I cannot tell for sure, but what I can say is that they were no longer moving.").]

63.      Neither Jane Doe III nor ████ knew who supervised, directed, or paid the Indonesian soldiers who abducted John Doe IX.  [Jane Doe III Dep. at 57:8–20, Ex. 60 ("**Q.** And you don't know anything about Exxon hiring Indonesian military, correct?  **A.** She doesn't know. **Q.** And you don't know anything about Exxon supervising the Indonesian military, correct?  **A.** She doesn't know.  **Q.** And you don't know—you have not seen any documents that suggest Exxon hired any Indonesian military, correct?  **A.** No, she doesn't know any documents."); ████ Dep. at 77:17–78:6, Ex. 38 ("**Q.** You don't know who their commanders are, right? **A.** Yes, I don't know.  **Q.** You don't know who gave the soldiers their orders, correct?  **A.** Yes, I don't know.  **Q.** You don't know what their orders were on that day, correct?  **A.** Yes, I don't know.  **Q.** You don't know who paid the soldiers on that day, correct? [] **A.** Yes, I don't know."); *id.* at 78:13–79:14 ("**Q.** You don't know if the soldiers received any orders from Exxon on that day, correct?  **A.** Yes, I don't know about that. . . . **Q.** And you don't know whether anyone from Exxon controlled these soldiers on that day. . . . **A.** Yes, I don't know.  **Q.** And you don't know whether anyone from Exxon supervised these soldiers on that day, right? . . . **A.** Yes, I don't know about that.  **Q.** And you don't know whether anyone from Exxon paid these soldiers on that day, right?  **A.** Yes, I don't know about that").]

64.      Jane Doe III testified that her husband earned ████████████ before his disappearance.  [Jane Doe III Dep. at 70:6–14, Ex. 60 ("**Q.** And your husband, when ████████████████, how much was he making a day?  **A.** It is ████████████.  **Q.** And how many days a week did he work?  **A.** It is every

day, except when he was sick.").]  She provided no evidence of whether his work was steady or

seasonal, or other information that would allow a jury to extrapolate lost wages from his daily

wage.  [*See, e.g.*, Jane Doe III Dep. 72:3–8, Ex. 60 ("**Q.** Do you have anything in writing, a bank

book, a ledger, a receipt, anything that would prove that █████████████████████████████

████████████████████████████  **A.** No.").]

65.     Jane Doe III produced no documentation to corroborate funeral expenses or her

husband's lost wages.  [*Id.* at 67:3–6 ("**Q.** And there [are] no written documents that show the

funeral expenses; is that right?  **A.** No."); *id.* at 72:3–8 ("**Q.** Do you have anything in writing, a

bank book, a ledger, a receipt, anything that would prove that your husband earned 200 to

300,000 Indonesian rupiah a day by selling fish?  **A.** No.").]

**D.      Jane Doe IV**

66.     Jane Doe IV, her son ██████, and her neighbor ██████ provided testimony

regarding Jane Doe IV's allegations.  [*See generally* Jane Doe IV Dep., Ex. 37; Deposition of

██████, dated Dec. 15, 2020 ("██████ Dep."), Ex. 63; Deposition of ██████ dated Dec. 8, 2020

("██████ Dep."), Ex. 64.]

67.     Jane Doe IV's husband, John Doe X, was shot ████████████████████████████

████████████████████████████████████████████████████████.  [Jane

Doe IV Dep. at 51:12–21, Ex. 37 ("**Q.** [W]as your house in 2000 close to any Exxon facilities?

**A.** Yes, my house in ████████ is close to Exxon facilities.  **Q.** [] Do you have a sense of how

far the distance is from your house to the Exxon facility?  **A.** It is about ████████.");  *id.* at

55:18–23 ("**A.** [M]y husband was out from the house to the rice paddy field and then we heard

gunfire and we got to the ground, and my husband was in the rice paddy field and got shot and

fall there in the rice paddy field.").]  In each complaint, Jane Doe IV alleged that her husband,

John Doe X, was ████████████████████████████████████████████.  [Compl. ¶ 58,

ECF No. 3; Am. Compl. ¶ 77, ECF No. 129-1; 2nd Am. Compl. ¶ 186, ECF No. 465.]  In her

2007 interrogatory responses, Jane Doe IV alleged that ████████████████████████

████████████████████████████████████████████████████████████████████████

████████. [Pl. Jane Doe IV's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. at

2–3, Ex. 65].

      68.     In her 2007 responses to Defendants' first set of interrogatories, Jane Doe IV

claimed that ████████████████████████████████████████████████████████████

███." [Pl. Jane Doe IV's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. at 3,

Ex. 65.]

      69.     In her 2016 responses to Defendants' first set of interrogatories, Jane Doe IV

claimed that she "████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

██████████." [Pl. Jane Doe IV's 2016 Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of

Interrogs. at 8, Ex. 66.] Jane Doe IV's story changed again at her deposition when she admitted

that: █████████████████████████████████████████ [Jane Doe IV Dep. at 51:18–

21, 52:5–8, Ex. 37 ("**Q.** [] Do you have a sense of ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████."]; she did not see soldiers leaving

or returning to Cluster IV on the day her husband was shot [*id.* at 69:7–13 ("**Q.** My question to

you, [Jane Doe IV], is you yourself did not see soldiers come out of the facility, shoot your

husband, and go back to the facility; is that correct?  **A.** At the day of the incident, I didn't see, I

wasn't able to see because I was taking care of my husband.")]; and, she could not see ████

from her house [*id.* at 67:17–21 ("**Q.** From the back of your house you could see the Exxon

facility?  **A.** So I couldn't see the Exxon facility from the back of my house because there were

many houses from there[.]").]

  70. Neither Jane Doe IV nor her non-party witnesses knew the identities of any of the

soldiers present when John Doe X was shot or which of those soldiers actually shot him.  [*Id.* at

93:15–24 ("**Q.** [Jane Doe IV], you also told us that at the time you heard gunfire, you were on

the ground in the back of your house and you saw out of the corner of your eye some soldiers

who may have fired the shots.  Do you recall giving us that testimony?  **A.** Yes, I do.  **Q.** You

told us that you don't know their names, correct?  **A.** Yes, I don't know their names."); *id.* at

93:25–95:4 ("**Q.** And these specific soldiers who may have fired the shots that killed your

husband, you don't know who they are at this time, correct?  . . .  **A.** I don't know their names.

At that time I recognize their face, but not their names. I can recognize their face.  **Q.** Can you

describe what they look like?  **A.** So they were tall and big and with dark skin and they have a

bigger spirit."); ████ Dep. at 50:13–23, Ex. 63 ("**Q.** Your father [John Doe X] was a hundred

meters away from you, correct?  **A.** That is correct.  **Q.** After they pas[sed] you and continued to

walk a hundred meters, all you could see was the back of their heads, correct? [] **A.** That is

correct."); *id.* at 63:15–21 ("**Q.** Do you know the names of any of the soldiers, who were in your

village, on December 4th of 2000?  **A.** No.  **Q.** Do you know the names of any of the soldiers

who shot your father?  **A.** No."); ████ Dep. at 84:23–85:2, Ex. 64 ("**Q.** Did you see [John Doe

X] get shot?  **A.** The shooter—I don't see the shooter, but the result of the shooting, yes, I see

there.  I see the body directly.  Even I—I get involved in carrying the body.").]

71.     Neither Jane Doe IV nor her non-party witnesses knew who supervised,

commanded, directed, or paid the soldiers who killed John Doe X.  [Jane Doe IV Dep. at 74:4–

75:7, Ex. 37 ("**Q.** You don't know who those soldiers' commanders were, correct?  **A.** I don't

know.  **Q.** You don't know who gave those soldiers their orders that day, correct?  **A.** Yes, that is

correct.  **Q.** You don't know what those soldiers' mission was on that day, correct?  **A.** I don't

know what mission means. I'm just a villager. I'm not really—I don't really understand mission

here.  **Q.** You don't know what their orders were on that day, correct?  **A.** Yes, that is correct.

**Q.** And you don't know who was directing their activities that day, correct?  **A.** Yes, that is

correct, I don't know.  What I know is that day was the anniversary of GAM.  Other than that, I

don't know.  **Q.** And you don't know who paid those soldiers on that day, correct?  **A.** That is

correct.  Maybe it's Exxon who paid them.  **Q.** Are you speculating, [Jane Doe IV]?  **A.** Yes.");

████████ Dep. at 62:25–63:14, Ex. 63 ("**Q.** Okay.  Do you know who the commander officer of the

5 to 10 soldiers was on December 4th of 2000?  **A.** No.  **Q.** Do you know who gave the soldiers

. . . the orders that they were carrying out on December 4th of 2000?  **A.** No.  **Q.** Do you know

what orders the soldiers were carrying out on December 4th of 2000?  **A.** No."); ██████ Dep. at

70:5–11, Ex. 64 ("**Q.** Do you know who—who the commander was for any of the six soldiers?

**A.** I—I do not know their commander.  **Q.** Do you know what military person in the Indonesia

Army it was that gave them their orders on December 4th of 2000?  **A.** I do not know.").]  Jane

Doe IV admitted that she was only speculating that the Indonesian soldiers who shot her husband

may have been paid by Defendants.  [Jane Doe IV Dep. at 75:2–7, Ex. 37 ("**Q.** And you don't

know who paid those soldiers on that day, correct?  **A.** That is correct.  Maybe it's Exxon who

paid them.  **Q.** Are you speculating, [Jane Doe IV]?  **A.** Yes."); *see also id.* at 27:7–21 ("**Q.** And

what is your evidence that they were Exxon soldiers?  **A.** So when they have patrol, they go out

from Exxon facility and come back to the Exxon facility too.  **Q.** Is that all of the evidence that you have?  **A.** Yes.  **Q.** Were these soldiers Indonesians or white Americans?  **A.** They were Indonesians, just like us, more Javanese.  **Q.** Were they wearing military uniforms?  **A.** Yes."); *id.* at 69:7–13 ("**Q.** My question to you, [Jane Doe IV], is you yourself did not see soldiers come out of the facility, shoot your husband, and go back to the facility; is that correct?  **A.** At the day of the incident, I didn't see, I wasn't able to see because I was taking care of my husband.").]

72.      Jane Doe IV testified that her ███████████████████████████ ████████████████████████, depending on the type of work.  [*Id.* at 105:12–106:6 ("**A.** ████████████████████████████████████████████████████. **Q.** Okay.  And what kind of work, different work, did he do?  You said what he got depended on the kind of work he did.  Other than construction, what else did he do?  **A.** What I meant by depending on what kinds of work was if ████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████.").]



73.      Both Jane Doe IV and ████████ testified that they did not have any documentation corroborating Jane Doe IV's husband's income or lost business opportunities. [Jane Doe IV Dep. at 106:3–6, Ex. 37 ("**Q.** Do you have any documents, [Jane Doe IV], that show how much money your husband earned on a weekly basis?  **A.** No."); ████████ Dep. at 67:3–5, Ex. 63 ("**Q.** Do you have any papers showing how much money your father earned in 2000?  **A.** No."); *see also* Jane Doe IV Dep. at 107:14–17, Ex. 37 ("**Q.** So at the time [December 2000] he wasn't exploring any business opportunities, correct?  **A.** No.").]

74.      Jane Doe IV admitted that she did not have any witnesses who could provide evidence regarding how much her husband earned.  [Jane Doe IV Dep. at 106:7–10, Ex. 37 ("**Q.**

Do you have any witnesses who can provide testimony as to how much money your husband made while he was alive?  **A.** No.").]

75.     Jane Doe IV did not pay for her husband's funeral.  [Jane Doe IV Dep. at 108:9–11, Ex. 37 ("**Q.** So you didn't actually pay anything for the funeral?  **A.** No.").]  Yet, Jane Doe IV requested ████████████████████████████████████.  [Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures at 8, Ex. 59.]

76.     Jane Doe IV did not produce any documentation corroborating any other damages claims.  [Jane Doe IV Dep. 108:12–15, Ex. 37 ("**Q.** Do you have any documents, [Jane Doe IV], that support your damages claims in this case?  **A.** No."); ████ Dep. at 67:12–14, Ex. 63 ("**Q.** Do you have any papers showing how much the funeral cost?  **A.** No.").]

### E.     Jane Doe V [John Doe I]

77.     Jane Doe V was the only witness who provided testimony regarding the allegations relating to John Doe I, her husband.  [*See generally* Deposition of Jane Doe V, dated Sept. 24, 2020 ("Jane Doe V Dep."), Ex. 67.]

78.     Jane Doe V had no personal knowledge of who abducted her husband, John Doe I.  [*Id.* at 32:11–21 ("**Q.** Did you see your husband get taken?  **A.** No, she didn't see directly, but when he was being returned.  **Q.** And so I know this is hard, but what you learned about what happened to him, he told you?  **A.** Yes.  **Q.** Did anyone else tell you anything about what happened to him?  **A.** No.").]

79.     Jane Doe V did not know who employed the Indonesian soldiers who abducted her husband.  [*Id.* at 37:2–7 ("**Q.** Do you know who those soldiers worked for?  **A.** She doesn't know.  **Q.** Did you husband tell you anything else about the men who took him?  **A.** No.").]

80.     Jane Doe V did not know where her husband was taken when he was abducted, or where he was located at any time while he was gone.  [*Id.* at 62:2–6 ("**Q.** Do you remember

39

when your husband disappeared in 2001?  **A.** Yes, I remember when he was lost, I just didn't

know where he went or where he was taken to.").]  Nor did Jane Doe V know why the

Indonesian soldiers assaulted and abducted her husband.  [*Id.* at 44:9–11 ("**Q.** Do you know why

the military attacked your husband?  **A.** She doesn't know.").]

> 81.     John Doe I never told his wife the identities of the soldiers who abducted him or
>
> whom they worked for.  [*Id.* at 37:2–17 ("**Q.** Do you know who those soldiers worked for?
>
> **A.** She doesn't know.  **Q.** Did your husband tell you anything else about the men who took him?
>
> **A.** No.  **Q.** He told you that he knew they were Exxon because they worked near Exxon's post; is
>
> that correct?  **A.** Yes.  **Q.** Did he ever tell you any of their names?  **A.** No.  **Q.** Did he ever tell
>
> you anything else about them?  **A.** No.").]  Jane Doe V ███████████████████
>
> ██████████████████████████.  [Pl. Jane Doe V's Objs. & Resps. to Defs.' 1st Reqs.
>
> for Admis. at 18, Ex. 68 (███████████████████████████████
>
> █████████████████████████████████████████
>
> ██████████████████.").]  She testified that John Doe I told her the soldiers were
>
> "Exxon soldiers" because he had previously seen some of them on a road near Arun Field, along
>
> with many other soldiers whom he saw on that road and in the area.  [Jane Doe V Dep. at 36:2–
>
> 8, Ex. 67 ("**Q.** Did your husband say how he knew that [those] people were Exxon?  **A.** He just
>
> know because he usually came across that street.  **Q.** How did he just know?  **A.** I don't know.
>
> He said he just knew, that's what he told me."); *id.* at 36:22–25 ("**Q.** During the years when your
>
> husband worked on that road, there were lots of soldiers on that road, right?  **A.** Yes.").]

> 82.     The only testimony Jane Doe V provided about her husband's income is that he
>
> earned between ████████████████████ prior to his abduction.  [*Id.* at 51:25–52:3
>
> ("**Q.** ████████████████████████  **A.** Yes.").]

83.      Jane Doe V did not produce any documentation reflecting her husband's lost

wages or any other damages she may be seeking, nor did she know the amount of hospital

expenses associated with her husband's care, because he did not tell her.  [*Id.* at 52:4–7 ("**Q.** Do

you have any papers or anything that shows how much money your husband made?  **A.** No."); *id.*

at 52:22–53:7 ("**Q.** Do you know how much money you paid or he paid to the hospital for those

visits?  **A.** She doesn't know, because she didn't ask when he returned home from the hospital.

**Q.** And you don't have any bills or anything from the hospital, correct?  **A.** No, he didn't give it

to her.  Maybe he kept with himself.").]

**F.       Jane Doe VI [John Doe III]**

84.      Jane Doe VI and her daughter, ███████████ provided testimony regarding the

allegations relating to John Doe III, Jane Doe VI's son.  [*See generally* Deposition of Jane Doe

VI, dated Sept. 27, 2020 ("Jane Doe VI Dep."), Ex. 69; Deposition of ███████ dated Nov. 17,

2020 ("████████ Dep."), Ex. 70.]

85.      Jane Doe VI and ████████ testified that John Doe III was beaten and shot by

Indonesian soldiers ██████████████████████████████ after soldiers came out of

the facility.  [████████ Dep. at 99:11–14, Ex. 70 ("**Q.** So your testimony is that your brother

was walking, and soldiers ████████████████ and shot him; is that right?  **A.** That is correct.");

Jane Doe VI Dep. at 123:5–8, Ex. 69 ("**Q.** Did the Exxon soldiers from ████████ who came

██████████████ shoot [John Doe III]?  **A.** Yes."); *id.* at 71:6–8 ("**Q.** You said that the soldiers beat

your son?  **A.** Yes.").]

86.      In July 2007, Jane Doe VI submitted sworn testimony in which ████████

████████████████████████████████████████████████████████████████

████████████████████████████ .  [Pl. Jane Doe VI's Suppl. Resp. to ExxonMobil Oil

Corp.'s 1st Set of Interrogs. (July 28, 2007) at 2–3, Ex. 71 ("███████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

███████████████.")  Nine years later, in Jane Doe VI's 2016 supplemental interrogatory

responses, Jane Doe IV changed her story and claimed that ██████████████████

████████████████████████ [Pl. Jane Doe VI's 2016 Suppl. Resp. to

ExxonMobil Oil Corp.'s 1st Set of Interrogs. (Jan. 24, 2016) at 8, Ex. 72 ("████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████.").]  In 2020, Jane Doe IV testified that

she was a firsthand witness to the alleged incident and that she directly witnessed her son being

assaulted and shot.  [Jane Doe VI Dep. at 71:6−11, Ex. 69 ("**Q.** You said that the soldiers beat

your son?  **A.** Yes.  **Q.** Did you see that?  **A.** Yes. Yes, I see it directly.  I was walking behind

him."); *id.* at 76:5−7 ("**Q.** Did you see a soldier shoot your son?  **A.** Yes.").]  Later in the

deposition, she testified that she did not witness the shooting or assault, only to reverse herself

once again and testify that she had seen the shooting and assault.  [*Id.* at 100:4−15 ("**Q.** Is it true

that on the day your son was shot, you heard gunshots but did not see your son get shot or

beaten; is that true?  **A.** Yes, that is true.  **Q.** That you only heard the gunshots but you did not

see your son [John Doe III] get shot or beaten?  **A.** Yes, that is true.  **Q.** So you did not see your

son get shot?  **A.** No. I was behind."); *id.* at 100:16−20 ("**Q.** Did you see [John Doe III] get shot?

**A.** Yes, I did.  **Q.** Did you see your son get beaten?  **A.** Yes, I did.").]

87.     In sworn interrogatory responses and during her deposition, Jane Doe VI testified

that her son, John Doe III, was ███████████████████████████████████████████

███████████. [Jane Doe VI Dep. at 88:6−20, Ex. 69 ("**Q.** Was your son eventually

released from the hospital and taken into custody by the police? **A.** Yes. **Q.** And the police held

him in jail for about a month? **A.** Yes. **Q.** And that's the Indonesian police who held him in jail

for a month? . . . **A.** Yes, he was taken by them, and it was about a month being interviewed in

the jail."); Pl. Jane Doe VI's Suppl. Resp. to ExxonMobil Oil Corporation's 1st Set of Interrogs.

at 3, Ex. 71 ("████████████████████████████████████████████████████████████

████████████████████████████████████████████.").]

88.     Neither Jane Doe VI nor ████████ knew the identities of the soldiers involved in

the assault of John Doe III. [Jane Doe VI Dep. at 75:11−14, Ex. 69 ("**Q.** Did you ever find out

the names of the soldiers who you saw beating your son? **A.** No."); ████████ Dep. at 96:6−8,

Ex. 70 ("**Q.** You don't know the name of the soldiers who shot your brother, correct? **A.** I do not

know.").]

89.     Jane Doe VI could not describe the soldiers except to say that they were

Indonesian soldiers wearing the same uniforms as other soldiers. [Jane Doe VI Dep. at 74:14−

18, Ex. 69 ("**Q.** Did you see the faces of the soldiers who beat your son? **A.** Yes, I saw their

faces, but I cannot describe them any more [sic]. It has been 20 years ago."); *id.* at 79:13−80:24

("**Q.** Those soldiers are all soldiers with the Indonesian military, right? **A.** Yes. **Q.** And you are

calling them Exxon soldiers simply because they are near facilities run by Exxon, right? . . . **A.**

Yes, it was the soldiers who were in Exxon's facility. **Q.** And those soldiers wore the same

uniforms as all the other soldiers who were on the road that you were traveling on, right? . . . **A.**

Yes, it was the soldiers who were in the Exxon's facility and then came out when they were

43

struggling.  **Q.** And they wore the same uniforms as the other soldiers that you saw on the road,

right? . . . **A.** Yes, they were the same uniforms, and they had guns, each of them had guns.").]

90.     Jane Doe VI did not know anyone who has ever worked for Exxon, and did not

know whether anyone at Exxon knew about her son's assault.  [*Id.* at 82:21–83:6 ("**Q.** Do you

know anyone who works for Exxon?  **A.** No.  **Q.** Do you know anyone who has ever worked for

Exxon?  **A.** No, I don't.  **Q.** Do you know whether anyone from Exxon knew about what was

happening to your son?  **A.** No.").]

91.     ██████████ also did not know anyone affiliated with Exxon or Mobil and referred

to Indonesian soldiers as "Exxon soldiers" solely because she saw them in an area "surrounding"

the Arun Field facilities.  [██████ Dep. at 82:22–84:3, Ex. 70 ("**Q.** ██████████ before the

break, I asked you what your evidence was that those were Exxon soldiers, and before answering

my question, you asked for a break.  Now that you've had your break, can you answer my

question?  **A.** I saw with my two eyes.  That is the evidence.  **Q.** What evidence do you have that

they were Exxon soldiers?  **A.** The evidence when they come out from the care of Exxon and

they shot my brother.  **Q.** Do you know that there were 40,000, more than 40,000 Indonesian

soldiers in Aceh during this time?  [] **A.** What I know, in this—in this surrounding Exxon area

were Exxon soldiers.  **Q.** Do you know, when you say Exxon area, what do you mean?  Can you

answer the question?  **A.** Exxon soldiers were in the surrounding of Exxon area.  **Q.** My question

to you is, what do you mean by Exxon area?  Can you answer the question?  **A.** My answer is the

soldiers in the area of Exxon were Exxon soldiers."); *id.* at 88:5–89:7 ("**Q.** You have never met

anyone from Exxon, have you? . . . **A.** I never met.  **Q.** You have never met anyone from Mobil

either, correct?  [] **A.** Never.  **Q.** And you have never met anyone from Pertamina, correct?

44

[] **A.** No.  **Q.** And you have never met anyone from [PT Arun], correct?  []  **A.** No.  **Q.** And you have no idea who owns the areas that you believe are Exxon area, correct?  []  **A.** No.").]

92.     Neither Jane Doe VI nor ███████ could identify who commanded or paid the soldiers who assaulted John Doe III or what their orders were on the day of the incident.  [Jane Doe VI Dep. At 81:13–16, Ex. 69 ("**Q.** Do you know who was in command of the soldiers who beat and shot your son?  **A.** No, I don't know.  The commander didn't take any responsibility.");

███████ Dep. at 96:12–97:3, Ex. 70 ("**Q.** And you don't know who [the soldiers'] commanders were that day, correct?  **A.** No.  **Q.** And you don't know who was paying them on that day, correct?  **A.** No.  **Q.** And you don't know what their mission was that day, correct?  **A.** I do not know.  What I know is the soldiers live inside Exxon, in Cluster 2.  **Q.** But you don't know which specific soldiers live in Exxon, correct? []  **A.** I do not know.").]

93.     Jane Doe VI testified that her son ███████████████████████████████ prior to his injuries but provided no documentation and did not testify about when and how often he worked.  She did not know how much he earned in the year prior to his assault.  [Jane Doe VI Dep. at 113:14−114:15, Ex. 69 ("**Q.** In the year prior to [John Doe III]'s getting shot, what sources of income did he have?  **A.** ███████████████████████████████ **Q.** Here is the next question:  Focusing on [John Doe III], how much money did he earn in the year prior to when he was shot?  **A.** ███████████████████████████████ ████████████████████████████").]

94.     Jane Doe VI claimed to have, but never produced, documentation reflecting 2.5 million rupiah in expenses for traditional medicine.  [*Id.* at 112:20−113:7 ("**Q.** Do you have any documentation showing how much the traditional healers were paid?  **A.** Yes, I have the document.  It was about two and a half million rupiah.  **Q.** Do you have any documents showing

how much you paid the hospital where [John Doe III] was treated?  **A.** Maybe I had the

documents, but I don't remember where I put it.  I just remember the one from the traditional

medication, traditional medicine.").]  The only documentation Jane Doe VI produced that may be

related to medical care—or any loss, for that matter—was a ████████████████

████████████████████████████████████████.  [DOE005013,

Ex. 73.]

      95.     █████████████████████████████ one or two years after the

events described in Jane Doe VI's allegations.  [██████ Dep. at 48:18−20, Ex. 70 ("**Q.** [Y]our

brother, [John Doe III] did not die in 2000, correct?  **A.** Yes."); Jane Doe VI Dep. at 97:12−98:6,

Ex. 69 ("**Q.** Did he die from drowning?  **A.** Yes.  **Q.** And did he drown while he was attempting

to take refuge from the Indonesian military?  **A.** Yes.  **Q.** What year did your son die?  **A.** Which

son do you mean?  **Q.** [John Doe III].  **A.** He died in 2001.  **Q.** Do you remember what month in

2001?  **A.** I don't remember.  **Q.** Are you sure it wasn't November of 2002?  **A.** 2002?  I don't

remember.  **Q.** Did you ever bring a claim against anyone for causing [John Doe III]'s death?  **A.**

No.").]  Despite John Doe III's death being unrelated to Jane Doe VI's allegations in this lawsuit,

she claimed ████████████████████████████.  [Pls.' Dec. 2019 Rule 26

Suppl. Damages Disclosures at 12, Ex. 59.]  Jane Doe VI later testified that she is *not* seeking to

recover funeral expenses and in any event does not have any documentation reflecting John Doe

III's funeral expenses.  [Jane Doe VI Dep. at 108:12−15, Ex. 69 ("**Q.** [A]re you asking to recover

5 million rupiahs for funeral expenses?  **A.** No."); *id.* at 109:25−110:5 ("**Q.** Did you ever have

documents showing the cost of the funeral?  **A.** There is no document about it.  It is just an

estimate how much it was cost.").]

G.    **Jane Doe VII [John Doe V]**

96.    Jane Doe VII and her son, ▮▮▮▮▮, provided testimony regarding John Doe V's allegations. [*See generally* Deposition of Jane Doe VII, dated Oct. 7, 2020 ("Jane Doe VII Dep."), Ex. 74; Deposition of ▮▮▮▮▮ dated Oct. 13, 2020 ("▮▮▮▮▮ Dep."), Ex. 75.]

97.    Jane Doe VII was the second wife of John Doe V.  [Jane Doe VII Dep. at 71:3–8, Ex. 74 ("**Q.** How many wives did your husband have?  **A.** Four, sir.  **Q.** How many of those wives did he marry before you?  **A.** One.").]

98.    Jane Doe VII did not inform all of John Doe V's other wives and children about the litigation.  [*Id.* at 74:7–24 ("**Q.** Did you notify all of [John Doe V]'s other wives and all of his children that you took his place as plaintiff in this case?  **A.** Yes, I did.  I told ▮▮▮▮▮ ▮▮▮▮▮.  **Q.** [] Did you tell both of the other wives as well?  **A.** I did not, because I'm afraid the other two will tell to everyone else.  **Q.** Did you tell all of the children that [John Doe V] had that you have taken his place as the plaintiff in this case?  **A.** Only to ▮▮▮▮▮ children, not the other two.").]

99.    John Doe V and his wife and successor Jane Doe VII claimed that different and inconsistent incidents occurred in 1999.  John Doe V claimed that his ▮▮▮▮▮ ▮▮▮▮▮.  [Pl. John Doe V's Suppl. Resp. to ExxonMobil Oil Corporation's 1st Set of Interrogs. (July 28, 2007) 2–3, Ex. 76 ("▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮.").]  Jane Doe VII claimed, in interrogatory responses served hours before her deposition and in her deposition testimony,



███████████████████████████████████████████████████████████

████████. [Jane Doe VII Dep. at 76:21–25, Ex. 74 ("**Q.** In 1999 did you see [John Doe V] get

taken away by soldiers?  **A.** Yes, I did."); *id.* at 80:9–12 ("**Q.** Did the soldiers burn down your

house the same day that they took [John Doe V] and held him at ████████  **A.** Yes, sir."); Pl.

Jane Doe VII's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. (Oct. 5, 2020) 7–9,

Ex. 77.]  The operative complaint alleged within the Relevant Period only that John Doe V's

house was burned down and his son was beaten in or about December 2000.  [2nd Am. Compl. ¶

180, ECF No. 465 ("In or about December 2000, ExxonMobil's security personnel came to

[John Doe V's] house and burned it down.  At that time, the security personnel also physically

beat his son and broke his son's leg.").]

      100.    In his 2007 interrogatory responses, John Doe V alleged that in ███████████

████████████████████████████████████████████████████████."  [Pl.

John Doe V's Suppl. Resp. to ExxonMobil Oil Corporation's 1st Set of Interrogs. (July 28, 2007)

at 3, Ex. 76.]

      101.    Neither Jane Doe VII nor ████████ knew the identities of any of the soldiers

involved in the incidents that they allege.  [Jane Doe VII Dep. at 85:17–22, Ex. 74 ("**Q.** Do you

know the names of any of the soldiers who assaulted [John Doe V], assaulted your son, detained

[John Doe V], burned down your house, do you know any of their names?  **A.** I don't know the

names.  I don't know the persons, sir."); *id.* at 80:13–17 ("**Q.** Do you know which soldiers

burned down your house?  **A.** I don't know which soldiers, but it was the soldiers who took my

husband, Exxon soldiers."); ████████ Dep. 42:9–43:6, Ex. 75 ("**Q.** And you don't know the

names of the soldiers that took your father in 1999, do you?  **A.** Yes, that is true. . . . **Q.** Your

mother also testified that she does not know the names of the soldier that held your husband—

held her husband and your father for months.  Do you know the names of the soldiers who held

him?  **A.** No, I don't know their names.").]

102.    Jane Doe VII did not know who commanded the soldiers who allegedly burned

down her husband's house or who gave them orders to do so.  [Jane Doe VII Dep. at 85:14–16,

Ex. 74 ("**Q.** Do you know who their commanders were for any of the soldiers?  **A.** I do not sir.");

*id.* at 85:23–86:5 ("**Q.**  Do you know what orders these soldiers were following when they

assaulted your son, assaulted your husband, detained your husband and burned down your

house? [] **A.** I don't know about that, sir.").]

103.    Jane Doe VII did not know whether the Indonesian soldiers who were involved in

the alleged incidents worked for Defendants or had any other connection to Defendants.  [*Id.* at

32:20–24 ("**Q.** Do you refer to them as Exxon soldiers because the soldiers were working near

Exxon Mobil facilities?  **A.** I don't know whether the soldiers were working for Exxon or

not. . . .").]  She testified that her husband called them "Exxon soldiers" because he said they

were "stationed near the Exxon facilities."  [*Id.* at 80:18–81:3 ("**Q.** Why do you call them Exxon

soldiers?  **A.** It was my husband who told me they were Exxon soldiers.  There are so many

Exxon soldiers—there are so many soldiers in there.  **Q.** And he called them Exxon soldiers

because the soldiers were stationed near the Exxon facilities?  **A.** Yes.").]

104.    Jane Doe VII testified that John Doe V ███████████████████

███████████████████████████████████████

by Indonesian soldiers in 1999.  [*Id.* at 57:5–15 ("**Q.** ███████████████

████████████████████████████████████

████████████████████████████████ **A.**

It was before he was taken by Exxon soldiers.  **Q.** Do you know how long before?  **A.** I don't

remember about it, sir.").] ███████████████████████████████████████

██████████████████. [*Id.* at 59:22–60:5 ("███████████████████████████

██ ████████████████████████████████████████████████████

██████████████████████████").]

105.    Jane Doe VII had no documentation reflecting how much John Doe V earned at any point in time.  [*Id.* at 60:6–20 ("**Q.** Do you have any documents showing how much your husband earned at any point in time from any employer?  **A.** I don't have it anymore, sir.  He passed away a long time ago.  I don't have any documents.  **Q.** Did you ever have any documents showing how much money your husband earned from any source of employment?  **A.** Yes, I did, but I'm not aware of that document.  **Q.** When was the last time you had documents showing any income that your husband earned from any employment?  **A.** I don't remember about it, sir.").]

106.    Jane Doe VII had no documentation reflecting expenses for medical care or the cost to repair their home.  [*Id.* at 102:25–103:18 ("**Q.** Do you have any documents showing the medical expenses that you or your husband incurred because of his detention by the soldiers?  **A.** No, I do not.  **Q.** Do you have any documents showing what it cost to repair your home after the soldiers burned it in 1999?  **A.** I do not have any documents showing medical expense or funeral. I don't have anything.  **Q.** [] Do you have any documents showing what it cost to repair your home after the soldiers burned it in 1999 or 2000?  **A.** No, I do not have documents.").]

107.    John Doe V passed away in 2007.  [*Id.* at 40:19–21 ("**Q.** When did your husband pass away?  **A.** He passed away in 2007.").]  Jane Doe VII stated that she incurred approximately 10 million rupiah in funeral expenses but had no documentation relating to those expenses.  [*Id.* at 98:18–99:8 ("**Q.** Did your husband's funeral cost 500 rupiah?  **A.** For the funeral, I spend a lot of money, because the funeral was seven days.  From day one to day seven it cost millions of

rupiah.  **Q.** Did it cost 5 million rupiah?  **A.** It is more than 5 million, because I spent to buy rice. From day one to day seven, maybe it was about 10 million rupiah.  **Q.** Do you have any documents showing how much money you spent on the funeral?  **A.** I don't have it anymore.").] She testified that she is not seeking compensation for funeral expenses.  [*Id.* at 98:14–17 ("**Q.** In this lawsuit you are asking to receive 5 million for funeral expenses; is that right?  **A.** I don't ask that money, sir.").]

108.    In fact, Jane Doe VII testified that she is not seeking any money damages in this lawsuit.  [*Id.* at 102:20–22 ("**Q.** So are you not looking for money through this lawsuit?  **A.** I'm not asking for money.").]

**H.    Jane Doe VIII [John Doe VI]**

109.    In his 2007 interrogatory responses, John Doe VI claimed that ██████████ ████████████████████████████████████████████████████████████ ██████.  [Pl. John Doe VI's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. (July 28, 2007) at 2–3, Ex. 78.]   There is no mention in the interrogatory responses of being taken to an Indonesian military camp.  [*Id.*]

110.    In her 2016 interrogatory responses, Jane Doe VIII stated that ██████████ ███████████████████████████████████████████████████████████ ██████.  [Resp. of Pl. Jane Doe VIII (as Substitute for John Doe VI) to ExxonMobil Oil Corp.'s 1st Set of Interrogs. (Jan. 23, 2016) at 8, Ex. 79.]   She made no mention of a months-long detention at police headquarters between John Doe VI's hospital stay and his return home.  [*Id.*]

111.    Jane Doe VIII was not made available for a deposition.  Two days before her noticed and agreed-upon deposition date, Plaintiffs notified Defendants that Jane Doe VIII was "too frail" to sit for the deposition.  [Letter from K. Pierson to A. Oh (Sept. 15, 2020), Ex. 80; Letter from J. Morton to K. Pierson (Sept. 17, 2020) Ex. 81; Am. Notice of Dep. to Pls.

(Sept. 18, 2020) Ex. 82; Letter from A. Fryszman to A. Oh (Sept. 29, 2020), Ex. 83.]  Jane Doe

VIII's daughter, ████████ appeared in her place.  [Letter from A. Fryszman to J. Morton

(Oct. 1, 2020), Ex. 84.]  ████████ and another non-party witness, ████████, provided

testimony regarding John Doe VI's allegations.  [*See generally* Deposition of ████████ dated

Feb. 11, 2021 ("████████ Dep."), Ex. 85; ████████ Dep., Ex. 62.]

112.  ████████ did not witness John Doe VI's assault or know the identities of any of

the Indonesian soldiers involved.  (████████ Dep. at 13:2–21, Ex. 85 ["**Q.** At the time of the

incident, where were you?  **A.** I was at home.  **Q.** How did you learn that your father had been

shot?  **A.** Because I heard a gunshot and then people were running, they were running toward my

direction to let me know that it was my father who was shot.  **Q.** Do you remember who these

people were that told you that?  **A.** So it was villagers, there were many of them.  **Q.** And what

did these villagers say to you?  **A.** They said that father – that my father had been shot and he

was already taken into a truck.").]

113.  ████████ claimed to have witnessed the incident.  [████████ Dep. at

9:24–10:6, Ex. 62 ("**Q.** [D]id you see the soldiers shoot [John Doe VI]?  **A.** Yes, I saw it.  **Q.**

And did you see the soldiers push him down?  **A.** Yes, I saw it, because I was very close.").]

████████ was not identified by John Doe VI in his 2007 interrogatory responses as having

relevant knowledge of the events underlying John Doe VI's claims.  [*See* Pl. John Doe VI's

Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. at 4–5, Ex. 78.]  According to

████████, soldiers brought John Doe VI, "████████," to ████████ house in

████████.  [████████ Dep at 6:13–20, Ex. 62. ("**Q.** And, sir, where do you

live?  **A.** I live in ████████.  **Q.** And have you lived there your whole

life?  **A.** So I come from there, and I live there. I have lived there for the whole life and that is

close to Exxon."); *id.* at 7:5–7 ("**Q.** Did you know a man named [John Doe VI]? **A.** He is my

███████████ .")]. ███████████ testified that the soldiers shot John Doe VI in front of his

(███████████) house. [*Id.* at 8:18–9:10 ("**Q.** And who was it that brought [John Doe VI] to

your house? **A.** The one who brought him were—so the ones who brought him were soldiers. . .

. **Q.** And what did you see? **A.** Okay.  So after my mother got upstairs to the house, he was

pushed on the back, and then he fell onto the ground, into the mud. And that's the time when he

was shot on his calf.").]

114.    ███████ testified that she was told by ███████████ that John Doe VI had been

assaulted and detained by "Exxon soldiers." [███████ Dep. at 71:11–72:11, Ex. 85 ("**Q.** Did

you see who shot your father? **A.** I did not.  I did not see it with my own eyes. . . . **Q.** You

testified earlier that it was Exxon soldiers who shot your father.  Do you remember that

testimony? **A.** I do.  **Q.** The reason you said it was Exxon soldiers is because ███████ told you it

was Exxon soldiers, right? **A.** Yes.").]  However, ███████████ testified that he did not know if

any of the soldiers involved in the incident worked for Exxon.  [███████████ Dep. at 18:5–9,

Ex. 62 ("**Q.** Who do those soldiers work for?  Do they work for Exxon? **A.** So that was not

clear.").]

115.    ███████████ claimed to have recognized some of the approximately twenty

soldiers who were present during the assault of John Doe VI.  [*Id.* at 112:24–113:3 ("**Q.** You said

there were about 20 soldiers that came to your house with [John Doe VI]; is that right? **A.** Yes,

that's correct.").]  He claimed to have recognized them from ███████████████████

███████████████████ .  He provided inconsistent testimony about how many of the

soldiers he recognized.  [*Id.* at 113:4–14 ("**Q.** And how many of them did you recognize? **A.** So

the total number that I was able to recognize was ten.  Four of them were pointing guns right



behind [John Doe VI], and six other[s] were following them.  **Q.** And did you recognize those

ten from ▮▮▮▮▮▮▮▮?  **A.** Yes, we—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮.”); *id.* at 10:21–25 (“**Q.** How many soldiers were there, under the house,

with you?  **A.** The one that I recognize were about 20, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.”); *id.* at 91:6–8 (“**A.** Among 20 of the soldiers, I knew only four of

them, because ▮▮▮▮▮▮▮▮▮▮▮▮.”).]  ▮▮▮▮▮▮▮ did not name, describe, or

otherwise identify any of the Indonesian soldiers he claimed to have recognized who were

present during the assault.  Nor did he identify which of the approximately twenty soldiers in the

village allegedly assaulted and shot John Doe VI.  [*Id.* at 9:17–19 (“**Q.** Who shot [John Doe

VI]?  **A.** It was the soldiers.”).]

116.    ▮▮▮▮▮▮ testified that John Doe VI ran the family’s kiosk and performed odd

jobs but did not indicate how much he earned, or when and how often he worked.  [▮▮▮▮▮▮

Dep. at 27:17–28:11, Ex. 85 (“**Q.** Did you have a chance to observe whether your father had a

daily routine prior to being shot and abducted?  **A.** So mainly he attended the kiosk, but he would

do everything else that he got assigned by other people or he got asked by other people.  **Q.** What

types of things did he do that he was assigned or asked by other people to do?  **A.** So such works

would include, for example, making or constructing fences for other people and also to clean the

field, the paddy field for other people, and also he would do—he got us to do construction work

as well.  **Q.** Do you know whether your father was paid for the work that he did?  **A.** Yes, he was

paid.”).]

117.    ▮▮▮▮▮▮ testified that at one point the kiosk that her father operated ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but she did not indicate what the expenses were.

[*Id.* at 84:5–10 (“**Q.** In the year 1999, do you have any records that show how much revenue was

generated by the kiosk in the year 1999?  **A.** ███████████████████████████

██████████████████████████████.").]

118.    ██████ had no records reflecting her father's wages or the kiosk revenues.  [*Id.* at 85:7–14 ("**Q.** Do you have records that show the revenue generated by the kiosk for any point in time at all?  **A.** No.  **Q.** Do you have any records showing how much money your father earned from any of the work that he did?  **A.** No.").]

119.    After her father's assault, ██████ and her mother ran the kiosk.  [*Id.* at 41:16–41:19 ("**Q.** After the incident, were you and your mother able to go to the kiosk and work together?  **A.** Yes.").]  However, ██████ testified that they did not open the kiosk on a "routine" basis, and did not provide any evidence of how frequently they operated the kiosk. [*Id.* at 83:4–12 ("**Q.** How many days a week was the kiosk open before December of 2000?  **A.** Before the year of 2000, I opened the kiosk every day.  **Q.** Okay.  And after the year 2000, how many days a week did you open the kiosk?  **A.** After the incident, I open and close the kiosk not that routine anymore.").]

**I.    John Doe II**

120.    John Doe II's ████████████████.  [Pl. John Doe II's Suppl. Resp. to ExxonMobil Oil Corporation's 1st Set of Interrogs. at 2–3, Ex. 86 ("███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████.")); Deposition of John Doe II, dated Nov. 10, 2020 ("John Doe II Dep.") 107:1–4, Ex. 87 ("**Q.** Do you have any reason to disagree with the statement that you were arrested on August 11th of 1999?  Is that an accurate statement?  **A.** I was arrested on August 11, 1999[.]").]

121.     John Doe II and non-party witness ███████ provided testimony regarding John

Doe II's allegations.  [*See generally* John Doe II Dep., Ex. 87; Deposition of ████████ dated

Nov. 19, 2020 ("████████ Dep."), Ex. 88.]

122.     John Doe II initially testified that he believed some of the Indonesian soldiers

who assaulted him had been stationed at Arun Field.  [John Doe II Dep. at 89:15–20, Ex. 87

("**Q.** Did you recognize any of the soldiers, at all, who approached the food stalls that morning?

**A.** I did not recognize them, but we—I see them every day there in ███████  They come out

from ████, and I can—we can see them there in █████████████.."); *id.* at 90:15–24

("**Q.** How do you know that the Indonesian soldiers, who beat you in August of 1999, were the

same Indonesian soldiers that you had seen near ██████? **A.** Because I used to go to that road

in the morning … and I can see two soldiers at their post . . . . And so all of the soldiers were

there.  We can see all of the soldiers in that post on Exxon's road.").]  But later he admitted that

he did not recognize any of the Indonesian soldiers involved in in the incident.  [John Doe II

Dep. at 91:16–20, Ex. 87 ("**Q.** Did you recognize the faces of the soldiers who beat you in

August of 1999?  **A.** I couldn't recognize their faces because I was [] beaten and I was afraid.  I

couldn't even see their faces at the time when I got beaten."); *id.* at 92:23–25 ("**Q.** And you don't

know the names of any of the soldiers who beat you in August of 1999, do you?  **A.** No.").]

123.     Neither John Doe II nor his non-party witness, ██████ knew who

commanded or gave orders to the Indonesian soldiers who allegedly assaulted and detained John

Doe II.  [John Doe II Dep. at 91:21–92:7, Ex. 87 ("**Q.** Who was in—who was the commanding

officer of the soldiers who beat you in August of 1999?  **A.** I do not know their commanding

officer. . . . How could we know the commanding officer?"); *id.* at 92:16–22 ("**Q.** Do you know

who gave the soldiers the orders that they were carrying out when they beat you in August of

1999?  **A.** I do not know.”); *id.* at 174:19–175:6 (“**Q.** Do you know who gave the orders to the

Indonesian soldiers who were detaining you for 51 days?  **A.** I don’t know who gave the orders,

but what I know is that they were Exxon soldiers because they were in the posts inside of Exxon

fence and outside of the Exxon’s fence they were also post.”); ███████ Dep. at 24:12–25,

Ex. 88 (“**Q.** Turning back to the 8 to 10 Indonesian soldiers who beat [John Doe II].  Do you

know who their commander was on the day they beat [John Doe II]?  **A.** I do not, sir.  **Q.** You

don’t know who their commanding officer was, do you?  **A.** No, sir.  **Q.** Do you know who gave

the soldiers their orders that day?  **A.** No, sir.  **Q.** Do you know what orders the soldiers had that

day?  **A.** No, sir.”).]

124.    ███████ did not witness John Doe II being detained because she fled when the

incident began and was hiding in her house when he was taken.  [███████ Dep. at 22:9–25,

Ex. 88 (“**Q.** You ran away right after the soldiers started hitting [John Doe II], didn’t you.  **A.**

Yes, sir.  **Q.** And how far did you run once the soldiers started hitting [John Doe II]?  **A.** 30

meters, sir, from [] my stall to my house.  **Q.** Did you go inside your house and close the door?

**A.** No.  **Q.** You didn’t go inside your house?  **A.** I did.  **Q.** What did you do after you went inside

your house?  **A.** I was sitting there.  I was terrified.”).]

125.    John Doe II testified that his kiosk was burned down by Indonesian soldiers.

[John Doe II Dep. at 126:22–127:13, Ex. 87 (“**Q.** After you were released, did soldiers ever burn

down your house?  **A.** It was my kiosk who—which they burn. . . . **Q.** What does that mean?

What—what—what kiosk did you have?  **A.** It’s a room for me to get dressed when I was young.

**Q.** Is it a free-standing structure outside of your house?  **A.** Yes.”).]  But he did not witness the

kiosk being burned and only was later told that unidentified soldiers in Indonesian military

uniforms were responsible.  [John Doe II Dep. at 127:14–128:13, Ex. 87 (“**Q.** How many

soldiers burned down your kiosk?  **A.** I didn't see.  I was not there.  **Q.** How do you know that

soldiers burned down your kiosk?  **A.** It was—I—I knew it was the soldiers when I get home

from the mosque.  And then all people said that your—your kiosk has been burned.  Your kiosk

has been burned.  And I asked—and I asked them, Who did it?  And they said, It's soldiers.

They get here with one car and then they laughed and all people cannot see the incident because

they were afraid.  **Q.** Do you know the names of the soldiers who burned down your kiosk?  **A.** I

do not know their names because I was go to the mosque for prayer.  It was the villagers who

told me.  **Q.** Did the villagers tell you the names of the soldiers who burned down your kiosk?

**A.** They do not know.  What they know is they wear military uniform.  **Q.** Indonesian military

uniform?  **A.** Yes, Indonesian military, but I don't know the people.").]



126.    John Doe II's kiosk and house were located ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.  [John Doe II Dep. at 67:12–14, Ex. 87 ("**Q.** ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").]

127.    John Doe II sought ▮▮▮▮▮▮▮ as damages.  [Pls.' Oct. 2016 Rule 26

Suppl. Damages Disclosures at 14, Ex. 89 ("▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").]  But John Doe II

did not pay his own medical expenses.  [John Doe II Dep. at 146:16–18, Ex. 87 ("**A.** It's my

sister who paid the medical bills.  It's more than 200,000 rupia [sic].").]

128.    John Doe II claimed that, prior to his injuries, he ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮, but did not say and provided no

documentation reflecting how frequently he worked on construction projects or how many

construction projects he worked on in any given period of time.  [*Id.* at 57:21–58:1 ("**Q.** What

did you do for a living before the incident?  **A.** So [] before the incident, ▮▮▮▮▮▮▮▮▮



.");

*id.* at 60:22–61:1 ("**A.** ███████████████████████████████████

██████████████████████████████████████████████████████████████

███████████ ).]  He had no documentation reflecting his earnings or any other losses he may be

alleging.  [*Id.* at 148:25–149:3 ("**Q.** Do you have any documents showing how much you earned

from work in 1999 and the years prior to 1999?  **A.** No.").]

**J.**      **John Doe IV**

129.    John Doe IV's injury occurred ███████.  [Pl. John Doe IV's Suppl. Resp. to

ExxonMobil Oil Corporation's 1st Set of Interrogs. at 3, Ex. 90 ("████████████████████

█████████████████.");  Deposition of John Doe IV, dated Dec. 11, 2020 ("John Doe IV

Dep.") 128:13–15, Ex. 91 ("**Q.** So the Exxon soldiers took you on July 29, 1999, correct?  **A.**

Correct.").]

130.    John Doe IV and non-party witness ████████ provided testimony regarding John

Doe IV's allegations. [*See generally* John Doe IV Dep., Ex. 91; ██████ Dep., Ex. 39.]

131.    John Doe IV did not see the faces of the Indonesian soldiers who detained and

assaulted him.  [John Doe IV Dep. at 73:4–9, Ex. 91 ("**Q.** All right.  So do you know the names

of any of the Indonesian soldiers who stopped you and Rusli, who put bags over your heads, who

took your wallet and your pants, do you know any of their names?  **A.** I do not."); *id.* at 75:7–13

("**Q.** Because it was dark and they put a bag over your head, you didn't get a good look at any of

the faces on these soldiers, did you?  **A.** No, how could we see them?  Our head is already put in

the bag.").]

132.    John Doe IV did not know who commanded, paid, or gave orders to the

Indonesian soldiers who assaulted and detained him.  [*Id.* at 36:24–37:11 ("**Q.** You testified that

the Indonesian soldiers were paid by Exxon to guard Exxon.  Do you have any proof that Exxon

paid the soldiers at all?  **A.** I do not have evidence, I do not have proof, but what I know is those

soldiers come in, and live, come out or go out from that Exxon area, they live there, their

vehicles were there within the fence of Exxon, so that means that those soldiers were the ones

who guard Exxon.  Other than that, I do not know."); *id.* 75:14–76:5 ("**Q.** Do you know who the

commanding officer of these soldiers was at the time they stopped you?  **A.** No.  **Q.** Do you

know what branch of the Indonesian military these soldiers were part of?  **A.** No, I do not know.

**Q.** Do you know who gave these Indonesian soldiers their orders?  **A.** No.  **Q.** Do you know

what orders these soldiers were following?  **A.** I do not know. Their business is always checking

around.").]  John Doe IV referred to the Indonesian soldiers who assaulted and detained him as

"Exxon soldiers" because he had seen *other* Indonesian soldiers—not the soldiers who assaulted

and detained him, whom he did not recognize—stationed in an area where Exxon had operations

and he had seen some soldiers going in and out "from that Exxon area."  [*Id.* at 163:4–9

("**Q.** And the reason you called them Exxon soldiers is because they were stationed in the area

where Exxon had operations, right?  **A.** Yes."); *id.* at 36:23–37:11 ("**Q.** You testified that the

Indonesian soldiers were paid by Exxon to guard Exxon.  Do you have any proof that Exxon paid

the soldiers at all?  **A.** I do not have evidence, I do not have proof, but what I know is those

soldiers come in, and live, come out or go out from that Exxon area, they live there, their

vehicles were there within the fence of Exxon, so that means that those soldiers were the ones

who guard Exxon.  Other than that, I do not know.").]

133.    John Doe IV did not know where he was taken and detained by the Indonesian

soldiers.  [*Id.* at 76:6–10 ("**Q.** After the Indonesian soldiers put bags over your head and Rusli's

head, did they lead you away?  **A.** They brought us with foot, but I do not know where.").]

134.     John Doe IV's witness, ████ learned about the incidents secondhand from

John Doe IV and did not witness any of the alleged acts.  [████ Dep. at 43:10–17, Ex. 39

("**Q.** So listen to my question, because it is different from what you're answering.  Did you see

who caused those bruises and injuries?  **A.** He told me it was the soldiers['] doing, and I saw it

myself, there were injuries and bruises in his body."); *id.* at 43:23–44:2 ("**Q.** Did you see with

your own eyes how [John Doe IV] got his wounds and bruises?  **A.** I did not.  When he got

beaten, I did not see with my own eyes.").]

135.     John Doe IV testified that he is not seeking money damages in this litigation.

[John Doe IV Dep. at 117:25–118:4, Ex. 91 ("**A.** I do not even care about money.  I'm looking

for justice here.  What I asked for from Exxon is justice.  About whom paying what, I do not care

about money."); *id.* at 113:5–8 ("**Q.** Are you asking Exxon Mobil to reimburse the funds that

were stolen from you?  **A.** I'm not asking for money.").]

136.     John Doe IV has no documentation reflecting medical expenses, ████████

████████████████, or lost earnings, and he testified that he does not

remember what his wages were at any time in his life.  [*Id.* at 112:21–24 ("**Q.** Did you save any

papers showing how much you spent in connection with your recovery?  **A.** No."); *id.* at 114:22–

115:4 ("████████████████████████████████

████"); *id.* at 117:18–25 ("**Q.** Can you estimate how much money you earned in any year

of your life? . . . **A.** I do not know how much money I earned."); *id.* at 118:12–16 ("**Q.** Do you

have any documents showing how much money you earned at any point in your life?  **A.** No, no

documents.  I do not keep any documents.").]

**K.**     **John Doe VII**

137.     John Doe VII, his friend ████ and ████████████████,

provided testimony regarding John Doe VII's allegations.  [*See generally* Deposition of John Doe

VII, dated Nov. 12, 2020 ("John Doe VII Dep."), Ex. 92; ████ Dep., Ex. 40; Deposition of

████████, dated Jan. 26, 2021 ("████████ Dep."), Ex. 93.]

138.     John Doe VII has no "concrete evidence" that Defendants are responsible for his

injuries. [John Doe VII Dep. at 62:7–16, Ex. 92 ("**Q.** So, you claim you have injuries but you

have no evidence that would establish that Exxon Mobil is responsible for those injuries, is that

correct? **A.** The evidence is my head, um, um, my head is in pain sometimes, um, this one, um,

and that is it.  If a concrete evidence, I do not have.").]  He testified that he believed his injuries

were caused by Defendants because his friend, ████ told him that the location where he was

taken, ████, "belong[ed] to Exxon Mobil."  [*Id.* at 65:25–66:12 ("**Q.** So, you claim that

because the soldiers live ███ that Exxon Mobil Corporation is responsible for your injury; is

that correct? **A.** Because they live ████████ belongs to Exxon Mobil.  **Q.** What do you

base that on?  **A.** ████████.  For now, I do not have evidence.  The living witness that I

have is ████ Evidence . . . I was arrested."); *id.* at 126:8–17 ("**Q.** What evidence do you

have or what facts can you identify that would establish that this Indonesian Military post was

used by soldiers that provided services to Exxon Mobil Oil Indonesia? **A.** The evidence was I

was being arrested by Exxon soldiers, and . . . the name of the one who beat me was Rusli, and

they also beat others.  Many others.").]

139.     ████ and ████████ likewise claimed to believe that the members of the

Indonesian military who abducted John Doe VII were "Exxon soldiers" because John Doe VII

was taken by Indonesian soldiers ███, which they claimed was owned by Exxon.  [████

████ Dep. at 16:21–25, Ex. 93 ("**Q.** Have you ever heard of a location called ███ **A.** Yes, in

the past they were called ███ but then they changed the name to ████ and then to ████."); *id.*

at 47:6–20 ("**Q.** ████ how do you know that this location . . . was Exxon?  **A.** So people who

work at Exxon said that it belonged to Exxon.  **Q.** And how else did you know that Exxon was

located at ███ ?  **A.** So how is it possible for me to not know this?  Because I grew up here.  I was

born here and I knew from the beginning when since it was ████ built by ████ and then ██,

and then handed over to ████ .”); ████ Dep. at 11:14–12:23, Ex. 40 (“**Q.** Was there a sign

at ██ that said it belonged to ████ n?  **A.**  Yes, yes that was—there was a pamphlet before, a

named pamphlet [sign], before, at that time.  It was complete.  Everything was there, and there

was even a warehouse, there, where they keep all the steel, the steel objects . . . there were two of

them, and one says ██ .”).]

140.    The location ██ is not owned by Exxon.  [Farmer Dep. at 153:10–14, Ex. 10

(“████████████████████████████████████████████

████████████████████████████████████

████ .”); (Johnson Dep. at 181:13–182:4, Ex. 6 (“████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████ ”).]

141.    ████ claimed to recognize one of the soldiers who abducted John Doe VII as

having been on patrol outside of Arun Field at an unspecified time.  [████ Dep. at 15:20–

16:5, Ex. 40 (“**Q.** Just so the record was clear, can you tell me who was beating you?  **A.** The one

that I recognized, and I know his name, it’s Razali.  **Q.** Can you tell me who Razali is?  **A.** Razali

is a soldier that was for Exxon as well, and he is a guard there.  And he was always in and out of

Exxon, and he was also involved in patrolling in the neighboring villages as well.”); *id.* at 16:13–

17 (“**Q.** Did you ever see Razali at Cluster 3?  **A.** Yes they were—they were patrolling—they

were always patrolling there, in and out.”).]

142.    Neither John Doe VII, █████ nor █████ knew who gave the orders to the soldiers who assaulted and detained John Doe VII.  [John Doe VII Dep. at 52:17–20, Ex. 92 ("**Q.** Do you know who gave the order to the military guards to beat you up?  **A.** I—I do not know who—I do not know who gave the order to beat me."); █████ Dep. at 82:19–83:2, Ex. 93 ("**Q.** Do you know who the commanding officers were who were responsible for the soldiers who detained and beat [John Doe VII] and █████  **A.** I do not know. . . . I do not know them."); *id.* 83:9–19 ("**Q.** Do you know what orders either the platoon commander or the soldiers at A1 were following on the day they detained and beat [John Doe VII] and █████? **A.** No, they didn't say anything about the orders, but they beat [John Doe VII] and █████ but they didn't say to us.  **Q.** So you are saying you don't know what orders those soldiers were following, right?  **A.** Yes, I do not know about that."); █████ Dep.at 37:13–18, Ex. 40 ("**Q.** Do you know who Razali's superior officer in the military was?  **A.** I do not know.  **Q.** So you don't know who gave his orders.  **A.** No, I don't.").]

143.    John Doe VII testified that he is not seeking money damages in this litigation. [John Doe VII Dep. at 23:22–24:4, Ex. 92 ("**Q.** So, to be clear: You're not seeking to get from a United States jury the profits that you claim you would have received had you not been injured; is that correct? . . . **A.** That is correct.").]

144.    John Doe VII has no documentation reflecting his earnings either prior to or following his injury.  [*Id.* at 24:5–12 ("**Q.** Do you have any documents that would show how much profit you made from farming prior to the incident?  **A.** No.  I do not have.  **Q.** Do you have any documents that show the profits that you made from farming after the incident? **A.** Um, no.").]

145.    John Doe VII did not pay for any medical expenses for his injuries.  [*Id.*at 25:15–25 ("**Q.** Where do you allege you went to for medical treatment after the incident?  **A.** A traditional medicine.  **Q.** And where was the traditional medicine facility located?  **A.** I made it myself.  **Q.** Did you ever have to pay for any medical treatment following your injuries to the incident?  **A.** Um, I did not, um, pay anything for my treatment.").]

## L.    Quantifiable Loss

146.    Defendants have been requesting relevant documents to substantiate Plaintiffs' damages claims since May 2006.  [Def. ExxonMobil Oil Corp.'s 1st Req. for Doc. Prod. (May 25, 2006) at Doc. Reqs. 1, 5, 7, Ex. 94.]

147.    Plaintiffs stated in their supplemental damages disclosures that they "██████████ ████████████████████████████████████████████████ ████████████."  [Pls.' Dec. 2019 Rule 26 Supp. Damages Disclosures at 1–2, Ex. 59.]

## IV.    CORPORATE SEPARATENESS

148.    Professor Macey provided a framework for identifying the "█████ ████████████████████████████████████████."  [Responsive Expert Report of Jonathan R. Macey, dated May 20, 2021 ("Macey Rept.") ¶ 9, Ex. 95.]  The framework consists of a four-prong analysis of separateness that is consistent with ordinary and customary business behavior and accepted corporate governance practice.  [*Id.*]

## A.    Defendants Are Separate and Independent Corporations

149.    Defendant Exxon Mobil Corporation is incorporated under the laws of New Jersey, with its principal place of business in Texas.  [Declaration of Brenda Fitzpatrick, dated Dec. 18, 2001 ("Fitzpatrick Decl.") ¶ 2, Ex. 96.]

Public Redacted Copy

150.    Defendant EMOI was incorporated in Delaware in 1967, and has its principal place of business in Jakarta, Indonesia.[13]  [Macey Rept. at ¶ 48, Ex. 95; Declaration of Ronald Wilson, dated Sept. 28, 2001 ("Wilson Sept. 2001 Decl.") ¶ 3, Ex. 97.]

151.    EMOI was known as Mobil Oil Indonesia Inc. until June 15, 2000, when it adopted its current name.  [Macey Rept. at 3 n.2, Ex. 95.]  This name change did not alter or affect EMOI's corporate structure or its relationship to Mobil Corporation or EMC.  [Declaration of Ronald Wilson, dated Dec. 14, 2001 ("Wilson Dec. 2001 Decl.") ¶ 2, Ex. 98.]

152.    EMOI is a wholly-owned subsidiary of Mobil Exploration and Producing North America ("MEPNA").  [Macey Rept. at 3 n.2, Ex. 95; EMOI (Boydell) 30(b)(6) Dep. at 32:13–19, Ex. 9; Fitzpatrick Decl. ¶ 6, Ex. 96.]  MEPNA is a wholly-owned subsidiary of Mobil Corporation.  [Macey Rept. at 3 n.2, Ex. 95; EMOI 30(b)(6) (Boydell) Dep. at 33:11–16, Ex. 9; Deposition of Brenda Fitzpatrick under Rule 30(b)(6) for Exxon Mobil Corporation, Mobil Corporation, and Mobil Oil Corporation, dated Dec. 12, 2007 ("EMC/MC/MOC 30(b)(6) (Fitzpatrick) Dep.") 33:14–20, Ex. 99; Fitzpatrick Decl. ¶ 7; Ex. 96.]

153.    On November 30, 1999, Mobil Corporation became a wholly-owned subsidiary of Exxon Mobil Corporation.  [EMOI 30(b)(6) (Boydell) Dep. at 33:17–34:8, Ex. 9; EMC/MC/MOC 30(b)(6) (Fitzpatrick) Dep. at 27:22–28:6, Ex. 99; Fitzpatrick Decl. ¶ 2, Ex. 96.]

---

[13]    In December 2005, EMOI became a Cayman Islands corporation.  [Coleman Decl. ¶ 2, Ex. 4.]  Its principal place of business remains Jakarta, Indonesia.

B.     **EMOI Observed Corporate Formalities**

154.    EMOI had articles of incorporation and bylaws separate from EMC.  [Macey

Rept. ¶ 17, Ex. 95; MOI Certificate of Incorporation, Ex. 3; CA0001046007 ("MOI Bylaws"),

Ex. 100.[14]]

155.    EMOI had its own board of directors, which met regularly and did not overlap in

membership with EMC's board of directors during the Relevant Period.  [Macey Rept. ¶ 17, Ex.

95 ("████████████████████████████████████████████████████████████

████████████████████████████████████."); EMC/MC/MOC 30(b)(6) (Fitzpatrick)

Dep. at 199:14–200:1, Ex. 99 (no directors in common as between EMOI and any other

defendant); EMC/MC/MOC 30(b)(6) (Fitzpatrick) Dep. at 72:10–73:18, 199:9–200:10.]  The

EMOI board of directors acted independently and made its own decisions.  [Macey Rept. ¶ 17,

Ex. 95; EMC/MC/MOC 30(b)(6) (Fitzpatrick) Dep. at 72:10–73:18, Ex. 99 ("██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████."); EMOI 30(b)(6)

(Boydell) Dep. at 140:12–22, Ex. 9 ("[████████████████████████████████████

████████████████████████████████████████████████████.").]

156.    The activities of the EMOI board of directors were appropriately documented in

regularly kept records.  [*See* Macey Rept. ¶ 17, Ex. 95; EMOI Corporate Records, 1994–2001,

---

[14]    For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.

CA0001046140, Ex. 101.[15]]  EMOI also held shareholder votes as required by its bylaws [Macey

Rept. ¶ 17 , Ex. 95; Record of EMOI shareholder vote, CA0001046140 at -81, Ex. 101.]

157.   EMOI's management personnel, employees, and operations were located in

Indonesia.  [Macey Rept. ¶ 20, Ex. 95; Wilson Sept. 2001 Decl. ¶ 4, Ex. 97.]

158.   EMOI administered its own payroll and paid its own liabilities.  [Macey Rept.

¶ 20, Ex. 95; EMC/MC/MOC 30(b)(6) (Ward) Dep. at 95:12–96:17, Ex. 8 (██████████████████

███████████████."), *id.* at 98:1–8 (██████████████████████████

████████████████████████); EMOI Balance Sheet, MS1000004115 at -118,

Ex. 102[16] (███████████████████████████████████████

██████); *see also* MOI Business Unit Summary, MS1000000158 at -161, Ex. 103[17] (███████

█████████████████████████████).]

159.   EMOI maintained, in its own name, books, records, and bank accounts, separate

from those of EMC.  [Macey Rept. ¶ 18, Ex. 95; EMC/MC/MOC 30(b)(6) (Ward) Dep. at 68:5–

10, Ex. 8; EMOI 30(b)(6) (Boydell) Dep. at 135:12–15, Ex. 9; Wilson Dec. 2001 Decl. ¶ 4, Ex.

98; Fitzpatrick Decl. ¶ 13, Ex. 96; *see also* EMOI Balance Sheet, MS1000004115, Ex. 102;

EMOI Bank Accounts, CA0001046091, Ex. 104.[18]]  Pursuant to arm's-length services

agreements or EMOI board-authorized delegations, certain ministerial administration of EMOI

bank accounts and cash management functions for EMOI's benefit were conducted, from time to

time, by individuals within another affiliate's treasury center.  [EMOI 30(b)(6) (Boydell) Dep. at

---

[15]   For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.

[16]   For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.

[17]   For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.

[18]   For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.

137:7–138:14, Ex. 9; *see also* Certification of ExxonMobil Oil Indonesia Inc. dated Sept. 25, 2000, CA0001046093, Ex. 105.[19]]  EMOI, however, at all times retained the beneficial ownership of all of its funds and the ability to control those funds.  [Macey Rept. ¶ 33, Ex. 95; EMOI 30(b)(6) (Boydell) Dep. at 132:16–133:14, 138:6–139:8, Ex. 9.]

160.    EMOI prepared and filed its own local tax returns.  [Macey Rept. ¶ 52, Ex. 95; EMOI 30(b)(6) (Boydell) Dep. at 95:8–15, Ex. 9; EMC/MC/MOC 30(b)(6) (Ward) Dep. at 90:13–92:1, Ex. 8; Wilson Dec. 2001 Decl. ¶ 5, Ex. 98.]

## C.    EMOI Was Financially Self-Sufficient and Adequately Capitalized

161.    EMOI was fully capitalized and has been since its formation.  [Macey Rept. ¶ 59, Ex. 95 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."); *id.* ¶ 77 ("█████████████████████████████████████████"); EMOI 30(b)(6) (Boydell) Dep. at 43:4–8; 47:9–11, Ex. 9; Wilson Dec. 2001 Decl. ¶ 7, Ex. 98.]

162.    EMOI ██████████████████████████████████████████████████ ████████."  [EMOI 30(b)(6) (Boydell) Dep. at 121:14–122:2, Ex. 9; *id.* at 51:24–52:19 ("█████████████████████████████████████████████████████ ████████████████████████████████████████████████████.").]

## D.    EMC Did Not Control or Dominate EMOI

163.    EMOI was responsible for the management of its own day-to-day affairs.  [EMOI 30(b)(6) (Boydell) Dep. at 67:4–9, Ex. 9 ("████████████████████████████

---

[19]    For authentication and business record certification, *see* ECF No. 268-1, Ex. 69.



█████.”); *id.* at 72:16–23 ("█████████████████████████████.”); Wilson

Dec. 2001 Decl. ¶ 9, Ex. 98; Wilson Dep. at 191:22–195:25, Ex. 18 ("████████

███████████████████████████████████████████████████████████████

████████████████████████████████.”).]  Individuals

employed by other, affiliated entities were available for consultation and to provide functional

guidance, but their role was only advisory and appropriate as shareholder representatives, and

they did not make day-to-day decisions regarding EMOI's operations.  [Johnson Dep. at 53:12–

54:2, Ex. 6 ("████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████.”); *see also* Feb. 21, 2001 Email from L. Johnson to M.

Scoggins, CA0001201224, Ex. 106[20] (████████████████████████████████

████████████████████████████████████████████████████████

██████████████.”).]

164.    EMOI prepared its own operating plans, budgets, and financial plans.  [EMOI

30(b)(6) (Boydell) Dep. at 68:20–69:10, Ex. 9.]  Although those plans and budgets were

submitted to shareholders' representatives for review, endorsement, and consolidation both pre-

and post-merger, the ████████████████████████████████████████

[EMC/MC/MOC 30(b)(6) (Ward) Dep. at 19:15–22:16, Ex. 8; *id.* at 23:10–24:4.]  EMOI had the

---

[20]    For authentication and business record certification, *see* ECF No. 268-1, Ex. 74.

autonomy and authority to make decisions altering its budget, [EMC/MC/MOC 30(b)(6) (Ward)

Dep. at 34:19–35:11, Ex. 8], and its planned expenditures, [EMOI 30(b)(6) (Boydell) Dep. at

123:22–124:22 & errata, Ex. 9; *id.* at 138:15–139:8 ("███████████████████████

████████████████████████████████████████████████████████

████████████████████████████."); Johnson Dep. at 76:24–78:8, Ex. 6

("█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█.")].

165.    EMOI retained sole responsibility and authority for the hiring, firing, training, and

supervising of its employees.  [Macey Rept. ¶ 20, Ex. 95; *see also* Wilson Dec. 2001 Decl. ¶ 9,

Ex. 98.]  EMOI maintained its own human resources department, which handled EMOI

personnel matters, including the hiring and firing of employees.  [EMC/MC/MOC 30(b)(6)

(Fitzpatrick) Dep. at 104:7–105:1, Ex. 99.]  EMOI did not require the approval of any other

affiliate to hire an employee, and the U.S. entities were not "████████████████████

██████████████████████."  [*Id.*]  EMOI consulted, pursuant to recommended

communication channels and best practices, with representatives of certain U.S. entities, to

apprise them of proposed key decisions regarding personnel at the management, professional,

and technical ranks, or to seek, when appropriate, recommendations for qualified candidates for

specialized positions.[21]  The purpose of such consultation, however, was not to seek approval for

decisions, and, at all times, authority for EMOI employment-related decisions remained with

---

[21]    Post-merger, these best practices were embodied in a Personnel Matters Guide.  [EMOI
       30(b)(6) (Boydell) Dep. at 237:16–238:22, Ex. 9; Personnel Matters Guide Preamble,
       CA0001354174, Ex. 107.]

EMOI.  [EMOI 30(b)(6) (Boydell) Dep. at 237:16–238:22, Ex. 9; *id.* at 75:22–76:8; Personnel

Matters Guides, CA0001354174 at -174, Ex. 107[22] (" █████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████ .").]

E.    **Plaintiffs' Expert Opinion Does Not Support Piercing the Corporate Veil between EMC and EMOI**

166.    On April 5, 2021, Plaintiffs served Defendants with an expert report prepared by

Harris L. Devor on " ████████████████████████████████████ .  [Expert Report

of Harris L. Devor, dated Apr. 5, 2021 ("Devor Rept.") ¶ 6, Ex. 108.]

167.    In his expert report, ██████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ .  [Deposition of Harris L. Devor,

dated June 16, 2021("Devor Dep.") 38:2–8, Ex. 109 (" ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ .").]  Mr. Devor made no " ████████████

██████████████████████████████████████████████████████████

██████████████████████████████ .  [*Id.* at 37:16–25 (" ██████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ .").]

--------

22    For authentication and business record certification, *see* ECF No. 268-1, Ex. 72.

168.    In his deposition, 

[Devor Dep. at 70:11–18, Ex. 109 (".")]

## V.    THE VIOLATION OF DEFENDANTS' DUE PROCESS RIGHTS

169.    In April 2016, Plaintiffs notified the Court that they were unable to obtain the visas needed to travel to the United States to testify at depositions.  [ECF No. 560-2 at 12–13 (".")]

170.    On at least one occasion, a plaintiff testified at her deposition with an unauthorized person in the room, in violation of the deposition protocol ordered by this Court. Pursuant to that protocol, the only persons permitted to attend any deposition in person were: (i) the witness, (ii) a technical support person affiliated with the court reporting service, or, if that was not feasible, a technical support person agreed to by the parties or approved by the Court, and (iii) a translator agreed to by the parties or authorized by the Court.  *See* ECF No. 750 at 5, § 7.  In violation of this Court-ordered protocol, the first witness to be deposed, Jane Doe III, admitted at her deposition—after first testifying that she was alone in the room [Jane Doe III Dep. at 14:16–18, Ex. 60]—that she was in fact accompanied by another person who Plaintiffs' counsel had hired to provide technical support, but whose presence had not been agreed to by Defendants or approved by the Court.  [*Id.* at 15:3–23.]  That unauthorized person turned out to be the son of one of the Aceh-based agents hired by Plaintiffs' counsel to assist with this litigation, who were themselves prohibited from attending any depositions by order of the Court.

[ECF No. 692 at 2.]  This relationship only came to light when revealed by the second witness to be deposed, Jane Doe V, at her deposition.  [Jane Doe V Dep. at 40:18–41:5, Ex. 67.]

171.    During fact discovery, Plaintiffs' counsel purported to legally represent each of Plaintiffs' non-party witnesses and prevented Defendants from speaking with those witnesses directly.  [*See* Letter from A. Fryszman to A. Oh (Sept. 29, 2020), Ex. 110 ("I write to notify you that Cohen Milstein represents the following individuals who are witnesses in this case: ███ (John Doe V); ████████████ (John Doe V); ██████████████████; ████████████████████ (Jane Doe IV); ████████████████; and ██████.  Because these persons are now represented by counsel, all contact should be made through Cohen Milstein."); Email from N. Jacques to A. Oh (Mar. 1, 2021), Ex. 111 ("We write to inform you that Cohen Milstein represents ████████ whose deposition is scheduled for this Wednesday, Indonesia time."); ██████████ Dep. at 40:13–14, Ex. 62; ██████ Dep. at 20:21–24, Ex. 56; ██████ Dep. at 26:3–9 Ex. 39.]  Plaintiffs' counsel met with these witnesses to prepare them for their depositions.  [*See* ██████ Dep. at 36:19–37:3, Ex. 39; ██████ Dep. at 66:16–20, Ex. 38.]  On several occasions during their depositions, Plaintiffs' counsel instructed these non-party witnesses, based on their supposed attorney-client relationship, not to answer questions on the ground of attorney-client privilege.  [*See* ██████ Dep. at 39:16–40:14, Ex. 70; ██████████ Dep. at 111:25–113:2, 113:16–114:3, 114:8–16, 116:23–117:8, Ex. 75; ██████ Dep. at 28:19–29:12, 31:24–32:23, Ex. 40; ██████ Dep. at 36:12–23, 41:4–10, Ex. 88.]

172.    Several of the third-party witnesses being represented by Plaintiffs' counsel testified that a member of the Aceh team, ████████████████████████████████ ██████, *see* DOE006004, Ex. 112, recruited them to testify for Plaintiffs in this litigation.

74

[█████ Dep. at 59:9–18, Ex. 38; █████ Dep. 96:16–97:1, Ex. 64; █████ Dep. 39:15–21, Ex. 40.]

173.    Throughout discovery, Plaintiffs have failed to preserve or produce documents and other evidence necessary to substantiate their allegations.  For example, Jane Does II and IV—whose claims are premised on alleged injuries to their husbands—have testified that they do not have any marriage certificates or other documentation corroborating those supposed spousal relationships.  [Jane Doe II Dep. at 98:4–6, 100:22–101:11, Ex. 57; Jane Doe IV Dep. at 100:9– 101:2, Ex. 37.]  In fact, several plaintiffs testified that they destroyed or lost relevant documents after their initial complaint was filed.  [*See, e.g.*, Jane Doe II Dep. at 100:9–14, Ex. 57 ("**Q.** Was [your marriage certificate] lost sometime after you filed this lawsuit?  **A.** Yes."); Jane Doe VI Dep. at 94:13–18, Ex. 69 ("**Q.** When did you throw [the documents] away?  . . . **A.** It was after my husband died, in 2004.").]  Several plaintiffs testified that they were never instructed to preserve documents relevant to their claims.  [*See* Jane Doe I Dep. at 80:14–21, Ex. 55 ("**Q.** No one told you to preserve these document[s] for this lawsuit?  **A.** No."); Jane Doe VI Dep. at 94:13–18, Ex. 69 (". . . I don't have [the documents] anymore.  I didn't know I have to keep it so I throw it away.  If I knew, I would have kept it."); Jane Doe VII Dep. at 60:21–61:2, Ex. 74 ("**Q.** Do you know that you were supposed to hold on to any documents showing sources of income your husband had?  **A.** I don't keep it, sir, because I don't think it is important, so I don't keep it.").]

174.    Plaintiffs have also wielded the Court's order prohibiting Indonesian discovery as both sword and shield, selectively producing evidence from Indonesia while refusing Defendants the opportunity to seek additional discovery on the same issues.  For example, Plaintiffs produced, only hours before John Doe VII's deposition, scanned copies of photographs

purportedly taken of John Doe VII, then refused to produce the original photographs, which

would have allowed Defendants to confirm their provenance based on metadata.  [*See* Pl. John

Doe VII's Objs. & Resps. to Defs.' 7th Req. for Produc. of Docs. (Dec. 18, 2020) at 3, Ex. 113

("Plaintiff further objects to this Request to the extent it seeks discovery of . . . information [that]

is located exclusively in Indonesia."); Letter from E. Cox to A. Fryszman (Jan. 15, 2021), Ex.

114.]  Plaintiffs' counsel also refused to produce government-issued identification for any non-

party witnesses (despite purporting to represent them), on the supposed ground that it would

violate the Court's order barring Indonesian discovery.  [*See* Pls.' Objs. & Resps. to Defs.' 8th

Req. for Produc. of Docs. (Jan. 15, 2021) at 4, Ex. 115 ("Plaintiffs further object to this Request

because it seeks documents located exclusively in Indonesia . . . .  Multiple Court orders have

restricted discovery of documents that reside exclusively in Indonesia."); Letter from M. Webber

to A. Fryszman (Jan. 25, 2021), Ex. 116 ("Your stonewalling on such a simple request—for

easily-obtainable documents allowing Exxon to verify that Plaintiffs' Witnesses are whom they

claim to be—is yet another denial of Exxon's due process rights and ability to defend itself.").]

Several of Plaintiffs and their witnesses failed to bring any identification to their depositions that

would enable Defendants to verify their identity.  [*See, e.g.*, John Doe IV Dep. 8:7–14, Ex. 91;

John Doe VII Dep. 8:10–12, Ex. 92; ███████ Dep. 39:25–40:3, Ex. 62.]  Plaintiffs also

refused to produce any documents located in Indonesia that would support the assertions in their

damages disclosures.  [Pls.' Objs. & Resps. to Defs.' 6th Req. for Produc. of Docs. (May 11,

2020) at 6–7, Ex. 117 ("Plaintiffs have already searched for and produced documents located

outside Indonesia relating to the damages sought.").]

   175. In addition, Plaintiffs routinely attempted "depositions by ambush," leaving

defense counsel with barely any time to review brand new allegations and just-produced

documents before deposing the producing plaintiffs and non-party witnesses.  For example, Plaintiffs' counsel served Jane Doe VII's supplemental interrogatory responses, which contained entirely new factual allegations, less than 48 hours before her deposition was scheduled to begin on October 7, 2020.  [Pl. Jane Doe VII's Supp. Resp. to ExxonMobil Oil Corporation's 1st Set of Interrogs. (Oct. 5, 2020), Ex. 118.]  Although Plaintiffs' counsel claimed that these responses were intended to "███████████████████████████████████████████████

████████" [*id.* at 6], Jane Doe VII was substituted as a plaintiff five years earlier, in July 2015, *see* ECF No. 513, giving her ample opportunity to supplement her husband's responses well in advance of her deposition.  Plaintiffs' counsel also chose to supplement their document productions with respect to John Doe VII mere hours before his deposition was scheduled to begin.  [*See* Letter from A. Fryszman to A. Oh (Nov. 12, 2020), Ex. 119; Letter from J. Morton to A. Fryszman (Nov. 12, 2020), Ex. 120.]  Further, Plaintiffs' counsel belatedly announced that they would be deposing non-party witness ███████████—a witness they had not previously indicated that they even intended to depose—with less than a week's notice before his deposition.  [*See* Email from A. Fryszman (Oct. 21, 2020), Ex. 121; Email from J. Morton to A. Fryszman (Oct. 21, 2020), Ex. 122; Letter from K. Pierson to J. Morton (Sept. 4, 2020), Ex. 123.]  Plaintiffs' counsel then produced documents relating to ███████████ on the day of his deposition.  [Notice of Dep. for ███████████ (Oct. 26, 2020) (noticing deposition for 9AM October 28, 2020 in Lhokseumawe, Indonesia), Ex. 124; Letter from A. Fryszman to A. Oh (Oct. 27, 2020), Ex. 125.]

Washington, D.C.
July 29, 2021

Respectfully submitted,

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX  77389
Telephone:  (832) 624-6336

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C.  20006-1047
Telephone: (202) 223-7300

*Attorneys for Defendants Exxon Mobil Corporation
and ExxonMobil Oil Indonesia Inc.*