# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 01-1357 (RCL/AK) |
| | ) |
| v. | ) |
| | ) |
| EXXON MOBIL CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLANTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I. Introduction and Summary of Argument ........................................................................ 1

II. Background ................................................................................................................. 2

III. Procedural History ..................................................................................................... 8

IV. Legal Standard .......................................................................................................... 9

V. Argument ................................................................................................................. 10

    A.    Plaintiffs Satisfy the Elements of Their Claims Under Indonesian Law. .......... 10

        1.    Pending Claims and Choice of Law ..................................................... 11

        2.    Direct Liability for Negligence Under Articles 1365 and 1366 ............. 11

        3.    Indirect Liability Under Article 1367 ................................................... 31

    B.    Moral Damages Need Not Be Quantified, Whether Under Indonesian Law or Federal Procedural Rules. ...................................................................... 40

        1.    Indonesian Law Does Not Require Quantification of Immaterial Damages. ........................................................................................... 41

        2.    The Quantification and Presentation of Damages Is A Matter Of Trial Management Quintessentially Governed By Federal Procedural Rules. ................................................................................ 42

        3.    Plaintiffs' Evidence Shows The Considerable Material and Immaterial Loss They Each Suffered. ................................................ 43

    C.    EMC Is Directly and Vicariously Liable for Plaintiffs' Injuries. ...................... 44

        1.    EMC Personnel Directly Participated in the Negligent Hiring/Retention and Supervision of TNI Soldiers. ................................ 44

        2.    EMC Is Liable Under Art. 1367 of the Indonesian Civil Code. ............. 46

        3.    EMC Is Also Liable Under Indonesia's Company Law Because of Its "Involvement" in Retention, Deployment and Use of the Military Security. ............................................................................. 48

    D.    Defendants' Due Process Argument Has No Foundation in Law or Fact. .......... 49

    E.    Unambiguous Controlling Law Shows Plaintiffs' Negligence Claims Are Timely. ............................................................................................... 52

        1.    John Does II and IV and Jane Doe VII Are Entitled to Equitable Tolling. .............................................................................. 53

VI. Conclusion ............................................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Boulter*,
   2012 WL 5245458 (D.D.C. Oct. 24, 2012) ........................................................................43

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ...............................................................................................................10

*\*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ...............................................................................................10, 23, 28

*Arce v. Garcia*,
   434 F.3d 1254 (11th Cir. 2006) ............................................................................................54

*Brumley v. Albert E. Brumley & Sons, Inc.*,
   727 F.3d 574 (6th Cir. 2013) ................................................................................................26

*Byrd v. Blue Ridge Rural Elec. Co-op.*,
   356 U.S. 525 (1958) ...............................................................................................................43

*Caldwell v. District of Columbia*,
   201 F. Supp. 2d 27 (D.D.C. 2001) ......................................................................................43

*Capitol Just., LLC v. Wachovia Corp.*,
   605 F. Supp. 2d 187 (D.D.C. 2009) .............................................................................12, 31

*Casey v. McDonald's Corp.*,
   880 F.3d 564 (D.C. Cir. 2018) .............................................................................................12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...............................................................................................................10

*Chavez v. Carranza*,
   559 F.3d 486 (6th Cir. 2009) ................................................................................................54

*Chesapeake & Ohio Ry. Co. v. U.S. Steel Corp.*,
   878 F.2d 686 (3d Cir. 1989) .................................................................................................55

*Council on Am.-Islamic Rels. Action Net. v. Gaubatz*,
   31 F. Supp. 3d 237 (D.D.C. 2014) ......................................................................................27

*Davis v. Grant Park Nursing Home LP*,
   639 F. Supp. 2d 60 (D.D.C. 2009) ......................................................................................53

\*  Cases upon which Plaintiffs chiefly rely.

*Davis v. Mobil Oil Expl. & Producing Se., Inc.*,
  864 F.2d 1171 (5th Cir. 1989) ............................................................23

*Dingle v. District of Columbia*,
  571 F. Supp. 2d 87 (D.D.C. 2008) .......................................................23

*Doe v. Exxon Mobil Corp.*,
  473 F.3d 345 (D.C. Cir. 2007) ..............................................................9

*Doe VIII v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011) ................................................................9

*East v. Graphic Arts Indus. Joint Pension Tr.*,
  718 A.2d 153 (D.C. 1998) ...................................................................53

*Entek GRB v. Stull Ranches, LLC*,
  840 F.3d 1239 (10th Cir. 2016) ...........................................................13

*Exxon Mobil Corp. v. Doe*,
  554 U.S. 909 (2008)...............................................................................9

*Feld v. Fireman's Fund Ins. Co.*,
  909 F.3d 1186 (D.C. Cir. 2018) .....................................................22, 27

*Fitzgerald v. Manning*,
  679 F.2d 341 (4th Cir. 1982) ...............................................................34

*Giraldo v. Drummond Co.*,
  2012 WL 12897083 (N.D. Ala. Mar. 5, 2012) ....................................54

*Gould Elecs. Inc. v. Livingston Cty. Road Comm'n*,
  470 F. Supp. 3d 735 (E.D. Mich. 2020)...............................................50

*Greenbaum v. Islamic Republic of Iran*,
  451 F. Supp. 2d 90 (D.D.C 2006) ........................................................42

*Guthrie v. U.S.*,
  207 F.2d 19 (D.C. Cir. 1953)...............................................................26

*Holassie v. District of Columbia*,
  2019 WL 5189005 (D.D.C. 2019) .......................................................27

*Hunter v. District of Columbia*,
  943 F.2d 69 (D.C. Cir. 1991)...............................................................52

*Jane W. v. Thomas*,
  354 F. Supp. 3d 630 (E.D. Pa. 2018) ...................................................54

*Johnson v. Long Beach Mortg. Loan Tr. 2001-4,*
    451 F. Supp. 2d 16 (D.D.C. 2006) .......................................................................52

*Joligard v. Addy,*
    959 F.2d 1101, 1992 WL 78069 (D.C. Cir. 1992) ..........................................42, 43

*Jones v. Servellon,*
    1996 WL 554513 (D.D.C. Sept. 18, 1996) ........................................................52

*Kimmel v. Gallaudet Univ.,*
    722 F. Supp. 2d 79 (D.D.C 2010) ....................................................................55

*Lampe v. U.S.,*
    229 F.2d 43 (D.C. Cir. 1956) ............................................................................26

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,*
    507 U.S. 163 (1993) ..........................................................................................52

*Lizarbe v. Rondon,*
    642 F. Supp. 2d 473 (D. Md. 2009) ..................................................................54

*Maurer v. Indep. Town,*
    870 F.3d 380 (5th Cir. 2017) ............................................................................27

*Miller v. Holzmann,*
    2007 WL 710134 (D.D.C. Mar. 6, 2007) ..........................................................55

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.,*
    175 F.3d 1221 (10th Cir. 1999) ........................................................................34

*Motus v. Pfizer Inc.,*
    358 F.3d 659 (9th Cir. 2004) ............................................................................34

*Pappas v. D.C.,*
    513 F. Supp. 3d 64 (D.D.C. 2021) ....................................................................53

*Pappas v. Middle Earth Condo. Ass'n,*
    963 F.2d 534 (2d Cir. 1992) ........................................................................23, 34

*Paraskevaides v. Four Seasons Wash.,*
    292 F.3d 886 (D.C. Cir. 2002) ..........................................................................12

*Parker v. Grand Hyatt Hotel,*
    124 F. Supp. 2d 79 (D.D.C. 2000) ....................................................................52

*Piper v. Andrews,*
    216 F.Supp. 758 (D.D.C. 1963) ........................................................................43

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*,
   576 F. Supp. 2d 128 (D.D.C. 2008) ..........................................................................23, 24

*Queen v. Wash. Metro Area Transit Auth.*,
   901 F.2d 135 (D.C, Cir. 1990) ........................................................................................43

*Richardson ex rel. Richardson v. Richardson-Merrell, Inc.*,
   857 F.2d 823 (D.C. Cir. 1988) .......................................................................................43

*Singh v. George Washington Univ.*,
   383 F. Supp.2d 99 (D.D.C 2005) ....................................................................................31

*Smith v. Pathmark Stores, Inc.*,
   485 F. Supp. 2d 235 (E.D.N.Y. 2007) .............................................................................23

*Sotloff v. Syrian Arab Republic*,
   2021 WL 965882 (D.D.C. 2021) .....................................................................................26

*Stewart-Veal v. District of Columbia*,
   896 A.2d 232 (D.C. 2006) ...............................................................................................52

*U.S. v. Alexander*,
   331 F.3d 116 (D.C. Cir. 2003) ..................................................................................25, 26

*U.S. v. Arnold*,
   25 M.J. 129 (C.M.A. 1987) .............................................................................................26

*U.S. v. Bazemore*,
   839 F.3d 379 (5th Cir. 2016) ....................................................................................12, 13

*U.S. v. Domenech*,
   2017 WL 8894650 (D.D.C. 2017) ...................................................................................26

*U.S. v. Palmer*,
   902 F. Supp. 2d 1 (D.D.C. 2012) ....................................................................................55

*U.S. v. Project on Gov't Oversight*,
   454 F.3d 306 (D.C. Cir. 2006) ........................................................................................23

*U.S. v. Smith*,
   2020 WL 5995100 (D.D.C. 2020) ...................................................................................26

*U.S. v. Valdez-Soto*,
   31 F.3d 1467 (9th Cir. 1994) .....................................................................................26, 27

*U.S. v. Williams*,
   216 F.3d 1099 (D.C. Cir. 2000) ......................................................................................25

*U.S. v. Ytem*,
 255 F.3d 394 (7th Cir. 2001) ..............................................................................27

*Villarini-Garcia v. Hosp. Del Maestro, Inc.*,
 8 F.3d 81 (1st Cir. 1993) ....................................................................................34

*Warfaa v. Ali*,
 1 F.4th 289 (4th Cir. 2021) .................................................................................54

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
 668 F.2d 1014 (9th Cir. 1981) ............................................................................55

*Williams v. Trader Publ'g Co.*,
 218 F.3d 481 (5th Cir. 2000) ..............................................................................42

**Statutes**

*Indonesian Civil Code Article 1365 ................................................................ passim

Indonesian Civil Code Article 1366 ........................................................................11

*Indonesian Civil Code Article 1367 ................................................................ passim

Indonesian Civil Code Article 1905 ........................................................................43

Indonesian Company Law Article 3(2)(c) ...............................................................48

D.C. Code § 12-301(8) .............................................................................................52

**Other Authorities**

Fed. R. Civ. P. 15(c) ................................................................................................55

Fed. R. Civ. P. 43(a) ................................................................................................50

Fed. R. Civ. P. 56(c) ................................................................................................24

Fed. R. Civ. P. 56(c)(2) ...........................................................................................27

Fed. R. Evid. 402 .....................................................................................................43

Fed. R. Evid. 803(2) .................................................................................................25

Fed. R. Evid. 807 ...........................................................................................25, 26, 27

19 Wright & Miller, Fed. Prac. & Proc. § 4512 (3d ed. 2021 update) .........................43

10A Wright & Miller, Fed. Prac. and Proc. § 2712 & n. 39 (4th ed. 2021 update)........34

## I. <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiffs, eleven villagers from rural Aceh, Indonesia, filed this lawsuit in June 2001. For over 20 years they have been seeking to hold ExxonMobil, the world's most powerful and profitable corporation, responsible for the sexual assault, wrongful death, battery and other abuses inflicted upon them and their families by the military guards engaged by Exxon to provide security at its enormously profitable Arun gas fields. This is Exxon's ninth attempt to dismiss Plaintiffs' claims. Using every tool at its disposal, Exxon has aggressively defended this suit for decades, while four Plaintiffs and several witnesses have died in the interim.

When it denied Exxon's last summary judgment motion, this Court held that the abuses were foreseeable ("there is sufficient evidence that EMOI should have known that the military security posed undue risks to local Indonesians near its Arun gas venture") and that there was sufficient evidence that EMOI requested security forces who were "dedicated exclusively" to its operations and had a "right to control" those security forces. Dkt. 365 at 12-23. As a result, Exxon has now filed a narrow second motion for summary judgment, arguing that Plaintiffs' claims under Indonesian fail if Plaintiffs cannot show that (1) Exxon's guards were responsible for their injuries and (2) the guards were protecting Exxon's Arun field at the time of the injuries.

First, each and every one of the eleven Plaintiffs, including many who are supported by direct eyewitness testimony, can identify their assailant as one of Exxon's military security personnel. For example, Jane Doe VI's daughter saw the guards at Exxon's Cluster 2 facility leave their posts and shoot her brother. John Doe VII identified his assailants by name and unit number, and was beaten within a facility operated by Exxon. In addition, Plaintiffs present ample evidence from Exxon's own documents to show that the soldiers who injured Plaintiffs were acting within were acting within the scope of their engagement for Exxon and protecting

Exxon's Arun field at the time of the injuries.

Second, Exxon's Indonesian law arguments conflict with both this Court's 2014 opinion which Exxon **never even mentions** in its brief and with the declaration filed by Exxon's **own** prior expert. Plaintiffs easily meet the standards of Indonesian law as set out by this Court and both Exxon's past expert and Plaintiffs' experts.

Exxon's remaining arguments are equally without merit: Plaintiffs need not quantify their "immaterial damages" whether under Indonesian law or the federal procedural rules which properly govern this question; Plaintiffs have sufficient evidence to proceed to trial on EMC's liability on all three bases pled in the Complaint; Unambiguous controlling law establishes that all of the Plaintiffs' claims are timely, and regardless would be entitled to equitable tolling; and, finally, Exxon's claim that it did not have "an opportunity to be heard" is devoid of merit, as Defendants have fully availed themselves of every procedural defense available under the Federal Rules.

The record is replete with facts that support Plaintiffs' claims, precluding dismissal as a matter of law. Defendants' motion should be denied.

## II.  <u>BACKGROUND</u>

For many years, Defendants regarded their profitable operations at the Arun gas field in North Aceh as ███████████████████ CSMF ¶185. Although there had been independence movements in Aceh for decades, security for Defendants' operations was provided primarily by hundreds of private security guards. CSMF ¶11.[1] By 1999, facing declining production,

---

[1] *Compare* Def. Mem. at 4 (claiming that Pertamina and Indonesian government had "exclusive authority to provide security for Arun Field") *with* the testimony of EMOI's own Rule 30(b)(6) witness. *See* CSMF ¶ 11 (testimony that EMOI undertook numerous security functions at Arun Field and employed *hundreds* of private security guards with security responsibilities).

████████████████████████████████████████. CSMF ¶¶186, 236, 262, 267. Exxon executives in the United States decided to "rework the entire security philosophy" to address potential threats to Defendants' operations. CSMF ¶187; *see* PX201 (cast of characters cheat sheet). Over the next two years, Defendants implemented a strategy of engaging hundreds of armed military guards for their operations. EMC's Global Security organization in the United States (supported by its Singapore regional office) would play a critical role in designing and effectuating this strategy. *See, e.g.,* CSMF ¶¶162-64, 185-98, 203, 223, 226, 230-32, 243-50, 265, 268, 272, 276**.** Defendants engaged these military guards knowing the grave risks this created for local villagers and without any serious effort to address them. CSMF ¶¶176-84, 214, 224, 258-61, 273-75, 305, 354**.** *See* Dkt. 365 at 19 (SJ Mem. Op.) ("There is sufficient evidence that EMOI should have known that the military security posed undue risks to local Indonesians ...."). In late 1998, a Business Week investigative reporter, who had conducted a five-week investigation (including interviews of present and former MOI employees) informed MOI's relatively new senior executives about the military's torture and mass executions near Mobil's operations, including the use of Mobil heavy equipment marked with its flying horse logo to dig mass graves.[2] These concerns were echoed in published reports by the State Department, the press, and Defendants' own internal sources. CSMF ¶¶182-84, 214, 224, 258-61, 273-75, 305, 354.[3] With no serious regard for these dangers, Defendants expanded their deployment of military guards.

---

[2] *See* CSMF ¶¶177-80; PX76 Shari Decl.; *see also* CSMF ¶178 (e-mail from Lance Johnson, MOI's President during the time period being investigated: ████████████████); CSMF ¶181 (Shari's article, *What did Mobil Know?,* was circulated to Mobil executives); CSMF ¶264 (Teuku Ismail testimony regarding use of equipment to dig mass graves).

[3] *See, e.g.,* CSMF ¶¶224, 275 (U.S. State Dept.: international and local human rights monitors "reported that the military continued routinely to torture detainees in Aceh. Methods of torture documented in the past included beating, whipping, electric shock, and rape.").

In Defendants' prior summary judgment motion, they asserted many of the same factual claims repeated now—i.e., that the Government of Indonesia state-owned oil company, Pertamina, owned the properties at issue and deployed these guards, and MOI (a wholly-owned subsidiary of the largest corporation in the world) was little more than an innocent bystander. The record flatly contradicts this. The Production Sharing Contract ("PSC") between Mobil and Pertamina explicitly provided that security for MOI's operations would be provide "*as may be requested by [EMOI].*" CSMF ¶201;[4] *see also* Dkt. 365 at 3 (same). ██████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Shortly after the Mobil-Exxon merger, Exxon decided to double its number of military guards. CSMF ¶¶202-07. This decision was made only after receiving approval from EMC officials in the United States, ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████

By December 21, 1999, ██████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████. When the military

---

[4] Emphasis is added throughout unless noted, and attorney objections are omitted.

personnel then arrived with the mistaken assumption that they would ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ This is exactly what happened. CSMF ¶209. EMOI also arranged that

████████████████████████████████████████████████████████████████████

████████████████████████████ CSMF ¶216; *see also* CSMF ¶¶217-222, 242.

This decision and the deployment decisions that followed were made with almost complete disregard for the dangers to local populations. CSMF ¶269 & nn.12-21; *see also* . ¶¶196, 215, 225-28, 235, 253-57, 262-64, 268-71, 276; PX5, Expert Rept. of Brig. Gen. Ling; PX4, Expert Rept. of Col. McFetridge); Dkt. 365 at 17-21 (holding that factual evidence of negligence presents issues for jury to resolve).

Over the next year, Defendants requested many hundreds of additional military guards. CSMF ¶¶229-30, 233-38, 265-66, 272-73, 277. Defendants worked in close concert with the military on virtually every aspect of these deployments, including payments to the military guards (CSMF ¶¶216-22, 242); the timing, number and locations of deployments, assignments and responsibilities, and logistical support (CSMF ¶¶207-11, 213, 229-30, 239-52, 265-66, 280-304). Because EMOI lacked the resources to do this, EMC sent personnel from its Houston security center to North Aceh to coordinate this logistical support—support that was a *prerequisite* for these deployments. CSMF ¶¶193, 202, 239-50. ████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ CSMF ¶251. *See* Dkt. 365 at 1 (EMOI "paid for the security" and "had the right to influence the forces' 'deployment logistics,'" "'influence the security plan and the development

███████████████████████████████████

███████████████████████████████

█████████████

EMC, the EMC Global Security group and other Exxon executives in the United States played critical roles in the engagement, deployment and support of military security. Recognizing that EMOI did not have the resources or expertise to do this, EMC was deeply involved in staffing, supporting and directing these activities. *See, e.g.,* CSMF ¶¶163-65, 185, 187-98, 203, 223, 226, 230-32, 243-50, 265, 268, 272**.** *See* Dkt. 365 at 23-25 (holding that EMC's role presents issues for fact-finder). And these engagements and expanded use of military guards were implemented over the continuing concerns and objections of security people on the ground at EMOI's facilities. As Jack Connor—who was an EMC employee as of April 30, 2000 and a day later was assigned to be EMOI's senior security advisor in Aceh—wrote in a

████████████████████████████████

███████████████████████████

█████████████████████

████████████████████████████

██████████████████████

█████████████████████████

████████████████

CSMF ¶265. There is ample evidence that Defendants not only requested, paid, and supported these military guards, they also provided both a broad mandate to the guards and micro-managed specific activities when they chose to do so. *See, e.g.*, CSMF ¶¶213, 252; *see also* ¶¶208-11, 239-52, 280-304. What Defendants did *not* do was make a serious effort to prevent, monitor, investigate or remedy abuses by their military security directed at the local populations, regardless of whether those abuses occurred at EMOI's operations or encampments, in front of EMOI facilities, or at the nearby roads or local villages where the military guards were

conducting patrols or "sweeps" to detain, abuse and sometimes kill individuals regarded as potential threats. CSMF ¶269 & nn.12-21; *see also* ¶¶196, 215, 225-28, 236, 253-57, 262-64, 268-71, 276. For example, in July 2000—as EMOI was substantially expanding its engagement of military personnel—EMC and EMOI were informed by a *Wall Street Journal* reporter about "four villagers who on the record say they were tortured by Indonesian troops at the A-13 military camp" and about local villagers who had fled after sweeps by soldiers who "say they are conducting these sweeps to protect Mobil's installations." CSMF ¶¶258-61. ███████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ CSMF ¶262. Indeed, the evidence from both the Plaintiffs and third parties about brutal abuses— including torture, sexual abuse and killings—by the military security ████████████ ████████████████████████████████████████ is overwhelming. Defendants' claim that the victims of this violence should be blamed because they did not proceed to ExxonMobil facilities to complain—when the record shows not only the failure to Defendants to investigate or take responsible actions when given clear notice but the risk of retaliation—requires no further comment.

Faced with these brutal facts, Defendants try to evade responsibility for their own conduct by claiming there were 40,000 Indonesian soldiers deployed to Aceh. Defs' Mem. at 2. This factual assertion illustrates the infirmities in Defendants' renewed motion. First, each and every Plaintiff can identify their assailant as a soldier engaged by Exxon to guard its operations. Second, Defendants' own records indicate that even by early 2001, there were only *5,500* Indonesian soldiers—not 40,000—deployed across all fifteen regencies that comprised Aceh. CSMF ¶¶27, 276, 282; PX3, Expert Rept. of Prof. Robinson at 12 n.37. Exxon's operations were

in a remote region of North Aceh, where more than 1,000 of these military personnel were

██████████████████████████████████████ CSMF ¶¶27, 211, 276, 282, 302.

Even 30(b)(6) witness Snell admitted that EMOI is aware of *no* evidence that the

atrocities experienced by Plaintiffs resulted from the actions of non-EMOI military personnel.

CSMF ¶27 n.1. Although Defendants made little or no effort to prevent or address the abuses,

they belatedly recognized that their ever-increasing engagements of military security had become

unsustainable. CSMF ¶278. ExxonMobil officials in the United States acknowledged that they

were making EMOI's facilities *less* safe and ██████████████████████████ *Id.*

This, however, was too late to help the Plaintiffs and other victims.

### III.  PROCEDURAL HISTORY

Defendants' latest motion for summary judgment is the ninth time Defendants have asked

the Court to dismiss Plaintiffs' claims. *See* Dkt. 13 (motion to dismiss, denied at Dkt. 103); Dkt.

125 (motion to dismiss amended complaint, denied at Dkt. 136); Dkt. 268(motion to dismiss for

lack of personal jurisdiction, denied at Dkt. 339); Dkt. 269 (motion for summary judgment,

denied at Dkt. 366); Dkt. 389 (motion to dismiss, denied by D.C. Circuit at Dkt. 421); Dkt. 426

(motion to dismiss, denied at Dkt. 454); Dkt. 468 (motion to dismiss second amended complaint,

denied at Dkt. 512); Dkt. 633 (motion to dismiss for lack of personal jurisdiction, denied Dkt.

645); Dkt. 818 (motion for summary judgment). The major issues in this case have been litigated

and resolved, the law of the case has been settled, and discovery has concluded.

In Defendants' 2008 motion for summary judgment, they argued *inter alia*: (1) it was

undisputed that "EMOI did not deploy, control, or monitor the Indonesian military" and EMC

did not have "any knowledge to the contrary," Dkt. 269 at 11; (2) Plaintiffs could not

"demonstrate any actionable acts or omissions on the part of any Defendants," *id.* at 12; (3)

"[t]here is not a shred of evidence" that Defendants "proximately caused Plaintiffs' injuries," *id.*;

and (4) there was no "evidence to support the argument that vicarious liability is appropriate because EMOI is an 'agent' of the U.S. Defendants," *id.* at 27. The Court rejected all of these arguments, finding sufficient evidence that: EMOI had a "right to control its paid security forces," Dkt. 365 at 12; EMOI requested security forces who were then "dedicated exclusively" to Defendants' operations, *id.* at 14; "EMOI paid the security personnel directly," *id.*; "Exxon Mobil exerted significant control over EMOI's security, particularly through Exxon Mobil's Global Security division," *id.* at 23; "the violent acts alleged here fall within the scope of EMOI's paid security forces' employment," *id.* at 16; "unauthorized acts of violence were foreseeable," *id.*; and "EMOI should have known that the military security posed undue risks to local Indonesians near its Arun gas venture," *id.* at 19. After the D.C. Circuit ruled that Indonesian substantive law governs Plaintiffs' claims, Defendants moved to dismiss on the argument that Plaintiffs' had not alleged "cognizable claims under Indonesian law." Dkt. 426 at 37. The Court disagreed and set out its understanding of Indonesian law, which has governed discovery in this case. Dkt. 455 at 35-41.

Defendants presented their arguments to the D.C. Circuit and the Supreme Court. *Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007); *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011), *Exxon Mobil Corp. v. Doe*, 554 U.S. 909 (2008). They served eight sets of document requests, their full allotment of interrogatories, dozens of requests for admission and at least six motions to stay the case (including Dkts. 108, 244, 445). They deposed ten of the eleven Plaintiffs (and the daughter of the eleventh) and cross-examined Plaintiffs' third-party witnesses. Defendants have litigated this case to its fullest over the past two decades. Four of the original eleven Plaintiffs died in the interim.

## IV.  **LEGAL STANDARD**

Summary judgment is an extreme remedy that is only available if the movant shows that

"there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "If reasonable minds could differ as to the import of the evidence," the motion must be denied. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250-51 (1986). In considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*, 477 U.S. at 255. Credibility determinations and weighing evidence are not appropriate on a motion for summary judgment as those functions are reserved for the jury. *Id.*

The moving party bears the burden of identifying those portions of record it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. A fact is "material" if it is capable of affecting the outcome of the litigation. *Anderson*, 477 U.S. at 248. Any doubt as to the existence of a genuine issue for trial should be resolved against the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-160 (1970). Defendants do not meet this burden here.

## V. <u>ARGUMENT</u>

### A. **Plaintiffs Satisfy the Elements of Their Claims Under Indonesian Law.**

Defendants have filed a narrow summary judgment motion focusing on one set of facts (can Plaintiffs identify the soldier who injured them?) that they argue impacts both theories of liability available to Plaintiffs under Indonesian law. But Defendants only do so by abandoning the declaration filed by their prior expert on direct liability and by completely ignoring this Court's own 2014 opinion on indirect liability under Indonesian law, which Defendants ***never even mention*** in their brief. Plaintiffs have ample eyewitness evidence identifying the individuals who injured Plaintiffs as soldiers engaged in providing security for Exxon. Plaintiffs also have ample evidence from Exxon's own documents that the soldiers who injured Plaintiffs did so in the course of protecting Exxon's operations.

1.    <u>Pending Claims and Choice of Law</u>

The parties agree that the following claims are in the case and are governed by Indonesian law: negligence (including negligent hiring/retention and supervision) and intentional torts (including wrongful death, battery, and assault). Def. Mem. 15 n.9. The parties agree that two theories of liability are available under Indonesian law, direct and indirect. *Id*. at 15. The parties agree that direct liability is governed by Indonesian Civil Code Articles 1365 and 1366 and that indirect liability is governed by Indonesian Civil Code Article 1367. Dkt. 819-4, Lindsey Decl. ¶¶7-8, 35.

2.    <u>Direct Liability for Negligence Under Articles 1365 and 1366</u>

a.    *Indonesian Law Framework*

Articles 1365 and 1366 govern Plaintiffs' negligence claims. These two articles provide a "very broad and general principle of liability for wrongful acts." PX1, Bell Decl. (2021) ¶16; PX2, Cammack Decl ¶8.[5] Although Defendants raise a very limited challenge to these claims, Plaintiffs provide the following background information. Defendants' prior expert, Robert Hornick, set out a framework for liability under Article 1365. PX393. He explained that Defendants can be held liable for conduct that "(i) violates a statute or regulation, (ii) violates another person's rights, (iii) violates good morals, or (iv) violates a duty of care owed to other persons or things." *Id.* ¶14a (Indonesian language omitted). Plaintiffs' expert, Professor Cammack, sets out the same standard. PX2, Cammack Decl. ¶7; *see also* PX1, Bell Decl. (2021) ¶11. Mr. Hornick also explained that, for causation, "the injury must be foreseeable and a direct,

---

[5] Notably, Defendants' current expert in his published work also described Article 1365 claims as "very commonly made" in Indonesia and a "catch-all provision" that, because the terms are not defined, provides for "extremely broad" civil liability. PX265, Simon Butt & Tim Lindsey, *Indonesian Law* (Lindsey Dep. Exh. PX101), at 309-10.

rather than indirect, consequence of the misbehavior." PX393 ¶14d. Defendants' current expert, Professor Lindsey, focuses on causation, although he concedes that causation has received "relatively limited scholarly and judicial attention in Indonesia." Dkt. 819-4, Lindsey Decl. ¶20-23.[6] He advocates, unsurprisingly, the narrowest of the three possible theories but, regardless, his analysis is similar to the foreseeability standard elucidated by Mr. Hornick. Lindsey Decl. ¶25.[7] Professor Cammack concurs that the standard is "foreseeability" and agrees that Indonesian courts give the concept little attention, which results, in practice, that the concept is almost never applied to limit liability. PX2, Cammack Decl. ¶27.

Defendants do not argue in this motion that Defendants were not negligent in their retention or supervision of the soldiers assigned to their facilities, likely recognizing that negligence is rarely susceptible to summary judgment. *Paraskevaides v. Four Seasons Wash.,* 292 F.3d 886, 893 (D.C. Cir. 2002) (quoting *Shu v. Basinger,* 57 A.2d 295, 295-96 (D.C.1948)).

With regard to causation, the Court has already found the conduct was foreseeable: "There is sufficient evidence that EMOI should have known that the military security posed undue risks to local Indonesians near its Arun gas venture." Dkt. 365 at 19. The Court's prior rulings that Plaintiffs had (at a minimum) established factual disputes are binding legal determinations under the law of the case doctrine. *See Capitol Just., LLC v. Wachovia Corp.*, 605 F. Supp. 2d 187, 190 (D.D.C. 2009) (Lamberth, J.); *see also, e.g.*, *U.S. v. Bazemore*, 839 F.3d

---

[6] Lindsey's declaration also presents a narrower view of what can constitute an "unlawful act" under Article 1365 than Defendants' prior expert, but Defendants have not included that argument in this motion.

[7] This standard is equivalent to the standard under U.S. law, where a plaintiff must show factual cause and foreseeability. *E.g.*, *Casey v. McDonald's Corp.*, 880 F.3d 564, 567-68 (D.C. Cir. 2018).

379, 385 (5th Cir. 2016) ("Moreover, the mandate rule bars litigation of issues decided by the district court but foregone on appeal …."); *Entek GRB v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) ("Law of the case doctrine rightly bars the way, precluding the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court.").

 That each victim suffered damages as a direct result of the torture, shooting, sexual assault or other violence inflicted upon them is not seriously in dispute. *See infra* § V.B.

 The only portion of Defendants' argument that applies to the direct liability (negligence) claims is their argument that Plaintiffs failed to identify their assailants as soldiers engaged by or assigned to Exxon (in short hand, "Exxon soldiers"). This is plainly wrong. Each Plaintiff is able to identify the perpetrator as an Exxon soldier.

> b.  *Plaintiffs meet their burden: they present sufficient evidence for a jury to conclude that the perpetrator was a soldier engaged by Exxon.*

**Jane Doe I**: ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ identified the soldier as a member of Unit 113, based on the 113 shoulder patch on his uniform and because he arrived and departed in a truck bearing the Unit 113 logo. *Id.* Unit 113 was engaged by Exxon. CSMF ¶¶41-42, 316-317. Every school day, ██████ waited for her school bus across the street from Exxon's Point A. CSMF ¶¶318-319. She saw that same Unit 113 truck—identifiable by a unique red sticker on the front windshield spelling out "Allahu Akbar" go in and out of Point A. CSMF ¶¶43-44, 318. ██████ testified that while she saw other Unit 113 trucks on the road, that

13

was the only truck with a red "Allahu Akbar" sticker on the front windshield. CSMF ¶¶43-44,

319. It is undisputed that Point A was operated by Exxon as it housed Exxon's administrative

offices for its on-site executives and an airport for Exxon's company plane. CSMF ¶¶ 280-281,

320-321. Exxon documents confirm that 

CSMF ¶¶ 320-321. A reasonable jury could conclude that the soldier who

was a member of Unit 113, stationed at Exxon's Point A

operations, and provided security for Exxon.

**Jane Doe II**: Jane Doe II's husband and Jane Doe IV's husband were both killed on the

same day, December 4, 2000, in the same attack. CSMF ¶¶48, 334-335. Both men were farmers

shot in their own rice paddies near EMOI's operations by Exxon military security personnel.

CSMF ¶337; ¶¶336-355. Several eyewitnesses identified the soldiers as guards at Exxon Cluster

4 and recognized the vehicles used by the soldiers in the attack as trucks usually parked at Exxon

Cluster 4 and used by Exxon. CSMF ¶¶ 50, 338-344. For example, the village chief identified the

trucks used by the soldiers in the attack as trucks routinely parked at Exxon Cluster 4, both

before and after the attack. CSMF¶¶ 50, 340-342. Internal Exxon documents



CSMF ¶354-355. The documents also

CSMF ¶352. A reasonable jury could conclude that the soldiers

who shot Jane Doe II's husband were based at Cluster 4 and provided security for Exxon.

**Jane Doe III:** Jane Doe III's husband was a traveling fish merchant who disappeared on

September 17, 2000. CSMF ¶358-359. One of his regular stops was at the village market where

Exxon's Bachelor Camp was located. CSMF ¶359. Two eyewitnesses confirmed that Exxon

soldiers beat and killed Jane Doe III's husband in response to a tire explosion that the soldiers mistakenly believed was an attack. CSMF ¶360; ¶¶58, 361-370. The soldiers ran out of the camp, fired their guns, and indiscriminately beat the villagers in response to the perceived explosion. CSMF ¶¶58-61, 360, 364-370. One of the eye witnesses was also beaten by Exxon's Bachelor Camp soldiers in the same attack, requiring 13 stitches in his head. That witness, ██████ knew Jane Doe III's husband (his wife had bought fish from him that morning); had worked for Exxon on the pipeline, including at Bachelor Camp, and was familiar with the soldiers; had opened a kiosk right in front of Bachelor Camp where he sold cigarettes and soda to the soldiers, and from which he could see the entire incident. CSMF ¶¶58-62, 360-368. He recognized the soldiers. CSMF ¶¶59-63, 361-362, 365-367. He saw the Bachelor Camp soldiers load the husband's body, not moving, onto a truck; the husband was never seen again. CSMF ¶¶62, 358, 360, 368. It is undisputed that Bachelor Camp was operated by Exxon, as Exxon's own employees confirmed. *E.g.*, PX18, Duffin Dep. 18:19-19:1; CSMF ¶¶63, 371. Exxon's internal documents ███████ ████████████████████████████████████████ CSMF ¶372(70 soldiers at Bachelor Camp in September 2000). A reasonable jury could conclude that the Bachelor Camp soldiers who provided security for Exxon beat and killed Jane Doe III's husband.

**Jane Doe IV**: Jane Doe IV's husband and Jane Doe II's husband were both killed on the same day, December 4, 2000, in the same attack. CSMF ¶¶66, 374. Both men were farmers shot in their own rice paddies by Indonesian soldiers who provided security for Exxon. CSMF¶¶ 67, 374, 377. Two eyewitnesses ██████████████ recognized individual soldiers on the field— including the soldier who shot Jane Doe IV's husband—as soldiers from Cluster 4 because those soldiers had frequently bullied the witnesses on the way to and from school. CSMF ¶¶386-387; *see also* ¶¶70-71, 379-388. Cluster 4 was on their way to school. The Cluster 4 soldiers had

ordered the boys to sing the national anthem and recite national principles, forcing them to do push-ups or pinching their stomachs if they made mistakes. *Id.* Both boys recalled the soldiers' faces. CSMF¶¶379-388. ███████████████ watched the soldiers he recognized go into the rice paddy, point their guns at his father, and kill him. *Id.* ████████ was asked at this deposition:

> Q.   Who shot him?
> A.   The soldiers.
> Q.   Did the soldier that shot your father, was that the same soldier that you saw at Cluster 4?
> A.   Yes.
> Q.   Did that soldier kill your father?
> A.   Yes.

PX33, ██████ Dep. 16:2-12; *see also id.* at 23:10-15 ("Q. Did you recognize the soldiers who shot your father? A. Yes Q. Where else did you see the soldiers who shot your father? A. At Cluster 4."). No one but the soldiers did any shooting. CSMF ¶401.

Jane Doe IV also recognized the soldiers from the village, where the soldiers patrolled and checked the villagers' IDs. CSMF ¶¶389, 391-92. In addition, four eyewitnesses recognized the vehicles used by the soldiers as trucks usually parked at Exxon Cluster 4 and used by Exxon. CSMF ¶390. ██████████████████████████████████████████████

████████████████████████████████████████ CSMF ¶¶398-399. A reasonable jury could conclude that the soldiers who shot Jane Doe IV's husband were based at Cluster 4 and provided security for Exxon.

**Jane Doe V**: Jane Doe V's husband sold vegetables from his motorcycle cart, traveling the same route every day which took him right past Exxon Point A and the Exxon Clusters. CSMF ¶¶407-409, 414. Both Jane Doe V and her husband were familiar with the route and with the Exxon security posts along the way. CSMF ¶408. Jane Doe V's husband went missing in

January 2001, when Jane Doe V was still bedridden from giving birth to a newborn baby. CSMF ¶¶80, 410. Soldiers brought Jane Doe V's husband back to the house. CSMF ¶¶78, 411. Jane Doe V's husband was horrifically injured. When the soldiers brought him home, he was only wearing underwear, his hand had been cut off and he was missing an eye. CSMF ¶¶ 79, 412. As soon as Jane Doe V's husband was able to speak, in shock and crying, "he said he was taken by soldiers working at Point A and then his hand was cut off and they took his eye." CSMF ¶¶79, 412-413. Jane Doe V's husband told her Exxon soldiers took him to an Exxon post and tortured him. *Id*. Although Jane Doe V's husband died while this case was pending, this testimony is admissible under several hearsay exceptions. *See infra* § V.A.2.c & n.12 A reasonable jury could conclude that that the soldiers who tortured Jane Doe V's husband were based at Point A and provided security for Exxon.

**Jane Doe VI:** A large group of villagers were traveling on Exxon Road to Exxon's Point A to seek refuge, among them Jane Doe VI's son, Jane Doe VI, her daughter ███████████████

███████████. CSMF ¶¶422-424. Jane Doe VI's son was on the road in front of Exxon Cluster 2, ahead of the rest of the family. His sister testified:

> Q. Could you see your brother from where you were standing?
> A. Yes, I could see.
> Q. Could you see the gate of Cluster 2 from where you were standing?
> A. Yes.
> Q. Can you describe what happened?
> A. Exxon soldiers came out of the gate and they shot my brother.

PX34, ██████ Dep. 9:24-10:8; *see also* CSMF ¶¶85, 426-431. Jane Doe VI provided similar testimony. CSMF ¶432. Exxon's own internal documents ████████████████

█████████████████████████████████████████████████████

██████████████CSMF¶ 423.

Cluster 2 was operated by Exxon. CSMF ¶433. Exxon stationed military security at Cluster 2 at the relevant time. CSMF ¶434 (35 soldiers stationed at Cluster 2). ▮▮▮▮▮ passed Cluster 2 at other times and saw soldiers working at the gate, checking IDs. *Id*; *see also* CSMF ¶91. A reasonable jury could conclude that that the soldiers who shot Jane Doe VI's son were based at Cluster 2 and provided security for Exxon.

**Jane Doe VII**: Jane Doe VII's husband, John Doe V, worked as a driver, including for Mobil Oil Indonesia, and was active in local policing efforts, attending trainings and courses organized by the local military district command. CSMF ¶¶436. In 1999, his house was set on fire by soldiers he identified as Exxon Mobil soldiers. CSMF ¶¶101, 443-44. In 2003, John Doe V was picked up by Exxon soldiers from Unit 100 who he identified by name as Andreas Danpos, Andreas Serda, Bonima Pratu and Bahrun Serda-Danru. CSMF ¶¶100, 437-438. John Doe V was taken to a post near Cluster 4, where soldiers kicked, beat and urinated on him. CSMF¶¶439. He returned home bruised, swollen, and smelling of urine and told his wife he had been taken on the road by Exxon soldiers and the Exxon soldiers had urinated on his head and all over his body. CSMF ¶¶440-441. Exxon internal documents ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ CSMF ¶442. A reasonable jury could conclude that that the soldiers who burned Jane Doe V's house and beat and urinated on her husband were members of a unit engaged by Exxon.[8]

**Jane Doe VIII**: Jane Doe VIII and John Doe VI have a special needs son. CSMF ¶447.

---

[8] Exxon misleadingly recites Jane Doe VII's testimony that she did not personally notify John Doe V's other wives and children of her substitution as a plaintiff after John Doe V's death to accuse Plaintiffs of violating this Court's order to provide notice and of filing a false affidavit. Def. Mem 24, n. 18. None of Exxon's assertions are true. *See* CSMF 98. Plaintiffs did not rely on their elderly client to carry out the court-ordered notice herself but retained an independent contractor to do so, as detailed in the court-ordered declaration. *Id.*

On the morning of the attack, John Doe VI's wife woke him to tell him that their son had run away. John Doe VI left to look for his son. CSMF ¶448. While looking for his son, John Doe VI stopped for a coffee and to buy cigarettes near Exxon Cluster 4. CSMF ¶449. Soldiers picked up John Doe VI and drove him to his village, demanding he identify suspected GAM members. Eventually, the soldiers ordered him to run away. CSMF ¶452. Instead, John Doe VI crouched by a nearby fence and pleaded for his life. *Id*. The soldiers shot him in the leg. Id. ██████████ ████████████████████████████████████████████████████████████████ recognized the soldiers who detained and shot John Doe VI as Exxon soldiers. CSMF ¶¶453, 456. ████████████████████ worked shifts at Exxon, spending two of every three weeks at Exxon's Bachelor Camp. CSMF ¶¶456-458. He recognized and had meals with the soldiers at Exxon Bachelor Camp. CSMF ¶¶459-463. He recognized the soldiers who detained at shot John Doe IV from Bachelor Camp: "I knew them from bachelor camp, because we had our meals at the same place." CSMF ¶459; *see also* ¶115. The soldiers recognized him as well. CSMF ¶446. ██████████████ also saw the soldiers working at Exxon's landing dock and other Exxon locations. CSMF ¶¶ 461; *see also* ¶114. ████████████ reported the attack to his Exxon supervisor, a man named Sukirman. CSMF ¶446. Internal Exxon reports show Exxon stationed soldiers at Bachelor Camp at the relevant time. CSMF ¶465 ██████████████████████████ A reasonable jury could conclude that that the soldiers who shot Jane Doe VIII's husband were based at Bachelor Camp and provided security for Exxon.

**John Doe II**: John Doe II was at a food stall just down the road from Custer 4 when he heard gunfire. CSMF ¶¶471-477. All of the other customers ran away except John Doe II who was waiting for his breakfast. CSMF ¶477. Soldiers from Cluster 4 came upon John Doe II and beat him. CSMF ¶478-479. Both John Doe II and a third-party eyewitness identified the soldiers

as soldiers from Exxon Cluster 4. John Doe II had seen the soldiers leave Cluster 4 and come down the road to the stall. CSMF ¶476. The witness, ███████████████████████████████, recognized the soldiers who beat John Doe II as her customers from Cluster 4. CSMF ¶¶475, 481. The soldiers from Cluster 4 were ████████████████████████████████ and she recognized them. *Id.* ██████████ also saw the soldiers come from Cluster 4. CSMF ¶476.

The soldiers who beat John Doe II at the food stall took him away and detained him for 51 days. CSMF ¶¶482-483. During that time he was tortured. ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ A reasonable jury could conclude that that the soldiers who beat and tortured John Doe II were based at Cluster 4 and provided security for Exxon.

**John Doe IV**: John Doe IV was returning from an errand (he had gone with a coworker to pick up their wages from construction job) when he was stopped by an Exxon patrol within sight of Cluster 4. CSMF ¶¶501-502, 506. The soldiers beat him, stole his money, and accused him of being a GAM member. CSMF ¶¶507, 509. They carved GAM into his back with a knife. CSMF ¶¶ 509-510. The Exxon soldiers told him they were taking him to A-13, Exxon's camp for its military personnel. CSMF ¶511. ██████████████████████████████████ ██████████████████████████████████████ CSMF ¶¶515-516. Exxon used the A-13 camp to house its military security and stationed troops there at the relevant time. CSMF ¶¶512-515, 303-305. Exxon used the A-13 military security specifically to help guard its facilities and to patrol the nearby roads, including the location where John Doe IV was stopped by a patrol. CSMF ¶¶504, 514. Exxon received reports of villagers being taken to A-13 and

tortured there, including from the Wall Street Journal. CSMF ¶37. A reasonable jury could conclude that that the soldiers who beat and tortured John Doe IV were A-13 soldiers who provided security for Exxon.

**John Doe VII**: John Doe VI and ████████████████, were visiting a neighbor during a religious festival. CSMF ¶¶521-522. As they were leaving, they were called over to A1 (a facility operated by Exxon) by soldiers on guard duty at the fence. CSMF¶523. John Doe VII and two other witnesses who lived near A1 testified that A1 was operated by Exxon at the time. CSMF ¶537. Exxon's own internal documents ████████  ████████████████ ████████████ Id.

The guards took the men to a warehouse on the site and beat them severely overnight, causing lasting damage. CSMF ¶¶524-526. Both men thought they were going to die. CSMF ¶¶524-526, 532. John Doe VII recognized approximately 10 of the soldiers who beat him as soldiers who he had regularly seen guarding EMOI's employees and operations. CSMF ¶527-528. Both John Doe VII ████████████ knew by name some of the soldiers who beat them and knew that they worked providing security for Exxon. CSMF ¶528 (identifying four soldiers by name). Both men had seen the soldiers conducting patrol and escort duties for Exxon. *Id*. Based on their uniforms, John Doe identified the units (units 111 and 113) and the name of the commander (Angiss) of the soldiers who detained him. CSMF ¶529. Internal Exxon documents ████████████████████████████████ CSMF ¶530; *see also* ¶531 (identifying commander of 113).

A third witness, ████████████, was present at A1 when the men were released. CSMF ¶¶534, 536. ████████████████████ had gone to A1 to seek the release of the boys and met with the Exxon soldiers, including the commander, at A1 to negotiate their release. *Id*.

That morning, the soldiers took the men to an Exxon clinic at Point A, Exxon's administrative headquarters, that was not open to the public, to clean them up for their release. CSMF ¶535. A reasonable jury could conclude that that the soldiers who beat and tortured John Doe VII were based at A1 and provided security for Exxon.

Finally, Exxon's operations were in a remote, rural part of North Aceh. CSMF ¶¶27, 282. There were many small villages scattered among Exxon's operations, but no other "vital national project" with TNI security was located within the area of Exxon's operations where Plaintiffs were injured (most near Cluster 4). *Id.* Even absent the eyewitness testimony detailed above, a reasonable jury could conclude that military security personnel at or near Exxon's operations were "detailed to EMOI." EMOI concedes that it is aware of no evidence that would counter this inference or the eyewitness testimony.[9] Exxon asks the Court to draw an inference in its favor that the tortfeasors could have been any soldier, but the evidence shows no other troops active near the Exxon facilities at that time, and such an inference is not permissible at this stage. *See, e.g.*, *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1194, 1197 (D.C. Cir. 2018).

   c.  *Exxon does not meet its burden.*

For each assault, plaintiffs provided more than enough evidence for a reasonable jury to conclude that the soldier responsible for the injuries was a member of Exxon's military security.[10] Exxon's arguments repeatedly omit key evidence from third party witnesses or

---

[9] *See* CSMF ¶27 & n.3. Exxon's arguments rest on the false premise that "the Indonesian government deployed approximately 40,000 Indonesian soldiers to Aceh." Defs' Mem. 8; see generally CSMF ¶27 & *supra* § II. But there were only 5,500 soldiers deployed across the entire 15 Regencies in Aceh. The 1,000 personnel dedicated to Exxon, in but one of the 15 Regencies that comprise Aceh, were dedicated exclusively to Exxon. *Id.*; *see also* CSMF ¶211.

[10] Exxon did not challenge any other aspect of Plaintiffs' Article 1365 (negligence) claim; other arguments that relate to causation are discussed below in Section V.A.3 on Article 1367, although Exxon combined its discussion of the facts.

Exxon's own documents, draw inferences against Plaintiffs (the non-movant), or ask the court to make credibility determinations, all of which are impermissible on summary judgment. *E.g., Anderson*, 477 U.S. at 255; *Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 94 (D.D.C. 2008) (Lamberth, J.). At most, Exxon manages to show a dispute of material fact—which is not sufficient to prevail. Plaintiffs do not need to win the dispute to defeat Exxon's motion. *U.S. v. Project on Gov't Oversight*, 454 F.3d 306, 313 (D.C. Cir. 2006).

As an initial matter, Exxon repeatedly argues that Plaintiffs "did not know the identity of the Indonesian soldier" responsible for the attack. Defs' Mem. 18-29. But Exxon then cites to testimony where the victim was asked whether they knew the ***name*** of the attacker. *Id.* (citing SOF ¶¶40 (asking "You don't know what his name is, correct?"), 50-51, 61 ("did you know any of their names"), 70, 81, 88, 101, 131. Plaintiffs do not need to know the ***name*** of the soldier to identify the soldier as Exxon military security. Across a wide range of cases, from upholding criminal convictions to admitting statements by agents, courts have found that a name is not necessary for identification purposes and that circumstantial evidence is more than sufficient. *E.g.*, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992) (circumstantial evidence can suffice to establish an agency relationship "without identifying the employee"); *Davis v. Mobil Oil Expl. & Producing Se., Inc.*, 864 F.2d 1171, 1174 (5th Cir. 1989) (finding speaker was an agent based on, *inter alia*, hard hat although name was unknown); *see also Smith v. Pathmark Stores, Inc.*, 485 F. Supp. 2d 235, 238-39 (E.D.N.Y. 2007) (holding circumstantial evidence was sufficient to find unidentified tortfeasor was defendant's employee even though plaintiff did not know the employee's name and plaintiff's description of the tortfeasor did not match defendant's maintenance employees on duty at the time); *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 576 F. Supp. 2d 128, 131 (D.D.C. 2008) (Lamberth, J.) (explaining

that "circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence" (quoting *U.S. ex rel. El-Amin v. George Washington Univ.*, 522 F. Supp. 2d 135, 143 (D.D.C. 2007))). Each Plaintiff submitted sufficient evidence, described above, to identify the perpetrator as a member of Exxon's military security personnel. For example, Exxon asserts that Jane Doe IV and two non-party witnesses, her son and a neighbor, could not identify the soldiers involved in the shooting. Def. Mem 20 (citing SOF ¶70 ("Do you know the names of any of the soldiers…?"). ███ ████████████, testified that he recognized the shooter as a soldier he routinely saw on guard duty at Exxon Cluster 4. CSMF ¶¶386-387; 388 (soldier at Cluster 4 admits shooting). ████ also recognized the assailants as Cluster 4 soldiers because they had bullied him on the way to school. CSMF ¶¶384-387. And Jane Doe IV recognized them because the soldiers at Cluster 4 checked her identification card when she went shopping in the village. CSMF ¶¶389, 391-392. Exxon's arguments on Jane Does I, II, III, IV, V, VI, VII and John Does IV and VII all suffer from this flaw.

Second, Exxon largely ignores the testimony of non-party witnesses and the evidence of its own documents, implying that the plaintiff must have personal knowledge of each material fact. Not so. The Federal Rules expressly permit reliance on documents, depositions, interrogatory answers, and admissions. *See* Fed. R. Civ. P. 56(c). For example, Exxon argues that Jane I "testified" that she herself did not know if the soldier was affiliated with Exxon. Def. Mem. at 18-19.[11] But Jane I identified the soldier by Unit number, based on the badge she observed on his uniform and an eyewitness saw him arrive in a Unit 113 truck. CSMF ¶¶315, 318. Exxon's own internal documents ███████████████████████████████

---

[11] Defendants asked Jane Doe I at the deposition to put aside what she'd learned from others. PX19, Jane Doe I Dep. 66:22-67:8.

███████████████. CSMF ¶¶316-317. And an eyewitness saw the perpetrator's distinctive Unit

113 truck routinely traveling in and out of Exxon's headquarters at Point A. CSMF ¶¶318-321.

Likewise, Defendants argue that Jane Doe III did not see what happened to her husband: that is

not disputed. But a third-party eyewitness, ██████, testified that troops from Exxon's Bachelor

Camp conducted the assault. CSMF ¶¶360-368. A former employee at Exxon's Bachelor Camp,

he operated a kiosk at Exxon's gate, selling soda and cigarettes to the soldiers stationed at

Exxon's facility. CSMF ¶¶361-362. Exxon's own documents ████████████████

████████████████████ CSMF ¶¶371-372. Exxon does not dispute that ██████ saw what

happened: he saw the Exxon Bachelor Camp troops beat the villagers and afterwards he saw Jane

Doe III's husband lying motionless on the ground. CSMF ¶¶50, 62; *see also* ¶360, 368 (██████

saw the motionless body loaded onto a truck). Exxon appears to argue that it is not "definitive"

that Jane III's husband was "injured in any way." Def. Mem 20, n.13. That does not meet their

burden. A reasonable jury could certainly conclude that the soldiers killed Jane Doe III's

husband and took his body. *See, e.g*, *U.S. v. Williams*, 216 F.3d 1099, 1103 (D.C. Cir. 2000)

("[I]f you go to bed on a winter's night and the ground is clear and you wake up the next morning

and see snow on the ground, you have circumstantial evidence that it snowed…."). Third,

Defendants complain that the statements from two now-deceased victims is inadmissible

hearsay. Def. Mem. 21-22, 25. All of this testimony is admissible as excited utterance, Fed. R.

Evid. 803(2).[12] The statements are also admissible under the residual exception, Fed. R. Evid.

---

[12] An out-of-court statement is admissible as an excited utterance if the court finds: "(1)
the occurrence of a startling event; (2) that the declarant made the statement while under the
stress of excitement caused by the event; and (3) that the declarant's statement relates to the
startling event." *U.S. v. Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003). John Doe I's and John
Doe V's statements about their horrific torture easily fit this exception. As soon as he was
brought home after having his hand cut off and his eye gouged out, John Doe I told he wife that

807.[13] Plaintiffs offer as evidence a handful of other out-of-court statements, but Defendants

---

"he was taken by soldiers working at Point A." CSMF ¶413. John Doe I, who had received no medical treatment, cried while recounting his ordeal and was in obvious pain. *Id.* ¶412 ("[H]e was in shock and shaking because he felt very painful."); *id.* ("[H]e felt terrible pain and he cried all that night."). Likewise, John Doe V was brought home after being detained, tortured, and urinated on, with sores all over his body. *Id.* ¶¶440-441. He was afraid, in pain from the beating, he looked pale, his voice was trembling, and he immediately cried out to his wife that Defendants' military security had abducted and tortured him. *Id.* A statement from the victim of a violent attack, while still under the pain and stress of the attack, that identifies the perpetrator is a quintessential excited utterance. *See, e.g., Alexander*, 331 F.3d at 120-21; *Guthrie v. U.S.*, 207 F.2d 19, 21-23 (D.C. Cir. 1953); *U.S. v. Domenech*, 2017 WL 8894650, at *8-9 (D.D.C. 2017). That there may have been a lapse in time between when the injuries were first inflicted and the out-of-court utterances does not change the analysis. *Alexander*, 331 F.3d at 122 ("[U]nlike the hearsay exception for present sense impressions, '[a]n excited utterance need not be contemporaneous with the startling event to be admissible.'" (citation omitted) (quoting *U.S. v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998))). This is especially true here, where John Doe I and John Doe V had not received medical treatment for their injuries, were still in pain, and made the out-of-court statements at the first opportunity. *See Lampe v. U.S.*, 229 F.2d 43, 46 (D.C. Cir. 1956) ("Lamar had had no medical attention and must have been suffering from his grievous wounds even more than when he first talked to the police."); *cf. U.S. v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987).

[13] These statements are also admissible under the residual exception, Fed. R. Evid. 807. Out-of-court statements are admissible under the residual exception if they are "supported by sufficient guarantees of trustworthiness" and are "more probative on the point for which [they are] offered than any other evidence." *U.S. v. Smith*, 2020 WL 5995100, at *7 (D.D.C. 2020) (quoting Fed. R. Evid. 807). In assessing trustworthiness, courts focus on "whether the declarant was 'highly unlikely to lie' in making their out-of-court statement." *Id.* (quoting *U.S. v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017)). In a factually similar case, a court in this District recently admitted a deceased torture victim's out-of-court statement describing his torture where the witness had an opportunity to observe the declarant's wounds and other evidence confirmed the alleged perpetrators practiced torture. *See Sotloff v. Syrian Arab Republic*, 2021 WL 965882, at *5 & n.11 (D.D.C. 2021). The same is true here: both Jane Doe V and Jane Doe VII saw their husband's injuries, and ample other evidence from the other Plaintiffs, State Department reports, and other sources, confirms that Defendants' military security regularly tortured detainees. CSMF ¶¶176-84, 214, 224, 258-61, 273-75, 305, 354, 412, 420, 440-41, 445. Moreover, John Does I and V had no conceivable incentive to lie to their wives upon their release: at the time they made the statements, litigation in Indonesia was out of the question, and the Plaintiffs had no access to an American attorney who could bring litigation in a U.S. court. That the statement was made to a close family member adds an additional layer of trustworthiness. *See Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 578 (6th Cir. 2013). Additionally, even assuming *arguendo* these statements were not excited utterances (which they are), they at least "almost fit[]" that hearsay exception, which further "cuts in favor of admission." *U.S. v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994) (admitting statement under former residual exception, Fed. R.

have not challenged their admissibility. Under Federal Rule of Civil Procedure 56(c)(2), it is "the obligation of the opposing party to object" to the admissibility of evidence at the summary-judgment stage. *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017); *see also, e.g.*, *Holassie v. District of Columbia*, 2019 WL 5189005, at *5 (D.D.C. 2019). *Council on Am.-Islamic Rels. Action Net. v. Gaubatz*, 31 F. Supp. 3d 237, 248 n.4 (D.D.C. 2014) (quoting *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)).[14]

For other Plaintiffs, Exxon omits key evidence from its narrative and asks the Court to improperly draw inferences against the Plaintiffs. For example, ███████████████████ ███████ where both John Doe II and the Exxon Cluster soldiers were regular customers, testified that she recognized the assailants. CSMF ¶¶475, 481. John Doe II testified that he saw the soldiers exit the Cluster before he ordered breakfast and that those soldiers attacked him. CSMF ¶¶476-477. Exxon asks the court to infer some other soldiers, not the attackers, ███████████ ████████████████ Drawing inferences against plaintiffs is improper on summary judgment. *E.g.*, *Feld*, 909 F.3d at 1194, 1197; *see generally U.S. v. Ytem*, 255 F.3d 394, 396 (7th Cir. 2001) (unlikely someone else picked up and mailed the checks). Similarly, in Jane Doe II's case, the village chief testified that Jane Doe II's village was 3km (1.8 miles) from Exxon Cluster 4, not "miles away" as Exxon contends without citation to the record. Def. Mem 18. Both the village chief and Jane II identified the trucks used in the attack as trucks they saw regularly parked at Cluster 4; Jane Doe II identified the assailants as soldiers she had seen at Cluster 4; and Exxon's

---

Evid. 803(24)); *see also* Fed. R. Evid. 807 Advisory Comm. Notes to 2019 Amend. ("[A] court assessing guarantees of trustworthiness may consider whether the statement is a "near-miss" of one of the Rule 803 or 804 exceptions.").

[14] If the Court allows Defendants to raise additional objections on reply, Plaintiffs should be given a chance to explain the admissibility of the challenged evidence. *Maurer*, 870 F.3d at 384 (quoting Fed. R. Civ. P. 56 cmte. note).

own internal documents ██████████████████████████████████████

████████████████████████████████████████████████████████████████

on December 4; and confirmed that villagers had been shot that day. CSMF ¶¶334-355. Exxon

asks the court to draw a contrary inference because Jane Doe II does not know the soldiers'

names, but this is improper. Exxon also improperly relies on a contrary inference to try to

undercut the testimony of an eyewitness to the shooting of Jane Doe VIII's husband.[15] ██████

███████████████████████████ and worked for an Exxon subcontractor at Bachelor Camp. CSMF

¶¶456-458. He recognized the soldiers who shot Jane VIII's husband as soldiers he knew from

Exxon's Bachelor Camp. CSMF ¶¶453-454, 459-461. Specifically, he recognized the four who

were pointing guns at Jane VIII's husband. CSMF ¶453. He explained that he ate meals with the

soldiers at Exxon's Bachelor Camp and, when not eating, the soldiers worked at the landing dock

and other areas "under Exxon, within Exxon." CSMF ¶¶459-461. Exxon relies on a truncated

legal conclusion expressed by the witness, but his full explanation of what he observed is clear:

he saw the soldiers performing services for Exxon. CSMF ¶¶114, 461. Exxon's own internal

documents ████████████████████████████████████████████ CSMF ¶465.

A reasonable jury could conclude that the four soldiers who pointed their guns at Jane Doe III's

husband, and who ate their meals at Exxon's Bachelor Camp and performed duties at other

Exxon locations were soldiers who worked for Exxon.

Exxon also asks this Court to make credibility determinations, which is not permissible

on summary judgment. *Anderson*, 477 U.S. at 255. Plaintiffs dispute that Jane Doe VI "changed

---

[15] Exxon did not object to the substitution of ████████████████, for Jane Doe VIII after it
became apparent that Jane Doe VIII was too frail to sit for deposition. CSMF ¶111. Jane Doe
VIII was a damages witness, not a percipient witness, and Exxon had an opportunity to question
████████ about her mother's health. *Id*. This substitution is not a "due process" violation. Def.
Mem at 26, n. 20; *see infra* § V.D.

her story," (*see* CSMF ¶86) but regardless Exxon's argument is beside the point, as Exxon wholly omits evidence from an eyewitness to the shooting. An eyewitness, ▮▮▮▮▮▮, saw soldiers exit Exxon Cluster 2 and shoot Jane Doe VI's son ▮▮▮▮▮▮▮▮▮▮▮ CSMF ¶¶421-431 ("the evidence, I saw. They came out of the gate of Cluster 2 and shot my brother.").

▮▮▮▮▮▮ was familiar with Cluster 2 and had seen soldiers working for Exxon at the Cluster 2 gate on other occasions. CSMF ¶¶431, 434. Her identification of the soldiers who killed her brother is based on her witnessing the shooting, not as Exxon contends, a definition of what it means to be an "Exxon soldier." CSMF ¶¶88, 431 ("I saw with my two eyes. That is the evidence."). Exxon's own documents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ CSMF ¶¶423, 433-434. Exxon also omits and improperly discounts evidence presented by John Doe IV. John Doe IV was stopped by soldiers on patrol within sight of Cluster 4. CSMF ¶506. Exxon's own documents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CSMF ¶¶286-294, 504. John Doe IV testified that had often seen patrols from Cluster 4 patrolling at the time and in the area where he was picked up, and that he was stopped by one of those routine patrols. CSMF ¶505. The soldiers told him, in a statement Exxon does not acknowledge or challenge, that they were taking him to A-13. CSMF ¶511. Exxon's own documents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ CSMF ¶¶281, 512-15. The logical inference from these facts is that soldiers from Exxon's Cluster 4 took John Doe to an Exxon camp, not that other, unrelated persons picked him and lied to him about where they were taking him.

Exxon does not have any plausible basis for challenging John Doe VII's claim. John Doe VII and a third-party eyewitness identified by name the soldiers who detained and beat them (the exact information Exxon complains was unavailable to the other victims); both men identified the named soldiers as soldiers they recognized from escort and guard duty for Exxon at Exxon Cluster 3; in addition, John Doe VII recognized approximately 10 of the soldiers who beat him as soldiers who he had regularly seen guarding EMOI's employees and operations; and John Doe VII identified the unit numbers (111 and 113) of the soldiers who beat him and their commander (Angiss). CSMF ¶¶ 527-31. Exxon fails to address any of this evidence and instead argues that A1 was not owned by Exxon but by the Government of Indonesia. Def. Mem. 29. But Exxon's own documents ███████████████████████████████████████████ ████████████████████████ CSMF ¶¶280-281, 537. The witnesses did not rest their testimony on the formal title to the land but all of them lived in the area for decades and confirmed A1 was operated by Exxon at the relevant time.

Finally, in passing, Exxon states that "the unrebutted evidence shows that EMOI had no legal authority to exercise command or control over the sovereign military." Def. Mem. at 15. Exxon never returns to this argument or cites any factual support for it. Plaintiffs do not read this stray sentence as a substantive part of Exxon's motion, but nonetheless present substantial factual evidence of Exxon's control over the military security assigned to its facilities (at Exxon's request). CSMF ¶¶ 11, 208-11, 213, 239-52, 280-304; *see also supra* § II. In addition, in the course of denying Exxon's prior motion for summary judgment on the negligence claims under D.C. law in 2008, this court held that Plaintiffs had presented sufficient evidence of EMOI's right to control the military security personnel. Dkt. 365 at 13-14. The Court's prior

rulings that Plaintiffs had established factual disputes are, as noted above, binding legal determinations under the law of the case doctrine. *See supra* § V.A.2.a.

       3.        <u>Indirect Liability Under Article 1367</u>

           a.      *This Court's 2014 opinion set out the framework for Article 1367 claims.*

In 2014, in an opinion Defendants fail to even acknowledge, this Court set out the standard for vicarious liability under Indonesian law and held that Plaintiffs had successfully stated a claim under Article 1367 of the Indonesian Civil Code. Dkt. 455 at 36-40. This Court's opinion has governed the discovery served and taken by Plaintiffs for the last seven years. It is the law of the case and Defendants provide no basis for departing from this prior ruling now, after the close of discovery.[16]

Article 1367 provides "Employees and those appointed to represent the affairs of others shall be responsible for damage caused by the act of their employees and subordinates in performing the work for which they are engaged." *Id.* at 37-38. Article 1367 authorizes vicarious liability over Exxon for the intentional torts (e.g., assault, battery) of the security providers. In its analysis of the scope of this provision, this Court relied on the work of Defendants' prior expert, Robert Hornick; Plaintiff's expert, Gary Bell[17]; and the Indonesian case law submitted to the Court. *Id.* at 37-39. The Court concurred with Mr. Hornick's description (who was, it bears

---

[16] Defendants do not meet their burden to overturn this Court's prior holding. *Capitol Just.*, 605 F. Supp. 2d at 190 (Lamberth, J.) ("where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" (quoting *In re Ski Train Fire in Kaprun, Austria, on Nov. 11, 2000*, 224 F.R.D. 543, 546 (S.D.N.Y.2004))); *accord, e.g.*, *Singh v. George Washington Univ.*, 383 F. Supp.2d 99, 101 (D.D.C 2005) (Lamberth, J.). As Plaintiffs' expert, Professor Bell, confirms, there have been no intervening changes in the governing law that would require revising or revisiting the Court's opinion. PX1, Bell Decl. (2021) ¶¶6-7. *See id.* ¶17, 19; PX2, Cammack Decl. ¶17.

[17] At his deposition, Prof. Lindsey described Gary Bell as "a well-regarded scholar of Indonesian law" whose work Lindsey has cited in his own work. PX42, Lindsey Dep. 51:22-52:4.

repeating, *Defendants*' expert) of the scope of the statute: there must be a "functional connection between the wrongful act and the work that the employee/representative is being directed to perform." *Id*. (also noting that Bell provided a similar interpretation). This Court emphasized that "[t]here is **no requirement of fault on the part of the employer** or principal—liability may be vicarious" and further held that vicarious liability may attach even where the employee or representative acted **"without authorization or against orders**." *Id.* (citing PX394, Bell Decl. (2013)). This Court expressly rejected the argument that a defendant may avoid liability by showing that an employee deviated from the employer's instructions, observing that "Indonesian case law submitted to the court indicates a rather expansive interpretation of Article 1367 that seems more in line with the 'functional connection' language adopted by Hornick and the rule stated by Bell." *Id*. at 104.

This Court, after evaluating the law and allegations in the Complaint, provided the following examples of "the kind of 'functional connection' required by Indonesian law to show that a principal is liable for the torts of its agent": (1) injuries caused on Exxon property; (2) injuries caused by Exxon personnel stationed at Exxon security posts; (3) actions of off-duty Exxon security, as Exxon "had a duty to prevent them from inflicting injuries using its equipment and on its property, even when those security personnel were off duty." *Id*. at 39-40.

Defendants, apparently unhappy with this Court's statement of Indonesian law, have ignored it. Defendants instead submitted yet another expert declaration—their tenth—that materially conflicts with the declarations of their own prior expert. Defendants' arguments also directly conflict with this Court's holding. Defendants argue that that vicarious liability does not attach unless Plaintiffs show "what, specifically, the defendant did to cause the perpetrator to engage in the alleged conduct." Defs.' Br. at 15. And they likewise imply Plaintiffs must show

Defendants "directed, participated, conspired, caused, or [were] present when Plaintiffs suffered their alleged injuries." Defs.' Br. at 2.

But Defendants' new argument is squarely foreclosed by this Court's 2014 decision. This Court already held "[t]here is *no requirement of fault on the part of the employer* or principal" and therefore no requirement that Exxon ordered, directed, participated, conspired, caused or was present at any of the intentional torts. Dkt. 455 at 38. Professor Bell confirms that this Court's analysis of Indonesian law is correct: "the only fault that needs to be proven is the fault (i.e. wrongful act) of the employee or appointee and a causal link between that fault and the damage." PX1, Bell Decl. (2021) ¶23. Bell further states that while Professor Lindsey is a friend of his and he "would rarely say that a statement about the law is absolutely wrong as the law of full of nuances, but unfortunately in this case, I must say that *this statement by Professor Lindsey is completely and absolutely inaccurate and is a misrepresentation*" of 200 years of interpretive jurisprudence on Indonesian law and its Dutch and French equivalents. *Id.* ¶¶10, 23. Rather, as this Court held and Exxon's own prior expert argued, Plaintiffs need only show a "functional connection" between the tort and the duties of the military security personnel. Dkt. 455 at 38; PX1, Bell Decl. (2021) ¶25. Bell also notes that this requirement is interpreted "very broadly" and that there is no need to prove precisely what the employer or principal's instructions were. PX1, Bell Decl. (2021) ¶25.

Defendants also argue that, under Indonesian law, Plaintiff must identify "the specific perpetrator" for vicarious liability to attach. Def. Mem at 15. But this is not a question of Indonesian law. While Indonesian law governs the substantive elements of Plaintiffs' vicarious liability claim—*i.e.*, that there must be an employment or representation relationship—the type and quantum of evidence Plaintiffs must present to survive summary judgment is a procedural

issue governed by federal law.[18] *See Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982)

("[W]hether there is sufficient evidence to create a jury issue of those essential substantive

elements of the action, as defined by state law, is controlled by federal rules.").[19] And under

federal law, circumstantial evidence can suffice to establish an agency relationship "without

identifying the employee." E.g., *Pappas*, 963 F.2d at 538; *supra* § V.A.1.c.[20]

> b.     *Plaintiffs have ample evidence that the soldiers injured Plaintiffs in the*
> *course of protecting the Arun Field facilities.*

As noted above this Court has already held that Defendants can be held vicariously liable

under Article 1367 for intentional torts, including (1) injuries caused on Exxon property; (2)

injuries caused by Exxon personnel stationed at Exxon security checkpoints; and (3) actions of

security personnel who were off duty, as Exxon "had a duty to prevent them from inflicting

injuries using its equipment and on its property, even when those security personnel were off

duty." Dkt. 455 at 39-40. Backtracking somewhat from their rhetoric about the scope of Article

1367, Defendants argue in Section I.C of their brief only that Plaintiffs must provide evidence

---

[18] This argument repackages an argument Defendants unsuccessfully raised in their 2013 motion to dismiss—that the physical tortfeasor must be named as a defendant. The Court ruled that federal law governed that question and rejected Defendants' argument. Dkt. 455 at 35-36.

[19] *Accord, e.g.*, *Motus v. Pfizer Inc.*, 358 F.3d 659, 660 (9th Cir. 2004); *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1258 n.47 (10th Cir. 1999); *Villarini-Garcia v. Hosp. Del Maestro, Inc.*, 8 F.3d 81, 86 (1st Cir. 1993); 10A Wright & Miller, Fed. Prac. and Proc. § 2712 & n. 39 (4th ed. 2021 update) (collecting cases).

[20] Lindsey's declaration makes a number of assertions that Defendants do not raise in their brief, so Plaintiffs do not address them except to note that Lindsey did not include these interpretations in the 27-page expert report he submitted, thereby avoiding deposition on them, and that none of the experts retained by Defendants (who submitted ten separate expert declarations on Indonesian law over the years) ever advocated some of the positions now taken by Prof. Lindsey. Finally, Lindsey's declaration is not consistent with his own book on Indonesian law. The chapter on civil liability is attached as PX265 and confirms that Lindsey's academic writings largely support Plaintiffs' analysis of Indonesian law.

"that the soldiers who allegedly injured Plaintiffs did so in the course of protecting the Arun field facilities." Def. Mem. at 17. All Plaintiffs easily meet this standard.

All of the victims were injured within the Arun gas field area[21] at or near the Clusters, with several tortured **on** Exxon property. *See* CSMF ¶280 (Jane Doe I assaulted in her village near Point A; Jane Doe II's and IV's husbands killed in their rice paddy near Cluster 4; Jane Doe III's husband killed outside the Bachelor Camp gate; Jane Doe V's husband abducted from the road in front of Point A and taken to an Exxon Post; Jane Doe VI's son shot at the Cluster 2 gate; Jane Doe VII's husband detained and beaten near Cluster 4; Jane Doe VIII's husband abducted just outside Cluster 4; John Doe II beaten and abducted just outside Cluster 4; John Doe IV abducted just outside Cluster 4 and detained and tortured at Camp A-13; John Doe VII detained and tortured inside of Camp A-1). John Doe IV and John Doe VII were detained and tortured *inside* Exxon facilities. *Id.* (at A-13 and in a warehouse at A-1, respectively). Both Jane Doe V's and Jane Doe VII's husband were taken to Exxon posts and tortured. *Id.* (taken to an Exxon Post where his hand was cut off and eye gouged out; taken to a post near Cluster 4, respectively). Two victims were injured right outside the gates of Exxon facilities by military guards stationed there: Jane Doe III's husband was killed right outside the Bachelor Camp gate and Jane Doe VI's son was shot right outside the Cluster 2 gate. CSMF ¶¶360, 421. These facts fit this Court's determination that injuries caused on Exxon property or caused by Exxon personnel stationed at

---

[21] The Arun field facilities were located in a remote part of rural north Aceh. CSMF ¶282. Exxon's operations included the work clusters, storage areas, heavy equipment yards, administrative facilities, and housing for expatriates and for the military, as well as the roads Exxon built and utilized for travel between these locations. CSMF ¶280-81. The facilities spread over a wide, decentralized area in north Aceh, with 263 small villages "in close proximity" to Exxon's operations. CSMF ¶282.

Exxon security checkpoints satisfy the "functional connection" required by Indonesian law. Dkt. 455 at 39.

In addition, Plaintiffs meet Defendants' test, at least to the extent it is consistent with Indonesian law. *See* PX1, Bell (2021) Decl. ¶25; PX2, Cammack Decl. ¶¶18-21 (describing connection required). Exxon tasked the military security with a wide range of security services.

█████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ ███████████████

█████████████████ CSMF ¶283; see also ¶¶284-300. All of the victims were injured in the course of carrying out these tasks.

To protect Exxon's operations, Exxon tasked its military security with conducting perimeter patrols both within the fence and outside its facilities. CSMF ¶¶286, 289. To provide security for its transportation needs, Exxon stationed their military guards along the roads, at security posts and checkpoints, and deployed roving patrols. CSMF ¶¶290, 293. Exxon also tasked the military security with providing escorts for its convoys, shift change and equipment movements, and instructed the military security to conduct "sweeping operations" along the route, including on public roads, prior to convoy departures. CSMF ¶¶291-292. Many of the victims (including Jane Doe V's husband, John Doe II, John Doe IV, Jane Doe VII's husband, Jane Doe VIII's husband, and John Doe VII) encountered these patrols and were injured by military security performing their patrolling or sweeping duties. For example, John Doe II was accosted and beaten by soldiers who had just left their Cluster as a group and appeared to be patrolling or sweeping the road. CSMF ¶¶476-77. Jane Doe V's husband was picked up on the

road outside Point A, by soldiers on duty, working at Point A. CSMF ¶¶409, 413-14. John Doe IV was accosted by group of soldiers on a regularly scheduled patrol right outside Cluster 4. CSMF ¶506. Jane Doe VII's husband and Jane Doe VIII's husband were both also picked up by military security units on duty near the perimeter of Cluster 4. CSMF ¶¶437-439, 448-452. John Doe VII was accosted by a patrol within the fence at A1. CSMF ¶¶523-24.

In addition, Exxon tasked its military security with investigating and responding to security breaches, threats and incidents. CSMF ¶¶283, 296. This included investigating reports of gunfire and other violence at or near Exxon facilities. CSMF ¶¶297-98 (Exxon A-13 combed the area after guns shots fired). A shooting and bombing were reported in Jane Doe I's village just outside Point A, Exxon's administrative headquarters the morning of her assault. CSMF ¶327. ██████████████████████████ was on duty: he arrived with his unit in a truck belonging to his unit and after they arrived, the soldiers dispersed into different alleyways; they also regrouped and left together. CSMF ¶329. When at her house, the soldier asked Jane Doe if her husband was in GAM and whether she had a hidden a bomb. CSMF ¶330. It is reasonable to infer that the soldiers were investigating the violence reported in her village that morning.

Jane Doe III's husband was likewise injured in response to a suspected attack. An eyewitness testified that the military security at Bachelor Camp rushed out of the gate in response to a tire explosion, thinking they were under attack. CSMF ¶360. Thirty or forty soldiers exited the Exxon compound and rounded up the locals, beating and interrogating them. CSMF ¶365. Jane Doe III's husband was injured in that attack. CSMF ¶¶367-68. The soldiers were on duty and acting in response to a perceived threat to Exxon's operations. CSMF ¶¶360, 365-67, 372. Similarly, John Doe II was picked up and beaten by soldiers from Cluster 3 and 4 right after a burst of nearby gunfire. CSMF ¶477.

Exxon expected their military security to provide ██████████████████ ████████ CSMF ¶289. Exxon also tasked the military guards with investigating and responding to threats and with providing security information. CSMF ¶296. Exxon viewed GAM as a potential threat to its operations and relied on its military security to neutralize this risk, including by proactive measures. *Id*. Many of the victims were injured in the course of actions taken to respond to threats from GAM or in the course of gathering information about ████████ ██████████████████████████. CSMF ¶¶283, 296. Exxon also expected its military security to pursue ████████████ as means of deterring threats to their operations. CSMF ¶297. Finally, Defendants also tasked the military security with ████████ ████████████████████████████████ ████████ CSMF ¶299. Exxon's planned response to a wide range of interactions with local villagers (from persons seeking food donations to requests that Exxon raise the Acehnese flag) was to ██████████████████ *Id.* Many of the victims fell into these categories.

Jane Doe II and IV's husbands were shot on December 4, a day when pro-independence locals flew the Acehnese flag. CSMF ¶¶334, 374, 398. Exxon documents ████████████ ████████████████████████████████████ ██████████████████████████. CSMF ¶¶ 354, 398. Both men were killed while working in their rice paddy, while the military security from Cluster 4 shot their weapons in the air and across the field. CSMF ¶¶335, 374. Exxon specifically tasked an ████████████ with responding to attempts to raise the Acehnese flag. CSMF ¶299.

Several of the Plaintiffs were injured when they were picked up by military security personnel and accused of being members of GAM or pressured to provide information about

GAM. Others were questioned and asked for identification, as if they were stopped as part of an investigation or suspected of wrongdoing. For example, John Doe VI was picked up right outside Cluster 4 by Exxon's military security who were on duty and on patrol. CSMF ¶446-452. He was taken to his village and asked to identify GAM members. CSMF ¶452. He was shot by the soldiers, who were identified by an eyewitness as Exxon military security from Bachelor Camp. CSMF ¶453. John Doe IV was also picked up within sight of Cluster 4 by military security on duty on a regularly scheduled patrol. CSMF ¶¶501-506. He was accused of being a GAM member—the military security carved the letters "GAM" into his back with a knife. CSMF ¶¶509-10. John Doe VII was detained and beaten by military security personnel on duty patrolling at A-1 who called out to him from within the fence at A-1 and asked to check his identification card. CSMF ¶523. The military security personnel took him to the warehouse within Exxon's facility. They had a key to the warehouse there and their Commander was aware that the men were being held and questioned. CSMF ¶524, 534 (describing discussions with village chief). The military security personnel who detained and beat John Doe VII were on duty when they stopped, questioned, and assaulted him. CSMF ¶523. The soldiers accused him of being in GAM. CSMF ¶538.

Jane Doe VI's son was shot by soldiers who were on duty at the Cluster 2 gate. CSMF ¶¶421-434. The family was with a large crowd of villagers who were blocking the road while seeking refuge. Exxon documents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ CSMF ¶423. Exxon documents also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The military security personnel who shot Jane Doe VI's son were plainly working to disperse the villagers who were blocking Exxon Road and obstructing Point A, including by shooting them.

In addition, Exxon equipment was used in several of the attacks. For example, the soldiers who attacked Jane Doe II and IV's husbands arrived in trucks that were stored at Cluster 4 and routinely used by Exxon. CSMF ¶¶338-39, 342, 390, 394. And multiple sources documented reports of the military security burning houses in the course of their "sweeps", as they did with Jane 7's house. CSMF ¶¶182, 443. All of the military security who perpetrated these attacks were on duty and paid by Exxon pursuant the agreement in the Production Sharing Contract. CSMF ¶¶216-22. Finally, Exxon's own documents ████████████████████ ████████████████████████████████████████████████████████. CSMF ¶211.

Exxon does not meet its burden. Plaintiffs have presented sufficient evidence from Exxon's own documents to show that the soldiers who injured Plaintiffs were acting within the scope of their engagement for Exxon and that Plaintiffs' injuries are "functional[ly] connect[ed]" to Exxon's assignment. Dkt. 455 at 38.

## B. Moral Damages Need Not Be Quantified, Whether Under Indonesian Law or Federal Procedural Rules.

Plaintiffs need not quantify their damages, whether under Indonesian law or federal procedural rules, which properly govern this question. Defendants' argument to the contrary is wrong at every turn. It (again) contradicts Defendants' own prior expert on the content of Indonesian law. It contradicts Defendants' current expert's own published and public academic writings. It disregards the central role of the jury in the federal legal system. And it would require this Court to preside over an unworkable trial in conflict with this Court's Local Rules and normal federal practice. Plaintiffs all testified extensively about the painful physical and

emotional harms they suffered at the hands of Defendants' military security personnel. A jury could readily conclude that Plaintiffs suffered the losses necessary to maintain tort actions under the Indonesian Civil Code.

      1.      <u>Indonesian Law Does Not Require Quantification of Immaterial Damages.</u>

As Defendants and Prof. Lindsey acknowledge, Indonesian law permits recovery for material *or* immaterial (also known as "moral") damages, or both. Def. Mem. at 30; Dkt. 819-4, Lindsey Decl. ¶30; PX1, Bell Decl. (2021) ¶40. Yet Defendants argue Plaintiffs' claims should be dismissed because they cannot *quantify* their immaterial damages. Dkt. 819-4, Lindsey Decl. ¶31. This directly contradicts Defendants' prior expert, Robert Hornick, who testified that "[d]amages for moral loss should compensate the injured party for harm that ***cannot be quantified in money***, such as reputational harm, pain and emotional distress." PX 393, Hornick Decl. (2006) ¶16. Professor Lindsey's declaration also contradicts his own prior discussion of tort damages in his book, *Indonesian Law*:

> The sum of damages *is calculated by the court* at the hearing and stated in the judgment in two parts: 'intangible' or 'immaterial' losses (pain and suffering) and 'tangible' or 'material' losses (other damages). 'Immaterial damages' are compensation for intangible personal injuries, including stress- related illnesses or conditions that are directly attributable to the wrongful act. They are largely discretionary, depending on the severity of the damage. Whether immaterial damages are available in relatively minor cases is somewhat unclear under Indonesian law but they are certainly available in serious cases. The Supreme Court has specified that these include death, serious injury, and offence....

> The amount of immaterial damages awarded is a *matter for the presiding judges*, although it is, of course, *open* to the plaintiff to suggest an amount and put forward arguments to support it. The general yardstick appears to be 'appropriateness in the circumstances'.

PX265, Butt & Lindsey, *supra*, at 310. Lindsey's prior, public and published work is correct. As Professor Bell explains, the position Professor Lindsey now advances "is not supported by any source of law whatsoever and contradicts the universally accepted position that moral damages

are granted at the discretion of the court." PX1, Bell Decl. (2021) ¶52; *see also id.* ¶¶47-51.

Immaterial damages are, "by definition," incapable of quantification. *Id.* ¶42. Indonesian and

U.S. authorities alike have noted the inherent difficulty with putting a dollar value on immaterial

damages. *See, e.g.*, PX394, Bell Decl. (2013) ¶34 (moral damages, such as emotional distress,

cannot be quantified); *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000)

(compensatory damages for emotional distress are a fact issue for the jury); *Greenbaum v.

Islamic Republic of Iran*, 451 F. Supp. 2d 90, 106 (D.D.C 2006) (Lamberth, J.) ("[M]ental

anguish is extremely difficult to quantify."). Neither Defendants nor their expert explain how

they expect Plaintiffs to quantify, for example, the pain and trauma John Doe II suffered from 51

days of severe torture and sexual abuse, CSMF ¶¶483-90, 498, or the emotional distress Jane

Doe II suffered when she saw her husband's brain protruding from a bullet wound in his head,

CMSF 347. In Indonesia, as in the United States, such damages are a matter of discretion for the

factfinder. *See* PX1, Bell Decl. (2021) ¶52; PX265, Butt & Lindsey, *supra*, at 310.

      2.    <u>The Quantification and Presentation of Damages Is a Matter of Trial Management
Quintessentially Governed By Federal Procedural Rules.</u>

Even if Indonesian law did require plaintiffs in Indonesian court to somehow quantify

immaterial damages (it does not), that rule still would not govern in U.S. federal court.

Quantification of damages is a matter of trial management and thus a quintessential question of

procedure left to the rules of the forum. Dkt. 455 at 35 (noting procedural issues are governed by

federal law); *Joligard v. Addy*, 959 F.2d 1101, 1992 WL 78069, at *2-3 (D.C. Cir. 1992) (table

op.) (evidentiary ruling governed by federal rules). Indeed, this Court's Local Rules speak

directly to the quantification issue, clarifying that in the parties' pretrial statement, "[n]o

monetary amount need be set forth for elements of intangible damage (e.g., pain and suffering,

mental anguish, or loss of consortium)." D.D.C. LCvR 16.5(b)(8). What is more, the rule of this

Circuit may *prohibit* counsel from quantifying immaterial damages for the jury to protect the jury's sacred role as factfinder. *See Queen v. Wash. Metro Area Transit Auth.*, 901 F.2d 135, 140 (D.C, Cir. 1990); *Caldwell v. District of Columbia*, 201 F. Supp. 2d 27, 31 (D.D.C. 2001)*, e.g.*, *Joligard*, 1992 WL 78069, at *2-3; *Piper v. Andrews*, 216 F.Supp. 758, 762 n.9 (D.D.C. 1963). Regardless of how Indonesia's civil law courts may divide responsibilities between the parties and the judges sitting as factfinders, a rule requiring damages be quantified for the jury would invade the jury's provenance as factfinder in the American common-law tradition. *See Byrd v. Blue Ridge Rural Elec. Co-op.*, 356 U.S. 525, 537 (1958). And the role and operation of the jury is another quintessential issue of procedure governed by federal law. *See id.* at 538-39; *see also, e.g.*, *3M Co. v. Boulter*, 2012 WL 5245458, at *2 (D.D.C. Oct. 24, 2012).[22]

      3.    <u>Plaintiffs' Evidence Shows the Considerable Material and Immaterial Loss They Each Suffered.</u>

Plaintiffs' and their witnesses' unrebutted testimony establishes the substantial loss they each suffered at the hands of Defendants' military security personnel. Plaintiffs presented evidence on, *inter alia*: physical pain and suffering, including from gunshot wounds, a gouged-out eye, and electrocution (CSMF ¶¶412-413, 420 (Jane Doe V), ¶435 (Jane Doe VI), ¶¶485-491, 496-498 (John Doe II), ¶520 (John Doe IV), ¶541 (John Doe VII); significant emotional

---

[22] It is not clear whether Defendants in Footnote 26 mean to invite the Court to apply Indonesian rules of evidence in this case. Regardless, Civil Code Art. 1905, which excludes uncorroborated testimony, also expresses a procedural rule of evidence that does not apply in U.S. federal court. *See, e.g.*, *Richardson ex rel. Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 825 n.9 (D.C. Cir. 1988); *see also* Fed. R. Evid. 402 ("Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court."); 19 Wright & Miller, Fed. Prac. & Proc. § 4512 (3d ed. 2021 update) (explaining that Rule 402 prohibits federal courts from excluding otherwise admissible evidence pursuant to a state (and by analogy, foreign) rule).

distress, including trauma from sexual assault and other torture (CSMF ¶¶314, 332-33 (Jane Doe I), ¶356 (Jane Doe II), ¶373 (Jane Doe III), ¶¶402-06 (Jane Doe IV), ¶420 (Jane Doe V), ¶435 (Jane Doe VI), ¶445 (Jane Doe VII), ¶470 (Jane Doe VIII), ¶¶485-90, 495-98 (John Doe II), ¶¶509-10, 516, 520 (John Doe IV), ¶540 (John Doe VII)); the distress they suffered in the aftermath, including families going hungry, women and children taking up manual labor, and the impact on their children's educations, including lack of funds to pay school fees (CSMF ¶357 (Jane Doe II), 373 (Jane Doe III), ¶405-406 (Jane Doe IV), ¶420 (Jane Doe V), ¶435 (Jane Doe VI), ¶470 (Jane Doe VIII), ¶¶495-98 (John Doe II), ¶520 (John Doe IV)).

**C.    EMC Is Directly and Vicariously Liable for Plaintiffs' Injuries.**

Plaintiffs pled three bases for EMC's liability: (1) direct liability for EMC's own negligence; (2) vicarious principal-agent liability; and (3) vicarious shareholder liability through corporate veil-piercing. Defendants ignore the first of these grounds. As to the second, this Court has already held there are sufficient facts to hold EMC liable under a common law principal-agent theory, and those same facts suffice under the broader Indonesian law. Finally, EMC has shareholder liability for EMOI under Indonesian Company Law because it was "involved in" the underlying wrongful acts.

1.    <u>EMC Personnel Directly Participated in the Negligent Hiring/Retention and Supervision of TNI Soldiers.</u>

Except on the same meritless causation grounds discussed *supra* § V.A, Defendants do not move against Plaintiffs' direct liability claims against EMC. *See* Dkt. 425, 2d. Am. Compl. ¶¶1, 212-235. The parties agree that negligence, negligent hiring and/or retention, and negligent supervision are all cognizable under Art. 1365 of the Indonesian Civil Code. Supra §V.A.1. As noted above, Defendants raised a very limited challenge to the negligence claims against EMOI. Supra §V.A.2. Though the Court has not previously ruled on EMC's direct liability, the evidence

shows that EMC directly participated in the negligent hiring, retention, and supervision of military security at EMOI's operations. Like EMOI, EMC is directly liable.

EMC personnel played key roles in the negligent hiring, retention, and supervision of military security, both at a high level and in granular details. In 1999, EMC personnel in the United States "rework[ed] the entire security philosophy for Indonesia." CSMF ¶187; PX216. EMC set security objectives, assigned responsibilities and set target deadlines for completing security tasks. *Id.* EMC assigned its own Global Security personnel to implement its plans. CSMF ¶¶190, 193, 231. EMC personnel prepared risk assessments of EMOI operational security. *See* CSMF ¶¶191, 194, 276. EMC ████████████████████████████ ████████████████████████████ CSMF ¶195. EMC's Lance Johnson received daily security reports from EMOI and EMC required weekly reporting tailored for review by EMC's CEO, Lee Raymond.[23] CSMF ¶210. EMC hired and assigned staff who led implementation of security policy in Aceh and coordinated with the TNI. CSMF ¶¶190, 230-31.

EMC also directly managed key aspects of Exxon's relationship with military security. EMC reviewed and approved military security headcounts and deployment locations. CSMF ¶¶202-05, 230-39. EMC coordinated logistical support for military security, including housing, food, water, vehicles, fuel, communications equipment, and money. CSMF ¶¶242-46. When EMOI begged EMC that the TNI's logistical requirements ████████████████████████

---

[23] Lance Johnson worked for Exxon Mobil Production Company, a division of EMC, and managed much of the daily security details for EMOI. *See* CSMF ¶¶ 178, 187, 189, 195, 198, 200, 210, 220, 223, 236, 247, 265-67, 277-78. ████████████████████████████ CSMF ¶¶ 265-67. Johnson was also a director of EMOI, but not an EMOI employee. PX201. "A corporation does not act through its individual directors, but rather through its board of directors as a whole." 2 Fletcher Cyc. Corp. § 505. Thus when Johnson managed EMOI's day-to-day security affairs he could not have been acting as a director of EMOI, but rather as an employee of EMC.

██████████████████ EMC sent Michel Laureys from its Houston Security Business Center to "coordinate the support" necessary for Exxon's military security. CSMF ¶¶191, 246; PX225.

This Court has already ruled that a reasonable jury could find that "unauthorized acts of violence" by military security "were foreseeable," and Defendants do not contest that conclusion. *Doe I*, 573 F.Supp.2d at 27. The record affirms the Court's holding. *See generally supra* § II; CSMF ¶¶176-312. Defendants similarly do not contest that EMC's negligence proximately caused Plaintiffs' injuries, except insofar as they argue that the particular soldiers who perpetrated Plaintiffs' injuries were not members of Exxon's military security. *Supra* § V.A.

EMC personnel set the "security philosophy" for EMOI's Aceh operations and closely supervised the ensuing military security deployments. EMC ought, therefore, to have undertaken reasonable and essential measures to mitigate foreseeable risks. A reasonable jury could find EMC is directly liable as a result.

2.    EMC Is Liable Under Art. 1367 of the Indonesian Civil Code.

Plaintiffs discuss the scope of Article 1367 of the Indonesian Civil Code above at Section V.A.3. Where a principal would be liable for an agent's acts under American common law—*i.e.*, where "the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to the matters entrusted to the subsidiary, and the parent exercises its control . . . ," Dkt. 235—the requisite Art. 1367 relationship and elements are also established. *See generally* PX1, Bell Decl. (2013) ¶¶17-38; PX2, Cammack Decl. ¶¶16-21.

This Court has held that "[a] reasonable trier of fact could conclude that EMOI acted as Exxon Mobil's agent with regard to the military security for the huge Arun gas field." Dkt. 365 at 23. "Sufficient evidence demonstrates that Exxon Mobil exerted significant control over EMOI's security, particularly through Exxon Mobil's Global Security division." *Id.* The same

46

facts that established EMC's potential liability under an agency theory of vicarious liability
under U.S. law establish its potential liability under Art. 1367. *See id.* at 23-25. Subsequent
discovery affirms that conclusion. EMC unequivocally *could* "instruct EMOI to carry out work
and the manner in which the work was to be performed," Def. Mem. 35, and did so with respect
to EMOI's hiring, retention, and supervision of military security. EMC prescribed EMOI's
"security philosophy" and ███████████████████████████████████████ appointed
key security personnel, and supervised the implementation of their instructions with daily reports
to EMC personnel. *See supra* § V.C.1. They supervised troop headcounts, deployments, and
logistics. *Id.* Indeed, EMC instructed EMOI to request additional military security from
Pertamina, *over EMOI's objections*. CSMF ¶¶232-35, 265. Even if EMC's direct negligence
were not established, it would be clear that EMC "appoint[ed]" EMOI "to manage [its] affairs"
with respect to security in Aceh. *See* PX1, Bell (2021) Decl. ¶17 (translating Art. 1367).

Defendants contest the existence of a "clear connection" between the work EMC
instructed EMOI to perform and Plaintiffs' alleged injuries. Def. Mem. 35-36. But such a
connection is plain under the agency theory ratified by this Court: EMC exerted substantial
control over EMOI's hiring, retention and supervision of military security, which proximately
caused Plaintiffs' injuries. To escape this conclusion Defendants offer an unsupportable
narrowly-worded restatement of Indonesian law and assert that the evidence does not meet the
standard. Def. Mem. 36. Defendants do not explain why the evidence marshalled by this Court in
*Doe I* is insufficient. To the extent Defendants argue Indonesian law requires that EMC have
"specifically instructed" EMOI to be negligent or that EMOI instruct the TNI to commit
intentional torts, they are simply wrong. PX1, Bell Decl. (2013) ¶¶17-38; PX2, Cammack Decl.
¶¶16-21 The common law test—that the principal has the right to exercise control over the

matters entrusted to the subsidiary (here EMOI's hiring, retention, and supervision of military security) and exercise that control beyond mere shareholder actions—establishes sufficient connection. Because Defendants do not and cannot contest the facts supporting the Court's prior conclusion, there is no basis for EMC to seek a different ruling today. *Doe I*, 573 F.Supp. at 31.

3.   EMC is Also Liable Under Indonesia's Company Law Because of its "Involvement" in Retention, Deployment and Use of the Military Security.

Independent of direct liability and liability under Art. 1367 of the Civil Code, EMC is liable for EMOI's liabilities under Indonesian veil-piercing doctrine. Indonesian Company Law provides an exception to the usual limitation of shareholder liability when "the shareholder concerned is *involved in* unlawful acts committed by the Company." PX395, Simon Butt & Tim Lindsey, *Indonesian Law* 324 (citing Law 40/2007 Art. 3).

The "illegal acts" in Law 40/2007 mirror the "unlawful acts" of Art. 1365 of the Civil Code, and are satisfied by the intentional and negligent torts at issue. "Involved" is also a broad standard, satisfied by EMC's direct participation in the retention, deployment and supervision of military security as set forth *supra* § V.C.1. The jury could find that EMC's extensive involvement the negligent hiring, retention, and supervision of EMOI's military security are sufficient grounds for EMC's liability under Art. 3(2)(c).[24]

Professor Lindsey's narrow interpretation of Art. 3(2)(c) is unsupported by authority and makes no sense. Lindsey concedes that vicarious liability "applies specifically to unlawful acts

---

[24] Defendants focus on the formalities of "corporate separateness," relying on Prof. Macey's expert report. Def. Mem. 36-38. But Art. 3(2)(c) requires only "involvement" in an unlawful act and requires no finding of lack of separateness. Moreover, Macey's published work and deposition testimony directly contradict the claims made in his report. CSMF ¶ 148. As assessed by factors considered under common law, EMC and EMOI were much less distinct than Exxon claims. CSMF ¶¶ 149-68. While these facts may establish alter ego liability under Company Law Art. 3(2)(a) or (b), they are not *necessary* for liability under Art. (3)(2)(c).

perpetrated by the [subsidiary] company that create obligations or losses for the company"—like

torts, in which the company creates by its tortfeasance a liability to the victim—but concludes

without reasoning that only contract or mismanagement obligations fit the bill. Dkt. 819-4,

Lindsey Decl. ¶47. Likewise, Prof. Lindsey's unsupported claim (*id.* ¶49) that *indirect*

shareholders involved in a tort cannot be liable subverts the purpose of the law by allowing

shareholders otherwise liable to avoid responsibility by interposing uninvolved subsidiaries.

**D.      Defendants' Due Process Argument Has No Foundation in Law or Fact.**

For more than two decades, Defendants have availed themselves of every ounce of

process offered under the Federal Rules. At every step, their rights have been vigorously

defended. *See* Dkt. 808. Defendants' claim that they lack "an opportunity to be heard" on the

core allegations of Plaintiffs' claims is entirely baseless—they have been heard on no fewer than

five motions to dismiss, a prior motion for summary judgment, two appeals and a petition for

certiorari. *Supra* § III. If they are unable to "present evidence on the contested facts" it is not for

lack of opportunity. And as Defendants marshalled enormous financial resources to press every

possible avenue for dismissing the suit, *unsuccessfully*, the Plaintiffs themselves have waited

more than twenty years for compensation for their injuries. Several have died waiting.

Defendants' argument that "Plaintiffs will not appear at trial" is wrong, and premature.

Def. Mem. 39. The single (miscited) "undisputed fact" on which it relies cites Plaintiffs'

*explanation* of why Plaintiffs were unable to get visas to travel to the United States for

*depositions*. Dkt. 560-2, at 8-14. The same document notes that the U.S. rarely grants visas for

depositions because they can be taken overseas or electronically (as indeed they were). *Id.* at 13.

As in 2016, Plaintiffs remain hopeful that visas can be obtained for trial. *Id.* However, even if

visas were denied, the Federal Rules permit testimony through trial depositions[25] or video, as this Court previously noted. Dkt. 586, at 43-44; Fed. R. Civ. P. 43(a); *see Gould Elecs. Inc. v. Livingston Cty. Road Comm'n*, 470 F. Supp. 3d 735, 742-43 (E.D. Mich. 2020) (rejecting due process challenge to trial via videoconference).

The remainder of Defendants' "Due Process" arguments seek to set a laundry list of misleading grievances before the Court that Defendants largely never raised during the discovery period or bothered to address with Plaintiffs. Defendants' narrative is inaccurate and misleading in ways too extensive to canvas fully here. *See* CSMF ¶¶37, 47, 68-69, 86, 99-100, 109-10, 113, 169-75. Even if it were undisputed, however, *Defendants have been represented by able counsel the whole time.* If Defendants truly thought Plaintiffs' conduct improper, they could (and in some cases, did, and were rebuffed) bring the matter to the Court for resolution *at that time*. To now claim, after two decades, that they have had an inadequate opportunity to investigate the facts is itself litigation by ambush.

 Defendants offer no case that comes even *close* to supporting their argument. The sole citation, to *Morgan v. United States*, concerns the sufficiency of an *administrative hearing* before the Agriculture Department, where the appellants had no opportunity to contest the government's findings of fact. 304 U.S. 1, 15-22 (1938). Defendants' only other case is about whether a trial court's *evidentiary rulings* amounted to a denial of due process. *Complaint of Bankers Trust Co.*, 752 F.2d 874, 889-91 (3d Cir. 1984). Neither has anything to do with whether a plaintiff's litigation of a suit prevents a defendant from investigating and rebutting the plaintiff's claims. Rather, these three mostly-single-spaced pages of Defendants' brief are transparently intended to

---

[25] Defendants previously agreed to "trial depositions" of Plaintiffs, and their insistence on live testimony should be considered waived. Dkt. 674, Exhs. R, S, T, U.

mischaracterize Plaintiffs and their counsel as unfair, incompetent, or unethical.[26] The Court should resist this improper attempt at prejudice and reject Defendants' argument as lacking a legal basis. Defendants *have* had plenty of time and opportunity to "meaningfully investigate" the claims against them. Each complaint and amendment has survived a motion to dismiss at which Defendants could have contested their notice of the claims involved. The basic thrust of Plaintiffs' claims has been evident from the start, and Defendants have known Plaintiffs' real names for 14 years. CSMF ¶37. They have had ample opportunity to conduct their own investigation into the events alleged.

This case has been challenging for all parties because of the distant, rural setting; the language barrier; the trauma of the tortures, killings, kidnappings, ███████ at issue; the real danger that Plaintiffs could face retaliation from their government and the military; intervening natural disasters, including a devastating tsunami; and length of time that has passed. It should be no surprise that some details in the complaint turn out to be mistaken; that new information is communicated to counsel slowly and inconsistently; and that witnesses' recollections fade over time. Defendants can and surely will attack any inconsistent testimony at trial.

But at every step of this litigation, Defendants have been protected by the Federal Rules of Civil Procedure and very expensive lawyers. Those lawyers have pressed every possible point of contention for two decades and still have not succeeded in defeating this suit. What more process could possibly be due before Plaintiffs get their day in Court?

---

[26] Defendants' complaint that Plaintiffs hired investigators and represented third-party witnesses at their depositions is particularly baseless. Def. Mem. 42. No authority suggests these practices are improper, and both are common among both defense and plaintiffs' counsel. Moreover, counsel here did not notify Defendants that they represented these witnesses until shortly before third-party depositions commenced—leaving in most cases years in which these witnesses were disclosed and available to talk to Defendants should they so desire. *See* CSMF ¶ 171.

**E.      Unambiguous Controlling Law Shows Plaintiffs' Negligence Claims Are Timely.**

Plaintiffs' negligent hiring and negligent supervision claims are all timely because they were filed within three years of Plaintiffs' injuries. *See* D.C. Code § 12-301(8). "The D.C. Circuit has stated that a cause of action for negligent supervision or negligent training [under D.C. law] has a three-year limitations period, ***even if the negligent conduct of the employer results in an intentional tort by the employee.*"* *Jones v. Servellon*, 1996 WL 554513, at *2 (D.D.C. Sept. 18, 1996); *see also Hunter v. District of Columbia*, 943 F.2d 69, 72-73 (D.C. Cir. 1991), (three-year statute of limitations governs "even if the negligent conduct . . . is alleged to have resulted in an intentional tort by the police."), *abrogated on other* grounds, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 86-87 (D.D.C. 2000); *Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235-37 (D.C. 2006). As this controlling authority demonstrates, numerous courts have rejected Defendants' argument that negligent hiring and supervision claims are so intertwined with the underlying intentional tort that D.C.'s shorter limitations period for intentional torts applies. *See, e.g.*, *Jones*, 1996 WL 554513, at *2 (negligent hiring and negligent supervision are "independent of Servellon's intentional conduct."). The intertwinement doctrine Defendants rely upon applies only where the two claims "turn[] on identical elements." *Johnson v. Long Beach Mortg. Loan Tr. 2001-4*, 451 F. Supp. 2d 16, 49 (D.D.C. 2006); *see also, e.g.*, *Stewart-Veal*, 896 A.2d at 236 (quoting *Reaves-Bey v. Karr*, 840 A.2d 701, 703-04 (D.C. 2004))). Here, as in *Jones*, *Hunter*, *Parker*, and *Stewart-Veal*, Plaintiffs' direct and vicarious liability claims rely on separate elements: the jury could hold Defendants vicariously liable under Article 1367 without finding fault (*see* PX1, Bell Decl. ¶ 20), or, on the converse, it could find Defendants directly liable under Article 1365 without finding the relationship required for an Article 1367 claim (*see* PX2, Cammack Decl. ¶ 15 & n.15).

1.      John Does II and IV and Jane Doe VII Are Entitled to Equitable Tolling

Plaintiffs agree that , subject to exceptions, their intentional tort claims are governed by a one-year statute of limitations, and that John Doe II's, John Doe IV's, and Jane Doe VII's house burning intentional tort claims were filed more than one year after the events at issue.[27] The Court should nevertheless toll these claims because the civil conflict in Aceh and Plaintiffs' reasonable fear of reprisal prevented Plaintiffs from filing their claims before June 2001.

In 2008, Judge Oberdorfer noted that the D.C. Court of Appeals had "never directly addressed" whether equitable tolling is available for extraordinary circumstances but deferred an *Erie* guess as to how the D.C. Court of Appeals would resolve the issue. Dkt. 365 at 29. The D.C. Court of Appeals has still not directly addressed this issue. The cases Defendants cite reflect the separate rule, acknowledged in 2008, that D.C. courts will not toll the limitations period to remedy a defective pleading. *Id.* at 28-29; *compare Pappas v. D.C.*, 513 F. Supp. 3d 64, 86 (D.D.C. 2021) (DC courts recognize "only two limited exceptions" to tolling bar) *with East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998) (court has recognized "*at least* two limited exceptions," but not for "plaintiff's good faith mistake of forum").

Given the continued uncertainty in D.C. law, the Court should look outside the forum to guide its *Erie* guess. *See Davis v. Grant Park Nursing Home LP*, 639 F. Supp. 2d 60, 69 (D.D.C. 2009). Directly analogous cases in other courts make it plain that D.C. Courts would equitably toll Plaintiffs' claims. The overwhelming majority of courts to have considered the question have held that civil conflict tolls the limitations period, especially when the plaintiffs allege human-rights abuses related to the conflict and reasonably fear reprisal for bringing claims. *See, e.g.*,

---

[27] John Does II and IV have been uncertain as to whether their injuries took place in 1999 or 2000, but Plaintiffs accept the 1999 date for the purposes of this motion.

*Warfaa v. Ali*, 1 F.4th 289, 294-95 (4th Cir. 2021)) ("Courts addressing the TVPA and its 'companion' statute, the ATS, have almost universally found equitable tolling appropriate where civil war and repressive authoritarian regimes significantly impeded a plaintiff's access to a judicial remedy…."); *Chavez v. Carranza*, 559 F.3d 486, 493-94 (6th Cir. 2009) ("When the situation in a given country precludes the administration of justice, fairness may require equitable tolling."); *Arce v. Garcia*, 434 F.3d 1254, 1262-65 (11th Cir. 2006) (same).[28]

Here, as Defendants themselves argue, it is undisputed that Aceh was embroiled in civil conflict during the 1999-2001 period. Def. SMF ¶27; Pls.' CSMF ¶542. As the Court has previously found, Plaintiffs reasonably feared reprisal for filing a complaint implicating members of the TNI, unless they could do so pseudonymously in a foreign court. *E.g.*, Dkt. 547 at 6-9. Indeed, John Doe VII did attempt to seek legal redress and his torturers came looking for him, forcing him to flee the area. CSMF ¶540. Prior to originating counsel's trip to North Aceh in 2001, Plaintiffs, who all live in a remote area, had no access to American counsel. CSMF ¶543. Foreigners' access to Aceh was limited in that period, and originating counsel had to make a treacherous journey through eight military checkpoints just to meet with plaintiffs. CSMF ¶¶542-43. Having no phone or internet access at the time, it was impossible for Plaintiffs to bring a lawsuit against Defendants before originating counsel's trip. CSMF ¶543.

Defendants' argument that John Doe II, John Doe IV, and Jane Doe VII should have been able to sue within the limitations period just because other Plaintiffs brought their claims within the limitations period is nonsensical. All Plaintiffs brought their claims on the same date. No Plaintiffs were able to sue prior to June 2001 when they were fortuitously put in contact with an

---

[28] *See also, e.g.*, *Jane W. v. Thomas*, 354 F. Supp. 3d 630, 635-36 (E.D. Pa. 2018); *Giraldo v. Drummond Co.*, 2012 WL 12897083, at *2 (N.D. Ala. Mar. 5, 2012); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 482 (D. Md. 2009).

American attorney willing the brave the journey to North Aceh. The only reason some Plaintiffs'
claims were timely filed is because their injuries were more recent. Accordingly, John Doe II's,
John Doe IV's and Jane Doe VII's intentional tort claims should be equitably tolled.[29]

Finally, Jane Doe VII's claims regarding her husband's 2003 abduction and torture are
timely. Although those claims were added in Plaintiffs' Second Amended Complaint, they relate
back to the original complaint. Federal Rule of Civil Procedure 15(c) provides that a new claim
in an amended complaint relates back to the date of the original, timely filed complaint if the
new claim "arose out of the conduct, transaction, or occurrence."[30] Here, both claims allege
Defendants are liable for the exact same conduct: they retained, directed, and failed to adequately
supervise their military security personnel, who then foreseeably committed a pattern of abuses
against the local population. Where, as here, claims for separate injuries are united by a common
pattern of conduct, the new claim relates back. *See, e.g.*, *Kimmel v. Gallaudet Univ.*, 722 F.
Supp. 2d 79, 80 (D.D.C 2010); *Miller v. Holzmann*, 2007 WL 710134, at *5-6 (D.D.C. Mar. 6,
2007) (Lamberth, J.). Relation back is particularly proper here because Plaintiffs' original
complaint, which sought injunctive relief, notified Defendants that the conduct was ongoing. *See
Chesapeake & Ohio Ry. Co. v. U.S. Steel Corp.*, 878 F.2d 686, 690-91 (3d Cir. 1989); *William
Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1057 (9th Cir. 1981).

## VI.  CONCLUSION

For the above reasons, Exxon's motion for summary judgment should be denied.

---

[29] Although the controlling caselaw makes clear these Plaintiffs' negligence claims are timely so
tolling is not necessary for those claims, it would be equally warranted.

[30] Jane Doe VII's claims regarding the 2003 attack may be better characterized as a supplemental
claim under Rule 15(d), but courts, "apply the principles of 15(c) to supplemental pleadings."
*U.S. v. Palmer*, 902 F. Supp. 2d 1, 13 n.3 (D.D.C. 2012) (Lamberth, J.) (quoting *U.S. v. Hicks*,
283 F.3d 380, 385 (D.C. Cir. 2002)).

Date: September 13, 2021

Respectfully submitted,

*/s/ Agnieszka Fryszman*
Agnieszka M. Fryszman (# 459208)
Kit A. Pierson (# 398123)
Robert W. Cobbs (#1045579)
Nicholas J. Jacques (#1673121)
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., N.W.
Suite 500, East Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
afryszman@cohenmilstein.com
kpierson@cohenmilstein.com
rcobbs@cohenmilstein.com
njacques@cohenmilstein.com


Paul L. Hoffman (*Pro Hac Vice*)
**Schonbrun Seplow Harris Hoffman & Zeldes
   LLP**
200 Pier Avenue, #226,
Hermosa Beach, CA 90254
Tel: (310) 396-0731
hoffpaul@aol.com

Terrence P. Collingsworth (# 471830)
**International Rights Advocates**
621 Maryland Ave., N.E.
Washington, DC 20002
Tel: (202) 255-2198

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2021, I electronically filed the foregoing *Plaintiffs'*

*Memorandum in Opposition to Defendants' Motion for Summary Judgment* with the Clerk of the

Court using the ECF, who in turn sent notice to all counsel of record.


Dated:     September 13, 2021                    */s/ Agnieszka Fryszman*
                                             Agnieszka Fryszman