# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, *et al.*,

   Plaintiffs,

  v.            Case No. 01-cv-01357 (RCL)

EXXON MOBIL CORPORATION, *et al.*,

   Defendants.

---

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX 77389
Telephone: (832) 624-6336

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300

**Public Redacted Copy**

## TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ......................................................................................... 3

I.      PLAINTIFFS CANNOT PROVE THE ELEMENT OF CAUSATION. ........................... 3

        A.      Plaintiffs Cannot Prove Causation by Mischaracterizing Witness Testimony. ................................................................................ 4

        B.      Calling Indonesian Military Personnel "Exxon Soldiers" Does Not Make It So, Nor Does It Create A Question of Material Fact. ........................................ 7

        C.      Plaintiffs Cannot Establish Causation with Inadmissible Hearsay. ..................... 11

II.     PLAINTIFFS CANNOT PROVE THE ELEMENT OF QUANTIFIABLE LOSS. ........ 14

III.    EMC IS NOT VICARIOUSLY LIABLE FOR PLAINTIFFS' INJURIES. ................... 16

IV.     DEFENDANTS HAVE BEEN DENIED A FAIR OPPORTUNITY TO ANSWER PLAINTIFFS' ALLEGATIONS IN VIOLATION OF THEIR DUE PROCESS RIGHTS. ........................................................................... 18

V.      THE TIME-BARRED CLAIMS SHOULD BE DISMISSED. ........................................ 19

CONCLUSION ..................................................................................... 21

Public Redacted Copy

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arrington* v. *United Parcel Serv.*,
  384 F. App'x 851 (11th Cir. 2010) ...............................................................................20

*Asplundh Mfg. Div.,* v. *Benton Harbor Eng'g,*
  57 F.3d 1190 (3d Cir. 1995)..........................................................................................9

*Athridge* v. *Iglesias,*
  No. CV 89-1222 (JMF), 2004 WL 7345458 (D.D.C. Dec. 21, 2004)...........................8

*Gilmore* v. *Palestinian Interim Self-Gov't Auth.,*
  843 F.3d 958 (D.C. Cir. 2016) .....................................................................................11

*Miller* v. *Downtown Bid Services Corp.*,
  281 F. Supp. 3d 15 (D.D.C. 2017)................................................................................20

*Pappas* v. *District of Columbia,*
  513 F. Supp. 3d 64 (D.D.C. 2021).................................................................................19

*Smalls* v. *Collins,*
  2021 WL 3700194 (2d Cir. Aug. 20, 2021)..................................................................20

*Stewart-Veal* v. *District of Columbia,*
  896 A.2d 232 (D.C. 2006) .............................................................................................20

*United States* v. *Alexander,*
  331 F.3d 116 (D.C. Cir. 2003) ......................................................................................12

*United States.* v. *Slade*,
  627 F.2d 293 (D.C. Cir. 1980) ........................................................................................8

*United States* v. *Slatten,*
  865 F.3d 767 (D.C. Cir. 2017) ......................................................................................12

*United States* v. *Winters,*
  33 F.3d 720 (6th Cir. 1994) ..........................................................................................12

*Weinberg* v. *Whatcom Cnty.,*
  241 F.3d 746 (9th Cir. 2001) ........................................................................................16

*Westfahl* v. *District of Columbia,*
  2015 WL 13697453 (D.D.C. July 24, 2015)...................................................................8

**Other Authorities**

Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6254 (2d ed.)........................................................9

Federal Rule of Evidence 701 ..................................................................................................8, 9

Federal Rule of Evidence 702 ......................................................................................................8

Federal Rule of Evidence 801 ....................................................................................................14

Federal Rule of Evidence 803 ....................................................................................................14

**Public Redacted Copy**

## PRELIMINARY STATEMENT

Defendants filed a narrow motion seeking summary judgment because Plaintiffs cannot prove two essential elements of their claims: causation and quantifiable loss. If Plaintiffs had good evidence supporting those elements, their opposition brief would have marshalled it for the Court. It did not. Instead, Plaintiffs filed an oversized brief debating points of law and fact irrelevant to the narrow issues before the Court and generally refusing to engage with the evidentiary record as it now stands after the close of all discovery. Plaintiffs' tactical dodge demonstrates only that summary judgment should be granted.

Plaintiffs cannot prove causation. The element of causation requires Plaintiffs to show that their injuries resulted from Defendants' conduct. Defendants argued Plaintiffs could not make that showing because none of them claims to have been injured by an EMOI or EMC official, employee, or contractor; none of them claims to have been injured inside the gas plant EMOI operated or while trying to enter it; and none of them claims to have told anyone at EMOI or EMC of their alleged injuries before this lawsuit.[1] Defs.' Opening Mem. at 9–10, 17–29. Plaintiffs contest none of those assertions, which are now conceded facts. Instead, Plaintiffs claim that EMOI and EMC are responsible for the misconduct of any member of the Indonesian military in Aceh during the relevant time period (and there were thousands of them). Why? Because some members of the Indonesian military deployed to Aceh protected the gas field and EMOI staff from armed insurgents waging a war against the Government. That does not establish causation. Operating a gas plant owned by the Indonesian government and protected

---

[1] Unless otherwise indicated, defined terms herein have the same definition as in Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment, ECF No. 818-1 ("Defs.' Opening Mem.").

by the Indonesian military does not convert Defendants into guarantors for the alleged misdeeds of a sovereign government or its military.

In an effort to paper over the lack of evidence connecting Defendants to the Indonesian soldiers that allegedly injured them, Plaintiffs rely on rote and conclusory recitations that they were injured by "Exxon soldiers." Yet there is no evidence showing that the soldiers who allegedly injured Plaintiffs were acting at the direction of an EMC or EMOI employee. Every plaintiff, and every one of their witnesses, admitted that they had no evidence that any EMC or EMOI employee or contractor directed, participated, or even was present when the plaintiffs were allegedly injured. The record does not even show whether the soldiers who allegedly injured Plaintiffs were, at that time, among the few soldiers assigned to guard EMOI-operated facilities or were instead part of the large-scale counter-insurgency campaign then underway in Aceh.

Plaintiffs are also unable to prove quantifiable loss. Defendants explained in their opening brief that quantifiable loss is an element of Plaintiffs' claims under Indonesian law, but the evidentiary record contains no support for that element. Defs.' Opening Mem. at 30–34. Plaintiffs do not contest as a factual matter that none of them has produced evidence substantiating the measure of his or her loss. Instead, Plaintiffs dodge once again. They argue that their immaterial losses cannot be precisely quantified and that the calculation of damages should be left to a jury. Neither argument excuses Plaintiffs from their burden to demonstrate quantifiable loss, and Plaintiffs have failed to show how the record satisfies that burden.

Whether for Plaintiffs' inability to prove causation or quantifiable loss, or for the other grounds raised in this motion, Defendants should be granted summary judgment.

## ARGUMENT

### I.    PLAINTIFFS CANNOT PROVE THE ELEMENT OF CAUSATION.

There is no dispute between the parties or their experts that Indonesian law

requires Plaintiffs to prove that Defendants were the factual cause of the injuries suffered by

each plaintiff.[2]  They cannot do so.  Defendants' description in their opening memorandum of

Plaintiffs' failure of proof as to each individual plaintiff is accurate and unrebutted.  *See* Defs.'

Opening Mem. at 17–29.

Plaintiffs spend nearly thirty pages of their fifty-five page opposition brief trying

to distract from the fact that they have no evidence of causation.  For example, Plaintiffs spend

five pages and submit over forty exhibits arguing that Defendants controlled the Indonesian

military.  The Government of Indonesia, the fourth most populous country in the world, has

informed the Court and the U.S. State Department on several occasions that Plaintiffs' assertion

is false and an affront to Indonesian sovereignty.  Defendants did not control Indonesia's

military.  But even it were the case that Defendants could hire, fire, oversee, and control the

activities of the Indonesian soldiers assigned by the Government of Indonesia to guard the

EMOI-operated facilities, Plaintiffs still could not establish causation.  There is no evidence that

Plaintiffs' alleged injuries were caused by *those relatively few soldiers* contemporaneously

assigned by the Government of Indonesia to protect the state-owned facilities EMOI operated,

---

[2]    This applies to both Plaintiffs' direct claims, which are governed by Articles 1365/66 of the
Civil Code of Indonesia, and their vicarious liability claims, governed by Article 1367.  *See*
Defs.' Opening Mem. at 14 ("Under Indonesian law, a plaintiff bears the burden of proving
that the defendant's unlawful act was the clear and direct factual cause of the plaintiff's
alleged loss."); Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary
Judgment ("Opp.") at 11–12 ("Mr. Hornick also explained that, for causation, 'the injury
must be foreseeable and a direct, rather than indirect, consequence of the misbehavior.'"); *id.*
at 12 n.7 ("This standard is equivalent to the standard under U.S. law, where a plaintiff must
show factual cause and foreseeability.").

rather than the *thousands of other Indonesian soldiers* in the region fighting a civil war against a guerrilla separatist movement in the very towns and villages where Plaintiffs were allegedly injured.[3]

Ultimately, Plaintiffs' attempt to establish causation comes down to numerous mischaracterizations of the record and unsupported, conclusory—and generally inadmissible hearsay—characterizations of their alleged military assailants as "Exxon soldiers."  This tactic of calling the Indonesian soldiers who injured them "Exxon soldiers" must not be allowed to succeed.  To attribute the conduct of any Indonesian soldier in the region to Defendants would be no different than, for example, holding the New York Mets liable for *any* alleged misconduct by *any* officer of the District of Columbia Metropolitan Police Department *anywhere* in D.C., and at any time, merely because a relatively small number of D.C. police officers are, at certain times, assigned to provide security at Nationals Park on nights when the Mets play the Nationals in Washington.  Such a finding would be absurd and, for the reasons discussed here and in Defendants' opening memorandum, impermissible as a matter of law.

### A.      Plaintiffs Cannot Prove Causation by Mischaracterizing Witness Testimony.

In response to Defendants' challenge to show causation, Plaintiffs rely on testimony they claim links Defendants to their injuries.  However, the transcripts do not support

---

[3]   Plaintiffs assert in their Opposition that there were fewer than 40,000 Indonesian soldiers in the region during that time period, but Plaintiffs themselves and their third-party witnesses repeatedly testified that there were 40,000 Indonesian troops in the region.  *See* Defendants' Statement of Material Facts Not in Genuine Dispute, ECF No. 818-1 ("SOF") ¶ 27.  Human Rights Watch reported the same figure.  *See* SOF ¶ 27.  Plaintiffs' own expert historian conceded that there could have been thousands more Indonesian security personnel in the region during the relevant time period.  *See* Defendants' Response to Plaintiffs' Counterstatement of Material Facts ("RSOF") ¶ 553.  Regardless, even accepting the number of troops that Plaintiffs now put forth—5,500 Indonesian soldiers, *see* Opp. at 7, 22 n.9— does not change the undisputed fact that the vast majority of Indonesian soldiers in the region had no connection whatsoever to guarding EMOI's operations and Plaintiffs cannot connect the Indonesian soldiers who allegedly injured them to Defendants.

Plaintiffs' characterization of the relevant testimony.  As demonstrated in several examples below, the record refutes at every turn Plaintiffs' purported evidentiary support for causation.

### 1.  Eyewitnesses did not "confirm[] that Exxon soldiers beat and killed Jane Doe III's husband."

Plaintiffs claim that "[t]wo eyewitnesses confirmed that Exxon soldiers beat and killed Jane Doe III's husband in response to a tire explosion that the soldiers mistakenly believed was an attack."  Opp. at 14–15.  That is not what the record actually reflects.  Jane Doe III testified that she had no personal knowledge about her husband's abduction, including who allegedly abducted him.  *See* SOF ¶ 58.  Jane Doe III's sole third-party witness, ███████ also testified clearly that he did *not* see what happened to Jane Doe III's husband, and did not see him harmed in any way.  *See* SOF ¶¶ 59, 62.  Rather, ███████ testified that *he* was injured by Indonesian soldiers who had emerged from ███████████[4] after which he was taken to a *secondary* location, where he saw Jane Doe III's husband surrounded by a mix of soldiers— some that ████████ said he believed had come from ███████████ and some that had not— standing nearby.  SOF ¶ 59.[5]  There is no evidence regarding what happened to Jane Doe III's husband before ███████ first saw him.  Nor, indeed, is there any evidence that any EMC or EMOI employee or contractor directed Indonesian soldiers to take any action to harm Jane Doe

---

[4] ██████████████████████████████████████████████████ *See* SOF ¶ 60.  There is no evidence, and Plaintiffs do not claim, that the only Indonesian soldiers who gathered and ate meals at ████████ were assigned by the Government of Indonesia to guard the facilities EMOI operated.  *See* Defs' Opening Mem. at 26 n.21; SOF ¶ 60.

[5] The second purported eyewitness, ████████, is not a witness in this case.  Rather, Jane Doe III testified that ████████ told her that people allegedly associated with "Exxon" took her husband away.  RSOF ¶ 558.  Jane Doe III said nothing about ████████ claiming to have witnessed an attack on Jane Doe III's husband.  *Id.*  Even if she had, Jane Doe III's testimony about ████████ out-of-court statements are inadmissible hearsay and thus incapable of creating a genuine issue of material fact.

**Public Redacted Copy**

III's husband; that anyone from EMC or EMOI was present when Jane Doe III's husband was injured; or that the Indonesian soldiers who allegedly injured Jane Doe III's husband were assigned by the Government of Indonesia to guard EMOI operations—or even ███████—at the time of Jane Doe III's husband's alleged injuries.  *See* Defs.' Opening Mem. at 19–20.

> **2.**      ████████ **did not "identif[y] the trucks used by the soldiers" in the alleged incident involving Jane Doe II's husband.**

Plaintiffs claim that ██████████ of Jane Doe II's ██████ "identified the trucks used by the soldiers in the attack" that allegedly killed Jane Doe II's husband.  Opp. at 14, 27.  Again, that is untrue.  Plaintiffs are referring here to Jane Doe II's third-party witness, ████████ who testified that he did not witness the attack on Jane Doe II's husband and was only told secondhand that Jane Doe II's husband was shot by soldiers.  *See* Defs.' Opening Mem. at 19; SOF ¶¶ 52, 53.  ████████ claimed to have seen military trucks on the road that day, but he could not have known, and did not speculate, that the Indonesian soldiers who allegedly killed Jane Doe II's husband were in those trucks.  *See* RSOF ¶ 557; SOF ¶ 52.

Between Jane Doe II's and ████████ testimonies, there is no evidence that any EMC or EMOI employee or contractor directed Indonesian soldiers to shoot Jane Doe II's husband; that anyone from EMC or EMOI was present when Jane Doe II's husband was killed; or that the Indonesian soldier or soldiers who allegedly killed Jane Doe II's husband were assigned at that time by the Government of Indonesia to guard EMOI operations.  *See* Defs.' Opening Mem. at 18–19.

> **3.**      **Defendants' internal documents do not "confirm" that Unit 100 was assigned to protect Government of Indonesia-owned premises operated by EMOI.**

In an attempt to link the alleged abduction of Jane Doe VII's husband by Indonesian soldiers to Defendants, Plaintiffs claim that those soldiers were from "Unit 100,"

which "Exxon internal documents confirm . . . was assigned to Exxon."  Opp. at 18.  In support

of this assertion, Plaintiffs cite to a single document: ████████████████████████████

████    *See* Plaintiffs' Counterstatement of Material Facts Not in Genuine Dispute in Opposition

to Defendants' Motion for Summary Judgment, ECF No. 825-2 ("CSOF") ¶ 442 (██████████).

The document does not mention "Unit 100."  It does ██████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████.  *Id.*; RSOF ¶ 554.

█████████████████████████████████████ do not suggest, much less

support, that "Unit 100 was assigned to Exxon."  In short, not only is there no evidence that any

EMC or EMOI employee or contractor directed Indonesian soldiers to take any action that

harmed Jane Doe VII's husband, or any evidence that anyone from EMC or EMOI was even

present when the alleged injuries occurred, but there is absolutely no evidence that the

Indonesian soldiers who allegedly injured Jane Doe VII's husband were even assigned by the

Government of Indonesia to protect EMOI-operated facilities at the time of the alleged injury.

These are only a few representative, non-exhaustive examples of Plaintiffs'

misrepresentations of the record.  Defendants address additional misrepresentations and

distortions of the record in their Response to Plaintiffs' Counterstatement of Material Facts.  *See,*

*e.g.*, RSOF ¶¶ 334, 432, 506.

### B.   Calling Indonesian Military Personnel "Exxon Soldiers" Does Not Make It So, Nor Does It Create A Question of Material Fact.

Once Plaintiffs' misrepresentations of the record are stripped away, they are left

with nothing to establish causation but conclusory rhetoric.

Plaintiffs argue that they should survive summary judgment because they all

claimed to be injured by "Exxon soldiers."  Opp. at 13.  Many of them even claimed to have used

the term prior to the merger between Exxon and Mobil in December 1999, when only Mobil was present in Aceh.  *See* RSOF ¶ 552.  Plaintiffs' third-party witnesses—all represented by Cohen, Milstein—also used the term "Exxon soldiers" to describe the Indonesian soldiers who allegedly injured plaintiffs.  *See, e.g.*, SOF ¶¶ 91, 114, 139.  Yet, according to plaintiffs' and their witnesses' own testimony, by "Exxon soldier" they meant any Indonesian soldier in the area.

Plaintiffs' persistent use of the phrase "Exxon soldiers"—repeated *nearly one hundred times* throughout their opposition brief and counterstatement of facts—is an impermissible attempt to establish the ultimate legal conclusions of causation and control through lay testimony.  It is black letter law that lay witnesses may testify as to matters within their personal knowledge; they may not opine as to the conclusions to be drawn from the evidence.  *See, e.g.*, *Athridge* v. *Iglesias*, No. CV 89-1222 (JMF), 2004 WL 7345458, at *1 (D.D.C. Dec. 21, 2004) (quoting *Kostelecky* v. *NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir. 1987)) ("Rules 701 and 702 require that the opinion of a witness assist the trier of fact, and 'evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible.'").  Here, Plaintiffs' use of "Exxon soldiers" assumes the very conclusion that Plaintiffs are required to prove.  *See United States.* v. *Slade*, 627 F.2d 293, 305 (D.C. Cir. 1980) (lay witnesses' references to "[Defendant]'s organization" improperly "implied [the existence of] evidence beyond that introduced . . . that such an organization existed"); *Westfahl* v. *District of Columbia*, 2015 WL 13697453, at *2 (D.D.C. July 24, 2015) (lay witnesses "may not simply state a legal conclusion").  It is of no evidentiary value.

Indeed, when questioned about their use of the term "Exxon soldiers," Plaintiffs themselves admitted to using the phrase merely to refer to any Indonesian soldiers observed in the general area of Arun Field.  Jane Doe VI's daughter, ███████ testified that "soldiers in the

8

area of Exxon were Exxon soldiers."  SOF ¶ 91.  John Doe V told Jane Doe VII that he called

them "Exxon soldiers" because they were stationed near the Exxon facilities.  SOF ¶ 103.  In

other words, as used by plaintiffs and their witnesses, "Exxon soldier" means any Indonesian

soldiers that were seen or stationed somewhere in the vicinity of Arun Field.  Needless to say,

this is not sufficient to establish the ultimate conclusion, *i.e.*, that the Indonesian soldiers who

injured Plaintiffs were, in fact, "Exxon soldiers."  *See, e.g.*, *Asplundh Mfg. Div.,* v. *Benton

Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995) ("Rule 701's requirement that the [lay]

opinion be 'rationally based on the perception of the witness' demands more than that the

witness have perceived something firsthand; rather, it requires that the witness's perception

provide a truly rational basis for his or her opinion."); Wright & Miller, 29 Fed. Prac. & Proc.

Evid. § 6254 (2d ed.) ("Where . . . the factual assumptions underlying the lay opinion are not

valid, that opinion is not rationally based even where the witness purports to base that opinion on

firsthand observation.").

      If Plaintiffs are correct that the mere assertion of injury by "Exxon soldiers" is

sufficient to establish causation, Defendants could then be held liable for the actions of any of

the 40,000 Indonesian soldiers in the region fighting the civil war during the relevant time

period, regardless of whether they were acting under EMOI's direction or even guarding EMOI's

operations at the time of the alleged incidents.  This is the sum and total of Plaintiffs' claims, and

underlies nearly all of their arguments.

      To provide just one further example of this sleight of hand: Plaintiffs claim that

Jane Doe I identified her assailant as a member of "Unit 113," which Plaintiffs claim was

guarding "Point A" of Arun Field.  *See* Opp. at 13–14, 24–25.  Not a single document cited by

Plaintiffs indicates that Indonesian soldiers from "Unit 113" (or "Battalion 113," which Plaintiffs

seem to believe, without explanation, is the same thing) were stationed at "Point A."  *See* RSOF ¶ 551.  Even if Plaintiffs had evidence that any soldiers from Unit 113/Batallion113 were assigned to guard Point A, the record reflects that there were usually in the range of 25–30 Indonesian soldiers, and at no time more than 63 Indonesian soldiers, assigned to guard Point A during the relevant time period.  *See* RSOF ¶ 550.  Plaintiffs offer no evidence of the size of an Indonesian battalion, but Defendants are aware of nothing in the record indicating that there are fewer than 600 Indonesian soldiers in a battalion, and perhaps hundreds more than that.  Accordingly, even under Plaintiffs' unsupported theory, 90% of Battalion 113 was assigned somewhere other than Point A, including general anti-insurgency operations in Aceh.  Membership in Battalion 113 therefore does not establish a connection to EMOI, much less show that any EMC or EMOI employee or contractor directed the relevant but unidentified Indonesian soldiers, was present when the alleged assaults occurred, or otherwise connect plaintiffs' injuries to EMC or EMOI.

Essentially conceding that they cannot tie their injuries to Defendants, Plaintiffs assert that EMOI "is aware of *no* evidence that the atrocities experienced by Plaintiffs resulted from the actions of non-EMOI military personnel."  Opp. at 8 (emphasis in original).  But it is not Defendants' burden to identify Plaintiffs' assailants or prove that the assailants have no connection to EMC or EMOI.  The burden of proof rests with Plaintiffs.  And they have failed to present evidence showing that Defendants caused the injuries Plaintiffs allegedly suffered at the hands of Indonesian soldiers.[6]

---

[6]   Plaintiffs' assertion that it is Defendants' responsibility to *disprove* their theory of causation, rather than Plaintiffs burden to *prove* causation is especially brazen given that: (i) not one plaintiff reported his or her alleged injuries to Defendants or suggests that Defendants bore any responsibility for those injuries before filing their first complaint in June 2001; and (ii) Plaintiffs then refused even to disclose their names or the names of their villages for another

C.      **Plaintiffs Cannot Establish Causation with Inadmissible Hearsay.**

Several plaintiffs attempt to show causation by claiming that *others* told them they were injured by "Exxon soldiers" or made similarly conclusory remarks meant to connect the Indonesian soldiers who allegedly injured them to Defendants.  These statements are all inadmissible hearsay and thus cannot create a genuine issue of material fact to defeat summary judgment.  *See Gilmore* v. *Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016) (alteration in original) (quoting *Greer* v. *Paulson*, 505 F.3d 1306 (D.C. Cir. 2007)) ("[S]heer hearsay . . . counts for nothing on summary judgment.").[7]  However, as described below, even if all of these out-of-court declarant statements were admissible, each suffers from the same deficiency described above: They assert that the Indonesian soldiers who injured them were "Exxon soldiers" or otherwise connected to Defendants without any support for that characterization.  None of these statements provided competent evidence with which to establish causation.

**John Doe I.**  Jane Doe V testified that her husband, John Doe I, told her he was abducted by "Exxon soldiers."  SOF ¶ 81.

This alleged out-of-court statement is inadmissible hearsay.  Plaintiffs claim that John Doe I's alleged statements can be admitted as excited utterances because they were spoken "[a]s soon as he was brought home" and he "cried while recounting his ordeal."  Opp. at 25–26 n.12.  Neither statement is supported by the record.  *See* RSOF ¶ 559.  Jane Doe V's testimony

---

*six years* after their original complaint was filed.  *See* Defs.' Opening Mem. at 1, 9; SOF ¶ 37.

[7]   Plaintiffs seemingly suggest that Defendants had an obligation to challenge the admissibility of Plaintiffs' evidence in Defendants' initial motion papers.  *See* Opp. at 26–27.  None of the cases cited by Plaintiffs support the proposition that Defendants were required to anticipate all of the evidence Plaintiffs intended to present in opposition papers and object to its admissibility *before* Plaintiffs filed their opposition.

makes no mention of when John Doe I allegedly made the statement at issue—*i.e.*, how long after his alleged injuries he mentioned "Exxon soldiers"—or what his physical or mental state was at the time—*i.e.*, whether he was "under the stress of excitement caused by the event." *United States* v. *Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003); *United States* v. *Winters*, 33 F.3d 720, 722–23 (6th Cir. 1994) (finding that a statement made by a declarant two days after he was shot was "the product of conscious reflection" and "not made under the stress and excitement caused by the shooting").  Nor does the statement qualify for the residual exception, because it is not supported by sufficient guarantees of trustworthiness, such as independent corroboration in the record as to the truthfulness of the statement.  *See United States* v. *Slatten*, 865 F.3d 767, 808 (D.C. Cir. 2017).

Even if John Doe I's alleged statement were admissible, Jane Doe V testified that John Doe I called the Indonesian soldiers "Exxon soldiers" merely because he had seen them on a road near Arun Field.  SOF ¶ 81.  According to Jane Doe V, John Doe I never said who these Indonesian soldiers were, who they worked for, what orders they were executing when they abducted him—or anything else about the soldiers other than that they were "Exxon soldiers."[8] SOF ¶ 81.  John Doe I's hearsay statement does not in any way establish that any EMC or EMOI employee or contractor directed Indonesian soldiers to take action to harm him, that any EMC or EMOI personnel were present when John Doe I was allegedly harmed, or that the Indonesian soldiers who alleged abducted and tortured John Doe I were assigned by the Government of

---

[8]   The story of who injured John Doe I has changed several times.  *See* RSOF ¶ 560.  In their opposition, Plaintiffs selected what they consider to be the best version of the story, and even that does not come close to establishing a connection between John Doe I's alleged injuries and Defendants.

Indonesia to protect any EMOI-operated facility at the time of the alleged incident.  *See* Defs.'
Opening Mem. at 21–22; SOF ¶¶ 78–81.

> **John Doe V.**  Jane Doe VII has submitted a declaration in connection with
Plaintiffs' opposition in which she claims that her husband, John Doe V, ███████████████
███████████  PX 223, ¶¶ 3, 4.  Again, this statement is inadmissible hearsay.  And as with
John Doe I's alleged statement, John Doe V's alleged statement cannot be admitted as an excited
utterance or under the residual exception.  Jane Doe VII's affidavit states that John Doe V was
gone for three days—he walked home under his own power—but says nothing about how much
time passed between his detention and torture and the alleged statement regarding "Exxon
soldiers."  *See id.* ¶ 2.  And there is no independent corroboration of the statement's truthfulness.

> Even if John Doe V's statement were admissible, there is no indication in the
affidavit or anywhere else in the record of what he supposedly meant by the phrase "Exxon
soldiers."  There certainly is no evidence that any EMC or EMOI employee or contractor
directed Indonesian soldiers to harm John Doe V, that anyone from EMC or EMOI was present
when John Doe V was allegedly injured, or that any of the Indonesian soldiers who allegedly
abducted John Doe V were, at the time of the alleged abduction, assigned by the Government of
Indonesia to protect EMOI-operated facilities.  *See* Defs.' Opening Mem. at 24–25.

> **John Doe IV.**  Finally, although he does not use the phrase "Exxon soldiers,"
John Doe IV, who claimed that he was detained and tortured, testified that he did not know
where he was held by the Indonesian soldiers who allegedly abducted him, SOF ¶ 133, but
claims to have overheard some of the soldiers saying that they were taking him to a location
known as ████  CSOF ¶ 511.

First of all, EMOI did not operate ███████████████████████, during the relevant time period.  RSOF ¶ 555.

Moreover, these alleged statements, too, are inadmissible hearsay.  Plaintiffs claim that these alleged remarks by unidentified Indonesian soldiers can be admitted as admissions by Defendants' agents under Federal Rule of Evidence 801(d)(2)(D) or as expressions of the declarants' state of mind under Federal Rule of Evidence 803(3).  *See* CSOF at 106 n.10.  Neither argument is availing.  The statements cannot be admitted as agent admissions because the statements themselves are the only purported evidence that the declarants were Defendants' agents.  *See* Fed. R. Evid. 801 ("The statement . . . does not by itself establish . . . the existence or scope of the relationship[.]").  Nor are the statements being offered as evidence of the declarant's state of mind.  *See* Fed. R. Evid. 803(3).

Once again, even if the statements that John Doe IV attributed to certain unidentified Indonesian soldiers were admitted, there still is no evidence that any EMC or EMOI employee or contractor directed any Indonesian soldier to detain and assault John Doe IV, that anyone from EMC or EMOI was at any time present when John Doe IV was harmed, or that John Doe IV was injured by Indonesian soldiers who, at the time, were assigned by the Government of Indonesia to protect EMOI-operated facilities (which, to reiterate, did not include ███).  *See* Defs. Opening Mem. at 27–28.

In sum, none of the out-of-court statements put forth by Plaintiffs to try to establish causation is admissible.  None of them could establish causation even if they were admitted.

## II.    PLAINTIFFS CANNOT PROVE THE ELEMENT OF QUANTIFIABLE LOSS.

Plaintiffs are likewise unable to prove that they suffered any quantifiable loss, another essential element of their claims.  As demonstrated in Defendants' opening

memorandum, Plaintiffs have introduced no evidence substantiating their alleged losses.  With

the exception of ███████████████████████, Plaintiffs have produced no documentary

evidence of loss—no hospital bills, no wage statements—and what little testimony they have

provided about their alleged injuries is devoid of any detail—whether as to medical expenses,

lost wages, or any other alleged injury—that would even remotely support an inference of

quantifiable loss.  *See* Defs.' Opening Mem. at 30–34.  As for the expert evidence of loss that

Plaintiffs promised, that evidence has never materialized.  *Id.* at 33.

Plaintiffs do not contest any of this.  Instead, they seek to distract from their

inability to prove this element by raising two meritless arguments.

Plaintiffs first contend that they cannot be expected to quantify their immaterial

losses because those losses cannot be precisely calculated.  Opp. at 41–42.  That is no excuse.

Indonesian law is clear that a plaintiff seeking to establish liability must quantify his or her

alleged losses.  *See* Defs.' Opening Mem. at 30–31; Lindsey Decl. ¶¶ 27–31; Suppl. Decl. of

T. Lindsey, dated October 13, 2021 ("Lindsey Suppl. Decl.") ¶ 14–29.  While certain kinds of

loss—especially immaterial loss, such as emotional pain and suffering—may resist precise

quantification, this does not relieve Plaintiffs of their burden to adduce evidence as to this

essential element.  Lindsey Suppl. Decl. ¶¶ 16–18, 26.  This is because Indonesian law

recognizes only compensatory damages (as Plaintiffs' own experts do not dispute, *see* Bell

Suppl. Decl., PX 1, ¶ 40; Cammack Decl., PX 2, ¶ 7), and a plaintiff cannot be compensated for

his or her loss unless that loss can be reliably quantified, *see* Lindsey Suppl. Decl. ¶ 18.  As such,

plaintiffs claiming immaterial loss are still required to present concrete and detailed evidence

that would support such quantification.  *Id*.  Here, Plaintiffs have failed to do so for any of their

alleged losses, whether material *or* immaterial.  That failure is fatal to their claims.

Plaintiffs next argue that the calculation of damages should be left to the jury's discretion.  Opp. at 42–43.  But Plaintiffs cannot rely on the jury's authority to award damages as an excuse for failing to produce evidence that might support the jury's decision to do so. Plaintiffs effectively seek to conflate *their* burden to prove quantifiable loss with the task of calculating an ultimate damages award, ignoring that one must necessarily come before the other.  It is only *after* Plaintiffs have established liability—including by producing detailed evidence quantifying their alleged losses—that the ultimate factfinder (in this case, a jury) can then determine, in its discretion, an appropriate measure of damages.  Lindsey Suppl. Decl. ¶ 15.

Here, there is no risk of intruding on the province of the jury when Plaintiffs are far from clearing that initial threshold.  In this regard, U.S. law is no different from Indonesian law.  It is well recognized that juries cannot award damages on an insufficient evidentiary record. And plaintiffs who rely on unsubstantiated allegations of loss do not survive summary judgment under U.S. law.  *See, e.g.*, *Weinberg* v. *Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001) (quoting *McGlinchy* v. *Shell Chem. Co.*, 845 F.2d 802 (9th Cir.1988)) ("[S]ummary judgment is appropriate where [plaintiffs] have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages.").  The result under Indonesian law is no different here.

## III.    EMC IS NOT VICARIOUSLY LIABLE FOR PLAINTIFFS' INJURIES.

Plaintiffs have no evidence showing that EMC—an entity that is even further removed in the chain of causation than EMOI—is in any way directly liable for their injuries. Plaintiffs therefore assert, in the alternative, that EMC should be held vicariously liable for their alleged injuries, either under an agency theory or by piercing the corporate veil.  As Plaintiffs' opposition confirms, both theories fail.

As to Plaintiffs' agency theory, Plaintiffs are required by Indonesian law but have failed to offer any evidence showing that EMC specifically instructed EMOI to perform the actions giving rise to their alleged injuries.  Defs.' Opening Mem. at 34–36.  Plaintiffs have put forward no evidence that EMOI caused Indonesian soldiers to injure Plaintiffs, let alone that EMC provided specific instructions, directly or indirectly through EMOI, to Indonesian soldiers to injure Plaintiffs.  Plaintiffs effectively concede this failure in their opposition, instead attempting to sidestep the requirements of Indonesian law by invoking the findings that Judge Oberdorfer made in 2008—under D.C. law and prior to any deposition testimony by plaintiffs or their witnesses—as somehow controlling over an issue that all parties now agree is governed by Indonesian law.  Opp. at 46–48.

This is just another red herring.  While Plaintiffs seek to manufacture a dispute as to the requirements for agency liability under Indonesian law, Opp. at 46, experts on both sides agree that in order to establish agency liability there must be *some* "connection" between "the wrongful act and the [agent's] work."  Bell Suppl. Decl., PX 1, ¶ 25; Lindsey Suppl. Decl. ¶ 34.  In the words of Plaintiffs' own expert, Professor Bell, "the plaintiff . . . must prove that the wrongful act occurred in the performance of the [agent's] work or duties."  Bell. Suppl. Decl., PX 1, ¶ 25.[9]  Here, there is no evidence of any such connection.  Because Plaintiffs have no evidence that EMOI took any action to harm Plaintiffs—much less that it did so while performing work at EMC's instruction—there is no basis to impute EMOI's alleged conduct to EMC under a theory of agency liability.

---

[9]   While Plaintiffs' expert claims that there is an "irrebuttable presumption" of vicarious liability in *employer-employee* relationships, Bell Suppl. Decl., PX 1, ¶ 34, this claim (even if true) is irrelevant here, where the alleged agency relationship is between a corporate parent and its indirect subsidiary.  *See* Lindsey Suppl. Decl. ¶ 38.

As to Plaintiffs' veil-piercing theory, Defendants demonstrated in their opening memorandum that there is no basis to pierce the corporate veil where the unrebutted evidence shows that EMOI was a separate corporate entity from EMC and that the two entities observed all of the corporate formalities required to preserve corporate separateness.  Defs.' Opening Mem. at 36–38.  Plaintiffs in their Opposition fail to rebut *any* of this evidence confirming corporate separateness.  Instead, Plaintiffs baldly assert that this is one of the rare situations in which Indonesian law permits corporate veil-piercing, because EMC was supposedly "involved in" EMOI's allegedly "unlawful acts."  Opp. at 48.  This does not suffice.  Crucially, Plaintiffs ignore that Indonesian law does not allow veil-piercing unless the allegedly "unlawful act" is one that specifically undermines corporate separateness.  *See* Lindsey Decl. ¶ 47.  Neither of Plaintiffs' two new declarations on Indonesian law argue otherwise.  Having failed to point to any such unlawful act that undermines corporate separateness, Plaintiffs cannot hold EMC liable for EMOI's alleged actions.

## IV.   DEFENDANTS HAVE BEEN DENIED A FAIR OPPORTUNITY TO ANSWER PLAINTIFFS' ALLEGATIONS IN VIOLATION OF THEIR DUE PROCESS RIGHTS.

Rather than address the several ways in which Defendants have been deprived of the opportunity to meaningfully investigate and challenge Plaintiffs' claims—and the ever-shifting nature of those claims,[10] *see* Defs.' Opening Mem. at 40–43, 40–41 n.34—Plaintiffs generally state that Defendants have "marshalled enormous financial resources" in this matter and that "the basic thrust of Plaintiffs' claims have been evident from the start."  Opp. at 49, 51.

---

[10]  As described in Defendants' opening memorandum, Plaintiffs' allegations have repeatedly shifted, at each new phase of the litigation, so that every time Defendants prepared to investigate or answer one accusation, a new or modified accusation arose—often immediately prior to or during depositions.  *See* Defs.' Opening Mem. at 40–43, 40–41 n.34.

That is no answer.  Defendants' wherewithal to retain counsel is of no legal significance in the face of the pattern by which Plaintiffs concealed allegations and core facts from Defendants; repeatedly modified those allegations; and prevented Defendants from challenging the allegations.[11]  *See* Defs.' Opening Mem. at 40–43.

To the extent that any of Plaintiffs' claims survive their failure of proof as to causation and loss, their claims must be dismissed for the independent reason that Defendants have been denied a fair opportunity to investigate and rebut Plaintiffs' allegations.

## V.    THE TIME-BARRED CLAIMS SHOULD BE DISMISSED.

Plaintiffs' attempt to salvage the untimely claims of John Doe II, John Doe IV, and Jane Doe VII is unavailing.  D.C. law—which Plaintiffs agree governs the applicable statute of limitations in this matter—does not recognize equitable tolling for "extraordinary circumstances."  *Pappas* v. *District of Columbia*, 513 F. Supp. 3d 64, 85 (D.D.C. 2021). Even if tolling for "extraordinary circumstances" were available, Plaintiffs still do not adequately explain, as this Court has instructed they must, "why these particular Plaintiffs . . . were unable to file timely claims while the other Plaintiffs were able to do so." ECF No. 365 at 30.

Plaintiffs initially assert, without citation or support, that John Doe II, John Doe IV, and Jane Doe VII were prevented from timely filing their claims due to a "fear of reprisal." Opp. at 53. But they ultimately admit that the timing of their complaint was based entirely on

---

[11]   In addition, this Court has already recognized the due process risk posed by Plaintiffs' inability to appear in the United States for trial. *See* ECF No. 586 at 44–45. Although Plaintiffs now say, in order to survive summary judgment, that they "remain hopeful" they can obtain visas for trial, Opp. at 49, their previous representation to the Court regarding their failure to obtain visas demonstrates otherwise. *See* ECF No. 560-2 at 11–13 ███████████████████████████████████████████████████████████████████████ █████████████   ).

when Plaintiffs' counsel found them. *See* Opp. at 54–55 (noting that Plaintiffs "live in a remote area" where they "had no access to American counsel," "it was impossible for Plaintiffs to bring a lawsuit against Defendants before originating counsel's trip," and "[n]o Plaintiffs were able to sue prior to June 2001 when they were fortuitously put in contact with an American attorney"). The timing of counsel's contact with plaintiffs is not an "extraordinary circumstance" even in jurisdictions where such tolling is recognized. *See Miller* v. *Downtown Bid Services Corp.*, 281 F. Supp. 3d 15, 21–22 (D.D.C. 2017) (applying federal law) ("[Plaintiff's] inability to retain an attorney is not an extraordinary circumstance.").[12]

Nor are Plaintiffs' negligence claims subject to a lengthier limitations period. Plaintiffs' assertion of separate negligent supervision and negligent hiring claims is irrelevant. Under D.C. law, negligence claims are subject to a one-year limitations period when intertwined with intentional tort claims, regardless of whether the plaintiff has timely asserted separate claims under a negligent supervision or negligent hiring theory. *See Stewart-Veal* v. *District of Columbia*, 896 A.2d 232, 235–37 (D.C. 2006) (negligence claims intertwined with intentional torts time-barred, notwithstanding separate negligent supervision and hiring claims).[13]

The untimely intentional tort and negligence claims brought by John Doe II, John Doe IV, and Jane Doe VII should be dismissed.

---

[12]  *See also Smalls* v. *Collins*, 2021 WL 3700194, at *18 (2d Cir. Aug. 20, 2021) (plaintiff's inability to contact attorney or find a new one did not constitute an extraordinary circumstance warranting equitable tolling); *Arrington* v. *United Parcel Serv.*, 384 F. App'x 851, 852 (11th Cir. 2010) (plaintiff's "inability to secure counsel" did not constitute "extraordinary circumstances sufficient to require equitable tolling").

[13]  Plaintiffs also argue that Jane Doe VII's claims relating to an alleged attack in 2003, which were first brought in Plaintiffs' Second Amended Complaint in 2014, were timely because they "relate back" to Plaintiffs' original complaint. Opp. at 55. Their claim is that the alleged 2003 attack somehow arises out of the "same conduct" as a separate alleged attack that, in their original complaint, they claimed to have occurred *thirteen years earlier*, in 1990. Needless to say, the relation back doctrine does not apply.

**Public Redacted Copy**

## CONCLUSION

Plaintiffs have no evidence that the Indonesian soldiers who allegedly injured them did so at the direction of Defendants, let alone that they were guarding the Government of Indonesia-owned facilities that Defendants operated at the time of the alleged incidents. They cannot prove causation, and for that reason alone all of their claims must fail. They have also failed to produce evidence of quantifiable loss—a necessary element of all of their claims—and do not contend otherwise. Their agency and veil-piercing theories for retaining EMC in this case are contrary to Indonesian law. They have failed to even address the various ways in which Defendants have been denied the opportunity to investigate and answer Plaintiffs' allegations, in violation of Defendants' due process rights. And the intentional tort and negligence claims of three plaintiffs are time-barred.

Defendants' motion for summary judgment on all claims should be granted.

Washington, D.C.
October 13, 2021

Respectfully submitted,

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX 77389
Telephone: (832) 624-6336

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300

*Attorneys for Defendants Exxon Mobil Corporation
and ExxonMobil Oil Indonesia Inc.*

22