**Public Redacted Copy**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 01-1357 (RCL/AK) |
| | ) |
| EXXON MOBIL CORPORATION., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX  77389
Telephone:  (832) 624-6336

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C.  20006-1047
Telephone: (202) 223-7300

**Public Redacted Copy**

## <u>TABLE OF CONTENTS</u>

DEFENDANTS' OBJECTIONS TO PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF FACTS ........................................................................................... 3

DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS ............................................................................................ 168

DEFENDANTS' ADDITIONAL MATERIAL FACTS NOT IN GENUINE DISPUTE ......... 384

**Public Redacted Copy**

Defendants Exxon Mobil Corporation ("EMC") and ExxonMobil Oil Indonesia, Inc. ("EMOI") (collectively, "Defendants") respectfully submit this Response to Plaintiffs' Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment, ECF No. 825-2 (the "Counterstatement"), and in support of their Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

Plaintiffs' 326-page Counterstatement is nothing more than an attempt to manufacture material disputes where there are none. Despite Plaintiffs' efforts to mischaracterize the evidence—and to further muddy the record by introducing hundreds of new and irrelevant "facts" and exhibits—Plaintiffs fail to specifically controvert the material facts stated by Defendants. Those facts therefore remain beyond any genuine dispute, and may be deemed admitted for purposes of Defendants' motion. *See* LCvR 7(h)(1).

Aside from its failure to specifically controvert Defendants' stated facts, Plaintiffs' Counterstatement is also generally objectionable on several grounds:

Defendants generally object to Plaintiffs' widespread assertion of supposed facts and arguments that are entirely irrelevant and unresponsive to Defendants' motion. The rules of this Court provide that an opposition to a motion for summary judgment "shall be accompanied by a separate *concise* statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue *necessary to be litigated*[.]" *Id.* (emphasis added). Plaintiffs brazenly ignore this rule, instead burdening this Court with a sprawling, kitchen-sink Counterstatement that is replete with arguments as to the weight and credibility of Defendants' evidence—issues not to be considered on a motion for summary judgment—and introduces nearly four hundred additional "facts," none of which truly implicate a genuine issue necessary to be tried. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere

Public Redacted Copy

existence of *some* alleged factual dispute" does not create a genuine issue unless it "might affect the outcome of the suit[.]"); *see also id*. at 249 ("At the summary judgment stage, the judge's function is not . . . to weigh the evidence . . . but to determine whether there is a genuine issue for trial.").

Defendants further object generally to the countless conclusory statements in Plaintiffs' Counterstatement that are unsupported, if not flatly contradicted, by the record.  In particular, Plaintiffs' constant refrain that they were injured by "Exxon soldiers"—without any evidence connecting those soldiers to Defendants—is merely baseless rhetoric that fails to create a genuine dispute.  *See Fawehinmi* v. *Lincoln Holdings, LLC*, 895 F. Supp. 2d 148, 152 (D.D.C. 2012) (a party opposing summary judgment cannot rely on "mere unsupported allegations" but must rather present "competent evidence setting forth specific facts showing that there is a genuine issue for trial").

Lastly, Defendants generally object to Plaintiffs' repeated reliance on inadmissible evidence, including hearsay and inadmissible lay witness opinions.  Inadmissible evidence cannot create a genuine dispute of fact.  *See Gleklen* v. *Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (inadmissible evidence "counts for nothing" on a motion for summary judgment).  Large swathes of Plaintiffs' Counterstatement should not be considered for this reason alone.

In this Response, Defendants will respond to both: (i) Plaintiffs' responses to the 175 paragraphs in Defendants' Statement of Material Facts Not in Genuine Dispute (ECF No. 819); and (ii) Plaintiffs' 372 "Additional Material Facts."  Defendants have also appended a small number of additional material facts as to which there is no genuine dispute in support of their Reply Memorandum and Responses to Plaintiffs' Counterstatement.

## DEFENDANTS' OBJECTIONS TO PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF FACTS

### I.      BACKGROUND

1.      ████████████████████████████████████████████████████

████████████. [Expert Report of Geoffrey Robinson, dated Mar. 31, 2021 ("Robinson Rept.")

at 6, Ex. 2; CA0001045992 ("MOI Certificate of Incorporation"), Ex. 3.]

**Plaintiffs' Response:** Undisputed (except that this fact is not material).

**Defendants' Objection to Response to Paragraph 1.**  N/A

2.      ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ [Robinson Rept. at 8-10, Ex. 2.]

**Plaintiffs' Response**: Undisputed (except that this fact is not material).

**Defendants' Objection to Response to Paragraph 2.**  N/A

3.      From the early 1970s through 2015, MOI, later EMOI (collectively, "EMOI"),

operated the Arun Field facilities, pursuant to a series of production sharing contracts, as a

contractor for Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"), a 100%

Indonesian state-owned entity.  [*See generally* Production Sharing Contract ("PSC")

CA0001186134, Ex. 5; *see also* Deposition of Lance Johnson, dated Jan. 11, 2008 ("Johnson

Dep.") 38:9-38:13, Ex. 6 ("████████████████████████████████████████

████████████████████████████████████████████████████."); Deposition

of John Connor, dated Jan. 14, 2008 ("Connor Dep.") 21:23-24, Ex. 7 (Pertamina was the

"████████████████████████████████").]

**Plaintiffs' Response:** Disputed. Undisputed that EMOI was a contractor and operated
pursuant to production sharing contracts. Disputed to the extent that Defendants operated
the Arun Field for a percentage of the proceeds of the project. PX51, CA0001186134, at
'161 ¶ 6.1.3.

Public Redacted Copy

**Defendants' Objection to Response to Paragraph 3.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of this Paragraph.  Defendants' dispute is irrelevant to this Paragraph.

4.       The operative production sharing contract during the Relevant Period (the "PSC")

was effective as of October 4, 1998, [PSC, CA0001186134, Ex. 5], succeeding an earlier

production sharing contract that expired on October 3, 1998. [*Id.* at -137.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 4.**  N/A

5.       EMC has never been a party to a production sharing contract for the extraction of

gas in Aceh. [*See generally id.*]

**Plaintiffs' Response:** Disputed. Undisputed that EMOI signed the PSC; however, Plaintiffs further state that the Parent Companies were involved in the negotiations over the PSC. PX15, Johnson Dep. 40:11-24. Plaintiffs also incorporate their contention that EMOI was an alter ego of EMC, as discussed *infra* ¶¶ 148-68.

**Defendants' Objection to Response to Paragraph 5.**  Defendants object to the use of "Parent Companies" as it inaccurately describes the relationship between EMOI, EMC, and several ExxonMobil-related entities.  Defendants further object to this Response as it does not dispute any evidence responsive to any material aspect of this Paragraph.  It is not material to this Paragraph whether the "Parent Companies" were involved in negotiating the PSC.

6.       As a contractor and operator, EMOI did not own any natural resources, facilities,

or equipment associated with the operations at Arun Field. [PSC, CA0001186134 at -136, Ex. 5

("█████████████████████████████████████████████████████████

████████████████████████████"); *id.* ¶¶ 5.3(f), 9.1 (█████████████████

███████████████████); Deposition of Mark R. Ward under Rule 30(b)(6) for

Exxon Mobil Corporation, Mobil Corporation, and Mobil Oil Corporation, dated Dec. 12, 2007

("EMC/MC/MOC 30(b)(6) (Ward) Dep.") 255:5-11, Ex. 8 ("█████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



███████████████.”); *id.* at 253:10-18 (“████████████████████

██████████████████…”); Deposition of John Boydell under Rule 30(b)(6) for

ExxonMobil Oil Indonesia Inc., dated Dec. 7, 2007 (“EMOI 30(b)(6) (Boydell) Dep.”) at 101:5-

7, Ex. 9 (“████████████████████████████████████████████

█████████████.”); Deposition of Michael Farmer, dated Dec. 18, 2007 (“Farmer Dep.”)

153:13-14, Ex. 10 (“█████████████████████████████████████████

██████.”); Johnson Dep. 38:3-8, Ex. 6 (“████████████████████

████████████████████████████████████████████████

██████████████████████████████.”); *id.* at 43:12-13 (“████████

███████████████████████████████████.”).]

**Plaintiffs' Response**: Undisputed that EMOI did not own (in the sense of having the right to alienate) the natural resources, facilities or some of the equipment associated with its operations. Disputed, however, insofar as the record indicates that some of the equipment was owned by EMOI, and EMOI exercised control over their facilities and the equipment associated with the operations. *See infra* ¶¶ 208-13, 239-52. This control included the right to provide or lend the equipment and operate, oversee and supervise its use. *See infra* ¶¶ 211, 239-52. This control also included the right to control access to the facilities. *See, e.g.*, PX49, CA0001213388; *infra* ¶¶ 208-09, 285. In accordance with this, EMOI executives and employees frequently described these operations at EMOI's facilities. *See, e.g.*, PX50, CA0001334012 (Email from J. Connor to K. Jayadev et al. discussing the "████████████████████████████████.").

**Defendants' Objection to Response to Paragraph 6.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph, and the purported evidence does not support Plaintiffs' proposition. Plaintiffs do not dispute that Defendants did not own any of the equipment used in EMOI's operations in Aceh. Defendants further object to Plaintiffs' use of the phrase "EMOI's Facilities," which misleadingly suggests that the facilities belonged to EMOI when, in fact, all facilities were the property of Pertamina and the Government of Indonesia.

7.      In accordance with the PSC, Pertamina also had control over management of the

operations. [PSC 1.1, CA0001186134 at -138, Ex. 5 (“████████████████████████

[REDACTED]

[REDACTED] . . .").]

> **Plaintiffs' Response:** Undisputed that the PSC provided that Pertamina [REDACTED] " but disputed that this meant that EMOI did not exercise substantial control over many aspects of the operations, including security. *See infra* ¶¶ 11, 208-11, 213, 239-52, 280-304. Pertamina did not provide day-to-day supervision; in fact, Pertamina's primary liaison was based in Jakarta— more than one thousand miles from the activities taking place in Aceh. *See* PX16, Connor Dep. 195:10-14, 212:4-10.

> **Defendants' Objection to Response to Paragraph 7.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs do not dispute that Pertamina had control over management of the operations in accordance with the PSC. Plaintiffs' additional assertions are irrelevant to this Paragraph.

8.     The Constitution of Indonesia provides that it is the responsibility of the

Government of Indonesia to secure and protect the country's natural resources, including through

use of the military. [Expert Report of Timothy Lindsey, dated May 20, 2021 ("Lindsey Rept.")

55-56 & n.24, Ex. 11.] EMOI was not responsible for, or permitted to, secure the facilities and

operations in Aceh. [*Id.* ¶¶ 61-70.]

> **Plaintiffs' Response:** Undisputed that the laws of Indonesia allow the Government of Indonesia to protect natural resources, including through the use of the military, but the statement that EMOI was not responsible for, or permitted to, secure the facilities and operations in Aceh is disputed. EMOI's own testimony confirms that EMOI assumed and implemented very substantial security functions both through the private security personnel it engaged and through its engagement, deployment and control of military security personnel. *See infra* ¶¶ 11, 208-11, 213, 239-52, 280-304. Moreover, the PSC specifically provided that [REDACTED]. PX51, CA0001186134, at '157 ¶ 5.3(c); PX18, Duffin Dep. 173:5-24 (under the PSC, [REDACTED]); *infra* ¶¶ 200-01. Moreover, EMOI had substantial ability to control the support and deployment of those security personnel because, among other things, EMOI could withhold logistical and financial support to the military guards unless it agreed that this support was necessary. *See infra* ¶243.

> **Defendants' Objection to Response to Paragraph 8.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs do not dispute that the laws of Indonesia require the

Government of Indonesia to protect natural resources, including through the use of the military.  Plaintiffs' additional assertions are irrelevant to this Paragraph.

9.      Arun Field was designated a Vital National Object by the Commander-in-Chief of

the Armed Forces of Indonesia in 1983. [Declaration of Dyah Soewito, dated Apr. 16, 2008

("Soewito Decl.") ¶¶ XIV-XV, Ex. 12.]

> **Plaintiffs' Response:** Disputed. During the relevant time period, neither the Arun Field nor EMOI's facilities had been designated through any official or legal process as a "national vital asset." In Defendants' previous Statement of Material Facts Not in Genuine Dispute (dated January 29, 2008), they claimed that the "Arun field was designated a national vital asset by the Ministry of Energy and Mineral Resources of the Government of Indonesia." Dkt. 268-1 at ¶ 54. There is no indication that the Ministry of Energy and Mineral Resources had any legal authority to make such a designation during the relevant time period. *See also* PX52, Panjaitan Decl. ¶ 6. Defendants now claim that "Arun Field was designated a Vital National Object by the Commander-in-Chief of the Armed Forces of Indonesia in 1983." Defendants' citation does not include any document or regulation indicating that there was such a designation or that the Commander-in-Chief had legal authority to make such a designation. Defendants' citation claims that an undated "guidance" document was issued "between June 30, 1999 and June, 2000." *See* Defs. Exh. 12, at XV. But the dates indicate that for much of the relevant period, even crediting Soewito's unsupported claim, this "guidance" was not in effect. In any event, the record indicates that regardless of the authority the military had to take actions to protect natural resources, the military guards engaged for EMOI's operations were provided in response to requests by EMOI and were then subject to substantial control by EMOI relating to the timing, location, support, conduct and other aspects of this deployment. *See infra* ¶¶ 207-211, 213, 229-230, 239-252, 265-266, 280-304.

> **Defendants' Objection to Response to Paragraph 9.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  The central proposition of this Paragraph is that Arun Field was designated as a Vital National Object; it is immaterial whether it was so designated by the Commander-in-Chief of the Armed Forces of Indonesia or by the Ministry of Energy and Mineral Reserves of the Government of Indonesia.  Moreover, the Response is irrelevant and thus immaterial to Defendants' motion for summary judgment.

10.      Designation as a Vital National Object provided Arun Field another reason for

protection by Indonesia's armed forces. [*Id.* at ¶¶ XIV-XVI; Declaration of Robert N. Hornick,

dated Feb. 3, 2006 ("Hornick Decl.") ¶ 35 & Ex. C, Ex. 13 ("Under Indonesian law, the Armed

Forces are mandated to protect against domestic as well as foreign threats, including armed

Public Redacted Copy

rebellion, civil war, and sabotage of vital national objects (such as natural gas fields). *See* Law

No. 3/2002 dated Jan. 8, 2002 re: National Defense, arts. 4, 7 and 10 and Official Elucidation

thereto. This was also the law at the time that the wrongful conduct alleged here purportedly

occurred.") (footnote omitted); Nov. 11, 1999 Security request from Pertamina to Commander of

TNI [Indonesian armed forces] Jakarta, CA0001078227, Ex. 14 (█████████████████████

███████████████████████████████████████████."); Letter from Acting Head

of BPPKA [Pertamina] to EMOI President and GM, CA0002019862 at -862, Ex. 15(█████████

██████████████████████████████████████████████████

███████████████████████████); May 26, 2000 Email from M. Budiman to R.

Wilson, CA0001005884 at -884, Ex. 16(█████████████████████████████████████████

█████████"); "Aceh: Exxon Mobil shuts down," Down to Earth Newsletter (May 2001),

DOE004404 at -404, Ex. 17 ("███████████████████████████████████████████

██████████████"); Deposition of Ron Wilson, dated Jan. 24, 2008 ("Wilson Dep.") 119:23-

120:8, Ex. 18 ("██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████[.]").]

**Plaintiffs' Response:** Disputed. Plaintiffs incorporate their response to ¶ 9, *supra*.
Moreover, regardless of the authority the military had to take actions to protect natural
resources, the military guards engaged for EMOI's operations were provided in response
to requests by EMOI and were then subject to substantial control by EMOI relating to the
timing, location, support, conduct and other aspects of this deployment. *See infra* ¶¶ 207-
211, 213, 229-230, 239-252, 265-266, 280-304.

**Defendants' Objection to Response to Paragraph 10.** Defendants object to this
Response as it does not dispute or offer any evidence responsive to any material aspect of

**Public Redacted Copy**

the Paragraph.  Plaintiffs do not dispute that the Vital National Object designation provided reason for the military to secure Arun Field.  Plaintiffs' additional assertions are irrelevant to this Paragraph.

11.     Under the PSC, it was Pertamina's exclusive responsibility to provide security for Arun Field. [PSC ¶ 5.3(c), CA0001186134 at -157, Ex. 5.] According to the PSC: ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.[1] [*Id.* (emphasis added); *see also* Wilson Dep. 96:24-25, Ex. 18 ("██████████████████████████████████.");

EMOI 30(b)(6) (Boydell) Dep. 199:13-15, Ex. 9 ("████████████████████████

██████████████████████████████████████.");  EMC/MC/MOC 30(b)(6) (Ward) Dep. 247:8-12, Ex. 8 ("████████████████████████████

████████████████████████████████████████

████████████████████████.");  Deposition of Robert Haines, dated Nov. 16, 2007 ("Haines Dep.") 40:18-41:1, Ex. 19 ("██████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████

███████.");  *id.* at 231:21-232:2 ("█████████████████████████████████

████████████████████████████████████████████████████

███████████.");  *id.* at 233:14-17 ("███████████████████████████████

████████████████████████████████████████████████████████

---

[1]     Italics added by Defendants; bold added by Plaintiffs.



███████████.”); Farmer Dep. 249:10-14, Ex. 10 (“██████████████████

████████████████████████████████████████████████

████████████████████████████████████████.”); Johnson Dep.

38:11-13, Ex. 6 (“████████████████████████████████████

███████.”); *id.* at 49:21-23 (“████████████████████████████████

████████████████████████████.”).]

**Plaintiffs' Response:** Disputed. The PSC provided that Pertamina would ████████
█████████████████████████. PX51, CA0001186134, at '157
¶ 5.3(c). The military also explicitly informed EMOI in August 1999 that "████
████████████████████████████████████████." PX53, CA0001123197;
*see infra* ¶¶ 200-201. Military security was frequently engaged for EMOI's facilities and
operations pursuant to such requests by EMOI. *See infra* ¶¶ 200-202, 207, 229-230, 233-
238, 265-266, 272-273, 277.

EMOI also undertook numerous security functions using its private security personnel.
This included █████████████████████████████████." PX8, EMOI 30(b)(6)
(Snell) Dep. 568:7-9. Their security functions included ████████████████████

████████████ *See, e.g., id* at 567:21-568:3 (███████████████

████); *id.* at 568:7-9 ("████████████████████

████████"); *id.* at 569:11-12, 570:2 (testifying that ████████

████).

███████████ *Id.* at 571:11-22. As EMOI requested more and more military personnel
to guard its facilities and operations, it expressly recognized that █████████████

████████. PX54, CA0001047716 at '716-17.

**Defendants' Objection to Response to Paragraph 11.** Defendants object to this
response as it does not dispute or offer any evidence responsive to any material aspect of
the Paragraph. The PSC speaks for itself. Plaintiffs do not dispute that under the PSC,
Pertamina was responsible for providing security protection to Arun Field. Defendants
further object to this Response as it addresses unrelated and immaterial issues that do not
create a genuine issue of material fact. Plaintiffs intentionally misconstrue the meaning
of the Paragraph and do not dispute that EMOI's private, unarmed security guards are not
alleged to have injured any plaintiffs.

10

12.     The Government of Indonesia alone selected and deployed military personnel to secure Arun Field. [PSC ¶ 5.3(c), CA0001186134 at -157, Ex. 5; Lindsey Rept. ¶¶ 69-70, Ex. 11; Letter from BPPKA to EMOI, CA0002019862 at -862, Ex. 15 (████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████.").] EMOI had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military assigned to protect Arun Field. [*See* Farmer Dep. 132:3-5, Ex. 10 ("██████████████████████████████████████████ ██████████████████████████████████."); Deposition of Mark Snell under Rule 30(b)(6) for ExxonMobil Oil Indonesia Inc., dated May 24, 2021 at 701:2-4, Ex. 20 ("██████ ██████████████████████████████████████████████████████████.");  Lindsey Rept. ¶¶ 69-70, Ex. 11 ("███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████.").]

**Plaintiffs' Response:** Disputed. *See infra* ¶¶ 207-211, 213, 229-230, 239-252, 265-266, 280-304.

**Defendants' Objection to Response to Paragraph 12.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  The PSC speaks for itself.  It is undisputed that Defendants had no authority to select and deploy the armed forces of a sovereign nation.

13.     The PSC reimbursed EMOI for any logistical support or resources EMOI was contractually required to provide the Indonesian military personnel protecting the government-

owned facilities at Arun Field, as requested by Pertamina. [PSC ¶ 6, CA0001186134 at -160-167, Ex. 5; June 7, 2000 Letter, CA0001003149 at -150, Ex. 21(" 

."); Wilson Dep. 131:4-19, Ex. 18 ("

."); *id.* at 251:8-252:1 ("

").]

**Plaintiffs' Response:** Disputed. Disputed insofar as it suggests that the very substantial logistical support and resources that EMOI provided for military security were reimbursed fully and came at no cost to EMOI.

**Public Redacted Copy**



would reduce EMOI's profits by approximately 25-30 cents. *See* PX18, Duffin Dep. 171:13-20 (

); PX55, CA0001055745, at '747

); PX15, Johnson Dep. 102:7-22 (Under the PSC.

).

**Defendants' Objection to Response to Paragraph 13.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The PSC speaks for itself. EMOI was required to be reimbursed for expenses it incurred under its contractual obligations pursuant to the PSC. Defendants further object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact.

14.     EMOI employed no armed security guards at Arun Field. EMOI's unarmed

security guards were essentially part of a community relations project through which EMOI

provided jobs to local communities. [Johnson Dep. at 44:17-18, Ex. 6 ("

."); *id.* at 96:16-24 ("Our

security was unarmed."); *id.* at 98:10-20 ("Q.

").] The unarmed guards provided certain limited access control

services for EMOI. [Connor Dep. at 37:2-38:3, Ex. 7 ("



**Plaintiffs' Response:** Disputed. Undisputed that the private security guards employed by EMOI were unarmed. Disputed that they were ███████████████████████████████████ their actual functions as security guards are described *supra* ¶ 11. In addition, EMOI requested, deployed, paid, supported and exercised significant control over military guards who were armed and, in fact, were directed by EMOI to ███████████████████████ PX54, CA0001047716, at '716-17; *see infra* ¶ 208. *See also infra* ¶¶ 207, 209-211, 213, 216-222, 239-252, 280-304.

**Defendants' Objection to Response to Paragraph 14.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact. Plaintiffs intentionally misconstrue the meaning of the Paragraph and do not dispute that EMOI's private, unarmed security guards are not alleged to have injured any plaintiffs.

15. Plaintiffs' allegations in this matter do not relate to EMOI's unarmed security guards. [*See* 2nd Am. Compl. ¶ 1, ECF No. 465 (allegations relate to "conduct inflicted by members of the Indonesian military"); ECF No. 160 at 34-35, 45 (statement of Terry Collingsworth, Esq., counsel for Plaintiffs, at a May 16, 2006 discovery conference: "We've not said any [Exxon employees] ever met our clients, had anything to do with going out and ordering people to do things in terms of the security force. . . . They have nothing to do with this particular question of who ordered or who personally and directly harmed our clients. . . . There's none of these [Exxon] folks, we're certain, that have ever met our clients, that have ever ordered our clients to be harmed[.]").] Plaintiffs admitted that the soldiers involved in the incidents that form the basis for their claims were wearing military uniforms. [*See, e.g.*, Pls.' Objs. & Resps. to Defs.' 1st Req. for Admis. (Apr. 28-May 14, 2016), Ex. 22 (█████████████████████ ████████████████████████████).] EMOI's unarmed guard force did not wear military uniforms. Rather, they wore blue pants, white shirts, and caps. [Connor

14

Dep. at 37:2-38:3, Ex. 7 ("

"); Wilson Dep. at 88:22-89:4, Ex. 18 ("

.").]

**Plaintiffs' Response:** Disputed. Disputed insofar as EMOI's private security team—including, but not limited to, the security team's senior officials—failed to take appropriate steps to prevent foreseeable and violent abuses by the military security guards requested and deployed by EMOI. *See infra* ¶ 269 & nn.12-21; *see also infra* ¶¶ 96, 215, 225-228, 235, 253-257, 262-264, 268, 270-271, 276. Further disputed insofar as Defendants' use of or policies related to unarmed security guards might relate to reasonable steps Defendants could have taken to mitigate the risks of human rights abuses perpetrated by military security.

**Defendants' Objection to Response to Paragraph 15.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Defendants further object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact. Plaintiffs intentionally misconstrue the meaning of the Paragraph and do not dispute that EMOI's private, unarmed security guards are not alleged to have injured any plaintiffs.

16.    The Indonesian government and military exercised "very strict" control over Arun Field specifically and the area generally because it "contained five major industries important to the nation's economic growth" and "the slightest disturbance would have a national impact." [Geoffrey Robinson, "Rawan Is as Rawan Does: The Origins of Disorder in New Order Aceh," 66 Indonesia 127, 137 (1998) ("Robinson, Rawan"), Ex. 23 (quoting Colonel Sofyan Effendie, the Commander of Korem 011 in Lhokseumawe); *see also* Soewito Decl., Ex. 12.]

" [Letter from BPPKA to EMOI, CA0002019862 at -862, Ex. 15.] By law, the Indonesian military's national defense mandate also included "

." [Lindsey Rept. ¶¶ 59-60, Ex. 11 (quoting Law 20 of 1982).]

**Plaintiffs' Response:** Disputed. In fact, EMOI exercised control over security in the vicinity of its operations. EMOI requested troops, supervised deployments, coordinated logistical support and managed other aspects of security support. *See infra* ¶¶ 207-211, 213, 229-230, 239-252, 265-266, 280-304. The Indonesian government and military, in contrast, *deferred* to EMOI when it came to security issues, and informed EMOI in August 1999 that it ███████████████████████████████ ██████████ PX53 CA0001123197.

Even absent the evidence above, Defendants cannot establish this claim with admissible evidence. The quoted language in Defendants' Exhibit 23 is not admissible evidence; it is hearsay-within-hearsay, and the quotation relates to a period (1990) almost a decade before the relevant time period. Defendants' Exhibit 12 is also inadmissible with respect to Defendants' claim. It is a 2008 declaration from an individual who has not been identified by Defendants as a fact witness in this case and Defendants' Statement of Facts does not even identify which part of Exhibit 12 is being relied upon. Defendants' Exhibit 15 is also inadmissible. It is not a "Letter from BPPKA to EMOI" as described, but apparently purports to be an undated translation, without any identification of the author of the translation, without attachment of the actual letter.

**Defendants' Objection to Response to Paragraph 16.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. Defendants further object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph, whose primary assertion is a direct quotation from Plaintiffs' own expert, Professor Geoffrey Robinson. Defendants further object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial.

17.    During the Relevant Period, Indonesia struggled with high rates of poverty. [Hal Hill, "What's Happened to Poverty and Inequality in Indonesia over Half a Century?" 38 Asian Dev. R. 68, 73 (2021), Ex. 24; *see also* World Bank Group, Indonesia Poverty & Equity Brief 2 (Apr. 2020), Ex. 25 (poverty rates in Indonesia were between 35% and 40% in 2000-2001).] The natural gas operations in Aceh were a "critical element" of the Acehnese economy. [Robinson Rept. at 9, Ex. 2.] EMOI offered high-paying jobs and meaningful technical training, which improved the economic fortunes of the Acehnese. [ExxonMobil Oil Indonesia Inc. Operations Fact Sheet ("EMOI Fact Sheet"), CA0001056717 at -722, Ex. 26 ("████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████



."); ExxonMobil Oil Indonesia Inc. Economic and Community Update ("EMOI Community Update"), CA0001045562 at -564, Ex. 27 ("

.").] Through the economic boon attributable to the natural gas facilities, "

." [Robinson Rept. at 9, Ex. 2.] EMOI provided economic opportunities and social services to the Acehnese people. [*See generally* EMOI Fact Sheet, CA0001056717, Ex. 26 ("

").] From 1998 to 2001, EMOI employed more than 1,000 Indonesian nationals at Arun Field, including many local employees in senior management positions. [EMOI Fact Sheet, *id.* at -722 ("

**Public Redacted Copy**

███████████████████████████████████████████████████

████████ .").]

**Plaintiffs' Response:** Disputed. These claims are not material to Defendants' summary judgment motion. To the extent they require any response, however, Plaintiffs dispute these claims to the following extent. Defendants' quotation from Professor Robinson's Report omits the following facts from Professor Robinson's discussion:



PX3, Robinson Rept. 9. These conditions are described in an analysis that was circulated internally at Exxon-Mobil in early 1999:



PX56, CA0001136907, at '910.



PX3, Robinson Rept. 9-10. *See also* PX57, CA00011179213, at '214 (

); PX58, CA0001194595, at '599 (

); PX4, McFetridge Rept. ¶ 4.3 & n.19; *id.* at ¶ 4.4

.

The characterization of Defendants' Exhibit 26 as an "EMOI Fact Sheet" is simply a label apparently created by Defense Counsel—the document does not bear that title and appears to be a public relations document created by ExxonMobil. There is no reason for a juror to accept the "facts" stated therein as true.

**Defendants' Objection to Response to Paragraph 17.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.

18.   In additional [sic] to employment opportunities, EMOI contributed to a number of local causes, from community health to education to cultural resources, among others. In 1999 alone, EMOI spent over US $1.2 million on its community relations program. [ExxonMobil Oil Indonesia Inc. North Sumatra Operations Community Relations Presentation, CA0001004081 at -085, Ex. 28.] EMOI built and funded schools; created scholarships for local Acehnese students to attend university; constructed roads and other infrastructure; built medical clinics; and contributed to regional environmental causes and local religious festivals. [EMOI Fact Sheet, CA0001056717 at -720-21, Ex. 26 ("



.”); Mobil Oil Indonesia Government Relations Contact Plan for Indonesia, CA0001146940 at -945, Ex. 29 (“

”); Letter from R. Wilson to L. Johnson, dated June 22, 2000, CA0001083002, Ex. 30 (

).]

**Plaintiffs' Response:** Disputed. These claims are not material to Defendants' summary judgment motion. To the extent they require any response, however, Plaintiffs dispute these claims to the following extent. In fact, EMOI's expenditures on community development efforts averaged only $856,000 per year—approximately l/5-1/3 of one percent of EMOI's $300-$500 million annual earnings from its operations in Aceh. See PX18, Duffin Dep. 137:13-138:12 (EMOI spent approximately $750,000 a year on average on community development in Aceh, which was approximately ¼ of 1% of its earnings in Aceh); PX4, McFetridge Rept. ¶ 4.3 & n.19; PX59, CA0001147297, at '300. When Lance Johnson, a senior Mobil Executive, indicated this amount might increase somewhat, he assured a senior executive that the amount involved would not "be onerous." PX60, CA0001125881, at '881. Moreover, because such expenditures were treated as recoverable costs to EMOI under the PSC, the impact on EMOI's earnings were only approximately 25-30% of the modest amounts expended. PX61, CA0001213343 (raising "OUT OF THE BOX" possibility of increasing community expenditures but explaining that, even if such expenditures had been implemented, most of the expense would have been cost recoverable).

Defendants' Exhibits 28 and 29 are public relations documents with no author identified and there is no reason for a juror to accept the stated "facts" as true. Defendants' Exhibit 26 suffers the same defects and does not identify itself as a "Fact Sheet" at all. Defendants' Exhibit 30 apparently reflects a proposal, but does not indicate it was acted upon.

**Defendants' Objection to Response to Paragraph 18.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.

19.     The MOI-built medical clinic was serving more than 100,000 local residents each year by the early 2000s. [EMOI Community Update, CA0001045562 at -564, Ex. 27 ("  .").] Overall, the clinic treated more than two million patients from its inception through the end of the Relevant Period. [EMOI Fact Sheet, CA0001056717 at -720, Ex. 26.]

> **Plaintiffs' Response:** Disputed. These claims are not material to Defendants' summary judgment motion and no response is required. To the extent they require any response, however, Plaintiffs and their witnesses, who lived in the area, testified that they were not familiar with the Exxon clinic and had not received services there. PX28, John Doe VII Dep. 24:13-23 ("Q. Are you familiar with the Civic Mission Clinic that was run by Exxon Mobil Oil Indonesia out by the landing in Batchelor Camp? A. I am. Q. And that clinic was a free clinic that was open to the surrounding villages to receive medical care; is that correct? A. Um, I don't know about that. I never went there.") *See also* PX36, ▮▮ Dep. 69:24-70:2 ("Q. Do you know whether Mobil or Exxon established clinics in Aceh? A. I do not know.").
>
> Plaintiffs note that the cited discussion in Defendants' Exhibit 27 again appears to be a PR piece with no author identified and no explanation of what is meant by statement that the referenced clinics "serve the health needs" of surrounding villagers. Defendants' Exhibit 26 is also a PR piece—not an "EMOI Fact Sheet"—with no explanation of the basis for the assertion about providing quality medical care or indication of the extent to which such services were provided in the relevant period.

**Defendants' Objection to Response to Paragraph 19.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  It is irrelevant whether the individual plaintiffs were familiar with or received services at the clinic.  Defendants also object on grounds that the purported evidence does not support the proposition that the Plaintiffs were not familiar with the clinic.  John Doe VII in fact testified that he ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Further, Defendants object to this Response because baseless conclusions from Plaintiffs, unsupported by evidence, do not create a genuine dispute of material fact.

20.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.  [Robinson Rept. at 4, Ex. 2.] Aceh fought "brutal" wars of independence

against Dutch Colonizers in the nineteenth century, in which tens of thousands of people were

killed. [*See* Michael L. Ross, "Resources and Rebellion in Aceh, Indonesia," in

UNDERSTANDING CIVIL WAR 35 (World Bank, 2005) ("Ross Chapter") at 38–39, Ex. 31;

Robinson Rept. at 4, Ex. 2 ("████████████████████████████████████████

████████████████████████████████.").] By the early 1900s, the Dutch claimed sovereignty

over all of modern-day Indonesia. [Ross Chapter at 38, Ex. 31; Robinson Rept. at 4, Ex. 2.]

> **Plaintiffs' Response:** Undisputed that the Dutch arrived in Indonesia and established a
> colonial presence in the seventeenth century, and that there were subsequent prolonged
> conflicts between certain Acehnese and Dutch forces (except that these claims are not
> material). Objection that the paragraph proffers as evidence hearsay not subject to any
> exception, including Michael L. Ross, "Resources and Rebellion in Aceh, Indonesia," in
> UNDERSTANDING CIVIL WAR 35 (World Bank, 2005) ("Ross Chapter").

> **Defendants' Objection to Response to Paragraph 20.** Defendants object to this
> response as the evidence offered is admissible as is, but if not, is fully capable of being
> made admissible at trial. Defendants further object to this Response as it does not dispute
> or offer any evidence responsive to any material aspect of the Paragraph.

21. ████████████████████████████████████. [Shigeru Sato,

"Indonesia 1939–1942: Prelude to the Japanese Occupation," 37 J. Southeast Asian Studies 225,

226 (2006), Ex. 32; Robinson Rept. at 4, Ex. 2.] ████████████████████████████

████████████████████████████████████████████████████████████

████████████████. [Robinson Rept. at 4, Ex. 2.] ████████████████████████

████████████████████████████████████. [*Id.*] ████████████████

████████████████████████████████████████████████████████

████████████████████████████. [*Id.* at 4–5.]

> **Plaintiffs' Response:** Disputed. Undisputed that in 1942, Japanese forces invaded and
> occupied Indonesia (except that this is not a material fact). Objection that the paragraph
> proffers as evidence hearsay not subject to any exception, including Shigeru Sato,
> "Indonesia 1939-1942: Prelude to the Japanese Occupation," 37 J. Southeast Asian
> Studies 225, 226 (2006). To the extent a response is required, disputed that the 1957
> regime change put the Indonesia government "under the control of . . . the Indonesian

Army." The cited source states only that "Army and the President exercised more executive power" beginning in 1957. PX3, Robinson Rept. 4-5.

**Defendants' Objection to Response to Paragraph 21.** Defendants object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial. Defendants further object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.

22.



. [Int'l Crisis Group, Aceh: Why Military Force Won't Bring Lasting Peace 2 (2001) ("Int'l Crisis Group"), Ex. 33; *see also* Robinson Rept. at 5, Ex. 2.] . [Int'l Crisis Group at 2, Ex. 33; Robinson Rept. at 5, Ex. 2.] ." [Robinson Rept. at 5, Ex. 2.]

." [*Id.*]

**Plaintiffs' Response:** Disputed. These claims are not material to Defendants' motion for summary judgment and no response is required. To the extent a response is required, undisputed that some Acehnese fought in a series of insurgencies but disputed that Dural Islam Rebellion was suppressed by military force alone. The record evidence indicates that the Rebellion was PX3, Robinson Rept. 5. Objection that the paragraph proffers as evidence hearsay not subject to any exception, including Int'l Crisis Group, Aceh: Why Military Force Won't Bring Lasting Peace 2 (2001).

**Defendants' Objection to Response to Paragraph 22.** Defendants object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial. Defendants further object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.

23.

. [Robinson Rept. at 5, Ex. 2.]

**Plaintiffs' Response:** Disputed. This claim is not material to Defendants' motion for summary judgment and no response is required. To the extent a response is required, disputed that Suharto seized control of the Indonesian government in 1965. The cited source shows

██████████████████████  PX3, Robinson Rept. 5. Suharto did not formally seize power
until 1967.

**Defendants' Objection to Response to Paragraph 23.**  N/A

24. ████████████████████████████████████████████████████████

███████████████████████████████. [Int'l Crisis Group at 3, Ex. 33; Robinson Rept. at

5, Ex. 2.] Although the movement gained some popular support, it did not achieve its goal of

Acehnese independence, with most of its leaders subdued by the early 1980s. [Ross Chapter at

39–41, Ex. 31.]

> **Plaintiffs' Response:** Disputed. Undisputed that resistance to the central government
> resurfaced in 1976 with the Aceh Merdeka movement. Otherwise disputed to the extent
> Defendants do not rely on references to admissible record evidence to support this claim.

> **Defendants' Objection to Response to Paragraph 24.**  Defendants object to this
> Response as the evidence offered is admissible as is, but if not, is fully capable of being
> made admissible at trial.  Defendants further object to this Response as it does not dispute
> or offer any evidence responsive to any material aspect of the Paragraph.

25. ███████████████████████████████████████████████████

███████████████████████████████. [Ross Chapter at 42–43, Ex. 31; Robinson

Rept. at 6, Ex. 2.] Beginning in 1990, the Government of Indonesia designated Aceh a Military

Operations Area (or "DOM"). [Ross Chapter at 44, Ex. 31.] DOM status facilitated ██████████

███████████████████████████████. [Deposition of Geoffrey Robinson,

dated June 2, 2021 ("Robinson Dep.") at 89:4–15, Ex. 34.] ████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████. [Robinson Rept. at 6, Ex. 2.] Over the next several

years, Indonesia and GAM forces fought a civil war in Aceh. [*Id.*] Estimates of the death toll

from 1990 to 1992 range from 2,000 to 10,000, the majority of which were caused by the

Indonesian military. [Ross Chapter at 44, Ex. 31.] By the time the DOM status was lifted in

1998, "many hundreds and possibly thousands more civilians had been killed." [*See* Amnesty

International, "New military operations, old patterns of human rights abuses in Aceh" (Oct. 7,

2004) at 6, Ex. 35.]

> **Plaintiffs' Response:** Disputed. Undisputed that the independence movement resurfaced in 1989, led by Gerakan Aceh Merdeka. Objection that the paragraph proffers as evidence hearsay not subject to any exception, including the Ross Chapter.
>
> Disputed that estimates of the death toll from 1990 to 1992 range from 2,000 to 10,000. The record evidence shows only that ███████████████████████ PX3, Robinson Rept. 14. There is no admissible record evidence demonstrating the estimated non-civilian death toll. Also disputed to the extent Defendants do not rely on references to admissible record evidence to support this claim.
>
> **Defendants' Objection to Response to Paragraph 25.** Defendants object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial. Defendants further object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.

26.   ███████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████." [Robinson Dep. at 100:6–12, Ex. 34

("████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████.").]

> **Plaintiffs' Response:** Undisputed (except that this is not a material fact).
>
> **Defendants' Objection to Response to Paragraph 26.** N/A

27.   ████████████████████████████████

████████████████████████████████████████. [Robinson Rept. at 6,

Ex. 2.] By no later than 2001, the Indonesian military had deployed approximately 30,000 to

40,000 Indonesian military personnel to Aceh to respond to the insurgency. [*See* Human Rights

Watch, "Indonesia: The War in Aceh" (Aug. 2001) ("Human Rights Watch 2001 Report") at 5,

Ex. 36 ("On one side are the Indonesian government forces, both police (Polisi Republik Indonesia, or Polri) and military (Tentara Nasional Indonesia, or TNI), with some 30,000 personnel in the field, poorly trained and poorly paid.") (citation omitted); Deposition of Jane Doe IV, dated Nov. 6, 2020 ("Jane Doe IV Dep.") 72:25–73:7, Ex. 37 ("Q. Other witnesses have said that there were as many as 40,000 Indonesian military in North Aceh in this time period in 2000. Do you agree with that? A. Yes, I agree with that. That's what I heard."); Deposition of ███████, dated Oct. 20, 2020 ("███████ Dep.") 49:5–9, Ex. 38 ("Q. There were tens of thousands of such soldiers, correct? A. Yes, that is correct. I was taught there were about 40,000 soldiers in Aceh at that time."); Deposition of ███████, dated Feb. 4, 2021 ("███████ Dep.") 45:8–15, Ex. 39 ("Q. And there were about 40,000 members of the Indonesian military fighting GAM around 1999; isn't that right? A. That is correct."); Deposition of ███████, dated Mar. 3, 2021 ("███████ Dep.") 43:17–22, Ex. 40 ("Q. At the time of the attack on you and Irwanda, there were, approximately, 40,000 Indonesian troops in Aceh, correct? A. That is correct.").]



**Plaintiffs' Response:** Disputed. Defendants' own internal documents reported—based on available information—that by 2001, there were approximately 5,500 TNI soldiers in all of Aceh (which consisted of approximately fifteen separate regencies). Defendants estimated that ███████████████████████████████████████ PX229, CA0001006150, at '166 ████████████████); PX63, CA0001006008 ████████████████); PX64, CA001333838 (Oct. 27, 2000) ████████████████████████████████████████; PX3, Robinson Rept. 12 ████; PX44, Robinson Dep. 105:2-23 ████████). These military personnel had been requested by EMOI and were exclusively dedicated to EMOI's facilities and operations. See PX65, CA0001174650, at '659 (interview by Lance Johnson in which he states that ████████████████████████) Although Johnson then asserts that ████████████



█████ I and ████████████████████████████████████ *id.*, EMOI was aware that these activities included sweeps of nearby villages and detention and mistreatment of individuals deemed potential threats. *See infra* ¶¶ 212, 258-261, 291, 294. In late March 2001, ████████████████████████████████████████

████████████████████████████████ See PX66, CA0001076009 (February 19, 2001 letter—approved by Lance Johnson in the United States—████████████████████████████████████████████████████████ ); PX67, CA0001046652 (March 20, 2001 article stating that ████████████████ ████████████████████████████ ); accord PX3, Robinson Rept. 19 (Explaining that ████████████████████████████

████████████████████████████████████████

████████████████████████████████████ ).

The approximately 5,500 troops in all of Aceh as of early 2001 were ████████ ████████████████████████████████████████ PX3, Robinson Rept. 12 n.37. There is no evidence that military troops other than those engaged to guard EMOI's facilities and operations were responsible for the injuries suffered by the Plaintiffs.[2]

Defendants' Exhibit 36 does not support their claim and all of the evidence Defendants cite is inadmissible either as hearsay or lacking in foundation. Exhibit 36 does not say that "no later than 2001, the Indonesian military had deployed approximately 30,000 to 40,000 Indonesian military." It states that as of late April 2001—*i.e.*, after the injuries incurred by plaintiffs between 1999 and mid-March 2001 and after a major infusion of military in late March and April—there were 12,000 military in all of Aceh (and a police force of 20,000). Defs. Exh. 36 at 5 n.2. This exhibit is inadmissible hearsay. The other evidence cited in Paragraph 27 lacks foundation and is also inadmissible. *Compare, e.g.*, Defs. Exh. 37 72:25–73:7 (Defense counsel asserts at deposition of Plaintiff, a rural

---

[2] See PX8, EMOI 30(b)(6) (Snell) Dep. 104:13-21 ( ████████████████████████████████



████████████████████████████████████████ "); *id.* 114:16-115:2 ( ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ "); *id.* 121:4-12 (" ██████

████████████████████████████████████████████

████████████████████████████████████████ "); *id.* 133:20-134:4 (same regarding torture of John Doe IV); *id.* 141:3-25 (same regarding shooting and beating of John Doe III); *id.* 150:23-151:10 (same regarding shooting of Jane Doe III's husband); *id.* at 250:13-21 (same regarding shooting of Jane Doe IV's husband); *id.* 256:24-257:8 (same regarding John Doe I) *id.* 434:19-435:17 (same regarding Jane Doe III's husband); *id.* 472:15-24 (same as to Jane Doe IV's husband).

villager, that "Other witnesses have said that there were as many as 40,000 Indonesian military in North Aceh in this time period in 2000. Do you agree with that?" and witness responds "Yes, I agree with that. That's what I heard.") *with* PX44, Robinson Dep. at 106:25-107:6 ("… ██████████████████████████████████████████████████████████ ██████████████████").

**Defendants' Objection to Response to Paragraph 27.** Defendants object to this Response as the purported evidence does not support Plaintiffs' proposition. Plaintiffs do not offer evidence that disputes that there were 30,000–40,000 military personnel (including soldiers and police) deployed to Aceh by 2001. Defendants further object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial.

Moreover, any reference to EMOI or Defendants in this Response is irrelevant and immaterial to this Paragraph. Specifically, Plaintiffs' assertion that ██████████ ████████████████████████████████████████████████ is false and a mischaracterization of the source that Plaintiffs cite for the proposition. In PX65, Lance Johnson states ████ ██████████████████████████████████████████████████ ████████████████████████ It is only those Indonesian soldiers specifically assigned by Pertamina to guard EMOI operations—rather than the thousands of Indonesian soldiers in Aceh at the time to fight the civil war—to whom Johnson was referring when he stated that "█████████████████████████████████████ ████████████████ Plaintiffs also omit the very next sentence, in which Johnson stated that ██████████████████████████████████████████████████ " In sum, Plaintiffs have brazenly mischaracterized their exhibit in an effort to suggest that all Indonesian soldiers in the region were "requested by EMOI and were exclusively dedicated to EMOI's facilities and operations"—a patently untrue statement.

28.    A small number of these Indonesian military personnel were assigned to guard the

government-owned facilities at Arun field. ██████████████████████████████

████████████████████████████████████████. [EMOI Daily

Security Report, dated Nov. 2–3, 1999, CA0001121094, Ex. 41.] ██████████████

████████████████████████████████████████████████████

██████████. [EMOI Daily Security Report, dated Dec. 12, 2000, CA0001333753, Ex. 42

(███████████████████████████████████████████████████

████████████████████████████████████████████████

**Public Redacted Copy**



██████████████████████████ ).]

███████████████████████████████████████████. [Deposition

of Mark Snell under Rule 30(b)(6) for ExxonMobil Oil Indonesia Inc., dated Feb. 14, 2021

("EMOI February 2021 30(b)(6) (Snell) Dep.") at 263:23–264:18, Ex. 43 ("█████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ .").]

**Plaintiffs' Response:** Disputed. Defendants' own Exhibit 42 indicates that ████████

████████████████████████████████████████ Defs. Ex. 42,
CA0001333753 at 754. *See also supra* ¶ 27 (and citation to Robinson Expert Report)
regarding increased engagement of military security for EMOI's operations.

The number of military guards engaged by EMOI began rising substantially in June 2000
and increased more than 500% by September 2000, and then continued to increase
through the relevant time period. PX68, CA0001174188 (June 14, 2000, Aceh Weekly
Update reporting ███████████████████████████████████████████████████

███████████████ ); PX69, CA0001005923 at '925 (September 5-6, 2000, daily security report
listing ███████████████████████████████ ). At the beginning of 2001,
Defendants' own security officials estimated that ███████████████████████

████████████████████ PX63, CA0001006008; *supra* ¶27.

EMOI's actions in the latter part of March 2001 are more accurately described as a shut
in, rather than a shutdown. Although most employees were temporarily evacuated
because of security concerns, "EMOI contract security staff" continued to voluntarily
report for work at EMOI's facilities. PX70, CA0002014541; *see also* PX71,
CA0001322823, at '823 (discussing ████████████████████████████████

████████████████████████████████████████████████

████ .

The sources cited by Defendants do not support the numbers provided in Defendants'
Statement. Defendants' Exhibit 41 does not indicate that ████████████████████

████████ It appears to indicate ████████████████████████████████

████████████████ e. Indeed, there is no evidence that this exhibit lists all active duty
stations at EMOI facilities at this time. And as noted *supra*, Defendants' Exhibit 42

counts nearly twice as many soldiers among Exxon's security resources as Defendants claim.

**Defendants' Objection to Response to Paragraph 28.**  Defendants object to this Response as the purported evidence does not support Plaintiffs' proposition.  In calculating troop totals, Plaintiffs improperly conflate EMOI-operated facilities with facilities operated by the Indonesian government.  Defendants further object to this Response in that it misleadingly suggests the sovereign Indonesian military worked for EMC and EMOI, which it did not, and that the facilities belonged to EMC and EMOI when, in fact, all facilities were the property of Pertamina and the Government of Indonesia.

29.     Both the Indonesian military and the Acehnese separatists engaged in violence, including against unarmed civilians, during the civil war. GAM abuses included "killings of . . . suspected military informants, as well as of family members of police and military personnel, unlawful detentions, forced expulsions, and other terrorizing of non-Acehnese." [Human Rights Watch 2001 Report at 22, Ex. 36.] The Indonesian military also committed human rights abuses and atrocities. According to Human Rights Watch, there was "ample evidence . . . that Indonesian forces deliberately and systematically employ[ed] executions to deter villagers from supporting GAM." [*Id.* at 15.] Further, "[t]orture by the police and army appear[ed] to be routine," and the Indonesian military "frequently punish[ed] entire villages for GAM attacks on police or military" during this period. [*Id.* at 18.] There was additional violence committed by "bandits" and "renegade rebels" who sparred with Indonesian troops in Aceh and committed acts of violence. [See Wayne Arnold, "Exxon-Mobil, in Fear, Exits Indonesian Gas Fields," New York Times (Mar. 24, 2001), Ex. 44.]

**Plaintiffs' Response:** Disputed. Undisputed that "[t]he Indonesian military . . . committed human rights abuses atrocities"; that "there was 'ample evidence . . . that Indonesian forces deliberately and systematically employ[ed] executions to deter villagers from supporting GAM'"; that "[t]orture by the police and army appear[ed] to be routine"; and that "the Indonesian military 'frequently punish[ed] entire villages for GAM attacks on police or military' during this period." Undisputed that GAM also committed human-rights abuses (except that this fact is not material). The record evidence show ███████████████████████████████████████████████████ ████████████████" PX3, Robinson Rept. 14. Otherwise disputed to the extent Defendants

do not rely on references to admissible record evidence to support these claims. Plaintiffs object that Defendants' Exhibit 36 is inadmissible hearsay. Defendants further object that Defendants' Exhibit 44 is inadmissible hearsay.

**Defendants' Objection to Response to Paragraph 29.** Defendants object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial. Defendants further object to this Response as it does not dispute or offer any evidence responsive to any material aspect of this Paragraph.

30.     The Arun Field facilities became a high-profile target for GAM, which threatened, shot at, abducted, and on a few occasions even killed EMOI employees and contractors. [Ross Chapter at 48, Ex. 31 ("Members of GAM have also tried to raise money from the Lhokseumawe natural gas facility, through both direct and indirect forms of extortion. Between 1999 and March 2001, ExxonMobil reported a growing tally of violence and threats. Its company vans and pickups had been hijacked about 50 times; company airplanes were twice hit by ground fire when they tried to land; facilities were repeatedly attacked with gunfire and grenades; company buses were bombed, or stopped and burned, as they brought employees to work; four employees were killed while off-duty; and other employees were threatened."); Robinson Rept. at 14, Ex. 2 ("

."); Connor Dep. at 19:7–16, Ex. 7 ("

."); *id.* at 239:23–240:4 ("

."); Farmer Dep. at 301:10–303:20, Ex. 10 ("

Public Redacted Copy



.”); APO Communications and Government Relations Plan, dated Mar. 16, 2001, CA0002170119 at -119, Ex. 45(“

”).]

**Plaintiffs' Response:** Disputed. Disputed as not material for the purposes of Defendants' summary judgment motion and therefore no response is required. To the extent a response is required, disputed as to the characterization of Defendants' facilities as a "high-profile target for GAM," to the extent it suggests that threats to and attacks on Defendants' facilities were part of a coordinated strategy on GAM's part or suggests some hierarchy of "targets" in which Defendants' facilities took pride of place. Defendants' evidence does not establish the coordinated campaign of attack its language implies. Indeed, some threats and attacks likely did not originate with GAM at all. For instance, disputed that "on a few occasions GAM even killed EMOI employees and contractors." Exxon cites no admissible record evidence that support these claims. EMC Global Security Director Michael Farmer testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX14, Farmer Dep. 301:10-302:2. Farmer further testified of unspecified instances ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 302:2-5; *see also id.* at 301:13-17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). Plaintiffs object that Defendants' Exhibit 31 is inadmissible as hearsay. Defendants' Exhibit 45 mentions only ▮▮▮▮▮▮▮▮▮▮▮" It does not mention the deaths of any EMOI employees and, in any event, is inadmissible hearsay-within-hearsay.

**Defendants' Objection to Response to Paragraph 30.** Defendants object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial. Defendants further object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of this Paragraph. Plaintiffs' assertion that "some threats and attacks likely did not originate with GAM at all" is not supported by evidence and does not refute any material aspect of this Paragraph.

31.     GAM targeted Arun Field in order to, among other things, attempt to provoke military reprisals that they believed would increase support for GAM. [Ross Chapter at 49, Ex.

31 ("In an interview with a British journalist, Ilias Pase, a GAM commander, suggested that

GAM has at times provoked military reprisals in order to boost its support.").]

> **Plaintiffs' Response:** Disputed. Not material, and Defendants do not rely on references
> to admissible record evidence to support these claims. Defendants' Exhibit 31 is
> inadmissible as hearsay-within-hearsay.

> **Defendants' Objection to Response to Paragraph 31.** Defendants object to this
> Response as the evidence offered is admissible as is, but if not, is fully capable of being
> made admissible at trial.

32.     GAM also targeted EMOI employees in an attempt to interrupt the Government of

Indonesia's gas revenues from Arun Field and to extort money from EMOI. [Ross Chapter at 48,

Ex. 31 ("To fund itself, GAM used a combination of voluntary donations, taxes, extortion,

kidnapping, and the sale of timber and cannabis. . . . From March to July 2001, [ExxonMobil]

was forced to shut down the LNG facility because of a lack of security. . . . [M]any of these

incidents were part of efforts by GAM to extort money from ExxonMobil, to reduce the

government's gas revenues, or both. . . . In March 2001, the GAM regional commander in the

Lhokseumawe area, Muzakir Mualim, explained, 'We expect them [ExxonMobil] to pay income

tax to Aceh. We're only talking about a few percent of the enormous profit they have made from

drilling under the earth of Aceh.'") (citations omitted).]

> **Plaintiffs' Response:** Disputed. Disputed as not material for the purposes of Defendants'
> summary judgment motion. Disputed that GAM "targeted EMOI employees in an attempt
> to interrupt the Government of Indonesia's gas revenues from Arun Field." Although it is
> true that the economic benefits of EMOI's operations in North Aceh were
> disproportionately returned to the central government in Java or retained by EMOI and
> that this imbalance created a sense of grievance among the local population, *see* PX3,
> Robinson Rept. 9 & n.25, there is no admissible record evidence that interrupting the
> revenue flow to the central government was among GAM's goals. Defendants' Exhibit
> 31 is inadmissible as hearsay and hearsay-within-hearsay.

> **Defendants' Objection to Response to Paragraph 32.** Defendants object to this
> Response as the evidence offered is admissible as is, but if not, is fully capable of being
> made admissible at trial.

33.     Members of the Indonesian military also threatened, and even assaulted, EMOI employees. Indonesian soldiers seized supplies and equipment from the Arun Field facilities, sometimes at gunpoint. [*See, e.g.*, Letter from R.I. Wilson to Mr. Susilo Bambang Yudhoyono, Minister of Mines and Energy, dated Feb. 20, 2000, CA0002020283, Ex. 46 ("███████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████."); EMOI Daily Security Report, dated Apr. 22–23, 2000, CA0001334368, Ex. 47 ("████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████."); EMOI Security Incident Reports, dated Jan. to Mar. 2001, CA0001046718 at -770, Ex. 48 ("████████████████ ████████████████████████████████████████████████████████████████████████



.)”); *id.* at -812 (“

.”); Farmer Dep. at 204:18–206:2, Ex. 10 (“

”).]

**Plaintiffs' Response:** Disputed. Undisputed that, in some instances, members of the Indonesian military seized equipment and supplies from EMOI, but disputed to the extent

Defendants suggest Defendants did not also willingly provide equipment and logistical support to the military personnel they retained to guard EMOI's operations in Aceh. *See infra* ¶¶ 241, 243-50; PX73, CA0001003149 at '150 (



PX8, Snell/EMOI 30(b)(6) Dep. 816:21-817:4 (

); PX16, Connor Dep. 177:7-21 (

) PX3, Robinson Rept. 18-19

PX14, Farmer Dep. 140:3-22 (

").

**Defendants' Objection to Response to Paragraph 33.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. It is undisputed that EMOI did not "retain" the military personnel legally required to secure Arun Field. Defendants further object to this Response as it misleadingly suggests that the sovereign Indonesian military worked for EMC and EMOI.

34.     In March 2001, the situation had become so dangerous that EMOI shut down its facilities altogether and evacuated its employees and contractors. [*See* Human Rights Watch 2001 Report at 10, Ex. 36 ("On March 9, 2001 . . . Exxon Mobil, the region's largest foreign investor, closed three of its gasfields in North Aceh, citing attacks on its employees."); Connor Dep. at 26:24–27:18, Ex. 7 ("

"); Wayne Arnold, "Exxon-

Mobil, in Fear, Exits Indonesian Gas Fields," New York Times (Mar. 24, 2001), Ex. 44 ("'We went from a situation where our people were in a dangerous area to where it actually appeared that our employees and contractors were being targeted,' said William J. Cummings, a spokesman for Exxon Mobil's subsidiary in Jakarta. Four off-duty employees have been killed in the last two years. The company decided that 'continuing the production imperiled our people and operations and put adjoining communities at unacceptable risk,' Mr. Cummings sa*id.*").]

> **Plaintiffs' Response:** Disputed. This Claim is an inaccurate and over-simplified description of what occurred. EMOI's actions in the latter part of March 2001 are more accurately described as a shut in, rather than a shutdown. Although Exxon suspended production in March 2001 for three months due to the deteriorating security situation, key employees remained on site, particularly at Point A, and military security personnel continued to protect the facilities and equipment. PX62, CA0001047515 at '516 (daily security report for March 8, 2001 showing ████████████ ); PX286, CA0001071651 (Alex Dodds at Point A after March 9, 2001); PX74 CA0002169955 at '956-57 (March 21, 2001 talking points state ████████
> ████████████████████████████████████ . In addition, a
> witness testified that the Exxon employee bus continued running throughout March 2001. PX29, ████ Dep. 19:19-24 (Q: . . . [D]id you take that Exxon employee bus to school during the whole month of March 2001? A: Yes). The witness also testified that she saw both soldiers and employees at the Point A site throughout the whole month of March 2001. *Id.* 19:25-20:8 (". . . after Exxon shut down, they [the military] were still there, only the employees, their number decreased at that time"). Although many employees were temporarily evacuated because of security concerns, ████████████
> ████████████████████████ . *See* PX70, CA0002014541;
> *see also* PX71, CA0001322823 (discussing ████████████████
> ████████████████████████████████████
> ████ ). Defendants' Exhibit 36 is inadmissible as hearsay.

**Defendants' Objection to Response to Paragraph 34.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Baseless conclusions unsupported by evidence cannot create a genuine dispute. Defendants further object to the Response as it misleadingly suggests that the sovereign Indonesian military worked for EMC and EMOI, which it did not, and that the facilities belong to EMC and EMOI when, in fact, the facilities were the property of Pertamina and the Government of Indonesia and the military remained to guard them as required by law. Defendants further object to this Response as the evidence offered is admissible as is, but if not, is fully capable of being made admissible at trial.

35.     After the resignation of President Suharto, media and international human rights

organizations published reports about allegations of war crimes and human rights abuses during

the previous decades. [*See, e.g.*, Human Rights Watch, "Indonesia: Aceh Trial–Amnesty

International and Human Rights Watch Call for Full Accountability" (May 16, 2000), Ex. 49;

Human Rights Watch, "Aceh Under Martial Law: Inside the Secret War" (Dec. 17, 2003), Ex.

50.]

> **Plaintiffs' Response:** Undisputed. Plaintiffs do not dispute that after the resignation of President Suharto in March 1998, the reports of the kind referenced in Paragraph 35 were published. Plaintiffs further state that Defendants were aware of the prior history of human rights abuses by military personnel in Aceh when Defendants were requesting, deploying and supporting the use of military guards for EMOI's facilities and operations. *See infra* ¶¶ 176-84, 214, 224, 227, 236, 255-61, 263, 273-75.

> **Defendants' Objection to Response to Paragraph 35.**  Defendants object to the final sentence of Plaintiffs' Response, which is unrelated and irrelevant to this Paragraph.

36.     On a number of occasions, EMOI inquired about the military's conduct and urged

the government to comply with the law and human rights standards. [Letter from R.I. Wilson to

Pertamina, dated June 7, 2000, CA0001003149 at -151, Ex. 21 ("███████████████████

████████████████████████████████████████████████████████████████████████

███████████████."); Letter from R.I. Wilson to Bapak Iin A. Takhyan, Director of Production

Sharing Management, Pertamina, dated Apr. 23, 2001, CA0001092701 at -701, Ex.

51("████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████."); Connor Dep. at 163:9–14, Ex. 7 ("██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████."); *id.* at 171:6–9 ("██████████████████████████

39

███████████████████████████████████████████████████

███████████████████████████  .").]

**Plaintiffs' Response:** Disputed. EMOI's occasional "generic" comments to Pertamina and the military concerning compliance with law and human rights standards cannot be characterized as "inquir[ing] about the military's conduct" or "urg[ing] the government" to protect human rights. EMOI's rare comments were purely and weakly hortatory, without any serious effort to follow-up or operationalize safeguards to prevent human rights abuses. *See, e.g.*, PX4, McFetridge Rept. ¶ 5.2



; *id.* ¶ IV.4

; PX5, Ling Rept. ¶ 98-99 (                          );
PX46, Ling Dep. 175:21-176:8

; PX17, Wilson Dep. 167:2-168:5 (

); PX45, McFetridge Dep. 293:23-295:7 (

); *id.* at 204:2-205:6 (

").

For example, EMOI failed to implement repeated recommendations from a Risk Assessment team and other security personnel to establish a code of conduct for the military guards; failed to provide training or even provide or post instructions about impermissible conduct; failed to implement recommendations to review the conduct of the military guards; failed to make any serious effort either to monitor or follow-up on human rights abuses; and failed to take other meaningful steps beyond occasional and lip service regarding human rights issues. *See infra* ¶ 269.

**Defendants' Objection to Response to Paragraph 36.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. Defendants further object to Plaintiffs' conclusory allegations that Defendants' actions were "purely and weakly hortatory" without factual evidence in support. Defendants further object to the final

paragraph of this Response as it addresses issues that are unrelated and immaterial to this Paragraph.

## II.   INDIVIDUAL PLAINTIFFS

37.    EMOI had no knowledge of any of the alleged facts related to Plaintiffs' claims until they filed their initial complaint in June 2001. [EMOI February 2021 30(b)(6) (Snell) Dep. at 112:24–113:8, Ex. 43 ("



.").] EMOI also had no knowledge of any reports or complaints regarding the alleged incidents underlying Plaintiffs' claims. [EMOI February 2021 30(b)(6) (Snell) Dep. at 113:9–16, Ex. 43 ("

").] Even after filing their complaint, Plaintiffs still refused to disclose their names or the names of their villages until six years after their original complaint was filed. [Letter from A. Fryszman to N. Singhvi, dated May 17, 2007, Ex. 52; Letter from A. Fryszman to N. Singhvi, dated June 5, 2007, Ex. 53.] Plaintiffs did not disclose Jane Doe I's name or village for another two years after that. [Letter from K. Konopka to A. Oh, dated Sept. 9, 2009, Ex. 54.]

> **Plaintiffs' Response:** Disputed. This claim is not material. To the extent a response is required, disputed that EMOI had no knowledge of any facts related to Plaintiffs' claims prior to June 2001, and disputed that EMOI had no knowledge of any reports or complaints regarding the underlying incidents relating to Plaintiffs' complaints. Prior to June 2001, EMOI had specific knowledge of, at a minimum, facts relating to the shooting of Jane Doe VI's son, John Doe III, and the shooting of Jane Doe VIII's husband, John Doe VI.
>
> Prior to June 2001, EMOI knew that in July 2000 there were confrontations between its military security personnel and refugees who had gathered around EMOI's Arun Project

41



operations in which the military fired gunshots. PX75, CA0001191447, at '448 ("S███████
████████████████."); *id.* at 449
("█
████████████████████████████"). Defendants' military security personnel
shot Jane Doe VI's son, John Doe III, while trying to stop a group of refugees on the road
outside of Cluster 2 from travelling through to Point A. PX34, █████████ Dep. 10:3-8,
55:9-13, 65:3-66:8; PX24, Jane Doe VI Dep. 55:20-56:8.

██████████, who worked for an EMOI contractor, reported to an EMOI supervisor
named Sukirman that Defendants' military security personnel shot John Doe VI in █████
█████ home. PX36, █████████ Dep. 14:16-15:21 ("Q. And when you went back to work,
when your shift started, did you report what had happened to you, to anyone, at Exxon?
A. Okay. So, yes, I—I talked about that. I reported that in a safety meeting, because the
leader of the meeting asked if we had any problems or any obstacles at our village or on
the road. So I reported, I talked about the incident of the shooting that happened at my
house. Q. Do you remember the name of the person you reported it to? So I reported, at
that time, to a person called Sukirman, and he was under the direct command of the
superintendent. . . . Q. And Sukirman, do you know what company he worked for? A. He
worked for Exxon, and because the rig were for Exxon, so Exxon send their supervisor to
the rig.").

EMOI was also more generally aware prior to June 2001 that its military security
personnel were abusing local villagers. Michael Shari, Business Week's Bureau Chief in
Singapore, informed senior EMOI officials in the fall of 1998 about allegations that,
"████████████████████████████████████████
████████████████████████████████████████
████████████████████████████" PX76, Shari Decl. ¶ 9. Shari later
told two EMOI officials that he learned about allegations that the military had conducted
"█████████" and "█████████████" approximately 100-200 meters from the gate
of EMOI's "Cluster A," where ████████████████████
██████████████" among other allegations of abuses. *Id.* ¶
11; *see also* PX77, CA0001149240 (Mobil Oil transcript of Duffin interview); PX18,
Duffin Dep. 116:16-137:10 (████████████████████). This and other
information was then publicly reported in a December 1998 Business Week article
entitled *What did Mobil Know*, which was read by senior Mobil and EMOI officials.
PX78, CA0001008719, PX18, Duffin Dep. 150:16-158:14; PX14, Farmer Dep. 135:1-22;
PX12, EMC 30(b)(6) (Ward) Dep. 152:3-18. In July 2000, a Wall Street Journal reporter
informed EMOI that he had learned of allegations that Defendants' military security
personnel were torturing local villagers at Camp A-13 and were conducting "█████" of
local villages to protect EMOI's operations. PX320, CA0001333998 at '000. This and
other information was publicly reported in a September 2000 Wall Street Journal. PX80,
CA000136125 (*Mobil Sees its Gas Plant Become Rallying Point for Indonesian Rebels*,
Wall St. J. (Sept. 7, 2000)); *see also* PX8, EMOI 30(b)(6) (Snell) Dep. 506:11-22; *id.* at
459:21-460:12; *id.* 859:21-860:17.

Undisputed that Plaintiffs did not disclose their names or the names of their villages until
six years after filing their complaint, but disputed to the extent Defendants suggest this

information was improperly withheld. Chief Judge Hogan granted Plaintiffs' initial motion to proceed pseudonymously when Plaintiffs filed their initial complaint. Dkt. 2. Once discovery commenced and the Court entered a protective order governing procedures for protecting Plaintiffs' identities, Dkt. 217, Plaintiffs disclosed their real names to Defendants. Defs. Exh. 52. Plaintiffs withheld Jane Doe I's real name for an additional period because Plaintiffs feared that she could be the target of retaliation if it was revealed in her village that she was a sexual assault victim. Plaintiffs sought assurances from Defendants that, per ¶¶ 27(b) and 27(e) of the then-operative protective order, this information would not be disseminated to individuals not reasonably likely to have relevant information or in a way that might have endangered Jane Doe I's life. PX81, Email from B. Landau to N. Singhvi, et al. (Aug. 8, 2007); *see also* Dkt. 217 ¶¶ 27(b), 27(e). Plaintiffs revealed Jane Doe I's name and village upon receiving Defendants' "assurance that Defendants [would] not launch an immediate investigation in Indonesia using this information." Defs. Exh. 54. Defendants never sought the Court's intervention to compel Plaintiffs to reveal their names or villages sooner.

**Defendants' Objection to Response to Paragraph 37.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  In fact, Defendants sought Court intervention to compel Plaintiffs to reveal their names or villages prior to, and subsequent to, the entry of the protective order.  Defendants moved to set aside the pseudonym order in September 2006, and argued the motion before Judge Oberdorfer in February 2007.  *See* ECF Nos. 173, 200.  After the Court denied Defendants' motion, Defendants moved for reconsideration of the pseudonym order in February 2007.  *See* ECF No. 206.  Defendants further object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact.  Plaintiffs do not dispute that no plaintiff notified Defendants of their alleged injuries prior to filing suit or that they continued to withhold certain core information about their identities and allegations long after filing suit, and Plaintiffs' assertion that Defendants were generally aware of violence in the region during the relevant time period is irrelevant to this Paragraph.

A.    **Jane Doe I**

38.     Jane Doe I and her neighbor, ▮▮▮▮▮, provided testimony regarding Jane Doe I's

allegations. [*See generally* Deposition of Jane Doe I, dated Dec. 3, 2020 ("Jane Doe I Dep."), Ex.

55; Deposition of ▮▮▮▮, dated Feb. 8, 2021 ("▮▮▮▮ Dep."), Ex. 56.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 38.**  N/A

39.     Jane Doe I was assaulted by an Indonesian soldier ▮▮▮▮▮▮. [Jane Doe I Dep.

at 49:10–12, Ex. 55 ("Q. Did the attack happen ▮▮▮▮▮▮▮▮, [Jane Doe I]? A. Yes."); *id.* at

Public Redacted Copy

52:17–21 ("Q. Was the soldier who ▮▮▮▮▮▮▮▮ wearing a military uniform? A. Yes.

Q. Was he Indonesian? A. Yes.").]

> **Plaintiffs' Response:** Undisputed but incomplete. Both Jane Doe I and ▮▮▮ identified the soldier as one of the soldiers engaged by Exxon. *See infra* ¶¶ 40-42, 315-319.

> **Defendants' Objection to Response to Paragraph 39.** Defendants object to this Response as the purported evidence does not support Plaintiffs' proposition. Neither Jane Doe I nor ▮▮▮ identified the soldier as "engaged by Exxon." Plaintiffs' assertion that the alleged assailant was "one of the soldiers engaged by Exxon" does not in any way connect the soldier to Defendants and does not refute that Jane Doe I had no knowledge of whether the soldier was affiliated with Defendants. *See* Defs.' Reply Mem. at 7–10. Defendants further object that the Response does not offer any evidence responsive to any material aspect of the Paragraph.

40.     Neither Jane Doe I nor ▮▮▮ knew the identity of the Indonesian soldier who

assaulted Jane Doe I. [Jane Doe I Dep. at 61:5–24, Ex. 55 ("Q. Did you tell ▮▮▮ the name of

the soldier that ▮▮▮▮▮▮▮▮? A. No, because I didn't see his name either. Q. So you

don't know the name of the soldier who ▮▮▮▮▮▮▮▮▮▮▮? A. What I can

see, the letter N in this area (indicating), because it was covered by the string of his weapon. . . .

Q. But apart from the letter N, you don't know what his name is, correct? A. Yes, that is

correct."); ▮▮▮ Dep. at 23:2–7, Ex. 56 ("Q. Do you agree that you do not know the name of

the soldier who attacked [Jane Doe I]? A. . . . I do not know the soldier's name.").]

> **Plaintiffs' Response:** Disputed. While neither Plaintiff Jane Doe I nor ▮▮▮ knew the full first or last name of the soldier who sexually assaulted Jane Doe I, both identified him as a member of Unit 113, based on the shoulder patch on his uniform and because he was transported in a truck bearing the Unit 113 logo. PX19, Jane Doe I Dep. 63:14-19 (soldier had a Unit 113 badge on the shoulder of his uniform); *id.* 94:11-19 (same); PX29, ▮▮▮ Dep. 9:7-12 (witness saw that soldier arrived and departed in a truck that had a Unit 113 logo); *id.* 68:25-69:6 (Unit 113 logo was "very big"); *see also infra* ¶¶ 315-319.

> **Defendants' Objection to Response to Paragraph 40.** Defendants object to this Response as it is immaterial and irrelevant to this Paragraph. The purported evidence does not create a material dispute: Plaintiffs' claim that the soldier who allegedly assaulted Jane Doe I was a member of "Unit 113," even if accurate, does not in any way connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants. *See* Defs.' Reply Mem. at 9–10; *infra* ¶¶ 315–16.

41.     Neither Jane Doe I nor ▮▮▮▮ knew who supervised, commanded, directed, or

paid the soldier who allegedly assaulted Jane Doe I. [Jane Doe I Dep. 62:10–63:9, Ex. 55 ("Q.

The soldier did not tell you what his mission was that day, did he? . . . . A. That is correct. Q. He

did not tell you who his commanders were, correct? A. Yes, he did not. Q. He did not tell you

who was paying him that day, correct? A. That is correct. Q. He did not tell you who was

directing him that day, correct? A. Yes. Q. And you don't know what military unit the soldier

was assigned to, correct? . . . . A. Yes."); ▮▮▮▮ Dep. 23:8–10, Ex. 56 ("Q. Do you know the

name of the commander of the soldier who attacked [Jane Doe I]? A. I do not."); *id.* at 50:18–20

("Q. Did you hear anybody give an order for them to group together? A. I did not.").]



**Plaintiffs' Response:** Disputed. Exxon engaged Unit 113 to provide security. *See infra*
¶¶316-317. Unit 113 was engaged in providing security outside the fence, "▮▮▮▮▮▮▮▮
▮▮▮▮▮," and "▮▮▮▮▮▮▮▮." PX82, CA0001334075. *See also* PX83,
CA0001334077 (June 27, 2000 email from Michel Laureys to R I Wilson, et al.,
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX82,
CA0001334075 (June 28, 2000 Email from Michel Laureys to R I Wilson, et al.,
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮); PX75, CA0001191447 at '448-50 (July 21, 2000 local newspaper articles
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX84, CA0001368009
(11/18/2000 local newspaper article ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮). Exxon's own documents identify Unit 113's commander as Erda Bachtiar, a
Lieutenant Colonel in the infantry. PX82, CA0001334075; PX85, CA0001182156 at
'157-58. EMOI paid the soldiers in Unit 113 for the security services they provided.
PX86, CA0001182942 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮); *see also* PX83, CA0001334077 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮); PX82, CA0001334075 (▮▮▮▮).

**Defendants' Objection to Response to Paragraph 41.** Defendants object to this
Response as the purported evidence does not support Plaintiffs' proposition. Plaintiffs'
baseless assertion that "Exxon engaged unit 113 to provide security" does not in any way
connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants and
does not refute that Jane Doe I had no knowledge of whether the soldier was affiliated
with Defendants. Plaintiffs' use of "Unit 113" misleadingly suggests that all members of
Unit 113 provided security to the Arun Field. In fact, only a portion of that unit did so.
Identifying an Indonesian soldier as a member of Unit 113 does not connect him to
Defendants. *See* Defs.' Reply Mem. at 9–10; *infra* ¶¶ 315–16.

42.     Jane Doe I had no knowledge of whether that soldier was affiliated with Exxon.

[Jane Doe I Dep. at 67:4–8, Ex. 55 ("Q. So you yourself have no idea whether the soldier who

came into your house had any connection to Exxon, correct? . . . A. For myself, I do not

know.").]

> **Plaintiffs' Response:** Disputed. Jane Doe I knew that the soldier served in Unit 113,
> which was assigned to Exxon. PX19, Jane Doe I Dep. 63:14-19 (soldier had a Unit 113
> badge on the shoulder of his uniform); *id.* 94:11-19 (same); *see also supra* ¶ 41. In
> addition, a witness saw the soldier arrive in a truck belonging to Unit 113. PX29, ▮▮▮
> Dep. 9:7-12 (witness saw that soldier arrived and departed in a truck that had a Unit 113
> logo); *id.* 68:25-69:6 (Unit 113 logo was "very big").

> **Defendants' Objection to Response to Paragraph 42.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph.  Defendants further object to this Response as the purported evidence does
> not support Plaintiffs' proposition.  Plaintiffs' assertion that "the soldier [who allegedly
> assaulted Jane Doe I] served in Unit 113" does not in any way connect the soldier to
> Defendants and does not refute that Jane Doe I had no knowledge of whether the soldier
> was affiliated with Defendants.  In fact, Jane Doe I did not testify that Unit 113 was
> assigned to Exxon.  Identifying an Indonesian soldier as a member of Unit 113 does not
> connect him to Defendants.  *See* Defs.' Reply Mem. at 9–10; *infra* ¶¶ 315–16.

43.     The soldier who assaulted Jane Doe I came in a truck that was "the same size and

color as all of the other Indonesian green military trucks." [Jane Doe I Dep. at 92:25–93:16, Ex.

55 ("Q. And then back to the incident for a minute, at the time of the incident, did you see the

truck that the soldiers came in? . . . A. Yes, I di*d.* Q. Can you tell me when you saw the truck? A.

Okay, so at that time I was trying to run to the front room to right—to adjust my

underwear, but then the soldier pulled me back again into the room, and then at that time I saw

the truck with the group of soldiers, and I think he saw the truck as well and then he got ready to

get out as well."); ▮▮▮ Dep. at 52:25–56:6, Ex. 56 ("Q. Was the truck the same size and color

as all of the other Indonesian green military trucks that you've seen? . . . A. For a truck version,

it's the same.").]

> **Plaintiffs' Response**: Disputed. A witness who lived across the street from Jane Doe I
> had a clear view of the truck, which had distinctive features, including red stickers on the

windshield in addition to the Unit 113 logo. She saw the soldiers arrive, and saw a soldier get out of the truck and go into Jane Doe I's house. PX29, ███ Dep. 7:14-24; 8:16-24; 14:5-16:17. The witness later saw the same soldier leave Jane Doe I's house and come to her own house. *Id.* 15:2-16:17. The witness was able to describe distinctive features of the truck: the truck had distinctive red stickers spelling out "god is great" in Arabic on the windshield and a logo for Unit 113 on the side. *Id.* 9:7-16 (███ testified that the truck was green, army green, and there was the writing Allahu Akbar . . . on the windshield, and on the body it says Yonif 113"); *id.* 9:13-16 (███ testifies she could read Arabic because she studied it in school); *id.* 13:1-13; 55:8-56:12 ("Allahu Akbar" was a sticker in the middle of the windshield and "it was clear to see"); *id.* 68:12-69:13 (the Allahu Akbar writing was big and Unit 113 logo "was very big"). ███ testified that the truck was unique. *See infra* ¶¶44, 318-319.

**Defendants' Objection to Response to Paragraph 43.** Defendants object to this Response as the purported evidence does not support Plaintiffs' proposition and does not create a genuine dispute. The testimony speaks for itself: when asked whether the truck she allegedly saw was the same size and color as all of the other Indonesian green military trucks, ███ responded "it's the same."

44.     The truck had a sticker with a common Arabic expression on the windshield.

[Jane Doe I Dep. at 93:17–20, Ex. 55 ("Q. Do you remember anything about the truck, what did it look like? A. I saw on the windshield there was Arabic writing."); ███ Dep. at 9:7–12, Ex. 56 ("Q. Can you describe the truck? A. So the truck was green, army green, and there was the writing Allahu Akbar . . . on the windshield."); *id.* at 54:4–7 ("Q. Is that expression [on the truck] a common expression used between people to talk about God is great? A. Yes.").] ███ claimed to have seen a truck with the same expression entering Arun Field on an unspecified date. [███ Dep. at 11:23–12:3, Ex. 56 ("Q. The truck that you described with the Arabic saying, did that truck go in and out of the Exxon facility? . . . A. Yes it d*id*.").]

**Plaintiffs' Response:** Undisputed. Plaintiffs further state that the "sticker with a common Arabic expression on the windshield" had the words in red letters on the front windshield (in addition to a Unit 113 logo on the side), making the truck uniquely identifiable. *See supra* ¶¶ 43, 318-319. A witness was familiar with the truck as she often saw it at Point A, where she waited for her school bus every day, and further testified that she had not seen any other truck with a red "Allahu Akbar" sticker in the middle of the windshield. ███ mother had a rice stand right in front of the gate at Exxon's Point A location and ███ waited for the school bus there every morning. PX29, ███ Dep. 9:17-11:4; 20:16-20 (sign at the location said "Exxon Mobil Point A"). ███ testified that while waiting for the school bus, she "often saw the truck passing in front of our rice stand, and

47

sometimes they would also stop by at our rice stand" and that the truck would go in and out of the Exxon facility. *Id.* 9:20-10:2; 11:23 -12:13 ("[I] often saw the truck coming out and coming into the facility."); *id.* 69:7-11 ("Q. the truck with that writing on it, did you see that truck go in and out of Point A? A. Yes"). ████ also often saw the truck passing on the road. *Id.* 13:17-21. ████ saw many other trucks on the road, including other Unit 113 trucks, but testified that she had not seen any other truck with a red "Allahu Akbar" sticker in the middle of the windshield. *Id.* 13:17-21.

**Defendants' Objection to Response to Paragraph 44.** Defendants object to this Response as it does not dispute any material aspect of the Paragraph, and addresses unrelated and immaterial issues that do not create a genuine dispute. Point A is not an "Exxon facility" and was not operated by EMOI during the relevant time period, and it is immaterial that a lay witness claimed to observe a military vehicle at Point A at unidentified times. *See* Defs.' Reply Mem. at 9–10; *infra* ¶¶ 315–16, 320–21.

45. Jane Doe I is not seeking money damages from Exxon. [Jane Doe I Dep. at 74:5–7, Ex. 55 ("Q. Are you expecting to be paid if you win this case? A. No."); *id.* at 78:13–79:9 ("Q. Are you saying in this lawsuit that Exxon should pay the expenses that you incurred to go to Bandung for three months? A. No. . . . Q. Did your husband not work during the period that he went to Bandung with you? A. Yes, he was no longer able to work because of that conditions I mentioned earlier, the Exxon is closed. . . . Q. Are you saying in this lawsuit that Exxon should pay him for the three months that he did not work because Exxon was closed? A. No.").]

**Plaintiffs' Response:** Disputed. The evidence cited does not support this claim. Jane Doe I was asked if she was "expecting to be paid" not whether she was seeking compensatory damages for her injuries. Defs. Exh. 55 at 74:5-7. Jane Doe I has submitted a detailed computation of damages. PX87, Pls.Dec. 2019 Suppl. Damages Disclosures 2-3. She is also seeking "moral" damages as allowable under Indonesian law and provided testimony in support of those damages. *See* PX19, Jane Doe I Dep. 87:4-20, 90:19-92:16. Jane Doe I described the sexual assault and its impact on her: "I had difficulty, I had sleep difficulty, and then I was haunted by the fear, and I also feel disgusted by my own body because I have been touched by other man … I remember that incident again, I think I always remember it." *Id.* 90:19- 91:12. She testified that she thought she would die that day. *Id.* 91:13-15. She also testified that there are no resources in her community for victims of sexual assault. *Id.* 91:16-18.

**Defendants' Objection to Response to Paragraph 45.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe I. *See* Defs.' Reply Mem. at 14–16.

46.     Jane Doe I may be seeking compensation because her child was born "██

████." [Jane Doe I Dep. at 79:10–80:4, Ex. 55 ("Q. As a result of what the soldier did to you,

[Jane Doe I], on March 20, 2001 in your house, are you seeking any other damages that you

think Exxon should pay for? . . . A. Yes, because the result, ████████████████

████.").]

> **Plaintiffs' Response:** Disputed. Undisputed that Jane Doe I is seeking damages,
> including "moral" damages under Indonesian law for the impact of the attack. In addition
> to a prolonged sexual assault, the soldier also forced Jane Doe I, who was eight months
> pregnant, to jump up and down "many times." PX19, Jane Doe I Dep. 87:4-17. The
> jumping caused Jane Doe I to have cramping, for which she sought medical treatment. *Id.*
> 87:11-20. Her infant, born after the attack, was damaged. *Id.* 92:5-16 (child can not feed
> herself and attends special needs school). Disputed to the extent Defendants seek to
> characterize Jane Doe I as seeking compensation for damages unrelated to the suit or as
> motivated by extraneous circumstances.

> **Defendants' Objection to Response to Paragraph 46.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a
> genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe I. *See*
> Defs.' Reply Mem. at 14–16.

47.     Jane Doe I did not produce any documents or records corroborating or quantifying

any expenses incurred for her own medical treatment or that of her child. [Jane Doe I Dep. at

76:8–11, Ex. 55 ("Q. Do you have any documentation of your hospital visit in Bandung? A. Not

anymore. It was a long time ago."); *id.* at 80:14–21 ("Q. Do you have any documentation of

these hospital visits for your child? A. No, not anymore. I didn't think about it because it is a

long time ago. Q. No one told you to preserve these document[s] for this lawsuit? A. No."); *id.* at

81:7–10 ("Q. Do you have any written documentation of this opinion from this doctor? A. No. . .

.").]

> **Plaintiffs' Response:** Disputed. Undisputed that Jane Doe I did not produce documents
> related to her visit to the hospital after the sexual assault, a visit that occurred before this
> litigation was contemplated. Disputed to the extent that Exxon implies Jane Doe I did not
> search for and collect relevant documents.

49

During counsel's initial investigation of the case, counsel instructed all potential plaintiffs to gather documents, including "." PX126, Collingsworth Decl. ¶ 4. Later, during interviews with each Plaintiff, counsel collected all documents Plaintiffs had gathered. *Id.* ¶ 9. On review, most of these documents turned out to be irrelevant, but those that were relevant to Plaintiffs' potential claims were preserved and ultimately produced. *Id.* After the interviews, counsel instructed each Plaintiff's family that "

" *Id.* ¶ 10. Assistants gathered what few documents Plaintiffs and their families gathered in response to these requests, and counsel reviewed them with the help of a translator. *Id.* ¶ 11. Again, most were nonresponsive, but counsel retained and produced the few documents relevant to the case. *Id.* Counsel instructed the potential plaintiffs about the importance of saving evidence for use in court later. *Id.* ¶ 10.

Defendants served at least eight sets of Requests for Production, totaling more than 430 requests. counsel responded to each of these requests in compliance with their obligations under the Federal Rules. For example, when counsel returned to North Aceh in 2016, counsel asked each Plaintiff, in simple, understandable language through an interpreter, if they had any additional documents that related to their claims or that were responsive to Defendants' requests for production. PX127, DiCaprio Decl. ¶¶ 2-3. Counsel specifically asked for "                                                  ." *Id.* ¶ 3. Counsel again "            ." *Id.* ¶ 4.

It should be unsurprising that Plaintiffs have few documentary records corroborating their claims for damages. Each Plaintiff lives in a rural area of Indonesia, in subsistence economies where records of transactions are not normally maintained. PX127, DiCaprio Decl. ¶ 5. Although Jane Doe I, a schoolteacher, can read, many of the other Plaintiffs cannot, and thus had no reason to retain documents in the first place prior to suit.[3] PX126, Collingsworth Decl. ¶ 9. In response to his requests for documents, counsel describes Plaintiffs bringing him indiscriminate unrelated papers, including school records, unrelated medical receipts, and birth records unrelated to the injured parties, because Plaintiffs could not discern what these documents said. *Id.*

**Defendants' Objection to Response to Paragraph 47.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs do not dispute that Jane Doe I had no documentation reflecting expenses for medical care for her or her child. Plaintiffs' response does not create a

---

[3] Even for Jane Doe I, given the unlikelihood of pursuing her claims in Indonesian courts, there is no reason to expect her to seek and retain documentation of her injuries. Jane Doe I could hardly have anticipated at the time of her injuries that she would pursue redress in American courts and should save her receipts in anticipation of litigation.

genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe I. *See* Defs.' Reply Mem. at 14–16. Defendants further object to the use of "Exxon Security Forces" as inappropriately conflating the Defendants and the armed military of a sovereign nation.

**B.      Jane Doe II**

48.      Jane Doe II and non-party witness ████████ provided testimony regarding Jane

Doe II's allegations. [*See generally* Deposition of Jane Doe II, dated Sept. 30, 2020 ("Jane Doe

II Dep."), Ex. 57; Deposition of ████████, dated Mar. 3, 2021 ("████████ Dep."), Ex. 58.]

> **Plaintiffs' Response:** Undisputed but incomplete. Jane Doe IV's husband was also killed in his ████████, in the same attack. The three witnesses to that killing (Jane Doe IV, ████ and ████ provided relevant testimony. In particular, four separate eyewitnesses identified the vehicles on the scene as vehicles that were usually parked at Exxon Cluster 4. *See infra* ¶¶342, 390, 393-394. And two witnesses identified the specific soldiers on the scene as soldiers who were stationed at Exxon Cluster 4. *See infra* ¶¶379-388.

> **Defendants' Objection to Response to Paragraph 48.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Furthermore, Plaintiffs provide no evidence that Jane Doe II's husband and Jane Doe IV's husband were killed in the same attack or that ████████ ████████. Plaintiffs' and their lay witnesses' conclusory statements cannot create a genuine dispute, and it is immaterial that a lay witness claimed to have observed Indonesian military vehicles at Cluster 4 at unidentified times unrelated to the alleged incident, especially because that lay witness, ████████ did not witness the incident and could not know which vehicles were on the scene. *See* Defs.' Reply Mem. at 6.

49.      The village in which Jane Doe II's husband, John Doe VIII, was shot ████████

████████. [Jane Doe II Dep. at 10:25–11:15, Ex. 57 ("Q. So going to the

house that you lived in in 2000, was that house near any Exxon Mobil facilities? A. ████████

████████

████████.").]

> **Plaintiffs' Response:** Disputed. ████████
> ████. PX30, ████ Dep. 28:19-29:16. ████████

**Public Redacted Copy**



. PX292, (map of distance ████ ).[4]

**Defendants' Objection to Response to Paragraph 49.** Defendants object to this Response as the purported evidence does not support Plaintiffs' proposition. The testimony speaks for itself: Jane Doe II stated that the village where John Doe VIII was shot ████████████████. Plaintiffs' request for judicial notice is directly contradicted by the testimony of Jane Doe II.

50.   Jane Doe II did not know the identity of the Indonesian soldier or soldiers who shot her husband. [Jane Doe II Dep. at 46:19–47:10, Ex. 57 ("Q. Were the soldiers on that truck Indonesian military soldiers? A. I'm not really sure about that. Q. Do you know who shot your husband? A. I just know they are soldiers, but I don't know their names. . . . Q. Do you know the name of the soldier who shot your husband? A. I don't know the name of the soldiers. I wasn't able to see. The people around me were not able to see.".).]

**Plaintiffs' Response:** Disputed. Jane Doe II identified the soldiers as Exxon Soldiers, the soldiers she saw at the Clusters and on patrol in her village: "the Exxon soldiers were the clusters of Exxon. There were no other soldiers. When I passed the street, there were the soldiers. There were no other soldiers except the Exxon." PX20, Jane Doe II Dep. 37:24-37:7. She also recognized the trucks she saw bringing the soldiers as trucks she saw parked at Exxon's Cluster 4. *Id.* 41:20-42:9 ("When the military truck passed by, we saw that truck and that truck is only in that clusters… In cluster four."); *id.* 45:17-46:6 ("I'm not sure whether it is [an] Indonesian military truck or not, but it's the Exxon soldiers truck. It always stand by there at Exxon's facilities."); *id.* 50:19-15 ("I know that truck" from passing by on the way to market). Another eyewitness, the village chief, also recognized the trucks as trucks normally parked at Exxon Cluster 4. PX30, ████ Dep. 13:6-15:3 ("I had not seen the truck anywhere else, except at—except they were parked at Cluster 4…they were already there long before"); *see also id.* (████ passed by Cluster 4 about three times a week and saw trucks there "long before" December 4); *id.* 66:7-10 ("I do not know who owns the military trucks, but what I know was that those military trucks were within the field of Exxon's, Cluster 4"); *id.* 70:18-22 ("Q. were [the trucks] parked [at] Cluster 4 both before December 4th and after December 4th? A. Yes").

**Defendants' Objection to Response to Paragraph 50.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants further object to this

---

[4] Plaintiffs request the Court take judicial notice of PX___, a Google Maps printout. *E.g.*, *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of Google Maps and collecting cases doing the same).

Response as the purported evidence does not support Plaintiffs' proposition. Plaintiffs' assertion that "Exxon soldiers" were the only soldiers at Cluster 4 is a baseless conclusion unsupported by evidence, and thus cannot create a genuine dispute. Plaintiffs' evidence does not connect Defendants to Jane Doe II's husband's injuries in any way. Cluster 4 is not an "Exxon's facility," and it is immaterial that a lay witness claimed to have observed a military vehicle at Cluster 4 at unidentified times prior to the alleged incident.

51.     Jane Doe II did not know who supervised or gave orders to the soldier or soldiers who killed her husband. [Jane Doe II Dep. at 49:6–18, Ex. 57 ("Q. So you don't know who shot your husband. Is it also accurate to say that you do not know the name of the Indonesian commander of that soldier? A. I don't know the name. Q. And since you don't know the name or the commander of the soldier who shot your husband, do you also agree that you do not know what assignment that soldier had in Aceh and what troop he belonged to? A. Yes, I don't understand about that too.").]

> **Plaintiffs' Response:** Undisputed. Undisputed that Jane Doe II did not know the name of the soldiers' supervisor. Objection that whether or not Jane Doe II knows this information is immaterial.

> **Defendants' Objection to Response to Paragraph 51.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.

52.      did not see the shooting and did not testify to the identity of the soldier or soldiers who allegedly killed Jane Doe II's husband, or his or their commander. [____ Dep. at 19:5–9, Ex. 58 ("[W]hat I witness on that day, after I get to the location, I saw the body was already in the mud, and then the mud—the blood has already mixed with the mud at that time.").]

> **Plaintiffs' Response:** Disputed. Undisputed that  did not see the shooting but disputed that he does not know who shot Jane Doe II's husband. ____ was the village chief from 2000 to 2008. PX30, ____ Dep. 7:3-13. Immediately after the shooting, a villager came to his house and reported that soldiers had shot Jane Doe II's husband. *Id.* 18:9-12 ("Q. Was she reporting to you because you were the village chief? A. Yes."). The villager, ____ had seen the shooting "with her own eyes. So that's why she was very upset and scared." *Id.* 18:6-8. ____ was "crying. She was crying

at [the] time, and then she said, oh, my younger brother, [Jane Doe II's husband] has been shot by the soldiers in the rice field … she saw the soldiers doing the shooting." *Id.* 16:21-18:2.[5]

**Defendants' Objection to Response to Paragraph 52.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Defendants further object to this Response as the purported evidence does not support Plaintiffs' proposition.  Plaintiffs' claim that John Doe VIII was shot by Indonesian soldiers does not in any way connect those soldiers to Defendants.  Defendants further object to this Response on the ground that the statement attributed to ▮▮▮▮▮▮▮ is an inadmissible out-of-court statement not capable of being made admissible at trial, and so cannot create a genuine issue of material fact.  Defendants further object to this Response as ▮▮▮▮▮▮ did not witness the attack on Jane Doe II's husband and cannot connect the attack to Defendants; thus, this Response cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 6.



53.     ▮▮▮▮▮▮▮ was told secondhand that John Doe VIII was shot by soldiers.



[▮▮▮▮▮▮ Dep. at 16:21–17:3, Ex. 58 ("Yes, so I learned the death of [John Doe VIII] from ▮▮▮▮▮▮ a woman called my ▮▮▮▮▮▮ . . . And then she said, to me, oh, my little, younger brother, [John Doe VIII] is dead. He has been shot by the soldiers.").]

**Plaintiffs' Response:** Disputed. Undisputed that an eyewitness to the shooting reported to ▮▮▮▮▮▮ the village chief, that Jane Doe II's husband had been killed by soldiers. *See* CSMF ¶¶ 52, 346. Disputed to the extent Defendants seek to characterize this excited-utterance testimony as unreliable or inadmissible. In addition, two additional eyewitnesses to the second shooting at the rice field identified the Exxon soldier responsible. *See infra* ¶¶379-388.

**Defendants' Objection to Response to Paragraph 53.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Defendants further object to this Response as the purported evidence does not support Plaintiffs' proposition.  Plaintiffs' claim that John Doe VIII was shot by Indonesian soldiers does not in any way connect those soldiers to Defendants.  Defendants additionally object on the ground that Plaintiffs have put forth no evidence showing the "two additional eyewitnesses to the second shooting" actually witnessed the shooting of John Doe II.  This is pure speculation by counsel that the alleged shootings of John Doe II and John Doe IV involved the exact same soldiers or were related in any way.  Defendants further object to this response on the ground that the statement attributed to ▮▮▮▮▮▮ is an inadmissible out-of-court statement not capable of being

---

[5] Defendants have not objected to the introduction of ▮▮▮▮▮▮ statement, so Plaintiffs are under no obligation to establish its admissibility, *see* Fed. R. Civ. P. 56(c)(2), though they note it is admissible hearsay as an excited utterance, Fed. R. Evid. 803(2), or, at the very least, under the residual exception, Fed. R. Evid. 807.

made admissible at trial, and so cannot create a genuine issue of material fact. Lastly, Defendants object on the grounds that baseless, conclusory statements about "Exxon soldiers" misleadingly suggest that the sovereign Indonesian military worked for EMOI, and Plaintiffs have provided no evidence that the soldier in question was connected to Defendants. Thus, Plaintiffs' Response cannot create a question of material fact. *See* Defs.' Reply Mem. at 7–10.

54. Jane Doe II alleged in her damages disclosures that ███████████████

███████████████. [Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures, dated Dec. 3, 2019, at 5, Ex. 59.]

**Plaintiffs' Response**: Undisputed.

**Defendants' Objection to Response to Paragraph 54.** N/A

55. Jane Doe II produced no documents demonstrating the amount of damages she may be seeking in this lawsuit, and she testified that she did not know how much money her husband earned prior to his death because he never told her the amount. [Jane Doe II Dep. at 26:22–27:10, Ex. 57 ("Q. Do you know how much he made when he was a tractor driver in the rice paddy? A. I cannot calculate how much because he didn't mention how much. I only received the money for shopping. Q. So would it be fair to say your husband never told you how much he made when he worked, he just gave you a portion of money so that you could buy food for the family? . . . A. Yes.").]

**Plaintiffs' Response** Disputed. Jane Doe II, like all Plaintiffs, served disclosures identifying damages sought in this suit. *See* PX87, Pls.' Dec. 2019 Suppl. Damages Disclosures 3-5. Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no wage-related documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 55.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe II. *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that Jane Doe II had no documentation reflecting her husband's wages.

### C.     Jane Doe III

56.     Jane Doe III and non-party witness ███████ provided testimony regarding Jane

Doe III's allegations. [*See generally* Deposition of Jane Doe III, dated Sept. 21, 2020 ("Jane Doe

III Dep."), Ex. 60; ███████ Dep., Ex. 38.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 56.**  N/A

57.     Jane Doe III claimed in her 2007 sworn interrogatory responses that ███████████



. [Pl. Jane Doe III's Suppl. Resp. to ExxonMobil Oil Corporation's 1st

Set of Interrogs., dated July 28, 2007, at 2, Ex. 61 ("█████████████████████████

██████████████████████.").]

**Plaintiffs' Response:** Undisputed but incomplete. Plaintiff's interrogatory answer also
stated that she feared her husband was no longer alive. PX88, Pl. Jane Doe III's Suppl.
Resp. to Exxon Mobil Oil Corp.'s First Set of Interrogatories at 3.

**Defendants' Objection to Response to Paragraph 57.**  Defendants object to this
Response as it does not dispute or offer any evidence responsive to any material aspect of
the Paragraph.

58.     Jane Doe III did not witness the abduction of her husband, John Doe IX, and did

not know the identities of the people who took him. [Jane Doe III Dep. at 46:6–20, Ex. 60 ("Q.

You did not see what happened to him; is that right? A. No, she didn't see anything. Q. You did

not see who the people who took your husband were, correct? A. No, she didn't see anyone. Q.

You don't know their names who took your husband? A. No. Q. And no one told you their

names, correct? A. No. Q. So you don't know who took your husband; is that right? A. She

didn't know.").]

**Plaintiffs' Response:** Disputed. Undisputed that Jane Doe III did not witness the attack
on her husband, but disputed that she did not know the identities of the persons
responsible. Jane Doe III's husband always left and returned at about the same time each
day. PX21, Jane Doe III Dep. 113:6-11. When Jane Doe III's husband did not return at
the end of the day on September 17, 2000, she was worried. *Id.* 113:12-16. Jane Doe III

took her motorcycle and searched for husband along his usual route. *Id.* 113:17-22. She drove to █████████████████████████████████████████████████, and "where he normally stopped to sell his fish." *Id.* 114:6-9.

There she met █████████. *Id.* 114:11. █████████ was very scared, trembling and crying. *Id.* 114:22-115:6. Jane Doe III testified that "█████████ told me that he was very scared, he was trembling, and he told me that, he was crying, and he said that my husband was already taken." *Id.* █████████ related that there had been a tire explosion and that the Indonesian military came in and took her husband. *Id.* 62:14-17. █████████ had seen the incident and was upset because his younger brother had been taken at the same time as Jane Doe III's husband. *Id.* 114:21, 115:18-23.[6] In addition, another third party witness identified the attackers as Exxon soldiers from █████████. *See infra* ¶¶ 360-368.

**Defendants' Objection to Response to Paragraph 58.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants also object to this Response on the grounds that Plaintiffs selectively omit the statements attributed to █████████, which are inadmissible hearsay and, even if admitted, do not support Plaintiffs' claim that Defendants were responsible for the injuries to Jane Doe III's husband. Further, Plaintiffs' and lay witnesses' conclusory use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact. Lastly, Defendants object to this Response as Plaintiffs' purported evidence does not support their proposition: the purported third-party witness, █████████ did not in fact witness the injury to Jane Doe III's husband. *See* Defs.' Reply Mem. at 5–6.

59.   Non-party witness █████████ testified that he did witness the abduction of John

Doe IX. He was working in his kiosk when a vehicle carrying members of the Indonesian Marine

Corps crashed into a ditch due to a tire blowout. █████████ Dep. at 22:6–18, Ex. 38 ("Q. I'm

going to ask you some questions about the day of the incident. Were you at your kiosk that day?

A. Yes, I was. Q. Can you tell us what happened? A. So there was a tire explosion. Q. And what

happened next? A. So after the tire explosion, they were . . . upsidedown, I don't the ditch [sic].

Q. So after the tire explosion, a week [sic] went upsidedown into the ditch? A. Yes, into the

Exxon's ditch."); *id.* at 32:4–23 ("Q. Earlier, you also testified about a truck, I think, that went

---

[6] Unfortunately, █████ passed away before depositions were permitted to proceed remotely. Defendants have not objected to the introduction of his statement, so Plaintiffs are under no obligation to establish its admissibility, *see* Fed. R. Civ. P. 56(c)(2), though they note it is admissible hearsay as an excited utterance, Fed. R. Evid. 803(2), or, at the very least, under the residual exception, Fed. R. Evid. 807

into a ditch. Is that right? A. Yes. Q. Who was in that truck? A. Marine corps. Q. And how many

marine corps were in that truck? A. It's about 10 or 12, around that number. Q. And what

happened to the marine corps that were in the truck? A. So the front tire exploded. Q. And then

what happened? A. And they fell into the ditch of Exxon. Q. And were any of them injured? A.

Yes, I think. I didn't really see it, but they said there were two of them who died.").] According

to ███████ following the crash, a number of soldiers emerged from ████████ and some of

them rounded up the people nearby, including █████ [*Id.* at 22:19–23:8 ("Q. And what

happened next? A. So after that, I heard gunshot, like consecutive gunshot from the ██████

████. Maybe they thought there was an attack from this side. Q. After you heard the gun fire

from back inside ████████, what happened next? A. Then after that, they gathered all of

us. Q. When you say they, who do you mean? A. The soldiers who came out from ████████

████").] ████████ testified that he was beaten by these soldiers for about fifteen minutes and

then was taken to a second location. [*Id.* at 27:19–28:4 ("Q. You said the beating lasted about 15

minutes; is that right? A. Yes, that's correct. Q. After that 15 minutes, did you see [John Doe

IX]? A. Yes. Yes, because after I was beaten, I was taken to the location where [John Doe IX]

was. And when I got there, I saw where they stick other people, where I saw [John Doe IX] was

laying on the road.").] At the second location, he saw a mix of soldiers composed of the marines

and the soldiers that had exited ████████ standing near six people lying on the road, one of

whom was John Doe IX. [*Id.* at 28:15–17 ("Q. So including [John Doe IX], how many people

were lying on the road? A. Six."); *id.* at 29:11–22 ("Q. Was anyone standing nearby? A. People,

the orbit—there were no ordinary people. It was just soldiers. Q. So how many soldiers were

standing nearby? A. I cannot really remember the number of the soldiers standing there. Q. Were

the soldiers standing there, the soldiers from ████████? . . . A. I think it was mixed. They



were mixed already."); *id.* at 35:10–16 ("Q. Were ███████ soldiers in that mix? . . . A.

Yes, there was. Q. And were there also some of the marine soldiers in the mix? A. Yes.").]

███████ said that he saw the six people, including John Doe IX, placed into a military truck. [*Id.*

at 30:4–19 ("Q. What happened next? A. Not very long after I was there, I was taken back to my

place, but then, I had the opportunity to—to look—to see that there were trucks, military trucks

coming. And they were taken on the truck. Q. When you say they were taken on the truck, what

do you mean? Is the they the bodies (indicating)? A. Yes, the bodies that—the six bodies that

laid on the road. Q. So who put the six bodies on the truck? A. The soldiers.").]

> **Plaintiffs' Response:** Undisputed but incomplete. A vehicle carrying members of the
> Indonesian Marine Corps crashed into a ditch due to a tire blow out. About ten or twelve
> marine corps were in the truck and that two of them were killed in the accident. After the
> tire explosion, ██████ saw soldiers rush out of ███████████████ operated by
> Exxon. PX31, ████ Dep. 23:9-15 ("Q. did you see the soldiers come out from
> ███████? A. Yes, I do. Q. And those were the soldiers walking, guarding, Exxon;
> is that correct? A. Yes, that's correct"); *id.* 24:8- 18 ("Q. About how many of the Exxon
> guards came out of ███████? A. I think it was about 30 or 40"); *id.* 69:8-13. ("Q.
> Now, turning to the incident itself, you said there were 30 or 40 soldiers who came out of
> ███████, after you heard the tire explosion; is that right? A. Yes"). ██████ saw
> the soldiers round up the local men and he himself was rounded up along with other local
> merchants. *Id.* 22:24-23:8, 24:8-14 ("So after they came out, they gathered all of us …
> they gathered all of close to my kiosk"). The soldiers from ███████ interrogated
> and beat the men. *Id.* 24:20-25:5 ("they were investigating us, they tortured us").
> ██████ was beaten so badly by the soldiers from ███████ that he required 13
> stitches in his head. *Id.* 25:6-21. Other merchants were also beaten by the ████████
> guards. *Id.* 26:9-11 ("Q. did the motorcycle taxi guys get beaten? A. Yes, they were
> beaten as well."). In addition, the soldiers stole about 1.5 million Rupiah worth of
> cigarettes from his kiosk. *Id.* 27:5-15. ██████ testified that it was the soldiers from
> ███████, not the ten or twelve marines in the truck who beat up the villagers. *Id.*
> 25:6-21 ("Q. the person that beat you, was that one of the Exxon guards from ███████
> ████? A. Yes, that's correct."); *id.* 75:25-76:2 (██████ did not know their names, but
> knew their faces). The marines did not beat the villagers, the marines were tending to
> their two compatriots who were injured in the crash. *Id.* 32:24-33:6.
>
> After he was beaten, the ███████ soldiers took ██████ to the roadside where
> they were holding other people. *Id.* 27:24- 28:4. There, ██████ saw Jane Doe III's
> husband lying on the road with the bodies of five other men. *Id.* 28:2-17. Jane Doe III's
> husband did not move. *Id.* 27:22-30:3 ("he was not moving, and he was laying—lying on
> the road."); *id.* 29:4-10. Soldiers loaded the six bodies on to a military truck. *Id.* 30:4-23.
> ██████ never saw Jane Doe III's husband again. *Id.* 30:24-31:2. ██████ believed Jane

Doe III's husband was dead. *Id.* 29:23-30:3 ("Q. Did you think the men that were lying on the ground were dead? A. I cannot tell for sure but what I can say is that they were no longer moving.").

**Defendants' Objection to Response to Paragraph 59.** Defendants object to this Response as it is does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants further object to this Response as the purported evidence does not support Plaintiffs' proposition. Plaintiffs' misleadingly suggest that ▓▓▓▓ observed the alleged assault of Jane Doe III's husband, when ▓▓▓▓ was not an eyewitness to the alleged assault of Jane Doe III's husband. *See* Defs.' Reply Mem. at 5–6.

60. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. [Deposition of ▓▓▓▓▓, dated Oct. 27, 2020

("▓▓▓▓▓ Dep."), 17:10–18:4 Ex. 62 ("▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.").]

**Plaintiffs' Response:** Undisputed but incomplete. ▓▓▓▓▓▓▓▓ was operated by Exxon. PX18, Duffin Dep. 18:19-19:1 (▓▓▓▓▓▓▓▓ was used by EMOI for housing employees); PX89, CA0001147209 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓); PX90, CA0001337933, at '974 (photo of ▓▓▓▓▓▓▓▓). Exxon stationed military resources at ▓▓▓▓▓▓▓▓ at the time of the incident. *See, e.g.,* PX91, CA0001005932 at '933 (Daily Security Report for September 13-14, 2000 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); PX92, CA0001005938 at '939 (Daily Security Report for September 22-26, 2000 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); *see also* PX31, ▓▓▓▓▓▓▓▓ Dep. 18:24-19:15.

**Defendants' Objection to Response to Paragraph 60.** Defendants object to this Response as it is does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Defendants further object to this Response as the purported evidence does not support Plaintiffs' proposition. ████████████████████████████ ████████████████████████████████████████ There is no evidence, and Plaintiffs do not claim, that the only Indonesian soldiers who ████ ████████████████████████ Lastly, EMOI did not control or employ the Indonesian military and accordingly did not "station[] military resources."

61.        ████████ did not know the identities of any of the people who took John Doe IX, despite testifying that he had seen some of the soldiers coming from ████████████. ████ Dep. at 23:9–15, Ex. 38 ("Q. So did you see the soldiers come out from ██████████? A. Yes, I do. Q. And those were the soldiers, walking, guarding Exxon; is that correct? . . . A. Yes, that's correct."); *id.* at 75:21–76:14 ("Q. The 30 or 40 soldiers that you said came out of the direction of the ████████████, did you know any of their names? A. I don't know their names. I just know their face. Q. Can you describe their faces now? A. I can't imagine that anymore. Q. Did you ever describe them to anyone in this case? A. No. Q. What about the mix of soldiers and marines that you've described around the people on the ground? Did you know any of their names? A. No, I don't—I didn't know their name. I don't know their names.").]



**Plaintiffs' Response:** Disputed. ████████████ ██ ████████████████████████████████ PX31,      ████ Dep. 9:7-11:9 (                                                    ); *id.* at 43:22-44:6 (                          ). ████████████████████████████████████████ . *Id.* at 9:7-11, 42:11-43:21.

████████████████████████████████████████, *see id.* at 44:7-13), ████████████     *Id.* at 12:14-13:21 (████████████████████). ████████████ *Id.* at 19:16-25. ████████ *Id.* at 19:8-15 (████████████████████████ ). Thus, while ████████ did not know the names of the soldiers, he was familiar with the local soldiers.



On September 17, 2000, a tire blew out on a vehicle transporting ten or twelve members of the marine corps. *Id.* at 22:10-15, 32: 8-12, 69:14-17. The truck vehicle went into a ditch, and two of the marines were crushed when it crashed into a tree. *Id.* at 33:6-12. After the tire explosion, ███████ saw 30 to 40 soldiers rush ███████████ *Id.* at 23:9-15 ("Q. did you see the soldiers come out ████████████? A. Yes, I do. Q. And those were the soldiers, ███████████t? A. Yes, that's correct"); *id.* at 24:8- 26:4 ("Q. about how many of the ████████████? A. I think it was about 30 or 40"); *id.* at 69:8-13. ("Q. Now, turning to the incident itself, you said there were 30 or 40 soldiers who █████████████, after you heard the tire explosion; is that right? A. Yes").

███████ saw the soldiers round up the local men and he himself was rounded up along with other local merchants. *Id.* at 22:24-23:8, 24:8-14 ("So after they came out, they gathered all of us … they gathered all of close to my kiosk").

The soldiers from ███████████ interrogated and beat the men. *Id.* at 24:20-25:5 ("they were investigating us, they tortured us"). ███████ was beaten so badly by the soldiers ██████████ that he required ████████████. *Id.* at 25:6-21. Other ████████ were also beaten by the ████████ guards. *Id.* at 26:9-11("Q. did the motorcycle taxi guys get beaten? A. Yes, they were beaten as well."). In addition, the soldiers stole about 1.5 million Rupiah worth of cigarettes from ███████. *Id.* at 27:11-15. ████████ testified that it was the soldiers from ███████, not the ten or twelve marines in the truck who beat up the villagers. *Id.* at 25:6-21 ("Q. the person that beat you, was that one of the Exxon guards from ███████? A. Yes, that's correct."); *id.* at 75:25-76:2 (███████ did not know their names, but knew their faces). The marines did not beat the villagers, the marines were tending to their two compatriots who were injured in the crash. *Id.* at 32:24-33:6.

**Defendants' Objection to Response to Paragraph 61.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. The purported evidence does not support Plaintiffs' proposition. ███████ was not an eyewitness to the alleged assault of Jane Doe III's husband and thus cannot know the identities of the alleged assailants. *See* Defs.' Reply Mem. at 5–6.

62.       ███████ did not know, when he saw John Doe IX, what had happened to him or whether he was deceased. [*Id.* at 78:7–12 ("Q. And you don't know what happened, actually, to [John Doe IX], correct, why he was on the ground? . . . A. Yes, I don't know."); *id.* at 29:23–30:3 ("Q. Did you think the men that were lying on the ground were dead? A. I cannot tell for sure, but what I can say is that they were no longer moving.").]

**Plaintiffs' Response:** Disputed. After he was beaten, the ███████████ soldiers took ███████ to the roadside where they were holding other people. PX31, ███████ Dep.

27:24- 28:4. There, ▮▮▮▮ saw Jane Doe III's husband lying on the road with the bodies of five other men. *Id.* at 28:2-17. Jane Doe III's husband did not move. *Id.* at 27:22-30:3 ("he was not moving and he was laying—lying on the road."); *id.* at 29:4-10. Soldiers loaded the six bodies on to a military truck. *Id.* at 30:4-23. ▮▮▮▮ never saw Jane Doe III's husband again. *Id.* at 30:24-31:2. ▮▮▮▮ believed Jane Doe III's husband was dead. *Id.* at 29:23-30:3 ("Q. Did you think the men that were lying on the ground were dead? A. I cannot tell for sure but what I can say is that they were no longer moving.").

**Defendants' Objection to Response to Paragraph 62.** Defendants object to this Response as it is does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants further object to this Response as the purported evidence does not support Plaintiffs' proposition. ▮▮▮▮ was not an eyewitness to the alleged assault of Jane Doe III's husband. Plaintiffs' statement does not connect the Indonesian soldiers who allegedly injured John Doe III's husband to Defendants. Additionally, Plaintiffs' use of the phrase ▮▮▮▮ ▮▮▮▮ where he was allegedly beaten. In fact, Bakhtiar testified that he wa ▮▮▮▮

*See* Defs.' Reply Mem. at 5–6.

63.    Neither Jane Doe III nor ▮▮▮▮ knew who supervised, directed, or paid the Indonesian soldiers who abducted John Doe IX. [Jane Doe III Dep. at 57:8–20, Ex. 60 ("Q. And you don't know anything about Exxon hiring Indonesian military, correct? A. She doesn't know. Q. And you don't know anything about Exxon supervising the Indonesian military, correct? A. She doesn't know. Q. And you don't know—you have not seen any documents that suggest Exxon hired any Indonesian military, correct? A. No, she doesn't know any documents.");

▮▮▮▮ Dep. at 77:17–78:6, Ex. 38 ("Q. You don't know who their commanders are, right? A. Yes, I don't know. Q. You don't know who gave the soldiers their orders, correct? A. Yes, I don't know. Q. You don't know what their orders were on that day, correct? A. Yes, I don't know. Q. You don't know who paid the soldiers on that day, correct? [] A. Yes, I don't know.");

*id.* at 78:13–79:14 ("Q. You don't know if the soldiers received any orders from Exxon on that day, correct? A. Yes, I don't know about that. . . . Q. And you don't know whether anyone from Exxon controlled these soldiers on that day. . . . A. Yes, I don't know. Q. And you don't know

whether anyone from Exxon supervised these soldiers on that day, right? . . . A. Yes, I don't

know about that. Q. And you don't know whether anyone from Exxon paid these soldiers on that

day, right? A. Yes, I don't know about that").]



> **Plaintiffs' Response:** Disputed. The guards who beat ███ and who beat and killed
> Jane Doe III's husband came from ██████████ *See* CSMF ¶¶ 61, 364-368. ███
> ████ was operated by Exxon. PX18, Duffin Dep. 18:19-19:1 (███████████ was used
> ███████████████); *id.* at 21:13-21 ("All these facilities were
> ExxonMobil's. Q. Okay, and What is—A. Or Mobil Oil, I mean. Q. Sorry, I didn't mean
> to interrupt you. ████████████████████████████████████████
> ████████████████████████ ? A. The operation of it, yes."). PX89,
> CA0001147209 (2000 email listing ████████████ among property "Mobil manages").
> Exxon stationed military resources at ███████████ at the time of the incident. *E.g.*,
> PX91, CA0001005932 at '933 (Daily Security Report for September 13-14, 2000
> ████████████████████); PX92, CA0001005938 at '939 (Daily Security Report for
> September 22-26, 2000 ████████████████████); *see also* PX31, ███████
> Dep. 18:24-19:15.

> **Defendants' Objection to Response to Paragraph 63.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph. Plaintiffs have put forth no evidence connecting Jane Doe III's husband's
> alleged injuries to Defendants. ███ was not an eyewitness to the alleged attack, and
> there is no evidence, and Plaintiffs do not claim, that the only Indonesian soldiers who
> gathered and ate meals at ████████ were assigned by the Government of Indonesia
> to guard the facilities operated by EMOI. *See* Defs.' Reply Mem. at 5–6.

> 64.     Jane Doe III testified that her husband earned ██████████████████

██ before his disappearance. [Jane Doe III Dep. at 70:6–14, Ex. 60 ("Q. And your husband,

when ████████████████████, how much was he making a day? A. It is

████████████████. Q. And how many days a week did he work? A. It is every

day, except when he was sick.").] She provided no evidence of whether his work was steady or

seasonal, or other information that would allow a jury to extrapolate lost wages from his daily

wage. [*See, e.g.*, Jane Doe III Dep. 72:3–8, Ex. 60 ("Q. Do you have anything in writing, a bank

book, a ledger, a receipt, anything that would prove that ████████████████████

████████████████? A. No.").]

**Plaintiffs' Response:** Undisputed but incomplete. Jane Doe III testified that her husband ████████████████████████ and that he worked every day, except the rare day when he was sick. PX21, Jane Doe III Dep. 70:6-14; 89:24-25. Jane Doe III also testified that her husband was rarely ill. PX21, Jane Doe III Dep. 89:24-25.

**Defendants' Objection to Response to Paragraph 64.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe III. *See* Defs.' Reply Mem. at 14–16.

65.     Jane Doe III produced no documentation to corroborate funeral expenses or her

husband's lost wages. [*Id.* at 67:3–6 ("Q. And there [are] no written documents that show the

funeral expenses; is that right? A. No."); *id.* at 72:3–8 ("Q. Do you have anything in writing, a

bank book, a ledger, a receipt, anything that would prove that your husband ████████████

████████████████████████████████? A. No.").]

**Plaintiffs' Response:** Undisputed but incomplete. Jane Doe III is seeking moral damages. After her husband's death, Jane Doe III went to work as ██████████████ to support herself and her children. PX21, Jane Doe III Dep. 116:6-117:7. She earned less than her husband, however. *Id.* at 117:8-16. As a result, she ████████████████████████ ████████████████████ *Id.* at 117:21-118:3. The family often went hungry, as sometimes they did not even have enough money to buy rice. *Id.* at 117:11-20. Jane Doe III did not earn enough to ████████████████████████████████████. *Id.* at 118:4-119:18. Jane Doe III ████████████████████. *Id.* at 119:24-25. Because ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████." *Id.* at 120:2-121:11. Finally, Jane Doe III submitted a damages computation. PX87, Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures 5-7.

Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no relevant damages-related documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 65.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe III. *See* Defs.' Reply Mem. at 14–16. The testimony speaks for itself, and Plaintiffs do not dispute that Jane Doe III had no documentation reflecting expenses for her husband's funeral.

### D.    Jane Doe IV

66.    Jane Doe IV, her son ██████ and her neighbor ██████ provided testimony

regarding Jane Doe IV's allegations. [*See generally* Jane Doe IV Dep., Ex. 37; Deposition of

██████ dated Dec. 15, 2020 ("██████ Dep."), Ex. 63; Deposition of ██████ dated Dec. 8, 2020

("██████ Dep."), Ex. 64.]

> **Plaintiffs' Response:** Undisputed but incomplete. Jane Doe II's husband was also killed
> in his neighboring rice field, in the same attack. The witnesses to that killing (Jane Doe II
> and ██████ provided relevant testimony. In particular, four separate eyewitnesses
> identified the vehicles on the scene as vehicles that were usually parked at ██████████
> ██ *See supra* ¶¶ 48-53, *infra* ¶¶ 334-57; 374-406.

> **Defendants' Objection to Response to Paragraph 66.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph.  It is immaterial that certain witnesses claimed to observe a military
> vehicle at ██████ at unidentified times unrelated to the alleged incident.  Further,
> Plaintiffs have put forth no evidence to support the claim that Jane Doe II's husband was
> allegedly killed in the same attack or in a neighboring rice field.  Two of the eyewitnesses
> whom Plaintiffs mention were Jane Doe II and her third-party witness, who testified
> about a different incident in a different village, and the other two did not identify any
> specific vehicles.  ██████ did not witness the attack on Jane Doe II's husband and
> thus is incapable of identifying "vehicles on the scene."  *See* Defs.' Reply Mem. at 6;
> *infra* ¶ 390.

67.    Jane Doe IV's husband, John Doe X, was shot ████████████████████

████████████████████████████████████████. [Jane

Doe IV Dep. at 51:12–21, Ex. 37 ("Q. [W]as your house in 2000 close to any Exxon facilities?

A. Yes, my house in ██████ is close to Exxon facilities. Q. [] Do you have a sense of how far

the distance is from your house to the Exxon facility? A. It is about ██████.");  *id.* at 55:18–

23 ("A. [M]y husband was out from the house to the rice paddy field and then we heard gunfire

and we got to the ground, and my husband was in the rice paddy field and got shot and fall there

in the rice paddy field.").] In each complaint, Jane Doe IV alleged that her husband, John Doe X,

████████████████████████████████████. [Compl. ¶ 58, ECF No. 3;

Am. Compl. ¶ 77, ECF No. 129-1; 2nd Am. Compl. ¶ 186, ECF No. 465.] In her 2007

interrogatory responses, Jane Doe IV alleged that ██████████████████████

███████████████████████████████████████████████████████████████

██████████. [Pl. Jane Doe IV's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. at

2–3, Ex. 65].

**Plaintiffs' Response:** Disputed. Undisputed that Jane Doe IV's ██████████

██████.⁷ Undisputed that Jane Doe IV's husband was ████████████████ when he

was shot and killed. Undisputed that Plaintiff, the witnesses and Plaintiff's husband

█████████ Undisputed that Plaintiff, her husband, and the villagers were afraid of the

soldiers. Disputed that there is a material difference between the 2007 interrogatory

answers and the deposition testimony. In her 2016 responses, Plaintiff made clear that she

████████████████████████████████████████████████ *See* PX93, Pl.

Jane Doe IV's 2016 Supp. Resp. to ExxonMobil Oil Corp.'s First Set of Interrogs. at 3.

**Defendants' Objection to Response to Paragraph 67.** Defendants object to this

Response to the extent it attempts to recast the clear record. In 2007, Jane Doe IV stated

that she and her husband ████████████, but in 2016 and in her 2020 testimony, Jane Doe

IV claimed that she was ████████████████████████████

68.     In her 2007 responses to Defendants' first set of interrogatories, Jane Doe IV

claimed that ███████████████████████████████████████████████████

██████." [Pl. Jane Doe IV's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. at 3, Ex.

65.]

**Plaintiffs' Response:** Undisputed but incomplete and immaterial, particularly to the

extent Exxon erroneously seeks to imply the testimony is inconsistent. Plaintiff stated

that "soldiers working for the Defendants" conducted the attack in every interrogatory

answer (including in 2007, see Defs. Exh. 65 at 2) and in her deposition testimony—as

did all five eyewitnesses. *See supra* ¶¶ 48-53; *infra* ¶¶ 338-343, 379-389; *see also* PX93,

Pl. Jane Doe IV's 2016 Supp. Resp. to ExxonMobil Oil Corp.'s First Set of Interrogs. at

8. (Identifying soldiers from ████████ Indeed, all the eyewitnesses specifically

identified the vehicles parked at ████████ and the soldiers stationed at ████████ the

attackers. *See supra* ¶ 50; *infra* ¶¶338-342, 390. The 2007 interrogatory response also

described the soldiers as from ██████ which was a colloquial term many villagers used to

refer to the Exxon soldiers based on ████████████████████████████████

████████—as do Exxon's own documents. *E.g.*, PX94, CA00010008793, at '805 (June

1999 memo stating, "during the last month, ████████████████████████████

_____

⁷ Plaintiffs ask the Court to take judicial notice of this ████ *See supra* n. 5.

67

guard facilities and to patrol, for example, ████████████████ ."); PX95, CA0001121093 at '094 ("████████████████████████ "); PX97, CA0001078251 (████████████ ████████████████████████ ). Indeed, Exxon's own documents describe ████████ ████████████████████████ PX98, CA0001194310 at '311; see also ¶304.

**Defendants' Objection to Response to Paragraph 68.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. Moreover, Plaintiffs' baseless conclusions that Indonesian soldiers were "working for the Defendants" is unsupported by evidence and thus cannot create a genuine dispute. Defendants further object to the use of ████ as a short-hand term to refer to "Exxon soldiers"—this is argument not supported by evidence. ████ was neither owned nor operated by EMOI. *See infra* ¶ 555.

69.    In her 2016 responses to Defendants' first set of interrogatories, Jane Doe IV claimed that ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████ ." [Pl. Jane Doe IV's 2016 Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. at 8, Ex. 66.] Jane Doe IV's story changed again at her deposition when she admitted that: ████████████████████████████ [Jane Doe IV Dep. at 51:18– 21, 52:5–8, Ex. 37 ("Q. [] Do you have a sense of ████████████████ ████████████████████████████████████ ████████████████████████████ .")]; she did not see soldiers leaving or returning to ████████ on the day her husband was shot [*id.* at 69:7–13 ("Q. My question to you, [Jane Doe IV], is you yourself did not see soldiers come out of the facility, shoot your husband, and go back to the facility; is that correct? A. At the day of the incident, I didn't see, I wasn't able to see because I was taking care of my husband.")]; and, she could not see ████████ from her house [*id.* at 67:17–21 ("Q. From the back of your house you could see the Exxon

facility? A. So I couldn't see the Exxon facility from the back of my house because there were

many houses from there[.]").]

> **Plaintiffs' Response:** Undisputed but incomplete and immaterial. It is unsurprising that
> occasional misunderstandings arose over the course of discovery. Jane Doe IV cannot
> read in any language and cannot speak English. PX22, Jane Doe IV Dep. 7:19-20 ("I
> cannot read this document. I can't read."); *id.* at 8:18-23 ("Q. Do you understand Bahasa,
> [Jane Doe IV]? A. No, I do not. Q. Do you understand any English? A. It is even more
> difficult for understanding English".). As a result, her interrogatory responses had to be
> read to her over the telephone by a translator for approval. Exxon had the opportunity to
> cross-examine Jane Doe IV for seven hours regarding the response and that cross-
> examination revealed that other witnesses, not Jane Doe IV herself, had seen the soldiers
> enter and exit ███████ on the day of the attack. *Id.* at 63:4-13 (uncle saw soldiers at
> ███████ after attack); *id.* at 67:11-25. However, it is undisputed that all of the
> eyewitnesses identified the soldiers from ███████ as the perpetrators of the attack and
> identified the vehicles used as ███████ vehicles. *See supra* ¶¶ 48-53; *infra* ¶¶338-342,
> 390.

> **Defendants' Objection to Response to Paragraph 69.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph. The testimony speaks for itself. Defendants further object to this
> Response as the purported evidence does not support Plaintiffs' proposition. None of the
> "other witnesses" to the attack testified that the Indonesian soldiers entered or exited
> ███████ the day of the alleged attack. Additionally, statements by these other
> witnesses are inadmissible out-of-court statements and are not capable of being made
> admissible at trial. *See* Defs.' Reply Mem. at 11–14.

70.     Neither Jane Doe IV nor her non-party witnesses knew the identities of any of the

soldiers present when John Doe X was shot or which of those soldiers actually shot him. [*Id.* at

93:15–24 ("Q. [Jane Doe IV], you also told us that at the time you heard gunfire, you were on the

ground in the back of your house and you saw out of the corner of your eye some soldiers who

may have fired the shots. Do you recall giving us that testimony? A. Yes, I do. Q. You told us

that you don't know their names, correct? A. Yes, I don't know their names."); *id.* at 93:25–95:4

("Q. And these specific soldiers who may have fired the shots that killed your husband, you

don't know who they are at this time, correct? . . . A. I don't know their names. At that time I

recognize their face, but not their names. I can recognize their face. Q. Can you describe what

they look like? A. So they were tall and big and with dark skin and they have a bigger spirit.");

████ Dep. at 50:13–23, Ex. 63 ("Q. Your father [John Doe X] was a hundred meters away from you, correct? A. That is correct. Q. After they pas[sed] you and continued to walk a hundred meters, all you could see was the back of their heads, correct? [] A. That is correct."); *id.* at 63:15–21 ("Q. Do you know the names of any of the soldiers, who were in your village, on December 4th of 2000? A. No. Q. Do you know the names of any of the soldiers who shot your father? A. No."); ████ Dep. at 84:23–85:2, Ex. 64 ("Q. Did you see [John Doe X] get shot? A. The shooter—I don't see the shooter, but the result of the shooting, yes, I see there. I see the body directly. Even I—I get involved in carrying the body.").]

**Plaintiffs' Response:** Disputed. Both ████ and ████ recognized individual soldiers on the field—including the soldier who shot Jane Doe IV's husband—as soldiers from ████ because those soldiers had bullied them on the way to and from school. *See infra* ¶¶386-389. Jane Doe IV also recognized the soldiers from the village. *See infra* ¶¶389-392.

████ was outside in the yard when the soldiers arrived. PX33, ████ Dep. 8-9. The soldiers walked past him to get to ████████████. *Id.* at 9:18-22. ████ recognized five to ten of the soldiers:

> Q.   How many of the soldiers did you recognize?
>
> A.   It's about 5 to ten.
>
> Q.   Can you tell me where you recognized the soldiers from?
>
> A.   Within the yard of Exxon.
>
> Q.   Did that Exxon yard have a name?
>
> A.   It's ████

*Id.* at 9:23-10:19. ████ also recognized a number of soldiers. PX32, ████ Dep. 9:25-10:3 ("Q. ████ did you recognize any of the soldiers who were there that day? A. Yes, yes, I do. About six of them, I know them.").

Both men recognized the soldiers because when they passed ████ on the way to and from school, the soldiers on guard duty at the ████ would harass them: "if we forgot to greet them or forgot to salute them or say hello to them, and then they would call us and ask—tell us to do the pushup, or sometimes to sing the Indonesian Anthems." *Id.* 10:15-25. *See also* PX33, ████ Dep. 11:4-13:10 (soldiers would ask boys to recite or sing, "and they would also punch us … I was not only scared but traumatized by them").



▮▮▮ watched as the soldiers walked towards his father in the field: "I kept watching at that time, and they were pointing their guns onto my father, at my father." PX33, ▮▮▮ Dep. 15:5-13. ▮▮▮ saw the soldiers shoot his father. *Id.* The soldier who shot his father was one of the soldiers from ▮▮▮

> Q.   Who shot him?
>
> A.   The soldiers.
>
> Q.   Did the soldier that shot your father, was that the same soldier that you saw at ▮▮▮
>
> A.   Yes
>
> Q.   Did that soldier kill your father?
>
> A.   Yes.
>
> ….
>
> Q.   Did you recognize the soldiers that shot your father?
>
> A.   Yes.
>
> Q.   Where else did you see the soldiers who shot your father?
>
> A.   ▮▮▮

PX33, ▮▮▮ Dep. 16:2-12, 23:10-15.

Jane Doe IV also recognized the soldiers as the same soldiers who patrolled the village and came to her house later to question her about her husband. PX22. Jane Doe IV Dep. 27:7-12 ("Q. What is your evidence that they were Exxon soldiers? A. So when they have patrol, they go out from Exxon facility and come back to the Exxon facility."); *id.* at 61:16-62:11 ("then after that we saw the same soldiers after the incident, we saw the same soldiers, they have the same patrol through the village and then they passed my house."); *id.* at 65:13-66:2 ("Q. Did you or did you not see the soldiers who fired the shots? A. Yes, I did see the soldiers… we also saw the soldiers when they left and we pick up the body of my husband, and then two days later the same patrol came again and that's when they asked me if I were the wife of a GAM member.").

▮▮▮ and Jane Doe II recognized the vehicles used by the soldiers that day as vehicles regularly parked at ▮▮▮ and used by Exxon. *See supra* ¶ 50, *infra* ¶¶338-342. In addition, Jane Doe IV and ▮▮▮ also recognized the vehicles used by the soldiers that day as vehicles regularly parked and used at ▮▮▮ *See infra* ¶390; PX32, ▮▮▮ Dep. 14:13-17 ("Q. Did they arrive on foot or by vehicle? A. When they were arriving, passing our house, they were on vehicles. But when they pass by our house, they were walking and they were walking very fast."); *id.* at 14:23-15:5 ("Q. Had you ever

seen those kind of vehicles before? A. Yes. I had seen them before. They were at the
Exxon—within the Exxon fence at the big post. Q. And is that—do you mean Exxon
███████    A. Yes. ███████

**Defendants' Objection to Response to Paragraph 70.**  Defendants object to this
Response as it does not dispute or offer any evidence responsive to any material aspect of
the Paragraph.  The testimony speaks for itself.  Defendants further object to this
Response as it addresses unrelated and immaterial issues that do not create a genuine
issue of material fact.  It is immaterial that lay witnesses claimed to observe Indonesian
military personnel and a military vehicle at ███████ at unidentified times unrelated to
the alleged incident.  *See* Defs.' Reply Mem. at 6.  Further, ██████ did not see which
Indonesian soldier shot Jane Doe IV's husband, and ██████ does not have a basis for his
testimony regarding who shot his father because, by his own admission, he claimed to
recognize only a few of the Indonesian soldiers allegedly present at the time of the
incident and testified that ████████████████████████████.

71.       Neither Jane Doe IV nor her non-party witnesses knew who supervised,

commanded, directed, or paid the soldiers who killed John Doe X. [Jane Doe IV Dep. at 74:4–

75:7, Ex. 37 ("Q. You don't know who those soldiers' commanders were, correct? A. I don't

know. Q. You don't know who gave those soldiers their orders that day, correct? A. Yes, that is

correct. Q. You don't know what those soldiers' mission was on that day, correct? A. I don't

know what mission means. I'm just a villager. I'm not really—I don't really understand mission

here. Q. You don't know what their orders were on that day, correct? A. Yes, that is correct. Q.

And you don't know who was directing their activities that day, correct? A. Yes, that is correct, I

don't know. What I know is that day was the anniversary of GAM. Other than that, I don't know.

Q. And you don't know who paid those soldiers on that day, correct? A. That is correct. Maybe

it's Exxon who paid them. Q. Are you speculating, [Jane Doe IV]? A. Yes."); ██████ Dep. at

62:25–63:14, Ex. 63 ("Q. Okay. Do you know who the commander officer of the 5 to 10 soldiers

was on December 4th of 2000? A. No. Q. Do you know who gave the soldiers. . . the orders that

they were carrying out on December 4th of 2000? A. No. Q. Do you know what orders the

soldiers were carrying out on December 4th of 2000? A. No."); ██████ Dep. at 70:5–11, Ex. 64

("Q. Do you know who—who the commander was for any of the six soldiers? A. I—I do not know their commander. Q. Do you know what military person in the Indonesia Army it was that gave them their orders on December 4th of 2000? A. I do not know.").] Jane Doe IV admitted that she was only speculating that the Indonesian soldiers who shot her husband may have been paid by Defendants. [Jane Doe IV Dep. at 75:2–7, Ex. 37 ("Q. And you don't know who paid those soldiers on that day, correct? A. That is correct. Maybe it's Exxon who paid them. Q. Are you speculating, [Jane Doe IV]? A. Yes."); *see also id.* at 27:7–21 ("Q. And what is your evidence that they were Exxon soldiers? A. So when they have patrol, they go out from Exxon facility and come back to the Exxon facility too. Q. Is that all of the evidence that you have? A. Yes. Q. Were these soldiers Indonesians or white Americans? A. They were Indonesians, just like us, more Javanese. Q. Were they wearing military uniforms? A. Yes."); *id.* at 69:7-13 ("Q. My question to you, [Jane Doe IV], is you yourself did not see soldiers come out of the facility, shoot your husband, and go back to the facility; is that correct? A. At the day of the incident, I didn't see, I wasn't able to see because I was taking care of my husband.").]

> **Plaintiffs' Response:** Disputed. All of the eyewitnesses identified the relevant soldiers as soldiers working for Exxon at ▮▮▮▮. *See supra* ¶¶ 48-53; *infra* ¶¶342, 344,346,379-392; *see also* PX22, Jane Doe IV Dep. 26:14-21 ("I don't know if he was killed by Indonesian soldiers or not. I'm not a smart person. What I know is he was killed by Exxon soldiers.").

> **Defendants' Objection to Response to Paragraph 71.** Defendants object to this Response as it is a baseless conclusion not supported by evidence, is improper argument, and thus cannot create a genuine issue of material fact. Baseless conclusions, such as the use of the phrase "Exxon soldiers," cannot create a genuine dispute. *See* Defs.' Reply Mem. at 7–10.

72.     Jane Doe IV testified that her ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, depending on the type of work. [*Id.* at 105:12–106:6



("A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. Okay. And what kind of work, different work, did he do? You said what he got depended on

the kind of work he d*id.* Other than ████████, what else did he do? A. What I meant by

depending on what kinds of work was if ████████████████████

████████████████████████████████████

████████████████████████.").]



> **Plaintiffs' Response:** Undisputed but incomplete and misleading. Undisputed that Jane
> Doe IV testified that her husband earned ████
> ████████████ depending on the type of work. Jane Doe IV also testified that her
> husband worked every day of the week. PX22, Jane Doe IV Dep. 104:9-13. ████ also
> testified that Jane Doe IV's husband was a diligent hard worker, who worked every day
> whether ████████████████████. PX32, ████ Dep. 32:11-
> 33:4.

> **Defendants Objection to Response to Paragraph 72.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a
> genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe IV. *See*
> Defs.' Reply Mem. at 14–16.

73.    Both Jane Doe IV and ████ testified that they did not have any documentation

corroborating Jane Doe IV's husband's income or lost business opportunities. [Jane Doe IV Dep.

at 106:3–6, Ex. 37 ("Q. Do you have any documents, [Jane Doe IV], that show how much money

your husband earned on a weekly basis? A. No."); ████ Dep. at 67:3–5, Ex. 63 ("Q. Do you

have any papers showing how much money your father earned in 2000? A. No."); *see also* Jane

Doe IV Dep. at 107:14–17, Ex. 37 ("Q. So at the time [December 2000] he wasn't exploring any

business opportunities, correct? A. No.").]

> **Plaintiffs' Response:** Disputed. Undisputed that Jane Doe IV, ████████
> ████████████████████████, did not possess
> documents. *See generally supra* ¶ 47 (detailing counsel's document collection process).
> Disputed to the extent Exxon implies that the testimony of three witnesses is insufficient
> to prove damages.

> **Defendants Objection to Response to Paragraph 73.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of
> evidence of quantifiable loss as to Jane Doe IV. *See* Defs.' Reply Mem. at 14–16.

Plaintiffs do not dispute that neither Jane Doe IV nor ███ had any documentation reflecting Jane Doe IV's husband's income or lost business opportunities.

74.     Jane Doe IV admitted that she did not have any witnesses who could provide evidence regarding how much her husband earned. [Jane Doe IV Dep. at 106:7–10, Ex. 37 ("Q. Do you have any witnesses who can provide testimony as to how much money your husband made while he was alive? A. No.").]

**Plaintiffs' Response:** Undisputed but incomplete. Both ███ and ███ provided testimony in support of Jane Doe IV's damages claim. *See infra* ¶¶404-406.

**Defendants Objection to Response to Paragraph 74.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe IV. *See* Defs.' Reply Mem. at 14–16. The testimony speaks for itself—Plaintiffs do not dispute that Jane Doe IV's witnesses could not provide evidence regarding her husband's earnings.

75.     Jane Doe IV did not pay for her husband's funeral. [Jane Doe IV Dep. at 108:9–11, Ex. 37 ("Q. So you didn't actually pay anything for the funeral? A. No.").] Yet, Jane Doe IV requested ███████████████████████████████████████. [Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures at 8, Ex. 59.]

**Plaintiffs' Response:** Undisputed but incomplete. Jane Doe IV's neighbors paid for the funeral. PX22, Jane Doe IV Dep. 108:5-11. The funeral was not free.

**Defendants Objection to Response to Paragraph 75.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.

76.     Jane Doe IV did not produce any documentation corroborating any other damages claims. [Jane Doe IV Dep. 108:12–15, Ex. 37 ("Q. Do you have any documents, [Jane Doe IV], that support your damages claims in this case? A. No."); ███ Dep. at 67:12–14, Ex. 63 ("Q. Do you have any papers showing how much the funeral cost? A. No.").]

**Plaintiffs' Response:** Undisputed but incomplete. ███ ███ and Jane Doe IV all provided testimony relevant to moral damages. *See infra* ¶¶404-406. Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in

rural subsistence economies and most cannot read, almost no relevant damages-related documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 76.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe IV. *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that Jane Doe IV produced no documentation corroborating her claims or reflecting funeral expenses.

### E.    Jane Doe V [Successor to John Doe I]

77.    Jane Doe V was the only witness who provided testimony regarding the

allegations relating to John Doe I, her husband. [*See generally* Deposition of Jane Doe V, dated

Sept. 24, 2020 ("Jane Doe V Dep."), Ex. 67.]

**Plaintiffs' Response:** Disputed. Other witnesses, including the experts and Defendants' own witnesses provided testimony relevant to the allegations. *See infra* ¶¶176-305.

**Defendants' Objection to Response to Paragraph 77.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. No witnesses other than Jane Doe V provided testimony particular to Jane Doe V's claims.

78.    Jane Doe V had no personal knowledge of who abducted her husband, John Doe

I. [*Id.* at 32:11–21 ("Q. Did you see your husband get taken? A. No, she didn't see directly, but

when he was being returned. Q. And so I know this is hard, but what you learned about what

happened to him, he told you? A. Yes. Q. Did anyone else tell you anything about what

happened to him? A. No.").]

**Plaintiffs' Response:** Disputed. Undisputed that Jane Doe V did not witness the attack on her husband, but disputed that she lacks personal knowledge of who abducted her husband. Indeed, it is undisputed that soldiers brought Jane Doe V's husband back to the house. *See* PX23, Jane Doe V Dep. 62:20-25 ("Q. who brought your husband back? A. the soldiers brought him home. Q. did any of the soldiers come in your house? A. yes, they did, five of them came in."). At that time, Jane Doe V was ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 62:11-19.

**Defendants' Objection to Response to Paragraph 78.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself.

79.     Jane Doe V did not know who employed the Indonesian soldiers who abducted

her husband. [*Id.* at 37:2–7 ("Q. Do you know who those soldiers worked for? A. She doesn't

know. Q. Did you husband tell you anything else about the men who took him? A. No.").]

**Plaintiffs' Response:** Disputed. Defendants cherry pick a snippet of testimony to create a misleading impression. The witness had already testified that her husband told her that the men who took him worked at Exxon's security post and that he knew who the soldiers were because they were stationed ████████████████████████. PX23, Jane Doe V Dep. 34:17-22; 36:4-11.[8] The question "did your husband tell you anything *else* about the men who took him" came after that testimony (emphasis added). *Id.* at 37:5-7.



When Jane Doe V's husband was ████████████████████████████████ . *Id.* at 63:4-23 ("████ "); PX99, DOE005050 (photograph of Jane Doe V's husband showing injuries); PX23, Jane Doe V Dep. 37:23-38:18 (Jane Doe V identifies photograph of husband). Jane Doe V's husband was in shock when he came: "he was in shock and shaking because he felt very painful." *Id.* at 63:24-64:2; *see also id.* at 64:11-14 ("he felt terrible pain and he cried all that night").

As soon as Jane Doe V's husband was able to speak, in shock and crying, "he said he was taken by soldiers ████████████████████████████ " *Id.* at 64:11-23. *See also id.* at 64:15-65:13 (Jane Doe V's husband told her Exxon soldiers took him to ████████ and tortured him). The family had no pain medication at their house, so Jane Doe V's husband suffered without any medication for three days with ████████████ . *Id.* at 65:24-66:10.

Exxon had security posts and patrols near ████████ , along the route driven by Jane Doe V's husband. PX100, CA0001047835 at '835-36 (summary of ████████████ procedures stating that prior to ████████████ "the TNI infantry deploy mobile patrols (hardened pick-up trucks) of 10 troops each approximately one kilometer to the North, East and West . . . . [T]he TNI Infantry remain on station/mobile patrol until ████ ."); PX101, CA0001334807 (████████████████████████████████████ ."); PX103, CA0001364429 ████████████████ ."); PX86, CA0001182942 (████████

---

[8] Note, the translator later corrected his translation of "post office" and clarified that he meant security post. *Id.* at.35:18-20.

**Public Redacted Copy**



); PX104 CA0001333975

); PX105, CA001334447 (

); PX16, Connor Dep. 64:3-9 (testifying that

); PX26, John Doe II Dep. 141:15-20 ("What I know is in that Exxon's facilities near my village like          there were so many posts. And sometimes when people tried to pass that road, they would stop them and check their IDs and ask them questions. And so people were afraid at that time.").

Finally, it is undisputed that          was operated by Exxon. PX106, Deposition Notes Produced by Defendants, EMOI 30(b)(6) (Snell) Dep. Ex. DX32, at Topic 3(f) p.1; PX107, CA0001007902 at '937

); PX108, Defs. Resps. & Objs. to Pls.' Jan. 2016 Requests for Admissions to All Defs., Req. Nos. 39 & 40 (

).

**Defendants' Objection to Response to Paragraph 79.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  Additionally, the statement attributed by Jane Doe V to her husband is inadmissible hearsay not subject to an exception and so cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 11–14.  Even if the hearsay statement were admitted, it does not in any way connect the Indonesian soldiers who allegedly injured Jane Doe V's husband.

80.    Jane Doe V did not know where her husband was taken when he was abducted, or where he was located at any time while he was gone. [*Id.* at 62:2–6 ("Q. Do you remember when your husband disappeared in 2001? A. Yes, I remember when he was lost, I just didn't know where he went or where he was taken to.").] Nor did Jane Doe V know why the Indonesian soldiers assaulted and abducted her husband. [*Id.* at 44:9–11 ("Q. Do you know why the military attacked your husband? A. She doesn't know.").]

**Plaintiffs' Response:** Disputed. While her husband was missing, Jane Doe V did not know where he was. PX23, Jane Doe V Dep. 62:7-16 (Jane Doe V was still . She was worried and cried day and night while he was missing). But soldiers brought her husband home, *see supra* ¶ 78, *infra* ¶¶411-412, and her husband, still in shock and crying, told Jane Doe                    ." PX23, Jane Doe V Dep. 64:11-23; *see also id.* at 64:24-65:13 (Jane Doe V's husband told her Exxon soldiers                    ).

**Defendants' Objection to Response to Paragraph 80.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Moreover, Plaintiffs' use of the conclusory terms "Exxon soldiers" and "Exxon post" cannot create genuine issues of material fact. *See* Defs.' Reply Mem. at 7–10. And the statement attributed by Jane Doe V to her husband is inadmissible hearsay not subject to an exception and so cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 11–14.

81.    John Doe I never told his wife the identities of the soldiers who abducted him or whom they worked for. [*Id.* at 37:2–17 ("Q. Do you know who those soldiers worked for? A. She doesn't know. Q. Did your husband tell you anything else about the men who took him? A. No. Q. He told you that he knew they were Exxon because they worked near Exxon's post; is that correct? A. Yes. Q. Did he ever tell you any of their names? A. No. Q. Did he ever tell you anything else about them? A. No.").] Jane Doe V ███████████████████████████

██████████████████████████. [Pl. Jane Doe V's Objs. & Resps. to Defs.' 1st Reqs. for Admis. at 18, Ex. 68 (█████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████.").] She testified that John Doe I told her the soldiers were "Exxon soldiers" because he had previously seen some of them on a road near Arun Field, along with many other soldiers whom he saw on that road and in the area. [Jane Doe V Dep. at 36:2–8, Ex. 67 ("Q. Did your husband say how he knew that [those] people were Exxon? A. He just know because he usually came across that street. Q. How did he just know? A. I don't know. He said he just knew, that's what he told me."); *id.* at 36:22–25 ("Q. During the years when your husband worked on that road, there were lots of soldiers on that road, right? A. Yes.").]

**Plaintiffs' Response:** Disputed. After he was brought home by five soldiers, and as soon as he was able to speak, in shock and crying, Jane Doe V's husband told her he was taken by soldiers working ██████████ and tortured. PX23, Jane Doe V Dep. 64:11-23 ("he said . . ███████████."). He identified the soldiers as Exxon soldiers. *See supra* ¶ 80; *infra* ¶¶ 412-413.

Public Redacted Copy

**Defendants' Objection to Response to Paragraph 81.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. The testimony and sworn interrogatory responses speak for themselves. Moreover, Plaintiffs' use of the conclusory term "Exxon soldiers" cannot create genuine issues of material fact. *See* Defs.' Reply Mem. at 7–10. And the statement attributed by Jane Doe V to her husband is inadmissible hearsay not subject to an exception and so cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 11–14.

82.     The only testimony Jane Doe V provided about her husband's income is that he earned ███████████████████████████████ prior to his abduction. [*Id.* at 51:25–52:3 ("Q.



███████████████████████████? A. Yes.").]

**Plaintiffs' Response:** Undisputed, except that this fact is not material. Jane Doe V testified that her husband earned ████████████████ a day prior to his abduction.

**Defendants' Objection to Response to Paragraph 82.** N/A

83.     Jane Doe V did not produce any documentation reflecting her husband's lost wages or any other damages she may be seeking, nor did she know the amount of hospital expenses associated with her husband's care, because he did not tell her. [*Id.* at 52:4–7 ("Q. Do you have any papers or anything that shows how much money your husband made? A. No."); *id.* at 52:22–53:7 ("Q. Do you know how much money you paid or he paid to the hospital for those visits? A. She doesn't know, because she didn't ask when he returned home from the hospital. Q. And you don't have any bills or anything from the hospital, correct? A. No, he didn't give it to her. Maybe he kept with himself.").]

**Plaintiffs' Response:** Disputed. Like all Plaintiffs, Jane Doe V's damages computation reflects damages she is seeking, including her husband's lost wages and expenses related to medical care. PX87, Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures at 10. Jane Doe V is also seeking moral damages as authorized under Indonesian law. Jane Doe V testified that after the attack, she had to help her husband with basic tasks, including bathing him. PX23, Jane Doe V Dep. 67:15-19. Jane Doe V's husband was afraid after the attack. *Id.* at 69:3-5. Jane Doe V's husband was unable to work, and the family did not have enough money for food. *Id.* at 68:3-8 ("sometimes we didn't even have the rice, our basic food. Q. did you skip meals? A. yes, we did"). The children had to drop out of school because the family could no longer afford the school fees. *Id.* at 68:9-15.

Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural barter economies and most cannot read, almost no relevant documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 83.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe V.  *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that Jane Doe V did not produce any documentation reflecting her husband's lost wages or medical expenses.

## F.    Jane Doe VI [Successor to John Doe III]

84.    Jane Doe VI and her daughter, ███████ provided testimony regarding the allegations relating to John Doe III, Jane Doe VI's son. [*See generally* Deposition of Jane Doe VI, dated Sept. 27, 2020 ("Jane Doe VI Dep."), Ex. 69; Deposition of ███████ dated Nov. 17, 2020 ("███████ Dep."), Ex. 70.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 84.**  N/A

85.    Jane Doe VI and ███████ testified that John Doe III was beaten and shot by Indonesian soldiers ███████████████████ after soldiers came out of the facility. [███████ Dep. at 99:11–14, Ex. 70 ("Q. So your testimony is that your brother was walking, and soldiers ███████████ and shot him; is that right? A. That is correct."); Jane Doe VI Dep. at 123:5–8, Ex. 69 ("Q. Did the Exxon soldiers from ███████ who came out of ███████ shoot [John Doe III]? A. Yes."); *id.* at 71:6–8 ("Q. You said that the soldiers beat your son? A. Yes.").]

**Plaintiffs' Response:** Undisputed but incomplete. Both Jane Doe VI and ███████ testified that soldiers came out of the ███████ gate and that the ███████ soldiers beat and shot the victim, John Doe III. *See infra* ¶¶ 421-432.

For example, ███████ testified that she, her mother, and her brother were part of a large group of villagers who had left their homes and were walking to Exxon Point A to seek refuge:

Q.      As you were walking on the road, did you walk near any Exxon facilities?

A.      Near the gate of Exxon.

Q.      Did that Exxon facility have a name?

A.      █████████

        . . . .

Q.      Could you see your brother from where you were standing?

A.      Yes, I could see.

Q.      Could you see the gate of          from where you were standing?

A.      Yes.

Q.      Can you describe what happened?

A.      Exxon soldiers came out of the gate and they shot my brother.

[ discussion regarding crying]

Q.      Did you see the soldiers raise their weapons?

A.      Yes, I did see. Yes, I see—I saw.

Q.      Did you hear a gunshot?

A.      Yes.

Q.      Did you see your brother fall?

A.      Yes.

Q.      After your brother fell, what did the soldiers do?

A.      After he fell, he was beaten again.

Q.      Who beat him?

A.      The Exxon soldiers who came out and who shot him, and then they be[a]t him.

PX34, █████████ Dep. 8:24-11:5 (immaterial statements by translator omitted and typographical errors corrected). Jane Doe similarly testified that:

Q.      Could you see the Exxon soldiers leave          ?

82

A.    Yes.

Q.    Did they come out of the gate?

A.    Yes.

Q.    Did the Exxon soldiers from ▮▮▮▮▮ who came out of the gate shoot [John Doe III]?

A.    Yes.

PX24, Jane Doe VI Dep. 122:15-123:8; *see also infra* ¶ 432.

▮▮▮▮▮ was operated by Exxon. *See infra* ¶¶280-281, 433. Exxon stationed soldiers at ▮▮ at the relevant time. *See infra* ¶434.

**Defendants' Objection to Response to Paragraph 85.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. It is undisputed that the alleged injury occurred on a road and outside of the ▮▮▮▮▮ facility. Plaintiffs have provided no evidence that the Indonesian soldiers who allegedly shot John Doe III were assigned by the Government of Indonesia to ▮▮▮▮▮ at the time of the alleged incident or were otherwise connected to Defendants. Defendants further object to Plaintiffs' claim that Exxon "stationed soldiers" at ▮▮ in that it misleadingly suggests that Defendants could deploy and control the deployment and assignment of the armed military of a sovereign nation.

86.    In July 2007, Jane Doe VI submitted sworn testimony in which ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. [Pl. Jane Doe VI's Suppl. Resp. to ExxonMobil Oil

Corp.'s 1st Set of Interrogs. (July 28, 2007) at 2–3, Ex. 71 ("▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮."] Nine years later, in Jane Doe VI's 2016 supplemental interrogatory

responses, Jane Doe IV changed her story and claimed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [Pl. Jane Doe VI's 2016 Suppl. Resp. to

ExxonMobil Oil Corp.'s 1st Set of Interrogs. (Jan. 24, 2016) at 8, Ex. 72 ("

.").] In 2020, Jane Doe IV testified that she was a firsthand witness to the alleged incident and that she directly witnessed her son being assaulted and shot. [Jane Doe VI Dep. at 71:6–11, Ex. 69 ("Q. You said that the soldiers beat your son? A. Yes. Q. Did you see that? A. Yes. Yes, I see it directly. I was walking behind him."); *id.* at 76:5–7 ("Q. Did you see a soldier shoot your son? A. Yes.").] Later in the deposition, she testified that she did not witness the shooting or assault, only to reverse herself once again and testify that she had seen the shooting and assault. [*Id.* at 100:4–15 ("Q. Is it true that on the day your son was shot, you heard gunshots but did not see your son get shot or beaten; is that true? A. Yes, that is true. Q. That you only heard the gunshots but you did not see your son [John Doe III] get shot or beaten? A. Yes, that is true. Q. So you did not see your son get shot? A. No. I was behind."); *id.* at 100:16–20 ("Q. Did you see [John Doe III] get shot? A. Yes, I d*id.* Q. Did you see your son get beaten? A. Yes, I d*id.*").]

> **Plaintiffs' Response:** Disputed. Because it is undisputed that two witnesses saw John
> Doe III shot by Exxon's solders who worked at ▮▮▮▮▮▮ Exxon seeks to distract by
> mischaracterizing one of the two witness' written interrogatory responses. First, Plaintiffs
> object to Exxon's statement in its entirety as immaterial to its motion, as credibility
> determinations (including related to an uneducated, somewhat garrulous, elderly
> witness's ability to relate, through a translator, an extremely traumatic event) are for a
> jury to decide. *See* Pls. Mem. § V.A.2.c & n.**Error! Bookmark not defined.** Second,
> Plaintiffs object to the Exxon's reference to the 2007 interrogatories as "in the third
> person." Plaintiff sought to respond to an awkwardly worded interrogatory seeking
> information about " ▮▮▮▮▮▮ " (*see* PX109, ExxonMobil Oil Corp's First Set of
> Interrogatories at No. 1), as the injuries were to her son, not to herself. There is no
> genuine dispute that Plaintiff Jane Doe VI was present and witnessed the attack. *See infra*
> ¶¶424, 432. In addition, Exxon seeks to sow confusion about whether Jane Doe VI
> testified that she "saw" or "heard" John Doe III get shot and/or "saw" or "heard" John
> Doe III get beaten, particularly as the answers, in translation, varied depending on
> whether the question was compound or included a negative. *See, e.g.*, PX24, Jane Doe VI

Dep. 71:6-11; 100:4-20. There is however no dispute that Exxon soldiers from in fact shot and beat John Doe III. *See infra* ¶¶ 421-434.

**Defendants' Objection to Response to Paragraph 86.**  Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact.  The testimony and interrogatory responses speak for themselves. Jane Doe VI could not have "witnessed" the alleged shooting because she has admitted that she only heard about the event after the fact.  Moreover, Jane Doe VI did not know the identities of the soldiers that allegedly shot John Doe III, and Plaintiffs have provided no evidence that the soldiers were assigned to ████.  Moreover, Plaintiffs' and their lay witnesses' use of the phrase "Exxon soldiers" and other conclusory statements cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.

87.     In sworn interrogatory responses and during her deposition, Jane Doe VI testified

that her son, John Doe III, was ████████████████████████████████████

████████████. [Jane Doe VI Dep. at 88:6–20, Ex. 69 ("Q. Was your son eventually released

from the hospital and taken into custody by the police? A. Yes. Q. And the police held him in jail

for about a month? A. Yes. Q. And that's the Indonesian police who held him in jail for a month?

. . . A. Yes, he was taken by them, and it was about a month being interviewed in the jail."); Pl.

Jane Doe VI's Suppl. Resp. to ExxonMobil Oil Corporation's 1st Set of Interrogs. at 3, Ex. 71

("████████████████████████████████████████████████████████████████

████████████████████████████████████.").]

**Plaintiffs' Response:** Undisputed. Undisputed that John Doe III was held by the Indonesian police after the shooting. He was eventually released after legal aid attorneys and the International Committee for the Red Cross (ICRC) intervened. PX24, Jane Doe VI Dep. 90:22-93:15, 123:9-125:12.

**Defendants' Objection to Response to Paragraph 87.**  N/A

88.     Neither Jane Doe VI nor ████████ knew the identities of the soldiers involved in

the assault of John Doe III. [Jane Doe VI Dep. at 75:11–14, Ex. 69 ("Q. Did you ever find out

the names of the soldiers who you saw beating your son? A. No."); ████████ Dep. at 96:6–8,

Ex. 70 ("Q. You don't know the name of the soldiers who shot your brother, correct? A. I do not

know.").]

**Plaintiffs' Response:** Disputed. Both witnesses identified the shooters as Exxon soldiers who worked at Exxon's ███████ facility, left ███████ through the gate, and shot John Doe III. ███████ repeatedly explained, under cross examination, why she was able to identify the soldiers as Exxon soldiers. PX34, ███████ Dep. 10:6-7, 58:8-9 ("the soldiers were at Exxon's. They guard Exxon"); *id.* 66:6-8; *id.* 83:4-10 ("I saw with my two eyes. That is the evidence. Q. what evidence do you have that they were Exxon soldiers? A. The evidence when they come out from the [gate] of Exxon and they shot my brother."); *id.* 95:24-96:2 ("the evidence, I saw. They came out of the gate of ███████ and shot my brother"); *id.* 100:23-101:3. ███████ was familiar with ███████ and had seen soldiers working for Exxon at the gate on other occasions. *Id.* 14:16-15:2 (Q. ███████ did you ever pass ███████ at other times? A. Yes. Q. At those other times, when you passed ███████, did you see soldiers [working] there? A. The soldiers were at the gate. Q. And what were they doing at the gate? A. They were checking people's ID"). Jane Doe VI similarly testified that John Doe III was shot and beaten by the soldiers from ███████ : "Q. who shot him? A. the Exxon soldiers. Q. How do you know? A. the soldiers were there in ███████. Nobody else was there and I was there too." PX24, Jane Doe VI Dep. 75:21-76:4; *see also id.* at 80:6-7 ("it was the soldiers who were in Exxon's facility"); *id.* 123:5-8 ("Q. Did the Exxon soldiers from ███████ who came out of the gate shoot [John Doe III]? A. Yes."). Both ███████ and Jane Doe VI also testified that no one else had guns. PX34, ███████ Dep. 11:6-22; PX24, Jane Doe VI Dep. 73:11-17.

**Defendants' Objection to Response to Paragraph 88.** Defendants object to this Response as it is not supported by evidence, is improper argument, and offers baseless conclusions from witnesses that cannot create a genuine issue of material fact. The testimony speaks for itself, and neither Jane Doe VI nor ███████ knew the identities of the soldiers that allegedly shot John Doe III, and Plaintiffs have provided no evidence that the soldiers were assigned to ███████. Moreover, Plaintiffs' and witnesses' use of the phrases "Exxon soldiers" and "Exxon's ███████ facility" misleadingly suggest that the sovereign Indonesian military worked for EMOI.

89.     Jane Doe VI could not describe the soldiers except to say that they were

Indonesian soldiers wearing the same uniforms as other soldiers. [Jane Doe VI Dep. at 74:14–

18, Ex. 69 ("Q. Did you see the faces of the soldiers who beat your son? A. Yes, I saw their

faces, but I cannot describe them any more [sic]. It has been 20 years ago."); *id.* at 79:13–80:24

("Q. Those soldiers are all soldiers with the Indonesian military, right? A. Yes. Q. And you are

calling them Exxon soldiers simply because they are near facilities run by Exxon, right? . . . A.

Yes, it was the soldiers who were in Exxon's facility. Q. And those soldiers wore the same

uniforms as all the other soldiers who were on the road that you were traveling on, right? . . . A.

Yes, it was the soldiers who were in the Exxon's facility and then came out when they were struggling. Q. And they wore the same uniforms as the other soldiers that you saw on the road, right? . . . A. Yes, they were the same uniforms, and they had guns, each of them had guns.").]

> **Plaintiffs' Response:** Disputed. Jane Doe VI described the soldiers as Exxon soldiers who worked at          . PX24, Jane Doe VI Dep. 75:21-76:4 ("Q. How do you know? A. the soldiers were there in          . Nobody else was there and I was there too."); *id.* 79:16-80:7 ("it was the soldiers who were in Exxon's facility"); *id.* 123:5-8 ("Q. Did the Exxon soldiers from          who came out of the gate shoot [John Doe III]? A. Yes."). Jane Doe VI testified that she saw their faces, although twenty years after the event she described them only as having black, straight hair. *Id.* 74:14-18; 75:7-10.

> **Defendants' Objection to Response to Paragraph 89.** Defendants object to this Response as it is not supported by evidence, is improper argument, and offers baseless conclusions from witnesses that cannot create a genuine issue of material fact. The testimony speaks for itself. Jane Doe VI did not know the identities of the soldiers that allegedly shot John Doe III, and Plaintiffs have provided no evidence that the Indonesian soldiers who allegedly assaulted John Doe III were assigned by the Government of Indonesia to          at the time of the alleged incident. Plaintiffs' use of the phrase "Exxon soldiers" misleadingly suggests that the sovereign Indonesian military worked for EMOI.

90.    Jane Doe VI did not know anyone who has ever worked for Exxon, and did not know whether anyone at Exxon knew about her son's assault. [*Id.* at 82:21–83:6 ("Q. Do you know anyone who works for Exxon? A. No. Q. Do you know anyone who has ever worked for Exxon? A. No, I don't. Q. Do you know whether anyone from Exxon knew about what was happening to your son? A. No.").]

> **Plaintiffs' Response:** Disputed. Undisputed to the extent the statement refers to U.S.-based employees for Exxon. Otherwise disputed, especially to the extent Defendants imply that Jane Doe VI could not identify the Exxon military security who shot John Doe III. Jane Doe VI testified that the soldiers who shot John Doe III worked at Exxon's          facility, as supported by other witnesses and objective criteria such as their exit through the          gate. *See supra* ¶432; *see also supra* ¶¶431-434.

> **Defendants' Objection to Response to Paragraph 90.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants further object to this Response as it is not supported by evidence, is improper argument, and offers baseless conclusions from witnesses that cannot create a genuine issue of material fact. Plaintiffs' use of the phrases "Exxon military security" and "Exxon's          facility"

misleadingly suggests that the sovereign Indonesian military worked for or was otherwise controlled by EMOI.  Moreover, Plaintiffs have provided no evidence connecting Defendants to the alleged attack of Jane Doe VI's son.

91. ███████ also did not know anyone affiliated with Exxon or Mobil and referred to Indonesian soldiers as "Exxon soldiers" solely because she saw them in an area "surrounding" the Arun Field facilities. [███████ Dep. at 82:22–84:3, Ex. 70 ("Q. ███████ before the break, I asked you what your evidence was that those were Exxon soldiers, and before answering my question, you asked for a break. Now that you've had your break, can you answer my question? A. I saw with my two eyes. That is the evidence. Q. What evidence do you have that they were Exxon soldiers? A. The evidence when they come out from the care of Exxon and they shot my brother. Q. Do you know that there were 40,000, more than 40,000 Indonesian soldiers in Aceh during this time? [] A. What I know, in this—in this surrounding Exxon area were Exxon soldiers. Q. Do you know, when you say Exxon area, what do you mean? Can you answer the question? A. Exxon soldiers were in the surrounding of Exxon area. Q. My question to you is, what do you mean by Exxon area? Can you answer the question? A. My answer is the soldiers in the area of Exxon were Exxon soldiers."); *id.* at 88:5–89:7 ("Q. You have never met anyone from Exxon, have you? . . . A. I never met. Q. You have never met anyone from Mobil either, correct? [] A. Never. Q. And you have never met anyone from Pertamina, correct? [] A. No. Q. And you have never met anyone from [PT Arun], correct? [] A. No. Q. And you have no idea who owns the areas that you believe are Exxon area, correct? [] A. No.").]

**Plaintiffs' Response:** Disputed. ███████ clearly and repeatedly testified that she saw Exxon soldiers exit the ███████ gate and shoot her brother. ███████ repeatedly explained, under cross examination, why she was able to identify the soldiers as Exxon soldiers. PX34, ███████ Dep. 10:6-7, 58:8-9 ("the soldiers were at Exxon's. They guard Exxon"); *id.* 66:6-8, 83:4-10 ("I saw with my two eyes. That is the evidence. Q. What evidence do you have that they were Exxon soldiers? A. The evidence when they come out from the [gate] of Exxon and they shot my brother."); *id.* 95:24-96:2 ("the evidence, I saw. They came out of the gate of ███████ and shot my brother"); *id.* 100:23-101:3. ███████ was familiar with ███████ and had seen soldiers working for

88



Exxon at the gate on other occasions. *Id.* 14:16-15:2 (Q. ██████████ did you ever pass at other times? A. Yes. Q. At those other times, when you passed ████████ , did you see soldiers [working] there? A. the soldiers were at the gate. Q. And what were they doing at the gate? A. they were checking people's ID"). ██████████ plainly stated the soldiers who shot her brother came out of the gate at ██████████ an Exxon facility. *See supra* ¶¶421-431.

██████████ was repeatedly asked, "when you say Exxon area, what do you mean?" *Id.* 83:18-87:22. ██████████ answered that she meant within the Cluster: "They came out from the [gate] of Exxon and shot my brother"; "Exxon soldiers were in the surrounding of Exxon area"; "In the area of Exxon, where are Exxon soldiers"; "How to say this, Exxon soldiers were in the area of Exxon. Two soldiers were there in the area of Exxon." *Id.* When she was asked, "So in your opinion, all of the Indonesian soldiers in Aceh were Exxon Soldiers?" she responded "Not in all Aceh, but especially in the area of Exxon. Those are—those were Exxon soldiers." *Id.* 81:9-16. ██████████ testimony is clear that she understood the soldiers in ████████ who came out of the gate to shoot her brother, and who she had previously seen working at ████████ checking IDs, were Exxon soldiers.

**Defendants' Objection to Response to Paragraph 91.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants further object to this Response as it is not supported by evidence, is improper argument, and offers baseless conclusions from witnesses that cannot create a genuine issue of material fact. Plaintiffs' and their witnesses' use of the phrases "Exxon soldiers," "soldiers working for Exxon," and "Exxon facility" misleadingly suggests that the sovereign Indonesian military worked for or was otherwise controlled by EMOI. Moreover, Plaintiffs have provided no evidence connecting Defendants to the alleged attack of Jane Doe VI's son. Plaintiffs have not put forth evidence establishing any connection between EMOI and the soldiers who allegedly exited the gate at ████████ .

92.    Neither Jane Doe VI nor ████████ could identify who commanded or paid the soldiers who assaulted John Doe III or what their orders were on the day of the incident. [Jane Doe VI Dep. At 81:13–16, Ex. 69 ("Q. Do you know who was in command of the soldiers who beat and shot your son? A. No, I don't know. The commander didn't take any responsibility.");

████████ Dep. at 96:12–97:3, Ex. 70 ("Q. And you don't know who [the soldiers'] commanders were that day, correct? A. No. Q. And you don't know who was paying them on that day, correct? A. No. Q. And you don't know what their mission was that day, correct? A. I do not

know. What I know is the soldiers live inside Exxon, in Cluster 2. Q. But you don't know which

specific soldiers live in Exxon, correct? [] A. I do not know.").]

> **Plaintiffs' Response:** Undisputed but incomplete and immaterial. Undisputed that Jane
> Doe VI and ▮▮▮▮▮ did not know the names of the soldiers' commander or who was
> paying them that day but whether or not the witnesses know this information is not
> material. Exxon documents indicate the soldiers' mission related to dispersing villagers
> who were seeking refuge at Point A. *See infra* ¶423; PX75, CA0001191447 (Exxon
> circulates news articles about 20,000 refugees camped at Point A, including one stating
> "
>                    ").

> **Defendants' Objection to Response to Paragraph 92.**  Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph.  Plaintiffs do not dispute that neither Jane Doe VI nor ▮▮▮▮▮ could
> identify who commanded or paid the soldiers who allegedly assaulted John Doe III.

93.    Jane Doe VI testified that her son ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

prior to his injuries but provided no documentation and did not testify about when and how often

he worked. She did not know how much he earned in the year prior to his assault. [Jane Doe VI

Dep. at 113:14–114:15, Ex. 69 ("Q. In the year prior to [John Doe III]'s getting shot, what

sources of income did he have? A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. . . . Q.

Here is the next question: Focusing on [John Doe III], how much money did he earn in the year

prior to when he was shot? A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").]

> **Plaintiffs' Response:** Disputed. Jane Doe VI testified that her son
>         from assisting her in selling food. PX24, Jane Doe VI Dep. 114:7-15. She also
> testified that he was a hard worker and helped her in the kitchen every day: "he helped
> everything, he helped plating the coconut, he helped pack the rice, he was faster than me
> although he was still a child." *Id.* 126:21-127:7. He also earned money farming. *Id.*
> 128:11-14; *see also* PX87, Pls.' Dec. 2019 Suppl. Damages Disclosures at 11.

> **Defendants' Objection to Response to Paragraph 93.**  Defendants object to this
> Response as it is not supported by evidence, is improper argument, and does not offer any
> evidence responsive to any material aspect of the Paragraph.  Plaintiffs' response does
> not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe
> VI.  *See* Defs.' Reply Mem. at 14–16.  Plaintiffs do not dispute that Jane Doe VI

provided no documentation and did not testify about when and how often her son worked, and that she did not know how much he earned in the year prior to his assault.

94.    Jane Doe VI claimed to have, but never produced, documentation reflecting 2.5 million rupiah in expenses for traditional medicine. [*Id.* at 112:20–113:7 ("Q. Do you have any documentation showing how much the traditional healers were paid? A. Yes, I have the document. It was about two and a half million rupiah. Q. Do you have any documents showing how much you paid the hospital where [John Doe III] was treated? A. Maybe I had the documents, but I don't remember where I put it. I just remember the one from the traditional medication, traditional medicine.").] The only documentation Jane Doe VI produced that may be related to medical care—or any loss, for that matter—was a ████████████████████ ████████████████████████████████████████████████. [DOE005013, Ex. 73.]

> **Plaintiffs' Response:** Disputed. Exxon's own quoted testimony and exhibit (Defs. Exh. 73) demonstrate Jane Doe VI saved and produced ███████—Exxon's complaint that the ███ is "substantially illegible" is immaterial to this motion. Like all Plaintiffs, Jane Doe VI also submitted a computation of damages, including moral and material damages. PX87, Pls.' Dec. 2019 Suppl. Damages Disclosures at 11.
>
> Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no relevant damages related documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).
>
> **Defendants' Objection to Response to Paragraph 94.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VI. *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that Jane Doe VI produced no documentation—other than ██ ████████████████████████████████████████—of any alleged loss.

95.    ████████████████████████████████████████████ one or two years after the events described in Jane Doe VI's allegations. [██████ Dep. at 48:18–20, Ex. 70 ("Q. [Y]our brother, [John Doe III] did not die in 2000, correct? A. Yes."); Jane Doe VI Dep. at 97:12–98:6,

Ex. 69 ("Q. Did he die from drowning? A. Yes. Q. And did he drown while he was attempting to take refuge from the Indonesian military? A. Yes. Q. What year did your son die? A. Which son do you mean? Q. [John Doe III]. A. He died in 2001. Q. Do you remember what month in 2001? A. I don't remember. Q. Are you sure it wasn't November of 2002? A. 2002? I don't remember. Q. Did you ever bring a claim against anyone for causing [John Doe III]'s death? A. No."). Despite John Doe III's death being unrelated to Jane Doe VI's allegations in this lawsuit, she claimed ███████████████████████████████. [Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures at 12, Ex. 59.] Jane Doe VI later testified that she is not seeking to recover funeral expenses and in any event does not have any documentation reflecting John Doe III's funeral expenses. [Jane Doe VI Dep. at 108:12–15, Ex. 69 ("Q. [A]re you asking to recover 5 million rupiahs for funeral expenses? A. No."); *id.* at 109:25–110:5 ("Q. Did you ever have documents showing the cost of the funeral? A. There is no document about it. It is just an estimate how much it was cost.").]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 95.** N/A

**G.   Jane Doe VII [Successor to John Doe V]**

96.   Jane Doe VII and her son, █████████, provided testimony regarding John Doe V's allegations. [*See generally* Deposition of Jane Doe VII, dated Oct. 7, 2020 ("Jane Doe VII Dep."), Ex. 74; Deposition of █████████, dated Oct. 13, 2020 ("█████████ Dep."), Ex. 75.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 96.** N/A

97.   Jane Doe VII was the second wife of John Doe V. [Jane Doe VII Dep. at 71:3–8, Ex. 74 ("Q. How many wives did your husband have? A. Four, sir. Q. How many of those wives did he marry before you? A. One.").]

**Public Redacted Copy**

**Plaintiffs' Response:** Disputed. In a declaration, Jane Doe VII stated she was the "first wife," a status confirmed by her son . PX110, Decl. of Proposed Jane Doe VII of Mar. 14, 2015 at ¶ 4; PX35███████████ Dep. 49:4-16.

**Defendants' Objection to Response to Paragraph 97.** Defendants dispute this response, as the testimony speaks for itself. To the extent it differs from Plaintiffs' declaration, this does not create a genuine issue of material dispute.

98.     Jane Doe VII did not inform all of John Doe V's other wives and children about

the litigation. [*Id.* at 74:7–24 ("Q. Did you notify all of [John Doe V]'s other wives and all of his

children that you took his place as plaintiff in this case? A. Yes, I did. I told ███████████. Q.

[] Did you tell both of the other wives as well? A. I did not, because I'm afraid the other two will

tell to everyone else. Q. Did you tell all of the children that [John Doe V] had that you have

taken his place as the plaintiff in this case? A. Only to ██████ children, not the other

two.").]

**Plaintiffs' Response:** Disputed. This Court ordered "that plaintiffs must notify the other distributees of the estates of John Doe V and John Doe VI of the substitution ordered herein within 60 days." Dkt. 513 at 5. Plaintiffs did so. In accordance with the Court's order, Plaintiffs filed a statement, including a sworn declaration describing the notice provided. Dkt. 531 & Dkt. 531-1 ¶¶ 2-4. Plaintiffs identified 25 distributees, both adults and children. Dkt. 531 at 1. Plaintiffs drafted a written notice (which was filed with the Court) and that notice was read to each distributee in his or her own language. *Id.* at 1 & Dkt. 531-1, Exh. A. Counsel did not rely on their elderly client to perform the notice plan but retained independent contractors to carry out the notice. Dkt. 531-1 at ¶¶ 2-4.

**Defendants' Objection to Response to Paragraph 98.** Defendants dispute this response, as the testimony speaks for itself, and Plaintiffs' cited evidence does not create a genuine issue of material fact.

99.     John Doe V and his wife and successor Jane Doe VII claimed that different and

inconsistent incidents occurred in 1999. John Doe V claimed that his ███████████

██████████████████. [Pl. John Doe V's Suppl. Resp. to ExxonMobil Oil

Corporation's 1st Set of Interrogs. (July 28, 2007) 2–3, Ex. 76 ("█████████████





.”).] Jane Doe VII claimed, in interrogatory responses served hours before her deposition and in her deposition testimony, ███

. [Jane Doe VII Dep. at 76:21–25, Ex. 74 ("Q. In 1999 did you see [John Doe V] get taken away by soldiers? A. Yes, I di*d*."); *id.* at 80:9–12 ("Q. Did the soldiers burn down your house the same day that they took [John Doe V] and held him at ███ ? A. Yes, sir."); Pl. Jane Doe VII's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. (Oct. 5, 2020) 7–9, Ex. 77.] The operative complaint alleged within the Relevant Period only that John Doe V's house was burned down and his son was beaten in or about December 2000. [2nd Am. Compl. ¶ 180, ECF No. 465 ("In or about December 2000, ExxonMobil's security personnel came to [John Doe V's] house and burned it down. At that time, the security personnel also physically beat his son and broke his son's leg.").]

> **Plaintiffs' Response:** Disputed. This claim is not material for purposes of Defendants' motion for summary judgment, and Plaintiffs have no obligation to respond. To the extent a response is required, Plaintiffs respond that they discovered an error in the pleadings, and asked Exxon to consent to an amendment of the complaint. Exxon declined. Determining that Exxon's objection to the delay in seeking amendment was not unreasonable, Plaintiffs declined to move to amend. Undisputed therefore that the operative complaint alleges that John Doe V's house was burned down and that he was abducted in 2003, but does not independently seek damages for John Doe V's 1999 abduction.

> **Defendants' Objection to Response to Paragraph 99.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs do not dispute that John Doe V and Jane Doe VII had inconsistent and differing accounts of the alleged incidents in 1999. Regarding the alleged "error" discovered in Plaintiffs, in October 2005 the Court issued an order to show cause "why the claims of John Doe V should not be dismissed based on a violation of the applicable statute of limitations." *See* ECF No. 104 at 2. Plaintiffs conceded that "John Doe V's claims are time barred under the applicable state tort law statutes of limitations." *See* ECF No. 110 at 8.

100.    In his 2007 interrogatory responses, John Doe V alleged that in ████████

███████████████████████████████████████████████████████████████████████████."

[Pl. John Doe V's Suppl. Resp. to ExxonMobil Oil Corporation's 1st Set of Interrogs. (July 28,

2007) at 3, Ex. 76.]

**Plaintiffs' Response:** Undisputed, but incomplete. In his interrogatory responses, John
Doe V identified Andreas Letda Danpos, Andreas Serda, Bonima Pratu and Bahrun
Serda-Danru from Unit 100 by name as his assailants (information Exxon complains
other victims are missing). PX111, Pl. John Doe V's Suppl. Resp. to ExxonMobil Oil
Corporation's 1st Set of Interrogs. (July 28, 2007) at 3. John Doe V stated that he was
taken to a temporary post near ████████ of the Exxon Mobil Complex, where soldiers
kicked and beat him all over. *Id.* at 3. The soldiers also urinated on John Doe V. PX112,
Pl. Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8-9; PX25, Jane
Doe VII Dep. 111:12-112:15. John Doe V returned home after roughly three days.
PX112, Pl. Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8. He was
bruised, swollen, and smelling of urine. *Id.*; PX25, Jane Doe VII Dep. 111:12-112:15. He
cried out that he had been taken on the road by Exxon soldiers and the Exxon soldiers
had urinated on his head and all over his body. PX112, Pl. Jane Doe VII Suppl. Resp. to
Interrogatory No. 1 (Oct 5, 2020) at 8-9; PX25, Jane Doe VII Dep. 111:12-112:15. He
told his wife he knew who the Exxon soldiers were, that he needed to wash, and that he
had been tortured. PX112, Pl. Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5,
2020) at 8-9; PX25, Jane Doe VII Dep. 111:12-112:15.

**Defendants' Objection to Response to Paragraph 100.**   Defendants object to this
Response as it does not dispute or offer any evidence responsive to any material aspect of
the Paragraph.  The interrogatory responses speak for themselves.  Defendants further
object to this Response as it is not supported by evidence, is improper argument, and
offers baseless conclusions from witnesses that cannot create a genuine issue of material
fact.  Plaintiffs' purported evidence does not connect Defendants to John Doe V's
injuries.  Plaintiffs' and witnesses' use of the phrase "Exxon soldiers" misleadingly
suggests that the sovereign Indonesian military worked for EMOI.  Additionally,
Plaintiffs have produced no evidence connecting Unit 100 to Defendants.  *See* Defs.'
Reply Mem. at 6–7; *infra* ¶ 437.

101.    Neither Jane Doe VII nor ████████ knew the identities of any of the soldiers

involved in the incidents that they allege. [Jane Doe VII Dep. at 85:17–22, Ex. 74 ("Q. Do you

know the names of any of the soldiers who assaulted [John Doe V], assaulted your son, detained

[John Doe V], burned down your house, do you know any of their names? A. I don't know the

names. I don't know the persons, sir."); *id.* at 80:13–17 ("Q. Do you know which soldiers burned

down your house? A. I don't know which soldiers, but it was the soldiers who took my husband, Exxon soldiers."); ████ Dep. 42:9–43:6, Ex. 75 ("Q. And you don't know the names of the soldiers that took your father in 1999, do you? A. Yes, that is true. . . . Q. Your mother also testified that she does not know the names of the soldier that held your husband—held her husband and your father for months. Do you know the names of the soldiers who held him? A. No, I don't know their names.").]

**Plaintiffs' Response:** Disputed. John Doe V knew the Exxon military security who burned his house in 1999 and conveyed that information to Jane Doe VII and ████ He also identified by name and unit number the soldiers who abducted him in 2003 and conveyed that information to Jane Doe VII. *See supra* ¶¶100, 438-441. This evidence is admissible as an excited utterance. *See* Pls. Mem. § V.A.2.c & n.**Error! Bookmark not defined.** John Doe V worked as a driver, including for Mobil Oil Indonesia at Arun Field as well as other oil industry related companies, and was familiar with the soldiers in the surrounding area. *E.g.* PX113, DOE005235; PX25, Jane Doe VII Dep. 55:22-57 (Q. How long did he work for Mobil? A. It was long.); *id.* at 107:25-108:19; PX35, ████ Dep. 23:23-25 (father was a driver "for as long as I can remember"). John Doe V was also familiar with the area, including the soldiers, because he was active in local policing efforts, attending trainings and courses organized by the military district command, the Koramil. PX35, ████ Dep. 26:17-27:9.

In addition, in 1999 ████ saw soldiers take his father away in a truck: "I saw a truck, a military truck, and on the truck was my father, and he was already blindfolded, and he was being beaten." PX35, ████ Dep. 9:16-22. The truck had two tigers drawn on the sides. *Id.* at 14:2-8. ████ later saw that same truck, with the two tigers drawn on it, driving into Exxon ████ past the guarded gate and the fence into *Id.* at 14:16-16:5; 93:15-20 ("Q. Do you know whether the vehicle you saw going into the Exxon facility, was the same day your father was abducted? A. Yes, it was the same truck, because there's no other trucks like that."); *see also* 92:23-95:5. These were the same soldiers who set John Doe V's and Jane Doe VII's house on fire. PX25, Jane Doe VII Dep. 79:16-80:3.

Both ████ and his mother were home when John Doe V was returned by soldiers in 1999. PX35, ████ Dep. 17:18-20:21. Six soldiers brought him home. *Id.* at 17:25-18:21. He had been beaten and cut. *Id.* at 19:19-24. He was weak and could barely stand. PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8. He was crying and in pain. *Id.*; *see also* PX35, ████ Dep. 18:15-21 ("he cried loudly"); PX25, Jane Doe VII Dep. 108:23-109:6 ("everybody was crying at the time"). John Doe V cried out that he had been tortured by Exxon soldiers, PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8, and that "he was taken by Exxon soldiers, and he know them by person . . . . he said that he was heavily tortured, and he said he knew, at

least, four people who tortured him, and he know them by name," PX35, ███ Dep. 20:15-21:6.

**Defendants' Objection to Response to Paragraph 101.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  The testimony speaks for itself.  Defendants further object to this Response to the extent it relates to an alleged incident that occurred in 2003, in connection with a claim that was not pled until Plaintiffs' 2014 Second Amended Complaint and is thus time-barred.  *See* Defs.' Reply Mem. at 19–20.  Statements regarding non-viable claims do not create genuine issues of material fact.  Moreover, the purported evidence does not show that John Doe V knew who burned his house in 1999, let alone connect the incident in any way to Defendants.  Additionally, Defendants object to this Response as it is not supported by evidence, is improper argument, and offers baseless conclusions from witnesses that cannot create a genuine issue of material fact.  Plaintiffs' and witnesses' use of the phrases "Exxon soldiers" and "Exxon military security" misleadingly suggests that the sovereign Indonesian military worked for EMOI.  Plaintiffs also have produced no evidence connecting Unit 100 to Defendants.  *See* Defs.' Reply Mem. at 6–7; *infra* ¶ 437.

102.    Jane Doe VII did not know who commanded the soldiers who allegedly burned down her husband's house or who gave them orders to do so. [Jane Doe VII Dep. at 85:14–16, Ex. 74 ("Q. Do you know who their commanders were for any of the soldiers? A. I do not sir."); *id.* at 85:23–86:5 ("Q. Do you know what orders these soldiers were following when they assaulted your son, assaulted your husband, detained your husband and burned down your house? [] A. I don't know about that, sir.").]

**Plaintiffs' Response:** Undisputed, but whether Jane Doe VII knew this information is not material to Defendants' motion.

**Defendants' Objection to Response to Paragraph 102.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs do not dispute that Jane Doe VII did not know who commanded or gave orders to the soldiers who allegedly burned down her husband's house—a fact that is plainly material to the element of causation.

103.    Jane Doe VII did not know whether the Indonesian soldiers who were involved in the alleged incidents worked for Defendants or had any other connection to Defendants. [*Id.* at 32:20–24 ("Q. Do you refer to them as Exxon soldiers because the soldiers were working near Exxon Mobil facilities? A. I don't know whether the soldiers were working for Exxon or not. . .

97

.").] She testified that her husband called them "Exxon soldiers" because he said they were

"stationed near the Exxon facilities." [*Id.* at 80:18–81:3 ("Q. Why do you call them Exxon

soldiers? A. It was my husband who told me they were Exxon soldiers. There are so many Exxon

soldiers—there are so many soldiers in there. Q. And he called them Exxon soldiers because the

soldiers were stationed near the Exxon facilities? A. Yes.").]

> **Plaintiffs' Response:** Disputed. John Doe V identified the Exxon military security who abused him to Jane Doe VII and ██████. This evidence is admissible excited utterance. *See supra* ¶¶ 100, 101, 438-441; Pls. Mem. § V.A.2.c & n.**Error! Bookmark not defined.** [*sic*].

> **Defendants' Objection to Response to Paragraph 103.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants further object to this Response as the statement attributed to John Doe V is an inadmissible out-of-court statement and so cannot create a genuine issue of material fact. Plaintiffs identify no facts that would support admission of the statement as an excited utterance. *See* Defs.' Reply Mem. at 13. Additionally, Plaintiffs have not put forth evidence connecting Defendants to John Doe V's injuries. Plaintiffs' use of the phrase "Exxon military security" misleadingly suggests that the sovereign Indonesian military worked for EMOI.

104.    Jane Doe VII testified that John Doe V ███████████████████████



by Indonesian soldiers in 1999. [*Id.* at 57:5–15 ("████████████████████

████████████████████████████████████████ A. It

was before he was taken by Exxon soldiers. Q. Do you know how long before? A. I don't

remember about it, sir.").] ██████████████████████████

████████████. [*Id.* at 59:22–60:5 ("Q. ████████████████

████████████████████████████████████

████████████████████.").]

> **Plaintiffs' Response:** Undisputed. Before his death John Doe V produced documents that detail his salary history, including his daily wage. *E.g.,* PX113, DOE005235-41. Jane

Doe VII, who has had little opportunity for education, was unable to read these documents.

**Defendants' Objection to Response to Paragraph 104.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VII.  *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that John Doe V had no employer for years, and possibly more than a decade, leading up his alleged abduction.

105.    Jane Doe VII had no documentation reflecting how much John Doe V earned at any point in time. [*Id.* at 60:6–20 ("Q. Do you have any documents showing how much your husband earned at any point in time from any employer? A. I don't have it anymore, sir. He passed away a long time ago. I don't have any documents. Q. Did you ever have any documents showing how much money your husband earned from any source of employment? A. Yes, I did, but I'm not aware of that document. Q. When was the last time you had documents showing any income that your husband earned from any employment? A. I don't remember about it, sir.").]

**Plaintiffs' Response:** Disputed. Before his death John Doe V produced documents that detail his salary history, including his daily wage. *See e.g.*, PX113, DOE005235-41. Jane Doe VII, who has had little opportunity for education, was unable to read these documents.

Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no relevant damages-related documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 105.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs' Response is insufficient to create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VII.  *See* Defs.' Reply Mem. at 14–16.  Plaintiffs' purported evidence does not reflect any information about John Doe V's wages in the years leading up to the alleged incident, and thus cannot create a genuine dispute.

106.    Jane Doe VII had no documentation reflecting expenses for medical care or the cost to repair their home. [*Id.* at 102:25–103:18 ("Q. Do you have any documents showing the medical expenses that you or your husband incurred because of his detention by the soldiers? A.

No, I do not. Q. Do you have any documents showing what it cost to repair your home after the soldiers burned it in 1999? A. I do not have any documents showing medical expense or funeral. I don't have anything. Q. [] Do you have any documents showing what it cost to repair your home after the soldiers burned it in 1999 or 2000? A. No, I do not have documents.").]

> **Plaintiffs' Response:** Disputed. Like all Plaintiffs, Jane Doe VII produced a damages computation. PX87, Pls.' Dec. 2019 Suppl. Damages Disclosures 12-14. Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no relevant damages documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

> **Defendants' Objection to Response to Paragraph 106.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VII. *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that Jane Doe VII produced no documentation reflecting expenses for medical care or the cost to repair her home.

107.    John Doe V passed away in 2007. [*Id.* at 40:19–21 ("Q. When did your husband pass away? A. He passed away in 2007.").] Jane Doe VII stated that she incurred approximately 10 million rupiah in funeral expenses but had no documentation relating to those expenses. [*Id.* at 98:18–99:8 ("Q. Did your husband's funeral cost 500 rupiah? A. For the funeral, I spend a lot of money, because the funeral was seven days. From day one to day seven it cost millions of rupiah. Q. Did it cost 5 million rupiah? A. It is more than 5 million, because I spent to buy rice. From day one to day seven, maybe it was about 10 million rupiah. Q. Do you have any documents showing how much money you spent on the funeral? A. I don't have it anymore.").] She testified that she is not seeking compensation for funeral expenses. [*Id.* at. 98:14–17 ("Q. In this lawsuit you are asking to receive 5 million for funeral expenses; is that right? A. I don't ask that money, sir.").]

> **Plaintiffs' Response:** Undisputed. *See* PX114, DOE005183 (Village attestation of death).

**Defendants' Objection to Response to Paragraph 107.**  N/A

108.    In fact, Jane Doe VII testified that she is not seeking any money damages in this lawsuit. [*Id.* at 102:20–22 ("Q. So are you not looking for money through this lawsuit? A. I'm not asking for money.").]

>    **Plaintiffs' Response:** Undisputed but immaterial and misleading. Jane Doe VII's claims include claims for money damages. Though Plaintiffs may be primarily motivated to file this lawsuit in order to obtain justice for the abuses they and/or their loved ones suffered, it will be up to a jury to determine the facts and where warranted, just compensation.

>    **Defendants' Objection to Response to Paragraph 108.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  The testimony speaks for itself, and Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VII.  *See* Defs.' Reply Mem. at 14–16.

### H.    Jane Doe VIII [Successor to John Doe VI]

109.    In his 2007 interrogatory responses, John Doe VI claimed that ███████████

████████████████████████████████████████████████████████████████

██████. [Pl. John Doe VI's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. (July 28, 2007) at 2–3, Ex. 78.] There is no mention in the interrogatory responses of being taken to an Indonesian military camp. [*Id.*]

>    **Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 109.**  N/A

110.    In her 2016 interrogatory responses, Jane Doe VIII stated that ████████████

████████████████████████████████████████████████████████

██████. [Resp. of Pl. Jane Doe VIII (as Substitute for John Doe VI) to ExxonMobil Oil Corp.'s 1st Set of Interrogs. (Jan. 23, 2016) at 8, Ex. 79.] She made no mention of a months-long detention at police headquarters between John Doe VI's hospital stay and his return home. [*Id.*]

>    **Plaintiffs' Response:** Undisputed but incomplete. After her husband's death and her substitution as a Plaintiff, Jane Doe VIII submitted a short supplemental interrogatory

answer based on additional facts within her personal knowledge. She did not restate facts known to her husband. *See generally* Defs. Exh. 79.

**Defendants' Objection to Response to Paragraph 110.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs do not dispute that Jane Doe VIII and her husband provided differing accounts of the alleged incident.

111.    Jane Doe VIII was not made available for a deposition. Two days before her

noticed and agreed-upon deposition date, Plaintiffs notified Defendants that Jane Doe VIII was

"too frail" to sit for the deposition. [Letter from K. Pierson to A. Oh (Sept. 15, 2020), Ex. 80;

Letter from J. Morton to K. Pierson (Sept. 17, 2020) Ex. 81; Am. Notice of Dep. to Pls. (Sept.

18, 2020) Ex. 82; Letter from A. Fryszman to A. Oh (Sept. 29, 2020), Ex. 83.] Jane Doe VIII's

daughter, ███████, appeared in her place. [Letter from A. Fryszman to J. Morton (Oct. 1,

2020), Ex. 84.]  ███████ and another non-party witness, ███████, provided testimony

regarding John Doe VI's allegations. [*See generally* Deposition of ███████, dated Feb. 11,

2021 ("██████ Dep."), Ex. 85; ██████ Dep., Ex. 62.]

**Plaintiffs' Response:** Disputed. Plaintiffs object that this claim is immaterial. In mid-September 2020, Plaintiffs proposed to make Jane Doe VIII, a widow who did not witness her husband's shooting and was therefore solely a damages witness, available for deposition on October 2, 2020. Unfortunately as time for the deposition drew near, Plaintiffs determined that Jane Doe VIII, an elderly widow, was too frail to be deposed and promptly notified Defendants:

> As you know, Jane Doe 8 is a substitute Plaintiff for the claims of John Doe VI, who died during the twenty years this litigation has been pending. Jane Doe 8 is a damages witness who did not witness her husband's shooting. While we are not medical professionals, based on our recent interactions with Jane Doe 8, we have concluded that she is too frail to be able to participate in a seven-hour deposition. Given her condition, we will not call her as a witness at trial.

Defs. Exh. 83. Plaintiffs proposed to make the daughter of John Doe VI and Jane Doe VIII available instead in place of her mother. *Id.* Plaintiffs specified that "We will of course schedule the daughter's deposition at a time that ensures you have sufficient time to prepare." *Id. Exxon did not object to the substitution* of the daughter for her infirm, elderly mother, the deposition was noticed and took place as scheduled. *See* PX115, Letter from J. Morton to A. Fryszman (Oct. 2, 2020) ("we do not object to you noticing



her for deposition"); PX116, Am. Notice of Dep. (Jan. 27, 2021). Exxon had the opportunity to question ███████ about her mother's condition.

At her deposition, ███████ testified that her mother "is now very thin" and that "her health was deteriorating, and sometimes she speaks well, but sometimes she doesn't speak well." PX37, ███████ Dep. 103:9-20; *see also id.* at 104:12-19 ("her physical condition is not good… when she start doing a little hard work and then she has to immediately take a rest.") To feed themselves, ███████ and her mother work in their rice paddy, but her mother can only work "little by little, little by little." *Id.* at 106:10-13.

**Defendants' Objection to Response to Paragraph 111.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs do not dispute that Jane Doe VIII was not made available for a deposition.

112.    ███████ did not witness John Doe VI's assault or know the identities of any of the Indonesian soldiers involved. (███████ Dep. at 13:2–21, Ex. 85 ["Q. At the time of the incident, where were you? A. I was at home. Q. How did you learn that your father had been shot? A. Because I heard a gunshot and then people were running, they were running toward my direction to let me know that it was my father who was shot. Q. Do you remember who these people were that told you that? A. So it was villagers, there were many of them. Q. And what did these villagers say to you? A. They said that father—that my father had been shot and he was already taken into a truck.").]

**Plaintiffs' Response:** Disputed. ███████ witnessed the assault, though she did not *see* it. "I heard a gunshot and then people were running, they were running toward my direction to let me know that it was my father who was shot." PX37, ███████ Dep. 13:7-10. ███████ immediately went to the place where her father had been shot. *Id.* 14:25-15:4 ("[S]o I went immediately, I went to the place where the incident happened, where many people were already crowding."). The villagers on the scene told her that her father had been taken by Exxon soldiers. *Id.* 99:19-100:5. In addition, when she got there, ███████ told her Exxon soldiers had shot her father and taken him. *Id.* 15:24-16:19. ███████ was her father's friend and used to come to their kiosk. *Id.* 16:15-19. He was also the village chief of the neighboring village. *See* PX36, ███████ Dep. 6:21-25. ███████ described him as "very sad at that time and I could hear that his voice was trembling and I can tell he was trying so hard not to get in tears or not to weep at that time, and he was very sad and he told me my father was taken by Exxon soldiers." PX37, ███████ Dep. 16:25-17:13.

103



**Defendants' Objection to Response to Paragraph 112.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Moreover, ▮▮▮▮ was designated as a witness on damages only; thus, her testimony regarding any observation of the alleged injury cannot create a genuine issue of material fact. Additionally, the statements attributed by ▮▮▮▮ to unidentified villagers and to ▮▮▮▮ are inadmissible out-of-court statements and so cannot create a genuine issue of material fact. Even if these statements were admissible, Plaintiffs' and witnesses' conclusory use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

113.   ▮▮▮▮ claimed to have witnessed the incident. [▮▮▮▮ Dep. at 9:24–10:6, Ex. 62 ("Q. [D]id you see the soldiers shoot [John Doe VI]? A. Yes, I saw it. Q. And did you see the soldiers push him down? A. Yes, I saw it, because I was very close.").] ▮▮▮▮ was not identified by John Doe VI in his 2007 interrogatory responses as having relevant knowledge of the events underlying John Doe VI's claims. [*See* Pl. John Doe VI's Suppl. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. at 4–5, Ex. 78.] According to ▮▮▮▮, soldiers brought John Doe VI, ▮▮▮▮ to ▮▮▮▮ house in ▮▮▮▮. [▮▮▮▮ Dep at 6:13–20, Ex. 62. ("Q. And, sir, where do you live? A. I live in ▮▮▮▮. Q. And have you lived there your whole life? A. So I come from there, and I live there. I have lived there for the whole life and that is close to Exxon."); *id.* at 7:5–7 ("Q. Did you know a man named [John Doe VI]? A. He is my ▮▮▮▮.")]. ▮▮▮▮ testified that the soldiers shot John Doe VI in front of his (▮▮▮▮) house. [*Id.* at 8:18–9:10 ("Q. And who was it that brought [John Doe VI] to your house? A. The one who brought him were—so the ones who brought him were soldiers. . . . Q. And what did you see? A. Okay. So after my mother got upstairs to the house, he was pushed on the back, and then he fell onto the ground, into the mud. And that's the time when he was shot on his calf.").]

**Plaintiffs' Response:** Disputed. Undisputed that ▮▮▮▮ witnessed the shooting. Disputed that ▮▮▮▮ was not identified as a witness. ▮▮▮▮ was listed as a

witness on Plaintiffs' Rule 26 disclosures in August 2015. PX117, Pls.' Oct. 2015 Rule 26 Disclosures at 7.

**Defendants' Objection to Response to Paragraph 113.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs do not dispute that ███████ was not identified as having relevant knowledge in John Doe VI's 2007 interrogatory responses.

114.     ███████ testified that she was told by ███████ that John Doe VI had been assaulted and detained by "Exxon soldiers." [███████ Dep. at 71:11–72:11, Ex. 85 ("Q. Did you see who shot your father? A. I did not. I did not see it with my own eyes. . . . Q. You testified earlier that it was Exxon soldiers who shot your father. Do you remember that testimony? A. I do. Q. The reason you said it was Exxon soldiers is because ███████ told you it was Exxon soldiers, right? A. Yes.").] However, ███████ testified that he did not know if any of the soldiers involved in the incident worked for Exxon. [███ Ismail Dep. at 18:5–9, Ex. 62 ("Q. Who do those soldiers work for? Do they work for Exxon? A. So that was not clear.").]



**Plaintiffs' Response:** Disputed. Undisputed that third party witness, ███████, told ███████ that her father had been shot by Exxon soldiers. Disputed that ███████ "did not know" the identity of the soldiers or that they worked for Exxon. He clearly identified the soldiers as soldiers he recognized and described their duties at A1, an Exxon location. *See infra* ¶ 461 (A1 an Exxon location). ███████ testified that "what I witnessed was, at the same time they—we had our meals, the military would come and have meals at the same place we had our meals." PX36, ███████ Dep. 18:9-17. He also testified that he saw the soldiers at work for Exxon: "so what I witnessed was, when they were not having meals with us, they were going back to landing dock, and that was in the area of A1. So it was not the area of our rig, but A1 was still the area under Exxon, within Exxon." *Id.* 18:23-19:4. To the extent ███████ testified that it was "not clear" whether the soldiers "worked for Exxon," ███████'s knowledge of whether a formal employment relationship existed between Exxon and its military security personnel is a legal question on which he is not qualified to testify and immaterial to the question whether the personnel in question were part of Exxon's military security force (which his testimony unequivocally establishes). To the extent Defendants suggest his testimony bears on the latter question, they cannot establish this because the form of the question and the substance of the full answer (which Defendants have truncated to mislead) clearly show that the soldiers worked for Exxon. The full statement is as follows:

     Q.     Who do those soldiers work for? Do they work for Exxon?

A.   So that was not clear. So when they—**what I witnessed was, at the same time they—we had our meals, the military would come and have meals at the same place where we had our meals. And at other posts, at other camps, they would also come when the meal time come and had their meals with us** . . . .

Q.   Do you know what the soldiers did when they weren't having their meals? Did you ever see them at work?

A.   So what I witnessed was, **when they were not having meals with us, they were going back to the landing dock, and that was in the area of A1. So it was not the area of our rig, but A1 was still the area under Exxon, within Exxon.**"

PX36, ▓▓▓▓▓▓ Dep. 18:5-19:4. The import of the entire statement is clear: the soldiers worked for Exxon.

**Defendants' Objection to Response to Paragraph 114.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  The testimony speaks for itself.  Defendants further object to Plaintiffs' use of the phrases "Exxon soldiers" and "they worked for Exxon" as it misleadingly suggests that the sovereign Indonesian military worked for EMOI.  Defendants object to Plaintiffs' use of "A1, an Exxon location," as it misleadingly suggests that A1 was operated by EMOI during the relevant time period when Plaintiffs' evidence—testimony that soldiers slept at A1—does not establish that Exxon operated A1 during the relevant time period.  Moreover, the final sentence of Plaintiffs' response is unrelated and immaterial to this Paragraph.

115.   ▓▓▓▓▓▓▓ claimed to have recognized some of the approximately twenty

soldiers who were present during the assault of John Doe VI. [*Id.* at 112:24–113:3 ("Q. You said

there were about 20 soldiers that came to your house with [John Doe VI]; is that right? A. Yes,

that's correct.").] He claimed to have recognized them from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓. He provided inconsistent testimony about how many of the

soldiers he recognized. [*Id.* at 113:4–14 ("Q. And how many of them did you recognize? A. So

the total number that I was able to recognize was ten. Four of them were pointing guns right

behind [John Doe VI], and six other[s] were following them. Q. And did you recognize those ten

from ▓▓▓▓▓▓? A. Yes, we—▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓."); *id.* at 10:21–25 ("Q. How many soldiers were there, under the house, with

you? A. The one that I recognize were about 20, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); *id.* at 91:6–8 ("A. Among 20 of the soldiers, I knew only four of

them, because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").] ▮▮▮▮▮▮▮▮ did not name, describe, or

otherwise identify any of the Indonesian soldiers he claimed to have recognized who were

present during the assault. Nor did he identify which of the approximately twenty soldiers in the

village allegedly assaulted and shot John Doe VI. [*Id.* at 9:17–19 ("Q. Who shot [John Doe VI]?

A. It was the soldiers.").]



> **Plaintiffs' Response:** Disputed. Undisputed that ▮▮▮▮▮▮▮ recognized the soldiers as
> soldiers from Exxon's Bachelor Camp. PX36, ▮▮▮▮▮ Dep. 8:5-14; 10:23- 11:23;
> 113:6-18. ▮▮▮▮▮▮ worked for an Exxon subcontractor in a skilled position. *Id.* 11:5-
> 8; 16:20-24 ("I was the skill man"). He worked shifts at Bachelor Camp and took his
> meals there. *Id.* 17:10-14. In addition to shooting John Doe VI, the soldiers went into his
> home and destroyed a medicine cabinet. *Id.* 13:15-14:10 ("I was the head of the village.
> So there was a village mid-wife posted in my village. And that medicine is for the
> carrying woman or pregnant woman … all the medicines were stepped on. So they were
> stepping on all of the medicine"). ▮▮▮▮▮▮ therefore had opportunity to observe the
> soldiers at both locations. *Id.*11:15- 23 ("I recognize the soldiers, and if they were still
> living, if I meet them today, I would be able to recognize.").
>
> Disputed that the testimony on the total number of soldiers present at the house,
> surrounding the victim, recognized by the witness, or known by the witness in response
> to differently worded questions transmitted through translation was inconsistent and
> objected to as immaterial to Defendants' motion. There is no inconsistency between
> ▮▮▮▮▮▮ testimony that he "recognized" 20 of the soldiers from Bachelor Camp
> and that he "knew only four of them," which suggests only that ▮▮▮▮▮ had varying
> levels of familiarity with the soldiers. Moreover, "when a court is confronted with self-
> contradictory deposition testimony, and '[t]his contradictory testimony leads to two
> possible conclusions,' on summary judgment the court 'must accept the [conclusion]
> most favorable to [the nonmovant].'" *Blevins v. Katherman*, 2010 WL 272004, at *1
> (M.D. Pa. Jan. 20, 2010) (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 476 n.
> 14 (3d Cir.1998)); *see also, e.g.*, *MCI Worldcom Networks Servs., Inc. v. Clearwater
> Drilling, Inc.*, 2002 WL 31444940, at *1 (S.D.N.Y. Nov. 1, 2002) ("Although Rowland's
> deposition testimony is internally inconsistent with regard to why he ignored the
> markout, for purposes of ECS's summary judgment motion, the portions of Rowland's
> testimony to which Clearwater and ECS point must be credited."). Finally, ▮▮▮▮▮▮
> did testify that four of the soldiers he recognized from Bachelor Camp were the ones
> pointing their guns at John Doe VI just before he was shot. PX36, ▮▮▮▮▮ Dep. 113:4-9.

**Defendants' Objection to Response to Paragraph 115.** Defendants object to this
Response as it is not supported by evidence, is improper argument, and does not offer any

evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Plaintiffs have presented no evidence that soldiers in ████████████ were assigned to guard Exxon-operated facilities or otherwise connected to Defendants in any way. *See* Defs.' Reply Mem. at 5 n. 4. Further, ████████████ was not "Exxon's."

116.    ████████ testified that John Doe VI ran the family's kiosk and performed odd jobs but did not indicate how much he earned, or when and how often he worked. [████████ Dep. at 27:17–28:11, Ex. 85 ("Q. Did you have a chance to observe whether your father had a daily routine prior to being shot and abducted? A. So mainly he attended the kiosk, but he would do everything else that he got assigned by other people or he got asked by other people. Q. What types of things did he do that he was assigned or asked by other people to do? A. So such works would include, for example, making or constructing fences for other people and also to clean the field, the paddy field for other people, and also he would do—he got us to do construction work as well. Q. Do you know whether your father was paid for the work that he did? A. Yes, he was pa*id*.").]

**Plaintiffs' Response:** Disputed. ████████ testified that prior to her father's injury, the kiosk was open every day. PX37, ████████ Dep. 83:2 -7 ("every day"). ████████ also testified that the income from the kiosk in 1999 was 400,000 to 500,000 Rupiah a day. *Id.* 84:8-10.

**Defendants' Objection to Response to Paragraph 116.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VIII. *See* Defs.' Reply Mem. at 14–16. Plaintiffs' purported evidence does not reflect how much John Doe VI earned, or when and how often he worked; nor does it reflect that John Doe VI himself worked at the kiosk "every day."

117.    ████████ testified that at one point the kiosk that her father operated ████████ ████████████████████, but she did not indicate what the expenses were.

[*Id.* at 84:5–10 ("Q. In the year 1999, do you have any records that show how much revenue was generated by the kiosk in the year 1999? A. ████████████████████

████████████████.").]

**Public Redacted Copy**

**Plaintiffs' Response:** Disputed. ███████ testified that the income (that is, the profit) was 400,000 or 500,000 in 1999. PX37, ███████ Dep. 84:8-10; *see also id.* 16-20 (interpreter clarifying that the witness stated that "the margin" "was a lot, because there were not many kiosks in the area at that time.").

**Defendants' Objection to Response to Paragraph 117.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VIII. *See* Defs.' Reply Mem. at 14–16.

118.    ███████ had no records reflecting her father's wages or the kiosk revenues. [*Id.* at 85:7–14 ("Q. Do you have records that show the revenue generated by the kiosk for any point in time at all? A. No. Q. Do you have any records showing how much money your father earned from any of the work that he did? A. No.").]

**Plaintiffs' Response:** Undisputed. Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural barter economies and most cannot read, almost no relevant documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 118.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to Jane Doe VIII. *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that ███████ produced no documentation reflecting John Doe VI's lost wages or take-home earnings from the kiosk.

119.    After her father's assault, ███████ and her mother ran the kiosk. [*Id.* at 41:16–41:19 ("Q. After the incident, were you and your mother able to go to the kiosk and work together? A. Yes.").] However, ███████ testified that they did not open the kiosk on a "routine" basis, and did not provide any evidence of how frequently they operated the kiosk. [*Id.* at 83:4–12 ("Q. How many days a week was the kiosk open before December of 2000? A. Before the year of 2000, I opened the kiosk every day. Q. Okay. And after the year 2000, how many days a week did you open the kiosk? A. After the incident, I open and close the kiosk not that routine anymore.").]

**Plaintiffs' Response:** Undisputed. John Doe VI was unable to run his business after the shooting. PX37, ███████ Dep. 28:11-17 ("Q. Did he continue to do this type of work after he was shot and abducted? A. No, he was not capable of doing anything after that").

**Defendants' Objection to Response to Paragraph 119.**  N/A

**I.      John Doe II**

120.      John Doe II's ███████████████. [Pl. John Doe II's Suppl. Resp. to

ExxonMobil Oil Corporation's 1st Set of Interrogs. at 2–3, Ex. 86 ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████."); Deposition of John Doe II, dated Nov.

10, 2020 ("John Doe II Dep.") 107:1–4, Ex. 87 ("Q. Do you have any reason to disagree with the

statement that you were arrested on August 11th of 1999? Is that an accurate statement? A. I was

arrested on August 11, 1999[.]").]

**Plaintiffs' Response:** Undisputed for the purpose of Defendants' statute of limitations argument made in this motion.

**Defendants' Objection to Response to Paragraph 120.**  N/A

121.      John Doe II and non-party witness ████████ provided testimony regarding John

Doe II's allegations. [*See generally* John Doe II Dep., Ex. 87; Deposition of ████████, dated

Nov. 19, 2020 ("████████ Dep."), Ex. 88.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 121.**  N/A

122.      John Doe II initially testified that he believed some of the Indonesian soldiers

who assaulted him had been stationed at Arun Field. [John Doe II Dep. at 89:15–20, Ex. 87 ("Q.

Did you recognize any of the soldiers, at all, who approached the food stalls that morning? A. I

did not recognize them, but we—I see them every day there in ████████. They come out from

████████, and I can—we can see them there in ████████████████."); *id.* at 90:15–24 ("Q.

How do you know that the Indonesian soldiers, who beat you in August of 1999, were the same

Indonesian soldiers that you had seen near ████████? A. Because I used to go to that road in the

morning … and I can see two soldiers at their post . . . . And so all of the soldiers were there. We

can see all of the soldiers in that post on Exxon's road.").] But later he admitted that he did not

recognize any of the Indonesian soldiers involved in in the incident. [John Doe II Dep. at 91:16–

20, Ex. 87 ("Q. Did you recognize the faces of the soldiers who beat you in August of 1999? A. I

couldn't recognize their faces because I was [] beaten and I was afra*id*. I couldn't even see their

faces at the time when I got beaten."); *id.* at 92:23–25 ("Q. And you don't know the names of

any of the soldiers who beat you in August of 1999, do you? A. No.").]

> **Plaintiffs' Response:** Disputed. Undisputed that John Doe II testified that he believed
> the soldiers who assaulted him were stationed at the Arun Project. Disputed that John
> Doe II did not recognize any of the soldiers involved. Although John Doe II did not
> individually know the soldiers, he testified that he watched them exit ████████
> ████████ before assaulting him. PX26, John Doe II Dep. 94:11-25 ("Q. When the soldiers
> appeared at the food stalls, is it right, [John Doe II], that you thought they came out of
> nowhere? THE WITNESS: They were—they came out from ████████████████████
> ████████████████████████████████████████████████████████████████████
> ████████" (counsel's objection omitted)); *id.* at 95:21-96:8 ("They come—come out from
> ████████, many of them. Q. You watched the soldiers come from ████████
> ████████ to the food stall where you were standing? THE WITNESS: The soldiers come
> out from the field of Exxon to the directions of Exxon state, and then they go forward to
> the directions of the food stall that I was standing."); *id.* at 96:24-97:1 ("Two soldiers that
> come out from ████████, they used the trail motorcycle."); *id.* at 97:8-23 ("Q. Okay. So
> [John Doe II], you saw soldiers coming on foot from ████████, and soldiers coming on
> motorcycles from ████████; is that right? A. That is right. . . . Q. But—but you saw both?
> Your testimony is that you saw soldiers on foot coming from ████████, and you saw
> soldiers on motorcycles coming from ████████; is that right? A. I believe—I believe I
> saw them both because in the middle of those area is the—the people or the village of the
> people."); *id.* at 150:5-10 ("So what happened was I was on my motor bike going to the
> rice—the rice stall where I wanted to buy the breakfast. So I slowed down in front of the
> rice stall. And then actually, I had seen earlier the—the soldiers coming out. And then I
> stop at—at the rice stall."); *id.* at 176:10-12 ("What I see—what I saw is they are—come
> out. They come out from the Exxon and approaching to the—the scene."). An eyewitness

to the incident, the owner of the rice stall, testified that she also recognized the soldiers as Cluster 4 soldiers. *See infra* ¶¶471-476, 481.

**Defendants' Objection to Response to Paragraph 122.** Defendants object to this Response as the purported evidence does not support Plaintiffs' proposition. John Doe II testified that he did not recognize any of the soldiers that allegedly beat him, and ██████████ did not witness the abduction or detention of John Doe II. Both John Doe II and ████████ testified that they did not know who assaulted and detained John Doe II, and Plaintiffs have provided no evidence that the Indonesian soldiers who allegedly injured John Doe II were assigned by the Government of Indonesia to provide security at ████████ at the time of the alleged incident or were otherwise connected to Defendants in any way.

123.    Neither John Doe II nor his non-party witness, ████████, knew who commanded or gave orders to the Indonesian soldiers who allegedly assaulted and detained John Doe II. [John Doe II Dep. at 91:21–92:7, Ex. 87 ("Q. Who was in—who was the commanding officer of the soldiers who beat you in August of 1999? A. I do not know their commanding officer. . . . How could we know the commanding officer?"); *id.* at 92:16–22 ("Q. Do you know who gave the soldiers the orders that they were carrying out when they beat you in August of 1999? A. I do not know."); *id.* at 174:19–175:6 ("Q. Do you know who gave the orders to the Indonesian soldiers who were detaining you for 51 days? A. I don't know who gave the orders, but what I know is that they were Exxon soldiers because they were in the posts inside of Exxon fence and outside of the Exxon's fence they were also post."); ████████ Dep. at 24:12–25, Ex. 88 ("Q. Turning back to the 8 to 10 Indonesian soldiers who beat [John Doe II]. Do you know who their commander was on the day they beat [John Doe II]? A. I do not, sir. Q. You don't know who their commanding officer was, do you? A. No, sir. Q. Do you know who gave the soldiers their orders that day? A. No, sir. Q. Do you know what orders the soldiers had that day? A. No, sir.").]

**Plaintiffs' Response:** Disputed. ████████ testified that she recognized the soldiers as "soldiers from Mobil" because they were frequent patrons at her food stall. PX38, ████████ Dep. 11:8-19 ("So he was buying breakfast from me, and then the soldiers from Mobil came, and then he was beaten, and then he was bleeding, and then he was

taken right away. Q. How do you know that the soldiers were from Mobil? A. They used to buy rice, breakfast from me, ma'am. Q. So you recognize the soldiers; is that right? A. Yes, I recognize them. I saw their faces. I do not know their names."); *id.* at 14:14-19 ("Q. The soldiers that you recognized as being from Mobil, how often did they buy rice at your stand? A. It was often, ma'am." (counsel's objection omitted)); *id.* at 19:19-20:4 ("Q. And you saw all of their faces, all 8 to 10? A. Yes, sir. Q. And you recognized those faces, all 8 to 10? A. Yes, sir. Q. And that's because all 8 to 10 of them had been customers of yours, at your rice stall? A. Yes, sir."). ▮▮▮▮▮ food stall was approximately 150-300 meters from Cluster 4. PX26, John Doe II Dep. 93:21-94:2; PX38, ▮▮▮▮ Dep. 15:15-18.

John Doe II also saw the soldiers coming out of Clusters 3 and 4. *Infra* ¶476. Clusters 3 and 4 were both operated by Exxon. *See infra* ¶¶ 280-281; PX8, EMOI 30(b)(6) (Snell) Dep. 650:14-19 ("Q. And in addition to their assignments at EMOI operations, these military guards would patrol the areas around EMOI's operations, correct? A. Some would conduct—would probably be mobile, yes."); PX26, John Doe II Dep. 89:15-20 ("I see [soldiers] every day there in Cluster 4. They come out from Cluster 4, and I can—we can see them there in Cluster 4 or Cluster 3."); *id.* at 90:8-13 ("If people pass the road near the Cluster 4, people can see [soldiers] in there, in Cluster 4."); PX38, ▮▮▮▮ Dep. 16:9-12 ("When you passed Cluster 4, did you see soldiers working there? Yes, ma'am, I could see them. They were standing at the gate."); PX27, John Doe IV Dep. 142:5-23 ("You said that the soldiers, the Exxon soldiers, would come out of the camp. Which camp are you referring to? A. From that facility, not camp, from that facility at Cluster 4, they would come out. Q. I'm not asking you to testify to anything that anybody else told you. I'm just asking you to testify to what you saw yourself. A. Yes, I did—I did see it by myself. Q. How many times did you see the Exxon soldiers patrolling around Matang Kuli? A. So it was—it was many times they would go out to patrol.").

Undisputed that neither John Doe II nor ▮▮▮▮▮▮ knew the name of the commanding officer. Objection that whether John Doe II or ▮▮▮▮▮ knows this information is immaterial to Defendants' motion. Both witnesses clearly identified the culpable soldiers from Cluster 3 and Cluster 4. *See supra* & ¶ 122; *infra* ¶¶ 475-476, 481.

**Defendants' Objection to Response to Paragraph 123.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Defendants further object to this Response as the purported evidence does not support Plaintiffs' proposition. John Doe II testified that he did not recognize any of the soldiers that allegedly beat him, and ▮▮▮▮▮▮ did not witness the attack on John Doe II. Both John Doe II and ▮▮▮▮▮▮ testified that they did not know who assaulted and detained John Doe II, and Plaintiffs have provided no evidence that the Indonesian soldiers who allegedly injured John Doe II were assigned by the Government of Indonesia to provide security at ▮▮▮▮▮▮ or were otherwise connected to Defendants in any way.

124.    ▮▮▮▮▮▮ did not witness John Doe II being detained because she fled when the

incident began and was hiding in her house when he was taken. [▮▮▮▮ Dep. at 22:9–25, Ex.

88 ("Q. You ran away right after the soldiers started hitting [John Doe II], didn't you. A. Yes, sir.

Q. And how far did you run once the soldiers started hitting [John Doe II]? A. 30 meters, sir,

from [] my stall to my house. Q. Did you go inside your house and close the door? A. No. Q.

You didn't go inside your house? A. I d*id.* Q. What did you do after you went inside your house?

A. I was sitting there. I was terrified.").]

> **Plaintiffs' Response:** Disputed. ▆▆▆▆▆▆ testified that she saw the soldiers who beat
> John Doe II take him away. PX38, ▆▆▆▆▆ Dep. 12:10-16 ("10 Q. Can you describe
> what the soldiers did to [John Doe II]? A. So he was—he was beaten at that time, and he
> got beaten on the head. And he was bleeding, and then he was taken right away. And I
> don't know where he was taken."); *id.* 15:5-7 (". . . [W]hen they got there, they just
> started beating him, continuously, and then he was taken."). ▆▆▆▆▆▆ testimony that
> she at some point she ran in fear to her house 30 meters away does not establish that she
> did not see the soldiers detain John Doe II, either before she ran or from her house.
> ▆▆▆▆ testified that when the soldiers arrived at her food stall, she dropped to the
> ground before running. *Id.* 21:25-22:4 ("Q. You remember that you ran form the soldiers,
> right? A. I fell on the ground sir, at that time."). And she testified that when she reached
> her home 30 meters away, she did not close the door. *Id.* at 22:12-18 ("Q. And how far
> did you run once the soldiers started hitting [John Doe II]? A. 30 meters, sir, from the—
> from my stall to my house. Q. Did you go inside your house and close the door? A.
> No.").

> **Defendants' Objection to Response to Paragraph 124.**  Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph.  Defendants further object to this Response as the purported evidence does
> not support Plaintiffs' proposition.  The testimony speaks for itself— ▆▆▆▆ did not
> witness the detention of John Doe II, thus Plaintiffs' Response cannot create a genuine
> dispute.

125.    John Doe II testified that his kiosk was burned down by Indonesian soldiers.

[John Doe II Dep. at 126:22–127:13, Ex. 87 ("Q. After you were released, did soldiers ever burn

down your house? A. It was my kiosk who—which they burn. . . . Q. What does that mean?

What—what—what kiosk did you have? A. It's a room for me to get dressed when I was young.

Q. Is it a free-standing structure outside of your house? A. Yes.").] But he did not witness the

kiosk being burned and only was later told that unidentified soldiers in Indonesian military

uniforms were responsible. [John Doe II Dep. at 127:14–128:13, Ex. 87 ("Q. How many soldiers

burned down your kiosk? A. I didn't see. I was not there. Q. How do you know that soldiers

burned down your kiosk? A. It was—I—I knew it was the soldiers when I get home from the

mosque. And then all people said that your—your kiosk has been burned. Your kiosk has been

burned. And I asked—and I asked them, Who did it? And they said, It's soldiers. They get here

with one car and then they laughed and all people cannot see the incident because they were

afraid. Q. Do you know the names of the soldiers who burned down your kiosk? A. I do not

know their names because I was go to the mosque for prayer. It was the villagers who told me.

Q. Did the villagers tell you the names of the soldiers who burned down your kiosk? A. They do

not know. What they know is they wear military uniform. Q. Indonesian military uniform? A.

Yes, Indonesian military, but I don't know the people.").]

**Plaintiffs' Response:** Undisputed. Plaintiffs do not dispute that there is insufficient admissible evidence regarding the kiosk burning.

**Defendants' Objection to Response to Paragraph 125.**  N/A

126.    John Doe II's kiosk and house were located ███████████████████

███████████████. [John Doe II Dep. at 67:12–14, Ex. 87 ("Q. ███████████████

███████████████████████████████.").]

**Plaintiffs' Response:** Undisputed. One kilometer is a short distance, about 10-15 minutes' walk. However, Plaintiffs do not dispute that there is insufficient admissible evidence regarding the kiosk burning.

**Defendants' Objection to Response to Paragraph 126.**  N/A

127.    John Doe II sought ███████████████ as damages. [Pls.' Oct. 2016 Rule 26 Suppl.

Damages Disclosures at 14, Ex. 89 ("███████████████████████████████

███████████████████████████.").] But John Doe II did not pay

his own medical expenses. [John Doe II Dep. at 146:16–18, Ex. 87 ("A. It's my sister who paid

the medical bills. It's more than 200,000 rupia [sic].").]

115

**Plaintiffs' Response:** Disputed. Undisputed that John Doe II seeks medical expenses as damages. Disputed that John Doe II did not pay his own medical expenses. John Doe II testified that his sister oversaw his medical care, but he testified that she paid for it by selling property jointly held by John Doe II and that both John Doe II and his sister went into debt to pay for his medical care. PX26, John Doe II Dep. 148:17-21 ("So my sister had to sell a piece of land. They had to sell a piece of land that we inherited from our parents. Even that is not enough. And we have to owe money from some other people as well.").

**Defendants' Objection to Response to Paragraph 127.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to John Doe II. *See* Defs.' Reply Mem. at 14–16.

128.    John Doe II claimed that, prior to his injuries, he ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but did not say and provided no

documentation reflecting how frequently he worked on construction projects or how many

construction projects he worked on in any given period of time. [*Id.* at 57:21–58:1 ("Q. What did

you do for a living before the incident? A. So [] before the incident, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); *id.* at

60:22–61:1 ("A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮.").] He had no documentation reflecting his earnings or any other losses he may be

alleging. [*Id.* at 148:25–149:3 ("Q. Do you have any documents showing how much you earned

from work in 1999 and the years prior to 1999? A. No.").]

**Plaintiffs' Response:** Disputed. Undisputed that John Doe II worked as a construction contractor prior to his detention and torture. Undisputed that John Doe II earned profits ranging from 300,000 to 3 million rupiah per project. Disputed that John Doe II did not say how frequently he worked or how many construction projects he worked on in any given time. John Doe II testified he was retained to construct an irrigation ditch "many times," and that he was once hired to build a bridge. And he testified that even when he lost a bid for a project, he was typically hired to supervise construction. PX26, John Doe II Dep. 60:7-13 ("Q. How many times did you oversee the digging of a ditch? A. It's many times. I used—I—I once won to build a bridge, to construct a bridge. And then in the rice paddy field, I got a project for making to construct an irrigation for the rice paddy field and many others."); *id.* at 62:18-22 ("if I lose a project, then my friends would ask

me to work with them as a supervisor. For example, if Heady wons the project and he would ask me to be the supervisor of that project.").

Undisputed that John Doe II does not have any documents reflecting his earnings from his contracting business prior to his detention and torture. Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no relevant damages documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 128.**   Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to John Doe II. *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that John Doe II had no documentation reflecting his employment status, earnings, or lost wages and provided no evidence of how often he worked on █████████████████.

**J.      John Doe IV**

129.    John Doe IV's injury occurred ███████. [Pl. John Doe IV's Suppl. Resp. to

ExxonMobil Oil Corporation's 1st Set of Interrogs. at 3, Ex. 90 ("███████████████████

███████████████."); Deposition of John Doe IV, dated Dec. 11, 2020 ("John Doe IV

Dep.") 128:13–15, Ex. 91 ("Q. So the Exxon soldiers took you on July 29, 1999, correct? A.

Correct.").]



**Plaintiffs' Response:** Undisputed for the purpose of Defendants' statute of limitations argument made in this motion.

**Defendants' Objection to Response to Paragraph 129.**  N/A

130.    John Doe IV and non-party witness ████████ provided testimony regarding John

Doe IV's allegations. [*See generally* John Doe IV Dep., Ex. 91; ███████ Dep., Ex. 39.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 130.**  N/A

131.    John Doe IV did not see the faces of the Indonesian soldiers who detained and

assaulted him. [John Doe IV Dep. at 73:4–9, Ex. 91 ("Q. All right. So do you know the names of

117

any of the Indonesian soldiers who stopped you and Rusli, who put bags over your heads, who

took your wallet and your pants, do you know any of their names? A. I do not."); *id.* at 75:7–13

("Q. Because it was dark and they put a bag over your head, you didn't get a good look at any of

the faces on these soldiers, did you? A. No, how could we see them? Our head is already put in

the bag.").]

> **Plaintiffs' Response:** Disputed. Although John Doe IV did not "get a good look" at the
> faces of the soldiers that detained him, John Doe IV saw the soldiers who detained him
> and the testimony Defendants cite do not support their claim that he was unable to see the
> soldiers' faces at all. John Doe IV saw the soldiers before they put a bag over his head,
> and he was able to describe the approximate number of soldiers and where they were
> along the road, the uniforms they were wearing, and that they were armed. PX27, John
> Doe IV Dep. 70:3-5 ("[T]hey were about 12 soldiers on the left and on the right when we
> got there."); *id.* at 70:9-11 ("("They were all wearing Indonesian military, camouflage
> uniforms of Indonesian military."); *id.* at 70:14-15 ("They were all armed, complete
> armed.").

> **Defendants' Objection to Response to Paragraph 131.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph. The testimony speaks for itself.

132.    John Doe IV did not know who commanded, paid, or gave orders to the

Indonesian soldiers who assaulted and detained him. [*Id.* at 36:24–37:11 ("Q. You testified that

the Indonesian soldiers were paid by Exxon to guard Exxon. Do you have any proof that Exxon

paid the soldiers at all? A. I do not have evidence, I do not have proof, but what I know is those

soldiers come in, and live, come out or go out from that Exxon area, they live there, their

vehicles were there within the fence of Exxon, so that means that those soldiers were the ones

who guard Exxon. Other than that, I do not know."); *id.* 75:14–76:5 ("Q. Do you know who the

commanding officer of these soldiers was at the time they stopped you? A. No. Q. Do you know

what branch of the Indonesian military these soldiers were part of? A. No, I do not know. Q. Do

you know who gave these Indonesian soldiers their orders? A. No. Q. Do you know what orders

these soldiers were following? A. I do not know. Their business is always checking around.").]

John Doe IV referred to the Indonesian soldiers who assaulted and detained him as "Exxon soldiers" because he had seen other Indonesian soldiers—not the soldiers who assaulted and detained him, whom he did not recognize—stationed in an area where Exxon had operations and he had seen some soldiers going in and out "from that Exxon area." [*Id.* at 163:4–9 ("Q. And the reason you called them Exxon soldiers is because they were stationed in the area where Exxon had operations, right? A. Yes."); *id.* at 36:23–37:11 ("Q. You testified that the Indonesian soldiers were paid by Exxon to guard Exxon. Do you have any proof that Exxon paid the soldiers at all? A. I do not have evidence, I do not have proof, but what I know is those soldiers come in, and live, come out or go out from that Exxon area, they live there, their vehicles were there within the fence of Exxon, so that means that those soldiers were the ones who guard Exxon. Other than that, I do not know.").]



> **Plaintiffs' Response:** Disputed. John Doe IV knew the soldiers who detained and
> tortured him were Defendants' military security. PX27, John Doe IV. Dep. 37:5-10
> ("[W]hat I know is those soldiers come in, and live, come out or go out from that Exxon
> area, they live there, their vehicles were there within the fence of Exxon, so that means
> that those soldiers were the ones who guard Exxon."). John Doe IV was stopped
> ▮▮▮▮▮▮▮▮▮▮▮ by approximately 12 soldiers on patrol. *See supra* ¶506; *see also* ¶¶501-
> 508. He was stopped at the same time of evening and in the same location that he
> regularly saw the soldiers patrol. *Id.* John Doe IV testified he had personally seen patrols
> in the area where he was detained, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, "many times."
> PX27, John Doe IV Dep. 142:5-23 ("You said that the soldiers, the Exxon soldiers,
> would come out of the camp. Which camp are you referring to? ▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").
>
> John Doe IV also testified that he knew his captors were Defendants' military guards
> because he was taken to and detained and tortured at ▮▮▮▮▮. *Id.* at 81:17-19
> ("[W]hen they were sitting on my back I hear that they said we bring them to ▮▮▮."); *id.*
> at 96:2-4 ("[W]hat makes me sure that it was Exxon was that when they said let's take
> them to ▮▮▮.").[9] Exxon housed its military security at ▮▮▮▮▮. PX89,
> CA0001147209 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[9] Defendants have not objected to the introduction of the soldiers' statement, so Plaintiffs are under no obligation to establish its admissibility, *see* Fed. R. Civ. P. 56(c)(2). Plaintiffs nonetheless note it is admissible nonhearsay as an admission of Defendants' agents, Fed. R. Evid. 801(d)(2)(D), or, alternatively, is admissible hearsay as the declarants' then-existing state of mind, Fed. R. Evid. 803(3).



); *see also* PX97, CA0001078251 (1999 EMOI security report ████████████ ████); PX94, CA00010008793, at '805 (June 1999 memo stating, "████████████████████████████████████████████"); PX49,CA0001213388 (1999 email discussing ████████████████████████; PX119, CA0001005955, at '956 (EMOI security report listing ████████████████████████). Undisputed that John Doe IV did not know the name of the commanding officer, but whether John Doe IV knows that information is not material to Defendants' motion.

**Defendants' Objection to Response to Paragraph 132.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself. Plaintiffs' purported evidence also does not connect Defendants to John Doe IV's injuries. John Doe IV did not know the soldiers who stopped and detained him, nor where he was taken. In any event, ████ was neither owned nor operated by Defendants. *See infra* ¶ 555. Defendants further object to this Response as the term "its military security" is a baseless conclusion unsupported by evidence that does not connect the soldiers to Defendants and misleadingly suggests that the sovereign Indonesian military worked for EMOI.

133.    John Doe IV did not know where he was taken and detained by the Indonesian

soldiers. [*Id.* at 76:6–10 ("Q. After the Indonesian soldiers put bags over your head and Rusli's

head, did they lead you away? A. They brought us with foot, but I do not know where.").]



**Plaintiffs' Response:** Disputed. Although John Doe IV did not know where he was initially lead on foot and held "for a moment," John Doe IV knew the soldiers then took him to A-13, where he was detained and tortured for 23 days. PX27, John Doe IV Dep. 76:23-77:7 ("Where did they take you by foot? A. I do not know where. . . . [D]id the Indonesian soldiers take you by foot to a building? A. They brought us to a building for a moment, and after that they put us in a car, a vehicle."); *id.* at 80:16-81:19 ("Q. They put both you and ████ into the back of that vehicle? A. In a truck. Q. The soldiers put you and Rusli in the back of a truck; is that right? A. Yes, a truck, a REO truck, a military truck. . . . Q. How long were you in the back of that truck? A. It was long. My body was cut. My back was cut, my body, and when they were sitting on my back I hear that they said we bring them to ████."); *id.* at 90:22-91:2 ("[T]hey brought us to ████, and that place is a torture place, and people said nobody will be safe when they are brought to ████, except me, I was lucky. I thought I was dead already."); *id.* at 95:19-96:4 ("[W]hat makes me sure that it was Exxon was that when they said let's take them to ████."). John Doe IV had lived in the area his entire life and was previously familiar with ████3, which was well known in the local community. *Id.* at 136:17-21; *id.* at 82:12-14 ("[W]hen I go out and go home, I pass that ████████████████████████."); *id.* at 90:22-25 ("[P]eople said nobody will be safe when they are brought to ████. . . ."); PX294, CA0001078076, at '082-83 (What Did Mobil Know? Article in Exxon files ████████████████████████); PX80, CA0001363125 (Wall Street Journal article ████████████████████████

**Public Redacted Copy**



.”).

**Defendants' Objection to Response to Paragraph 133.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Moreover, the statement in Plaintiffs' Response attributed by John Doe IV to an Indonesian soldier is an inadmissible out-of-court statement and so cannot create a genuine issue of material fact. Even if the statement were admissible, ▮ was neither owned nor operated by EMOI. *See infra* ¶ 555.

134. John Doe IV's witness, ▮, learned about the incidents secondhand from

John Doe IV and did not witness any of the alleged acts. [▮ Dep. at 43:10–17, Ex. 39 ("Q.

So listen to my question, because it is different from what you're answering. Did you see who

caused those bruises and injuries? A. He told me it was the soldiers['] doing, and I saw it myself,

there were injuries and bruises in his body."); *id.* at 43:23–44:2 ("Q. Did you see with your own

eyes how [John Doe IV] got his wounds and bruises? A. I did not. When he got beaten, I did not

see with my own eyes.").]

**Plaintiffs' Response:** Undisputed. ▮ arrived at John Doe IV's house "about an hour after he was brought home and I saw him in a very terrible condition." PX39, ▮ Dep. 10:11-14. ▮ observed that John Doe IV "was very pale at the time when I saw him, and then he was trembling and shaking when he was talking, telling us what happened, and then he was also crying when he was talking to us, and there were a lot of bruises and wounds on his body. … it is so painful to look at and he was already crying and it made us cry as well, and he was almost unable to talk at that time." *Id.* 10:17-12:6.

**Defendants' Objection to Response to Paragraph 134.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The statement in Plaintiffs' Response attributed by ▮ to John Doe IV is an inadmissible out-of-court statement and so cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 13–14. It is undisputed that ▮ did not witness any of the alleged attacks on John Doe IV.

135. John Doe IV testified that he is not seeking money damages in this litigation.

[John Doe IV Dep. at 117:25–118:4, Ex. 91 ("A. I do not even care about money. I'm looking

for justice here. What I asked for from Exxon is justice. About whom paying what, I do not care

about money."); *id.* at 113:5–8 ("Q. Are you asking Exxon Mobil to reimburse the funds that were stolen from you? A. I'm not asking for money.").]

> **Plaintiffs' Response:** Disputed. John Doe IV testified that he is seeking justice by way of the legal remedies to which he is entitled. PX27, John Doe IV Dep. 113:8-13 ("I'm asking for justice. Justice, justice from this law, the law that how you consider it. THE CHECK INTERPRETER: And I think at the end he said if the law would define what justice is."); *id.* at 113:20-23 ("The justice that I'm looking for is how the law would see it fits. I'm not asking for money, but for justice, and it depends on the law."). While he refrained from drawing a legal conclusion, John Doe IV specifically testified that if the law entitles him to money damages, he will accept those money damages, regardless of whether the prospect of winning a monetary judgment motivated him to bring this lawsuit. *Id.* at 122:17-123:12 ("[I]f the law says that you are entitled to be compensated for the damages you suffered as a result of the damages you suffered, are you looking for that in this lawsuit? A. This is what I can say, is that if it fits what justice means or what the law says, I will accept. If it doesn't fit, I will not accept. Q. If the law says that you are entitled to compensation for medical expenses, would you accept that? A. So if it fits with the justice, I will accept.").

> **Defendants' Objection to Response to Paragraph 135.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to John Doe IV. *See* Defs.' Reply Mem. at 14–16.

136.    John Doe IV has no documentation reflecting medical expenses, , or lost earnings, and he testified that he does not remember what his wages were at any time in his life. [*Id.* at 112:21–24 ("Q. Did you save any papers showing how much you spent in connection with your recovery? A. No."); *id.* at 114:22–115:4 ("

."); *id.* at 117:18–25 ("Q. Can you estimate how much money you earned in any year of your life? . . . A. I do not know how much money I earned."); *id.* at 118:12–16 ("Q. Do you have any documents showing how much money you earned at any point in your life? A. No, no documents. I do not keep any documents.").]

> **Plaintiffs' Response:** Undisputed. John Doe IV has no documents reflecting medical expenses, money stolen from him by Indonesian soldiers, or lost earnings. John Doe IV testified that he did not maintain documents for his construction business. PX27, John

Doe IV Dep. 116:11-13 ("We got the money and we split the money, that's it, we didn't—we didn't use any documents."). Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no relevant wage or damages documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).

**Defendants' Objection to Response to Paragraph 136.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to John Doe IV. *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that John Doe VI had no documentation reflecting expenses for medical care, lost wages, or any earnings in his life whatsoever.

### K.     John Doe VII

137.     John Doe VII, his friend ▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 

provided testimony regarding John Doe VII's allegations. [*See generally* Deposition of John Doe

VII, dated Nov. 12, 2020 ("John Doe VII Dep."), Ex. 92; ▮▮▮▮▮ Dep., Ex. 40; Deposition of

▮▮▮▮▮▮, dated Jan. 26, 2021 ("▮▮▮▮▮▮ Dep."), Ex. 93.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 137.**  N/A

138.     John Doe VII has no "concrete evidence" that Defendants are responsible for his

injuries. [John Doe VII Dep. at 62:7–16, Ex. 92 ("Q. So, you claim you have injuries but you

have no evidence that would establish that Exxon Mobil is responsible for those injuries, is that

correct? A. The evidence is my head, um, um, my head is in pain sometimes, um, this one, um,

and that is it. If a concrete evidence, I do not have.").] He testified that he believed his injuries

were caused by Defendants because his friend, ▮▮▮▮▮, told him that the location where he was

taken, ▮▮▮▮▮▮, "belong[ed] to Exxon Mobil." [*Id.* at 65:25–66:12 ("Q. So, you claim that

because the soldiers live ▮▮▮ that Exxon Mobil Corporation is responsible for your injury; is

that correct? A. Because they live ▮▮▮▮▮▮▮ belongs to Exxon Mobil. Q. What do you

base that on? A. ▮▮▮▮▮▮▮▮. For now, I do not have evidence. The living witness that I

have is ▮▮. Evidence . . . I was arrested."); *id.* at 126:8–17 ("Q. What evidence do you

have or what facts can you identify that would establish that this Indonesian Military post was

used by soldiers that provided services to Exxon Mobil Oil Indonesia? A. The evidence was I

was being arrested by Exxon soldiers, and . . . the name of the one who beat me was Rusli, and

they also beat others. Many others.").]

> **Plaintiffs' Response:** Disputed. As an initial matter, John Doe VII, a villager who
> attended only one year of primary schooling and cannot read or write, did not understand
> the term "evidence" when it was used by Defendants' counsel. *See* PX28, John Doe VII
> Dep. 165:24-166:19. He understood evidence to mean "what you can see on my body at
> the time" and did not understand evidence to include documents or testimony. *Id.*
>
> Second, ample evidence demonstrates that soldiers engaged by Exxon injured John Doe
> VII at a location operated by Exxon, as discussed below and *infra* ¶537. Both John Doe
> VII and an eyewitness who was detained and beaten at the same time identified their
> assailants as soldiers working for Exxon. In addition, both men were detained and beaten
> overnight at ▮, which was operated by Exxon and utilized by Exxon military security
> personnel. A third eyewitness was at ▮ seeking to obtain the release of the boys, and
> confirms that Exxon soldiers at ▮, a location long operated and occupied by Exxon,
> were holding the boys.
>
> Both John Doe VI and an eyewitness, ▮▮▮, testified that they were visiting a
> neighbor during a religious festival and, as they were leaving, were called over to ▮ by
> soldiers on guard duty at the fence. PX28, John Doe VII Dep. 144:14-147:3 ("A. So, I
> was being called from the Exxon soldiers, Exxon soldiers who guard ▮▮▮▮, and
> then they asked my ID, and I gave them my ID); PX41, ▮▮▮ Dep. 13:12-14:22. Both
> men testified that they were dragged ▮▮▮ by the soldiers who took them to a
> warehouse, where they were held and severely beaten overnight. PX28, John Doe VII
> Dep. 144:19-23 ("And suddenly I was being taken, and I was being dragged ▮▮▮▮
> ▮▮ and then they took the key. They open, um, um, ▮▮▮, and I was being
> dragged ▮▮▮▮▮."); PX41, ▮▮▮ Dep. 14:17-23 ("we were dragged inside.
> We were beaten and dragged ▮▮▮▮."). ▮▮▮, a third witness,
> was present at A1 when the men were released. PX40, ▮▮ Dep. 30:15-34:24. ▮▮
> ▮▮▮ and the village chief had gone to A1 to seek the release of the boys and met with
> the Exxon soldiers, including the commander, at A1. *Id.* 24:9-29:12.
>
> All three eyewitnesses identified ▮ as a location long utilized by Exxon. PX41,
> ▮▮▮ Dep. 11:8-12:21 ("Q. And was Exxon using ▮, in 1999, to 2001? 12 A. Yes,
> yes, Exxon was there at that time. Q. Was there a sign at A1 that said it belonged to
> Exxon? A. Yes, yes, …"); PX40, ▮▮▮ Dep. 47:12-20 ("Q. And how else did you know
> that Exxon was located at ▮? A. So how is it possible for me to not know this? Because
> I grew up here. I was born here and I knew from the beginning when since it was ▮▮▮
> built by ▮▮▮, and then ▮, and then handed over to ▮▮▮."); PX28, John Doe VII



Dep. 121:16-125:3 ███████████
███████████ ). ███████ and his mother were lifelong residents of the community. *See infra* ¶537. John Doe VII had lived there as a child. *See infra* ¶539. They were therefore familiar with the location and its operations.

Exxon documents corroborate that ███ was a location managed by Exxon ████████
█████████ PX214, CA0001005148, at '152 (map depicting "████
█████ ); *See also* PX89, CA0001147209 ████████
█████████████████ ); PX121, CA0001184161, at '163 (An EMOI payment request from 2000 ██████████████████████
████████████████████████ .").

John Doe VII testified that, as revealed by the numbers on their vehicles and uniforms, the soldiers who detained and tortured him were from Battalions 111 and 113. PX28, John Doe VII Dep. 50:14-21 ("Q. Do you know what military unit of the Indonesian Army these soldiers were from? A. A mix of 111, and one, um—a mix of 111 and 113. Q. And how do you know that? A. From the car and the uniform, there was 111 and 113."). Battalions 111 and 113 provided security for Exxon. PX83, CA0001334077 (email from EMC security adviser Michel Laureys discussing ███████████
████████████████████████ ); PX82, CA0001334075 (email from Laureys ██████████████████████████
████████████████████ ); PX75, CA0001191447 (local newspaper articles indicating █████████████
███████ ); PX84, CA0001368009 (local newspaper article ████████
████████ ); *see also infra* ¶¶529-531.

John Doe VII testified that there were about 20 soldiers involved in his detention and beating and that he recognized about 10 of them from their work as Exxon guards. PX28, John Doe VII Dep. 169:16- 170:8. John Doe VII had seen the soldiers performing guard duty for Exxon, including "guarding employees of Exxon" and guarding the road. *Id.*; *see also id.* 146:20-147:7 ("every morning at 8:00 they call and take Exxon's employees to Seurike … on duty on the road"); *id.* 147:8-19 ("They guard—they guard Exxon, and they provided security for Exxon.").

Both John Doe VII and the third party eyewitness were able to identify specific soldiers—Angiss, Rusli, Mulyadi and Razali—by name, and identify those soldiers as soldiers they observed working for Exxon, conducting patrols, on guard duty, and escorting Exxon staff. *See* PX125, Pl. John Doe VII's 2016 Suppl. Resp. to Exxon Mobil Corp's First Set of Interrogatories at 8 (identifying Rusli, Angih and Mulyadi: "He would see the soldiers often while they were working for Exxon . . . . when they secured the road for Exxon convoys or when they worked at the gate to Exxon's compound"); PX28, John Doe VII Dep. 147:8-19 (Mul, Rusli and Angiss "guard Exxon, and they provided security for Exxon"); PX41, ███████ Dep. 15:22-16:17. John Doe VII identified Muliyadi, a "soldier[] who guard Exxon," as one of the soldiers present. PX28, John Doe VII Dep. 138:10-23, 147:8-19. John Doe VII also identified another soldier, named Rusli, as a soldier who detained and tortured him, and testified that he had seen Rusli guarding

EMOI's employees and operations. *Id.* 126:15-17 ("[T]he name of the one who beat me was Rusli"); *id.* at 135:18-136:15 ("Prior to the incident, had you ever met Rusli? A. I have."); *id.* 135:18-137:23 (describing Rusli's duties as guarding Exxon workers on Exxon Road in front of Cluster 3). Defendants did not dispute that a soldier named Rusli "was among the Military Security Personnel." PX108, Responses & Objections to Plaintiffs' 2016 Requests for Admission at Resp. No. 114 (responding Defendants "lack sufficient information to admit or deny"). ████ identified one of the soldiers who beat him as Razali, "a soldier that was for Exxon as well, and he is a guard there" who ████ would see on patrol and at Cluster 3. PX41, ████ Dep. 15:22-16:17.

John Doe VII further testified that he knew the commander of the soldiers who detained and tortured him, named Aggnis, and that he had seen Aggnis and Aggnis's subordinates guarding EMOI's employees and operations. PX28, John Doe VII Dep. 129:20-130:15 ("Q. Do you know who Rusli's commander was? A. Anggis.") *id.* at 140:17-141:2 ("[D]id you have any specific information about Anggis and his rank or troop assignment? A. Um, their assignment was to guard Exxon, to guard Exxon's employee who work, um, they start in the morning. Some of them guard the Exxon employee with the, um, military trucks, the [Reo] truck, and some of them were on the road.").

Finally, the soldiers took both men to Point A, another Exxon location. PX28, John Doe VII Dep. 153:6-154:7; PX41, ████ Dep. 19:21-20:25 (Point A is the "office of the employees of Exxon" and the location of the airstrip); *see infra* ¶¶ 280-281, 535( Point A is an Exxon facility. The men were taken to a medical clinic which was not open to the public, but just for Exxon employees. PX28, John Doe VII Dep. 153:6-154:10; PX41, ████ Dep. 20:2-16.

**Defendants' Objection to Response to Paragraph 138.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs provide no evidence that the soldiers that allegedly harmed John Doe VII were assigned by the Government of Indonesia to provide security for EMOI's operations at the time of the alleged incident.  Moreover, Plaintiffs' evidence does not establish that Defendants operated A1 at the time John Doe VII was allegedly injured.[10]  Further, the clinic at Point A was open to the public and provided medical services to members of the community. *See infra* ¶ 554.  Finally, Plaintiffs' and lay witnesses' conclusory statements such as "Exxon soldiers," "Exxon location," and "operated by Exxon" cannot create a genuine issue of material dispute.  *See* Defs.' Reply Mem. at 7–10.

---

[10]  Lance Johnson provided clear testimony that Defendants did not operate A1 at the time John Doe VII was allegedly injured.  *See* SOF ¶ 140. (Plaintiffs claim that Johnson was referring only to production facilities, but his testimony is clear that A1 was not one of EMOI's "operated responsible [] areas."  *See id.*)  Plaintiffs have no evidence to the contrary.  PX 89 is an email *asking* whether A1 was operated by MOI; PX 121 contains a list of Indonesian Army vehicles for use at A1 that makes no mention of Defendants.

139.  ██████ and ████████ likewise claimed to believe that the members of the Indonesian military who abducted John Doe VII were "Exxon soldiers" because John Doe VII was taken by Indonesian soldiers ████, which they claimed was owned by Exxon. [████ ██ Dep. at 16:21–25, Ex. 93 ("Q. Have you ever heard of a location called ██? A. Yes, in the past they were called ██, but then they changed the name to ████ and then to ████."); *id.* 47:6–20 ("Q. ████, how do you know that this location . . . was Exxon? A. So people who work at Exxon said that it belonged to Exxon. Q. And how else did you know that Exxon was located at ██? A. So how is it possible for me to not know this? Because I grew up here. I was born here and I knew from the beginning when since it was ████, built by ██████, and then ██, and then handed over to ██████."); ████ Dep. at 11:14–12:23, Ex. 40 ("Q. Was there a sign at ██ that said it belonged to ████? A. Yes, yes that was—there was a pamphlet before, a named pamphlet [sign], before, at that time. It was complete. Everything was there, and there was even a warehouse, there, where they keep all the steel, the steel objects . . . there were two of them, and one says ██.").]



**Plaintiffs' Response:** Disputed. Undisputed that ██████ and ████████ knew the soldiers who assaulted John Doe VII were members of Defendants' military security personnel in part because the soldiers were stationed ████, which is part of the Arun Project and is "property Mobil manages," PX89, CA0001147209. Disputed to the extent Defendants suggest that ██████ and ████████ testimony was focused on whether Defendants held legal title to ██ in perpetuity. Neither ██████ nor ████ ██████ testified that they believed Defendants held legal title to ██ in perpetuity, and regardless, neither's testimony depended upon such a belief. ██████████ testified that

██████████ PX41, ████ Dep. 11:2-13 ("███████████████████████████████████████████████████████████████████████████████████████████████████████."). He also described a sign ████ during that period identifying the property as ████" and as "████." *Id.* at 11:12-12:22. ████████, testified she had lived near A1 her whole life. PX40, ████ Dep. 47:12-20 ("Q. And how else did you know that Exxon was located at ██? A. So how is it possible for me to not know this? Because I grew up here. I was born here and I knew from the

beginning when since it was ███, built by ████l, and then ██, and then handed over to ██.").

Both witnesses also recognized the soldiers at ██ as soldiers who performed guard duty for Exxon. *See supra* ¶138, *infra* ¶¶527-520. ████ testified that he was beaten ███ by a soldier he knew named Razali, whom he had regularly seen patrolling Cluster 3. PX41, ████ Dep. 15:20-16:17 ("Q. Just so the record was clear, can you tell me who was beating you? A. The one that I recognized, and I know his name, it's Razali. Q. Can you tell me who Razali is? A. Razali is a soldier that was for Exxon as well, and he is a guard there. And he was always in and out of Exxon . . . . Q. Did you ever see Razali at Cluster 3? A. Yes, they were—they were patrolling—they were always patrolling there, in and out.").

**Defendants' Objection to Response to Paragraph 139.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  The testimony speaks for itself.  Plaintiffs provide no evidence that the Indonesian soldiers who allegedly harmed John Doe VII were assigned by the Government of Indonesia to provide security for EMOI's operations at the time of the alleged incident.  Moreover, Plaintiffs' evidence does not establish that Defendants operated ██ at the time John Doe VII was allegedly injured.

140.    The location ██ is not owned by Exxon. [Farmer Dep. at 153:10–14, Ex. 10 ("█

███████████████████████████████████████████

██████████████████████████████████████████

██.");  (Johnson Dep. at 181:13–182:4, Ex. 6 ("█

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████.").]

**Plaintiffs' Response:** Disputed, incomplete and misleading. Undisputed that Defendants did not exercise legal title in perpetuity to ██, or any of the facilities Exxon operated in Aceh. Disputed to the extent Defendants imply they did not exercise control over ██ during the relevant time period. *See infra* ¶¶280-281, 537. The cited testimony by Lance Johnson omitted the question he was asked, which was "█████████████████████ ██████████████████?" PX15, Johnson Dep. 180:10-13. He responded that, ████████████████, that ███ ████████████████████████ *Id.* 182:4-8. Exxon operated and controlled locations that were not production facilities—like the explosives depot and ███████████████████████████████ *See supra* & ¶¶138, 280-281. Exxon internal

documents demonstrate that Defendants operated and managed A1. PX89, CA0001147209 (listing "███████████████████████████████████████"); PX121, CA0001184161 at 163 (EMOI payment request from 2000 ███████████████ ██████████████████████████████████████████████████████████████ ███████████████).

In addition, two of the eyewitnesses spent their entire lives in the village near ███ and Plaintiff John Doe VII spent his childhood there. *See infra* ¶¶ 537, 539; PX40, Dep. 59:19-60:10 ("Q. And did [John Doe VII] grow up in that village with you and your son and others? A. Yes, many of them, they were born there, grew up there, even their grandmothers were also there. Q. [John Doe VII] lived in your village all the way from the time when he was born up until the events you were describing earlier today at A1? A. Yes, his house was ██████████████████████. Q. And he lived there from the time he was born up until at least the events you have been describing involving soldiers at ██; is that right? A. That is correct."); PX37, ██████████ Dep. 52:17-53:6; PX40, ██████ Dep. 47:12-20 (Q. And how else did you know that Exxon was located at ██? A. So how is it possible for me to not know this? Because I grew up here. I was born here and I knew from the beginning when since it was ████, built by ██████, and then ██, and then handed over to ██████); PX28, John Doe VII Dep. 143:6-17 (Q. And how do you know ██████? A. We were from the same village when we were kids. Q. And is that the village that your grandmother lives in? A. That is correct. Q. How close is ██████ house to your grandmother's house? A. About 500 meters. Q. How close is ██████ house to the location you've described as ███? A. About 15 meters, 1-5.)).

All the eyewitnesses testified that ███ was a facility controlled by Exxon with Exxon troops stationed there during the relevant time period. PX41, ██████████ Dep. 11:8-12:21 ("Q. And was Exxon using ██, in 1999, to 2001? 12 A. Yes, yes, Exxon was there at that time.); PX40, ██████ Dep. 47:12-20 ("Q. And how else did you know that Exxon was located at ██? A. So how is it possible for me to not know this? Because I grew up here. I was born here and I knew from the beginning when since it was █████, built by ██████, and then ████, and then handed over to ██████."); PX28, John Doe VII Dep. 121:25-122:5 ████████████████).

Indeed, ████████ testified that there was a sign identifying ████████ at the time. PX41, ██████████ Dep. 11:8-12:21 ("Q. Was there a sign at ███ that said it belonged to ████? A. Yes … there was a pamphlet [sign] which says ██ on its own. And there is— there was another one that says ██████.").

**Defendants' Objection to Response to Paragraph 140.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs provide no evidence that the soldiers who allegedly harmed John Doe VII were assigned by the Government of Indonesia to provide security for EMOI's operations at the time of the alleged incident.  Moreover, Plaintiffs' evidence does not establish that Defendants operated ██ at the time John Doe VII was allegedly injured.

141.      ████████ claimed to recognize one of the soldiers who abducted John Doe VII as having been on patrol outside of Arun Field at an unspecified time. [██████ Dep. at 15:20–16:5, Ex. 40 ("Q. Just so the record was clear, can you tell me who was beating you? A. The one that I recognized, and I know his name, it's Razali. Q. Can you tell me who Razali is? A. Razali is a soldier that was for Exxon as well, and he is a guard there. And he was always in and out of Exxon, and he was also involved in patrolling in the neighboring villages as well."); *id.* at 16:13–17 ("Q. Did you ever see Razali at Cluster 3? A. Yes they were—they were patrolling—they were always patrolling there, in and out.").]

**Plaintiffs' Response:** Undisputed. ████████ recognized Razali as one of Defendants' military guards. PX41, ████ Dep. 16:13-17; *see supra* ¶¶138, 528.

**Defendants' Objection to Response to Paragraph 141.** Defendants object to this Response because the purported evidence does not support Plaintiffs' proposition, nor does it establish a connection between Razali and Defendants. Plaintiffs' use of the phrase "Defendants' military guards" misleadingly suggests that the sovereign military of Indonesia worked for EMOI.

142.      Neither John Doe VII, ████████, nor ████████ knew who gave the orders to the soldiers who assaulted and detained John Doe VII. [John Doe VII Dep. at 52:17–20, Ex. 92 ("Q. Do you know who gave the order to the military guards to beat you up? A. I—I do not know who—I do not know who gave the order to beat me."); ████████ Dep. at 82:19–83:2, Ex. 93 ("Q. Do you know who the commanding officers were who were responsible for the soldiers who detained and beat [John Doe VII] and ████? A. I do not know. . . . I do not know them."); *id.* 83:9–19 ("Q. Do you know what orders either the platoon commander or the soldiers at A1 were following on the day they detained and beat [John Doe VII] and ████? A. No, they didn't say anything about the orders, but they beat [John Doe VII] and ████, but they didn't say to us. Q. So you are saying you don't know what orders those soldiers were following, right? A. Yes, I do not know about that."); ████████ Dep.at 37:13–18, Ex. 40 ("Q. Do you know

who Razali's superior officer in the military was? A. I do not know. Q. So you don't know who gave his orders. A. No, I don't.").]

**Plaintiffs' Response:** Disputed. John Doe VII testified that Aggnis was the commanding officer of the soldiers who kidnapped and tortured him. *See supra* ¶¶138, 531; PX28, John Doe VII Dep. 129:20-130:15 ("Q. Do you know who Rusli's commander was? A. Anggis. Q. How do you know that? A. When he go to the village and villagers are—in the community call him Mr. Anggis. Q. How do you know that? A. From the community, from the people, that is Mr. Anggis. Q. Do you any personal knowledge as to what his name is? A. Whose name do you mean? Q. Anggis. A. Um, um, that name, Anggis, Mr. Anggis, is what his subordinate calls him, and the community also calls him that, Mr. Anggis."). John Doe VII further testified that Anggis was a member of Defendants' military security personnel, and that he had witnessed Anggis and his men guarding Defendants' employees and operations. *Id.* at 140:17-141:2 ("[D]id you have any specific information about Anggis and his rank or troop assignment? A. Um, their assignment was to guard Exxon, to guard Exxon's employee who work, um, they start in the morning. Some of them guard the Exxon employee with the, um, military trucks, the [Reo] truck, and some of them were on the road.").

And John Doe VII testified that the soldiers who kidnapped, detained, and tortured him belonged to Battalions 111 and 113. *Id.* at 50:14-21 ("Q. Do you know what military unit of the Indonesian Army these soldiers were from? A. A mix of 111, and one, um—a mix of 111 and 113. Q. And how do you know that? A. From the car and the uniform, there was 111 and 113.").

Battalions 111 and 113 provided security for Defendants. PX83, CA0001334077 (email from EMC security adviser Michel Laureys discussing ); PX82, CA0001334075 (email from Laureys reporting "I                                                      "); PX108, Defendants' Responses and Objections to Plaintiffs' September 2016 Requests for Admissions Regarding Unit Numbers to All Defendants at Resp. No. 1 (                                        ); *id.* at Resp. No. 3 (                                        ). Defendants regularly gave orders and instructions to their military security personnel. *See infra* ¶¶ *See infra* ¶¶ *See infra* ¶¶ 207-211, 213, 229-230, 239-252, 265-266,  280-304.

**Defendants' Objection to Response to Paragraph 142.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  The testimony speaks for itself.  Defendants further object to the final sentence of this Response as there is no evidence that EMOI employed, let alone "gave orders and instructions" to the sovereign military of Indonesia.  Further, Plaintiffs' purported evidence, which interchangeably refers to sovereign military outfits as "Battalions" and "Units," does not connect Defendants to the soldiers who allegedly harmed John Doe VII.  *See infra* ¶ 551.

143.    John Doe VII testified that he is not seeking money damages in this litigation.

[John Doe VII Dep. at 23:22–24:4, Ex. 92 ("Q. So, to be clear: You're not seeking to get from a

United States jury the profits that you claim you would have received had you not been injured;

is that correct? . . . A. That is correct.").]

**Plaintiffs' Response:** Disputed. John Doe VII testified that he was "seeking . . . justice." PX28, John Doe VII Dep. 23:11. John Doe VII, who is not an expert in American or Indonesian law, was not asked whether "justice" would include an award of compensatory damages as dictated by applicable law, nor did he testify that he would not accept compensatory damages if that is what the law dictates. John Doe VII is seeking compensatory damages as allowed by Indonesian law. He submitted a detailed damages computation. PX87, Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosure at 19-21.

Moreover, the testimony Defendants cite discusses only John Doe VII's lost profits. John Doe VII is also seeking moral damages as allowed by Indonesian law and provided testimony in support of those damages. John Doe VII testified extensively about the pain Defendants' military guards inflicted upon him, and the ongoing impact of the severe head wounds. PX28, John Doe VII Dep. 25:25-26:8 ("Up until now, I still got a fracture in here, and I—it's still injured in here (indicating). MS. FRYSZMAN: Let the record reflect where he was pointing. He was pointing to the top of his head, and then he was showing the inside of his mouth."); *id.* at 171:25-172:11 ("Q. And where on your body did you get hit? A. Most of them were on the head, on the parts of the head and on the chest. Q. Can you describe the injuries to your head? Um, so, my head—my head was swollen at that time, and it was bleeding."); *id.* at 174:3-175:20 ("A. So my lip—my lip, this lip, I can flip it here. I could flip it here on those days, and I thought it was no – [I] was not going to speak again … So, my jaw—my jaw was off, would—almost fell off at that time. And my lip, everything was, um, I had injured—I think I had injured everything at that time. My lip, as I said before, I couldn't—I was able to flip it here, and I thought it was not coming back. Q. Did anything happen to your teeth? A. Yes. Q. What happened to your teeth? A. Yes. My—yes. I got hit on my teeth as well, and now I had to use a denture on—on this as I am showing you. Q. And then, you said something about the rice falling. Did you say the rice fell through the bottom of your mouth when you ate? A. So, when—when you eat rice, you would usually use the sides of the mouth here. And then the rice would fall off here, would fall to this area, to the lower part of your mouth."); *id.* at 176:10-23 ("Q. Do you still suffer any of the after effects of the beating? A. Yes … A very terrible headache …. pain as well if I speak for a long time.").

**Defendants' Objection to Response to Paragraph 143.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to John Doe VII. *See* Defs.' Reply Mem. at 14–16.

144.     John Doe VII has no documentation reflecting his earnings either prior to or

following his injury. [*Id.* at 24:5–12 ("Q. Do you have any documents that would show how

much profit you made from farming prior to the incident? A. No. I do not have. Q. Do you have

any documents that show the profits that you made from farming after the incident? A. Um,

no.").]

> **Plaintiffs' Response:** Disputed. Undisputed that John Doe VII does not have documents reflecting his income. But disputed to the extent Defendants imply John Doe VII has not provided evidence of his lost income. John Doe VII testified in detail about his income from managing farmland prior to his abduction and torture and his drop in income since, when he has had to work as a tenant farmer and day laborer. PX28, John Doe VII Dep.. 20:16-21:2; *id.* at 21:7-14 ("Q. So, how much money do you allege you made in 1999 before the incident? A. Before the incident, um, it's about six million. Q. Six million rupiah for the entire year? A. Just one harvest."); *id.* at 21:19-22 ("[F]or banana, for example, I harvest it, um, once in two weeks, and for cassava I harvest it once in nine month."); *id.* at 78:4-79:6 ("Q. Do you have a job? A. My job is, um, go to rice paddy field now."); *id.* at 79:12-22 ("Q. How much money do you make per day in the rice paddy fields, currently? A. It is not certain because the harvest of the paddy is about four months. So in four months sometimes I got two million, and that would be enough, um, for to, um, buy the food only. Q. So, do you only work four months a year? A. Twice in a year. The harvest is every four months."); *id.* at 80:2-6 ("Q. What do you do the other four months a year? A. I do [construction] work, like a mixing the cement . . . ."); *id.* at 80:23-81:2 ("I work, um, other people's farm. So after harvest, I have to pay the rent for the owner and all that is left is very little").
>
> Counsel collected and produced all relevant documents from all Plaintiffs, though because Plaintiffs live in rural subsistence economies and most cannot read, almost no relevant damages-related documents exist. *See generally supra* ¶ 47 (detailing counsel's collection and production of documents responsive to Defendants' requests).
>
> **Defendants' Objection to Response to Paragraph 144.**  Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.  Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to John Doe VII.  *See* Defs.' Reply Mem. at 14–16. Plaintiffs do not dispute that John Doe VII has no documentation reflecting his lost earnings.

145.     John Doe VII did not pay for any medical expenses for his injuries. [*Id.*at 25:15–

25 ("Q. Where do you allege you went to for medical treatment after the incident? A. A

traditional medicine. Q. And where was the traditional medicine facility located? A. I made it

myself. Q. Did you ever have to pay for any medical treatment following your injuries to the incident? A. Um, I did not, um, pay anything for my treatment.").]

**Plaintiffs' Response:** Disputed. Although John Doe VII did not have any money to spend on medical treatment at the time of his injury, he has since had to treat ongoing symptoms. PX28, John Doe VII Dep. 174:24-175:4.

**Defendants' Objection to Response to Paragraph 145.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The testimony speaks for itself, and Plaintiffs' response does not create a genuine dispute as to the lack of evidence of quantifiable loss as to John Doe VII. *See* Defs.' Reply Mem. at 14–16.

## III.    OTHER ISSUES

146.    Defendants have been requesting relevant documents to substantiate Plaintiffs' damages claims since May 2006. [Def. ExxonMobil Oil Corp.'s 1st Req. for Doc. Prod. (May 25, 2006) at Doc. Reqs. 1, 5, 7, Ex. 94.]

**Plaintiffs' Response:** Undisputed. Plaintiffs searched for relevant documents, and some, including, for example, John Doe V produced relevant documents. Other Plaintiffs did not have relevant document to produce, which is not surprising in a rural, agrarian society. *See generally* PX126, Decl. of T. Collingsworth; PX127, Decl. of A. DiCaprio. Undisputed that Defendants served document requests in 2006 (except that this claim is not material to Defendants' motion for summary judgment).

**Defendants' Objection to Response to Paragraph 146.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' statements do not relieve them of their burden to prove quantifiable loss. *See* Defs.' Reply Mem. at 14–16.

147.    Plaintiffs stated in their supplemental damages disclosures that they "███████

████████████████████████████████████████████

████████████." [Pls.' Dec. 2019 Rule 26 Suppl. Damages Disclosures at 1–2, Ex. 59.]

**Plaintiffs' Response:** Undisputed (except that this fact is not material). Plaintiffs later determined an additional expert would not be required.

**Defendants' Objection to Response to Paragraph 147.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs' determination that an expert report "would not be required"

does not relieve them of their burden to prove quantifiable loss. *See* Defs.' Reply Mem. at 14–16

148.     Professor Macey provided a framework for identifying the "█████

████████████████████████████████████████████████." [Responsive Expert Report of Jonathan R. Macey, dated May 20, 2021 ("Macey Rept.") ¶ 9, Ex. 95.] The framework consists of a four-prong analysis of separateness that is consistent with ordinary and customary business behavior and accepted corporate governance practice. [*Id.*]

> **Plaintiffs' Response:** Disputed. First, whether EMC is liable for EMOI's torts is a matter of Indonesian law, on which Professor Macey is not an expert, so this "fact" is immaterial. Second, Professor Macey's own testimony and published work make clear that his framework cannot be used to ███████████████████████████████
> █████████████████████" Even if Professor Macey had not disclaimed the conclusions set forth in his report under oath and in print, those conclusions would be inadmissible *ipse dixit*. Finally, this "fact" is merely disguised legal opinion and has nothing to do with any matter in the purview of the jury.

In his deposition Professor Macey explicitly disclaimed the "fact" above:





PX43, Macey Dep. 37:21-40:4; *accord id.* 56:23-57:16. Thus, by Professor Macey's own admission, the framework he lays out in his report does *not* actually identify the circumstances under which courts pierce the corporate veil. Professor Macey's report itself does not contain the basis for this opinion. *See* Defs. Exh. 95, Macey Rept. ¶¶ 9, 14-15 (discussing framework); PX43, Macey Dep. 10:17-11:13 ("



"); *see also id.* 22:24-28:23 (                        ). The "fact" that Professor Macey's framework "                " when courts pierce the veil is the purest form of *ipse dixit.* Professor Macey's testimony on the matter, even if it were relevant to a matter of fact (which it is not), would be inadmissible under Rule 702. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999).

The sole citation "supporting" Professor Macey's claims about his framework is an article he published in the *Cornell Law Review. See* Defs. Exh. 95, Macey Rept. ¶ 9 n.1; PX128, Jonathan Macey & Joshua Mitts, *Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 Cornell L. Rev. 99 (2014) (Macey Dep. Exh. PX 2) (hereinafter, "Macey Article"). The framework in Professor Macey's report, however, appears nowhere in the article, and no support for his framework can be found in it. *See* PX43, Macey Dep. 16:5-8 ("                                                "); *see generally* PX128, Macey Article.

Moreover, this published, careful, empirical work by Defendants' own expert *actually* reaches the *exact opposite* of the conclusions set out in Professor Macey's report—that the factors articulated in his "framework" are *irrelevant* to whether courts pierce the veil, and that what actually determines veil-piercing cases are whether veil-piercing would serve three public policy goals *completely unrelated* to Professor Macey's framework.

*See* PX128, Macey Article at 102 ("Thus it is our view that all of the standard litany of justifications for disregarding the corporate form, which include failure to observe corporate formalities, undercapitalization, alter ego, mere instrumentality, ownership of all or most of the stock in the company, payment of dividends, failure to pay dividends, etc., are mere proxies for one of the three core reasons for piercing described above."); *id.* at 103 ("The confusion and incoherence of the law of piercing the corporate veil is compounded by the fact that because judges do not explicitly recognize these policy objectives, their justifications for piercing the corporate veil are incoherent." . . . As a consequence of this intellectually vapid reasoning by intuition, legal opinions are full of vague assertions about nonsensical justifications such as 'observing corporate formalities' and broad generalizations such as 'achieving justice.'"); *compare* PX43, Macey Dep. 31:2-8 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████.) *with* Defs. Exh. 95, Macey Rept. ¶ 9(a) (including in framework factors such as whether "████████████████████████████████████████████████") *and* PX43, Macey Dep. 29:15-30:25 (characterizing these considerations as "███████████████████."). When pressed in deposition, Professor Macey admitted that his analytical framework has no demonstrated predictive power. PX43, Macey Dep. 55:6-63:3.

Finally, Professor Macey's framework is not a matter of fact for the jury to decide. It purports to set out a tool for determining whether courts would *actually* pierce the veil in any given circumstance; but the criteria for determining whether to pierce the veil are a matter of *law*, not fact. Professor Macey's attempt to reframe the considerations that bear on veil-piercing is inadmissible legal argument.

**Defendants' Objection to Response to Paragraph 148.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. Plaintiffs offer no evidence rebutting Defendants' evidence of corporate separateness or Professor Macey's expert analysis of separateness. Plaintiffs' statements thus offer no support for their veil-piercing theory. *See* Defs.' Opening Mem. at 36–38.

149.    Defendant Exxon Mobil Corporation is incorporated under the laws of New

Jersey, with its principal place of business in Texas. [Declaration of Brenda Fitzpatrick, dated

Dec. 18, 2001 ("Fitzpatrick Decl.") ¶ 2, Ex. 96.]

**Plaintiffs' Response:** Undisputed.

**Defendants' Objection to Response to Paragraph 149.** N/A

150.    Defendant EMOI was incorporated in Delaware in 1967, and has its principal

place of business in Jakarta, Indonesia.[Macey Rept. at ¶ 48, Ex. 95; Declaration of Ronald

Wilson, dated Sept. 28, 2001 ("Wilson Sept. 2001 Decl.") ¶ 3, Ex. 97.]

> **Plaintiffs' Response:** Disputed. Undisputed that EMOI's corporate predecessor, Mobil
> Oil Indonesia, Inc., was incorporated in Delaware in 1967. As of December 2005, EMOI
> reincorporated in the Cayman Islands. As to EMOI's principal place of business, disputed
> to the extent that it requires a legal conclusion.
>
> Plaintiffs further state that EMOI was incorporated by Mobil Oil Corporation. *See* PX7,
> Devor Rept. ¶ 10; PX129, CA0001347512; PX130, CA0001347510. EMOI was owned
> by Mobil Oil Corporation until 1987, when Mobil Exploration and Production North
> America ("MEPNA") acquired full ownership of EMOI's outstanding capital—ten shares
> of stock. PX10, EMOI 30(b)(6) (Boydell) Dep. 32:13-22; PX131, CA0001347517
> (memorandum memorializing transfer of MOI from Mobil Oil Corporation to MEPNA).
> MEPNA is a wholly-owned subsidiary of Mobil Corporation. *See infra* ¶ 152. Since
> November 30, 1999, Mobil Corporation has been a wholly-owned subsidiary of Exxon
> Mobil Corporation. *See infra* ¶ 153.
>
> **Defendants' Objection to Response to Paragraph 150.** Defendants object to this
> Response as it does not dispute or offer any evidence responsive to any material aspect of
> the Paragraph.

151.    EMOI was known as Mobil Oil Indonesia Inc. until June 15, 2000, when it

adopted its current name. [Macey Rept. at 3 n.2, Ex. 95.] This name change did not alter or affect

EMOI's corporate structure or its relationship to Mobil Corporation or EMC. [Declaration of

Ronald Wilson, dated Dec. 14, 2001 ("Wilson Dec. 2001 Decl.") ¶ 2, Ex. 98.]

> **Plaintiffs' Response:** Undisputed.
>
> **Defendants' Objection to Response to Paragraph 151.**  N/A

152.    EMOI is a wholly-owned subsidiary of Mobil Exploration and Producing North

America ("MEPNA"). [Macey Rept. at 3 n.2, Ex. 95; EMOI (Boydell) 30(b)(6) Dep. at 32:13–

19, Ex. 9; Fitzpatrick Decl. ¶ 6, Ex. 96.] MEPNA is a wholly-owned subsidiary of Mobil

Corporation. [Macey Rept. at 3 n.2, Ex. 95; EMOI 30(b)(6) (Boydell) Dep. at 33:11–16, Ex. 9;

Deposition of Brenda Fitzpatrick under Rule 30(b)(6) for Exxon Mobil Corporation, Mobil

Corporation, and Mobil Oil Corporation, dated Dec. 12, 2007 ("EMC/MC/MOC 30(b)(6)

(Fitzpatrick) Dep.") 33:14–20, Ex. 99; Fitzpatrick Decl. ¶ 7; Ex. 96.]

> **Plaintiffs' Response:** Undisputed.

> **Defendants' Objection to Response to Paragraph 152.**  N/A

153.    On November 30, 1999, Mobil Corporation became a wholly-owned subsidiary of

Exxon Mobil Corporation. [EMOI 30(b)(6) (Boydell) Dep. at 33:17–34:8, Ex. 9;

EMC/MC/MOC 30(b)(6) (Fitzpatrick) Dep. at 27:22–28:6, Ex. 99; Fitzpatrick Decl. ¶ 2, Ex. 96.]

> **Plaintiffs' Response:** Undisputed.

> **Defendants' Objection to Response to Paragraph 153.**   N/A

154.    EMOI had articles of incorporation and bylaws separate from EMC. [Macey Rept.

¶ 17, Ex. 95; MOI Certificate of Incorporation, Ex. 3; CA0001046007 ("MOI Bylaws"), Ex.

100.]

> **Plaintiffs' Response:** Undisputed but incomplete. Plaintiffs further state that because at
> all times EMC or its predecessors in interest owned EMOI, *see supra* ¶¶ 150-53, EMC or
> its predecessors in interest at all times had control over EMOI's incorporation and
> bylaws. Indeed, EMC used this control to cause EMOI to reincorporate in the Cayman
> Islands in 2005 after the commencement of this suit. *See supra* ¶ 150.

> **Defendants' Objection to Response to Paragraph 154.**  Plaintiffs object to this
> response as the purported evidence does not support Plaintiffs' proposition.  Plaintiffs
> have provided no evidence supporting their conclusory statement that EMC "had control
> over EMOI's incorporation and bylaws."

155.    EMOI had its own board of directors, which met regularly and did not overlap in

membership with EMC's board of directors during the Relevant Period. [Macey Rept. ¶ 17, Ex.

95 ("███████████████████████████████████████████

███████████████████████████."); EMC/MC/MOC 30(b)(6) (Fitzpatrick)

Dep. at 199:14–200:1, Ex. 99 (no directors in common as between EMOI and any other

defendant); EMC/MC/MOC 30(b)(6) (Fitzpatrick) Dep. at 72:10–73:18, 199:9–200:10.] The

EMOI board of directors acted independently and made its own decisions. [Macey Rept. ¶ 17, Ex. 95; EMC/MC/MOC 30(b)(6) (Fitzpatrick) Dep. at 72:10–73:18, Ex. 99 ("▮▮▮▮▮



"); EMOI 30(b)(6) (Boydell) Dep. at 140:12–22, Ex. 9 ("▮▮▮▮▮▮▮

▮▮▮▮▮.").]

**Plaintiffs' Response:** Disputed. Undisputed that EMOI had a board of directors, and that none of EMOI's directors were also directors of EMC. Otherwise disputed.

The EMOI board did not meet regularly. PX7, Devor Rept. ¶ 67. In fact, EMOI's board of directors did not meet at all between 1987 and 2006. PX10, EMOI 30(b)(6) (Boydell) Dep. 34:9-35:15; PX132, 000381. Rather, it transacted what little business it had exclusively through written consents that were drafted by personnel of EMC or EMC affiliates rather than of EMOI. PX10, EMOI 30(b)(6) (Boydell) Dep. 34:25-35:15; PX133, CA0001046125. The evidence cited by Defendants has no support whatsoever for the proposition that EMOI's board of directors met regularly; Professor Macey's expert report does in fact *say* the EMOI board met regularly, but the only citations in support have nothing to do with EMOI's board meetings. *Compare* Defs. Exh. 95, Macey Rept. ¶ 17 *with* PX11, EMC 30(b)(6) (Fitzpatrick) Dep. 72:10-73:18; 199:9-200:10.

EMOI directors were *officers* of EMC or EMC affiliates. PX7, Devor Rept. ¶¶ 68-70. Two directors of EMOI during the relevant period, Lance Eric Johnson[11] and John Charles Simpson, held concurrent positions as Executive Vice Presidents of EMOMC. PX134, EMC 30(b)(6) (Fitzpatrick) Dep. Exh. 32. Moreover, many *officers* of EMOI held concurrent positions as *officers* of EMC affiliates. *Id.*

The EMOI board of directors did not act independently or make its own decisions. As noted above, the EMOI board acted exclusively through signed consents. *See, e.g.*, PX133, CA0001046125. These were prepared by EMOI's corporate parents and EMOI adopted them at the direction of the parent companies. *Id.*; PX148, CA00011125848; PX10, EMOI 30(b)(6) (Boydell) Dep. 93:5-95:3. EMOI administrators in Jakarta "▮▮▮

---

[11] Mr. Johnson was an officer of Exxon Mobil Production Company, a division of EMC. *See infra* ¶ 190.

███████████████████████████████████████████████ ," and instead they
were managed from the United States. PX136, CA0002196327, at '328.

**Defendants' Objection to Response to Paragraph 155.** Defendants object to this
Response as it addresses unrelated and immaterial issues that do not create a genuine
dispute as to the issue of corporate separateness. For instance, it is immaterial whether
EMOI directors or officers served concurrently at EMC or EMC affiliates as officers or
lower-level employees.

156.    The activities of the EMOI board of directors were appropriately documented in

regularly kept records. [*See* Macey Rept. ¶ 17, Ex. 95; EMOI Corporate Records, 1994–2001,

CA0001046140, Ex. 101.] EMOI also held shareholder votes as required by its bylaws [Macey

Rept. ¶ 17 , Ex. 95; Record of EMOI shareholder vote, CA0001046140 at -81, Ex. 101.]

**Plaintiffs' Response:** Disputed. Undisputed that the written consents through which
EMOI's board acted were documented in records, and that EMOI's sole shareholder
"voted" when required. Disputed as to the characterization of the records as "regularly
kept" or "appropriate"; the records offered by Defendants show ████████████████
███████████████████████████████████████████████████████████
██████████████████ . *See* Defs. Exh. 101; PX137, CA0001046140, at 144-45.

**Defendants' Objection to Response to Paragraph 156.** Defendants object to this
Response as it addresses unrelated and immaterial issues that do not create a genuine
dispute as to the issue of corporate separateness.

157.    EMOI's management personnel, employees, and operations were located in

Indonesia. [Macey Rept. ¶ 20, Ex. 95; Wilson Sept. 2001 Decl. ¶ 4, Ex. 97.]

**Plaintiffs' Response:** Disputed. Undisputed that *some* of EMOI's management
personnel, employees, and operations were located in Indonesia. Otherwise disputed.

EMOI employed contractors, agents and consultants based in the United States and other
locations outside of Indonesia, especially relying on support functions provided by other
EMC affiliates. *See infra* ¶ 163. Moreover, much of EMOI's work, especially as to
security, was managed and overseen by persons based outside of Indonesia. For example,
persons based outside of Indonesia who regularly managed and supervised EMOI's
security arrangements included Michael Farmer and Lance Johnson, both based in the
United States; and Tommy Chong and Chee Khoon Oh, both based in Singapore. *See*
PX201, Cast of Characters Chart.

The evidence Defendants cite in support of this assertion amounts to a single sentence of
Mr. Wilson's 2001 declaration, in which Mr. Wilson asserts without elaboration, context,

or support, that "███████████████████████████████████
███████████." *See* Defs. Exh. 97 ¶ 4. Professor Macey's report, also cited, relies on Mr.
Wilson's unsupported assertion as well as two documents that have nothing to do with
the locations of EMOI personnel. *See* Defs. Exh. 95, Macey Rept. ¶ 20. To the extent Mr.
Wilson's declaration is true on this point, it relies on vagueness to elide the fact that
much of EMOI's work was performed and managed by actors outside Indonesia.

**Defendants' Objection to Response to Paragraph 157.**  Defendants object to this
Response as it addresses unrelated and immaterial issues that do not create a genuine
dispute as to the issue of corporate separateness.

158.    EMOI administered its own payroll and paid its own liabilities. [Macey Rept. 20,



Ex. 95; EMC/MC/MOC 30(b)(6) (Ward) Dep. at 95:12–96:17, Ex. 8 ("███████████████████

███████████."), *id.* at 98:1–8 (█████████████████████████████

████████████████████████████); EMOI Balance Sheet, MS1000004115 at -118, Ex.

102(███████████████████████████████████████████████████████);

*see also* MOI Business Unit Summary, MS1000000158 at -161, Ex. 103(███████████████

██████████████████████████████).]

**Plaintiffs' Response:** Disputed. Many of EMOI's expatriate employees were paid by an
EMC affiliate in their home countries and retained on the affiliate payroll. PX7, Devor
Rept. ¶¶ 52-57; PX12, EMC 30(b)(6) (Ward) Dep. 99:8-100:10; PX138, CA0001123061
(███████████████████████████████████████████████████████████████).
The Parent Companies paid the costs of some of the services that were provided to EMOI
by shared business departments. *See infra* ¶ 159.

Moreover, EMOI was reliant on its parent companies to pay its liabilities, because
EMOI's revenues were immediately deposited in bank accounts outside of its control. *See
infra* ¶ 159. EMOI could pay its liabilities only with cooperation from its parent
companies, in spite of its nominal beneficial ownership of its substantial revenues. *Id.*
EMOI was sometimes denied access to funds it nominally owned for expenditures it
sought to make. *Id.*

**Defendants' Objection to Response to Paragraph 158.**  Defendants object to this
Response as it addresses unrelated and immaterial issues that do not create a genuine
dispute as to the issue of corporate separateness.  It is immaterial where expatriate
employees were paid because it is undisputed that EMOI administered its own payroll
and maintained its own bank account separately from EMC.  EMOI retained the
beneficial ownership of all of its funds and the ability to control those funds.  *See* SOF
¶ 159.

159.     EMOI maintained, in its own name, books, records, and bank accounts, separate

from those of EMC. [Macey Rept. ¶ 18, Ex. 95; EMC/MC/MOC 30(b)(6) (Ward) Dep. at 68:5–

10, Ex. 8; EMOI 30(b)(6) (Boydell) Dep. at 135:12–15, Ex. 9; Wilson Dec. 2001 Decl. ¶ 4, Ex.

98; Fitzpatrick Decl. ¶ 13, Ex. 96; *see also* EMOI Balance Sheet, MS1000004115, Ex. 102;

EMOI Bank Accounts, CA0001046091, Ex. 104.] Pursuant to arm's-length services agreements

or EMOI board-authorized delegations, certain ministerial administration of EMOI bank

accounts and cash management functions for EMOI's benefit were conducted, from time to time,

by individuals within another affiliate's treasury center. [EMOI 30(b)(6) (Boydell) Dep. at

137:7–138:14, Ex. 9; *see also* Certification of ExxonMobil Oil Indonesia Inc. dated Sept. 25,

2000, CA0001046093, Ex. 105.] EMOI, however, at all times retained the beneficial ownership

of all of its funds and the ability to control those funds. [Macey Rept. ¶ 33, Ex. 95; EMOI

30(b)(6) (Boydell) Dep. at 132:16–133:14, 138:6–139:8, Ex. 9.]

> **Plaintiffs' Response:** Disputed.
>
> As to the first sentence: EMOI had two sets of financial books: one maintained by EMC
> "HQ," the other maintained by EMOI in Indonesia. *See* PX139, MS1000002653.
> Controllers of the parent companies directed two sets of accounting procedures to
> correspond to the two sets of books. EMOI's U.S. books were maintained by the parent
> companies' accountants and deviation from the headquarters accounting procedures
> required approval from high-ranking executives of the Parent Companies. PX140,
> CA0001203019 ███████. EMOI was required to submit comprehensive financial records
> to the parent companies, which maintained these records in the companies' shared
> accounting function in the United States. PX141, CA0002215603 (letter and instructions
> ███████).
>
> As to the second sentence: Defendants' citations do not support the proposition that
> arm's-length service agreements governed EMC affiliates' administration of EMOI bank
> accounts and cash management functions. The only documentation provided is an EMOI
> board authorization for affiliates to open and manage bank accounts in EMOI's name.
> Defs. Exh. 105. No invoices for such "services" have been cited. Furthermore, neither
> services agreements nor board delegations concerning EMOI's cash can be reasonably
> characterized as "arm's-length," because EMOI's board did not act independently. *See
> supra* ¶ 155.

Nor did EMOI retain beneficial ownership over its funds. PX7, Devor Rept. ¶¶ 15-16, 25-37. Though affiliate companies may have maintained intercompany receivables reflecting EMOI's book revenues, in practice EMOI did not have access to the funds managed on its behalf by other affiliates; rather, EMOI's access to its funds was subject to authorization and control from affiliate company personnel. *See infra* ¶ 162.

Plaintiffs further state that invoices from the shared intercompany accounting system were sent to an entity referred to as "  " in Houston, Texas. *See, e.g.*, PX142, CA0003001383, at '383. EMOI had no office or employees in Houston. *See* Dkt. 268-1 Defs. Statement of Material Facts (2008) ¶ 13; PX142, CA0003001383 at '387 ("                                                  "). "                                        " was a placeholder for the Parent Companies' corporate controllers headquarters in Houston, on which EMOI relied to prepare its books in accordance with U.S. GAAP accounting protocol and maintain its financial records in the United States. *See, e.g.,* PX143, MS1000003500 (                                                ).

**Defendants' Objection to Response to Paragraph 159.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness. For instance, it is immaterial whether EMC also kept records of EMOI's financial information. Further, Plaintiffs' purported evidence does not support their conclusory statements that EMOI's services agreements were not "arms-length" or that EMOI's board was not independent.

160.    EMOI prepared and filed its own local tax returns. [Macey Rept. ¶ 52, Ex. 95;

EMOI 30(b)(6) (Boydell) Dep. at 95:8–15, Ex. 9; EMC/MC/MOC 30(b)(6) (Ward) Dep. at

90:13–92:1, Ex. 8; Wilson Dec. 2001 Decl. ¶ 5, Ex. 98.]

**Plaintiffs' Response:** Undisputed but incomplete. EMC and its predecessors prepared and filed consolidated financial statements and tax returns in the United States, which included revenues, expenses, and ultimate results of EMOI operations. PX7, Devor Report ¶ 11-12; PX144, MS10000000859-64; PX10, EMOI 30(b)(6) (Boydell) Dep. 95:4-96:20.

**Defendants' Objection to Response to Paragraph 160.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness.

161.    EMOI was fully capitalized and has been since its formation. [Macey Rept. ¶ 59,

Ex. 95 (" 





███████████████████████████████████████████."); *id.* ¶ 77

("█████████████████████████████████"); EMOI 30(b)(6) (Boydell) Dep. at

43:4–8; 47:9–11, Ex. 9; Wilson Dec. 2001 Decl. ¶ 7, Ex. 98.]

> **Plaintiffs' Response:** Disputed. EMOI's initial capitalization was $1,000. PX7, Devor
> Rept. ¶ 14; PX129, CA0001347512; PX145, CA0001347597 at '600 (issued stock
> ██████████████); PX10, EMOI 30(b)(6) (Boydell) Dep. 43:4-11.
> The $1,000 sum represented ten shares of one hundred dollar stock, paid for and owned
> by Mobil Oil Corp. PX145, CA0001347597 at '600; PX130, CA0001347510 (cover letter
> attaching "███████████████████████████████████████
> ██████████████████████████."). EMOI received no subsequent
> capital contributions. PX10, EMOI 30(b)(6) (Boydell) Dep. 43:4-44:18. At the time this
> lawsuit was filed, only ten shares had ever been sold—the same ten shares that were
> issued to MOC when it incorporated MOI. PX145, CA0001000610 at '647 ████████
> ██████.
>
> Because EMOI's never had dominion over its revenues, *see infra* ¶ 162, those revenues
> are not properly counted in EMOI's capitalization. Bank accounts in EMOI's name held
> trivial amounts relative to the size and risk of EMOI's business. *See* PX147,
> CA0001347388 (EMOI bank accounts ██████████████████████
> ██████). EMOI did not own natural resources or facilities. *See supra* ¶ 6. What book
> revenues accrued to EMOI were swept away in their entirety whenever EMOI's parent
> companies directed that a dividend be paid. PX7, Devor Rept. ¶¶ 16, 31-32; PX148,
> CA0001125848.
>
> This capitalization was obviously inadequate in light of the nature and risk of EMOI's
> business. EMOI developed and operated one of the largest natural gas production
> facilities in the world. PX149, CA0001009665 (██████████████████████
> ████████████████████); PX150, CA0001203576 ███████████████
> ████████████████████████████). It employs significant numbers
> of people and machinery to do so. PX151, MS1000000158. The financial capital required
> for this undertaking is considerable, not least because the petroleum resources were
> located in the Indonesian jungle. PX15, Johnson Dep. 44:20-45:18 ("█████████
> ████████████████████████████████████████████
> ████████████████████.").
>
> Plaintiffs further state that for approximately ten years after its incorporation, EMOI was
> engaged in exploration and development activities, not production, and had no revenue.
> PX59, CA0001147297 (██████████████████████). Even when EMOI
> eventually began drawing revenue in the late 1970s, the cash flow and growth of the
> corporation was not reflected in its capital account. PX152, CA0001347515 (██████
> ████████████████████████████████████████████
> ████████████████████████████████████████████

██████); PX133, CA0001046125 ██████████

██████████████████████; PX146, CA0001000647

(██████████████████████████████████████████████).

**Defendants' Objection to Response to Paragraph 161.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness.

162.    EMOI was "████████████████████" and "████████████

████████." [EMOI 30(b)(6) (Boydell) Dep. at 121:14–122:2, Ex. 9; *id.* at 51:24–52:19

("████████████████████████████████████████

████████████████████████████████.").]

**Plaintiffs Response:** Disputed. Undisputed that EMOI's revenues, which flowed to its corporate parents, exceeded the expenditures that EMOI's parents authorized and financed. Otherwise disputed.

All revenue from EMOI's gas sales in Indonesia were wired directly to EMOI's parent corporation in the United States. PX7, Devor Rept. ¶¶ 28-29; PX153, CA0002195379 ("████████████████████████████████████

████████████████████████████████████████"); PX154, MS1000002303 (████████████████████████████████████); PX139, MS1000002653 ████████████████████████

████████████████). After arriving in MEPNA's bank account in New York, EMOI's revenue was swept into Mobil Corporation's corporate account. PX155, MS1000000184 (████████████████████████████

████████████████████; PX148, CA0001125848 ("Mobil ████████████████████████████."). EMOI then made "████████" requesting money be wired back to Indonesia to cover EMOI's operating expenses. PX7, Devor Rept. ¶¶ 28-29; PX139, MS1000002653 ████████████████

████████████████████████); PX156, CA0001215265 ("██████████████████████████████████

████."); PX153, CA0002195379 ("████████████████

████████████").

Plaintiffs further state that projects that could have been financed with EMOI's large revenue flow were vetoed by the Parent Companies, which treated EMOI's budget as a subset of the larger regional and global production budget. PX7, Devor Rept. ¶¶ 25-27; PX157, CA0001069057 ("████████████████"); PX15, Johnson Dep. 71:25-72:9, 137:9-16 (████████████████████████████████████

████); *id.* 74:5-11 (████████████████████████████

████████); *id.* 75:5-11 ████████████████████████

████████); *id.* 76:11-77:19



); *id.* 77:15-17

); PX158, CA001126192

; PX159, CA0001070344

); PX160, CA0001070329 (

); PX161, CA0001136194 (

).

Plaintiffs further state that even petty charges, such as employee bonuses and expense accounts, were submitted to the parent corporation for review. PX162, CA0001137601 (Ron Wilson seeking EMC's approval for a $2,000 bonus for one EMOI employee and a $500 bonus for another); PX163, CA0001194621

).

Plaintiffs further state that EMOI also sought—and was denied—approval to shift funds from MOI's own producing budget to MOI's exploration budget. PX164, CA0001124120.

Because EMOI had no dominion over its revenues, which were sent directly to parent companies, EMOI was not "self-financing"—it relied for financing on disbursements from its corporate parents. Nor can it be said that EMOI paid its expenses out of its own revenues; parent company control over EMOI's budget prevented EMOI from using its revenues to pay the expenditure EMOI felt were in its best interests.

**Defendants' Objection to Response to Paragraph 162.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness.

163.    EMOI was responsible for the management of its own day-to-day affairs. [EMOI



30(b)(6) (Boydell) Dep. at 67:4–9, Ex. 9 ("

."); *id.* at 72:16–23 ("                                                    ."); Wilson

Dec. 2001 Decl. ¶ 9, Ex. 98; Wilson Dep. at 191:22–195:25, Ex. 18 ("

.").] Individuals

employed by other, affiliated entities were available for consultation and to provide functional

guidance, but their role was only advisory and appropriate as shareholder representatives, and

they did not make day-to-day decisions regarding EMOI's operations. [Johnson Dep. at 53:12–

54:2, Ex. 6 ("

."); *see also* Feb. 21, 2001 Email from L. Johnson to M.

Scoggins, CA0001201224, Ex. 106(

).]

**Plaintiffs' Response:** Disputed. At nearly every turn, but particularly with respect to management of its security functions, EMOI was subject to active management by non-EMOI personnel from affiliate companies whose "guidance" was not optional and routinely made day-to-day decisions.

EMOI required approval from EMC for basic functions like issuing employee bonuses, restructuring business units or operational functions, sponsorships, and implementation of security functions and policies. *See, e.g.,* PX162, CA0001137601 (                    ; PX164, CA0001124120                    ; PX165, CA0001179798 (                    ); PX166, CA0001075584 (letter from Ron Wilson to Lance Johnson                    ); PX167, CA0001074741 (letter from Lance Johnson to Ron Wilson                    ); PX168, CA0001070665 (letter from Ron Wilson to Lance Johnson                    ).

The Parent Companies were also involved in hiring, firing, and promotions of staff. *See infra* ¶ 165.

Lance Johnson, a vice president of Exxon Mobil Corporation's EMPC division, spent approximately half of his time working on Indonesia. PX15, Johnson Dep. 54:3-11. He spoke with the general manager of the Indonesian affiliate daily. *Id.* 41:18-42:11, 51:16-

52:2. Defendants produced more than 1,100 e-mails, letters, and memoranda authored by Lance Johnson, and 6,600 documents sent to Lance Johnson concerning Indonesia. Lance Johnson traveled to EMOI approximately every other month. *Id.* 122:25-124:11. Mr. Johnson's supervisory purview covered "████████████████████." *Id.* 29:24-30:14. None of Lance Johnson's costs were billed to EMOI. *Id.* 78:9-79:4.

Plaintiffs further state that EMOI and the other Defendants shared numerous business departments, including:

- Accounting, *see* PX169, CA0001136811 (████████████████████ ██████████████████████████);

- Drilling, *see* PX170, CA0001348979, at '985 (organization chart of Mobil Drilling & Well Operations); PX171, CA0001135059, at '563 (Mobil Drilling & Well Operations overview);

- Upstream Office of the Secretary, *see* PX11, EMC 30(b)(6) (Fitzpatrick) Dep. 11:10-17, 58:10-21, 64:6-65:5;

- Global Security, *see infra* ¶¶ 163-165, 185, 187-198, 203, 223, 226, 230-232, 243-250, 265, 268, 272;

- Global Aviation, *see* PX15, Johnson Dep. 58:13-59:8 (████████████ ████████████████████;

- Public Affairs, *see* PX172, CA0001214086 (████████████████ ████████████████));

- Global Exploration, *see* PX173, CA0001138645 ████████████ ████████████████████████████);

- Global Procurement, *see* PX174, CA0001132727 (████████████ ████████████████████);

- Tax , *see* PX10, EMOI30(b)(6) (Boydell) Dep. 93:10-15 (████████ ████████████); *id.* 94:11-95:3 ████████████████████████ ████████████████████); *id.* 95:19-23 (████████████ ████████████); PX12, EMC 30(b)(6) (Ward) Dep. 94:18– 95:11 (████████████████████);

and others. Many of the functions provided by EMC affiliates to EMOI were not charged to EMOI. PX15, Johnson Dep. 78:9-79:4. These affiliate employees made day-to-day decisions on EMOI's behalf and managed EMOI's affairs directly, with no "advisory" dimension.

**Defendants' Objection to Response to Paragraph 163.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness. Defendants further object to this response as the purported evidence does not support Plaintiffs' proposition. The evidence does not show that EMOI required approval for day-to-day operations, let alone security operations, nor that EMOI and EMC shared "numerous business departments."

164.    EMOI prepared its own operating plans, budgets, and financial plans. [EMOI 30(b)(6) (Boydell) Dep. at 68:20–69:10, Ex. 9.] Although those plans and budgets were submitted to shareholders' representatives for review, endorsement, and consolidation both pre- and post-merger, the " ███████████████████████████████████ ." [EMC/MC/MOC 30(b)(6) (Ward) Dep. at 19:15–22:16, Ex. 8; *id.* at 23:10–24:4.] EMOI had the autonomy and authority to make decisions altering its budget, [EMC/MC/MOC 30(b)(6) (Ward) Dep. at 34:19–35:11, Ex. 8], and its planned expenditures, [EMOI 30(b)(6) (Boydell) Dep. at 123:22–124:22 & errata, Ex. 9; *id.* at 138:15–139:8 (" ███████████████████ ████████████████████████████████████████ ████████████████████████████ ."); Johnson Dep. at 76:24–78:8, Ex. 6 (" ███████████████████████████████████████████ ████████████████████████████████████████ ██ .")].

**Plaintiffs' Response:** Disputed. The Parent Companies controlled EMOI's operating plans, budgets, and financial plans, and EMOI had no autonomy or authority to make alterations to its budget or expenditures. PX7, Devor Rept. ¶¶ 25-27, 38-51; PX169, CA0001136811 ██████████████████████████████████ ); PX139, MS1000002653 ( ████████████████████████████████████████ ████ ; PX153, CA002195379 (" ████████████ ██████ "); PX158, CA0001126192 ████████████████ ; PX160, CA0001070329 ( ████████████ ); PX161, CA0001136194 ( ████████████ ████████ ); PX162, CA0001137601 ( ████████████



███████████████████████████████ ); PX164,
CA0001124120 ████████████████████████████████
████████████████████████. This financial relationship was nearly
unique among all of the ExxonMobil affiliated companies. PX139, MS1000002653.

**Defendants' Objection to Response to Paragraph 164.** Defendants object to this
Response as it addresses unrelated and immaterial issues that do not create a genuine
dispute as to the issue of corporate separateness. The evidence offered by Plaintiffs does
not in any way refute that EMOI prepared its own operating plans, budgets, and financial
plans.

165.    EMOI retained sole responsibility and authority for the hiring, firing, training, and

supervising of its employees. [Macey Rept. ¶ 20, Ex. 95; *see also* Wilson Dec. 2001 Decl. ¶ 9,

Ex. 98.] EMOI maintained its own human resources department, which handled EMOI personnel

matters, including the hiring and firing of employees. [EMC/MC/MOC 30(b)(6) (Fitzpatrick)

Dep. at 104:7–105:1, Ex. 99.] EMOI did not require the approval of any other affiliate to hire an

employee, and the U.S. entities were not "██████████████████████████████████

████████████████████." [*Id.*] EMOI consulted, pursuant to recommended communication

channels and best practices, with representatives of certain U.S. entities, to apprise them of

proposed key decisions regarding personnel at the management, professional, and technical

ranks, or to seek, when appropriate, recommendations for qualified candidates for specialized

positions. The purpose of such consultation, however, was not to seek approval for decisions,

and, at all times, authority for EMOI employment-related decisions remained with EMOI.

[EMOI 30(b)(6) (Boydell) Dep. at 237:16–238:22, Ex. 9; *id.* at 75:22–76:8; Personnel Matters

Guides, CA0001354174 at -174, Ex. 107("████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.").]

**Plaintiffs' Response:** Disputed. *See generally* PX7, Devor Rept. ¶¶ 52-65. EMC executives were responsible for numerous hiring and firing decisions at EMOI: in 1996, a high-ranking executive of MOC, EMC's operating arm, selected EMOI's President and General Manager. PX17, Wilson Dep. 25:14-28:16. Ron Wilson left EMOI in December 2005, when a representative from EMC suggested that Ron Wilson leave EMOI and return to the United States to fill a position in Houston, Texas. *Id.* 53:2-20. This move was necessary, according to Ron Wilson, because EMC's representative did not travel to Jakarta and persuade BP MIGAS to renew Ron Wilson's Indonesian work permit. *Id.* 56:1-57:1. Ron Wilson specified that the year before, EMC's representative, Rich Krugar, traveled to Indonesia to talk to BP MIGAS and successfully convinced them to extend Ron Wilson's work permit. Ron Wilson was not at that meeting. *Id.* 57:11-25. In May 2001, Lance Johnson hired John Haseman to " ███████████████████████████ ███████████████ ." PX175, CA0001075956; PX15, Johnson Dep. 86:16-23. Lance Johnson approved EMOI hiring Mark Johnson to work for EMOI as a contractor on community relations. John Gibbs, a human resources manager from EMC with no ostensible connection with EMOI, signed the employment contract. PX17, Wilson Dep. 301:13-302:13; PX176, CA0001128604; PX177, CA0001070534. Lance Johnson scouted and interviewed a prospective EMOI employee, Alex Dodds, for the position of Arun operations manager. PX15, Johnson Dep. 129:18-131:5; PX178, CA0001327328.

EMOI's headcount was tightly controlled by EMC. *See, e.g.*, PX179, CA0002102821 (███████████████████████████████████████████); PX167, CA0001074741 ███████████████████████████████████████████████ ███████ ).

Plaintiffs also state that EMC executives participated in promotions, performance reviews, and reorganizations within EMOI. General Manager Ron Wilson had to seek Lance Johnson's endorsement of high-level promotions. PX15, Johnson Dep. 153:12-154:12; PX180, CA0001069255. Lance Johnson asserted that his endorsement was necessary because, █████████████████████████████████████ ███████████████████ ." PX15, Johnson Dep. 153:12-23; 154:2-4.

Ron Wilson himself—the top manager at EMOI—had his performance reviewed by a high-level executive at EMC. PX181, CA0001354157. In July 1999, Bill Scoggins and Lance Johnson blocked the promotion of EMOI employee Maman Budiman. PX182, CA0001131832 (██████████████████████████████); PX183, CA0001131831 (██████████████████████████).

Plaintiffs also state that personnel were regularly transferred or loaned and borrowed between EMOI and its parent corporations. PX10, EMOI 30(b)(6) (Boydell) Dep. 226:15-227:20 ███████████████████████████████████ ; *id.* 227:5-8 ( ███████████████████████████████████ )

Public Redacted Copy



"). *Id.* 83:2-14
( ); *see also infra*
¶¶ 190, 231

. So intertwined was EMOI with other ExxonMobil affiliates that Ron Wilson could not recall the names of the various other entities for which he had worked. PX17, Wilson Dep. 20:9-21:10.

**Defendants' Objection to Response to Paragraph 165.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness. The evidence offered by Plaintiffs does not in any way refute that EMOI retained sole responsibility and authority for the hiring, firing, training, and supervising of its employees.

166.    On April 5, 2021, Plaintiffs served Defendants with an expert report prepared by

Harris L. Devor on " . [Expert Report

of Harris L. Devor, dated Apr. 5, 2021 ("Devor Rept.") ¶ 6, Ex. 108.]

**Plaintiffs' Response:** Undisputed except that the scope of Mr. Devor's assignment and opinions are more fully set forth in his report.

**Defendants' Objection to Response to Paragraph 166.** N/A

167.    In his expert report,

. [Deposition of Harris L. Devor, dated

June 16, 2021("Devor Dep.") 38:2–8, Ex. 109 ("

.").] Mr. Devor made no

. [*Id.* at 37:16–25 ("

.").]

**Plaintiffs' Response:** Disputed. Undisputed as to the fact that Mr. Devor evaluated ███ ████████████████████████████████████. PX7, Devor Rept. ¶ 7; PX48, Devor Dep. 37:16-39:6. Disputed as to whether Mr. Devor had a basis for believing ██████████████████; obviously, the fact that counsel had asked him to opine on those topics constitutes a basis for such belief. *Cf.* PX48, Devor Dep. 136:25-137:10 Moreover, Mr. Devor's beliefs about ████████████████ he was asked to evaluate are irrelevant to Defendants' motion, as are Prof. Macey's; what standard Plaintiffs must meet to pierce the corporate veil is a matter of law for the Court to decide.

**Defendants' Objection to Response to Paragraph 167.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness.

168.    In his deposition, ████████████████████████████

████████████████████████████████████████████.

[Devor Dep. at 70:11–18, Ex. 109 ("████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████.").]

**Plaintiffs' Response:** Undisputed but incomplete. Mr. Devor's expert report examined ████████████████████████████

████████. Neither American law nor Indonesian law requires a finding of fraud to pierce the corporate veil. PX43, Macey Dep. 97:5-15 (████████████████

████████████████████████████████

████████████████████.").

**Defendants' Objection to Response to Paragraph 168.** Defendants object to this Response as it addresses unrelated and immaterial issues that do not create a genuine dispute as to the issue of corporate separateness.

169.    In April 2016, Plaintiffs notified the Court that they were unable to obtain the

visas needed to travel to the United States to testify at depositions. [ECF No. 560-2 at 12–13

("████████████████████████████████████

████████████.").]

**Plaintiffs' Response:** Undisputed but incomplete and immaterial. Undisputed that Plaintiffs applied for visas and traveled to Jakarta at great expense for their visa interviews, but were denied visas to enter the United States for depositions. *See e.g.* PX26, John Doe II Dep. 17:11-18 (Q. How long have you had a passport? A. When I went to Jakarta, I do not remember the year. It's been a long time. Q. Was it more than five years ago? A No, more than five years ago. It's when we tried to get to go to the U.S. but got canceled . . . ."); *id.* 18:6-14 ("there were many people who tried to go to the U.S., and those were—those who were [involved] in this case. And we tried to went together to the U.S. at the time but got canceled."); PX22, Jane Doe IV Dep. 43:21-44:3 (Q. Did you go to Jakarta in 2015 to get your passport? A. Yes, I did. Q. And you knew that was for this case, correct, the passport was for this case? A. Yes, that is correct.).

All of the Plaintiffs appeared for their noticed depositions which were conducted remotely due to the Coronavirus pandemic. *See* Dkt. 750; *see generally* PX19-PX28 (deposition transcripts of each Plaintiff).

**Defendants' Objection to Response to Paragraph 169.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph.

170.    On at least one occasion, a plaintiff testified at her deposition with an

unauthorized person in the room, in violation of the deposition protocol ordered by this Court.

Pursuant to that protocol, the only persons permitted to attend any deposition in person were: (i)

the witness, (ii) a technical support person affiliated with the court reporting service, or, if that

was not feasible, a technical support person agreed to by the parties or approved by the Court,

and (iii) a translator agreed to by the parties or authorized by the Court. *See* ECF No. 750 at 5, §

7. In violation of this Court-ordered protocol, the first witness to be deposed, Jane Doe III,

admitted at her deposition—after first testifying that she was alone in the room [Jane Doe III

Dep. at 14:16–18, Ex. 60]—that she was in fact accompanied by another person who Plaintiffs'

counsel had hired to provide technical support, but whose presence had not been agreed to by

Defendants or approved by the Court. [*Id.* at 15:3–23.] That unauthorized person turned out to be

the son of one of the Aceh-based agents hired by Plaintiffs' counsel to assist with this litigation,

who were themselves prohibited from attending any depositions by order of the Court. [ECF No.

692 at 2.] This relationship only came to light when revealed by the second witness to be

deposed, Jane Doe V, at her deposition. [Jane Doe V Dep. at 40:18–41:5, Ex. 67.]

> **Plaintiffs' Response:** Disputed. This claim is not material to Defendants' motion for summary judgment, and Plaintiffs are not required to respond. To the extent any response is required, disputed that Plaintiffs violated the deposition protocol or otherwise acted improperly during Jane Doe III's deposition.[12] As Plaintiffs have explained to Defendants, Plaintiffs retained Kasrawi, a local college student studying computer science, to set up and troubleshoot the technology for the remote depositions, since the Plaintiffs and third-party witnesses are all rural Acehnese villages who have no experience using computers. PX185, Ltr. from A. Fryszman to J. Janghorbani (Sept. 24, 2020); PX186, Ltr. from A. Fryszman to J. Morton (Sept. 26, 2020). It would not have been possible to depose nearly two dozen rural Acehnese witnesses during a global pandemic without such help. The deposition protocol expressly contemplated the parties would retain an IT support person for the depositions and authorized said person to be in the room during the deposition. Deposition Protocol, Att. to Dkt. 750, ¶ 5.
>
> Plaintiffs repeatedly requested that, as contemplated by the deposition protocol, the parties jointly meet with Veritext Legal Solutions, Defendants' handpicked deposition service provider, to work out logistical issues, such as who would operate the technology. *See id.* ¶ 7 (authorizing paralegals to also provide remote IT help, "[c]onsistent with recommendations from the Service Provider"); *see also* PX187, Ltr. from K. Pierson to J. Morton (Sept. 4, 2020) ("We also propose again that the parties jointly confer with the court reporting/videographer service to discuss technical and other logistical issues presented by videoconference depositions and the most efficacious way to move forward."); PX188, Ltr. from K. Pierson to A. Oh (Sept. 15, 2020) ("As we have previously urged, we again request that the parties jointly confer with Veritext, the court-reporting service Exxon has elected to use, to talk through any logistical challenges that may be presented and the best way to approach these."). Defendants, who were the noticing party, failed to arrange for an IT support person and ignored Plaintiffs' requests to discuss these logistical issues with Veritext. PX186, Ltr. from A. Fryszman to J. Morton (Sept. 26, 2020) ("Exxon has *never* recommended, proposed or identified any technical person to perform this service. Exxon failed to propose anyone in either Banda Aceh or Lhokseumawe . . . . For many weeks, we have repeatedly asked defense counsel to participate in joint discussions with the court reporting service to address all technical and logistical issues. For reasons that remain hard to understand, Exxon has repeatedly declined to do so."). Although the then-proposed deposition protocol contemplated that the parties would agree on the IT helper allowed the be present during the deposition, Plaintiffs' inability to proceed with the depositions without an IT helper and Defendants' refusal to discuss the issue provided "good cause" under the deposition protocol for Plaintiffs' to retain Kasrawi without Defendants' agreement. Deposition Protocol, Att. to Dkt. 750 ¶ 7; *see also* PX186, Ltr. from A. Fryszman to J. Morton (Sept. 26, 2020)

---

[12] Contrary to Defendants' claim, by the time of Jane Doe III's deposition, the Court had not yet entered the deposition protocol. *Compare* PX21, Jane Doe III Dep. cvr. (Sept. 21, 2020), *with* Dkt. 750 (Sept. 24, 2020).

("Exxon declined to participate in this dialogue, or provide any proposed solution, knowing that a technical person would have to be used at Exxon's depositions and would need to be provided by Plaintiffs' counsel because Exxon was making no effort to do so.").

Before Jane Doe III's deposition went on the record, Kasrawi was plainly visible on screen to all participants (including Defendants' counsel) setting up the remote deposition platform for Jane Doe III. PX189, Ltr. from A. Fryszman to J. Morton (Oct. 1, 2020) ("Not only did we repeatedly raise and disclose the need for a technical support person, but Mr. Kasrawi was plainly visible on the screen to everyone present at the deposition through zoom before we went on the record. We could all hear him trying to set up the video before the deposition began and after he connected to the video we could all see him—including part of his face up close to the screen—as he was tinkering with the computer. We did not 'affirmatively conceal' his presence. Indeed, it is hard to imagine how Exxon could have thought otherwise."). Defendants did not object to his presence at that time or ask that he leave the room before the deposition began. *Id.* at 2 ("[N]either side took the time to reiterate their expectations to Mr. Kasrawi, a young student, about next steps."). As the parties' expectations that Kasrawi leave the room was not sufficiently communicated to either Kasrawi or Jane Doe III (neither of whom speak English or have any prior familiarity with depositions or other U.S. legal procedures), and Kasrawi remained in the room, off camera, while the deposition commenced. Jane Doe III was wearing headphones (Kasrawi was not), so Kasrawi could not hear counsel's questions. *Id.* Notably, the deposition protocol expressly allowed the IT support person to remain in the room during the deposition. *See* Dkt. 750 at 4, Deposition Protocol ¶ 7.

Regardless, as soon as it became apparent that Kasrawi was still in the room, Plaintiffs' counsel instructed him to leave, and he complied. PX189, Ltr. from A. Fryszman to J. Morton (Oct. 1, 2020). During the short time that Kasrawi was in the room while Jane Doe III's deposition was on the record, counsel entered their appearances, the interpreters were sworn in, the witness was sworn in, the parties discussed confusion over the translation, counsel questioned the translators, and the witness was questioned about her name, her address, and what language she spoke. PX21, Jane Doe III Dep. 4:2-15:5.

During the very next deposition, Jane Doe V's deposition, Plaintiffs' counsel learned for the first time (at the same time as Defendants' counsel) that Kasrawi was related to one of Plaintiffs' agents. PX185, Ltr. from A. Fryszman to J. Janghorbani (Sept. 24, 2020). Although neither the deposition protocol nor the Court's March 26, 2020, order prohibited Plaintiffs from using the relative of one of their agents to provide technical assistance (*see* Dkt. 692; Dkt. 750), Plaintiffs immediately terminated Kasrawi. PX185, Ltr. from A. Fryszman to J. Janghorbani (Sept. 24, 2020). Plaintiffs then identified a different local student, Iksan, proposed him to Defendants, and insisted Defendants interview him before giving their approval. PX186, Ltr. from A. Fryszman to J. Morton (Sept. 26, 2020). The parties agreed that Iksan was an acceptable IT support person, and Iksan provided critical technical support for the remaining approximately 20 Plaintiff and third-party depositions.

It was not easy to find an IT person in rural Aceh who was willing to come to the deposition hotel at 6:30 in the morning to set up the computer for depositions one or two days a week and to be on call for the duration of the depositions to troubleshoot during a pandemic. Without this person, the depositions could not have taken place at all as most of the Plaintiffs were entirely unfamiliar with the necessary technology. Exxon made no effort to supply this person or to assist with the search. It is surprising there were not more problems especially at the beginning of a logistically complicated series of remote depositions. Plaintiffs remain proud of the effort undertaken to accomplish this task.

**Defendants' Objection to Response to Paragraph 170.** Defendants object to this Response as it does not dispute or offer any evidence responsive to any material aspect of the Paragraph. The bulk of Plaintiffs' lengthy and argumentative response is unrelated or irrelevant to the undisputed fact that Plaintiffs' actions violated the deposition protocol.

171.    During fact discovery, Plaintiffs' counsel purported to legally represent each of Plaintiffs' non-party witnesses and prevented Defendants from speaking with those witnesses directly. [*See* Letter from A. Fryszman to A. Oh (Sept. 29, 2020), Ex. 110 ("I write to notify you that Cohen Milstein represents the following individuals who are witnesses in this case: ▮▮▮ (John Doe V); ▮▮▮▮▮▮ (John Doe V); ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (Jane Doe IV); ▮▮▮▮▮▮; and ▮▮▮. Because these persons are now represented by counsel, all contact should be made through Cohen Milstein."); Email from N. Jacques to A. Oh (Mar. 1, 2021), Ex. 111 ("We write to inform you that Cohen Milstein represents ▮▮▮, whose deposition is scheduled for this Wednesday, Indonesia time."); ▮▮▮ Dep. at 40:13–14, Ex. 62; ▮▮▮ Dep. at 20:21–24, Ex. 56; ▮▮▮ Dep. at 26:3–9 Ex. 39.] Plaintiffs' counsel met with these witnesses to prepare them for their depositions. [*See* ▮▮▮ Dep. at 36:19–37:3, Ex. 39; ▮▮▮ Dep. at 66:16–20, Ex. 38.] On several occasions during their depositions, Plaintiffs' counsel instructed these non-party witnesses, based on their supposed attorney-client relationship, not to answer questions on the ground of attorney-client privilege. [*See* ▮▮▮ Dep. at 39:16–40:14, Ex. 70; ▮▮▮ Dep. at 111:25–113:2, 113:16–114:3, 114:8–16, 116:23–117:8, Ex. 75; ▮▮▮ Dep. at 28:19–29:12, 31:24–32:23, Ex. 40; ▮▮▮ Dep. at 36:12–23, 41:4–10, Ex. 88.]

158

**Plaintiffs' Response:** Disputed. Defendants had approximately five years within which to contact these witnesses directly, before they were represented for the purpose of their depositions. Almost all of the witnesses were identified—and their contact information provided—on Plaintiffs' Rule 26 disclosures in October, *2015*. PX117, Pls. Oct. 2015 Rule 26 Disclosures, dated Oct. 30, 2015. Two additional witnesses were identified—with their contact information—on Plaintiffs' Rule 26 disclosures in October *2016*. PX190, Pls.' Oct. 2016 Rule 26 Disclosures. One witness—███████—was substituted in 2021 as a replacement for previously disclosed witnesses with substantially the same information. PX191, Pls.' Feb. 22, 2021 Rule 26 Disclosures. Plaintiffs then withdrew the unavailable witnesses. *Id.* This type of substitution was specifically contemplated by the parties in their August 2019 disclosures given the passage of time, the age of the witnesses, and, ultimately, the worldwide pandemic. *See* PX392, Pls.' Aug. 2019 Supp. Disclosures; PX397, Ltr. from A. Fryszman to J. Morton (Oct. 1, 2020). Defendants did not object to this substitution. Defendants and their investigators therefore had ample time—several years—to contact these witnesses directly.

It is undisputed that Plaintiffs' counsel provided legal representation to the non-party corroborating witnesses at their deposition and provided appropriate notice to Defendants regarding this. PX192, Ltr. from A. Fryszman to A. Oh (Sept. 29, 2020); PX193, Ltr from A. Fryszman to J. Morton (Oct. 26, 2020); PX194, Email from N. Jacques to A. Oh (Feb. 1, 2021; PX195, Email from N. Jacques to A. Oh, et al. (Mar. 1, 2021). For the majority of the witnesses, Plaintiffs notified Defendants that the witness would be represented at the deposition in September, 2020, immediately prior to the depositions. *Id.* Nothing stopped Defendants or their investigators from contacting these witnesses beforehand.

These witnesses would otherwise have had no legal representation when questioned by defense counsel, including questioning that warned witnesses of potential criminal liability, implicitly (and without basis) suggested wrongdoing by witnesses, or used leading questions in an effort to elicit "admissions" from witnesses that lacked any proper evidentiary basis. Plaintiffs do not dispute that the attorney-client privilege was invoked (by both sides) at depositions when appropriate. During the course of these depositions and over the past ten months, Defendants neither argued to the Court that these representations (or invoking the attorney-client privilege when applicable) were in any way inappropriate nor claimed that any form of relief was necessary or justified.

There is nothing unusual about counsel for a party representing third-party witnesses. It is routine for defense counsel to represent third-party witnesses, such as former employees of Defendants those counsel represent, at depositions—almost always at the expense of the Defendants. What is good for the goose is good for the gander.

**Defendants' Objection to Response to Paragraph 171.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.

172.    Several of the third-party witnesses being represented by Plaintiffs' counsel

testified that a member of the Aceh team, ██████████████████████████████

██████, *see* DOE006004, Ex. 112, recruited them to testify for Plaintiffs in this litigation.

[██████ Dep. at 59:9–18, Ex. 38; ████ Dep. 96:16–97:1, Ex. 64; ██████ Dep. 39:15–21, Ex.

40.]



**Plaintiffs' Response:** Disputed. Plaintiffs do not dispute that they have used an
investigator to help ascertain relevant facts and identify potential witnesses in Indonesia.
Disputed otherwise.

██████ r testified that he and others were beaten by soldiers who were guarding ██████
██████████████ (PX31, ████ Dep. 22:6-27:4) and witnessed Plaintiff Jane
Doe III's husband and others lying on the ground and not moving after these beatings (*id.*
at 27:22-29:10); that Mr. ████ subsequently informed Plaintiffs' investigator of these
events, was asked "whether I want to be the witness or not" and "I said yes, it's for the
truth" (*id.* at 60:3-15); and was asked by defense counsel if he was offered "any money to
be a witness" and testified "no" (*id.* at 60:23-61:10).

██████ testified that (a) he witnessed soldiers who he recognized from posts inside and
outside Exxon's Cluster 4 approach the field where Plaintiff Jane Doe IV's husband was
working, heard shots, and then saw the victim "lying on the ground . . . and there was a
big hole in the back of his head . . . behind the ear. . . . [H]e was dead" (PX32, ████
Dep. 8:24-14:3; *see also id.* 100:2-102:15); and (b) that ***Plaintiff Jane Doe IV*** "asked me
if [I was] willing to be a witness of the death of [her] husband, and I said, yes, I would,
because I see the incident directly" (*id.* 35:24-36:18); (c) that Plaintiffs' investigator met
with ████ in 2016 and asked "if I'm willing to be a witness" (*id.* at 96:22-97:1); and (d)
Mr. ████ testified that he has only received compensation for travel expense (in
accordance with 28 U.S.C. § 1821) and was not provided or promised any other
compensation (*id.* at 97:5-8).

██████ was with John Doe VII when they were both beaten by Exxon's military
security personnel. ████████ mother was also a witness. Mr. ████ testified that (a)
he and Plaintiff John Doe VII were taken by soldiers (including a soldier named Razali
who was a guarded Exxon's facilities at Cluster 3 and "was always in and out of Exxon,"
(PX41, ████ Dep. 15:22-16:17) to an Exxon facility and were then beaten severely
"for about 5 hours or more" (*id.* at 10:22-11:13, 13:20-15:19 & 16:21-19:9); and (b) that
he was asked by Plaintiffs' investigator "to talk to you guys like this" (*id.* at 41:11-13),
and was never given any money or compensation in connection with his testimony (*id.* at
43:5-10).

Disputed that the investigator's compensation is based on the outcome of the
investigation. Mr. Ibrahim is compensated for his time and expenses. In addition, he was
party to a contract produced as DOE006004-08. *See* Defs. Exh. 112. The contract

provided for a one-time payment upon timely completion of Plaintiffs' passport applications, a task not contingent on the success of the litigation. In exchange for deferring compensation payments the contract provided for a total potential bonus of $150,000 split between all Plaintiffs' agents—which comes out to about $1,875 per year per person in bonus, in exchange for deferred compensation. *Id.*

Cohen Milstein reviewed the 2015 contract produced as DOE006004-08 for compliance with the applicable rules, including the D.C. Rules of Professional Conduct, before executing the agreement. Dkt. 605-3 at Exh. 2, Fryzsman Decl. (2017) ¶ 9. The ethics review undertaken by Cohen Milstein confirmed that the terms of the agreement were consistent with the D.C. Rules of Professional Conduct, including D.C. Bar Ethics Opinion 233. After this review, counsel agreed to the contract. *Id.* Defendants have raised this contract in multiple briefs, and ultimately grudgingly conceded, Dkt. 677 n.9, that D.C. Rules of Professional Conduct do not bar this type of contract.

**Defendants' Objection to Response to Paragraph 172.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  Defendants further object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact.

173.    Throughout discovery, Plaintiffs have failed to preserve or produce documents

and other evidence necessary to substantiate their allegations. For example, Jane Does II and

IV—whose claims are premised on alleged injuries to their husbands—have testified that they do

not have any marriage certificates or other documentation corroborating those supposed spousal

relationships. [Jane Doe II Dep. at 98:4-6, 100:22-101:11, Ex. 57; Jane Doe IV Dep. at 100:9-

101:2, Ex. 37.] In fact, several plaintiffs testified that they destroyed or lost relevant documents

after their initial complaint was filed. [*See, e.g.*, Jane Doe II Dep. at 100:9-14, Ex. 57 ("Q. Was

[your marriage certificate] lost sometime after you filed this lawsuit? A. Yes."); Jane Doe VI

Dep. at 94:13-18, Ex. 69 ("Q. When did you throw [the documents] away? . . . A. It was after my

husband died, in 2004.").] Several plaintiffs testified that they were never instructed to preserve

documents relevant to their claims. [*See* Jane Doe I Dep. at 80:14-21, Ex. 55 ("Q. No one told

you to preserve these document[s] for this lawsuit? A. No."); Jane Doe VI Dep. at 94:13-18, Ex.

69 (". . . I don't have [the documents] anymore. I didn't know I have to keep it so I throw it

away. If I knew, I would have kept it."); Jane Doe VII Dep. at 60:21-61:2, Ex. 74 ("Q. Do you

know that you were supposed to hold on to any documents showing sources of income your

husband had? A. I don't keep it, sir, because I don't think it is important, so I don't keep it.").]



**Plaintiffs' Response:** Disputed. Plaintiffs, with the assistance of counsel and translation support, searched for and produced responsive documents. PX126, Collingsworth Decl. ¶¶ 4, 9-11; PX127, DiCaprio Decl. ¶¶ 3-5. Defendants served at least eight separate sets of Requests for Production, totaling more than 430 requests. The discovery period was limited to documents ███████████████████████████████████████." *E.g.*, PX197, EMOC Doc Request to Jane Doe I, at 2. In other requests for production, Defendants specified that they were limiting their requests to documents "█████████████████████████████████████████████." *E.g.*, PX198, Defs' Third Request for Production of Documents to Plaintiff Jane Doe I at Instr. No. 2. Thus, Defendants cannot now complain about documents they did not request or that were not responsive. Regardless, Plaintiffs searched for and produced responsive documents, including from Indonesia. However, it is not surprising that rural villagers who did not go to school, practice subsistence farming, and live in isolated agrarian communities had relatively few paper documents.

The Plaintiffs, who cannot read, were at times mistaken about the contents of a document. PX126, Collingsworth Decl. ¶ 9; *see, e.g.*, PX22, Jane Doe IV Dep. 7:17-20 ("I cannot read this document. I can't read."). For example, Defendants cite the testimony of Jane Doe VII and assert documents related to her husband's income were not produced. That is incorrect. Before his death John Doe V produced documents that detail his salary history, including his daily wage. *E.g.*, PX113, DOE005235-41. Jane Doe VII, who has had little opportunity for education, was unable to read these documents. Defendants also cite Jane Doe I's testimony, implying she destroyed documents after the lawsuit was filed. That is also incorrect. Jane Doe I did not save documents related to her visit to the hospital after the sexual assault, a visit that occurred before this litigation was contemplated.

Finally, Plaintiffs object that this claim is immaterial to Defendants' motion. There is no genuine dispute that Jane Doe II and Jane Doe IV were married. Indeed, several witnesses confirmed the spousal relationship. PX20, Jane Doe II Dep. 18:19-23 (testifying she married John Doe VIII in 1996); PX30, ███████ Dep. 7:14-8:18 (testifying that Jane Doe II was married to John Doe VIII at the time of his death); PX22, Jane Doe IV Dep. 48:9-10 (testifying her husband was John Doe X); PX32, ████ Dep. 15:8-16:6 (testifying that Jane Doe IV was John Doe X's wife).

**Defendants' Objection to Response to Paragraph 173.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. Defendants further object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact.

174.    Plaintiffs have also wielded the Court's order prohibiting Indonesian discovery as both sword and shield, selectively producing evidence from Indonesia while refusing Defendants the opportunity to seek additional discovery on the same issues. For example, Plaintiffs produced, only hours before John Doe VII's deposition, scanned copies of photographs purportedly taken of John Doe VII, then refused to produce the original photographs, which would have allowed Defendants to confirm their provenance based on metadata. [*See* Pl. John Doe VII's Objs. & Resps. to Defs.' 7th Req. for Produc. of Docs. (Dec. 18, 2020) at 3, Ex. 113 ("Plaintiff further objects to this Request to the extent it seeks discovery of . . . information [that] is located exclusively in Indonesia."); Letter from E. Cox to A. Fryszman (Jan. 15, 2021), Ex. 114.] Plaintiffs' counsel also refused to produce government-issued identification for any non-party witnesses (despite purporting to represent them), on the supposed ground that it would violate the Court's order barring Indonesian discovery. [*See* Pls.' Objs. & Resps. to Defs.' 8th Req. for Produc. of Docs. (Jan. 15, 2021) at 4, Ex. 115 ("Plaintiffs further object to this Request because it seeks documents located exclusively in Indonesia . . . . Multiple Court orders have restricted discovery of documents that reside exclusively in Indonesia."); Letter from M. Webber to A. Fryszman (Jan. 25, 2021), Ex. 116 ("Your stonewalling on such a simple request—for easily-obtainable documents allowing Exxon to verify that Plaintiffs' Witnesses are whom they claim to be—is yet another denial of Exxon's due process rights and ability to defend itself.").] Several of Plaintiffs and their witnesses failed to bring any identification to their depositions that would enable Defendants to verify their identity. [*See, e.g.*, John Doe IV Dep. 8:7-14, Ex. 91; John Doe VII Dep. 8:10-12, Ex. 92; ███████ Dep. 39:25-40:3, Ex. 62.] Plaintiffs also refused to produce any documents located in Indonesia that would support the assertions in their damages disclosures. [Pls.' Objs. & Resps. to Defs.' 6th Req. for Produc. of Docs. (May 11,

2020) at 6-7, Ex. 117 ("Plaintiffs have already searched for and produced documents located outside Indonesia relating to the damages sought.").]

**Plaintiffs' Response:** Disputed. This claim is not material to Defendants' motion for summary judgment, and Plaintiffs have no obligation to respond. To the extent a response is required, disputed that Plaintiffs have used the Indonesian discovery ban as a sword and a shield. The two discovery requests Defendants cite sought irrelevant documents, were improper on a multitude of grounds (even putting the Court's ban on Indonesian discovery aside), and were plainly sent only to manufacture a dispute over a nonissue and enable Defendants' present argument.

Defendants' request that Plaintiffs send a forensic discovery expert (or anyone with sufficient knowhow) to travel to rural Aceh to extract metadata of unclear relevancy from John Doe VII's camera was plainly overbroad and unduly burdensome. PX199, Pl. John Doe VII's Objections and Responses to Defs.' Seventh Request for Production of Documents at 2-3. Defendants had a full opportunity to question John Doe VII about when and where he took the photographs at issue, which depicted the exterior of ███ ████████ te where John Doe VII was brutally tortured in 2000. *See, e.g.*, PX28, John Doe VII Dep. 200:11-19 ("[D]id you take this photograph? A. Um, yes. Q. Do you remember when you took it? A. Um, I took it at the same time I took early—the earlier pictures. I don't remember that day anymore. I think it was about a week ago."). Moreover, Defendants have known since at least 2007 that John Doe VII was detained and tortured at ███ , have had ample opportunity to investigate and take their own photographs of ███ , and could have easily verified that John Doe VII's photographs depicted A1. PX200, Plaintiff John Doe VII's 2007 Supplemental Response to ExxonMobil Oil Corporation's First Set of Interrogatories, at Resp. No. 1(b) ( ████████████████████████████████████████████████ .").

Defendants did not at the time articulate to Plaintiffs—and it is still not clear—what additional information Defendants needed about the "provenance" of these photographs or for what plausibly relevant purpose Defendants needed this information. Plaintiffs offered to meet and confer with Defendants to find a solution. PX199, Pl. John Doe VII's Objections and Responses to Defs.' Seventh Request for Production of Documents at 3 ("If Defendants believe they have a proper purpose for seeking such discovery and can provide a convincing explanation of the reasons such discovery is appropriate under the Federal Rules, Plaintiff's counsel are available to consider the proffered explanations and confer with Defendants regarding the matter."). Had Defendants met and conferred with Plaintiffs and still been unsatisfied with Plaintiffs' response, they could have moved to compel or exercised any of the other mechanisms readily available to them in the Federal Rules of Civil Procedure to seek this information. Defendants chose not to do so, saving their grievances for the present motion.

Defendants' request for production under Federal Rule of Civil Procedure 34, directed to Plaintiffs, for government identification belonging to ***third parties***, was facially inappropriate. PX202, Pls.' Objections and Response to Defs.' Eighth Request for Production of Documents, at 2-4. These documents were not in Plaintiffs' possession, so

Public Redacted Copy

Plaintiffs obviously could not have produced them. *Id.* at 2. That Plaintiffs' counsel represented these third-party witnesses for the limited purpose of defending their depositions does not turn them into parties subject to Rule 34. Even if Counsel had treated Defendants' Rule 34 requests as subpoenas under Rule 45, Plaintiffs' counsel did not have the power to compel these witnesses, who all testified voluntarily, to produce any documents, and as these witnesses are all beyond the Court's compulsion power, they would have had little incentive to do so voluntarily. This elementary flaw with Defendants' request aside, Defendants articulated no proper purpose for seeking copies of the third-party witnesses identifications, all of whom testified under significant fear of their safety. Defendants had the opportunity to question all witnesses about their identities, and some witnesses even voluntarily displayed their identifications for Defendants' counsel during their depositions. Defendants have presented no reason to believe any witness was lying about their identity.

Plaintiffs once again offered to meet and confer with Defendants to discuss a solution to Defendants' concerns. *Id.* at 4 ("If Defendants believe they have a proper purpose for seeking such discovery and can provide a convincing explanation of the reasons such discovery is appropriate under the Federal Rules, Plaintiffs' counsel are available to consider the proffered explanations and confer with Defendants regarding the matter."). But Defendants again did not accept Plaintiffs' offer, instead sending a short letter stating, without any elaboration, that Defendants were "perplexed" by Plaintiffs' rationale for not producing documents in the exclusive possession of third-party witnesses. PX203, Ltr. from M. Webber to A. Fryszman, at 2 (Jan. 25, 2021). Had Defendants met and conferred with Plaintiffs and still been unsatisfied with Plaintiffs' response, Defendants would have had the full opportunity to seek whatever relief they believed they were entitled to under the Federal Rules of Civil Procedure and other relevant authority. Defendants again chose not to do so, saving their grievances for the present motion.

There is no requirement in the Federal Rules of Civil Procedure, the parties' deposition protocol, or any other governing authority that third-party deponents present identification at their deposition.

Finally, Plaintiffs searched for and produced documents related to their damages claims, including from Indonesia. However, it is not surprising that rural villagers who did not go to school, practice subsistence farming, and live in isolated agrarian communities had relatively few paper documents. *See supra* ¶¶ 47, 173.

**Defendants' Objection to Response to Paragraph 174.**  Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph.  Defendants further object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact.

175.    In addition, Plaintiffs routinely attempted "depositions by ambush," leaving

defense counsel with barely any time to review brand new allegations and just-produced

documents before deposing the producing plaintiffs and non-party witnesses. For example,

Plaintiffs' counsel served Jane Doe VII's supplemental interrogatory responses, which contained

entirely new factual allegations, less than 48 hours before her deposition was scheduled to begin

on October 7, 2020. [Pl. Jane Doe VII's Supp. Resp. to ExxonMobil Oil Corporation's 1st Set of

Interrogs. (Oct. 5, 2020), Ex. 118.] Although Plaintiffs' counsel claimed that these responses

were intended to " █████████████████████████████████

███████ " [*id.* at 6], Jane Doe VII was substituted as a plaintiff five years earlier, in July 2015,

*see* ECF No. 513, giving her ample opportunity to supplement her husband's responses well in

advance of her deposition. Plaintiffs' counsel also chose to supplement their document

productions with respect to John Doe VII mere hours before his deposition was scheduled to

begin. [*See* Letter from A. Fryszman to A. Oh (Nov. 12, 2020), Ex. 119; Letter from J. Morton to

A. Fryszman (Nov. 12, 2020), Ex. 120.] Further, Plaintiffs' counsel belatedly announced that

they would be deposing non-party witness ██████████—a witness they had not previously

indicated that they even intended to depose—with less than a week's notice before his

deposition. [*See* Email from A. Fryszman (Oct. 21, 2020), Ex. 121; Email from J. Morton to A.

Fryszman (Oct. 21, 2020), Ex. 122; Letter from K. Pierson to J. Morton (Sept. 4, 2020), Ex.

123.] Plaintiffs' counsel then produced documents relating to ████████ on the day of his

deposition. [Notice of Dep. for ████████ (Oct. 26, 2020) (noticing deposition for 9AM

October 28, 2020 in Lhokseumawe, Indonesia), Ex. 124; Letter from A. Fryszman to A. Oh (Oct.

27, 2020), Ex. 125.]

> **Plaintiffs' Response:** Disputed. Defendants' claim is not material for purposes of
> Defendants' motion for summary judgment, and Plaintiffs have no obligation to respond.
> To the extent a response is required, disputed that Plaintiffs ever "attempted 'deposition
> by ambush.'"
>
> Jane Doe VII did not "ambush" Defendants with new allegations. Plaintiffs discovered an
> error in the pleadings, supplemented the interrogatory answers upon discovering the

error, and asked Exxon to consent to an amendment of the complaint. Exxon declined. Determining that Exxon's objection to the delay in seeking amendment was not unreasonable, Plaintiffs declined to move to amend. Therefore, the operative claims in the case that relate to Jane Doe VII remain the claims pled in 2014. There are no "brand new" allegations.

John Doe VII did not "ambush" Defendants. John Doe VII produced several photographs shortly before his deposition because John Doe VII *took those photographs shortly before his deposition.* PX28, John Doe VII Dep. 178:9-180:18 (testifying that he took the photograph Bates stamped DOE006032 "a few days ago"); *id.* at 180:19-195:14 (testifying that he took the photograph Bates stamped DOE006033 "about one week ago"); *id.* at 199:13-200:19 (testifying that he took the photograph Bates stamped DOE006031 "at the same time [he] took . . . the earlier pictures . . . . about a week ago"). John Doe VII could not have produced documents that did not exist. John Doe VII's photographs depicted the exterior of the ▮▮▮▮▮▮▮▮▮▮ where he was unlawfully detained and brutally tortured. *See id.* at 196:9-18 ("So the photo was—is where I was, um, um, where I was tortured before, and that is where, um, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. And that is where I was tortured. I was held. And it was at ▮▮▮ . . . ."). Defendants have known since at least 2007 that John Doe VII was tortured at Camp A1 and have had ample opportunity to investigate the site depicted in these photographs. PX200, Pl. John Doe VII's 2007 Supplemental Response to ExxonMobil Oil Corporation's First Set of Interrogatories, at Resp. No. 1(b) ("Plaintiff was arbitrarily detained and assaulted at ▮▮▮▮▮▮▮ . . . .").

Plaintiffs did not "ambush" Defendants with ▮▮▮▮▮▮▮ deposition. As Defendants' own exhibits disclose, Defendants expressly agreed to scheduling his deposition on October 28: "in the interest of avoiding further delay, we will agree to move forward with ▮▮▮▮▮▮▮ on October 28." Defs. Exh. 122. This scheduling change was necessary because one Plaintiff's son died, which necessitated rescheduling her daughter's deposition; another witness was hospitalized. *See* Defs. Exh. 121. In order to stay on schedule, Plaintiffs proposed swapping ▮▮▮▮▮▮▮ for ▮▮▮▮▮▮▮ (the hospitalized witness). *Id.* Plaintiffs explained all of this in writing to Defendants, who agreed to the schedule change. Defs. Exh. 122. Moreover, in their *2015* Rule 26 disclosures, Plaintiffs identified ▮▮▮▮▮▮▮ as an eyewitness to the attack on John Doe VI and provided his village and contact information. PX117, Plaintiffs' October 2015 Rule 26 Disclosures at 7. Thus, Defendants knew ▮▮▮▮▮▮▮ was a witness for approximately five years before his deposition and had ample opportunity to investigate his knowledge of Plaintiffs' claims. ▮▮▮▮▮▮▮ is a third-party witness who voluntarily testified, so Plaintiffs had no ability—and were under no obligation—to produce documents in ▮▮▮▮▮▮▮ sole possession. Plaintiffs produced certain documents from ▮▮▮▮▮▮▮ immediately after ▮▮▮▮▮▮▮ voluntarily provided those documents to Plaintiffs' counsel.

**Defendants' Objection to Response to Paragraph 175.** Defendants object to this Response as it is not supported by evidence, is improper argument, and does not offer any evidence responsive to any material aspect of the Paragraph. Defendants further object to this Response as it addresses unrelated and immaterial issues that do not create a genuine issue of material fact.

## DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

I. **EMOI'S AND EMC'S NEGLIGENT HIRING, RETENTION, AND SUPERVISION OF MILITARY SECURITY**

A. **Mobil and MOI Were Informed About Torture, Summary Executions, Mass Graves and other Abuses by the Military Near MOI's Operations in Aceh**

176.     **Defendants knew of the military's record of human rights abuses.** Before requesting military guards for EMOI's[13] facilities and operations, the Defendants were aware of the military's history of detentions, torture, killings, rape and other violent actions directed at civilians and the extreme risk of such abuses if EMOI engaged the military to protect its operations. Senior officials at EMC and EMOI were aware or should have been aware of specific reports of abuses both historically and during the relevant period. These reports were buried or ignored. *See infra* ¶¶ 177-84, 214, 224, 273-75, 305, 354.

> **Defendants' Response.**  The statement in Paragraph 176 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.  Moreover, Plaintiffs' purported evidence does not support Plaintiffs' proposition.  Plaintiffs' claim that "EMOI engaged the military to protect its operations" misleadingly suggests that the sovereign military of Indonesia worked for EMOI, which is false.

177.     **In late 1998,** *Business Week***'s Michael Shari specifically informed EMOI officials of historical abuses.** In the Fall of 1998, senior officials at EMOI (then MOI) were contacted by Business Week's Bureau Chief in Singapore, Michael Shari.[14] *See* PX76, Shari Decl. ¶ 8. Shari informed EMOI that Business Week was investigating allegations that, "███████

---

[13]     In the discussion that follows, EMOI is often used to refer collectively to EMOI and MOI because the latter corporation became EMOI at the time of the merger. Similarly, EMC is used to refer to its predecessors in interest.

[14]     During the recent deposition period, Plaintiffs noticed Mr. Shari to be deposed, but Defendants declined to consent to a deposition between the numerical limits in the Federal Rules. Accordingly, Plaintiffs have submitted Mr. Shari's sworn declaration. *See* PX76, Shari Decl.



*Id.* at ¶ 9. Over the course of a five-week investigation, Shari had met with █████████████████████████████████████████████████████████████████████████████████████" and "█████████████████████████████████████████████████████████████████████████████ as well as other allegations. *Id.* at ¶ 7.

> **Defendants' Response.** The statement in Paragraph 177 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. The *Business Week* article concerns events occurring more than eight years
> prior to the beginning of the relevant time period, during an earlier period of significant
> violence between the Indonesian military and the Aceh separatist movement, and does
> not concern any of Plaintiffs' alleged injuries.

178.    **Defendants refused to cooperate with Shari's investigation of past abuses tied
to their operations.** In November and December 1998, Shari asked to meet with Mobil Oil
Indonesia officials and employees—including, in particular, "███████████████████████████████████████████████████████████████"—to determine the company's involvement and knowledge
regarding these matters. *Id.* at ¶¶ 7-8, 14. The Mobil Oil executive (Lance Johnson) who had
been the President of Mobil Oil Indonesia during the time period Shari was investigating—and
was now a Mobil Oil executive in the United States—told other Mobil officials in the United
States and Indonesia that "█████████████████████████████████████████████████████████████████████████████████████████████████████████." PX204,
CA0001126953. Mobil decided *not* to make Lance Johnson available to Mr. Shari, and instead
arranged for Shari to speak with Neil Duffin, who had only recently (in January 1998) become
the Senior Vice President at EMOI and had not been in Indonesia or otherwise associated with
Mobil Oil Indonesia during the years Mr. Shari and Business Week were investigating. PX205,

CA0001149202 ("

.").

> **Defendants' Response.** The statement in Paragraph 178 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. The statement in Paragraph 178 also is unsupported by the record. By
> Plaintiffs' own admission, Mobil Oil Indonesia provided a senior executive to meet with
> the author of the *Business Week* article. The *Business Week* article concerns events
> occurring more than eight years prior to the beginning of the relevant time period, during
> an earlier period of significant violence between the Indonesian military and the Aceh
> separatist movement, and does not concern any of Plaintiffs' alleged injuries.

179. **Shari provided Defendants with detailed allegations of abuse.** In November

and December 1998, Mr. Shari provided the following information to Senior Vice President

Duffin and a second Mobil Oil official (Jon Loader, a public relations official for Mobil):



- I told the Mobil Oil officials that the witnesses indicated that "the stench



- 

PX76, Shari Decl. ¶ 11. *See also* PX77, CA0001149240 (Mobil Oil transcript of Duffin

interview); PX18, Duffin Dep. 116:6-137:10 (                                                    ); *id.* at

134:9-137:7 (

                                                    ). After receiving this information about executions

and torture by the military, Mr. Duffin took no steps to determine if the witnesses to these events

would be willing to speak with MOI. *Id.* at 137:8-10.

> **Defendants' Response.** The statement in Paragraph 179 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. The *Business Week* article concerns events occurring more than eight years
> prior to the beginning of the relevant time period, during an earlier period of significant
> violence between the Indonesian military and the Aceh separatist movement, and does
> not concern any of Plaintiffs' alleged injuries.

180. **Shari traveled with Exxon officials to the sites of mass graves near Exxon**

**facilities.** Mr. Shari also traveled with Mr. Loader to the sites of many of these atrocities and

informed him of the additional facts described in Mr. Shari's declaration. PX76, Shari Decl. ¶ 16.

During the course of this travel and other contacts with Mobil Oil Indonesia officials, Mobil and

MOI were further informed that:

- 



**Defendants' Response.** The statement in Paragraph 180 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. The *Business Week* article concerns events occurring more than eight years prior to the beginning of the relevant time period, during an earlier period of significant violence between the Indonesian military and the Aceh separatist movement, and does not concern any of Plaintiffs' alleged injuries.

181.    **The record contains no evidence showing that Defendants conducted a serious investigation of Shari's allegations.** In December 1998, this and other information was reported in a *Business Week* article entitled "*What did Mobil Know.*" PX78, CA0001008719. This information was provided to Mobil and EMOI officials. PX18, Duffin Dep. 150:16-158:14; PX14, Farmer Dep. 135:1-20; PX12, EMC 30(b)(6) (Ward) Dep. 152:5-153:2. Although the Defendants have stated that a legal investigation was undertaken, they have withheld any information from that report—such as the individuals who were interviewed, what they said, or any other information from the report on the basis of privilege. PX8, EMOI 30(b)(6) (Snell) Dep. 86:11-25); EMC and EMOI did nothing to investigate these allegations independent of the withheld report. *Id.* at 88:16-89:7; PX18, Duffin Dep. 145:21-22, 146:12-17 (testifying that ▮

████████████████████████████████████

███████████████████

> **Defendants' Response.** The statement in Paragraph 181 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. The *Business Week* article concerns events occurring more than eight years
> prior to the beginning of the relevant time period, during an earlier period of significant
> violence between the Indonesian military and the Aceh separatist movement, and does
> not concern any of Plaintiffs' alleged injuries.

182. **Contemporaneous public State Department reports warned of abuses by the**

**military during the relevant period.** Information about detentions, torture, killings and rape by

the military in Aceh was also available to EMC and EMOI's management in publicly released

reports by the United States Department of State in February 1999, February 2000 and February

2001. PX206, CA0001045038; PX207, State Dept. Rept. 1999 (EMOI 30(b)(6) (Snell) Dep.

Exh. PX65); PX208, CA0001055705. Two of these reports were produced during discovery

from EMC's records. The Department of State *Indonesia Country Report on Human Rights*

*Practices for 1998*, released on February 26, 1999, reported, *inter alia*, that:



PX206, CA0001045038, at 1117-1118.

> **Defendants' Response.** The statement in Paragraph 182 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. The referenced State Department reports in no way connect Plaintiffs'
> alleged injuries to Defendants.

183.    **Defendants' senior executives knew of the military's history of abuses.** Senior

Mobil executives were aware of the military's recent history of torture, killing, rape and other

abuses in Aceh. *See, e.g.,* PX18, Duffin Dep. 45:12-46:20 (testifying that he ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id.* at

50:11-20 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *id.* at 51:5-52:1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *id.* at 147:21-148:23 (▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also* PX209,

CA0001044067 (same); PX18, Duffin Dep. 150:16-158:14 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮); *id.* at 191:7-12 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮); *id.* at 219:18-221:5 (knowledge of torture); PX210,

CA0001179871 (Daily Risk Assessment sent to Wilson and Duffin ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮); *supra* ¶¶ 176-83.

**Defendants' Response.** The statement in Paragraph 183 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact.  The fact that executives at EMC or EMOI may have been aware of
historical abuses by the Indonesian military, even if true, in no way connects Plaintiffs'
alleged injuries to Defendants.

184.    Defendants had actual and constructive knowledge of the risk that military

security would violate the human rights of local civilians. Because of Mobil Oil's long history in

Aceh, the information received from Mr. Shari, and the substantial information in both public

174

information from the State Department and other published reports, executives at Mobil Oil

Corporation, EMC and MOI/EMOI were actually and constructively aware of the history of

torture, executions and other abuses by military personnel in Aceh and the risks that engagement

of military security would lead to further abuses of local civilians. *See supra* ¶¶ 176-84; PX3,

Robinson Rept. 21-23; PX5, Ling Rept. ¶¶ 64-75.

> **Defendants' Response.** The statement in Paragraph 184 is not supported by evidence, is
> improper argument, and is immaterial to Defendants' motion for summary judgment. An
> immaterial statement cannot create a genuine issue of material fact. The fact that
> executives at EMC or EMOI may have been aware of historical abuses by the Indonesian
> military, even if true, in no way connects Plaintiffs' alleged injuries to Defendants.

### B.    "Rework[ing] the Entire Security Philosophy for Indonesia"

185.    **Mobil's Indonesian operations had been very profitable.** For many years,

Mobil had considered the company's LNG operations in Aceh ███████████████" PX65,

CA0001174650, at '55. In 1998, MOI earned approximately $295 million in earnings from these

operations—a number that increased to $500 million by 2000. PX211, Defs. 2008 Stmt. of

Material Facts (Duffin Exh. PX7) ¶20.

> **Defendants' Response.** The statement in Paragraph 185 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact.

186.    **Arun's energy reserves were diminishing, pushing Defendants into**

**operations beyond its fenceline.** Mobil was aware that the energy reserves in the Arun Field

were diminishing. Maintaining the profitability of these operations required not only

maintenance of those fields, but expansion of drilling in nearby areas. █████████████

████████████████████████████████████████████████████

██████████. *See* PX212, CA0001351986 (map of EMOI production areas, █████████████

██████████████████████████████████"); PX213, CA0001337947

("North Sumatra Operations Map"); PX214, CA0001005148, at '152; PX18, Duffin Dep. 78:2-

17 (testifying that ███████████████████████████████████████████████

███████████████████████████████████████████████ ”). Mobil

executives in the United States instructed MOI ████████████████████████

████████████.” PX18, Duffin Dep. 79:1-84:1; PX215, CA0001131118.

> **Defendants' Response.** The statement in Paragraph 186 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Further, Plaintiffs' purported evidence does not support Plaintiffs' claim that EMOI "operat[ed] beyond its fenceline."

187.   **In early 1999, EMC executives in the United States began "**████████████

████████████████████████ **"** PX216, CA0001126263; *see also* PX217,

CA0001134812, at '813 (EMC Global Security group's Mike Farmer to Lance Johnson in the

United States: ████████████████████████████████████); PX218,

CA0001134588 (Farmer explains that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████"); PX219, CA0001126149, at '50 (Johnson

and Farmer discuss ████████████████████████████████████████

██████). Over the next two years, these and other executives in the United States, including

EMC's Global Security group, would play a critical role in assigning security personnel to EMOI

in Aceh, approving and implementing plans to increase substantially the use of military guards

for EMOI's facilities and operations, and coordinating and providing the payments and logistical

support that was a prerequisite to the military guards' presence and operations in the area of

EMOI's operations.

> **Defendants' Response.** The statement in Paragraph 187 is immaterial. An immaterial statement cannot create a genuine issue of material fact. The statement in Paragraph 187 also is unsupported by the record. EMOI was responsible for the management of its own affairs, including its security operations. See SOF ¶¶ 163–165.

C.      **The Dominant Role Played by EMC and EMC's Global Security Group**

188.    **EMC's Global Security organization is based in the United States, with**

**regional security offices in various locations.** *See, e.g.,* PX220, CA0001355089, at '125. Mike

Farmer was " ███████████████████████████████████████████ " in the

Asia Pacific area (including Indonesia) and other locations. *Id.* at '126. The geographic area

covered by EMC's regional security office in Singapore included Indonesia. *Id.* at '125. *See also*

PX14, Farmer Dep. 62:6-63:3 (describing Global Security group's ███████████████

███████████████████████ ). Prior to the merger, the Global Security

organization's regional office in Singapore was incorporated as MAPPL. Post-merger it was

incorporated at EMAPPL. *See* PX9, EMC 30(b)(6) (Snell) Dep. 1051:23-1053:11.

> **Defendants' Response.** The statement in Paragraph 188 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.

189.    **ExxonMobil Production Company is a division of EMC with no separate**

**corporate existence.** Several key players in Defendants' negligent hiring, retention, and

supervision of military security are referred to internally as working for ExxonMobil Production

Company, or often simply "the production company." *See, e.g.*, PX15, Johnson Dep. 20:17-20

( ███████████████████████████ ). ExxonMobil Production Company,

however, is a division of EMC with no separate corporate existence. *See* PX11, EMC 30(b)(6)

(Fitzpatrick) Dep. 45:7-14 ( ██████████████████████████████████████

███████████████████████████████████████████████████████████

███████ "). "Production Company" employees are thus actually EMC employees. Key

EMC employees who worked in the "production company" division include Lance Johnson, Bill

Scoggins, and Terry Koonce. *See* PX15, Johnson Dep. 20:17-20 ████████████████

███████████████ ); PX12, EMC 30(b)(6) (Ward) Dep. 232:5-16 ████████████



.”); PX15, Johnson Dep. 65:24-66:10 (

.”); PX11,

EMC 30(b)(6) (Fitzpatrick) Dep. 79:22-80:2 (“

).

**Defendants' Response.**  The statement in Paragraph 189 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.

190.    EMC Global Security selected key personnel involved in Defendants' negligent hiring, retention, and supervision of military security. Beginning in at least 1999 and continuing through 2001, Mobil's (and then EMC's) Global Security organization selected managers and security personnel who played critical roles in implementing security policies in Aceh and, in particular, coordinating and supporting the use of military guards. EMC and its predecessor corporations at Mobil, played central roles in these activities. For example:

A.    Tommy Chong, Mobil's Regional Security Manager in Singapore assumed a significant security role for EMOI's operations after being assigned to that role by Mobil's Global Security organization. *See* PX14, Farmer Dep. 113:20-21

); PX18, Duffin Dep. 25:11-26:7 (“

178



.”); PX14, Farmer Dep. 37:10-38:10 (

t”)**;** PX221, CA0001194210

(e-mail from Singapore office to EMC's Mike Farmer in the United States indicating that

).

B.      In February 1999, Lance Johnson[15] requested that Mobil's Global Security

.” PX218, CA0001134588, at '590.

C.      In April 1999, Chong hired Richard Pereira

PX222, CA0001337582, at '84.

.” PX224,

CA0001179816, at '817; *see also* PX165, CA0001179798.

> **Defendants' Response.**  The statement in Paragraph 190 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The
> statement in Paragraph 190 also is unsupported by the record.  EMOI was responsible for

---

[15] Lance Johnson was an employee of Exxon Mobil Production Company, a division of EMC
with no separate corporate existence. *See supra* ¶ 189. Johnson was also a director of EMOI, but
not an EMOI employee or officer. PX134, Fitzpatrick Dep. Exh. PX32; PX11, EMC 30(b)(6)
(Fitzpatrick) Dep. 199:14-200:10; PX10, EMOI 30(b)(6) (Boydell) Dep. 66:19-24 (describing
). "A corporation does not act through its individual
directors, but rather through its board of directors as a whole." 2 Fletcher Cyc. Corp. § 505. Thus
when Johnson managed EMOI's day-to-day security affairs he could not have been acting as a
director of EMOI, but rather as an employee of EMC.

the management of its own affairs, including its security operations. *See* SOF ¶¶ 163–165.

191. **EMC produced a strategic security study on Indonesia in May 1999.** On May 7, 1999, Mobil Oil's joint Global Security/Global HR team completed an Indonesia Strategic Security Study. PX218, CA0001134588. This report recognized that ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ s. *Id.* at '601. (Even though MOI's internal documents and State Department reports had informed Mobil Oil and MOI officials about torture and killings during interrogations by military personnel in Aceh, *see supra* ¶¶ 176-85).

   **Defendants' Response.** The statement in Paragraph 191 is immaterial. An immaterial statement cannot create a genuine issue of material fact.

192. **As Defendants implemented the security strategy set forth in EMC's report, EMC continued to play a dominant role.** After EMC's May 1999 report was prepared—and as Defendants proceeded to engage more and more military security—Defendants' officials in both the United States and Aceh understood that the design, staffing and implementation of EMOI's security strategy was heavily dependent on resources and direction provided by Mobil's (and then EMC's) Global Security organization. Discussing the May 1999 Indonesia Strategic Security Study, Mike Farmer (Mobil, and then EMC's, Global Security Manager—International[16]) indicated that it ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

---

[16] Mike Farmer was Mobil Corporation's Global Security Manager from January 1, 1998-November 30, 1999, and then became the Global Security Manager—International for EMC from December 1, 1999-June 30, 2001. PX8, EMOI 30(b)(6) (Snell) Dep. 707:13-708:2. Throughout that period he was based in Fairfax, Virginia. *Id.*

 " PX218, CA000113588. Farmer also made clear that MOI did

not have the resources or expertise to implement these strategies. He informed senior Mobil

executives in the United States that:

*Id.* at '589.

> **Defendants' Response.** The statement in Paragraph 192 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 192 also is unsupported by the record. EMOI was responsible for
> the management of its own affairs, including its security operations. *See* SOF ¶¶ 163–
> 165.

> 193.    EMC management, personnel and resources continued to be indispensable to

Defendants' Indonesian operations throughout the next two years. For example, in seeking EMC



Jim Russell advised EMOI's Wilson and Duffin and EMC's Farmer that

"). PX224,

CA0001179816 at '817. *See also* PX221, CA0001194210 (email from EMC's Farmer explaining

that

"); PX225, CA0001335064, at '065 (email

from Russell explaining that " 

"); *id.* (response to

); PX15, Johnson Dep. 56:13-57:21 (

); PX14, Farmer Dep. 54:2-6

).

**Defendants' Response.** The statement in Paragraph 193 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 193 also is unsupported by the record. EMOI was responsible for the management of its own affairs, including its security operations. *See* SOF ¶¶ 163–165.

194.    EMC Global Security reviewed Defendants' Indonesian operational security in excruciating detail, and prescribed tasks at a granular level. As the May 1999 Indonesia Strategic Security study reflects, Mobil's—and then EMC's—Global Security group evaluated EMOI's security policies and procedures in detail. *See* PX218, CA0001134588. EMC continued to supervise operations in Aceh closely. *See* PX226, CA0001004852 (Aceh security status report

); PX227, CA0001004887 (MOI Safeguards and Security Risk Assessment); PX228, CA0001047338, at '340 (risk assessment

") [17]; PX229, CA0001006150, at '153 (same). EMC identified tasks, assigned individuals to complete the enumerated tasks, and set target completion

---

[17] Although the document is labeled a "draft," this was apparently the final document prepared by the Risk Assessment team. *See* PX9, EMC 30(b)(6) (Snell) Dep. 1061:3-20.

dates. *See, e.g.*, PX218, CA0001134588 The evaluations identified support required from EMC's

Global Security organization as well as EMOI. *See, e.g.,* PX230, CA0001169178 (█████████

█████████████████████████████████████

███████████████████████████████").

They also assessed EMOI's retention of armed security personnel in Aceh and suggested detailed

modifications to these arrangements. *See generally* PX218, CA0001134588.

> **Defendants' Response.** The statement in Paragraph 194 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 194 also is unsupported by the record. EMOI was responsible for
> the management of its own affairs, including its security operations. *See* SOF ¶¶ 163–
> 165.

195. **EMC Global Security prescribed and enforced exacting standards on EMOI**

**and other affiliates.** EMC's Global Security organization implemented company-wide security

policies. *See, e.g.,* PX228, CA0001047338, at '041 (explaining that ███████████

██████████████████████████████████

████████████") (emphasis in original). During the pre-merger era, there was a Mobil

Security Guide. PX14, Farmer Dep. 54:11-16. Monitoring whether EMOI was complying with

the Security Guide was a standard component of the risk assessments led by Global Security. *Id.*

55:17-56:9; *see also id.* 25:17-22 █████████████████████████

████████████████████████████████

██████████████████████████████

███████████") Following the merger, the Mobil Security Guide was replaced with the

"Integrated Security Management System." *Id.* 70:20-71:8. The ISMS was a collection of EMC

security policies. *See* PX12, EMC 30(b)(6) (Ward) Dep. 105:18-106:3, 108:7-12, 111:9-12.

EMC would routinely audit EMOI to ensure compliance with the overarching management

systems. PX12, EMC 30(b)(6) (Ward) Dep. 139:10-140:7; PX14, Farmer Dep. 70:20-71:5;

PX218, CA0001134588 (█████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████").

> **Defendants' Response.**  The statement in Paragraph 195 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 195 also is unsupported by the record.  EMOI was responsible for the management of its own affairs, including its security operations.  *See* SOF ¶¶ 163–165.

196.    **EMC's risk assessments did not consider risks to local communities.**

Remarkably, Mobil—and then EMC's—written documents and assessments did not include

directions or guidance on how to protect the community members living around EMOI's

facilities and operations from known risks—including risks created by Defendants' plans to

increase military security. *See* PX14, Farmer Dep. 54:14-55:15 ███████████████████

███████████████████████████████████████); *id.* at 71:6-72:15 (████████████

███████████████████████████████████████). As a result, EMC's security

reviews routinely ignored the threat posed to local villagers by EMOI's retention of military

guards. *Id.* 101:10-12 (█████████████████████████████████████████

██████████"); *id.* at 166:11-21 ("████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████"); PX4, McFetridge Rept. at ¶III.2.2 (Defendants' risk assessments

████████████████████████████████████████████████████████████

████████████████████████████"); *id.* at 2.2.1-2.8; *id.* at 2.9 ███████████le

█████████████████████████████████████████████████████

█████████████████████████████████████ ").

> **Defendants' Response.**  The statement in Paragraph 196 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.

197.  **EMC's Robert Haines managed public relations and public affairs related to EMOI security.**  EMC also coordinated with EMOI through Robert Haines, EMC's Manager of International Relations, who worked from an EMC office in Washington, D.C. *See* PX211, (Duffin Exh. PX7) at ¶ 33. Haines assisted in preparing public relations materials addressing EMOI's security concerns, EMOI's security arrangements, allegations of tortious conduct by security personnel and other matters. PX13, Haines Dep. 27:19-28:4; PX232, CA0002158421; PX233, CA0001148191. He also trained EMOI's public affairs personnel to interface with the media and government officials in Indonesia, PX234, CA0002169196; and communicated with EMOI's President as much as multiple times per week ████████████████████

███████████████ " PX17, Wilson Dep. 297:10-12.

> **Defendants' Response.**  The statement in Paragraph 197 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 197 also is unsupported by the record.  EMOI was responsible for the management of its own affairs, including its security operations.  *See* SOF ¶¶ 163–165.

198.  **EMC's Global Security group continued to exert granular, detailed control over security at Defendants' Indonesian operations.**  The discussion below chronicles, among other things, the extensive involvement of EMC personnel—particularly Mike Farmer, Lance Johnson, and (later) Michel Laureys. *See generally infra* ¶¶ 185, 187-198, 203, 223, 226, 230-232, 243-250, 265, 268, 272, 276. Throughout the 1999-2001 time period, the Global Security Group and other executives in the United States continued to assign personnel to assume critical

security roles at EMOI's operations. These officials in the United States also played indispensable roles approving, implementing and supporting the military security strategy over the period that ensued, and doing so with no serious regard for the enormous risks this entailed for—and the price ultimately paid by—villagers living in close proximity to EMOI's facilities and operations). *Id.*

> **Defendants' Response.** The statement in Paragraph 198 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 198 also is unsupported by the record. EMOI was responsible for the management of its own affairs, including its security operations. *See* SOF ¶¶ 163–165.

### D.    Doubling the Military Guards Engaged and Deployed for EMOI's Facilities and Operations

199.    For much of 1999, MOI relied on a combination of private security guards and military and police personnel to guard its operations in Aceh. The military security were stationed at the A-13 encampment in very close proximity to (and directly between) MOI's headquarters at "Point A" and MOI's facilities at "Bachelor Camp," where many of MOI's workers were housed. PX214, CA0001005148, at '152 (showing ██████████████

██████████████); PX18, Duffin Dep. 230:8-14 (██████████████████████████

██████████████████t).

> **Defendants' Response.** The statement in Paragraph 198 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 199 is also unsupported by the record. EMOI did not control the Indonesian military. *See* SOF ¶¶ 11–12. The Government of Indonesia owned the gas plant and facilities that EMOI operated. *See* SOF ¶ 6.

200.    **In August 1999, MOI's President, Ron Wilson, met with the staff of the military's senior officer in Aceh.** Wilson was informed that the military "██████████████

██████████████████████" PX53, CA0001123197. Wilson declined to

Public Redacted Copy

make such a request at that time and, accordingly, no additional troops were provided. Wilson

reported to Mobil officials Lance Johnson, Bill Scoggins and Mike Farmer in the United States

that the military would not put additional troops at EMOI's facilities unless they were requested

by EMOI. *Id.; see also* PX8, EMOI Rule 30(b)(6) (Snell) Dep. 604:12-20.

> **Defendants' Response.** The statement in Paragraph 200 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants.

201.    The Production Sharing Contract between EMOI and Pertamina provided that

█████████████████████████████████████████████. PX51,  CA0001186134, at '157

¶5.3(c); *see also* PX8, EMOI 30(b)(6) (Snell) Dep. 611:14-612:3.

> **Defendants' Response.** The statement in Paragraph 201 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 201 also is misleading and is not supported by the record.
> Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12.

202.    **In December 1999 EMOI requested increased military security.** Wilson

reversed his position on adding military guards for EMOI's operations after receiving approval

for that increase from ExxonMobil officials in the United States.[18] On December 6, 1999,

---

[18] This was one of many occasions in which EMOI exercised its authority under the PSC to make
requests for military guards. *See, e.g.,* PX235, CA0001134685 (May 9, 1999) (███████████
██████████████████████████████████████); PX53, CA0001123197 (Aug. 19, 1999); PX236,
CA0001056178 (Dec. 13, 1999: ███████████████████████████████████████████████
███████████"); PX237, CA0001046595 (March 13, 2000) (███████████████████████████
███████████████████████████"); PX238,
CA0001176006 (April 10, 2000) (Wilson tells Pertamina that████████████████████████
██████████████████████████"); PX239, CA0001140952 (April 27,
2000) (Wilson tells Pertamina that████████████████████████); PX240, CA0001046569
(May 26 ,2000) (Wilson tells Pertamina that███████████████████████████████████████
██████████████████████); PX241, CA0001191868 (May 30, 2000) ('

EMOI's Jim Russell—the Vice President of EMOI's North Sumatra Business Unit in Aceh—

prepared a memorandum to EMOI's senior executives and Mike Farmer at EMC requesting

█████████████████████████████████████████████████████████████████

████████████████████████ PX224, CA0001179816 at '817. EMC's Global Security group

was also asked ██████████████████████████████████████████████████████

████████████████████████████████████████████" *Id.* In seeking further

resources from EMC's Global Security, ███████████████████████████████████

███████████████████████████ ████████ *Id.*

> **Defendants' Response.** The statement in Paragraph 202 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 201 also is misleading and is not supported by the record.
> Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12.

203.   **EMOI sought and received approval for the increase from EMC.** Shortly

thereafter, President Wilson responded that ███████████████████████████████████

████████████████████████████████████████." PX165,

CA0001179798. Wilson further reported that █████████████████████████████████

█████████████████████. *Id.*; *accord* PX8, EMOI 30(b)(6) (Snell) Dep. 620:17-

621:6. This was a reference to ExxonMobil's Lance Johnson in the United States. *Id.* at 621:7-

15. *See also* PX243, CA0001179093, at '094 (communication from Wilson to Johnson ████████

█████████████████████

───────────────────────

███████████████████████████████████████."); PX50, CA0001334012

(referencing ███████████████████████████████████████████████"); PX64,

CA0001333838 at '839 (Oct. 27, 2000) █████████████████████████████████████

████████████████████████); PX66, CA0001076009 (Feb. 19, 2001) requesting ████████████

████████████████████████████████████"); PX67, CA0001046652 (March 20, 2001)

█████████████████████████████████████████████████████████.

██████████████████████████████████████████████████████████

███████████████████████ ").

**Defendants' Response.**  The statement in Paragraph 203 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 203 also is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  And EMOI was responsible for the management of its own affairs, including its security operations.  *See* SOF ¶¶ 163–165.

204.    These approvals were provided despite Tommy Chong's reservations about using these military guards. PX165, CA0001179798.

**Defendants' Response.**  The statement in Paragraph 204 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 204 also is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.

205.    EMOI's national staff also ████████████████████████████

██████████████████████████████████████████████████████████

PX244, CA0001121817 (reporting ███████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████ ").

**Defendants' Response.**  The statement in Paragraph 205 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 205 also is misleading and is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.

206.    **The increased use of military guards was also approved despite Pertamina's**

**request that EMOI consider other options.** PX165, CA0001179798. EMOI made no effort to

evaluate the cost of alternative security arrangements. PX8, EMOI 30(b)(6) (Snell) Dep. at

625:11-22 ("█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████"); *see also id.* 625:24-626 ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████").

> **Defendants' Response.** The statement in Paragraph 206 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 206 also is misleading and is not supported by the record.
> Plaintiffs' referenced exhibit does not state that Pertamina requested that EMOI consider
> options other than the use of military guards, and specifically mentions that EMC
> approval is not required for security logistics. And pursuant to both the PSC and the laws
> of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the
> natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12.

207.    Pursuant to this request, the number of military guards engaged for EMOI's

operations and facilities was doubled in December to approximately 200. In late December,

Tommy Chong reported to senior EMOI management and EMC's Mike Farmer on EMOI's





PX54, CA0001047716 at '716-17. *See also* PX18, Duffin Dep. 224:12-25 (testimony ██████████

██████████████████████████████████████████████████

██████████████████████████████████ ).

> **Defendants' Response.**  The statement in Paragraph 207 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 207 also is misleading and is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military.  *See* SOF ¶¶ 11–12.  The Government of Indonesia owned the gas plant and facilities that EMOI operated.  *See* SOF ¶ 6.

## E.  Correcting the Military's Misunderstanding of Their Role and Making ExxonMobil's Expectations Clear

208.    **Defendants dictated the military's role.** When the requested military guards arrived, they did so with the misunderstanding that they would simply *back-up* the access control

and security provided by EMOI's existing guard force. PX49, CA0001213388. EMOI

management informed the military that this understanding was *wrong* and that, as EMOI and

EMC had discussed internally, the military guards would take over the security roles private

security was providing. *Id.* EMOI's Maman Budiman summarized his meeting with ███████

████████████████████████████████████████████████████████████████████

███████████████████████████████████:

█ █████████████████████████████████████████████

███████████████████████████████████████████████

*Id.* Wilson also █████████████████████████████████████████████████

██████████████████████████████████████████████████" *Id.*

*See also* PX18, Duffin Dep. 230:15-237:11.

> **Defendants' Response.** The statement in Paragraph 208 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 208 also is misleading and is not supported by the record.
> Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI could not and did not "dictate
> the . . . role" to the sovereign military of Indonesia.

209. **Defendants put the military security to work on access control and had**

**weekly meetings with the A13 commander.** In accordance with these instructions from

ExxonMobil, Chong soon reported to Wilson, Farmer and Chee Khoon Oh (the new, post-merger

manager for Global Security in Singapore) that the military guards were now on duty and

conducting "strict access checks on vehicles, employees and visitors and Chong was having

███████████████████████████████████████████████" PX245,

CA0001334816. Chong indicated that ████████████████████████████████

████████████████████████████████." *Id. See also* PX246,

CA0001334355, at '359 ("██████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████." ). *See also* PX16, Connor Dep. 40:7-17 (███████████████

██████████████████████████████████████████████); PX14,

Farmer Dep. 128:17-129:3 (████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████"); 

PX247, CA0001120418, at '419 (███████████████████████████████████

██████████████████████████████████████████████████

████████████.").

**Defendants' Response.** The statement in Paragraph 209 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 209 also is misleading and is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI could not and did not "put the [Indonesian] military security to work."

210.   These developments were reported on a weekly basis to EMC's most senior executives in the United States, including ██████████████████████████████████

████████████████████). PX163, CA0001194621 ██████████████████████████

193



); PX15, Johnson Dep. 176:21 (

). *See also* PX249, CA0002107486 (Terry Koonce "

); PX250, CA000113976 (                                    ); *see, e.g.,* PX251,

CA0001076098 (

) ") (emphasis added).

**Defendants' Response.** The statement in Paragraph 210 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 210 also is not supported by the record. EMOI was responsible for the management of its own affairs, including its security operations. *See* SOF ¶¶ 163–165.

211.    **The military personnel engaged by EMOI were dedicated exclusively to security for EMOI's operations and facilities.** PX252, CA0001046566,  at '570 (describing

); PX73, CA0001003149 at '151 (

"); PX253, CA0001324826, at

'828 (draft Q&A) ("                                              ");

PX65, CA0001174650, at '659 (transcript of Lance Johnson interview) ("

").

**Defendants' Response.** The statement in Paragraph 211 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The

---

[19] Terry Koonce was a Vice President of EMC. *See supra* ¶ 190; PX248, Exxon Mobil Annual Report (10-K) for the Year Ending December 31, 1999.

statement in Paragraph 211 also is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military and did not "engage" military personnel.  *See* SOF ¶¶ 11–12.  The Government of Indonesia owned the gas plant and facilities that EMOI operated.  *See* SOF ¶ 6.

212.    **Defendants knew its military security was sweeping local villages in its protection of Exxon facilities.** EMOI understood that the military personnel understood and implemented this mandate to protect Exxon operations and facilities broadly, including sweeps of the local villages to detain, interrogate and sometimes kill individuals who were identified or characterized as potential threats to EMOI's facilities and operations. *See infra* ¶¶ 258-61, 291, 294; PX255, CA0001055488 (██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████").

> **Defendants' Response.**  The statement in Paragraph 212 is not supported by the record and so cannot create a genuine issue of material fact.  There is no evidence in the record that any sweeps of local villages were performed to protect EMOI.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military.  *See* SOF ¶¶ 11–12.  The Government of Indonesia owned the gas plant and facilities that EMOI operated. *See* SOF ¶ 6.  Lastly, Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.

213.    **Defendants exerted exacting control over its military security when they wanted to.** The military escort policies adopted by EMOI illustrate the level of management and control EMOI could invoke *when it chose to do so.* PX256, CA0001178945. After doubling the number of military guards engaged, EMOI adopted the following transportation/security requirements for all military escorts between many of EMOI's facilities and operations:

- 



*Id.* at '947.

*Id.* at '948.

. PX18, Duffin Dep. 256:4-13.

" PX256, CA0001178945, at '948.

" *Id.* at '947.

." PX256, CA0001178945, at '947.

*See also* PX18, Duffin Dep. 248:1-258:25. Similarly, EMOI identified

. PX14, Farmer Dep. 127:14-128:1, 128:20-129:3; PX16, Connor Dep. 40:7-17.

> **Defendants' Response.**  The statement in Paragraph 213 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if

true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 213 also is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military and had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military. *See* SOF ¶¶ 11–12. Nothing in the record shows that Defendants could or did exercise control over any of the soldiers who allegedly injured Plaintiffs.

### F.   Willfully Disregarding the Dangers Posed by Military Security

**214.   Defendants knew increased military security would endanger local civilians.**

When Defendants doubled EMOI's use of military security, they were fully aware of the extreme

danger of violence by these personnel directed at civilians, including the risks of beatings,

torture, killings and rape. *See, e.g.*, PX18, Duffin Dep. 147:21-148:24, 219:18-221:5; *supra* ¶¶

176-84. The Defendants also knew these guards were poorly trained and unfit to assume the

responsibilities they were being given. PX14, Farmer Dep. 210:6-22 (military guards were ███

██████████████████████████████████████████████████████████

████ ); PX16, Connor Dep. 111:21-25 ( ██████████ ); PX257, CA0001337402, at '405 ( ██

████████████████████████████████████████████████████████

██████████ PX258, CA0001171802 at '805 ███████████████████████████████

██████████████████████████████████████████████████

██████████ ); PX298, CA0001334351 ( ██████████████████████████████████

██████████ ); PX260, CA0001334028 at '030 ████████████████████████████████

████████████████████████ ); PX261, CA0001067468 ████████████████████

████████████████████████████████████████████ ); PX262, CA0001179212

( ██████████████████████████████████████████████████████████ ); PX263,

CA0001124551 ( ████████████████████████████████████████████

██████████████████ ); PX264, CA0001006104 (reporting on ██████████████████████

█████████████████████████████████████████

████████████████████████████████████████ ).

**Defendants' Response.**  The statement in Paragraph 214 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 214 also is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

215.    **Defendants took no meaningful steps to mitigate these known risks.** In

contrast to the detailed and prescriptive transportation policies described above, *see supra* ¶ 213,

neither EMC nor EMOI took meaningful steps to (a) establish specific limitations on the use of

force; (b) provide or make available appropriate training; (c) provide or post instructions

regarding the use of force or torture; or (d) monitor the actions of the military guards it had

requested and then deployed at its facilities and operations. *See* PX18, Duffin Dep. 99:4-18 (█

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ ); *id.* at 96:10-98:14 ("██████████████████

█████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████ ); *id.* at 94:2-95:24 (██████

███████████████████████████████████████



); *id.* at 219 (

). *See also infra* at ¶ 269 & nn.12-21.

**Defendants' Response.**  The statement in Paragraph 215 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 215 also is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

G.      **Paying for Military Security**

216.    **Exxon's military security were paid by EMOI pursuant to a budget set by**

**EMOI and endorsed by ExxonMobil in the United States.** In January 2000, Maman Budiman

reported that

PX266, CA0001178145.

. *Id.* Discussing

guards for EMOI's area for stored explosives, Budiman advised senior EMOI executives that



██████████████████████████████ *Id. See also* PX267, CA0001212379 (discussing

EMOI's payments ████████████████).

> **Defendants' Response.** The statement in Paragraph 216 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 216 also is not supported by the record. Plaintiffs' purported evidence does not show that EMOI set a budget or paid Indonesian soldiers, nor does it show that EMC endorsed any proposal. Under the PSC, it was the Government of Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical support or resources to support the Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

217. **Payments were made directly to the security personnel.** E.g., PX268,



CA0001144447 (████████████████████████████████████████

████████████████████████); PX269, CA0001144260 ███████████████████████

███████████████████████████████████████); PX270,

CA0001144406 (█████████████████████████████████████

████████████████████████████████████); PX271, CA0001144392

(██████████████████████████████████████) PX272, CA0001150824

(same). In addition, EMOI security advisors ████████████████████████████████

████████████████████████████████. *E.g.,* PX273, CA0001152995

(████████████████████████████████████████████

████████████████████████████████████████████);

PX274, CA0001152426 (███████████████████████████████

████████████████████████████████████████████).

Wage payments included overtime payments for extra hours worked. *E.g.,* PX275,

CA0001150857 (█████████████████████████████████████

████████████████████████████████████). These receipts and payment

requests were found in the files of EMOI's parent corporations in the United States. *See* PX276,

Defs' Custodian Bates Ranges; *see also* PX277, CA0001334090 (████████████████

████████████████████████████████████████ ).

> **Defendants' Response.** The statement in Paragraph 217 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 217 also is not supported by
> the record. Under the PSC, it was the Government of Indonesia's exclusive
> responsibility to provide security for the Aceh gas plant, and EMOI recovered under the
> PSC any costs it incurred providing logistical support or resources to support the
> Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

218. **These payment arrangements were subsequently memorialized in a letter**

**from EMOI's President to Pertamina.** Wilson confirmed that EMOI would pay ████████

████████████████████████████████████████████████████████████

████████████████████████████████████ PX73, CA0001003149,

at '150. *See also* PX278, CA0001006997 (████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ ).

> **Defendants' Response.** The statement in Paragraph 218 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 218 also is not supported by
> the record. Under the PSC, it was the Government of Indonesia's exclusive
> responsibility to provide security for the Aceh gas plant, and EMOI recovered under the
> PSC any costs it incurred providing logistical support or resources to support the
> Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

219. **Payments to military security required EMOI approval.** Before such

payments for military security were made, EMOI's agreement on the reasonableness and

necessity of these payments was required. ████████████████████████████████

████████████████████████████████████████████████████



██████████████████████. PX73, CA0001003149, at '150 ¶¶ 2, 2(f).

> **Defendants' Response.** The statement in Paragraph 219 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 219 also is not supported by the record. Under the PSC, it was the Government of Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical support or resources to support the Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

220. The ██████████████████████████████████ had to be

agreed to by both Pertamina and Mobil ████████████████████████████

██████ PX73, CA0001003149 at '150 ¶ 3; *accord* PX279, CA0001046538 (letter from

Wilson ███████████████████████████████████████████

██████████████████████). EMOI prepared this budget annually and shared it

with Pertamina. PX17, Wilson Dep. 283-84. The budget was also presented to ExxonMobil

representatives in the United States for review and endorsement. *Id.* 286:1-8; PX280,

CA0001174374 (communication from Lance Johnson to Ron Wilson regarding ████████

████████████████████████████ and telling Wilson that ████████████

████████████████████████████████████████

████████).

> **Defendants' Response.** The statement in Paragraph 220 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 220 also is not supported by the record. The PSC speaks for itself. Under the PSC, it was the Government of Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical support or resources to support the Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

221. **Payments to the military guards were a prerequisite to securing their**

**services.** *See* PX281, CA0001201126 (████████████████████████████████



). Because of the limited pay provided to these

military guards, EMOI was aware that some of the guards would supplement their income by

engaging in acts of extortion and intimidation directed at the civilians living near EMOI's

operations. *See* PX258, CA0001171802, at '805 (reporting that some of military personnel were

acting as ███████████████████████████████████). EMOI's payments for

the military guards gave it ████████████████████████████████████

████████████████████ (if it chose to exercise that control). PX46, Ling Dep. 138:18-22;

*see also id.* at 137:23-24 ("He who pays the piper calls the tune.").

> **Defendants' Response.** The statement in Paragraph 221 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 221 also is not supported by
> the record. Under the PSC, it was the Government of Indonesia's exclusive
> responsibility to provide security for the Aceh gas plant, and EMOI recovered under the
> PSC any costs it incurred providing logistical support or resources to support the
> Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

222.  ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████, *see* PX15, Johnson Dep. 102:7-103:19, and reduced

the amounts distributed to both EMOI and Pertamina. *See supra* ¶ 13.

> **Defendants' Response.** The statement in Paragraph 222 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 222 also is not supported by
> the record. The PSC speaks for itself. Under the PSC, it was the Government of
> Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI
> recovered under the PSC any costs it incurred providing logistical support or resources to
> support the Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

### H.    Exxon's Top Brass Visit Indonesia

223.    **Senior Exxon executives visited Indonesia in February 2000 to review**

**security arrangements.** Soon after the ███████████████████████████████

██████, several of ExxonMobil's most senior executives traveled to Indonesia in February 2000

to review the security arrangements and related issues. PX282, CA0001176979, at '980; PX283,

CA0001177406. These executives included L.A. Noto (who, until the merger, was Mobil Oil

Corporation's CEO and was now EMC's Vice Chairman, PX9, EMC 30(b)(6) (Snell) Dep.

993:24-994:3); Harry Longwell (one of five members of EMC's management committee, *id.* at

995:11-996:6); Bill Scoggins (EMC Executive Vice President); Terry Koonce; and Lance

Johnson. Most of these executives met with Pertamina and a senior government official to

discuss security issues and then traveled to Aceh to review EMOI's operations. PX282,

CA0001176979 at '980. On February 17, 2000, Longwell, Koonce, Scoggins and Johnson met

with Tommy Chong and received a ██████████████ which, among other things, reviewed

EMOI's use of ████████████████████████ the ██████████████████ PX284,

CA0001079158 at '162.

> **Defendants' Response.**  The statement in Paragraph 223 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

### I.    The State Department Again Issues a Public Report Discussing "Beating, Whipping, Electric Shock, and Rape" by the Military

224.    **On February 25, 2000, the U.S. Department of State publicly released its**

**1999 Country Report for Indonesia**. The report advised that "[h]uman rights monitors, both

international and locally based, reported that the military continued routinely to torture detainees

in Aceh. Methods of torture documented in the past included beating, whipping, electric shock,

and rape." PX207, State Dep't Rept. 1999 (EMOI 30(b)(6) (Snell) Dep. Exh. PX65) at 13.

**Defendants' Response.**  The statement in Paragraph 224 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.

225.   **Defendants ignored the report's warnings.** EMOI did nothing to mitigate risks that would have been obvious had Defendants heeded the State Department's reports, and in fact continued to request more military security. PX8, EMOI 30(b)(6) (Snell) Dep. 760:23-761:7 █

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ ).

**Defendants' Response.**  The statement in Paragraph 225 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.

**J.     The ExxonMobil Risk Assessment Team Recommends a Code of Conduct for the Military and Monitoring of CCTV Video Feeds at EMOI Facilities, but These Recommendations Are Ignored**

226.    Shortly after the State Department report was released, EMC's Global Security group conducted a Risk Assessment in Indonesia for EMOI's operations in Aceh. PX228, CA0001047338. Risk assessments are periodically conducted by energy and other extraction companies operating in foreign countries to identify risks and recommend appropriate safeguards. The team reviewing EMOI's operations did not discuss the State Department's findings or engage in a serious analysis of the risks presented by use of the military guards or the alternatives available to EMOI. PX9, EMC 30(b)(6) (Snell) Dep. 1086:4-17 ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



); PX14, Farmer Dep. 101:3-14 (risk assessments

conducted for Aceh only evaluated threats to EMOI employees and contractors).

    **Defendants' Response.** The statement in Paragraph 226 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants.

    227.    Even Defendants' inadequate assessment recommended basic safeguards like

establishing a code of conduct for military security. Despite the paucity of its analysis, the Risk

Assessment team did make the following recommendations that are relevant here:

- Management should  . PX228, CA0001047338, at '397.

- The CCTV system that EMOI had installed at the entrances to some of its
  facilities (such as Point ) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
  ▓▓▓▓▓▓▓ *Id.* at '363.

- EMOI should  .

- EMOI should " ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ " by moving
  " ▓▓▓▓▓▓▓ *Id.* at '347.

- "  *Id.* at '401.

**Defendants' Response.** The statement in Paragraph 227 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of

Public Redacted Copy

material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 227 also is misleading and is not supported by the record. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

228. **Defendants did not implement even these basic recommendations.** Despite the

State Department's report only days earlier about "torture" and "beating, whipping, electric

shock, and rape" there was no meaningful follow-up or implementation by EMC or EMOI

regarding the recommended need for a "code of conduct" for the military guards EMOI was

engaging, any steps to monitor their behavior, or any other safeguards. PX8, EMOI 30(b)(6)

(Snell) Dep. 706:15-19 (███████████████████████████████

████████████████████████████████████████████

████████████); *see also infra* ¶¶ 235, 269 n.17 (recommended code of

conduct was not drafted or implemented).

> **Defendants' Response.** The statement in Paragraph 228 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 228 also is misleading and is
> not supported by the record. EMOI did not control the Indonesian military, had no
> authority to hire, train, give orders to, oversee, transfer, or terminate any members of the
> Indonesian military, and repeatedly urged the Indonesian government to comply with the
> law and human rights standards. *See* SOF ¶¶ 11–12, 36.

> **K.    Despite the State Department's Report About "Torture," "Beating,
>        Whipping, Electric Shock and Rape" by Military Personnel, EMOI Meets
>        with the Military To Secure More Military Personnel for Its Profitable
>        Operations in the "Remote Areas."**

229. **Defendants' desire for profits outside their established operations drove**

**requests for more military security.** Shortly after Chong met with senior EMC executives

regarding the use of ████████████████████████████████████ EMOI

began taking steps to further increase the use of military guards for EMOI's operations. EMOI

understood that drilling and production activities in the more remote locations at Pace and SLS
were both necessary to maintain ExxonMobil's production and were highly profitable.



*See* PX267, CA0001212379

(summarizing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮) EMOI's representative reported on March 9th that

*Id*. EMOI's representative also reported ▮▮▮▮▮▮▮▮▮▮▮ *See also*
PX237, CA0001046595 (memorandum from Ron Wilson summarizing meeting with Pertamina
to review ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮); PX288, CA0001176490, at '491 (▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX289, CA0001176316, at '317
(Reporting that ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████ ); PX290,

CA0001176142, at '143 (reporting that MOI has ████████████████████████

██████████████████████████████████████████████████████

██████████████████████ ); PX291, CA0001204980 (communication

between senior EMC and other ExxonMobil officials in the United States—Johnson, Longwell,

Koonce and Scoggins that ████████████████████████████████

████████████████████████████ ).

> **Defendants' Response.** The statement in Paragraph 229 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 229 also is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

### L. EMC and EMOI Continue to Closely Coordinate and Support the Increased Use of Military Guards for EMOI's Facilities and Operations

230. Throughout this period, EMC Global Security continued to play a critical role in staffing and implementing Defendants' security strategy. EMC's Global Security was particularly involved in matters relating to the use of military security at EMOI's operations in North Aceh. For example, as EMOI's use of military security (and related payments for military guards) was being doubled in late 1999, Mike Farmer (EMC's Global Security group manager for international operations) provided the following directives to Chee Khoon Oh, the organization's Regional Security Manager in Singapore:





PX221, CA0001194210. Farmer instructed Oh to [REDACTED]

[REDACTED] and said he would discuss the [REDACTED] *Id.;*

*see also* PX4, McFetridge Rept. at ¶ 5.11 & n.31 ([REDACTED]

[REDACTED]

[REDACTED]). This is reflected in numerous documents

demonstrating the role of EMC in [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] *See supra* ¶¶ 163-165, 185, 187-198, 203, 223, 226; *infra* ¶¶ 231-232,

243-250, 265, 268, 272.

**Defendants' Response.** The statement in Paragraph 230 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 230 also is misleading and is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36. EMC likewise had no authority to control the sovereign military of Indonesia.

231.    Over the ensuing months, ExxonMobil's Global Security organization filled key positions in North Aceh that assumed responsibilities for coordinating and supporting the use of military guards for EMOI's facilities and operations. This included, for example:

- John ("Jack") Connor, an EMC employee who was reassigned to EMOI and became its security manager (*see* PX9, EMC 30(b)(6) (Snell) Dep. 1108:9-1109:9) (Connor was an EMC employee as of April 30, 2000, and an EMOI employee as of May 1, 2000); *id.* at 1170:24-1171:6; PX16, Connor Dep. 119:23-25 (███████████████████████████████████████████████████████████); PX295, CA0001212182, at '183 ███████████████████████████████ ;

- John Piper (an EMC employee who was the Project Manager for the Risk Assessment team) (*see* PX220, CA0001355089, at '128 (Piper's position at EMC); PX228, CA0001047338, at '338 (identifying Piper as Project Manager for Risk Assessment));

- Adrian Wong, an employee in the Global Security organization who was ███████████████████████████████ (*see* PX296, CA0001176187; PX220, CA0001355089, at '131); and

- Michel Laureys, an EMC employee from the Global Security organization's Houston Business Center, who was sent to Aceh to coordinate logistical support for the military guards. PX8, EMOI 30(b)(6) (Snell) Dep. 836:19-837:3; PX220, CA0001355089, at '119.

**Defendants' Response.** The statement in Paragraph 231 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 231 also is misleading and is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36. EMC likewise had no authority to control the sovereign military of Indonesia.

232.    **EMC met in Washington, D.C. in April 2000, where they decided to request additional military security in Indonesia.** EMC's Global Security organization met for six days in Washington, D.C. from April 9-14, 2000. PX220, CA0001355089, at '090-94. The

officials from the organization invited to attend those meetings included Mike Farmer, Chee

Khoon Oh (from the Singapore security center), John Piper (the Project Manager for the recent

Risk Assessment), John Connor, Tommy Chong and Michel Laureys. PX9, EMC 30(b)(6)

(Snell) Dep. 1105:3-1107:3; PX297, CA0001335728, at '728 (invitees identified in e-mail);

PX296, CA0001176187 (email from Chee Khoon Oh indicating he will be attending); PX14,

Farmer Dep. 161:2-5 (meeting involved ███████████████████████████████████

████████████████████████████).

> **Defendants' Response.** The statement in Paragraph 232 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 232 also is misleading and is not supported by the record.
> Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant. *See* SOF ¶¶ 7-12. EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36. EMC likewise
> had no authority to control the sovereign military of Indonesia.

233. **EMOI's Jack Connor was "uncomfortable" with increasing military**

**security.** Shortly before these meetings, Jack Connor communicated to Farmer, Oh and Chong

that he was ███████████████████████████████████████████████████████████████████

██████ PX298, CA0001334351, at '351. ████████████████████████████████████████████

██████████████████████████████████ *Id.* Connor indicated that the military ███████████

██████████████████████████████████████ and even intimidated MOI's own employees. *Id.* at '353

(emphasis in original). Oh and Farmer made plans to meet and ██████████████ while Oh was

in Washington, D.C. *Id.* at '351.

> **Defendants' Response.** The statement in Paragraph 233 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 233 also is misleading and is not supported by the record.
> Pursuant to both the PSC and the laws of Indonesia, it was the Government of

Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

234.    Despite Connor's concerns, Defendants went ahead with plans to



A week after the EMC Global Security organization met in Washington, Adrian Wong and K. Jayadev (another employee in the Global Security organization) met with the military in Aceh to ███████████████████████████████ PX299, CA0001078966. At that meeting, Wong and Jayadev briefed the military ███████████████████ and ████████████████████ for EMOI's ███████████████ *Id.* at '966. Responding to ███████████████ *Id.*

**Defendants' Response.** The statement in Paragraph 234 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 234 also is misleading and is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

235.    Adrian Wong advised that Defendants should negotiate a code of conduct with the military as part of its request for more security but was ignored. Summarizing this latest meeting with the military, Wong reported to Connor (who was employed by EMC at this time), Oh, and EMOI officials, that:



PX299, CA0001078966, at '967. Wong advised the EMC and EMOI officials that the

deployment of these additional guards should be supported as long as several conditions were

met. These conditions included ███████████████████████████ by MOI and

the military ███████████████████████████ *Id.* The conditions also

included the military's agreement on ███████████████████████████

███████████████████ *Id.* Although this was now the second time that EMOI

management and EMC officials had been told of the importance of an agreed code of conduct,

this code was never even drafted by EMC or EMOI. PX9, EMC 30(b)(6) (Snell) Dep. 1125:8-

1126:9 (testifying that (a) responsibility to establish code of conduct was assigned to Connor and

(b) Connor has indicated he is not aware of any code of conduct being established); *id.* at

1126:20-1127:3 (witness has ███████████████████████████

that a code of conduct was not prepared). Wong indicated that the next steps would include

EMOI Security working ███████████████████████████

███████████████████████████ PX299,

CA0001078966, at '967.

> **Defendants' Response.** The statement in Paragraph 235 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 235 also is misleading and is not supported by the record. EMOI
> did not control the Indonesian military, had no authority to hire, train, give orders to,

oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

236.    **Over the ensuing weeks, EMOI** ████████████████████████ **for its**

**operations.** PX241, CA0001191868, at '868. In late May 2000, Wilson reported to Scoggins and

Johnson in the United States that ████████████████████████████████████

████████████████████████████ *Id.* In addition to ████████████████

████████████████████████ senior officials in both the United States and

Aceh placed a high priority on the more profitable LNG drilling and production in the remote

locations at PASE and SLS. Scoggins emphasized to Johnson the ████████████████

████ :



PX96, CA0001191702, at '703. *See also id.* at '702 (response by EMOI's Martin Massey:

████████████████████████████████████████████████████

████████████████████████████████ )

Defendants' Response.  The statement in Paragraph 236 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 236 also is misleading and is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

237.    On May 26, 2000, EMOI's President wrote a letter to the President of Pertamina

reiterating ████████████████████████████████████ . PX240,

CA0001046569. Wilson indicated that security from the ████████████████ was being

provided for EMOI's ongoing repair work █████████████████████████████████

███, but ██████████████████████████████████████████████████████████

████████████████████████████████ of other ██████████████████████████. *Id.* at '569.

Wilson stated that the target date of July 1 for these additional troops was ███████████ and it

was urgent that these ████████████████████████ be █████████████████████████

to support these business activities. *Id.* at '569-70. Wilson indicated that ██████████████

███████████████████████████████████████████████████████████████████

would be sufficient for two ██████████████████████████ specified by Wilson and

██████████████████████ would ██████████████████████████████ *Id*

> **Defendants' Response.** The statement in Paragraph 237 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The
> statement in Paragraph 237 also is misleading and is not supported by the record.
> Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

238. **As requested, the number of military personnel for EMOI's facilities and**

**operations again more than doubled by early June 2000.** On June 5, Chee Khoon Oh

forwarded information from Jack Connor to EMC's Mike Farmer in the United States regarding

the ██████████████████████ PX300, CA0001334185. Connor indicated that 410 troops

were █████████████████████████████████ and █████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ *Id.* Connor reported that hundreds

of additional troops would be placed in the ████████████████████████████████ *Id.*

███████████████████████████████████████████████████████████████████

*See* PX82, CA0001334075; PX83, CA0001334077.

> **Defendants' Response.**  The statement in Paragraph 238 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 238 also is misleading and is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

239.   ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████  *See, e.g.,* PX301,

CA0001174469, at '469 (summarizing meeting involving ██████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████);

PX302, CA0001174361 (summarizing the same meeting); PX82, CA0001334075 (summary by

EMC's Michel Laureys regarding ██████████████████████████████████

████████████████████████████); PX83, CA0001334077 (report by EMC's

Laureys—forwarded to EMC's Farmer in the United States—regarding Laureys' ████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████);

PX303, CA0001334073 (EMC's Laureys reports that ████████████████████████

███████████████████████████████████████████████████████████████████



██████████████████████); PX304, CA0001334094, at '095 (██████████████████████

██████████████████████████████████████).

> **Defendants' Response.**  The statement in Paragraph 239 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 239 also is misleading and is not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.  EMC likewise had no authority to control the sovereign military of Indonesia.

240. **Defendants replaced police "Brimob" with military security.** Prior to these new deployments, ██████████████████████████████████████

██████████████████ *See* PX305, CA0001334040, at '041 (indicating that personnel of

██████████████████████████████████████████████████

██████████). As additional security guards were added for EMOI's operations in early June 2000, EMOI made clear to the military and Pertamina that it wanted the Brimob police guards to be relieved and relocated. PX306, CA0001334180, at '180 (reporting that ████████████████ at EMOI's remote locations and ██████████████████████████████████). Connor's report of a June 6 meeting with the military's Chief of Staff reports that it ██████████ ██████████████████████████ would provide security. PX302, CA0001174361, at '361 ████ ██████████████████████████████████); *see also* PX307, CA0001334179 ██████████████████████████████████████ ██████████"). Within weeks, the Brimob security personnel were ██████████████ to another location. PX305, CA0001334040, at '041; PX4, McFetridge Rept. at ¶ 5.3 ("Exxon, with Pertamina's support, decided to ██████████████████████████████████ ██████████████████).

**Defendants' Response.**  The statement in Paragraph 240 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 240 also is misleading and is not supported by the record.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.  Under the PSC, it was the Government of Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical support or resources to support the Government of Indonesia in these efforts.  *See* SOF ¶¶ 11, 13.

241.    **On June 7, 2000, Wilson wrote a letter to Pertamina dictating the role that the military guards would perform.** Wilson set forth their responsibilities in broad terms that

included ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

PX73, CA0001003149, at '149. Wilson indicated that these military personnel had to be

████████████████████████████████████ and Mobil was not providing

████████████████████████████████ or ████████████████████

████████  *Id.* at '151. Wilson also added, almost as an afterthought, that Mobil does not

████████ any use of ████████████ or ████████████████████

████████████████████  *Id.* As discussed *infra,* Wilson, EMOI and EMC made no

effort to specify, implement, monitor or enforce these generic provisos in any serious way. *See*

*infra* ¶¶ 269 & n.12-21; *see also supra* ¶¶ 196, 215, 225-228, 235; *infra* ¶¶ 253-257, 262-264,

268, 270-271, 276. In prescribing the work that the military guards would perform , EMOI was

aware that the military personnel both understood and implemented this directive ████████

████████████████████████████████████████████████

████████████████████ and provide security information ████████████████ as a

broad mandate.  Just as Defendants' Statement of Facts (at ¶¶ 30-32) alleges that members of the

GAM independent movement were potential threats to EMOI's operations, personnel,

contractors and equipment, the military guards engaged by EMOI detained, interrogated and

tortured (and, in many cases, injured, assaulted and/or killed) individuals at or living in close

proximity to EMOI's operations and facilities who were regarded as ████████████████

EMOI was aware that the military guards' actions to protect EMOI's operations or secure

information about ████████████████ included patrols and sweeps of local villages to detain,

interrogate and assault (or worse) local villagers.  *See infra* ¶¶ 258-261, 291, 294.  EMC and

EMOI made no serious efforts to prevent these entirely foreseeable results.  *See, e.g., infra* ¶ 269

& nn.12-21.

> **Defendants' Response.**  The statement in Paragraph 241 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The
> statement in Paragraph 241 also is misleading and is not supported by the record.
> Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.  It could not
> and did not "dictat[e] the role that the military guards would perform."

242.   **Defendants increased their** ████████████████████████████



████████████**.** Wilson also indicated that Mobil would pay ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ PX73, CA0001003149, at '150. Like other

expenses incurred by either Mobil or Pertamina, these payments would be charged to the project

and would ultimately reduce the profits received by both Mobil and Pertamina. *See supra* ¶ 13.

> **Defendants' Response.**  The statement in Paragraph 242 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if
> true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The
> statement in Paragraph 242 also is misleading and is not supported by the record.  Under
> the PSC, it was the Government of Indonesia's exclusive responsibility to provide

security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical support or resources to support the Government of Indonesia in these efforts.  *See* SOF ¶¶ 11, 13.

**M.    EMC and EMOI Coordinate Logistical Support and Supplies for Military Security**

243.    **Defendants provided supplies and coordinated logistics for military security.**



PX73, CA0001003149, at '150. Wilson's June 2000 letter to Pertamina specified that Mobil would provide this ▮▮▮▮▮▮▮▮▮▮ as long as Mobil, as well as Pertamina, considered such support ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *Id.* Wilson also indicated that the ▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮ also had to be ▮▮▮▮▮▮▮▮ by Pertamina and Mobil. *Id.* Accordingly, ▮▮▮▮▮

**Defendants' Response.**  The statement in Paragraph 243 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 243 also is misleading and is not supported by the record.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.  EMC likewise had no authority to control the sovereign military of Indonesia.  And under the PSC, it was the Government of Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical

support or resources to support the Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

244. **Defendants' supplies and assistance were necessary for military security's operations.** As these dedicated military guards arrived, EMOI understood that none of these deployments could proceed without EMOI's assistance in coordinating and providing logistical support. Adrian Wong advised Oh (who informed EMC's Farmer) that:



PX308, CA0001334116, at '116. Professor Robinson described the support supplied:

A list of the materials the [military] requested from Exxon-Mobil in June 2000,



PX3, Robinson Rept. at 18-19.

> **Defendants' Response.** The statement in Paragraph 244 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 244 also is misleading and is not supported by the record. Under the PSC, it was the Government of Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical support or resources to support the Government of Indonesia in these efforts. *See* SOF ¶¶ 11, 13.

245. **Absent Defendants' assistance, the military would not have operated extensively in North Aceh during the relevant period.** Defendants' documents paint a picture

████████████████████████████████████

of military security that was incapable of operating without substantial assistance from

Defendants. *See, e.g.*, PX309, CA0001335088, at '089-90 (reporting EMOI needs to provide

logistical support to military security ████████████████████████████████████

████████████████████████████████████████); PX83, CA0001334077

(████████████████████████████████████████████

████████████████████████████████████); PX303,

CA0001334073 (████████████████████████████████

████████████████████████████s).

> **Defendants' Response.** The statement in Paragraph 245 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 245 also is not supported by
> the record. The Government of Indonesia was fighting a brutal civil war in Aceh during
> the relevant time period, and Indonesian soldiers were operating extensively through the
> region. *See infra* ¶¶ 548, 553. Any suggestion that Indonesian soldiers were primarily
> deployed by the Government of Indonesia in Aceh to protect EMOI personnel and were
> primarily supported by EMOI is a brazen falsehood unsupported by any evidence
> whatsoever.

246.    **EMC devoted its employee Michel Laureys to coordinate military security's**

**supply and logistics.** On June 13, Chee Khoon Oh confirmed that the Global Security

organization ████████████████████████ from EMC's ████████████

████ to handle these responsibilities in Aceh. PX310, CA0001335064, at '065*; see also*

PX220, CA0001355091 at '119 (identifying Laureys as an EMC Security Advisor for its

Houston facilities); PX304, CA0001334094, at '094-95 (email from Alex Dodds to Wong,

Laureys and others regarding ████████████████████████ indicating that ████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████



In response, Oh told Wong to ██████

██████ ).

> **Defendants' Response.** The statement in Paragraph 246 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 246 also is misleading, not
> supported by the record, and mischaracterizes PX 304. EMOI did not control the
> Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or
> terminate any members of the Indonesian military, and repeatedly urged the Indonesian
> government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.
> EMC likewise had no authority to control the sovereign military of Indonesia.

247.   **Defendants wanted to avoid being** ████████████████████████████

████████████████████████████ In coordinating and providing the required

support, EMOI and EMC employees obfuscated the critical role they were performing ████████

████████████████████████████

████████ PX277, CA0001334090, at '090. The Defendants' internal documents, however,

make those roles clear. As EMOI's Massey[20] reported to Lance Johnson and Bill Scoggins in the

United States, "████████████████." PX96, CA0001191702, at '702. Massey reported,

for example, that because of "████████████" EMOI had "████████████

████████████████████████"—support that had received

endorsement from "████████████████. *Id. See also, e.g.,* PX312,

CA0001334109, at '109 (email from Dodds recommending that ████████████

████████████████████████████" various

materials for the military); PX96, CA0001191702, at '705 (reporting to Johnson and Scoggins

that "████████████████████████████

---

[20] In early 2000, Massey replaced Duffin as a senior management person reporting to EMOI's
President, Ron Wilson. PX8, EMOI 30(b)(6) (Snell) Dep. 788:18-23.



██████████ ); PX277, CA0001334090, at '090 (advising that "██████████████" will

"██████████████████"); PX303, CA0001334073 (discussing logistical support by

EMOI so that ███████████████████ ); PX96, CA0001191702, at '702 (reporting

to Johnson and Scoggins in the United States that "████████████████████

████ in Pase before returning EMOI employees to the area. ██████████████

████████████████████████████████████████

████ ).

> **Defendants' Response.** The statement in Paragraph 247 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 247 also is misleading and is
> not supported by the record. EMOI did not control the Indonesian military, had no
> authority to hire, train, give orders to, oversee, transfer, or terminate any members of the
> Indonesian military, and repeatedly urged the Indonesian government to comply with the
> law and human rights standards. *See* SOF ¶¶ 11–12, 36. Under the PSC, it was the
> Government of Indonesia's exclusive responsibility to provide security for the Aceh gas
> plant, and EMOI recovered under the PSC any costs it incurred providing logistical
> support or resources to support the Government of Indonesia in these efforts. *See* SOF ¶¶
> 11, 13.

248. **Defendants retained control over the support they provided their military**

**security.** As this logistical support was being provided, Wilson communicated to Pertamina that



████████████████████████████████████████

█████████████████████████████████████ PX73,

CA0001003149, at '150. ████████████████████████

███████████████████████████ . *Id.* The provision of the

████████████████████████████████████████

███████████████ . *Id.* ¶ 3. *See* PX8, EMOI 30(b)(6) (Snell) Dep. 811:14-24 (█

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████ ). Because the costs of ████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████   *See supra* ¶ 13.

**Defendants' Response.**  The statement in Paragraph 248 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 248 also is not supported by the record.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.   *See* SOF ¶¶ 11–12, 36.  Under the PSC, it was the Government of Indonesia's exclusive responsibility to provide security for the Aceh gas plant, and EMOI recovered under the PSC any costs it incurred providing logistical support or resources to support the Government of Indonesia in these efforts.  *See* SOF ¶¶ 11, 13.

249.  **Defendants supervised the use of their equipment by military security.**

Defendants have represented that ██████████████████████████████████████

████████████████—which would include, for example, the vehicles provided to the military

personnel used to conduct patrols and other ████████████████████████████████████

██████████████████████████████████████   PX211, Defs.

2008 Statement of Material Facts (Duffin Ex. 7) ¶ 58; *see also* PX15, Johnson Dep. 107:3-5

(heavy equipment was ████████████████████████████████████████

████████████████████████████████████).

**Defendants' Response.**  The statement in Paragraph 249 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 249 also is misleading and is not supported by the record.  Plaintiffs' use of the phrase "their equipment" misleadingly suggests that EMOI owned the equipment used at the gas plant it operated.  In fact, under the PSC, all equipment belonged to Pertamina.  *See* SOF ¶ 6.

250. **Defendants closely supervised deployments of their military security.** To coordinate these deployments, EMOI also mapped and tracked the military deployments on a daily basis and forwarded these reports to EMOI's senior executives in Jakarta. Alex Dodds (who had now replaced Russell as the head of EMOI's North Sumatra operations in Aceh) informed Wong and Laureys that ███████████████ on ███████████████

███████████████████████████████████

███████████████████████████████ PX304, CA0001334049, at '095. ████████

███████████████████████████████████

███████████████████████████████████

███████████████ *See, e.g.,* PX314, CA0001005970. EMC's Laureys advised EMOI's President that ███████████████████████████████ including ███████████████████████████ and ███████ ███████████ PX315, CA0001334045. This request was approved by Wilson in late June. *Id.*

> **Defendants' Response.** The statement in Paragraph 250 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 250 also is misleading and is not supported by the record. Plaintiffs' use of the phrases "supervised" and "their military security" misleadingly suggests that EMOI controlled the Indonesian military. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

N.    **EMOI** ███████████████████████████████
███████████████████

251. **Laureys acknowledged EMOI could not maintain plausible deniability about its involvement in military deployments.** He wrote internally that ███████████████

███████████████████████████████████

██████  PX260, CA0001334028, at '032. To the contrary, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  PX4, McFetridge Rept. at

¶ 5.3; *accord* PX3, Robinson Rept.17 (EMOI "was deeply entangled with the TNI at every

level"); *id.* at 20 ("[T]here is abundant evidence" that EMOI "had frequent meetings with the

highest military authorities, that the two sides shared operational and intelligence information,

that the ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ).

**Defendants' Response.** The statement in Paragraph 251 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 251 also is misleading and is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

252. **Defendants established detailed rules for military security when it suited them.** As was the case in establishing detailed policies for escorts for the military guards, *see supra* ¶ 213,  EMOI could, if it wished to, establish detailed "Rules for Military personnel deployed" at EMOI's operations. As deployments of the military guards continued, EMOI managers met with ████████████████████████████████████████████████

██████████████████████████████████████ (with similar briefings planned for

Clusters 3 and 4 and other facilities). PX316, CA0001334096, at '097. These █████████

███████████████████



*Id.*; *see also* PX14, Farmer Dep. 236:17-22 (█ █████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████).

**Defendants' Response.** The statement in Paragraph 252 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants. The statement in Paragraph 252 also is misleading and is
not supported by the record. The fact that EMOI encouraged and sought to enforce
certain safety protocols within the gas plant that it operated does not in any way establish
that EMOI had operational control over the military of Indonesia, a sovereign country.
EMOI had no authority to hire, train, give orders to, oversee, transfer, or terminate any
members of the Indonesian military, and repeatedly urged the Indonesian government to
comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

O.     **EMC and EMOI Ignore the Dangers Presented by Military Guards And Repeatedly Fail to Implement Safeguards to Address These Dangers**

253.     **During their briefings for the military guards, EMOI did not address or provide any guidance regarding the use of force.** PX8, EMOI 30(b)(6) (Snell) Dep. 516:15-23. EMOI did not say anything about the use of excessive force. *Id.* at 516:15-517:5. EMOI did not say anything about the use of torture during interrogations. *Id.* at 517:6-11.

> **Defendants' Response.** The statement in Paragraph 253 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 253 also is misleading and is not supported by the record. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

254.     E**MOI did not post any rules or restrictions on the use of force on its notice boards for military security.** *See* PX316, CA0001334096 (referencing notice boards); PX8, EMOI 30(b)(6) (Snell) Dep. 518:7-23; *see also id.* at 703:7-12 (████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████ ).

> **Defendants' Response.** The statement in Paragraph 254 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 254 also is misleading and is not supported by the record. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

255.     Despite repeated warnings that Defendants should institute a code of conduct for military security, Defendants never followed through. As the requested additional military security was arriving at EMOI's operations, K. Jayadev reiterated to Oh, Wong, Connor and EMC's John Piper—now for the third time—that ████████████████████████████



). PX318,

CA0001334182, at '182. This was not done. *See supra* ¶ 235; *infra* ¶ 269 n.17.

> **Defendants' Response.** The statement in Paragraph 255 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 255 also is misleading and is
> not supported by the record. EMOI did not control the Indonesian military, had no
> authority to hire, train, give orders to, oversee, transfer, or terminate any members of the
> Indonesian military, and repeatedly urged the Indonesian government to comply with the
> law and human rights standards. *See* SOF ¶¶ 11–12, 36.

256.   **Alex Dodds recommended monthly reviews of military security's**

**performance and behavior, but was ignored.** Alex Dodds, who had now replaced Jim Russell,

indicated that there needed to be

PX277, CA0001334090, at '091. Dodds' recommendations were forwarded to

Wilson, EMC's Laureys, Chee Khoon Oh and EMC's Mike Farmer, among others. *Id.* at '090.

No action was taken to implement Dodds' recommendation. PX8, EMOI 30(b)(6) (Snell) Dep.

834:4-10 (

).

> **Defendants' Response.** The statement in Paragraph 256 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 256 also is misleading and is
> not supported by the record. EMOI did not control the Indonesian military, had no
> authority to hire, train, give orders to, oversee, transfer, or terminate any members of the
> Indonesian military, and repeatedly urged the Indonesian government to comply with the
> law and human rights standards. *See* SOF ¶¶ 11–12, 36.

257.    EMOI and EMC ignored these recommendations from their own personnel despite being on clear and continuing notice of the dangers involved. *See, e.g., supra* ¶¶ 176-84, 214, 224, 273-75, 305, 354; PX8, EMOI Rule 30(b)(6) (Snell) Dep. 586:22-587:10 (acknowledging published allegations of military misconduct in August 1998, December 1998, January 1999, October 1999, December 1999, July 2000 and September 2000).

> **Defendants' Response.** The statement in Paragraph 257 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 257 also is misleading and is not supported by the record. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

## P.    EMC and EMOI Are Again Told About Human Rights Abuses Resulting from Sweeps, Detentions, and Torture By Its Military Security But Do Not Investigate or Address The Abuses

258.    **The Wall Street Journal warned Defendants of military security's "sweeps" of local villages and torture of local civilians.** As EMOI continued to increase the use of the military guards being housed at A-13 and other locations, EMOI and EMC were informed by a Wall Street Journal investigative reporter that the A-13 soldiers were conducting "sweeps" of local villages and were torturing local villagers at A-13. EMOI and EMC were also notified that the A-13 soldiers were justifying these sweeps as necessary to protect EMOI's facilities. In July, the reporter informed EMOI that:



PX320, CA0001333998, at '000.

**Defendants' Response.** The statement in Paragraph 258 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants. The statement in Paragraph 258 also is misleading.
EMOI did not control the Indonesian military, had no authority to hire, train, give orders
to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly
urged the Indonesian government to comply with the law and human rights standards.
*See* SOF ¶¶ 11–12, 36. Moreover, EMOI did not operate A-13 during the relevant time
period. *See infra* ¶ 555.

259.    ExxonMobil officials at both EMOI and EMC in the United States were aware of

this information regarding the sweeps of local villages and torture at A-13. They were advised by

William Cummings tha ███████████████████████████████████████

████████████████████████████████████████ PX320, CA0001333998, at '999.

Connor forwarded the information to Oh, advising him to █████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████ *Id.* at '998 (bold in original). Oh then

warned Wong and EMC's Mike Farmer that █████████████████████████████

███████████ *Id.* See also PX8, EMOI 30(b)(6) (Snell) Dep. 749:18-24 (███████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ ); *id.* at 457:16-

19 (information from WSJ reporter ██████████████████████████████████ ).

**Defendants' Response.** The statement in Paragraph 259 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants. The statement in Paragraph 259 also is misleading.
EMOI did not control the Indonesian military, had no authority to hire, train, give orders
to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly
urged the Indonesian government to comply with the law and human rights standards.
*See* SOF ¶¶ 11–12, 36. Moreover, EMOI did not operate A-13 during the relevant time
period. *See infra* ¶ 555.

260.    Military security's behavior was notorious, including among Exxon employees, and Defendants were specifically informed of abuses. The military guards' use of "sweeps" to identify, detain, torture or kill individuals who they considered even potential threats to EMOI's facilities, operations or personnel (even if there was no evidence that supported targeting the individuals impacted) could not have been a surprise to EMOI or EMC because these tactics by the military were well known. *See, e.g.,* PX228, CA0001047338, at '376 (memorandum by Tommy Chong explaining that military has ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████); *id.* at '378 (indicating that military has warned NSO about local employees who may be GAM sympathizers); *id.* at '379 (indicating the local Acehnese employees and contract workers are ███████████████████████████████████); PX322, CA0001329561, at '561 (reporting that ███████████████████████████████████████

███████████); PX229, CA0001006150, at '166 (███████████████████████████

███████████████████████████████████); PX207, 1999 State Dept. Rept. at 15 (stating that on "January 9, [2000,] the military detained 37 to 40 persons from rural villages and brought them to nearby Lhokseumawe, Aceh. Most of these persons were beaten and tortured severely and four died in custody …"); PX255, CA0001055488, at '488 (advising EMC's Robert Haines that ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████"); PX256, CA0001178945, at '947 (███████

███████████████████████████████████████████████████████████████



); *see also* PX264, CA0001006104, at '104 (discussing ████████████████████ ███████████████████████████████████████████ ).

**Defendants' Response.** The statement in Paragraph 260 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' use of the phrase "specifically informed of abuses" misleadingly suggests that Defendants were informed of the alleged incidents underlying Plaintiffs' claims. EMOI had no knowledge of any of the alleged facts related to Plaintiffs' claims until they filed their initial complaint in June 2001 or of any reports or complaints regarding the alleged incidents underlying Plaintiffs' claims. *See* SOF ¶ 37. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 260 also is misleading. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

261.    In September 2000, the Wall Street Journal published the results of its investigation. The story reported that:

> Some villagers claim they were physically abused by soldiers assigned to Mobil duty, particularly by troops from A-13, a barracks across from a Mobil gas well. One man, 24-year-old Iskandar (like many Indonesians, he goes by one name), claims that three years ago he and seven friends were at a food stall when A-13 troops picked them up, alleging they had robbed a bank. The eight men were taken to the barracks, he says, where they were kicked, tortured with electric shock and held overnight. Mr. Iskandar lifts his shirt to reveal scars he says resulted from the torture.

PX80, CA0001363125, at '128 (*Mobil Sees its Gas Plant Become Rallying Point for Indonesian Rebels,* WSJ (Sept. 7, 2000)); *see also* PX8, EMOI 30(b)(6) (Snell) Dep. 506:11-22 (



); *id.* at 460:9-12 ████████ ████████████████████████████████████████████ ████████████); *id.* at 859:21-860:17 (████████████████████████

[REDACTED]

).

**Defendants' Response.**  The statement in Paragraph 261 is immaterial to Defendants'
motion for summary judgment.  An immaterial statement cannot create a genuine issue of
material fact.  The *Wall Street Journal* article did not concern Plaintiffs' alleged injuries.
Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries
to Defendants.  The statement in Paragraph 261 also is misleading.  EMOI did not control
the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or
terminate any members of the Indonesian military, and repeatedly urged the Indonesian
government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.
Moreover, EMOI did not operate A-13 during the relevant time period.  *See infra* ¶ 555.

262.    **EMOI and EMC did nothing after receiving this information.** They made no

effort to investigate these events or contact the witnesses involved and did not take any

meaningful steps to prevent these actions by the A-13 or other military guards. *See* PX8, EMOI

30(b)(6) (Snell) Dep.796:13-20 ( [REDACTED]

[REDACTED]

[REDACTED] ); *id.* at 855:24-858:14 [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████).

> **Defendants' Response.** The statement in Paragraph 262 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 262 also is misleading. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36. Moreover, EMOI did not operate A-13 during the relevant time period. *See infra* ¶ 555.

263.   **EMC's professed helplessness to investigate military security contrasts with their prior actions.** Although EMOI claims it could not lawfully investigate misconduct by the military guards, EMC's original 30(b)(6) witness (Mr. Ward) claimed that Mobil Corporation *was* able to conduct ██████████████████████ of the allegations of human rights violations by the military reported by Business Week in December 1998. PX12, EMC 30(b)(6) (Ward) Dep. 156:3-12; *see also* PX15, Johnson Dep. 242:22-24 (discussing 1998 allegations of human rights violations by military security: ████████████████████████████ ████████████████████████). Mr. Shari, Business Week's reporter, was able to conduct an extensive investigation of misconduct by the military, including interviews with many local villagers, current and former Mobil Oil employees and contractors, and government officials. *See* PX76, Shari Decl. (describing his investigation); PX45, McFetridge Dep. 194:16-195:13 ("So if he [Shari] could do that [investigation in] a few weeks, then it's hardly plausible that the people at Exxon, who live there full-time, would not have been aware of or at least had access to the same kind of information."); PX46, Ling Dep. 164:17-168:15 (discussing EMOI's ability to investigate claims of misconduct and secure termination of military personnel involved if it chose to exercise that power). Despite the resources available to them, there is no evidence that EMOI or EMC conducted *any* investigation after being informed

that military personnel were ***contemporaneously*** conducting sweeps of local villages and

justifying these as necessary to protect EMOI's operations and were then detaining and torturing

villagers at A-13. PX8, EMOI 30(b)(6) (Snell) Dep. 796:13-20; *id.* at 855:23-857:6 (EMOI never

requested removal or discipline of any guard for participating in torture at A-13).

> **Defendants' Response.** The statement in Paragraph 263 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 263 also is misleading and is
> not supported by the record. EMOI had no authority to investigate the conduct of the
> military of Indonesia. *See* SOF ¶ 12.

264.    **Defendants made a habit of not investigating potential wrongdoing.** EMC's

and EMOI's failure to take any steps to investigate or address these sweeps of the nearby villages

and torture by the A-13 military personnel was the same as their response to the violent

mistreatment of plaintiffs. Regardless of whether that mistreatment occurred inside the fence of

EMOI's facilities and operations, immediately outside or proximate to those locations, or in

"sweeps" of nearby villages to detain and/or kill potential "threats," there is no evidence of any

serious actions by EMC or EMOI to investigate these matters or do anything to remedy them.

*See, e.g.*, PX5, Ling Rept. ¶ 97 ("Although EMOI established a process that was sometimes used

to report and request investigations relating to the military personnel's mistreatment of EMOI's

own employees and contractors, there is little evidence that this was used to report abuses

directed at the local populations."); PX36, ███████ Dep. 21:14-33:22 (testifying that he

witnessed military order that an excavator be used to bury individuals alive and this was reported

to EMOI supervisor, but no action was taken); PX8, EMOI 30(b)(6) (Snell) Dep. 508:6-16

(testifying that EMOI was not aware of events alleged by Plaintiffs and did not request any

investigations).

> **Defendants' Response.** The statement in Paragraph 264 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of

material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 264 also is misleading and is not supported by the record. EMOI had no authority to investigate the conduct of the military of Indonesia. *See* SOF ¶ 12. Moreover, EMOI did not operate A-13 during the relevant time period. *See infra* ¶ 555.

*Q.*



265.   The almost five-fold increase in the engagement of military guards for EMOI's

operations in the year 2000 was approved by ExxonMobil executives in the United States over

the opposition of EMOI security personnel on the ground in Aceh. On October 27, 2000, Jack

Connor acknowledged this in a communication to Chee Khoon Oh and K. Jayadev of the Global

Security organization. Connor warned that some of the information being conveyed ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX317, CA0001333838. Connor

indicated that the military was ▮▮▮▮▮▮▮▮▮ and wrote:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Id.* at '839; *see also* PX9, EMC 30(b)(6) (Snell) Dep. 1140:15-24 ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮); PX8, EMOI 30(b)(6) (Snell) Dep. 845:12-847:17

(▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



). At the time he overrode

the opposition of EMOI's security people in Aceh Johnson

PX14, Farmer Dep. 185:16-22.

> **Defendants' Response.** The statement in Paragraph 265 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 265 also is not supported by
> the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36. EMC likewise
> had no authority to control the sovereign military of Indonesia.

266.    By November 2000, EMOI's ▮▮▮▮ of its security ▮▮▮▮

and ▮▮▮▮ indicated that it had ▮▮▮▮ PX314, CA0001005970,

at '970.001 & '971. Military security was located at numerous ▮▮▮▮ and ▮▮▮▮[21]

areas including, for example, ▮▮▮▮

▮▮▮▮ *Id.* In contrast, its Resources now

included only ▮▮▮▮ *Id.* at '971; *see also* PX14, Farmer

Dep. 254 (EMOI was able to reduce number of EMOI private security guards because ▮▮▮▮

▮▮▮▮

▮▮▮▮); PX328, CA0001006150, at '166

(indicating that approximately ▮▮▮▮); PX63,

CA0001006008 (same); PX64, CA0001333838 at '8390▮▮▮▮

▮▮▮▮); PX331,

---

[21] EMOI's 30(b)(6) witness testified that ▮▮▮▮ of security refers to ▮▮▮▮
▮▮▮▮ and ▮▮▮▮ refers to
the area ▮▮▮▮ PX8, EMOI
30(b)(6) Dep. 491:11-492:5.

CA0001005975 at '976 ( 

). This number again doubled by mid-

2001. *See supra* ¶ 27.

> **Defendants' Response.** The statement in Paragraph 266 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 266 also is misleading and is
> not supported by the record. Plaintiffs' use of the phrases "its security" and "it had"
> misleadingly suggest that the sovereign Indonesian military worked for EMOI. Pursuant
> to both the PSC and the laws of Indonesia, it was the Government of Indonesia's
> exclusive responsibility to protect the natural resources and associated facilities at the
> Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no
> authority to hire, train, give orders to, oversee, transfer, or terminate any members of the
> Indonesian military, and repeatedly urged the Indonesian government to comply with the
> law and human rights standards. *See* SOF ¶¶ 11–12, 36. EMC likewise had no authority
> to control the sovereign military of Indonesia.

267.    **Defendants' expanded Indonesian operations were extremely profitable,**

**despite the human cost of military security's abuses.** Between 1998 and 2000, EMOI's

earnings 

PX211, Defs. 2008 Statement of Material Facts (Duffin Ex. PX7) ¶20; *see also* PX215,

CA0001131118 (instructions from Lance Johnson in the United States to

); PX96, CA0001191702, at '703 (

); *id.* at '702 (

).

> **Defendants' Response.** The statement in Paragraph 267 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

### R.      EMC and EMOI Disregard Their Own Recommendations and Policies

268.      While they reaped outsized profits, both EMC and EMOI disregarded their own

recommendations and policies regarding steps required to mitigate the risks of military security.

Almost two years earlier, when Johnson, Farmer and other officials in the United States had

initiated steps to ███████████████████████████████████ PX216, CA0001126263;

*supra* ¶ 187. Defendants recognized that █████████████████████████████

████████████ PX335, CA0001124879. They did not do so. *See* PX9, EMC 30(b)(6)

(Snell) Dep. 1029:14-1032:3 (█████████████████████████████).

> **Defendants' Response.**  The statement in Paragraph 268 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 268 also is misleading and is
> not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was
> the Government of Indonesia's exclusive responsibility to protect the natural resources
> and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control
> the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or
> terminate any members of the Indonesian military, and repeatedly urged the Indonesian
> government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

269.      Defendants failed to take reasonable steps to prevent foreseeable risks that their

military security would violate the human rights of local civilians. Exxon's failure to audit their

security plans as recommended is illustrative of the numerous respects in which EMC and EMOI

failed to adopt, implement or enforce even the most basic safeguards as they engaged many

hundreds of military guards for their operations in Aceh.[22] These failures included disregard for

---

[22] *See generally* PX5, Ling Rept. at ¶¶ 76-104. Brigadier General Ling served in the British
Army for 33-years, then worked on security and human rights issues for British Petroleum from
1992-2001, and since that time has taught, lectured and consulted on a broad range of security
and human rights matters including, in particular, the application of these principles when public
security forces are being engaged. *Id.* at ¶¶ 6-16. *See also generally* PX4, McFetridge Rept. at ¶¶
III.2.1-2.12, 4.1-5.15 & § IV (Conclusions). Colonel McFetridge has an M.A. in Asian History
and, after being selected by the Army to join the Foreign Area Officers Program, attended the
Indonesian Army Command and Staff School in Indonesia. From 1994-98, McFetridge served as

their own policies and recommendations; the policies and practices adopted by other major

energy and extractive companies, including those described in the Voluntary Principles on

Security and Human Rights[23]; and the policies and practices considered necessary and

appropriate by leading experts on security issues and human rights. In particular:

---

the U.S. Defense and Army Attaché in Indonesia. He subsequently worked on security matters for Exxon in Cepu, Indonesia and then British Petroleum in Papua, Indonesia. Since 2005, McFetridge has worked as a consultant on security and human rights issues for many corporations and public entities such as the World Bank. *Id.* at ¶¶ 2.1-2.7.

[23] In December 2000, leading energy and extraction companies detailed many of these practices in the Voluntary Principles ("VP's"). PX4, McFetridge Rept. Ex. 1 (attaching VPs). The VP's memorialized policies and practices the leading energy and extractive companies had already adopted. *See* PX6, Expert Decl. of Michael Posner (former Assistant Secretary of State for Democracy, Human Rights and Labor) at ¶ 21; PX47, Posner Dep. 65:11-25 ("[T]he voluntary principles didn't create a new standard of care, they codified existing practice. So beginning in the early/mid '90s, leading companies were developing, and maybe before that, but certainly by the early/mid '90s, companies like Exxon and Shell and BP were developing a robust sort of duty of care and dealing with these issues of security in their global operations. So the voluntary principles put on paper what they have already committed to do and what they were doing, what they said they were doing."); *id.* at 79:15-80:23 (same); *id.* at 86:2-14 ("I don't recall a single instance where a company said oh yeah ... these are new requirements that we have to now add on. The companies are saying this is what we are doing anyway and we're now codifying it, we are reinforcing our existing commitments …"). The original companies that assisted in the formulation of the VP's included many of the major energy and extraction companies in Indonesia (and world-wide). PX45, McFetridge Dep. 295:12-297:9 (discussing British Petroleum and predecessors Arco and Amoco); *id.* at 297:18-302:11 (discussing Caltex and Freeport-McMoRan); *id.* at 301:21-302:24 (discussing Texaco and Chevron); *id.* at 302:25-303:14) (Rio Tinto); *id.* at 304:5-30515 (discussing human rights organization signatories and International Federation of Chemical, Energy, Mine and General Workers Union). *See also* PX5, Ling Rept. at ¶ 34 & n.16.

Similarly, Exxon publicly announced that the initiatives set forth in the Voluntary Principles were consistent with its own practices. *See* PX337, CA0002015842 (informing Washington Post that ███████████████████████████████████████████);
*see also* PX338, CA0001330593 (EMC statement approved by EMC President and CEO Lee Raymond that ██████████████████████████████████████████████████████████████████████████ .
Exxon's senior security official in Aceh, Jack Connor, has testified that the safeguards set forth in the VP's ██████████████████████ and ████████████████████████
PX16, Connor Dep. 88:18-89:6.

- EMC and EMOI failed to provide the most basic information to the senior executives at EMOI involved in ExxonMobil decisions to request and deploy military security.[24]

- Defendants provided little or no training on the use of the military security to EMOI's other supervisory personnel.[25]

- Contrary to EMC's professed policies, the "Risk Assessments" led by EMC's Global Security organization paid only cursory attention to the egregious human rights records of the military personnel Defendants were engaging, the dangers those guards posed to civilian populations, and the adoption and enforcement of safeguards to address these dangers.[26]

---

[24] MOI President Wilson and Senior Vice President Duffin were placed in the most senior executive positions at EMOI—and became key actors in decisions and/or tactical implementation of the use of military guards at EMOI's facilities and operations—without any serious effort to train or inform them about the military's human rights records or the dangers this posed to local populations. PX8, EMOI 30(b)(6) (Snell) Dep. at 396:16-20 (

; *id.* at 391:25-392:12; *id.* at 398:25-399:8 (

); PX18, Duffin Dep. 41:21-42:2

); *id.* at 62:11-18

); *id.* at 65:17-22 (

).

[25] *See* PX9, EMC 30(b)(6) (Snell) Dep. 1005:9-14

; PX4, McFetridge Rept. at 5.7 (EMOI's NSBU did not make standards and expectations clear "through signage, induction training, daily briefings or other methods of communication."); *id.* at 5.10 ("Exxon Security did not provide training modules for employees, local security guards, or Indonesian PSF on proper security practices and human rights protection."). *See also* PX14, Farmer Dep. 83:5-13 (

).

[26] The Voluntary Principles—which EMC informed the public were in accord with its own policies and practices—specify that accurate risk assessments are critical to protecting local

- To the extent the EMC risk assessments included even limited recommendations relating to controls on military security, EMC and EMOI then either ignored or failed to implement those recommendations.[27]

- EMC and EMOI failed to provide or make available *any* training or instructions to the military security at its facilities and operations to avoid human rights abuses.[28]

---

communities and, in particular, these assessments "should consider the available human rights records of public security forces … Awareness of past abuses and allegations can help Companies to avoid recurrences … Also, identification of the capability of [these] entities to respond to situations of violence in a lawful manner (i.e., consistent with applicable international standards) allows Companies to develop appropriate measures in operating environments." PX4, McFetridge Rept. Ex. 1 (VPs).

Contrary to EMC's public claim that  PX337, CA0002105842, the risk assessments led by EMC paid little attention to the                                                       *See* PX14, Farmer Dep. 166:11-21 (

);
PX4, McFetridge Rept. at 2.2 (Defendants' risk assessments "essentially ignored the threat of Indonesian PSF [Public Security Force] misbehavior and made no effort to examine that clear and present problem"); *id.* at 2.2.1-2.8; *id.* at 2.9 "It is remarkable … that no RA was done to specifically consider the implications of bringing in hundreds of PSF to the project, even as these numbers grew.").

[27] *See, e.g., supra* ¶ 235; *infra* ¶ 269 n.17 (failure to draft or implement code of conduct recommended by Risk Assessment team); PX339, CA0001333197 (EMOI's senior security official, Jack Connor, informing EMC's Global Security Manager—International, Mike Farmer, that

).

[28] *See supra* ¶ 215; PX18, Duffin Dep. 95:15-21 (

); *id.* at 98:9-14

); PX8, EMOI 30(b)(6) (Snell) Dep. 516:15-23(

245



- EMC and EMOI ignored their own internal recommendations that a code
  of conduct was needed for the military guards they were engaging[29]; failed
  to provide any form of instruction about acceptable conduct; and
  disregarded the Voluntary Principles and their own professed policies by
  failing to provide or seek agreement on acceptable practices and specific
  limitations regarding the use of force by military security assigned to
  EMOI's facilities and operations.[30]

_____

); *id.* at 517:6-11

); PX4, McFetridge Rept.
at 5.5 (MOI "did not take any steps to instruct, train or monitor the actions of the military
personnel assigned to the company's operations regarding human rights, the use of force or
related issues."); *id.* at 5.4 (comparing Exxon's "detailed instructions" regarding permissible
practices "at or near the EMOI facilities and the manner in which military personnel would
provide patrols and escorts to the company's workforce, sometimes in levels of … detail that
approached micromanagement" with the absence of any instructions "relating to the use of force,
detention, etc."); PX45, McFetridge Dep. 160:15-24 (EMOI provided extensive training to
military guards on some subjects, "but not human rights"); *id.* at 162:23-164:3.

[29] *See* PX228, CA0001047338 at '397 (recommending that management

; PX299, CA0001078966, at '967 (recommending that use of

); PX318, CA0001334182

; PX16, Connor Dep. 171:6-15 (never saw draft of code of conduct); PX8, EMOI
30(b)(6) (Snell) Dep. 488:8-11

);
PX5, Ling Rept. ¶ 87.

[30] EMC's Rule 30(b)(6) witness testified that EMC's policy was that companies should promote
the policy that                                    to public security forces and
EMC would communicate this to its affiliated companies in monitoring their activities. PX9,
EMC 30(b)(6) (Snell) Dep. 925:18-926; *see also id.* at 926:6-20 (same policy regarding principle
that                                                    ). EMC also
claimed that its policies and practices were consistent with the Voluntary Principles which—in
addition to reaffirming the limitation that
                                    provided that companies "should take all appropriate
measures to promote observance of applicable international law enforcement principles,
particularly those reflected in the UN Code of Conduct for Law Enforcement Officials and the
UN Basic Principles on the Use of Force and Firearms." *Id.* at 924:24-925:2, 931:18-24. *See
supra* ¶ 269 n.11; PX337, CA0002015842 (informing Washington Post that

246

- EMC and EMOI made no serious effort to monitor the conduct of the military security[31] and even rejected recommendations from officials on

_____

████████████████████████████ ). The UN Code and the UN Basic Principles set forth very specific limitations on the use of torture, force and/or firearms and apply to military security and State security forces who exercise arrest or detention powers, as the military guards at EMOI often did. *See* UN Code of Conduct for Law Enforcement Principles at Art. 1 cmt.b; UN Basic Principles on the Use of Force and Firearms; PX5, Ling Rept. at ¶¶ 39, 99 (setting forth limitations such as (a) prohibition on use of torture; (b) force and firearms should be used only in narrow circumstances—i.e., in response to imminent threats of death or serious injury ad only when less extreme means will be insufficient).

EMC knew how to incorporate these safeguards into its agreements with public security forces. *See* PX319, CA300003127 at '133 ███████████████████████████████

████████████████████████████ ); PX321, CA300003225, at Appendix F (setting forth specific limitations on situations in which force can be used by public security forced engaged by ESSO). However, both EMC and EMOI failed to implement or adhere to any of these policies in Aceh. *See* PX5, Ling Rept. ¶ 99 ("Aside from the company's generalized references to human rights, there is no indication that EMOI took 'all appropriate measures to promote observance of applicable international law enforcement principles, particularly those reflected in the UN Code of Conduct for Law Enforcement Officials and the UN Basic Principles on the Use of Force and Firearms.' I have seen no evidence that EMOI ever communicated its expectation that personnel providing security for its operations would act in accordance with these principles or, for that matter, even discussed these principles with Pertamina or the military, let alone embodied these and other terms set forth in the Code of Conduct and the UN Basic Principles in the documents relating to the project or ExxonMobil's use of military guards."); *id.* at ¶ 100 (explaining that "Exxon's failure to have specific, standard-based discussions with Pertamina and the military" was "a very dangerous prospect indeed given the TNI's history of abuses. A reasonable company, faced with TNI's history, would have made a point of communicating specific expectations about TNI's conduct and the standards to which it would be held. It would have carefully monitored the results … Instead, Exxon allowed the TNI to operate as it wished, invoking the term 'human rights' in only vague terms rather than as a set of concrete operational principles. The barely concealed message was clear: Exxon would not hold the TNI to any meaningful standard of good conduct with respect to the local populations."); PX4, McFetridge Rept. at ¶ 5.2; PX9, EMC 30(b)(6) (Snell) Dep. 975:24-976:6 (discussing Human Rights Framework adopted by EMC *after* it was sued, which provided that affiliates should inform host government security that they were expected to act In a manner consistent with UN Code of Conduct for Law Enforcement Officials and UN Basic Principles on the Use of Force and Firearms by Law Enforcement Officials; witness is aware of no evidence that EMC communicated this to its affiliates prior to being sued in this litigation).

_____

[31] PX18, Duffin Dep. 94:2-95:24 ████████████████████████████████████

████████████████ ); PX8, EMOI 30(b)(6) (Snell) Dep. 439:5-10 (

the ground in Aceh about the need for regular reviews of the military security personnel's behavior.[32]

- When security tortured, sexually assaulted or killed local civilians, EMC and EMOI made little if any effort to investigate this misconduct and, on the rare occasions where they even asked Pertamina or the government to investigate, there is no evidence of any serious follow-up by EMC or EMOI.[33]

**Defendants' Response.** The statement in Paragraph 269 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 269 also is misleading and is not supported by the record. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

270. **Defendants could and should have implemented these common-sense**

**mitigation measures.** These are all safeguards that EMC and EMOI could and should have

implemented in Aceh. They were all either (a) consistent with EMC and EMOI professed

policies, (b) reflected in the practices of other companies and/or the Voluntary Principles

reflecting accepted practice by similarly situated companies; and/or (c) otherwise required by the

grave and foreseeable dangers presented by EMC and EMOI's engagement of many hundreds of

---

█████████████████████████████████████████

██ ); *id.* at 703:23-704:2 (

████████████████████████████████ ); PX5, Ling Rept. at ¶ 96

("In light of the [military's history of human rights abuses] it was … obviously necessary for ExxonMobil to have a system in place to monitor carefully the actions of the growing number of military personnel being used to guard its operations … Despite this, MOI (and later EMOI) apparently made no effort to monitor behavior of the military guards towards the local villagers.").

[32] *See supra* ¶¶ 195, 256; PX277, CA0001334090 at '091 (Dodds' recommendation for monthly reviews of, *inter alia*, the military guards' behavior); PX8, EMOI 30(b)(6) (Snell) Dep. 834:4-10 (EMOI Rule 30(b)(6) (witness has seen no evidence that Dodds' recommendation was ever implemented).

[33] *See supra* ¶¶ 262-64; PX5, Ling Rept. ¶ 97.

military guards with a long and well-documented history of human rights abuses (including, in particular, abuses by military security at and near EMOI's operations). *See* PX4, McFetridge Rept. at ¶¶ III.2.1-5.10; PX5, Ling Rept. at ¶¶ 31-104.

> **Defendants' Response.** The statement in Paragraph 270 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 270 also is misleading and is not supported by the record. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

271.    **Defendants' wealth and power gave them leverage to enforce human rights standards.** Because ExxonMobil was one of the largest and wealthiest corporations in the world—and because of the extraordinary leverage it had by virtue of its resources, investments and expertise in Aceh—EMC and EMOI were very well positioned to implement these safeguards. Instead, they did virtually nothing to protect the local populations. Had EMC an EMOI taken appropriate steps, the risk of misconduct directed at local populations by the military guards would have been dramatically reduced. *See* PX4, McFetridge Rept. ¶¶ III.5.11-5.15 & Conclusions (7); PX5, Ling Rept. ¶¶ 105-115 & Summary and Conclusion.

> **Defendants' Response.** The statement in Paragraph 271 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 271 also is misleading and is not supported by the record. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

**S.     Despite continued warnings about the military guards, The Defendants request additional deployments**

272.    As conditions deteriorated in Aceh in early 2001, ExxonMobil officials in the United States continued to instruct EMOI to move forward with gas drilling and production

activities in Aceh. PX63, CA0001006008 (████████████████████████████

███████████████████████████████████████████).

    **Defendants' Response.**  The statement in Paragraph 272 is immaterial to Defendants'
motion for summary judgment.  An immaterial statement cannot create a genuine issue of
material fact.  The statement in Paragraph 272 also is misleading and is not supported by
the record.  EMOI was responsible for the management of its own affairs.  *See* SOF ¶¶
163–165.

    273.    In early January 2001, EMC's Global Security organization and EMOI received

continued warnings about the military guards' poor training and undisciplined conduct. *See*

PX257, CA0001337402, at '405 (Jan. 11, 2001 Report by Stirling Group sent to Chee Khoon

Oh, EMC's Mike Farmer, EMOI's Ron Wilson and others: ████████████████████

███████████████████████████████████████████); *id.* at

'406 (██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████); *id.* at '408 (████████████

████████████████████████████████████████████████████

████████████████████████████).

    **Defendants' Response.**  The statement in Paragraph 273 is immaterial to Defendants'
motion for summary judgment.  An immaterial statement cannot create a genuine issue of
material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants.  The statement in Paragraph 273 also is not supported by
the record.  EMOI had no authority to train the sovereign military of Indonesia.  *See* SOF
¶ 12.

    274.    EMC and EMOI were also aware of the dangers presented by the military guards

because of violence directed at their own employees and contractors. *See, e.g.*, PX323,

CA0001193387 (████████████████████████████); PX324, CA0001046597, at '598

(describing incident where TNI officer and ten troops lined up EMOI workers and told them

████████████████████████████████████████████); PX326,

CA0001047806 (describing beating of EMOI contractor at EMOI facility by military); PX327,

CA0001005883 (describing incident in which soldier put ████████████████ of

EMOI driver and ██████████████████████ ).

**Defendants' Response.** The statement in Paragraph 274 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants.

275. **Warnings from the U.S. Department of State continued.** The Department's

most recent country report—produced from EMC's records (PX208, CA0001055705)—was

released in February 2001. Like earlier State Department reports available to EMC and EMOI, it

reported that:

- "Security forces were responsible for numerous instances of, at times,
  indiscriminate shooting of civilians, torture, rape, beatings and other
  abuse, and arbitrary detention in Aceh" and other locations. *Id.* at '706.

- "TNI personnel often responded with indiscriminate violence after
  physical attacks on soldiers. They also continued to conduct 'sweeps'
  which led to killing of civilians and property destruction." *Id.*

- "Security forces systematically employed arbitrary arrest and detention
  without trial in Aceh." *Id.*

- "There were numerous credible reports that the army and police continued
  routinely to torture detainees in Aceh." *Id.* at '711.

**Defendants' Response.** The statement in Paragraph 275 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants.

276. **Another risk assessment failed to account for dangers posed to civilian**

**populations by military security.** In the same month, February 2001, EMC's Global Security

group undertook another Risk Assessment. PX229, CA0001006150 (transmitting report to

EMC's Mike Farmer). This report, based on the best information available to EMC and EMOI,

indicated that there were ████████████████████████████████████████

████████████████████████ in the North Aceh regency. *Id.* at '166. *See supra*

¶27 (North Aceh regency accounts for only 5% of total land area of Aceh). Like earlier risk

assessments, this latest assessment included no serious analysis of the dangers presented by

EMOI's increasing reliance on military guards or comprehensive safeguards that should be put in

place to address those dangers. *See* PX4, McFetridge Rept. ¶¶ III.2.5-2.9. And, even where the

risk assessments did make recommendations, EMC and EMOI often failed to implement them.

*See* PX339, CA0001333197 (Connor advising EMC's Mike Farmer, that ████████████



).

> **Defendants' Response.**  The statement in Paragraph 276 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.

277.   **Defendants yet again requested more military security.** In late February 2001,

EMOI's President Wilson sent yet another letter to Pertamina to ██████████████████

██████████████████████ PX66, CA0001076009. First, however,

Wilson received approval from EMC. *Id.* (Johnson's handwritten approval. Shortly thereafter,

EMOI also wrote Pertamina and agreed ████████████ additional ████████

██████████████████████ adding that this was ████████████

████ PX332, CA0001046642.

> **Defendants' Response.**  The statement in Paragraph 277 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 277 also is misleading and is
> not supported by the record.  Pursuant to both the PSC and the laws of Indonesia, it was
> the Government of Indonesia's exclusive responsibility to protect the natural resources
> and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.

T.    **It Is** 

**and**

278.    **Defendants realized their military security was destabilizing their operations.**

By March, these steadily increasing engagements of military security had become

unsustainable—even ExxonMobil officials in the United States acknowledged that they were

making EMOI's facilities *less* safe (in addition to the grave consequences for civilians living

near EMOI's operations). Even Lance Johnson—the same Exxon Mobil executive in the United

States who had ▮▮▮▮▮ the opposition of EMOI's own security people to ▮▮▮▮▮

▮▮▮▮▮ PX317, CA0001333838, at '839, belatedly recognized that it



PX261, CA0001067468; *see also* PX258, CA0001171802, at '804-05 (Connor presentation to

EMOI President in November 2000 reporting, *inter alia*, that ▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮ ).

**Defendants' Response.** The statement in Paragraph 278 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.

279.    **Exxon "shut in" its operations in March 2001.** In mid-March—based on ▮▮

▮▮▮▮▮—a temporary ▮▮▮ was announced

for EMOI's operations in response to the deteriorating situation. PX72, CA0001332890.023.

Although most employees were temporarily evacuated because of security concerns, ▮▮▮

▮▮▮▮▮ continued to voluntarily report for work at EMOI's facilities.  PX70,

CA0002014541; *see also* PX71, CA0001322823 (discussing █████ and indicating that ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ ).

> **Defendants' Response.**  The statement in Paragraph 279 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Defendants describe the temporary suspension of its operations in Aceh
> due to the deteriorating security situation on pages 8–9 of their opening memorandum
> and in paragraph 34 of their Statement of Material Facts Not in Genuine Dispute.

> **U.**   **Defendants Engaged the Military for a Wide Range of Security Services
> and Deployed Their Military Security Personnel ██████████████ in the
> Communities Around the Arun Field As Part of Their Efforts to Secure
> Defendants' Sprawling Operations in a Rural and Isolated Part of Aceh**

280.   ████████████████████████████████████████████████████

████████████ Defendants built and managed the natural gas extraction operations in the

Arun Field in North Aceh. Among other facilities, Defendants' Arun Gas Field operations

included:

- Four ██████████ named Clusters 1, 2, 3, and 4, where Defendants'
  drilling wells were concentrated. PX18, Duffin Dep. at 16:16-17:8.

- ██████████ a centralized facility that included offices, maintenance
  operations, and an airfield. PX18, Duffin Dep. 17:19-18:3; PX106,
  Deposition Notes Produced by Defendants, EMOI 30(b)(6) (Snell) Dep.
  Ex. DX32 at 1; PX107,CA0001007902, at '937.

- Approximately 18 gas injection and observation wells scattered
  throughout the area. PX334, CA0001005773.

- A number of support facilities, including Camp A-1, Camp A-13, and
  Bachelor Camp. PX89, CA0001147209; PX18, Duffin Dep. 18:15-23.

*See generally* PX212, CA0001351986 (map of Arun Gas Field). ████████████████████

████████████████████████ *See infra* ¶323 (████████████████████████

████████████████████████ ); *infra* ¶350 (████████████████████████

████████████████████████████████████████); *infra* ¶360 (██████████████

██████████████████████████████████████████); *infra* ¶375 (███████

██████████████████████████████████████████████████████); *infra*

¶¶408-409, 413 (████████████████████████████████); *infra* ¶421 (███████

████████████████████████████████████████████); *infra* ¶439 (████████

████████████████████████████████████████); *infra* ¶¶449-452 (███████████

████████████████████████████████); *infra* ¶473 (███████████████████

████████████████████████████████); *infra* ¶503 (██████████████████

████████████████████████████████████████); *infra* ¶¶523-526 (███████

████████████████████████████████████████████).

**Defendants' Response.** The statement in Paragraph 280 is immaterial to Defendants'
motion for summary judgment. An immaterial statement cannot create a genuine issue of
material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants. The statement in Paragraph 280 also is unsupported by
the record. ████████████████████████████████████████████████
████████ *See* SOF ¶¶ 39, 49, 59–60, 67, 80, 85–86, 99, 112–13, 120, 133, 139–40.

281.    Defendants managed and were ████████████ each facility in the Arun Field,

including Clusters 1-4, Point A, Camp A-1, Camp A-13, and Bachelor Camp. PX89,

CA0001147209 (█████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████); PX18, Duffin Dep. 10:16-

11:9 (testifying Arun Gas Field facilities ████████████████████████); PX212,

CA0001351986 (map of Arun Gas Field); PX336, CA0001182939 (EMOI accounting of repair

costs at its facilities, including charges for repairs to A-13 army camp (repair toilet and renovate

camp), gas injection wells (repair security posts), Pipeline Road (provide army facilities and

install carpet at Army sleeping post), Cluster 4 (repair security tower), and A-1 (carpet and

pillows for military at A-1)); PX108, Defs.' R&Os to Pls.' Jan. 2016 Requests for Admission at

Resp. 8 (admitting EMOI operated Cluster 3); *id.* at Resp. 21 (admitting EMOI operated Cluster

4); *id.* at Resp. 75 (admitting EMOI operated Cluster 2); *id.* at Resp. 94 (admitting EMOI

operated Point A).

> **Defendants' Response.** The statement in Paragraph 281 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 281 also is unsupported by
> the record. Under the PSC, Pertamina owned and managed all facilities at the Aceh gas
> plant. *See* SOF ¶¶ 6, 7–12. Moreover, Defendants did not operate A-13 during the
> relevant time period. *See infra* ¶ 555.

282.    **The Arun Field was located among rural villages in an isolated part of the**

**province**. PX18, Duffin Dep. at 20:2-10; PX89, CA0001147209 (discussing Defendants' Aceh

██████████ as ██████████ and ██████████). Defendants' relevant operations were

primarily in North Aceh, one of Aceh's 15 regencies (now 18), which accounts for 5% of Aceh's

total land area.[34] PX3, Robinson Rept. 3-4 & n.1. Although North Aceh contains one city,

Lhokseumawe, it is completely rural outside of Lhokseumawe. PX44, Robinson Dep. at 214:12-

21; *see also* PX3, Robinson Rept. App. C. The Arun Field is approximately a one-hour drive

from Lhokseumawe. PX21, Jane Doe III Dep. at 8:11-9:3. There were 263 villages ██████

██████ to Defendants' operations. PX89, CA0001147209, at '210; PX342, CA0001081306

(map of villages around the Arun Field).

---

[34] Additional "remote" operations known as PASE and SLS may have included area in one
neighboring regency. *See* PX341, CA0001076096.

**Defendants' Response.**  The statement in Paragraph 282 is immaterial to Defendants'
motion for summary judgment.  An immaterial statement cannot create a genuine issue of
material fact.

283.   **Exxon engaged the military for a wide range of security services**. EMOI

President Ron Wilson described the scope of the security services to be provided by the military

as follows:



PX73, CA0001003149 (letter from Ron Wilson to Pak Baihaki, President of Pertamina). *See also*

*supra* ¶¶241.

**Defendants' Response.**  The statement in Paragraph 283 is immaterial to Defendants'
motion for summary judgment.  An immaterial statement cannot create a genuine issue of
material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
alleged injuries to Defendants.  The statement in Paragraph 283 also is not supported by
the record.  Defendants did not "engage" the Indonesian military.  Pursuant to both the
PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive
responsibility to protect the natural resources and associated facilities at the Aceh gas
plant.  *See* SOF ¶¶ 7–12.

284.   To accomplish the security goals expressed by Ron Wilson, supra, Exxon

deployed military security to ▮▮▮▮▮ and ▮▮▮▮▮ operations.  *Supra* ¶ 266 (citing EMOI

30(b)(6) testimony). Exxon deployed military security not just at its facilities (*supra* ¶ 281), but

on the roads that ran between Exxon facilities and work locations, and into the local villages. *See infra* ¶¶289-293.

> **Defendants' Response.**  The statement in Paragraph 284 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 284 also is not supported by the record.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

285.    **Exxon stationed Military Security at the front gates of Exxon operated locations.** At the gates, the military security conducted access control: checking identification cards, limiting access to authorized vehicles, ███████████████████████ and removing unwelcome visitors. For example, EMOI President Ron Wilson wrote that EMOI ████████ ████████████████████████████████████████████████████████████ ██████████████████ PX49, CA0001213388. EMOI employee Maman Budiman confirmed that he ████████████ to the A-13 commander ████████████████████ ████████████████████████████████████████ ████████████████████████ *Id*. Security Advisor Tommy Chong later reported on improved access control by military security: █████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████ PX343, CA0001213060, at '061; *see also* PX345, CA0001004882, at '883 (██████████████████████████████████████████); PX346,

CA0001078250 (); PX97, CA0001078251 (same); PX247,

CA0001120418, at '419 (███████████████████████████████).

*See also supra* ¶ 208.

> **Defendants' Response.**  The statement in Paragraph 285 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 285 also is not supported by
> the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

286.    **Exxon tasked military security with conducting perimeter patrols around**



**Exxon operated facilities.** In order to protect Exxon's ███████████████

█████████████████████████████████████ PX73, CA0001003149

(*see also supra* ¶ 283), Exxon tasked its military security with conducting perimeter patrols.

PX345, CA0001004882 at '883-84 (A-13 soldiers to ██████████████████

and ████████████); PX347, CA0001193422, at '423 (artillery soldiers ██████

████████); PX348, CA0001191650 (████████████████████████

████████████████████████████████████████); PX349,

CA0001146479 (guard posts are located on each cluster ███████████████

████████████). *See also supra* ¶ 208.

> **Defendants' Response.**  The statement in Paragraph 286 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 286 also is not supported by
> the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

287.     **Exxon stationed military security at warehouses to protect its equipment and property**. Exxon tasked its military security with protecting its facilities, equipment and property against crime. PX73, CA0001003149 (scope of work included protecting facilities, equipment, and property against crime). To that end, Exxon stationed military units ███████████ ████████████ in response to thefts and looting from the warehouses. PX350, CA0001334507; *see also, e.g.*, PX362, CA0001121219, at '220 (████████████ ████████████).

> **Defendants' Response.** The statement in Paragraph 287 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 287 also is not supported by
> the record.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.  Moreover,
> under the PSC, all property and equipment at the Aceh gas plant was owned by
> Pertamina.  *See* SOF ¶ 6.

288.     **Exxon stationed military security at wells located throughout area**. Defendants' military security personnel also guarded the Arun Field's approximately 18 gas injection and observation wells located outside the four fenced-in "Clusters." PX334, CA0001005773 (map showing widespread well locations outside of clusters); PX351, CA0001192560, at '561 (daily security report noting damage to security post at a gas injection well); PX352, CA0001329596, at '601 (describing access control check-points at Rig location and camps).

> **Defendants' Response.** The statement in Paragraph 288 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 288 also is not supported by
> the record.  EMOI did not control the Indonesian military, had no authority to hire, train,
> give orders to, oversee, transfer, or terminate any members of the Indonesian military,

and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

289.    Defendants also expected their military security personnel to provide ███

███████ not just ████████████ and tasked their military security with patrolling outside

the facilities. In order to provide security for Exxon's operations and equipment, including

security for the wells, remote sites, and personnel traveling between work locations, Defendants

expected their military security personnel to provide ████████████ not just ████

████████ PX353, CA0001334427 (█████████████████████████████████

█████████████████████████████████████████████████████████

████████). Defendants' military security carried out regular patrols outside the facilities.

PX16, Connor Dep. 64:3-9 (testifying that military security personnel would conduct patrols ███

██████████████████████████); PX69, CA0001005923, at '924-25 (mobile

patrol near explosives depot); PX354, CA0001005958, at '959 (same); PX105, CA0001334447

(Exxon security adviser suggesting troops re-deployed to vacant ████████ could ███

████████████████████); PX104, CA0001333975 (recommending military

security personnel conducting access control at EMOI's facilities should ████████████

██████████████████████). Exxon's military security also

patrolled in the local villages. *E.g.*, PX255, CA0001055488 (correspondence to Mr Haines

regarding patrols in villages). Indeed, Exxon expressly requested military security at ████████

████████████████████ located in the villages. PX73, CA0001003149.

**Defendants' Response.** The statement in Paragraph 289 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants. The statement in Paragraph 289 also is not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any

members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

290. **Defendants stationed their military security along the roads, establishing security posts and checkpoints**. Defendants deployed their military security personnel on Pipeline Road and the public roads around the Arun Field, establishing security posts and checkpoints. PX118, CA0001173763 at '764 (███████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████); PX86, CA0001182942 (Approved request to install ███████████████ along Pipeline Road for Unit 113); PX346, CA0001078250 (████████████████████████████ ████████████████); PX388, CA0001179998, at '999 (soldiers on standby along public road); PX362, CA0001121219, at '220 (████████████████████████ ████████████████████████).

> **Defendants' Response.**  The statement in Paragraph 290 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 290 also is not supported by the record.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

291. Defendants tasked the military with providing escorts for travel along the roads, including for shift changes and equipment movements.  Exxon expressly tasked its military guards with providing security for its transportation needs, including providing security for shift changes, convoys, equipment movements, and travel between housing and work sites on the local roads. *E.g.*, PX73, CA0001003149 (scope of work includes security for vehicles required for transportation of personnel and goods); PX357, CA0001329626 (A-13 to escort shift workers aboard buses on Pipeline Road); PX358, CA0001078264 (A-13 to ███████████████ and



■■■■■■■ ); PX97, CA0001078251 (same); PX95, CA0001121093, at '094 (

■■■■■■■ ). Exxon's transportation policies required military escorts for

convoy movements. *E.g.*, PX256, CA0001178945 (Dec. 1999 security plan required an ■■■■

■■■■■■■ for travel between Point A and Bachelor Camp in the morning, evening and

lunch time); *supra* ¶ 213 (December 1999 transportation and military escort policy); PX352,

CA0001329596, at '600 (Aug. 1999 transportation policy stating, ■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■ ). When Executives and VIPs visited, Exxon security arranged for military

escorts for their vehicles.  PX359, CA0001193645, at '647. The transportation plans also

provided that the military would provide emergency response on the road. *E.g.,* PX256,

CA0001178945, at '949-51 (A-13 Commander responsible for responding to emergencies or

overdue vehicles); *see also* PX362, CA0001121219, at '220 (■■■■■■■

■■■■■■■■■■■■■■■■■■■■ ).

> **Defendants' Response.**  The statement in Paragraph 291 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 291 also is not supported by
> the record.  EMOI did not control the Indonesian military, had no authority to hire, train,
> give orders to, oversee, transfer, or terminate any members of the Indonesian military,
> and repeatedly urged the Indonesian government to comply with the law and human
> rights standards.  *See* SOF ¶¶ 11–12, 36.

292.  **Defendants instructed their military security to "sweep" the area before**

**convoy movements on the road.** Defendants instructed their military security personnel to

conduct ■■■■■■■ along the convoy route, including on public roads, prior to a

convoy's departure. *See* PX256, CA0001178945, at '947 (Exxon requires ■■■■■■

■■■■■■■■■■■■■■■■■■ or 15 minutes prior to the movement of

a convoy); PX360, CA0001078271, at '272 (all convoys on Pipeline Road to be assigned armed

escorts and ████████████████████████████████████████); *id.* at

'273 (noting that ████████████████████████████████████

███████████████████████████████████).

> **Defendants' Response.**  The statement in Paragraph 292 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 292 also is not supported by
> the record.  EMOI did not control the Indonesian military, had no authority to hire, train,
> give orders to, oversee, transfer, or terminate any members of the Indonesian military,
> and repeatedly urged the Indonesian government to comply with the law and human
> rights standards.  *See* SOF ¶¶ 11–12, 36.

293.    **Defendants employed roving patrols on the roads.** Defendants' transportation

policy called for roving vehicle patrols to protect convoys and commuting routes. PX352,

CA0001329596, at '600 (to protect heavy equipment movements from Point A to drilling sites,

security escorts will accompany each convoy and two █████████████ will be on duty

along Pipeline Road); PX103, CA0001364429, at '430 █████████████████

████████████████████); PX345, CA0001004882, at '884 (A-13 soldiers at

Cluster 4 will have a vehicle for patrols); *see also* PX8, EMOI 30(b)(6) (Snell) Dep. 650:14-19

(█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████). In addition, Exxon's security plan for its airfield at Point A included tasking

military security with █████████████ and █████████████ on the █████████

█████████████ PX361, CA0001175232, at '234.

> **Defendants' Response.**  The statement in Paragraph 293 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 293 also is not supported by
> the record.  EMOI did not control the Indonesian military, had no authority to hire, train,
> give orders to, oversee, transfer, or terminate any members of the Indonesian military,
> and repeatedly urged the Indonesian government to comply with the law and human
> rights standards.  *See* SOF ¶¶ 11–12, 36.

294.    As part of their mission to protected Defendants' employees and operations,

Defendants' military guards conducted ███████████ in the neighboring villages. For

example, Security Advisor Tommy Chong noted that the ████████████████████

████████████████████████████████████████████

████████   PX101, CA0001334807, at '808.  The sweeps were conducted at Exxon's request.

PX355, CA0001177105. at '106 (████████████████████████

████████████████); PX322, CA0001329561 (████████████████

████████████████████████████████████████████

████████████).  Sweeping was a standard military security strategy.  *E.g.*, PX356,

CA0001358129, at '131 (Email forwarding excerpt from State Dep't HR Rep. on Human Rights

in Indonesia for 2000 discussing TNI practice of conducting sweeps: TNI "continued to conduct

'sweeps' which led to killing of civilians and property destruction."). *See also supra* ¶¶ 212, 258-

261; *infra* ¶ 294.

> **Defendants' Response.**  The statement in Paragraph 294 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 294 also is not supported by
> the record.  EMOI did not control the Indonesian military, had no authority to hire, train,
> give orders to, oversee, transfer, or terminate any members of the Indonesian military,
> and repeatedly urged the Indonesian government to comply with the law and human
> rights standards. *See* SOF ¶¶ 11–12, 36.

295.    Defendants' security policy dictated that Defendants deploy their military security

personnel to patrol a one-kilometer perimeter around the Point A airstrip in advance of arriving

aircraft. PX100, CA0001047835, at '835-36 (summary of airfield security procedures stating that

prior to an aircraft's arrival ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████



██████████ ); PX214, CA0001005148, at '149 (██████████████

██████████████████████████ ).

> **Defendants' Response.** The statement in Paragraph 295 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 295 also is not supported by
> the record. Pursuant to both the PSC and the laws of Indonesia, it was the Government of
> Indonesia's exclusive responsibility to protect the natural resources and associated
> facilities at the Aceh gas plant. *See* SOF ¶¶ 7–12. EMOI did not control the Indonesian
> military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any
> members of the Indonesian military, and repeatedly urged the Indonesian government to
> comply with the law and human rights standards. *See* SOF ¶¶ 11–12, 36.

296.    **Exxon tasked the military with investigating and responding to threats and**

**with providing security information.** Defendants expected their military security personnel to

detect and deter potential threats to Defendants' employees and operations. PX73,

CA0001003149 (military security to provide ████████████████████

████████████████████ and to provide ████████████████████

██████████ ); PX214, CA0001005148, at '149 (████████████████



██████ ). Exxon viewed GAM as a potential threat to its operations. Defs.' SMF ¶¶ 30- 32.

Exxon relied on its military security to neutralize the threat from GAM, including by proactive

measures. *E.g.* PX96, CA0001191702 (June 2000 email to Lance Johnson emphasizing

importance of resuming operations at remote Pase site where GAM members were reportedly

present: ████████████████████████████████████

██████ ). *See also supra* ¶ 241 (military security given responsibility to provide security

information to avoid potential problems and protect Mobil personnel and property).

> **Defendants' Response.** The statement in Paragraph 296 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 296 also is not supported by

the record.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

297.    **Defendants expected their military security personnel to pursue and apprehend** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as a means of deterring threats to their operations. PX214, CA0001005148 at '149 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX355, CA0001177105 at '108

(reporting military security personnel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the area

surrounding Defendants' South Lhok Sukon facilities in an operation ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also supra* ¶ 241 (Wilson letter indicating that military

personnel were assigned responsibilities to provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and

provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮).

**Defendants' Response.**  The statement in Paragraph 297 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 297 also is not supported by the record.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

298.    **Military security routinely investigated reports of violence near Exxon operations**.  *E.g.*, PX97, CA0001078251 (shots heard, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX362, CA0001121219,

at '220 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮); PX95, CA0001121093, at '094 (same); PX363, CA0001334429 (propane truck convoy

attacked, in response ███████████████████████████████); PX364,

CA0001334710 (A13 requested to check area after shots heard).

> **Defendants' Response.** The statement in Paragraph 298 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 298 also is misleading.
> EMOI did not control the Indonesian military, had no authority to hire, train, give orders
> to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly
> urged the Indonesian government to comply with the law and human rights standards.
> *See* SOF ¶¶ 11–12, 36. Moreover, EMOI did not operate A-13 during the relevant time
> period. *See infra* ¶ 555.

299.   **Defendants also tasked the military security with** ███████ **the locals** – job

seekers, contractors sneaking in for free meals at the mess halls, and other villagers they saw as a

nuisance. For example, Security Advisor Tommy Chong directed military security to ████████

enforce the rule against drivers and third party employees taking a free lunch at the mess hall.

PX343, CA0001213060 at '061. He reported that Exxon staff at Cluster 3 were pleased that the

military discouraged villagers from trying to make ██████████████ to seek jobs: ████

████████████████████████████████████; *see also* PX247, CA0001120418, at

'419 (youths ██████████████ into the mess hall during lunch time for free meals: ████████

██████████████████); PX345, CA0001004882, at '885

█████████████████████████████████████). Exxon's planned response locals in

a wide range of potential interactions, from making a request for food donations to raising the

Acehnese flag was to ████████████████████ PX365, CA0001180142, at '145

(response to ██████████████████████████████████████████████████████████

████████████████████████ is to deploy A-13 fast response team).

> **Defendants' Response.** The statement in Paragraph 299 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants. The statement in Paragraph 299 also is misleading and is
> not supported by the record. Pursuant to both the PSC and the laws of Indonesia, it was

the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  EMOI did not control the Indonesian military, had no authority to hire, train, give orders to, oversee, transfer, or terminate any members of the Indonesian military, and repeatedly urged the Indonesian government to comply with the law and human rights standards.  *See* SOF ¶¶ 11–12, 36.

300.    All actions Defendants' military security personnel took were done exclusively

for ████████████████████████████████████" and not part of ███████████████

██████████████████████████████ PX366, CA0001184361, at '362 (████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████). *See also supra* 211, 241

**Defendants' Response.**  The statement in Paragraph 300 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs' alleged injuries to Defendants.  The statement in Paragraph 300 also is misleading.  Pursuant to both the PSC and the laws of Indonesia, it was the Government of Indonesia's exclusive responsibility to protect the natural resources and associated facilities at the Aceh gas plant.  *See* SOF ¶¶ 7–12.  And under the PSC, Pertamina owned and managed all facilities at the Aceh gas plant.  *See* SOF ¶ 6, 12.

301.    **Exxon hid its role.**  PX118, CA0001173763, at '764. (███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████);

PX367, CA0001334406 (A-13 Commander complained ████████████████████

████████████████████████████████).

**Defendants' Response.**  The statement in Paragraph 301 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

302.     During the 1999-2001 time period, Infantry Battalions (or "Yonif"), including 111

and 113, were responsible for outer ring security. PX368, CA0001210702 (describing outer ring

security as ███████ ); PX85, CA0001182156, at '157 (equipment request describing

Battalion 113 as ███████ ); PX82, CA0001334075 ( ████████████████████

████████████████████████████ ); PX83, CA0001334077

(6/27/2020 email from Michel Laureys to R I Wilson, et al., summarizing meeting with

representatives from ████████████████████

████████████ ). *See also supra* ¶¶ 238-239.



> **Defendants' Response.** The statement in Paragraph 302 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 302 also is misleading to the
> extent that Plaintiffs imply that all soldiers in Battalions 111 and 113 were assigned by
> the Government of Indonesia to guard EMOI operations, when in fact only a small
> portion of them did so.  *See* Defs.' Reply Mem. at 9–10.

303.     **Soldiers from Battalions 111 and 113 were housed at Camp A-1, Camp A-13,**

**and Bachelor Camp, among other locations.** *E.g.*, PX354, CA0001005958, at '959 ( ████

████████████████████████████████████████

██████████████████████ ); PX28, John Doe VII Dep. 133:

14-19 ("Q. Where were the sleeping quarters for Unit 111, if you know? A. In that office of A1.

Q. Where, if you know, were the sleeping quarters for Unit 113? A. Also in the same place.").

> **Defendants' Response.** The statement in Paragraph 303 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 303 also is misleading to the
> extent that Plaintiffs imply that all soldiers in Battalions 111 and 113 were assigned by
> the Government of Indonesia to guard EMOI operations, when only a small portion of
> them did so.  *See* Defs.' Reply Mem. at 9–10.  Finally, Plaintiffs have mischaracterized
> the security report cited in this paragraph, which states only the number of military
> personnel stationed at each location and does not name any Battalions or describe
> housing arrangements.  *See* PX354, CA0001005958, at -959.

304.    Indeed, Camp A-13, the main barracks for outer ring security, was so heavily associated with Defendants' military guards that Defendants would colloquially refer to them as "A-13 troops" or just "A-13." PX357, CA0001329626 (

); PX94, CA0001008793, at '805 (June 1999 memo stating,

); PX49, CA0001213388 (1999 email discussing meeting

to coordinate on security arrangements for EMOI's facilities); PX224, CA0001179816 (memorandum to EMOI's senior executives and Mike Farmer at EMC requesting approval

).

> **Defendants' Response.**  The statement in Paragraph 304 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 304 also is misleading.
> EMOI did not operate A-13 during the relevant time period.  *See infra* ¶ 555.

305.    **Camp A-13 was "notorious" in the local community as a "torture place."**

PX27, John Doe IV Dep. 90:21-91:2 ("[T]hey brought us to A-13, and that place is a torture place, and people said nobody will be safe when they are brought to A-13, except me, I was lucky. I thought I was dead already."); *id.* at 96:6-8 ("A-13 had been notorious for torturing people to death or at least half death."); PX320, CA0001333998, at, '000 (

). *See also supra* ¶¶ 258-61 (discussing Wall Street Journal investigation of torture at A-13).

> **Defendants' Response.**  The statement in Paragraph 305 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect Plaintiffs'
> alleged injuries to Defendants.  The statement in Paragraph 305 also is misleading.
> EMOI did not operate A-13 during the relevant time period.  *See infra* ¶ 555.

306.    [Intentionally left blank]

307.    [Intentionally left blank]

308.    [Intentionally left blank]

309.    [Intentionally left blank]

310.    [Intentionally left blank]

311.    [Intentionally left blank]

312.    [Intentionally left blank]

## II.    THE HUMAN TOLL OF DEFENDANTS' ENGAGEMENT AND DEPLOYMENT OF MILITARY SECURITY

313.    EMC and EMOI's engaged many hundreds of military guards for its facilities despite clear and repeated warnings of the dangers this involved. They did so with no serious effort to adopt, implement or enforce even the most basic safeguards. This has predictable and tragic consequences for the Plaintiffs, their families, and other civilians living near EMOI's operations.

> **Defendants' Response.**  The statement in Paragraph 313 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Additionally, Plaintiffs' use of the phrase "engaged . . . military guards for its facilities" misleadingly suggests that the sovereign Indonesian military worked for EMC and EMOI and that the facilities in Aceh belonged to EMC and EMOI when, in fact, all facilities were the property of Pertamina and the Government of Indonesia.  *See* SOF ¶ 6.

### A.  Jane Doe I

314.    Jane Doe I was sexually assaulted by a soldier who held a gun to her head, although she was eight months pregnant at the time.

███████████████████████████████████████████████████

████████████████████████  PX19, Jane Doe I Dep. 49:1-9, 83:8-19. The soldier threatened to kill her if she did not comply with his demands: "He threatened me that I have to follow

whatever [] he wanted … if I would not follow what he asked me, I would be murdered, I would be killed, and his weapon was pointed right on my head." *Id.* 88:7-19.

Jane Doe I was terrified the soldier would hurt her toddler, who she was holding in her arms when the attack began. *Id.* at 88:20-25 ("Q. Were you still holding [child] at that time in your arms? A. Yes, I was still holding him.").

The soldier groped Jane Doe I while forcing her to watch the assault in the mirror: "And then he was pulling me into the front of the mirror with him … and then he was feeling, he was touching my body from the back, he was groping me from the back." *Id.* at 85:21-86:3.

The soldier forced Jane Doe I to touch his penis and violated her with his fingers. *Id.* at 89:2-10. Jane Doe I was horrified and frozen as the assault continued. *Id.* at 89:11-14.

The soldier also forced Jane Doe I to jump up and down "many times", although she was eight months pregnant. *Id.* 87:4-17. The jumping caused Jane Doe I to have cramping, for which she sought medical treatment. *Id.* 87:11-20.

> **Defendants' Response.**  The statement in Paragraph 314 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not connect the soldier who
> allegedly assaulted Jane Doe I to Defendants.  Further, Plaintiffs' and their lay witnesses'
> unsubstantiated use of the phrase "Exxon soldier" does not create a genuine issue of
> material fact.

315.    The soldier who assaulted Jane Doe I served in Exxon Unit 113: his uniform had a Unit 113 shoulder badge and his truck had a "very big" Unit 113 logo.

The soldier wore an army uniform with a unit 113 badge on the shoulder and arrived in a truck with a unit 113 logo. PX19, Jane Doe I Dep. 63:14-19 (soldier had a Unit 113 badge on the shoulder of his uniform); *id.* at 94:11-19 (same); PX29, ▓▓▓ Dep. 9:7-12 (witness saw that soldier arrived and departed in a truck that had a Unit 113 logo); *id.* at 68:25-69:6 (Unit 113 logo was "very big").

**Defendants' Response.**  The statement in Paragraph 315 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' claim that the soldier who allegedly assaulted Jane Doe I was a member of "Unit 113," even if accurate, does not in any way connect the soldier to Defendants.  Further, there is no such thing as "Exxon Unit 113."  *See* Defs.' Reply Mem. at 9–10; *infra* ¶ 551.

316.    **Exxon's own internal documents show Unit 113 provided security to Exxon**.

*Supra* ¶¶ 238-39, 304-305. *See also* PX83, CA0001334077 (6/27/2000 email from Michel Laureys to Ron Wilson, et al., summarizing meeting with representatives from Unit 113 and stating unit is ready to deploy along pipeline road pending delivery of supplies from EMOI); PX82, CA0001334075 (6/28/2000 Email from Michel Laureys to Ron Wilson, et al., describing deployment plans for unit 113, including outer ring security and ███████████████); PX75, CA0001191447, at '448 (7/21/2000 local newspaper articles in Exxon's files indicating Unit 113 was stationed near EMOI airport); PX84, CA0001368009, at '010 (11/18/2000 local newspaper article in Exxon's files reporting Unit 113 was stationed at various Exxon locations).

In responses to Plaintiffs' Request for Admission regarding whether Unit 113 provided security at Exxon's operations, Defendants responded that they "lack sufficient information to admit or deny this request." PX369, Defs.' Responses &Objections to Pls.' Sept 2016 Requests for Admissions Regarding Unit Numbers to All Defs.', at Nos. 3 & 14.

**Defendants' Response.**  The statement in Paragraph 316 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' claim that the soldier who allegedly assaulted Jane Doe I was a member of "Unit 113," even if accurate, does not in any way connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants.  *See* Defs.' Reply Mem. at 9–10.

317.    **Exxon provided Unit 113 with equipment and supplies, including vehicles**.

PX82, CA0001334075 (discussing supplying Unit 113 with vehicles and fuel); PX85, CA0001182156, at '157; *see also supra* ¶¶ 41, 304.

**Defendants' Response.**  The statement in Paragraph 317 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' claim that the soldier who allegedly assaulted Jane Doe I was a member of "Unit 113," even if accurate, does not in any way connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants.  *See* Defs.' Reply Mem. at 9–10.

318.    The soldier who assaulted Jane Doe I arrived and departed in a Unit 113 truck that was seen routinely coming and going from Point A, an Exxon facility, and the truck had a distinctive red sticker on the windshield.

An eyewitness, then a local student and now a teacher, recognized the truck that arrived at ▮▮▮▮ PX29, ▮▮▮ Dep. 9:4-13; 36:11-14 (▮▮▮ teaches at a local elementary school). ▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮. *Id.* 7:14-21; 8:16-24. She saw a soldier get out of the truck and go ▮▮▮ ▮▮▮▮ *Id.* 14:5-11. She later saw the same soldier leave ▮▮▮▮▮ and come to her own house. *Id.* 15:2-16:8.

▮▮▮ had a clear view of the truck and was able to describe it: the truck had distinctive red stickers spelling out "god is great" in Arabic and a logo for Unit 113 on the side. *Id.* at 9:7-12 (▮▮ testified that "the truck was green, army green, and there was the writing Allahu Akbar . . . on the windshield, and on the body it says Yonif 113"); *id.* at 9:13-16:9 (▮▮ testifies she could read Arabic because she studied it in school); *id.* at 13:4-13, 56:6-12 ("Allahu Akbar" was a sticker in the middle of the windshield and "it was clear to see"); *id.* at 68:12-69:13 (writing was big and Unit 113 logo "was very big").

▮▮▮ mother had a rice stand right in front of the gate at Exxon's Point A location, and ▮▮▮ waited for the school bus there every morning. *Id.* at 9:17-11:4, 20:9-20 (sign at the location said "Exxon Mobil Point A").

███ testified that while waiting for the school bus, she "often saw the truck passing in front of our rice stand, and sometimes they would also stop by at our rice stand" and that the truck would go in and out of the Exxon facility. *Id.* at 9:20-10:2; 11:23 -12:13 ("I often saw the truck coming out and coming into the facility."); *id.* at 69:7-11 (Q. the truck with that writing on it, did you see that truck go in and out of Point A? A. Yes). ███ also often saw the truck passing on the road. *Id.* at 13:17-21.

> **Defendants' Response.** The statement in Paragraph 318 is unsupported by the record and so cannot create a genuine issue of material fact. Point A is not an "Exxon facility." *See* SOF ¶ 6. The statement in Paragraph 318 is also immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. A lay witness claiming to observe a military vehicle at Point A at unidentified times does not in any way connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants. *See* Defs.' Reply Mem. at 8–10.

319.    Eyewitness testimony confirms no other Exxon Unit 113 truck had a red "Allahu Akbar" sticker in the middle of the windshield.

███ saw many other trucks on the road, including other Unit 113 trucks, but testified that she had not seen any other truck with a red "Allahu Akbar" sticker in the middle of the windshield. PX29, ███ Dep. 13:17-21.

> **Defendants' Response.** The statement in Paragraph 319 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs provide no basis for the phrase "Exxon Unit 113 truck," and there is no such thing as "Exxon Unit 113." The statement in Paragraph 319 is also immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. The fact that no other lay witness claimed to have seen any other trucks with a red "Allahu Akbar" sticker does not in any way connect the soldier who allegedly assaulted Jane Doe I to Defendants. *See* Defs.' Reply Mem. at 10.

320.    **Point A was operated by Exxon.** PX106, Mark Snell Deposition Notes Produced by Defendants, at 1. *Supra* ¶¶280-281; PX107, CA0001007902, at '937 (PowerPoint describing Exxon's operations, including Point A, which housed administrative offices, power generation plant, warehouses, and an airport for the company plane); PX108, Defs.' Responses

& Objections to Pls.' Jan. 2016 Requests for Admissions to All Defs.', at Nos. 94 & 95

( ██████████████████████████████████████████████████████████

in March 2001).

> **Defendants' Response.**  The statement in Paragraph 320 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldier who allegedly assaulted Jane Doe I was ever assigned by the Indonesian government to Point A or otherwise connected to Defendants.

321.   **Exxon stationed military resources at Point A**. PX329, CA0002088789, at '791

(daily security report for March 6-7, 2001, ███████████████████████

██████████████████████████████████████ ); PX62,

CA0001047515 (daily security report for March 8-9, 2001 ███████████████

████████████████████████████████████████████████ ); PX370,

CA0001055969 (daily security report for Mar 9-19, 2001 █████████████████

████████████████████████████ ).

> **Defendants' Response.**  The statement in Paragraph 321 is unsupported by the record and so cannot create a genuine issue of material fact.   EMOI did not control the Indonesian military and accordingly did not "station[] troops at Point A."  *See* SOF ¶ 6, 11–12.  The statement in Paragraph 321 is also immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Even if some Indonesian soldiers were stationed at Point A, that does not in any way connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants.

322.   Exxon's documents identify Unit 113's commander as Erda Bachtiar, a

Lieutenant Colonel in the infantry. PX82, CA0001334075; PX85, CA0001182156.

> **Defendants' Response.**  The statement in Paragraph 322 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.

323.   **Jane Doe I's village was near Point A**. PX342, CA0001081306 (map showing

location of █████████████████████████ ); PX371 (same)[35].

---

[35] Plaintiffs ask the Court to take judicial notice of this map. *See supra* n.5.

**Defendants' Response.**  The statement in Paragraph 323 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldier who allegedly assaulted Jane Doe I was assigned by the Government of Indonesia to Point A at the time of the incident or otherwise connected to Defendants.

324.   **Jane Doe I's village was also near Cluster 2**. PX372 (map showing location of

██████████████████████████████████ ).

**Defendants' Response.**  The statement in Paragraph 324 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldier who allegedly assaulted Jane Doe I was assigned to Cluster 2 or otherwise connected to Defendants.

325.   **Cluster 2 was an Exxon operated facility.** *Supra* ¶¶281-82; PX108, Defs.'

Responses & Objections to Pls.' Jan. 2016 Requests for Admissions to All Defs.', at No. 75

(██████████████████████████████ ).

**Defendants' Response.**  The statement in Paragraph 325 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldier who allegedly assaulted Jane Doe I was assigned to Cluster 2 or otherwise connected to Defendants.

326.   **Exxon stationed military resources at Cluster 2.** PX329, CA0002088789, at

'791 (daily security report for March 6-7, ████████████████████████████ ); PX62,

CA0001047515 (daily security report for March 8-9, 2001 ████████████████████

████ ); PX370, CA0001055969 (daily security report for Mar 9-19, 2001 ████████████████

██████████ ).

**Defendants' Response.**  The statement in Paragraph 326 is unsupported by the record and so cannot create a genuine issue of material fact.  EMOI did not control the Indonesian military and accordingly did not "station[] military resources at Cluster 2." *See* SOF ¶¶ 6, 11–12.  The statement in Paragraph 321 is also immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldier who allegedly assaulted Jane Doe I was assigned to Cluster 2 or otherwise connected to Defendants.

327.   **Gunfire and a bombing were reported at Jane Doe I's village that morning**.
PX19, Jane Doe I Dep. 53:12-14; PX29, ███ Dep. 29:11-25; *id* at 29:4-6 (heard one bomb
explode that morning).

> **Defendants' Response.**  The statement in Paragraph 327 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if
> true, does not in any way connect the Indonesian soldier who allegedly assaulted Jane
> Doe I to Defendants.

328.   **Exxon tasked its military security with investigating reports of gunfire and
other violence.** PX97, CA0001078251 (A13 soldiers combed the area after a security supervisor
heard 3 shots fired nearby); *see also supra* ¶¶296-98. It is reasonable to infer that the Exxon
troops were investigating the gunfire.

> **Defendants' Response.**  The statement in Paragraph 328 is unsupported by the record
> and so cannot create a genuine issue of material fact.  Plaintiffs' use of the phrase "its
> military security" misleadingly suggests that the sovereign Indonesian military worked
> for EMOI.  EMOI did not control the Indonesian military and accordingly did not control
> its activities.  *See* SOF ¶¶ 11–12.  The statement in Paragraph 328 is also immaterial.  An
> immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement,
> even if true, does not in any way connect the Indonesian soldier who allegedly assaulted
> Jane Doe I to Defendants.

329.   **The soldier was on duty.** The soldier arrived in an official vehicle, not a personal
vehicle. *Supra* ¶¶ 315, 318, He arrived with a group of soldiers. PX29, ███ Dep. 8:14-24
(saw soldiers coming out of the truck and dispersing into different alleyways); *id.* at 44:13-17
("The other soldiers were spread out into other areas"). The soldier who committed the assault
left in the same truck with a group of soldiers. *Id.* at 52:11-22 (eyewitness testifies that after the
███████████, "He was just standing in front of my house, maybe because at
that time there was an order for them to get together again… Q. Did you hear anybody give an
order for them to group together? A. I did not. It's just my prediction because they were all
already there together as a group.")

**Defendants' Response.** The statement in Paragraph 329 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants.

330. **The soldier asked Jane Doe I questions about the recent violence and about**

**GAM.** The soldier came to Jane Doe I's door. The soldier asked Jane Doe I if her husband was a

member of GAM and accused Jane Doe I's husband of being a GAM member (he was not).

PX19, Jane Doe I Dep. 85:4-13. The soldier asked Jane Doe I if she had a bomb. PX373, Pl. Jane

Doe I's Suppl. Interrogatory Responses at 3.

**Defendants' Response.** The statement in Paragraph 330 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldier who allegedly assaulted Jane Doe I to Defendants.

331. **Exxon did not dispute that their military security personnel were present in**

**Jane Doe I's village.** In response to Plaintiffs' Request for Admission Request No. 20,

Defendants stated they ███████████████████████████████████████████████

███████████████████████████████████████████. PX108, Defs.' Responses &

Objections to Pls.' Jan. 2016 Requests for Admissions to All Defs.', at No. 20.

**Defendants' Response.** The statement in Paragraph 331 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. The statement in Paragraph 331 is also unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs' use of the phrase "their military security personnel" misleadingly suggests that the sovereign Indonesian military worked for EMOI, and Plaintiffs' use of the phrase "did not dispute" mischaracterizes Defendants' cited response, which stated only that Defendants lacked sufficient information to admit or deny.

332. **Jane Doe I suffered lasting moral damages due to the sexual assault.** Jane Doe

I testified about the lasting impact of the sexual assault. PX19, Jane Doe I Dep. 90:19- 91:18.

She testified that "I had difficulty, I had sleep difficulty, and then I was haunted by the fear, and I

also feel disgusted by my own body because I have been touched by other man." *Id.* at 90:19-

91:2. She also testified that she had stomach aches and other symptoms of stress that continued

for a long time: "I remember that incident again, I think I always remember it." *Id.* at 91:3-12.

She testified that she thought she would die that day. *Id.* at 91:13-15. She also testified that there

are no resources in her community for victims of sexual assault. *Id.* 91:16-18.

> **Defendants' Response.**  The statement in Paragraph 332 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement does not
> support a quantification of loss, as required under Indonesian law.  *See* Defs.' Reply
> Mem. at 14–16; Supplemental Declaration of Professor Timothy Lindsey, dated October
> 13, 2021 ("Lindsey Suppl. Decl.") at 14–29.  Plaintiffs did not produce any evidence
> from which Jane Doe I's alleged losses could be quantified.  *See* SOF ¶ 47.

333.     **In addition, Jane Doe I's child was born damaged after the sexual assault**

**and the forced jumping.** In addition to a prolonged sexual assault, the soldier also forced Jane

Doe I, who was eight months pregnant, to jump up and down "many times." *Id.* 86:23- 87:7. The

jumping caused Jane Doe I to have cramping, for which she sought medical treatment. *Id.* 87:11-

20. Her infant, born after the attack, was damaged. *Id.* 91:22-92:16 (child cannot feed herself and

attends special needs school: "I think she has to learn to be independent").

> **Defendants' Response.**  The statement in Paragraph 333 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement does not
> support a quantification of loss, as required under Indonesian law.  *See* Defs.' Reply
> Mem. at 14–16; Lindsey Suppl. Decl. at 14–29.  Plaintiffs did not produce any evidence
> from which Jane Doe I's alleged losses could be quantified.  *See* SOF ¶ 47.

### B. Jane Doe II

334.     **Jane Doe II's husband and Jane Doe IV's husband were both killed on the**

**same day, December 4, 2000, in the same attack.** *Infra* ¶¶335, 374-403. ███████████

████████████████████████████████████████████████████████████████.

*Infra* ¶¶335-355, 374-403. Several eyewitnesses identified the soldiers as guards at Exxon

Cluster 4 and recognized the vehicles as trucks usually parked at Exxon Cluster 4 and used by

Exxon. *Infra* ¶¶338-344. Internal Exxon documents anticipated violence on December 4, a

symbolic day, and later confirmed that villagers had been shot. *Infra* ¶¶354-355.

> **Defendants' Response.** The statement in Paragraph 334 is unsupported by the record
> and so cannot create a genuine issue of material fact. Plaintiffs provide no evidence in
> the cross-cited paragraphs to support the assertion that Jane Doe II's husband and Jane
> Doe IV's husband were killed in the same attack. The statement in Paragraph 334 is also
> immaterial. An immaterial statement cannot create a genuine issue of material fact. Lay
> witnesses claiming to observe military vehicles at Cluster 4 at unidentified times prior to
> the alleged incident does not in any way connect the Indonesian soldiers who allegedly
> shot Jane Doe II's husband to Defendants. *See* Defs.' Reply Mem. at 6, 8.

335. **Jane Doe II's husband was killed on December 4, 2000.** PX374, Plaintiff Jane

Doe II's 2016 Suppl. Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories at 9; PX20,

Jane Doe II Dep. at 56:23-57:3.

> **Defendants' Response.** The statement in Paragraph 335 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

336. **Jane Doe II was home with a newborn baby when the soldiers arrived.** PX20,

Jane Doe II Dep. at 56:23-60:2 (baby was about two months old).

> **Defendants' Response.** The statement in Paragraph 336 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.



337. **Jane Doe II's husband was** ████████████████████**, when the**

**soldiers arrived.** PX20, Jane Doe II Dep. at 59:7-11; PX374, Plaintiff Jane Doe II's 2016 Suppl.

Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories at 8; PX30, ██████ Dep. at

19:16-20:3 (Jane Doe II's husband "was ████████████████████

████████████████████████████████████████

██ —that's where he was shot. ████████████████████.")

> **Defendants' Response.** The statement in Paragraph 337 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

338.    **The soldiers arrived in trucks that Jane Doe II recognized from Cluster 4.**

PX20, Jane Doe II Dep. at 41:25-42:9 ("the evidence is the day of the events or the incidents, the

soldiers used the military truck in the clusters of Exxon … when the military truck passed by, we

saw that truck and that truck is only in the clusters … in cluster 4" (questions by counsel

omitted)); *Id*. 45:17-22; *Id*. 46:2-6 ("it's the Exxon soldiers truck. It always stand by there at

Exxon's facilities.")

> **Defendants' Response.** The statement in Paragraph 338 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Even if true, the fact that Jane Doe II claimed to have seen a military
> vehicle at Cluster 4 at unidentified times prior to the alleged incident does not in any way
> connect the Indonesian soldier or soldiers who allegedly shot her husband to Defendants.
> *See* Defs.' Reply Mem. at 6.

339.    **Jane Doe II saw the trucks at Cluster when she went to market.** PX20, Jane

Doe II Dep. at 50:19-25 ("the evidence of the soldier who shot my husband was the truck that

they used. I know that truck when I pass by the street to the market and when I pass the street to

the hospital when I was taking him to the hospital.")

> **Defendants' Response.** The statement in Paragraph 339 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Even if true, the fact that Jane Doe II claimed to have seen a military
> vehicle at Cluster 4 at unidentified times prior to the alleged incident does not in any way
> connect the Indonesian soldier or soldiers who allegedly shot her husband to Defendants.
> *See* Defs.' Reply Mem. at 6, 8.

340.    ▮▮▮▮▮▮ **was the village chief at the time of the attack.** ▮▮▮▮▮ was

village chief from 2000 to 2008. PX30, ▮▮▮▮ Dep. at 7:3-13.

> **Defendants' Response.** The statement in Paragraph 340 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

341.    ▮▮▮▮▮, the village chief, went past Cluster 4 three times a week, including

on trips to the market. PX30, ▮▮▮▮ Dep. at 13:14-14:20.



**Defendants' Response.**  The statement in Paragraph 341 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

342.      ███████, the village chief, saw and recognized the trucks that were used in the attack as trucks routinely parked at Exxon Cluster 4, long before and after the attack. ███████ saw the trucks going out and coming back. PX30, ███████ Dep. at 11:11-17, 15:13-16:16, 59:10-20. ███████ recognized the trucks as trucks routinely parked at Exxon Cluster 4. *Id.* 13:6-15:3 ("I have not seen the truck anywhere else, except at—except they were parked at Cluster 4…they were already there long before"); *see also id.* (███████ passed by Cluster 4 about three times a week and saw trucks there "long before" December 4); *id.* at 15:9-12 ("what I saw was all the trucks and the Pansers and the trial motorcycle, they were parked within the compound of Cluster 4"); *id.* at 66:7-10 ("I do not know who owns the military trucks, but what I know was that those military trucks were within the field of Exxon's, Cluster 4"); *id.* at 70:18-22 (Q. the trucks and Pansers that we were talking about, were they parked at Cluster 4 both before December 4th and after December 4th? A. Yes).

**Defendants' Response.**  The statement in Paragraph 342 is unsupported by the record and so cannot create a genuine issue of material fact.  ███████ did not witness the attack on Jane Doe II's husband and could not have known whether the Indonesian soldiers who allegedly killed Jane Doe II's husband were in the trucks he claimed to have seen.  *See* Defs.' Reply Mem. at 6; SOF ¶¶ 52–53.

343.      **Jane Doe II identified the soldiers as soldiers she had seen at Cluster 4 and on patrol in her village.** PX20, Jane Doe II Dep. at 37:24-38:7 ("the Exxon soldiers were the clusters of Exxon. There were no other soldiers. When I passed the street, there were the soldiers. There were no other soldiers except the Exxon.")

**Defendants' Response.**  The statement in Paragraph 343 is unsupported by the record and so cannot create a genuine issue of material fact.  Jane Doe II did not testify that she had previously seen the soldiers who shot her husband at Cluster 4; rather, she testified that she believed the only soldiers in the region were "Exxon soldiers."  *See* Defs.' Reply

Mem. at 7–10; *infra* ¶ 556.  This conclusory statement cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.

344.    **Three eyewitnesses to the shooting of Jane Doe IV's husband also identified the soldiers as guards at Cluster 4.** *Infra* ¶¶374, 386-389.



PX375 (map showing ).[36]

**Defendants' Response.**  The statement in Paragraph 344 is unsupported by the record and so cannot create a genuine issue of material fact.  The "eyewitnesses" referenced in Paragraph 344 testified about the alleged shooting of Jane Doe IV's husband; they were not present at the alleged shooting of Jane Doe II's husband, ██████████████ and did not testify about the alleged shooting of Jane Doe II's husband.  *See infra* ¶ 557, 562–63.

345.    **The Soldiers began shooting.** Jane Doe II testified that she was at her house, with her newborn, when the shooting began. PX20, Jane Doe II Dep. at 66:2-67:6.

Q.    What did you do when the shooting began, [Jane Doe II]?
A.    We were immediately lying on the ground. We were terrified.
…
Q.    And did you lie down on the ground and attempt to protect your baby?
A.    Yes, I was protecting my baby from the shooting.
Q.    And for the entire time of the shooting, did you stay on the ground and try to protect your baby?
A.    Yes.
Q.    And even after the shooting stopped and you heard no more noise, was it true that you had difficulty even standing at that point?
A.    Yes, that is correct.

*See also* PX374, Plaintiff Jane Doe II's 2016 Suppl. Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories at 8 ("Jane Doe II was at her house with her new baby. She heard some noise, and thought, but was not sure, that the noise was gunshots. She looked and saw soldiers. They had come down the road that leads to Exxon Cluster IV. She realized some houses appeared to

---

[36] Plaintiffs ask the Court to take judicial notice of this map. *See supra* n.5.

be on fire. She was afraid. She dropped to the ground with her baby and lay on the ground. Her

four-year-old son was nearby with her mother. Both of them also got down on the ground not far

from Jane Doe II when the shooting started. Jane Doe II was terrified. She was so scared, she

couldn't move. She heard gun shots. She saw her neighbor's house burn, she saw smoke, she

heard more gunshots. ████████████████████ get shot and fall to the ground.").

> **Defendants' Response.** The statement in Paragraph 345 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian solider or soldiers who allegedly shot Jane Doe II's husband to Defendants.

346. **An eyewitness reported the shooting to the village chief.** Immediately after the

shooting, a villager came to his house and reported that soldiers had shot Jane Doe II's husband.

PX30, ████████ Dep. at 18:9-12 (Q. Was she reporting to you because you were the village

chief? A. Yes). The villager, ████████ had seen the shooting "with her own eyes. So that's

why she was very upset and scared." *Id.* at 18:6 - 8; *see also id.* at 17:20-18:2 ("she saw the

soldiers doing the shooting because she was right by the ████ at that time."). ████████ was

"crying, she was crying at the time, and then she said, oh, my younger brother, [Jane Doe II's

husband] has been shot by the soldiers in the ████ … she saw the soldiers doing the

shooting." *Id.* at 16:21-18:2. ████████ was visibly upset, crying, and repeated herself three

times. *Id.* at 16:17-17:25.[37]

> **Defendants' Response.** The statement in Paragraph 346 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian solider or soldiers who allegedly shot Jane Doe II's husband to Defendants.

---

[37] Defendants have not objected to the introduction of ████████ statement, so
Plaintiffs are under no obligation to establish its admissibility, *see* Fed. R. Civ. P. 56(c)(2),
though they note it is admissible hearsay as an excited utterance, Fed. R. Evid. 803(2), or, at the
very least, under the residual exception, Fed. R. Evid. 807.

347.    After the shooting stopped, the village chief found the body of Jane Doe II's

husband in ▮▮▮▮▮▮▮; he had been shot in the back of the head. "What I witness on that day,

after I get to the location, I saw the body was already in the mud … So it was very painful to

look at, and then he had a hole. He had a hole on his head, up. That's the hole because of the

bullet, I think." PX30, ▮▮▮▮▮▮ Dep. 19:2-12. Jane Doe II's husband had been shot in the

back: "he was shot from the back. And it went out through the forehead." *Id.* at 20:16-23; PX20,

Jane Doe II Dep. at 118:19-119:14 ("when I looked at it, the place where the bullet came in, it

was not that big, this small, but the place or the spot where it came out from, it is bigger"); *id.* at

120:4-19 (Jane Doe II observed her husband's "brain was out of the head" and when she saw

him, "I collapsed again, I fainted again.").

> **Defendants' Response.** The statement in Paragraph 347 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian solider or soldiers who allegedly shot Jane Doe II's husband to Defendants.

348.    **Jane Doe II's husband was not a member of GAM.** PX20, Jane Doe II Dep. at

65:8-11 ("Q. Was your husband a member of GAM? A. No, my husband was just a common

citizen.")

> **Defendants' Response.** The statement in Paragraph 348 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian solider or soldiers who allegedly shot Jane Doe II's husband to Defendants.

349.    **Jane Doe II's husband was not armed.** PX30, ▮▮▮▮▮▮ Dep. at 20:4-12

(victim did not have a gun with him)

> **Defendants' Response.** The statement in Paragraph 349 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian solider or soldiers who allegedly shot Jane Doe II's husband to Defendants.

350.    

██████████████ PX30, ██████ Dep. at 28:19-29:16; PX292.[38] At a reasonable pace, it

would take thirty to forty minutes to walk 3 km.

> **Defendants' Response.** The statement in Paragraph 350 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldier
> or soldiers who allegedly shot Jane Doe II's husband were assigned by the Government
> of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

351.    Exxon operated Cluster 4. *See supra* ¶¶280-281.

> **Defendants' Response.** The statement in Paragraph 351 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldier
> or soldiers who allegedly shot Jane Doe II's husband were assigned by the Government
> of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

352.    **Exxon stationed troops at Cluster 4 on December 4, 2000.** PX314,

CA0001005970, at '970.001 (Daily security report for Nov. 24, 2000 listing ████████



██████████████████████ ); PX376, CA0001005972, at '973 (daily security report for

██████████████████████████████████ ). Additional troops

were stationed nearby, including at A-13, A-1, Bachelor Camp and Cluster 3. PX314,

CA0001005970 at 970.001 (Daily security report for Nov. 24, 2000 ████████████

████████████████████████████████████

██████████████ ); PX376, CA0001005972 at 973 (same, for December 1-4,

2000).

> **Defendants' Response.** The statement in Paragraph 352 is unsupported by the record
> and so cannot create a genuine issue of material fact. EMOI did not control the
> Indonesian military and accordingly did not "station[] troops at Cluster 4" or elsewhere.
> *See* SOF ¶ 11–12. The statement in Paragraph 352 is also immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldier

---

[38] Plaintiffs request the Court take judicial notice of PX292, a Google Maps printout. *See supra*
n.5.

or soldiers who allegedly shot Jane Doe II's husband were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

353.    **No other vehicles were on the roads on December 4, 2000.** PX377,

CA0002171506 (Exxon Mobil email noting there was ███████████████████████████

████████████████████████████████ on Dec 4); PX331, CA0001005975, at '976

(ExxonMobil internal memoranda noting that ████████████████████ on Dec 4)

> **Defendants' Response.** The statement in Paragraph 353 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

354.    **Violence was foreseeable on December 4, 2000.** Exxon was aware that

December 4 was a day of symbolic importance, when pro-independence activists flew the

Achenese flag and the military, in turn, retaliated. *E.g.* PX377, CA0002171506; PX22, Jane Doe

IV Dep at 58:8-60:4 (discussing soldiers on patrol looking for GAM flag ceremony); PX32,

█████ Dep. at 34:14-23 ("A. The date was 4 -- 4th of December. Q. How do you know that? A. I

-- we knew because the 4th December they have a flag ceremony. We were afraid to go to

school. Q. You say who has flag ceremony? Is that GAM? A. Yes. GAM."). Violence by the

security personnel was foreseeable and, in fact, internal Exxon memoranda reported on past

violence and anticipated clashes. Specifically, Exxon management knew that soldiers at its

Clusters had torn down flags and fired warning shots at villagers, largely around Cluster 4. For

example, a log from the prior year, 1999, notes that activists hopped the Cluster 4 fence and

raised the Aceh flag in the Cluster. PX378, CA0001180003. The log records that the Army

lowered the flags at Cluster 4, A-13 troops engaged in shooting behind Cluster 3, and security

forces went to the village road ███████████████████████████████████████

██████ *Id.* at CA000118004. *See also supra* ¶¶ 176-184, 214, 224, 258-261, 273-75, 305, 354

(knowledge of military abuses).

**Defendants' Response.** The statement in Paragraph 354 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian solider or soldiers who allegedly shot Jane Doe II's husband to Defendants.

355.    **Exxon documents confirm shooting and deaths on December 4, 2000**. PX377,

CA0002171506 (there was sporadic shooting around North Aceh as soldiers and policemen

either pulled down or shot down Aceh flags); PX379, CA0002015936 (Exxon staff circulates

Dow Jones article reporting that clashes left at least 15 people dead in Aceh on Dec. 4).

**Defendants' Response.** The statement in Paragraph 355 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian solider or soldiers who allegedly shot Jane Doe II's husband to Defendants.

356.    **Jane Doe II suffered moral damages.** Jane Doe II had just given birth when her

husband was shot and she fainted after learning her husband had been killed. PX30, █████

Dep. at 21:2-19 (she cried hysterically, and then she just dropped on the floor, and then she

fainted." Adding to the trauma, she saw her husband's body, with the gunshot wound in the head,

and saw that part of his brain had fallen out. PX20, Jane Doe II Dep. 120:5-19 ("[W]hen he was

taken from the scene to home, his brain was out on the way, so his brain—yeah, his brain was

out on the way, some of them dropped on the way."); *id.* at 118:19-119-19 Her husband's death

has caused Jane Doe II lasting emotional distress. *Id.* at 120:20-121:17.

**Defendants' Response.** The statement in Paragraph 356 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence from which Jane Doe II's alleged losses could be quantified. *See* SOF ¶ 55.

357.    **Jane Doe II suffered financially after her husband's murder.** *Id.* at 121:23-24.

Jane Doe II moved in with her grandmother after her husband's death. PX20, Jane Doe II

Dep.10:4-9 . To support her two young children, Jane Doe II had to perform manual labor,

earning as little as $2.10 per day. *Id.* at 122:8-16 ("[U]p until today I have to do whatever jobs

people offer me to do up until today. Q. The jobs that you do, does that include manual labor? A.

So yes, it was manual labor. Sometimes the work was to crack the areca nut. So the wage was

about 30,000 rupiahs [$2.10 USD] for a day."). Jane Doe II could not afford to send her children

to school, and she often did not have enough money to feed or even clothe her children. *Id.* at

122:3-8 ("So I was not even able to buy food and then to send my children—I was not able to

send my children to school, both to the general education school and to the Islamic teaching

school, the religious one."); *id.* at 122:17-123:8 ("Q. After your husband was murdered, did you

have any difficulty providing clothing for your children? A. So yes, and for the clothing, it was

only on the yearly celebration, that was the only time we were able to afford for clothing. So the

situation was we were not even able to provide or to buy food, not to mention the clothing. Q. So

there were times when you didn't have enough money to buy food after your husband died? A.

Yes, that was very often. Q. Did that also include not being able to provide food for your

children? A. Yes, that's correct.").

> **Defendants' Response.** The statement in Paragraph 357 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement does not
> support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply
> Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence
> from which Jane Doe II's alleged losses could be quantified, including her husband's
> alleged lost wages. *See* Defs.' Opening Mem. at 32; SOF ¶ 55.

### C. Jane Doe III

358.    **Jane Doe III's husband disappeared on September 17, 2000**. PX88, Plaintiff

Jane Doe III's Suppl. Resp. to ExxonMobil Oil Corp's First Set of Interrogatories at 3.

> **Defendants' Response.** The statement in Paragraph 358 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

359.    **Jane Doe III's husband was a traveling fish merchant**. He sold fish from a

basket on the back of his motorcycle. PX21, Jane Doe III Dep. 39:24-40:9; PX88, Plaintiff Jane

Doe III's Suppl. Resp. to ExxonMobil Oil Corp's First Set of Interrogatories at 2. Jane Doe III's husband had a set route he took every day, a route that included a stop at Paya Brandang where Exxon's Bachelor Camp was located. PX21, Jane Doe III Dep. 113:1-114:9; PX380, CA0001337974 (Exxon aerial photograph of area)

> **Defendants' Response.** The statement in Paragraph 359 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

360. Two eyewitnesses, including a former employee who worked on the Exxon pipeline, confirm that Exxon soldiers beat and killed Jane Doe III's husband in response to a tire explosion that they mistakenly believed was an attack. A truck transporting military personnel was passing Bachelor camp when its tire blew out, causing the truck to go into a roadside ditch. PX31, ▮▮▮▮ Dep. at 22:10-15; PX21, Jane Doe III Dep. at 51:3-18, 114:19-115:6. Exxon Soldiers at ▮▮▮▮▮▮ apparently believed the truck was under attack. PX31, ▮▮▮▮ Dep. at 22:19-23. The soldiers at ▮▮▮▮▮ fired weapons in the air. PX31, ▮▮▮▮ Dep. at 22:19-23

Thirty to 40 soldiers rushed out of ▮▮▮▮▮▮, gathered up the locals who were nearby and interrogated them, beating them up in the process. PX31, ▮▮▮▮ Dep. at 23:3-15, 24:8-26:4, 69:8-13. Six of the locals were beaten to death. *Id.* at 27:22-30:3; PX21, Jane Doe III Dep. at 114:19-115:23. The witness saw their bodies lying on the ground. PX31, ▮▮▮▮ Dep. at 27:22-30:3. Jane Doe III's husband was one of the men: "he was not moving and he was laying—lying on the road." *Id.* at 27:22-30:3. The soldiers loaded his body on to a military truck. *Id.* 30:4-23. Jane Doe's husband was never seen again. *Id.* at 30:24-31:2 ("Did you ever see [Jane Doe III' husband] again? No."); PX21, Jane Doe III Dep. at 64:7-15, 120-121:20. The witness himself was beaten so severely he required 13 stitches in his head. PX31, ▮▮▮▮ Dep. at 25:9-11.

292

**Defendants' Response.** The statement in Paragraph 360 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs falsely claim that ████ witnessed an alleged assault on Jane Doe III's husband by Indonesian soldiers. ████ did not witness the alleged assault on Jane Doe III's husband. *See* SOF ¶ 59; Defs.' Reply Mem. at 5–6. Plaintiffs' and their lay witnesses' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

361.    ████ **an eyewitness, had worked on the pipeline and at Bachelor Camp for an Exxon subcontractor**. ████ worked for three and a half years at Exxon facilities, including working inside Bachelor Camp. PX31, ████ Dep. at 9:7-11:9 (████ worked at Exxon locations including Landing, Point A and at the Clusters); *id.* at 43:22-44:6 (████ spent time inside Bachelor Camp). He worked for an Exxon subcontractor and was responsible for maintaining the pipeline. *Id.* at 9:7-11, 42:11- 43:21.

**Defendants' Response.** The statement in Paragraph 361 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. ████ did not witness the alleged assault on Jane Doe III's husband. *See* SOF ¶ 59; Defs.' Reply Mem. at 5–6. Further, the statement in Paragraph 361 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs falsely characterize Bachelor Camp, Point A, and "the Clusters" as "Exxon facilities" and "Exxon Locations." *See* SOF ¶¶ 6, 12, 60. Defendants did not own these locations, nor did they have any control over the deployment of soldiers to these locations or the activities of the sovereign military of Indonesia at these locations.

362.    ████ **left his Exxon job on good terms and opened a kiosk right outside the Gate to Bachelor Camp**. After he stopped working at Exxon (on good terms, *see* PX31 ████ Dep. at 44:7-13), ████ opened a small kiosk selling cigarettes, water and soda just outside the gate to Exxon's Bachelor Camp. *Id.* at 12-13 (Exxon fence was "just right behind my kiosk" and he could see the Exxon gate from his kiosk). ████ sold his goods to the soldiers stationed at Exxon's Bachelor Camp. *Id.* at 19:16-25. ████ was familiar with the soldiers and the locations of their posts. *Id.* at 19:8-15 (describing locations of the Exxon guards and their camp).

**Defendants' Response.** The statement in Paragraph 362 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of

material fact.  The statement in Paragraph 362 is unsupported by the record and so cannot create a genuine issue of material fact.  Plaintiffs' falsely characterize Bachelor Camp as "Exxon's."  *See* SOF ¶¶ 6, 60.  "Bachelor Camp" is a residential area among the larger Arun Field complex where Indonesian soldiers sometimes ate meals.  There is no evidence, and Plaintiffs do not claim, that the only Indonesian soldiers who gathered and ate meals at Bachelor Camp were assigned by the Government of Indonesia to guard the facilities EMOI operated.

363.    ████ **Knew Jane Doe III's husband**. ████ knew Jane Doe III's husband

because ████ wife regularly bought fish from Jane Doe III's husband. PX31, ████ Dep.

21:6- 22:5 ("Q. do you know who [husband] is? A. Yes, I know him. … my wife used to buy fish

from him … I saw him every day when he came."); *see also id.* ("he was skinny"). On

September 17, 2000, before the incident, ████ wife bought fish from Jane Doe III's

husband. *Id.* at 55:13-18.

> **Defendants' Response.**  The statement in Paragraph 363 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

364.    ████ **witnessed the attack by Bachelor camp security personnel.** On

September 17, 2000, a tire blew out on a vehicle transporting ten or twelve members of the

marine corps. PX31, ████ Dep. at 22:10-15 ("there was a tire explosion"); *id.* at 69:14-17

("Q. so you were at your kiosk when you heard … what turned out to be a tire explosion? A.

Yes"); PX21, Jane Doe III Dep. at 51:3-18, 114:19-115:6. The soldiers at Bachelor camp fired

weapons in the air. PX31, ████ Dep. at 22:19-23; 69:18-70:10 ("I heard gun fires from the

Bachelor Camp site"). The Exxon Soldiers at Bachelor camp apparently believed the truck was

under attack. *Id.* at 22:19-23.

> **Defendants' Response.**  The statement in Paragraph 364 is unsupported by the record and so cannot create a genuine issue of material fact.  Plaintiffs falsely claim that ████ witnessed an alleged assault on Jane Doe III's husband by Indonesian soldiers. ████ did not witness the alleged assault on Jane Doe III's husband.  *See* SOF ¶ 59; Defs.' Reply Mem. at 5–6.

294

365.     ██████     saw soldiers rush out of **Bachelor Camp, the facility operated by**

**Exxon**. PX31, ██████ Dep. at 23:9-15 ("Q. did you see the soldiers come out from Bachelor

camp? A. Yes, I do. Q. And those were the soldiers walking, guarding, Exxon; is that correct? A.

Yes, that's correct"); *id.* at 24:8- 26:4 ("Q. about how many of the Exxon guards came out of

Bachelor camp? A. I think it was about 30 or 40"); *id.* at 69:8-13 ("Q. Now, turning to the

incident itself, you said there were 30 or 40 soldiers who came out of Bachelor Camp, after you

heard the tire explosion; is that right? A. Yes").

> **Defendants' Response.**  The statement in Paragraph 365 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement is not related to Jane Doe III's husband in any way
> and does not provide any evidence connecting the Indonesian soldiers at Bachelor Camp
> to Jane Doe III's husband. *See* Defs.' Reply Mem. at 5–6.

366.     ██████     saw the soldiers round up the local men and he himself was

**rounded up along with other local merchants**. PX31, ██████ Dep. 22:24-23:8, 24:8-14 ("So

after they came out, they gathered all of us … [t]hey gathered all of us close to my kiosk")

> **Defendants' Response.**  The statement in Paragraph 366 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement is not related to Jane Doe III's husband in any way
> and does not provide any evidence connecting the Indonesian soldiers at Bachelor Camp
> to Jane Doe III's husband. *See* Defs.' Reply Mem. at 5–6.

367.  **The soldiers from Bachelor Camp interrogated and beat the men**. PX31,

██████ Dep. 24:20-25:5 ("they were investigating us, they tortured us"). ██████ was beaten

so badly by the soldiers from Bachelor Camp he required 13 stitches in his head. *id.* at 25:6-21

("Q. the person that beat you, was that one of the Exxon guards from Bachelor Camp? A. Yes,

that's correct."); *id.* at 75:25-76:2 (██████ did not know their names, but knew their faces).

Other merchants were also beaten by the Bachelor camp guards. *Id.* at 26:9-11 ("Q. did the

motorcycle taxi guys get beaten? A. Yes, they were beaten as well."). In addition, the Bachelor

Camp soldiers stole about 1.5 million Rupiah worth of cigarettes from his kiosk. *Id.* at 27:13-15.

**Defendants' Response.** The statement in Paragraph 367 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement is not related to Jane Doe III's husband in any way and does not provide any evidence connecting the Indonesian soldiers at to Jane Doe III's husband. *See* Defs.' Reply Mem. at 5–6. Further, Plaintiffs' use of the phrases "Exxon guards" and "                    guards" are conclusory statements and so cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

368.    After the soldiers stopped beating the men,                    saw Jane Doe III's husband

lying motionless on the side of the road; the soldiers loaded his body onto a truck. After he was

beaten, the                    soldiers took                    to the roadside where they were holding other

people. PX31,                    Dep. 27:24- 28:4. There,                    saw Jane Doe III's husband lying on

the road with the bodies of five other men. *Id.* at 28:2-14. Jane Doe III's husband did not move.

*Id.* at 27:22-30:3 ("he was not moving, and he was laying—lying on the road."); *id.* at 29:4-10.

Soldiers loaded the six bodies on to a military truck. *Id.* at 30:4-23.                    never saw Jane Doe

III's husband again. *Id.* at 30:24-31:2.

**Defendants' Response.** The statement in Paragraph 368 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.                    did not witness any assault on Jane Doe III's husband. In fact, he claimed that he was assaulted *at a different time* and *in a different location* than the location where he saw Jane Doe III's husband. *See* SOF ¶¶ 59, 62; Defs.' Reply Mem. at 5.

369.    **witnessed the attack by                    security personnel.**                    was

also an employee at Exxon's facility. PX31,                    Dep. 56:21-57:3. Jane Doe III's husband

always left and returned at about the same time each day. PX21, Jane Doe III Dep. 113:6-11.

When Jane Doe III's husband did not return at the end of the day on September 17, 2000, she

was worried, and cried. *Id.* at 113:12-16. Jane Doe III took her motorcycle and searched for

husband along his usual route. *Id.* at 113:17-9. She drove to                    , where Exxon's

                   is located, and "where he normally stopped to sell his fish." *Id.* at 114:6-9.

**Defendants' Response.** The statement in Paragraph 369 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of

material fact.                              was not "Exxon's"; it was a residential area where
Indonesian soldiers sometimes took their meals.  *See* SOF ¶¶ 6, 60.  Plaintiffs' statement,
even if true, does not in any way connect the Indonesian soldiers who allegedly injured
Jane Doe III's husband to Defendants.  *See* Defs.' Reply Mem. at 5–6.  Moreover, the
statements allegedly attributed to                      are inadmissible hearsay.  *See id.* at 5 n. 5.
Finally, Plaintiffs' statement is not supported by the contents of Paragraph 369.

370.    **There she met**          . *Id.* at 114:11.                was very scared, trembling

and crying. *Id.* at 114:22-115:6. Jane Doe III testified that "                told me that he was very

scared, he was trembling, and he told me that, he was crying, and he said that my husband was

already taken." *Id.*                related that there had been a tire explosion and that the Indonesian

military came in and took her husband. *Id.* at 62:14-17.                had seen the incident and was

upset because his younger brother had been taken at the same time as Jane Doe III's husband. *Id.*

at 114:21, 115:18-23.[39]

> **Defendants' Response.**  The statement in Paragraph 370 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian soldiers who allegedly injured Jane Doe III's husband to Defendants.
> Moreover, the  statements allegedly attributed to                are inadmissible hearsay.
> *See* Defs.' Reply Mem. at 5 n. 5.

371.    **Bachelor Camp was operated by Exxon**. *Supra* ¶¶  281-82; PX18, Duffin Dep.

18:19-19:1 (Bachelor camp was used by EMOI for housing employees).

> **Defendants' Response.** The statement in Paragraph 371 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian soldiers who allegedly injured Jane Doe III's husband to Defendants.

372.    **Exxon stationed military resources at Bachelor Camp at the time of the**

**incident**. *E.g.*, PX91, CA0001005932, at '933 (Daily Security Report for September 13-14, 2000

---

[39] Defendants have not objected to the introduction of his statement, so Plaintiffs are under no
obligation to establish its admissibility, *see* Fed. R. Civ. P. 56(c)(2), though they note it is
admissible hearsay as an excited utterance, Fed. R. Evid. 803(2), or, at the very least, under the
residual exception, Fed. R. Evid. 807.

listing ExxonMobil Resources as including 70 soldiers at Bachelor Camp); PX92,

CA0001005938, at '939 (Daily Security Report for September 22-26, 2000 listing ExxonMobil

Resources as including 70 soldiers at Bachelor Camp); *see also* PX31,              Dep. 18:24-

19:15.

      In its Responses to Plaintiffs' Request for Admission, Defendants stated they

                        that military security personnel were present in or about

Paya Brandan (the village abutting Bachelor Camp) on September 17, 2000. PX108, Defs.'

R&Os to Pls.' Jan. 2016 Requests for Admission at No. 37.

> **Defendants' Response.** The statement in Paragraph 372 is unsupported by the record and so cannot create a genuine issue of material fact. EMOI did not control the Indonesian military and accordingly did not "station[] military resources." *See* SOF ¶¶ 11–12. The statement in Paragraph 372 is also immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured Jane Doe III's husband to Defendants.

      373.    **Jane Doe III is seeking moral damages**. After her husband's death, Jane Doe III

went to work as a manual laborer to support herself and her children. PX21, Jane Doe III Dep.

116. She earned less than her husband, however. *Id.* at 117. As a result, she had to move out of

her home and to her grandmother's house. *Id.* at 117-118. The family often went hungry, as

sometimes they did not even have enough money to buy rice. *Id.* at 117. Jane Doe III did not

earn enough to send her daughters, who were good students, to college. *Id.* at 118-119. Jane Doe

III never remarried. *Id.* at 119. Because her husband's body was never returned to her, Jane Doe

II was particularly traumatized by being unable to properly bury her husband, which is important

to her: "I'm very sad that I was not able to do that properly, and by thinking of him going away

or having to die without anyone beside him." *Id.* at 120-121:11.

> **Defendants' Response.** The statement in Paragraph 373 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply

Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence from which Jane Doe III's alleged losses could be quantified. *See* SOF ¶¶ 64–65.

### D. Jane Doe IV

374.   **Jane Doe IV's husband and Jane Doe II's husband were both killed on the same day, December 4, 2000, in the same attack.** *Supra* ¶¶334; *Infra* ¶¶375-394. Both men were farmers killed in their own rice paddies by Indonesian soldiers who provided security for Exxon. *Id*. Two eyewitnesses (          and          ) recognized individual soldiers on the field—including the soldier who shot Jane Doe IV's husband—as soldiers from Cluster 4 because those soldiers had bullied the witnesses on the way to and from school every day. *Infra* ¶¶379-388. Indeed, Jane Doe IV's son watched the soldiers go into the rice paddy, point their guns at his father, and kill him. *Infra* ¶381. Jane Doe IV also recognized the soldiers from the village. *Infra* ¶¶ 383, 389, 391-392. In addition, four eyewitnesses recognized the vehicles used by the soldiers as trucks usually parked at Exxon Cluster 4 and used by Exxon. *Supra* ¶¶338-342 *Infra* ¶¶ 390-394, 397. Internal Exxon documents anticipated violence on December 4, a symbolic day, and later confirmed that villagers had been shot. *Infra* ¶¶398-399.

> **Defendants' Response.** The statement in Paragraph 374 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs provide no evidence in the paragraph to support their assertion that Jane Doe II's husband and Jane Doe IV's husband were killed in the same attack. Plaintiffs' conclusory statements likewise cannot create a genuine issue of material fact. Additionally, both          and          recognized only ten or fewer of the "20 to 30" soldiers who Plaintiffs admit were present. *See* Plaintiffs' Counterstatement of Material Facts Not in Genuine Dispute in Opposition to Defendants' Motion for Summary Judgment, ECF No. 825-2 ("CSOF") ¶ 382.          testified that he did not see which soldier shot Jane Doe IV's husband, and          , who recognized only five to ten of the soldiers, testified that the shooting went on continuously for an hour with the soldiers' backs to          , who was 150 meters away. *See infra* ¶ 561. Two of the "eyewitnesses" whom Plaintiffs claim recognized the vehicles were Jane Doe II and her third-party witness, who testified about a different incident, in a different village. The other two alleged "eyewitnesses" did not identify any specific vehicles. *See* SOF ¶¶ 70–71; *infra* ¶¶ 562–63.

375.     **Jane Doe IV lived near Cluster IV.** Jane Doe IV lived in a village called

, about 1km from Exxon Cluster 4. PX342, CA0001081306 (map); PX293 (map);

PX22, Jane Doe IV Dep. 51:12-21, (**"**Q. [W]as your house in 2000 close to any Exxon facilities?

A. Yes, my house in            is close to Exxon facilities. Q. [] Do you have a sense of how far

the distance is from your house to the Exxon facility? A. It is about 1 kilometer.").

> **Defendants' Response.** The statement in Paragraph 375 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldier
> or soldiers who allegedly shot Jane Doe IV's husband were assigned by the Government
> of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

376.     **On the morning of December 4, 2000, Jane Doe IV was home and her**

**children, and some of their friends, were playing in the yard**. PX22, Jane Doe IV Dep. 52:14-

24, 55:15-57:12; PX32,         Dep. 9:1-4 ("we were playing at home. And then, suddenly, —

suddenly, there were troops, soldiers coming up, passing our house"); PX33,         Dep. 8:16-

9:5 (on the morning of December 4, 2000,         was home "playing around within the house

yard" along with friends).

> **Defendants' Response.** The statement in Paragraph 376 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

377.     **On the morning of December 4, 2000, Jane Doe IV's husband was in the rice**

**paddy.** PX22, Jane Doe IV Dep. 134:3-136:2; PX33,         Dep. 27; PX32,         Dep. 66:1-

11 (John Doe X was in the rice field)

> **Defendants' Response.** The statement in Paragraph 377 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

378.     **On the morning of December 4, 2000, soldiers arrived at the rice paddy.**

PX22, Jane Doe IV Dep. 134:3-136:2; PX33,         Dep. 9; PX32,         Dep. 9:1-20.

**Defendants' Response.**  The statement in Paragraph 378 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.

379.   **The soldiers walked right past**                . The soldiers from Cluster 4 walked

right past          —within 5 meters—providing ample opportunity for          to recognize them.

PX33,          Dep. 9:11-10:19:

> Q.      After you dropped down to the ground, did you see any soldiers?
> A.      Yes, I did.
> Q.      Did the soldiers pass by you?
> A.      Yes, they did.
> Q.      How close to you were the soldiers who passed by?
> A.      More or less, 5 meters.
> Q.      Did you recognize the faces of some of the officers who passed by?
> A.      Yes.

**Defendants' Response.**  The statement in Paragraph 379 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs admit that 20 to 30 soldiers were present, CSOF ¶ 382, and Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who claimed to have recognized were the same soldiers who allegedly shot Jane Doe IV's husband, or that those soldiers were in any way connected to Defendants.  Moreover, Plaintiffs' phrase "soldiers from Cluster 4" is a conclusory statement unsupported by the record and so cannot create a genuine issue of material fact.

380.        **recognized the soldiers as soldiers from Exxon Cluster 4**.

recognized five to ten of the soldiers as soldiers from Exxon Cluster 4. PX33,          Dep. 9:11-

10:19-. They soldiers spoke to and bullied          (*infra* ¶¶386-387). As a result, he had the

opportunity to observe and recognize them:

> Q.      Can you tell me where you recognized the soldiers from?
> A.      Within the yard of Exxon ….
> Q.      Did that Exxon yard have a name?
> A.      It's Cluster 4….
> Q.      Did you see those 5 to 10 soldiers inside the fence at Cluster 4?
> A.      Yes.
> Q.      Did those 5 to 10 soldiers who were inside the fence at Cluster 4, did they
>          ever talk to you?
> A.      Yes.

301

PX33,          Dep. 10:7-11:7.

> **Defendants' Response.**  The statement in Paragraph 380 is unsupported by the record and so cannot create a genuine issue of material fact.  Plaintiffs' use of the phrase "the soldiers" misleadingly suggests that          recognized all of the soldiers when          claimed to have recognized only five to ten of the 20 to 30 Indonesian soldiers whom he claimed were present in his village at the time.  *See infra* ¶ 561.  The statement in Paragraph 380 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs admit that there were 20 to 30 Indonesian soldiers present in the village at the time of the incident, CSOF ¶ 382, and thus Plaintiffs' statement, even if true, does not show that the  Indonesian soldiers whom          claimed to have recognized were the Indonesian soldiers who allegedly shot Jane Doe IV's husband, or that those soldiers were in any way connected to Defendants.  *See* SOF ¶¶ 70–71.
>          's testimony that the Indonesian soldiers whom he claimed to have seen at Cluster 4 at unspecified times does not show that they were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

381.          **saw the soldiers walk into the field and shoot his father.** PX33,

Dep. 13-17; *Id.* at 23:10-15.          testified that he saw "the soldiers went into the field.

I—I drop down to the ground. The soldiers went to the—to the place where my father was, and

they [tried] to get my father up. And I kept watching at that time, and then they were pointing

their guns onto my father, at my father." *Id.* at 15:7-13. And then,          testified, his father was

shot. *Id.* at 15:13-25. He was asked:

> Q.    Who shot him?
> A.    The soldiers.
> Q.    Did the soldier that shot your father, was that the same soldier that you
>        saw at Cluster 4?
> A.    Yes.
> Q.    Did that soldier kill your father?
> A.    Yes.

PX33,          Dep. 16:2-12; *see also id.* at 23:10-15 ("Q. Did you recognize the soldiers who

shot your father? A. Yes Q. Where else did you see the soldiers who shot your father? A. At

Cluster 4").

After the shooting stopped,          went to look for his father. PX33,          Dep. 17:1-

11. His father was dead, covered with blood, and no longer moving. *Id.*

**Defendants' Response.**  The statement in Paragraph 381 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  _____ claimed to have recognized only five to ten of the soldiers and testified that the shooting went on continuously for an hour with the soldiers' backs to _____, who was 150 meters away.  *See infra* ¶ 561.  Plaintiffs admit that there were 20 to 30 Indonesian soldiers present in the village at the time of the incident, CSOF ¶ 382, and thus Plaintiffs' statement, even if true, does not connect the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.  *See* SOF ¶¶ 70-71.

382.   **There were about 20 to 30 soldiers in the field;          recognized five to ten of them**.  _____, the witness with the best view of the field, testified that he saw about 20 to 30 soldiers on the field. PX33, _____ Dep. 37:6-13.

**Defendants' Response.**  The statement in Paragraph 382 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.

383.   **Jane Doe IV also witnessed her husband being shot.** She saw him fall to the ground. PX22, Jane Doe IV Dep. 53:17-54:5; 65:9-15 ("Q. And you said you heard the gunfire and you got down on the ground because you were afraid; is that right? A. Yes, that is correct. Q. Did you or did you not see the soldier who fired the shots? A. Yes, I did see the soldiers.")

**Defendants' Response.**  The statement in Paragraph 383 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.

384.   _____ **was a neighbor of Jane Doe IV**. PX32, _____ Dep. 7:24 – 8:3. _____ was at home that day and witnessed the attack. *Id*. at 8:24 -9:21, 14:9-17.

**Defendants' Response.**  The statement in Paragraph 384 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  _____ testified that he did not see which Indonesian soldier or soldiers allegedly shot Jane Doe IV's husband.  *See* SOF ¶ 70.

385.   _____ also recognized six of the soldiers as soldiers from Exxon Cluster 4. PX32, _____ Dep. 9:25-12:16.

Q.   _____ did you recognize any of the soldiers who were there that day?

303

> A.    Yes, Yes, I do. About six of them, I know them.
> Q.    Where did you know them from?
> A.    Because we often saw them, we often met on the way to the school or coming back form the school. They would always call out on us.

PX32,          Dep. 9:25-10:7. The soldiers were stationed at the Exxon Cluster 4 security post.

> **Defendants' Response.**  The statement in Paragraph 385 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs admit that 20 to 30 Indonesian soldiers were present in the village at the time of the incident, CSOF ¶ 382, and thus Plaintiffs' statement, even if true, does not connect the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.  *See* SOF ¶¶ 70–71.  Moreover,          's testimony that the Indonesian soldiers he allegedly recognized were at Cluster 4 at unspecified times does not show that they were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

386.    Both          and          recognized the soldiers as guards at Cluster 4, guards who had bullied them on the way to and from school. Both          and          passed Cluster 4 every day on the way to and from school. PX33,          Dep. 11:16-12:15, 20:10-15. PX32,          Dep. 11:19-12:14. Before December 4, 2000,          would see the five to ten soldiers he later recognized at the rice paddy inside the fence at Cluster 4. PX33,          Dep. 10:23-11:7.          similarly recognized six soldiers who were at the field as soldiers he would regularly see at the Exxon post. PX32,          Dep. 10:2-7.          saw the soldiers working both inside and outside the fence at Cluster 4. PX32,          Dep. 101:4-102:10 (the soldiers worked rotation shifts both inside and outside the fence).

> **Defendants' Response.**  The statement in Paragraph 386 is unsupported by the record and so cannot create a genuine issue of material fact.  Plaintiffs' use of the phrase "the soldiers" misleadingly suggests that          and          recognized all of the soldiers in the village at the time of the incident, when          claimed to have recognized only five to ten of the soldiers and          claimed to have recognized only six of the soldiers.  *See infra* ¶ 561.  The statement in Paragraph 386 is also immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs admit that there were 20 to 30 Indonesian soldiers present in the village at the time of the incident, CSOF ¶ 382, and thus Plaintiffs' statement, even if true, does not connect the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.  Further,          and          's testimony that those soldiers were at Cluster 4

at unspecified times does not show that they were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

387.     **The soldiers would come out from the Exxon security post and make the boys sing the national anthem or recite national slogans.** PX33,            Dep. 11:7-15; PX32, PX 32,            Dep. 10:15-11:15. The soldiers would harass the boys: "if we forgot to greet them or forgot to salute them or say hello to them, and then they would call us and ask—tell us to do the pushup, or sometimes to sing the Indonesian Anthems." PX32,            Dep. 10:15-25. *See also* PX33,            Dep. 11:4-13:10 (soldiers would ask boys to recite or sing, "and they would also punch us … I was not only scared but traumatized by them"). If the boys made a mistake in singing the anthem or reciting the national principles, the soldiers would require them to do push ups, punch them, or pinch them. PX33,            Dep. 11:4-13:10; PX32,            Dep. 10:17-12:16 ("they would also pinch us on the stomach or on the belly"). Both            and            thus had ample opportunity to observe and recognize the soldiers.

> **Defendants' Response.**   The statement in Paragraph 387 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldiers            and            claimed to have recognized were the same soldiers who allegedly shot Jane Doe IV's husband.  Moreover, there is no basis in the record for the phrase "Exxon security post."

388.     **One of the Cluster 4 soldiers admitted shooting Jane Doe IV's husband and threatened            .**            testified that the soldiers at Cluster 4 hurt him "often" on the way to and from school. PX33,            Dep. 12:16-13:5. The five to ten soldiers that            recognized on December 4, 2000, were the same soldiers who bullied him on the way to and from school. *Id.* at 13:6-13. After the shooting,            went back to school. When he passed the Cluster 4 guard post, one of the soldiers told him "I killed the man on—in the field, on that day. And he accuse me of being the son of a [GAM] member. And he said . . . we will kill all GAM members, and he also said that after I finish school later, I will be—I will also be a GAM member. So he said that

I will kill all GAM members to the root." PX33,         Dep. 20:16-21:23.         felt

threatened and afraid. *Id.* at 21:23-22:2. The soldier who made that admission was one of the

soldiers who had been at the rice paddy on December 4, 2000. PX33,         Dep. 22:2-7.

> **Defendants' Response.** The statement in Paragraph 388 attributed by         to an
> unidentified Indonesian soldier is inadmissible hearsay and so cannot create a genuine
> issue of material fact.  Plaintiffs do not argue otherwise.  Moreover, even if the statement
> attributable to the unidentified Indonesian solder were admissible, Plaintiffs' statement is
> unsupported by the record.  Even according to         , Jane Doe IV's husband was not the
> only person allegedly shot and killed by Indonesian soldiers in the rice paddy on the date
> of the incident.  *See infra* ¶ 562.  There is no indication in the alleged statement by the
> unidentified Indonesian soldier that he was referring to Jane Doe IV's husband.

389.    Jane IV recognized the soldiers as guards from Cluster 4 who patrolled her

village; the guards stopped at her house after the shooting. After the shooting stopped, Jane Doe

IV went to the rice paddy field to pick up her husband's body. There were still soldiers there in

the field: "and then we also saw the soldiers." PX22, Jane Doe IV Dep. 65:16-25. The same

soldiers from the field came to her house two days later, and asked her if she was the wife of a

GAM member. *Id.* at 65:16-66:2 ("two days later the same patrol came again"); *id.* at 137:13-

24.[40] Jane Doe IV was familiar with the local guards at Cluster 4 and recognized the soldiers at

the rice paddy: "But what I know is those soldiers were the same soldiers who were at Exxon's

facilities. When we go, we see them there." *Id.* at 70:6-12; *id.* at 68:6-16 ("when we go shopping,

we see those soldiers are at Exxon's facilities, even they check our identification card. I don't

know their names, but I am familiar with their faces. When we go to the market, it's the same

faces, and then when we go back home it's the same faces too"); *id.* at 94:21-24 ("I don't know

their names. At the time I recognize their face, but not their names. I can recognize their face.").

---

[40] Jane Doe IV was not sure that the two soldiers who returned to her house were the soldiers
who actually shot her husband, but was certain they were the same soldiers who were at the rice
paddy during the attack. Compare PX22, Jane Doe IV Dep. 65:16-66:2 ("the same patrol") with
*id.* at 70:18-71:17 ("It's not really clear whether they were the same soldiers who shot my
husband")

Under aggressive cross examination, Jane Doe IV was certain: "I don't know if he was killed by Indonesian soldiers or not. I'm not a smart person. What I know is he was killed by Exxon soldiers." *Id*. at 26:14-18.

> **Defendants' Response.**  The statement in Paragraph 389 is unsupported by the record and so cannot create a genuine issue of material fact.  Jane Doe IV could not identify any of the soldiers who allegedly shot her husband.  *See* SOF ¶¶ 70–71.  Additionally, Plaintiffs' and their lay witnesses' use of the phrase "Exxon soldiers" and other conclusory statements cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.

> 390.    **The eyewitnesses recognized the trucks used by the soldiers on December 4 as trucks used by Exxon at Cluster 4**.                    and Jane Doe II identified the trucks used during the attack as Exxon trucks generally parked at Cluster 4. *Supra* ¶¶ 338-39, 342. Jane Doe IV saw the soldiers arrive in trucks and motorcycles. PX22, Jane Doe IV Dep. 52:16-24, 57:4-12, 92:24-93:4 ("Q. Did you see any trucks on December 4th, 2000 at the time your husband was shot? A. Yes, I did. I did see on the road."). Like the other witnesses, Jane Doe IV identified the trucks and motorcycles as vehicles she would see at parked at Exxon Cluster 4. *Id.* at 70:9-12 ("when we go back, we also see them there, and the same car, the same truck, and the same motorcycle"). Jane Doe IV also testified that she saw the Exxon guards from Cluster 4 use the same vehicles when they went on patrol. *Id.* at 81:12-16 ("when we passing by the facility, we also see those soldiers, and when they have patrol, they take that truck, that motorcycles"), *Id.* at 131:18-132:19.          similarly identified the vehicles as the vehicles from Cluster 4. PX32,

Dep. 14:23-15:5 ("Q. Had you ever seen those kind of vehicles before? A. Yes. I had seen them before. They were at the Exxon—within the Exxon fence at the big post. Q. And is that— do you mean Exxon Cluster 4? A. Yes. Cluster 4.").

> **Defendants' Response.**  The statement in Paragraph 390 is unsupported by the record and so cannot create a genuine issue of material fact.  Two of the "eyewitnesses" whom Plaintiffs claim to have identified the Indonesian military vehicles were Jane Doe II and her third-party witness, who testified about a different incident in a different village,

while the other two witnesses, Jane Doe IV and _____, did not identify any specific Indonesian military vehicles. *See infra* ¶¶ 562–63.

391.    Jane Doe IV went to market twice a week, passing Cluster 4 each time. PX22, Jane Doe IV Dep. 130:4-25.

> **Defendants' Response.** The statement in Paragraph 391 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

392.    **When she passed Cluster 4, Jane Doe IV saw soldiers working there**. PX22, Jane Doe IV Dep. 131:2-25. "[The soldiers] would stop people and they would check their IDs" *Id.* at 68:6-16 ("when we go shopping, we see those soldiers are at Exxon's facilities, even they check our identification card. I don't know their names, but I am familiar with their faces. When we go to the market, it's the same faces."). Jane Doe IV therefore had ample opportunity to observe the soldiers stationed at Cluster 4.

> **Defendants' Response.** The statement in Paragraph 392 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Jane Doe IV could not identify any of the soldiers who allegedly shot her husband. *See* SOF ¶¶ 70–71.

393.    **When Jane Doe IV passed Cluster 4 she saw same vehicles that the soldiers used on December 4th parked at Cluster 4**. PX22, Jane Doe IV Dep. 131:9-17, 133:6-11 ("Q. The vehicles that were used on December 4th, 2000 were the same vehicles that you saw parked at Cluster 4, is that right? A. The same, yes.").

> **Defendants' Response.** The statement in Paragraph 393 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Even if true, the fact that Jane Doe IV claimed to see Indonesian military vehicles parked at an unspecified time prior to the incident at Cluster 4 does not show that the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

394.    **Jane Doe IV also saw the Exxon soldiers using those same vehicles when they went on patrol**. PX22, Jane Doe IV Dep. 81:12-16 ("when we passing by the facility, we also

see those soldiers, and when they have patrol, they take that truck, that motorcycles"); *id.* at

131:18-132:19.

> **Defendants' Response.** The statement in Paragraph 394 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Even if true, the fact that Jane Doe IV claimed to have seen certain unidentified Indonesian soldiers using Indonesian military vehicles parked at an unspecified time prior to the incident in Cluster 4 does not show that the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants. Moreover, Plaintiffs' use of the phrase "Exxon soldiers" does not create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

395.   **Exxon operated Cluster 4**. *Supra* ¶¶280-281; *see also e.g.*, PX108, Defs.' R&Os

to Pls.' Jan. 2016 Requests for Admission at No. 21 (admitting EMOI operated Cluster IV);

PX107, CA0001007902, at '952 (describing Cluster 4); PX30,                     Dep. 14:14-17.

> **Defendants' Response.** The statement in Paragraph 395 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

396.   **Exxon stationed troops at Cluster 4 on December 4, 2000.** PX314,

CA0001005970 at '970.001 (Daily security report for Nov. 24, 2000 listing 28 "

         " stationed at Cluster 4); PX376, CA0001005972, at '973 (daily security report for

December 1-4, 2000 listing 28 "                     " stationed at Cluster 4). Additional troops

were stationed nearby, including at A-13, A-1, Bachelor Camp and Cluster 3. PX314,

CA0001005970, at' 970.001 (Daily security report for Nov. 24, 2000 listing 76 soldiers at A-13,

65 at A-1, 70 at Batch Plant (near Cluster 4), 70 at Bachelor Camp at 30 at Cluster 3 for a total of

962 military at Exxon locations); PX376, CA0001005972, at '973 (same, for December 1-4,

2000).

> **Defendants' Response.** The statement in Paragraph 396 is unsupported by the record and so cannot create a genuine issue of material fact. EMOI did not control the Indonesian military and accordingly did not "station[] troops at Cluster 4." *See* SOF

¶¶ 11–12.  The statement in Paragraph 396 is also immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or otherwise connected to Defendants.

397.   **Few, if any,  other vehicles were on the roads on December 4, 2000**. PX377, CA0002171506 (Exxon Mobil email noting there was "

" on Dec. 4); PX331, CA0001005976 (ExxonMobil internal memoranda noting that "                                " on Dec. 4).

**Defendants' Response.**  The statement in Paragraph 397 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

398.   **Violence was foreseeable on December 4, 2000.** Exxon was aware that December 4 was a day of symbolic importance, when pro-independence activists flew the Achenese flag and the military, in turn, retaliated. *E.g.*, PX377, CA0002171506; PX22, Jane Doe IV Dep. 55:15-23; *Id.* at 59:7-24 (Jane Doe IV could hear the soldiers in the field talking, the soldiers said "that GAM had flag ceremony, and then they will be dead and I was trembling, I was afraid, I was worried."). Violence by the security personnel was foreseeable and, in fact, internal Exxon memoranda reported on past violence and anticipated clashes. Specifically, Exxon management knew that soldiers at its Clusters had torn down flags and fired warning shots at villlagers, largely around Cluster 4. For example, a log from the prior year, 1999, notes that activists hopped the Cluster 4 fence and raised the Aceh flag in the Cluster. PX378, CA0001180003, at '004. The log records that the Army lowered the flags at Cluster 4, A-13 troops engaged in shooting behind Cluster 3, and security forces went to the village road "

." *Id.* at '004. *See also supra* ¶¶ 176-184, 214, 224, 258-261, 273-75, 305, 354 (knowledge of military abuses).

**Defendants' Response.** The statement in Paragraph 398 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.

399. **Exxon documents confirm shooting and deaths on December 4, 2000.** PX377, CA0002171506 (there was sporadic shooting around North Aceh as soldiers and policemen either pulled down or shot down Aceh flags); PX379, CA0002015936 (Exxon staff circulates Dow Jones article reporting that clashes left at least 15 people dead in Aceh on Dec. 4).

**Defendants' Response.** The statement in Paragraph 399 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.

400. **Jane Doe IV's husband was not a member of GAM and did not support GAM.** PX22, Jane Doe IV Dep. 95:18 -22; PX33,        Dep. 17:16-23 (father not in GAM and no GAM on the field that day)

**Defendants' Response.** The statement in Paragraph 400 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.

401. **Jane Doe IV's husband did not have a gun.** PX33,        Dep. 16:21-22; PX32,        Dep. 100:16-18 ("Q. When you saw [Jane Doe IV's husband's] body on the field, did he have a gun? A. No"). No one else on the field was shooting that day, other than the soldiers. PX33,        Dep. 16:13-20; PX32,        Dep. 100:2-6.

**Defendants' Response.** The statement in Paragraph 401 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldier or soldiers who allegedly shot Jane Doe IV's husband to Defendants.

402. **Jane Doe IV suffered material and moral damages.** Jane Doe IV found her husband's corpse in the rice paddy field shortly after his murder. He had been shot and was

311

covered with blood. PX22, Jane Doe IV Dep. 136:3-137:5.  Jane Doe IV washed his face in the

field. *Id.*

> **Defendants' Response.**  The statement in Paragraph 402 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement does not
> support a quantification of loss, as required under Indonesian law.  *See* Defs.' Reply
> Mem. at 14–16; Lindsey Suppl. Decl. at 14–29.  Plaintiffs did not produce any evidence
> from which Jane Doe IV's alleged losses could be quantified.  *See* SOF ¶¶ 72–76.

403.    The soldiers who murdered Jane Doe IV's husbands also stole 200,000 rupiah off

of her husband's body, leaving Jane Doe IV with nothing. PX22, Jane Doe IV Dep. 106:11-

107:2

> **Defendants' Response.**  The statement in Paragraph 403 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement does not support a quantification of loss, as required
> under Indonesian law.  *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29
> Jane Doe IV produced no documentation corroborating this or any other of her alleged
> losses.  *See* SOF ¶¶ 72–76.

404.    **Jane Doe IV has suffered lasting emotional distress since her husband's**

**murder.** PX22, Jane Doe IV Dep. 19:3-16 ("[M]y husband was shot by Exxon soldiers. I cannot

bear the memory of my husband. It has been 20 years  . . . . MS. FRYSZMAN: Alex, the witness

is crying and she is rubbing her eyes. Maybe we could give her a minute. A. I cannot continue to

testify. I'm really sad now."); PX32,        Dep. 38:4-6 ("[W]e would talk about it a lot, about

the sadness—about her sadness of losing her husband  . . . ."). She never remarried. PX22, Jane

Doe IV Dep. 101:3-5.

> **Defendants' Response.**  The statement in Paragraph 404 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement does not
> support a quantification of loss, as required under Indonesian law.  *See* Defs.' Reply
> Mem. at 14–16; Lindsey Suppl. Decl. at 14–29.  Plaintiffs did not produce any evidence
> from which Jane Doe IV's alleged losses could be quantified.  *See* SOF ¶¶ 72–76.

405.    **After her husband's death, Jane Doe IV struggled to provide for her family.**

PX32,        Dep. 16:20-21. To earn enough money to put food on the table, Jane Doe IV had to

take work doing physical labor in other farmers' fields, washing other people's laundry, and frying banana crackers for sale. PX22, Jane Doe IV Dep. 138:10-19; PX32,          Dep. 15:20-16:3 ("Q. What was the impact of          death on his wife? THE WITNESS: So after—after the incident, she had to—she had to provide for the family by herself, and she had to do other people's laundry. And, also, she fried—she fried crackers, to sell crackers, or chips, banana chips."). Her teenage son          worked every day after school to support the family, doing hard labor at a rice mill for four hours every day after school. PX33,          Dep. 18:25-20:4 ("Q. Did you get a job to help your mother? A. Yes, I did. …. Q. Did you work at the rice mill every day after school? A. Yes. Q. About how many hours did you work at the rice mill, every day, after school? A. From 2:00 to 6:00. Q. And was it hard, physical labor? A. Yes.").

>    **Defendants' Response.**  The statement in Paragraph 405 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law.  *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29.  Plaintiffs did not produce any evidence from which Jane Doe IV's alleged losses could be quantified, including with respect to her husband's alleged lost wages.  *See* SOF ¶¶ 72–76.

406.    **Nevertheless, Jane Doe IV's and          's efforts did not make up for the income Jane Doe IV lost when her husband was murdered**. PX22, Jane Doe IV Dep. 138:23-139:2. Jane Doe IV did not have the money to send her children to college. PX33,          Dep. 18:11-24 ("[M]y mother had to work really hard to provide for the family, and I myself, I had to give up my—my dream, my ambition. Q. Did you give up going to university? A. Yes. Q. Did you have to give up going to university because your family couldn't afford to pay for it? A. Yes."); PX22, Jane Doe IV Dep. 139:3-24.

>    **Defendants' Response.**  The statement in Paragraph 406 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law.  *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29.  Plaintiffs did not produce any evidence from which Jane Doe IV's alleged losses could be quantified, including her husband's alleged lost wages.  *See* SOF ¶¶ 72–76.

### E.  Jane Doe V

407.    **Jane Doe V's husband was businessman who sold vegetables.** PX23, Jane Doe

V Dep. 60:11-13. He sold vegetables every day. *Id.* at 60:14-17.

> **Defendants' Response.**  The statement in Paragraph 407 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

408.    **Jane Doe V's husband drove the same route every day.** Jane Doe V's husband

took a motorcycle cart with a basket on same route every day. *Id.* at 60:22-61:4 ("Q. did he take

the same route every time? A. Yes, that was the usual road because he had to pass that road

every time.") It is also undisputed that her husband knew who the Exxon soldiers were along his

route. *Id.* at 36:4-11 (he knew the soldiers because it was his usual route, the route that he passed

on a "daily basis"); *Id.* at 61:12-25 ("he would know them because he always went back and

forth through that road"); *Id.* at 61:2-3 (route passed by Blangjruen and Geudong). Jane Doe V

also traveled along that route and was familiar with it. *Id.* at 33:14-23.

> **Defendants' Response.**  The statement in Paragraph 408 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.   Moreover, Plaintiffs' use of the phrase "Exxon soldiers" cannot create a
> genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.

409.    **Jane Doe V's husband's daily route took him past Exxon Point A and Exxon**

**Cluster 3.** PX381, Decl. of Jane Doe V & Exh.A (explaining Jane Doe V's husband's vegetable-

selling route and attaching map).

> **Defendants' Response.**  The statement in Paragraph 409 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian
> soldiers who allegedly injured Jane Doe V's husband were assigned by the Government
> of Indonesia to Point A or Cluster 3 at the time of the alleged incident or were otherwise
> connected to Defendants.  Moreover, there is no support in the record for Plaintiffs' use
> of the phrases "Exxon Point A" or "Exxon Cluster 3."

410. **Jane Doe V's husband went missing in January 2001.** Jane Doe V's husband went missing in January 2001. PX111, Plaintiff Jane Doe V's Suppl. Resp. to ExxonMobil Oil Corp's First Set of Interroga[t]ories at Resp. 1(a). Jane Doe V was still in bed from giving birth to a newborn baby. PX23, Jane Doe V Dep. 62:7-16. She was worried and cried day and night while he was missing. *Id.*

> **Defendants' Response.** The statement in Paragraph 410 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly abducted Jane Doe V's husband to Defendants.

411. **Soldiers brought Jane Doe V's husband back to the house.** PX23, Jane Doe V Dep. at 62:20-25 (Q. who brought your husband back? A. the soldiers brought him home. Q. did any of the soldiers come in your house? A. yes, they did, five of them came in.)

> **Defendants' Response.** The statement in Paragraph 411 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly abducted Jane Doe V's husband to Defendants.

412. **Jane Doe V's husband was horrifically injured**. When Jane Doe V's husband was brought home, he was only wearing underwear, his hand had been cut off and he was missing an eye. PX23, Jane Doe V Dep. 63:4-23 ("when he came home, he had already lost his eyes—his eye and his hand."); PX99, DOE005050 (photograph of Jane Doe V's husband showing injuries); PX23, Jane Doe V Dep. 37:23-38:18 (Jane Doe V identifies photograph of husband). Jane Doe V's husband was in shock when he came: "he was in shock and shaking because he felt very painful." *Id.* at 63:24- 64:14; *see also id.* at 64:11-14 ("he felt terrible pain and he cried all that night").

> **Defendants' Response.** The statement in Paragraph 412 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly abducted Jane Doe V's husband to Defendants.

413.   **Jane Doe V's husband was taken and tortured by soldiers working at**

. As soon as Jane Doe V's husband was able to speak, in shock and crying, "he said he was

taken by soldiers working at            and then his hand was cut off and they took his eye." *Id.* at

64:11-23. *See also id.* at 64:24-65:13 (Jane Doe V's husband told her Exxon soldiers took him to

an Exxon post and tortured him). The family had no pain medication at their house, so Jane Doe

V's husband suffered without any medication for three days with an amputated hand and gouged

out eye. *Id.* at 65:24-66:10.

> **Defendants' Response.**  The statement in Paragraph 413 attributed by Jane Doe V to her
> husband is inadmissible hearsay not subject to an exception and so cannot create a
> genuine issue of material fact.  *See* Defs.' Reply Mem. at 11–13.  Additionally, Plaintiffs'
> and their lay witnesses' use of the phrase "Exxon soldiers" and other conclusory
> statements cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–
> 10.

414.   **Exxon had security posts along the route driven by Jane Doe V's husband.**

PX23, Jane Doe V Dep. 72:16-73:20; *see also* PX26, John Doe II Dep. 140:8-141:20 (Exxon had

security posts along its roads: "there were so many posts. And sometimes when people tried to

pass that road, they would stop them and check their IDs and ask them questions."); PX105,

CA0001334447 (discussing "                                        "); PX100,

CA0001047835, at '835-36 (discussing patrols outside of Point A support landing/departing

aircraft); PX214, CA0001005148, at '149 ("

. . . .").

> **Defendants' Response.**  The statement in Paragraph 414 is unsupported by the record
> and so cannot create a genuine issue of material fact.  EMOI did not own any facilities in
> Aceh and did not control the Indonesian military or its activities.  *See* SOF ¶¶ 6, 11–12.
> The statement in Paragraph 414 also is immaterial to Defendants' motion for summary
> judgment.  An immaterial statement cannot create a genuine issue of material fact.
> Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers
> who allegedly abducted Jane Doe V's husband to Defendants.

415. **Point A was operated by Exxon**. *Supra* ¶¶280-281; PX106, Mark Snell

Deposition Notes Produced by Defendants at 1; PX107, CA0001007902, at '937 (powerpoint

describing Exxon's operations, including Point A, which housed administrative offices, power

generation plant, warehouses, and an airport for the company plane); PX108, Defs.' R&Os to

Pls.' Jan. 2016 Requests for Admission at 39 & 40 ("

" in January 2001).

> **Defendants' Response.**  The statement in Paragraph 415 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian
> soldiers who allegedly injured Jane Doe V's husband were assigned by the Government
> of Indonesia to Point A at the time of the alleged incident or otherwise connected to
> Defendants.

416. **Cluster 3 was operated by Exxon.** *Supra* ¶¶281-82;  PX108, Defs.' R&Os to

Pls.' Jan. 2016 Requests for Admission at Resp. at 8 (admitting EMOI operated Cluster 3).

> **Defendants' Response.**  The statement in Paragraph 416 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if
> true, does not show that the soldiers who allegedly injured Jane Doe V's husband were
> assigned by the Government of Indonesia to Cluster 3 at the time of the alleged incident
> or otherwise connected to Defendants.

417. **Exxon stationed military security personnel at Point A in January 2001**. *E.g.,*

PX382, CA0001006003 (January 8, 2001 daily security report listing ExxonMobil Resources as

including 27 security officers, and 34 military at Point A); PX383, CA0001006010.001 (January

11-12, 2001 daily security report listing same); PX384, CA0001006014, at '015 (January 12-15

daily security report listing same); PX385, CA0001006019 (January 18-19, 2001 daily security

report listing same). In response to Plaintiffs' Request for Admission Request No. 41,

Defendants stated they "                                                    " that their military security

personnel were present at Point A in January 2001. PX108 Defs.' R&Os to Pls.'  Jan. 2016

Requests for Admission at 31-32.

**Defendants' Response.** The statement in Paragraph 417 is unsupported by the record and so cannot create a genuine issue of material fact. EMOI did not control the Indonesian military and accordingly did not "station[] military security personnel at Point A" in January 2001 or at other times. *See* SOF ¶¶ 11–12. The statement in Paragraph 417 is also immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly injured Jane Doe V's husband were assigned by the Government of Indonesia to Point A at the time of the incident or otherwise connected to Defendants.

418. **Exxon stationed military security at Cluster 3 in January 2001.** *E.g.*, PX382, CA0001006003 (January 8, 2001 daily security report listing 30 soldiers as "resources" at Cluster 3); PX383, CA0001006010 (January 11-12, 2001 daily security report listing same); PX384, CA0001006014, at '015 (January 12-15 daily security report listing same); PX385, CA0001006019.001 (January 18-19, 2001 daily security report listing same).

**Defendants' Response.** The statement in Paragraph 418 is unsupported by the record and so cannot create a genuine issue of material fact. EMOI did not control the Indonesian military and accordingly did not "station[] military security at Cluster 3" in January 2001 or at other times. *See* SOF ¶¶ 11–12. The statement in Paragraph 418 is also immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly injured Jane Doe V's husband were assigned by the Government of Indonesia to Cluster 3 at the time of the incident or otherwise connected to Defendants.

419. **Exxon stationed military security personnel at other nearby locations in January 2001.** PX386, CA0001005152 (map showing 30 military stationed near Blang juren and 76 men stationed on road near A-13); PX214, CA0001005148-149 (security coverage includes "                                    ", military coverage includes "                         " and "

            "); PX382, CA0001006003 (January 8, 2001 daily security report listing ExxonMobil Resources as including security officers and military at A-13 Camp, A-1 Camp, Mobile patrol, Clusters, and other locations); PX383, CA0001006010 (January 11-12, 2001 daily security report listing same); PX384, CA0001006014 at '015 (January 12-15 daily security

report listing same); PX385, CA0001006019 (January 18-19, 2001 daily security report listing

same).

> **Defendants' Response.** The statement in Paragraph 419 is unsupported by the record
> and so cannot create a genuine issue of material fact. EMOI did not control the
> Indonesian military and accordingly did not "station[] military security personnel at other
> nearby locations" in January 2001 or at other times. *See* SOF ¶¶ 11–12. The statement in
> Paragraph 419 is also immaterial to Defendants' motion for summary judgment. An
> immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement,
> even if true, does not show that the Indonesian soldiers who allegedly injured Jane Doe
> V's husband were assigned by the Government of Indonesia to "other nearby locations"
> at the time of the incident, or that any of the "other nearby locations" were even operated
> by EMOI or otherwise connected to Defendants.

420. **Jane Doe V is seeking moral damages**. Jane Doe V submitted a damages

computation. PX87, Pls.' Sep. 2019 Suppl. Damages Disclosures at 8-10. Jane Doe V testified

that after the attack, she had to help her husband with basic tasks, including bathing him. PX23,

Jane Doe V Dep. 67:15-19. Jane Doe V's husband was afraid after the attack. *Id.* at 69:3-5. Jane

Doe V's husband was unable to work, and the family did not have enough money for food. *Id.* at

68:3-8 ("sometimes we didn't even have the rice, our basic food. Q. did you skip meals? A. yes,

we did"). The children had to drop out of school because the family could no longer afford the

school fees. *Id.* at 68:9-15.

> **Defendants' Response.** The statement in Paragraph 420 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement does not
> support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply
> Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence
> from which Jane Doe V's alleged losses could be quantified. *See* SOF ¶¶ 82–83.

### F. Jane Doe VI

421. John Doe III was shot and beaten by soldiers on guard duty at Exxon          .

, an eye witness testified:

Q.    Can you describe what happened?
A.    Exxon soldiers came out of the gate and they shot my brother.
…
Q.    Were they the only soldiers you saw that day?

A.      That is correct, they came out from Exxon's gate in            .

PX34,            Dep. 10: 6-7; 100:23-101:3. Jane Doe VI,            's mother, was also

present.  PX24, Jane Doe VI Dep. 64:2-7 ("I was there too").

>   **Defendants' Response.**  The statement in Paragraph 421 is unsupported by the record
>   and so cannot create a genuine issue of material fact.  Plaintiffs' and their witnesses' use
>   of the phrase "Exxon soldiers" cannot create a genuine issue of material fact.  *See* Defs.'
>   Reply Mem. at 7–10.  Plaintiffs have no evidence that the Indonesian soldiers whom
>                   claimed to have assaulted John Doe III were assigned by the Government of
>   Indonesia to            at the time of the alleged incident or otherwise connected to
>   Defendants.  In fact, both of John Doe III's witnesses, his mother and sister, admitted that
>   they did not know the identities of the soldiers who shot John Doe III or who commanded
>   or paid the soldiers—and in fact had never met anyone affiliated with Exxon or Mobil.
>   SOF ¶¶ 88, 92.

422.    **Local villagers were walking on Exxon Road to Exxon's Point A facility to**

**seek refuge**. PX34,            Dep. 55:12-13; PX24, Jane Doe VI Dep. 55:20-56:8 (Thousands

of villagers went to seek refuge); see also PX34,            Dep.7:21-25 ("Q. were you walking

on a road that day? A. Yes. Q. Did that road have a name? A. It was Exxon Road.")

>   **Defendants' Response.**  The statement in Paragraph 422 is immaterial to Defendants'
>   motion for summary judgment.  An immaterial statement cannot create a genuine issue of
>   material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian
>   soldiers who allegedly assaulted John Doe III were assigned by the Government of
>   Indonesia to Point A at the time of the incident or otherwise connected to Defendants.
>   Plaintiffs' use of the phrase "Exxon's Point A," misleadingly suggests that Point A
>   belonged to Exxon but, in fact, all facilities were the property of Pertamina and the
>   Government of Indonesia.

423.    Exxon's own documents confirm that villagers were traveling to Point A for

refuge and concede that troops fired "            " to disperse the villagers. PX79,

CA0001173787 (July 17, 2000 Email to Alex Dodds estimating 12,000 villagers taking refuge at

Point A); PX102, CA0001191483 (July 17, 2000 email to Ron Wilson and forwarded to Lance

Johnson in Texas describing 5,000 villagers "                        " who seem

"            " but noting "

                        "); PX75, CA0001191447 (Exxon circulates news

320

Public Redacted Copy

articles about 20,000 refugees camped at Point A, including one stating "

").

> **Defendants' Response.**  The statement in Paragraph 423 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian
> soldiers who allegedly assaulted John Doe III were assigned by the Government of
> Indonesia to Point A at the time of the incident or otherwise connected to Defendants.

424.                    was walking on the road with her mother, Jane Doe VI, and her two

young children. PX34,              Dep. 8:2-15. There were also other villagers on the road. *Id.*

> **Defendants' Response.**   The statement in Paragraph 424 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.   Moreover,  Jane Doe VI claimed that she only heard about the alleged
> assault of John Doe III after the fact.  *See* SOF ¶ 86.

425.  **The group was on the road in front of               a facility operated by Exxon**.

PX34,              Dep. 8:24-9:6 ("Q. as you were walking on the road, did you walk near any

Exxon facilities? A. Near the gate of Exxon. Q. Did that Exxon facility have a name? A.

 "); *id.* at 53:2-4 (Q. And you said that was near              , correct? A. Yes"); see also PX24,

Jane Doe VI Dep. 64:2-12 (John Doe III was stopped at               )

> **Defendants' Response.**  The statement in Paragraph 425 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

426.              **could see her brother**.               's brother was ahead of her on the

road in front of Exxon's              . PX34,              Dep. 9:14-20.              could see her

brother from where she was standing. *Id.* at 9:21-10:2 (Q. about how away from you was your

brother? A. It was not far. Q. Could you see your brother from where you were standing? A. Yes,

I could see).

> **Defendants' Response.**  The statement in Paragraph 426 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

427.          **could see the Gate of**          .          could also see the Gate of

. PX34,          Dep. 10:3-5 (Q. Could you see the gate of          from where you

were standing? A. Yes.)

> **Defendants' Response.** The statement in Paragraph 427 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact.

428.          **saw soldiers exit the          Gate.** PX34,          Dep. 10:3-8;

*id.* at 66:6-8 ("the soldiers come out from Exxon's facility at that time, and then they shot my

brother");

> **Defendants' Response.** The statement in Paragraph 428 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not show that the Indonesian
> soldiers who allegedly assaulted John Doe III were assigned by the Government of
> Indonesia to          at the time of the incident or otherwise connected to Defendants.
> Moreover,          specifically testified that she did not know the identities of the
> soldiers who allegedly shot her brother. *See* SOF ¶ 88.

429.          **saw the soldiers who exited the          Gate go up to and shoot

her brother**. She heard the gunshot and saw her brother fall. PX34,          Dep. 10:12-22 (Q.

Did you see the soldiers raise their weapons? A. Yes, I did see. Yes, I see—I saw. Q. Did you see

your brother fall? A. Yes")

> **Defendants' Response.** The statement in Paragraph 429 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not show that the Indonesian
> soldiers who allegedly assaulted John Doe III were assigned by the Government of
> Indonesia to          at the time of the incident or otherwise connected to Defendants.
> Moreover,          specifically testified that she did not know the identities of the
> soldiers who allegedly shot her brother. *See* SOF ¶ 88.

430.          **saw the soldiers who exited the          gate and shot her brother

also beat her brother.** PX34,          Dep. 10:24-11:6 (Q. After your brother fell, what did

the soldiers do? A. After her fell, he was beaten again. Q. Who beat him? A. the Exxon soldiers

who came out and who shot him, and then the [beat] him.")

**Defendants' Response.**  The statement in Paragraph 430 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly assaulted John Doe III were assigned by the Government of Indonesia to            at the time of the incident or otherwise connected to Defendants. Moreover,            specifically testified that she did not know the identities of the soldiers who allegedly shot her brother.  *See* SOF ¶ 88.

431.            **identified the shooters as the Exxon soldiers who were guarding**

**the Exxon            gate**. *Id.* at 10: 6-7; 58:8-9 ("the soldiers were at Exxon's. They guard

Exxon"); *id.* at 66:6-8, 83:4-10 ("I saw with my two eyes. That is the evidence. Q. what evidence

do you have that they were Exxon soldiers? A. The evidence when they come out from the [gate]

of Exxon and they shot my brother."); *id.* at 95:24-96:2 ("the evidence, I saw. They came out of

the gate of            and shot my brother"); *id.* at 100:23-101:3.            was familiar with

          and had seen soldiers working for Exxon at the gate on other occasions. *id.* at 14:16-

15:2 (Q.            , did you ever pass            at other times? A. Yes. Q. At those other times,

when you passed            , did you see soldiers [working] there? A. the soldiers were at the gate.

Q. And what were they doing at the gate? A. they were checking people's ID").

**Defendants' Response.**  The statement in Paragraph 431 is unsupported by the record and so cannot create a genuine issue of material fact.            did not know the identities of the soldiers who allegedly shot her brother, and she testified that she called *all* soldiers in the area "Exxon soldiers."  *See* SOF ¶¶ 88, 91; Defs.' Reply Mem. at 8–9. Moreover, even if true, the statements referenced in Paragraph 431 do not show that the Indonesian soldiers who allegedly assaulted John Doe III were assigned by the Government of Indonesia to            at the time of the incident or otherwise connected to Defendants.

432.  **Jane Doe VI was with            and also witnessed the incident**. PX34,

      Dep. 66:14-18; 67:7-9 ("my mom was beside me, looking at my brother being shot at

the time"). Jane Doe VI also identified the soldiers as Exxon's soldiers: "It is the soldiers in

Exxon's clusters." PX24, Jane Doe VI Dep. 68:19-20. Jane Doe III testified that:

Q.      Could you see            from where you were on the road?
A.      Yes, I can—Yes, I could see            .

Q.      Did            have a gate?
A.      Yes. Yes, it does.
Q.      Could you see the Exxon soldiers leave            ?
A.      Yes.
Q.      Did they come out of the gate?
A.      Yes.
Q.      Did the Exxon soldiers from            who came out of the gate shoot
        [John Doe III]?
A.      Yes.

PX24, Jane Doe VI Dep. 122:18-123:8.

> **Defendants' Response.**  The statement in Paragraph 432 is unsupported by the record
> and so cannot create a genuine issue of material fact.  Jane Doe VI could not have
> "witnessed" the alleged shooting because she has admitted that she only heard about the
> event after the fact.  *See* SOF ¶ 86.  Moreover, Jane Doe VI testified that she did not
> know the identities of the soldiers who allegedly assaulted John Doe III.  *See id.* at ¶ 88.
> Additionally, Plaintiffs' use of the phrase "Exxon's soldiers" does not create a genuine
> issue of material fact.  *See* Defs.' Reply Mem. at 7–10.

433.    **Cluster 2 was operated by Exxon**. *Supra* ¶¶280-281; PX107, CA001007902;

PX108, Defs.' Responses to Jan. 2016 Requests for Admission at No. 75 ("

                                                                        ")

> **Defendants' Response.**  The statement in Paragraph 433 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not show that the soldiers who
> allegedly assaulted John Doe III were assigned by the Government of Indonesia to
> Cluster 2 at the time of the incident or otherwise connected to Defendants.

434.    **Exxon stationed military security personnel at Cluster 2 in July 2000.** *E.g.*

PX120, CA0001005921, at '22 (Daily Security Report for July 13-14, 2000 listing ExxonMobil

Resources as including 35 soldiers at Cluster 2); PX135, CA0001191451 at 52 (Daily Security

Report for July 20-21, 2000 listing ExxonMobil Resources as including 35 soldiers at Cluster 2);

*see also* PX34,            Dep. 14:16-15:2 (Q.            , did you ever pass Cluster 2 at other

times? A. Yes. Q. At those other times, when you passed Cluster 2, did you see soldiers

[working] there? A. the soldiers were at the gate. Q. And what were they doing at the gate? A.

they were checking people's ID").

In their Responses to Plaintiffs' Request for Admission, Defendants stated they "

" that military security personnel were present at Cluster 2

in July, 2000. PX108, Defs Responses to Jan 2016 Requests for Admission at No. 77.

> **Defendants' Response.** The statement in Paragraph 434 is unsupported by the record and so cannot create a genuine issue of material fact. EMOI did not control the Indonesian military and accordingly did not "station[] military security personnel at Cluster 2" in July 2000 or at any other time. *See* SOF ¶¶ 11–12. The statement in Paragraph 434 is also immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the soldiers who allegedly assaulted John Doe III were assigned by the Government of Indonesia to Cluster 2 at the time of the incident or otherwise connected to Defendants.

435. **Two witnesses testified to John Doe III's moral damages.** Both                and

her mother testified that John Doe III was in a lot of pain after he was shot, that he limped and

had to use a cane to walk afterwards, and that he was unable to do many of the activities,

including sports, that he used to enjoy. PX34,                Dep. 12:19-13:17; PX24, Jane Doe VI

Dep. 126:7-129:18. Jane Doe VI testified that it took years for her son to recover from the

physical injury and that he was never able to walk like before. PX24, Jane Doe VI Dep. 127:14

– 128:6. The injury also impacted John Doe III's ability to do his job and to farm. *Id.* at 126:7-

129:18. The witnesses also provided testimony on the impact of the injury on his emotional state.

*Id.*                testified that her brother had been friendly and social with other people before the

shooting. PX34,                Dep. 12:22-25. Jane Doe IV testified that her son was worried and

cried a lot after he was shot. PX24, Jane Doe IV Dep. 129:15-18.

> **Defendants' Response.** The statement in Paragraph 435 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs have produced no evidence from which Jane Doe VI's losses could be quantified. *See* SOF ¶¶ 93–94.

### G.  Jane Doe VII

436.    John Doe V worked as a driver, including for Mobil Oil Indonesia at Arun Field

as well as for Bechtel and other oil industry related companies, and was familiar with the soldiers

in the surrounding area. *E.g.* PX113, DOE005235-41; PX25, Jane Doe VII Dep. 55:22-57:12

(John Doe V was a driver for Mobil, including at Point A); *Id.* at 107:25- 108:19; PX35,

Dep. 23:23-25 (father was a driver "for as long as I can remember"). John Doe V was also

familiar with the area, including the soldiers, because he was active in local policing efforts,

attending trainings and courses organized by the military district command, the Koramil. PX35,

Dep. 26:17-27:9.

> **Defendants' Response.**  The statement in Paragraph 436 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Additionally, Plaintiffs' use of the phrase "worked as a driver"
> misleadingly suggests that John Doe V was still working as a driver at the time of the
> alleged incidents.  It is undisputed that John Doe V stopped working in the 1980s and had
> no job throughout the 1990s.  *See* Defs.' Opening Mem. at 32; SOF ¶ 104.

437.    **In 2003, John Doe V was picked up by Exxon soldiers from Unit 100.** PX111,

Plaintiff John Doe V's Supp Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories at 3;[41]

PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8-9; PX25, Jane Doe

VII Dep. 111:12-112:15.

> **Defendants' Response.**  The statement in Paragraph 437 relates to an alleged incident
> that Plaintiffs claim occurred in 2003, but which Plaintiffs did not plead until their
> November 24, 2014 Second Amended Complaint.  Thus all claims related to this alleged
> incident are time-barred, and statements regarding non-viable claims do not create
> genuine issues of material fact.  *See* Defs.' Reply Mem. at 19–20; SOF ¶¶ 99–100.
> Moreover, the statement in Paragraph 437 is unsupported by the record and so cannot
> create a genuine issue of material fact.  Plaintiffs' use of the phrase "Exxon soldiers"

---

[41] Although John Doe V sadly passed away after signing his interrogatories, Defendants have not
objected to their admissibility, so Plaintiffs are under no obligation to establish they are
admissible. *See* Fed. R. Civ. P. 56(c)(2). Plaintiffs nevertheless note that they are admissible
under Fed. R. Evid. 807.

cannot create a genuine issue of material fact, and there is no evidence connecting "Unit 100" to Defendants.  *See* Defs.' Reply Mem. at 6–10.

438.    John Doe V identified the soldiers who attacked him by name as Andreas Letda Danpos, Andreas Serda, Bonima Pratu and Bahrun Serda-Danru. PX111, Plaintiff John Doe V's Supp Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories at 3.

> **Defendants' Response.**  The statement in Paragraph 438 relates to an alleged incident that Plaintiffs claim occurred in 2003, but which Plaintiffs did not plead until their November 24, 2014 Second Amended Complaint.  Thus all claims related to this alleged incident are time-barred, and statements regarding non-viable claims do not create genuine issues of material fact.  *See* Defs.' Reply Mem. at 19–20; SOF ¶¶ 99–100.  The statement in Paragraph 438 is also inadmissible hearsay and so cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 13.  Lastly, Plaintiffs' statement, even if admissible, does not in any way connect the Indonesian soldiers who allegedly injured John Doe V to Defendants.

439.    John Doe V was taken to a temporary post near            of the Exxon Mobil Complex, where soldiers kicked him, beat him all over, and urinated on him. PX111, Plaintiff John Doe V's Supp Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories at 3; PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020); PX25, Jane Doe VII Dep. 111:12-112:15. The soldiers also urinated on John Doe V's head and all over his body. PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020); PX25, Jane Doe VII Dep. 111:12-112:15.

> **Defendants' Response.**  The statement in Paragraph 439 relates to an alleged incident that Plaintiffs claim occurred in 2003, but which Plaintiffs did not plead until their November 24, 2014 Second Amended Complaint.  Thus all claims related to this alleged incident are time-barred, and statements regarding non-viable claims do not create genuine issues of material fact.  *See* Defs.' Reply Mem. at 19–20; SOF ¶¶ 99–100. The statement in Paragraph 439 is also immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe V to Defendants.

440.    **John Doe V returned home after roughly three days.** PX111, Plaintiff John Doe V's Supp Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories; PX112, Jane Doe

VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8-9; PX25, Jane Doe VII Dep. 111:12-

112:15. When he returned home, he was bruised, swollen, and smelling of urine. PX111,

Plaintiff John Doe V's Supp Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories at 3;

PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8-9; PX25, Jane Doe

VII Dep. 111:12-112:15. As soon as he got home, he cried out that he had been taken on the road

by Exxon soldiers and the Exxon soldiers had urinated on his head and all over his body. PX112,

Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8-9; PX25, Jane Doe VII Dep.

111:12-112:15; PX223 Decl. of Jane Doe VII.

> **Defendants' Response.** The statement in Paragraph 440 relates to an alleged incident that Plaintiffs claim occurred in 2003, but which Plaintiffs did not plead until their November 24, 2014 Second Amended Complaint. Thus all claims related to this alleged incident are time-barred, and statements regarding non-viable claims do not create genuine issues of material fact. *See* Defs.' Reply Mem. at 19–20; SOF ¶¶ 99–100. Moreover, the alleged statements attributed to John Doe V are inadmissible hearsay and so cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 13. Plaintiffs' statement, even if admissible, does not in any way connect the Indonesian soldiers who allegedly injured John Doe V to Defendants. Finally, Plaintiffs' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact. Defs.' Reply Mem. at 7–10.

441.    **He told his wife he knew who the Exxon soldiers were, that he needed to**

**wash, and that he had been tortured.** PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1

(Oct 5, 2020) at 9; PX25, Jane Doe VII Dep. 111:10-112:15. John Doe V could not walk

normally when he returned home and did not look or sound like his usual self. PX223, Decl. of

Jane Doe VII. He was in pain from the beating and afraid, his face was pale and his voice was

trembling. *Id*. Jane Doe VII could see the bruises and marks on his wrist where his hands had

been tied. PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8.

> **Defendants' Response.** The statement in Paragraph 440 relates to an alleged incident that Plaintiffs claim occurred in 2003, but which Plaintiffs did not plead until their November 24, 2014 Second Amended Complaint. Thus all claims related to this alleged incident are time-barred, and statements regarding non-viable claims do not create genuine issues of material fact. *See* Defs.' Reply Mem. at 19–20; SOF ¶¶ 99–100.

Moreover, the alleged statements attributed to John Doe V are inadmissible hearsay and so cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 13. Finally, Plaintiffs' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

442. **Unit 100 was assigned to Exxon.** E.g. PX231, CA0001228382, at '403 (February 21, 2002 email from John Connor to Alex Dodds attaching a chronology noting Lance Corporal of Battalion100 on patrol).

In responses to Plaintiffs' Request for Admission regarding whether Unit 100 provided security at Exxon's operations, Defendants responded that they "

." PX369, Defs R&Os to Pls. Sept 2016 Requests for Admissions Regarding Unit Numbers at Nos. 11 & 22.

> **Defendants' Response.** The statement in Paragraph 442 is unsupported by the record and so cannot create a genuine issue of material fact. There is no evidence connecting Unit 100 to Defendants. *See* Defs.' Reply Mem. at 6–7.

443. **In 1999, Plaintiffs' house was set on fire by soldiers working for Exxon.**

PX111, Plaintiff John Doe V's Supp Resp. to Exxon Mobil Oil Corp's First Set of Interrogatories; PX25, Jane Doe VII Dep. 79:16-19 ("Q. Did soldiers burn your house in 1999 or 2000? A. Yes, they did. I was crying at that time."). John Doe V identified the soldiers as Exxon soldiers. PX25, Jane Doe VII Dep. 80:15-23. The soldiers who burned the house also took John Doe V away. *Id.* Dep. 80:13-17 ("It was the soldiers who took my husband, Exxon soldiers.").[42]

> **Defendants' Response.** The statement in Paragraph 443 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10. Additionally, Jane Doe VII testified that she called the Indonesian soldiers who allegedly burned down her home "Exxon soldiers" merely because that is what her husband, John Doe V, called them. See Defs.' Opening Mem. at 24–25; SOF ¶ 103. The statements that Jane Doe VII attributes to John Doe V are inadmissible hearsay and so cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 13.

---

[42] John Doe V has not filed a claim for the 1999 abduction. See *supra* ¶ 99.

444.    **Jane Doe VII and John Doe V's son,                , saw the soldiers take his father away in a truck.** "I saw a truck, a military truck, and on the truck was my father, and he was already blindfolded, and he was being beaten." PX35,        Dep. 9:16-22. The truck had two tigers drawn on the sides. *Id*. 14:2-8.                later saw that same truck, with the two tigers drawn on it, driving into Exxon        , past the guarded gate and the fence into

 . *Id*. at 14:16-16:5; 93:15-20 (Q. Do you know whether the vehicle you saw going into

 , the Exxon facility, was the same day your father was abducted? A. Yes, it was the same truck, because there's no other trucks like that."), *Id*. at  92:23-95:5. Both                and his mother were home when John Doe V was returned by the soldiers.  PX35,        Dep. 17:18 – 20:21. Six soldiers brought him home. *Id*. He had been beaten and cut. Id. 19:19-24.  He was weak and could barely stand. PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8. He was crying and in pain. *Id. See also*PX35,                Dep. 18:15-21 ("he cried loudly"); PX25, Jane Doe VII Dep. 108:23-109:6 ("everybody was crying at the time").  John Doe V cried out that he had been tortured by Exxon soldiers, and that "he had been taken by Exxon soldiers, and he know them by person …he said that he was heavily tortured, and he said he knew, at least, four people who tortured him, and he know them by name." PX112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8; PX35,        Dep. 20:18-21:6.

> **Defendants' Response.**  The statement in Paragraph 444 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.                's claim to have seen Indonesian military trucks parked at some unidentified time at        , even if true, does not show that the Indonesian soldiers alleged to have injured John Doe V were assigned by the Government of Indonesia to        at the time of the incident or otherwise connected to Defendants. Moreover, the statements that Jane Doe VII attributes to John Doe V are inadmissible hearsay and so cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 13.  Finally, Plaintiffs' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact.  Defs.' Reply Mem. at 7–10.

445.   **John Doe V suffered material and moral damages.** Before his death, John Doe V produced documents showing his past wages from his driving jobs. E.g., PX113, DOE005235-41. He is also seeking moral damages. He suffered injuries "all over his body" from the beating, and he was urinated on. PX25, Jane Doe VII Dep. 111:17-112:15. After the beating, John Doe V had difficulty walking and taking care of himself. PX25, Jane Doe VII Dep. 113:15-114:5 ("[W]hen he had to take a shower, I had to help him. I have to pour water on to him while he was sitting and then I washed him. I had to wash him. He was not able to do—he was not able to do that by himself." Q. Did he have trouble walking? A. He had to use a cane, he had to use a stick to walk, to support him. Q. How long did he have to use the cane; do you remember? A. I cannot remember exactly how long he had to use the stick, but it was very long until he can walk without the stick."). John Doe V also suffered emotional distress from the beating. He became afraid to go to the market or to even go outside. *Id.* at 113:4-8 ("[A]fter he returned from being detained, from being taken, he was scared a lot. He was scared even to go to the market. He was not—he didn't have the courage even to go outside.").

> **Defendants' Response.** The statement in Paragraph 445 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs cannot quantify lost wages with evidence of John Doe V's wages from his job as a driver, when it is undisputed that John Doe V stopped working in the 1980s and had no job throughout the 1990s. *See* Defs.' Opening Mem. at 32; SOF ¶ 104. John Doe V's documentation of wages from his driving jobs is immaterial because those jobs ended years before the alleged assault. *See id.* Plaintiffs have produced no evidence from which Jane Doe VII's or John Doe V's losses could be quantified. *See* SOF ¶¶ 104–107.

### H.  Jane Doe VIII

446.   John Doe VI was picked up, driven around the local villages, asked to identify suspected GAM members, and ultimately shot by soldiers working for Exxon. Eyewitnesses, including the village chief of the neighboring village who worked at the Exxon facility,

recognized the soldiers who detained and shot John Doe VI as soldiers he recognized and had

meals with at Exxon's Bachelor Camp. PX36,                    Dep. 8-10:2:5-4 (Q. And did you see

the soldiers shoot [John Doe VI]? A. Yes, I saw it."); *id.* at 10:21-11:23; 113:6-18 ("I knew them

from bachelor camp, because we had our meals at the same place'). The soldiers recognized him

as well. PX36,                    Dep. 12:19-24. The eyewitness,                    , reported the attack to

his Exxon supervisor, a man named Sukirman.. *Id.* at 14:16-16:3.

> **Defendants' Response.**  The statement in Paragraph 446 is unsupported by the record
> and so cannot create a genuine issue of material fact.  Plaintiffs' conclusory assertion that
> the Indonesian soldiers who allegedly injured John Doe VI "work[ed] for Exxon" cannot
> create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.  The statement in
> Paragraph 446 is also immaterial.  An immaterial statement cannot create a genuine issue
> of material fact.  A witness's claim to have recognized certain Indonesian soldiers as
> having been present at an unspecified time in Bachelor Camp does not show that the
> Indonesian soldiers who allegedly injured John Doe VI were assigned by the Government
> of Indonesia to Bachelor Camp at the time of the alleged incident or were otherwise
> connected to Defendants.  Indeed, the same witness testified affirmatively that he did *not*
> know if any of the soldiers involved in the alleged incident worked for Exxon.  SOF ¶
> 114.

> 447.    Jane Doe VIII and John Doe VI have a special needs son. PX37,                    Dep.

10:13-11:16.

> **Defendants' Response.**  The statement in Paragraph 447 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

> 448.    On the morning of the attack, John Doe VI's wife woke him to tell him that their

son had run away. John Doe VI left to look for his son. PX242, Plaintiff John Doe VI's 2007

Suppl. Resp. to ExxonMobil Oil Corp's First Set of Interrogatories at No. 1.[43]

---

[43] Although John Doe VI sadly passed away after signing his interrogatories, Defendants have
not objected to their admissibility, so Plaintiffs are under no obligation to establish they are
admissible. *See* Fed. R. Civ. P. 56(c)(2). Plaintiffs nevertheless note that they are admissible
under Fed. R. Evid. 807.

**Defendants' Response.** The statement in Paragraph 448 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

449.     **While looking for his son, John Doe VI stopped for a coffee and to buy**

**cigarettes in Matang Kuli, a small town.** PX242, Plaintiff John Doe VI's Suppl. Resp. to

ExxonMobil Oil Corp's First Set of Interrogatories at No. 1; PX36,                    Dep. 8:5-14.

**Defendants' Response.** The statement in Paragraph 449 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

450.     Matang Kuli abuts Exxon Cluster IV. PX342, CA0001081306 (map)

**Defendants' Response.** The statement in Paragraph 450 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

451.     **Exxon operated Cluster IV at the relevant time**. *Supra* ¶¶ 281-82; see also,

e.g., PX108, Defs.' R&Os to Pls. Jan 2016 Requests for Admission No 21 (admitting EMOI

operated Cluster IV).

**Defendants' Response.** The statement in Paragraph 451 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly injured John Doe VI were assigned by the Government of Indonesia to Cluster 4 at the time of the incident, or were otherwise connected to Defendants.

452.     **Exxon soldiers picked up John Doe VI and drove him to his home village,**

**demanding he identify GAM members.** PX242, Plaintiff John Doe VI's Suppl. Resp. to

ExxonMobil Oil Corp's First Set of Interrogatories at No. 1; PX36,                    Dep. 93:7-11.

Eventually, the soldiers ordered him to run away. Fearing he would be shot if he ran, John Doe

VI instead crouched by a nearby fence and pleaded for his life. PX242, Plaintiff John Doe VI's

Suppl. Resp. to ExxonMobil Oil Corp's First Set of Interrogatories at No. 1; PX36,

Dep. 8:5- 9:23 ("he was brought toward to my house with hands tied behind his back and with

guns pointed behind him … he was pushed on the back, and then he fell onto the ground, into the mud. And that's the time when he was shot on his calf … it was meant as if he was making an effort to run, but it was not the case."); *id.* at 8:5-14 (Q. And did you see the soldiers shoot [John Doe VI]? A. Yes, I saw it.").

> **Defendants' Response.** The statement in Paragraph 452 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

453.    **An eyewitnesss recognized the soldiers who shot John Doe VI as soldiers from Exxon's Bachelor Camp.** PX36,                   Dep. 8:5-14; *id.* at 10:21-11:23; *id.* at 113:6-18. For example,                testified that:

> Q.   You said there were about 20 soldiers that came to your house with [John Doe VI]; is that right?
> A.   Yes, that's correct.
> Q.   And how many of them did you recognize?
> A.   So the total number I was able to recognize was ten. Four of them were pointing guns right behind [John Doe VI], and six other were following them.
> Q.   And did you recognize those ten from [B]achelor [C]amp?
> A.   Yes, we—I knew them from bachelor camp because we had our meals at the same place. They had their meals at the same place where we have our meals as well, and they were just sleeping in the next—in the place that's just next to the bachelor camp.

PX36,                Dep. 112:24-11318. The soldiers had meals at Bachelor Camp and had their sleeping quarters there. *Id.*

> **Defendants' Response.** The statement in Paragraph 453 is immaterial. An immaterial statement cannot create a genuine issue of material fact. A witness's claim to have recognized certain Indonesian soldiers as having been present at an unspecified time in Bachelor Camp does not show that the Indonesian soldiers who allegedly injured John Doe VI were assigned by the Government of Indonesia to Bachelor Camp at the time of the alleged incident or were otherwise connected to Defendants. Indeed, the same witness testified affirmatively that he did *not* know if any of the soldiers involved in the alleged incident worked for Exxon. SOF ¶ 114.

454.    **The soldiers recognized                as well**. PX36,                Dep. 12:19-24 (soldiers "looked that they were ashamed because I knew them").

334

**Defendants' Response.**  The statement in Paragraph 454 is immaterial.  An immaterial statement cannot create a genuine issue of material fact. A witness's claim to have recognized certain Indonesian soldiers as having been present at an unspecified time in Bachelor Camp does not show that the Indonesian soldiers who allegedly injured John Doe VI were assigned by the Government of Indonesia to Bachelor Camp at the time of the alleged incident or were otherwise connected to Defendants.  Indeed, the same witness testified affirmatively that he did *not* know if any of the soldiers involved in the alleged incident worked for Exxon.  SOF ¶ 114.

455.                              **, reported the attack to his Exxon supervisor**. The supervisor was

a man named Sukirman. PX36,                    Dep. 14:16-16:3 ("I reported that in a safety

meeting, because the leader of the meeting asked if we had any problems or any obstacles at our

village or on the road.").                    also identified Sukirman's supervisor, a Canadian named

Jim. *Id.*

**Defendants' Response.**  The statement in Paragraph 455 is unsupported by the record and so cannot create a genuine issue of material fact.                    claimed to have worked for an "Exxon subcontractor."  CSOF ¶ 457.  There is no evidence that his supervisor was an EMOI employee. *See infra* ¶ 564.  The statement in Paragraph 455 is also immaterial.  An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe VI to Defendants.

456.                    **was the village chief of the neighboring village.** PX36,

Dep. 6:21-25; PX37,          Dep. 72:12-14.

**Defendants' Response.**  The statement in Paragraph 456 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

457.                    **worked at Exxon, on a rig for an Exxon subcontractor**. PX36,

Dep. 11:5-8; *id.* at 16:20-24 ("I was the skill man").

**Defendants' Response.**  The statement in Paragraph 457 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe VI to Defendants.

458.                    **worked shifts at Bachelor Camp**.            worked shifts: 7

days on, 7 nights on, and 7 days off.  PX36,                    Dep. 17:10-14. He stayed at Bachelor

Camp: "I stayed at bachelor camp 7 days, and then I stayed at bachelor camp 7 nights, and then the other 7 days, I stayed at home."

> **Defendants' Response.** The statement in Paragraph 458 is immaterial. An immaterial statement cannot create a genuine issue of material fact. "Bachelor Camp" is a residential area among the larger Arun Field complex where Indonesian soldiers sometimes ate meals. There is no evidence, and Plaintiffs do not claim, that the only Indonesian soldiers who gathered and ate meals at Bachelor Camp were assigned by the Government of Indonesia to guard the facilities EMOI operated in Aceh. *See* Defs.' Opening Mem. at 26 n. 21; SOF ¶ 60.

459.        **observed the soldiers at bachelor camp and shared meals with them:** "we were always together at Exxon when we had coffee time." PX36,        Dep. 10:21-11:23; see also *id.* ("Q. And when you had coffee time with the soldiers, where was that? A. It was bachelor camp."); *id.* at 18:2-17 ("the military would come and have meals at the same place where we had our meals")

> **Defendants' Response.** The statement in Paragraph 459 is immaterial. An immaterial statement cannot create a genuine issue of material fact. "Bachelor Camp" is a residential area among the larger Arun Field complex where Indonesian soldiers sometimes ate meals. There is no evidence, and Plaintiffs do not claim, that the only Indonesian soldiers who gathered and ate meals at Bachelor Camp were assigned by the Government of Indonesia to guard the facilities EMOI operated in Aceh. *See* Defs.' Opening Mem. at 26 n. 21; SOF ¶ 60.

460.    [Intentionally left blank]

461.        **also saw the soldiers working for Exxon at the landing dock and other Exxon locations**: He also testified that he saw the soldiers at work for Exxon: "[s]o what I witnessed was, when they were not having meals with us, they were going back to landing dock, and that was in the area of A1. So it was not the area of our rig, but A1 was still the area under Exxon, within Exxon." PX36,        Dep. 18:23-19:4.

> **Defendants' Response.** The statement in Paragraph 461 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs' evidence does not establish that Defendants operated A1 at the time John Doe VI was allegedly injured. Plaintiffs' witnesses' conclusory statements that Indonesian soldiers "work[ed] for Exxon" cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

The statement in Paragraph 461 is also immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldier who allegedly injured John Doe VI was assigned by the Government of Indonesia to an EMOI-operated facility at the time of the alleged incident.

462.    The soldiers also destroyed medicine intended for pregnant villagers that was stored at                's house, providing additional opportunity to observe their faces. In addition to shooting John Doe VI, the soldiers went into                's home and destroyed a medicine cabinet that was stored at his house by the mid-wife posted in his village.  PX36,                Dep. 13:15-14:10 ("I was the head of the village. So there was a village mid-wife posted in my village. And that medicine is for the carrying woman or pregnant woman … all the medicines were stepped on. So they were stepping on all of the medicine"); *id.* at 106:8-17.

**Defendants' Response.**  The statement in Paragraph 462 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe VI to Defendants.

463.            **therefore had opportunity to observe the soldiers at both his home and at Bachelor Camp**. PX36,                Dep. 11:15- 23 ("I recognize the soldiers, and if they were still living, if I meet them today, I would be able to recognize.")

**Defendants' Response.**  The statement in Paragraph 463 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  A witness's claim to have recognized certain Indonesian soldiers as having been present at an unspecified time in Bachelor Camp does not show that the Indonesian soldiers who allegedly injured John Doe VI were assigned by the Government of Indonesia to Bachelor Camp at the time of the alleged incident or were otherwise connected to Defendants.  Indeed, the same witness testified affirmatively that he did not know if any of the soldiers involved in the alleged incident worked for Exxon.  SOF ¶ 114.

464.    **Bachelor Camp was operated by Exxon**. *Supra* ¶¶280-281; PX18, Duffin Dep. 18:19-19:1 (Bachelor camp was used by EMOI for housing employees); PX31,                Dep. 9:13-10:11; *id.* at 19:17-21:4 (testifying an Exxon badge was required to get into Bachelor

Camp); *id.* at 13:22-14:17 (testifying Bachelor Camp was a dormitory for Exxon staff: "Just the

staff").

> **Defendants' Response.**  The statement in Paragraph 464 is immaterial.  An immaterial
> statement cannot create a genuine issue of material fact.  "Bachelor Camp" is a
> residential area among the larger Arun Field complex where Indonesian soldiers
> sometimes ate meals.  There is no evidence, and Plaintiffs do not claim, that the only
> Indonesian soldiers who gathered and ate meals at Bachelor Camp were assigned by the
> Government of Indonesia to guard the facilities EMOI operated in Aceh.  *See* Defs.'
> Opening Mem. at 26 n. 21; SOF ¶ 60.  A witness's claim to have recognized certain
> Indonesian soldiers as having been present at an unspecified time in Bachelor Camp does
> not show that the Indonesian soldiers who allegedly injured John Doe VI were assigned
> by the Government of Indonesia to Bachelor Camp at the time of the alleged incident or
> were otherwise connected to Defendants.

> 465.    **Exxon stationed military resources at Bachelor Camp at the relevant time.**

Exxon stationed soldiers at Bachelor Camp at the relevant time. PX285, CA0001005943, at '944

(daily security report for November 6-11, 2000  listing ExxonMobil Resources as including 70

military stationed at Bachelor Camp); PX123, CA0001005946, at '947 (daily security report for

November 7-8, 2000 listing ExxonMobil Resources as including 70 military stationed at

Bachelor Camp); *id.* (same, for November 1-8, 2000); PX325, CA0001005955, at '956 (daily

security report for November 17-20, 2000 listing ExxonMobil Resources as including 70 military

stationed at Bachelor Camp); PX354, CA0001005958, at '959 (daily security report for

November 21-22, 2000  listing ExxonMobil Resources as including 70 military stationed at

Bachelor Camp); PX314, CA0001005970, at '970.001 (daily security report for November 24-

27, 2000 listing ExxonMobil Resources as including 70 military stationed at Bachelor Camp).

> **Defendants' Response.**  The statement in Paragraph 465 is unsupported by the record
> and so cannot create a genuine issue of material fact.  EMOI did not control the
> Indonesian military and accordingly did not "station[] military resources at Bachelor
> Camp."  *See* SOF ¶¶ 11–12.  The statement in Paragraph 465 is also immaterial.  An
> immaterial statement cannot create a genuine issue of material fact.  "Bachelor Camp" is
> a residential area among the larger Arun Field complex where Indonesian soldiers
> sometimes ate meals.  There is no evidence, and Plaintiffs do not claim, that the only
> Indonesian soldiers who gathered and ate meals at Bachelor Camp were assigned by the
> Government of Indonesia to guard the facilities EMOI operated in Aceh.  *See* Defs.'

Opening Mem. at 26 n. 21; SOF ¶ 60.  A witness's claim to have recognized certain Indonesian soldiers as having been present at an unspecified time in Bachelor Camp does not show that the Indonesian soldiers who allegedly injured John Doe VI were assigned by the Government of Indonesia to Bachelor Camp at the time of the alleged incident or were otherwise connected to Defendants.

466.   **Exxon stationed troops at Cluster 4 at the relevant time**. PX285, CA0001005943, at '944 (daily security report for November 6-11, 2000 listing ExxonMobil Resources as including 28 military stationed at Cluster 4); PX123, CA0001005946, at '947 (daily security report for November 7-8, 2000 listing ExxonMobil Resources as including 28 military stationed at Cluster 4); PX325, CA0001005955, at '956 (daily security report for November 17-20, 2000 listing ExxonMobil Resources as including 28 military stationed at Cluster 4); PX354, CA0001005958, at '959 (daily security report for November 21-22, 2000 listing ExxonMobil Resources as including 28 military stationed at Cluster 4); PX314, CA0001005970, at '970.001 (daily security report for November 24-27, 2000  listing ExxonMobil Resources as including 28 military stationed at Cluster 4).

**Defendants' Response.**  The statement in Paragraph 466 is unsupported by the record and so cannot create a genuine issue of material fact.  EMOI did not control the Indonesian military and accordingly did not "station[] troops at Cluster 4."  *See* SOF ¶¶ 11–12.  The statement in Paragraph 466 is also immaterial.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly injured John Doe VI were assigned by the Government of Indonesia to Cluster 4 at the time of the alleged incident or were otherwise connected to Defendants.

467.   **John Doe VI's daughter,              , heard the gun shot**: "I heard a gunshot and then people were running toward my direction to let me know that it was my father who was shot." PX37,           Dep. 13:7-10.              went to the place where her father had been shot, "[s]o I went immediately, I went to the place where the incident happened, where many people were already crowding...." *Id.* at 14:25-15:4. The villagers on the scene immediately after the shooting told her that her father had been taken by Exxon soldiers. *Id.* at 99:19-100:5.

**Defendants' Response.**  The statement in Paragraph 467 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe VI to Defendants.  Moreover, the statement in Paragraph 467 attributed by              to unidentified villagers is inadmissible hearsay and so cannot create a genuine issue of material fact.

468.    **John Doe VI himself identified the soldiers who abducted and shot him as**

**Exxon soldiers to his daughter**: "He was in trauma when he told me this, he said look at my

leg, I was shot by Exxon soldiers and I was abducted by Exxon soldiers." PX37,              Dep.

100:10-18.

**Defendants' Response.**    The statement in Paragraph 468 is inadmissible hearsay and so cannot create a genuine issue of material fact.  Moreover, Plaintiffs' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.

469.    **John Doe VI produced hospital records, village records and a photograph of**

**his scar.** PX333, DOE005062-63; PX344, DOE005014 (hospital record); PX387, DOE005059

(village record). The records confirm he was shot and was treated at the hospital.

**Defendants' Response.**  The statement in Paragraph 469 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law.  *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence, including the documents referenced in this paragraph, from which Jane Doe VIII's or John Doe VI's alleged losses could be quantified.  *See* SOF ¶¶ 116–19.

470.    **Jane Doe VIII seeks material and moral damages for the injuries to her**

**husband.** John Doe VI suffered a "deep" and painful bullet wound that impaired his mobility.

PX37,              Dep. 20:5-21:13 ("[H]e was under a lot of pain at that time, and the way he

walked was limping.").  The physical suffering continued for years. PX36,              Dep.

36:14-37:2.

He also suffered lasting emotional distress. John Doe VI had been an outgoing, cheerful

person who was busy and sociable. PX37,              Dep. 37:8-38:8 ("[A]t a party, wedding

340

parties like that, he would always be at the front giving a hand to the people having the party.");

PX36,                     Dep. 36:4-16 ("before the incident, before the shooting, he was very

cheerful person, and then, before, he was funny. That's before the incident…"). After the

shooting, he became fearful, did not want to leave his house, and was afraid to be left alone.

PX37,              Dep. 20:9-16; *id.* at 22:14-23:13; PX36,                     Dep. 36:4-10.  After the

shooting, John Doe VI would startle easily. PX37,              Dep. 50:5-18 ("[A]fter the incident,

he would be scared of everything, any noise that he would heard he would be scared of, and he

heard the motorcycle noise, he would ask me to check outside because he was scared ..."). He

would often worry there were soldiers nearby. PX37,                     Dep. 48:21-49:5 ("[S]ometimes

he would ask me can you please go check outside, is it the military passing, are those soldiers

passing. Q. How often did this happen during the period after your father was shot and abducted?

A. It was often."); *id* at 23:24-24:3 ("If you talk about the trauma, he never recovered from that.

He was traumatized until—until he passed away, until the day he died.").

    Before the shooting, John Doe VI had been the family breadwinner. PX37,

Dep,  46:20-47:12 ("So what made him very sad, he told me that before he was the one who

went to provide for the family but then after the incident—after the incident he had to watch us

to work and to provide for the family and to take care of him."). John Doe VI's "family was

destroyed" after the shooting. PX37,              Dep. 38:13-17 ("After the incident our family

was destroyed. Usually we had a provider in the family, but after there was no longer—there

wasn't that provider anymore."); PX36,                     Dep. 37:17-19 ("[T]heir economics . . .

severely suffered by the incident."). Jane Doe VIII and              had to do manual labor to

make up for John Doe VI's lost income, but they still did not have enough money to meet their

daily needs. PX37,              Dep. 45:7-22 ("me and my mother would have to work labor for

341

other people while at the same time we also had to take care of our father. … it was the work in the rice field, planting and also harvesting. Q. Was this difficult work? A. Yes, it was heavy work.").

> **Defendants' Response.** The statement in Paragraph 470 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs have produced no evidence reflecting John Doe VI's lost income, including how much he earned, or when and how often he worked. *See* SOF ¶¶ 116–18.            specifically testified that she had no documents reflecting her father's wages or the revenue from their kiosk. SOF ¶ 118. Plaintiffs did not produce any evidence from which Jane Doe VIII's or John Doe VI's alleged losses could be quantified. SOF ¶¶ 116–19.

## I. John Doe II

471.    **Both John Doe II and a third-party eyewitness identified the soldiers who attacked John Doe II as soldiers from Exxon Cluster 4**. John Doe II was beaten at a local food stall just down the road from            . Both John Doe II and the soldiers from Cluster 4 were regular customers at the food stall. The owner for the food stall,            , recognized the soldiers who beat John Doe II as her customers from Cluster 4. In addition, John Doe II saw the soldiers leave            and come down the road to the stall.

> **Defendants' Response.** The statement in Paragraph 471 is unsupported by the record and so cannot create a genuine issue of material fact. John Doe II testified that he did not recognize any of the Indonesian soldiers who allegedly assaulted him, and            did not witness the alleged attack on John Doe II. *See* SOF ¶¶ 122–24.

472.    **John Doe II went to            's food stall for breakfast.** On the morning of August 11, 1999, John Doe II travelled by motorcycle to a food stall near            to buy breakfast. PX26, John Doe II Dep. 77:24-78:1; *id.* at 80:7-8; *id.* at 82:2-4; PX38,            Dep. 11:6-11. The food stall John Doe II went to was operated by            . PX26, John Doe II Dep. 80:12-14; PX38,            Dep. 11:6-11.

342

**Defendants' Response.**  The statement in Paragraph 472 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

473.               **'s stall was on the road between              and              . PX342,** CA0001081306 (map); PX26, John Doe II Dep. 93:21-94:2 (estimating the food stall was "150 meters and maybe even less" from              and 200 to 300 meters from              ); PX38,              Dep. 15:15-18 (estimating the food stall was "a little less than 300 meters" from              ).

**Defendants' Response.**  The statement in Paragraph 473 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

474.  **John Doe II was a regular customer at              's stall**. John Doe II bought food from              "[o]ften." PX38,              Dep. 10:11-21 (also describing John Doe II as friendly).

**Defendants' Response.**  The statement in Paragraph 474 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

475.  **The soldiers from Exxon Cluster 4 were also regular customers at              's food stall**. PX38,              Dep. 11:12-18 ("Q. How do you know that the soldiers were from Mobil? A. They used to buy rice, breakfast from me, ma'am. Q. So you recognize the soldiers; is that right? A. Yes, I recognize them."); *id.* at 14:9-19 (the soldiers that she recognized bought rice "often" at              's stand); *id.* at 30:2-20 (soldiers spoke Indonesian, not Acehnese).

**Defendants' Response.**  The statement in Paragraph 475 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs misleadingly suggest that              recognized the Indonesian soldiers who allegedly attacked and detained John Doe II.              did not witness the alleged attack on John Doe II and did not know who assaulted and detained John Doe II. *See* SOF ¶¶ 123–24.

476.   **Both John Doe II and                    saw the soldiers emerge from the**

**and approach the food stall**. Around the time JD2 arrived at                    's food stall on August

11, 1999, a group soldiers emerged from               and   . PX26, John Doe II Dep. 94:15-20

("they came out from the field of            . Q. You saw them come from            ? A. From the

field of—from the field of               "); *id.* at 95:21-96:8 ("They come—come out from the field

of            , many of them. BY MR. ANDERSON: Q. You watched the soldiers come from the

field of            to the food stall where you were standing? THE WITNESS: The soldiers come

out from the field of Exxon to the directions of Exxon [street], and then they go forward to the

directions of the food stall that I was standing." (counsel's objection omitted)); *id.* at 96:24-97:1

("Two soldiers that come out from               ., they used the trail motorcycle."); *id.* at 97:8-23

("Q. Okay. So [John Doe II], you saw soldiers coming on foot from            , and soldiers

coming on motorcycles from               ; is that right? A. That is right."); *id.* at 150:5-10 ("So

what happened was I was on my motor bike going to the rice—the rice stall where I wanted to

buy the breakfast. So I slowed down in front of the rice stall. And then actually, I had seen earlier

the—the soldiers coming out. And then I stop at—at the rice stall."); *id.* at 176:10-12 ("What I

see—what I saw is they are—come out. They come out from the Exxon and approaching to

the—the scene.").               also saw the soldiers come from            . PX38,               Dep.

14:20-24 ("Q. Did the soldiers that came and get [John Doe II] come from            ? A. From

            , ma'am." (counsel's objection omitted)).

**Defendants' Response.**  The statement in Paragraph 476 is immaterial.  An immaterial
statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if
true, does not show that the Indonesian soldiers who allegedly assaulted John Doe II were
assigned by the Government of Indonesia to               at the time of the alleged
incident or were otherwise connected to Defendants.  Both John Doe II and
testified that they did not know who assaulted and detained John Doe II.  *See* SOF ¶¶
122–24.

477.    John Doe II was ordering his breakfast when he heard gunfire; the gunfire made the other civilians at the food stall run away but John Doe II, who was on his motorbike waiting for his breakfast, did not run. PX26, John Doe II Dep. 150:5-151:16 (John Doe II asked

"[c]an you serve me one plate of breakfast? And please pack another one. And also please pack another one. And while I was saying that, and I thought con—I heard continuous gunshot, gunfire."; *id.* at 78:1-5 ("[M]any soldiers come out and they—they have gunfires everywhere, and they were everywhere in the left and the right. And all people was—were running from them."); *id.* at 84:18-20 ("[T]hey were already on the road at the time and then suddenly there were gunfires and everybody runs."). John Doe II was still on his motorcycle, so he was not able to run before the soldiers surrounded him. *Id.* at 78:5-7 ("I couldn't run because they were already everywhere, so I was there on the ground."); *id.* at 78:25-79:2 ("I was not able to run anywhere because they are all on—on every side, on all sides of me."); *id.* at 84:20-22 ("I couldn't run at that time because I was still on my motorcycle and I got beaten because I didn't run at that time."); PX38,                 Dep. 20:21-21:3 (when soldiers arrived, the other people at the stall ran).

> **Defendants' Response.**  The statement in Paragraph 477 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian soldiers who allegedly injured John Doe II to Defendants.

478.    **The Soldiers from Cluster 4 attacked John Doe II.** The attack was witnessed by                : "he was buying breakfast from me, and then as soon as I handed the breakfast to him, and then the soldiers came and attack him." PX38,                 Dep. 12:3-9. When they reached John Doe II, a group of between 8 and 20 soldiers began to beat him with their butts of their guns and their fists. PX26, John Doe II Dep. 84:21-22 ("I got beaten because I didn't run at that time."); *id.* at 86:9-10 ("[T]he ones who—who beat me were 10 to 20 people."); *id.* at

150:10-151:16 ("and then suddenly, they, because I was still there, and then they—they hit me with the butt of the gun and then here and on the head, and there were a lot of scars, a lot of wounds on—on my body and on my head at that time.").

> **Defendants' Response.** The statement in Paragraph 478 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly injured John Doe II were assigned by the Government of Indonesia to Cluster 4 at the time of the incident or were otherwise connected to Defendants. Moreover, the testimony from         and John Doe II referenced in Paragraph 478 does not support Plaintiffs' statement that "Soldiers from Cluster 4 attacked John Doe II."

479. **John Doe II was severely beaten for about a half hour by eight to ten soldiers.**

PX38,         Dep. 11:8-11 ("soldiers from Mobil came, and then he was beaten, and then he was bleeding . . . ."); *id.* at 12:10-13 ("Q. Can you describe what the soldiers did to [John Doe II]? A. So he was—he was beaten at that time, and he got beaten on the head."); *id.* at 12:19-21 ("[T]hey were beating him with the fists, repeatedly, until he was bleeding."); *id.* at 13:2-6 (soldiers used their fists to punch John Doe II I the head, beating him for about a half hour); *id.* at 19:16-18 ("16 Q. How many soldiers did you see beating [John Doe II]? A. About 8 to 10, sir.").

> **Defendants' Response.** The statement in Paragraph 479 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe II to Defendants. Moreover, Plaintiffs' witness's use of the conclusory phrase "soldiers from Mobil" cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10.

480. John Doe II did not provoke the attack. PX38,         Dep. 11:20-25.

> **Defendants' Response.** The statement in Paragraph 480 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe II to Defendants.

481.         **recognized the soldiers**. PX38,         Dep. 11:16-19 ("Q. So you recognize the soldiers; is that right? A. Yes, I recognize them. I saw their faces."); *id.* at

19:8-20:4 ("[Y]ou saw the faces of the soldiers who beat [John Doe II]? A. I can saw their faces, sir. Q. You had a clear view of their faces. A. It was clear, sir. Q. Nothing was blocking your view of their faces? A. It was clear, sir. Q. How many soldiers did you see beating [John Doe II]? A. About 8 to 10, sir. Q. And you saw all of their faces, all 8 to 10? A. Yes, sir. And you recognized those faces, all 8 to 10? A. Yes, sir. Q. And that's because all 8 to 10 of them had been customers of yours, at your rice stall? A. Yes, sir.").

> **Defendants' Response.** The statement in Paragraph 481 is unsupported by the record and so cannot create a genuine issue of material fact. _____ did not witness the alleged assault of John Doe II and did not know who allegedly assaulted and detained John Doe II. *See* SOF ¶¶ 123–24.

482. **The same soldiers who beat John Doe II then held him for 51 days**. PX26, John Doe II Dep. 102:4-11 ("Q. Do you know who arrested you that day? THE WITNESS: It was the sol-—it was the soldiers who beat me. They took me, but I don't know where. I don't know the directions. I was bleeding. My head was injured."); *id.* at 152:4-16 ("I was thrown into a vehicle and then I was taken to a place that I don't know. BY MR. DiCAPRIO: Q. Who took you to the place that you don't know? A. Those who beat me the first time …. They are the one who took me. Q. And who were those that beat you the first time? A. Those who—who came— who came out of the field of Exxon."); *id.* at 176:17-21 ("What I can feel from my hands was that those soldiers who beat me and the same soldiers who brought me and detained me, can feel—that's what I can feel from my hands.").

> **Defendants' Response.** The statement in Paragraph 482 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe II to Defendants. John Doe II testified that he did not recognize any of the Indonesian soldiers who allegedly assaulted him. SOF ¶ 122.

483.   **The soldiers detained John Doe II for 51 days.**  PX26, John Doe II Dep. 153:4-7 ("Q. And how long were you held initially? A. So the first detention was by the people who were in clean military uniform where I was mostly unconscious. I was there for 51 days.").

**Defendants' Response.**  The statement in Paragraph 483 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

484.   **John Doe II heard a buzzing sound while he was detained.** PX26, John Doe II Dep. 157:21-25. Gas wells buzz. *See* Marie Cusick, Nat'l Pub. Radio, *Long After Fracking Stops, the Noise Lives On* (Oct. 14, 2014), https://www.npr.org/2014/10/14/356191305/long-after-fracking-stops-the-noise-lives-on.

**Defendants' Response.**  The statement in Paragraph 484 is immaterial.  An immaterial statement cannot create a genuine issue of material fact.  The fact that John Doe II heard "a buzzing sound," even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

485.   **John Doe II was tortured during his detention, including by electric shock on his genitals and he was also sexually assaulted**. John Doe II's hands and legs were tied for almost the entirety of his 51-day detention. PX26, John Doe II Dep. 159:8-13. He was kept in only his underwear. *Id.* at 117:20-21 ("I was laying on a bed with only my underwear and bleeding."); *id.* at 153:21-24 ("[D]uring the 51 days that you were held, you said that you were kept in your underwear; is that correct? A. Yes, correct."). The soldiers electrocuted John Doe II on his head and stomach. *Id.* at 160:16-25 ("they use these electric appliances to abuse me. I felt it on my head. And when they put it, I—I feel tremble. I became tremble. My body became tremble like that and it was very—very painful."). The soldiers burned John Doe II. *Id.* at 156:7-16 ("Q. You said you were—you were burned. Where were you burned [John Doe II]? A. So here, they burned me here. I thought after 20 years the mark would disappear, … but I can still see the marks or the scars from that burn." (court reporter's interjection omitted)).

**Defendants' Response.**  The statement in Paragraph 485 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

486.   **The soldiers forced John Doe II to perform oral sex on them and committed other acts of sexual abuse.** PX26, John Doe II Dep. 154:3-156:7 ("Q. Would you describe the various things that they did? A. So first thing, they—they treat me naked. I didn't know. And they—they did almost everything to my private organ or my vital organ. And then I lost—I think I lost my—my dignity at that time. I don't even know how to describe … They—they—they burn me and then they would—they would blow it, and then I—I was just stripped naked at that time. Q. When you say 'they,' who do you mean? Who did this? A. So the people under—under which I was—under whom I was detained, those military.")

**Defendants' Response.**  The statement in Paragraph 486 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

487.   **John Doe II was sexually assaulted.** PX26, John Doe II Dep. 154:3-156:6 (BY MR. DiCAPRIO: Q. When you say you—you lost your dignity, what did you mean by that, [John Doe II]? A. So what I meant was they treated me like they treat—they would treat a woman. So that was a real torture. I think—I think no—nobody else has had to experience that. And I'm just happy that I can—I live now, but if I have to remember about that, it was just—it is just a terrible feeling … Q. [John Doe II], when you say you were treated like a woman, do you mean that you were sexually abused? A. So it was more than that. It—it was more than—more than sexual abuse. Because I was already weak like that, but they still did that to me, I think that was very inhuman."); *id.* at 163:12-15 ("[T]hey treated me like—like women, like a woman, and then they treated me like—the way that they like to treat me."); *id.* at 167:1-168:13 ("Q. … I know this is difficult but when you say that you were treated like a woman, do you mean that

you were sexually abused? A. So, well, that was—that was the—they—they did a lot of things in that particular matter. And one of it I was asked to blow their vital parts and I just don't want to remember that anymore. I just don't. I don't have the strength to answer this question. … it's very painful. They did a lot of things. Sometimes I was put on—on the front of my body on the floor and then they abused me in that position as well.").

> **Defendants' Response.**  The statement in Paragraph 487 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

488.    **The soldiers stepped on John Doe II and "crippled" his leg and fingers.**

PX26, John Doe II Dep. 156:3-7 ("[T]hey would step on me for the torture. And then you can see my fingers have been crippled. And my—my leg as well, my leg is—what is left on my leg is just bone, the bone in the skin.").

> **Defendants' Response.**  The statement in Paragraph 488 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

489.    The soldiers would make John Doe II stick his hand into water and feel what they told him was a human head, and then they would threaten to kill him too. PX26, John Doe II Dep. 158:9-157:11 ("And then they—they ask, Where is your G-d? Why can't your G-d help you?"); *id.* at 169:12-18 ("They put me in a pond and I can hear the sound of water from that pond and then the sound of a bumble bee. And sometimes I can see, although not clearly, I can see a head come out from that pond, but I'm not sure whether it was a head, a human head or not.").

> **Defendants' Response.**  The statement in Paragraph 489 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

490.     **The torture John Doe II experienced during his initial 51-day detention made him wish he was dead.** *See* PX26, John Doe II Dep. 159:10-160:10 ("I feel that I would rather die th[a]n live another day at the time.")

> **Defendants' Response.**  The statement in Paragraph 490 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

491.     After the soldiers detained and tortured John Doe II for 51 days, they transferred him to the police, where he was held without charge for an additional three months until his family could arrange his release. PX26, John Doe II Dep. 122:22-24; *id.* at 123:18-25; *id.* at 153:7-8. The police did not want to accept John Doe II as a prisoner, but the soldiers insisted. *Id.* at 123:7-11 ("[T]he head of the police district did not want to accept [me], but the military said, We'll just leave him here."); *id.* at 153:9-14 ("[T]he head of the district police, the commander of the district police denied to—denied at that time. He didn't want to accept me at his place. But the military who brought me there force so that the police accepted me, and I was there for about three months.").

> **Defendants' Response.**  The statement in Paragraph 491 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly detained John Doe II to Defendants.

492.     **John Doe II was never charged with a crime.** PX26, John Doe II Dep. 123:16-18 ("Q. Were you charged with a crime? A. No. No. They didn't charge me with anything.").

> **Defendants' Response.**  The statement in Paragraph 492 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

493.     **John Doe II was not a member of GAM**. PX26, John Doe II Dep. 136:11-14 ("Q. Are you familiar with something called: The Free Aceh movement? A. That's other people's business, not mine.").

**Defendants' Response.** The statement in Paragraph 493 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

494. **John Doe II had run a successful construction business**. Prior to his detention, John Doe II was a construction contractor for public works projects. PX26, John Doe II Dep. 57:23-58:1 ("So I before the incident, I have small projects, small construction projects in the village. Sometimes I go 300, 400 or 600 or 1 million rupia."); *id.* at 59:11-16 ("Q. What type of construction projects did you work on before the incident? A. It's a small project in the village. I build a ditch, kennel, a small kennel. And then an irrigation or a school fence. So I got sometimes a profit for 1 million rupia."); *id.* at 60:2-13 ("I had people work for me and my job was to connect the government offices and to win the project. BY MR. ANDERSON: Q. How many times did you oversee the digging of a ditch? A. It's many times. I used—I—I once won to build a bridge, to construct a bridge. And then in the rice paddy field, I got a project for making to construct an irrigation for the rice paddy field and many others." (interpreter's interjection omitted)); *id.* at 60:22-61:1 ("[S]ometimes I got project and I won project for 200,000 millions rupia or 300,000 millions rupia, and then I subcontracted that project to my friends and I got a profit for 2 or 3 million."); *id.* at 62:18-22 ("[I]f I lose a project, then my friends would ask me to work with them as a supervisor. For example, if Heady wons the project and he would ask me to be the supervisor of that project.").

**Defendants' Response.** The statement in Paragraph 494 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Although John Doe II testified that he earned 300,000 to 3 million rupiah per construction project, he produced no documents whatsoever reflecting those earnings and provided no evidence of how many projects he worked on in any given period of time. *See* Defs.' Opening Mem. at 33; SOF ¶ 128. Plaintiffs did not produce any evidence from which John Doe II's alleged losses, including his alleged lost earnings, could be quantified. *See* SOF ¶¶ 127–28.

352

495.    **Since his detention, John Doe II can no longer win contracts or work construction.** PX26, John Doe II Dep. 55:5-16 ("Q. Are you currently working? A. I'm not able to work anymore. I'm sick. My body is sick. My eyes are sick. I have been traumati[zed]. I'm old. So I'm not able to work anymore. Q. When was the last time that you did work? A. After the incident, I'm not able to work anymore. I help my wife to—in the rice paddy field sometimes. And sometimes I take care of the children. I've been sick. My fingers is broken and my eyes are sick."); *id.* at 56:5-8 ("[B]efore the incident, I had found small projects and I was able to do, but then after the incident, I would not be—I was not able to compete with other workers."); *id.* at 58:6-9; *id.* at 59:18-60:4; *id.* at 161:21-162:7; *id.* at 164:3-166:21.

> **Defendants' Response.** The statement in Paragraph 495 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Although John Doe II testified that he earned 300,000 to 3 million rupiah per construction project, he produced no documents whatsoever reflecting those earnings and provided no evidence of how many projects he worked on in any given period of time. *See* Defs.' Opening Mem. at 33; SOF ¶ 128. Plaintiffs did not produce any evidence from which John Doe II's alleged losses, including his alleged lost earnings, could be quantified. *See* SOF ¶¶ 127–28.

496.    John Doe II has lasting physical injuries from his torture, including to his head, his vision, his leg, his joints, his fingers, and his bones, from which he had not fully recovered from as of his November 10, 2020, deposition. PX26, John Doe II Dep. 55:15-16; *id.* at 148:11-23 ("My recovery took years . . . . And my recovery was still not complete."); *id.* at 157:4-7 ("[Y]ou can see my fingers have been crippled. And my—my leg as well, my leg is—what is left on my leg is just bone, the bone in the skin."); *id.* at 156:14-16 ("I though[t] the marks would disappear after 20 years, but I can still see the marks or the scars from that burn."); *id.* at 162:2-7.

> **Defendants' Response.** The statement in Paragraph 496 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply

Mem. at 14–16; Lindsey Suppl. Decl. at 14–29.  Plaintiffs did not produce any evidence from which John Doe II's alleged losses could be quantified.  *See* SOF ¶¶ 127–28.

497.    **John Doe II and his sister spent more than 200,000 rupiah on medical care to treat John Doe II's injuries.** PX26, John Doe II Dep. 146:16-21. John Doe II and his sister had to sell land they inherited from their parents and go into debt to pay for John Doe II's medical care. *Id.* at 148:17-21 ("So my sister had to sell a piece of land. They had to sell a piece of land that we inherited from our parents. Even that is not enough. And we have to owe money from some other people as well.").

> **Defendants' Response.**  The statement in Paragraph 497 is unsupported by the record and so cannot create a genuine issue of material fact.  Plaintiffs have produced no documentation reflecting John Doe II's alleged medical expenses.  *See* SOF ¶ 127.

498.    **John Doe II has experienced significant lasting emotional trauma from his torture and sexual abuse.** PX26, John Doe II Dep. 155:16-19 ("I'm just happy that I can—I live now, but if I have to remember about that, it was just—it is just a terrible feeling."); *id.* at 162:16-22; *id.* at 163:3-21 ("I also feel—always feel alone and feel very sad. I never expected that this would happen to me … Q. When you—when you say that you always feel sad, would you describe what you mean by that, please, [John Doe II]? A. By sad, I mean, I'm—I'm—I feel sad because of the memory of that—that abuse that I experience during that time, and they treated me like—like women, like a woman, and then they treated me like—the way that they like to treat me. So I was not able to do anything. I was not able to fight back because my hands and my legs were tied at that time. And some—and they also hit me about the butt of a—the rifle, so that was very, very sad. So I feel very, very sad because of that, because of that memory."); *id.* at 167:15-20 ("I am very affected by this especially when I have this story. Even to close friend, I—I don't tell this story. So if they ask me, Were you tortured, I would just say, yes, I was tortured. So the details like this is too much to bear to tell other people.").

**Defendants' Response.** The statement in Paragraph 498 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence from which John Doe II's alleged losses could be quantified. *See* SOF ¶¶ 127–28.

499.   Exxon operated Cluster 4. *Supra* ¶¶ 281-82.

**Defendants' Response.** The statement in Paragraph 499 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly injured John Doe II were assigned by the Government of Indonesia to Cluster 4 at the time of the alleged incident or were otherwise connected to Defendants.

500.   Exxon operated Cluster 3. *Supra* ¶¶ 281-82.

**Defendants' Response.** The statement in Paragraph 500 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not show that the Indonesian soldiers who allegedly injured John Doe II were assigned by the Government of Indonesia to Cluster 3 at the time of the alleged incident or were otherwise connected to Defendants.

### J.   John Doe IV

501.   John Doe IV was returning from an errand (he had gone with a coworker to pick up their wages from construction job) when he was stopped by an Exxon patrol within sight of

. *Infra* ¶¶502-506. The soldiers beat him, stole his money, and accused him of being a

GAM member. *Infra* ¶509. They carved GAM into his back with a knife. *Infra* ¶510. The Exxon

soldiers told him they were taking him to          , Exxon's camp for its military personnel. *Infra*

¶¶511-515. He was detained and tortured, and left in a small room where he had to urinate and

defecate in the spot where he was tied up. *Infra* ¶¶515-516.

**Defendants' Response.** The statement in Paragraph 501 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs' use of the phrases "Exxon patrol," "Exxon soldiers," and other conclusory statements cannot create a genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10. Additionally,        was not operated by EMOI. *See infra* ¶ 555. Finally, Plaintiffs' use of the phrase "its military personnel" misleadingly suggests that the sovereign Indonesian military worked for EMOI.

502.   **On the evening of July 29, 1999, John Doe IV went with a coworker to pick**

**up their wages from a construction project**. On the evening of July 29, 1999, John Doe IV

travelled with a coworker by motorcycle from his home in                    to                   . PX27,

John Doe IV Dep. 62:20-23; *id.* at 63:3-12.                    and                    are approximately six

kilometers apart, 15 to 20 minutes by motorcycle. *Id.* at 62:24-63:2; *id.* at 66:16-21. The purpose

of John Doe IV's trip to                    was to collect 1,200,000 rupiah owed him and his workers

for a construction project. *Id.* at 62:20-23; *id.* at 66:13-15. John Doe IV traveled to                   ,

collected the 1,200,000 rupiah, put it in his pocket and began the return trip home. *Id.* at 67:8-20.

> **Defendants' Response.**  The statement in Paragraph 502 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

503.   **The road between                    and                    passes by                   **. PX27,

John Doe IV Dep. 138:10-140:12 (Q. [I]f I wanted to go to                    and to markets, to shop,

we always had to pass that place."); PX389 (map showing route from                    to

       ); PX390 (same with closeup on                   )[44]; PX391, Declaration of John Doe IV at ¶ 2

("The part of                    where I was detained  about 150 to 200 meters from                   . I could

clearly see the fence surrounding                    from where I was detained.").

> **Defendants' Response.**  The statement in Paragraph 503 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

504.   **Exxon tasked its military security with patrolling the roads near Cluster 4**

**and the perimeter of the Cluster.** Exxon instructed its military security to patrol the areas,

including the public roads, around its operations. *Supra* ¶¶283-286, 289-293; PX8, EMOI

30(b)(6) (Snell) Dep. 650:14-19 ("Q. And in addition to their assignments at EMOI operations,

---

[44] Plaintiffs ask the Court to take judicial notice of these maps. *See supra* n.5.

these military guards would patrol the areas around EMOI's operations, correct? A. Some would

conduct—would probably be mobile, yes."); PX27, John Doe IV Dep. 141:13- 22 (Cluster 4

soldiers "were patrolling days and night everywhere. They would come out of the camp and then

they would patrol everywhere."); *id.* at 142:5-144:8.

> **Defendants' Response.** The statement in Paragraph 504 is unsupported by the record
> and so cannot create a genuine issue of material fact. Plaintiffs' use of the phrase "its
> military security" misleadingly suggests that the sovereign Indonesian military worked
> for EMOI. EMOI did not control the Indonesian military and accordingly did not control
> their activities. *See* SOF ¶¶ 11–12. The statement in Paragraph 504 is also immaterial to
> Defendants' motion for summary judgment. An immaterial statement cannot create a
> genuine issue of material fact. Plaintiffs' statement, even if true, in no way connects the
> Indonesian soldiers who allegedly injured John Doe IV with Defendants.

505.    **John Doe IV was familiar with the area and with the soldiers around Cluster**

**4 and A-13.** PX27, John Doe IV Dep**.** 137:20-140:12 (Q. Did you ever pass by Cluster 4? A.

Always. . . . I often pass the place"); *id.* at 142:5-143:5 (John Doe IV often saw the soldiers on

patrol, including soldiers going between A-13 and Cluster 4); *id.* at 161:20-162:12 (A-13 soldiers

guarded Cluster 4).

> **Defendants' Response.** The statement in Paragraph 505 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, in no way connects the Indonesian
> soldiers who allegedly injured John Doe IV with Defendants. John Doe IV admitted that
> he never saw the faces of the soldiers who allegedly detained and assaulted him. *See*
> SOF ¶ 131.

506.    **On his way home, John Doe IV was stopped by an Exxon patrol just outside**

.    On his way back to                  , John Doe IV was detained by approximately 12

soldiers on the road near              . PX27, John Doe IV Dep. 68:25-69:20 ("[W]e were returning

to                  , but in the middle of the road they were there . . . . On the road, they stopped us.

It was near              , near the              "). John Doe IV knew the soldiers who detained and

tortured him were Defendants' military security. *Id.* at 37:5-10 ("[W]hat I know is those soldiers

come in, and live, come out or go out from that Exxon area, they live there, their vehicles were

there within the fence of Exxon, so that means that those soldiers were the ones who guard

Exxon."). John Doe IV was stopped within sight of _____ by soldiers on patrol. PX391, Decl

of John Doe IV at ¶ 2. He was stopped at the same time of evening and in the same location that

the regularly saw the soldiers patrol. *Id*. ¶ 3. John Doe IV testified he had personally seen patrols

in the area where he was detained, near Defendants' _____ facility, "many

times." PX27, John Doe IV Dep. 142:17-22; *id.* at 142:5-23 ("You said that the soldiers, the

Exxon soldiers, would come out of the camp. Which camp are you referring to? A. From that

facility, not camp, from that facility at _____, they would come out.").

> **Defendants' Response.** The statement in Paragraph 506 is unsupported by the record
> and so cannot create a genuine issue of material fact. Plaintiffs' use of the phrases
> "Exxon soldiers," "Exxon patrol," and other conclusory statements cannot create a
> genuine issue of material fact. *See* Defs.' Reply Mem. at 7–10. John Doe IV admitted
> that he called Indonesian soldiers "Exxon soldiers" merely because he had seen other
> Indonesian soldiers—not the soldiers who assaulted and detained him, whom he did not
> recognize—stationed in an area where Exxon had operations, going in and out "from that
> Exxon area." SOF ¶ 132.

507.     The soldiers who stopped John Doe IV took off his pants, took his wallet with 1.2

million rupiah in it, and put a sack on his head. PX27, John Doe IV Dep. 68:25-69:20 ("there

were 12 soldiers, and they stopped me and covered my eyes, my head, with a sack."); *id.* at

72:20-73:3 ("they took my wallet, all of it."); *id.* at 73:2-3 ("they took off my pants")

> **Defendants' Response.** The statement in Paragraph 507 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, in no way connects the Indonesian
> soldiers who allegedly injured John Doe IV with Defendants.

508.     The soldiers who detained John Doe IV were armed and were wearing Indonesian

military uniforms. PX27, John Doe IV Dep. 70:6-15.

> **Defendants' Response.** The statement in Paragraph 508 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, suggests only that the soldiers who
> allegedly detained John Doe IV were members of the Indonesian military. It in no way
> connects the Indonesian soldiers who allegedly injured John Doe IV with Defendants.

509.     The soldiers accused John Doe IV of being a member of GAM and beat him,

eventually carving the words "GAM" into his back with knife. PX27, John Doe IV Dep. 71:19-

22; *id.* at 76:9-78:9 ("I do not know whether it was inside or outside the building, but they were

just beating us continuously, again and again, and for a long time, and they asked are you GAM?

And I said I'm not GAM, I'm just a worker from the village, and they continuously beat us.").

> **Defendants' Response.**  The statement in Paragraph 509 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, in no way connects the Indonesian
> soldiers who allegedly injured John Doe IV with Defendants.

510.     **The soldiers sat on John Doe IV's back and sliced his back and his body with**

**a bayonet, and carved "GAM" into his back.** PX27, John Doe IV Dep. 90:17-91:13 ("I was

cut in the back and in here and in here (indicating), my head, they cut all over my body . . . . So

they cut all over my back. I can show you the marks or the scars if you want. They also write

GAM on my back . . . ."); *id.* at 129:15-24 ("Q. What was used to write GAM on your back? A.

Using knives, knives at the point of the gun. THE CHECK INTERPRETER: I think it is a

bayonet. Q. So you are saying a knife was used to write GAM in your back by Exxon soldiers?

A. Yes."); PX39,           Dep. 24:23-24 (testifying that he witnessed knife slices that said

"GAM" on John Doe IV's back after John Doe IV was released).

> **Defendants' Response.**  The statement in Paragraph 510 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, in no way connects the Indonesian
> soldiers who allegedly injured John Doe IV with Defendants.

511.     **John Doe IV was put in the back of a military truck and heard to soldiers say**

**they were bringing him to          , an Exxon camp**. PX27, John Doe IV Dep. 80:16-81:4 (John

Doe IV put in the back of a military truck, a REO truck). While John Doe IV was in the back of

the truck, a soldier said they were bringing him to          . *Id.* at 81:18-19 ("I hear that they said we

bring them to            ”); *id.* at 89:18- 90:2; *id.* at 91:11-13 (“I passed out after I heard them say let's

take them to           . It is a torture place.”).[45]

> **Defendants' Response.**  The statement in Paragraph 511 is unsupported by the record
> and so cannot create a genuine issue of material fact.          is not “an Exxon camp.”
>        was neither owned nor operated by Exxon.  *See infra* ¶ 555.  Moreover, the statement
> in Paragraph 511 attributed by John Doe IV to an unidentified Indonesian soldier is
> inadmissible hearsay and so cannot create a genuine issue of material fact.  *See* Defs.'
> Reply Mem. at 13–14.  Even if the statement were admissible, it is immaterial because it
> does not in any way show that the Indonesian soldiers who allegedly injured John Doe IV
> were connected with Defendants.

512.    **A-13 was an Exxon camp**. A-13 was a barracks that housed soldiers who

guarded the Arun Project. PX27, John Doe Dep. 81:20-22 (“Q. What is A-13? A. Their

dormitory, their mess, soldiers' mess, Exxon soldiers' mess.”); *id.* at 82:9-20 (A-13 is “dormitory

for soldiers who guard Exxon.”).

> **Defendants' Response.**  The statement in Paragraph 512 is unsupported by the record
> and so cannot create a genuine issue of material fact.  A-13 is not an “Exxon camp” and
> was neither owned nor operated by Defendants.  *Infra* ¶ 555.

513.    **Exxon stationed troops at A-13.** PX97, CA0001078251 (1999 EMOI security

report listing 100 soldiers at A-13 as “            ”); PX235, CA0001134685, at '685 (“

                                                                                    …”)

> **Defendants' Response.**  The statement in Paragraph 513 is unsupported by the record
> and so cannot create a genuine issue of material fact.  Exxon did not control the sovereign
> Indonesian military and accordingly did not “station[] troops at A-13,” which was neither
> owned nor operated by Defendants.  *Infra* ¶ 555.

514.    **Exxon referred to its security as “A-13” and stationed the troops at its**

**facilities and used them to patrol the roads.** PX94, CA00010008793, at '805 (June 1999

---

[45] Defendants have not objected to the introduction of the soldiers' statement, so Plaintiffs are
under no obligation to establish its admissibility, *see* Fed. R. Civ. P. 56(c)(2), though they note it
is admissible nonhearsay as an admission of Defendants' agents, Fed. R. Evid. 801(d)(2)(D), or,
alternatively, is admissible hearsay as the declarants' then-existing state of mind, Fed. R. Evid.
803(3).

memo stating, "[

                                                  "); PX49, CA0001213388 (1999 email

discussing meeting "                                              " to coordinate on

security arrangements for EMOI's facilities); PX119, CA0001005955, at '956 (EMOI security

report listing "            " at A-13 as "            " security); PX357, CA0001329626, at '926

("

                                                  ."); PX224, CA0001179816, at '817

(memorandum to EMOI's senior executives and Mike Farmer at EMC requesting approval "


            ."); PX345, CA0001004882, at '883 (A-13 soldiers will be responsible for

access control at various locations); PX346, CA0001078250 (10 A13 soldiers on duty at main

gate); PX247, CA0001120418, at '419 (youths "                " into the mess hall during lunch

time for free meals:                                        ").

> **Defendants' Response.**  The statement in Paragraph 514 is unsupported by the record
> and so cannot create a genuine issue of material fact.  Plaintiffs' use of the phrase "its
> security" misleadingly suggests that the sovereign Indonesian military worked for EMOI.
> EMOI did not control the Indonesian military and accordingly did not "station[] the
> troops at its facilities" or control their activities.  *See* SOF ¶¶ 11–12.  A-13 also was not
> owned or operated by EMOI.  *See infra* ¶ 555.

515.            had a local reputation as "a torture place." PX27, John Doe IV Dep.

90:21-91:2 ("[T]hey brought us to          , and that place is a torture place, and people said nobody

will be safe when they are brought to          , except me, I was lucky. I thought I was dead

already."); *id.* at 96:6-8 ("        had been notorious for torturing people to death or at least half

death."); PX294, CA0001078076, at '082-83 (What Did Mobil Know? Article in Exxon files

describing villagers detained at          Camp and later killed); PX80, CA0001363125, at

'128 (Wall Street Journal article recounting story of eight men wrongfully detained at          and

361

reporting provincial factfinder's allegations that "[p]eople 'suspected of being GAM were brought and tortured' in          . . . ."). While he was held by the Exxon soldiers "in the torture place," John Doe IV's captors beat him regularly and cut him with knives. PX27, John Doe IV. Dep. 92:6-14 ("When I was still in there, in the torture place,        , I was not conscious. They cut all of my body and they tied my hands together to the side and they said hey dog, eat this food, hey dog, eat this food, and then they beat me again and then they poured water on me, they watered me, and then they beat me with the back of their weapon."); *Id.* at 144:10-22 ("Everything, all over my body was damaged. . . . Q. What caused that damage? A. On the outside of my body, they cut me using knives, but on the internal damage was caused—was caused by the beatings."); PX39,          Dep. 11:14-20 (testifying that when John Doe IV was released, the knife slices on his back were "too many to count"). John Doe IV's captors beat John Doe IV with the butts of their rifles, their fists, and their feet. PX27, John Doe IV Dep. 144:23-145:11 ("Q. What type of beatings did you suffer? A. So I don't even know how to describe this. They hit me with the butt, with the butt of rifles. They would use their feet. They would use their fist. And they would do—the way they would hit me the way that they like it and I was not able to fight against them. All I was able to do was to let them do it. Q. When you say 'they' and 'them,' who are you referring to? A. Beaten by the soldiers.").

> **Defendants' Response.**  The statement in Paragraph 515 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe IV with Defendants.          was neither owned nor operated by Defendants.  *See infra* ¶ 555.  Moreover, Plaintiffs' use of the phrase "Exxon soldiers" cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.

516.    **John Doe IV was kept tied up and had to urinate and defecate in that spot.**

John Doe IV was kept tied up on a concrete floor. PX27, John Doe IV Dep. 150:3-14 ("Q. Did you sleep on a bed during that period of time before being taken to the police station? A. No, it

was on a concrete floor, all on the ground, it was very hard."); *id.* at 152:3-17 ("Q. Were you restrained during that period? A. Yes, I was tied."). John Doe IV's captors gave him food once or twice a day, but John Doe IV did not have the strength to eat it. *Id.* at 93:20-22 ("[T]hey only said there that hey, dog, eat this, but I couldn't eat."); *id.* at 151:15-24. John Doe IV was not given a bathroom to use, so he had to urinate and defecate on himself on the same spot of concrete ground he tied up on. *Id.* at 93:6-9; *id.* at 93:24-25 ("I was urinate and poop there, I urinate myself there and poop there.").

> **Defendants' Response.** The statement in Paragraph 516 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe IV to Defendants.

517.    John Doe IV was not a member of GAM, nor did he support GAM. PX27, John Doe IV Dep. 108:18-109:11.

> **Defendants' Response.** The statement in Paragraph 517 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

518.    **Eventually, John Doe IV was transferred to a police station and released.** John Doe IV was detained for 23 days before being transferred to a police station. PX27, John Doe IV Dep. 97:17-21 (testifying he was detained 24 days total); *id.* at 99:9-14 (testifying he was released the morning after being transferred to the police station).

> **Defendants' Response.** The statement in Paragraph 518 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe IV to Defendants.

519.    **Exxon operated Cluster 4**. *Supra* ¶¶ 281-82; *see also e.g.*, PX108, Defs.' Responses to Jan 2016 Requests for Admission No. 21 (admitting EMOI operated Cluster IV); PX107, CA0001007902, at '952 (describing Cluster 4).

**Defendants' Response.**  The statement in Paragraph 519 is immaterial to Defendants'
motion for summary judgment.  An immaterial statement cannot create a genuine issue of
material fact.  Plaintiffs' statement, even if true, does not show that the Indonesian
soldiers who allegedly injured John Doe IV were assigned by the Government of
Indonesia to Cluster 4 at the time of the incident or were otherwise connected to
Defendants.

520.    **John Doe IV is seeking material and immaterial damages.** John Doe IV

suffered lasting injuries. When John Doe IV was finally released, he was unable to walk, sit, or

stand. PX27, John Doe IV Dep. 146:5-23; PX39,            Dep. 13:15-18 (explaining that after

John Doe IV was released. "he was unable to lie down, and he was also—it was also difficult for

him to sit down, and he almost could not do anything . . . ."). He was weak and in substantial

pain, and displayed internal and external injuries. PX27, John Doe IV Dep. 92:9-20; *id.* at

147:18-24; PX39,            Dep. 11:5-9-12:7-20 (describing witnessing injuries on John Doe IV

shortly after his return, including "slices on his back, many slices," "the mark of the boots where

he was kicked and spat on", "[bruises] [a]s big as your palm" on his chest and stomach, and

"bruises on the face."); *id.* at 13:4-19 ("He was under a lot of pain, and even when he was

talking, his voice was trembling, and we cannot even look at it, we just feel very sad about it. . . .

he said that he was feeling the pain inside his body, and then he was feeling the pain on his back,

and he was unable to lie down, and he was also—it was also difficult for him to sit down, and he

almost could not do anything, and he was just crying at that time."); *id.* at 24:19-25:3; *id.* at 25:8-

12 ("What I saw at that time when he returned home, he looked very skinny. Q. Had he been

skinny before? A. No, he was very healthy before and he was with a lot of muscles.").

John Doe IV did not fully regain his ability to walk for more than two years after he was

released. PX27, John Doe IV Dep. 148:10-15. John Doe IV has experienced problems with his

sexual functioning since his release, and experienced both rectal and urinary bleeding. *Id.* at

155:20-156:4 ("If I can tell you honestly, that thing of mine is no longer working either. Q. What

thing are you referring to that is no longer working? A. So that thing that I mean was my private part, my genital, is no longer ….”); *id.* at 147:18-24 (“when I urinated, sometimes it was bleeding, and also when I defecated, sometimes it would bleed as well.”)

Prior to his 1999 detention, John Doe IV ran a successful construction business. *Id.* at 130:19-22 (“I was the head of the workers, because usually I win a project, I won a project, and then I asked my workers to work with me.”); *id.* at 116:3-8 (testifying his business would earn $2 million to $5 million rupiah per project); PX39,          Dep. 15:18-17:4 (testifying that before his 1999 detention, John Doe IV ran a successful business: “it was very easy for him to find jobs”). Prior to his 1999 detention, John Doe IV made enough money to feed his family, send his children to school, and buy land. PX27, John Doe IV Dep. 130:23-132:12; PX39,          Dep. 18:3-19:5 (“[B]efore he was very comfortable and it was very easy for him to earn money to support his family.”).

After his detention, John Doe IV was unable to work. PX27, John Doe IV Dep. 132:13-25 (“Q. Why were you ill and no longer able to work? A. Because I was beaten. Everything inside me was damaged.”); PX39,          Dep. 19:9-23 (“He was physically and mentally collapsed, destroyed, at that time, so that's why he was no longer able to work.”); *id.* at 22:14-17 (“[H]e is no longer able to work and now he lives with his child, and his child is the one who provide for him and for the family.”). After his detention, John Doe IV could no longer afford his children’s school tuition. PX27, John Doe IV Dep. 134:8-12; PX39,          Dep. 20:16-22 (testifying John Doe IV’s children “had to stop going to school” after John Doe IV’s detention). After his detention, John Doe IV’s wife and children have had to do farm work and wash laundry to pay for John Doe IV’s medical treatment and support their family. PX27, John Doe IV Dep. 54:12-14; *id.* at 134:17-135:5; *id.* at 135:9-18; PX39, PX39,          Dep. 20:4-13. The trauma

of the assault continues to impact John Doe IV. PX27, John Doe IV Dep. 154:25-155:2; *id.* at 158:6-13; *id.* at 158:24-159:10.

> **Defendants' Response.** The statement in Paragraph 520 is immaterial. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' statement does not support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence from which John Doe IV's alleged losses could be quantified, including alleged medical expenses and lost earnings. *See* Defs.' Opening Mem. at 33; SOF ¶ 136.

### K. John Doe VII

521. **John Doe VII and an eyewitness,          , were visiting a neighbor during a religious festival.** *Infra* ¶ 522. As they were leaving, were called over to      , a facility operated by Exxon, by soldiers on guard duty at the fence. *Infra* ¶ 523. The guards took the men to a warehouse on the site and beat them severely overnight, causing lasting damage. *Infra* ¶¶ 524-26, 533. Both men thought they were going to die. *Infra* ¶ 532. Both men recognized the soldiers—including several they knew by name—as soldiers who worked for Exxon. *Infra* ¶¶527-531. Both men had seen the soldiers conducting patrol and escort duties for Exxon. *Infra* ¶¶527-528. John Doe also knew identified the Unit and Commander of the soldiers who detained him. *Infra* ¶¶529, 531.          , a third witness, was present at      when the men were released. *Infra* ¶¶534, 536.          and the village chief had gone to      to seek the release of the boys and met with the Exxon soldiers, including the commander, at      to negotiate their release. *Id.* The next morning, the soldiers took the men to an Exxon clinic at          , Exxon's administrative headquarters, that was not open to the public, to clean them up for their release. *Infra* ¶535.

> **Defendants' Response.** The statement in Paragraph 521 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Moreover, the statements in the paragraph are unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs' evidence does not establish that Defendants operated      at the time John Doe VII was allegedly injured, and the clinic at          was open to the public and provided medical services to

members of the community.  *See* SOF ¶ 140; *infra* ¶ 554.  Finally, Plaintiffs' and their lay witnesses' conclusory statements that the soldiers conducted activities "for Exxon" cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.  John Doe VII himself admitted that he had no evidence linking his injuries to Defendants.  SOF ¶ 138.  And his third-party witness testified that he believed John Doe VII was assaulted by "Exxon soldiers" based on a mistaken belief that      was operated by Exxon.  *See id.* at ¶¶ 139–40.

522.   **John Doe VII visited a neighbor,          , to celebrate a religious festival**.

PX28, John Doe VII Dep. 141:25-142:23.         , a young villager was also there. PX28, John

Doe VII Dep. 142:20-143:8; PX41,         Dep. 13:4-19.         's house was across an alley

from A1, approximately 15 meters from the A1 fence. PX28, John Doe VII Dep. 143:15-17;

PX41,         Dep. 10:6-17 ("Q. And where is         's house? A. So her house was right next

to A1. Not in front of A1, but right next to A1. Next to [her] house, there is—there was a little

ally, a little street, and then A1.").

> **Defendants' Response.**  The statement in Paragraph 522 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

523.   **As John Doe VII and         were leaving         's house, soldiers on**

**guard duty at         called the men over to the fence**. PX28, John Doe VII Dep. 127:21-24 ("So,

at that time, when I was going out from         house, I was caught by Exxon soldier. And he

asked or they asked my IDs, and I gave my IDs."); *id.* at 168:9-13 ("[W]hen we were [outside

's house], I was called over by the soldiers, um, at a post, and then I approached them.

And then when I came there, um, they asked for my identification . . . ."); PX41,         Dep.

13:23-14:19 ("So after we sat there for a while, and then we were on hour way to go back home,

and then when we got in front of the place, in front of     , they called—they called us, and they

were pointing the guns at us. And we were asked to return. Q. And when you say they, who is

they? A. The TNI that guarded Exxon, the one who were residing, who were at     .").

**Defendants' Response.**  The statement in Paragraph 523 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  Plaintiffs' use of the phrase "Exxon soldier" and other conclusory statements cannot create a genuine issue of material fact.  *See* Defs.' Reply Mem. at 7–10.  There is nothing in Paragraph 523 that in any way connects the Indonesian soldiers who allegedly injured John Doe VII to Defendants.

524.   **The soldiers dragged John Doe VII and            to a warehouse within   .**

After checking their IDs, the soldiers at        dragged John Doe VII and            to the fence

surrounding      , retrieved a key to a warehouse within      , and then dragged John Doe VII and

into the warehouse. PX28, John Doe VII Dep. 127:32-128:12; *id.* at 141:12-18

("[T]hey asked my ID, and I gave my ID. And after that, um, I was being kicked, um, again and

again, and then I was being dragged to the warehouse. And then they took the key off the

warehouse and opened it, and I was dragged into the warehouse."); *id.* at 144:19-144:23 ("And

suddenly I was being taken, and I was being dragged to the office of      and then they took the

key. They open, um, um, the warehouse, and I was being dragged into that warehouse."); *id.* at

168:12-169:5; PX41,            Dep. 14:17-22 ("[W]e returned and this asked for our IDs, to

check our IDs. And I was still a student at that time. And when—after that, we—we were

dragged inside. We were beaten and dragged inside to the warehouse.").

**Defendants' Response.**  The statement in Paragraph 524 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact Moreover, Plaintiffs' evidence does not establish that Defendants operated      at the time John Doe VII was allegedly injured.  *See supra* ¶¶ 138–140. There is nothing in Paragraph 524 that in any way connects the Indonesian soldiers who allegedly injured John Doe VII to Defendants.

525.   **Inside the warehouse, the soldiers turned on loud music**. The soldiers played

loud music while beating John Doe VII and            to drown out their cries. PX28, John Doe

VII Dep. 175:21-176:5 ("Q. Did the soldiers turn on loud music while they were beating you? A.

Yes, they did. Yes. They turn the music on very loudly because mostly I was crying at that

time."); PX41,            Dep. 14:25-15:4 ("[W]hen we got to the warehouse, and then they

started beating. And it was a very severe beating, and the music—they played the music

loudly."); PX40,                Dep. 13:3-5 ("I was there and then I heard the music being

played there from the building …."); *id.* at 22:10-18 ("Q. Was the music coming from inside of

or outside of     ? A. So I was walking on the road and this is—this is the building where they

were at the military, the soldiers, and where they keep them, where they kept them, and I heard

the music from there." (counsel's objection omitted)); *id.* at 31:20-32:20; PX40,

Dep. 22:10-23:4 (heard music that sounded like "gadoom [phonetic], gadoom, gadoom, gadoom"

from     ).

> **Defendants' Response.**  The statement in Paragraph 525 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian soldiers who allegedly injured John Doe VII to Defendants.

526.    **The men were savagely beaten**. PX28, John Doe VII Dep. 150:7-10 ("Q. How

long did your beating take place? A. Um, half day. I was [beaten] until the afternoon."); *id.* at

169:6-17 ("When they brought you inside the building, what happened next? A. When I got

inside, I was beaten. I was tied. I was beaten."); *id.* at 176:8-9 ("They took turns to beat me, and

then after—one after the other."). The soldiers beat John Doe VII with their hands, feet, and

boots, the butts of their rifles, a hammer, a radio, and wooden planks. *Id.* at 170:18-21 ("[T]hey

beat me using, um, the rifle, the guns, and then, um, with, um, hammer, and then also the butt of

the rifle . . . ."); PX41,            Dep. 17:10-18:19 ("[T]hey beat us with their feet, with their

hand, and, also, using their radio and the sole of their boots at that time. . . . they put plywood on

my chest and they kick on the plywood. Q. And did that hurt? A. Yes, it was very painful, and I

got my—one of my rib displaced."); PX41,            Dep. 17:10-23 (testifying the soldiers beat

them with a "big" and "heavy" handy talky radio); *id.* at 18:16-19 ("[W]e just thought, at that

time, it was just the end, that's it ... I thought I was going to die.").

John Doe VII was beaten on the head, leading to severe injury, including to his jaw, his

teeth and his skull. PX28, John Doe VII Dep. 171:25-172:4 (testifying he was mostly beaten "on

the head" and on his chest); *id.* at 174:8-19 (testifying he received injuries to "all parts" of his

head); *id.* at 174:20-23 (testifying his jaw "almost fell off"); *id.* at 175:9-11 ("I got hit on my

teeth as well, and now I had to use a denture . . . ."); *id.* at 176:10-17 (testifying that, 20 years

later, he still feels "very terrible" pain in his head from the beating).

> **Defendants' Response.** The statement in Paragraph 526 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Plaintiffs' statement, even if true, does not in any way connect the
> Indonesian soldiers who allegedly injured John Doe VII to Defendants.

527. **The men knew the soldiers who beat them as soldiers who regularly provided**

**security services for Exxon**. John Doe VII recognized approximately 10 of the soldiers who

beat him as soldiers who he had regularly seen guarding EMOI's employees and operations.

PX28, John Doe VII Dep. 169:18-170:8 ("Q. Of those 20 soldiers, how many had you seen

before? A. Before the incident, I think I had seen about 10 of them. Q. And what were those 10

soldiers doing when you saw them before? A. They would come into the village every morning.

They were guarding employees of Exxon, going to the [points], the places where they work,

some of them in the field, some of them in the [Reo] trucks and some of them on the—on the

road, guarding on the road, and the post in front of my grandmother's village.").

> **Defendants' Response.** The statement in Paragraph 527 is unsupported by the record
> and so cannot create a genuine issue of material fact. John Doe VII's and his third-party
> witness's belief that the Indonesian soldiers whom they claimed to recognize "guard[ed]
> EMOI's employees and operations" was based on their mistaken belief that EMOI owned
> A1. *See* SOF ¶¶ 139–40. John Doe VII additionally provided no evidence of when he
> allegedly saw the Indonesian soldiers whom he claimed to recognize "guarding EMOI's
> employees and operations."

528. Both John Doe VII and                knew some of the soldiers who beat them by

name and knew they worked providing security for Exxon. Both John Doe VII and the third

Public Redacted Copy

party eyewitness were able to identify specific soldiers —- Angiss, Rusli, Mulyadi and Razali—

by name, and identify those soldiers as soldiers they observed working for Exxon, conducting

patrols, on guard duty, and escorting Exxon staff. *See* PX125, Pl. John Doe VII's 2016 Suppl.

Resp. to Exxon Mobil Corp.'s First Set of Interrogs., at 8 (identifying Rusli, Angih and Mulyadi:

"



"); PX28, John

Doe VII Dep. 147:15-19 (Mul, Rusli and Angiss "guard Exxon, and they provided security for

Exxon"); PX41,           Dep. 15:22-16:17. John Doe VII identified Muliyadi, "[a] soldier[]

who guard Exxon," as one of the soldiers present. PX28, John Doe VII Dep. 138:22-23; *id.* at

147:15-19. John Doe VII also identified another soldier, named Rusli, as a soldier who detained

and tortured him, and testified that he had seen Rusli guarding EMOI's employees and

operations. *Id.* at 126:15-17 ("[T]he name of the one who beat me was Rusli…."); *id.* at 135:18-

136:15 ("Prior to the incident, had you ever met Rusli? A. I have."); *Id.* at 136:2-24 (describing

Rusli's duties as guarding Exxon workers on Exxon Road in front of Cluster 3); *id.* at 148:23-25

("Q. How many times did Rusli kick or punch you? A. Many times."). Defendants did not

dispute that a soldier named Rusli "was among the Military Security Personnel." PX108, Def.'s

Resps. & Objs. to Pl's Jan. 2016 Reqs. for Admis. to All Defs.', No. 114 (responding Defendants

"                                              ").           identified one of the soldiers who beat

him as Razali, "a soldier that was for Exxon as well, and he is a guard there" who

would see on patrol and at Cluster 3. PX41,           Dep. 15:22-16:17.           had seen

Razali guarding EMOI's operations. *Id.* at 15:24-16:17 ("Q. Can you tell me who Razali is? A.

Razali is a soldier that was for Exxon as well, and he is a guard there. And he was always in and

out of Exxon, and he was also involved in patrolling in the neighboring villages as well. Q. And

did you see him doing those things? A. Yes, yes, and—and all—I think all—all of the villagers

also saw it. Q. Was Razali Acehnese? A. Yes, he was. Q. Did you ever see Razali at Cluster 3?

A. Yes, they were—they were patrolling—they were always patrolling there, in and out.").

> **Defendants' Response.** The statement in Paragraph 528 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. There is no evidence, and John Doe VII does not claim, that the Indonesian
> soldiers who allegedly injured John Doe VII were assigned to provide security for
> EMOI's operations at the time of the alleged incident.

529.    **John Doe VII knew the unit number of the soldiers**. **John Doe VII identified**

**the soldiers as members of Units 111 and 113**. PX28, John Doe VII Dep. 50:14-21 ("Q. Do

you know what military unit of the Indonesian Army these soldiers were from? A. A mix of 111,

and one, um—a mix of 111 and 113. Q. And how do you know that? A. From the car and the

uniform, there was 111 and 113."). *See also supra* ¶¶ 238-239.

> **Defendants' Response.** The statement in Paragraph 529 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. There is no evidence that Indonesian soldiers in Units 111 and 113 were
> ever stationed at A1—which, in any event, EMOI did not own. SOF ¶ 140. Neither
> Plaintiffs' statement, nor identifying Indonesian soldiers as members of Units 111 or 113,
> connects those soldiers to Defendants. See Defs.' Reply Mem. at 9–10.

530.    **Exxon engaged units 111 and 113**. In 2000, Units 111 and 113 provided outer

ring security for Exxon. *Supra* ¶ 301; *see also, e.g.*, PX83, CA0001334077 (email from EMC

security adviser Michel Laureys discussing meeting with representative from Unit 113 regarding

deployments of Units 111 and 113); PX82, CA0001334075 (email from Laureys reporting "


").

> **Defendants' Response.** The statement in Paragraph 530 is unsupported by the record
> and so cannot create a genuine issue of material fact. Plaintiffs' use of the term
> "engaged" misleadingly suggests that the sovereign Indonesian military worked for
> EMOI. Additionally, there is no evidence that Indonesian soldiers in Units 111 and 113
> were ever stationed at A1. *See* Defs.' Reply Mem. at 9–10.

531.    **John Doe VII knew the soldiers' commander**. John Doe VII also knew the

commander of the soldiers at A1, Anggis. PX28, John Doe VII Dep. 129:20-130:15 ("Q. Do you

know who Rusli's commander was? A. Anggis. Q. How do you know that? A. When he go to the

village and villagers are—in the community call him Mr. Anggis.") John Doe VII had seen

Anggis guarding EMOI's employees and operations. *Id.* at 140:17-141:2 ("[D]id you have any

specific information about Anggis and his rank or troop assignment? A. Um, their assignment

was to guard Exxon, to guard Exxon's employee who work, um, they start in the morning. Some

of them guard the Exxon employee with the, um, military trucks, the [Reo] truck, and some of

them were on the road."); *id.* at 147:8-19 ("Q. Other than your observation that certain military

troops provided security for Exxon Mobil Oil Indonesia operated facility, do you have any other

evidence that would suggest any control by Exxon Mobil Oil Indonesia? A. Other evidence were

Anggis. Anggis worked there. Mul also worked there, and Rusli also worked there. They

guard—they guard Exxon, and they provided security for Exxon."). Internal Exxon documents

indicate a soldier named Anngit was a unit 113 commander at this time. PX118, CA0001173763,

at '764 (listing Lt. Anngit Exton as an "                                      " officer);

PX86, CA0001182942, at '943 (request for services signed by Anngit Exton stamped as

"            " of "                    ")

> **Defendants' Response.**  The statement in Paragraph 531 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.  John Doe VII's identification of the commander of the Indonesian soldiers
> who allegedly injured him, even if accurate, does not in any way show that he or the
> Indonesian soldiers were assigned by the Indonesian government to guard EMOI
> operations at the time of the alleged incident, or otherwise connect them to Defendants.
> Moreover, John Doe VII's conclusory statements cannot create a genuine issue of
> material fact.  *See* Defs.' Reply Mem. at 7–10.

532.    **The men thought they were going to die**. PX41,            Dep. 14:25-15:19

("all I was thinking was I just have to surrender myself, to surrender myself to God and say the

prayers. And there was no hope for you to get away when you are in that situation, and because there were a lot of them, there were a lot of soldiers. Q. Did you think you were going to die? A. So, yes, so I just thought, at that time, I'm gone, I'm gone.").

> **Defendants' Response.** The statement in Paragraph 532 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

533.    **John Doe VII and          were held overnight at       .** PX28, John Doe VII Dep. 155:6-157:18 (testifying he was released to the village chief the next morning); PX41,

Dep. 19:4-12 ("Q. How long were you kept in the warehouse of    ? A. So that, it starts at 10:00 a.m. in the morning, and then to the morning of the next day. So the next morning, we were—we were released. Q. Were you held overnight? A. Yes. Yes, we spent overnight there.")

> **Defendants' Response.** The statement in Paragraph 533 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' evidence does not establish that Defendants operated    at the time John Doe VII was allegedly injured. *See supra* ¶¶ 138–140. Plaintiffs' statement, even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe VII to Defendants.

534.              **'s mother got a group of villager and village chief to seek the return of the men by protesting at the       gate.** PX40,                  Dep. 24:10-30:22 ("all villagers came to that place, and then at about 3:00 our village chief returned and we went to see the commander."). The village chief negotiated the release of the men with the       commander. *Id.* at 25:15-19 ("we sat there and then the village chief went to speak to the commander"); *id.* at 28:11-16 ("[t]hey were just kids. They are just innocent. And then               guaranteed that they were innocent, so that was the situation at that time."); *id.* at 28:25-29:5 ("they already admitted that our boys were there and they asked us to come back the day after.").

> **Defendants' Response.** The statement in Paragraph 534 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Plaintiffs' evidence does not establish that Defendants operated    at the time John Doe VII was allegedly injured. *See supra* ¶¶ 138–140. Plaintiffs' statement,

374

even if true, does not in any way connect the Indonesian soldiers who allegedly injured John Doe VII to Defendants.

535.    The soldiers took both John Doe VII and          to an Exxon clinic inside

Exxon's Administrative Headquarters, which was not open to the public. The next morning,

the soldiers took John Doe VII and           to Defendants' clinic at          for medical

treatment, but they did not allow the doctor to take a scan of John Doe VII's head. PX28, John

Doe VII Dep. 153:6-25; *id.* at 155:12-14 ("My head was swollen at the time. The doctor asked

for a scan, but the soldiers did not allow it."); PX41,          Dep. 19:21-20:6 ("Q. And what

happened the next morning? A. So the next morning, they—they clean us, and then they—

they—they wipe—they wiped the blood from—from us. And they cleaned the clothes, we

changed the clothes. And they gave us some food at that time, but it—we were not able to eat

anymore at that time. And then they took us to a clinic at          .").

The clinic at          was "just for Exxon employees" and was not open to the general

public. *Id.* at 20:7-12 ("Q. Was the clinic at          open to the villagers or only to Exxon? A.

Just for Exxon employees. For the employees of Exxon." (counsel's objection omitted)). PX108,

Def.'s Resps. & Objs. to Pl's Jan. 2016 Reqs. for Admis. to All Defs.', No. 39 ("

. . . .").

**Defendants' Response.**  The statement in Paragraph 535 is unsupported by the record and so cannot create a genuine issue of material fact.  Plaintiffs' evidence does not establish that Defendants operated        at the time John Doe VII was allegedly injured, and the clinic at          was open to the public and provided medical care to members of the community.  *See supra* ¶¶ 138–140; *infra* ¶ 554.

536.    **Both John Doe VII and          were released the next morning.** PX40,

Dep. 29:6-31:2 ("Q. And did you return back to      ? A. Yes, to    , to the military

post. Q. And what happened when you returned back to      that next morning at 7 a.m.? A. So

when we got there and the village chief was also there, and then the village chief came also, and

they both have been taken to the clinic and they have been brought back, they have received

under medical attention, and I saw them that their face, their faces were swollen, it is very big, it

became very big, and then there were wounds all over their heads.").

> **Defendants' Response.**  The statement in Paragraph 536 is immaterial to Defendants'
> motion for summary judgment.  An immaterial statement cannot create a genuine issue of
> material fact.

537.   **Exxon operated A1, housing soldiers and storing equipment in the**

**warehouses there**. All three eyewitnesses identified A1 as a location long utilized by Exxon.

PX41,          Dep. 11:8-12:21 ("Q. And was Exxon using A1, in 1999, to 2001? A. Yes, yes,

Exxon was there at that time. Q. Was there a sign at A1 that said it belonged to Exxon? A. Yes,

yes, …"); PX40,               Dep. 47:12-20 ("Q. And how else did you know that Exxon was

located at A1? A. So how is it possible for me to not know this? Because I grew up here. I was

born here and I knew from the beginning when since it was Mobil, built by Bechtel, and then A1,

and then handed over to Exxon."); PX28, John Doe VII Dep. 121:25-122:25 (A1 is "a location of

Exxon's fields" containing offices and housing for soldiers who guard Exxon).

and his mother were lifelong residents of the community. PX41,          Dep.

9:8-12; PX40,               Dep. 47:12-20. John Doe VII had lived there as a child. PX40,

Dep. 7:17-20; *id.* at 58:17-23. They were therefore familiar with the location and

its operations. *Id.* at 47:12-20 ("Q. And how else did you know that Exxon was located at A1? A.

So how is it possible for me to not know this? Because I grew up here. I was born here and I

knew from the beginning when since it was Mobil, built by Bechtel, and then A1, and then

handed over to Exxon."); PX28, John Doe VII Dep. 121:25-122:5 ("Q. Do you have any

knowledge, personal knowledge, about what type of location A1 is? A. It's a location of Exxon's

fields."); *id.* at 123:21-124:3 ("Q. And when you say 'the office of soldiers,' what do you mean

Public Redacted Copy

by that? A. A place that—a place where the soldiers live, um, the soldiers who guard Exxon, they live there.").

Exxon documents corroborate that A1 was a location operated and managed by Exxon in the heart of the Arun project area, near Cluster 3 and Point A. PX214, CA0001005148, at '152 (map depicting "          " across Pipeline Road from Cluster 3 and down the road from Point A); *See also* PX89, CA0001147209, at '209 ("                    " included on a March 16, 2000 list of property Mobil manages); PX121, CA0001184161, at '163 (An EMOI payment request from 2000 further reveals that Defendants paid for vehicle fuel, service, and maintenance in support of "                                        .").

Defendants do not deny that their military security personnel were present at A1 March 2000.  PX108, Def.'s Resps. & Objs. to Pl's Jan. 2016 Reqs. for Admis. to All Defs.', No. 114 (responding Defendants "                                      " that "

                                          "); *id.* at No. 121 (responding Defendants "

                              " that "

                  "); *id.* at No. 123 (responding Defendants "

        " that "                                                      ").

John Doe VII had seen the other soldiers who were at A1 guarding EMOI's employees and operations, including escorting Exxon employees and convoys. PX28, John Doe VII Dep. 146:4-12 ("Q. Do you have any evidence or any facts that would establish that Exxon Mobil Oil Indonesia owned the facility you thought to as A1? A. I do. Evidence was those soldiers guard Exxon's employee in the morning at 8:00. They guard some, um, Exxon's employee and took them to Seuringke, Seurike."); *id.* at 146:23-147:7 ("What I know now is those soldiers guard Exxon's employee. Every morning at 8:00 they call and take Exxon's employees to Seurike, and

the soldiers were 111—were from 111 and 113 units, and some of the employees were taken to

Seurike by rail truck or military truck, and some by a common car, and some of the soldiers,

guards, are—were on duty on the road.").

> **Defendants' Response.** The statement in Paragraph 537 is unsupported by the record and so cannot create a genuine issue of material fact. Plaintiffs' evidence does not establish that Defendants operated A1 at the time John Doe VII was allegedly injured. *See supra* ¶¶ 138–140. Plaintiffs' and their lay witnesses' conclusory statements also cannot create a genuine issue of material fact. Further, Plaintiffs' use of the phrase "their military security personnel" misleadingly suggests that the sovereign Indonesian military worked for EMOI.

538.    **John Doe VII was not a member of GAM.** PX28, John Doe VII Dep. 116:7-

117:13. Exxon's military security accused John Doe VII of being a member of GAM when he

was taken to the warehouse. *Id.* at 118:12-23; PX41,         Dep. 38:4-10.

> **Defendants' Response.** The statement in Paragraph 538 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

539.    **John Doe VII had grown up in the area and had returned to take care of**

**grandmother, who was ill.** John Doe VII was John Doe VII was born in a local village and

lived there with his grandmother until he was 9 years old. PX28, John Doe VII Dep. 92:6-18.

John Doe VII's grandmother's house was approximately 50 meters from Cluster 3. *Id.* at 95:17-

24. John Doe VII had returned to the village to care for his ailing grandmother. *Id.* at 166:25-

167:3 ("I went back to the village because I wanted to take care of my grandmother because she

was sick….").

> **Defendants' Response.** The statement in Paragraph 539 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

540.    **John Doe VII reported his detention and torture to the legal aid office**. PX28,

John Doe VII Dep. 158:25-159:7 ("Q. Did you ever file a complaint with anyone about Rusli and

his assault on you? A. I did—um, to the legal office aid. CHECK INTERPRETER: Legal aid

office."). After John Doe VII reported his detention and torture, the soldiers came looking for him, so he had to flee his grandmother's village. *Id.* at 177:16-178:8 ("So, after I reported this to LBH, the Legal Aid office, I was not able to stay in my village anymore …. my grandmother said that you can no—you can longer live in this village. You have to go. You're being sought or—the military or the soldiers are trying to find you.").

> **Defendants' Response.** The statement in Paragraph 540 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

541.  **John Doe suffered severe injuries and seeks moral damages**. John Doe VII sustained severe physical injuries from his torture, including injuries to his head, jaw, face, and teeth from the beating. PX28, John Doe VII Dep. 25:25-26:8; *id.* at 171:25-172:11; *id.* at 174:3-175:20 ("A. So my lip—my lip, this lip, I can flip it here. I could flip it here on those days, and I thought it was no—it was not going to speak again to where it was before.… Can you tell me what happened to your jaw? A. So, my jaw—my jaw was off, would—almost fell off at that time. And my lip, everything was, um, I had injured—I think I had injured everything at that time. My lip, as I said before, I couldn't—I was able to flip it here, and I thought it was not coming back. Q. Did anything happen to your teeth? A. Yes. Q. What happened to your teeth? A. Yes. My—yes. I got hit on my teeth as well, and now I had to use a denture on—on this as I am showing you. Q. And then, you said something about the rice falling. Did you say the rice fell through the bottom of your mouth when you ate? A. So, when—when you eat rice, you would usually use the sides of the mouth here. And then the rice would fall off here, would fall to this area, to the lower part of your mouth."); PX40,                     Dep. 30:23-31:10 ("[A]nd I saw them that their face, their faces were swollen, it is very big, it became very big, and then there were wounds all over their heads."); *id.* at 33:18-22 ("[T]hey were bleeding, and            had a

379

crack on his head as a result of the beating, so his head was cracked, and the same thing

happened to [John Doe VII]").

As of his November 12, 2020, deposition, John Doe VII had not fully recovered from his

injuries. PX28, John Doe VII Dep. 25:25-26:8; *id.* at 176:10-17 ("Q. Do you still suffer any of

the after effects of the beating? A. Yes. I still feel it. And then I still feel it here. Very painful on

my head. A very terrible headache. And then, also, when I speak—when I speak a lot, um, I

would feel, um, the pain as well if I speak for a long time.").

> **Defendants' Response.** The statement in Paragraph 541 is immaterial. An immaterial
> statement cannot create a genuine issue of material fact. Plaintiffs' statement does not
> support a quantification of loss, as required under Indonesian law. *See* Defs.' Reply
> Mem. at 14–16; Lindsey Suppl. Decl. at 14–29. Plaintiffs did not produce any evidence
> from which John Doe VII's alleged losses could be quantified. *See* SOF ¶ 144.

## III.   PLAINTFFS' ACCESS TO JUSTICE

542.   **The civil conflict in Aceh prevented Plaintiffs from seeking relief sooner than**

**they did.** Aceh was in a period of civil conflict from early 1999 until 2004, which was only

briefly interrupted by two short cease fires. PX3, Robinson Decl. 6. During the 1999-2001

period, the Indonesian government tried, with some success, to restrict human rights groups',

foreign media's, and other outsiders' access to Aceh. PX44, Robinson Dep. 126:7-18.

> **Defendants' Response.** The statement in Paragraph 542 is immaterial to Defendants'
> motion for summary judgment. An immaterial statement cannot create a genuine issue of
> material fact. Equitable tolling for "extraordinary circumstances" is not available under
> D.C. law, and the timing of counsel's contact with plaintiffs is not an "extraordinary
> circumstance" even in jurisdictions where such tolling is recognized. *See* Defs.' Reply
> Mem. at 19–20.

543.   **Originating counsel's 2001 trip to Aceh presented Plaintiffs with their first**

**opportunity to litigate their claims in 2001.** Originating counsel first travelled to Aceh in 2001

after a group of student activists in Banda Aceh requested he investigate human rights issues

connected to the Arun Field. PX126, Decl. of T. Collingsworth ¶ 2. Prior to originating counsel's

Public Redacted Copy

trip to Aceh in 2001, none of the Plaintiffs had access to an American attorney. *Id.* at ¶ 4 ("As far as I am aware, I was the first U.S. lawyer to make the trip."); *id.* at ¶ 8 ("I asked each of them if they had spoken to any other lawyer or investigator about what happened to them and every family said no one had ever come there. Most of the folks were illiterate. They were very poor and did not have any electronic means to be in contact with the world. They were mostly simple farmers living in a very rural area with very little knowledge of what was going on in the world. I was the first white person and first foreigner any of them had met. To me, the visit was like going back in time and seeing the way things were before modern gadgets."). Originating counsel was stopped at eight military checkpoints while travelling from Banda Aceh to North Aceh and heard "intense gunfire" during the journey. *Id.* at ¶ 5. Plaintiffs had no access to any telecommunication technology, including phone or internet. *Id.* at ¶ 3 ("None of the people in had access to phone service of any kind (I never met anyone during my 2001 stay in Aceh who had a cell phone)"); *id.* at ¶ 8 ("They were very poor and did not have any electronic means to be in contact with the world.").

> **Defendants' Response.** The statement in Paragraph 543 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact. Equitable tolling for "extraordinary circumstances" is not available under D.C. law, and the timing of counsel's contact with plaintiffs is not an "extraordinary circumstance" even in jurisdictions where such tolling is recognized. *See* Defs.' Reply Mem. at 19–20.

544.     Bringing this action in Indonesia would have been "futile" and would have posed a "serious risk" to Plaintiffs' safety. Dkt. 103 at 15.

> **Defendants' Response.** The statement in Paragraph 544 is immaterial to Defendants' motion for summary judgment. An immaterial statement cannot create a genuine issue of material fact.

## IV.   DEFENDANTS' INDONESIAN LAW EXPERT

545.    Defendants hired Professor Timothy Lindsey and Professor Simon Butt to produce a report expressing their opinions on matters of Indonesian law. PX42, Lindsey Dep. 43:17-44:3; *id.* at 44:16-19; *id.* at 45:20-22. Defendants paid Professor Timothy Lindsey $500 AUD per hour for this work and for attending his deposition. May 20, 2021, Rept. of T. Lindsey, ¶ 7; PX42, Lindsey Dep. 56:13-19. Defendants also retained Professor Simon Butt as a consulting expert, who assisted Professor Lindsey with his May 21 report, and paid him an undisclosed amount. PX42, Lindsey Dep. 44:20-25; *id* at 56:24-57:6: *id.* at 64:25-65:3.

> **Defendants' Response.**  The statement in Paragraph 545 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

546.    In their 2018 book, *Indonesian Law*, Professors Lindsey and Butt wrote that under Indonesian law, "[t]he amount of immaterial damages awarded is a matter for the presiding judges, although it is, of course, open for the plaintiff to suggest an amount and put forward arguments to support it":

> The sum of damages is calculated by the court at the hearing and stated in the judgment in two parts: "intangible" or "immaterial" losses (pain and suffering) and "tangible" or "material" losses (other damages). "Immaterial damages" are compensation for intangible personal injuries, including stress- related illnesses or conditions that are directly attributable to the wrongful act. They are largely discretionary, depending on the severity of the damage. Whether immaterial damages are available in relatively minor cases is somewhat unclear under Indonesian law but they are certainly available in serious cases. The Supreme Court has specified that these include death, serious injury, and offence
> ….
> The amount of immaterial damages awarded is a matter for the presiding judges, although it is, of course, open to the plaintiff to suggest an amount and put forward arguments to support it. The general yardstick appears to be "appropriateness in the circumstances".

PX265, Simon Butt & Tim Lindsey, Indonesian Law 310 (2018) (footnotes omitted). At his deposition, Professor Lindsey recommended *Indonesian Law* as a "

**Public Redacted Copy**

" and testified that he stood by what he wrote in it. PX42, Lindsey Dep. 19:16-20:21.

> **Defendants' Response.**  The statement in Paragraph 546 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.  The quoted passage refers to the calculation of damages by courts in Indonesia.  It is unrelated to plaintiffs' obligation to present evidence of quantifiable loss as an essential element of their substantive claims.  *See* Defs.' Opening Mem. at 30–34; Defs.' Reply Mem. at 14–16; Lindsey Suppl. Decl. ¶ at 14–29.

547.     At his deposition, Professor Lindsey testified that "

" whom Professor Lindsey has cited in his own work. PX42, Lindsey

Dep. 51:22-25.

> **Defendants' Response.**  The statement in Paragraph 547 is immaterial to Defendants' motion for summary judgment.  An immaterial statement cannot create a genuine issue of material fact.

## DEFENDANTS' ADDITIONAL MATERIAL FACTS NOT IN GENUINE DISPUTE

548.     During the relevant time period, the Indonesian military operated extensively

throughout Aceh, including in areas far removed from the gas plant owned by the Indonesian

government and operated by EMOI in North Aceh.  [Robinson Dep. at 103:11–21, Ex. 126 ("

.").]

549.     Pursuant to the PSC, and at the behest of Pertamina, Defendants provided limited

supplies and monetary support to the security personnel assigned to protect EMOI-operated

facilities.  [CA0001003149 at -151, Ex. 21 ("

.").]  EMOI recovered any

costs it incurred to provide such "          " under the PSC.  [*Id.* at -150 ("

.").]

550.     There is no evidence that there were ever more than 63 Indonesian security

personnel assigned to "Point A" at any time during the relevant time period.  [CA0001333932,

Ex. 127 (listing 59 soldiers and 4 police at Point A).]

551.     Plaintiffs point to six documents, PX 75 and PX 82–86, to support their claim that Indonesian soldiers from "Unit 113" (or "Battalion 113," which Plaintiffs seem to believe, without explanation, is the same thing) were stationed at "Point A."  None of the documents support this proposition.  PX 75 is a series of news clippings describing a situation in which local villagers sought refuge *inside* of Point A *from* "                                    " who had posts near, but not inside, Point A.  [PX 75 at -448–49 (Villagers "

       " "

                                                                                    .").]  Neither PX 82 nor PX 83 contains any mention of Point A or any other Exxon-operated facility.  PX 84 is an opinion piece, published in the *Aceh Times* in November 2000, written by a representative of Kontras, an Indonesian human rights organization, claiming to list the locations, numbers, and units of soldiers "within sites controlled by Exxon Mobil Oil."  [PX 84 at -009.]  The only Indonesian military unit it lists in relation to Point A is "ARHANUD (Air Defence Artillery Detachment)." [*Id*. at -010.]  PX 85 and PX 86 both appear to be supply requests, at least half of which are in a language other than English.  PX 85 makes no mention of Exxon, Mobil, MOI, or EMOI, let alone Point A.  The two pages of PX 86 appear to be unrelated to one another,[46] and the page that is in English does not mention either Unit 113 or Battalion 113.  [PX 86 at -942.]

552.     Certain Plaintiffs claimed to have used the term "Exxon soldiers" prior to the merger between Exxon and Mobil on November 30, 1999, when only Mobil was present in Indonesia.  [*See, e.g.* John Doe IV Dep. at 162:23–163:3, Ex. 128 ("**Q.** Did you refer to the soldiers who were stationed near Cluster 4 and A-13 as Exxon soldiers even before July of 1999?

---

[46]   The page of PX 86 that is written in English does not appear to be a translation of the page of PX 86 that is written in Indonesian.

385

**Public Redacted Copy**

. . .  **A.** Yes, all of them.").]  Exxon and Mobil merged on November 30, 1999.  [Decl. of B. Fitzpatrick (Dec. 18, 2001) ¶ 2, Ex. 96.]  It was not until June 15, 2000 that Mobil Oil Indonesia changed its name to include "Exxon."  [*Id.* ¶ 14.]

553.    Plaintiffs' own expert historian admitted that there may have been thousands more Indonesian security personnel in the region during the relevant time period than he estimated in his report.  [Robinson Dep. at 113:19–114:19, Ex. 126 ("

."); *id*. at 110:21–112:2

("

.").]

554.    The clinic at Point A also treated civilians that did not work for EMOI.  [*See, e.g.*, CA0001126432, Ex. 129 ("



.").]

555.    A-13 was neither owned nor operated by EMOI.  [Farmer Dep. at 175:13–22, Ex. 130 ("



."); Johnson Dep. at 182:2–4, Ex. 131 ("

.").]

556.    Jane Doe II did not testify that she had previously seen the soldiers who shot her husband at Cluster 4; she testified that she believed the only soldiers in the region were "Exxon soldiers."  [Jane Doe II Dep. at 37:24–38:7, Ex. 132 ("**Q.** Yes. What evidence do you have that Exxon is responsible for having your husband shot?  **A.** So the Exxon soldiers were the clusters of Exxon.  There were no other soldiers.  When I passed the street, there were the soldiers. There were no other soldiers except the Exxon.").]

557.              claimed to have seen Indonesian military trucks on the road the day Jane Doe II's husband was shot and killed, but he did not testify that the Indonesian soldiers who allegedly killed Jane Doe II's husband were in those trucks.  [              Dep. at 15:13–16:16,

Ex. 133 ("**Q.** I want to take you back, again, to the date of December 4th, 2000.  You testified

that you saw the trucks leaving in the morning.  Did you see the trucks, again, later? . . .  **A.** Yes,

so after we had coffee and we saw the trucks . . . .  And then after I went to my home, I did went

out, once again, to go check my rice field.  And then when I got back, I saw the trucks were

coming—were coming back from the south direction, from                    . . . . **Q.** When you came

back to the rice field, did you go back to your house?  **A.** Yes, we were -- I went back to my

house, directly, from my rice field."); *id.* at 60:8–10 ("**Q.** You didn't see who fired those shots,

did you?  **A.** Yes, I did not."); *id.* at 60:17–19 ("**Q.** But you didn't see          being shot,

correct?  **A.** That is correct.").]

        558.    Jane Doe III said nothing about                 claiming to have witnessed an "attack"

on her husband.  She testified that              told her that people allegedly associated with

"Exxon" took her husband away but did not explain why he believed those people to be

associated with Exxon.  [Jane Doe III Dep. at 50:23–51:2, Ex. 134 ("**Q.** And what did

tell you when you saw him that day?  **A.**          said that her husband has been taken by

Exxon's people.").]

        559.    Jane Doe V testified that John Doe I cried the whole night after he was brought

home [Jane Doe V Dep. at 64:11–14, Ex. 135], and that it was only once he was able to speak,

after some time had passed, that he made the statements relied on by Plaintiffs.  [*Id.* at 64:15–

19.]

        560.    Plaintiffs' description of whom they claim injured John Doe I has changed several

times.  [*Compare* Compl. ¶ 48, ECF No. 3 (alleging that John Doe I "was accosted by soldiers

who were assigned to Exxon Mobil's TNI Unit 113") *with* Second Am. Compl. ¶ 176, ECF No.

465 (alleging that John Doe I "was accosted by ExxonMobil's security personnel") *with* Pl. Jane

Doe V's Supp. Resp. to ExxonMobil Oil Corp.'s 1st Set of Interrogs. (July 28, 2007) at 3, Ex.

136 (claiming John Doe I was

          ) *with* Jane Doe V Dep. at 64:15–19, Ex. 135 (claiming John Doe I "was taken by soldiers

working at point A").]

          561.          testified that he recognized only approximately six of the 50 to 100

Indonesian soldiers present in the rice paddy when Jane Doe IV's husband was allegedly shot

and killed. [          Dep. at 9:25–10:6, Ex. 137 ("**Q.**          , did you recognize any of the soldiers

who were there that day?  **A.** Yes.  Yes, I do.  About six of them, I know them."); *id.* at 62:21–

63:6 ("**Q.** How many soldiers did you see in the rice field?  **A.** I could -- I couldn't count many

of them.  **Q.** More than 10?  **A.** More -- more than 10.  **Q.** More than 50?  **A.** More than 50.  **Q.**

More than a hundred?  **A.** I -- I do not know whether it was more than 100.").]          testified

that he recognized only five to ten of the Indonesian soldiers, who were 150 meters away when

his father was shot, and that the shooting went on continuously for an hour. [          Dep. at

10:4–6, Ex. 138 ("**Q.** How many of the soldiers did you recognize?  **A.** It's about 5 to 10."); *id.* at

59:5–16 ("**Q.** You're saying that more than 5 to 10 soldiers ran into the rice paddy field, right?

**A.** That is correct.  There were many soldiers who ran into the rice field, sir, but that I could --

that I could see was that 5 to 10 soldiers who were passing next to my house.  **Q.** And then many

more also ran into the rice paddy field, who didn't pass [b]y your house, correct?  **A.** That's

correct."); *id.* at 57:12–15  ("**Q.** You testified that the soldiers were shooting their guns for about

an hour on December 4th, is that correct?  **A.** That is correct."); *id.* at 50:13–15 ("**Q.** Your father

was a hundred meters away from you, correct?  **A.** That is correct."); *id.* at 61:17–23 ("**Q.** Did

the soldiers bring your father closer to you or farther away from you?  **A.** Farther away.  **Q.** It

was 50 meters farther away, correct?  **A.** That is correct.").]

562.          testified that on the day Jane Doe IV's husband was allegedly shot and

killed, another person was also shot and killed by Indonesian soldiers in the same rice paddy, but

the body was not recovered until three days later.  [          Dep. at 85:11–20, Ex. 137 ("**Q.** Was

       the only one who was killed in the rice paddy field on December 4th of 2000?  **A.** There

was another person, two of them, so          and that other person.  Even that other person was

found three days after that.  **Q.** By that you mean his body was not discovered until three days

later?  **A.** Yes. The body was not discovered until three days later, about three days later, because

the body was covered with the mud.").]

563.    Jane Doe IV and          did not identify any specific Indonesian military

vehicles.  [Jane Doe IV Dep. at 93:5–14, Ex. 139 ("**Q.** And were they all similar-looking military

trucks?  **A.** Yes, military trucks, tank and motorcycles.  **Q.** And they were all similar looking that

you recognized them as Indonesian military equipment? . . . **A.** Yes, they were similar."); 

Dep. at 74:21–75:5, Ex. 137 ("**Q.** Did you identify anything unique or distinctive about any of

the 15 trucks to distinguish them from all of the other military trucks transporting Indonesia

military troops throughout Aceh? . . . [**A.**] I—I was not able to distinguish them.  What I know is

they were real trucks, military trucks and soldiers trucks and Panzer trucks, or a tank.").]

564.                testified that Sukirman was under "the direct command" of the

superintendent, Jim, who worked for an Indonesian company.  [                Dep. at 15:3–16,

Ex. 140 ("**Q.** Do you remember the name of the person you reported it to?  **A.** So I reported, at

that time, to a person called Sukirman, and he was under the direct command of the

superintendent.  And the superintendent's name was Jim.  I don't remember which Jim, but what

I knew was he was from Canada.  **Q.** And did Jim work for Exxon?  **A.** So Jim was the boss of

our rig.  The rig called ODE and it was subcontracted to Indonesian contractor, by the company

named Daya Turangga.  And I worked for -- I worked at that rig.").]  When                    was

asked for whom Sukirman worked, he testified that he believed Sukirman worked for Exxon

because his badge said Exxon.  [*Id.* at 15:22–16:3 ("**Q.** And do you remember what [Sukirman's]

job title was?  **A.** I don't remember the job title.  What I saw was the [badge] of -- the [badge] of

Exxon.  So I recognize that he was from Exxon.").]  But                    also testified that while he

himself did not work for Exxon, he was given a badge by Exxon security that included the name

"Exxon" because he worked for a subcontractor of Exxon.  [*Id.* at 19:17–20:6 ("**Q.** Mr.            ,

did you have a badge that you wore when you worked at Exxon? . . . **A.** Yes, I—I had bat on—

badge on.  **Q.** Can you describe the badge?  **A.** Okay. So we were—although we were not

directly working for Exxon, we worked for a company who subcontract from Exxon, but our

badge was—our badges were issued by Exxon security.  So there was Exxon name on the

badge.").]

**Public Redacted Copy**

Washington, D.C.
October 13, 2021

Respectfully submitted,

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren Janghorbani (admitted *pro hac vice*)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
N1.4B.388
Spring, TX 77389
Telephone: (832) 624-6336

Justin Anderson (Bar No. 1030572)
janderson@paulweiss.com
Mitchell Webber (Bar No. 1024005)
mwebber@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300

*Attorneys for Defendants Exxon Mobil Corporation
and ExxonMobil Oil Indonesia Inc.*