**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**JOHN DOE I,** *et al.,*

    *Plaintiffs,*

**v.**

**EXXON MOBIL CORPORATION,** *et al.,*

    *Defendants.*

Case No. 1:01-cv-1357-RCL
*UNDER SEAL*

*u n seal
Ref 8/2/22*

## MEMORANDUM OPINION

### TABLE OF CONTENTS

I. INTRODUCTION .................................................................................. 2

II. BACKGROUND ................................................................................. 4

    A. Factual Background ...................................................................... 4

        1. The Acehnese Conflict ........................................................... 4

        2. The Arun Field Natural Gas Facilities And The Indonesian Military's Security Role ...................................................................... 5

        3. Locations And Roles Of Indonesian Military Assigned To Arun Field ... 10

    B. Procedural History ...................................................................... 13

III. LEGAL STANDARDS ...................................................................... 14

IV. DISCUSSION .................................................................................. 14

    A. Timeliness ................................................................................ 15

        1. The Applicable Statute of Limitations ....................................... 15

        2. Relation Back ...................................................................... 18

        3. Equitable Tolling .................................................................. 20

    B. Causation ................................................................................. 24

        1. Standard for Determining Foreign Law ...................................... 25

        2. Direct Liability for Negligence under Articles 1365 and 1366 .......... 26

        3. Indirect Liability Claims under Article 1367 ................................ 29

        4. Applying These Causation Standards To Plaintiffs' Claims .............. 33

            (i) Jane Doe I ..................................................................... 33

            (ii) Jane Doe II .................................................................... 37

            (iii) Jane Doe III ................................................................... 42

        (iv)    Jane Doe IV ...............................................................................45

        (v)    Jane Doe V................................................................................47

        (vi)    Jane Doe VI ..............................................................................53

        (vii)   Jane Doe VII .............................................................................55

        (viii) Jane Doe VIII............................................................................60

        (ix)    John Doe II ...............................................................................63

        (x)    John Doe IV ..............................................................................66

        (xi)    John Doe VII.............................................................................68

  C.  EMC's Liability For Plaintiffs' Injuries................................................................72

      1.   EMC's Vicarious Liability Under Article 1367.........................................72

      2.   EMC's Direct Liability For Its Own Negligence......................................75

  D.  Quantifiable Loss .................................................................................................76

      1.   Indonesian Law Permits Recovery For Immaterial Losses ......................77

      2.   Plaintiffs Have Provided Sufficient Evidence Of Cognizable Losses ......79

  E.  Due Process.........................................................................................................80

      1.   Due Process Right To Cross-Examine Witnesses.....................................81

      2.   Defendants' Opportunity To Respond To Plaintiffs' Claims ...................83

V. CONCLUSION ..............................................................................................................85

## I.   INTRODUCTION

Plaintiffs—eleven villagers from Aceh, Indonesia—allege that between 1999 and 2003,
they (or their deceased next of kin) were the victims of human rights violations committed by the
Indonesian military. Plaintiffs aim to hold defendants Exxon Mobil Corporation ("Exxon Mobil"
or "EMC") and its subsidiary Exxon Mobil Oil Indonesia ("EMOI") responsible for the abuses
inflicted by Indonesian soldiers providing security for defendants' natural gas operations.

The case comes before the Court with an extensive procedural history. The parties have
litigated motions to dismiss, motions for summary judgment, motions for judgment on the
pleadings, contentious discovery disputes, and appeals to both the D.C. Circuit and Supreme Court.
The record in this case is now closed. Plaintiffs' remaining claims, which are the focus of this
opinion, are governed by Indonesian law and can be separated into two categories. In the first,

plaintiffs aim to hold defendants directly liable for their negligence in hiring, retaining, or supervising the members of the Indonesian military providing security at defendants' operations. In the second, plaintiffs aim to hold defendants vicariously liable for the intentional torts—like assault, battery, and unlawful detention—committed by these same soldiers.

Defendants move for summary judgment on all claims. Defs.' Mot., ECF No. 819; Defs.' Mem. in Support of Mot. for Summary J. ("Defs.' Mem."), ECF Nos. 818-1, 819.[1] First, they contend that there is insufficient proof linking the soldiers who engaged in wrongdoing to defendants and their activities. Defs.' Mem. 13–29. Thus, defendants argue, plaintiffs cannot prove causation. *Id.* at 30–34. Next, defendants allege that plaintiffs' claims fail because plaintiffs have provided insufficient evidence of "quantifiable loss." *Id.* at 30–34. Third, defendants state that even if the claims against EMOI may proceed, EMC is too far removed from the events to be held liable. *Id.* at 34–38. Fourth, defendants characterize these proceedings as a violation of their due process rights warranting dismissal. *Id.* at 39–43. Finally, defendants assert that several of plaintiffs' claims are barred by the applicable statute of limitations. *Id.* at 43–45. Plaintiffs oppose. Pls.' Opp'n, ECF Nos. 826, 828. They concede a handful of the claims at issue, but otherwise reject defendants' arguments. Defendants filed a reply in support of their motion for summary judgment. Defs.' Reply, ECF Nos. 830-1, 832.

Upon consideration of the parties' filings, applicable law—including the prior decisions in this case, and the record as a whole, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motion for summary judgment. A handful of plaintiffs' claims are time-barred. But

---

[1] Several of the filings in this case have been designated as highly sensitive documents ("HSD"). HSD is not filed on the electronic docket, even under seal, so hard copies were provided to the Court. Thus, in several instances, there are multiple versions of the same documents with different levels of redactions. The Court will cite to the HSD (unredacted) versions of the parties' filings but provides the ECF numbers for the sealed and public redacted versions of the parties' briefing here.

with only limited exceptions, defendants' remaining arguments—about causation, quantifiable loss, EMC's liability, and due process—are entirely meritless.

## II.   BACKGROUND

### A. Factual Background

#### 1. The Acehnese Conflict

The facts of this case took place during a brutal civil war between a militant group seeking Aceh's independence and the central Indonesian government. Periods of conflict between groups seeking Aceh's independence and the central government existed since the 1950s—with major resurgences of the independence movement taking place in 1976 and 1989. *See generally* Defs.' Statement of Material Facts Not in Genuine Dispute ("SOF") ¶¶ 22–27; Pls.' Counterstatement of Material Facts ("CSMF") ¶¶ 22–27.[2]

In 1989, the independence movement resurfaced, led by a militant group known as Gerakan Aceh Merdeka, or GAM. SOF ¶ 25. By the mid-1990s, GAM and Indonesian forces were engaged in a civil war in the Aceh region. *Id.* Then, in 1998, the President of Indonesia resigned, and there was a pause in the violence that lasted approximately seven or eight months. SOF ¶ 26. This peace was short lived. By early 1999—when the events in this case began to take place—hostilities had resumed. SOF ¶ 27.

Thousands of civilians were killed or injured during this conflict. *See, e.g.*, CSMF ¶ 25; SOF ¶ 25. There is no dispute among the parties that, among other abuses, the Indonesian military executed villagers to deter them from supporting GAM, engaged in "routine" torture, and would

---

[2] The record in this case is extensive. To shorthand the number of citations to the record, the Court will cite the parties' statements of undisputed facts, and incorporate the sources cited therein, where there is no dispute that the record supports the proposition at issue. Where the parties dispute aspects of the record or what it reflects, the Court will also cite the record by the parties' exhibit number (Plaintiffs' Exhibit ("PX") or Defendants' Exhibit ("DX")).

punish entire villages for GAM attacks. SOF ¶ 29; *see* PX-36, Human Rights Watch 2001 Report at 15, 18. GAM also committed human rights abuses. *See* CSMF ¶ 29.

While defendants suggest that their knowledge of the Indonesian military's human rights record is immaterial to the issues raised in their present motion,[3] plaintiffs present evidence that defendants were aware of the Indonesian military's conduct. For example, in 1998, the editor of Business Week's Singapore Bureau investigated and wrote a story about atrocities committed by the Indonesian military in the early 1990s. *See, e.g.*, CSMF ¶¶ 176–80; RCSMF ¶¶ 176–80. These human rights abuses occurred near defendants' operations and purportedly involved defendants' equipment. *See, e.g.*, CSMF ¶¶ 176–80; RCSMF ¶¶ 176–80. Contemporaneous State Department reports warned of wrongdoing by the military during the time period relevant to this case—several of these reports were even produced from EMC's records during discovery. *See* CSMF ¶ 182; PX-206; PX-208. And defendants' executives have acknowledged their awareness of the military's human rights abuses. CSMF ¶ 183; *see, e.g.*, PX-18, Neil W. Duffin Dep. ("Duffin Dep.") 45:12–46:20, 191:7–12; PX-210 (risk assessment sent to executives describing recent detentions, killings, and torture by Indonesian military operating in Aceh).[4]

## 2. The Arun Field Natural Gas Facilities And The Indonesian Military's Security Role

In 1971, Mobil Oil Indonesia, Inc. ("MOI") discovered gas reserves in North Aceh, Indonesia. SOF ¶ 1. The government of Indonesia and MOI worked together to develop extraction facilities, which later became known as Arun Field. *Id.* ¶ 2. From the 1970s until 2015, MOI—

---

[3] *See, e.g.*, Defendants' Response to Plaintiffs' Counterstatement of Material Facts ("RCSMF") ¶ 183 ("The fact that executives at EMC or EMOI may have been aware of historical abuses by the Indonesian military, even if true, in no way connects Plaintiffs' alleged injuries to Defendants.").

[4] These facts are material to the extent that plaintiffs must provide sufficient evidence of defendants' fault. *See infra* Sec.IV.B.

and later EMOI (the Court will refer to these entities collectively as "EMOI")[5]—operated the Arun

Field as a contractor for Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"),

a 100% Indonesian state-owned entity.   SOF ¶ 3, CSMF ¶ 3. There is no dispute that Arun Field

and the connected remote locations where defendants operated with Pertamina were profitable,

even while operating in the middle of war-torn Aceh. *See, e.g.*, CSMF ¶ 185; PX-65 at

CA0001174655; PX-211, Defs.' 2008 Statement of Material Facts ¶ 20 (reflecting $295 million

in earnings from these operations in 1998, and $500 million in earnings by 2000).   Since October

4, 1998, the relationship between EMOI and Pertamina was governed by a production sharing

contract (or "PSC").  SOF ¶ 4.

The parties present drastically different characterizations of the record about defendants'

relationship with the Indonesian military.  Defendants (repeatedly) state that "EMOI had no legal

authority to exercise command or control over the sovereign military of the Government of

Indonesian including over the Indonesian soldiers assigned to guard Arun Field." Defs.' Mem. 15.

Under the PSC's terms, EMOI did not own the natural resources, facilities, or many of the

equipment pieces associated with Arun Field—Pertamina did.    SOF ¶ 6; *see* DX-5 at

CA0001186134 (hereinafter, the "PSC") ¶¶ 5.3(f), 9.1. The PSC also stated that Pertamina "shall

have and be responsible for the management of the operations contemplated hereunder." SOF ¶ 7;

CSMF ¶ 7; DX-5, PSC ¶ 1.1.  Finally, the Constitution of Indonesia requires the Indonesian

government to secure and protect the country's natural resources, including through use of the

military. SOF ¶ 8; CSMF ¶ 8; DX-11, May 20, 2021 Decl. of Timothy Lindsey ("May 20 Lindsey

Decl.") 55–56 & n.24.  Defendants contend—but plaintiffs dispute—that Arun Field was

---

[5] MOI is EMOI's predecessor in interest. *See* SOF ¶ 3; RCSMF ¶ 552 (explaining that "Exxon and Mobil merged on November 30, 1999" and that in June 2000 MOI changed its name to EMOI).

designated a Vital National Object by the Commander in Chief of the Armed Forces and thus the military was required to safeguard the facilities. *See* SOF ¶¶ 9–10; CSMF ¶¶ 9–10.

But the PSC also requires Pertamina to "assist and expedite [EMOI's] execution of" gas extraction and production "by providing . . . *security protection . . . as may be requested by [EMOI]*." DX-5, PSC ¶ 5.3(c) (emphasis added). Plaintiffs contend that, notwithstanding the terms in the PSC and the Indonesian government's sovereignty, defendants *in fact* exercised control over the military providing security at Arun Field facilities.[6]

Up through 1999, security at Arun Field was provided by a combination of MOI's private security guards and members of the Indonesian military and police. *See* CSMF ¶ 199. Indonesian soldiers that provided security for Arun Field were stationed at the A-13 encampment near, and inbetween, MOI's headquarters at "Point A" and MOI's facilities at "Bachelor Camp," where workers were housed and ate meals. *See, e.g.*, CSMF ¶ 199; PX-214 at CA0001005152; PX-18, Duffin Dep. 230:8–14.

But as mentioned previously, in 1999, the conflict in Aceh resumed with renewed intensity. DX-2, Expert Report of Professor Geoffrey Robinson ("Robinson Report.") 6. Defendants' facilities, equipment, and even personnel were sometimes caught up in the region's violence. *See, e.g.*, SOF ¶¶ 30–33; CSMF ¶¶ 30–33 (acknowledging the violence that took place); DX-10, Michael Farmer Dep. ("Farmer Dep.") 301:10–303:20; DX-2, Robinson Report 14. Moreover, the main Arun Field sources began to deplete, so MOI began to expand drilling operations into

---

[6] Judge Oberdorfer previously rejected the same characterizations that defendants make in their present motion for summary judgment. Judge Oberdorfer explained that a reasonable finder of fact could conclude (1) "that the security forces were EMOI's servants and acted within the scope of their employment when committing the alleged torts" and (2) that EMOI was negligent in hiring, retaining, and supervising its military security forces. *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 28–30 (D.D.C. 2008). While the Court need not cover these issues again, the factual discussion below is probative of the connection between the soldiers who harmed plaintiffs and defendants—which is the focus of defendants' motion.

7

"remote" locations to meet its contractual obligations. *See, e.g.*, PX-18, Duffin Dep. 78:10–22. These locations were close to other facilities operated by defendants. CSMF ¶ 187.

In August 1999, MOI's president, Ron Wilson, met the military in Aceh and was informed that the military "would not put more troops at [MOI's] facilities unless [MOI] asked for them." PX-53 (email from Ron Wilson). While Wilson initially declined additional military security, *id.*, in December 1999, he reversed course, CSMF ¶ 202. Jim Russell, an EMOI executive, sent a memorandum to EMOI's senior executives and Mike Farmer, an EMC executive, requesting "approval . . . to deploy A-13 soldiers to help augment existing [Northern Sumatra Business Unit] security at all our facilities including producing clusters." PX-224 at CA0001179817. The memorandum "recognize[d] that there are significant issues and risks in utilizing the military in [EMOI's] own facilities" but Russell concluded that "the current situation in our area leaves us little choice." *Id.* Russell also requested that EMC's Global Security group provide dedicated personnel to improve security because EMOI's management team lacked the time or skills required. *Id.*

Wilson responded that there was no "need to ask for [Farmer]'s approval to put soldiers at the clusters" because Wilson had "talked to [Farmer] last week and [Wilson] also obtained [EMC executive] Lance[ Johnson's] approval." PX-165 at CA0001179798; *see* CSMF ¶ 203. But Wilson noted that "Pertamina asked [them] to consider other options" and MOI's regional security manager "Tommy [Chong] has reservations on using the a13." *Id.* Nevertheless, after consultation with EMC, EMOI requested additional troops. CSMF ¶ 206. By December 1999, the number of military guards engaged at Arun Field facilities operated by EMOI doubled to 200, as reflected by a communication from Chong to Wilson describing "the deployment logistics of the new military resources." PX-54 at CA0001047716. Soldiers were tasked with escorting

employees, guarding the gates, providing access control, conducting patrols, and standing by at A-13 for emergency purposes. *Id.* at CA0001047716–17; *see* PX-18, Duffin Dep. 224:12–25; CSMF ¶¶ 207–09.

From that point forward, the record reflects not only steady increases in the Indonesian military's responsibility for Arun Field security, but also defendants' greater involvement and influence in the military's security operations. By December 1999, EMOI management informed military commanders that, contrary to the military's understanding, the soldiers would no longer "back up [EMOI's] Security function" but instead "replac[e] [EMOI's] own Security function." PX-49 at CA0001213388. Military personnel assigned to EMOI's operations and facilities in Arun Field were "dedicated exclusively" to providing security for these operations. PX-73 at CA0001003151; *see* PX-65 at CA0001174659 ("There are a number of military personnel that are stationed in the immediate area of our operations. They are essentially dedicated to the protection of our people and assets. They do not perform a broader role with respect to military activities within the region."). Defendants' management held regular meetings with the military, and EMOI management indicated that it would "work out a small incentive program to motivate [the military's] continuous performance." PX-245 at CA0001334816 (email from Tommy Chong to Jim Russell); *see, e.g.*, PX-6, Connor Dep. 40:7–17, PX-14, Farmer Dep. 128:17–129:3. Defendants paid the military and soldiers directly for their services. *See, e.g.*, CSMF ¶¶ 216–221 (collecting record cites); PX-46, Ling Dep. 137:20–138:22; PX-73 at CA0001003150, PX 268–77.

As the number of soldiers assigned to defendants' operations continued to increase, defendants' use of private security guards decreased. Several times during the year 2000, defendants requested additional troops for their operations. *See, e.g.*, PX-240 at CA0001046569

9

(requesting "[a]dditional security personnel over and above the current A 13 detachment" that would be "under the direction of the A 13 commander for maximum efficiency"). By late 2000, approximately 1000 soldiers were assigned to defendants' operations. *See, e.g.*, PX-317 at CA0001333839 ("We now have 1000 troops, with approximately 70 percent inside the wire and 30 percent in the jungle, where they moved only after we built them accommodations."); PX-314 at CA0001005970.01–971 (indicating 962 military security forces). Meanwhile, in December 2000, EMOI had less than 100 of its own security officers and less than 30 local police providing security at defendants' operating locations. *See* PX-314 at CA0001005970.01–'974; *see also* PX-14, Michael Farmer Dep. 254:16–20 ("[I]t was the feeling of EMOI that having hundreds and hundreds of private security guards that were simply standing there behind military security was redundant and expensive and unnecessary."). By February 2001, reports provided to defendants indicated that there were "5,500 troops currently deployed to Aceh, of which 1,000 are detailed to EMOI [North Sumatra Organization] (or 20 percent)." PX-328 at CA0001006166.

### 3. Locations And Roles Of Indonesian Military Assigned To Arun Field

With this timeline in mind, the Court will provide a non-exhaustive overview of (1) the locations where defendants operated, (2) where military members providing security for defendants were stationed, and (3) the military's security roles related to Arun Field and defendants' operations.

A reasonable jury could find that defendants built, managed, or otherwise retained some level of responsibility for the following facilities in Arun Field:

- Four "work clusters," called Clusters 1, 2, 3, and 4, where defendants' drilling wells were concentrated. *See* CSMF ¶ 281 (citing defendants' admissions); PX-18, Duffin Dep. 16:16–17:8; PX-54 at CA0001047716–17.

- "Point A," a centralized facility that included management offices, maintenance operations, and an airfield. *See* PX-18, Duffin Dep. 17:19–18:3; PX-106, Deposition Notes Produced

10

by Defs., EMOI 30(b)(6) (Snell) Dep. Ex. at 1; PX-107 at CA0001007937; PX-54 at CA0001047716–17.

- Approximately 18 gas injection and observation wells scattered throughout the area. *See* PX-334 at CA0001005773.

- A number of support facilities, including Camp A-1 (or A1) and Bachelor Camp. *See, e.g.,* PX-89 at CA0001147209; PX-18, Duffin Dep. 18:15–23; PX-36,          Dep. 18:5– 19:16 (testifying that "Exxon" operated the landing dock in A1); PX-41,          Dep. 11:2–12:22 ("A. The first drilling well for oil was at A1. Q. And who was drilling for oil at that time, the first well? A. The first one was PBI, and then Mobil, and then Exxon."); PX-121, PX-336 (reflecting payments by defendants for carpeting and pillows at A-1); PX-214 at CA0001005152; PX-54 at CA0001047716–17 ("Soldiers will take over from MOI security to guards to [man Bachelor Camp's] main gate."); *see also* PX-376 at CA0001005973.

Plaintiffs also contend that defendants managed and were responsible for Camp A-13, the support facility where military members providing security for Arun Field were located. *See* CSMF ¶ 281. Defendants argue that there is insufficient support in the record for this conclusion. *See* RCSMF ¶ 555. For the most part, this dispute has no bearing on plaintiffs' claims so the Court will not opine on defendants' management responsibilities. Even if defendants did not "manage" or maintain responsibility for A-13, there is adequate support for a connection between A-13 and defendants: defendants' military security personnel were housed at A-13, A-13 soldiers appear to be a primary source of defendants' military security during the relevant time period, defendants paid for repairs to A-13 facilities, defendants coordinated with the A-13 commander, and soldiers at A-13 remained stationed and available for emergencies at defendants' operating locations. *See, e.g.,* CSMF ¶¶ 303, 304 (collecting sources discussing A-13 soldiers' roles providing security); PX-336 (reflecting repairs and renovations to A-13 facilities paid for by defendants); PX-240 at CA0001046569; PX-18, Duffin Dep. 230:8–14; PX-224 at CA0001179817; PX-54 at CA0001047716–17 ("A-13 CAMP: 20 soldiers to be based at the camp for emergency purposes."); PX-365 at CA0001180191–92.

Members of the military were assigned to protect or provide security at (and near) each of these defendant-affiliated locations. *See, e.g.*, PX-73 at CA0001003149; PX-350 at CA0001334507; PX-351 at CA0001192561; PX-314 at CA0001005970.001; PX-352; PX-376 at CA0001005973. As explained below, military security personnel provided not just "point protection" at the facilities themselves, but also "area protection," which required securing the outside of the facilities. PX-353 at CA000133427.

A reasonable jury could find that units of the Indonesian military assigned to provide security for defendants' facilities, among other things, engaged in the following types of security services during the relevant period in this case:

- Providing access control and security at the front gates of defendant-operated locations. *See, e.g.*, PX-49 at CA0001213388 ("[R]einforce our expectations of the military regarding their role as taking over access control to facilities."); PX-343 at CA0001213061, PX-346; PX-97; PX-247. There, military members checked badges and packages, limited vehicle access, and removed unwelcome visitors. *See, e.g.*, PX-343 at CA0001213061 ("[T]he soldiers attached to our facilities are really helping us to tighten access control.").

- Conducting perimeter patrols. *See, e.g.*, PX-353 at CA000133427 ("I responded that we didn't want buildings guarded, we wanted patrolling and activity outside the fence that would provide area protection and not point protection.").

- Conducting patrols of the roads and routes near and leading up to defendant-operated facilities. *See, e.g.*, PX-16, Connor Dep. 64:3–9; PX-104, PX-105; PX-103 at CA0001364430; PX-8, EMOI 30(b)(6) Snell Dep. 650:14–19; CSMF ¶ 293 (collecting examples).

- Establishing security posts and checkpoints along the roads leading up to and surrounding Arun field. *See, e.g.*, PX-118 at CA0001173764; PX-86 at CA0001182942; CSMF ¶ 290 (citing examples of soldiers providing services along nearby roads).

- Providing escorts for defendants' travel, including convoys, shift changes, equipment movements, and other travel between work sites. *See, e.g.*, PX-73 at CA0001003149; PX-256 at CA0001178949–51; CSMF ¶ 291 (collecting examples).

- Conducting "sweeping" operations. *See, e.g.*, CSMF ¶¶ 292, 294; PX-256 at CA0001178947; PX-360 at CA0001078272; PX-101 at CA0001334808.

• Investigating and responding to threats and updating defendants with security-related information. CSMF ¶¶ 241, 296–98; *see* PX-73 at CA0001003149; PX-214 at CA0001005149 ("'The official security services will also employ a pursuit capability to increase the likelihood of apprehension in the event of contact with armed or criminal elements, once again adding to the deterrence.").

Defendants do not dispute these military roles but instead focus again on their purported inability to control the Indonesian military.

### B. Procedural History

Plaintiffs' initial complaint was filed in June 2001. Compl., ECF No. 3. The operative complaint, the second amended complaint, was filed on November 25, 2014. 2nd Am. Compl., ECF No. 465. The Court's prior opinions discuss other aspects of this case's factual and procedural history at length. *See, e.g.*, *Doe v. Exxon Mobil Corp.*, 391 F. Supp. 3d 76 (D.D.C. 2019); *Doe v. Exxon Mobil Corp.*, No. 01-cv-1357 (RCL), 2019 WL 2348100 (D.D.C. June 3, 2019); *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75 (D.D.C. 2014); *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16 (D.D.C. 2008); *Doe v. Exxon Mobil Corp.*, No. 01-cv-1357 (LFO), 2006 WL 1193855 (D.D.C. May 3, 2006); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005).

At this stage in the litigation, plaintiffs' remaining claims can be sorted into two categories. The first set of claims encompasses negligence-based claims—they seek to hold defendants' liable for their negligence in hiring, supervising, or retaining members of the military as their security forces. *See* 2nd Am. Compl. ¶¶ 212–235. The second set of claims encompasses intentional tort claims—like wrongful death, assault, battery, conversion, and false imprisonment. *Id.* at ¶¶ 193–211, 236–40. In these, plaintiffs seek to hold defendants vicariously liable for the intentional torts committed by soldiers acting as defendants' security forces.

13

· Defendants now move for summary judgment on all claims. *See* Defs.' Mot., Defs.' Mem. Plaintiffs filed an opposition. Pls.' Opp'n. Defendants filed a reply in support of their motion. Defs.' Reply. Defendants' motion is ripe for review.

## III.   LEGAL STANDARDS

A court may grant summary judgment only if a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion, all inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Facts are material if a "dispute over [them] might affect the outcome of a suit under governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute about a material fact is "genuine" if the nonmovant presents evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.   DISCUSSION

For the reasons set forth below, the Court will **GRANT IN PART** and **DENY IN PART** defendants' motion for summary judgment. First, the Court will grant summary judgment on a handful of claims that are untimely and barred by the applicable statute of limitations. Second, the Court will spend the lion's share of this opinion addressing defendants' arguments that plaintiffs cannot prove causation. The Court will set forth the applicable standards for causation under Indonesian law and then apply those standards to the facts of each plaintiff's claims. With limited exceptions, defendants' causation arguments fail. Third, the Court will address—and reject— defendants' contention that they are entitled to judgment because plaintiffs have provided insufficient proof of quantifiable loss. While plaintiffs must prove a cognizable loss under Indonesian law, plaintiffs can recover for immaterial damages, which are, by definition, unable to

14

be precisely calculated in monetary terms. Fourth, the Court explains why defendants' arguments that EMC cannot be held liable for EMOI's actions are unavailing. Finally, the Court will turn down defendants' request for dismissal on due process grounds. The opportunity to raise these due process challenges has either not yet arrived or is long gone. The Court will not give defendants a second bite at the apple for the latter category.

### A. Timeliness

The Court begins with defendants' timeliness challenges. Plaintiffs allege in their complaint that John Doe II, John Doe IV, and Jane Doe VII's husband, John Doe V, were injured in 2000. *See* 2nd Am. Compl. ¶¶ 177, 179–80. But the evidence supports (and plaintiffs do not dispute) that these injuries actually occurred in 1999, more than one year before plaintiffs filed their first complaint in June 2001. *See, e.g.*, SOF ¶¶ 99, 120, 129; Pls.' Opp'n 53 n.27. And in the Second Amended Complaint filed in 2014, Jane Doe VII alleged for the first time that, in 2003, her husband was abducted and tortured by defendants' security personnel. 2nd Am. Compl. ¶ 180. Defendants argue that the claims related to these injuries are time-barred and should be dismissed. This argument succeeds in part.

The Court's analysis proceeds in three steps. First, the Court will determine the applicable statute of limitations that applies to each of plaintiffs' claims. Next, the Court will address plaintiffs' contention that Jane Doe VII's claims about her husband's 2003 abduction and torture are timely because they relate back to the original complaint. Finally, the Court will address plaintiffs' request for equitable tolling.

### 1. The Applicable Statute of Limitations

To begin, the Court must determine which jurisdiction's law governs timeliness issues. The Court "must apply the choice-of-law rules of the jurisdiction in which [it] sit[s]" to determine

15

the appropriate sources of procedural and substantive law governing plaintiffs' claims. *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014); *see Ideal Elec. Sec. Co., Inc. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997) ("When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit."). District of Columbia choice-of-law rules provide that (1) the forum state's law applies to "procedural" issues and (2) that the statute of limitations is a "procedural" issue. *See, e.g., Namerdy v. Generalcar*, 217 A.2d 109, 113 (D.C. 1966); *Gardel v. SK & A Structural Engineers PLLC*, 286 F. Supp. 3d 120, 125 (D.D.C. 2017). The Court will thus apply the District of Columbia's statute of limitations.

The District of Columbia has a one-year limitations period for filing intentional tort claims. D.C. Code § 12-301(4). Negligence claims are generally governed by the District's default three-year limitations period for claims that are not otherwise "specially prescribed." D.C. Code § 12-301(8); *see Johnson v. Long Beach Mortg. Loan Tr. 2001-4*, 451 F. Supp. 2d 16, 48 (D.D.C. 2006) ("This statute applies to Plaintiff's claims of negligence."). However, courts in the District of Columbia will not resort to this default provision when the plaintiff's stated cause of action is "intertwined" with a claim for which a shorter limitations period applies. *Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997). Here, defendants contend that the shorter, one-year limitations period applies to all of John Doe II's, John Doe IV's, and Jane Doe VII's claims because their negligence claims are "intertwined with" their intentional tort claims. Defs.' Mem. 43 (citing *Ryan v. Jaffe*, 457 F. Supp. 22, 24). The Court is not persuaded.

"A claim is 'intertwined' with another when it is 'completely dependent' on or essentially the same as another, and cannot survive as a separate, independent cause of action." *Johnson*, 451 F. Supp. 2d at 48 (quoting *Thomas v. News World Communications*, 681 F. Supp. 55, 73

16

(D.D.C. 1988)). But a claim that is "pled as a clear and distinct tort" is not intertwined with another. *Saunders v. Nemati*, 580 A.2d 660, 661–62 (D.C. 1990); *see Reaves-Bey v. Karr*, 840 A.2d 701, 704 (D.C. 2004) (intertwining doctrine "do[es] not preclude separate causes of action where the plaintiff has pled and established separate and distinct claims"). Thus, when the plaintiff does "more than merely recharacterize" their intentional tort claim, *Reaves-Bey*, 840 A.2d at 704, and properly states the elements of a negligence claim, the three-year statute of limitations applies to the negligence claim, *see Stewart-Veal v. District of Columbia*, 896 A.2d 232, 236 (D.C. 2006).

Plaintiffs' negligence-based claims are neither "completely dependent" on nor "essentially the same" as their intentional tort claims. Instead, plaintiffs plead clear and distinct negligence claims. Each element of a negligence claim is present: plaintiffs allege that defendants owed a duty of reasonable care to plaintiffs when hiring, retaining, and supervising security personnel and that defendants breached that duty of care, resulting in plaintiffs' injuries. *See* 2nd Am. Compl. ¶¶ 212–35; *see also Pannell v. District of Columbia*, 829 A.2d 474, 479 (D.C. 2003) ("In a negligence action, the plaintiff bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury."). Indeed, plaintiffs' negligence and intentional tort claims turn on entirely different elements and types of proof—plaintiffs could succeed on one set of claims while failing on the other. For example, defendants can be vicariously liable for the acts of their security personnel without a finding that defendants acted negligently or breached an applicable standard of care. *See infra* Sec.IV.B.3. Conversely, defendants may be held liable for breaching a duty of care owed to plaintiffs without proof of the relationship required for vicarious liability. *See infra* Sec.IV.B.2.

17

Because plaintiffs have properly stated the elements of a negligence claim, the three-year statute of limitations applies to their negligence claims, and John Doe II's, John Doe IV's, and Jane Doe VII's claims for negligence, negligence hiring, and negligent supervision stemming from conduct in 1999 are timely.

## 2. Relation Back

Plaintiffs acknowledge that Jane Doe VII's claims about her husband's 2003 abduction and torture first appeared in a pleading after the limitations period had passed. But they contend that these claims are nevertheless timely because they "relate back" to the original, timely filed complaint in 2001. Pls.' Opp'n 55. This argument prevails in part.

In limited circumstances, Federal Rule of Civil Procedure 15(c) may save an otherwise untimely amendment to the complaint when it "relates back" to the original pleading. Fed. R. Civ. P. 15(c).[7] Federal Rule of Civil Procedure 15(c)(1)(B) provides that a subsequent pleading "relates back to the date of the original pleading" when it "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The underlying question is whether the original complaint adequately notified the defendants of the basis for liability the plaintiffs would later advance" in the subsequent pleading. *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008). Accordingly, if "the original pleading gave notice that the conduct, transaction,

---

[7] The codified standards in Rule 15(c) do not expressly apply to Jane Doe VII's 2003 claims. Rule 15 distinguishes between "amendments" and "supplements" to pleadings, and the express terms of Rule 15(c) apply only to amendments. *See United States v. Hicks*, 283 F.3d 380, 385 (D.C. Cir. 2002); Fed. R. Civ. P. 15(c). Amendments "rest on matters in place *prior to* the filing of the original pleading" while supplements set forth "events which have happened *since* the date of the pleading sought to be supplemented." *Hicks*, 283 F.3d at 386 (quoting Fed. R. Civ. P. 15(d)). Here, allegations in the operative complaint concerning Jane Doe VII's husband's abduction and torture in 2003 occurred after the initial complaint was filed. The pleading should be treated as a supplement when considering these allegations. Nevertheless, this Court has previously followed the example of other courts that apply Rule 15(c)'s principles to supplemental pleadings. *United States v. Palmer*, 902 F. Supp. 2d 1, 13 n.3 (D.D.C. 2012) (quoting *United States v. Hicks*, 283 F.3d 380, 385 n.3 (D.C. Cir. 2002)); *see* Wright & Miller, Federal Practice & Procedure § 1508 (3d ed.).

18

or occurrence is of a continuing nature, defendant should be prepared to defend against all claims arising out of it, whether they arose before or after the original complaint was filed." 6A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1508 (3d ed.); *see Chesapeake & Ohio Ry. Co. v. U.S. Steel Corp.*, 878 F.2d 686, 691 (3d Cir. 1989); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1057 (9th Cir. 1981).

But while Rule 15's provision for relation back "relaxes . . . the statute of limitations," it "does not obliterate" it. *Mayle v. Felix*, 545 U.S. 644, 650 (2005). A pleading does not relate back when it "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650. Indeed, even an amendment that shares "some elements and some facts in common" with the original claim does not relate back if its effect is "to fault [defendants] for conduct different from that identified in the original complaint." *Meijer*, 533 F.3d at 866. Courts have refused to apply relation back when supplemental pleadings "require proof of independent operative facts peculiar to the transaction involved." *Blau v. Lamb,* 191 F. Supp. 906, 906 (S.D.N.Y. 1961).

Applying these principles to the claims in the operative complaint, Jane Doe VII's negligence claims relate back to the original complaint.[8] The plaintiffs' original complaint pleaded the same "basis for liability" advanced in the operative complaint, that is, defendants' negligent hiring, retention, and supervision of Indonesian soldiers. Moreover, the original complaint alleged that this conduct was ongoing and requested injunctive relief. *See* Compl., ECF No. 1; *see William Inglis & Sons Baking Co.*, 668 F.2d at 1057 ("We are satisfied that Inglis' original pleadings provided [defendant] adequate notice of the subject matter of the action. They alleged a continuing course of conduct and contained prayers for injunctive relief as well as for damages."). Because

---

[8] Jane Doe VII does not bring any intentional tort claims for the 2003 incident. *See* 2nd Am. Compl. ¶¶ 193–211.

19

the negligence claims pertaining to John Doe V's injuries in 2003 arose out of a continuing course of negligent conduct set forth in the original pleading, they relate back to the original pleading.[9]

## 3. Equitable Tolling

Plaintiffs contend that these otherwise untimely claims should be equitably tolled because the "civil conflict in Aceh and [p]laintiffs' reasonable fear of reprisal" prevented them from timely filing. Pls.' Opp'n 53. "[F]ederal courts cannot apply the doctrine of equitable tolling differently than would the District of Columbia courts." *Williams v. District of Columbia*, 916 F. Supp. 1, 5 (D.D.C. 1996). In 2008, Judge Oberdorfer reasoned that the D.C. Court of Appeals had "never directly addressed" whether equitable tolling was permitted for extraordinary circumstances and deferred ruling on the issue. *Doe*, 573 F. Supp. 2d at 34. Upon consideration of the relevant authorities, the Court concludes that equitable tolling for extraordinary circumstances is not available when applying the District of Columbia's statute of limitations.

This Court has previously held that "District of Columbia law does not recognize an equitable tolling exception to the statute of limitations." *Nattah v. Bush*, 770 F. Supp. 2d 193, 208 (D.D.C. 2011) (quoting *Johnson v. Marcheta Invs. Ltd. P'shp.*, 711 A.2d 109, 112 (D.C. 1998)). The Court acknowledges—as Judge Oberdorfer previously did—that the language from the D.C. Court of Appeals in *Johnson* explicitly rejecting equitable tolling is dicta. Nevertheless, the Court concludes that this is an accurate statement of the law.

---

[9] The Court is cognizant that these claims were raised not only several years after the limitations period had passed but also several additional years after the claims were identified in discovery. Nevertheless, if the requirements for relation back are met, then relation back is mandatory and not subject to equitable considerations. *See T Mobile Ne. LLC v. City of Wilmington, Delaware*, 913 F.3d 311, 327 (3d Cir. 2019). Equitable considerations are ordinarily litigated when a plaintiff moves to file a supplemental pleading. *See Hall v. CIA*, 437 F.3d 94 (D.C. Cir. 2006). Defendants did not raise—and thus forfeited—any argument that the supplemental allegations were improper or inequitable. *See* ECF No. 466-2. *Cf. Butler v. White*, 67 F. Supp. 3d 59, 67–68 (D.D.C. 2014) (quoting *In re Vitamins Antitrust Litig.*, 217 F.R.D. 30, 32 (D.D.C. 2003)) ("To demonstrate 'prejudice sufficient to justify a denial of leave to [supplement,] the *opposing party must show* that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the [supplement] been timely.'" (emphasis added)).

In the District of Columbia, statutes of limitations are "strictly construed in accordance with their terms." *Atiba v. Washington Hosp. Ctr.*, 43 A.3d 940, 941 (D.C. 2012). Moreover, the District of Columbia is one of a minority of jurisdictions that does not have a general equitable "saving" statute to toll statutes of limitations. *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998). Thus, faced with requests to toll the statute of limitations in cases involving a plaintiff's good faith mistake of forum, the D.C. Court of Appeals rejected equitable tolling—even when the purposes of the statute of limitations would not be served in the case at issue. *See Sayyad v. Fawzi*, 674 A.2d 905, 905 (D.C. 1996). The D.C. Court of Appeals explained that "[r]ejection of the application of equitable tolling on a case-by-case basis . . . rests on the belief that where the legislature has provided no savings statute, courts would exceed their prescribed role by providing a remedy where the legislature has determined that none should lie." *Id.* at 906.

Guided by this principle, the Court must then consider the two recognized, "limited exceptions" to the District's otherwise "strict" limitations statute—the lulling doctrine and the discovery rule. *East*, 718 A.2d at 156–57. Under the lulling doctrine, "a defendant cannot assert the bar of the statute of limitations, if it appears the defendant has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run." *Id.* (internal quotation marks and alterations in original omitted). And the discovery rule "is designed to prevent the accrual of a cause of action before an individual can reasonably be expected to discover that he has a basis for legal redress, [so] the statute should not commence until a claimant knows, or through the exercise of due diligence, should know, that his injury resulted from someone's wrongdoing." *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 430 (D.C. 1986).

21

The issue that the Court must address is whether the principles underlying these exceptions would permit recognizing equitable tolling for extraordinary circumstances. They do not. These doctrines are distinct from equitable tolling.[10] "Equitable tolling" describes a doctrine that pauses, or "tolls," a statutory limitations period after it has commenced. *See, e.g., Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014). But the discovery rule addresses a different issue—when the claim accrues in the first place. *See Gabelli v. S.E.C.*, 568 U.S. 442, 447 n.2 (2013); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) ("Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule—governing, as we have seen, accrual—on the other."); 4 Wright & Miller, Fed. Practice & Procedure § 1056 (4th ed.) ("The often confusing distinction between accrual and tolling of statutes of limitations is at play in those cases discussing the discovery rule; the rule has been characterized as performing both functions."). Lulling is also distinct from equitable tolling because it does not prevent the statute of limitations from running; it instead prevents the defendant *from asserting* a statute of limitations defense. *See East*, 718 A.2d at 156; *Hornblower v. George Washington Univ.*, 31 App. D.C. 64, 75 (D.C. Cir. 1908) ("We think it is a well-settled principle that a defendant *cannot avail himself of the bar of the statute of limitations*, if it appears that he has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run against him."). Both the D.C. Circuit and D.C. Court of Appeals have recognized that these doctrines are distinct. *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1086–87 (D.C. Cir. 2007) (applying D.C. law); *Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578–79 (D.C. Cir. 1998) (explaining the "sometimes muddled" distinction between the discovery rule and the equitable

---

[10] The Court recognizes the ambiguity surrounding this issue when there is language from both the D.C. Circuit and D.C. Court of Appeals stating that these doctrines "toll" the statute of limitations. *See Goldman v. Bequai*, 19 F.3d 666, 672–76 (D.C. Cir. 1994); *Peters v. Riggs Nat. Bank, N.A.*, 942 A.2d 1163, 1168 (D.C. 2008).

doctrines of estoppel and equitable tolling); *East*, 718 A.2d at 160 n.21; *Interdonato v. Interdonato*, 521 A.2d 1124, 1135 (D.C. 1987) ("The effect of such an estoppel is not necessarily to toll the running of the statute."). Accordingly—and despite any semantic ambiguities in the case law— neither lulling nor the discovery rule support recognizing a form of equitable tolling that is absent from the statute.

Finally, to the extent that there is any ambiguity in D.C. caselaw, caselaw from the Maryland Court of Appeals bolsters the Court's conclusion. *See Conesco Indus., Ltd. v. Conforti & Eisele, Inc., D.C.*, 627 F.2d 312, 316 (D.C. Cir. 1980) ("[T]he District of Columbia courts should look to the law of Maryland for guidance before it looks to the law of other states."); *Bond v. Serano*, 566 A.2d 47, 53 (D.C. 1989) (Farrell, J., concurring) ("Maryland, like the District of Columbia, is one of a minority of states lacking a 'saving' statute."). The Maryland Court of Appeals has "long adhered to the principle that[,] where the [General Assembly] has not expressly provided for an exception in a statute of limitations, the court will not allow any implied or equitable exception to be engrafted upon it." *Ademiluyi v. Maryland State Bd. of Elections*, 181 A.3d 716, 733 (Md. 2018) (citation omitted) (alterations in original); *accord Walko Corp. v. Burger Chef Sys., Inc.*, 378 A.2d 1100, 1102 (Md. 1977). The Court will adhere to that principle here.

The District of Columbia does not recognize an equitable tolling exception to its statute of limitations for extraordinary circumstances. Without a recognized exception to the statute of limitations, the intentional tort claims of John Doe II, John Doe IV, and Jane Doe VII are untimely. So too are Jane Doe VII's intentional tort claims stemming from her husband's 2003 abduction and torture. The Court will **GRANT** defendants' motion for summary judgment on these claims.

23

### B. Causation

Defendants argue that the Court should grant summary judgment because "[p]laintiffs have failed to produce evidence showing that [d]efendants caused their injuries." Defs.' Mem. 12.

Despite some broad rhetoric in their filings, defendants' causation arguments are quite narrow. For example, while defendants state in passing that "EMOI had no legal authority to exercise command or control over the sovereign military of the Government of Indonesia," Defs.' Mem. 15, they do not return to this argument. That is not surprising, since Judge Oberdorfer previously held (in this case) that "a reasonable finder of fact could conclude that a master-servant relationship existed between EMOI and its paid military security forces." *Doe*, 573 F. Supp. 2d at 27. Instead, defendants' overarching theory is that plaintiffs have failed to show that the *"particular* soldiers who injured them were acting under direction or control of EMOI" or were "protecting Arun Field." Defs.' Mem. 15 (emphasis added).

Plaintiffs' claims are governed by Indonesian law. *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 70 (D.C. Cir. 2011) ("[W]e hold that Indonesian law applies to appellants' non-federal claims."), *vacated on other grounds* 527 F. App'x 7 (D.C. Cir. 2013). The parties agree that there are two available theories of liability under Indonesian law—direct liability and indirect liability. Each theory has its own causation standard. Direct liability encompasses plaintiffs' claims that defendants negligently hired, retained, and supervised members of the Indonesian military acting as defendants' security personnel. Indirect liability encompasses plaintiffs' intentional tort claims—like wrongful death, conversion, arbitrary arrest, false imprisonment, assault, and battery—where plaintiffs seek to hold defendants vicariously liable for the actions of the Indonesian soldiers who committed the wrongful acts.

The Court's analysis below proceeds in several steps. First, the Court will set forth the standard for establishing the law of a foreign jurisdiction. Next, the Court will outline the requirements for direct liability claims, which are governed by Indonesian Civil Code Articles 1365 and 1366. Third, the Court will outline the requirements for indirect liability claims, which are governed by Indonesian Civil Code Article 1367. Finally, the Court will address the claims of each individual plaintiff in this case and apply the relevant causation standards to plaintiffs' claims. As the Court's analysis demonstrates, while the legal standards for the direct and indirect liability claims are distinct, the inquiries involve overlapping factual analyses because the Court must determine whether there is sufficient proof of a connection between defendants and the soldiers who harmed plaintiffs.

### 1. Standard for Determining Foreign Law

The Court's review of foreign law is governed by Federal Rule of Civil Procedure 44.1. Under Rule 44.1, the Court's foreign law determination "may consider any relevant material or source, . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Ordinarily, foreign law is established through "written or oral expert testimony accompanied by extracts from foreign legal material." *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984). This expert testimony is "intended to aid the court in determining the content of the law, not in applying that law to the facts of the case." *Est. of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 227–28 (D.D.C. 2011).

But a court need not uncritically accept this expert testimony: "Rule 44.1 frees courts 'to reexamine and amplify material . . . presented by counsel in partisan fashion or in insufficient detail.'" *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (quoting Fed. R. Civ. P. 44.2, Advisory Committee's Note 1966). Indeed, the court may "reject

25

even uncontradicted expert testimony" in its inquiry. *Est. of Botvin*, 772 F. Supp. 2d at 228 (quoting *Rutgerswerke AG v. Abex Corp.*, 2002 WL 1203836, at \*16 (S.D.N.Y. June 4, 2002)). And despite the Court's authority to conduct independent research into foreign law, if "the parties fail to provide an adequate statement of the law, the court is not obligated to independently remedy the deficiency." *Doe*, 69 F. Supp. 3d at 105 (quoting *Est. of Botvin*, 772 F. Supp. 2d at 228).

## 2. Direct Liability for Negligence under Articles 1365 and 1366

The first set of plaintiffs' claims is premised on a direct liability theory. In these claims, plaintiffs allege that defendants' negligent hiring, retention, and supervision caused plaintiffs' injuries. *See, e.g.*, 2nd Am. Compl. ¶¶ 212–35.

Two provisions of the Indonesian Civil Code govern the direct liability claims. The first, Article 1365, states that "[a] person who causes loss to another person by means of an unlawful act . . . must, because of his or her fault in causing the loss, compensate for that loss." Timothy Lindsey July 29, 2021 Decl. ("Lindsey Decl.") ¶ 7, ECF No. 819-4 (first alteration in original). The second provision, Article 1366 of the Indonesian Civil Code, states that "[e]very person is responsible not only for the loss they cause because of their acts, but also for the loss caused because of omissions or lack of care." *Id.* ¶ 8. Broadly speaking, a direct liability claim under these provisions of Indonesian law requires proof of (1) wrongful behavior, (2) fault, (3) loss, and (4) causation. *See, e.g.*, Robert N. Hornick Decl. ("Hornick Decl.") ¶ 14, ECF No. 127 (also filed as DX-13).

Three of these four elements—wrongful behavior, fault, and loss—are not at issue at this stage. Despite some disagreement among the parties' experts about what might constitute an "unlawful act," *see* Pls.' Opp'n 11–12, for purposes of their summary judgment motion, defendants do not dispute that they committed an unlawful act. Nor do they dispute that they behaved

negligently and would be at fault. Accordingly, for purposes of deciding defendants' motion, the Court will assume that defendants negligently hired, retained, and supervised members of the Indonesian military. This is a sufficient "unlawful" or "wrongful" act to prove a claim under Indonesia law. *See, e.g.*, PX-1, Gary F. Bell Decl. ("Bell Decl.") ¶ 11. Finally, plaintiffs have suffered cognizable losses under Indonesian law. *See infra* Sec.IV.D.

The Court turns then to causation. Causation has received "relatively limited scholarly and judicial attention in Indonesia." Lindsey Decl. ¶ 20-23; *see* PX-2, Mark Cammack Decl. ¶ 22 (agreeing with Professor Lindsey's assessment). Defendants' current expert, Professor Lindsey, represents that scholars and the judiciary in Indonesia commonly use the following formulation for causation:

> In essence, the causal connection between the unlawful act and the loss is encapsulated in the "factual connection" theory and the "approximate cause" theory. The factual causal connection (causation in fact) is an issue of fact, or what factually occurred.

Timothy Lindsey October 13, 2021 Suppl. Decl. ("Lindsey Suppl. Decl.") ¶ 8, ECF No. 832-4. Defendants' prior expert, Mr. Hornick, provided a similar formulation: "the injury must be both foreseeable and a direct, rather than indirect, consequence of the misbehavior. Foreseeability refers to scope of injury as well as possibility." Hornick Decl. ¶ 14(d). Plaintiffs' expert, Professor Mark Cammack, agrees that Article 1365 permits recovery for losses that are foreseeable. PX-2, Cammack Decl. ¶ 22. After reviewing the Indonesian law, as aided by the parties' filings and expert declarations, the Court agrees that causation under Indonesian law requires proof of (1) factual causation and (2) foreseeability.

Beyond this bare-bones framework, the parties and their experts disagree on most aspects of the causation standard for direct liability claims. For example, the parties' experts dispute whether a defendant's wrongdoing must be a "clear or direct" cause of the loss or whether the loss

27

must be sufficiently "likely" to occur from the defendant's action. *See, e.g.*, PX-2, Cammack Decl. ¶¶ 24–26. These disputes have no impact on the present motion. As defendants recognize, *see* Defs.' Mot. 16–17, in 2008, Judge Oberdorfer rejected defendants' motion for summary judgment on the issue of whether defendants knew of and proximately cause plaintiffs' injuries. *Doe*, 573 F. Supp. 2d at 26–29. Judge Oberdorfer concluded that "the military security forces were engaged to perform armed security for EMOI, and unauthorized acts of violence were foreseeable." *Id.* at 27.[11] The Court sees no reason to reconsider Judge Oberdorfer's factual determinations and defendants provide none. *See Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005).

Nevertheless, Judge Oberdorfer's analysis assumed that it was the soldiers connected to defendants—or "EMOI's paid [military] security forces"—that harmed plaintiffs when analyzing Exxon's and EMOI's liability. *Doe*, 573 F. Supp. 2d at 23–29. That assumption was based on "limited discovery" and the allegations in plaintiffs' complaint. *Id.* at 23.[12] Now that the record has been closed, defendants are correct that the Court must consider only competent evidence. Thus, the relevant issue for the direct liability claims—and the focus of the Court's analysis—is whether there is sufficient evidence from which a reasonable jury could conclude that the soldiers who caused plaintiffs' injuries are *the same soldiers* that defendants negligently hired, retained, or supervised. Without this evidence, plaintiffs cannot prove causation.

---

[11] Accordingly, whether the soldiers who injured plaintiffs "did so in the course of protecting Arun Field" or "acted under the control and supervision of [d]efendants," Defs.' Mem. 12, are entirely irrelevant to plaintiffs' direct liability claims. In other words, defendants' negligence could lead to a foreseeable injury from their military security even if the soldier at issue was not engaged in his security functions for defendants at the moment the plaintiff was injured.

[12] Judge Oberdorfer's opinion explained that the discovery prior to this round of summary judgment briefing was limited to only two issues: "(1) personal jurisdiction over EMOI; and (2) the Exxon Defendants' knowledge of, and proximate cause of, Plaintiffs' alleged injuries." *Doe*, 573 F. Supp. 2d at 22; *see* ECF Nos. 138 & 158.

### ·3. Indirect Liability Claims under Article 1367

The second category of plaintiffs' claims is based on a theory of indirect liability. In these claims, plaintiffs seek to hold defendants vicariously liable for the intentional torts—like wrongful death, conversion, arbitrary arrest, false imprisonment, assault, and battery—committed by members of the Indonesian military engaged by defendants.

Plaintiffs' indirect liability claims are governed by Article 1367 of the Indonesian Civil Code. This Court previously addressed Article 1367's legal standard. Article 1367 provides that a "party may be liable for the actions of persons over which he has responsibility." *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d at 103; *see* Lindsey Decl. ¶ 35; Hornick Decl. ¶ 32. And subsection 3 of Article 1367 specifically provides for liability when there is an employer-employee relationship: "Employers and those appointed to represent the affairs of others shall be responsible for damage caused by the acts of their employees and subordinates in performing the work for which they are engaged. There is no requirement of fault on the part of the employer or principal— liability may be vicarious." *Doe*, 69 F. Supp. 3d at 103 (internal citations and quotation marks omitted).

As this Court previously explained, vicarious liability under Article 1367 requires proof of two elements. First, plaintiffs must demonstrate a principal-agent or employment relationship— that is: (1) that the perpetrator was an employee of the defendant, (2) that the defendant could instruct the perpetrator to carry out work and give instructions as to how that work was to be carried out, or (3) the perpetrator was appointed, either formally or informally, by the defendant to represent the business of the defendant to third parties. Lindsey Decl. ¶ 36; *see Doe*, 69 F. Supp. 3d at 103–04. Second, plaintiffs must show that the act was committed "in the course

of performing the employment or representation." *Doe*, 69 F. Supp. 3d at 103 (citation omitted); *see* PX-1, Bell Decl. ¶ 25.

Defendants now contend that to establish a principal-agent or employment relationship, the plaintiff must identify "the specific perpetrator of the offense." Defs.' Mem. 15; *see* Lindsey Decl. ¶ 37 (arguing that "the identity of both the perpetrator and defendant [must] be known and proven" because the "work relationship cannot be established" without knowing their respective identities). The Court is not persuaded. First, defendant's expert cites no authority for this proposed "implicit" requirement. Lindsey Decl. ¶ 37. Second, the proposed rule is based on a false premise. While identity may be critical in some cases to establishing a work relationship, circumstantial evidence may nevertheless sufficiently demonstrate that such a relationship existed.[13] Imagine that a plaintiff arrives at a pizza restaurant and overhears the manager tell another individual to deliver a pizza to a customer. As the plaintiff is leaving the restaurant, he is hit by that individual, who is driving a restaurant vehicle, wearing restaurant clothes, and carrying the pizza with the customer's name on the box. It is preposterous to suggest that, in this example, there is no proof that "the defendant could instruct the perpetrator to carry out work and give instructions as to how that work was to be carried out," Lindsey Decl. ¶ 36, simply because the identity of the driver is unknown. The Court rejects defendants' proposed "identification" requirement.[14]

---

[13] Indeed, in other contexts, American courts have recognized an agency relationship may be "sufficiently established without identifying the employee," based on circumstantial evidence. *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992); *see Davis v. Mobil Oil Expl. & Producing Se., Inc.*, 864 F.2d 1171, 1174 (5th Cir. 1989) ("Davis testified that the man who issued the unsafe order was wearing a Mobil hard hat.").

[14] Moreover, whether there is sufficient evidence for a reasonable jury to find that the required principal-agent or employment relationship existed is governed by Rule 56, not Indonesian law. *See, e.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (explaining that when a federal rule "answers the question in dispute," "it governs," notwithstanding a state's conflicting law, if the federal rule does not exceed Congress's rulemaking power); 10A Wright & Miller, Federal Practice & Procedure § 2712 (4th ed.) (collecting cases); *cf. Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 998 (7th Cir. 2016) ("Federal courts may grant summary judgment under Rule 56 on concluding that no reasonable jury could return a verdict for the party opposing the motion, even if the state would require the judge to submit an identical case to the jury."). As explained above, a reasonable jury could rely on circumstantial evidence to find that an employment relationship existed.

The Court turns then to Article 1367's second requirement: that the act was committed "in the course of performing the employment or representation." *Doe*, 69 F. Supp. 3d at 103 (citation omitted). The parties and their experts previously disputed the scope of this element, but the Court ultimately concluded that "Indonesian case law . . . indicates a rather expansive interpretation of Article 1367." *Id.* at 104. The Court adopted the characterization provided by defendants' prior expert that Article 1367 requires only a "functional connection between the wrongful act and the work that the employee/representative is being directed to perform." *Id.* at 103. Under this "functional connection" standard, employers can be liable for damages caused by employees "in performing their duties, even if the employees acted without the authorization or against the order of employers." *Id.* at 103–04.

While defendants suggest that vicarious liability in this case requires proof that the soldiers who committed wrongdoing "did so in the course of protecting Arun Field facilities," Defs.' Mem. 12, 17, the "functional connection" standard is not so narrow. The Court did explicitly recognize that a "functional connection" exists when a plaintiff's injuries were "caused by Exxon personnel stationed at Exxon security checkpoints." *Doe*, 69 F. Supp. 3d at 104. But the Court *also* recognized that a "functional connection" exists when the plaintiff's injuries were caused by security personnel "using [defendants'] equipment" or "on [defendants'] property, even when those security personnel were off duty." *Id.* Similarly, a soldier's proximity to Arun Field facilities when they committed wrongdoing cannot be dispositive. Instead, if there is evidence that the soldiers were "performing their duties"—that is, the tasks that they were instructed or otherwise expected to complete in order to secure defendants' operations—a "functional connection" is present, even when the events took place away from defendants' facilities. *Id.*; *see* PX-1, Bell Decl. ¶ 25.

31

Even though the Court's rationale was based in part on expert testimony provided by *defendants*, they propose a brand-new standard in their motion for summary judgment. They contend that a plaintiff must show "what, specifically, the defendant did to cause the perpetrator to engage in the alleged conduct." Defs.' Mem. 15; *see* Lindsey Decl. ¶ 38. The Court rejects defendants' eleventh-hour suggestion to adopt a new legal standard for plaintiffs' indirect liability claims. The Court previously concluded that "employers can be liable for the acts of employees even when committed without authorization or against orders" *Doe*, 69 F. Supp. 3d at 103–04. And Article 1367 has "no requirement of fault on the part of the employer or principal—liability may be vicarious." *Id.* at 103 (citation omitted).[15] "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Singh*, 383 F. Supp. 2d at 101. Defendants provide no good reason to reconsider the Court's prior statement of Indonesian law. After reviewing the parties' experts' declarations, scholarly materials, and examples from Indonesian case law, the Court will adhere to the "functional connection" standard set forth in its prior opinion. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) ("[T]he *same* issue presented a second time in the *same* case in the *same* court should lead to the *same result*.").

Thus, to prove causation under Article 1367, plaintiffs must establish (1) an employment or agency relationship between the soldier who committed the wrongdoing and defendants and (2) that there is a "functional connection" between the wrongful act and the work the soldier was directed to perform.

---

[15] Plaintiffs' expert also attests that Professor Lindsey's characterization is "completely and absolutely inaccurate and is a misrepresentation of the state of the law under Article 1367." PX-1, Bell Decl. ¶ 23.

### 4. Applying These Causation Standards To Plaintiffs' Claims

To summarize, the overarching issue before the Court when addressing defendants' causation arguments is whether there is sufficient proof of a connection between defendants and the soldiers who harmed plaintiffs. For the direct liability claims, there must be sufficient evidence from which a reasonable jury·could conclude that the soldiers who harmed plaintiffs were the same ones that defendants negligently hired, retained, or supervised. For the indirect liability claims, there must be sufficient evidence from which a reasonable jury could conclude that (1) "an employment or representation relationship" existed between the soldier and defendants (or that the soldier was in fact assigned to guard defendants' operations), and (2) that there is a "functional connection" between the soldier's wrongful act and the work that they were directed to perform.

With these principles in mind, the Court turns to the plaintiffs' claims.

#### (i) Jane Doe I

Jane Doe I alleges that                                  who also forced her to jump up and down repeatedly while she was eight months' pregnant. CSMF ¶¶ 314, 315; PX-19, Jane Doe I Dep. 49:1–9, 83:8–9. She brings claims for assault, battery, negligence, negligent hiring, and negligent supervision. *See* 2nd Am. Compl. ¶¶ 199–207. Defendants contend that she cannot "connect[] her assault to·[d]efendants in any way." Defs.' Mem. 17–18. The Court is not persuaded.

To link the soldier who committed the·assault to defendants, plaintiffs rely on the soldier's uniform and vehicle. Jane Doe I testified that the soldier's uniform had a Unit 113 shoulder badge. PX-19, Jane Doe I Dep. 63:14–19, 94:11–19. The soldier arrived and departed in a truck with a logo for Unit 113 on the side and with distinctive red stickers spelling out "god is great" in Arabic in the middle of the windshield. *See* PX-29,      Dep. 9:7–12 (testimony of third-party witness

who witnessed the soldier arrive and depart in a truck with Unit 113 logo and red stickers), 14:5–11, 15:2–16:8, 56:6–12, 68:12–69:13. Plaintiffs proffer testimony that this truck was unique—an eyewitness who waited daily for the school bus near the front of Point A (a defendant-operated facility) testified that she often saw the same truck enter and exit Point A. *See, e.g.* CSMF ¶ 318; PX-29,  Dep. 9:17–12:13, 20:9–20. The witness testified that while she saw many trucks on the road, no other truck had this red sticker in the middle of the windshield. *Id.* at 13:17–21.

Plaintiffs begin by arguing that Unit 113 is connected to defendants. They cite internal communications reflecting that "Battalion 113" deployed to provide security services for defendants. *See, e.g.*, PX-83, PX-82. Defendants provided this unit with supplies and vehicles. PX-82 at CA0001334075 (discussing supplying Unit 113 with vehicles and fuel for deployment and "community relations"); PX-85 at CA0001182157. Local newspaper articles—produced from Exxon's files—reported that Battalion 113 was stationed at or near various locations operated by defendants, such as a Cluster and the EMOI airport. *See* PX-75; PX-84. Defendants dispute whether Battalion and Unit 113 refer to the same thing. *See, e.g.*, Defs.' Reply 9–10. This is not a great inferential leap—a jury could easily infer that Battalion 113 is Unit 113. Next, they fault plaintiffs for failing to provide proof of a Battalion's size—contending that potentially ninety percent of Battalion 113 could be assigned somewhere other than Point A. *Id.* Even accepting that a Battalion's size could exceed the number of soldiers guarding Point A, the Court would not view this evidence in isolation. If there is evidence to support the notion that members of Battalion 113 were specifically deployed to provide security for defendants, that also supports the inference that the soldiers in question here—who were members of Battalion 113—provided security for defendants.

34

In any event, the Court must also consider the inferences that a reasonable jury could draw from this specific truck routinely entering and exiting Point A. There is sufficient evidence from which a jury could find that Point A was operated by defendants at the time Jane Doe I was assaulted. PX-107 at CA0001007937; PX-108, Defs.' Responses & Objections to Pls.' Jan. 2016 Requests for Admissions to All Defs.' Nos. 94 & 95; PX-18, Duffin Dep. 17:19–18:3. Moreover, there is sufficient evidence that defendants actively monitored the military resources that were stationed at Point A at that time. *See, e.g.*, PX-62; PX-370.

Finally, the Court must consider the inferences that a reasonable jury could draw from the broader factual context. Around this point in time, approximately 20 percent of the soldiers in the region were providing security services for defendants. *See* PX-328 at CA0001006166. There is evidence in the record that soldiers associated with defendants' facilities worked exclusively at defendants' operations. *See* PX-73 at CA0001003151; PX-65 at CA0001174659. Soldiers guarding defendants' operations were required to provide "area protection" in addition to point protection. *See, e.g.*, PX-353 at CA000133427. This included engaging in patrols and sweeps of the areas surrounding defendants' facilities, including the villages. *See, e.g.*, CSMF ¶¶ 292, 294. And defendants' military security also investigated violence occurring nearby to defendants' facilities and reported this information to defendants. CSMF ¶¶ 241, 296. Jane Doe I's village was close to both Point A and Cluster 2 (another defendant-operated location where the military was stationed). *See, e.g.*, CSMF ¶¶ 323–26.

*Direct Liability Claims.* Construing the record in the light most favorable to plaintiffs, a reasonable jury could conclude that the soldier was one who was tasked with providing security for defendants. This is a reasonable inference because he: (1) belonged to a unit with known ties to defendants, (2) was engaged in the type of activity that defendants' military security provided,

35

(3) was driving in a vehicle routinely observed at defendants' facilities where the military provided security, and (4) committed the acts nearby defendants' facilities, (5) at a time when a significant number of military personnel in the region were affiliated exclusively with defendants. Jane Doe I has provided sufficient evidence of causation for her direct liability claims.

*Indirect Liability Claims.* For the same reasons, a reasonable jury could conclude that there was an employment relationship between the soldier and defendants. The Court also concludes that there is sufficient evidence of a "functional connection" between the soldier's acts and his employment relationship with defendants. Defendants' military security was tasked with providing "area protection"—which included investigating and reporting threats. *See* CSMF ¶ 328; PX-97. In fact, defendants' own security procedure documents from early-2001 reflect that the military security at Point A would "*primarily* deploy 'outside the wire,'" "employ a pursuit capability to increase the likelihood of apprehension" of "armed criminal elements," and provide "reconnaissance" and "intelligence support to EMOI security." ~PX-214 · at CA0001005149 (emphasis added). Here, the record reflects that gunfire and a bombing were reported at Jane Doe I's village that morning, which was only a kilometer from defendants' facilities at Point A. *See, e.g.*, PX-19, Jane Doe I Dep. 53:12–14; PX-371.[16] Drawing all reasonable inferences in Jane Doe I's favor, a reasonable jury could conclude that the soldiers assigned to Point A arrived to investigate as part of their assigned duties. Indeed, Jane Doe I testified that the soldiers in the village asked questions about GAM and recent violence, and they were spread out among the village. *See, e.g.*, CSMF ¶¶ 329–330. Because a reasonable jury could conclude that the soldiers— including the soldier who assaulted her—were investigating violence in order to protect

---

[16] The Court will take judicial notice of this map. *See* Fed. R. Evid. 201(b); *Burroughs*, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016).

defendants' operations, there is a functional connection between the soldier's wrongdoing and his employment relationship with defendants. There is sufficient evidence of causation for Jane Doe I's indirect liability claims.

### (ii) Jane Doe II

Jane Doe II alleges that around 11 A.M. on December 4, 2000, her husband, John Doe VIII, was working in his rice paddies near their home when he was shot and killed by "members of ExxonMobil's security personnel." 2nd Am. Compl. ¶ 184; *see* CSMF ¶¶ 48, 334–55. Jane Doe II witnessed the soldiers in her village, heard the gunshots, and saw an unspecified male in the rice paddy outside shot by a soldier. *See* PX-374; Jane Doe II's Suppl. Resp. to Exxon Mobil Oil Corp.'s First Set of Interrogatories at 8; PX-20, Jane Doe II Dep. 65:16–17, 66:2–25. She brings claims for John Doe VIII's wrongful death, as well as for negligence, negligent hiring, and negligent supervision. 2nd Am. Compl. ¶¶ 193–98, 212–35. Defendants argue that there "is no evidence" connecting the shooting to defendants. Defs.' Mem. 18. They are wrong.

Jane Doe II testified in her deposition that "Exxon soldiers" murdered her husband. *See, e.g.*, PX-20, Jane Doe II Dep. 37:6–9. Jane Doe II linked the soldiers to defendants through their vehicles—she testified that she recognized the soldiers' trucks from Cluster 4, which was three to four kilometers from her home.[17] *See, e.g.*, CSMF ¶¶ 338, 350; PX-20, Jane Doe II Dep. 41:25–42:9, 45:17–22, 46:2–6. And Jane Doe II is not the only witness to link the soldiers in the village on December 4, 2000, to Cluster 4 (and defendants) through the soldiers' vehicles.

The chief of Jane Doe II's village testified that on the morning of December 4, 2000, around 7:30 or 8 A.M., he witnessed the group of military trucks and other vehicles with soldiers arrive at

---

[17] There is some ambiguity in the deposition as to whether Jane Doe II recognized a particular *truck* or *trucks* despite the translator consistently using the singular "truck." In their Counterstatement of Material Facts, plaintiffs say that Jane Doe II recognized the *trucks* from Cluster 4. The Court thinks this is a reasonable inference given Jane Doe II's (or the translator's) usage of the singular "truck" elsewhere in the deposition. *See* Jane Doe II Dep. 51:2–52:8.

the village from the direction of Cluster 4. CMSF ¶ 342; *see* PX-375 (map showing Jane Doe II's village, Jane Doe IV's village, and Cluster 4).[18] Like Jane Doe II, the village chief also recognized these trucks because they were routinely parked at Cluster 4, both before and after the shooting. CSMF ¶ 342; *see* PX-30, ▮▮▮▮▮▮ Dep. 13:6–15:3; 15:9–12 ("I do not know who owns the military trucks, but what I know was that those military trucks were within the field of Exxon's, Cluster 4"); 66:7–10; 70:18 22. These vehicles then headed south. PX-30, ▮▮▮▮▮▮ Dep. 12:24–13:5. Around 11:00 A.M. (when John Doe VIII was shot), the village chief witnessed the same vehicles returning from the south. *See* CMSF ¶ 342; PX-30, ▮▮▮▮▮▮ Dep. 59:8 15. He then heard several gunshots. PX-30, ▮▮▮▮▮▮ Dep. 59:8 15. Immediately after the shooting, a villager came to the village chief's house and reported that she had witnessed the soldiers shoot John Doe VIII. CSMF ¶ 346; *see* PX-30, ▮▮▮▮▮▮ Dep. 18:9–12.[19]

Defendants characterize the connection between defendants and the soldiers' trucks as "absurd." Defs.' Mem. 18. Not so. First, a reasonable jury could rely on the factual link between defendants and a soldier's affiliation with Cluster 4. At the time John Doe VIII was killed, defendants operated Cluster 4, which was nearby Jane Doe II's village. *See* RCSMF ¶¶ 350–51; PX-30, ▮▮▮▮▮▮ Dep. 28:19–29:16; PX-292 (map showing the village and Cluster 4).[20] Internal documents from defendants reflect that they monitored the number of military resources stationed there when John Doe VIII was killed. *See* PX-314 at CA0001005970.001; PX-376 at CA0001005973. By December 2000, the number of soldiers assigned to defendants' Arun Field facilities was substantial nearly 1,000 military personnel, making up roughly twenty percent of

---

[18] The Court will take judicial notice of this map. *See* Fed. R. Evid. 201(b); *Burroughs*, 810 F.3d at 835 n.1.

[19] The village chief testified that the villager had witnessed the shooting with "her own eyes" so she was "very upset and scared" and repeated herself several times. CSMF ¶ 346.

[20] The Court will take judicial notice of this map. *See* Fed. R. Evid. 201(b); *Burroughs*, 810 F.3d at 835 n.1.

38

all soldiers in the region. *See, e g.*, PX-317 at CA0001333839 ("We now have 1000 troops, with approximately 70 percent inside the wire and 30 percent in the jungle, where they moved only after we built them accommodations."); PX-31 at CA0001005971 (reflecting 128 soldiers at Clusters 1 through 4 in November 2000); PX-328 at CA0001006166. A reasonable factfinder could connect soldiers affiliated with Cluster 4 on December 4, 2000, to defendants.

Next, if crediting the witnesses' testimony that the trucks used by the soldiers that killed John Doe VIII were regularly stationed at Cluster 4, then a reasonable jury could draw the inference that the soldiers using these trucks were also connected to the operation of defendants' facilities there. The record provides additional support for this inference. For example, the record reflects that defendants not only supplied the military with equipment—like vehicles—but that defendants did so with the understanding that this equipment would be used to "provide security for Mobil's Aceh operations." PX-73 at CA0001003150 (letter from EMOI Executive to Pertamina); *see* PX-308 at CA0001334116 ("The only 'things' that the military provides nowadays are bodies in uniform and their weapons and ammo! Anything else [has] to come from us."); PX-3, Robinson Report 18–19 (listing materials that the military requested from Exxon in June 2000). And a reasonable jury could also find that defendants retained some control over the equipment that they furnished to the Indonesian military providing security. *See, e.g.*, PX-8, EMOI 30(b)(6) Snell Dep. 811:14–24; CSMF ¶ 249. Even for those vehicles that defendants did not provide to the military, they nevertheless provided· fuel and "reasonable support for maintenance/repair of military vehicles dedicated to Mobil's Aceh operations." PX-252 at CA0001046567 (letter from Wilson to President Director CEO of Pertamina). In other words, there is more than enough evidence to support the inference that a vehicle's recurring usage at defendants' facilities is indicative of some connection to those facilities.

39

A reasonable jury could also consider the types of security services provided by the military protecting Arun Field, which extended beyond the Arun Field facilities themselves. As previously discussed, the military provided escorts, established security posts and employed roving patrols along the roads, and conducted "sweeping" operations. *See infra* Sec. II.A.3. There is evidence in the record that these "sweeps" were conducted in the neighboring villages and were sometimes conducted at defendants' request. *See* CSMF ¶¶ 289, 291, 292, 294. Thus, when construing the record in the light most favorable to plaintiffs, the fact that John Doe VIII's shooting occurred away from Cluster 4 is of no moment. A reasonable jury could conclude that "area protection" and "protective sweeps" of nearby local villages were part and parcel of the security services provided by soldiers guarding Arun Field.

Finally, a reasonable jury could draw inferences in favor of Jane Doe II's claim from the evidence supporting Jane Doe IV's claim. *See infra* Sec.IV.B.4.iv. Jane Doe IV's husband was also killed on the morning of December 4, 2000, and her village was along the same road between Jane Doe II's village and Cluster 4. *See* PX-375. Jane Doe IV testified that she recognized the trucks that arrived in her village from Cluster 4, and her son and neighbor testified that they recognized the soldiers arriving in these trucks (and who killed Jane Doe IV's husband) because these soldiers were assigned to guard Cluster 4. *See infra* Sec.IV.B.4.iv. This evidence also supports Jane Doe II's claim.

*Direct Liability Claims.* Viewing the record in the light most favorable to plaintiffs, a reasonable jury could conclude that the soldiers who killed Jane Doe II's husband were the same soldiers that defendants negligently hired and supervised. The record supports the inference that the soldiers who committed the killing provided security for Cluster 4. Accordingly, a reasonable

jury could find that defendants caused Jane Doe II's injuries in the context of her direct liability claims.

*Indirect Liability Claims.* A reasonable jury could also find that defendants are vicariously liable for the murder of Jane Doe II's husband. First, for the same reasons set forth above, a reasonable jury could find that there is an employment relationship between defendants and the soldier who committed the shooting because of his ties to Cluster 4. Second, a reasonable jury could find that there is a "functional connection" between the shooting and guarding defendants' operations. The Court's conclusion here warrants additional discussion. Plaintiffs contend that the killing occurred "within the Arun gas field area." Pls.' Opp'n 35. The Court is skeptical of this argument because the shooting took place *outside* of Cluster 4—where the soldiers appear to have been assigned.

Nevertheless, the Court finds that a reasonable jury could find a "functional connection" between John Doe VIII's shooting and the protection of Arun Field because it is reasonable to infer that the soldier killed John Doe VIII "in the course of performing his duties." *See Doe*, 69 F. Supp. 3d at 103. The Court has already explained that "area protection" and "protective sweeps" were part and parcel of the security services provided by soldiers guarding Arun Field. *See supra* Sec.II.A.3. So were the soldiers who arrived in the village providing "area protection" for defendants? A reasonable jury could conclude as such. December 4 was a day of symbolic importance for the Aceh independence movement—and Cluster 4 had been a previous target on this day. CSMF ¶ 354. Witnesses testified about GAM's flag ceremonies and the military's efforts to stop GAM from flying the Acehnese flag. *See, e.g.*, PX-32, ██ Dep. 34:14–23; PX-22, Jane Doe IV Dep. 58:8–60:4. Defendants' internal documents chronicled activists climbing over the Cluster 4 fence in 1999 and raising the Aceh flag in the Cluster—before the military took the flags

down. CSMF ¶ 354. At bottom, there is not only support for the proposition that violence was foreseeable on December 4, 2000, but there is also support for the notion that the military in the area proactively sought out GAM members that day. *See, e.g.*, PX-377 (describing defendants' diminished operating capacity on December 4, 2000, due to violence); PX-378. If Cluster 4 was a previous target for activists, it is not surprising that the soldiers assigned to guard Cluster 4 would be engaged in proactive sweeps. A reasonable jury could infer that the proactive sweeps of nearby villages—including Jane Doe II's village—were functionally connected to protecting Arun Field. Accordingly, there is sufficient evidence of causation for Jane Doe II's indirect liability claims.

### *(iii) Jane Doe III*

Jane Doe III alleges that on September 17, 2000, "members of ExxonMobil's security personnel" killed and "disappeared" her husband, John Doe IX. 2nd Am. Compl. ¶¶ 193–98, 212–35; *see* CSMF ¶¶ 358, 360. She brings claims for wrongful death, negligence, negligent hiring, and negligent supervision. 2nd Am. Compl. ¶¶ 193–98, 212–35. Defendants contend Jane Doe III "has no evidence" of which soldiers abducted her husband, "where they took him, what their assignment was, the identity of their commander, or who was directing their activities." Defs.' Mem. 19. That is incorrect.

John Doe IX was a traveling fish merchant who regularly stopped at the market in the village of Paya Brandang, where Exxon's Bachelor Camp was located. RCSMF ¶ 368. Bachelor Camp was operated and managed by defendants. *See, e.g.*, CSMF ¶¶ 281, 371; PX-18, Duffin Dep. 18:19–19:1 (explaining that Bachelor Camp was used by EMOI to house employees); PX-89 at CA0001147209 (listing Bachelor Camp among properties that "Mobil manages"). Members of the Indonesian military were tasked with guarding and providing security at Bachelor Camp and would often eat meals there. *See, e.g.*, CSMF ¶ 63; PX-91 at CA0001005933 (Daily Security

Report for September 13–14, 2000 listing 70 soldiers at Bachelor Camp); PX-92 at CA0001005939 (Daily Security Report for September 22–26, 2000 listing 70 soldiers at Bachelor Camp); PX-31, ▆▆▆ Dep. 18:24-19:15; *see also* PX-54 at CA0001047716–17 (email from defendants' manager "revis[ing] the deployment logistics of the new military resources" for Bachelor Camp in December 2000).

On the day of John Doe IX's disappearance, one eyewitness, ▆▆▆ was working in his small kiosk near the Bachelor Camp facilities. *See* PX-31, ▆▆▆ Dep. 11:16–23, 22:6–9. A truck transporting ten to twelve marine corpsmen was passing by Bachelor Camp, when its tire exploded, causing the truck to fall into a roadside ditch. *See* CSMF ¶ 360, PX-31, ▆▆▆ Dep. 22:10–18, 32:4–23. ▆▆▆ then heard gunshots from the soldiers inside Bachelor Camp, who apparently believed that the truck was under attack. PX-31, ▆▆▆ Dep. 22:19–23.

Thirty to forty soldiers exited Bachelor Camp. SMF ¶ 59; CSMF ¶¶ 365–66. ▆▆▆ testified that these soldiers were the same ones that he recognized to be tasked with guarding defendants' facilities at Bachelor Camp. CSMF ¶ 365; *see* PX-31, ▆▆▆ Dep. 12:14–14:21; 17:5–22; 18:24–20:12; 23:9–15. These soldiers gathered the local men—including ▆▆▆ —and interrogated and beat them. *See, e.g.*, CSMF ¶ 367; PX-31, ▆▆▆ Dep. 24:20–25:5.[21]

The primary dispute among the parties is whether a reasonable jury could find that the so-called "Bachelor Camp" soldiers were the same ones that killed and "disappeared" John Doe IX. *See* Defs.' Mem. 20 n.13. ▆▆▆ testified that after he was beaten for more than fifteen minutes, he was taken by the soldiers to another nearby location where he witnessed John Doe IX lying

---

[21] While Exxon spurns the characterization "Bachelor Camp soldiers," *see, e.g.*, RCSMF ¶ 367; Defs. Reply 7–10, the characterization makes sense when the witness is testifying that the soldiers who committed these beatings were the same soldiers that he recognized because they regularly guarded Bachelor Camp. Considering ▆▆▆ background as a former-Exxon employee who spent time at Bachelor Camp, CSMF ¶ 361; *see* ▆▆▆ Dep. 43:22–44:6; and the proximity of his kiosk, the inference that "Bachelor Camp soldiers" refers to those who were guarding the facilities is a reasonable one.

motionless on the ground with five other individuals. *See* CSMF ¶ 360; PX-31, ████ Dep. 27:22–30:3. At this point, he testified that the group of soldiers present and standing nearby was "mixed" between the Bachelor Camp soldiers and the marine corpsmen from the disabled vehicle. *See* PX-31, ████ Dep. 29:11–22; 33:13–19. He then witnessed military trucks arrive and unspecified soldiers load John Doe IX onto a truck. *See* PX-31, ████ Dep. 30:5–23.[22]

*Direct Liability Claims.* A reasonable jury could find that the soldiers who killed John Doe IX were the same soldiers assigned to guard Bachelor Camp. The Court must construe all facts in the light most favorable to plaintiffs. Here, it was the Bachelor Camp soldiers who (1) began shooting from within the camp in response to a perceived threat; (2) exited the facility and gathered the local men; and (3) conducted interrogations and beatings. The Bachelor Camp soldiers stood nearby John Doe IX as he lay motionless on the ground. ████ also testified that the accident was severe—the vehicle was "upsidedown," ████ Dep. 22:14; and ████ witnessed two of the marines crushed by the trunk of the truck, *id.* at 33:3–13. The marines in the accident were attending to the other marines in the vehicle. *Id.* It is thus less likely that these marines were the ones who harmed John Doe IX. Under these circumstances, it is reasonable to infer that the soldiers conducting the beatings—including John Doe IX's—were the ones assigned to Bachelor Camp.

A reasonable jury could find that the soldiers who killed John Doe IX were the same soldiers that defendants negligently hired and supervised. Accordingly, there is sufficient proof of causation for Jane Doe III's direct liability claims.

---

[22] The statements from plaintiffs' other eyewitness, ████, who relayed the events to Jane Doe III when she arrived in the village, are not probative on this particular issue. *See, e.g.*, CSMF ¶ 370.

44

*Indirect Liability Claims.* For the same reasons, a reasonable jury could conclude that the soldiers who exited Bachelor Camp and killed John Doe IX were in an employment relationship with defendants to provide security for their facilities. The "functional connection" analysis only confirms this conclusion. Here, witness testimony reflects that the soldiers responded to what they believed to be an apparent attack on Bachelor Camp—which prompted shooting, interrogations, beatings, and John Doe IX's killing. The Court previously recognized that injuries committed by military security who were stationed at, and provided security for, defendants' operations implicate the "functional connection" required by Indonesian law. *Doe*, 69 F. Supp. 3d at 104. Because they were responding to a perceived attack on defendants' facilities, there is a "functional connection" between the killing and the protection of Bachelor Camp. There is sufficient proof of causation for Jane Doe III's indirect liability claims.

### *(iv) Jane Doe IV*

Jane Doe IV alleges that her husband, John Doe X, was killed on December 4, 2000 (the same day that Jane Doe II's husband was killed). CSMF ¶¶ 66, 374; *see* 2nd Am. Compl. ¶ 186. John Doe X was a rice farmer who was shot while working in his rice paddy near their family home. *See* CMSF ¶¶ 377, 381. Jane Doe IV brings claims for wrongful death, negligence, negligent hiring, and negligent supervision. 2nd Am. Compl. ¶¶ 193–98, 212–35. Defendants argue that Jane Doe IV's allegations are "completely devoid of any evidence that could tie [d]efendants to the death of her husband." Defs.' Mem. 20. They are wrong.

On December 4, 2000, Jane Doe IV and her family lived in a village about one kilometer from Cluster 4. *See, e.g.*, CSMF ¶ 375. Soldiers arrived at their home that morning. CSMF ¶ 377. Jane Doe IV's son, ████ testified that he recognized five to ten of these soldiers from "within the yard of Exxon"—that is, "Cluster 4." CSMF ¶¶ 380, 382; *see* PX-33, ████ Dep. 9:11–11:7;

45

37:6–13. ▆▆▆ and ▆▆▆ a neighbor who also witnessed John Doe X's murder, walked by Cluster 4 daily on their way to and from school. *See* PX-33, ▆▆▆ Dep. 12:5–15; PX-32, ▆▆▆ Dep. 9:25–10:7. ▆▆▆ testified in his deposition that he recognized six of the soldiers, and that these soldiers worked both inside and outside the fence at Cluster 4. CSMF ¶¶ 386–87; PX-32, ▆▆▆ Dep. 69:18–22, 101:4–102:10. These soldiers would "often" bully the boys by requiring them to recite national principles and to sing the national anthem, forcing the boys to do push-ups or pinching the boys' stomachs when they made mistakes. PX-33, ▆▆▆ Dep. 11:4–12:21; *see* CSMF ¶¶ 380, 386–87; PX-33, ▆▆▆ Dep. 20:10–15; PX-32, ▆▆▆ Dep. 11:19–12:14. Jane Doe IV also testified that the vehicles used by the soldiers on December 4, 2020, were the same vehicles that she saw parked at Cluster 4. PX-22, Jane Doe IV Dep. 70:3–12.[23]

Twenty to thirty soldiers—including the five to ten soldiers that ▆▆▆ recognized and the six recognized by ▆▆▆—passed ▆▆▆ and went into the rice paddy where ▆▆▆'s father was working. PX-33, ▆▆▆ Dep. 13:17–14:3; 15:5–16:17; ▆▆▆ Dep. 10:2–7. There, the soldiers shot John Doe X. *See* CSMF ¶¶ 381, 383. ▆▆▆ testified that his father was shot by a soldier that he recognized from Cluster 4. PX-33, ▆▆▆ Dep. 16:4–9, 23:10–15.

Accordingly, defendants are simply wrong that neither Jane Doe IV's son nor her neighbor "could identify any of the soldiers involved in the shooting." Defs.' Mem. 20. Instead, eyewitnesses recognized the soldiers from Cluster 4, where they worked inside and outside the fence. As noted in the discussion of Jane Doe II's claims, defendants operated Cluster 4 at the relevant time and relied on the military to provide security. *See supra* Sec.IV.B.4.ii. Jane Doe IV also linked the soldiers to Cluster 4 via their vehicles. Accordingly, for all the same reasons set

---

[23] While Exxon accuses Jane Doe IV of inconsistent and evolving testimony, *see* SOF ¶¶ 67–69, Jane Doe IV has also stated that she recognized the soldiers from Exxon's facilities, *see, e.g.*, CSMF ¶ 389; PX-22, Jane Doe IV Dep. 69:17–21. At this stage, the Court will not make credibility determinations. *See United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency*, 859 F.3d 1085, 1091 (D.C. Cir. 2017).

forth in the discussion of Jane Doe II's claims, a reasonable jury could connect the soldiers to Cluster 4—and defendants—via the vehicles that the soldiers used. *See supra* Sec.IV.B.4.ii.

*Direct Liability Claims.* A reasonable jury could find that the soldiers who murdered Jane Doe IV's husband were the same soldiers that defendants negligently hired and supervised. Indeed, in addition to the inferences supporting Jane Doe II's claims, there is witness testimony that the soldiers who killed John Doe X were assigned to guard Cluster 4 while it was operated by defendants. Accordingly, there is sufficient proof of causation for Jane Doe IV's direct liability claims.

*Indirect Liability Claims.* A reasonable jury could find that the soldiers who killed Jane Doe IV's husband did so "in the course of performing their duties" because there is a "functional connection" between the shooting and guarding defendants' operations. Defendants contend that plaintiffs cannot show "who supervised, commanded, directed, or paid the soldier who allegedly killed Jane Doe IV's husband." Defs. Mem. 20–21. But a specific "supervisor," "commander," "director," or "payor" is not needed to connect the soldiers to the defendants. Instead, all that is needed is a functional connection. As discussed in the context of Jane Doe II's claims, a reasonable jury could find that proactive sweeps of the villages close to Cluster 4 on December 4, 2000, were functionally connected to providing security at defendants' facilities. *See supra* Sec.IV.B.4.ii. Accordingly, there is sufficient proof of causation for Jane Doe IV's indirect liability claims.

*(v) Jane Doe V*

Sometime in January 2001, John Doe I went missing. CSMF ¶ 41, SOF ¶¶ 78–80. Eventually, after several days, soldiers returned John Doe I to his home. CSMF ¶ 411. When he arrived home, John Doe I was wearing only his underwear, his hand had been cut off, and he was missing an eye. CSMF ¶ 412; *see* PX-99 (photo of John Doe I's injuries). Jane Doe V brings

claims on behalf of her husband, John Doe I, for battery, assault. arbitrary arrest, detention and false imprisonment, negligence, negligent hiring, and negligent supervision. *See* 2nd Am. Compl. ¶¶ 199–235.[24] Defendants contend that Jane Doe V "provided no evidence identifying who allegedly took her husband or where he was taken, and could not connect the Indonesian soldiers to defendants." Defs.' Mem. 21. They also argue that the only evidence connecting the soldiers to defendants is inadmissible and thus cannot be considered. Defs.' Reply 11–12. Neither argument holds water.

John Doe I was a businessman who traveled and sold vegetables from his motorcycle cart. CSMF ¶ 408. His daily route took him past Point A and Cluster 3, which were operated by defendants. CSMF ¶ 409; PX-381; *see* CSMF ¶¶ 415–16. Also along his route were posts set up by the military providing security for defendants' operations. *See, e.g.*, PX-26, John Doe II Dep. 140:8–141:20 (describing temporary posts around defendants' facilities); PX-214 at CA0001005149 (document from January 2001 providing that "official security services will primarily deploy 'outside the wire' [at Point A]"). John Doe I was familiar with the soldiers stationed along his route. CSMF ¶ 408; PX-23, Jane Doe V Dep. 36:4–11, 61:12–25 ("[H]e would know them because he was always went back and forth along that road.").

Jane Doe V testified that after John Doe I was returned by the soldiers after his abduction, he was in pain and "shock," and that he cried the entire night that he returned. CSMF ¶ 412; *see* PX-23, Jane Doe Dep. 63:24–64:14. As soon as he was able to speak, he told Jane Doe V that "he was taken by soldiers working at Point A and then his hand was cut off and they took his eye." PX-23, Jane Doe V Dep. 64:15–19. He also told Jane Doe V that he had been taken by "Exxon soldiers," who took him to an Exxon post and tortured him. *Id.* at 64:20–65:10.

---

[24] Jane Doe V was substituted as a plaintiff for her husband after he died in 2003. *See* Order, ECF No. 200.

48

Defendants argue that these statements are inadmissible hearsay, and thus cannot create a genuine dispute of material fact. To survive a motion for summary judgment, the non-moving party must "produce evidence . . . capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). "[S]heer hearsay" evidence "counts for nothing" at the summary judgment stage unless an exception to the rule against hearsay applies to the statement at issue. *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen*, 199 F.3d at 1369).

Plaintiffs counter that John Doe I's statements qualify as excited utterances. Federal Rule of Evidence 803(2) creates a hearsay exception for "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). "The rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable.'" *United States v. Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003) (quoting *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001)). "Thus, to qualify as an excited utterance, 'the declarant's state of mind at the time that the statement was made [must] preclude[ ] conscious reflection on the subject of the statement.'" *Id.* (quoting *United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999)).

~   The D.C. Circuit has held that "[f]or a statement to qualify as an excited utterance, the proponent of the exception must establish: (1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event." *Id.* Notably—and unlike the present sense impression exception, *see* Fed. R. Evid. 803(1)—an excited utterance "need not be

contemporaneous with the startling event to be admissible," *Alexander*, 331 F.3d at 122. Instead, the statement must be "contemporaneous with the excitement engendered by the startling event." *Id.* (quoting *Joy*, 192 F.3d at 766).

John Doe I's statements fall neatly within the exception for excited utterances. A "startling event" is present here. John Doe I was taken, tortured, and horrifically injured by the soldiers. *See, e.g.*, *United States v. Pursley*, 577 F.3d 1204, 1220 (10th Cir. 2009) ("Mr. Cluff clearly experienced at least one startling event, the brutal assault."); *cf. Alexander*, 331 F.3d at 123 (noting that courts should consider "the characteristics of the event" and the declarant's "physical and mental condition"). Next, the evidence supports that his statement was made while under the stress and excitement caused by the event. Jane Doe V testified that they had no medication at their house, so John Doe I received no pain medication or treatment before the statements were made. CSMF ¶ 413; *see* PX-23, Jane Doe V Dep. 65:24–66:7. The severity of John Doe I's injuries (including a lost eye and a missing hand) was reflected by his demeanor—he "was in shock and shaking" from the pain and crying through the night. *Id.* at 63:24–64:14. He was otherwise unable to speak. *See, e.g.*, *id.* at 65:18–19 ("It was like he was dead and he was not able to talk, he couldn't remember."). All these facts support the conclusion that John Doe I made his statements under the stress caused by a traumatic experience. *See, e.g.*, *Webb v. Lane*, 922 F.2d 390, 395 (7th Cir. 1991) ("[P]hysical suffering serves to prolong the reflection period."); *Pursley*, 577 F.3d at 1220 (recognizing declarant's "considerable pain" and the fact that he "vomited" shortly before he made the statements). Finally, John Doe I's statement relates to the startling event—he told his wife what had happened to him and who did it. John Doe I's statements qualify as excited utterances.

Defendants' arguments to the contrary are without merit. They contend that plaintiffs fail to identify "how long after [John Doe I's] injuries he mentioned 'Exxon soldiers.'" Defs.' Reply

12. But the D.C. Circuit has explained that while "the lapse of time between the startling event and the declarant's statement is relevant to whether the declarant made the statement while under the stress of excitement, the temporal gap between the event and the utterance is not itself dispositive." *Alexander*, 331 F.3d at 122–23 (citing *United States v. Jones*, 299 F.3d 102, 112 (2d Cir. 2002)). So too here. The temporal gap between the event and the statement is "only one factor to be taken into account" in determining whether the declarant was under the stress of excitement caused by the event or condition." *Jones*, 299 F.2d at 112. Here, for the reasons set forth above, context indicates that John Doe I's "state of mind at the time that the statement was made precluded conscious reflection on the subject of [his] statement.'" *Alexander*, 331 F.3d at 122 (quoting *Joy*, 192 F.3d at 766). And despite the lack of definitive temporal information in the record, the timeline for John Doe I's statement is not unbounded. John Doe I made these statements before he received medical attention, which was three days after arriving home. Moreover, Jane Doe V testified that John Doe I made the statements at issue "as soon as [he] was able to speak" when he returned. PX 23, Jane Doe V Dep. 64:13–19. Even then, Jane Doe V was surprised that John Doe I was alive when he made the statements. *Id.* at 65:15–23 ("It was like he was dead and he was not able to talk, he couldn't remember."). Timing is simply not dispositive under these circumstances to determine whether John Doe I's statements qualify as an excited utterance. At this stage, there is sufficient evidence that John Doe I's statements qualify for the hearsay exception.

Defendants also contend that there is insufficient information about John Doe I's "physical or mental state" at the time. Defs.' Reply 12. This argument is frivolous. There is evidence in the record that John Doe I had lost his hand and eye, was in terrible pain and crying all night, and did not receive medical treatment for his injuries. Given his condition, the evidence is more than

51

sufficient to conclude that his statements were made under the stress of excitement caused by the events.

Defendants also contend that John Doe I called the Indonesian soldiers "'Exxon soldiers' merely because he had seen them on a road near Arun Field." Defs.' Reply 12. The Court rejects this characterization of the record, which not only ignores aspects of Jane Doe V's testimony, but also does not construe the facts in a light most favorable to plaintiffs. Jane Doe V's husband told her that "he was taken by soldiers *working at point A*" and also that he was taken to an "Exxon post." PX-23, Jane Doe V Dep. 64:15–65:10. Elsewhere in her deposition testimony, Jane Doe V reiterated that her husband described the men who took him as those who were at defendants' post or security office. *Id.* at 34:19–35:21. John Doe I maintained a consistent route for his business that passed by defendants' facilities, and it is reasonable to infer that he was familiar with the soldiers in the area. To the extent that defendants criticize the witnesses' credibility, *see* Defs.' Reply 12 n.8, or ask the Court to draw inferences against the plaintiffs, the Court will not do so. *See Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

*Direct Liability Claims.* If crediting John Doe I's statements, a reasonable jury could conclude that the soldiers who abducted and tortured John Doe I worked at Point A and provided security for defendants. Accordingly, a reasonable jury could conclude that the soldiers who harmed John Doe I were the same soldiers that defendants negligently hired or supervised. There is sufficient proof of causation for Jane Doe V's direct liability claims.

*Indirect Liability Claims.* A reasonable jury could conclude that the soldiers were in an employment relationship with defendants—John Doe I stated as much. Because John Doe I testified that he was taken to and tortured at defendants' facilities, the soldiers' acts have a "functional connection" to their role of providing security at Arun Field. *See Doe,* 69 F. Supp. 3d

52

at 104 (holding that the functional connection test is satisfied for "injuries [] inflicted on Exxon property"). There is sufficient proof of causation for Jane Doe V's indirect liability claims.

### *(vi) Jane Doe VI*

Jane Doe VI alleges that, in or around July 2000, her son, John Doe III, was shot and beaten by soldiers guarding Cluster 2. *See* 2nd Am. Compl. ¶ 178. She brings claims on John Doe III's behalf for battery, assault, arbitrary arrest, detention and false imprisonment, negligence, negligent hiring, and negligent supervision. *Id.* ¶¶ 199–235.[25]

In July 2000, a large group of villagers was walking along the "Exxon Road" to Point A to seek refuge. CSMF ¶ 422; *see, e.g.*, PX-34, ████████ Dep. 7:21–25, 55:12–13; PX-24, Jane Doe VI Dep. 55:20–56:8. Defendants' internal documents and emails reflect that as thousands of villagers sought refuge at Point A, troops fired "warning shots" to disperse the villagers. CSMF ¶ 423; *see, e.g.*, PX-75 at CA0001101448–50, PX-79 at CA0001173787; PX-102 at CA0001191483–86. Jane Doe VI ████████████ ████████, and her two other young children were walking down the road toward Point A when they passed by Cluster 2, a facility operated by defendants. CSMF ¶¶ 422, 424–425, 433. At this time, defendants requested and monitored military security personnel assigned to Cluster 2. *See, e.g.*, PX-120, PX-135. As Jane Doe VI and her family arrived at the facility, a group of soldiers exited the Cluster 2 gate and shot John Doe III. CSMF ¶¶ 427–29; *see* PX-34, ████████ Dep. 10:3–22, 66:6–8. After shooting John Doe III, the soldiers beat him. *See* CSMF ¶ 430; PX-34, ████████ Dep. 10:24–11:6.

████████ testified that "the Exxon soldiers" shot and beat her brother—a characterization that defendants vehemently dispute. Defs.' Mem. 23, Defs. Reply 7–9; *see, e.g.*, CSMF ¶¶ 430–

---

[25] Jane Doe VI was substituted as a plaintiff for John Doe III due to his death in 2002. *See* ECF No. 198, Ex. B; ECF No. 200.

31. Defendants focus their arguments on _____'s statements about "Exxon soldiers" in the "surrounding of Exxon area." *See, e.g.*, SOF ¶ 91; DX-70, _____ Dep. 83:18–87:22. While _____'s deposition testimony is (often) ambiguous,[26] the Court must construe the record in the light most favorable to plaintiffs. Several times during her testimony, _____ characterized Cluster 2 as an "Exxon area." PX-34, _____ Dep. 91:17–19, 94:7–13. And _____ also testified that she had passed by Cluster 2 on previous occasions and saw soldiers at the Cluster 2 gate checking IDs. *See* CSMF ¶ 431; PX-34, _____ Dep. 14:6–15:2. A reasonable jury could find that _____'s characterization that "Exxon soldiers" committed these acts captures all of her observations: that "the soldiers were at Exxon's[,] [t]hey guard Exxon," PX-34, _____ Dep. 58:8–9; that soldiers worked at the gate checking IDs, *id.* at 14:16–15:2; and that the soldiers "came out of the gate of Cluster 2 and shot [her] brother," *id.* at 95:24–96:2. The Court must avoid improperly evaluating _____'s credibility or weighing her testimony. *See Johnson,* 823 F.3d at 705.

*Direct Liability Claims.* Viewing this evidence in the light most favorable to Jane Doe VI, a reasonable jury could conclude that John Doe III was shot and beaten by soldiers guarding Cluster 2 and that these soldiers were negligently hired and retained by defendants. Defendants' arguments to the contrary warrant little discussion because they focus on irrelevant information that _____ her mother did not know—like whether they knew anyone who worked for defendants or the identities of the soldiers involved. But circumstantial evidence that the soldiers worked for defendants guarding Cluster 2 is sufficient, and the precise identities of the soldiers are

---

[26] _____'s deposition was also affected by, among other things, technical problems, disputes between counsel about their conduct during the deposition, and repeated breaks where the witness was crying.

not needed. *See supra* Sec.IV.B.2. There is sufficient proof of causation for Jane Doe VI's direct liability claims.

*Indirect Liability Claims.* A reasonable jury could also find that the soldiers were employed by defendants to guard Cluster 2; thus, an employment relationship existed. The "functional connection" standard is also satisfied here because a reasonable jury could conclude that the security personnel committed the acts "while working at an Exxon security post" and while they were engaged in their guard duties. *Doe*, 69 F. Supp. 3d at 104.

However, the Court will **GRANT** summary judgment on Jane Doe VI's arbitrary arrest, detention and false imprisonment claims. Plaintiffs have conceded that after the incident where John Doe III was shot and beaten, he was held by the *Indonesian police*, not by Indonesian soldiers assigned to defendants' facilities who allegedly shot him. *See* CSMF ¶ 87. In all other aspects, there is sufficient proof of causation for Jane Doe VI's indirect liability claims.

### (vii) *Jane Doe VII*

On behalf of her deceased husband, John Doe V, Jane Doe VII alleges that, in 1999, "ExxonMobil's security personnel" burned down their house. *See* 2nd Am. Compl. ¶ 180; CSMF ¶ 443.[27] She also alleges that, in 2003, John Doe V was "again abused by ExxonMobil's security personnel," who "took him to one of their posts near Cluster IV," where he was severely beaten and held for three or four days. 2nd Am. Compl. ¶ 180. Her remaining claims—because her conversion claim is time-barred—are for negligence, negligent hiring, and negligent supervision. *Id.* ¶¶ 212–35. Defendants claim that "Jane Doe VII has failed to produce evidence

---

[27] Jane Doe VII was substituted as a plaintiff in 2015. *See* Order, ECF No. 513. Defendants argue that her claims should be dismissed because she failed to notify all of John Doe V's other wives and children about the litigation, as she was ordered by the Court. Defs.' Mem. 24 n.18. But while Jane Doe VII did not herself notify all of the other wives and children, *see* SOF ¶ 98, counsel represented that they retained an independent contractor to provide the notice required by this Court's order, *see* CSMF ¶ 98; ECF No. 531. Jane Doe VII's personal failure to notify these other individuals is thus of no moment.

of causation and her claims must be dismissed." Defs.' Mem. 25. The Court disagrees and addresses each incident in turn.

### (a) Claims for 1999 Injuries

The evidence connecting the soldiers who burned plaintiffs' house in 1999 comes primarily from the testimony of Jane Doe VII and [REDACTED]. While there are potentially conflicting accounts of what occurred in 1999, the Court construes the record in the light most favorable to plaintiffs. Jane Doe VII testified that soldiers arrived at their home, took her husband, and set their house on fire. *See* PX-25, Jane Doe VII Dep. 79:16–80:17; CSMF ¶ 443.[28] Jane Doe VII identified these soldiers as "Exxon soldiers," *id.* at 80:15–17, but only because her husband "told [her] that they were Exxon soldiers," *id.* at 80:20–23. After these soldiers took John Doe V, [REDACTED] witnessed them load his father into a military truck where John Doe V was blindfolded and beaten. CSMF ¶ 444; *see* PX-35, [REDACTED] Dep. 9:16–22. [REDACTED] testified that he later saw this same truck—which he testified was unique because it had two tigers drawn the sides—driving past the fence and guarded gate into Point A. PX-35, [REDACTED] Dep. 14:3–16:5, 93:15–20. When soldiers eventually returned John Doe V home, he was beaten, cut, weak, and barely able to stand. CSMF ¶ 444; *see* [REDACTED] Dep. 18:22–19:24. Witnesses testified that John Doe V was sobbing when he returned and cried out that he had been badly tortured and beaten up by "Exxon soldiers" that he knew by name. *See* CSMF ¶ 444, PX 35, [REDACTED] Dep. 18:15–21, 20:18–21:6; PX-25, Jane Doe VII Dep. 108:23–109:6; PX-112, Jane Doe VII Suppl. Resp. to Interrogatory No. 1 (Oct 5, 2020) at 8.

The Court agrees with defendants that Jane Doe VII's contention that "Exxon soldiers" took her husband is not based on her personal knowledge and thus cannot create a genuine dispute.

---

[28] Jane Doe VII does not bring a claim for the 1999 abduction. CSMF ¶ 443 n.42.

of material fact. *See Gleklen*, 199 F.3d at 1369 (noting that evidence considered at summary judgment must be capable of being converted into admissible evidence at trial); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Nevertheless, a reasonable jury could draw inferences based on *John Doe V's* statement that he was taken by "Exxon soldiers." Defendants try to cut these inferences off at the source and contend that his statements are inadmissible hearsay. Defs.' Mem. 25. This argument is unpersuasive. There is sufficient evidence that these statements were excited utterances. *See* Fed. R. Evid. 803(2). Like John Doe I, a startling event is present here because John Doe V had been taken, beaten, and tortured. There is evidence in the record that John Doe V made the statement "under the stress" caused by the startling event because he had only just returned home, was cut in multiple places, burned, weak, barely able to stand, and crying. *Alexander*, 331 F.3d at 122; *see* PX-112 at 8 (noting that his family ran out to meet him and, while crying, he cried out "I'm back home, I'm still alive"). Finally, the statements "relate to" the startling event because John Doe V identified who harmed him. *Id.* The statements are excited utterances and thus would be admissible.

The Court must then address whether John Doe V's statements about the soldiers' identity—and the other evidence in the record—are sufficient to create a genuine dispute about whether the soldiers guarded defendants' facilities. There is sufficient evidence here. John Doe V stated that he knew the individual soldiers who took him. *See* PX-35, ▮▮▮▮▮ Dep. 20:18– 21:6 ("[H]e knew them by person. He knew the person or the people. . . . [H]e know [sic] them by name."). It is a reasonable inference that knowing the individual soldiers could also encompass personal knowledge about their duties.

Defendants try to capitalize on Jane Doe VII's testimony that John Doe V gave the soldiers their label "because the soldiers were stationed near the Exxon facilities." PX-25, Jane Doe VII Dep. 80:24–81:3. The Court is not persuaded. First, defendants rely on a faulty premise—that being stationed near defendants' facilities is not probative of whether a soldier provided security for defendants. But as discussed previously, the record supports that soldiers providing security at Arun Field also engaged in "area protection," extending the security services outside of the facilities themselves. Second, Jane Doe VII's testimony is not as clear as defendants suggest: Jane Doe VII initially stated, "There are so many Exxon soldiers—there are so many soldiers *in there*." *Id.* at 80:20–23 (emphasis added). In other words, a reasonable jury could conclude that the descriptor seems to encompass soldiers working in *and* around defendants' facilities. Finally, there is sufficient evidence in the record suggesting that John Doe V was capable of distinguishing between military assigned to roles at defendants' facilities from the other soldiers in the region.

testified that Jane Doe V attended local police trainings facilitated by the district military command, so John Doe V had some familiarity with the other soldiers in the surrounding area that were not affiliated with defendants. CSMF ¶ 436, PX 35, Dep. 26:18–27:9. John Doe V also previously worked as a driver, including for MOI at Arun Field and at Point A through the 1980s, so he was familiar with the soldiers in the area (and their roles) at the time he drove. CSMF ¶ 436; SOF ¶ 104; PX-25, Jane Doe VII Dep. at 107:18–108:19.[29]

Finally, in conjunction with this evidence, a reasonable jury could consider that the truck was later seen at Point A. In light of all the available evidence in the record, viewed as a whole, the Court concludes that a reasonable jury could find that the soldiers who burned down the

---

[29] Plaintiffs have stated that they do not dispute that John Doe V had no employer in the 1990s. CSMF ¶ 104.

house—and then took and held John Doe V—were the same soldiers negligently hired, supervised, or retained by defendants.

### (b) Claims for 2003 Injuries

The evidence in support of the claims for Jane Doe V's 2003 injuries comes mostly from John Doe V's sworn interrogatory answers.[30] John Doe V stated that in 2003, he was picked up by soldiers from "Unit 100." CSME ¶ 437, PX-111 John Doe V's Suppl. Resp. to Exxon Mobil Oil Corp.'s First Set of Interrogatories ("John Doe V Responses") at 3. He named each of the soldiers who attacked him. *See* PX-111, John Doe V Responses at 3. They took him to a temporary post near Cluster 3, where they kicked him, beat him all over, and urinated on him. *Id.* He returned home about three days later, bruised, swollen, and smelling of urine. *Id.*; *see* PX-25, Jane Doe VII Dep. 111:12–112:15 ("So he felt a lot of sores on his body and . . . in his ribs, and he smelled like urine because he said the Exxon soldiers urinate [sic] or peed on him."). Jane Doe VII has provided a declaration in which she explains that when John Doe V returned home that he was "weak, afraid, and shocked"; that she could see the bruises and marks on his wrists where he was tied; that he was unable to walk normally, and that "his face was pale and his voice was trembling when he told [her] the Exxon soldiers had taken him and tortured him" and that he "knew who the Exxon soldiers were." PX-112, Jane Doe VII Decl. ¶¶ 4–5. Jane Doe VII believed that John Doe V was in a lot of pain and scared. *Id.* ¶ 4.

---

[30] By citing the interrogatory answers, plaintiffs have met their burden to support their factual assertions. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). While defendants suggest in their Response to Plaintiffs' Counterstatement of Material Facts that some of the statements made by John Doe V in his interrogatory responses are hearsay and include a citation to their brief; *see* RCSMF ¶ 438, they do not address the interrogatory statements in their brief at all. Principles of forfeiture and waiver bar consideration of the issue at this juncture because defendants have failed to object or develop any purported objection. *See* Fed. R. Civ. P. 56(c)(2); *Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 126 (D.D.C. 2015) (explaining that "perfunctory and undeveloped arguments" are "deemed waived").

Defendants raise similar objections that these identifications and statements to Jane Doe VII are hearsay and that the reference to "Exxon soldiers" cannot create a dispute of material fact. For the same reasons as before, these objections fail. The abduction and torture and subsequent pain constitute a startling event. The evidence reflects that John Doe V was under the influence of the events—he appeared to be in pain and unable to walk normally, he was pale and his voice was trembling, and this was the "first thing" he said to Jane Doe VII when he returned home. PX-112, Jane Doe VII Decl. ¶¶ 4–5. Here too, defendants' timing objections have no merit when the circumstances indicate that John Doe V was under the influence of the event. Finally, the statement relates to the event—John Doe V identified who took him. Regarding the "Exxon soldiers" identification, as before, a reasonable jury could infer that this characterization reflects John Doe V's observations—he was taken to a temporary post near Cluster 3 and he knew *who the soldiers were.* Not only did defendants operate Cluster 3, but their military security also set up temporary posts near defendants' facilities as part of their security role. *See, e.g.,* PX-118 at CA0001173764; PX-86 at CA0001182942. A reasonable jury could conclude that the soldiers who took John Doe V in 2003 were the same ones that defendants negligent hired, retained, or supervised. There is sufficient evidence of causation for Jane Doe VII's direct liability claims.

        *(viii) Jane Doe VIII*

Jane Doe VIII alleges that, in or around November 2000, "ExxonMobil's security personnel" abducted her husband, John Doe VI, and tortured him, after which he was held by the police for four months. 2nd Am. Compl. ¶ 181. Jane Doe VIII brings claims on behalf of John Doe VI for battery, assault, arbitrary arrest, detention and false imprisonment, negligence, negligent hiring, and negligent supervision.[31] Defendants claim that Jane Doe VIII has provided

---

[31] Jane Doe VIII was substituted for John Doe VI after his death in 2012. *See* ECF No. 495-4, Ex. 2; ECF No. 513.

"no evidence that the soldiers who allegedly shot and detained her husband did so at the direction of EMOI or even while protecting Arun Field." Defs.' Mem 27. As explained below, Jane Doe VIII has provided sufficient proof of causation for her direct liability claims. But plaintiffs have failed to provide sufficient evidence of the "functional connection" necessary to survive summary judgment on the indirect liability claims.

Jane Doe VIII and John Doe VI have a special-needs son. CMSF ¶ 447. One morning in November 2000, Jane Doe VIII woke John Doe VI to tell him that their son ran away from home. CSMF ¶ 448. John Doe VI left to look for his son and stopped in Matang Kuli, a small-town abutting Cluster 4. CSMF ¶¶ 449–50. Defendants operated Cluster 4 at this time. CSMF ¶ 451. There, soldiers detained John Doe VI and eventually took him to his home village, demanding that he identify GAM members. *See, e.g.*, CSMF ¶ 452. Soldiers then ordered John Doe VI to run away, but fearing that he would be shot, John Doe VI instead crouched by a nearby fence, pleading for his life. *Id.*

A third party— [32]—witnessed this interaction and recognized several of the soldiers from Exxon's facilities. Twenty soldiers brought John Doe VI near 's house. PX-36, Dep. 8:3–10:6. There, saw John Doe VI with his hands tied behind his back before the soldiers pushed him onto his back, into the mud, and then shot him in the calf. *Id.* at 9:6–23. recognized ten of the soldiers from Exxon's Bachelor Camp—"four of them were pointing guns right behind [John Doe VI], and six other [sic] were following them." CSMF ¶¶ 453–54; *see* PX-36, Dep. 10:21–11:23, 112:24–113:18. also believed that the soldiers recognized him as well because they "looked that they were ashamed because [he] knew them." *Id.* at 12:19–24; CSMF ¶ 454.

---

[32] The Court will refer to this witness by his full name to avoid confusion with the witness discussed previously.

███████ testified in his deposition that he worked at defendants' facilities on a rig for an Exxon subcontractor. *See, e.g.*, CSMF ¶ 457. And as part of his job, he worked shifts and would stay at Bachelor Camp, which was operated by defendants. *See* CSMF ¶¶ 457–58. ███████ not only observed the soldiers at Bachelor Camp but shared meals with them. CSMF ¶ 459; *see* PX-36, ███████ Dep. 10:21–11:23, 18:2–17  When asked who the soldiers worked for, ·· ███████ said it "was not clear," *id.* at 18:8, but that when he saw the soldiers outside of mealtime, they were working in the landing dock area at A1 and other locations affiliated with defendants, *see, e.g.*, CSMF ¶ 461; PX-36, ███████ Dep. 18:23–19:4. As discussed previously, a reasonable jury could find that A1 was a location managed and operated by defendants. *See, e.g.*, PX-40, ███████ Dep: 47:12–20; PX-89 at CA0001147209 (including "A-1 - storage yard" on a list of property Mobil managed in March 2000); PX-121 at CA0001184163.

*Direct Liability.* Viewing the evidence in the light most favorable to Jane Doe VIII, a reasonable jury could conclude that John Doe III was shot and beaten by soldiers who provided security for defendants' operations and were negligently hired and retained by defendants. Notably, the jury could draw reasonable inferences connecting the soldiers to defendants' operations based on ███████ s established familiarity with the soldiers at· defendants'· facilities. This conclusion is also consistent with other evidence that soldiers—such as those at A-13—were assigned specifically to defendants' operations.

The fact that ███████ is not sure who formally employed the soldiers does not affect the Court's conclusion. As stated previously, circumstantial evidence is sufficient to establish an employment or agency relationship. The evidence that the soldiers consistently returned to the landing dock at A-1 is sufficient to support the inference that the soldiers were negligently hired and retained by defendants.

*Indirect Liability Claims.* There is insufficient evidence in the record for a reasonable jury to conclude that the soldiers shooting and beating John Doe III bears a "functional connection" to their employment relationship with defendants. Plaintiffs suggest that this connection exists because John Doe III was "abducted just outside Cluster 4," by soldiers "on duty," who were engaged in patrolling or sweeping duties. Pls.' Opp'n 35–37. The Court agrees that this would be a sufficient factual predicate to establish a functional connection. But the problem is that this factual predicate lacks sufficient support in the record. There is no evidence or testimony suggesting that the soldiers were "on duty" providing security for defendants—in fact, the witness testimony suggests that they were generally based at Bachelor Camp or A-1, not Cluster 4. Next, there is no testimony supporting the inference that the soldiers were engaged in patrolling or sweeping duties to protect the Cluster. Plaintiffs identify no facts about what the soldiers were doing when they detained John Doe III to support this inference. The only fact that supports these inferences is the soldiers' proximity to Cluster 4. While this may reinforce the point that a reasonable jury could find that the soldiers provided some security services for defendants, it is not enough for a reasonable jury to find a functional connection between the soldiers' actions and their employment.

Accordingly, there is insufficient evidence of causation for Jane Doe VIII's indirect liability claims—battery, assault, arbitrary arrest, detention and false imprisonment—and the Court will **GRANT** defendants' motion for summary judgment on these counts.

### *(ix) John Doe II*

John Doe II alleges that "ExxonMobil security personnel . . . detained and tortured him" for several months.. 2nd Am. Compl. ¶ 177. He brings claims for battery, assault, arbitrary arrest, detention and false imprisonment, conversion, negligence, and negligent supervision. 2nd Am.

Compl. ¶¶ 199–235.[33] As noted above, John Doe II's intentional tort claims are untimely—so the Court only considers John Doe's negligence claims.

On August 11, 1999, John Doe II was assaulted at, and then taken from, a local food stall just down the road from Cluster 4. *See, e.g.*, CSMF ¶¶ 471–73. Plaintiffs contend that a reasonable jury could find that the soldiers who beat and took John Doe II came from Cluster 4 and were assigned to defendants' facilities there. *See* Pls.' Opp'n 19; CSMF ¶¶ 476–78. Defendants argue that John Doe II did not know who beat and took him and that his third-party witness did not view the alleged assault. *See* Pls.' Opp'n 28. These genuine disputes of material fact are not fit for summary judgment and must be resolved by a jury.

The primary evidence in support of John Doe II's claims comes from his testimony and the testimony of the food stall's owner, █████████ John Doe II testified that while he waited for his breakfast, he observed a group of soldiers emerge from Cluster 4 and approach the food stall on foot. CSMF ¶ 476–77; *see, e.g.*, PX-26, John Doe II Dep. 94:15–20; 95:21–96:8, 97:8–23, 150:5–151:16. █████████ also testified that she witnessed the soldiers exit Cluster 4. PX-38, █████████ Dep. 14:20–24. Both John Doe II and █████████ heard gunfire after the soldiers were leaving the cluster. *See, e.g.* PX-26, John Doe II Dep. 78:1–5, 84:18–20. While other civilians fled from the sounds of gunfire, John Doe II did not run before he was surrounded by the soldiers. *See* CSMF ¶ 477; PX-26, John Doe II Dep. 84:20–22. These soldiers attacked John Doe II and proceeded to beat him with their fists and the butts of their guns. CSMF ¶ 478–79. These same soldiers then held and detained John Doe II for 51 days, CSMF ¶ 482–83; PX-26, John Doe II Dep. 102:4–11,

---

[33] John Doe II originally alleged that Indonesian soldiers burned down his house (although later he testified that it was his kiosk). *See, e.g.*, 2nd Am. Compl. ¶ 177; SOF ¶ 125. Plaintiffs have conceded that there is insufficient admissible evidence regarding the kiosk burning. *See* CSMF ¶ 125. In any event, the Court has already explained that it will grant summary judgment on John Doe II's intentional tort claims, which includes the conversion claim.

64



152:4–16, 176:17–21, during which time they horrifically tortured him, █████████████
██████████, and crippled his leg and fingers, *see, e.g.*, CSMF ¶¶ 482–490.

██████████ explicitly linked the soldiers to defendants. ██████████ testified that she knew the soldiers were "from Mobil," PX-38, ██████████ Dep. 11:9, because they were regular customers at her food stall, CSMF ¶ 475. ██████████ also lived and worked close to Cluster 4, so she was familiar with soldiers "standing at the gate." *See* PX-38, ██████████ Dep. 6:12. A reasonable jury could infer from this testimony that the soldiers who took John Doe II were assigned to work at or guard Cluster 4.

Defendants try to eliminate this factual link by arguing that ██████████ did not witness the alleged assault or see John Doe II's abduction. *See* Defs.' Mem 28; SOF ¶ 124. They make this argument despite ██████████'s testimony (1) that she witnessed the soldiers arriving from Cluster 4, *see* PX-38, ██████████ Dep. 14:20–24; (2) that she recognized the faces of the soldiers who arrived and beat John Doe II, *id.* at 19:19–22:4; (3) that the soldiers "were beating [John Doe II] with the fists, repeatedly until he was bleeding" for half an hour, *id.* at 12:19–23, 13:4–6; and (4) that she initially fell to the ground while the beating was taking place, *see, e.g.*, *id.* at 22:3–4; and (5) that after the beating John Doe II was "taken right away," *id.* at 12:15. Defendants contend that despite these unambiguous statements, ██████████ did not witness the beating or abduction because at some point during this encounter, she ran to her house. Defs.' Mem. 27. But the Court will not draw inferences against the non-moving plaintiffs. ██████████ testified about the events, about her house's close proximity to her stall, about how she did not close the door to her house when she arrived, and about how she was not hiding from the soldiers. *See, e.g.*, PX-38, ██████████ Dep. 11:8–11, 12:10–13:11, 22:9–25. A reasonable jury could find that ██████████ witnessed the events.

65

A reasonable jury could find that the soldiers who harmed John Doe II provided security for defendants. Defendants focus on John Doe II's lack of knowledge or perception—but he testified that he saw the soldiers who beat him leave Cluster 4. Moreover, a reasonable jury could find that ███████ witnessed the events and knew from her time operating a kiosk next to the Cluster that the soldiers worked for defendants. Her testimony that the soldiers were "from Mobil" strongly supports that inference. Accordingly, there is sufficient evidence of causation for John Doe II's direct liability claims.

### (x) John Doe IV

John Doe IV alleges that, in July 2000,[34] he was returning from an errand when he was "accosted by ExxonMobil security personnel" who detained and tortured him for several weeks. 2nd Am. Compl. ¶ 179; *see* CSMF ¶ 501. John Doe IV brings claims for battery, assault, arbitrary arrest, detention and false imprisonment, negligence, negligent hiring, and negligent supervision. *See* 2nd Am. Compl. ¶¶ 199–235. As previously discussed, his intentional tort claims are time-barred. *See supra* Sec.IV.A. Regarding the negligence claims, defendants argue that John Doe IV cannot tie his assault and abduction to defendants because he does not know who took him or where he was taken. *See* Defs.' Mem. 27–28. Defendants' arguments are unpersuasive.

On the evening of July 29, 1999, John Doe IV traveled with a coworker by motorcycle from Paya Bankong to Matang Kuli to pick up his wages. CSMF ¶ 502. The road between these two locations passes by Cluster 4. CSMF ¶ 503; PX-389, 390 (maps of route and showing the location of Cluster 4).[35] After John Doe IV collected the wages, he began the return trip home and was stopped about 150–200 meters (and within eyesight) of Cluster 4 by a group of about twelve

---

[34] While the complaint alleges July 2000, the record supports, and plaintiffs acknowledge, that these injuries occurred in 1999. *See* CSMF ¶ 502.

[35] The Court will take judicial notice of these maps. *See* Fed. R. Evid. 201(b); *Burroughs*, 810 F.3d at 835 n.1.

66

soldiers. *See* CSMF ¶ 506; PX-27, John Doe IV Dep. 69:9–20; PX-392, John Doe IV Decl. ¶ 2. It was dark, and the soldiers who stopped John Doe IV put a sack over his head. CSMF ¶ 507; *see, e.g.*, PX-27, John Doe IV Dep. 75:7–13 ("Q. Because it was dark and they put a bag over your head, you didn't get a good luck at any of the faces on these soldiers did you? . . . A. No, how could we see them? Our head is already put in the bag.").

As defendants correctly point out, John Doe IV did not have the opportunity to identify the faces of the individuals who stopped him. But plaintiffs contend that there is nevertheless sufficient evidence for a reasonable jury to conclude that the soldiers who harmed John Doe IV were assigned to defendants' facilities. The Court agrees. John Doe IV has explained that he was familiar with the area and the soldiers around Cluster 4 and A-13, *see* PX-27, John Doe IV Dep. 137:20–140:12, and that he "often saw soldiers come from Cluster 4 and conduct regular patrols along the road," PX-392, John Doe IV Decl. ¶ 3; *see* PX-27, John Doe IV Dep. 142:17–22. John Doe IV claims that on the night of July 29, 1999, "[t]he soldiers who picked [him] up were part of one of those regular patrols" because he "was stopped around the same time of evening and in the same location where they normally patrolled." PX-392, John Doe IV Decl. ¶ 4; *see* PX-27, John Doe IV Dep. 37:5–10 ("[W]hat I know is those soldiers come in, and live, come out or go out from that Exxon area, they live there, their vehicles were there within the fence of Exxon, so that means that those soldiers were the ones who guard Exxon.").

Defendants argue that John Doe IV's conclusion lacks support because he relied on his observation of *other* Indonesian soldiers who did not commit the assault. This argument hardly warrants serious discussion. It is true that a reasonable jury need not accept John Doe IV's ultimate conclusion that the soldiers were affiliated with defendants. But at this stage, the Court does not weigh the evidence or evaluate John Doe IV's credibility. John Doe IV testified about his

familiarity with patrols conducted by soldiers stationed at Cluster 4 and that the soldiers who accosted him appeared to be part of one of those patrols based on, among other things, the time and location where he was stopped. The Court will pause only momentarily to reiterate that there is ample support in the record that soldiers assigned to guard defendants' operations conducted perimeter patrols as part of their security services. *See, e.g.*, PX-353 at CA000133427

The soldiers who stopped John Doe IV accused him of being a member of GAM, beat him, carved the words GAM into his back, and eventually placed him in the rear of a military truck, where he heard soldiers say they were bringing him to "A-13." *See* CSMF ¶¶ 509–511. "A-13" had a notorious reputation among locals as a "torture place," CSMF ¶ 515, and while John Doe IV was not entirely sure where he was taken, he assumes that he was taken to A-13 because for the next several weeks, he was tortured, beaten, cut with knives, kept tied up, and forced to urinate and defecate in the same spot where he was tied, *see, e.g.*, CSMF ¶¶ 515–16; PX-27, John Doe IV Dep. 93:10–94:14.

As noted previously in the Court's background discussion, there is abundant support in the record for the Court to conclude that the soldiers stationed at A-13 provided security for defendants' facilities. Moreover, the inference that John Doe IV was taken to A-13 is a reasonable one—the soldiers said they were taking him there. The Court need not belabor the point. Taking all these facts together, a reasonable jury could conclude that the soldiers who detained and harmed John Doe IV were the same ones providing security for defendants. There is sufficient evidence of causation to support John Doe IV's direct liability claims at this stage.

### *(xi) John Doe VII*

John Doe VII alleges that, in January 2001, he was "accosted by members of ExxonMobil's security personnel" who took him inside of a warehouse at an Exxon-operated facility and beat

him severely before releasing him the next day. 2nd Am. Compl. ¶ 182; *see* CSMF ¶ 521. John

Doe VII brings claims for battery, assault, arbitrary arrest, detention and false imprisonment,

negligence, negligent hiring, and negligent supervision. *See* 2nd Am. Compl. ¶¶ 199–235.

Defendants contend that John Doe VII has "no first-hand evidence linking his injuries to

defendants." Defs.' Mem. 28. Defendants' contentions are meritless.

In January 2001, John Doe VII was visiting a neighbor, ███, to celebrate a religious

festival. CSMF ¶ 522. ████ was located next to A-1. CSMF ¶ 522; *see, e.g.*, PX-41,

███ Dep. 10:6 –17 (explaining that ████ was separated from A-1 only by "a little

alley, a little street"). At the party, John Doe VII saw another villager, ███ (a non-party to

this case). *Id.* As John Doe VII and ███ were leaving ███ soldiers on guard duty

at A-1 called the men over to the fence. *See* CSMF ¶ 523; PX-28, John Doe VII Dep. 127:21–24,

168:9–13; PX-41 ███ Dep. 13:23–14:19. The soldiers pointed their guns at the men and

asked for IDs. CSMF ¶ 523. After checking the IDs, the soldiers dragged John Doe VII and

███ to the fence surrounding A-1, retrieved a key to the warehouse within A-1, and then

dragged the men into the warehouse. CSMF ¶ 524. Inside the warehouse, the soldiers turned on

loud music and beat John Doe VII and ███ using their hands, feet, boots, the butts of their

rifles, a hammer, a radio, and wooden planks. *See, e.g.*, CSMF ¶¶ 525–26. The men were held

overnight at A-1, while ███'s mother gathered a group of villagers and the village chief to

protest at the A-1 gate for the men's return. *See* CSMF ¶¶ 533–34. The next morning, the soldiers

took the men to a clinic operated by defendants at Point A before releasing them. *See* CSMF

¶¶ 535–36.

Plaintiffs identify several links between defendants and the soldiers who harmed John Doe

VII and ███. Together, there is more than enough evidence for a reasonable jury to conclude

that the soldiers who detained and beat John Doe VII and ▆▆▆▆ provided security for defendants. First, there is witness testimony that these soldiers regularly provided security services for EMOI's employees and operations. *See, e.g.*, PX-28, John Doe VII Dep. 146:4–147:7; 169:18–170:8; PX-125 at 8 ("[H]e would see the soldiers often while they were working for Exxon . . . when they secured the road for Exxon convoys or when they worked at the gate to Exxon's compound"). John Doe VII and ▆▆▆▆ even identified the specific soldiers by name when explaining that they witnessed these same soldiers conducting patrols, guarding defendants' facilities, and escorting defendants' staff. *See* PX-28, John Doe VII Dep. 135:18–136:24; 147:15–19, 148:23–25; PX-41, ▆▆▆▆ Dep. 15:22–16:17 ("Razali is a soldier that was for Exxon as well, and he is a guard there. And he was always in and out of Exxon, and he was also involved in patrolling in the neighboring villages as well."); PX-125 at 8. John Doe VII also identified the soldiers' unit numbers—Units 111 and 113—and the soldiers' commander ("Mr. Anggis"). *See* CSMF ¶¶ 529–31; PX-28, John Doe VII Dep. 129:2–130:15. Defendants' internal documents reflect communications with "Anngit Exton" the "Komandan" of "Batalyon Infanteri 113." PX-118 at CA0001173763. Defendants' internal documents also discuss Unit 113's deployments and supplying Unit 113 with vehicles and fuel. *See* PX-83 at CA0001334077; PX-82; PX-85. Newspaper articles (in defendants' files) also confirm that Unit 113 was stationed at or nearby the locations where defendants operated. PX-75; PX-84. Finally, the soldiers took John Doe VII and ▆▆▆▆ to a defendant-operated clinic the morning after their meeting. CSMF ¶ 535; *see* PX-41, ▆▆▆▆ Dep. 19:21–20:6.

Defendants dispute whether they were affiliated with the A-1 facilities and the jury could infer an association from where the soldiers worked. *See, e.g.*, SOF ¶ 140, RCSMF ¶ 140. Their arguments are unavailing. First, whether defendants owned—or could exercise legal title—to A-1

is irrelevant to determine the soldiers' relationship with defendants. *See* Defs.' Mem. 29. If A-1 was a facility managed or operated by defendants, or was otherwise linked to defendants' operations, that is probative of the connection between the soldiers and defendants. There is evidence in the record supporting the inference that the A-1 facilities were connected to defendants' operations. *See, e.g.*, PX-89 at CA0001147209; PX-121 at CA0001184163 (indicating that defendants paid for costs incurred at A-1); PX-41, ▓▓▓▓▓ Dep. 11:2–12:21 (testifying about Exxon sign over A-1 facilities); PX-40, ▓▓▓▓Dep. 47:12–20; PX-214. And the testimony on which defendants rely to the contrary is ambiguous: Lance Johnson testified that the A-1 camp was not "an MOI facility"—but counsel's question could also be plausibly be understood as asking whether A-1 was a *production facility. See, e.g.* PX-15, Johnson Dep. 180:11–12, 182:2–8. The Court must construe the record in a light most favorable to plaintiffs.

*Direct Liability Claims.* There is sufficient evidence of causation at this stage for John Doe VII's direct liability claims. Indeed, a reasonable jury need only credit the witnesses' testimony that the soldiers guarded defendants' facilities and escorted defendants' personnel. This testimony is bolstered by evidence of the soldiers' unit, commander, and location. A reasonable jury could find that the soldiers who harmed John Doe VII were the same soldiers that defendants negligently hired and supervised.

*Indirect Liability Claims.* For the reasons set forth above, a reasonable jury could find that an employment relationship exists between the soldiers who harmed John Doe VII and defendants. And there is sufficient evidence in the record of a functional connection as well. If the witness testimony is credited, the soldiers who harmed John Doe VII were on duty and dragged him into one of defendants' operating facilities. *See Doe*, 69 F. Supp. 3d at 104. There is sufficient proof of causation for John Doe VII's indirect liability claims.

71

## C. EMC's Liability For Plaintiffs' Injuries

With the detailed factual discussion in the rear, the Court turns to the remaining legal arguments that defendants contend warrant judgment in their favor. Defendants next argue that there is insufficient evidence to hold EMC vicariously liable for plaintiffs' injuries. *See* Defs.' Mem. 34. They are wrong. And in any event, defendants' arguments are beside the point because plaintiffs also sued EMC for its own negligence.

### 1. EMC's Vicarious Liability Under Article 1367

The parties agree that Indonesian law governs whether EMC can be held vicariously liable for EMOI's actions. *See* Defs.' Mem. 35 n.29; Pls.' Opp'n 46–49; *see also United States ex rel. Small Bus. Admin. v. Pena*, 731 F.2d 8, 11 (D.C. Cir. 1984). Vicarious liability is governed by Indonesian Civil Code Article 1367. The Court has already described the applicable standard for vicarious liability under Article 1367 in this opinion. There must be sufficient evidence for a reasonable jury to find (1) that a principal-agent relationship exists and (2) that a wrongful act was committed in the course of performing the agency role or representation.

Turning first to the relationship, the issue is whether a reasonable jury could find either (1) that EMC could instruct EMOI to carry out work and give instructions as to how that work was to be carried out, or (2) that EMOI was appointed, either formally or informally, by EMC to represent EMC's business to third parties. Lindsey Decl. ¶ 36; *see infra* Sec.IV.B.3; *Doe*, 69 F. Supp. 3d at 103–04. While defendants are correct that Judge Oberdorfer previously applied D.C. law to the vicarious liability issue, his prior factual determinations squarely foreclose the arguments that defendants make in their motion. As Judge Oberdorfer explained:

> A reasonable trier of fact could conclude that EMOI acted as Exxon Mobil's agent with regard to the military security for the huge Arun gas field. Sufficient evidence demonstrates that Exxon Mobil exerted significant control over EMOI's security, particularly

through Exxon Mobil's Global Security division. For example, Exxon Mobil Vice President Lance Johnson wrote to Global Security Manager Mike Farmer that "we need to rework the entire security philosophy for Aceh." Pls.' Ex. 60. Global Security evaluated EMOI's security policies and procedures in detail and prepared a report entitled "Indonesia Strategic Security Study," which Farmer sent to Johnson. Pls.' Ex. 241. Farmer noted that the report "identifies a range of critical tasks that must be completed quickly to position MOI to respond to ongoing and potential security concerns." *Id.* He further stated that, "[f]or each task, we have attached responsibility, recommended a target completion date, and indicated collaborative support required." *Id.* Another report stated that a key to risk reduction at EMOI was to "[e]nhance implementation of XOM [Exxon Mobil] standards by enforcing uncompromising controls across the board." Pls.' Ex. 320 at CA0001047341 (emphasis in original).

There is also evidence explaining why Exxon Mobil would exert so much control over EMOI's security: EMOI was a subsidiary "based on . . . exploring and producing oil and gas" and was not "equipped to handle all the issues that were cropping up" related to security. Johnson Dep. 56:21–57:21, Ex. 401. Thus, EMOI did not implement various security procedures without Exxon Mobil's significant guidance and participation. *See* Pls.' Ex. 241 ("To meet these very ambitious targets, MOI will require extensive support from global staff services, particularly Security, Human Resources, Public Affairs and Government Relations."). As Farmer stated in regard[] to the Indonesia Security Study, "The daily business demands on MOI staff and management make it difficult, if not impossible, to fully progress these items without external help." *Id.* EMOI had to look to its parent corporation in these instances: "If they said that they didn't have the resources and they had a significant problem, basically the only route that they had was to go up the chain and request additional corporate kinds of support." Farmer Dep. 54:2–6, Pls.' Ex. 405. Such a request of support is also consistent with Plaintiffs' stance regarding EMOI's reliance on Exxon Mobil for funding in general, as EMOI made numerous "cash calls" to Exxon Mobil for greater funds. Pls.' Ex. 93.

*Doe*, 573 F. Supp. 2d at 31–32 (alterations in original). Applicable legal standard aside, for the same reasons, a reasonable jury could find that EMC could instruct EMOI to carry out work and give instructions as to how that work was to be carried out.

The Court turns then to the second issue: whether EMOI's alleged wrongdoings were committed in the course of the agency relationship or representation. The Court has already rejected defendants' proposed requirement that EMC must have "specifically instructed" EMOI to perform the work that resulted in plaintiffs' injuries. *See supra* Sec.IV.B.3; Defs.' Mem. 35–36. Instead, the relevant inquiry is whether there is sufficient evidence of a "functional connection" between EMOI's wrongful act and the work that EMOI was directed to perform. *See supra.* Sec.IV.B.3. Judge Oberdorfer's factual analysis is again sufficient—the functional connection standard is satisfied here. The Court will provide a brief overview of the salient facts here.

As discussed, a reasonable jury could find that EMOI engaged or exerted control over the Indonesian military providing security for defendants' operations. And the examples in the record indicative of connections between EMOI's engagement of the Indonesian military and EMC's involvement in EMOI's operations are numerous. For example, as Judge Oberdorfer explained, the record reflects that "EMOI did not implement various security procedures without Exxon Mobil's significant guidance and participation." *Doe*, 573 F. Supp. 2d at 31–32; *see, e.g.*, PX-218 at CA000113588; PX-221 at CA0001194210 (email from EMC's Farmer explaining that because "the local and affiliate infrastructure have become less and less capable of dealing with the situation, we have found it necessary to supplement the national security force with a full time contractor, overseen by [Chong]"). EMC produced a strategic security study on Indonesia in May 1999, identifying tasks for EMOI and recognizing that EMOI needed additional resources and personnel in order to facilitate these goals. CSMF ¶¶ 191–92. EMC personnel, or individuals otherwise selected by EMC, would ultimately play critical roles in overseeing EMOI's security policies and coordinating with the Indonesian military. *See, e.g.*, CSMF ¶¶ 189–90, 193 (listing examples of these individuals and their roles). And there is evidence in the record that EMC

74

would, on an ongoing basis, continue to review EMOI's security policies and prescribe tasks pertinent to EMOI's security and deployment of the military. PX-218, 226, 227, 228, 229.[36]

In summary, a reasonable jury could find that EMC is vicariously liable for EMOI's actions under Article 1367.

### 2. EMC's Direct Liability For Its Own Negligence

Defendants' motion for summary judgment focuses on EMC's *vicarious liability* for plaintiffs' injuries—i.e., EMC's liability for EMOI's actions. But as plaintiffs point out, the operative complaint also alleges that EMC is directly liable for its *own* negligence causing plaintiffs' injuries. 2nd Am. Compl. ¶¶ 212–35. So even if EMC is not vicariously liable for EMOI's actions, to be entitled to judgment on all claims against it, there would also need to be insufficient evidence of EMC's direct liability for its own negligence. Yet in a footnote, defendants fire a solitary parting shot at this theory:

> As described above, Plaintiffs have failed to provide evidence connecting either Defendant to Plaintiffs' alleged injuries. Even if they could somehow show that EMOI in some way directed the specific Indonesian soldiers that allegedly injured Plaintiffs—and they cannot—EMC is still another several levels removed in the chain of causation.

Defs.' Mem. 34 n.28.[37]

This perfunctory argument is insufficient to obtain summary judgment on the issue of EMC's liability. *Rochon v. Lynch*, 139 F. Supp. 3d 394, 398 n.13 (D.D.C. 2015), *aff'd*, 664 F. App'x 8 (D.C. Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that

---

[36] A reasonable jury could also rely on facts in the record about EMOI's and EMC's shared business objectives, operational goals, and infrastructure. *See, e.g., Doe*, 573 F. Supp. 2d at 26–29.

[37] Defendants' reply gives this issue equally short shrift. *See* Defs.' Reply 16 ("Plaintiffs have no evidence showing that EMC—an entity that is even further removed in the chain of causation than EMOI—is in any way directly liable for their injuries.").

are unsupported by pertinent authority, are deemed waived." (quoting *Johnson v. Panetta*, 953 F.Supp.2d 244, 250 (D.D.C. 2013))). As described above, plaintiffs have provided sufficient evidence connecting defendants to several of the soldiers who injured plaintiffs. That showing does not require evidence that defendants "in some way directed the specific Indonesian soldier." Defs.' Mem. 34 n.28; *see supra* Sec.IV.B.3. Plaintiffs have also provided proof of EMC's involvement in EMOI's security decisions involving the military. *See, e.g., Doe*, 573 F. Supp. 2d at 31–32. Stated simply, EMC has failed to show that it is entitled to judgment as a matter of law on defendants' direct liability claims.

**D. Quantifiable Loss**

Defendants next argue that they are entitled to summary judgment because plaintiffs have failed to present sufficient evidence quantifying their damages. Defs.' Mem. 30. According to defendants, "[q]uantifiable loss is a necessary element of all of [p]laintiffs' remaining claims" under Indonesian law. *Id.* Plaintiffs respond that defendants get both the choice-of-law analysis and Indonesian law wrong. *See* Pls.' Opp'n 40–41.

Because the choice-of-law analysis could be affected by the content of Indonesian law, the Court's analysis begins—and ends—there. The "quantifiable loss" requirement proposed by defendants finds no support in Indonesian law or logic. As explained below, Indonesian law permits recovery for immaterial losses—injuries that, by definition, are resistant to precise quantification. Instead, Indonesian law requires proof that plaintiff *suffered* an immaterial loss. Each plaintiff in this case has provided sufficient evidence concerning the existence and extent of immaterial loss that they have suffered. Thus, defendants' arguments must fail.[38]

---

[38] Despite defendants' broad rhetoric that "[p]laintiffs' failure to adduce evidence sufficient to prove [quantifiable loss] is fatal to *all* of their tort claims," Defs.'Mem. 34 (emphasis added), defendants provide no support for the notion that "quantifiable loss" is even applicable to claims brought under Article 1367. Indeed, their expert claims only that

## 1. Indonesian Law Permits Recovery For Immaterial Losses

The parties and their experts do not dispute that to recover under Article 1365, a plaintiff must provide evidence of a loss that is cognizable under Indonesian law. It is also undisputed that Indonesian law permits recovery for two types of losses: material losses and immaterial (also called "moral") losses. *See, e.g.*, Lindsey Decl. ¶ 30; PX-1, Bell Decl. ¶ 40. Material losses include "identifiable expenses (such as medical expenses), money paid for goods or services that are not received because of an unlawful act, and anticipated losses (such as loss of income because of injury or death of a dependent's spouse)." Lindsey Decl. ¶ 30. Immaterial losses include intangible injuries, like pain and suffering, or mental illnesses resulting from the unlawful act. *See, e.g.*, Lindsey Decl. ¶ 30, PX-1, Bell Decl. ¶ 40.

Defendants contend that "a plaintiff must set forth the precise amounts that he or she seeks, for each type of alleged loss, and both the losses themselves and the plaintiff's quantification of those losses must be supported by evidence." Defs.' Mem. 31; *see* Lindsey Decl. ¶ 31 ("For both material and immaterial losses, the claimed losses must be capable of quantification and must, in fact, be quantified by the plaintiff . . . ."). The Court disagrees. While the Court considers the experts' characterizations of Indonesian caselaw, the Court must assure itself of the content of Indonesian law in light of the examples and sources provided by the parties. *See Animal Sci. Prod.*, 138 S. Ct. at 1873 ("Rule 44.1 frees courts 'to reexamine and amplify material . . . presented by counsel in partisan fashion or in insufficient detail."); *cf. G & G Prods. LLC v. Rusic*, 902 F.3d 940, 944 (9th Cir. 2018) ("Arnulfo supported his declaration with exactly the sort of materials that a court would need to decide an issue of foreign law, including relevant Italian statutes and case law

---

"detailed evidence of quantifiable loss is an essential element of an Article 1365 claim." Lindsey Decl. ¶ 19. Thus, even if there was such a requirement for claims under Article 1365 (and there is not) the Court has not been provided with any authority to support the proposition that such a requirement would also extend to claims under Article 1367.

in translation."). Defendants' expert's characterizations aside, none of the examples of Indonesian caselaw on which defendants rely impose a strict "quantification" requirement on plaintiffs for immaterial losses.

Take, for example, Indonesian Supreme Court Decision 78 K/Sip/1973. *See, e.g.*, Lindsey Suppl. Decl. ¶ 22 (describing case). There, a plaintiff sued over a shipment of ice cream that was spoiled when the cooling machine on the defendant's truck failed. *Id.* The plaintiff sought to recover damages for immaterial loss, which included the harm to plaintiff's reputation among consumers due to their diminished trust in plaintiff's company. *Id.* The court rejected the plaintiff's claims for immaterial loss because "the plaintiff bears the burden of proof to prove the existence and amount of the damage suffered in a detailed way with valid evidence, [and if] it is not proven the claim/demand must therefore be rejected." *Id.* (alteration in original). Defendants do not provide any additional translated reasoning from the opinion. But simply put, this is not a quantification requirement. The Supreme Court's holding could refer to any number of deficiencies besides "quantification," including the failure to prove the *existence* of reputational harm or the failure to prove the *extent* of reputational harm suffered.

Beyond their bare characterizations of Indonesian law, defendants provide no example of Indonesian authority that imposes an additional "quantification" requirement once a plaintiff has provided evidence concerning the existence and extent of immaterial loss suffered. *See, e.g.*, Lindsey Suppl. Decl. ¶ 21 ("In another case, Supreme Court Decision 492K/Sip/1970, the Supreme Court rejected a claim for compensation on grounds that the amount claimed was not justified by 'reference to details of *any* loss.'" (emphasis added)); *id.* ¶ 24 (describing Indonesian Supreme Court decision that awarded no compensation for immaterial loss because "there were no clear

details of the immaterial loss").[39] The only case provided to the Court by defendants that invokes precise quantification explicitly references *material* damages. *See id.* ¶ 23.

This is not particularly surprising given that immaterial damages cannot be precisely quantified. Indeed, defendants' prior expert recognized as much—and acknowledged that immaterial damages are nevertheless compensable under Indonesian law. *See* Hornick Decl. ¶ 16 ("Damages for moral loss *should compensate the injured party* for harm that *cannot be quantified in money*, such as reputational harm, pain and emotional distress."). In addition to providing declarations that contradict defendants' expert, *see* PX-1, Bell Decl. ¶¶ 39–52, plaintiffs also cite defendants' expert's own treatise, in which he states: "The amount of immaterial damages awarded is *a matter for the presiding judges*, although it is, of course, *open* to the plaintiff to suggest an amount and put forward arguments to support it. The general yardstick appears to be 'appropriateness in the circumstances.'" PX-265, Simon Butt & Tim Lindsey, Indonesian Law 310.

Accordingly, Indonesian law does not require proof of "quantifiable loss" to recover for a claim under Article 1365. Instead, it is plaintiff's burden to provide sufficient proof of a cognizable loss under Indonesian law. Immaterial losses—which cannot be precisely quantified in monetary terms—are cognizable.

### 2. Plaintiffs Have Provided Sufficient Evidence Of Cognizable Losses

A reasonable jury could find that plaintiffs have provided sufficient that they suffered immaterial losses. Indeed, defendants do not dispute the *existence* of these immaterial losses.

---

[39] Neither is the Court is persuaded by defendants' expert's citation to decision 650/PK/PDt/1994. There, the Indonesian Supreme Court cited another case which held that "[a] demand for compensation can only be granted if the person making the claim can prove in detail that loss was suffered and the size of that loss." Lindsey Supp. Decl. ¶ 20. But it is not clear whether the internally cited case implicated immaterial loss. Nor is it clear how the Indonesian Supreme Court applied the principle because defendants did not provide any translated reasoning from the case.

Plaintiffs have presented evidence that plaintiffs endured physical pain and suffering from, among other things, gunshot wounds, a gouged-out eye, and electrocution, *see* CSMF ¶¶ 412–13, 420 (Jane Doe V), ¶ 435 (Jane Doe VI), ¶¶ 485–91, 496–98 (John Doe II), ¶ 520 (John Doe IV), ¶ 541 (John Doe VII); and that plaintiffs have suffered emotional distress, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, torture, and other wrongful conduct, CSMF ¶¶ 314, 332–33 (Jane Doe I), ¶ 356 (Jane Doe II), ¶ 373 (Jane Doe III), ¶¶ 402–06 (Jane Doe IV), ¶ 420 (Jane Doe V), ¶ 435 (Jane Doe VI), ¶ 445 (Jane Doe VII), ¶ 470 (Jane Doe VIII), ¶¶ 485–90, 495–98 (John Doe II), ¶¶ 509–10, 516, 520 (John Doe IV), ¶ 540 (John Doe VII).

A reasonable jury could find that plaintiffs have suffered immaterial losses that are cognizable under Indonesian law. Accordingly, defendants' request for judgment on plaintiffs' claims for the failure to prove quantifiable loss must be denied.

### E. Due Process

Defendants complain that they have been deprived of a fair opportunity to rebut plaintiffs' claims, in violation of their due process rights. They are wrong.

Constitutional due process requires that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171–72 (Frankfurter, J., concurring); *see Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015); *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1117–18 (5th Cir. 1980) ("[N]otice and hearing are preliminary steps essential to the passing of an enforceable judgment and . . . they constitute basic elements of the constitutional requirement of due process of law."). But "unlike some legal rules," due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205 (D.C. Cir. 2001) (quoting *Gilbert v. Homar*, 520 U.S. 924, 930 (1997)). Rather,

due process is "flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to ensure that they are given a meaningful opportunity to present their case." *Matthews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 268-269 (1970)).

Crucially, "there can be no claim of a due process violation if a [party] voluntar[ily] foregoes the due process procedures provided him." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 317 (D.C. Cir. 2014); *see Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019); *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) ("[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies."). The Court finds this reasoning instructive. When there is an apparently adequate procedural remedy available to defendants, their failure to invoke that procedure forecloses a due process claim.

With this basic framework in mind, the Court will address defendants' specific arguments in turn. Their due process challenges are focused on (1) the right to cross-examine plaintiffs and (2) what they characterize as an inability to rebut plaintiffs' "shifting" claims.

### 1. Due Process Right To Cross-Examine Witnesses

First, defendants claim that "it is apparent" that plaintiffs will be unable to appear in the United States for trial and defendants will be deprived of the opportunity to "confront and cross-examine" plaintiffs as witnesses. Defs.' Mem. 39 (citation omitted). The Court previously explained that it would be "premature" to consider this issue until the case is approaching a trial

date. *Doe I v. Exxon Mobil Corp.*, No. 01-cv-1357 (RCL), slip op. at 44 (D.D.C. Dec. 17, 2016), ECF No. 586. So too here.

It is not, as defendants suggest, "apparent" that plaintiffs will not attend their trial. Defs.' Mem. 39. Plaintiffs argue that the United States rarely grants visas for depositions because they can be taken overseas or electronically, but plaintiffs are again seeking admission to the United States for the trial. Pls.' Opp'n 49; *see* Pls.' Mot. for Letters from Court to Facilitate the Visa and Parole Processes, ECF No. 835. It remains to be seen whether plaintiffs' visa or parole applications will be successful. The Court remains mindful that at the summary judgment stage, the Court should construe the record in a light favorable to the plaintiffs. The Court will not speculate in defendants' favor about the likelihood that plaintiffs will successfully obtain entry.

In any event, the Federal Rules of Civil Procedure speak to the issue raised by defendants. They provide that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." Fed. R. Civ. P. 43(a). The D.C. Circuit has held that a foreign plaintiff may testify live via videoconference if unable to attend trial when the Rule's strictures are met. *El-Haddad v. United Arab Emirates*, 496 F.3d 658, 668–69 (D.C. Cir. 2007); *see United States v. Approximately $299,873.70 Seized From a Bank of Am. Acct.*, 15 F.4th 1332, 1339 (11th Cir. 2021) ("A witness need not always testify in person."); *Rodriguez v. Gusman,* 974 F.3d 108, 114 (2d Cir. 2020) ("There is no evidence in the record to suggest that appropriate safeguards would be unavailable or that testimony by video would be infeasible, let alone virtually impossible.").[40] While in-person

---

[40] Additionally, Rule 32 provides that "[a] party may use for any purpose the deposition of a witness, *whether or not a party*, if the court finds: . . . on motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used." Fed. R. Civ. P. 32(e) (emphasis added); *see Youssef v. Lynch,* No. 11-cv-1362 (CKK), 2016 WL 10674025, at *3 (D.D.C. Apr. 29, 2016). Even if live video testimony is not available, plaintiffs contend that trial depositions are also

Case 1:01-cv-01357-RCL   Document 850   Filed 08/02/22   Page 83 of 85

testimony may be the preferred method of taking testimony in Federal Court, the Federal Rules expressly provide for testimony by videoconference under appropriate circumstances.

As before, the Court will wait until the appropriate time—when the trial date is approaching and there is sufficient clarity about the status of plaintiffs' applications for entry into the United States—to consider the outstanding issues pertaining to plaintiffs' trial testimony.

### 2. Defendants' Opportunity To Respond To Plaintiffs' Claims

Defendants argue that they have been "denied . . . the opportunity to meaningfully investigate and rebut [plaintiffs'] claims" because plaintiffs have "obfuscat[ed] the very nature of their claims." Defs.' Mem. 40. This is false. Broadly speaking, defendants suggest that these denied opportunities are the result of (1) discrepancies between plaintiffs' amended complaints, discovery responses, and deposition testimony, (2) brand new allegations "that have suddenly surfaced after years of this litigation," and (3) plaintiffs' counsels' "obstructive tactics" throughout this litigation. *Id.* at 40–42. The Court will address each in turn.

First, defendants challenge purported discrepancies between the complaint(s) and evidence produced during discovery. But discrepancies between the allegations, the evidence, and the testimony are proper fodder for the jury at trial. There is no support for the proposition that having to litigate inconsistencies in the evidence and testimony is sufficient to constitute a due process violation. *See, e.g., United States v. Perkins,* 94 F.3d 429, 433 (8th Cir. 1996) ("[I]t is not improper to put on a witness whose testimony may be impeached. Truth determination is still the traditional jury function."); *cf. Burns v. Mays,* 31 F.4th 497 (6th Cir. 2022) ("[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.").

---

sufficient to address the complaints raised by defendants. Pls.' Opp'n 50. The Court will also address this argument at an appropriate time closer to trial.

Next, defendants challenge purportedly new allegations "that have suddenly surfaced after years of this litigation." Defs.' Mem. 40. Due process protects litigants from having to defend against belated allegations if they were not given "a fair opportunity to respond." *Emory v. Sec'y of the Navy*, 708 F. Supp. 1335, 1343 (D.D.C. 1989), *aff'd sub nom. Emory v. Sec'y of Navy*, No. 89-5196, 1989 WL 201552 (D.C. Cir. Dec. 29, 1989); *see Crude Co. v. U.S. Dep't of Energy*, 189 F.R.D. 1, 3 (D.D.C. 1999). That is not the case here. Defendants have not only had the opportunity to conduct discovery on the allegations brought in 2014 and 2015, they also have had the opportunity to challenge the evidentiary support underlying plaintiffs' allegations. *See generally* Defs.' Mem. Indeed, defendants did not contest their own lack of notice when the second amended complaint was filed. *See* Defs.' Opp'n to Pls.' Mot. for Leave to File An Amended Complaint, ECF No. 466-2. Finally, as noted before, inconsistencies in plaintiffs' stories may be considered by the jury at trial. These "suddenly surfaced" allegations do not support summary judgment on due process grounds.

Finally, defendants allege that plaintiffs' counsel engaged in obstructive tactics throughout this litigation. Defendants accuse plaintiffs' counsel of initiating attorney-client relationships with eyewitnesses to improperly assert privilege for relevant testimony, failing to preserve documents and other evidence, and engaging in other bad-faith litigation tactics. *See, e.g.*, Defs.' Mem. 41–42. Yet defendants have always had the opportunity to file motions seeking the Court's intervention when warranted. *See* Fed. R. Civ. P. 37. Defendants did so on several occasions. But where defendants have failed to avail themselves of the procedural protections afforded, no due process violation has occurred. *See, e.g.*, *Badgett*, 925 F. Supp. 2d at 32.

The Federal Rules provide protection against the concerns raised by defendants here. In this case, the opportunities to raise these procedural issues have either not yet arrived or passed

84

long ago. The Court will consider the issues surrounding plaintiffs' testimony at the appropriate time before trial. But the Court will not permit defendants to weaponize foregone opportunities to invoke the appropriate procedure at the appropriate time. The Court rejects defendants' request for summary judgment on due process grounds.

\* \* \*

...     To summarize, the Court will **GRANT** defendants' motion for summary judgment in regard to the battery claims (Count 2) brought by Jane Doe VIII, John Doe II, and John Doe IV; the assault claims (Count 3) brought by Jane Doe VIII, John Doe II, and John Doe IV; the arbitrary arrest, detention and false imprisonment claims (Count 4) claims brought by Jane Doe VI, Jane Doe VIII, John Doe II, and John Doe IV; and the conversion claims (Count 8) brought by John Doe II and Jane Doe VII. On all other claims, defendants' motion for summary judgment is **DENIED.** The remaining claims must be heard by a jury.

## V.     CONCLUSION

Based on the foregoing, the Court will **GRANT IN PART** and **DENY IN PART** defendants' motion for summary judgment by separate order.

Date:     **7 - 2 2 - 2 2**

*Royce C. Lamberth*

Royce C. Lamberth
United States District Judge