**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE I, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 01-1357 (RCL/AK) |
| | ) |
| v. | ) |
| | ) |
| EXXON MOBIL, CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**JOINT STATUS REPORT ON PLAINTIFFS' ATTEMPTS TO OBTAIN PERMISSION
TO ENTER THE UNITED STATES**

Pursuant to the Court's December 1, 2022 Order, the Parties submit this Joint Status Report on Plaintiffs' Attempts to Obtain Permission to Enter the United States.

**I.      PLAINTIFFS' APPLICATIONS FOR VISAS AND PAROLE**

A.      Plaintiffs' Position

Plaintiffs have been diligently pursuing steps needed to obtain visas and/or humanitarian parole to obtain entry to the United States for trial.  Because this matter was set for trial recently (and letters in support of Plaintiffs' applications for visas and parole issued), it will be some time before the Parties are in a position to know whether these applications will be granted. Nonetheless, Plaintiffs believe the Court's May 24, 2023 trial date is still practicable, as detailed below.

When the Parties submitted their first Joint Status Report in August, *see* Dkt. 851, Plaintiffs believed that if a trial date was set at that time, Plaintiffs would know by December 15, 2022 whether Plaintiffs would be able to secure access to the United States for trial. As noted in that report, however, "Plaintiffs' counsel's personal experience seeking visas for litigants, and official guidance from USCIS on parole, strongly suggest that Plaintiffs should not submit

1

applications for visas or parole until after the Court has set a trial date and issued letters in support of their applications." *Id.* at 9. Accordingly, Plaintiffs did not submit their applications as they awaited further instruction from the Court.

On December 1, 2022, the Court set this case for trial on May 24, 2023, and on December 2, 2022 it issued letters in support of the Plaintiffs' visa and parole applications. Both during the pendency of Plaintiffs' motion for trial date and since December 1, Plaintiffs have been making the many arrangements required to prepare and submit their visa and parole applications.

Plaintiffs have prepared applications for parole on behalf of the Plaintiffs and are prepared to complete submission of parole applications the moment it is advisable to do so. As Plaintiffs noted last year in their motion for letters from the Court to support their applications, Plaintiffs' counsel are consulting with knowledgeable sources familiar with the parole process to determine how best to sequence Plaintiffs' applications for visas and parole. In particular, Plaintiffs are evaluating with knowledgeable help whether to submit parole applications before Plaintiffs' visa processes are concluded, in light of the expected time to completion of that process, current political considerations, and the time to the Court's trial date.

To support their parallel applications for visas, which are logistically complex as described below, Plaintiffs have retained a retired senior foreign service officer who will work with Plaintiffs' counsel, a trusted in-country Acehnese translator, and an in-country technical helper to provide assistance and experienced guidance on the visa process. Plaintiffs have also retained a travel agency to handle the complicated group arrangements, and have identified potential itineraries; Plaintiffs expect to secure refundable tickets and reservations shortly.

Plaintiffs and their counsel are working with these personnel to submit the Plaintiffs' visa applications as soon as possible.

The limiting factor as to the time for submitting visa applications is that each application for a visa requires an in-person and electronic meeting with at minimum each Plaintiff, a computer-literate helper, and a translator to review each Plaintiff's application and answers and to electronically sign Form DS-160, through which visitors to the United States must apply for a visa. Form DS-160 is only available electronically and requires each applicant to personally click a "Sign Application" button. *See* U.S. State Dept., *DS-160: Frequently Asked Questions* .[1] By clicking the button, each applicant must attest that they have read and understood the questions in the application and that their answers are true and correct to the best of their knowledge and belief. *Id.* Because applicants must answer in English, and because most of the Plaintiffs cannot read at all and cannot speak English or Bahasa Indonesian, the Plaintiffs may fulfill the requirements of the application only with the help of a translator who speaks Acehnese and English and an on-site helper who can connect Plaintiffs with their translator electronically and guide them through the physical steps to submitting their forms. To further complicate the scheduling and logistics of these meetings, an attorney or visa specialist in the United States will likely also need to attend electronically or at least be available at each meeting to answer questions about the form.

The DS-160 forms may be filled out in advance, but it is important that each Plaintiff be able to understand each question and aver that their answers are true at the time of signing. It is likely that visa interviewers will ask the Plaintiffs about individual questions and whether they

---

[1] https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/forms/ds-160-online-nonimmigrant-visa-application/ds-160-faqs.html (accessed December 12, 2022).

understood the questions and their answers at the time they signed their applications. Moreover, the forms are extremely extensive, estimated by the State Department to take approximately 90 minutes to complete. The additional burden of translation and explanation of questions makes 90 minutes per applicant a highly optimistic estimate.

Arranging and conducting these meetings is a complicated and time-consuming process; steps that would take only minutes to accomplish between English speakers in the same time zone may take days under the frictions of communications across language barriers, time zones, and literacy obstacles. Nonetheless, Plaintiffs expect that their visa applications will be submitted by mid-January.

Fortunately, wait times for visa interviews have decreased substantially from the time Plaintiffs expected in August. If these patterns hold, it is not unrealistic to expect decisions on Plaintiffs' applications by late January or early February.

Defendants' outrage below is misplaced. It seeks to place blame on Plaintiffs for not submitting applications in September, though Plaintiffs were clear that the letters from the Court issued on December 2 were prerequisites to further steps in the application process. Exxon's argument that Plaintiffs' applications "should already have been submitted" reflects a fundamental misunderstanding of the visa and parole processes and the complexity of communicating with clients who cannot read, speak only Acehnese, and live in rural areas with little access to technology. Were it possible to have submitted visa applications by now, Plaintiffs would have. They did substantial preparatory work before the Court set a trial date, but much of the work in preparing applications necessarily falls after the trial date has been set. Many of the application questions concern travel arrangements that could only be made after the Court set a trial date, and all questions must be answered at the time of the application. And, as

noted, the Plaintiffs must personally send their applications after having fully attested to all answers. Consequently, there is no avoiding the requirement that each Plaintiff attend a lengthy meeting to go over each application form. As explained above, it is these meetings that make earlier applications impracticable.

Plaintiffs' staff in Indonesia consist of one translator and one technical helper, neither of whom are full-time employees and neither of whom has substantial experience with difficult visa issues. Arranging for lengthy meetings with each of ten Plaintiffs and both in-country staff while a U.S.-based attorney or consultant is available to give guidance is not something that can happen at the drop of a hat. Defendants' suggestion, based on no experience and no evidence, that Plaintiffs could submit applications by December 23 (two days before Christmas) is simply mistaken.

As for parole applications, as noted, Plaintiffs are ready to submit these as soon as it makes sense to do so (because parole applications do not have similar in-person meeting requirements). Parole is usually only available *after* visas have been denied, however, and submitting parole applications prematurely risks their applications being denied in circumstances where a later application would be granted. *See* U.S. Customs & Immigration Servs., *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*,[2] (listing among discretionary factors considered "Whether there are other means, other than parole, that are available to the beneficiary so they can travel to and remain in the United States for the stated parole purpose, such as the ability or inability to obtain a visa.") Parole applications are much less routinized and more discretionary than visa applications. As noted before,

---

[2] https://www.uscis.gov/humanitarian/ humanitarianpublicbenefitparoleindividualsoutsideUS (accessed Dec. 15, 2022)

Plaintiffs are in close consultation with knowledgeable individuals who can help guide Plaintiffs as to the best strategy for their parole applications; Plaintiffs intend to follow this guidance, which they believe offers the best chance of Plaintiffs securing attendance at trial, rather than Exxon's uninformed and adversarial demands. Contrary to Defendants' assertion, Plaintiffs have been in consultation with sources familiar with parole for more than a year, when they so informed the Court and noted that the sequencing of visa and parole requests requires a weighing of considerations. *See* Dkt. 835 at 3 n.5.

        B.        <u>Defendants' Position</u>

Plaintiffs' visa and parole applications should already have been submitted. They have had over a year to prepare the applications. They moved for the Court to issue letters to facilitate these applications over a year ago. *See* ECF No. 835. In August 2022, Plaintiffs wrote that they "expect to submit their applications as soon as practicable after the Court's decision on supporting letters." ECF No. 851 at 9. The Court issued those letters on December 2. Plaintiffs protest that they are moving quickly, but, inexplicably, Plaintiffs have not yet submitted their visa applications, and they do not intend to file them for another month, in mid-January 2023.

Plaintiffs do not even say when they will submit their parole applications—only that they will be ready "the moment it is advisable to do so," which may not be until *after* their visa applications have been decided. This is the first that Plaintiffs are telling the Court and Defendants that they will be submitting their visa and parole applications sequentially rather than in parallel. Nor is it clear why Plaintiffs are "consulting with knowledgeable sources familiar with the parole process" only now, rather than during the past year-plus when they claimed to be ready and waiting to apply for entry. As Plaintiffs surely know, but do not say here, it will take

6

at least three months from the date of submission for their parole applications to be resolved.[3]

Even if Plaintiffs submitted their visa and parole applications at the same time, it will be at least

mid-April 2023 before they are likely to have been resolved.  And since Plaintiffs apparently do

not intend to request parole at the same time as they apply for visas, the actual date is likely well

beyond April.

Plaintiffs' delay risks jeopardizing the May 24 trial date.  The parties agreed to a late

May trial date on the assumption that Plaintiffs would file their applications for entry in

September; that Plaintiffs "w[ould] likely know whether [they] will be able to obtain access to

the United States for trial by December 15, 2022"; and that by now the parties would either be

proceeding toward a trial at which Plaintiffs would attend and testify in person, or would be

addressing the consequences of their inability to attend.  ECF No. 851 at 5.  Instead of having

this issue behind us, Plaintiffs now notify the Court that they do not even plan to submit their

visa applications for another month, and perhaps longer still for their parole applications.  The

timeline that supported a late May trial date is no longer operative, and Plaintiffs' further delay

in submitting their visa and parole applications risks subverting it entirely.

---

[3]  According to the U.S. Citizenship and Immigration Services website:

> We are currently receiving an extremely high number of requests for parole. While
> we try to process all urgent requests for parole quickly and efficiently, petitioners
> should expect to wait ***significantly longer than 90 days*** for their parole request to be
> processed right now. It will take time for us to work through the unprecedented
> number of parole requests we have received since fall 2021 and return to normal
> processing times.

Website, "Humanitarian or Significant Public Benefit Parole for Individuals Outside the United
States," *U.S. Citizenship and Immigration Services*,
https://www.uscis.gov/humanitarian/humanitarianpublicbenefitparoleindividualsoutsideUS
(visited Dec. 14, 2022) (emphasis added).

In an effort to preserve the trial date, Plaintiffs should be directed to submit their visa and parole applications no later than December 23, 2022, with a further status report due on February 15, 2023.

## II.   SCHEDULING OF TRIAL DEPOSITIONS AND BRIEFING OF EXXON'S DUE PROCESS OBJECTIONS

### A.   Plaintiffs' Position

The Plaintiffs' inability to submit visa and parole applications during the pendency of their request for a trial date compresses substantially the schedule contemplated by the Parties in August. Nonetheless, Plaintiffs believe the Court's May 24, 2023 trial date remains feasible.

The Parties agreed in their August status update that, "if obtaining live in-person testimony proves impossible, the trial testimony of any Plaintiff denied entry to the United States should be secured by *de bene esse* (trial) depositions." Dkt. 851 at 5. The Parties then contemplated that, if Plaintiffs had not been granted access to the United States by December 15, 2022, "Defendants intend to move to dismiss the action under the Due Process Clause. And the parties agree, if Defendants' motion is denied, to take in-person trial depositions of Plaintiffs." *Id.* at 6.  (Though Plaintiffs believe these objections are meritless and that the Court has already rejected the legal theory on which they are based, *see* Dkt. 850 at 82-83, the Parties' August submission contemplates giving Exxon another opportunity to brief the issue).

Plaintiffs believe this is still the best course of action. The Parties should prudently plan for the possibility that it will be necessary to take in-person trial depositions of the Plaintiffs, to be completed no later than March 22, 2023.[4] The Parties can arrange refundable travel and

---

[4] Ramadan begins March 23, 2023, and it would be impracticable to take trial depositions for the month that follows, as the Plaintiffs have religious commitments including fasting. Depositions after Ramadan ends on April 21, 2023 would strain the Parties' ability to plan for a May trial using these depositions.

logistics for such depositions. Hopefully, by late January or early February all Plaintiffs will be granted permission to attend trial in the United States and the Parties can cancel their plans for trial depositions; however, should it be necessary, the depositions can go forward at that time.

The trial depositions should take place in Lhokseumawe, Aceh, Indonesia—just as all of the earlier discovery depositions were—rather than a location outside Indonesia, for several reasons. First, most of the Plaintiffs cannot read any language and can speak only Acehnese. They have no way of navigating the world beyond Aceh as individuals, and can only travel beyond places where Acehnese is commonly spoken with the constant accompaniment of a translator. As a practical matter, this means the Plaintiffs must travel as a group. Because the Parties must plan for an extended trial deposition period of approximately two weeks,[5] it is unreasonable to ask each Plaintiff to travel to a foreign country and stay for this period while each Plaintiff is deposed in turn.

Second, several of the Plaintiffs have health issues that make it difficult to travel. For example, individual Plaintiffs suffer from serious knee problems and osteoporosis, impeding their mobility. While Plaintiffs are willing and able to travel to the United States for trial and to undertake the travel such a commitment entails (such as traveling to Jakarta for visa interviews), it would be an undue hardship to require these Plaintiffs to undertake additional travel for trial depositions that could just as easily take place near their homes. Even for Plaintiffs in relative

---

[5] Plaintiffs anticipate a trial deposition schedule of one deposition per day on as compressed a timeline as practicable. The limiting factor is likely to be the availability of Acehnese-English translators, who are few and far between. For example, Plaintiffs' translator during the 2020-21 depositions of the Plaintiffs was a university professor with attendant commitments to his students and work; it is not certain that any translator would be able to undertake a deposition schedule consisting of eleven straight days of multi-hour commitments. Plaintiffs have contacted their prior deposition translator to determine his availability in the March timeframe required by the Court's trial schedule.

good health, of course, and especially for Plaintiffs with health challenges like diabetes, unnecessary travel comes with attendant elevated risks of Covid. The Plaintiffs have all been vaccinated against Covid, but vaccines available in Indonesia are less reliable than those offered in the United States, and Plaintiffs wish to minimize Covid risks.

Third, taking trial depositions outside of Aceh would be logistically more complicated, particularly as to securing translators. As noted above in footnote 3, the only Acehnese-English translator Plaintiffs were able to secure for depositions in 2020-21 was a university professor with responsibilities elsewhere.[6] Finding a translator willing to travel to another country for two weeks to take trial depositions would be substantially more complicated than finding one who could attend depositions in Aceh.[7]

Finally, trial depositions outside Indonesia would be wildly more expensive for the parties, and this expense would fall disproportionately on the Plaintiffs. Because the Plaintiffs must travel as a group, in order to attend depositions outside Aceh each of up to 10 Plaintiffs[8] and two assisting personnel (in addition to counsel) would have to incur expenses for approximately two weeks of room and board over and above what would be required for each individual to travel alone were it possible for them to do so. Moreover, destinations Defendants have proposed, such as Singapore, are extremely expensive cities by any measure, in contrast to

---

[6] Plaintiffs have a longstanding translator who has helped facilitate communications between Plaintiffs and their counsel, but she is not eligible to translate at depositions per the Court's Order. *See* Dkt. 692.

[7] In contrast, arrangements for court reporters and videographers to travel *to* Aceh would be easier, because these arrangements are facilitated by professional firms who regularly send professionals to distant locations.

[8] As Plaintiffs have informed the Court previously, Jane Doe VIII is too frail to testify and will not be seeking entry to the United States. Plaintiffs will establish her case through other witnesses.

Aceh, where prices are reasonable to the point of insignificance. Setting aside expenses for

Plaintiffs' and Defendants' counsel and one translator per side, which will be roughly equivalent

for each side no matter the destination, arranging for travel to Singapore for the Plaintiffs and

their necessary staff would incur an estimated $42,000+ of expenses beyond those borne by

Defendants.[9]

Aceh has the accommodations and infrastructure necessary to take trial depositions.

Lhokseumawe, the Indonesian city just 15 miles from the Arun field facilities, has modern hotels

with internet access. Indeed, the Plaintiffs successfully attended depositions by videoconference

in the recent past, demonstrating the availability of the necessary electronic infrastructure. It has

an airport accessible via short flights to and from the nearby international airport at Medan,

Indonesia. There is no reason not to take trial depositions in Aceh, where they will be

considerably more convenient, less risky, and less expensive to arrange.[10]

---

[9] Estimates assume 10 Plaintiffs and 2 assisting personnel incur expenses of $700 each for flights; $139 per diem for 14 nights for lodging; and $65 per diem for meals and other expenses. Flight expenses are based on actual prices available as of December 13, 2022. Lodging and meal expenses are half the U.S. Government allotted per diem rates for Singapore, *see* U.S. Dept. of State, Office of Allowance, *Foreign Per Diem Rates in U.S. Dollars (Singapore)*, https://aoprals.state.gov/web920/per_diem_action.asp?MenuHide=1&CountryCode=1141 (accessed Dec. 13, 2022). Counsel have halved the U.S. per diem rates on the assumption that the Plaintiffs can economize by using budget-friendly hotels and cooking or eating inexpensive prepared foods; these rates are broadly consistent with accommodations that are currently available in March 2023. Not included are other expenses including travel to airports in Banda Aceh or Medan and overnight stays in Jakarta while awaiting connecting flights.

[10] As noted, Lhokseumawe is accessible to both sides' attorneys and has modern infrastructure sufficient to support trial depositions. It should be the default location for such deposition, though the Parties should be able to modify this arrangement by agreement. It would be more difficult for the Plaintiffs to attend depositions in Banda Aceh, a 6-hour drive from Lhokseumawe, or Medan, a seven-hour drive or one-hour flight away. Taking depositions in these locations would require complicated logistical arrangements to bring each Plaintiff to these cities for deposition preparation meetings and return them home after their depositions. In particular, it would strain the translator and assistance resources available to Plaintiffs and counsel, as it would require staff in Lhokseumawe and the city where depositions took place

Plaintiffs believe trial depositions should be limited to 90 minutes on the record per side. Plaintiffs do not expect to take more than 90 minutes of direct and re-direct examination of any Plaintiff, and believe Defendants' cross-examination should be limited to an equivalent time. All of these parties have previously been deposed by Defendants and, accordingly, direct and cross-examinations can and should be conducted efficiently. Not only will these time limits reduce the burden of depositions on Plaintiffs, but also on counsel, who will be traveling overseas during this period and who must take up to 10 depositions in close succession.

In the meantime, Exxon can and should brief its Due Process objections to trial without the Plaintiffs' live in-person testimony. Plaintiffs propose that Defendants' motion be filed no later than January 6, with Plaintiffs' opposition due on January 13, and no reply permitted, so this issue can be resolved in a timely manner that will permit trial depositions to be completed no later than March 22. This is not a substantial burden on Exxon, which has briefed its objections in substance already on summary judgment, and the Court has made clear that live in-person testimony is not required by the Due Process Clause. *See* Mem. Op., Dkt. 850 at 82-83. Briefing of these objections for the purposes of preserving Exxon's appeal need not be lengthy or laborious.

By proceeding with Exxon's briefing of its Due Process objections and prudently planning for the possibility that the Plaintiffs will not be granted entry into the United States, the trial can proceed as planned on May 24, 2023.

Defendants do not explicitly ask for a continuance, but insist that "[a]ny proposed schedule must build in time for the parties to brief and the Court to decide Defendants' motion to

---

devoted to accompanying the Plaintiffs in their travels. (In Medan, in particular, Acehnese is not commonly spoken). Nevertheless, either of these cities would be preferable locations for depositions than Singapore or other international hubs beyond Sumatra.

dismiss this action on due process grounds once there is "sufficient clarity" on whether Plaintiffs will be able to enter the country for trial," apparently envisioning a lengthy briefing period. They do not say why they cannot brief these issues now, when they have been asserting virtually the same arguments for *years* and briefed *exactly the same arguments* in their summary judgment motion. *See* Dkt. 819 at 39 (arguing "it is apparent that Plaintiffs will not appear at trial," and that this premise leads to violation of Defendants' due process rights).[11] The Court rightly rejected Defendants' faulty premise, but *also* noted that, *even if Plaintiffs were unable to attend*, the Federal Rules and common law do not demand the live in-person testimony on which Exxon stakes its objections. *See* Dkt. 851 at 82-83.

Having briefed its objections once before on the premise that Plaintiffs will not testify in person, nothing prevents them from doing it again. If the factual predicate for Google's argument materializes, as Plaintiffs hope it does not, the Court can dispose of the argument quickly and the Court can maintain its trial date. Defendants' claim that, notwithstanding their resources, they cannot brief these issues until some uncertain time in the future is a transparent effort to avoid the May 2023 trial date set by the Court.

Defendants fault Plaintiffs for "not having had any discussions about trial depositions since submitting their August status report," but obviously those conversations would have been premature before a trial date had been set. Now that a trial date has been set, Defendants argue it is "premature" to schedule trial depositions. But trial depositions, if necessary, will be a significant logistical undertaking, and not preparing for them now would risk the parties' ability

---

[11] Exxon, of course, seeks to have its cake and eat it too by trying to prevent Plaintiffs from filing successful visa and parole applications while simultaneously arguing that, if Plaintiffs are unable to attend trial, it violates Exxon's rights.

to meet the Court's schedule. Plaintiffs are available to discuss these logistical issues at the Defendants' earliest convenience.

Defendants suggest that Plaintiffs' willingness to undertake significant hardship to travel to the United States for trial means the Court should ignore the hardships that would be imposed on *each* of them *for two weeks* by travel to Singapore for trial depositions. They suggest that travel to Aceh would be unhealthy or unsafe, but review of the State Department page on which they rely reveals no reason to think so. The State Department advises ordinary Covid-19 precautions and suggests that travelers monitor news and websites to ensure no natural disasters are imminent, but does not advise against travel to Aceh. (It does advise against travel to Central Sulawesi and Papua—more than 1,500 miles away). Nor do Defendants even try to dispute that all of the Plaintiffs were previously deposed in Aceh and that process was completed without difficulty.

Defendants argue that Singapore is "only" 700 miles from Aceh. But major airports in Banda Aceh and Medan are six and seven-hour drives away. The airport at Lhokseumawe has flights to Medan irregularly, and flights to Singapore, if available at all, would typically require hours-long layovers in Medan. Similarly, Defendants assert without support and against the experience of the parties, that Aceh lacks infrastructure with which to take depositions—an enterprise that typically requires only a location, electricity, and such equipment as court reporters and videographers bring themselves. Aceh lacks none of these resources. Defendants' standards for a "modern business hotel" and claims of rolling blackouts aside (none of which prevented the Plaintiffs from being deposed), it remains easier for a handful of professionals to travel *into* Lhokseumawe than for ten deponents to travel *as a group* away from it, with each deponent committed to a two-week stay.

It is hard to read Defendants' position as anything other than an attempt to delay trial and deflect blame for the delay onto Plaintiffs. The Court should reject these efforts; a May 24 trial is possible with minimal adjustments to the Parties' efforts.

B.    Defendants' Position

In its December 1, 2022 order, the Court instructed that it "will not address questions regarding trial depositions unless the issue arises, and the parties are unable to resolve their differences." ECF No. 858 at 2. The issue of trial depositions has not yet arisen, because the parties: (i) still do not know whether Plaintiffs' visa and parole applications will be successful; and, if they are unsuccessful, (ii) have not briefed the due process implications of Plaintiffs' failure to attend trial in person. Nor is it clear whether the parties will, in fact, be unable to resolve their differences in the event that trial depositions become necessary. Plaintiffs have not even tried to engage with Defendants on these issues—and only now, faced with this fact, claim that they are "available to discuss these logistical issues at the Defendants' earliest convenience." The parties have not had any discussions about trial depositions since submitting their August joint status report, and Plaintiffs have not requested a meet-and-confer on any of these issues. Plaintiffs previously had agreed to discovery depositions in Singapore and Malaysia and even filed a motion to compel at the onset of COVID that in person depositions take place in Malaysia.

Defendants first learned that Plaintiffs would make these new proposals on December 13, two days before this report was due to be filed. Nothing has changed since the Court addressed this question 14 days ago, except Plaintiffs' inexplicable decision to delay filing their visa and parole applications for another month. It remains premature to decide how trial depositions will proceed unless and until it is clear that they are needed, and for how many plaintiffs they will be needed.

In short, Plaintiffs have raised numerous issues beyond the Court's request for a report on "Plaintiffs' attempts to obtain permission to the enter the United States." ECF 858 at 1. When the issues ripen, the Court should reject Plaintiffs' various proposals on the merits for the following reasons.

**Timing of Trial Depositions and Due Process Motion.** The parties have agreed to take trial depositions only if Plaintiffs applications to enter the country are denied *and* "if Defendants' motion [to dismiss on due process grounds] is denied." ECF No. 851 at 6. Defendants have long taken the position that the unwillingness or inability of Plaintiffs to appear in person at trial, so that their credibility can be tested and observed, would pose insurmountable prejudice to Defendants and violate their due process rights to mount a defense.[12] *See, e.g.*, ECF No. 818-1 at 39. While Plaintiffs falsely claim that this question has already been decided, the Court has previously recognized that Plaintiffs' inability to appear in the United States for trial may violate Defendants' due process rights. *See* ECF No. 586 at 44–45. But the Court has deferred ruling on the matter until there is "sufficient clarity about the status of plaintiffs' applications for entry into the United States." ECF No. 850 at 83.

Defendants do not intend to forgo their right to make this motion at the appropriate time. Any proposed schedule must build in time for the parties to brief and the Court to decide Defendants' motion to dismiss this action on due process grounds once there is "sufficient clarity" on whether Plaintiffs will be able to enter the country for trial. In the event Plaintiffs are denied entry, this Court will either dismiss the complaint under the Due Process Clause or the parties will proceed to take trial depositions of the plaintiffs who are unable to appear in person

---

[12] Plaintiffs' claim, in footnote 11, above, that Defendants are "trying to prevent Plaintiffs from filing successful visa and parole applications" is false and improper. Defendants have long asserted that Plaintiffs *must* attend trial.

16

at trial.  It would be premature to schedule trial depositions now before it is known (i) whether one or more plaintiff will be denied entry and (ii) whether the action will be dismissed due to any such denial.

**Location of Trial Depositions.**  If Defendants' motion to dismiss is denied and trial depositions are necessary, the depositions should take place in Singapore.  Singapore is nearby and easily accessible to Plaintiffs and does not impose a visa requirement.

The primary consideration in selecting a location for depositions must be safety.  There is no reason to think that travel to Singapore would be unhealthy or unsafe for any plaintiff, attorney, or staff, and good reason to think that Aceh would be.  The State Department currently imposes a heightened warning for travelers to Indonesia, to say nothing of Aceh,[13] while suggesting only "normal precautions," the lowest threat level, for travel to Singapore.[14]

Aceh also does not have the necessary facilities and technology infrastructure to support multiple weeks of depositions by visiting attorneys.  Notwithstanding Plaintiffs' assurances, Lhokseumawe, Aceh is a remote area of the westernmost populated island of Indonesia.  Plaintiffs themselves note that major airports are "six and seven-hour drives away" and "[t]he airport at Lhokseumawe has flights to Medan irregularly, and flights to Singapore, if available at all, would typically require hours-long layovers in Medan."  There are no modern business hotels; no court reporting, transcription, or videography services; and the area is subject to rolling blackouts, which the parties endured during their remote discovery depositions of

---

[13] *See* Website, "Indonesia Travel Advisory," *U.S. Department of State – Bureau of Consular Affairs*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/indonesia-travel-advisory.html (visited December 14, 2022).

[14] *See* Website, "Singapore Travel Advisory," *U.S. Department of State – Bureau of Consular Affairs*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/singapore-travel-advisory.html (visited December 14, 2022).

Plaintiffs.  Indeed, in the section above, Plaintiffs themselves claim that one of the reasons they cannot promptly file their visa and parole application is because Plaintiffs "live in rural areas with little access to technology."

Plaintiffs' opposition to Singapore for trial depositions is difficult to square with their willingness to travel elsewhere, even now, to give testimony.  For example, Plaintiffs assure the Court that, if permitted, they will travel 15,000 miles to the United States for trial.  At the same time, they claim, if they are not permitted to enter the United States, that it would be an undue burden to travel the less than 700 miles to Singapore for trial depositions.  Plaintiffs do not explain this discrepancy.  Nor do they adequately explain why all 10 Plaintiffs would need to travel as a group and each be present in Singapore for two weeks or more while ALL depositions were conducted  This assuredly would not be the case as travel could be arranged in smaller groups so each Plaintiff would only be present for a short period prior to or after their own deposition.  But even if this were true, it is equally applicable if they are able to give trial testimony in the United States.  In short, the concerns Plaintiffs express about expense, translators, and other matters are no less manageable, and in fact vastly mitigated, by travel to Singapore rather than to Washington, D.C.

Indeed, in late 2019, prior to the pandemic and when the parties were planning to conduct discovery depositions in person, Plaintiffs initially agreed to proceed with depositions in Singapore.  They subsequently agreed to make plaintiffs available to be deposed in Kuala Lumpur.

Plaintiffs current insistence on being deposed in Aceh would present significant risk and inconvenience to both parties.  If Plaintiffs can travel to their chosen forum of Washington D.C.,

18

then they can travel to Singapore.  Thus, if trial depositions become necessary, Defendants will urge Plaintiffs to reconsider.

**Limitations on Examination Time.**  Without consulting with Defendants, Plaintiffs propose to limit our cross examination of Plaintiffs to 90 minutes.  Given the seriousness of the allegations against Defendants in this case, the difficulty of cross-examining witnesses through interpreters, and the due process implications of Defendants' right to cross-examine its accusers, this proposed limitation is inappropriate.

*　　*　　*

Plaintiffs' proposed delay is unjustifiable and places the current pretrial schedule in doubt.  They should not be allowed to leverage their own delay to dictate an unreasonable pre-trial schedule.

December 15, 2022

Respectfully submitted,

/s/ Robert W. Cobbs

Agnieszka M. Fryszman (#459208)
Kit A. Pierson (#398123)
Robert W. Cobbs (# 398123)
Nicholas J. Jacques (#1673121)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

afryszman@cohenmilstein.com
kpierson@cohenmilstein.com
rcobbs@cohenmilstein.com
njacques@cohenmilstein.com

Paul L. Hoffman (Pro Hac Vice)
Schonbrun Seplow Harris Hoffman &
Zeldes
200 Pier Avenue, #226
Hermosa Beach, CA 90254
Tel: (31) 396-0731
hoffpaul@aol.com

Terrence P. Collingsworth (#471830)
International Rights Advocates
621 Maryland Ave., N.E

Brent Nelson Rushforth (#331074)
1112 Cripplegate Road
Potomac, MD 20854
Tel: (301) 943-7977
brentrushforth@icloud.com

Poorad Razavi
Cohen Milstein Sellers & Toll PLLC
2925 PGA Blvd. Suite 200
Palm Beach Gardens, FL. 33410
Tel: (561) 515-1400
Fax: (561) 515-1401
prazavi@cohenmilstein.com

*Attorneys for Plaintiffs*

/s/ Justin Anderson

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
Jaren E. Janghorbani (pro hac vice)
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Justin Anderson (Bar No. 1030572)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006-1047
Telephone: (202) 223-7300

Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
Spring, TX 77389
Telephone: (832) 624-6336

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2022, I electronically filed the Parties' *Joint Status Report on Plaintiffs' Attempts To Obtain Permission To Enter the United States* with the Clerk of the Court using the ECF, who in turn sent notice to all counsel of record in this matter.


Dated:    December 15, 2022                    /s/ Robert W. Cobbs
                                               Robert W. Cobbs