**PUBLIC REDACTED VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN DOE I, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 01-1357 (RCL/AK) |
| | ) | |
| v. | ) | |
| | ) | |
| EXXON MOBIL CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' OMNIBUS MOTIONS IN LIMINE**

**PUBLIC REDACTED VERSION**

## <u>**TABLE OF CONTENTS**</u>

I.  Documents Not Disclosed on Defendants' Exhibit List ....................................................1

    1.  The Court Should Exclude the Use of Documentary Material Not
        Disclosed on Defendants' Exhibit List ..............................................................1

II.  Mischaracterizations of the Acehnese Conflict..................................................4

    2.  The Court Should Exclude Questioning, Testimony, Attorney Argument
        and Documentary Material Concerning Defendants' Inaccurate and
        Entirely Unsupported Assertion That There Were "40,000 Indonesian
        Soldiers" Near Exxon's Facilities. ............................................................4

    3.  The Court Should Exclude Questioning, Testimony, Attorney Argument
        and Documentary Material Concerning Exxon's Self-Serving "Incident
        Reports" of GAM Violence, Which Are Irrelevant To Any Nonhearsay
        Purpose And Do Not Meet Hearsay Exceptions...................................................8

    4.  The Court Should Exclude Questioning, Testimony, Attorney Argument
        and Documentary Material Concerning Designation of Exxon's
        Operations as a "Vital National Project" as Irrelevant, Unsupported, and
        Prejudicial. ......................................................................................11

III.  Improper Questioning and Argument Regarding Plaintiffs and Witnesses......................15

    5.  The Court Should Exclude Defendants from Introducing Questioning,
        Testimony, Attorney Argument and Documentary Material Suggesting
        That Plaintiffs, Witnesses or Victims Were Associated with GAM as
        Unsupported, Irrelevant and Prejudicial.............................................................15

    6.  The Court Should Exclude Questioning, Testimony, and Attorney
        Argument Concerning Plaintiffs' and Witnesses' Understanding of
        Confusing and Unfamiliar American Legal Terminology. ...............................20

    7.  The Court Should Exclude Questioning, Testimony, Attorney Argument
        and Documentary Material Concerning Plaintiffs' Attempts to Obtain
        Visas as Irrelevant and Prejudicial....................................................................22

IV.  Procedural Complaints Not Before the Jury ................................................................23

    8.  The Court Should Exclude Questioning, Testimony, Attorney Argument
        and Documentary Material Concerning Matters Already Litigated as
        Irrelevant and Prejudicial. ..............................................................................23

9.      The Court Should Exclude Questioning, Testimony, Attorney Argument
        and Documentary Material Concerning the Substitution of Plaintiffs and
        Notice Thereof as Irrelevant and Prejudicial.......................................................26

V.   Attempts to Mislead the Jury with Irrelevant Argument ....................................................28

        10.     The Court Should Exclude Questioning, Testimony, Attorney Argument
                and Documentary Material Suggesting that the Actions of Lance Johnson,
                an EMC Employee, Should Be Attributed Exclusively to EMOI. .......................28

        11.     The Court Should Carefully Regulate Any Questioning, Testimony,
                Attorney Argument and Evidence Concerning Exxon's Alleged Legal
                Investigation Into Allegations of Human Rights Abuse by Indonesian
                Soldiers, Over Which Exxon Has Claimed Privilege. .........................................31

VI.  Admissible Evidence and Procedures...................................................................................33

        12.     To Avoid Confusing the Jury, the Court Should Allow Into Evidence
                Exxon's Testimony About the Court's Sanctions Ruling; the Court Should
                Issue Instructions to the Jury To Explain the Unusual Structure of the
                Depositions of Mark Snell.....................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1443 Chapin St., LP v. PNC Bank, N.A.*,
    2012 WL 13225423 (D.D.C. 2012) ..................................................................................12

*Baxter v. Mallory*,
    2015 WL 3793340 (W.D. Tenn. 2015) ............................................................................24

*Bittaker v. Woodford*,
    331 F.3d 715 (9th Cir. 2003) ...........................................................................................32

*Boca Investerings P'ship v. U.S.*,
    128 F. Supp. 2d 16 (D.D.C. 2000) .....................................................................................9

*Chapman v. Olymbec USA, LLC*,
    2022 WL 1632658 (W.D. Tenn. 2022) ............................................................................13

*Daubert v. Merrel Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ........................................................................................................12

*\*Doe v. Exxon Mobil Corp.*,
    2022 WL 3043219 (D.D.C. 2022) .......................................................................20, 25, 27

*Doe v. Exxon Mobil Corp.*,
    393 F. Supp. 2d 20 (D.D.C. 2005) ..............................................................................24, 25

*Doe v. Exxon Mobil Corp.*,
    654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C.
    Cir. 2013) .........................................................................................................................24

*Doe v. Exxon Mobil Corp.*,
    69 F. Supp. 3d 75 (D.D.C. 2014) .....................................................................................24

*Fowler v. State Farm Fire & Cas. Co.*,
    2008 WL 3050417 (S.D. Miss. 2008) ..............................................................................24

*\*Huthnance v. D.C.*,
    722 F.3d 371 (D.C. Cir. 2013) ...........................................................................................2

*Johnson v. Lutz*,
    170 N.E. 517 (1930) ........................................................................................................10

*Jordan v. Binns*,
    712 F.3d 1123 (7th Cir. 2013) ............................................................. 10

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
    292 F. Supp. 3d 211 (D.D.C. 2017) ..................................................... 10

*Lelchook v. Syrian Arab Republic*,
    2019 WL 2191177 (D.D.C. 2019) ....................................................... 27

*Little v. Wash. Metro Area Transit Auth.*,
    2017 WL 6767384 (D.D.C. 2017) ....................................................... 27

*Melendez-Diaz v. Massachusetts*,
    557 U.S. 305 (2009) ........................................................................... 10

*Menendez v. Constellation Power, Inc.*,
    2003 WL 25781422 (M.D. Fla. 2003) ................................................. 13

*Park W. Galleries, Inc. v. Global Fine Art Registry, LLC*,
    2010 WL 891695 (E.D. Mich. 2010) ................................................... 13

*Pearson P'ship v. Dakota, Minn. & E.Railroad Co.*,
    2010 WL 11561457 (S.D. Iowa 2010) ................................................. 13

*\*S.E.C. v. Lavin*,
    111 F.3d 921 (D.C. Cir. 1997) ........................................................... 32

*Standley v. Edmonds-Leach*,
    783 F.3d 1276 (D.C. Cir. 2015) ............................................................ 3

*Surowitz v. Hilton Hotels Corp.*,
    383 U.S. 363 (1966) ........................................................................... 21

*U.S. v. Baker*,
    693 F.2d 183 (D.C. Cir. 1982) ............................................................. 9

*U.S v. DeLeon*,
    316 F. Supp. 3d 1303 (D.N.M. 2018) ................................................... 9

*U.S. v. Lemire*,
    720 F.2d 1327 (D.C. Cir. 1983) ......................................................... 10

*\*U.S. v. Warren*,
    42 F.3d 647 (D.C. Cir. 1994) ............................................................... 9

*\*U.S. v. Williams*,
    827 F.3d 1134 (D.C. Cir. 2016) ......................................................... 13

## Other Authorities

Civ. R. 16-5(b)(1)(5) ........................................................................................................3

Civ. R. 16-5(b)(1)(6) ........................................................................................................3

Fed. R. Civ. P. 25(a)(1) ...................................................................................................27

Fed. R. Civ. P. 26 ..................................................................................................... *passim*

Fed. R. Civ. P. 26(c)(3) .....................................................................................................2

Fed. R. Civ. P. 30(b)(6) ...................................................................................................32

Fed. R. Civ. P. 37(c)(1) ...............................................................................................2, 3

Fed. R. Civ. P. 11 .............................................................................................................33

Fed. R. Evid. 104(b) .............................................................................................4, 17, 30

Fed. R. Evid. 401 ...................................................................................................... *passim*

Fed. R. Evid. 402 ...................................................................................................... *passim*

Fed. R. Evid. 403 ...................................................................................................... *passim*

Fed. R. Evid. 602 .......................................................................................................7, 21

Fed. R. Evid. 611 .....................................................................................................15, 19

Fed. R. Evid. 701 .............................................................................................................13

Fed. R. Evid. 702 .............................................................................................................13

Fed. R. Evid. 801 .............................................................................................................13

Fed. R. Evid. 802 .............................................................................................................13

Local Rule 16-5 ............................................................................................................2, 3

8A Richard L. Marcus & Arthur R. Miller, *Federal Practice & Procedure* § 2054
     (3d ed. 2022) ...........................................................................................................2, 3

2 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private
     Corporations* § 505 (Sept. 2022 update) ..............................................................29

**PUBLIC REDACTED VERSION**

Pursuant to the Federal Rules of Evidence, the Court's inherent authority to manage trial, and the Court's Order, ECF No. 858 (Dec. 12, 2022), Plaintiffs respectfully submit the following motions *in limine*. Additional motions *in limine* concerning allegations against Plaintiffs' counsel or their conduct during the case are filed concurrently under separate cover.

## I.   *Documents Not Disclosed on Defendants' Exhibit List*

### 1.   The Court Should Exclude the Use of Documentary Material Not Disclosed on Defendants' Exhibit List

Defendants' exhibit list, served on Plaintiffs on March 15, 2023 in accordance with the Court's scheduling order, contains an unusual, sweeping, and improper limitation: It notes that "**This Exhibit List does not include all documents that Defendants may use for cross examination, for impeachment, to refresh recollection, or in rebuttal.**" Ex. 1, Defs.' Exhibit List (Mar. 15, 2023).[1] Defendants have since clarified that that their exhibit list "includes all documents that [they] anticipate using at present," but they continue to "reserve the right to supplement [their] exhibit list in response to plaintiffs' testimony and other live testimony." Ex. 58, Email from J. Anderson to K. Pierson (Mar. 19, 2023).

Defendants' limitation is plainly contrary to Federal and Local Rules. Federal Rule of Civil Procedure 26(a)(3)(A) states:

> *In General.* In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment:
>
> …

---

[1] Exhibits referenced herein are attached to the Declaration of Robert W. Cobbs (Mar. 21, 2023), filed with these motions.

(iii) an identification of each document or other exhibit, including summaries of other evidence—separately identifying those items the party expects to offer and those it may offer if the need arises.

Fed. R. Civ. P. 26(a)(3)(A) (emphasis added). The Court's scheduling order governs the timing of these disclosures. *See* Fed. R. Civ. P. 26(a)(3)(B); Order, ECF No. 858 (Dec. 12, 2022). Local Rule 16.5 requires that the list of exhibits in the parties' Pretrial Statement "set forth a description of **each exhibit** the party **may offer in evidence** (other than those created at trial), separately identifying those which the party expects to offer and those which the party may offer if the need arises." (emphases added).

"Failure to list a witness or exhibit without substantial justification will lead to exclusion of that evidence pursuant to Rule 37(c)(1) unless the failure to disclose was substantially justified or harmless." 8A Richard L. Marcus & Arthur R. Miller, *Federal Practice & Procedure* § 2054 (3d ed. 2022) (hereinafter, "Wright & Miller"); *accord Huthnance v. D.C.*, 722 F.3d 371, 377 (D.C. Cir. 2013) (affirming exclusion of evidence not disclosed on exhibit list); *see also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). "The basic goal" of the pretrial disclosure requirements in Rule 26 and Local Rule 16-5 "is to avoid surprise at trial and facilitate receipt of evidence during the trial." Wright & Miller § 2054.

The combined effect of Rule 26(a)(3)(iii), Local Rule 16-5(b)(1)(6), and Rule 37(c)(1) is to preclude Defendants from introducing into evidence ***any*** exhibit not listed on their exhibit list unless Defendants can show the omission was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Although Rule 26(a)(3) creates an exception for exhibits used "solely for impeachment," Local Rule 16-5(b)(1)(6) does ***not***. *See* Fed. R. Civ. P. 26(c)(3) advisory committee's notes to 1993 amendment ("[D]isclosure of evidence to be used solely for

PUBLIC REDACTED VERSION

impeachment purposes…may be required by local rule."). The lack of an impeachment exception in Local Rule 16-5(b)(1)(6) is particularly conspicuous when read against the very preceding paragraph, which expressly specifies that "[a] party need not list any ***witness*** who will be called solely for impeachment purposes." Loc. Civ. R. 16-5(b)(1)(5) (emphasis added).

Neither Rule 26(a)(3) nor Local Rule 16-5(b)(1)(6) creates an exception for exhibits to be used solely on rebuttal or cross-examination, so by the plain language of these rules, such exhibits must be listed if they are to be offered into evidence. Indeed, Rule 26(a)(3)'s exception for exhibits to be used "solely for impeachment" plainly contemplates a much narrower scope than either cross-examination or rebuttal—strongly suggesting that undisclosed evidence on cross-examination or rebuttal may *not* be admitted as substantive evidence. *See Standley v. Edmonds-Leach*, 783 F.3d 1276, 1283 (D.C. Cir. 2015) ("[T]he courts have focused on the word 'solely' and our sister circuits have read that term strictly.").

The Court should exclude from evidence all documentary material not disclosed on Defendants' exhibit list absent a judicial ruling before any such material is presented before the jury that Defendants' omission is (1) substantially justified or (2) harmless. Fed. R Civ. P. 37(c)(1).[2]

---

[2] Plaintiffs do not object to the use of an undisclosed document solely to refresh a witness's memory, as long as such a document is not "offered into evidence," Loc. Civ. R. 16-5(b)(1)(6), the document is not used as "merely a script that is being read into evidence under the guise of refreshed recollection," and the proper foundation is otherwise established. Wright & Miller § 6184.

II.  *Mischaracterizations of the Acehnese Conflict*

   **2.  The Court Should Exclude Questioning, Testimony, Attorney Argument and Documentary Material Concerning Defendants' Inaccurate and Entirely Unsupported Assertion That There Were "40,000 Indonesian Soldiers" Near Exxon's Facilities.**

   The Court should exclude questioning of lay witnesses, attorney argument, testimony and documentary material relating to Defendants' unfounded and erroneous claim that "[d]uring the relevant time period, the Indonesian government deployed approximately 40,000 Indonesian soldiers to Aceh." Defs. Mot. for Summ. J. (hereinafter, "2021 MSJ"), ECF No. 819 (July 29, 2021) at 8. Defendants have repeatedly argued this figure in their papers and in depositions despite a complete lack of supporting evidence and Plaintiffs' unrebutted evidence—including information cited from Defendants' own risk assessment—that no more than 5,500 Indonesian military were in *all of Aceh* at the time of most of the events of this case. *See, e.g.*, 2021 MSJ at 2, 8, 19; Ex. 3, Snell [EMOI] 30(b)(6) Dep. (Feb. 15, 2021) (hereinafter, "Snell 2/15 Dep.") 28:15-21[3] ("███████████████████████████████████████████████████████████ ███████████████████████████████████████████"); *id.* at 223:21-224:5 (same words); *id.* at 253:14-18; 342:8-16; Ex. 4, Snell [EMOI] 30(b)(6) Dep. (May 24, 2021) (hereinafter, "Snell 5/24 Dep.") 865:2-7; *compare* Ex. 5, Expert Rept. of Geoffrey Robinson (hereinafter, "Robinson Rept.") at 12 & n.37 (5,500 troops in all Aceh in 2000).

   This number is inaccurate and has no support in evidence. This figure would have relevance to the jury only if it were true, and the evidence establishes that it is not. To be admissible, Defendants must offer proof "sufficient to support a finding that the fact [i.e., that there were 40,000 troops in the area during the relevant period] does exist." Fed. R. Evid. 104(b).

---

[3] Objections are excluded from quotations throughout.

Defendants can point to no evidence that would support such a finding, and no jury could reasonably accept Defendants' argument. Accordingly, it must be excluded as irrelevant under Rules 401 and 402 and in the alternative prejudicial under Rule 403.

Defendants' own "support" for their claim contradicts their argument. Defendants cite only one written source to support their number: an August 2001 Human Rights Watch report. Defs.' Statement of Material Facts ISO MSJ, (hereinafter, "2021 SMF"), ECF No. 819 (July 29, 2021) at ¶ 27. Far from establishing that there were "█████████████████████ ████████████" during the relevant time period, *see* Ex. 3, Snell 2/15 Dep. 28:15-21, the Human Rights Watch Report estimated that there were *12,000* Indonesian soldiers in *all of Aceh* in *August* 2001.[4] *See* Ex. 6, Human Rights Watch, *Indonesia: The War in Aceh* 5 & n.2 (2001).

Moreover, the Human Rights Watch report estimates troop levels *after* a rapid *increase* in the number of Indonesian soldiers deployed to Aceh in late March and April 2001. *See* Ex. 5, Robinson Rept. at 12 (noting that "near the end of March and April 2001 … the Army deployed 14 Infantry Battalions and roughly 1,000 Marines, bringing the total to about 9,500 troops in that year.") The Human Rights Watch report, dated *August* 2001, reflects this increase, reporting estimates dated in *late April* 2001. *Indonesia: The War in Aceh*, *supra* at 1, 5 n.2. But Plaintiffs' injuries, with one exception in 2003, occurred no later than March 20, 2001—*before* the troop buildup reported by Professor Robinson and other sources. *See generally* Pls. Counterstatement of Material Facts ISO Opp. to MSJ (hereinafter, "CSMF"), ECF No. 825-2 (Sept. 13, 2021) at ¶¶ 38-145, 314-541.

---

[4] The Human Rights Watch report notes that these estimates "vary greatly depending on source." Human Rights Watch, *Indonesia: The War in Aceh* 5 n.2 (2001).

PUBLIC REDACTED VERSION

The high range of Defendants' claim—40,000—appears only in Defendants' depositions of third-party witnesses and Plaintiffs who have no possible foundation for knowing the Indonesian government's troop levels. Defendants repeatedly sought to get the Plaintiffs and third-party witnesses—none of whom had any personal knowledge about the total number of troops deployed—to agree to Defendants' unsupported number. For example, Defense counsel asked Jane Doe IV, "Other witnesses have said that there were as many as 40,000 Indonesian military in North Aceh in this time period in 2000. Do you agree with that?"  Ex. 7, Jane Doe IV Dep. 72:25-73:4. Defendants then asked third party witness ███ whether he agreed with his older neighbor's testimony:

> Q: [Jane Doe IV] and other plaintiffs in this litigation have testified that there were over 40,000 Indonesia military troops in Aceh during the 1998 through 2001 time period. Do you agree with that estimate?
>
> THE WITNESS: **I do not know about how many. If I say agree, it might be wrong. If I say disagree, it might also be wrong.**
>
> Q: My question was, is it your understanding that there were about 40,000 Aceh—40,000 Indonesia military troops fighting the civil war in Aceh?
>
> THE WITNESS: **I do not know about that, sir.**

Ex. 8, ███ Dep. 71:11-72:12; *see also* Ex. 9, John Doe VII Dep. 87:10-88:4 ("I do not know about that."); Ex. 10, ███ Dep. 33:9-25 ("I do not know about that."). These witnesses were able to express their lack of knowledge; other witnesses were confused or bullied into agreement. *See, e.g.*, Ex. 11, ███ Dep. 43:17-22 (Q: At the time of the attack on you and [John Doe VII], there were, approximately, 40,000 Indonesian troops in Aceh, correct? A: That is correct."); Ex. 12, ███ Dep. 45:8-15; *compare* Ex. 5, Robinson Rept. at 12 (estimating Indonesian military strength in Aceh during the relevant period of 5,500 using Indonesian media sources).

None of this testimony establishes the witness's personal knowledge of troop levels in the region during the relevant period. In fact, when Defendants managed to secure the answer they wanted, they pointedly did not inquire as to the basis for the witnesses' answers. Defendants failed to establish a foundation of personal knowledge for this testimony, because none exists—unless the witnesses individually counted 40,000 soldiers during the relevant period, something they could not possibly have done. For example, third-party witness ███████, made clear that the figure does not come from his personal knowledge: "I was taught there were about 40,000 soldiers in Aceh that time," he testified. Ex. 13, ██████ Dep. 49:7-9. The witness's testimony cannot suffice to establish the conditional relevance of Defendants' figure and must be excluded.[5] Fed. R. Evid. 104(b), 401, 402, 602. Defendants then adopted this foundationless hearsay and used the claim that "other witnesses" had testified to it to try to extract further testimony. *See, e.g.*, Ex. 7, Jane Doe IV Dep. 72:25-73:4; Ex. 8, █████ Dep. 71:11-80:12.

Defendants' argument is additionally misleading because it deliberately conflates estimates of the number of Indonesian soldiers in *all of Aceh* with the number of soldiers in *the area of Exxon's operations*. As Professor Robinson notes, the regency of North Aceh, the area of Exxon's operations, constitutes "approximately 5% of the land area in Aceh." Ex. 5, Robinson Rept. at 12 n.37. Exxon's own documents noted that even in May 2001, after a substantial troop increase, "████████████" of troops in the area were assigned to ████████████████████". *Id.* (citing CA000133300).

---

[5] The testimony Exxon cites is inadmissible on other grounds as well. For example, the question to Jane Doe IV is fatally ambiguous: "Q: Other witnesses have said that there were as many as 40,000 Indonesian military in North Aceh in this time period in 2000. Do you agree with that? [Objection] A: Yes, I agree with that. That's what I heard." Ex. 7, Jane Doe IV Dep. 72:25-73:7. *See also* Ex. 13, ██████ Dep. 49:5-9 (hearsay).

Plaintiffs' expert historian Geoffrey Robinson offers unrebutted evidence of the correct

figure. Using his training as a historian and reliable historical sources, Professor Robinson

estimated that there were 5,500 Indonesian soldiers in all of Aceh during the relevant time period

(the same figure estimated from public sources cited in EMOI's contemporaneous internal

documents). *Id.*; *compare* Ex. 14, CA0001006150 at '66 ███████████████████

████████████████████████████████████") Robinson also consulted

"ExxonMobil documents" and Professor Douglas Kammen, *see* Ex. 15, Robinson Dep. 105-106,

a "recognized expert in military history and military politics of Indonesia," Robinson Dep.

12:15-17.

Any questioning, argument, testimony or documentary material concerning the presence

of Indonesian military in strengths of 30,000 to 40,000 should be excluded as baseless,

irrelevant, and prejudicial under Rules 104(b), 401, 402, and 403. If the Defendants are permitted

to use the Human Rights Watch report at all or argue from its numbers—something they should

only be permitted to do with Prof. Robinson—they should be required to make clear (a) that the

period they are discussing is April 2001 (after a major increase in deployments); (b) that even

then there were only 12,000 soldiers; and (c) that those soldiers were dispersed throughout Aceh,

not in the much more limited area where EMOI was operating.

**3.  The Court Should Exclude Questioning, Testimony, Attorney Argument and Documentary Material Concerning Exxon's Self-Serving "Incident Reports" of GAM Violence, Which Are Irrelevant To Any Nonhearsay Purpose And Do Not Meet Hearsay Exceptions.**

Plaintiffs respectfully request that the Court preclude Defendants from introducing into

evidence DX075, 076, 092, and any other "Incident Report" Defendants may seek to offer, and

preclude questioning, testimony, or attorney argument based on such material. Ample precedent

from the District of Columbia Circuit demonstrates that these reports are inadmissible as they

contain multiple levels of hearsay. No hearsay exception applies to permit their admission. Furthermore, even if there were a non-hearsay purpose for introducing the Incident Reports as evidence, they should be excluded under Federal Rules of Evidence 401, 402, and 403.

DX075 and DX076 are both lists of purported security incidents—ranging from a crowd of people looking for jobs or villagers complaining about banana trees cut down to thefts, arson, grenade attacks and murder, including at the Governor's office in North Aceh, at a firewater pump at the river, and during a highway robbery of a bank vehicle. *See* Ex. 16, DX075; Ex. 17, DX076. DX092 is a letter about the murder of a contractor employed by a company not party to this lawsuit (PT Welltekindo) that also attaches a report about an unrelated arson at a community clinic in the town of Lhokseumawe, about 15km from Exxon's operations at the Arun gas field. *See* Ex. 18, DX092.

These reports are not business records. To qualify as a business record, each participant in the chain producing the record, including the initial observer-reporter, must be acting in the course of regularly conducted business. *U.S. v. Warren*, 42 F.3d 647, 656–57 (D.C. Cir. 1994). Here, the drafter is not identified. More importantly, the initial observer is not identified. Exxon has not shown that the person who originally observed each of these events and reported them was an Exxon employee acting in the course of regularly conducted business as required—and, in fact, it is extremely unlikely that the unidentified observer of each incident (whether at the Governor's office, the river, the highway bank robbery or elsewhere) was an Exxon employee. This is fatal to their admissibility as a business record. *See, e.g.*, *Warren*, 42 F.3d at 656–57; *U.S. v. Baker*, 693 F.2d 183, 188 (D.C. Cir. 1982) (business record exception does not apply "if the source of the information is an outsider"); *Boca Investerings P'ship v. U.S.*, 128 F. Supp. 2d 16, 20–22 (D.D.C. 2000) ("[N]o such safeguards of regularity or business checks automatically

assure the truth of a statement [made] *to* the business by a stranger to it." (quoting *U.S. v. Vigneau*, 187 F.3d 70, 75–76 (1st Cir. 1999))); *U.S v. DeLeon*, 316 F. Supp. 3d 1303, 1307 (D.N.M. 2018) (business records exception did not apply to reports including information from confidential, unnamed, in some cases unknown, sources). *Cf. Johnson v. Lutz,* 170 N.E. 517 (1930) (holding that a police report prepared using information obtained from a bystander was not admissible because the informant was not acting in the regular course of business, although the officer who prepared the report was).

Moreover, these records appear to be compilations made for a public relations or lobbying purpose: they are bullet point lists (one in draft "█████"), prepared well after the events took place, and appear to include only cherry-picked incidents ("██████████████"). *See* Ex. 16, DX075; Ex. 17, DX076; *See also* Ex. 18, DX092 (letter to Minister of Mines and Energy). Such material is not admissible as a business record. *See, e.g.*, *U.S. v. Lemire*, 720 F.2d 1327, 1351 (D.C. Cir. 1983) ("We think that memoranda prepared as part of an investigation into substantial abnormal procedures are not prepared for a regular business purpose. We find such memoranda similar to accident reports, which generally are not admissible as business records"); *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 292 F. Supp. 3d 211, 220–21 (D.D.C. 2017) ("The reports may not have been prepared in anticipation of litigation, but they were prepared with a particular client and goal in mind, which raises similar concerns about their trustworthiness."); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009) (citing *Palmer v. Hoffman*, 318 U.S. 109 (1943) and noting that an accident report provided by an employee of a railroad company did not qualify as a business record); *Jordan v. Binns*, 712 F.3d 1123, 1136 (7th Cir. 2013) (documents prepared with an eye toward litigation raise serious trustworthiness concerns because there is a strong incentive to deceive (namely, avoiding liability)).

Finally, because the documents list so many incidents wholly unrelated to Plaintiffs'
injuries, committed by unknown assailants with unknown motives, ranging from cutting down
trees to murder, over a far-flung area (including towns away from the gas fields), the documents
are of questionable relevance, their probative value outweighs their prejudicial value, and they
will confuse the issues. They should be excluded under Rules 401, 401 and 403.

### 4. The Court Should Exclude Questioning, Testimony, Attorney Argument and Documentary Material Concerning Designation of Exxon's Operations as a "Vital National Project" as Irrelevant, Unsupported, and Prejudicial.

Plaintiffs move to preclude Defendants from eliciting testimony or offering argument that
the Indonesian government had by law designated the Arun Field a "Vital National Project," or
"Vital National Object," or that the Arun Field otherwise bore special legal status that compelled
the Government of Indonesia to station military guards at the Arun Field in order to provide
security for Exxon Mobil's operations regardless of Exxon's wishes. While the Indonesian
government, like all governments, is responsible for protecting its own territory, ExxonMobil
should not be permitted to argue to the jury that Defendants' operations had a special protected
status under Indonesian law that impacted Exxon's legal liability.[6]

This argument is unsupported. Defendants cannot show that such a law existed at the time of
Plaintiffs' injuries, nor can they show that any such law limited Exxon's legal liability. It is also
irrelevant under Rule 401, as the Court has already found that whether Defendants were required
to have miliary security at the Arun Field does not bear on Defendants' liability. *See* Mem. Op.,
ECF No. 365, at 11-12 (Aug. 27, 2008). Permitting Defendants to argue this issue will only

---

[6] Plaintiffs do not seek to exclude argument, testimony, or evidence that the Indonesian
military and others used "vital project" and similar terms in reference to the Arun Field, so long
as such argument, testimony, or evidence is not presented in such a way as to imply that these
terms carried legal significance or accompanied a legal requirement that the government station
military guards at the Arun Field.

confuse the issues, mislead the jury and lead to undue delay, and should be precluded under Rule 403.

The one Indonesian legal expert on Defendants' witness list, Professor Timothy Lindsey, **did not write in his Rule 26(a)(2)(B) report that the Arun Field was designated as a "vital national project**" or carried any other special status that required military protection.[7] *See generally* Ex. 20, Expert Rept. of Timothy Lindsey (hereinafter, "Lindsey Rept."). Professor Lindsey offered only a much more general opinion that Indonesian law ███████████████

█████████████████████████████████████████████

███████████████████████ " Ex. 21, Lindsey Rept. at ¶ 60. Professor Lindsey did not mention the term "vital national project," "national critical asset," or any other similar phrase in his report, nor did he argue the Arun Field bore any special legal status. *See id.*; *see also* Ex. 21, Lindsey Dep. 14:7-10 (confirming report is "██████████████████████████

██████████████████████ "); *id.* at 43:8-12 ("████████████████

████████████████████████████████████ ").

Thus, if the Court permits Professor Lindsey to testify,[8] it should not permit him to testify to these matters outside the scope of his report. *See, e.g.*, *1443 Chapin St., LP v. PNC Bank, N.A.*, 2012 WL 13225423, at *2 (D.D.C. 2012) ("[I]t suffices to say that Krogh's testimony during Chapin Street's case-in-chief shall be confined to matters that can reasonably be said to be within the scope of his expert report and deposition testimony.").

---

[7] It is telling that with 22 years to prepare for trial, Defendants could not locate an expert witness who would offer trial testimony that the Arun Field enjoyed special legal status because it was a designated "Vital National Project."

[8] Plaintiffs separately move to exclude the entirety of Professor Lindsey's testimony under *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

While several of Defendants' lay witnesses described the Arun Field as a vital project or a similar term, they are not offered as Indonesian legal experts,[9] nor are they so qualified, so they are not competent to opine on the meaning of Indonesian law, such as whether the Arun Field bore special legal status as a Vital National Project or the meaning of any such status.[10] Federal Rule of Evidence 701(c) states that lay witness opinion testimony may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." "The addition of subsection (c) was intended to preclude litigants from proffering an expert in lay witness's clothing and thereby avoid the disclosure and other requirements for expert opinion testimony under FRE 702." *U.S. v. Williams*, 827 F.3d 1134, 1156 (D.C. Cir. 2016). Legal conclusions offered by nonlawyers squarely fall within this prohibition. *See, e.g.*, *Chapman v. Olymbec USA, LLC*, 2022 WL 1632658, at *4 (W.D. Tenn. 2022) ("Rule 701 [] prevents a [lay witness] from offering opinions on the law."); *Park W. Galleries, Inc. v. Global Fine Art Registry, LLC*, 2010 WL 891695, at *2 (E.D. Mich. 2010) ("Legal opinions, when offered by a non-lawyer lay witness, are both 'incompetent and unpersuasive.'") (quoting *U.S. v. Canipe*, 569 F.3d 597, 603 (6th Cir. 2009)); *Pearson P'ship v. Dakota, Minn. & E.Railroad Co.*, 2010 WL 11561457, at *2 (S.D. Iowa 2010) ("Pearson is not an expert witness on legal matters and shall not be permitted to testify or make any statements as to any provisions of Iowa law which may or may not be applicable to this case."). It does not matter that Defendants' lay witnesses may have encountered Indonesian law in the course of their nonlegal work. *See Menendez v. Constellation*

---

[9] If Defendants intended to designate them as expert witnesses, the time to do so has passed. See Order, ECF No. 685 (Mar. 27, 2020) (setting Defendants' FRCP 26(a)(2)(D) deadline as 90 days after the close of fact discovery); Order, ECF No. 858 (Dec. 1, 2022) (ordering parties to identify experts that may testify at trial 70 days before the start of trial).

[10] They are also not qualified to testify to the motivations of the military, on which they would have to speculate or could offer only hearsay. Fed. R. Evid. 602, 801, 802. Exxon has not included any other lay witnesses on its witness list.

*Power, Inc.*, 2003 WL 25781422, at *1-2 (M.D. Fla. 2003) (holding manager of Guatemala's third largest power company who had no legal training was not qualified to testify to "the 'legal aspects' of the sale and distribution of electricity in Guatemala").

What is more, Defendants' admissions and internal emails belie the argument that the Arun Field bore any special legal status. Exxon Mobil operated various facilities in Aceh, Indonesia pursuant to a Production Sharing Contract. *See, e.g.*, Ex. 22, Defs.' Resps. & Obj. to Pls.' Jan. 2016 Reqs. for Admission No. 8 ("████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████."). Defendants also admit that "████████████████████████████████████████████████████ ████████████████████████████████████." *Id*. at Req. No. 1 (internal citations omitted). Defendants' internal emails confirm that Defendants repeatedly requested additional troops. For example, in August 1999, MOI President Ronald Wilson sent an email to Lance Johnson, at Mobil in Houston, reporting that the TNI commander's staff told him that "█████████████████ ███████████████████████████." Ex. 26, TPX 386 (CA0001123197); *see also* 2021 SMF ¶¶ 199-207. This is yet further reason the Court should not allow Defendants' unqualified witnesses to offer the Exxon company line on the contents and meaning of Indonesian law.

Exxon previously argued that "they were required by Indonesian law to have military security personnel on site." Mem. Op., ECF No. 365, at 11-12 (Aug. 27, 2008). As Judge Oberdorfer explained in denying Defendants' 2008 motion for summary judgment (albeit under D.C., not Indonesian, tort law), even if true, this fact is irrelevant:

> Is the owner of a swimming pool insulated from liability per se for a lifeguard's negligence simply because the lifeguard is required to be there? Surely not. There

would still be issues of negligence in hiring or supervision and of control—the
exact issues disputed here.

*Id*. Thus, even if Defendants could muster otherwise admissible evidence, the Court should

exclude it under Rules 401 and 402 because it would be irrelevant or, alternatively, under Rule

403 because its potential to confuse the issues and mislead the jury would substantially outweigh

its slight probative value.

In sum, the Court should prohibit Defendants from making the dubious argument that the

Arun Field was a "Vital National Project" or enjoyed some other special designation under

Indonesian law because Defendants have disclosed no witness qualified to offer such testimony

or to testify to the legal implications of any such designation.

### III.   *Improper Questioning and Argument Regarding Plaintiffs and Witnesses*

**5.   The Court Should Exclude Defendants from Introducing Questioning, Testimony, Attorney Argument and Documentary Material Suggesting That Plaintiffs, Witnesses or Victims Were Associated with GAM as Unsupported, Irrelevant and Prejudicial.**

Defense counsel should be prohibited from suggesting directly or indirectly that any

plaintiff, victim, or witness belonged to or was affiliated with the Gerakan Aceh Merdeka

(GAM). Such meritless suggestions, entirely unsupported by the factual record, fail to meet the

conditional relevance standard of Federal Rules of Evidence 104(b),401, and 402, and would

confuse and prejudice the jury against the Plaintiffs in violation of Federal Rule of Evidence 403.

Moreover, Defendants used these questions to unfairly harass and badger the witnesses and

activate self-protective instincts developed during years of brutal conflict. They should be

excluded under Federal Rule of Evidence 611.

The civil conflict in Aceh was an important part of the context for the events of this case,

and Plaintiffs expect Defendants will seek to justify their actions by focusing on the threat that

GAM posed to their employees and operations (*see, e.g.*, Ex. 3, Snell 2/15 Dep. 28:5-29:7). The

**PUBLIC REDACTED VERSION**

record contains unambiguous and unrebutted testimony, however, that no plaintiff, victim, or witness in this case was in any way associated with GAM. *See, e.g.*, Ex. 9, John Doe VII Dep. 116:7-117:13; Ex. 28, Jane Doe II Dep. 65:8-11; Ex. 7, Jane Doe IV Dep. 95:18-22; Ex. 29, Jane Doe VII Dep. 82:18-19, 88:3-18; Ex. 30, John Doe II Dep. 136:11-14; Ex. 31, John Doe IV Dep. 108:18-109:22; Ex. 32, █████████ Dep. 47:7-14, 52:7-16; Ex. 13, █████ Dep. 38:12-13, 50:18-51:3; etc.). Significantly, Defendants, asked if they were aware of "the slightest evidence" that the Plaintiffs or their loved ones had any involvement in GAM, conceded that they had none. Ex. 3, Snell 2/15 Dep. 115:3-11; *accord id.* at 121:13-17, 134:5-12; 151:11-15; 240:5-2; 247:3-10; 250:22-251:2.) Intimation that any plaintiff, victim, or witness was connected with GAM is therefore categorically unfounded and inaccurate, and Defense counsel should be prohibited from introducing any questioning, argument, testimony or documentary material that tends to suggest such a connection.

In depositions, Defendants repeatedly asked the Plaintiffs and third-party witnesses not only whether they or their deceased family were members of GAM (*see* citations *supra*), but also about their knowledge of Indonesian politics, about their personal political views, their understanding of GAM's aims, and whether or not they agreed that Aceh should be independent. *See, e.g.*, Ex. 33, Jane Doe VI Dep. 102:20-108:3; Ex. 28, Jane Doe II Dep. 60:15-65:15; Ex. 29, Jane Doe VII Dep. 88:19-92:18; Ex. 32, ██████ Dep. 52:17-55:11; Ex. 13, █████ Dep: 49:10-52:25; etc.

These questions have no probative value. The witnesses are not experts on Indonesian history or politics, and they typically disclaimed knowledge even of the existence of GAM or its purposes. *See, e.g.*, Ex. 33, Jane Doe VI Dep. 103:22-24 ("Q: Are you familiar with something called Gerakan Aceh Merdeka? A: No."); Ex. 28, Jane Doe II Dep. 60:15-19 ("Q: Do you know

what the Free Aceh Movement is? A: No. Q: Do you know what GAM is? A: No, I don't

understand."). Nor are plaintiffs and witnesses' views on, for example, whether Aceh should be

independent relevant to any jury question.

But these questions are potentially highly prejudicial. First, any suggestion by Defendants

that the plaintiffs, their deceased family, or third-party witnesses were members of GAM has the

potential to mislead and pollute the jury's perception, even if it evokes testimony denying any

connection. Any questioning from Defendants on a witness's experience with GAM must be

excluded under Federal Rules of Evidence 104(b) and 403.

It is particularly important to exclude Defendants' questioning of witnesses on GAM

because Defendants' questions in depositions exploited witness confusion, psychological trauma

responses and deeply-ingrained self-preservation habits of professing ignorance that the

witnesses developed during years of brutal conflict where violence could come from any

direction at any time. Take, for example, the following exchange:

> Q: Are you aware of a conflict between Acehnese separatists and the Indonesian
> government that took place in the late '90s/early 2000s?
>
> A: I don't remember anymore.
>
> Q: Are you aware that there were people in Aceh who believed their country
> should be independent from the rest of Indonesia?
>
> A: **I don't know who they are.**
>
> Q: Do you believe that Aceh should be independent from the rest of Indonesia?
>
> A: **If that is the question, I don't want to answer. I'm an elderly. I don't
> know—I don't want to answer such kind of question.**
>
> …
>
> Q: Have you ever heard of something called the Free Aceh Movement?
>
> A: **No. I don't know. I don't know about it. Don't ask that questions. I don't
> know about it.**

Ex. 33, Jane Doe VI Dep. 102:20-104:5. Questions like these seek responses that, for many

years, would have gotten Jane Doe VI killed. Her confusion is evident—her answer, "I don't

know who they are," indicates that she has understood the question to be asking her to "name

names" of people she knows associated with GAM. Her distress is evident—she begs not to have

to profess an opinion on an issue that, for most of her life, would have put her and her loved ones

in danger no matter how she answered. Pressed, she begs again: "Don't ask that questions. I

don't know about it."

Another exchange is illustrative, from the deposition of Jane Doe VII:

Q: Do you know whether your husband was a member of GAM?

A: They thought my husband was GAM, but he was actually not. He is just a
common person.

…

Q: Do you know anyone who is a member of GAM?

A: I do not.

Q: Do you know anyone who supported GAM?

A: **I don't know that either, sir**.

Q: Can you tell me what GAM is?

A: **I don't understand about that, sir. I don't know about that.**

...

Q: Do you know what GAM wanted to accomplish?

A: I do not know. **I don't know politics.**

…

Q: In the late 1990s and early 2000s, was there a civil war in Aceh between the
Indonesian military and GAM?

A: I don't know.

…

Q: In the late '90s and early 2000s, who was the military fighting in Aceh?

A: **I don't understand about that matter, sir. I don't even know what that is.**

Ex. 29, Jane Doe VII Dep. 88:5-90:2. As with Jane Doe VI, this series of hostile questions begins in dangerous territory and only gets worse. Reading it is enough to see Jane Doe VII retreat into the kind of impassivity that would have been necessary to survival during the worst years of the Acehnese conflict. Faced with increasingly hostile and pointed questions, Jane Doe VII begins to call her inquisitor "sir," and professes ignorance of GAM and even of the conflict itself.

Defendants' questioning clearly activates in these witnesses and others like them the experience of decades of trauma. It also exploits deeply rooted practices of self-preservation. Plaintiffs' expert historian Professor Geoffrey Robinson has worked with survivors of conflict in Indonesia for more than 30 years. Ex. 5, Robinson Rept. at 2. As he put it in his report, Acehnese survivors "have learned through bitter experience that it is often safer to remain silent than to try to answer the questions of an aggressive interrogator." *Id.* at 8; *see also id.* at 7-8.

The witnesses' circumstances reduce the probative value of their answers and increase the possibility of prejudice. The Court may also exclude such questioning under Rule 611 to "protect witnesses from harassment or undue embarrassment," and should.

Not all testimony concerning GAM should be excluded, however. Plaintiffs, by contrast, must be allowed to establish the elements of their case by introducing argument, testimony, and evidence that:

- The plaintiffs, victims, and witnesses are not associated with GAM (*see, e.g.*, Ex. 7, Jane Doe IV Dep. 95:18-22; Ex. 31, John Doe IV Dep. 108:18-109:11), and that Defendants have no evidence whatsoever suggesting otherwise (*see* Ex. 3, Snell 2/15 Dep. 115:3-11; 121:13-17; 134:5-12; 151:11-15; 240:5-12; 247:3-10; 250:22-251:2.). This unrebutted testimony is directly relevant to, at a minimum, the causation prong of negligence claims as it excludes other potential causes of harm.

19

- During the particular incidences of abuse in this case, the Exxon military guards who abused the victims were motivated in whole or in part by suspicion that a victim was associated with or a sympathizer with GAM (*see, e.g.*, Ex. 34, Jane Doe I Dep. 85:4-13; Ex. 31, John Doe IV Dep. 71:15-22, 77:22-78:9). This evidence is probative of whether the abuse took place in the scope of the military guards' security duties for Exxon.

Plaintiffs recognize that Defendants may seek to cross-examine witnesses who offer such testimony. Cross-examination, however, must be limited to questioning directly related to that testimony—for example, the basis for their knowledge—and must not seek to harass a witness or provoke a trauma response. Moreover, Defendants should not be allowed to seek to impeach the witness's credibility with prior testimony they obtained through improper and intimidating questioning in prior depositions.

> **6. The Court Should Exclude Questioning, Testimony, and Attorney Argument Concerning Plaintiffs' and Witnesses' Understanding of Confusing and Unfamiliar American Legal Terminology.**

In depositions, Defendants often quizzed Plaintiffs—Indonesian nationals who, with few exceptions, cannot read even in their native tongues and have no familiarity with the American legal system—on the details of the Plaintiffs' case, often using the specialized terminology of American law, or distinctions of corporate form as to which the Plaintiffs have no possible frame of reference. *See, e.g.*, Ex. 33, Jane Doe VI Dep. 104:14-23 (Q: Are you aware that in a document your lawyers provided us with your signature under a declaration that you state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, that you admit that GAM sought independence for Aceh from Indonesia from the 1970s to 2004? A: No, I don't know about the document."); Ex. 34, Jane Doe I Dep. 17:11-18:23 ("Q: Who are the defendants in this lawsuit? A: The people from Exxon, Exxon's TNI. … Q: Do you know whether there are other plaintiffs in this case? A: No. Q: You have never met anyone else asserting claims against Exxon? A: Please repeat. … Yes. … I met – yes, I have met. … Q: How

did you learn that she had asserted a claim against Exxon? A: I met her and then we went to

Jakarta together."); Ex. 28, Jane Doe II Dep. 34:15-34:24 ("Q: What is Exxon Mobil

Corporation? A: I don't know. Q: Do you know what Exxon Mobil Oil Indonesia is? A: Yes, I

do. Q: Okay. What is it? A: I just know Exxon Mobil, not other things.").

      These kinds of questions, filtered through translators who are also unfamiliar with

American law, serve no purpose for the Defendants other than to seek to confuse the Plaintiffs

into testimony that Defendants hope will undermine Plaintiffs' credibility (or the credibility of

Plaintiffs' counsel) with the jury. Questions concerning the details of the litigation are irrelevant

to any jury question; if relevant to the litigation at all they bear only on the many procedural

challenges Exxon has pursued unsuccessfully with the Court. *See Doe v. Exxon Mobil Corp.*,

2022 WL 3043219, at *40-41 (D.D.C. 2022) ("[D]efendants have always had the opportunity to

file motions seeking the Court's intervention when warranted. Defendants did so on several

occasions."). Plaintiffs are not required to have a sophisticated understanding of the legal details

of their case, and even if they were, trial would not be the forum to adjudicate those issues. *Cf.*

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366-73 (1966) (reversing dismissal of suit based

on plaintiff's "false" verification of the complaint where plaintiff, "a Polish immigrant with a

very limited English vocabulary and practically no formal education," demonstrated in

deposition that "she did not understand the complaint at all … had a very small degree of

knowledge as to what the lawsuit was about … [and] did not know any of the  defendants by

name" because "Mrs. Surowitz verified the complaint, not on the basis of her own knowledge

and understanding, but in the faith that her son-in-law [and attorney] had correctly advised

her ….")

**PUBLIC REDACTED VERSION**

Because these questions have no probative value and could only prejudice the jury, they should be excluded under Rules 401, 402, and 403. Questions that might have relevance if the Plaintiffs had a foundation for being able to answer them—such as those relying on a distinction between EMC, EMOI, and other members of the Exxon corporate family—must be excluded for lack of foundation under Rule 602, or as more prejudicial than probative under Rule 403 given the dubious probative value of a Plaintiff's testimony on such a distinction.

The Court should exclude Defendants from asking Plaintiffs or witnesses questions that rely on an understanding of American legal concepts, including questions that presume distinction between corporate forms, or introducing prior testimony from Plaintiffs or witnesses on questions like these. The Court should also exclude Defendants from attorney argument touching on the Plaintiffs' understanding of legal details of their case or Exxon's corporate family.

### 7. The Court Should Exclude Questioning, Testimony, Attorney Argument and Documentary Material Concerning Plaintiffs' Attempts to Obtain Visas as Irrelevant and Prejudicial.

Though to date all of the testifying Plaintiffs but one have secured visas to attend trial,[11] Defendants may seek to question Plaintiffs as to their efforts to obtain visas for trial or depositions. *See, e.g.*, Ex. 35, Jane Doe III Dep. 43:21-44:13 ("Q: Did you try to find out whether you could obtain a visa to go to the United States before you agreed to join this lawsuit? A: She doesn't know. Q: You never did try to find out before you joined this lawsuit, did you? A: No."). Most Americans' understanding of American visa requirements is scant and may be weighted with strong feelings about (a) immigration; or (b) terrorism. Questioning, testimony,

---

[11] As Plaintiffs informed the Court in their summary judgment opposition, Plaintiff Jane Doe VIII was too infirm to testify at deposition and Plaintiffs instead offered her daughter, ███████,. *See* Pls. Opp. to MSJ, ECF No. 828 at 28 & n.15 (Sept. 13, 2021).

argument, or documentary material concerning visa denial, in particular, is irrelevant to any jury issue and potentially prejudicial, as jurors might conclude that visas were denied because the Plaintiffs sought to settle in the United States illegally or because the Plaintiffs represent a threat to U.S. security. The Court should exclude such material.

IV.   ***Procedural Complaints Not Before the Jury***

> **8.   The Court Should Exclude Questioning, Testimony, Attorney Argument and Documentary Material Concerning Matters Already Litigated as Irrelevant and Prejudicial.**

Defendants may seek to elicit testimony in order to argue to the jury explicitly or implicitly that (a) this Court is an inappropriate forum to litigate the Plaintiffs' claims, and the case would be better tried in an Indonesian court; (b) that it is inappropriate to litigate Plaintiffs' claims against these Defendants, instead of other potentially responsible parties; or (c) that Plaintiffs' conduct of the case has been unfair or violative of Defendants' due process rights. Defendants have already made these arguments—sometimes several times—and the Court has rejected them. Attorney argument, questioning, testimony or documentary material on these topics should be excluded under Federal Rule of Evidence 401, 402 and 403.

At the Plaintiffs' depositions, Defendants repeatedly asked Plaintiffs whether they had consulted with Indonesian attorneys or filed claims in an Indonesian court or commission, often confusing the Plaintiffs with legal terminology. *See, e.g.,* Ex. 28, Jane Doe II Dep. 103:21-104:18 ("Q: Did you ever file a complaint in any Indonesian court about your husband's death? ... [Jane Doe II], do you remember filing any lawsuit or any complaint with an Indonesian human rights commission regarding your husband's death? A: I don't remember. I don't know more. I'm confused."); Ex. 35, Jane Doe III Dep. 104:24-105:25 ("Q: Have you filed any claims in an Indonesian court about his disappearance? A: No. Q: What about any commissions

like the Aceh Truth and Reconciliation Commission? A: No. Q: Have you hired an Indonesian lawyer to help her with her claims? A: No.").

Defendants also asked Plaintiffs about other potential Defendants. *See, e.g.*, Ex. 33, Jane Doe VI Dep. 46:12-23 ("Q: Is the government of Indonesia a defendant in this case? A: No. Q: Is the military a defendant in this case? A: No. Q: Are the police a defendant in this case? A: No.")

Defendants have also argued to the Court that Plaintiffs' prosecution of the case has violated their due process rights. *See* 2021 MSJ at 39-42.

The kind of questioning cited above, attorney argument, discovery responses, and documentary material on these topics are irrelevant under Rule 401 and 402. They are also inadmissible under Rule 403, as their probative value is outweighed by the likelihood that the material will cause unfair prejudice, confuse the issues, or mislead the jury.

The material is irrelevant because this Court and the Court of Appeals have already found that this forum—not Indonesia—is the appropriate forum to hear this case and in particular found that there are no effective, non-futile remedies available in Indonesia. *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 26–27 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) (noting "the unchallenged finding by the district court is that the plaintiffs could not litigate their claims in Indonesia, even assuming, as Exxon argued before the district court, that international law required exhaustion of local remedies, because they had demonstrated such efforts would be futile, an exception to prudential exhaustion"); *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 88-93 (D.D.C. 2014) (finding "pursuit of local remedies in Indonesia would be futile" and rejecting forum non conveniens and comity challenge); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 28-29 (D.D.C. 2005) (rejecting *forum non conveniens* challenge). Questions about alternative Indonesian forums therefore have no probative value and may only confuse and

mislead the jury into concluding, contrary to the court's own rulings, that Plaintiffs improperly brought their claims in the United States or, contrary to the law, that whether Plaintiffs' claims are appropriately litigated in this forum is a question for the jury to resolve. *Cf. Fowler v. State Farm Fire & Cas. Co.*, 2008 WL 3050417, at * 5 (S.D. Miss. 2008) (granting MIL excluding evidence concerning Defendant's failed motion to change venue).

The same is true for testimony regarding other possible defendants. *See Baxter v. Mallory*, 2015 WL 3793340, at *3 (W.D. Tenn. 2015) (granting MIL excluding evidence "about other potential defendants" as irrelevant). This Court has rejected arguments that the suit must name other defendants who may share responsibility for Plaintiffs' injuries. *See Doe*, 69 F. Supp. 3d at 101-02.  The Court expressly found that Plaintiffs need not name joint tortfeasors, including the military security personnel who injured the Plaintiffs or the Government of Indonesia.  Indeed, the Court found that the presence of some potential defendants in the litigation would render the controversy nonjusticiable because of the significant risk of "interfering in Indonesian affairs and thus U.S. foreign policy concerns." *Doe*,393 F. Supp. 2d at 28.

Finally, the Court has also rejected Defendants' argument that Plaintiffs' prosecution of the case has violated their due process rights, noting *inter alia* that "defendants have always had the opportunity to file motions seeking the Court's intervention when warranted." *Doe v. Exxon Mobil Corp.*, 2022 WL 3043219, at *41 (D.D.C. 2022); *see id.*, at *39-41.

Specifically, the Court should exclude any attorney argument, questioning, testimony or documentary material which argues explicitly or implicitly, or is designed to support an argument, that:

- The case should not be litigated in this forum, or should be litigated in another forum, including specifically Indonesian civil or criminal courts, Indonesia's Truth and Reconciliation Commission, or the Jakarta Human Rights Court;

- The case should be litigated against any other party or parties, that any other party or parties are "more responsible" for Plaintiffs' injuries than Defendants, or that it is inappropriate for Plaintiffs to litigate against these Defendants instead of any other party or parties, including Pertamina, the Government of Indonesia or its military, or individual Indonesian soldiers who committed the human rights abuses at issue in this case; or

- The way the case has been litigated presents an affront to Defendants' due process rights, or that Defendants have not had an adequate opportunity to defend themselves.

> **9. The Court Should Exclude Questioning, Testimony, Attorney Argument and Documentary Material Concerning the Substitution of Plaintiffs and Notice Thereof as Irrelevant and Prejudicial.**

Defendants also deposed some of the Plaintiffs on matters that appear to be aimed at challenging their qualifications to serve as a successor to their deceased husband, the substitution procedure, or improperly injecting non-traditional (to an American jury) family arrangements. For example:

> Q: How many wives did your husband have?
>
> A: Four, sir….
>
> Q: Who received [John Doe V]'s property after his death?
>
> A: The property was divided to all the children …
>
> Q: Did any of [John Doe V]'s other wives oppose your participation in this lawsuit as a plaintiff?
>
> A: No, they did not. They asked me to be a plaintiff, whatever I can.

Ex. 29, Jane Doe VII Dep. 70:14-75:22; *see also* Ex. 36, Jane Doe V Dep. 24:11-26:4; Ex. 33, Jane Doe VI 53:13-22. The defendants also designated on their Exhibit List the family cards for several of the Plaintiffs (Jane Doe V, Jane Doe VI, Jane Doe VIII). *See* Ex. 37, DX0005 & 005-A; Ex. 38, DX011 & DX011-A; Ex. 39, DX022 & DX022-A. These "family cards" list family

members and their children based on local law and custom.[12] Defendants also designated on their

exhibit list the retainer agreements for these plaintiffs, wherein the substitute Plaintiffs indicated

their intent to continue the representation. Ex. 40 DX006 (Jane Doe V); Ex. 41, DX010 (Jane

Doe VI); Ex. 42, DX019 (John Doe V (deceased)). All of these documents were produced to

Defendants years (if not over a decade) ago and were subject to cross examination during the

Plaintiffs' depositions.

The three Plaintiffs whose family cards Defendants seek to introduce were all substituted

as plaintiffs for their husbands or son who died during the pendency of this litigation and whose

claims survived their deaths. The substitute plaintiffs' relationship to the original plaintiffs is

irrelevant to the merits of the pending claims. And whether they were appropriately substituted is

a matter for the Court, not the jury. *See* Fed. R. Civ. P. 25(a)(1) ("If a party dies and the claim is

not extinguished, *the court* may order substitution of the proper party." (emphasis added); *see*

*also, e.g.*, *Lelchook v. Syrian Arab Republic*, 2019 WL 2191177, at *1 (D.D.C. 2019)

(substituting a deceased party under Rule 25(a)(1)); *Little v. Wash. Metro Area Transit Auth.*,

2017 WL 6767384, *1 (D.D.C. 2017)) (same). This Court has already resolved that issue.  Each

Plaintiff who substituted for a deceased relative did so by motion. *See* Mot. to Substitute, ECF

No. 167 (Aug. 15, 2006) (Jane Doe V, Jane Doe VI); Mot. to Substitute, ECF No. 496 (Apr. 28,

2015) (Jane Doe VII, Jane Doe VIII). The Court granted each motion. *See* Order, ECF No. 200

---

[12] To the extent Defendants seek to establish the relationship between certain defendants and third-party witnesses who testified in their support, they do not need the family cards to do so. The deposition testimony clearly establishes that ▮▮▮▮▮ is Jane Doe VI's daughter, that ▮▮▮▮▮ is Jane Doe VII's son, and that ▮▮▮▮▮ is Jane Doe VIII's daughter. Plaintiffs would stipulate to these relationships if that is what Defendants want to do. These relationships are simply not in dispute. None of Jane Doe V's relatives testified as third-party witnesses, so her family card could not be relevant for this purpose.

(Feb. 7, 2007); Order, ECF No. 513 (July 6, 2015); *see also* Minute Entry (Feb. 5, 2007) (memorializing hearing).

Defendants vigorously opposed these motions, across hundreds of pages of submissions including, with respect to Jane Doe V and Jane Doe VI's motion, a surreply and a motion for reconsideration (among other procedural maneuvers). *See* ECF Nos. 168, 178, 182, 189, 202, 206, 211, 500. Defendants also challenged the substitution procedure in their summary judgment papers. *See* 2021 SMF at ¶ 98; 2021 CSMF at ¶ 98. This Court rejected this and related arguments. *Doe*, 2022 WL 3043219 at *40-41. If Defendants believe the Court wrongly decided those motions, it should have moved for reconsideration or sought interlocutory appeal. But the time to do so "passed long ago"; the Court should not permit Defendants to relitigate the substitution to the jury. Accordingly, the substituted Plaintiffs' "family cards," retainer agreement, and any other evidence, cross-examination, or argument bearing on whether any Plaintiff was properly substituted is irrelevant, prejudicial, confusing, and misleading, and should be excluded under Federal Rule of Evidence 401 through 403.

## V.   *Attempts to Mislead the Jury with Irrelevant Argument*

### 10. The Court Should Exclude Questioning, Testimony, Attorney Argument and Documentary Material Suggesting that the Actions of Lance Johnson, an EMC Employee, Should Be Attributed Exclusively to EMOI.

Lance Johnson, a key player in the events of this case, was an Executive Vice President of Mobil Oil Corporation from April 1, 1998 through November 30, 1999, and a Vice President of Exxon Mobil Corporation from December 1, 1999 through June 2001. *See* Ex. 43, Snell EMC 30(b)(6) Dep. (June 6, 2021) (hereinafter, "Snell EMC Dep.") Ex. DX-60 at 6; *accord* Ex. 44, Johnson Dep. 18:23-20:20. From April 1, 1998 through the merger between Exxon and Mobil, Johnson was also a Director of Mobil Oil Indonesia—either President or Chairman of the

Board.[13] *See* Ex. 44, Johnson Dep. 22:5-20; Ex. 43, Snell EMC Ex. DX-60 at 6; Ex. 45, Snell

2/15 Dep. Ex. DX-32 at 1.

It was Mr. Johnson who in January 1999, wrote to another Mobil senior executive in the

United States that "███████████████████████████████████████████." Ex. 46,

TPX 404 (CA0001126263). It was Johnson who, according to a December 12, 1999 email from

Ron Wilson, President and General Manager of EMOI, approved EMOI's request to "█████

████████████████████████████████████████████████████████████████████

██████████████████████" Ex. 47, TPX 51 (CA0001179798), at '798.001. And, after

another major increase in military guards at EMOI's operations, an October 2000 email between

EMOI's senior security advisor and other Exxon security officials reports that "████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████" Ex. 48, TPX 12, CA0001333838, at '839 (emphasis added). At all of these

times, Mr. Johnson was a senior executive for Mobil (and then ExxonMobil) in Houston and

Dallas. Mr. Johnson's █████████████" and similar decisions he made or directed on behalf

of EMC are an important part of Plaintiffs' Art. 1365 claims against the parent company.

EMC may seek to evade liability by arguing or seeking to elicit testimony that Mr.

Johnson's actions during the relevant period were taken in his capacity as a director or

"shareholder representative" of EMOI, rather than as a Vice President of EMC. *See, e.g.*, Ex. 49,

Wilson Dep. 188:21-195:25 (discussing TPX 51 (CA000179798), regarding Johnson's

"████████"; "███████████████████████████████████████████████████████

---

[13] Mr. Snell's deposition notes indicate that Mr. Johnson was Chairman of the Board of Directors of EMOI until April 24, 2000, but this conflicts with Mr. Johnson's recollection. *Compare* Ex. 3, Snell 2/15 Dep. Ex. DX-32 at 1; Johnson Dep. 18:23-20:20.

**PUBLIC REDACTED VERSION**

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.").

  But EMC cannot disown Mr. Johnson's actions and attribute them to EMOI. Mr. Johnson was not an employee of EMOI, but a director. Directors are not officers, and have no authority to act on behalf of a corporation. "A corporation does not act through its individual directors, but rather through its board of directors as a whole. An individual director has no authority to take action on behalf of the corporation without the consent of the board of directors." 2 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 505 (Sept. 2022 update). Mr. Johnson's decisions, approvals, directives and instructions to EMOI employees thus may not be attributed to EMOI but were delivered in his capacity as an officer of EMC.

  Lest there be any doubt on this point, Mr. Johnson continued to give approvals and instructions to EMOI even after his tenure on the EMOI Board of Directors. *See, e.g.*, Ex. 50, TPX 506 (CA0001174374) (June 1, 2000 email from EMOI's Ron Wilson to Johnson, subject: letter to pertamina regarding budget for security support, Wilson: "████████████████████████ ██████." Johnson reply June 5, 2000: "████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ██████."); Ex. 51, Snell 5/25 Dep. Ex. 35 (draft letter stamped "████████████████ ██████" with handwritten note from EMOI's Ron Wilson: "██████████████████████████ ████████████████████"; handwritten note from Johnson: "██████████████████████████ ████████████████████████████████████████"). That Johnson's management of EMOI on EMC's behalf continued after he was no longer a director of EMOI makes clear that Johnson's actions throughout must be attributed to EMC.

The Court should exclude any questioning, testimony, argument, or documentary material suggesting that Mr. Johnson's decisions, approvals, directives and instructions should be exclusively attributed to EMOI. Such material would be relevant only if it were true that Mr. Johnson acted on EMOI's behalf in his capacity as director. But as a matter of law, he cannot have done so, and as a matter of fact, Johnson did not stop issuing such decisions, approvals, directives and instructions after leaving EMOI's board. Because Exxon cannot prove the condition precedent to relevance of such material under Rule 104(b), the Court must exclude such material under Rule 401.

> **11. The Court Should Carefully Regulate Any Questioning, Testimony, Attorney Argument and Evidence Concerning Exxon's Alleged Legal Investigation Into Allegations of Human Rights Abuse by Indonesian Soldiers, Over Which Exxon Has Claimed Privilege.**

Plaintiffs respectfully move to preclude Defendants' witnesses from testifying about the conduct, content or results of a legal investigation that Defendants contend was undertaken in late 1998 or early 1999. Defendants instructed their witnesses not to answer questions regarding who performed the investigation, its purpose, its scope, or its results. Having asserted the privilege and foreclosed discovery on these matters, Defendants must not be allowed to now introduce material concerning the substance of this investigation—and especially may not imply that it exonerated Defendants in any way. This motion would not preclude Defendants from simply asserting the fact that a legal investigation was done without implying its result.

Defendants have stated that a legal investigation was conducted around the time of a December 1998 Business Week article, "What Did Mobil Know," which alleged that the Indonesian military had committed terrible atrocities in the immediate vicinity of Mobil's operations in Aceh. *See* Ex. 52, Ward EMC 30(b)(6) Dep. 166:4-12. But during deposition testimony, defense counsel claimed that the legal investigation was privileged and instructed

witnesses not to answer questions about the investigation on that basis.  During the testimony of

Mark Ward, one of EMC's 30(b)(6) witnesses, Mr. Ward was instructed as follows:



Ex. 52, Ward Dep. 166:4-168:13; *see also id.* 178:17-179:3. In the subsequent deposition of

Mark Snell, appearing as EMOI's Rule 30(b)(6) witness, similarly refused to testify beyond the

fact that a legal investigation was conducted. *See* Ex. 3, Snell 2/15 Dep. 86:5-25.[14]

Attorney-client privilege may not be used as sword and shield. *See, e.g., S.E.C. v. Lavin,*

111 F.3d 921, 933 (D.C. Cir. 1997) ("The prohibition against selective disclosure of confidential

materials derives from the appropriate concern that parties do not employ privileges both as a

sword and as a shield."); *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003) ("[P]arties in

litigation may not abuse … privilege by asserting claims the opposing party cannot adequately

dispute unless it has access to the privileged materials."). Having effectively insulated its legal

investigation from discovery that might be used to cross-examine any testimony or evidence as

to its character, Defendants should be precluded from introducing any such material or argument.

## VI.   *Admissible Evidence and Procedures*

### 12. To Avoid Confusing the Jury, the Court Should Allow Into Evidence Exxon's Testimony About the Court's Sanctions Ruling; the Court Should Issue Instructions to the Jury To Explain the Unusual Structure of the Depositions of Mark Snell.

"At his deposition, the corporate representative of defendant Exxon Mobil Oil Indonesia

("EMOI") refused to answer most of the substantive questions posed to him. Instead, he

_____

[14] Mr. Snell testified that EMOI undertook no other investigation. *See* Ex. 3, Snell 5/11 Dep. 503:15-22 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " )

[15] The Court granted Plaintiffs' request for sanctions in full, which had sought sanctions against each. *See* Mot. to Compel Discovery and for Sanctions, ECF No. 777 (Feb. 23, 2021) at 40. Exxon's counsel were later further sanctioned on the Court's *sua sponte* finding that their cross-motion for sanctions against Plaintiffs' counsel violated Rule 11. *See* Mem. Op., ECF No. 808 (May 12, 2021).

repeatedly read nonresponsive statements verbatim from pre-prepared notes." Mem. Op., ECF No. 803 (May 7, 2021) at 1. During the deposition, Mr. Snell (and his counsel) also repeatedly responded to questions by incorrectly stating or implying that Plaintiffs' counsel was acting improperly or deceptively by declining to identify the broad subject area to which each question related. *See id.* at 17.

The Court found that "Mr. Snell severely, repeatedly, and perversely obstructed his own deposition." *Id.* at 16. As a result of this misbehavior, for which the Court sanctioned EMOI, Mr. Snell, and EMOI's counsel, *see* Order, ECF No. 799 (Apr. 26, 2021),[15] Mr. Snell sat for four separate depositions in 2021—his original EMOI 30(b)(6) deposition on February 11, 2021; a "make-up" deposition on May 11, 2021, for which Mr. Snell was ordered to provide responsive answers to 107 questions to which the Court determined Mr. Snell had failed to give responsive answers in his February deposition; a renewed deposition on May 24, 2021, during which counsel was afforded seven additional hours of questioning on the record to pursue additional questions in light of these responsive answers; and finally on June 7, 2021, a deposition of Mr. Snell as 30(b)(6) representative of EMC, which had been cancelled as a result of the misconduct at Mr. Snell's February deposition. *See generally id.*

If all of this is confusing and exhausting to read, it will be even more so for the jury to follow Mr. Snell's testimony. Plaintiffs will at times need to play a question they asked in February, the nonresponsive, scripted answer Mr. Snell gave in 2021, a court reporter reading the same question again in May, and Mr. Snell's responsive answer, followed by questions delivered

---

[15] The Court granted Plaintiffs' request for sanctions in full, which had sought sanctions against each. *See* Mot. to Compel Discovery and for Sanctions, ECF No. 777 (Feb. 23, 2021) at 40. Exxon's counsel were later further sanctioned on the Court's *sua sponte* finding that their cross-motion for sanctions against Plaintiffs' counsel violated Rule 11. *See* Mem. Op., ECF No. 808 (May 12, 2021).

two weeks later on the same subject but with Mr. Snell wearing a different corporate hat. Exxon's misconduct upset completely Plaintiffs' ability to structure their deposition questions in a way that the jury can easily understand. Mr. Snell's answers—especially the tactic of repeatedly demanding to be directed to a topic—may also confuse the jury and suggest that *Plaintiffs' counsel*, rather than Defendants, were acting improperly.

Plaintiffs considered asking for leave to edit Mr. Snell's testimony out of chronological order, but ultimately decided it would likely be even more confusing for the jury (and an unnecessary distraction as Plaintiffs prepare for trial). Accordingly, Plaintiffs believe it is best to present Mr. Snell's testimony in chronological order, but because of the likelihood of juror confusion, Plaintiffs face potential additional prejudice from Exxon's misconduct unless the jury is given clear explanations for the unusual presentation and instruction that the disorganized presentation is not to be held against Plaintiffs.

Plaintiffs are entitled to use at trial Mr. Snell's self-serving and nonresponsive answers, his reading of answers from a script, his concealment of his scripted answers from the camera and Plaintiffs' counsel, and his evasive answers about whether he was reading his answers. Obviously, all of these bear on the jury's credibility determinations as to Mr. Snell. Plaintiffs are also clearly entitled to rely on Mr. Snell's responsive answers.

To attempt to reduce the confusion induced by this record, both Plaintiffs and Defendants offered prefatory statements on the record before Mr. Snell's May 11, 2021 deposition explaining how the parties had agreed to execute the Court's Order that EMOI provide responsive answers to identified questions. Ex. 53, Snell EMOI 30(b)(6) Dep. (May 11, 2021) (hereinafter "Snell 5/11 Dep.") 373:13-379:13. During each of Mr. Snell's May and June depositions, Plaintiffs' counsel also asked questions concerning the circumstances of the Court's

Order. *See, e.g., id.* at 381:14-388:7; Ex. 4, Snell 5/24 Dep. 550:25-567:20; Ex. 54, Snell EMC

Dep. 887:15-894:15.

It is important that the jury be allowed to hear these prefatory statements and the answers

to these questions, which will explain to the jury why the testimony they will hear is so

disjointed. The Court should also issue instructions before each of Mr. Snell's depositions is

played, so that the jury may hear from the Court itself why Mr. Snell's testimony is being

presented in this way; how they may assess these circumstances in weighing Mr. Snell's

credibility; and that the fault for any confusion in the presentation of Mr. Snell's testimony lies

with Defendants and should not be held against the Plaintiffs. Plaintiffs respectfully request that

the Court issue the following instructions:

> Mark Snell is testifying as each Defendants' corporate representative in this case. This is sometimes referred to as a Rule 30(b)(6) witness. Each Defendant had a duty to select a corporate representative, and could select an officer, director or manager or someone else with that person's consent. Both defendants selected Mr. Snell.

> Exxon Mobil Corporation and EMOI had a duty to prepare Mr. Snell to testify about information known or reasonably available to that Defendant in subject areas the Plaintiffs had listed in the notice for the deposition. Mr. Snell had an obligation to testify on those matters as each corporation's representative.

> Mr. Snell first testified under oath as EMOI's corporate representative on February 15, 2021.  After that testimony, the Court determined that in response to many questions, Mr. Snell had provided testimony that was non-responsive, evasive or inaccurate. The Court ordered Mr. Snell to attend a second deposition and was directed by the Court to again answer many questions that he had failed to answer properly at his first deposition. The Court also ordered Mr. Snell to appear for additional depositions, so that Plaintiffs' counsel would have a fair opportunity to ask Mr. Snell questions and receive direct and responsive answers based on information known or reasonably available to the Defendants.

> The Plaintiffs conducted several depositions of Mr. Snell in the sequence directed by the Court.  It was appropriate for the Plaintiffs to proceed in this manner because of Mr. Snell's misconduct and the Court's instructions about how Mr. Snell's depositions should proceed.

**PUBLIC REDACTED VERSION**

Because Plaintiffs had to depose Mr. Snell several times to obtain responsive answers, you may find some of the deposition confusing because similar questions had to be asked several times or on different days.  Because this was a result of Mr. Snell's improper tactics, you should not hold this against the Plaintiffs.

March 22, 2023                              Respectfully submitted,


                                           /s/ Kit A. Pierson
                                           Kit A. Pierson (#398123)
                                           Agnieszka M. Fryszman (#459208)
                                           Robert W. Cobbs (#1045579)
                                           Nicholas J. Jacques (#1673121)
                                           Cohen Milstein Sellers & Toll PLLC
                                           1100 New York Ave. NW ● Fifth Floor
                                           Washington, DC 20005
                                           Tel: (202) 408-4600
                                           Fax: (202) 408-4699
                                           afryszman@cohenmilstein.com
                                           kpierson@cohenmilstein.com
                                           rcobbs@cohenmilstein.com
                                           njacques@cohenmilstein.com

                                           Paul L. Hoffman (Pro Hac Vice)
                                           Schonbrun Seplow Harris Hoffman & Zeldes
                                           200 Pier Avenue, #226
                                           Hermosa Beach, CA 90254
                                           Tel: (31) 396-0731
                                           hoffpaul@aol.com

                                           Terrence P. Collingsworth (#471830)
                                           International Rights Advocates
                                           621 Maryland Ave., N.E
                                           Washington, D.C. 20002
                                           Tel: (202) 396-0731

                                           Brent Nelson Rushforth (#331074)
                                           1112 Cripplegate Road
                                           Potomac, MD 20854
                                           Tel: (301) 943-7977
                                           brentrushforth@icloud.com

                                           Leslie M. Kroeger (*pro hac vice*)
                                           Poorad Razavi
                                           Cohen Milstein Sellers & Toll PLLC
                                           2925 PGA Blvd. Suite 200
                                           Palm Beach Gardens, FL. 33410
                                           Tel: (561) 515-1400
                                           Fax: (561) 515-1401
                                           LKroeger@cohenmilsetin.com
                                           prazavi@cohenmilstein.com

**PUBLIC REDACTED VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2023, I electronically filed the *Plaintiffs' Omnibus Motions in Limine* with the Clerk of the Court using the ECF, who in turn sent notice to all counsel of record in this matter.


Dated:    March 22, 2023                                    /s/ Kit A. Pierson
                                                            Kit A. Pierson